IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No. 5:22-CV-00068-BO

| | | |
|---|---|---|
| YOLANDA IRVING, individually and as the natural parent and guardian of J.I., JUWAN HARRINGTON, CYDNEEA HARRINGTON, KENYA WALTON, individually and as the natural parent and guardian of R.W., ZIYEL WHITLEY, DYAMOND WHITLEY, KAMISHA WHITLEY, and NANETTA GRANT as the natural parent and guardian of Z.G., | ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | **MEMORANDUM IN SUPPORT OF CITY OF RALEIGH'S MOTION TO DISMISS** |
| v. | ) ) | |
| THE CITY OF RALEIGH, OFFICER OMAR I. ABDULLAH, SERGEANT WILLIAM ROLFE, OFFICER RISHAR PIERRE MONROE, OFFICER JULIEN DAVID RATTELADE, OFFICER MEGHAN CAROLINE GAY, and JOHN and JANE DOE OFFICERS 1-10, in their individual capacities, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

This matter is before the Court on the City of Raleigh's motion, pursuant to Fed. R. Civ. P 12(b)(6), to dismiss Plaintiffs' two claims asserted against the City, both arising under *Monell*. While the complaint contains numerous factual allegations about conduct of the defendant officers during an alleged conspiracy, it plausibly alleges no more than *respondeat superior* liability against the City. Among other deficiencies, the complaint:

- Fails to plausibly establish deliberate indifference,

- Fails to attribute any unconstitutional policy or custom to the City, and

- Fails to provide facts from which the Court could reasonably infer the "affirmative causal link" required for a *Monell* claim.

For these reasons and others explained below, Plaintiffs' claims against the City should be dismissed.

## NATURE OF THE CASE

This case arises out of the service of a search warrant for 1628 Burgundy Street, Apartment B, in Raleigh, North Carolina, on May 21, 2020. (DE 2, Complaint (hereafter "Compl.") ¶ 85.) A Wake County Magistrate issued the warrant based on a prior undercover purchase at this location by a confidential informant of a substance that was supposedly heroin from "Marcus." (Compl. ¶87; Search Warrant, p. 4. (Davis Decl., Ex. 1).) Plaintiffs allege that the informant was unreliable and that the RPD Drugs & Vice detectives conspired among themselves and with the informant to bring fraudulent criminal charges and conduct illegal searches based on fake heroin, which culminated in the searches of the Plaintiffs' homes. (Compl. ¶¶ 59, 80.)

Plaintiffs filed this action on February 22, 2022 and assert a total of ten claims against sixteen defendants, including the City of Raleigh ("City"). Against the City, Plaintiffs assert two claims under 42 U.S.C. § 1983.[1] The City waived service, (DE 10), and has now filed a motion to dismiss Plaintiffs' two *Monell* claims.

## STATEMENT OF FACTS

According to the complaint,[2] two Raleigh Police Department ("RPD") Vice officers recruited Dennis Williams as an informant after Williams' arrest for selling crushed aspirin and

---

[1]    Plaintiffs assert a State law claim for false imprisonment but only against Officer Abdullah and the members of the RPD Vice team. (Compl. ¶¶218-221.)

[2]    As Rule 12(b)(6) requires, the facts are recited from the complaint and the warrant described in the complaint. This does not mean that the City agrees with those allegations.

representing the substance as cocaine. (Compl. ¶43.) Williams was approved to work as a confidential informant and made undercover buys of crack cocaine valued at less than $100.00. (Compl. ¶53.) He was subsequently jailed on a felony larceny charge until February 2019. (Compl. ¶55.)

In September 2019, Williams was re-recruited by one of the RPD Vice officers who previously worked with Williams: Defendant Omar I. Abdullah ("Mr. Abdullah"). (Compl. ¶¶30, 56). Mr. Abdullah was placed on administrative leave in September 2020 and his employment with the City terminated on October 28, 2021. (Compl. ¶¶136-37.)

The complaint alleges that for roughly six months—between November 29, 2019 and May 21, 2020—Williams, Mr. Abdullah, three other RPD Vice officers, and one RPD Sergeant engaged in a conspiracy to fabricate heroin trafficking charges. (Compl. ¶¶59, 61-62.) As a result of those fraudulent charges, many innocent bystanders, including Plaintiffs, had their homes raided or were wrongfully seized. (Compl. ¶60.) The complaint describes violations of RPD policies that occurred during the alleged conspiracy including,

- Williams shielding surveillance cameras in violation of RPD policies so each alleged buy could not be video recorded. (Compl. ¶68.)
- Mr. Abdullah meeting alone with Williams and paying him without witnesses, both in violation of RPD policy. (Compl. ¶¶38, 71-72.)

According to the complaint, RPD Vice officers Monroe, Rattelade, and Gay informed Mr. Abdullah on numerous occasions that the alleged drugs were not heroin but brown sugar or some other substance. (Compl. ¶75.) RPD Vice officers told Mr. Abdullah that the alleged drugs were not packaged like heroin. (Compl. ¶76.) RPD Vice officers sometimes conducted field tests on the fake heroin and each time it tested negative for a controlled substance. Those officers did not

- 3 -

preserve or record those field test results, however. (Compl. ¶¶77-78.) In each case, lab reports from the City County Bureau of Investigation reported that the alleged heroin tested negative and was not a controlled substance. (Compl. ¶79.)

RPD Vice officers including Defendant Monroe reported Mr. Abdullah's ongoing scheme and pattern of wrongful arrests to Defendant Sgt. Rolfe. Sgt. Rolfe failed to intervene because he was fearful that Mr. Abdullah would accuse him of discrimination based on Mr. Abdullah's religion. Mr. Abdullah is a Muslim. (Compl. ¶¶81-82.)

Plaintiffs Yolanda Irving, J.I., Juwan Harrington, and Cydneea Harrington ("the Irvings") lived at 1628 Burgundy Street, Apartment B, in Raleigh, North Carolina ("Apartment B"), on May 21, 2020. (Compl. ¶¶ 98-99.) Plaintiffs Kenya Walton, R.W., Ziyel Whitley, Dyamond Whitley, and Kamisha Whitley ("the Waltons") lived next door at 1628 Burgundy Street, Apartment A, in Raleigh, North Carolina ("Apartment A") on May 21, 2020. (Compl. ¶¶ 100-101.) At the time, Z.G. lived with the Waltons in Apartment A. (Compl. ¶ 103.)

Unbeknownst to the Irvings or the Waltons, Mr. Abdullah obtained a search warrant on May 21, 2020 for Apartment B. (Compl. ¶ 85.) The warrant was based on information provided by informant Williams and in getting the warrant, Mr. Abdullah falsely represented that Williams "has always been proven to be truthful and reliable." (Compl. ¶92.) The search warrant also falsely claimed that Williams had purchased heroin at Apartment B from "Marcus" and that RPD detectives had seen Williams entering Apartment B. (Compl. ¶¶94, 96; Search Warrant, pp. 4-5 (Davis Decl., Ex. 1).) Fabricated information resulted in a warrant being issued to search the Irvings' home. (Compl. ¶97.)

On the afternoon of May 21, 2020, J.I., Ziyel Whitley, Dyamond Whitley, and Z.G. were sitting outside on the front stoop of Apartment B. (Compl. ¶¶102, 215.) Z.G. saw RPD Selective

Enforcement Unit ("SEU") officers running toward them carrying shields and with assault rifles pointed at them. (Compl. ¶105.) Z.G. opened the door to Apartment A and ran inside. (Compl. ¶106.) Dyamond Whitley followed Z.G. into Apartment A, and both ran up the stairs screaming that SEU officers were coming. (Compl. ¶107.) Plaintiffs contend that SEU officers immediately burst into Apartment A without knocking or announcing their intentions. (Compl. ¶109.) The officers ordered everyone downstairs with hands raised. (Compl. ¶111.)

After seeing Z.G. and Dyamond run into Apartment A, J.I. and Ziyel Whitley turned and saw SEU officers running toward them. (Compl. ¶113.) J.I. immediately ran into Apartment B and Ziyel followed, slamming the door behind him. (Compl. ¶114.) J.I. ran upstairs screaming "SWAT, SWAT, SWAT!" (Compl. ¶115.) Ziyel tripped on a wheelchair and fell. (Compl. ¶116.) Approximately fifteen (15) SEU and Vice officers burst into Apartment B without knocking or announcing their intentions. (Compl. ¶117.) The officers entering Apartment B pointed their guns at the Irvings and the Irvings were terrified. (Compl. ¶¶119-125.) The Irvings were ordered downstairs and to sit on the ground for approximately an hour while SEU and Vice officers tore Apartment B apart allegedly searching for contraband. (Compl. ¶126.) No drugs or contraband was found in Apartment B. (Compl. ¶129.)

SEU and Vice officers also allegedly searched the upstairs and downstairs of Apartment A. (Compl. ¶128.) No drugs or contraband was found in Apartment A. (Compl. ¶129.)

Approximately an hour and a half after the raid, SEU and Vice officers left both apartments and removed handcuffs from Ziyel Whitley. (Compl. ¶130.) As they were leaving, Plaintiff Yolanda Irving asked Mr. Abdullah why they had raided her home. (Compl. ¶131.) Mr. Abdullah provided Ms. Irving with a search warrant. Ms. Irving told Mr. Abdullah that the apartment pictured in the warrant was not hers. (Compl. ¶132.)

On the day after the raid, May 22, 2020, Williams was suspended as a confidential informant. (Compl. ¶135.)

Plaintiffs allege, on information and belief, that RPD has a general practice of executing warrants in a "No Knock" or "Quick Knock" manner that does not provide constitutionally required advance notice before entering a premise pursuant to a search warrant. (Compl. ¶142.) Plaintiffs allege that these types of warrants are dangerous and have led to trauma, injuries, and death of innocent people, subjects of criminal investigations, and law enforcement officers. (Compl. ¶145.)

Plaintiffs allege that the failure to supervise and monitor informants properly has led to at least three (3) illegal "No Knock" or "Quick Knock" raids of homes of innocent families. (Compl. ¶228.) Plaintiffs identify only the May 21, 2020 incident involving the Irvings and Waltons and a subsequent April 2021 entry of Amir Abboud's home. (Compl. ¶¶84, 143-144.)

## ARGUMENT

### I. PLAINTIFFS FAIL TO RAISE PLAUSIBLE *MONELL* CLAIMS AGAINST THE CITY AND THUS, THEIR NINTH AND TENTH CLAIMS MUST BE DISMISSED.

Like any other claim, to survive a motion to dismiss, a complaint asserting claims under 42 U.S.C. § 1983 against a municipality must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In evaluating a Rule 12(b)(6) motion, the court accepts all well-pled facts as true and construes those facts in the light most favorable to the plaintiff, but it does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual

enhancement, [or] . . . unwarranted inferences, unreasonable conclusions, or arguments." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009) (citations omitted).

Generally, a Rule 12(b)(6) motion cannot include additional documents as part of the motion without converting it to a summary judgment. However, a reviewing court can consider "documents attached to the complaint, as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Philips v. Pitt Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (citation omitted); *see also Soliman v. Worldwide Language Resources, Inc.*, No. 5:16-CV-748-D, 2016 WL 7494858, fn.1 (E.D.N.C. Dec. 29, 2016) (job description and wage statement referred to in complaint were properly considered on a motion to dismiss). A declaration from RPD Internal Affairs Sergeant D.L. Davis provides an authentic copy of the search warrant for Apartment B. The warrant attached to Sergeant Davis' declaration matches the photographic excerpt that appears in paragraph 132 of the complaint, providing further proof of its authenticity. The search warrant for Apartment B underpins Plaintiffs' claims and is described in detail within the complaint. (See Compl. ¶¶85-97, 126-34.) It is clearly integral to the complaint and the Court can consider the search warrant on the City's Rule 12(b)(6) motion.

Any person acting "under color of any statute, ordinance, regulation, custom, or usage, of any State" who deprives another of a constitutional right faces liability under 42 U.S.C. § 1983. In *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978), the Supreme Court held that municipalities may also be liable for a plaintiff's constitutional harms under § 1983. "[U]nder *Monell*, a municipality is liable only for its *own* illegal acts" and not merely because it employed a wrongdoer. *Owens v. Baltimore City State's Attorney's Office*, 767 F.3d 379, 402 (4th Cir. 2014), *cert. denied,* 575 U.S. 983 (2015) (citing *Monell*, 436 U.S. at 691). *Respondeat superior* does not apply to *Monell* claims. *Id.* Municipal liability results only when the municipality can be directly charged with fault for a constitutional violation. Thus, liability results only when a policy or

custom is (1) fairly attributable to the municipality as its "own," and is (2) the "moving force" behind the particular constitutional violation claimed by the plaintiff. *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987), *cert. denied,* 484 U.S. 1027 (1988).

There are three necessary elements for *Monell* liability. First, the plaintiff must plausibly allege a constitutional harm that stems from the acts of a municipal employee "taken in furtherance of some municipal 'policy or custom.' " *Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984) (quoting *Monell*, 436 U.S. at 694); see also *Spell*, 824 F.2d at 1389. As interpreted by the Fourth Circuit, a "policy or custom" can manifest in four ways:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999)). Second, the plaintiff must allege facts showing that the policy's creation is fairly attributable to the municipality. *Spell*, 824 F.2d at 1389; *see also Owens*, 767 F.3d at 402 ("Only if a municipality subscribes to a custom, policy, or practice can it be said to have committed an independent act, the *sine qua non* of *Monell* liability."). Third, the plaintiff must allege an affirmative causal link between the "policy or custom," and the particular injury suffered by the plaintiff. *Spell*, 824 F.2d at 1389.

In this action, Plaintiffs assert *Monell* liability against the City on two theories, a failure to supervise the confidential information program (ninth claim) and a persistent and widespread practice of conducting "No Knock" or "Quick Knock" entries when serving search warrants (tenth claim). The complaint fails to raise a plausible *Monell* claim under either theory.

## A. **Plaintiffs Have Not Plausibly Alleged a *Monell* Claim For Failure to Supervise.**

The complaint identifies the source of the constitutional harm suffered by the Plaintiffs for which they assert *Monell* liability: "the illegal raid on Yolanda Irving's and Kenya Walton's homes." (Complaint, ¶232.) A plausible *Monell* claim then requires factual content in Plaintiffs' complaint that allows the Court to draw the reasonable inference that the illegal raid stems from the acts of RPD Officers taken in furtherance of some municipal policy or custom, that the policy or custom is fairly attributable to the City, and that there is an affirmative causal link between the policy or custom, and the illegal raid.

### 1. *The complaint does not plausibly allege that the illegal raid was taken in furtherance of a City "policy or custom."*

Like failure-to-train, a failure-to-supervise claim is a tenuous form of *Monell* liability. *Connick v. Thompson*, 563 U.S. 51, 61 (2011). This is because these claims seek to hold a municipality liable not for directly inflicting injury, as was the case in *Monell*, but rather for causing an employee's misconduct. *See Bryan County Commissioners v. Brown,* 520 U.S. 397, 405 (1997). Municipal failure claims are thus available only in "limited circumstances," *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387 (1989), and they are subject to "rigorous" fault and causation requirements, *Bryan County*, 520 U.S. at 405. These rigorous standards are necessary to ensure that a municipality is not held liable solely for the actions of its employee. *Carter*, 164 F.3d at 218.

The Supreme Court's standard from *City of Canton* applies to Plaintiffs' failure-to-supervise claim. They must plausibly allege a municipal failure that amounts to deliberate indifference. *City of Canton*, 489 U.S. at 388; *Connick,* 563 U.S. at 61.

Deliberate indifference is a stringent standard that requires evidence that the municipality knew of the need to train or supervise in a particular area and made a deliberate choice not to act. *Bryan County,* 520 U.S. at 407-10.  It is not enough for the Plaintiffs to allege that the City was generally lax or ineffective in its supervision of officers.  *Spell*, 824 F.2d at 1390–91.  Nor is it sufficient to allege that the constitutional violations claimed might have been prevented or somehow been mitigated by the adoption of new or different procedures, or that the inappropriate actions of a single officer or a small group of officers escaped detection or discipline.  *Connick,* 563 U.S. at 68.  Unfortunate, imprudent, or legally negligent conduct will not suffice to establish deliberate indifference.  *Jones v. Wellham,* 104 F.3d 620, 627 (4th Cir. 1997); *Riddick v. City of Portsmouth School Bd.,* 238 F.3d 518, 526 (4th Cir. 2000).  It is not even sufficient for the plaintiff to show that the alleged constitutional violations were "likely to happen in the long run." *Spell*, 824 F.2d at 1390–91. To the contrary, the *Monell* claim requires a plausible basis to believe that the challenged decisions were taken with deliberate indifference to the potential consequences of known risks.  *Jones,* 104 F.3d at 627.  It requires proof that a municipal actor disregarded a known or obvious consequence of his action.  *Connick,* 563 U.S. at 61.  Specific deficiencies must be so serious as to make the constitutional violation that the plaintiff asserts "almost bound to happen, sooner or later." *Spell,* 824 F.2d at 1391.

A plaintiff cannot rely on scattershot allegations of unrelated constitutional violations but must demonstrate that a municipal decision reflects deliberate indifference to the risk that a particular constitutional violation will follow the decision.  *Carter*, 164 F.3d at 218.  *See also Barrett v. Board of Educ. of Johnston County*, 13 F. Supp. 3d 502, 511 (E.D.N.C. April 9, 2014), *affirmed,* 590 F. App'x 208 (November 6, 2014) ("This is nothing more than a formulaic recitation of the legal standard for finding municipal liability under § 1983.  The complaint offers no non-

conclusory factual allegations . . ..  Indeed, plaintiffs point to no particular policy at all.").

Boilerplate allegations and generalized claims without "details about [the] policies and practices

and how they are inadequate, inaccurate, or ineffective" are insufficient as a matter of law to

establish a custom or practice claim under *Monell*.  *I.P. by Newsome v. Pierce*, No. 5:19-CV-228-

M, 2020 WL 1231809, at *6 (E.D.N.C. Mar. 9, 2020); *Lyles v. Prawdzik*, No. PWG-15-1056, 2016

WL 3418847, at *5 (D. Md. June 22, 2016).  In the failure-to-train context, a complaint should

contain facts revealing the nature of the training, that the training was a conscious or deliberate

choice by the municipal employer, and that the officer's unconstitutional conduct resulted from

the training.  *Smith v. City of Greensboro,* No. 1:19CV386; 2020 WL 1452114 (M.D.N.C. Mar. 25,

2020).  Thus, similar facts about supervision should appear in a complaint raising a failure to

supervise.

The facts pled in the complaint state that over six months, a small group of officers

intentionally conspired with a confidential informant to create fraudulent heroin charges against

15 individuals.  Other than the alleged conspirators, the complaint identifies no one else who was

aware of the scheme.[3]  The complaint states that $3,545.00 was paid to the informant over those

six months, which is not the sort of information that would put a municipality on notice of  the

criminally corrupt behavior Plaintiffs allege here.  *Ruiz-Cortez v. City of Chicago,* 931 F.3d 592,

600 (7th Cir. 2019) ($800,000 paid to informant over time did not put city on notice of criminal

conspiracy).  Although the complaint does not explain how it happened, the complaint does

acknowledge that the City suspended the informant on May 22, 2020, the day after the searches of

Plaintiffs' homes, and subsequently terminated Mr. Abdullah's employment.  When a supervisor

---

[3]      Plaintiffs allege that RPD Vice officer Nance left the unit before the conspiracy began.
(Compl. ¶¶46-56.)  They identify another RPD Vice officer, Ouellette, who signed informant fund
sheets but have not alleged that he was a co-conspirator.  (Compl. ¶73.)

investigates claims of improper police conduct and suspends the alleged offenders, "it simply cannot be said that he is indifferent to the risk of the underlying constitutional violation." *Carter*, 164 F.3d at 221.

It is the conspiracy and not the substances involved that are critical to the complaint. The illicit sale of heroin is a crime. N.C. Gen. Stat. § 90-95(a)(1) (2021). So, too, is the creation, possession with the intent to sell or deliver, and the sale or delivery of a counterfeit controlled substance. All are crimes under North Carolina law. N.C. Gen. Stat. § 90-95(a)(2) (2021). Thus, if officers had probable cause to establish that "Marcus" had sold counterfeit heroin from Apartment B, they could have obtained a search warrant to find evidence of the commission of that crime.

The complaint contains nine contentions about the City's purported failure to supervise.[4] Those contentions directly conflict with the factual content Plaintiffs pled in their complaint.

---

[4] They appear in paragraphs 223 through 231 of the complaint:

> 223. The City of Raleigh maintains a policy of not field-testing alleged heroin, even when purchased by a confidential informant.
>
> 224. On the rare occasions RPD officers do field test heroin, the City has a custom or practice to not disclose these results to the DA, defense counsel, or the Court.
>
> 225. The failure to field test alleged heroin, resulted in the continued use of an unreliable confidential informant and the illegal arrest, search, and seizure of numerous individuals.
>
> 226. Specifically, the failure to field test alleged heroin after the May 20, 2020, arranged buy led directly to the warrant application based on fabricated evidence which resulted in the unconstitutional raid of the Irving and Walton families' homes.
>
> 227. The City of Raleigh also maintains a policy, custom, and practice of not properly supervising or monitoring VICE officers and their informants.

According to Plaintiffs' alleged facts, the defendant RPD Vice officers conspired together to fabricate heroin trafficking charges and wrongfully arrested over 15 people. (Compl. ¶59.) They staged buys and produced fake heroin allegedly purchased from those whom they arrested. (Compl. ¶¶66-69.) They violated RPD policies in their work with the informant. (Compl. ¶¶68, 72-73.) Some members of the Vice unit reported to Mr. Abdullah "on numerous occasions" that the alleged drugs were not heroin but was some other substance. (Compl. ¶¶75-76.) On occasion, Vice officers field tested the substances, which tests were negative for controlled substances, but did not preserve the results. (Compl. ¶¶77-78.) The members of the alleged conspiracy reported Mr. Abdullah's ongoing scheme and pattern of arrests to Sgt. Rolfe who failed to intervene because he was fearful that Mr. Abdullah would accuse Rolfe of discrimination based on Abdullah's Muslim religion. (Compl. ¶81-83.) "After more than six months of wrongful arrests and fabricated evidence, *this scheme resulted* in the *"No Knock" raid of the homes of Yolanda Irving and Kenya Walton*." (Compl. ¶84 (emphasis added).)

---

228. The failure to properly supervise and monitor RPD VICE informants has led to at least three illegal "No Knock" or "Quick Knock" raids of homes of innocent families and individuals.

229. The RPD VICE unit has a policy or custom of not requiring supervisor review of undercover buy video.

230. The RPD VICE unit has a policy or custom of failing to review or supervise the timely submission of alleged drugs to the CCBI lab.

231. The RPD VICE unit has a policy or custom of failing to review or supervise the results of CCBI lab results when returned to the RPD VICE unit.

These allegations are conclusions of law, are not assumed to be true on a motion to dismiss, and without further factual support do not state a plausible *Monell* claim. *See Clemons v. City of Greensboro,* No. 1:19-cv-961, 2020 WL 2850981 at *2 (M.D.N.C. June 2, 2002) (addressing similar allegations).

Plaintiffs go on to explain that the conspirators knew that informant Williams was not a reliable informant, but Mr. Abdullah, with the conspirators' knowledge and Sgt. Rolfe's approval to use informant funds, obtained the search warrant for Apartment B. (Compl. ¶¶85-92.) The complaint pleads that Mr. Abdullah's statements provided in support of the warrant were false and the conspirators knew they were false. (Compl. ¶¶93-97.)

Plaintiffs cannot assert a viable failure-to-supervise claim under *Monell* by listing unrelated constitutional violations. *Carter*, 164 F.3d at 218. Plaintiffs must plausibly demonstrate that a municipal decision reflects deliberate indifference to the risk that a particular constitutional violation will follow the decision. *See Willis v. Blevins,* 966 Fed. Supp. 2d 646, 664-67 (general history insufficient; *Monell* claim requires plaintiff to identify specific deficiency in training program). They fail to allege facts from which the Court can reasonably infer that the City's deliberate indifference led the defendant officers to engage in a conspiracy to create fraudulent criminal charges. For this reason alone, Plaintiffs' *Monell* claim for failure to supervise should be dismissed.

## 2. *The complaint fails to attribute an omission to a policymaker.*

When a failure-to-supervise claim is asserted against a municipality under *Monell*, the plaintiff must establish that the failure was committed by an official with final authority in the relevant matter. *Riddick*, 238 F.3d at 523 (to impose liability on school board, plaintiffs "must identify municipal officials with 'final policymaking authority' to implement the alleged policy of 'acquiescence' with respect to [the culpable employee's] conduct."); *Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983) ("Since Chief Austin is responsible for the choice and implementation of [Newport News] police department practices and procedures, his acts and omissions reflect government policy"). *See also City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) ("[O]nly

those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability."). A line supervisor, like Sergeant Rolfe, does not have final policymaking authority under North Carolina law. N.C. Gen. Stat. § 160A-148 (explaining powers and duties of a city manager). !

Plaintiffs do not mention any City policymaker in their complaint. They do not plausibly attribute any specific failure to a policymaker. They do not claim that any official RPD policy authorized fraud, nor do they allege that RPD lacked official policies on search warrants or officer discipline. They do not claim that the conspiracy they allege here had ever occurred before. Instead, they identify a small group of RPD Vice officers who allegedly conspired with an informant over a six-month period to fabricate false heroin charges. A municipal custom will not be inferred from municipal inaction in the face of isolated constitutional deprivations by municipal employees. *Milligan*, 743 F.2d at 230. Plaintiffs allege no facts suggesting that anyone outside the conspiracy knew or should have known about it—and certainly not a policymaking official.

Plaintiffs have not alleged factual content plausibly asserting widespread and flagrant practices, so permanent and well-settled, that they are sufficient to place a policymaker on notice. *Carter,* 164 F.3d at 218. In fact, the complaint establishes the opposite; when someone outside the alleged conspiracy learned about the matter, they stopped it. *Accord Lytle*, 326 F.3d 463, 474 (4th Cir 2003) (City Manager unaware of constitutional violations; three incidents "do not constitute a pattern of unconstitutional conduct of which the City's final policymakers should have been aware."). Because they offered no factual content to attribute their claims plausibly to a policymaker, Plaintiffs' complaint fails to raise a *Monell* claim for failure to supervise. *Spell*, 824 F.2d at 1391.

### 3. The complaint fails to allege a plausible affirmative link between a City policy/custom and the particular injury Plaintiffs allege.

According to Plaintiffs, the conspirators bungled the search—officers searched the wrong house. (Compl. ¶132.) The Walton family claims that there was no basis whatsoever for any officer to enter or search Apartment A. (Compl. ¶¶165-66.) Thus, the Walton family cannot link a failure to prevent the alleged conspiracy, which led to the fraudulent warrant, and the illegal entry into their home. According to the Waltons, no entry and no search should ever have occurred.

In any case, it is the unlawful conspiracy to fabricate false evidence that allegedly caused injuries to the Plaintiffs—and nothing in the complaint remotely suggests that the City was the "moving force" to generate that alleged conspiracy. *Ruiz-Cortez*, 931 F.3d at 599. *Monell* claims require more than but-for causation; they require a direct causal link between the municipal action and the constitutional injury. *Bryan County*, 520 U.S. at 404. Plaintiffs have alleged but-for cause in their complaint; they have not plausibly alleged the required direct link. Their failure-to-supervise claim fails for this additional reason.

### B. **The Complaint Fails to Assert a Plausible *Monell* Claim Based on a Persistent and Widespread Custom or Usage of Allowing Illegal "No Knock" or "Quick Knock" Warrant Service.**

!

If a law enforcement agency develops an unconstitutional "custom or usage," i.e., a widespread practice of a particular unconstitutional method, that practice may be the basis for municipal liability, "but only if its continued existence can be laid to the fault of municipal policy-makers, and a sufficient causal connection between the 'municipal custom and usage' and the specific violation can then be established." *Randall v. Prince George's County*, 302 F.3d 188, 210 (4th Cir. 2002) (quoting *Spell*, 824 F.2d at 1390); see also *Bryan County,* 520 U.S. at 404 (custom must be "so widespread as to have the force of law"). A *Monell* claim of this type requires that,

(1) the municipality must have "actual or constructive knowledge" of the custom and usage by its responsible policymakers, and (2) there must be a failure by those policymakers, "as a matter of specific intent or deliberate indifference," to correct or terminate the improper custom and usage."

*Randall,* 302 F.3d at 210.

Plaintiffs' scant allegations in their tenth claim concerning a City custom and usage consist solely of legal conclusions.[5]   The section styled "Facts" in the complaint claims, on information and belief, that RPD has a general practice of executing search warrants in a "no knock" or "quick knock" manner, with a highly militarized and armed team, regardless of individualized circumstances.  (Compl. ¶142.)  The factual content alleged, however, does not support their claim. The complaint points to three instances in which RPD officers have conducted "quick" or "no knock" warrant service:   the search of Apartment A, the search of Apartment B, and a search

---

[5]      They are:

> 236. The City of Raleigh maintains a custom or practice of permitting and/or encouraging RPD officers to execute their search warrants[footnote omitted] in a "No Knock" or "Quick Knock" style, regardless of the actual individualized circumstances of the situation, and in violation of state and federal law.
>
> 237. This custom or practice led directly to the RPD VICE unit executing the warrant in a "No Knock" style, giving no warning or notice to the families before suddenly invading private homes with guns drawn.
>
> 238. This custom or practice also led directly to the RPD VICE unit invading the home of Kenya Walton, without warning, notice, or consent, even though her address was not contained in the search warrant and there was no reason to believe that the subject of the warrant had been, or would be, in her home.
>
> 239. Under the principles of municipal liability, the City and the RPD owed a duty to the public at large and to Plaintiffs to implement policies, procedures, customs, and practices sufficient to prevent, deter, and avoid conduct that violates the constitutional rights of criminal suspects and other members of the public.
>
> 240. However, the RPD and its designees, as policymakers for the City, knowingly and intentionally breached, or were deliberately indifferent to, this duty.

involving Amir Abboud about eleven months later.  Plaintiffs identify no alleged illegal notice and entry that occurred before theirs.

The Fourth Amendment incorporates the common law requirement that police officers knock on the door and announce their identity and purpose before attempting forcible entry. *Richards v. Wisconsin* 520 U.S. 385, 387 (1997).  This requirement may be excused by exigent circumstances.  To justify a "no knock" entry, officers need "a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *Richards*, 520 U.S. at 394. "Whether exigent circumstances existed at the time of the entry, and whether the degree of the exigency was sufficient to justify the extent of the noncompliance, is determined by an analysis of the facts of each case." *United States v. Grogins,* 163 F.3d 795, 797 (4th Cir. 1998). For a no-knock search to pass constitutional muster, officers must have some particularized basis for their suspicion. *Id*.

Plaintiffs provide no facts suggesting that officers lacked a particularized basis for a quick entry into Mr. Abboud's home.  And the facts as pled and as contained in the search warrant indicate—falsely, says the complaint—that heroin had previously been sold/stored at Apartment B.  When RPD SEU officers ran toward Plaintiffs' homes, the four people sitting on the front stoop ran inside screaming that SEU officers were coming, (Compl. ¶¶107 (Apartment A)),  and screaming "SWAT, SWAT, SWAT!" followed by slamming the door to Apartment B shut.  (Compl. ¶¶114-15.)

The Supreme Court in *Richards* found the reasonable suspicion standard met by two particularized facts:  the occupants of the premises to be searched recognized that undercover police officers were at his door and that the officers were searching for easily disposable drugs.

*Richards*, 520 U.S. at 395. As the Fourth Circuit explained in *Grogins,* officers may also consider what their experience tells them—"that drug dealers will dispose of evidence if given the opportunity." *Grogins,* 163 F.3d at 798.

A claimant must point to a persistent and widespread practice by municipal officials with sufficient duration and frequency to establish the required *Monell* elements—for both knowledge and failure to act. *Holloman v. Markowski*, 661 F. App'x 797, 800 (4th Cir. 2016) (per curiam), *cert. denied*, _ U.S. _, 137 S. Ct. 1342, 197 L. Ed. 2d 531 (2017) (affirming dismissal of *Monell* claim). The custom or usage must truly be widespread, meaning that the prototypical argument focuses on "the application of the policy to many different individuals." *Gaddy v. Yelton,* No. 1:10CV214, 2011 WL 3608023, *6 (M.D.N.C. Aug. 16, 2011). Considerably more than a single incident is necessary. *See Horton v. City of Raleigh*, No. 5:15-CV-349-FL, 2016 WL 2901743, *4 (E.D.N.C. May 18, 2016). "[M]erely asserting that a custom or practice of misconduct exists thus is not sufficient to state a claim for municipal liability after *Iqbal*. To meet this standard, plaintiffs must allege some factual content permitting a reasonable inference of multiple incidents of prior violations. *Id.* And a sporadic or isolated violation of rights will not give rise to *Monell* liability, "'only widespread or flagrant violations will.'" *Holloman*, 661 F. App'x at 799 (quoting *Owens*, 767 F.3d at 402-03). The facts pled in the complaint do not support a reasonable inference that RPD officers have such a widespread and persistent practice.

Finally, a viable *Monell* claim is subject to a strict causation requirement. The challenged custom, uncorrected by policymakers, must make the constitutional violation suffered by a plaintiff, "almost bound to happen, sooner or later." *Randall*, 302 F.3d at 211. No facts in the complaint connect an unconstitutional custom that policymakers deliberately ignored to the May

21, 2020 searches of Plaintiffs' homes, much less made that incident "almost bound to happen, sooner or later."

## **<u>CONCLUSION</u>**

Plaintiffs' complaint does only what is forbidden for a *Monell* claim. It plausibly alleges only vicarious liability for the allegedly criminal acts of a small group of officers and does not plausibly allege a direct charge of fault to the City for a constitutional violation. For the reasons set forth herein, the City respectfully requests that the Court grant its motion and dismiss the claims that Plaintiffs assert against it.

This the 29th day of April, 2022.

<div style="margin-left: 45%;">

**CITY OF RALEIGH**
**Robin L. Tatum, City Attorney**

By:   <u>/s/ Dorothy V. Kibler</u>
DOROTHY V. KIBLER
Deputy City Attorney
N.C. Bar No. 13751
P.O. Box 590
Raleigh, NC 27602
Tel: (919) 996-6560
Fax: (919) 996-7021
Dorothy.Kibler@raleighnc.gov
ATTORNEYS FOR DEFENDANT CITY
OF RALEIGH

</div>

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No. 5:22-CV-00068-BO

| | | |
|---|---|---|
| YOLANDA IRVING, individually and as the natural parent and guardian of J.I., JUWAN HARRINGTON, CYDNEEA HARRINGTON, KENYA WALTON, individually and as the natural parent and guardian of R.W., ZIYEL WHITLEY, DYAMOND WHITLEY, KAMISHA WHITLEY, and NANETTA GRANT as the natural parent and guardian of Z.G., | ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | **CERTIFICATE OF SERVICE** |
| THE CITY OF RALEIGH, OFFICER OMAR I. ABDULLAH, SERGEANT WILLIAM ROLFE, OFFICER RISHAR PIERRE MONROE, OFFICER JULIEN DAVID RATTELADE, OFFICER MEGHAN CAROLINE GAY, and JOHN and JANE DOE OFFICERS 1-10, in their individual capacities, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

I hereby certify that on April 29, 2022, I electronically filed the foregoing

Memorandum in Support with the Clerk of Court using the CM/ECF system, which will send

notification of such filing to all counsel of record as follows:

Abraham Rubert-Schewel
TIN FULTON WALKER & OWEN, PLLC
119 East Main Street
Durham, NC 27701
(919) 451-9216 phone
(718) 709-7612 fax
Email: schewel@tinfulton.com
*Attorneys for Plaintiff*

Emily Gladden
TIN FULTON WALKER & OWEN, PLLC
204 N. Person Street
Raleigh, NC 27601
(919) 720-4201 phone
(919) 720-4640 fax
Email: egladden@tinfulton.com
*Attorneys for Plaintiff*

Micheal Littlejohn, Jr.
LITTLEJOHN LAW, PLLC
227 W. 4th Street, Ste. B-113
Charlotte, NC 28202
(704) 322-4581 phone
(704) 625-9396 fax
Email: mll@littlejohn-law.com
*Attorneys for Plaintiff*

Ian Mance
Elizabeth Simpson
EMANCIPATE NC
P.O. Box 309
Durham, NC 27702
(828) 719-5755 phone
Email: ian@emancipatenc.org
elizabeth@emancipatenc.org
*Attorneys for Plaintiff*

Jason R. Benton
PARKER POE ADAMS & BERNSTEIN,
LLP
620 South Tryon Street, Suite 800
Charlotte, NC 28202
Office: 704.335.9509
Fax: 704.335.9747
Email: jasonbenton@parkerpoe.com
*Attorneys for Mr. Abdullah*

Norwood P. Blanchard, III
CROSSLEY McINTOSH COLLIER &
EDES, PLLC
5002 Randall Parkway
Wilmington, NC 28403
Tel.  (910) 762-9711
Fax.  (910) 256-0310
Email: norwood@cmclawfirm.com
*Attorneys for RPD Sergeant Rolfe*

Rodney E. Pettey
Samuel G. Thompson, Jr.
YATES MCLAMB & WEYHER, L.L.P.
Post Office Box 2889
Raleigh, N.C. 27602
Email: rpettey@ymwlaw.com
bthompson@ymwlaw.com
*Attorneys for RPD Detectives Monroe,
Rattelade, and Gay*

Respectfully submitted,

**CITY OF RALEIGH**
**Robin L. Tatum, City Attorney**

By:     /s/ Dorothy V. Kibler
        Dorothy V. Kibler
        Deputy City Attorney
        N.C. Bar No. 13571
        P.O. Box 590
        Raleigh, NC  27602
        Tel: (919) 996-6560
        Fax: (919) 996-7021
        Dorothy.Kibler@raleighnc.gov
        ATTORNEYS FOR DEFENDANT CITY
        OF RALEIGH