IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CASE NO. 5:22-cv-68-BO

| YOLANDA IRVING, et al., | ) | |
|---|---|---|
| | ) | |
| Plaintiffs, | ) | |
| | ) | **MEMORANDUM IN SUPPORT OF** |
| v. | ) | **MOTION TO DISMISS PLAINTIFF** |
| | ) | **EMANCIPATE NC, INC.** |
| THE CITY OF RALEIGH, et al., | ) | |
| | ) | |
| Defendants. | ) | |

Defendants City of Raleigh, Chief of Police Estella Patterson in her official capacity, and City Manager Marchell Adams-David in her official capacity (collectively "City Defendants") respectfully submit this Memorandum of Law in support of their Motion to Dismiss Plaintiff Emancipate NC, Inc. ("Emancipate") pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure on the grounds that Emancipate lacks standing to bring the claims asserted in Plaintiffs' Amended Complaint.

## NATURE OF THE CASE

The factual allegations in the complaint show that Emancipate, as an organization, has not suffered an injury in fact that is fairly traceable to Defendants' alleged misconduct or that is likely redressable by a favorable decision. Emancipate's allegations show, instead, that it made budgetary choices to engage in a variety of activities to pursue its broad mission to end mass incarceration and racism in the legal system independent of circumstances at issue in this case. Defendants' alleged misconduct in this case did not obstruct Emancipate's ability to pursue its mission or cause a drain on its resources. Instead, Emancipate has a social interest in the outcome of the Individual Plaintiffs' litigation concerning the search of their homes resulting from the

1

conduct of a "rogue officer" and unreliable confidential informant, which is insufficient to confer standing on Emancipate. Therefore, the City Defendants respectfully request that the Court dismiss Emancipate as a plaintiff in this action and grant any other relief that the Court deems proper and just.

## STATEMENT OF FACTS[1]

This case is related to a lawsuit that was filed on April 26, 2021, by eleven men and one woman who were involved in transactions with a confidential informant who was working for the Raleigh Police Department. *See Washington et al. v. City of Raleigh et al.,* Case No. 5:21-cv-000194-M, ECF No. 2. The confidential informant led several Raleigh police detectives to believe that he was purchasing heroin from the men involved in the transactions, when drug tests later determined that the substances involved were not heroin. *Id.* The men, represented largely by the same counsel who are representing the Plaintiffs in this case, filed a lawsuit under 28 U.S.C. § 1983 seeking compensation for damages they allegedly suffered as a result of being charged with heroin-related offenses. *Id.* That lawsuit was settled in September 2021. *Id.*, ECF No. 48.

Four months later, the instant lawsuit was filed by two families, whose homes Raleigh police officers entered while executing a search warrant related to one of the Plaintiffs in the earlier lawsuit.[2] Compl., ECF No. 2. The search warrant authorized the search of 1628 Burgundy Street, Apartment B, Raleigh, North Carolina 27610 ("Apartment B"). Search Warrant, ECF No. 32-2. A magistrate determined that probable cause existed to search Apartment B based on reasonable

---

[1] As required at this stage of the proceeding, the facts are recited from the Amended Complaint. The City Defendants are not admitting Plaintiffs' allegations are true and reserve the right to deny said allegations in its Answer to Plaintiffs' Amended Complaint.

[2] As the complaint notes, the men involved in the prior lawsuit, and the Plaintiffs in the instant lawsuit, are black. *Washington,* Case No. 5:21-cv-000194-M, ECF No. 2 ¶ 1; Am. Compl. ¶ 188, ECF No. 41.

2

suspicion that heroin was being sold or stored there. *Id.*; Application for Search Warrant, ECF No. 32-2 at 4. RPD Detective Omar Abdullah, who prepared the warrant application, attested that a confidential informant, Dennis Williams, purchased heroin from a male named Marcus, who was residing in Apartment B. Application for Search Warrant, ECF No. 32-2 at 4. After meeting with Detective Abdullah, Mr. Williams contacted Marcus and met him in Apartment B for a controlled buy. *Id.* at 5. The controlled buy was monitored using electronic and physical surveillance. *Id.*

The warrant application reported that, after the transaction, Detective Abdullah met with Mr. Williams and recovered contraband. *Id.* Detective Abdullah applied for the search warrant based upon the controlled buy that occurred in Apartment B within seventy-two hours of the application, that heroin was purchased from Marcus, and that Mr. Williams was familiar with how drugs are packaged and sold, common street terms, and jargon associated with drug trafficking. *Id.* at 6.

On May 21, 2020, officers set out to execute the warrant authorizing the search of Apartment B. As officers approached Apartment B, they observed four young men on the stoop of the duplex. Am. Compl. ¶ 109, ECF No. 41. When the young men saw the officers approaching, two of them immediately fled into Apartment A. Am. Compl. ¶¶ 114-115. Suspicious that they may be destroying evidence, the officers pursued them into Apartment A and ordered all individuals to come downstairs. Am. Compl. ¶¶ 117, 119. The other two young men fled into Apartment B, the residence to be searched based on suspicion of heroin trafficking. Am. Compl. ¶ 122. Similarly suspicious that the fleeing individuals may be destroying evidence, several officers pursued them into Apartment B while announcing "Police, Search Warrant," and while one of the young men ran up the stairs yelling "SWAT, SWAT, SWAT!" Am. Compl. ¶¶ 123,

3

125. Plaintiffs were secured downstairs while officers searched Apartments A and B. Am. Compl. ¶¶ 134-36. No Individual Plaintiff was arrested in conjunction with the search.

Importantly, Plaintiffs acknowledge that the conduct of Mr. Williams and Detective Abdullah in obtaining the search warrant for Apartment B was in violation of RPD policy. Am. Compl. ¶¶ 70, 73, 76-77. In fact, following the search of Plaintiffs' homes, Mr. Williams was suspended as a confidential informant. Am. Compl. ¶ 143. Plaintiffs also note that Mr. Williams is now being criminally prosecuted by the Wake County District Attorney's Office for his participation in fabricating evidence of heroin trafficking. Am. Compl. n.2. Similarly, Detective Abdullah was placed on administrative leave in September 2020 and terminated from the RPD on October 28, 2021. Am. Compl. ¶¶ 144-45.

Individual Plaintiffs filed this action on February 22, 2022, raising claims of unlawful entry, unlawful arrest and seizure, fabrication of evidence, failure to intervene, civil conspiracy, failure to train and/or supervise, excessive force, false imprisonment, and unlawful custom of executing "No Knock" or "Quick Knock" searches. Compl., ECF No. 2.

On the latter claim, Plaintiffs allege that RPD officers routinely enter apartments in violation of the "Knock-and-Announce" Rule articulated by the United States Supreme Court. Am. Compl. ¶¶ 149-51, 273-87. Specifically, Plaintiffs allege that RPD has a "general practice" of executing search warrants in a "No Knock" or "Quick Knock" fashion. Am. Compl. ¶¶ 152, 283-86. Plaintiffs acknowledge that there are exceptions to the "Knock and Announce" Rule, including danger to the officer or potential for destruction of evidence. ¶ 157, 171, 175, 180. Plaintiffs do not allege that the RPD's "general practice" is motivated by race. Am. Compl. Further, Plaintiffs acknowledge that the allegedly corrupt officer at issue in this case is a minority himself. Am. Compl. ¶ 89.

4

As examples of the alleged "general practice," Plaintiffs refer to other alleged "No Knock" entries of the homes of Amir Abboud, Blake Banks, Kesha Knight, Gregory Washington, and Keith Green. Am. Compl. ¶¶ 156-180. None of these individuals are Plaintiffs in this action and at least three of them previously settled claims they did bring against the City. *See Washington,* Case No. 5:21-cv-000194-M. It is not alleged that any of these individuals contacted Emancipate in conjunction with the entries of their home or that the prior searches of their homes were racially motivated. Am. Compl.

On May 16, 2022, Plaintiffs filed an Amended Complaint, which largely included the same claims, but this time added Emancipate, NC, Inc. as a Plaintiff. Emancipate is a non-profit organization, whose mission is to end mass incarceration and structural racism in the legal system in North Carolina through community education, narrative shift, and litigation. Am. Compl. ¶ 187. One way that Emancipate carries out its broad mission is to investigate allegations of police misconduct, and to offer support to individuals who may be victims of such conduct. Am. Compl. ¶ 189. Specifically, Emancipate has a "rapid response" initiative, through which community members can report incidents of police misconduct, among other issues, and seek advice. Am. Compl. ¶ 189. Emancipate deploys a staff person to analyze what response, if any, the organization will take, which could include informal administrative advocacy, media advocacy, litigation, or other forms of moral support. Am. Compl. ¶ 190. Emancipate does not actively pursue every inquiry. Blagrove Decl. ¶ 6, ECF No. 41-1. There is no allegation or other evidence in the record that any of the Individual Plaintiffs at issue here called Emancipate after the warrant execution at issue in this case. *See* Am. Compl.; Blagrove Decl. Similarly, Plaintiffs do not allege that any of the other individuals discussed in the amended complaint who allegedly were involved in "No Knock" entries contacted Emancipate at any time. Am. Compl.

5

Emancipate joins Individual Plaintiffs in four of the twelve claims asserted in the Amended Complaint. Am. Compl. ¶¶ 213-217, 273-301. Emancipate seeks declaratory and injunctive relief on the following causes of action alleging violations of the Fourth Amendment:

- Second Claim alleging officers entered the Individual Plaintiffs' homes unlawfully using "No Knock" or "Quick Knock" execution;

- Tenth Claim alleging the City maintains a custom, practice, or policy of encouraging officers to execute warrants in a "No Knock" or "Quick Knock" style;

- Eleventh Claim alleging failure to train and supervise officers in reviewing and handling drug evidence; and

- Twelfth Claim alleging deliberate indifference in policies regarding warrant execution and related training.

Am. Compl. ¶¶ 213-217, 273-301.

## LEGAL STANDARD

In reviewing standing challenges, the Court accepts material allegations as true. *S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 181-82 (4th Cir. 2013). The Court is not, however, required to accept allegations that are nothing more than legal conclusions or naked assertions. *Id.* The Court may also consider exhibits attached to the complaint. *Id.* at 182. If the allegations of the complaint conflict with an exhibit, the exhibit prevails. *Id.*

Emancipate filed the Declaration of Dawn Blagrove, Executive Director of Emancipate, with the amended complaint. Blagrove Decl., ECF No. 41-1. Thus, this Court's review is not limited to the bare allegations contained in Plaintiffs' amended complaint.

## ARGUMENT

Emancipate fails to satisfy its burden of establishing that it has standing to bring this claim. Its allegations do not establish that Emancipate suffered an injury in fact that is fairly traceable to

6

Defendants' misconduct, which the Court can redress with a favorable decision, rather than a mere abstract interest and effort to vindicate its value preference through the judicial process. Accordingly, Emancipate lacks standing and should be dismissed as a Plaintiff in this action.

I.  **An Association Does Not Have Standing To Sue To Vindicate Its Value Preferences, And Instead Only Has Standing if the Defendants' Conduct Thwarted the Organization's Mission.**

Federal courts have jurisdiction only to resolve actual cases or controversies. *Simon v. E. Kentucky Welfare Rights Org.,* 426 U.S. 26, 37 (1976). A threshold question in determining whether a federal court has jurisdiction is whether the plaintiff has standing under Article III of the United States Constitution. *Id*. The standing inquiry "focuses *on the party* seeking to get his complaint before a federal court and *not on the issues* he wishes to have adjudicated." *Id.* at 38 (emphasis added).

Article III requires each plaintiff to have a personal stake in the outcome of a controversy to allow him to invoke federal court jurisdiction and justify exercise of the Court's remedial powers. *Id*. When a plaintiff's standing is challenged, the Court must determine whether "the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision." *Id*. at 38-40. To satisfy Article III standing, a plaintiff must show that he or she suffered (1) an injury in fact, (2) that is fairly traceable to the defendant's alleged misconduct, and (3) is likely to be redressed by a favorable decision. *Lane v. Holder,* 703 F.3d 668, 671 (4th Cir. 2012). The injury must be concrete, as opposed to conjectural, and the likelihood of redressability must be more than speculative. *Id.* When the Court considers whether an organization has standing, it conducts the same inquiry as to whether an individual has standing. *Id.* at 674. An organization suing on its

7

own behalf[3] must have suffered an injury in fact that impeded its purpose with an associated drain on its resources. *Id*.

The Supreme Court unequivocally clarified, "[o]ur decisions make clear that an organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art. III." *Simon,* 426 U.S. at 40. In *Sierra Club v. Morton,* the Supreme Court explained that "a mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem" does not confer standing for an organization. *Sierra Club v. Morton,* 405 U.S. 727, 739 (1972) (finding the organizational plaintiff, whose mission was to protect the environment, lacked standing to challenge a proposed development that allegedly contravened federal laws). A mere interest is insufficient to render an organization 'adversely affected' or aggrieved. *See id*.

The Court cautioned that allowing any group with a bona fide 'special interest' to litigate claims would make it difficult to prohibit an individual citizen with the same bona fide special interest from litigating those interests even where an individual clearly would not have standing under Article III. *Id.* at 739-40. The requirement that a litigant must be adversely affected "serve[s] as at least a rough attempt to put the decision as to whether review will be sought in the

---

[3]An organization may, under some circumstances, sue in a representative capacity *on behalf of its members* rather than on its own behalf. An organization has standing to sue on behalf of its members when (a) one of its members would have standing in the member's own right; (b) the interests it seeks to protect in suit are germane to its mission; and (c) the participation of individual members is not necessary in the lawsuit. *Hunt v. Washington State Apple Advert. Com'n,* 432 U.S. 333, 343 (1977). Despite its reliance on a case articulating the standard for representative standing, the amended complaint otherwise contains no indication that Emancipate is suing on behalf of any members. *See* Pls. Am. Compl. n.3 (citing *Equity in Athletics, Inc. v. Dep't of Educ.,* 639 F.3d 91 (4th Cir. 2011), and *Cape Hatteras Access Pres. All. v. Jewell,* 28 F. Supp. 3d 537 (E.D.N.C. June 20, 2014)). Emancipate does not claim to be a membership organization and does not allege any members would have standing to sue. Am. Compl. Accordingly, this memorandum does not further address representative standing.

hands of those who have a direct stake in the outcome . . . . " *Id.* at 740. That goal is undermined if the Court affords standing to "organizations or individuals who seek to do no more than vindicate their own value preferences through the judicial process." *Id.*

Case law applying these principles shows that when an organization *elects* to devote resources to a specific activity or issue that is merely related to or encompassed by its broad interests and mission, it cannot establish Article III standing. For example, associations did not have standing to sue in the following situations.

- A homeowners' association whose responsibility it was to install and maintain exclusive utility contracts sought to void its contract with a wire-based video service provider based on an order from the Federal Communications Commission banning exclusivity agreements. The Fourth Circuit held that the organization lacked standing because the challenged conduct did not cause the organization's alleged injury. *S. Walk at Broadlands Homeowner's Ass'n*, 713 F.3d 175.

- A nonprofit organization – Second Amendment Foundation, Inc. ("SAF") – whose mission was to promote the exercise of the right to keep and bear arms through education, research, publication, and litigation sought to challenge the constitutionality of a federal statute that restricted the interstate transfer of handguns. The Fourth Circuit held that SAF's alleged injury was merely a budgetary choice to expend resources on educating members and responding to inquiries, and that undertaking litigation was not an injury inflicted by the defendants' alleged misconduct sufficient to confer standing to bring suit. *Lane,* 703 F.3d 668.

- A nonprofit organization– Maryland Shall Issue ("MSI"), whose mission was to educate the community about the right of self-protection, safe handling of firearms, and responsible means of carrying a firearm through public outreach, research, and litigation, sought to challenge the constitutionality of a statute banning rapid fire trigger activators. The Fourth Circuit held that MSI's alleged injury amounted only to a disagreement with policy decisions, not an injury in fact under Article III, and the organization thus lacked standing. *Maryland Shall Issue, Inc. v. Hogan*, 963 F.3d 356, 362 (4th Cir. 2020).

Importantly, in *Lane*, the Fourth Circuit explained that a "mere expense" does not constitute an injury in fact sufficient to confer standing to an organizational plaintiff. 703 F.3d at

9

675. The Court explained that a "diversion of resources" may cause harm to an organization, but that such harm is insufficient to constitute an injury in fact for purposes of Article III standing if the diversion results from the organization's budgetary choices rather than the defendant's alleged misconduct. *Id.* at 675 (internal citations omitted). An organization does not suffer a cognizable injury sufficient to satisfy Article III by responding to member inquiries or undertaking litigation in response to legislation. *Id.*

Associations have standing only when they establish a narrowly tailored mission that is *obstructed by* misconduct that requires the organization to use resources to address the defendant's actions in lieu of other, specific activities in which it planned to engage.[4] For example, associations have had standing to sue under the following circumstances.

- A nonprofit organization – Housing Opportunities Made Equal ("HOME") – whose mission was to achieve equal opportunities in housing through counseling services, investigation of leasing practices, and referral of discrimination complaints to the appropriate authorities, challenged the actions of an apartment complex under the Fair Housing Act. The United States Supreme Court held that HOME adequately alleged an injury in fact where defendants' racial steering practices obstructed its mission to assist its members in finding equal housing opportunities and required it to expend resources to identify and counteract the defendant's discriminatory practices, including through the use of HOME-employed "test renters" (one who was black and one who was white), who were also named plaintiffs. *Havens Realty Corp. v. Coleman,* 455 U.S. 363 (1982).

- A nonprofit organization – People for Ethical Treatment of Animals ("PETA") – whose mission is to protect animals from abuse, neglect, and cruelty through education, investigations, research, rescue, and protest

---

[4]The following analogy may be helpful in considering when challenged conduct thwarts an organization's mission so as to confer standing on the organization. Consider an ambulance service, whose mission it is to tend to injured persons. If a defendant injures a person, and the ambulance service expends resources traveling to and tending to the person, the ambulance service is carrying out its mission. The ambulance service would not have standing to sue the defendant for causing the injury. On the other hand, if a defendant puts up roadblocks throughout the town, which prevent the ambulance service from tending to injured persons, and the ambulance service cannot reach injured persons as a result, then the defendant would be thwarting the ambulance service's mission, and the ambulance service would have standing to sue.

campaigns, filed suit against the defendant zoo for violating the Endangered Species Act. The Fourth Circuit determined that PETA's mission required it to take action, and expend resources, to rescue animals from defendant's zoo, which reduced its ability to engage in mission-related campaigns against other zoos." *People for Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of Western Maryland, Inc.*, 843 F. App'x 493 (4th Cir. 2021) (unpublished);

- Organizational plaintiffs whose mission was to increase voter participation by low-income and minority individuals alleged that the DMV failed to submit voter registration information, in violation of the National Voter Registration Act, requiring Action NC to divert limited resources to assist voters with registrations that should have been otherwise accomplished through public assistance. Specifically, organizational plaintiffs established, through pleadings and declarations, that they diverted resources that would have been directed toward voter education, outreach, and engagement efforts but-for the diversion to address defendants' failures. *Action NC v. Strach,* 216 F. Supp. 3d 597 (M.D.N.C. Oct. 27, 2016);

- Organizational plaintiffs whose mission was to increase voter participation by low-income and minority individuals alleged that they suffered a diversion of resources injury because they had to divert time, money, and resources away from voter registration activities to disseminate information about early voting opportunities, publicize Rides-to-the-Polls programs to address voter registrations that were cancelled because the registration was returned as undeliverable. *N. Carolina State Conf. of NAACP v. N. Carolina State Bd. Of Elections,* 283 F. Supp. 3d 939 (M.D.N.C. Sept. 26, 2017) ("*NAACP I*"); and

- Organizational plaintiffs whose mission was to increase voter participation by low-income and minority individuals alleged that they suffered a diversion of resources injury because they had to divert time, money, and resources away from voter registration activities to educate volunteers on the potential risks of registering a felon to vote and caution the community on the risks of voting after a felony conviction. *N. Carolina State Conf. of NAACP v. N. Carolina State Bd. Of Elections,* Case No. 1:18-CV-994, 2022 WL 446833 (M.D.N.C. Mar. 28, 2022).

As is discussed below, the alleged injury in this case is one to Emancipate's value interests, and not one that thwarts its mission—and thus Emancipate lacks standing to sue.

**II.    Emancipate Is Suing To Vindicate Its Value Preferences And Has Not Shown Any Thwarting of its Mission.**

11

Here, the allegations in the Amended Complaint, and testimony in Blagrove's Declaration, show that Emancipate does not have standing to sue, because (1) Emancipate's mission has not been thwarted by the alleged misconduct, (2) Emancipate has a broad mission, whereas standing typically requires an injury to a targeted mission, and (3) Emancipate has not alleged any specific activities that were affected by the alleged misconduct.

First, the allegations and declaration do not show that Emancipate's mission has been thwarted by Defendants' alleged conduct. Plaintiffs generally allege that Emancipate has been required to divert resources to respond to inquiries regarding alleged misconduct by Raleigh police. Am. Compl. ¶¶ 189-191. However, Plaintiffs do not allege that their rapid response initiative is limited to allegations of police misconduct. Blagrove Decl. ¶ 4. Further, Emancipate acknowledges that it does not expend resources pursuing every inquiry or reported complaint, but rather "sometimes" pursues advocacy and other times "simply provide[s] advice and empathy." Blagrove Decl. ¶ 6. Other than generally stating it "hoped" to do more work in Pasquotank County, Emancipate provides no specifics as to the activities from which its resources have been devoted to respond to inquiries related to RPD's "general practice" of "No Knock" entries. *See* Am. Compl.; Blagrove Decl. Accordingly, Emancipate's allegations that its mission has been frustrated fall short.

Second, the allegations and affidavit show that Emancipate has a broad mission, rather than a focus on specific activities as is typically required to form a basis for standing. Emancipate has a broad mission to end mass incarceration and structural racism. Am. Compl. ¶ 187; Blagrove Decl. ¶ 2. It works towards that goal through education, narrative shift, and litigation. Am. Compl. ¶ 187. This broad mission allows Emancipate the latitude to engage in a wide variety of activities, including lobbying for bail reform and the end of youth confinement, distributing resources to

12

subvert structural racism, and promoting restorative justice. *See What We Do*, Emancipate NC, https://emancipatenc.org/what-we-do/ (last visited June 27, 2022).

Unlike the organizational plaintiffs in *Havens*, *People for Ethical Treatment of Animals*, and the voting cases, Emancipate's mission does not require it to engage in any particular activities in order to pursue its broad goal. In the Amended Complaint, Emancipate includes conclusory allegations that RPD policies regarding search warrants and handing of drug evidence perceptibly impaired its mission, but fails to allege factual allegations to support its legal conclusion. Am. Compl. ¶ 188. It does not allege that Defendants' alleged misconduct was motivated by race or that it disproportionately impacted minority races. *See* Am. Compl. Nor does the amended complaint allege that either the Individual Plaintiffs, or the other individuals allegedly subject to "No Knock" or "Quick Knock" entries, contacted Emancipate in conjunction with the entries of their homes. *See* Am. Compl. Notably, the Individual Plaintiffs were not arrested or incarcerated as a result of the challenged search. *See* Am. Compl.

Further, Emancipate does not allege that its mission requires it to engage in activities related to alleged police misconduct rather than any other activity in which it may choose to participate to pursue its mission to end mass incarceration or racism in the legal system. *See* Am. Compl. Plaintiffs' general and conclusory allegations that Defendants' misconduct "perceptibly impaired" Emancipate's mission falls short of the concrete injuries of the organizational plaintiffs in *Havens*, *People for Ethical Treatment of Animals*, and the voting cases referenced in the amended complaint.

Third, unlike the organizational plaintiffs who had standing in the cases discussed above, Emancipate fails to specify activities from which its resources were diverted in order to address an alleged impediment to its mission. *See* Am. Compl.; Blagrove Decl. Unlike each of the voting

13

cases on which Plaintiffs rely, and in which the Court concluded that the organizational plaintiffs sufficiently alleged a diversion injury, Emancipate merely asserts the conclusory allegation that it has been forced to divert resources due to the alleged misconduct. *See* Blagrove Decl. In each of the voting cases, legislation or a failure to comply with a duty prevented the organizational plaintiffs from engaging in intended activities to increase voter turnout. Furthermore, in the cases where standing was present, the organizational plaintiffs specified the activities from which resources were diverted in order to address a specific impediment to their mission. Emancipate has not done so here.

Emancipate alleges Defendants' misconduct increased the demand on Emancipate's rapid response initiative, through which community members report and seek advice regarding instances of police misconduct, incidents that occur in jail or prison, and unfair charges or convictions. Am. Compl. ¶ 189. The reports require a staff person to investigate and potentially respond, which Emancipate claims diverts resources from other aspects of its work, including in other parts of the state. Am. Compl. ¶¶ 190-92. However, Emancipate's budgetary choice to expend resources on responding to inquiries is not an injury inflicted by the Defendants' alleged misconduct exactly as, in *Lane*, SAF's budgetary choices did not constitute an injury in fact sufficient to confer standing. *See Lane,* 703 F.3d at 674. Further, Emancipate's claims in this action amount only to a disagreement, not an injury in fact sufficient to confer standing, just as MSI's alleged injury in *Maryland Shall Issue* amounted only to a disagreement with legislative policy decisions. *See Maryland Shall Issue,* 963 F.3d at 362.

In sum, allowing Emancipate to proceed in this action would undermine the requirement that a litigant be adversely affected to have standing to sue and would permit exactly what the Supreme Court cautioned against in *Sierra Club* and *Simon. Sierra Club,* 405 U.S. at 739; *Simon,*

14

426 U.S. at 40. Given Emancipate's mission to end mass incarceration, it undoubtedly has an abstract interest in policing policies. That interest, however, is not a substitute for a concrete injury. Emancipate fails to allege factual allegations that establish its mission has been perceptibly impaired with a consequent drain on resources to establish an injury in fact sufficient to confer standing. *See* Am. Compl. For these reasons, Emancipate should be dismissed.

**III.    Emancipate's Claims Also Are Not Redressable in the Context of the Factual Allegations Asserted in this Case.**

In addition to the reasons set forth above, Emancipate lacks standing for yet another reason: because its alleged injuries have no relationship to the dispute underlying this case.

Even where an association has standing, the 'case or controversy' limitation of Art. III still requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, not an injury that results from the independent action of some third party. *Simon*, 426 U.S. at 42-43 (concluding organizational plaintiffs' alleged injury that the favorable IRS ruling resulted in hospitals denying care to indigent patients was "purely speculative" and insufficient to confer standing); *S. Walk*, 713 F.3d at 181-82 (concluding organizational plaintiff's alleged injury resulted not from the allegedly illegal exclusivity clause of the contract, but rather from the bulk billing clause and therefore its cause of action was not redressable). That requirement is not met here.

Plaintiffs' Amended Complaint acknowledges that the alleged "No Knock" entry into Individual Plaintiffs' homes in this case was the result of a "rogue officer" and "unreliable confidential informant." Am. Compl. ¶ 188. Plaintiffs further allege that the misconduct in fabricating evidence to obtain a warrant that resulted in the search of Individual Plaintiffs' homes was in violation of RPD policy. Am. Compl. ¶¶ 70-77. Plaintiffs acknowledge that Mr. Williams is being charged for his participation in the conspiracy and that Detective Abdullah has been

15

terminated. Am. Compl. ¶¶ 143-45, n.2. Finally, Plaintiffs allege that the misconduct occurred for an approximately six-month period from November 29, 2019 through May 21, 2020, *ending with the search of 1628 Burgundy Street*, while Mr. Williams and Detective Abdullah worked together. Am. Compl. ¶¶ 66-67, 91.

The factual allegations of this case do not support Emancipate's claims for declaratory and injunctive relief as Mr. Williams and Detective Abdullah are no longer employed by the Raleigh Police Department and Emancipate is not requesting compensatory damages for resources allegedly spent responding to Defendants' alleged misconduct in this case. *See generally* Am. Compl; *compare with Havens,* 455 U.S. 363 (after individual plaintiffs settled their claims, HOME abandoned its claim for injunctive relief and merely pursued compensatory damages associated with its work to counteract defendants' discriminatory steering practices). A favorable ruling in this case is unlikely to redress Emancipate's claims that the RPD policy and supervision of executing search warrants and handing drug evidence is insufficient because the individuals whose conduct precipitated the search of Individual Plaintiffs' apartments are no longer part of the RPD.

## CONCLUSION

Based on the foregoing, the City Defendants respectfully request that this Court dismiss Plaintiff Emancipate and grant such other relief it deems proper and just.

16

Respectfully submitted,

This the 28th day of June, 2022.

          **CITY OF RALEIGH**
          **Robin L. Tatum, City Attorney**

By:   /s/ Dorothy V. Kibler
       DOROTHY V. KIBLER
       Deputy City Attorney
       N.C. Bar No. 13751
       PO Box 590
       Raleigh, NC 27602
       Tel:  (919) 996-6560
       Fax:  (919) 996-7021
       Dorothy.Kibler@raleighnc.gov

*Counsel for Defendants City of Raleigh, Chief of Police Estella Patterson in her official capacity, and City Manager Marchell Adams-David in her official capacity*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CASE NO. 5:22-cv-68-BO

| YOLANDA IRVING, et al., | ) | |
|---|---|---|
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **CERTIFICATE OF SERVICE** |
| | ) | |
| THE CITY OF RALEIGH, et al. | ) | |
| | ) | |
| Defendants. | ) | |

I hereby certify that on June 28, 2022, I electronically filed the foregoing **MEMORANDUM IN SUPPORT OF MOTION TO DISMISS EMANCIPATE NC, INC.** with the Clerk of Court using the CM/ECF system, which sends notification of such filling to all counsel of record as follows:

Abraham Rubert-Schewel
Tin Fulton Walker & Owen, PLLC
119 E. Main Street
Durham, NC 27701
schewel@tinfulton.com
*Counsel for Plaintiffs*

Jason Benton
Parker Poe Adams & Bernstein, LLP
620 South Tyson Street, Suite 800
Charlotte, NC 28202
jasonbenton@parkerpoe.com
*Counsel for Defendant Abdullah*

Emily Gladden
Tin Fulton Walker & Owen, PLLC
204 N. Person Street
Raleigh, NC 27601
egladden@tinfulton.com
*Counsel for Plaintiffs*

Rodney Pettey
Samuel Thompson, Jr.
Yates McLamb & Weyher, LLP
PO Box 2889
Raleigh, NC 27602
*Counsel for Defendants Monroe, Rattelade, and Gay*

Michael Littlejohn, Jr.
Littlejohn Law, PLLC
PO Box 16661
Charlotte, NC 28297
mll@littlejohn-law.com
*Counsel for Plaintiffs*

Norwood Blanchard, III
Crossley McIntosh Collier, & Edes, PLLC
5002 Randall Parkway
Wilmington, NC 28403
norwood@cmclawfirm.com
*Counsel for Defendant Rolfe*

18

Ian Mance
Elizabeth Simpson
Emancipate NC, Inc.
ian@emancipatenc.org
elizabeth@emancipatenc.org
*Counsel for Plaintiffs*

                                **CITY OF RALEIGH**
                                **Robin L. Tatum, City Attorney**

By:    /s/ Dorothy V. Kibler
         DOROTHY V. KIBLER
         Deputy City Attorney
         N.C. Bar No. 13751
         PO Box 590
         Raleigh, NC 27602
         Tel: (919) 996-6560
         Fax: (919) 996-7021
         Dorothy.Kibler@raleighnc.gov

*Counsel for Defendants City of Raleigh, Chief of Police Estella Patterson in her official capacity, and City Manager Marchell Adams-David in her official capacity*