UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| YOLANDA IRVING, individually and as the natural parent and guardian of J.I., JUWAN HARRINGTON, CYDNEEA HARRINGTON, KENYA WALTON individually and as the natural parent and guardian of R.W., ZIYEL WHITLEY, DYAMOND WHITLEY, KAMISHA WHITLEY, NANETTA GRANT as the natural parent and guardian of Z.G., and EMANCIPATE NC, INC., <br><br> Plaintiffs, <br><br> v. <br><br> THE CITY OF RALEIGH, Officer OMAR I. ABDULLAH, Sergeant WILLIAM ROLFE, Officer RISHAR PIERRE MONROE, Officer JULIEN DAVID RATTELADE, and Officer MEGHAN CAROLINE GAY, JOHN and JANE DOE Officers 1-10, in their individual capacities, Chief of Police ESTELLA PATTERSON and City Manager MARCHELL ADAMS-DAVID, in their official capacities. <br><br> Defendants. | 5:22:CV-0068-BO |

**MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS**

Plaintiff Emancipate NC, Inc. ("Emancipate NC") respectfully opposes the

Motions to Dismiss filed by the City of Raleigh (D.E. 60) and Defendants Monroe,

Rattelade, and Gay (D.E. 63). The Amended Complaint (D.E. 41) states a claim for

declaratory and injunctive relief under 42 U.S.C. § 1983 and Emancipate NC has standing to bring its claim, because the Defendants' unlawful conduct injures Emancipate NC and perceptibly impairs Emancipate NC from carrying out its mission to end structural racism in the legal system of North Carolina.

## SUMMARY

Emancipate NC alleges that it has been and continues to be required to divert scarce organizational resources in order to respond to the misconduct of the Raleigh Police Department (RPD). This includes RPD's violations of the Fourth Amendment through its practice of entering private residences by surprise in a "No Knock" or "Quick Knock" fashion, even when no exigency demands such dangerous and sudden invasive action; RPD's generalized poor supervision and oversight of its officers, which permits reckless police work like the erroneous address on the search warrant that was served upon the individual plaintiffs; and the outright corruption of former-detective Abdullah, to go undetected. The organization also alleges that its mission of ending mass incarceration and structural racism in the legal system has been perceptibly impaired by RPD's misconduct. Under *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), and its progeny, these allegations are more than adequate to confer organizational standing on Emancipate NC.

## FACTS

The Amended Complaint alleges that the Raleigh Police Department illegally invaded the private homes of 10 innocent Black women and children, pointing guns at them and terrifying them after having relied on fraudulent evidence that was

fabricated by a now-indicted former police detective and his now-indicted confidential informant. D.E. 41 at ¶¶ 1, 5-6. It alleges that the Raleigh Police Department has a policy and practice of conducting warrant executions in a "No Knock" or "Quick Knock" style, in which they enter premises without warning and without providing an opportunity for the occupants of the premises to voluntarily answer or open the door. *Id.* at ¶¶ 2, 8, 152. This style of warrant execution is connected with the deaths of innocent people, and it has been banned by a number of states, including Oregon, Florida, and Virginia, because their lawmakers recognized that such practices are both dangerous and constitutionally infirm. *Id.* at ¶ 3. RPD's pattern and practice of knocking while simultaneously entering ("Quick Knock") has effectively turned "knock and announce" warrants into "No Knock" executions in the City of Raleigh. *Id.* at ¶ 154. The Amended Complaint cites other examples of this type of warrant execution misconduct in Raleigh, with victims including Amir Abboud, Kesha Knight, Blake Banks, Gregory Washington, and Keith Green.[1] Id. at ¶¶ 158-176. The Amended Complaint seeks declaratory and injunctive relief to remedy constitutional violations.

In the affidavit attached to the Amended Complaint, Emancipate NC alleges that its mission is to "end structural racism and mass incarceration in North

---

[1] All these five victims are people of color; four out of five identify as Black. Emancipate NC makes *no* allegation that these entries were "motivated by race;" rather, that they are symptoms of "structural racism in the legal system." Because of residential segregation and differential patterns of policing by neighborhood, innocent Black people are more likely to be impacted by police misconduct. This is the type of problem that Emancipate NC's mission seeks to remediate.

Carolina" and that it accomplishes this mission through community education, narrative shift, and litigation, with a particular focus in the City of Raleigh. Affidavit of Dawn Blagrove at ¶ 2. Defendants' wrongful actions with respect to the unconstitutional execution of search warrants, and the association of the warrants with the wrongful arrest and long-term jailing of nearly two dozen Black men, has sewn significant distrust in the Raleigh community and has perceptibly impaired Emancipate NC's mission of ending structural racism in the legal system. *Id.* at ¶ 3; *see also* WRAL, *Former Raleigh Police Officer Arrested After Fake Drug Arrests*, Aug. 17, 2022, https://www.wral.com/wake-grand-jury-indicts-former-raleigh-police-officer-linked-to-bogus-drug-arrests/20421020/ ("Abdullah is accused of framing 23 people over fake heroin deals and conspiring to target Black men for arrest.").

Emancipate NC alleges that a major part of its work consists of "rapid response," where staff members respond to inquiries for help from community members who have experienced police misconduct, as well as prison issues and unfair charges and convictions. *Id.* at ¶ 4. Emancipate NC alleges that it receives on average 3 inquiries per week about Raleigh Police misconduct, and that each inquiry requires extensive time to call back witnesses, interview them, listen empathetically, provide advice, and evaluate what response, if any, the organization will take as a result. *Id.* at ¶ 10.  This process includes debriefing other team members and making game plans. *Id.* These inquiries include complaints about warrant executions, aggressive home raids, excessive use of force, officer-involved shootings, and wrongful arrests. *Id.* at ¶ 11.

While this lawsuit arises in the immediate context of a particular Raleigh police detective who routinely falsified warrants, the Complaint alleges (and Emancipate NC seeks to end) a systemwide trend of Raleigh officers unconstitutionally executing warrants in a "No-Knock" or "Quick-Knock" fashion. As a result of the Raleigh Police Department's unlawful warrant executions and the poor supervision of its officers, Emancipate NC has been forced to divert resources to attend to these systemic constitutional violations. *Id.* at ¶ 12. The organization has been forced to add a paid intern to help with the volume of intake work and triage of Raleigh-based inquiries, and it has not been able to expand its work in Pasquotank County, as previously planned, due to the high volume of complaints in Raleigh. *Id.* at ¶ 13.

## ARGUMENT

Article III of the Constitution limits the authority of the federal courts: they decide "Cases" and "Controversies." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992). The "irreducible constitutional minimum" of standing has three elements: (1) the plaintiff has suffered a concrete injury, (2) that injury is fairly traceable to actions of the defendant; and (3) it must be likely–not merely speculative–that the injury will be redressed by a favorable decision. *Id.* at 560-61.

## I. Emancipate NC Has Alleged an Injury-In-Fact that is Traceable to Defendants

Organizations have standing to challenge actions that cause them direct injury. *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). They must allege a personal stake in the outcome of the controversy sufficient to warrant the invocation of federal court jurisdiction. *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 261 (1977). Direct organizational standing is cognizable in two ways, both of which are met here: (1) a diversion of organizational resources to identify or counteract the allegedly unlawful action, or (2) frustration of the organization's mission. *Havens*, 455 U.S. at 378–79.

One indication of an organization's injury is if it would suffer some *other* injury if it failed to divert its resources to counteract the problem. In *Havens*, for instance, the plaintiff, HOME, was an organization that offered counseling and referral services to local community members as a means of pursuing its organizational objectives. HOME challenged the racial steering practices of defendant – the owner of two apartment complexes – which threatened to diminish the resources available to offer "counseling and other referral services" to the large number of community members seeking to rent apartments from the dozens of other landlords throughout the service region. *Havens*, 455 U.S. at 379. Put differently, the defendant's unlawful conduct (relating directly to HOME's organizational mission) necessitated that HOME reduce the resources devoted to its day-to-day mission-oriented work of offering counseling and providing referral services.

In *Haven*, like in more recent cases, the organization could not avoid suffering the diversion of resources without compromising its mission, and therefore it had standing to sue. *Cf. People for Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of Western Maryland, Inc.*, 843 Fed.Appx. 493, 496 (4th Cir. 2021) ("[T]his court has reaffirmed that a plaintiff has suffered an organizational injury if the challenged policy or practice frustrated both its purpose and caused a drain on its resources."); *Action NC v. Scratch*, 216 F.Supp.3d 597, 616 (MDNC 2016) ("[I]f a defendant's practices have hampered an organization's stated objectives causing the organization to divert its resources as a result, then 'there can be no question that the organization has suffered injury in fact.'" (quoting *Havens*, 455 U.S. at 379)); *Smith v. Pacific Props. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004) (finding standing where organization "had . . . to divert its scarce resources from other efforts"); *El Rescate Legal Servc., Inc. v. Exec. Office of Immigration Rev.*, 959 F.2d 742, 748 (9th Cir. 1992) (finding standing where challenged policy "require[d] the organizations to expend resources . . . they otherwise would spend in other ways.").

So too, here. Emancipate NC's mission to end structural racism in North Carolina's legal system would be harmed if it were to stand idly by while Raleigh Police's unlawful and systematic warrant execution methods harm overwhelmingly Black residents of the State's capital city. Of the sixteen individual victims of warrant misconduct named in the Amended Complaint, fifteen identify as Black; similarly, all the victims of former-Officer Abdullah's scheme were Black people.

Defendants suggest that the present lawsuit is not closely related to Emancipate NC's stated objective of ending "structural racism" because the lawsuit fails to allege that officers were "racially motivated" when they illegally entered the homes of the individual Plaintiffs. D.E. 60 at 5, 13. This reflects a misunderstanding of the difference between structural (i.e, systemic) racism and individual acts of racism. As a Fourth Circuit judge recently observed in a concurring opinion, structural racism refers to policing systems that may be "infected with years of racial bias" informed by historical practices in which police send a disproportionate number of officers to police Black neighborhoods. *United States v. Curry*, 965 F.3d 313, 345 (4th Cir. 2020) (Thacker, J. concurring).

The distinction between a discrete instance of discrimination and an overarching systemic racism is perhaps best illustrated by the Supreme Court's Equal Protection jurisprudence. The Supreme Court long ago concluded that – even where there is incontrovertible statistical evidence that "race has infected the administration" of a governmental undertaking – statistics alone are "clearly insufficient to support an inference that any of the decisionmakers" in a particular case "acted with discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 297 (1987). Consequently, Emancipate NC is foreclosed from pursuing relief under the Equal Protection Clause. But this inability to bring legal claims directly alleging racial animus does not undermine or weaken the sincerity of Emancipate NC's underlying organizational objective to end structural racism. An organization can

tackle a societal ill by pursuing any number of strategies that fit the particular facts of a case.

RPD's misconduct, which has been regularly chronicled on the organization's website and in its newsletters,[2] and which has overwhelming impacted Black residents, has further entrenched the perception of structural racism[3] in the legal system of North Carolina by undermining Black residents' constitutional rights in the security of their private homes and by increasing Black residents' mistrust in the police and legal system. Emancipate NC cannot meet its mission if it ignores this kind of gross misconduct in the State's capital while Raleigh residents repeatedly reach out to the organization for assistance. Emancipate NC was forced to divert its finite resources away from a planned expansion in Pasquotank County

---

[2] *See generally* Emancipate NC Blog at *https://emancipatenc.org/blog/*
[3] "Structural racism" refers to the totality of ways in which a society produces uneven racial outcomes through mutually reinforcing systems of housing, education, employment, earnings, benefits, credit, media, health care, and criminal justice. Because Black people in North Carolina are disproportionately impacted by poverty and disproportionately live in neighborhoods with higher levels of police interaction, they are more likely to be impacted by police misconduct, including illegal police home raids, like the one suffered by Plaintiffs, Amir Abboud, Kesha Knight, Blake Banks, Gregory Washington, and Keith Green (all people of color; four out of five identifying as Black people). In seeking to end structural racism in the legal system, Emancipate NC works to combat this phenomenon. Unjust policing, like the practices described in the Amended Complaint, disproportionately impacts Black communities. This is not an allegation that any of the individual officers who conducted the "No Knock" raid in this case were "motivated by race," rather, it is an allegation that addressing police misconduct in Raleigh and supporting citizens impacted by police misconduct is one way that Emancipate NC seeks to alleviate the risk that innocent Black families will be harmed by police misconduct, because among other harms, the mistrust that such unlawful practices engender fundamentally threatens the integrity of the legal system at large.

on account of defendant's practices. Among other things, the organization was made to spend significant staff time responding to citizen inquiries and adding a paid intake intern to conduct triage and intake work with Raleigh residents impacted by Raleigh PD's misconduct, which includes the execution of No Knock/Quick Knock warrants, the repeated wrongful detention and arrest of Black people, and poor supervision of officers.

Finding that Emancipate NC has standing to challenge such practices comports with recent precedent in the Fourth Circuit and the federal courts of North Carolina. In *People for the Ethical Treatment of Animals*, for instance, the Fourth Circuit concluded that PETA's mission to protect animals from "abuse, neglect, and cruelty" forced the organization to divert its resources to respond to the defendant zoo's illegal treatment and confinement of animals by compiling and publishing information, investigating and monitoring, and making complaints to government agencies. 843 Fed.Appx. at 496. This is the precise type of work that Emancipate NC has been forced to conduct to respond to the misconduct of Raleigh Police. "Combatting animal abuse, neglect, and cruelty" is no less broad a statement of mission than "ending structural racism in the legal system in North Carolina."

Defendants rely heavily on *Lane v. Holder*, 703 F.3d 668 (4th Cir. 2012), a narrow holding, and one which has subsequently been called into question or otherwise distinguished multiple times. *Lane* was decided in the context of a plaintiff organization with "merely abstract concerns with a subject that *could* be affected by an adjudication." 703 F.3d at 675 (emphasis added). The Eastern

District of Virginia elucidated the distinction in *Lane* as compared to organizational plaintiffs with standing in *Harrison v. Spencer*, 449 F.Supp.3d 594 (EDVa 2020). In *Harrison*, the plaintiff organization "observed a significant increase in requests for help from individuals seeking [assistance]" after the military's announcement of a "Deploy or Get Out" policy, causing it to delay specific projects that lay at the core of its mission. 449 F.Supp. at 603. The court found organizational standing. Emancipate NC's situation is more akin to the organization in *Harrison* and *People for the Ethical Treatment of Animals* than the one in *Lane.*

The holding in *NAACP v. N.C. State Board of Elections*, 283 F.Supp.3d 393 (MDNC 2017) is the same. There, the NAACP alleged that it had "been forced to divert its valuable and limited resources away from its core mission and planned voter-mobilization, voter-protection, and voter-education activities in order to investigate, respond to, mitigate, and address the concerns of its members resulting from Defendants' unlawful *en masse* voter challenge and purging practices." 283 F. Supp.3d at 402. A showing of an expenditure of resources, including sending multiple letters to the State Board and interviewing individuals with knowledge, proved the injury.

This tracks with Emancipate NC's diversion of existing staff resources away from a planned expansion of activities in Pasquotank County and the addition of a new paid intern to conduct triage and intake with Raleigh residents impacted by illegal warrant execution and poor supervisory practices of RPD. This drain on resources "constitutes far more than simply a setback to its abstract social

11

interests." *See Havens*, 455 U.S. at 379; *see also Lane*, 703 F.3d at 674 ("An organization may suffer an injury-in-fact when a defendant's actions impede its efforts to carry out its mission."). For instance, using scarce resources to register voters because the University of Maryland was not complying with the National Voter Registration Act was "sufficient to show an actual or threatened injury in fact that is fairly traceable to the alleged illegal action and is likely to be redressed by a favorable court decision ordering injunctive relief." *National Coalition for Students with Disabilities Education & Legal Fund v. Scales*, 150 F.Supp.2d 845, 850 (D. Md. 2001). Surely the organization in *National Coalition* "chose" to expend resources to register disabled voters on campus, rather than let them go unregistered to vote – but to have made that kind of choice would have perceptibly hampered its mission to "promot[e] educational opportunities for and the legal rights of students with disabilities." *Id.* at 847. Similarly, Emancipate NC could only "choose" to let Raleigh residents' urgent concerns about police warrant and supervision misconduct – concerns that overwhelmingly impact Black residents – go unaddressed by perceptibly hampering its mission of ending structural racism in the legal system in North Carolina.

## II. Emancipate NC's Injury Is Redressable

Defendants misapprehend Emancipate NC's complaint about RPD's policy and practice. Its injury has not been alleviated by the termination of former-Detective Abdullah. While the gross misconduct of the detective – who has now been indicted for obstruction of justice by the Wake County District Attorney for his

12

Case 5:22-cv-00068-BO    Document 88    Filed 08/18/22    Page 12 of 16

corruption[4] – contributed greatly to the illegal home entries of the individual plaintiffs, the gravamen of Emancipate NC's complaint is that even when RPD obtains a legal search warrant based on non-fabricated evidence, RPD regularly executes the warrant in an illegal fashion by entering private homes too quickly and without any consideration of the actual particularized circumstances. The U.S. Supreme Court has adopted a "reasonableness" inquiry, deciding that police generally should "announce their intent to search before entering closed premises," unless it would be "dangerous or futile." *United States v. Banks*, 540 U.S. 31, 36 (2003). In *Banks*, the Court identified a period of "15 or 20 seconds without a response" as a reasonable period of time for officers to wait before entering if they are concerned about a potential loss of evidence. *Id.*

RPD's ignorance of the constitutional requirements of "knock and announce" warrants is apparently ongoing, because even without any particularized indicia of extenuating circumstances RPD enters homes without knocking at all (plaintiffs) or simultaneously as they knock (Amir Abboud, Kesha Knight, Blake Banks, Gregory Washington, and Keith Green). Entering a home by force and without warning is a dangerous situation for police and civilians and is associated with loss of life. The announcement rule is rooted in "the protection of human life and limb." *Hudson v.*

---

[4] Joel Brown, "Ex-Raleigh detective Omar Abdullah, accused of using fake heroin in drug cases, indicted," ABC 11 News, July 27, 2022, available at, *https://abc11.com/omar-abdullah-incidcted-fake-drugs-planting-evidence/12076963/#:~:text=RALEIGH%2C%20N.C.%20%28WTVD%29%20--%20Omar%20Abdullah%2C%20the%20ex-Raleigh,Abdullah%20on%20Tuesday%20with%20felony%20obstruction%20of%20justice.*

*Michigan*, 547 U.S. 586, 593-94 (2006). The widely-reported deaths of Breonna Taylor, in Louisville, KY, and Amir Locke, in Minneapolis, MN, were both associated with "No Knock" and "Quick Knock" warrant executions. ¶ 148. Earlier this month, the U.S. Department of Justice criminally indicted officers in Louisville connected to Ms. Taylor's death, whose conduct is indistinguishable from some of the conduct at issue here. *See* U.S. Dep't of Justice, Office of Pub. Aff., *Current and Former Louisville, Kentucky Police Officers Charged with Federal Crimes Related to Death of Breonna Taylor*, Aug. 4, 2022 (describing indictment of officers who "knew [an] affidavit [for a home search warrant] contained false and misleading statements[ and] omitted material facts").

Emancipate NC's injury would be redressed by amending Raleigh Police's warrant execution policy to end the practice of "No Knock" warrants and by making clear that "knock and announce" generally requires sufficient time for the person to actually respond to the door, unless there are particularized extenuating circumstances. It does *not* mean entering simultaneously with knocking as a default matter of course. Additionally, RPD must adopt policies that ensure sufficient supervision and oversight of officers and confidential informants to prevent issues varying from sloppiness in address transcription to outright corruption and obstruction of justice. Poor supervisory practices imperil the constitutional rights and liberties of Raleigh residents.

## CONCLUSION

Emancipate NC respectfully requests that the Court deny the Motions to Dismiss.

Respectfully submitted,

this the 18th day of August, 2022,

/s/ Abraham Rubert-Schewel
Abraham Rubert-Schewel
(N.C. Bar # 56863)
TIN FULTON WALKER &
OWEN, PLLC
119 E. Main Street
Durham, NC 27701
Tel: (919) 451-9216
schewel@tinfulton.com

/s/ *Emily Gladden*
Emily D. Gladden
TIN FULTON WALKER &
OWEN, PLLC
State Bar No.: 49224
204 N. Person Street
Raleigh, NC 27601
Telephone: (919) 720-4201
Facsimile: (919) 400-4516
Egladden@tinfulton.com

*/s/ Micheal L. Littlejohn Jr.*
Micheal L. Littlejohn Jr.
N.C. Bar No. 49353
Littlejohn Law PLLC
PO Box 16661
Charlotte, NC 28297
Telephone: (704) 322-4581
Fax: (704) 625-9396
mll@littlejohn-law.com

*/s/ Ian Mance*
Ian A. Mance
N.C. Bar No. 46589
EMANCIPATE NC
Post Office Box 309
Durham, NC 27702
Tel: (828) 719-5755
ian@emancipatenc.org

*/s/ Elizabeth Simpson*
Elizabeth G. Simpson
N.C. Bar No. 41596
EMANCIPATE NC
Post Office Box 309
Durham, NC 27702
Tel: (919) 682-1149
elizabeth@emancipatenc.org

# CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2022, I electronically filed the foregoing **OPPOSITION TO MOTION TO DISMISS** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Dorothy Kibler
Deputy City Attorney
P.O. Box 590
Raleigh, NC 27602
Email: Dorothy.Kibler@raleighnc.gov
*Counsel for Defendant The City of Raleigh*

Jason R. Benton
Parker Poe Adams & Bernstein, LLP
620 South Tryon Street, Suite 800
Charlotte, NC 28202
Email: jasonbenton@parkerpoe.com
*Counsel for Defendant Omar Abdullah*

Norwood P. Blanchard, III
Crossley McIntosh Collier Hanley & Edes, PLLC
5002 Randall Parkway
Wilmington, NC 28403
Email: norwood@cmclawfirm.com
*Counsel for Defendant William Rolfe*

Rodney E. Petty
rpetty@ymwlaw.com
Samuel G. Thompson, Jr.
bthompson@ymwlaw.com
Yates, McLamb & Weyher, LLP
Post Office Box 2889
Raleigh, North Carolina 27602
*Counsel for Officer R.P. Monroe, J.D. Rattelade, and M.C. Gay in their individual capacities*

                                          */s/ Elizabeth Simpson*
                                          Elizabeth Simpson
                                          EMANCIPATE NC