**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

Formatted: Centered

Formatted: Centered

| | |
|---|---|
| YOLANDA IRVING, individually and as the natural parent and guardian of J.I., JUWAN HARRINGTON, CYDNEEA HARRINGTON, KENYA WALTON individually and as the natural parent and guardian of R.W., ZIYEL WHITLEY, DYAMOND WHITLEY, KAMISHA WHITLEY, NANETTA GRANT as the natural parent and guardian of Z.G., and EMANCIPATE NC, INC., | |
| Plaintiffs, | |
| v. | **5:22:CV-0068-BO** |
| THE CITY OF RALEIGH, Officer OMAR I. ABDULLAH, Sergeant WILLIAM ROLFE, Officer RISHAR PIERRE MONROE, Officer JULIEN DAVID RATTELADE, and Officer MEGHAN CAROLINE GAY, Officer DAVID MEAD, Officer JESUS ORTIZ, Officer KYLE PERRIN, Officer MICHEAL MOLLERE, Officer KYLE THOMPSON, Officer VINCENT DEBONIS, Officer DANIEL TWIDDY, Officer THOMAS WEBB, Officer DAVID MCDONALD, Officer DAVID GARNER, Chief of Police ESTELLA PATTERSON and City Manager MARCHELL ADAMS-DAVID, in their official capacities. | **SECOND AMENDED COMPLAINT**<br>**(Jury Trial Demanded)** |
| Defendants. | |

Deleted: JOHN and JANE DOE Officers 1-10, in their individual capacities

NOW COMES Plaintiffs, demanding a jury trial and alleging the following against the Defendants:

**INTRODUCTION**

1. Plaintiffs include ten Black women and children whose homes were illegally raided and who were wrongfully detained because of evidence fabricated by the Raleigh Police Department ("RPD") and an unreliable confidential informant.

2. Raleigh Police Officer Omar Abdullah and individual officers in the RPD VICE unit conspired to fabricate evidence which was used to procure a search warrant and resulted in the illegal "No Knock" raid of Plaintiffs' homes.

3. A "No Knock" raid or "No Knock" warrant is a colloquial term used to refer to the execution of a search warrant by law enforcement by entering a premises without warning, and without providing an opportunity for the occupants of the premises to voluntarily answer or open the door.

4. "No Knock" warrant execution has expanded exponentially in use over the course of the last forty years, is connected with the exercise of deadly force by police and the deaths of innocent people, and has been banned by three U.S. states, including Oregon, Florida, and Virginia, because of concerns about officer and public safety and constitutional rights. The U.S. Supreme Court has observed that no knock entries pose a danger to the lives of home occupants. *See Hudson v. Michigan*, 547 U.S. 586, 593-94 (2006) (observing that the announcement rule is rooted in "the protection of human life and limb").

5. During the "No Knock" raid in this case, RPD officers pointed assault rifles at Plaintiffs, some of whom were minor children, entered their homes suddenly, forcefully, and without consent or warning, frisked and searched them, and forced them to sit on the ground for over an hour while their homes were ransacked.

6. None of the individual Plaintiffs were ever suspected of or charged with a crime. Rather, they were innocent civilians with no connection to criminal activity.

7. The individual Plaintiffs are not the only Raleigh residents subjected to this type of unconstitutional "No Knock" or "Quick Knock"[1] search warrant execution.

_____

[1] The RPD's pattern and practice of knocking while simultaneously entering homes ("Quick

2

8. As a result of RPD's unconstitutional "No Knock" and "Quick Knock" warrant execution policy and practice, and as a result of RPD's generalized failure to adequately train and supervise their officers to prevent them from engaging in misconduct, Plaintiff Emancipate NC, Inc., (hereinafter referred to as "Emancipate NC") has been forced to divert its resources to respond to community need.

9. Plaintiffs bring this action for compensatory damages, punitive damages, declaratory, and injunctive relief pursuant to 42 U.S.C. §§ 1983, and the Fourth, Fifth and Fourteenth Amendments to the United States Constitution and under North Carolina law.

## PARTIES

10. Plaintiff Yolanda Irving is a resident of Wake County, North Carolina. Ms. Irving sues individually and as the natural guardian and parent on behalf of her minor son, J.I. J.I. is 14 years old.

11. Ms. Irving is a Wake County bus driver for special needs children. Ms. Irving is also the mother of Cydneea Harrington and Juwan Harrington.

12. Plaintiff Cydneea Harrington is a resident of Wake County, North Carolina. Cydneea Harrington, is 19 years old and works at Food Lion.

13. Plaintiff Juwan Harrington is a resident of Wake County, North Carolina. Juwan Harrington is 22 years old, paralyzed on his left side and wheelchair bound as a result of a car accident, and works for a café that employs special needs people.

14. Plaintiff Kenya Walton is a resident of Wake County, North Carolina. Ms. Walton sues individually and as the natural guardian and parent on behalf of her minor son R.W. R.W. is 17 years old.

---

Knock") has effectively turned knock and announce warrants into "No Knock" executions.

3

15. Plaintiff Ziyel Whitley is 18 years old and a resident of Wake County, North Carolina. Ziyel Whitley is a student at Infinity Wake and works at Walmart.

16. Plaintiff Dyamond Whitley is 20 years old, a resident of Wake County, North Carolina and works at Walmart.

17. Plaintiff Kamisha Whitley is 22 years old and a resident of Wake County, North Carolina. Kamisha is a student at Wake Tech and works at Walmart.

18. Plaintiff Nanetta Grant is a resident of Wake County, North Carolina. Ms. Grant sues as the natural parent and guardian on behalf of her minor son Z.G. Z.G. is 17 years old, works at Zaxby's, and is a student at Cary High School.

19. Plaintiff Emancipate NC is a North Carolina nonprofit organization dedicated to ending mass incarceration and structural racism in the legal system.

20. Defendant City of Raleigh (the "City") is a municipal corporation organized by charter under Chapter 160A of the North Carolina General Statutes. It maintains and operates the Raleigh Police Department ("RPD"). Employees of RPD are employees and agents of the City, which bears legal responsibility under state law for negligent acts and omissions of RPD in the course of their employment. The City is responsible for the appointment, training, supervision, promotion and discipline of police officers and supervisory police officers, including the individually named defendants herein.

21. Further, on information and belief, the City of Raleigh, at the time of the wrongful raid and seizures, had waived governmental or sovereign immunity from the state law tort claims in this case pursuant to G.S. § 160A-485, either by participation in a government risk pool or through purchase of commercial insurance that will indemnify the City and its agents for any judgment against it or its agents named in this action.

4

22. All Individual Defendant RPD Officers, listed below, are entitled to indemnification by the City of Raleigh under North Carolina law for any liability arising from conduct described herein.

23. Officer Omar Abdullah is a police officer formerly employed by the Raleigh Police Department, being sued in his individual capacity.

24. Sergeant William Rolfe is a police officer employed by the Raleigh Police Department, being sued in his individual capacity.

25. Officer Rishar Pierre Monroe is a police officer employed by the Raleigh Police Department, being sued in his individual capacity.

26. Officer Julien David Rattelade is a police officer employed by the Raleigh Police Department, being sued in his individual capacity.

27. Officer Meghan Caroline Gay is a police officer employed by the Raleigh Police Department, being sued in her individual capacity.

28. Officer David Mead is a police officer employed by the Raleigh Police Department, being sued in his individual capacity.

29. Officer Jesus Ortiz is a police officer employed by the Raleigh Police Department, being sued in his individual capacity.

30. Officer Kyle Perrin is a police officer employed by the Raleigh Police Department, being sued in his individual capacity.

31. Officer Micheal Mollere is a police officer employed by the Raleigh Police Department, being sued in his individual capacity.

32. Officer Kyle Thompson is a police officer employed by the Raleigh Police Department, being sued in his individual capacity.

5

33. Officer Vincent Debonis is a police officer employed by the Raleigh Police Department, being sued in his individual capacity.

34. Officer Daniel Twiddy is a police officer employed by the Raleigh Police Department, being sued in his individual capacity.

35. Officer Thomas Webb is a police officer employed by the Raleigh Police Department, being sued in his individual capacity.

36. Officer David Mcdonald is a police officer employed by the Raleigh Police Department, being sued in his individual capacity.

37. Officer David Garner is a police officer employed by the Raleigh Police Department, being sued in his individual capacity.

**Deleted:** ¶
John and Jane Doe Officers 1-10 are members of the RPD Selective Enforcement Unit ("SEU") and are being sued in their individual capacities. The Selective Enforcement Unit is the RPD's equivalent of a SWAT team.

38. Chief of Police Estella Patterson is the chief of the Raleigh Police Department, being sued in her official capacity.

39. City Manager Marchell Adams-David is the city manager of the City of Raleigh, being sued in her official capacity.

**JURISDICTION**

40. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(a)(3) and (a)(4) because Plaintiffs' claims arise under law of the United States and seek redress of the deprivation under color of state law of rights guaranteed by the United States Constitution. The Court may grant declaratory and injunctive relief for the constitutional violations alleged herein under 28 USC §§ 2201 and 2202 and under Federal Rule of Civil Procedure 65.

41. Plaintiffs further invoke this Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over any and all North Carolina state law claims and causes of action which derive

6

from the same nucleus of operative facts and are part of the same case or controversy that gives rise to the federally based claims and causes of action.

<strong>VENUE</strong>

42.  Venue is proper for the United States District Court for the Eastern District of North Carolina, pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2), and 28 U.S.C. § 1402(b), where Defendants reside and maintain their relevant places of business, and where the actions complained of herein occurred.

<strong>JURY DEMAND</strong>

43.  Plaintiffs respectfully demand a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

<strong>FACTS</strong>

**The RPD VICE Unit and the use of Confidential Informants**

44.  Officers Omar Abdullah, Meghan Gay, Rishar Monroe and David Rattelade all were members of the RPD VICE unit at the time of the "No Knock" raid of Plaintiffs' homes.

45.  Sgt. Rolfe was a supervisor in the RPD VICE Unit at the time of the raid.

46.  The RPD VICE unit is tasked with, among other things, enforcing drug laws.

47.  The RPD VICE unit often recruits confidential informants to assist with or develop investigations.

48.  Confidential informants are typically recruited after they are arrested on a separate charge, with the expectation that they will receive leniency on that charge, or with the promise that they will receive payment for their work.

49.  The informants are then tasked with finding individuals from whom to purchase narcotics.

50.  Once they identify a target, confidential informants are given pre-recorded buy money and

7

instructed to make a buy.

51.  Informant funds are approved and distributed by the City finance department, which then
     releases them to the Chief of Police, who releases them to the Division commander and then to
     the supervisor of the officer working with the confidential informant.

52.  Each time funds are disbursed to confidential informants, RPD policy requires: (1) a record of
     the transaction with the date and time the money was received, (2) signatures of the officers who
     witnessed the distribution and payment of funds, and (3) the signature of both the officer and
     informant involved on the receipt of funds sheet.

53.  The arranged buy is then monitored by officers in the RPD VICE unit using video and audio
     surveillance.

54.  After the buy is completed, the RPD VICE officers then arrest the target or apply for a search or
     arrest warrant based on the drug sale.

**RPD VICE Recruits an Unreliable Confidential Informant**

55.  In the fall of 2018, RPD VICE Officers arrested an individual they suspected of selling cocaine.

56.  This individual was arrested using a confidential informant employed by the RPD.

57.  The individual sold the confidential informant crushed aspirin and claimed it was cocaine.

58.  The individual was arrested and charged with selling fake drugs.

59.  The individual's name is Dennis Leon Williams, Jr.

60.  After his arrest, RPD VICE Officers David Chadwick Nance and Omar Abdullah recruited Mr.
     Williams to work as a confidential informant with the RPD.

61.  Officers Nance and Abdullah gave Mr. Williams the nickname Aspirin[2] because he had sold

_____

[2] Mr. Williams is now being criminally prosecuted by the Wake County District Attorney's Office
for his role in the conspiracy to illegally arrest and seize individuals on fabricated heroin trafficking
charges.

them aspirin he claimed was cocaine.

62. Mr. Williams had a lengthy criminal record and prior arrests for violent felonies.

63. On August 16, 2018, Mr. Williams was approved to work as a confidential informant for the RPD.

**Dennis Williams Starts out Making a few Small Level Crack Buys**

64. Mr. Williams was homeless at the time of his arrest and agreed to be a confidential informant to work off his pending criminal charges and to make money.

65. He initially reported to Officers Nance and Abdullah and completed a few controlled drug buys.

66. The officers provided him pre-marked United States currency.

67. Mr. Williams allegedly bought crack valued at less than $100.

68. In late 2018, Officer Nance was transferred to a different unit within the RPD and Officer Abdullah began to supervise Mr. Williams alone.

69. Around this time, Mr. Williams was arrested in Nash County and jailed until February 2019 on a felony larceny charge.

70. In September of 2019, Mr. Williams was re-recruited by Abdullah to continue his work as a CI.

71. According to VICE Officer Julien Rattelade, after Mr. Williams complained about his pay, Abdullah told him he could make more money if he brought in bigger cases.

72. During his time as an informant, Mr. Williams, according to RPD records, was paid $3,545.

**Officer Abdullah, RPD VICE Officers, and Aspirin Conspire to Fabricate Heroin Trafficking Offenses**

73. Officer Abdullah, Mr. Williams, and RPD VICE officers Gay, Rattelade, Monroe, and Sgt.

_____

9

Rolfe, conspired to fabricate heroin trafficking charges and wrongfully arrest and seize over 15 individuals.

74. As a result of these fabricated charges, many innocent bystanders, including the families of Yolanda Irving and Kenya Walton, had their homes illegally raided or were wrongfully seized.

75. The first of the fabricated heroin arrests—involving the RPD VICE squad and Mr. Williams—occurred on or around November 29, 2019.

76. The last occurred on May 21, 2020, and resulted in the illegal raid of the homes of Yolanda Irving and her family and Kenya Walton and her family.

**The RPD VICE Officers' Conspiracy**

77. The RPD VICE officers always worked as a team when making controlled buys, raids, and arrests.

78. Before each fabricated buy the RPD VICE officers including Sgt. Rolfe, and Officers Abdullah, Monroe, Rattelade, and Gay met and discussed the buy plan.

79. Mr. Williams was outfitted with at least one electronic surveillance device that recorded video and audio.

80. RPD VICE officers Rolfe, Monroe, Rattelade, and Gay staged the buy area and listened to and observed the transaction.

81. Abdullah claimed he searched Mr. Williams before each alleged buy and never located any contraband on his person.

82. Mr. Williams shielded the surveillance cameras, in violation of RPD procedure, so each alleged buy could not be video recorded.

83. After each controlled buy, Mr. Williams, Abdullah, and the VICE team produced fake heroin allegedly purchased from the arrested individuals.

10

84. Abdullah claimed he also searched Mr. Williams after each controlled buy and never located any contraband on his person.

85. Abdullah, against RPD policy on the Management of Informants, met alone with Mr. Williams, before and after buys.

86. Abdullah always paid Mr. Williams without any other officers present, which was also a violation of RPD policy, requiring witnesses to be present for these payments.

87. Upon information and belief, RPD VICE Officers, including Rolfe, Ouellette and Rattelade, assisted in this scheme by signing receipt of informant funds sheets, falsely stating that they had witnessed payment of informant funds to Mr. Williams.

88. After each fabricated buy, Sgt. Rolfe, Abdullah, Monroe, Rattelade, and Gay attended a debriefing, where they would view and process the evidence recovered, including the fake heroin.

89. RPD VICE officers including Monroe, Rattelade and Gay informed Abdullah on numerous occasions that the alleged drugs were not heroin but brown sugar or some other substance.

90. RPD VICE officers informed Abdullah that the alleged drugs were not packaged the same way as heroin.

91. RPD VICE officers sometimes conducted field tests on the fake heroin—immediately after the alleged buy from the arrested individuals—and each time it tested negative for a controlled substance.

92. The negative field tests were never preserved, recorded, or noted in the RPD officers' reports.

93. RPD officers delayed—often for weeks—submitting the fake heroin to the City County Bureau of Identification ("CCBI") Lab.

11

94. In each case, the CCBI Lab reported to RPD that the alleged heroin tested negative and was not a controlled substance.

95. RPD VICE officers failed to, or again severally delayed, informing the Wake County District Attorney ("DA") or the Court about the negative CCBI Lab tests.

96. RPD VICE officers continued to use Mr. Williams as a CI for months even after he repeatedly conspired to fabricate heroin buys and continued to produce fake heroin that tested negative for a controlled substance.

97. RPD VICE officers, after participating numerous wrongful arrests over a period of months, reported Abdullah's ongoing scheme and pattern of fabricated charges to Sgt. Rolfe, who failed to intervene.

98. Officers Monroe and Rattelade stated that Abdullah was never disciplined or stopped from making false arrests by supervisors because he is Muslim, he had previously accused a supervisor of discrimination, and that Sgt. Rolfe was afraid of also being accused of discrimination.

99. RPD VICE Officers William Rolfe, Rishar Pierre Monroe, Julien David Rattelade, and Meghan Caroline Gay were aware of and participated in Abdullah's scheme and failed to intervene to stop the continued use of Mr. Williams as a confidential informant or the continued wrongful searches, seizures, and prosecutions based on fabricated evidence.

100. After more than six months of wrongful arrests and fabricated evidence, this scheme resulted in the "No Knock" raid of the homes of Yolanda Irving and Kenya Walton.

**RPD VICE Officers Fabricate Evidence to Procure a Warrant to Search the Home of Yolanda Irving and her Family**

101. On May 21, 2020, Officer Abdullah applied for a warrant to search 1628 Burgundy St., Apt B, Raleigh, NC 27610.

12

102. The warrant was required to be reviewed by Officer Abdullah's supervisor, Sgt. Rolfe.

103. The warrant application was based on a buy allegedly made by Mr. Williams at this location the day before.

104. For the alleged drug sale that was the basis of the search warrant application, Sgt. Rolfe approved the release of informant funds and Officer Rattelade signed that he witnessed the receipt of informant funds paid to Mr. Williams.

105. At the time of this alleged buy, Abdullah and the RPD VICE officers knew that Mr. Williams had repeatedly fabricated heroin buys and produced fake heroin that tested negative for a controlled substance.

106. Abdullah and RPD VICE officers knew that all the alleged heroin purchased by Mr. Williams—that had been analyzed by the CCBI lab—had tested negative for a controlled substance.

107. RPD VICE officers Monroe, Rattelade, and Gay informed Officer Abdullah on multiple occasions that the alleged heroin had field tested negative for a controlled substance, did not look like heroin, and was not packaged like heroin.

108. Still, Abdullah, with the knowledge of RPD VICE officers, falsely claimed in the search warrant application that Mr. Williams had provided information in the past that "has always been proven to be truthful and reliable."

109. The search warrant also falsely alleged that Mr. Williams had purchased heroin from an individual at 1628 Burgundy St, Apt B—the home of Yolanda Irving and her children.

110. And the search warrant falsely claimed that RPD Detectives observed Mr. Williams entering the residence of Yolanda Irving and her family.

13

111. The RPD VICE officers knew that these statements were false, that Mr. Williams had been proven to be unreliable on numerous occasions, and that he should not have been used as a confidential informant.

112. The RPD VICE officers also knew that Mr. Williams had not actually purchased any heroin and that no detectives had observed him entering the home of Yolanda Irving and her family.

113. This fabricated information resulted in a warrant being issued to search the home of Yolanda Irving and her three children.

**RPD SEU and VICE Officers Raid the Home of Yolanda Irving and her Family and Kenya Walton and Her Family**

114. On May 21, 2020, Yolanda Irving lived at 1628 Burgundy St, Apt B, Raleigh, NC.

115. Ms. Irving lived with her three children, J.I., Juwan Harrington and Cydneea Harrington.

116. Kenya Walton lived in the apartment next door, 1628 Burgundy St., Apt A, Raleigh, NC.

117. Ms. Walton lived with her children R.W., Dyamond Whitley, Ziyel Whitley, and Kamisha Whitley.

118. On the afternoon of May 21, 2020, J.I. was sitting outside on his front stoop hanging out with his neighbors Ziyel Whitley, Dyamond Whitley, and their friend, Z.G.

119. Z.G. had been friends with Ziyel and Dyamond for years and was staying at their house.

120. At the time of this incident, J.I was 12 years old, Z.G. was 15 years old, Ziyel Whitley was 16 years old, and Dyamond Whitley was 18 years old.

121. Z.G. was the first to see Raleigh SEU officers—David Mead, Jesus Ortiz, Kyle Perrin, Micheal Mollere, Kyle Thompson, Vincent Debonis, Daniel Twiddy, Thomas Webb, David Mcdonald and David Garner—running towards them carrying shields and with assault rifles pointed at them.

**Deleted:** r

14

122. The RPD SEU officers had received no description matching the four children standing outside of the apartment and had no evidence or allegations that any of the children had been involved in selling drugs.

123. Z.G., after seeing the SEU officers and thinking he was about to be shot, opened the door to Kenya Walton's Apartment (1628 A) and ran inside.

124. Dyamond Whitley immediately followed Z.G., and they both ran upstairs to Kamisha and R.W.'s rooms and began screaming that SEU officers were coming.

125. At the time, Kamisha Whitley was 20 years old and 6 months pregnant, and R.W. was 15.

126. RPD SEU officers Kyle Thompson and Vincent Debonis immediately burst into the Walton's apartment.

127. Kenya Walton's apartment was not an address listed on the search warrant.

128. RPD SEU Thompson and Debonis ordered everyone to come downstairs.

129. Dyamond, Z.G., R.W. and Kamisha followed their orders and—frightened that they could be shot and killed—walked downstairs with their hands raised.

130. After seeing Z.G. and Dyamond run into Kenya Walton's apartment, J.I. and Ziyel turned around and saw Raleigh SEU officers running towards them with assault rifles pointed at them.

131. J.I. immediately ran into the Irvings' apartment (1628 B) and Z.G. followed him and slammed the door behind them.

132. J.I. ran screaming up the stairs yelling, "SWAT, SWAT, SWAT!"

133. Ziyel tried to run after J.I. but tripped on Juwan's wheelchair and fell to the floor.

134. The SEU and VICE officers burst into the Irvings' apartment without knocking or announcing their intentions or cause to be at the premises.

**Deleted:** officers

**Deleted:** Approximately 15

15

135. They pointed their guns at Ziyel, ordered him to put his hands up, and placed him in handcuffs.

136. SEU officers David Mead, Jesus Ortiz, Kyle Perrin, Micheal Mollere, Daniel Twiddy, Thomas Webb, David Mcdonald and David Garner then ran up the stairs and pointed their assault rifles at Cydneea, who was standing at the top of the stairwell.

**Deleted:** At least five

137. Upon reaching the top of the stairwell, the same SEU officers pointed their guns at Ms. Irving and J.I., who were standing in the hallway.

138. J.I. ran into his brother Juwan's room and dove face down on the bed, hoping that he would not get shot and killed.

139. SEU officers then entered Juwan's room and pointed their rifles at him and ordered him to get on the floor.

140. Juwan told the officers that he was not able to get down on the floor because he was disabled and pulled up his pants leg to show a permanent brace on his leg.

141. Ms. Irving was terrified that her son Juwan would be shot because she knew he would not be able to comply with the officers' orders to get on the floor due to his disability. She told the officers repeatedly that he was handicapped.

142. Ms. Irving and her three children were all terrified they would be killed if they made the wrong move.

143. Ms. Irving, J.I., and Cydneea were then ordered downstairs and forced to sit on the ground for approximately one hour while VICE and SEU officers tore apart their apartment allegedly searching for contraband.

144. Juwan, following the officers' orders, eventually walked downstairs with the assistance of his cane and sat in his wheelchair.

16

145. The SEU and VICE officers also searched the upstairs and downstairs of Kenya Walton's apartment.

146. No drugs or contraband were found in either apartment.

147. Approximately 1.5 hours after the raid, the SEU and VICE officers left both apartments and released Ziyel from his handcuffs.

148. As they were leaving, Ms. Irving asked Officer Abdullah why they had raided their home.

149. Officer Abdullah provided Ms. Irving with a search warrant, and she informed him that the apartment pictured in the warrant was not hers.

150. In the photograph of the premises in the search warrant, there is a large tree in front of the home. There was no tree in front of Ms. Irving's home.



151. Officer Abdullah offered no apology and left their apartment without any further explanation.

**Dennis Williams Is Suspended as a CI and Officer Abdullah Is Suspended and Terminated from RPD.**

17

152. On May 22, 2020, one day after the raid, Dennis Williams was suspended as a confidential informant.

153. In September of 2020, Officer Abdullah was placed on administrative leave pending the results of investigations by the State Bureau of Investigation and District Attorney's office.

154. On October 28, 2021, Officer Abdullah was terminated by the RPD.

**The Known Dangers Posed By "No Knock" and "Quick Knock" Warrants**

155. Over the past forty years, as part of the "War on Drugs" and the militarization of police, the use of "No Knock" and "Quick Knock" warrants has increased exponentially by law enforcement around the United States, including in North Carolina. *See generally* AMERICAN CIVIL LIBERTIES UNION, WAR COMES HOME: THE EXCESSIVE MILITARIZATION OF AMERICAN POLICING (2014) (documenting the rise of SWAT-like tactics in American policing); RADLEY BALKO, RISE OF THE WARRIOR COP: THE MILITARIZATION OF AMERICA'S POLICE FORCES (2013) (same).

156. The practice of military-style warrant executions has led to trauma, injuries, and deaths of innocent people, subjects of criminal investigations, and law enforcement officers.

157. The widely-reported deaths of Breonna Taylor, in Louisville, KY, and Amir Locke, in Minneapolis, MN, were both associated with "No Knock" and "Quick Knock" warrant executions.

**Federal and State Law Related to "Quick Knock" and "No Knock" Warrant Execution**

158. The U.S. Supreme Court has adopted a "reasonableness" enquiry, deciding that although the standard generally requires the police to "announce their intent to search before entering closed premises, the obligation gives way when officers have a reasonable suspicion" that it would be "dangerous or futile" to knock and announce. *United States v. Banks*, 540 U.S. 31,

18

36 (2003). In *Banks*, the Court held that it was reasonable to enter a home "15 to 20 seconds" after knocking and announcing when officers suspected "imminent loss of evidence. *Id.*

159. Similarly, North Carolina law requires a law enforcement officer to give "appropriate notice of his identity and purpose" before executing a search warrant and entering a premises. N.C. Gen. Stat. § 15A-249. An officer may dispense with the requirement if they have probable cause to believe that giving of notice would endanger the life or safety or any person, or if they have announced their identity and purpose and reasonably believe that admittance is being denied or unreasonably delayed or that the premises are unoccupied. N.C. Gen. Stat. § 15A-251.

160. In practice, the "appropriate notice" that is provided by RPD officers is perfunctory and unconstitutional. RPD officers routinely enter apartments while simultaneously knocking.

**The RPD SEU Unit's Pattern and Practice of Executing Quick Knock or No-Knock Warrants**

161. RPD has a general practice of executing its search warrants in a "No Knock" or "Quick Knock" manner, with a highly militarized and armed team, regardless of individualized circumstances.

162. The practice of law enforcement announcing itself and immediately entering a premises by force is known colloquially as a "Quick Knock."

163. The RPD's pattern and practice of knocking while simultaneously entering—"Quick Knock"—has effectively turned knock and announce warrants into "No Knock" executions.

164. The below photo provides an example of this practice. The photo is a screen shot taken from video footage of the raid of Amir Abboud's home in April of 2021. As shown in the photo, RPD officers knock on the door while simultaneously using a battering ram to burst into his home.

19



165.   The RPD officers then point assault rifles at Mr. Abboud and his family who were standing near the doorway and easily would have been able to answer the door if the officers had given them the opportunity.

166.   The RPD officers had no "reasonable suspicion" that knocking and announcing their presence—and then allowing Mr. Abboud 15-20 seconds to answer the door—as required by *United States v. Banks*, 540 U.S. 31, 36 (2003), would be dangerous or futile or allow for the destruction of evidence.

167.   In fact, Mr. Abboud and his family were entirely innocent of any crime and no contraband was found during the search of their apartment.

20



168. Plaintiffs now have evidence, including body camera footage, that RPD SEU officers have engaged in illegal "No Knock" or "Quick Knock" raids on at least five occasions, in addition to the two incidents before the Court.

169. These raids occurred on December 11, 2019 (Blake Banks), February 12, 2020 (Kesha Knight), February 28, 2020 (Gregory Washington), March 19, 2020 (Keith Green), and April 7, 2021 (Amir Abboud and family).

**RPD SEU Officers Raid Kesha Knight's Home**

170. Kesha Knight is a 43-year-old disabled African American woman, whose home was raided by the Raleigh Police Department ("RPD") on February 12, 2020, while she sat at her kitchen table talking to her mother on the telephone.

171. Ms. Knight was wearing only pajama pants and a bra when RPD officers broke down her door with a battering ram and burst into her home.

172. Ms. Knight was never suspected of or charged with a crime. Rather, she was an innocent

21

civilian with no connection to criminal activity.

173. RPD, after a petition for law enforcement recording, released body camera footage of the raid of Ms. Knight's home.

174. Video seven shows RPD SEU officers shouting "police" while simultaneously breaking down her door with a battering ram.

175. The officers ran towards Ms. Knight who was sitting at her kitchen table, pointing assault style rifles at her.

176. Eventually, the officers told Ms. Knight that they had made a mistake and raided the wrong apartment, based allegedly on information provided by a confidential informant.

177. Ms. Knight was so traumatized by the incident that she was taken immediately to Wake Med and then admitted to Holly Hill Hospital for five days, from February 13 to February 17, 2020.

**RPD SEU Officers Raid Blake Banks' Home**

178. On December 11, 2019, RPD SEU officers raided the home of Blake Banks.

179. RPD SEU officers entered an apartment building and approached unit 243 and without knocking or announcing opened the door and entered and searched the apartment.

180. On information and belief, RPD officers had no "reasonable suspicion" that knocking and announcing their presence would be dangerous or futile or allow for the destruction of evidence.

181. Body camera of this raid was provided to Plaintiffs' attorneys by RPD.

**RPD SEU Officers Raid Gregory Washington's Home**

182. On February 28, 2020, RPD SEU officers raided Gregory Washington's home.

183. As in the above-described SEU raids, officers simultaneously knocked while breaking down the door with a battering ram.

22

184. On information and belief, RPD officers had no "reasonable suspicion" that knocking and announcing their presence would be dangerous or futile or allow for the destruction of evidence.

185. Body camera of this raid was provided to Plaintiffs' attorneys by RPD.

**RPD SEU Officers Raid a Home Keith Green is Visiting**

186. On March 19, 2020, RPD SEU officers raided a home Keith Green was visiting.

187. As in the above-described SEU raids, officers simultaneously knocked while breaking down the door with a battering ram.

188. RPD Officers used a flash bang grenade during the execution of this warrant.

189. On information and belief, RPD officers had no "reasonable suspicion" that knocking and announcing their presence would be dangerous or futile or allow for the destruction of evidence.

**RPD's Deficient Warrant Execution Policies**

190. RPD Policy 1110-08, Searches and Seizures: Investigative Stops and Frisks, is the primary publicly available document providing guidance to RPD officers on warrant execution.

191. This policy contains no procedures or guidelines meant to prevent RPD officers from executing warrants at the wrong location.

192. At best, the policy requires a supervisor to be present for entry of a home, and for a uniformed officer to be present if forced entry is anticipated.

193. Nowhere in the policy, is there any requirement that, prior to entry, the officers compare the names of the individuals subject to the search warrant with the names of the individuals residing in the apartment they plan to enter or requiring officers to double check and compare the address on the warrant to the actual address of the home or housing unit before forcibly entering with a battering ram.

23

194. Nowhere in the policy is there any requirement that an SEU or VICE team do a second survey of the home to be searched prior to the day of the search or designate a secondary validator to identify the home.

195. Nowhere in the policy is there any requirement to promptly compare the names and physical features of the persons in the home or housing unit entered with the name and described features of the search warrant target.

**Emancipate NC is Forced to Divert Its Resources to Respond to the Raleigh Police Department's Misconduct**

196. The mission and purpose of Emancipate NC is to end mass incarceration and structural racism in the legal system in North Carolina through community education, narrative shift, and litigation.[3] The organization has a particular focus on and does considerable work in the City of Raleigh.

197. Defendants' wrongful actions with respect to the execution of search warrants against Plaintiffs, as well as the fact that the warrant was associated with a case in which over fifteen Black men were wrongfully arrested by a rogue police officer, has sewn significant distrust in the Raleigh community and has perceptibly impaired Emancipate NC's mission of ending structural racism in the legal system.[4]

198. One aspect of Emancipate NC's work is "rapid response." Community members contact Emancipate NC to report incidents of police misconduct and to seek advice. Emancipate NC

---

[3] *See, e.g.*, *Equity In Athletics, Inc. v. Dep't of Educ.*, (4th Cir. 2011) (finding organizational standing where "the interests [the organization] seeks to protect are germane to its purpose"); *accord*, *Cape Hatteras Access Pres. All. v. Jewell*, 28 F. Supp. 3d 537, 543 (E.D.N.C. 2014).
[4] *See, e.g.*, *People for Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of W. Maryland, Inc.*, 843 F. App'x 493, 497 (4th Cir.) (holding that defendants' actions "perceptibly impaired a key component of the organization's mission" sufficient to confer organizational standing), *cert. denied sub nom. Tri-State Zoological Park of W. Maryland, Inc. v. People for the Ethical Treatment of Animals, Inc.*, 141 S. Ct. 2854 (2021).

24

also receives inquiries about incidents that occur inside jail or prison, as well as unfair charges and convictions.

199. When Emancipate NC receives these inquiries, a staff person is deployed to respond and to analyze what response, if any, the organization will take, whether it is informal administrative advocacy, media advocacy, litigation, or other forms of moral support.

200. As of Spring 2022, Emancipate NC receives on average about 3 inquiries about Raleigh police misconduct per week. Each require time to call back witnesses, interview them, listen empathetically, provide advice, and evaluate what response, if any, the organization will take, as a result, including debriefing team members and making campaign plans.

201. Emancipate NC has been forced to divert its resources from other aspects of work, and other parts of the state, to attend to problems related to No Knock and Quick Knock warrant executions by RPD, as well as to attend to problems attributable to generalized poor training and supervision of RPD officers, who seldom face serious consequences for misconduct.[5]

### INJURIES AND DAMAGES

202. This action seeks damages on behalf of Plaintiffs for the loss of liberty, extraordinary emotional pain and suffering, and injuries to their person that Plaintiffs were forced to endure as a consequence of Defendants' decidedly wrongful actions.

---

[5] *See, e.g.*, *N. Carolina A. Philip Randolph Inst. v. N. Carolina State Bd. of Elections*, No. 1:20CV876, 2022 WL 446833, at *6 n.6 (M.D.N.C. Feb. 14, 2022) ("broad allegations of diverting resources are sufficient to establish organizational injury"), *report and recommendation adopted,* No. 1:20CV876, 2022 WL 903114 (M.D.N.C. Mar. 28, 2022); *accord, Action NC v. Strach*, 216 F. Supp. 3d 597, 610–11 (M.D.N.C. 2016); *N. Carolina State Conf. of NAACP v. N. Carolina State Bd. of Elections*, 283 F. Supp. 3d 393, 402–03 (M.D.N.C. 2017).

25

203. Plaintiffs have suffered, and continue to suffer, severe and ongoing damages, specifically physical pain and injuries, serious psychological and emotional damage, and loss of quality of life.

204. The acts and omissions of Defendants entitle Plaintiffs to compensatory and punitive damages.

## FIRST CLAIM

**Fourth Amendment: Unlawful Entry and Search of Plaintiffs' Homes Against RPD VICE Defendants, 42 U.S.C. § 1983**

205. Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

206. Officers Abdullah, Monroe, Rattelade, and Gay violated the Fourth Amendment when they intentionally conspired to fabricate evidence to obtain a warrant and then illegally entered and searched the homes of Yolanda Irving and her family and Kenya Walton and her family.

207. The search warrant application was required to be reviewed by Officer Abdullah's supervisor, Sergeant Rolfe.

208. The warrant application was based on a buy allegedly made by Mr. Williams at this location, on May 20, 2020, one day prior to the raid.

209. For the alleged May 20 buy, Sgt. Rolfe approved the release of informant funds and Officer Rattelade signed that he witnessed the receipt of informant funds paid to Mr. Williams.

210. Then, Officer Abdullah, with the knowledge of RPD VICE officers, applied for a warrant to search Yolanda Irving's home on May 21, 2020.

211. The RPD VICE officers, on information and belief, met prior to the issuance of the warrant as a team to discuss the planned May 21, 2020, buy and bust operation, and the execution of the warrant.

26

212. The RPD VICE officers knew at the time they applied for the search warrant that in the recent past, Mr. Williams had repeatedly fabricated heroin buys and produced fake heroin that had tested negative for a controlled substance.

213. RPD VICE officers Monroe, Rattelade, and Gay informed Officer Abdullah on multiple occasions that the alleged heroin had field tested negative for a controlled substance, did not look like heroin, and was not packaged like heroin.

214. Still, Officer Abdullah, with the knowledge of the other RPD VICE officers, falsely claimed in the warrant that Mr. Williams, the confidential informant, had provided information in the past that "has always been proven to be truthful and reliable."

215. The warrant also falsely alleged that the CI, Mr. Williams, had purchased heroin from an individual at 1628 Burgundy St, Apt B—the home of Yolanda Irving and her children.

216. And the warrant falsely claimed that RPD Detectives observed Mr. Williams entering the "residence" of Yolanda Irving and her family.

217. The officers knew that these statements were false, that Mr. Williams had been proven to be unreliable on numerous occasions, and that he should not have been used as a confidential informant.

218. The RPD VICE Officers, relying on the warrant procured through fabricated information, raided and then searched the home of Yolanda Irving and her family.

219. During the raid, the RPD VICE and SEU Officers also illegally entered the home of Kenya Walton and her family, at apartment 1628 A, an address that was not contained on the search warrant, and which they did not have consent to enter.

220. The officers had no probable cause or search warrant authorizing them to enter the home of Kenya Walton and her family.

27

221. As a direct and proximate result of this unlawful conduct, Individual plaintiffs sustained the damages herein alleged and seek compensatory and punitive damages.

### SECOND CLAIM

**Fourth Amendment: Injunctive and Declaratory Relief Against the City of Raleigh, Chief Patterson and City Manager Marchell Adams-David: Unlawful "No Knock" or "Quick Knock" Entry of Plaintiffs' Homes, 42 U.S.C § 1983**

222. Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

223. Ms. Irving's and Ms. Walton's children were standing outside their homes when RPD SEU officers equipped in SWAT gear started running towards them.

224. Terrified, the children ran into the two apartments.

225. The RPD SEU officers David Mead, Jesus Ortiz, Kyle Perrin, Micheal Mollere, Kyle Thompson, Vincent Debonis, Daniel Twiddy, Thomas Webb, David Mcdonald and David Garner, followed by Abdullah, Monroe, Rattelade, and Gay, in violation of the Fourth Amendment, entered the homes of Ms. Irving and Ms. Walton using "No Knock" or "Quick Knock" execution.[6]

226. As to this Count, Plaintiff Emancipate NC seeks injunctive and declaratory relief; the Individual Plaintiffs seeks compensatory and punitive damages.

---

[6] *Betton v. Knowles,* No. 415CV04638AMQKDW, 2018 WL 4404073, at *6 (D.S.C. May 21, 2018), *report and recommendation adopted,* No. 4:15-CV-04638-AMQ, 2018 WL 3744957 (D.S.C. Aug. 7, 2018), *aff'd sub nom. Betton v. Belue,* 942 F.3d 184 (4th Cir. 2019) ("[A]bsent exigent circumstances, the Fourth Amendment requires law enforcement officers to knock and announce their presence when executing a search warrant. Based on these instructions, the Fourth Circuit "requires a court to analyze the facts of each case to determine that the officers had some particularized basis for their suspicion." *United States v. Dunnock,* 295 F.3d 431, 434 (4th Cir. 2002)).

**Deleted:** John and Jane Doe

28

### THIRD CLAIM

**Fourth Amendment: Unlawful Arrest and Seizure of Plaintiffs Against RPD VICE Defendants, 42 U.S.C § 1983**

Deleted: ¶

227. Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

228. Officers Abdullah, Monroe, Rattelade, and Gay violated the Fourth Amendment when they relied on fabricated evidence to procure a search warrant and then illegally entered Plaintiffs' homes, illegally seized Plaintiffs, and then continued the detention of Plaintiffs even when they knew that Plaintiffs were innocent and that none of them were the subject in the search warrant.

229. The RPD VICE officers knew that the information relied on to procure the warrant was fabricated and that Mr. Williams, the CI, was unreliable.

230. Still, the RPD VICE officers relied on the fabricated evidence to illegally enter Plaintiffs' homes and illegally seize Plaintiffs.[7]

231. Plaintiffs had guns pointed at them by RPD officers, were required to put their hands up, were frisked and searched, were ordered to come downstairs, and then ordered to sit on the ground for over an hour. Ziyel Whitley was handcuffed.

232. The RPD VICE Officers had no probable cause, or evidence of any crime, to justify the seizing and the continued detention of Plaintiffs.

---

[7] *Figg v. Schroeder,* 312 F.3d 625, 636 (4th Cir. 2002) ("Though neither was subject to formal arrest, both were nonetheless 'seized.' An individual has been seized if, in view of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (citation omitted)); *see also Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) ("In the absence of formal arrest, the trial court must determine whether a suspect's freedom of movement was sufficiently curtailed by considering how a reasonable man in the suspect's position would have understood his situation.").

29

233. As a direct and proximate result of this unlawful conduct, Individual plaintiffs sustained the damages herein alleged and seek compensatory and punitive damages.

**FOURTH CLAIM**

**Fourth and Fourteenth Amendment: Fabrication of Evidence in Violation of Due Process of Law Against RPD VICE Defendants, 42 U.S.C § 1983**

234. Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

235. Plaintiffs have a fundamental right to be free from fabrication of evidence pursuant to the Fourth and Fourteenth Amendments of the United States Constitution that is enforceable under 42 U.S.C. § 1983.[8]

236. Mr. Williams along with Defendants conspired to fabricate multiple heroin buys and charges against innocent individuals.

237. Officers Abdullah, Rolfe, Monroe, Rattelade, and Gay knew from field testing and observing the alleged heroin that it was fake.

238. Defendants knew Mr. Williams' alleged heroin buys were fabricated.

239. Despite knowing that the heroin was fake and that the trafficking allegations were fabricated, Defendants continued to use Mr. Williams as a confidential informant.

---

[8] *Willis v. Blevins*, 966 F. Supp. 2d 646, 657 (E.D. Va. 2013) ("The Fourth Circuit has recognized that the fabrication of evidence by an officer "acting in an investigating capacity" constitutes a violation the Fourth Amendment. *Washington v. Wilmore,* 407 F.3d 274, 282 (4th Cir. 2005)."); *see also Gilliam v. Sealey*, 932 F.3d 216, 241 (4th Cir. 2019), *cert. denied,* 140 S. Ct. 2641, 206 L. Ed. 2d 713 (2020) ("[A]n individual has a constitutional right not to be deprived of liberty as a result of the intentional, bad-faith withholding of evidence by an investigating officer. *See Jean v. Collins*, 221 F.3d 656, 663 (4th Cir. 2000) (holding that it was clearly established in 1982 that when police intentionally withhold or destroy evidence, or otherwise act in bad faith, their actions violate the due process rights of a criminal defendant).").

30

240. Officer Abdullah fabricated evidence with the knowledge of RPD VICE officers when he falsely claimed in the warrant application that Mr. Williams had provided information in the past that "has always been proven to be truthful and reliable."

241. The warrant application also falsely alleged that the CI, Mr. Williams, had purchased heroin from an individual at 1628 Burgundy St, Apt B—the home of Yolanda Irving and her children.

242. The warrant application falsely claimed that RPD Detectives observed Mr. Williams entering the "residence" of Yolanda Irving and her family.

243. Officers Abdullah, Rattelade, Gay and Monroe knew that these statements were fabricated, that Mr. Williams had been proven to be unreliable on numerous occasions, and that he should not have been used as a confidential informant.

244. The RPD VICE Officers, relying on the warrant procured through fabricated information, illegally raided and searched Plaintiffs' homes and then illegally seized the Plaintiffs.

245. As a direct and proximate result of this unlawful conduct, Individual plaintiffs sustained the damages herein alleged and seek compensatory and punitive damages.

### FIFTH CLAIM

**Fourth and Fourteenth Amendment: Failure to Intervene Against RPD VICE Defendants, 42 U.S.C § 1983**

246. Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

247. Defendants that were present for and observed the aforementioned unlawful conduct, had a duty and opportunity to intervene and prevent such conduct, and failed to intervene.

31

248. Accordingly, the defendants who failed to intervene violated the Fourth and Fourteenth Amendments.[9]

249. Officers Abdullah, Rolfe, Monroe, Rattelade, and Gay knew, from field testing and observing the alleged heroin produced by Mr. Williams in the past, that it was fake.

250. Defendants knew that Mr. Williams had repeatedly fabricated evidence which had led to falsified charges and arrests of innocent individuals.

251. Defendants knew that Mr. Williams had provided fabricated information that was used as the basis to procure the search warrant for the home of Yolanda Irving and her family.

252. Defendants, although they knew he was unreliable, failed to intervene and stop the continued use of Mr. Williams as a confidential informant.

253. Defendants failed to intervene and stop the fabricated warrant application and the resulting unlawful raid, entry, search and seizure of Plaintiffs and their homes.

254. As a direct and proximate result of this unlawful conduct, Individual plaintiffs sustained the damages herein alleged and seek compensatory and punitive damages.

### SIXTH CLAIM

### Civil Conspiracy Against RPD VICE Defendants, 42 U.S.C. § 1983

255. Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

---

[9] *See Ensley v. Soper*, 142 F.3d 1402, 1407 (11th Cir. 1998) ("[i]f a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation . . . takes place in his presence, the officer is directly liable under Section 1983."); *see also Velardo v. Lewko,* No. 3:18-CV-1885, 2019 WL 5095657, at *8 (M.D. Pa. Aug. 22, 2019) ("(1) the officer had a duty to intervene; (2) the officer had the opportunity to intervene; and (3) the officer failed to intervene.").

32

256. Officers of the RPD VICE team, including Officers Abdullah, Rolfe, Monroe, Rattelade and Gay, conspired with each other and with Mr. Williams to deprive Plaintiffs of their constitutional rights.

257. Despite knowing that Mr. Williams was unreliable and had repeatedly produced fabricated evidence, Defendants continued to use him as the basis for illegal warrants and illegal arrests and seizures in violation of the Fourth Amendment.

258. In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were willful participants in joint activity.

259. In furtherance of the conspiracy, RPD VICE officer Defendants engaged in and facilitated numerous overt acts, including the following:

   a. One or more of the individual Defendants fabricated evidence against Plaintiffs, and then acting together, proceeded to arrest or seize them for a crime they did not commit.

   b. Defendants participated directly in the conspiracy by field testing and observing the fake drugs, witnessing, and participating in the fabricated buys conducted by the VICE team and Mr. Williams, and in conducting illegal raids on the homes of Plaintiffs and illegally seizing Plaintiffs.

   c. Defendants met with Mr. Williams, paid Mr. Williams for his participation in the conspiracy, and provided Mr. Williams with "buy money" to fabricate narcotics purchases.

33

260. Defendants also acquiesced[10] in the conspiracy by having full knowledge of the conspiracy and failing to intervene.

261. As a direct and proximate result of this unlawful conduct, Individual plaintiffs sustained the damages herein alleged and seek compensatory and punitive damages.

### SEVENTH CLAIM

**Failure to Train and or Supervise Against Sergeant Rolfe, 42 U.S.C § 1983**

262. Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

263. Sgt. Rolfe failed to properly supervise RPD officers, despite having actual knowledge of the need for better and additional training and supervision.

264. Officers Monroe and Rattelade informed Sgt. Rolfe on numerous occasions about the fake heroin, fabricated charges by Abdullah, and the unreliability of Mr. Williams.

265. Sgt. Rolfe stated that he never reviewed buy video from Abdullah's arrests.

266. Sgt. Rolfe stated that he was aware that Abdullah—in violation of RPD procedure—would always meet with Mr. Williams alone before the buy and then again meet with him alone after the buy.

267. Sgt. Rolfe was responsible for reviewing the accuracy and truthfulness of Abdullah's warrant applications—and failed to intervene or stop Abdullah from filing fabricated warrant applications.

268. Sgt. Rolfe was responsible for reviewing the accuracy of Abdullah's reports and his compliance with RPD policy, including the policy on management of informant funds.

---

[10] *Hafner v. Brown*, 983 F.2d 570, 576–78 (4th Cir. 1992) (finding that a claim of civil conspiracy can be proven "by a mere showing of acquiescence" in the conspiracy.).

34

269. Sgt. Rolfe never intervened to ensure that Abdullah was complying with proper procedure for distributing funds to the informant Mr. Williams.

270. Sgt. Rolfe failed to take any steps to correct Abdullah or prevent this unconstitutional activity from recurring.

271. Because of Sgt. Rolfe's inaction, Plaintiffs' homes were illegally entered and searched, and they were illegally seized.

272. Individual plaintiffs sustained the damages herein alleged and seek compensatory and punitive damages.

**EIGHTH CLAIM**

**Fourth Amendment: Excessive Force by RPD SEU Defendants,
42 U.S.C § 1983**

273. Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

274. RPD Selective Enforcement Unit ("SEU") Officers, David Mead, Jesus Ortiz, Kyle Perrin, Micheal Mollere, Kyle Thompson, Vincent Debonis, Daniel Twiddy, Thomas Webb, David Mcdonald and David Garner, used excessive force in violation of the Fourth Amendment when they pointed their firearms at Plaintiffs.

**Deleted:** John and Jane Doe Defendants 1-10,

275. Plaintiffs J.I., Ziyel Whitley, Dyamond Whitley, and Z.G., were sitting on their front stoop when SEU David Mead, Jesus Ortiz, Kyle Perrin, Micheal Mollere, Kyle Thompson, Vincent Debonis, Daniel Twiddy, Thomas Webb, David Mcdonald and David Garner, rushed towards them in full body armor and with their firearms, including assault rifles, pointed at them.

**Deleted:** officers

276. The SEU officers David Mead, Jesus Ortiz, Kyle Perrin, Micheal Mollere, Kyle Thompson, Vincent Debonis, Daniel Twiddy, Thomas Webb, David Mcdonald and David Garner then

**Deleted:** John and Jane Doe

35

burst into the Irving's home and pointed their firearms at Ziyel, J.I., Cydneea Harrington, Juwan Harrington and Yolanda Irving.

277. SEU Officers Debonis and Thompson then entered the Walton's apartment and pointed their firearms at Dyamond Whitley, Robert Whitley, Z.G., and Kamisha Whitley who had their hands raised, were following the officers orders and were standing in the kitchen.

278. As a direct and proximate result of this unlawful conduct, Individual plaintiffs sustained the damages herein alleged and seek compensatory and punitive damages.

## NINTH CLAIM

### False Imprisonment Under North Carolina State Law
### Against RPD Individual Defendants

279. Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

280. Officer Abdullah and the members of the RPD VICE team violated North Carolina law when they seized or arrested Plaintiffs based on a falsified warrant and without probable cause.[11]

281. RPD VICE team officers detained Plaintiffs, after raiding their home, for over an hour.

282. As a direct and proximate result of this unlawful conduct, Individual plaintiffs sustained the damages herein alleged and seek compensatory and punitive damages.

## TENTH CLAIM

### Fourth Amendment: Monell Liability and Injunctive and Declaratory Relief
### Against the City of Raleigh, Chief Patterson and City Manager Marchell Adams-
### David: "No Knock" or "Quick Knock" Raids, 42 U.S.C § 1983

---

[11] The elements of false imprisonment include: "(1) the illegal restraint of plaintiff by defendant, (2) by force or implied threat of force, and (3) against the plaintiff's will. . . The restraint requirement of this action requires no appreciable period of time, simply sufficient time for one to recognize his illegal restraint. The tort is complete with even a brief restraint of the plaintiff's freedom." *Wilkerson v. Duke Univ.,* 229 N.C. App. 670, 674 (2013).

36

283. Plaintiffs repeat and reallege each allegation contained in the preceding paragraphs as if fully set forth herein.

284. The City of Raleigh maintains a custom or practice, and on information and belief a policy, of permitting and/or encouraging RPD officers to execute their search warrants[12] in a "No Knock" or "Quick Knock" style, regardless of the actual individualized circumstances of the situation, and in violation of state and federal law.

285. This includes the above mentioned "No knock" or "Quick Knock" raids at the homes of Blake Banks, Kesha Knight, Gregory Washington, Keith Green and Amir Abboud and his family, in addition to the raids of Yolanda Irving's and Kenya Walton's homes.

286. These seven raids occurred over a period of 18 months.

287. Plaintiffs' counsel possesses body camera footage of six of these raids.

288. Body camera footage can only be obtained through a petition for law enforcement recordings, making "No Knock" or "Quick Knock" raids difficult to document.

289. Plaintiffs' counsel neither possesses nor has seen any footage of RPD officers executing a warrant that was not done in a "Quick Knock" or "No Knock" fashion.

290. This is because RPD has a de facto policy, or pattern and practice, of entering without knocking, or knocking while simultaneously entering in every warrant execution, regardless of the individualized circumstances.

---

[12] *Betton v. Knowles*, No. 415CV04638AMQKDW, 2018 WL 4404073, at *19 (D.S.C. May 21, 2018), *report and recommendation adopted,* No. 4:15-CV-04638-AMQ, 2018 WL 3744957 (D.S.C. Aug. 7, 2018), *aff'd sub nom. Betton v. Belue,* 942 F.3d 184 (4th Cir. 2019) (Finding that the "DEU's alleged practice of executing standard search warrants without first knocking and announcing and waiting a reasonable period of time before entering a private residence" could found to be a custom of the City and denying summary judgment).

37

291. This de facto policy was confirmed by RPD Chief Estella Patterson, when she stated in an interview with WRAL that "[The law] just states you knock and announce your presence," Patterson said. "I have always been taught that you clearly knock on the door, and then you clearly announce, and then you enter at that time."[13]

292. This understanding of the law is directly contradicted by the Supreme Court precedent in *United States v. Banks*, 540 U.S. 31, 36 (2003), which held that it was reasonable to enter a home "15 to 20 seconds" *after* knocking and announcing when officers suspected "imminent loss of evidence." *Id.* The only exception to this rule, is if officers have "reasonable suspicion" that it would be "dangerous or futile" to knock and announce. *United States v. Banks*, 540 U.S. 31, 36 (2003).

293. RPD's de facto policy, or custom or practice led directly to the RPD VICE unit executing the warrant in a "No Knock" style at the home of Yolanda Irving, giving no warning or notice to her or her family before suddenly invading their home with guns drawn.

294. This de facto policy, or custom or practice also led directly to the RPD VICE unit invading the home of Kenya Walton, also in "No Knock" or "Quick Knock" style, without warning, notice, or consent, even though her address was not contained in the search warrant and there was no reason to believe that the subject of the warrant had been, or would be, in her home.

295. Under the principles of municipal liability, the City and the RPD owed a duty to the public at large and to Plaintiffs to implement policies, procedures, customs, and practices sufficient to

---

[13] Joe Fisher, *RPD States they don't use no-knock warrants amid criticism from civil rights groups*, WRAL February 23, 2022, https://www.wral.com/rpd-says-they-don-t-use-no-knock-warrants-amid-criticism-from-civil-rights-groups/20155737/. This understanding of the law is directly contradicted by Supreme Court precedent in *United States v. Banks*, 540 U.S. 31, 36 (2003), which held that it was reasonable to enter a home "15 to 20 seconds" *after* knocking and announcing when officers suspected "imminent loss of evidence."

38

prevent, deter, and avoid conduct that violates the constitutional rights of members of the public.

296. However, the RPD and its designees, as policymakers for the City, knowingly and intentionally breached, or were deliberately indifferent to this duty.

297. As to this Count, Plaintiff Emancipate NC seeks injunctive and declaratory relief; the Individual Plaintiffs seek compensatory damages.

**ELEVENTH CLAIM**

**Fourth Amendment: Monell Liability and Injunctive and Declaratory Relief Against the City of Raleigh, Chief Patterson and City Manager Marchell Adams-David: Unconstitutional RPD Policies and Omissions of RPD VICE, 42 U.S.C § 1983**

298. Plaintiffs repeat and reallege each allegation contained in the preceding paragraphs as if fully set forth herein.

299. The City of Raleigh employed the following municipal actors and final policy makers for the policies, customs and practices of the RPD: Chief Estella Patterson, Former Chief of Police Cassandra Deck-Brown, City Manager Marchell Adams-David, and former City Manager Ruffin Hall.

300. The RPD VICE Officers fabrication of evidence and resulting constitutional violations were the direct and proximate result of the existing customs, policies, omissions, and practices of the RPD established by the above-named policy makers.

301. Specifically, the City, by and through the above-named policy makers failed to institute the proper policies, and or train/ supervise RPD VICE Officers in the review and handling of drug evidence, including:

    a. RPD VICE maintains a policy of not field-testing alleged heroin, even when purchased by a confidential informant. In interviews with the SBI, Lt. Bunch

39

along with officers Nance, Rattelade and Rolfe all confirmed that RPD had a policy to not field test alleged heroin. The failure to field test alleged heroin, resulted in the continued use of an unreliable confidential informant and the illegal arrest, search, and seizure of at least fifteen individuals—Sgt. Rolfe, in his interview with the SBI, specifically cites the inability to field test the fake heroin as the cause of the wrongful arrests and seizures. Here, the failure to field test alleged heroin after the May 20, 2020, arranged buy led directly to the warrant application based on fabricated evidence which resulted in the unconstitutional raid of the Irving and Walton families' homes. Had officers field tested the heroin they would have discovered it was fake, or not a controlled substance, and would not have been granted the warrant which led to the raid of Plaintiffs' homes.

b. The RPD VICE unit has a policy or custom of not requiring supervisor or officer review of undercover buy video. After Williams was suspended, RPD began to review his buy video and discovered that none of the videos actually depicted a sale, and the vast majority only show a dark screen. The City's policy makers were aware that the failure to review undercover buy video could result in informants and officers fabricating charges resulting in false arrests or false allegations.

c. The RPD VICE unit has a policy or custom of failing to review, supervise, or require, the timely submission of alleged drugs to the CCBI lab. The RPD VICE unit has a policy or custom of failing to review or supervise the results of CCBI lab results when returned to the RPD VICE unit. These combined failures caused fake heroin to sit for weeks in evidence, or to sit unreviewed once the results were

40

returned from the lab, without exposing the pattern of use of fake heroin that would have ended this scheme before it resulted in the raid of Plaintiffs' homes.

302. These omissions of policy, and or failure to supervise/ train—related to the handling and review of drug evidence by RPD VICE officers—led directly to the fabrication of evidence and resulting raid on Yolanda Irving's and Kenya Walton's homes.

303. In prior litigation, *Washington, et al. v. City of Raleigh et al.*, 21-CV-194, Plaintiffs' expert, Howard Jordan (former City of Oakland Chief of Police), recommended extensive policy and practice changes to the RPD. These policy recommendations included:

   a. Field testing all drugs immediately or within 24 hours of recovery.

   b. Require RPD officers to video record field testing and submit the footage as evidence.

   c. Submit all drugs to the crime lab for processing within 24 hours after recovery.

   d. Require the crime lab to provide results within 72 hours.

   e. No warrants shall be "sworn out" until the charging officer received results from the crime lab indicating the tested drugs were a controlled substance.

   f. Require RPD supervisors to review undercover buy footage.

304. On information and belief, none of the above policy recommendations have been implemented by the RPD and these policies, or lack thereof, continue to lead to the fabrication of evidence and wrongful searches and arrests.

305. Under the principles of municipal liability, the City, its policy makers, and the RPD owed a duty to the public at large and to Plaintiffs to implement policies, procedures, customs, and practices sufficient to prevent, deter, and avoid conduct by subordinates that violate the constitutional rights of criminal suspects or defendants and of other members of the public.

41

306.  However, the RPD and its designees, as policymakers for the City, knowingly and
      intentionally breached, or were deliberately indifferent to, this duty.

307.  As to this Count, Plaintiff Emancipate NC seeks injunctive and declaratory relief; the
      Individual Plaintiffs seeks compensatory damages.

### TWELFTH CLAIM

**Fourth Amendment: Monell Liability and Injunctive and Declaratory Relief, Against the
City of Raleigh, Chief Patterson and City Manager Marchell Adams-David: Deliberate
Indifference in Warrant Execution Policies and Training 42 U.S.C § 1983**

308.  Plaintiffs repeat and reallege each allegation contained in the preceding paragraphs as if fully
      set forth herein.

309.  The City of Raleigh and its policy makers for the RPD, Chief Patterson, former Chief Deck-
      Brown, City Manager Adams-David and former City Manager Hall, have adopted policies or
      omitted policies, that caused the wrongful entry into Plaintiffs' homes.

310.  In addition, on information and belief based on the publicly available policies, the City and
      its policy makers have not adopted proper policies and practices, to avoid entries into the
      wrong homes and/or to cause them to cease invasions into the wrong homes at the earliest
      opportunities.

311.  Supervision, training, and policies that apparently are absent include, but are to limited to, a
      policy explaining what should be done to identify the correct unit when the warrant affiant/
      informant will not be present, including a policy requiring a secondary verifier of the target
      residence; a policy that an officer actually executing the no-knock warrant doublecheck the
      address on the warrant against clearly marked addresses at the location; a policy that officers
      compare the names of the individuals subject to the search warrant with the names of the

42

individuals residing in the apartment they plan to enter; a policy that the SEU unit, or VICE detectives, confirm the day of the planned raid that the targets actually live at the address; and a policy requiring those executing the warrant to be on alert for other indicia that they may be on the verge of executing, or have executed, the warrant at the wrong home.

312. As to this Count, Plaintiff Emancipate NC seeks injunctive and declaratory relief; the Individual Plaintiffs seeks compensatory damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment for Plaintiffs and order relief as follows:

A. Compensatory damages against all Defendants, jointly and severally;

B. Punitive damages against the individual officer defendants, jointly and severally;

C. Declaratory relief, to include an order declaring that the individual Defendants' entry into the individual Plaintiffs' homes was unconstitutional, and an order that RPD's policy and practice of conducting "No Knock" or "Quick Knock" SWAT-style raids of people's homes absent reasonable suspicion of danger or destruction of evidence is unconstitutional;

D. Injunctive relief, to include an order prohibiting the Defendants from conducting "No Knock" or "Quick Knock" SWAT-style raids of people's homes in violation of Supreme Court precedent in *Hudson v. Michigan*, 547 U.S. 586, 593-94 (2006) and *United States v. Banks*, 540 U.S. 31, 36 (2003);

E. Injunctive relief, to include an order requiring Defendants to field or lab test suspected narcotics prior to swearing out warrants to search or arrest;

43

F. Injunctive relief, to include an order requiring Defendants develop policies and training to prevent RPD officers from executing search warrants at wrong homes;

G. Pre-judgment and post-judgment interest and recovery of costs, as well as reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988, and other applicable laws;

H. Any other and further relief the Court deems equitable and just.

Respectfully submitted, this the 22nd day of August, 2022.

**Deleted:** 16th

**Deleted:** May

**Formatted:** Superscript

_____

Abraham Rubert-Schewel (N.C. Bar # 56863)
TIN FULTON WALKER & OWEN, PLLC
119 E. Main Street
Durham, NC 27701
Tel: (919) 451-9216
schewel@tinfulton.com

/s/ Emily Gladden
Emily D. Gladden
TIN FULTON WALKER & OWEN, PLLC
State Bar No.:   49224
204 N. Person Street
Raleigh, NC 27601
Telephone:    (919) 720-4201
Facsimile:    (919) 400-4516
Email:        Egladden@tinfulton.com

/s/ Micheal L. Littlejohn Jr.
Micheal L. Littlejohn Jr.
N.C. Bar No. 49353
Littlejohn Law PLLC
PO Box 16661
Charlotte, NC 28297
Telephone: (704) 322-4581
Fax: (704) 625-9396

/s/ Ian Mance
Ian A. Mance
N.C. Bar No. 46589
EMANCIPATE NC
Post Office Box 309
Durham, NC 27702
Tel: (828) 719-5755
ian@emancipatenc.org

/s/ Elizabeth Simpson
Elizabeth G. Simpson
N.C. Bar No. 41596
EMANCIPATE NC
Post Office Box 309
Durham, NC 27702
Tel: (919) 682-1149
elizabeth@emancipatenc.org

44

Email: mll@littlejohn-law.com

45