UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | |
|---|---|
| YOLANDA IRVING, individually and as the natural parent and guardian of JALEN IRVING, JUWAN HARRINGTON, CYDNEEA HARRINGTON, KENYA WALTON individually and as the natural parent and guardian of ROBERT WHITLEY, ZIYEL WHITLEY, DYAMOND WHITLEY, KAMISHA WHITLEY, and NANETTA GRANT as the natural parent and guardian of ZIQUIS GRANT and EMANCIPATE NC, INC, <br><br> Plaintiffs, <br><br> v. <br><br> THE CITY OF RALEIGH, Officer OMAR I. ABDULLAH, Sergeant WILLIAM ROLFE, Officer RISHAR PIERRE MONROE, Officer JULIEN DAVID RATTELADE, and Officer MEGHAN CAROLINE GAY, Officer DAVID MEAD, Officer JESUS ORTIZ, Officer KYLE PERRIN, Officer MICHEAL MOLLERE, Officer KYLE THOMPSON, Officer VINCENT DEBONIS, Officer DANIEL TWIDDY, Officer THOMAS WEBB, Officer DAVID MCDONALD, Officer DAVID GARNER, Chief of Police ESTELLA PATTERSON and City Manager MARCHELL ADAMS-DAVID, in their official capacities in their individual capacities, <br><br> Defendants. | Case No. 5:22-CV-00068-BO |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO OFFICER ABDULLAH'S MOTION TO STAY THE PROCEEDINGS**

Plaintiffs write in opposition to Defendant Omar Abdullah's ("Officer Abdullah") motion for a stay of the proceedings or, in the alternative, a partial stay of discovery. Plaintiffs oppose both requests.

# INTRODUCTION

A stay of this litigation will not cure Officer Abdullah's Fifth Amendment dilemma. Officer Abdullah is currently being prosecuted by the Wake County District Attorney's Office for one count of felony obstruction of justice, but his criminal liability goes far deeper. Over nearly two years, Officer Abdullah, the VICE team, and their confidential informant Dennis Williams conspired to fabricate evidence which led to the wrongful prosecution of at least 15 individuals. The State Bureau of Investigation ("SBI") and Wake County District Attorney's Office investigation into this misconduct is ongoing. Because there is no statute of limitations on felony offenses, and because the roughly 30 other fabricated controlled buys made by Mr. Williams and the VICE team are discoverable and relevant conduct, it is likely that—however and whenever his current criminal prosecution is resolved—Officer Abdullah will continue to invoke his Fifth Amendment privilege in this action and any other related civil litigation. The threat of criminal prosecution will continue to haunt Officer Abdullah.

Furthermore, Officer Abdullah's prosecution for a single obstruction of justice charge is in its infancy, with no clear end in sight. He has had a single court appearance and has no set future court date. Unlike the federal system, North Carolina state courts have no statutory speedy trial act. *See infra, State v. Farook*, 2022-NCSC-59, ___ N.C. ___ (May 6, 2022) (finding a 6-year delay between indictment and trial does not necessarily implicate constitutional speedy trial rights). State prosecutors control the court calendar and can take cases off the docket at their discretion and often with the consent of defendants who may benefit from delay. Some cases sit off calendar for months and occasionally even years. Even cases that remain on the calendar can take years to resolve.

Plaintiffs will suffer real prejudice if a stay is granted, not only in the form of loss of memories and documents but also because a criminal conviction could cause the City of Raleigh ("City") to refuse to indemnify Officer Abdullah's misconduct, making any resolution or collection of a judgment significantly more difficult. This prejudice, or inconvenience, will also extend to the Court, which will likely be faced with a similar quandary when this litigation resumes, and Officer Abdullah faces further criminal exposure and again seeks to invoke his Fifth Amendment privilege or seek a second stay.

Lastly, the public has significant interest in the resolution of this matter, particularly the *Monell* claims brought against the City of Raleigh. Plaintiffs seek to enjoin and hold the City liable for its unconstitutional policies, patterns, and practices related to no-knock and quick-knock raids; its policy for identification of the correct unit or home when executing a search warrant; and its supervision and use of confidential informants. The City has claimed that it no longer conducts no-knock raids, yet it has refused to publicly state when its policy related to no-knock warrants was revised and what those current revisions entail. The public seeks these answers. *See, e.g.,* Virginia Bridges, *Lawsuit Filed Against Fired Detective, City of Raleigh after Police Raid Wrong Apartment,* News & Observer, February 22, 2022, (available at https://www.newsobserver.com/article258636778.html) (The RPD "didn't answer follow up questions submitted Feb. 8 about when and whether the policy was changed and any related statistics on how often RPD had used them.").

## RELEVANT FACTS AND PROCEDURAL HISTORY

Plaintiffs include ten Black women and children whose homes were illegally raided and who were wrongfully detained because of evidence fabricated by the Raleigh Police Department ("RPD") in conspiracy with an unreliable confidential informant. Second Amended Complaint

("SAC") at ¶ 1. Plaintiffs were entirely innocent of any crime. *Id.* at ¶ 6.

## Procedural History

Plaintiffs filed suit in this matter on February 22, 2022. ECF No. 1[1]. In April of 2022, Defendants filed motions to dismiss certain claims against the officers and the *Monell* claims against the City. ECF No. 30-35. In response, Plaintiffs filed an Amended Complaint on May 16, 2022, adding additional factual detail and adding Emancipate, NC, Inc. ("Emancipate") as an organizational plaintiff. ECF No. 41. Defendants did not refile their motions to dismiss. Defendants did move to dismiss Emancipate and that motion is fully briefed and pending before the Court.

On June 27, 2022, Magistrate Judge Robert Numbers held a hearing on the parties' Rule 26(f) report. ECF No. 58. At that hearing, Plaintiffs' counsel inquired as to whether any Defendants intended to invoke their Fifth Amendment privilege; no defense counsel responded. On July 6, 2022, Magistrate Judge Robert Numbers entered a scheduling order which required discovery to be complete by December 20, 2022. ECF No. 69. On August 31, 2022, after learning the identity of the John and Jane Doe Defendants, Plaintiffs filed their Second Amended Complaint. ECF No. 93.

Plaintiffs and Defendants have issued written discovery. Some responses have been provided, but the majority of documents have yet to be produced. Depositions of Defendants, including Officer Abdullah, were noticed on July 21, 2022, and are scheduled for the week of October 24, 2022. Depositions of Plaintiffs are tentatively scheduled for the week of November 14, 2022.

## The Conspiracy

In August of 2018, Dennis Williams was arrested by Officer Abdullah and Officer David

---

[1] The extent of Officer Abdullah's misconduct was first documented in *Washington, et al. v. City of Raleigh, et al.*, 5:21-CV-194, a lawsuit that was filed in April of 2021 and settled in September of 2021.

Nance for selling crushed aspirin that he claimed was cocaine. *Id.* at ¶¶ 55-63. In exchange for leniency on his criminal charges, and to "make money," Mr. Williams agreed to work as a confidential informant for the RPD VICE team. *Id*. at 65. Mr. Williams worked with Officer Abdullah and other VICE officers to identify targets for controlled buys. *Id.* at ¶¶ 64-72. RPD VICE officers provided Mr. Williams with pre-marked United States currency that he used to attempt to purchase narcotics. *Id.*

Typically, Mr. Williams would complete an initial controlled buy and then Officer Abdullah or another VICE officer would apply for an arrest or search warrant on the alleged seller or their premises. The VICE officers would then conduct a second controlled buy, after which they would complete a "take down" of the target. The "take down" often involved a SWAT-style raid of the target's home.

Before each controlled buy, "the RPD VICE officers including Sgt. Rolfe, and Officers Abdullah, Monroe, Rattelade, and Gay met and discussed the buy plan" and outfitted Mr. Williams "with at least one electronic surveillance device that recorded video and audio." *Id.* ¶ 78-79. The RPD VICE officers "staged the buy area and listened to and observed the transaction." *Id.* ¶ 80. Mr. Williams shielded his surveillance camera and produced fake heroin in conspiracy with the VICE team. Officers Rolfe, Ouellette and Rattelade falsified receipt of informant funds sheets by signing and confirming that they had witnessed payment of informant funds to Mr. Williams, when, in reality, Officer Abdullah repeatedly violated RPD policy by meeting with and paying Williams alone. *Id.* ¶¶ 82-87.

After each fabricated buy, the RPD VICE Officers attended a debriefing where they processed the fake heroin and on multiple occasions reported to Officer Abdullah that "the alleged drugs were not heroin but brown sugar or some other substance"; that the fake drugs were "not

5

packaged the same way as heroin"; and that the substance had field tested "negative for a controlled substance." *Id.* ¶¶ 88-92. This conspiracy continued for nearly two years, even after the fake heroin repeatedly "tested negative for a controlled substance [by the CCBI lab and in field tests]." *Id.* ¶¶ 90-100. RPD VICE Officers, including Monroe, eventually "reported Abdullah's ongoing scheme and pattern of wrongful arrests to Sgt. Rolfe, who failed to intervene." *Id.* ¶ 88. Over 15 individuals were wrongfully arrested and incarcerated based on the fabricated evidence produced by Mr. Williams and the RPD VICE team. *Id.* ¶ 73. According to the SBI report, Mr. Williams made over 30 controlled buys. In his interview with the SBI, Officer Rattelade stated that he believed only one of these was a good buy.

This conspiracy continued through May 21, 2020, the day of the RPD raid on Plaintiffs' homes. *Id.* ¶ 76.

**The First Fabricated Controlled Buy**

On May 20, 2020, a day before the raid, Officer Abdullah and the RPD VICE team arranged a controlled buy between Mr. Williams and a target named Marcus VanIrvin. *Id.* ¶ 101-113; *see also* Ex. 1, Search Warrant Application. This fabricated controlled buy served as the basis for the search warrant application for Yolanda Irving's home. *Id.* Officer Abdullah, in conspiracy with the RPD VICE officers, falsely claimed in the search warrant application that Mr. Williams purchased an amount of heroin (allegedly 3 grams) from Mr. VanIrvin, and falsely claimed that the sale of heroin occurred at 1628 Burgundy St., Apt B, the home of Ms. Irving and her children. *Id.* The warrant was required to be reviewed by Officer Abdullah's supervisor, Sgt. Rolfe. *Id.*

For the fabricated controlled buy, "[Sgt.] Rolfe approved the release of informant funds and Officer Rattelade signed that he witnessed the receipt of informant funds paid to Mr. Williams." *Id.*

6

¶ 104. Officer Abdullah made several false claims in the search warrant application, including that: (1) Mr. Williams had "purchased an amount of heroin from an individual who goes by the name Marcus," (2) that "Mr. Williams had provided information in the past that has always been proven to be truthful and reliable," and (3) that "RPD Detectives observed Mr. Williams entering the residence of Yolanda Irving and her family." *Id.* ¶¶ 108-111. The RPD VICE officers, Sgt. Rolfe, Rattelade, Gay and Monroe, knew that these material claims in the warrant were fabricated or made with reckless disregard for the truth. *Id.*

This fabricated information, as part of the ongoing conspiracy, resulted in a search warrant being issued by a Wake County Magistrate, which led directly to the terrifying raid on the Plaintiffs' homes. Ex. 1, Search Warrant Application.

**The Second Fabricated Controlled Buy**

One day later, May 21, 2020, Officer Abdullah and the RPD VICE team arranged a second controlled buy with Mr. Williams and Marcus VanIrvin. Mr. Williams was given $800 in pre-recorded buy money. Ex. 2, VanIrvin Report. VICE officers then allegedly observed Mr. Williams as he met with Mr. VanIrvin. *Id.* The officers then conspired with Mr. Williams to fabricate evidence and allege that Mr. VanIrvin had sold a trafficking amount of heroin. After the alleged sale, VICE officer Jason Gwinn, as reported by the SBI, observed the alleged heroin, and stated that it did not look like heroin but appeared to be brown sugar. VICE officer Rattelade field tested the alleged heroin and it tested negative for a controlled substance. Officer Abdullah—faced with the exculpatory observations and tests made by his fellow VICE officers—still charged Marcus VanIrvin with trafficking heroin.

Shortly after the second fabricated sale, RPD VICE and SEU officers raided the Plaintiffs' homes.

## RPD SEU and VICE Officers Raid Plaintiffs' Homes

On the day of the raid, May 21, 2020, Ms. Irving lived with her three children, J.I., Juwan Harrington and Cydneea Harrington at 1628 Burgundy St, Apt B, Raleigh, NC. SAC at ¶¶ 114-115. At the time, J.I. was 12 years old and Cydneea was 17. Juwan was 20, paralyzed on his left side, and wheelchair bound because of a car accident. *Id.* at ¶¶ 10-13. Next door, at Apartment A, Kenya Walton resided with her children R.W., Dyamond Whitley, Ziyel Whitley, and Kamisha Whitley. *Id.* at ¶¶ 116-117. A family friend, Z.G., was staying at their house at the time of the raid. Z.G. was 15 years old, Ziyel was 16 years old, Dyamond was 18 years old, and R.W. was 15 years old. *Id.* ¶ 120.

That afternoon, J.I. was sitting outside on his front stoop, hanging out with his neighbors Ziyel, Dyamond, and their friend, Z.G. *Id.* ¶ 118. Z.G. was the first to see RPD SEU officers rushing towards them, carrying shields, and with assault rifles pointed at them. *Id.* ¶ 121. The RPD SEU officers had received no description matching the four children standing outside of the apartment, and they had no evidence or allegations that any of the children had been involved in selling narcotics. *Id.* ¶ 122.

Z.G., after seeing the SEU officers and thinking he was about to be shot, opened the door to Kenya Walton's Apartment (1628 A) and ran inside. *Id.* ¶ 123. Dyamond immediately followed Z.G., and they both ran upstairs to Kamisha and R.W.'s rooms. *Id.* ¶ 124. Even though their address was not listed on the warrant—and none of the children matched the description of Mr. VanIrvin or were alleged to be involved in narcotics—RPD SEU officers immediately burst into the Waltons' home and ordered everyone to come downstairs. *Id.* ¶¶ 124-128. Dyamond, Z.G., R.W. and Kamisha followed their orders and—frightened that they could be shot and killed—walked downstairs with their hands raised. *Id.* ¶ 129.

8

After seeing Z.G. and Dyamond run into the Waltons' apartment (1628 A), J.I. and Ziyel turned around and saw Raleigh SEU officers running towards them with assault rifles pointed at them. *Id.* ¶ 130. J.I. immediately ran into the Irvings' apartment (1628 B) and Z.G. followed him and slammed the door behind them. *Id.* ¶ 131. Ziyel tried to run after J.I. but tripped on Juwan's wheelchair and fell to the floor. *Id.* ¶ 133. Almost immediately, approximately 15 SEU and VICE officers burst into the Irvings' apartment without knocking or announcing their presence, pointed their guns at Ziyel, ordered him to put his hands up, and placed him in handcuffs. *Id.* ¶¶ 134-135.

At least five SEU officers then ran up the stairs and pointed their assault rifles at Cydneea, who was standing at the top of the stairwell. *Id.* ¶ 136. Upon reaching the top of the stairwell, the SEU officers pointed their guns at Ms. Irving and J.I., who were standing in the hallway. *Id.* ¶ 137. J.I. ran into his brother Juwan's room and dove face down on the bed, hoping that he would not get shot and killed. *Id.* ¶ 138.

SEU officers then entered Juwan's room and pointed their rifles at him and ordered him to get on the floor. *Id.* ¶ 139. Juwan told the officers that he was not able to get down on the floor because he was disabled and pulled up his pants leg to show a permanent brace on his leg. *Id.* ¶ 140. Ms. Irving was terrified that her son Juwan would be shot because she knew he would not be able to comply with the officers' orders to get on the floor due to his disability and told the officers repeatedly that he was handicapped. *Id.* ¶ 141.

Ms. Irving, J.I., and Cydneea were then ordered downstairs and forced to sit on the ground for approximately one hour while VICE and SEU officers tore apart their apartment allegedly searching for contraband. *Id.* ¶ 143. Juwan, following the officers' orders, eventually walked downstairs with the assistance of his cane and sat in his wheelchair. *Id.* ¶ 144. The SEU

and VICE officers also searched the upstairs and downstairs of Kenya Walton's apartment. *Id.* ¶ 145. No drugs or contraband were found in either apartment. *Id.* ¶ 146.

Approximately 1.5 hours after the raid, the SEU and VICE officers left both apartments and released Ziyel from his handcuffs. *Id.* ¶ 147. As the officers were leaving, Ms. Irving asked Officer Abdullah why they had raided their home. *Id.* ¶ 148. Officer Abdullah provided Ms. Irving with a copy of the search warrant, and she informed him that the apartment pictured in the warrant was not the Irvings' home. *Id.* ¶ 149. The home pictured in the search warrant has a large tree in front of it. *Id.* ¶ 150. There was no tree in front of Ms. Irving's home. *Id.*

### Officer Abdullah is Charged with Felony Obstruction of Justice

On July 26, 2022, Officer Omar Abdullah was indicted by a Wake County Grand Jury for felony obstruction of justice. The indictment was based on Officer Abdullah "providing false statements to a judicial official pertaining to a fake and counterfeit substance falsely represented [by Abdullah] to be heroin." Ex. 3, Abdullah Indictment.

Officer Abdullah's indictment was the result of a long-standing investigation by the SBI in cooperation with the Wake County District Attorney's Office. This investigation began on September 25, 2020, at the request of District Attorney Lorrin Freeman. Shortly after its inception, SBI agents sought to interview Officer Abdullah as part of the investigation and he refused an interview at the advice of his then criminal defense attorney, Lee Turner.

Officer Abdullah's current criminal attorney, Christian Dysart, has indicated that he will instruct him to invoke his Fifth Amendment privilege at a deposition and in response to any written discovery. Ex. 4, Dysart Declaration. Mr. Dysart states that the allegations in the "Amended complaint appear to concern the same subject matter as that in the Criminal Action." *Id.* at ¶ 7. He notes that the civil action is based on false statements made in a warrant application

10

on "May 21, 2020—the same date that Mr. Abdullah has been criminally charged for making false statements to a judicial officer." *Id.* Notably missing from Mr. Dysart's declaration is the fact that Officer Abdullah also made false statements to a magistrate related to charging Marcus VanIrvin with trafficking heroin on May 21, 2020. While Mr. Dysart does not state which alleged fabrication led to the obstruction charges, it is clear that Officer Abdullah faces criminal exposure from multiple incidents occurring on May 21, 2020 for nearly two years prior.

## LAW

"While the burden is a high one, a court may stay civil proceedings when there is a risk of self-incrimination by a party." *Transamerica Life Ins. Co. v. Kaufmann*, No. 5:20-CV-00059, 2020 WL 7083968, at *2 (W.D. Va. Dec. 3, 2020). The dilemma faced by individuals confronting both criminal charges and pending civil litigation is "not uncommon . . . and courts in these cases have made two principles unmistakably clear:

(i) The Constitution does not require a stay in these cases and

(ii) The grant or denial of a stay in these cases is committed to the sound discretion of the district court."

*In re Anderson*, 349 B.R. 448, 458 (E.D. Va. 2006); *see also In re Phillips, Beckwith & Hall*, 896 F. Supp. 553, 557–58 (E.D. Va. 1995) (collecting cases finding no stay is required).

Although the Constitution does not mandate the stay of civil proceedings in the face of parallel criminal proceedings, "a court may decide in its discretion to stay civil proceedings, postpone civil discovery, or impose protective orders and conditions when the interests of justice seem to require such action." *Harbour Town Yacht Club Boat Slip Owners Ass'n v. Safe Berth Management, Inc.,* 411 F.Supp.2d 641, 643–44 (D.S.C. 2005). "The party seeking a stay must justify it by clear and convincing circumstances outweighing potential harm to the party against whom it is operative." *Williford*, 715 F.2d at 127. In balancing the equities, courts in the Fourth

11

Circuit typically consider "(i) the interests of the civil plaintiff in proceeding expeditiously with the civil litigation, including the avoidance of any prejudice to the plaintiff should a delay transpire; (ii) the hardship to the defendant, including the burden placed upon him should the cases go forward in tandem; (iii) the convenience of both the civil and criminal courts; (iv) the interests of third parties; and (v) the public interest." *In re Anderson*, 349 B.R. 448, 458 (E.D. Va. 2006); *Suntrust Mortg., Inc. v. Busby*, Nos. 2:09 CV 3 -15, 2009 WL 4801347, at *7 (W.D.N.C. Dec. 7, 2009).

Courts in the Fourth Circuit and beyond have found prejudice to the Plaintiff may occur from the time delay associated with a stay and the effect on witnesses' memories and the deterioration of evidence. *In re Phillips, Beckwith & Hall*, 896 F. Supp. 553, 559–60 (E.D. Va. 1995) ("[B]ecause memories fade over time, the government's case, based chiefly on Covington's recollection, will inevitably erode during the stay. A party is not entitled to delay resolution of a civil action, even to accommodate her Fifth Amendment interests, if her adversary's case will deteriorate as a result of the stay."); *see also Avalonbay Communities, Inc. v. San Jose Water Conservation Corp.,* No. CIV A 07-306, 2007 WL 2481291, at *2 (E.D. Va. Aug. 27, 2007), *aff'd*, 325 F. App'x 217 (4th Cir. 2009) (denying a stay of civil proceedings pending a criminal lawsuit, holding that while the defendants' Fifth Amendment rights were implicated, the prejudice to plaintiff outweighed the burden on defendants as staying a case for the undeterminable time length of any criminal prosecution ... makes it more likely that: (1) documents will be misplaced, (2) memories will fade and (3) Defendants will have fewer monetary resources available for Plaintiff to collect on any financial judgment.).

## ARGUMENT

I.     **The Court Should Deny Officer Abdullah's Request for a Stay**

The investigation into Officer Abdullah and his fellow VICE officers is not over. The Wake County District Attorney's Office has not closed their investigation, nor have they foreclosed the possibility of additional charges. Because felony offenses in North Carolina have no statute of limitations, the potential for criminal liability will continue indefinitely against Officer Abdullah regardless of the outcome of his current criminal prosecution. *State v. Johnson,* 275 N.C. 264, 271 (1969) ("In this State no statute of limitations bars the prosecution of a felony. . ."); *see generally* Shea Denning, *What's the Statute of Limitations for a Felony in NC*, N.C. Crim. L. Blog (UNC Sch. Gov't Sept. 26, 2018) (describing N.C. rule as uncommon among the states). Officer Abdullah and the other VICE officers face criminal exposure from not only the fabricated heroin offenses but also from each of the roughly 30 controlled buys involving Mr. Williams, including the pending civil litigation involving David Weaver, in which Officer Abdullah is accused of planting 36 grams of cocaine in Mr. Weaver's underwear. *See Weaver v. City of Raleigh*, *Omar Abdullah, et al.,* 5:22-CV-241. Officer Abdullah and the VICE Officers can offer this Court little assurance that they will not seek to invoke their Fifth Amendment privilege after the resolution of Officer Abdullah's criminal prosecution.

### A. The Prejudice to Plaintiffs Will be Great if this Litigation is Stayed

If this litigation is stayed pending the resolution of Officer Abdullah's criminal prosecution, it may not resume for years. Officer Abdullah has argued that serious delay is unlikely because of his right to a constitutional speedy trial. This argument is unpersuasive. Until its repeal in 1989, North Carolina had the Speedy Trial Act, formerly G.S. 15A-701, which required trial within 120 days of indictment. However, in the decades since its repeal, criminal defendants in North Carolina have been almost uniformly unsuccessful in establishing speedy trial violations. *See generally* JULIE R. LEWIS & JOHN RUBIN, NORTH CAROLINA DEFENDER

MANUAL, Vol. 1 § 7.3, Post-Accusation Delay (UNC Sch. Gov't, March 2019) (collecting cases). District Attorneys looking to the appellate courts will find little reason to accelerate their disposition of a criminal prosecution beyond the speed at which they are comfortable proceeding. Earlier this year, the North Carolina Supreme Court reversed the Court of Appeals' vacatur of criminal charges on speedy trial grounds in a case where "over six years elapsed between the initial indictment" of the Defendant and trial. *State v. Farook*, 2022-NCSC-59, ___ N.C. ___ (May 6, 2022); *see also State v. Farmer*, 376 N.C. 407, 852 S.E.2d 334 (2020) (holding defendant's constitutional right to speedy trial was not violated where trial occurred more than five years after indictment). Under state law, Constitutional speedy trial rights "generally don't kick in until a year has passed, at which point, courts apply a four-factor test to determine whether a defendant's constitutional speedy trial rights have been compromised." *See* Jeff Welty, *Speedy Trial*, N.C. CRIM. L. BLOG (UNC Sch. Gov't, March 10, 2009), available at https://nccriminallaw.sog.unc.edu/speedy-trial/.

Furthermore, Officer Abdullah may wish to waive, or not actively assert, his constitutional speedy trial right, given than he is not currently incarcerated and that a delay may result in a better outcome for him. According to the Wake County Clerk of Court's office, Officer Abdullah has had one court appearance in his criminal case. The second court date has not been set. No motions have been filed, nor is there a trial date.

During the inestimable period awaiting resolution of his criminal case, the memories of Officer Abdullah's colleagues and co-defendants—who will be the key witnesses in this litigation—will undoubtedly fade. Emails, text messages, and other documents will also be more difficult to obtain as time passes. *See In re Anderson*, 349 B.R. 448, 458–60 (E.D. Va. 2006) ("Without any idea of a possible end date for the criminal case, the bankruptcy court reasonably

14

understood that any stay granted might last for an indefinite period, to the prejudice of appellees.").

Perhaps most severely, if Officer Abdullah is convicted at his criminal trial of obstruction of justice, the City of Raleigh may refuse to indemnify his misconduct and any civil judgment against him, making recovery more difficult, more time consuming, and more costly. *Cf.* Radley Balko, *Durham, N.C. Refuses to Compensate Innocent Man After 24 Years in Prison*, WASH. POST, April 26 2022 (detailing Durham's assertion that city police officer acted in bad faith as the basis for refusing to pay damages awarded by federal jury in civil rights action); *see also Avalonbay Communities, Inc. v. San Jose Water Conservation Corp.,* No. CIV A 07-306, 2007 WL 2481291, at *2 (E.D. Va. Aug. 27, 2007), *aff'd*, 325 F. App'x 217 (4th Cir. 2009) (considering ability to collect a judgment as a relevant factor for prejudice on a Plaintiff).

## B. Officer Abdullah's Fifth Amendment Dilemma Will Continue Indefinitely

It is increasingly likely that Officer Abdullah's criminal exposure will continue to follow him even after the conclusion of this criminal prosecution, and as a result, he will continue to invoke his Fifth Amendment privilege. Plaintiffs intend to explore the roughly 30 prior fabricated controlled buys conducted by Mr. Williams in conspiracy with Officer Abdullah and the VICE team to prove that the Defendants knew that Mr. Williams was unreliable and to show their intent, knowledge of his illegal acts, and absence of mistake. *See* Fed. R. Evid. 404. At his deposition, whenever it occurs, Officer Abdullah will have great motivation to invoke the Fifth Amendment in response to not only questions related to the current criminal prosecution but also to questions related to any of the other incidents under investigation or that could lead to additional criminal exposure. This dilemma will continue regardless of whether or not Officer Abdullah faces an active criminal prosecution. In fact, Officer Abdullah chose to remain silent

15

when faced with questioning from the SBI in 2019—at a time when no criminal prosecution was pending. Mr. Dysart will likely continue to instruct Officer Abdullah to invoke the Fifth Amendment even if he receives double jeopardy protection from the single May 21, 2020, incident.

### C. Convenience of the Court

Because Officer Abdullah is facing ongoing and widespread criminal exposure, this Court, if it grants a stay, may confront this same issue again when the litigation is continued. Officer Abdullah is likely to continue to invoke his Fifth Amendment right indefinitely. The litigation in *Weaver v. City of Raleigh*, *Omar Abdullah, et al.,* 5:22-CV-241, continues as does the SBI and Wake County District Attorney criminal investigations. If Officer Abdullah implicates himself years from now in a deposition or at trial, he certainly could face a second criminal prosecution and request a second stay from this Court.

### D. Public Interest

There is significant public interest in this litigation and the resolution of its public policy implications. *See, e.g.,* Virginia Bridges, *Lawsuit Filed Against Fired Detective, City of Raleigh after Police Raid Wrong Apartment*, NEWS & OBSERVER, February 22, 2022, (available at https://www.newsobserver.com/article258636778.html); Joel Brown, *Their Homes were Msitakenly Raided by Police, Now They're suing the City of Raleigh*, ABC 11, February 22, 2022, (available at https://abc11.com/raleigh-police-mistaken-raids-wrong-house-raided-federal-lawsuit/11590951/). As emphasized by *The News & Observer*, this action raises three *Monell* claims related to RPD's policies and practices surrounding no-knock and quick knock raids, policies and training related to identification of the correct unit or home when executing a search warrant, and policies related to supervision and use of confidential informants:

> The lawsuits and related actions have raised questions about a range of Raleigh police practices including confidential informant oversight, use of no-knock warrants — in which police don't give a warning before entering a home — and officers proceeding with search warrants based on inaccurate and unreliable information.
>
> On Feb. 2, The N&O requested information and statistics about the use of no-knock warrants and proper procedures when police search the wrong address. Spokesperson Laura Hourigan responded on Feb. 7 that RPD doesn't use no-knock search warrants but didn't answer follow up questions submitted Feb. 8 about when and whether the policy was changed and any related statistics on how often RPD had used them.

*Lawsuit Filed Against Fired Detective,* News & Observer, February 22, 2022. The RPD has still not publicly addressed the reported change in policy related to no-knock search warrants.

## CONCLUSION

The equities weigh in favor of continuing this litigation. Plaintiffs respectfully request the Court deny Officer Abdullah's request for a stay.

Respectfully submitted, this the 10th day of October, 2022.

_____
Abraham Rubert-Schewel (N.C. Bar # 56863)
TIN FULTON WALKER & OWEN, PLLC
119 E. Main Street
Durham, NC 27701
Tel: (919) 451-9216
schewel@tinfulton.com

/s/ *Emily Gladden*
Emily D. Gladden
TIN FULTON WALKER & OWEN, PLLC
State Bar No.:   49224
204 N. Person Street
Raleigh, NC 27601
Telephone:    (919) 720-4201
Facsimile:     (919) 400-4516
Email:          Egladden@tinfulton.com

*/s/ Micheal L. Littlejohn Jr.*
Micheal L. Littlejohn Jr.
N.C. Bar No. 49353
Littlejohn Law PLLC
PO Box 16661
Charlotte, NC 28297
Telephone: (704) 322-4581
Fax: (704) 625-9396
Email: mll@littlejohn-law.com

*/s/ Ian Mance*
Ian A. Mance
N.C. Bar No. 46589
EMANCIPATE NC
Post Office Box 309
Durham, NC 27702
Tel: (828) 719-5755
ian@emancipatenc.org

*/s/ Elizabeth Simpson*
Elizabeth G. Simpson
N.C. Bar No. 41596
EMANCIPATE NC
Post Office Box 309
Durham, NC 27702
Tel: (919) 682-1149
elizabeth@emancipatenc.org