IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CIVIL ACTION NO.: 5:22-cv-00068-BO

YOLANDA IRVING, individually and as the )
natural parent and guardian of J.I. JUWAN )
HARRINGTON, CYDNEEA HARRINGTON, KENYA )
WALTON, individually and as the natural )
parent and guardian of R.W., ZIYEL WHITLEY, )
DYAMOND WHITLEY, KAMISHA WHITLEY, NANETTA )
GRANT as the natural parent and guardian )
of Z.G., and EMANCIPATE NC, INC. )
)
                    Plaintiffs,          )
                                          )
       vs.                                )
                                          )
THE CITY OF RALEIGH, Officer OMAR I.      )
ABDULLAH, Sergeant WILLIAM ROLFE, Officer )
RISHAR PIERRE MONROE, Officer JULIEN DAVID )
RATTELADE, and Officer MEGHAN CAROLINE GAY, )
Officer DAVID MEAD, Officer JESUS ORTIZ,  )
Officer KYLE PERRIN, Officer MICHAEL      )
MOLLERE, Officer KYLE THOMPSON, Officer   )
VINCENT DEBONIS, Officer DANIEL TWIDDY,   )
Officer THOMAS WEBB, Officer DAVID        )
McDONALD, Officer DAVID GARNER, Chief of  )
Police ESTELLA PATTERSON and City Manager )
MARCHELL ADAMS-DAVID, in their official   )
capacities,                               )
                                          )
                    Defendants.           )
_____)


D E P O S I T I O N

OF

**SERGEANT JULIEN DAVID RATTELADE**


At Raleigh, North Carolina

Tuesday, February 28, 2023

REPORTER:  DEBORAH A. HYDE


**REED & ASSOCIATES**
980.339.3575

A P P E A R I N G


On Behalf of the Plaintiffs:

        ABRAHAM RUBERT-SCHEWEL, ESQUIRE
        Tin Fulton Walker & Owen, PLLC
        119 East Main Street
        Durham, North Carolina  27701
        919-451-9216
        schewel@tinfulton.com


On Behalf of Defendants City of Raleigh, Estella
    Patterson, and Marchell Adams-David:

        DOROTHY V. KIBLER, ESQUIRE
        City of Raleigh Attorney's Office
        Post Office Box 590
        Raleigh, North Carolina  27602
        919-996-6560
        dorothy.kibler@raleighnc.gov


On Behalf of Defendant Officers David Mead, Jesus
    Ortiz, Kyle Perrin, Michael Mollere, Kyle Thompson,
    Vincent Debonis, Daniel Twiddy, Thomas Webb, David
    McDonald, and David Garner:

        LESLIE C. PACKER, ESQUIRE
        Ellis & Winters LLP
        4131 Parklake Avenue, Suite 400
        Raleigh, North Carolina  27612
        919-865-7009
        leslie.packer@elliswinters.com


On Behalf of Defendant Officer Omar I. Abdullah:

        JESSICA C. DIXON, ESQUIRE
        Parker Poe Adams & Bernstein, LLP
        620 South Tryon Street, Suite 800
        Charlotte, North Carolina  28202
        704-372-9000
        jessicadixon@parkerpoe.com


                    (Continued)

A P P E A R I N G


On Behalf of Defendant Officers Rishar Pierre Monroe,
    Julien David Rattelade, and Meghan Caroline Gay:

        RODNEY E. PETTEY, ESQUIRE
        ALAYNA M. POOLE, ESQUIRE
        Yates, McLamb & Weyher, LLP
        Two Hannover Square
        434 Fayetteville Street, Suite 2200
        Raleigh, North Carolina  27601
        919-835-0900
        rpettey@ymwlaw.com
        apoole@ymwlaw.com


On Behalf of Defendant Officer William Rolfe:

        NORWOOD P. BLANCHARD, III
        Crossley McIntosh Collier Hanley & Edes, PLLC
        5002 Randall Parkway
        Wilmington, North Carolina  28403
        910-762-9711
        norwood@cmclawfirm.com


                    * * * * *

# C O N T E N T S

PAGE

Examination by Mr. Schewel:                             5

Examination by Mr. Blanchard:                         166

Further Examination by Mr. Schewel:                   170

Further Examination by Mr. Blanchard:                 173

## PLAINTIFFS' EXHIBITS

Exhibit  2 - Rattelade IA Interview of 8/14/20        109

Exhibit  3 - Meghan Gay Cell Phone Text Messages      123

Exhibit  4 - VanIrvin Search Warrant of 5/21/20       117

Exhibit  5 - Rattelade IA Interview of 10/20/21        81

Exhibit  6 - Rattelade SBI Interview                   36

Exhibit  7 - Felony Investigative Report of Sherrod   111
             Anton Smith

Exhibit  8 - Rattelade Third Follow-up Internal        49
             Affairs Interview

Exhibit  9 - VanIrvin 5/21 Buy, Video Recording       155

Exhibit 10 - Banks-Howard Video Recording              58

(Exhibits provided with the transcript.)

*Reporter's Note:  This transcript contains quoted
material.  Such material is reproduced as read or quoted
by the speaker.*

1              This is the deposition of SERGEANT JULIEN DAVID

2       RATTELADE, taken in accordance with the Federal Rules of

3       Civil Procedure in connection with the above case.

4              Pursuant to Notice, this deposition is being

5       taken in the offices of Yates, McLamb & Weyher,

6       434 Fayetteville Street, Suite 2200, Raleigh, North

7       Carolina, beginning at 10:24 a.m. on Tuesday,

8       February 28, 2023, before Deborah A. Hyde, Certified

9       Verbatim Reporter and Notary Public.

10                              *   *   *

11      Whereupon,

12                  **SERGEANT JULIEN DAVID RATTELADE**

13      was called as a witness and, having first been duly

14      sworn, was examined and testified as follows:

15                            EXAMINATION

16              BY MR. SCHEWEL:

17          Q.    My name is Abraham Rubert-Schewel.  I'm with the

18      law firm of Tin, Fulton, Walker and Owen.  We represent

19      the Plaintiffs in this lawsuit against the City of

20      Raleigh and individually named officers such as yourself.

21              You are testifying under oath and under the

22      penalty of perjury today just as if you were in a court

23      of law.  Do you understand that?

24          A.    Yes, sir.

25          Q.    Have you ever been deposed before?

1          A.    This is the first time.

2          Q.    Have you ever been party to a lawsuit other than

3     this case or the Washington litigation?

4          A.    No, sir.

5          Q.    As you can tell, these questions and answers are

6     being transcribed by a court reporter, meaning it's very

7     important that you speak loudly and clearly, which you've

8     done so far.

9                You must also answer questions verbally; for

10    example, using "yes" or "no," not phrases such as

11    "uh-huh."  Do you understand?

12         A.    Yes, sir.

13         Q.    And I assume you've testified in court before?

14         A.    Many times.

15         Q.    Your attorney, Mr. Pettey or Ms. Poole, may

16    object to certain questions that I ask.  You should know

17    that you are still required to answer every question

18    unless instructed not to, which should happen rarely.

19    Otherwise, you're required to answer each question

20    truthfully and completely as possible.  Do you

21    understand?

22         A.    Yes, sir.

23         Q.    Please state and spell your name.

24         A.    Julien David Rattelade.  It's J-u-l-i-e-n David,

25    D-a-v-i-d, Rattelade, R-a-t-t-e-l-a-d-e.

1      Q.   You started with RPD in 1999?

2      A.   Yes, sir.

3      Q.   And you joined Drugs and Vice in 2015?

4      A.   Yes, sir.

5      Q.   And you're a member of vice team 1?

6      A.   At the time, I was.  I'm no longer with that

7   team.

8      Q.   In February of 2022, you were transferred to a

9   different unit?

10      A.   Yes, sir.

11      Q.   What unit is that?

12      A.   I was promoted to the rank of sergeant, and I

13   took over supervision of downtown district, Squad C.

14      Q.   What are your responsibilities there?

15      A.   Supervising the patrol officers assigned to that

16   unit.

17      Q.   Prior to leaving vice in 2022, who was your

18   supervisor?

19      A.   When I left, it was Sergeant Kenneth Barber.

20   Prior to that, it was Sergeant Scott Rolfe.

21      Q.   When Sergeant Barber came to the unit, did he

22   instill any new policies?

23      A.   No, sir.

24      Q.   Any new procedures?

25      A.   No, sir.

 1      Q.   Did he have any discussions with you about the

 2   situation that happened with Aspirin and Abdullah?

 3      A.   Not that I recall.

 4      Q.   Did any members of RPD have discussions with you

 5   or your unit about the situation?

 6      A.   As far as a Internal Affairs investigation, we

 7   were investigated by them.

 8      Q.   Okay, but your testimony is that nobody from RPD

 9   came down and said, you know, "We need to start doing

10   things differently"?

11      A.   I mean, those discussions were ongoing, yes.

12      Q.   Okay.  So who did you have those discussions

13   with?

14      A.   I mean, members of the squad.  If I'm getting

15   your question correctly, I mean, we were talking amongst

16   ourselves of some change that could occur.

17      Q.   Okay.  So you and other members of the vice

18   unit?

19      A.   Yes.

20      Q.   Okay.  And what changes did you think should

21   occur?

22      A.   A piece of equipment that we would like to see

23   for field testing.

24      Q.   Okay.  And that was so you could test fentanyl

25   safely or heroin that may be laced with fentanyl safely?

1          A.    Yes, sir.

2          Q.    Is it your opinion that fentanyl is a dangerous

3    substance?

4          A.    Yes.

5          Q.    In what ways can it be dangerous?

6          A.    It can cause an overdose through depressing your

7    respiratory system and be fatal if not treated.

8          Q.    And is it your opinion that it can cause that

9    through ingestion?

10         A.    Ingestion, inhalation, absorption.  There's

11   multiple ways it can be ingested.

12         Q.    Okay.  So your testimony is that exposure to

13   fentanyl could cause those symptoms that you just stated?

14         A.    Yes, sir.

15         Q.    And by "exposure," you mean simply field testing

16   it?

17         A.    Correct.

18         Q.    And I guess field testing it with the device

19   that you all were using previously?

20         A.    Correct.  It was just a chemical reaction test.

21         Q.    And when you do the chemical reaction test, how

22   would you be exposed to the narcotic?

23         A.    You would have to open the package, place it on

24   something small to get a sample of it from the baggie,

25   and then put it inside the plastic pouch.

1      Q.   Okay.  And so your concern is that, by just

2   opening the bag, you could have been exposed to some sort

3   of fentanyl that could have caused those reactions you

4   described?

5      A.   Yes, sir.

6      Q.   Have you ever seen any officer suffer from those

7   reactions that you described from fentanyl?

8      A.   Through training, yes.

9      Q.   So you mean in video?

10     A.   In video.

11     Q.   Okay.  And could you describe what happened in

12  that video?

13     A.   Officer was exposed to fentanyl, started getting

14  kind of woozy and just collapsed on the road and started

15  having respiratory distress.  Another officer used Narcan

16  to counteract the effects and that officer was sent to

17  the hospital.

18     Q.   How was the officer exposed in the video?

19     A.   I don't know.

20     Q.   Have you ever seen an officer in RPD suffer

21  those reactions from fentanyl exposure?

22     A.   No, sir.

23     Q.   Did you meet with Mr. Pettey before testifying

24  today?

25     A.   Yes, sir.

1       Q.   Did you consult with a criminal attorney before

2   preparing to testify today?

3       A.   No, sir.

4       Q.   Do you intend to invoke your Fifth Amendment

5   right to remain silent in response to any questions?

6       A.   No, sir.

7       Q.   Have you met with any attorneys in the Wake

8   County District Attorney's office related to the

9   prosecution of Officer Abdullah?

10      A.   Yes.

11      Q.   Would that be David Saacks?

12      A.   I believe so.

13      Q.   How about Lorrin Freeman?

14      A.   I have not met with her.

15      Q.   Any other DAs?

16      A.   No, sir.

17      Q.   When did you meet with David Saacks?

18      A.   Last year.  I don't remember the date.

19      Q.   Was Officer Gay present for that meeting?

20      A.   It was just me and the district attorney.

21      Q.   Why did you meet with the district attorney --

22   sorry, strike that question.

23           How did you come to meet with the district

24   attorney?

25      A.   They requested my presence at the DA's office.

1    I showed up and we had a meeting.

2         Q.   Did they email you?

3         A.   I don't recall the method of communication.

4         Q.   Who requested your presence?

5         A.   The -- I'm assuming it was DA Saacks.

6         Q.   Okay.  What information did you provide

7    Mr. Saacks?

8         A.   I gave him an account of what occurred after the

9    searches.  I believe it was May 20th or 21st of -- would

10   have been 2020 -- on the -- your Plaintiff's residence.

11   We described what occurred back at the office involving

12   my comm- -- what happened between me and Detective

13   Abdullah.

14        Q.   Okay.  Did you go into any other detail about --

15   about Office Abdullah?

16        A.   Just my opinion that -- of his work.

17        Q.   Okay.  And what did you tell Mr. Saacks?

18        A.   My personal opinion was that he had sloppy work.

19        Q.   Did you give ADA Saacks any examples of that?

20        A.   I don't recall any specifics, examples.  I think

21   it was just a general conversation about his past

22   performance.  The focus of the meeting was the events of

23   that day in question.

24        Q.   Okay.  Did you discuss with ADA Saacks any

25   previous controlled buys related to Officer Abdullah that

1   you were involved in?

2       A.   I don't recall if we spoke about previous buys.

3       Q.   Did you relay to Mr. Saacks that you were

4   concerned about any previous buys?

5       A.   I don't recall.

6       Q.   Now, do you intend to testify at a trial, if it

7   occurs, related to Officer Abdullah?

8       A.   If I'm subpoenaed to testify, I will be there

9   and I will testify.

10      Q.   Were you offered or given any sort of immunity

11  in exchange for your cooperation?

12      A.   No, sir.

13      Q.   Is it your understanding that you are subject to

14  prosecution or any sort of criminal charges related to

15  this incident?

16      A.   To my knowledge, I am not under any

17  investigation.

18      Q.   Did ADA Saacks tell you that?

19      A.   No.

20      Q.   Has anyone told you that?

21      A.   Just making the assumption.  I've been

22  interviewed by Internal Affairs, I've been interviewed by

23  the SBI, and quite amount of time has passed.

24      Q.   And no one has ever said you're under

25  investigation?

1      A.   Correct.

2      Q.   Okay.  So on May 21st, 2020, when you returned

3   back to Green Dairy, you field tested the alleged heroin?

4      A.   Correct.

5      Q.   And what device did you use to field test the

6   heroin?

7      A.   I used some sort of cutting instrument to open

8   the package, introduced a sample to the chemical reaction

9   test.  I think the manufacturer is Sirchie.  Conducted

10  the field test by breaking the ampules, which introduces

11  a mixture of acids to the sample, and you're looking for

12  a rapid color change through chemical reaction.  That did

13  not occur, so to me it was a negative field test.

14     Q.   Why did you feel comfortable testing it in this

15  instance?

16     A.   Because it was my opinion that it was not

17  heroin.

18     Q.   So you weren't worried about fentanyl exposure?

19     A.   At that particular moment, no.

20     Q.   At Green Dairy, does the vice team have any sort

21  of masks or gloves you could use to prevent fentanyl

22  exposure?

23     A.   We typically always have gloves.  We don't have

24  any sort of special masks or anything like that.  There

25  is a vented hood testing device at our evidence unit,

1  which is located at another location, but it's not

2  connected to any outside ductwork, so I'd be very

3  suspicious of its effectiveness.

4       Q.   Okay.  And, I mean, are you aware if a mask is

5  effective or not in preventing fentanyl exposure?

6       A.   I don't have a, I guess, a professional opinion

7  about the effectiveness of the mask.  I just know that

8  there is a threat of fentanyl and I've, through training

9  videos, seen the effects of the fentanyl exposure.

10      Q.   Have you arrested someone with fentanyl on them?

11      A.   Yes.

12      Q.   Have you ever been exposed to fentanyl?

13      A.   I believe so.

14      Q.   Okay.  And did you have a reaction?

15      A.   I mean, not at that -- I guess what I'm asking,

16 what is your definition of "exposure"?  Was I around it

17 or did I have it put on me?

18      Q.   I just -- were you around it?

19      A.   I've been around it, yes.

20      Q.   Can you describe that situation?

21      A.   A gentleman took off from a buy bust.  He was

22 taken into custody after a short foot pursuit, removed a

23 clear baggy from his pocket, which we thought was

24 cocaine.  A field test later showed -- or lab tests later

25 showed it was fentanyl.

1      Q.   Okay.  And can you describe how you were around

2  it?

3      A.   I removed it from his pocket, placed it in the

4  evidence bag.

5      Q.   Did you open it?

6      A.   No.

7      Q.   Okay.  Have you ever opened a bag that contained

8  fentanyl?

9      A.   To my knowledge, I don't -- I don't know if I've

10  personally done that.

11      Q.   Okay.  So on May 21, 2020, you placed some of

12  the alleged heroin into a bag?

13      A.   It's like a thick plastic pouch.

14      Q.   Okay.  And what did you do after that?

15      A.   I broke the ampules of acid in sequence and

16  concluded that it was a negative field test.

17      Q.   Because it did not show any color or it did not

18  show the positive color?

19      A.   Didn't show a positive color.

20      Q.   Which is what?

21      A.   For that test, it's like a olive green.

22      Q.   Did you preserve these results?

23      A.   No, sir.  It's a liquid chemical reaction with

24  acids and stuff.  You just throw it away.

25      Q.   Did you take a picture of it?

1     A.   I did not.

2     Q.   Did you provide it to Officer Abdullah?

3     A.   I did.  I -- verbally, I showed -- or I visually

4  showed it to him and verbally explained to him my

5  opinion.

6     Q.   Do you know if he took a picture of it?

7     A.   I do not know.

8     Q.   What did you do after you did the test?

9     A.   I explained to Detective Abdullah that it was

10 not heroin, that my opinion was that the person had sold

11 a counterfeit controlled substance to the informant and,

12 therefore, the person should be charged with sale of a

13 counterfeit controlled substance, deliver counterfeit

14 controlled substance, and possession with intent to sell

15 and distribute a counterfeit controlled substance.

16    Q.   You said all that to him?

17    A.   Yes, and I put it in writing.

18    Q.   Where did you put that in writing?

19    A.   On a dry-erase board.

20    Q.   As far as you know, was that documented in any

21 way?

22    A.   No, sir.  The dry-erase board is just used

23 temporarily to put up information so that everyone can

24 conduct their assignment without having to ask a hundred

25 questions.

1     Q.   Why did you feel the need to put that up on the

2  dry-erase board?

3     A.   Because it was my opinion that the CI had been

4  played and had -- he had been duped, and I thought that

5  this was a pattern of him being duped.

6     Q.   Okay.  Had you ever done that in the past where

7  you put up the charges you believe should occur or should

8  be given to someone else's informant?

9     A.   It's common to write up the proper charges up

10 there, but not in the manner that it occurred that day.

11    Q.   Tell me what you mean by that.

12    A.   That I was basically, emphatically telling

13 Detective Abdullah, like, "Your informant had been

14 played," like, "This is the proper charge."

15    Q.   But you said it's not common to do that in the

16 way that you did it on that day.  How would you do it

17 otherwise?

18    A.   Just write it on the board versus going to him,

19 showing it to him and explaining why this is the proper

20 charge.  You would just write the charge up there and it

21 would be accepted.

22    Q.   Because, normally, there's an agreement on the

23 charge?

24    A.   Correct.

25    Q.   And why are you writing the charge on the board

1   as opposed to any other officer?

2       A.   Because it's next to my -- it was next to my

3   desk at the time and I was the one that conducted the

4   field test.

5       Q.   Okay.  Had there been other occasions in the

6   past where you had written the charge up on the board for

7   other people's CIs?

8       A.   Yes.

9       Q.   Tell me how that would occur, why that would

10  occur.

11      A.   After we -- an example would be as we conduct a

12  search warrant on a residence, we come back -- let's say,

13  for example, I was the investigating detective or the

14  lead officer.  The lead officer typically would write

15  very basic information on the board.  It would include a

16  case number, date, time, location, anyone that's in

17  custody, their identifying information.

18           Whoever is collecting the evidence would

19  typically document what evidence was recovered on the

20  board and then, that way, we could determine what the

21  proper charges are, because there's -- everyone's got a

22  different role.

23           If I was the lead investigator, I would be in

24  the interview room conducting interviews.  I would have

25  someone processing my evidence for me.  I would have

1  someone doing my paperwork for me, as far as drafting up

2  arrest documents that -- if I was the lead, at that

3  point, I would go swear to.

4      Q.   Okay.  So it's fairly common, then, for other

5  officers on the vice team to put up information on the

6  board such as what the proper charges are?

7      A.   Correct.

8      Q.   And this writing on the board of details related

9  to the operation, does that occur after almost every

10 operation?

11     A.   It's routine.  I wouldn't say it occurs after

12 every operation.

13     Q.   Is the board ever documented?

14     A.   No, sir.  It's just -- their stuff is written up

15 there, the information is used, the assignments are

16 completed, and then the board is erased.

17     Q.   Did you write on the board that the drugs had

18 field tested negative?

19     A.   No.  I just wrote what I thought the proper

20 charges were.

21     Q.   Could you go over again what information is

22 typically included on the board?

23     A.   Case number, date, time, location, suspects that

24 are in custody, evidence that was recovered and what the

25 charges should be.

1      Q.   What about the CI?

2      A.   We don't -- I mean, there's no need to list them

3   on the board.  That's -- the CI is their responsibility,

4   is to the lead officer.

5      Q.   So the board is basically information that

6   you're going to use to later fill out arrest paperwork?

7      A.   It's basically -- it's on a wall in a central

8   location where everyone can see it so that, once the

9   assignments are divvied out to each detective, they can

10  refer to the board and conduct their business without

11  having to go -- if I was the lead, they wouldn't have to

12  come ask me a hundred questions and prevent me from doing

13  my job.

14     Q.   Okay.  Had there been other cases prior to this

15  one involving Aspirin and Abdullah where you felt he

16  should have charged the individuals with selling fake

17  narcotics?

18     A.   No.  This was the first time where I had handled

19  the product at the end of the day and was confident that

20  it was a counterfeit substance.

21     Q.   Well, earlier you just said that this had become

22  a pattern.

23     A.   As far as him being duped?

24     Q.   Yeah.

25     A.   Yeah, that's with hindsight.

1       Q.   Tell me what you mean by that.

2       A.   We didn't have lab results at the time, knowing

3   that these were counterfeit drugs.

4       Q.   Did you have lab results on May 21st, 2020?

5       A.   May 21st, 2020, the -- you're talking about lab

6   results for that day?  No, we didn't have lab results for

7   a while on it.  That was strictly a field test.

8       Q.   Okay.  So what did you mean by "pattern"?

9       A.   Just felt that he was getting duped, as far as

10  he was buying small amounts of a product and then he was

11  going out and buying large amounts, and that just doesn't

12  fit the pattern of behavior and how you conduct these

13  investigations.

14      Q.   Did you tell Mr. Saacks that you had doubts

15  about Aspirin's reliability?

16      A.   I believe so.  I don't recall the actual

17  conversation as far as like what the answer was.

18      Q.   Okay.  Have you met with any member of the U.S.

19  Attorney's Office as part of this investigation?

20      A.   No, sir.

21      Q.   Who trained you in vice?

22      A.   Detective Peirera.

23      Q.   How do you spell Peirera?  Just your best guess

24  is okay.

25      A.   P-e-i-r-e-r-a, maybe.  I'm not sure.

1      Q.   Okay.  And did Detective Peirera train you on

2  how to work with informants?

3      A.   Yes, as far as guidance on working with

4  informants.  Yes.

5      Q.   What were some of the important things you

6  learned during your time in vice about working with

7  informants?

8      A.   It's a continual process of monitoring your

9  informants for their reliability.

10     Q.   Any other important things you learned?

11     A.   I mean, it's -- that's the best way I can sum it

12  up, is it's a ongoing process.  You have to closely watch

13  and monitor your informants to make sure that they're

14  reliable.  If they're not reliable, then you have to get

15  rid of them.

16     Q.   You have to blacklist them?

17     A.   Yes.

18     Q.   Okay.  So would you say the integrity of your CI

19  is important?

20     A.   Very.

21     Q.   And it's important, as you just said, for your

22  CI to be reliable?

23     A.   Yes.

24     Q.   Would you ever apply for a warrant using an

25  unreliable informant?

1      A.    No, sir.

2      Q.    If you wrote in a warrant application that an

3   informant had been unreliable in the past, do you think

4   it would be granted?

5      A.    Can you repeat that?

6      Q.    Sure.  If you wrote in a warrant application to

7   a magistrate or a judge that an informant had been

8   unreliable in the past, do you believe that that warrant

9   application would be granted?

10         MR. BLANCHARD:  Objection.

11         MS. DIXON:  Objection.

12         THE WITNESS:  I do not believe, if you're

13   putting that verbiage, that exact verbiage, in a search

14   warrant affidavit, the magistrate would not sign it.

15         BY MR. SCHEWEL:

16      Q.    How do you determine if an informant is

17   reliable?

18      A.    It's a ongoing process.  You're monitoring their

19   behavior, their demeanor, their actions, why you're using

20   them, are they following instructions, are they being

21   deceptive.  Probably similar to raising children.

22      Q.    Okay.  And so you said a lot of different

23   things.  Demeanor, instruction, deceptiveness.  Give me

24   some context for those.  What situations are you in with

25   the informant when you're monitoring those different

1    things?

2         A.    Can I give them a set of instructions, deploy

3    them in the field; can they follow those instructions and

4    come back to me and provide -- provide what was agreed

5    upon.

6              So if you were my informant and you said, "I

7    know Mr. A and Mr. A is going to sell me a bag of

8    marijuana," and I give you money and I send you to meet

9    Mr. A, I would expect to watch the video to see you meet

10   with Mr. A, exchange money for the marijuana, and then I

11   expect you to bring the marijuana back to me.

12        Q.    Would it be concerning to you if you could not

13   see that transaction on the video?

14        A.    In a singular incident, stuff happens where

15   videos fail.  Stuff happens, but if it's a pattern, then

16   that's something that I would monitor.

17        Q.    But you're saying if it happened once, you may

18   continue to still use that CI?

19        A.    It's possible.  It's a case-by-case situation.

20        Q.    Okay.  But you're saying you would continue to

21   monitor that situation?

22        A.    Yes.

23        Q.    Meaning that -- how would you monitor that?

24        A.    To see if -- you know, I would remind them that

25   you don't manipulate the camera system, this is what we

1   expect you to do, this is what we expect to see, and

2   check that performance during the next buy.

3        Q.   And by expect to see it, you mean actually

4   expect to see a hand-to-hand transaction occur?

5        A.   That would be preferred, yes, just much like the

6   body-worn cameras that we wear.  I mean, the camera angle

7   doesn't catch everything.

8        Q.   Okay.  But that is your hope.  That is the goal,

9   is to actually see the exchange of --

10       A.   Correct.

11       Q.   When you were in vice, did you ever use an

12  informant who you believed was unreliable?

13            MR. PETTEY:  Objection.

14            THE WITNESS:  Anyone I believed was unreliable

15  was blacklisted and never used again.

16            BY MR. SCHEWEL:

17       Q.   How does it -- that occur, someone getting

18  blacklisted?

19       A.   It's the lead investigator -- or the assigned

20  handler, it's their determination whether or not they

21  should be blacklisted, and then you notify your chain of

22  command and they're removed from the roles of active

23  informants.

24       Q.   So what if Sergeant Rolfe told you, "Detective,

25  you know, your informant has done X, Y and Z and I'm

1    going to blacklist him," would he have the power to do
2    that?
3         A.   I'm sure he would have -- as a supervisor over
4    the detective, he would definitely have the right to have
5    that discussion with the detective.  I would think there
6    would be some sort of collaborative conversation there to
7    determine if there is a reliability issue and then, if
8    so, then they need to make the determination on if the
9    informant continues or if they're blacklisted.
10        Q.   Okay.  But let's say you disagreed with Sergeant
11   Rolfe and you said, "No"?
12        A.   He outranks me and would have the final say.
13        Q.   Did you ever meet with an informant alone when
14   you were in vice?
15        A.   Meet with them alone?  It happened.
16        Q.   So that's yes?
17        A.   Yes.
18        Q.   And in what circumstances?
19        A.   Just pulling up on a corner, talking to them.
20        Q.   Okay.  And would you say this is a common
21   practice in vice, to meet with informants alone?
22        A.   The goal was to have someone with you, but it
23   wasn't always possible.
24        Q.   Okay.  So did other members of the vice unit
25   meet with informants alone?

1      A.   I can't speak to what other members did on --
2  when I wasn't around them.
3      Q.   Well, did they ever tell you that they met with
4  informants alone?
5      A.   Not that I recall.
6      Q.   What about paying a CI?  Did you ever do that
7  alone?
8      A.   I probably did.
9      Q.   So you're familiar with the CI payment sheet?
10     A.   Correct.
11     Q.   And that requires a witness to be present for CI
12  payment?
13     A.   Correct.
14     Q.   Was it your practice to have the witness
15  physically present to observe the payment to the CI?
16     A.   Typically, that was the goal, yes.
17     Q.   Okay.  But you're saying, on some occasions,
18  that did not happen?
19     A.   It's possible that they might be nearby, but not
20  like standing with you as you hand money off.
21     Q.   And they would still sign the sheet saying that
22  they witnessed it?
23     A.   Correct.
24     Q.   And you don't think that's perjury?
25          MR. PETTEY:  Objection.

1          THE WITNESS:  Under those circumstances, no.

2          BY MR. SCHEWEL:

3      Q.   Do you currently have an assigned RPD work

4  phone?

5      A.   I do.

6      Q.   How did -- when did you obtain this phone?

7      A.   My current phone?  Whenever I broke the last

8  one.  I don't know.

9      Q.   Okay.  Was your last phone taken as part of the

10  IA investigation?

11     A.   Yes.

12     Q.   So it wasn't broken?

13     A.   I mean, I -- what I'm saying is I've broken

14  multiple phones throughout my career.  The first time I

15  was ever issued a phone is when I made detective in 2015,

16  and I've had a couple phones due to either IA taking it

17  for the investigation or I've dropped and broken a phone.

18     Q.   Okay.  I'm just asking about your last phone, so

19  the most recent --

20     A.   Oh, okay.  Internal Affairs has that phone.

21     Q.   Okay.  Have you seen any of your old text

22  messages from that phone?

23     A.   I saw a short list of messages from -- I believe

24  it was May 21st.

25     Q.   Okay.  Other than that short list of text

1    messages, have you seen anything else from your old

2    phone?

3          A.    No, sir.

4          Q.    Who was Officer Abdullah's training officer at

5    the vice team?

6          A.    Detective Nance.

7          Q.    Did you ever train Officer Abdullah?

8          A.    I did not.

9          Q.    Did you outrank Officer Abdullah?

10         A.    No.

11         Q.    Were you more experienced than Officer Abdullah?

12         A.    Yes.

13         Q.    Did you have any responsibility, being more

14   experienced than him, in the vice unit?

15              MR. PETTEY:  Objection.

16              THE WITNESS:  We were equals on paper.

17              BY MR. SCHEWEL:

18         Q.    I understand on paper that you were equals.  I'm

19   just wondering if there was any sort of informal thing in

20   the vice unit where you have a responsibility to help

21   other team members that you're more experienced than.

22         A.    I mean, I would act as a mentor to those that

23   would accept it.

24         Q.    Did Abdullah accept it?

25         A.    No, sir.

1     Q.    Why?

2     A.    He was just a lone wolf.

3     Q.    What do you mean by that?

4     A.    He operates on his own and -- I mean, the

5  shortest way to describe it is just he's a -- I mean, he

6  operates by himself.  The only time we were around him

7  was just out of pure necessity because he would tell us

8  he needed help with manpower.

9     Q.    Was he difficult to work with?

10    A.    Yes.

11    Q.    In what ways?

12    A.    Just because he didn't communicate with us.

13    Q.    So when Abdullah was preparing to make a

14 controlled buy, how would he communicate that to the vice

15 team?

16    A.    Typically, through text message.

17    Q.    And would this be a group text?

18    A.    Correct.

19    Q.    And after he communicated that he was going to

20 make a controlled buy, what would occur next?

21    A.    Typically, the team members that were available

22 would meet at whatever location we're supposed to be at

23 and assist him in whatever duties he gave us.

24    Q.    Who would choose the location?

25    A.    If Abdullah was calling for our help, Abdullah

1   would choose the location.

2        Q.   Okay.  And when you met as a team at the

3   location, what would occur?

4        A.   Typically, it was just a short, very brief

5   meeting of, "This is what I got going on, this is what

6   we're going to try to accomplish."  And the -- if it was

7   like a buy walk, then our goal would be to just be

8   overall security.  We would try to be eyeballs where we

9   could.  I mean, some neighborhoods you just can't get

10  into.  You sit a block or two away and your primary goal

11  is, if something were to happen to the informant, then

12  your obligation is to go in and rescue them.

13       Q.   Okay.  What about if it was a takedown?

14       A.   If it was a takedown, typically we would be

15  supplemented by a tactical team, and we would basically

16  go in and secure the scene and the people involved and

17  then start identifying people, collecting evidence.

18       Q.   And the tactical team is the SEU unit?

19       A.   Yes, sir.

20       Q.   So at this meeting, would you typically discuss

21  the type of drugs being purchased?

22       A.   Typically, yes.

23       Q.   The amount of drugs?

24       A.   It's possible.

25       Q.   The CI being used?

1      A.   We wouldn't always know the CI used, but that's
2  typical.  You would want your team members to know who
3  the informant is so that, if you see them out and about,
4  you know that they're on our team.
5      Q.   And you recognize them?
6      A.   Correct.
7      Q.   Okay.  And so after the meeting, you said that
8  you would try and get eyeballs on the transaction?
9      A.   Correct.
10     Q.   And what do you mean by that?
11     A.   Just being able to say that you saw them walk to
12 where they were supposed to be at, you saw who they meet
13 with.  Sometimes you don't know who these people are.
14         So one example might be, is if you're the drug
15 dealer and I'm the informant, I walk up and meet with you
16 and then they would see you walk away.  They might have
17 an officer approach you and identify you under the guise
18 of a suspicious person encounter, maybe, but a detective
19 would need to see you during the transaction and then
20 watch you walk to that location and watch another officer
21 walk up and approach you so that we know that we've
22 identified the right person.
23     Q.   Okay.  Why is it important to see them walk to
24 the right location?
25     A.   It's important for when you're conducting search

1    warrants, making sure you have the right location.

2         Q.   Is it also important to monitor the credibility

3    of your informant, that they're going where you instruct

4    them to?

5         A.   Yes.  That's part of the ongoing observation of

6    their reliability.

7         Q.   Would Aspirin ever ride in your vehicle?

8         A.   I think on a few occasions he did.

9         Q.   Did you typically monitor the controlled buy on

10   the 10-21 app?

11        A.   When I could, yes.

12        Q.   What do you mean, when you could?

13        A.   Sometimes you'd get kicked out of the system or

14   you'd lose -- depending on where we were, you'd get

15   electronic interference.  There's locations where the

16   cellular service is horrendous.

17        Q.   So why is it important to monitor the controlled

18   buy on the 10-21 app?

19        A.   To make sure that -- if I -- if I'm assisting

20   Abdullah, it's just to make sure everything's going down

21   safely because that's my job, is safety.  Abdullah's job

22   is to monitor his informant, his informant's performance.

23        Q.   And so part of your monitoring is to look at the

24   10-21 app and make sure Aspirin is not being attacked?

25        A.   Correct.

1        Q.   Did you ever observe a hand-to-hand transaction

2   occur on the 10-21 app when using Aspirin as a CI?

3        A.   I don't recall.

4        Q.   So your answer is maybe?

5        A.   It's possible, yeah.  I've witnessed so many

6   transactions on -- or operations on that app, I can't

7   speak to specific ones.

8        Q.   Okay.  So you don't remember if you saw one when

9   using Aspirin?

10        A.   I don't recall.

11        Q.   When monitoring Aspirin, was the screen on the

12   10-21 app typically obscure?

13        A.   With that particular informant, it did happen

14   multiple times, yes.

15        Q.   Do you -- strike that.

16             Do you recall ever observing Aspirin with the

17   10-21 app not observed -- not obscured?

18        A.   I don't recall.

19        Q.   Did you ever visually observe a hand-to-hand

20   transaction occur when using Aspirin?

21        A.   Specific with Aspirin, I don't recall.

22        Q.   To your knowledge, did Aspirin ever complete a

23   legitimate controlled buy?

24        A.   I believe he did.

25        Q.   When?

 1       A.    When he was first being used under the

 2  supervision of Detective Nance and Detective Abdullah.

 3       Q.    Okay.  What do you recall about that incident?

 4       A.    I believe he purchased some pills from a

 5  suspect.

 6       Q.    Were you present for that?

 7       A.    I would have been there as an -- as an assist;

 8  not as a lead investigator, but strictly there as an

 9  assist.

10       Q.    Okay.  And what do you recall from that

11  incident?

12       A.    Not much.  I just recall -- plus, the benefit of

13  hindsight -- knowing that his early buys were legitimate.

14       Q.    Well, I think you said once earlier.

15             MR. PETTEY:  Objection.

16             MS. DIXON:  Same objection.

17             THE WITNESS:  It's my belief that there was more

18  than one, but it was early in his time as an informant.

19             BY MR. SCHEWEL:

20       Q.    Okay.  I'm going to direct you to Exhibit 6 in

21  your binder, please.  Do you recognize this document?

22       A.    I believe this is a transcription of my

23  interview with SBI.

24             (Exhibit 6 was identified for the record.)

25             BY MR. SCHEWEL:

1      Q.   Okay.  Were you honest with the SBI?

2      A.   Yes.

3      Q.   Were you truthful to them?

4      A.   Yes.

5      Q.   Okay.  I'm going to turn to page 3 and the one,

6   two, third full paragraph.  You state -- or the -- I

7   should say the SBI agent interviewing you writes down,

8   "Out of all the controlled purchases that Aspirin

9   completed," comma, "only one buy was good."  Do you

10  remember stating that to the SBI agent?

11     A.   As far as that specific statement, I don't

12  recall it.  I mean, if he transcribed it, I -- I know

13  from reviewing the statement there are some errors in his

14  statement about our conversation --

15     Q.   Is your testimony that that's an error?

16          MR. PETTEY:  Let him finish.  Are you done with

17  your answer?

18          BY MR. SCHEWEL:

19     Q.   Go ahead.

20     A.   At that time, you know, it may have been my

21  belief that the pill buy was the one good buy.  In

22  hindsight and knowing now some additional information,

23  it's my belief that additional controlled buys were good,

24  but I may have not been present for them.

25     Q.   Okay.  What additional information have you

1    learned that leads you to believe that earlier buys were

2    good buys?

3         A.   I do not recall the source, but I believe there

4    was a buy of cocaine or something that was a good buy

5    that I was not present for.

6         Q.   How did you learn this information?

7         A.   I don't recall.  Probably just reviewing

8    different cases and stuff.

9         Q.   Okay.  And was that reviewing in preparation for

10   your deposition today or --

11        A.   No, it's just --

12        Q.   -- some other time?

13        A.   -- just in the past.

14        Q.   Why would you be reviewing Abdullah's old cases?

15        A.   Why would I be reviewing them?  I guess

16   curiosity, trying to see -- identify what went wrong, you

17   know, trying to figure out what happened.

18        Q.   When did you start doing this?

19        A.   Shortly after the informant was terminated.

20        Q.   And you did this on your own?

21        A.   Yes.

22        Q.   And so your testimony is that you actually went

23   back through Abdullah's old cases, starting at the

24   beginning?

25        A.   There was a list that had been provided to me of

1   his cases, and I went through them to review the cases to

2   see if -- A, what had occurred and, B, if we were even

3   getting real drugs.

4        Q.   Who provided you with that list?

5        A.   That list was provided to me by Sergeant Rolfe.

6        Q.   That list was heroin cases, right?

7        A.   I don't recall the -- I'd have to look at the

8   list.

9        Q.   Okay.  But at some point, you're stating you

10  went back and you observed paperwork that led you to

11  believe that he also made a legitimate cocaine buy?

12       A.   Reviewing paperwork, I believe my opinion was

13  based on just conversations with people.

14       Q.   Okay.  So your testimony, just so I'm clear, is

15  that Aspirin completed two legitimate controlled buys;

16  one is this cocaine buy and the other is a pill buy?

17       A.   The pill buy would be the one in my statement

18  here because I was present for that.  It's my belief that

19  a good cocaine buy had occurred, but I don't -- I can't

20  speak to the facts of it because I do not recall being

21  there.

22       Q.   Okay.  And you don't know who told you that?

23       A.   I don't.

24       Q.   And you don't know when you were told that?

25       A.   I mean, so much time has passed, I don't recall

1   the conversation.

2       Q.   Okay.  So that was not actually based on any

3   information you reviewed.  That was based on a

4   conversation with someone?

5       A.   Correct.

6       Q.   Okay.  Any other legitimate controlled buys, to

7   your knowledge?

8       A.   No, sir.

9       Q.   In your interview with Internal Affairs, you

10  stated that the handling of Aspirin by Abdullah amounted

11  to gross negligence.  What about Abdullah's handling of

12  Aspirin amounted to gross negligence?

13      A.   As far as -- I mean, it was just my opinion.  He

14  just didn't monitor him properly and see the red flags

15  and realize earlier on that he was being duped.

16      Q.   Why did he not monitor him properly?

17      A.   I don't know.

18      Q.   How did he not monitor him properly?

19      A.   Because this all happened.

20      Q.   I understand this all happened.  I guess I

21  should rephrase my question.

22           You stated that the gross negligence was -- was

23  your statement or reaction to Abdullah not monitoring him

24  properly.  I want to know what led you to believe that

25  Abdullah had not monitored him properly.

1      A.   Because if he had monitored him properly,

2   Abdullah would have identified the behavior of the

3   informant and taken action.

4      Q.   Okay.  What were the red flags you identified?

5      A.   Manipulating the camera systems, not following

6   instructions, being delayed on giving a signal for us to

7   come in resulting in suspects getting away.

8      Q.   Do you think he was doing that intentionally?

9      A.   With hindsight, yes.

10     Q.   Why?

11     A.   To -- I think to make these -- I guess to make

12  these cases.  I don't -- I don't know his motivations.  I

13  don't know him.

14     Q.   So you think maybe to cover up for the fact that

15  these were actually marijuana dealers?

16     A.   With hindsight, correct.

17     Q.   And so they wouldn't actually be taken down and

18  the weed wouldn't be found on them?

19     A.   Correct.

20     Q.   Do you recall Abdullah stating to Aspirin that

21  he could make more money for heroin buys?

22     A.   That statement was an assumption on my part, and

23  then the SBI agent transcribed it in his report as a

24  factual statement.

25     Q.   What was your assumption?

1      A.   My assumption was that the CI had probably
2   complained to Abdullah about not making enough money, and
3   the typical response is bigger cases, bigger pay.
4      Q.   So you're saying you didn't actually hear that
5   conversation occur?
6      A.   Correct.
7      Q.   Why did you make that assumption?
8      A.   Because he went to heroin cases from buying
9   pills and cocaine.
10     Q.   Okay.  And you thought his motivation for that
11  was that he learned he could make more money from heroin
12  cases?
13     A.   Yes.
14     Q.   As a vice officer, have you ever told your CI to
15  go and get heroin cases or different types of drugs to
16  make more money?
17     A.   I've told them, like, if you make bigger cases,
18  you make bigger money.
19     Q.   Okay.  And do you ever encourage them to do
20  that?
21     A.   I don't think "encouragement" would be the right
22  word.  It's just a factual statement of -- you know, if
23  you were to go risk your life and go buy two stolen guns
24  and a brick of heroin for me, that's worth more
25  compensation than going and buying a bag of marijuana off

 1   the street corner for me.

 2       Q.   And as a vice officer, do you benefit in any way

 3   if your informants make bigger buys?

 4       A.   No.  I could sit at my desk and do nothing and

 5   get the same pay.

 6       Q.   Would you get the same review?

 7       A.   Honestly, yeah.

 8       Q.   Why do you say that?

 9       A.   Because our review system is -- I mean, pretty

10   much, we just show up to work and you're acceptable.

11       Q.   And so you don't think Sergeant Rolfe would have

12   changed what he wrote in your performance evaluation?

13       A.   I can't speak to what his review of me would

14   have been.

15       Q.   Well, you just said that, honestly, yeah, you

16   think it would have been the same.

17       A.   That's my opinion, but as far as what he would

18   put, maybe he dings me, maybe he doesn't.  I don't know.

19   I'm not him.

20       Q.   Okay.  But why do you think that someone who is

21   making buys or has their CIs making buys would get the

22   same review as someone who's just sitting at their desk

23   doing nothing?

24       A.   I mean, there's -- I guess what I'm trying to

25   portray here is there's no incentive -- there's no

1   monetary incentive or anything for performance.

2       Q.   Okay.  I understand that, but I'm asking about

3   your statement that you just made about the reviews.

4       A.   Uh-huh.

5       Q.   And you said that you could sit at your desk and

6   do noting and you would still get the same review.

7       A.   As far as the overall review, yeah.  There's --

8   it's literally, like, acceptable --

9       Q.   Well, part of your -- sorry to interrupt.

10      A.   You're fine.

11      Q.   Do you have anything more to add?

12      A.   Huh-uh.

13      Q.   Part of your review process does state this

14  officer made -- you know, had a goal of making a certain

15  amount of buys per quarter.

16      A.   No.  Quantitatively, there's no goal for -- tied

17  to your review.

18      Q.   You've never seen that in your personnel file?

19      A.   We're talking about, like -- you're talking

20  about like quotas, right?

21      Q.   If you want to call it a quota, you can call it

22  a quota.  I'm saying, in your performance review, have

23  you ever seen anything stating the goals for this office

24  or for this quarter were to make a certain amount of

25  controlled buys?

1      A.   Quantitatively, no.  I mean, you'd want some

2   level of performance to sit there and say, like, "You're

3   doing your job."  I'm just making a blanket statement of

4   I can do nothing and still be employed and make the same

5   money.

6      Q.   Okay.  So you've never seen that in a

7   performance evaluation?

8      A.   A quantitative amount?

9      Q.   Yeah, an amount.

10      A.   I don't recall ever seeing a quantitative

11   amount.  Are you saying, like -- for me, an example, like

12   Detective Rattelade needs to go out and make ten arrests

13   this quarter?

14      Q.   Yeah, or that that was a goal for Detective

15   Rattelade to make a certain amount of controlled buys in

16   this quarter.

17      A.   I don't recall seeing it.  I mean, honestly, the

18   review -- it's all electronic.  You sign off on it and

19   keep moving.

20      Q.   Okay.

21      A.   So if it's in there, I didn't see it.

22      Q.   Okay.  Is it fair to say that you really began

23   to notice Aspirin's deficiencies when he started

24   purchasing heroin?

25           MR. PETTEY:  Objection.

1           THE WITNESS:  My opinion is the deficiencies --

2     they're kind of always lingering, plus -- but it was

3     exacerbated when Detective Nance left the unit.

4           BY MR. SCHEWEL:

5      Q.   Okay.  So when did Detective Nance leave the

6     unit?

7      A.   I want to say either 20- -- 2018, 2019, maybe.

8     I don't recall the exact time.

9      Q.   But it was --

10     A.   Prior to the heroin buys.

11     Q.   Okay.  So you did start to notice deficiencies

12    prior to the heroin buys?

13     A.   Correct.

14     Q.   What specific deficiencies or red flags did you

15    notice in the handling of Aspirin?  And I know that

16    you've already stated manipulating the camera, not

17    following instructions, delaying the signal.  Any other

18    ones?

19          MR. PETTEY:  Objection.

20          MR. BLANCHARD:  Objection.  Abe, I think you

21    asked about Abdullah's deficiencies first, not -- did I

22    catch that wrong?  I thought the last question was

23    Abdullah, not Aspirin, but --

24          MR. SCHEWEL:  Okay.  Well, I can back up then

25    and make sure that's clear.

1           BY MR. SCHEWEL:

2       Q.    The question was Aspirin.  It was --

3       A.    Okay.

4       Q.    -- you started to notice -- and I believe you

5    stated that you started to notice Aspirin's

6    deficiencies --

7       A.    Or I misunderstood that.  I thought you were

8    saying Abdullah's deficiencies.

9       Q.    Okay.  So tell me what you mean by that.

10      A.    Just his -- once Detective Nance left the unit,

11   Abdullah's deficiencies were more obvious because

12   Detective Nance wasn't there to carry him.

13      Q.    Okay.  So when did you start to notice Aspirin's

14   deficiencies?

15      A.    Aspirin's deficiencies?

16      Q.    Yes.

17      A.    I mean, it would have been during the -- the

18   heroin buys is when we had our most -- I guess our most

19   encounters with him.  I was present -- I do recall I was

20   present when he was first arrested for selling

21   counterfeit drugs.

22          I was there as a security officer, but I didn't

23   handle him.  I didn't work him.  He's not my

24   responsibility.  I have my own cases and informants to

25   work.  So over time, during his heroin buys, you know, it

1    became our opinion that he was being played by the

2    suspects.

3        Q.   So were you present for any of the pre-heroin

4    buys?

5        A.   There was a -- I believe a pill takedown that I

6    was present for.  If I was present for anything else, I

7    don't recall.

8        Q.   Okay.  And do you recall observing the 10-21 app

9    during the pill takedown?

10       A.   Specifically for that day, I don't recall

11   anything.

12       Q.   So I'll go back to my question.  What are the

13   specific deficiencies or red flags you noticed in the

14   handling of Aspirin?

15           MR. PETTEY:  Objection.

16           THE WITNESS:  In the handling?  So are you

17   talking about Abdullah's performance or Aspirin's

18   performance?

19           BY MR. SCHEWEL:

20       Q.   Let's start with Aspirin's performance.

21       A.   The same.

22       Q.   Okay.

23       A.   Obscuring the camera, not following

24   instructions, delayed signals.

25       Q.   What about the packaging of the alleged heroin?

1       A.   For the last day where I conducted the field

2   test, that was a red flag for me, yes.

3       Q.   Okay.  I'm going to ask you to go to Exhibit 8

4   in your binder, please.

5            MR. SCHEWEL:  What time is it?

6            MR. BLANCHARD:  11:18.

7            MR. SCHEWEL:  Okay.  So I'll try and stop in

8   five minutes.  Is that okay?

9            MS. DIXON:  Oh, no.  11:35, 11:40 will be fine.

10           MR. SCHEWEL:  Okay.  Just give me a heads-up.

11           MS. DIXON:  Okay.

12           BY MR. SCHEWEL:

13      Q.   Okay.  So do you recognize this exhibit?

14      A.   It looks like a transcription of my interview

15  with Internal Affairs.

16           (Exhibit 8 was identified for the record.)

17           BY MR. SCHEWEL:

18      Q.   Did you review this before your deposition

19  today?

20      A.   I glazed over it.

21      Q.   Okay.  I'm going to ask you to turn to page 7.

22  Okay.  I'm going to just read at the bottom of page 7

23  where it starts as A, for answer.

24           "Ah, yeah.  It's, a, I mean, you're either gonna

25  get it in those wax paper bindles.  Um, every now and

1    then there could be an anomaly like it might be in a

2    folded up piece of paper.  Ah, but it's typically gonna

3    be in a bindle or in a plastic baggie.  But I've never,

4    not until year, I've never seen it in a vacuum sealed

5    bag."

6              Question.  "And that's what you saw this year,

7    is a vacuum sealed bag?"  I'm going to page 8.

8              "Ah, yes, involving one particular informant.

9    He's the only informant I've ever seen return supposed

10   heroin in a vacuum sealed bag."

11             "And that incidents, are you talking about

12   Aspirin?"

13             "Yes, sir."

14             "Okay.  So other than Aspirin, you've never seen

15   anybody return heroin in a vacuum sealed bag?"

16             "No, sir."

17        A.   And that was the packaging for May 21st.

18        Q.   Okay.  So when he said "incidents," you were

19   referring to a single incident?

20        A.   Correct.

21        Q.   Even though he said plural?

22        A.   I mean, this was a phone conversation.  Maybe it

23   was transcribed incorrectly.  I don't know, but this was

24   a singular incident.

25        Q.   Your understanding was that you had only

1    observed actual vacuum-sealed heroin from Aspirin on one

2    occasion?

3        A.    That was May 21st, 2020.

4        Q.    Okay.  And that's -- that's the truth?

5        A.    Yes.

6        Q.    Okay.  How about going from an initial buy walk

7    where Aspirin purchased a small amount of alleged heroin

8    to then purchasing a trafficking amount on the next

9    occasion?

10       A.    It's uncommon.  Not saying it couldn't happen,

11   but -- you know, almost like a unicorn.  It started

12   happening back to back.

13       Q.    Okay.  Why would that be unusual?

14       A.    Just to -- I mean, most of these dealers know if

15   you hit 4 grams or more, you're looking at mandatory

16   minimum sentencing, so if you were to order 4 grams,

17   you're going to -- these drug dealers are always shorting

18   you.  It's all about maximizing profits and, I guess,

19   minimizing liability, would be the correct word, if

20   they're apprehended.

21            So you have to order higher amounts to get over

22   the 4-gram threshold for the trafficking offenses. You

23   know, if an informant's a player, he might get a tester,

24   a small amount, and then go up higher, but my personal

25   opinion is that Aspirin was not a player.

1      Q.    What's a tester?

2      A.    A small amount to check for purity or quality.

3      Q.    Okay.  When you were in the vice unit, was it

4   unusual to make multiple heroin trafficking buys with the

5   same CI?

6      A.    It would be a case-by-case basis.  With this

7   particular informant, I had my suspicions.

8      Q.    Okay.  What were those suspicions?

9      A.    That it was just unusual that he was able to get

10  access to so many drug dealers that were willing to sell

11  him trafficking amounts.  It was just -- it just didn't

12  add up, but he kept doing it and I'm like, all right,

13  maybe he's a unicorn.

14     Q.    Was it because they were street-level purchases?

15     A.    Can you define "street-level"?

16     Q.    Okay.  So I'm going to ask you to go back to

17  Exhibit 8, which we just looked at.  This is your

18  Internal Affairs interview on November 10th, 2020 and I'm

19  going to ask you to turn to page 5.  And I'm going to

20  direct you to the middle question, and I'll read this out

21  loud.

22         "Okay.  And how difficult would it be to make

23  multiple trafficking buys of heroin with the same CI over

24  a few months time?"

25         Answer, "Ah, if he's, as far as if he's using

1   the same, if he's buying and walking the same target and

2   they're not getting busted, if he's built that

3   relationship with the suspect, I mean, he can just keep

4   buying and buying and buying, and then obviously when the

5   suspect is arrested, ah, they're not gonna have access to

6   that target anymore cause they immediately become

7   suspicious of anyone that has sold to them.  Ah,

8   especially if the CI is there during the takedown.  And

9   that basically, immediately burns our CI for future use.

10          "Ah, if you're buying, if you're using that CI

11  to buy from multiple suspects doing street level rips

12  with the takedown over and over and over again, it's

13  just, I, for me personally, I don't see how that's

14  possible."

15       A.   In that context, yes, that's correct.

16       Q.   Can you describe that?

17       A.   If you're in the same neighborhoods doing buy

18  busts where you're making a buy and we're jumping out and

19  making an arrest and there's a pattern of that particular

20  person being present during those takedowns, these

21  individuals in these criminal enterprises talk to each

22  other and they would be -- they'd figure out pretty quick

23  that this informant is the one setting them up, so he

24  could not accomplish, you know, buying over and over and

25  over again from the same -- he can't fish in the same

1    pond and keep catching fish.

2        Q.    In your time on vice, had anyone ever purchased

3    close to 20 grams of heroin on a controlled buy?

4        A.    I'm sure it had happened.

5        Q.    Okay.  I'm going to ask you to turn to page 7 of

6    the same document that we've been looking at, which is

7    your Internal Affairs interview.  It's Exhibit 8.

8        A.    What page?

9        Q.    Page 7.

10        A.    Page 7.

11        Q.    Okay.  I'm going to direct you to the middle.

12    The question is, "Has anybody confiscated 15 grams or

13    approached 20 grams of heroin from a CI buy?"

14            Answer, "Not on my squad.  That would be

15    something from, um, typically, that's a joint

16    investigation with the federal agents involving Career

17    Criminal and Criminal Enterprise."

18        A.    So, basically, that would be like if our guys

19    were operating with the feds, then that could happen.  We

20    don't have the -- we don't have the money to conduct

21    these buys without federal assistance.

22        Q.    Okay.  But without the feds, it hadn't happened?

23        A.    Correct.

24        Q.    So Aspirin was the first time that anyone, to

25    your knowledge, on your team had purchased or recovered

1  20 grams or close to 20 grams of heroin without the feds

2  involved?

3      A.   Correct, because the -- I believe it was

4  somewhere in my statement in here that the price was off.

5      Q.   But just to be clear, the only time that had

6  happened, to your knowledge, is with Aspirin?

7      A.   Up to that point in my career, yes.

8      Q.   Okay.  Are you stating that, after Aspirin, you

9  were part of a controlled buy with the vice unit where

10  the feds were not involved where you recovered close to

11  that amount of heroin?

12      A.   I don't believe it was heroin.  I believe they

13  were methamphetamine purchases.

14      Q.   Okay.  But not heroin?

15      A.   Correct.

16      Q.   If someone in the Raleigh area was selling this

17  amount of heroin, would they likely be on the radar of

18  the career criminal unit or another RPD task force?

19      A.   Could they be?  Yes.  Would they be?  There's no

20  telling because the market is so saturated with drug

21  dealers.

22      Q.   Okay.  I'm going to direct you to the same

23  Exhibit 8, page 10, at the very bottom.

24           Question, "And it sounds like some of the larger

25  amount of heroin sellers are known by, like, our career

1    criminal units and some of the task force that you guys

2    have access to find that information out."

3              Answer, "Yes, sir.  Yes, sir.  It's very

4    unlikely that anyone is going to be a large-scale heroin

5    dealer in Raleigh and they're not either known or popping

6    up on the radar."

7              Is that a accurate statement?

8         A.   I guess it depends on how you're quantifying

9    what large-scale is, but I would say that's an accurate

10   statement.

11        Q.   Okay.  Well, you said it, right?

12        A.   Yeah.  I mean, to me, like our task force guys

13   and our career criminal unit, they're going after kilos.

14   Twenty grams is a long way from a kilo.  It's 980 grams

15   away from a kilo.

16        Q.   Okay.  So you're stating that 20 grams wouldn't

17   necessarily be on their radar?

18        A.   It could be.  What I'm saying is it's a big

19   transaction, but it is not a high-level transaction.

20        Q.   Okay.  So you're saying it's possible?

21        A.   For street-level, I'm saying it's a big -- it's

22   a big deal for a street-level drug transaction, but not

23   for a federal task force.

24              MR. SCHEWEL:  Okay.  I think now is a good time

25   to take a break.

1          (Brief recess from 11:29 a.m. to 11:49 a.m.)

2          BY MR. SCHEWEL:

3     Q.   Okay.  I'm going to ask you about an operation

4   that occurred on December 11th, 2019, when -- one of the

5   first where Abdullah claimed that Aspirin purchased

6   heroin.  This eventually resulted in warrants being taken

7   out for two individuals, Blake Banks and Messiah Howard.

8   Do you recall this incident?

9     A.   I believe -- is that the one off Rock Quarry

10  Road somewhere?

11    Q.   Yeah.  It occurred near a Sweepstakes on Rock

12  Quarry.

13    A.   Yeah.  I recall parts of it, yes.

14    Q.   What do you recall?

15    A.   I remember the buy bust signal being delayed.

16  The suspect vehicle came at me and another officer head

17  on, almost hit me.  Made a U-turn to go after the vehicle

18  to try to get the license plate.

19          He swerved at another police car head on, which

20  almost caused both of us to hit a telephone pole.  The

21  vehicle left the scene at a high rate of speed going

22  south on Rock Quarry Road.  That's pretty much what I

23  remember.

24    Q.   Do you recall that the buy money was never

25  located?

1      A.   We didn't locate anything.  The car was gone.

2      Q.   So that's an accurate statement?

3      A.   Yes.

4      Q.   And you recall this occurred near the

5  Sweepstakes?

6      A.   Correct.

7      Q.   Do you recall that other controlled buys made by

8  Aspirin occurred near the Sweepstakes?

9      A.   I don't recall that particular sweepstakes.  I

10 remember he did buys at the Food Lion on Poole Road a few

11 times.

12     Q.   Okay.  Okay.

13          MR. SCHEWEL:  I'm going to play what is marked

14 as Exhibit 10.  Norwood, if you don't mind.

15          MR. BLANCHARD:  Yeah.  You ready?

16          MR. SCHEWEL:  Yeah.  You can go ahead and hit

17 it.

18          (Video recording played.)

19          BY MR. SCHEWEL:

20     Q.   And I'll pause it.  I'm pausing it at 12

21 seconds, for the record.  This is a body camera that was

22 disclosed to us by the City of Raleigh that is actually

23 marked -- or was initially marked related to Crystal

24 Williams, but for here it's Exhibit 10.

25          (Exhibit 10 was identified for the record.)

1           MS. KIBLER:  Crystal Williams?

2           MR. SCHEWEL:  Am I getting her name wrong?

3      Crystal Hamlin, yes.  Thanks, Dottie.

4               (Video recording played.)

5               BY MR. SCHEWEL:

6      Q.    Do you recognize the voice of the officer?

7      A.    That's Sergeant McDonald.

8      Q.    And was Sergeant McDonald in the car with you

9      when you swerved?

10     A.    I was by myself.

11     Q.    I thought you said that you were -- you and

12     another officer swerved.

13     A.    Like, separate vehicles.

14     Q.    Was that Sergeant McDonald's vehicle?

15     A.    I don't know.  It was a unmarked Tahoe.

16     Q.    So would that have been a vice officer or an SEU

17     officer?

18     A.    That would have been a SEU officer.

19              (Video recording played.)

20              BY MR. SCHEWEL:

21     Q.    And sorry.  I'm playing -- I paused at 47

22     seconds and I'm playing again.

23              (Video recording played.)

24              BY MR. SCHEWEL:

25     Q.    Okay.  I'm pausing at 2:13.  Do you know where

1    you were while this was occurring?

2        A.   Probably returning back from trying to get that

3    vehicle.

4        Q.   Okay.  And do you know why they were holding the

5    woodline?

6        A.   I believe there was someone that left on foot.

7        Q.   And prior to this operation, do you remember

8    meeting with Abdullah and the vice unit?

9        A.   I don't remember the specific meeting for this

10   night, no.

11       Q.   Okay.  Do you recall whether Aspirin was seeking

12   to purchase heroin?

13       A.   I mean, any knowledge of him purchasing heroin

14   is now going to be with hindsight.

15       Q.   Okay.  So with hindsight, do you recall that on

16   this occasion Aspirin was purchase -- trying to purchase

17   heroin?

18       A.   I believe so, yes.

19       Q.   Okay.  I'm going to fast-forward to -- sorry,

20   it's not showing me, so --

21            (Video recording played.)

22            MR. SCHEWEL:  Sorry.  I'm going to try and go

23   one more.

24            (Video recording played.)

25            MR. SCHEWEL:  And I'm playing again at 8:09.

 1              (Video recording played.)

 2              BY MR. SCHEWEL:

 3      Q.    Okay.  I'm pausing at 8:29.  Do you recognize

 4  the officer who just walked into the screen?

 5      A.    There's a little bit of a glare.  I'm pretty

 6  sure it's Abdullah.

 7      Q.    Okay.  And did you hear them say anything about

 8  an individual named Swayson?

 9      A.    It was kind of muffled.  I didn't hear it.

10      Q.    Do you want me --

11      A.    If you could rewind it.

12      Q.    Sure.  I'm going to rewind it and I'm going to

13  play again at 8:17.

14              (Video recording played.)

15              BY MR. SCHEWEL:

16      Q.    Okay, I'm pausing at 9:01.  As far as you know,

17  was an individual named Maurice ever charged?

18      A.    I don't know if a Maurice was charged.

19      Q.    Okay.

20              (Video recording played.)

21              MR. SCHEWEL:  I'm playing again at 11:26.

22              (Video recording played.)

23              BY MR. SCHEWEL:

24      Q.    Okay.  Did you hear what Sergeant McDonald just

25  stated?

1      A.    He was asked -- it sounded like he was asking

2    Abdullah where the money was or who had it, and it

3    sounded like the response was "the middle man."

4      Q.    Okay.  And did you hear him say something about

5    maybe the middle man threw the money?

6      A.    Yes.

7      Q.    And so we need to have a track done?

8      A.    Correct.

9      Q.    What's a track?

10     A.    A canine track, use of a dog to try to locate a

11   path that a person may have fled on.

12     Q.    Does watching this video refresh your

13   recollection at all of any of that occurring?

14     A.    I mean, I recall some of the events that night

15   because I did return to that cul-de-sac after losing the

16   vehicle.  I don't remember -- I believe all this

17   encounter was prior to my returning.  I remember a

18   neighbor being on the porch screaming profanities at us

19   after I got there.

20           I believe there was a female detained and

21   something about a dog.  Other than that, I don't remember

22   much more.

23     Q.    Okay.  I paused it at 11:53 and again -- playing

24   again at 13:19.

25           (Video recording played.)

1              BY MR. SCHEWEL:

2        Q.    Okay, I'm pausing at 13:48.  Who did you see in

3    that video?

4        A.    Detective Abdullah to the left.

5        Q.    Do you recognize any of the other officers?

6        A.    Straight ahead in the regular traditional

7    uniform is Officer Beausoleil, and to the right wearing a

8    helmet is, I believe, Officer Twiddy.

9              COURT REPORTER:  Who is the one before Twiddy?

10             THE WITNESS:  Officer Beausoleil, I believe.

11   It's like B-e-a-u-s-o -- something.

12             BY MR. SCHEWEL:

13       Q.    And did you hear what Abdullah said?

14       A.    The money left in the car.

15       Q.    Okay.  Did you hear him say anything about the

16   CI?

17       A.    I think he said the CI told him that the money

18   left in the car, unless I misheard it.

19       Q.    In the Charger?

20       A.    In the Charger.

21       Q.    Do you want to listen to it again?

22       A.    Sure.

23       Q.    Okay.  So I paused it at 13:48.  I'm going to go

24   back a few seconds.  This is 13:29.

25             (Video recording played.)

1          BY MR. SCHEWEL:

2     Q.   Okay.  So did you hear Abdullah say, "Text me

3 the tag number"?

4     A.   Correct.

5     Q.   Do you know who he was talking to there?

6     A.   I'm assuming the informant.

7     Q.   So was he talking to him on his cell phone?

8     A.   It appeared that he was on his cell phone

9 talking to the informant.

10    Q.   Okay.  And the informant texted him the tag

11 number?

12    A.   I don't know.

13    Q.   Do you know if the tag number ever came back to

14 match Banks or Howard?

15    A.   I don't remember ever being provided with the

16 tag number.  I just remember making an effort to go after

17 the vehicle and losing it.

18    Q.   Okay.  I'm going to -- this is at 14:05 that I

19 paused it.  I'm going to go again to 15:38.

20         (Video recording played.)

21         BY MR. SCHEWEL:

22    Q.   Okay.  I paused it at 17:01.  Are you aware that

23 the heroin attributed to Banks and Howard tested negative

24 by the CCBI lab?

25    A.   Hindsight, yes, I was aware that it tested

 1   negative.

 2         Q.   Are you aware that it had tested negative as

 3   early as December 19th, 2020?

 4         A.   I am not aware of --

 5              MS. KIBLER:  Objection to form.

 6              THE WITNESS:  I am not aware of a date that it

 7   was tested.  I just know that the lab results that I

 8   checked for each case came back negative.

 9              BY MR. SCHEWEL:

10         Q.   How do you look up CCBI lab results, or how did

11   you do it at the time?

12         A.   At that time, they were dumped into a internal

13   server called PolShare and you had to have access via a

14   city device to go in there and look at a specific folder

15   to find your file.

16         Q.   A city device?

17         A.   Like a city computer.  You couldn't log in with

18   your -- like your personal cell phone or personal

19   computer.

20         Q.   Would it have to be an RPD computer?

21         A.   For an RP -- I mean, if it was issued to us, it

22   would b a RPD computer, so it would be like your -- the

23   way you look it up is -- if it was me and I was running

24   my case, I would be at my desk.  I would log into

25   PolShare.  I would go into the subfolder for the lab

1    results and find my lab results or see that they're not

2    there, which means they just weren't ready.

3         Q.   Okay.  So you stated in an interview with

4    Internal Affairs that you taught Abdullah how to look up

5    CCBI results.

6         A.   I don't know if "taught" is the right term.  I

7    would say that he approached me with a question of how --

8    he -- it was very evident he couldn't do it and I had to

9    show him how to do it.

10        Q.   Okay.  And what happened?

11        A.   I guess he went in and did it.

12        Q.   Well -- sorry.  Go ahead.

13        A.   The -- I think my statement to Internal Affairs

14   was that it was just troubling that he was this far into

15   his career with us and didn't know how to look up lab

16   results.

17        Q.   Okay.  But you showed him how to do it?

18        A.   Yes.

19        Q.   Okay.  What happened -- describe that.

20        A.   The same thing.  I would have told him, "You

21   need to go to this server, look for these files and go

22   look for your case number."

23        Q.   Okay.  Did you go and look for his case number?

24        A.   I mean, I coached him and he did it.

25        Q.   Okay.  Did you observe him do that?

 1          A.    It would have been -- where my desk is here

 2    (indicating), he would have been sitting two chairs over,

 3    distance-wise, and I was just coaching him, not --

 4          Q.    Okay.

 5          A.    I'm not over his shoulder, like assisting him.

 6          Q.    But he could look at your computer screen and

 7    see what you were doing to see what to do?

 8          A.    I mean, I'm not -- I'm just literally verbally

 9    giving him cues, like, "This is how you do it."

10          Q.    Okay.  And that was prior to May 21, 2020?

11          A.    Correct.

12          Q.    Did he tell you that he looked up the results?

13          A.    I don't believe so.  I think I literally -- so

14    we didn't communicate with each other very much.  Like,

15    it was kind of a big deal for him to ask me for help

16    because we just didn't get along.

17          Q.    Did you learn that the results were negative?

18          A.    After all this started snowballing, yes.

19          Q.    So your testimony is that you did not learn that

20    the heroin had tested negative from CCBI until after

21    May 21, 2020?

22          A.    Correct.

23                MR. SCHEWEL:  Norwood, you can hit PC if you

24    want.

25                MR. BLANCHARD:  PC?

1          MR. SCHEWEL:  Yeah.

2          BY MR. SCHEWEL:

3     Q.   When conducting a controlled buy, what type of

4  video equipment would you use when you were on the vice

5  unit?

6     A.   We had a few options.  The only live-streaming

7  option we had would have been a cell phone, that 10-21

8  app, which was a live-stream audio/video via the cellular

9  phone, and then we had a couple fixed options, as far as

10 a body-worn -- a covert body-worn camera or a -- there

11 was other fixed-mounted cameras in, like, concealed and

12 conspicuous devices.

13    Q.   And after a controlled buy, was it your practice

14 to review your buy videos?

15    A.   For my cases, yes.

16    Q.   And what would that -- what videos would you

17 actually review?

18    A.   Whatever devices I deployed.

19    Q.   Okay.  So --

20    A.   Commonly for me, the most commonly used systems

21 would have been the phone and the body-worn camera.

22    Q.   Okay.  So the 10-21 app video?

23    A.   Yes, sir.

24    Q.   And then some type of body-worn camera?

25    A.   Yes, sir.

1      Q.   And that would either be the hat or the button?

2      A.   Correct.

3      Q.   Okay.  And the hat is actually physically

4   installed into the hat?

5      A.   Yes.

6      Q.   Did you have multiple hats?

7      A.   We had one hat.

8      Q.   What kind of hat was it?

9      A.   Baseball hat.

10     Q.   Was it a Yankees hat?

11     A.   I believe so.  It got retired because it broke

12   so frequently.

13     Q.   Did Sergeant Rolfe ever review your buy videos?

14     A.   Not to my knowledge.

15     Q.   So earlier you testified that you field tested

16   the alleged narcotics after the VanIrvin arrest.

17     A.   Yes, sir.

18     Q.   And you did that because you could tell from a

19   visual inspection that it was not heroin?

20     A.   Yes, sir.

21     Q.   And you also did that because you knew that

22   Abdullah would not trust you if you just told him that

23   the product was not heroin?

24     A.   I'd say that --

25          MS. DIXON:  Objection to form.

1              THE WITNESS:  I'd say that's a fair assessment.

2              BY MR. SCHEWEL:

3         Q.    Why did you know that Abdullah would not trust

4    you?

5         A.    I mean, I don't know if the word "I know" would

6    be factual.  We just didn't have a good working

7    relationship and he didn't -- we just didn't collaborate.

8         Q.    Okay.  And had you told him things in the past

9    where he had not trusted you?

10        A.    I'm sure I've tried to mentor him before and

11   just kind of get sloughed off, so if -- if you don't want

12   my help or my advice, eventually I'm going to stop

13   providing it.

14        Q.    Okay.  And was this particular to Aspirin or was

15   this in general?

16        A.    I'd have to speculate it was in general.

17        Q.    Did he ever accuse you of picking on Aspirin?

18        A.    Not to my face.

19        Q.    Okay.  So he may have done that behind your

20   back?

21        A.    Probably.

22        Q.    And you heard that from someone?

23        A.    I can't say that I remember hearing it.

24        Q.    And was it particular to you or was it everybody

25   in the vice unit who was picking on Aspirin?

1      A.   I think it was everybody.  He was kind of a --
2  like I said before, he was a lone wolf and it was kind of
3  everyone versus him kind of thing.
4      Q.   Now, of the people in the vice unit, who would
5  you say gave him the most feedback related to Aspirin?
6      A.    Initially, it would have been Detective Nance
7  because they worked closely together.  After that, I
8  would assume nobody was giving him feedback if he was
9  not -- like, if he's not accepting feedback, then you
10  just stop giving feedback.
11      Q.   Okay.  So after Nance left, you never gave any
12  feedback to Abdullah about Aspirin?
13      A.   I'm sure I probably made a passing comment or
14  something, but I can't speak to specifics.
15      Q.   Okay.  So even if you noticed errors in what he
16  was doing or his monitoring of Aspirin, you didn't say
17  anything at all?
18      A.   I would have said something to the supervisor.
19      Q.   Okay.  So you would have said something to
20  Sergeant Rolfe?
21      A.   Yes.
22      Q.   Or you did say something to Sergeant Rolfe?
23      A.   Yes.  I mean, over the years, I commented on his
24  performance.
25      Q.   Over the years?

1      A.   The time that Abdullah was with our unit.  It

2 was just general comments about his aptitude as far as

3 being a drug detective.

4      Q.   And what did you think about his aptitude or

5 what did you say to Sergeant Rolfe about his aptitude?

6      A.   Just it was my personal opinion that he had

7 sloppy work and was in over his head.

8      Q.   And you conveyed that to Sergeant Rolfe?

9      A.   Over time, yes.

10      Q.   What do you mean, over time?

11      A.   Just complaining to him about performance issues

12 and, you know, not being a team player, not doing things,

13 I guess, the way we normally do it.  I mean, it would

14 just be general gripes and complaints to the supervisor.

15      Q.   Well, what was he doing in ways that you don't

16 normally do?

17      A.   I mean, if we're going to -- talking about this

18 Aspirin, you know, the pattern of repetitively doing

19 these small buys and then going up to a bigger buy with a

20 takedown and then doing it back to back to back.

21      Q.   That wasn't normal?

22      A.   I'm not saying it couldn't happen, but it wasn't

23 normal.

24      Q.   And you raised that to Sergeant Rolfe?

25      A.   At some point, I would have complained, yes.

1       Q.   I'm not asking what you would have done.  I'm

2  asking if you did.

3       A.   I'm sure I did, yes.

4       Q.   Did you ever raise concerns to Sergeant Rolfe or

5  other supervisors about Abdullah's monitoring of other

6  confidential informants?

7       A.   I don't believe so.

8       Q.   Okay.  So it was solely concerns about his

9  monitoring of Aspirin?

10      A.   As far as CI handling, the only time I've ever

11 made any comments to supervisors was concerning Aspirin,

12 yes.

13      Q.   Okay.  Are you familiar with SEU Officer Twiddy?

14      A.   Very.

15      Q.   Very?

16      A.   Yes.

17      Q.   You worked with him --

18      A.   Many years.

19      Q.   Okay.  So Officer Twiddy testified at his

20 deposition that he thought that you and other members of

21 the vice team may have been jealous of Abdullah and

22 Aspirin and that's why you were critical.

23           MS. KIBLER:  Objection.

24           MS. DIXON:  Objection.

25           THE WITNESS:  Can you reread that to me?

1          BY MR. SCHEWEL:

2      Q.   Sure.  Officer Twiddy testified at his

3  deposition that he thought that you and other members of

4  the vice team may have been jealous of Abdullah and

5  Aspirin and that that's why you were critical of them.

6          MS. PACKER:  Objection.

7          MR. PETTEY:  Objection.

8          THE WITNESS:  I would say no, I was not jealous

9  at any point in time.

10          BY MR. SCHEWEL:

11      Q.   Okay.  Were you ever jealous of Abdullah's

12  success?

13      A.   No.  I've never been jealous of Detective

14  Abdullah in my life.

15      Q.   Were you jealous of Abdullah's success with

16  Aspirin?

17      A.   No.

18      Q.   Well, why do you think Officer Twiddy would have

19  said that?

20          MR. PETTEY:  Objection.

21          MS. PACKER:  Objection.

22          MS. DIXON:  Objection.

23          THE WITNESS:  I have no idea.

24          BY MR. SCHEWEL:

25      Q.   Do you think that's a fair critique?

1        A.   No.

2        Q.   So earlier you discussed different concerns that

3   you had raised to Sergeant Rolfe, and one of them that

4   you mentioned was from going from small to large amount

5   of buys.  Do you -- did you raise concerns to Sergeant

6   Rolfe about Aspirin covering his buy video?

7        A.   I'm sure that was one of my complaints,

8   specifically a daytime conversation.  I couldn't speak to

9   it, but that would have been one of my complaints, was

10  his performance and manipulating the camera.

11       Q.   Okay.  So I'm not asking for an exact date or

12  time.  I just want to know, did you raise that issue to

13  Sergeant Rolfe?

14       A.   I would have to say that I did.

15       Q.   Did you raise the issue of Aspirin and

16  Abdullah's targets having a weed history and not a heroin

17  history?

18       A.   At that time, no, because I didn't know anything

19  about these guys.  They were -- Abdullah was conducting

20  his own investigations, I was conducting mine. All that

21  was after the fact, knowing about their history.

22       Q.   Did you raise concerns that the targets after

23  takedowns often had marijuana on them?

24       A.   At the time, no, because it's common for people

25  to have multiple drugs.

1      Q.   Did you raise concerns about the targets never

2   having heroin on them?

3      A.   I don't believe so.

4      Q.   Would that have been common?

5      A.   I mean, if they're -- if they show up just to

6   sell -- if I were to call you and ask you to bring me a

7   bag of heroin, you, as a drug dealer, would know I

8   can't -- this stuff is really bad to get caught with, and

9   you would just bring what I asked for and sell it to me

10  and then be done with it.

11     Q.   So you're saying it's possible?

12     A.   It's possible that they would have more heroin

13  on them, but I would say it's unlikely.

14     Q.   Okay.  So you think it's actually more likely

15  that a drug dealer would show up for heroin with no

16  additional heroin on them, only the exact amount they're

17  seeking to sell?

18     A.   I'd say it could go either way.

19     Q.   Okay.  Did you ever tell Abdullah that he should

20  not be using Aspirin as a CI?

21     A.   I really don't know if I ever told him that.

22     Q.   Did you ever tell Sergeant Rolfe that Aspirin

23  should not be used as a CI?

24     A.   That -- making that specific statement to

25  Sergeant Rolfe, I don't recall making it.

1    Q.   Okay.  So you raised a number of concerns --

2    A.   Yes.

3    Q.   -- about Aspirin -- about Aspirin's work?

4    A.   Yes.

5    Q.   And did you raise concerns about Aspirin's

6  reliability?

7    A.   I believe it all kind of is one big package.

8  Like if I'm -- if I'm grieving to my supervisor about the

9  performance, I think the reliability kind of is a package

10  deal.

11    Q.   When you expressed these concerns to Sergeant

12  Rolfe -- strike that.

13         At the time you expressed these concerns to

14  Sergeant Rolfe, would you have blacklisted Aspirin?

15         MR. PETTEY:  Objection.

16         MR. BLANCHARD:  Objection.

17         THE WITNESS:  I'd say that I didn't have enough

18  information to make that determination because I wasn't

19  handling him.  I was -- would have been making just vague

20  complaints about the performance.

21         BY MR. SCHEWEL:

22    Q.   Okay.  So even though you had all these concerns

23  about Aspirin, you still would not have blacklisted him?

24         MR. PETTEY:  Objection.

25         MR. BLANCHARD:  Objection.

1          THE WITNESS: I would have monitored him further

2   if I was handling him.  Because I was not handling him, I

3   didn't have enough information to say that, yes or no, I

4   would blacklist him.

5          BY MR. SCHEWEL:

6      Q.   And what about if you were Abdullah's

7   supervisor?

8      A.   If I was his -- I wasn't his supervisor.

9      Q.   Well, you're a supervisor now, right?

10     A.   Yes, sir.

11     Q.   Okay.  So if you were Abdullah's supervisor in

12  this situation, would you have blacklisted Aspirin?

13         MR. BLANCHARD:  Objection.

14         MS. DIXON:  Objection.

15         THE WITNESS:  I would have, you know, looked

16  further to determine if we need to.

17         BY MR. SCHEWEL:

18     Q.   How would you have done that?

19     A.   A review of past performance and a review of

20  ongoing performance, having -- having a discussion with

21  Abdullah about the performance.

22     Q.   And what would that review of performance

23  entail?

24     A.   I mean, I haven't been a supervisor of that

25  unit.  I can't speculate to what -- how Sergeant Rolfe

 1   would or would not have handled it.

 2        Q.   Would you have reviewed the buy videos?

 3        A.   Potentially, yes.

 4        Q.   When you expressed these concerns to Sergeant

 5   Rolfe, did he act on that information?

 6        A.   I have no idea.

 7        Q.   Well, after you expressed your concerns, did

 8   Aspirin continue to make heroin buys?

 9             MR. BLANCHARD:  Objection.

10             THE WITNESS:  Without knowing the exact dates of

11   complaining to the supervisor, I'd be hard-pressed to say

12   if the buys continued on, but it was a continuation of

13   just kind of complaining to him about the performance as

14   far as -- I guess the easiest way -- so the entire time,

15   we thought the CI was being duped, like people were -- he

16   thought he was buying heroin and he wasn't.

17             BY MR. SCHEWEL:

18        Q.   So did it concern you that Abdullah was charging

19   these individuals with trafficking heroin?

20        A.   At the -- leading up to May, we didn't know

21   that -- what was going on.  We didn't know that -- that

22   these people were being improperly charged.  May 21st was

23   the first time.

24        Q.   Well, you just testified that it was a concern

25   the entire time that he was being duped.

1      A.    With --

2            MR. PETTEY:  Objection.

3            THE WITNESS:  With hindsight.  The -- any

4    complaints beforehand would have strictly just been on

5    just general performance.  At no time did we ever know

6    what was going on until after May 21st.

7            BY MR. SCHEWEL:

8      Q.    Okay.  So I'll ask you again.  After you

9    expressed your concerns to Rolfe, did Aspirin continue to

10   make heroin buys?

11     A.    I guess what -- what -- if we're talking about

12   my general complaints about Aspirin, then yes, he would

13   have made more buys.

14     Q.    Okay.  And that includes the items that we

15   previously discussed?

16           MS. KIBLER:  Objection.

17           THE WITNESS:  Which items?  You're talking about

18   as far as the camera manipulation --

19           BY MR. SCHEWEL:

20     Q.    Yes.

21     A.    Yes.

22     Q.    Going from small amounts to large amounts?

23     A.    Yes.

24     Q.    Okay.  I'm going to ask you to turn to Exhibit 5

25   in your binder, please.  And have you seen this exhibit

1    before?

2          A.   Yes, sir.

3          Q.   Okay.  And so this is your IA interview on

4    October 20th, 2021.

5               (Exhibit 5 was identified for the record.)

6               BY MR. SCHEWEL:

7          Q.   I'm going to ask you to turn to page 15, please.

8          A.   Okay.

9          Q.   And I'm going to go to the very bottom, 535, and

10   the question is, "Okay.  Did you ever inform Sergeant

11   Rolfe --" well, sorry.  Strike that.

12              I'm going to go to 528 and start with your --

13   with the answer.  Well, I'll go to 525 so we have the

14   question.

15              Question, "Okay.  And, um, I think you kind of

16   alluded to it, that you -- did you suspect this of

17   Detective Abdullah's CI, Aspirin?"

18              Answer.  "Uh, yeah, I was pretty suspicious of

19   him, uh, once he -- the fact that he was arrested under

20   the circumstances that he was arrested, for selling fake

21   drugs, should've been a red flag for close monitoring.  I

22   wasn't involved in directly handling him during any

23   cases, uh, and I don't recall."

24              "Some of his early cases I think might've been

25   legit, but as soon as he started conducting heroin

1    purchases, uh, the red flags went up really quick."

2            Question, "Okay.  Did you inform Sergeant Rolfe

3    while Aspirin was still being used of your suspicions?"

4            Answer, "Yes, sir."

5            Page 16.  "And, uh, what did Sergeant Rolfe do

6    with that information?"

7            Answer, "I'm not sure what he did with that

8    information."

9            Question, "Okay.  So you're not sure what he did

10   with the information.  Did it ever seem that he did

11   anything with the information?"

12           Answer, "Uh, not really, 'cause, uh, the

13   purchases continued occurring."

14           Were those accurate and truthful statements?

15       A.   Yes, sir.

16       Q.   Do you believe that Aspirin was -- sorry, strike

17   that.

18           Do you believe that Abdullah was supervised the

19   same as the rest of the vice unit?

20       A.   No, sir.

21       Q.   Why not?

22       A.   Due to race and religion and the culture within

23   the department at that time.

24       Q.   Okay.  What do you mean by that?

25       A.   Certain officers were known to have -- the chief

1    at that time was very fond of them.  Abdullah was one of

2    them and, culturally, as a supervisor, it would have been

3    terrifying to supervise Abdullah out of fear of

4    retaliation from supervisors or being transferred out if

5    he was to file a complaint.

6         Q.   How do you know that the chief was fond of

7    Abdullah?

8         A.   I've personally witnessed it.

9         Q.   What did you witness?

10        A.   We used to have yearly award ceremonies where --

11   let's say there's a particularly top ten officers that

12   served the most warrants or got the most DWIs.  They

13   would come to this event and be given a document, like an

14   award, basically saying, "Hey, you did really good last

15   year."

16             Abdullah -- both of us were commonly at these

17   award ceremonies receiving awards, but she noticeably

18   always gushed over Abdullah.  I remember, in 2018, we had

19   a employee appreciation dinner and the chief came to our

20   table, ignored all of us and just gushed all over

21   Abdullah that night.

22        Q.   And what was the chief's name?

23        A.   Deck-Brown.

24        Q.   And you said you also received awards?

25        A.   Correct.

1      Q.   What awards did you receive?

2      A.   Gun seizures, DWIs, traffic stops, and some of

3  them are repeat awards over several years.  It was when I

4  was a patrol officer.

5      Q.   Did you receive these awards yearly?

6      A.   Up until the awards stopped being issued.  I'm

7  pretty sure I was there every year getting an award.

8      Q.   When did the awards stop being issued?

9      A.   Prior to 2015.  The exact date, I don't know.

10     Q.   I'm sorry if I heard you wrong, but I thought

11  you said in 2018 there was an awards ceremony.

12     A.   That was an employee appreciation dinner.

13     Q.   Okay.  Did the employee appreciation dinner take

14  place of the awards ceremony?

15     A.   A separate event.  It was during police

16  appreciation day or whatever.  I think it's in January.

17     Q.   Okay.

18     A.   The city caters a dinner.

19     Q.   Do you know why the awards ceremony ended?

20     A.   Have no idea.

21     Q.   Okay.  So you were sitting at an employee

22  appreciation dinner and you saw the chief come over to

23  your table --

24     A.   Uh-huh.

25     Q.   -- and gush over Abdullah?

1      A.   Yeah.

2      Q.   Did you hear what they said?

3      A.   Only thing I remember is she was asking him if

4   he was happy with the alternative meal that she was able

5   to coordinate for him.

6      Q.   Okay.  You said it would have been terrifying to

7   supervise Abdullah.

8      A.   Yes.

9      Q.   And I believe you said that because of the fear

10  of retaliation.

11     A.   Yes, sir.

12     Q.   Why would Rolfe have feared retaliation?

13     A.   Because Abdullah had a reputation for -- as

14  someone who would complain -- strictly reputation.  I

15  can't give examples.  His mentor within the division in a

16  different unit recently had a conflict with a supervisor,

17  and that supervisor was kicked out of the unit and sent

18  back to patrol.

19     Q.   Abdullah's mentor?

20     A.   Someone who I would say is a mentor.  That's

21  strictly my personal opinion.

22     Q.   Who is that?

23     A.   He's retired now.  He would have been Senior

24  Officer Brian Lindsay on the fugitive unit.

25     Q.   Okay.  And Officer Lindsay had a conflict with

1   someone else?

2        A.   That's my understanding.

3        Q.   And what happened?

4        A.   The rumor was that the officer was borderline

5   insubordinate, not checking in with his supervisor

6   because he was on a federal task force, and when that

7   officer -- when that supervisor tried to supervise him,

8   that supervisor was transferred out.

9        Q.   Was Officer Lindsay black?

10       A.   Yes.

11       Q.   Was he Muslim?

12       A.   No.

13       Q.   Were you aware of any instances where Officer

14  Abdullah, himself, had complained to supervisors?

15       A.   Was I personally aware?

16       Q.   Or had you heard?

17       A.   I'd heard rumors that he had filed complaints

18  against officers during his time in patrol.

19       Q.   Did Sergeant Rolfe ever express any of these

20  concerns to you?

21       A.   I don't believe so.

22       Q.   So when you went to Sergeant Rolfe with these

23  complaints, what would he say?

24       A.   "It'll work itself out."

25       Q.   Did he ever tell you that he was going to speak

1    to the lieutenant or the captain?

2        A.   He said that he would speak to command and seek

3    a transfer.

4        Q.   How many times did he say that?

5        A.   Multiple times.  Transfers only occurred a few

6    times a year, and the list would always come and go and

7    he would still be with us.

8        Q.   How did that make you feel?

9        A.   Just -- I mean, just another day.  I mean, I

10   wasn't shocked.  I was disappointed.  I've seen other

11   people come and go during short stints with our unit.

12   You have to, you know -- you have to be sharp to succeed

13   in a drug world, and I think Abdullah just -- it wasn't a

14   good fit for him.  He needed to be on another unit.

15       Q.   Was that demoralizing?

16       A.   I wouldn't call it demoralizing.  It just -- it

17   is what it is.

18       Q.   When you went on operations with Abdullah, did

19   you trust him?

20       A.   I guess depends on what we're trusting him on. I

21   didn't think he was going to put a gun to the back of my

22   head and shoot me, but I didn't trust him to -- you know,

23   as far as like he's going to be a good observer or

24   anything like that.

25            I mean, it wasn't anything like -- I guess I'm

1    trying to figure out where you're kind of going with this

2    question, like --

3        Q.   Well, did you trust he was going to conduct good

4    operations?

5        A.   I thought he was sloppy, and that's why I didn't

6    trust him with certain tasks.

7        Q.   Did you feel like you needed to double-check

8    him?

9        A.   If he was directly involved in anything in my

10   case, I double-checked it.

11       Q.   What about if you were involved in his cases?

12       A.   I gave him the same effort I gave everyone else.

13   I was -- I'm a very detail-oriented person and that --

14   due to that, I mean, that's why people would usually ask

15   me to help them with documenting stuff like their

16   evidence or processing their evidence, because they know

17   that I wouldn't mess it up.

18       Q.   And when you saw him being sloppy or him messing

19   up, how would you react?

20       A.   I'd just cut him out of the equation.

21       Q.   So you would just go and do the evidence

22   yourself?

23       A.   Or have someone else do it.

24       Q.   But your testimony is that you didn't feel that,

25   until May 21, 2020, that people were actually being

 1   wrongfully charged because of this?

 2       A.   The day after that incident is where Detective

 3   Monroe and I figured it out, or we thought we had figured

 4   it out, went to the bosses.

 5       Q.   So you're saying all the other heroin buys --

 6   what did you think was happening with those?

 7       A.   We just thought that it didn't add up, but we

 8   never saw the lab results, so for all we knew, they were

 9   good buys.

10       Q.   Did you ever seen the heroin?

11       A.   Very rarely.  I mean, on a buy walk, the CI is

12   going to go out, come back to Abdullah, give him the

13   stuff, and we're never going to see it.

14       Q.   What about if you're in the car?

15       A.   Honestly, we probably wouldn't see it and we

16   just didn't have that close of a working relationship

17   where I cared to be around him.

18       Q.   So your testimony is that you never actually saw

19   the heroin other than after May 21, 2020?

20            MR. PETTEY:  Objection.

21            THE WITNESS:  I mean, I don't recall what I did

22   or didn't see on specific dates.  I can testify that on

23   May 21st, 2020, I saw a suspicious package that wasn't

24   heroin.  I tested it, conveyed my thoughts to Detective

25   Abdullah.

 1          BY MR. SCHEWEL:

 2     Q.    Okay.  How was Aspirin recruited as a CI?

 3     A.    Substantial assistance CI after he was arrested.

 4          COURT REPORTER:  I'm sorry?

 5          THE WITNESS:  He was a substantial assistance

 6     informant after he was arrested during a buy bust.

 7          BY MR. SCHEWEL:

 8     Q.    And you were present for that?

 9     A.    I was there as a security officer, yes.

10     Q.    What does it mean to be a security officer?

11     A.    Strictly there for -- in case something happens,

12     to go in there and rescue the informant or to make the

13     scene safe.

14     Q.    And then afterwards, because it's possible that

15     you have other responsibilities?

16     A.    Yes.  I could assist with searching, recovering

17     evidence, processing evidence.

18     Q.    What was Aspirin selling when he was arrested?

19     A.    I believe it was thought to be oxycodone or some

20     sort of narcotic pill, but I believe it was crushed-up

21     over-the-counter medication, hence his name.

22     Q.    So he was caught selling fake narcotics?

23     A.    Yes, sir, and he was charged with selling fake

24     narcotics.

25     Q.    Who decided what to charge him with?

1      A.    It would have been Nance or Abdullah.  It was

2   their case.

3      Q.    Who nicknamed Aspirin?

4      A.    I don't know.

5      Q.    It wasn't you?

6      A.    It was not me.

7      Q.    Did you ever raise your concerns with Aspirin to

8   the district attorney's office?

9      A.    Yes.

10     Q.    And I'm -- just to be clear, I'm not talking

11  about speaking with David Saacks.  I'm talking about

12  prior to that.

13     A.    After the May 21st incident, that's where we

14  went to the DA's office with our suspicions.

15     Q.    Who's "we"?

16     A.    Me and Detective Monroe.

17     Q.    Why did you go over Sergeant Rolfe's head?

18     A.    I guess we felt like nothing was being done.

19     Q.    And which district attorneys did you contact?

20     A.    I believe it was Jason Smith and David Coleman.

21     Q.    How did you contact them?

22     A.    I'm sure we probably called them and said, "We

23  need to come talk to you."

24     Q.    Did you have an in-person meeting?

25     A.    Yes.

1       Q.   Who was present?

2       A.   I don't remember.  I just remember going to the

3    DA's -- we went to the DA's office and had a conversation

4    with them.

5       Q.   Was a defendant who had been arrested present?

6       A.    Not on the initial complaint.  We did arrange

7    for a debrief with one of the defendants to try to iron

8    out the truth, and that was attended by Detective Monroe.

9       Q.   Okay.  So these meetings actually occurred

10   twice?

11      A.    Correct.

12      Q.   Okay.  On the first meeting, it was you, Officer

13   Monroe, and Coleman and Smith?

14      A.    If both of them were in the meeting, I don't

15   recall.  I just know we went to the DA's office and

16   expressed our concerns over what we had found.

17      Q.   Did you express concerns about any prior cases?

18      A.    I think it's kind of a lumped-in assumption that

19   if the CI is doing this on this date, that we need to go

20   back and look at everything.

21      Q.   So is that a yes?

22      A.   I guess we'd call it a yes.

23      Q.   Well, I don't want you to just call it a yes.

24   I'm asking you if -- if you expressed concerns about

25   other controlled buys, other than May 21, 2020.

 1      A.   The specifics of the conversation with the DAs,

 2   I can't speak to exact words, but I can assume that part

 3   of that -- expressing that concern is that we need to

 4   take a look at all of this.

 5      Q.   Okay.  Do you recall being present for the

 6   arrest of Curtis Logan?

 7      A.   Where was he arrested at?

 8      Q.   At the Sheetz.  He had two minor children in the

 9   car.

10      A.   I believe I was there.

11      Q.   What do you recall about the incident?

12      A.   Not much.  I think he was parked directly in

13   front of the store's entrance.  Some sort of transaction

14   occurred, a buy bust signal was given.  We moved in, took

15   him into custody.

16           I think there was two kids in the back.  I want

17   to say it was a pickup truck, maybe.  Took two -- or took

18   him into custody.  Two children -- I believe mom or some

19   family member came and picked them up.

20      Q.   After the arrest, did vice team 1 debrief at

21   Green Dairy?

22      A.   Did we debrief?  I don't -- if we did, I don't

23   remember it.

24      Q.   Did you return to Green Dairy?

25      A.   I would assume so, yes.

1     Q.   Do you recall that Officer Abdullah claimed that

2  Curtis Logan had sold 20 grams of heroin to Aspirin for

3  $400?

4     A.   I remember there being a conflict with amounts

5  and value.  I don't remember if it was that specific

6  incident, but it does ring a bell.

7     Q.   Okay.  I'm going to ask you to turn to Exhibit 6

8  in your binder, please.  I think I showed you this

9  earlier today, but do you recognize this as your

10 interview with the SBI?

11    A.   Yes, sir.

12    Q.   And I'm going to ask you to turn to page 4 and

13 I'll go down to the third full paragraph.  Well,

14 actually, I'll start at the second paragraph.

15         "After the second or third controlled purchase

16 that resulted in counterfeit drugs, Rattelade advised

17 that he would have been speculative of Aspirin's

18 behavior.  Additionally, Aspirin did not fit the part of

19 being a wholesaler of heroin.

20         "On January 2nd, 2020, Aspirin purchased 20.8

21 grams of heroin for $400 when the going rate for 20 grams

22 of heroin was approximately $2,000."

23         Does that refresh your recollection?

24    A.   Yes, sir.

25    Q.   Does that appear accurate?

1    A.    Yes, sir.

2    Q.    "The previous drugs also tested negative in a

3  field test for heroin.  On that date, Monroe told

4  Abdullah that the field test came back negative for

5  heroin and Abdullah later charged the drug target with

6  trafficking charges."  Does that appear accurate?

7    A.    Yes, sir.

8    Q.    Were you suspicious that Mr. Logan sold --

9  allegedly sold 20 grams of heroin to Mr. Williams for

10  $400?

11    A.    With the hindsight of knowing the amounts and

12  the values, that's -- that is unusual to me, yes.

13    Q.    So you're saying at the time, you didn't know

14  that?

15    A.    I don't know what I knew at the time.  I mean,

16  usually, with Abdullah, it was I would just show up and

17  do my role.  I had no parts in planning his operations.

18  I had no parts in helping him with the investigations.  I

19  was strictly there as a -- you know, basically armed

20  security guard is the best term, I guess.

21    Q.    Well, you testified earlier that you had a

22  meeting before each controlled operation.

23    A.    Correct.  There was safety briefings.

24    Q.    Okay.  And at those safety briefings, you

25  testified that, typically, you learned the type of drug

1    you were going after?

2         A.    Uh-huh.

3         Q.    You've got to say "yes."  Sorry.

4         A.    Yes, sir.

5         Q.    The amount?

6         A.    Yes.

7         Q.    And so that's why my question is, you know, did

8    it make you suspicious when you learned that he claimed

9    Mr. Logan had sold 20 grams for $400?

10        A.    Those protocols being typical in a safety

11   briefing before an operation, yes, those are typical.

12   Did Omar tell us that day the amounts?  I don't know.  If

13   he had told me those amounts, I'd have been like,

14   "Something doesn't sound right."  Not to say it couldn't

15   happen.  I've seen discounted drugs before, but it would

16   be -- if I had that knowledge prior, it would be a little

17   suspicious to me, yes.

18        Q.    So you're saying you don't recall if you had

19   that knowledge or not?

20        A.    Correct.  Most of this information that I gave

21   to the Internal Affairs and SBI was with hindsight, doing

22   a deep dive and evaluation of what had happened.

23        Q.    Okay.  So how about Monroe field testing the

24   alleged heroin?  Do you recall that happening?

25        A.    I recall documenting it in my timeline of events

1   that I put together.  As far as the actual field test, I

2   mean, I know it happened.  I just don't recall the

3   specifics about it.

4        Q.   How did you learn that a field test had

5   occurred?

6        A.   Probably from discussing everything with Monroe

7   while compiling the timeline of events.

8        Q.   Okay.  So your testimony is that you weren't --

9   you didn't know after this happened -- you didn't know on

10  January 2nd?

11       A.   It is possible, I know, but with this much time

12  passing, I just can't speak today to say that I know for

13  a fact that I witnessed or observed something that

14  particular day.

15       Q.   Would it be a surprise to you if Officer Monroe

16  testified that you were present when he field tested the

17  heroin?

18       A.   It wouldn't surprise me at all.

19       Q.   Do you recall being suspicious after the arrest

20  of Curtis Logan?

21       A.   I mean, at this particular day, this particular

22  event, I don't recall my feelings.  I mean, all my

23  feelings now are going back over the totality of

24  everything and having hindsight knowledge.

25       Q.   So just to be clear, you don't recall if, at

1   this time after this arrest, you were suspicious of

2   Aspirin?

3       A.    Specifically on this particular day, I don't

4   recall my feelings.  Looking back at what we know now, I

5   can look at that and go like, "Yeah, something's not

6   right there."

7       Q.    Okay.  But at the time, you don't recall whether

8   or not you had suspicions --

9       A.    Correct.

10      Q.    -- at that point?  Were you ever present for a

11  takedown involving Aspirin and Abdullah where heroin was

12  located on the person seized?

13      A.    I don't believe so.

14      Q.    How about where heroin was located at their home

15  or apartment?

16      A.    I don't recall.

17      Q.    And I think you testified to this earlier, but

18  was it your belief that Mr. Williams or Aspirin was

19  purchasing marijuana and not actually purchasing heroin?

20      A.    With hindsight knowledge, that is my belief.

21      Q.    Okay.  And how do you believe that the fake

22  heroin was produced?

23      A.    I think he was concealing it, probably -- if I

24  had to guess, somewhere probably in his butt crack or up

25  under his nuts, and that's how it was being missed on a

1    search.  And I think he was planting it by handing it off

2    to investigators after the buy.

3         Q.   Would it be difficult to do that with 20 grams

4    of fake heroin?

5         A.   No.

6         Q.   It would be easy?

7         A.   Yeah.

8         Q.   How?

9         A.   I mean, the package was only maybe 2 inches by 2

10   inches.  Stuff it in your underwear, stuff it in your

11   butt crack.  I've seen over an ounce of cocaine in a butt

12   crack before.

13        Q.   So you've seen over 28 grams come out of

14   someone's butt?

15        A.   Yeah.

16        Q.   Okay.  What about someone's underwear?

17        A.   Even more.

18        Q.   How much have you seen?

19        A.   Probably an ounce, two ounces.  I've seen rifles

20   stuffed down pants that you couldn't see until you

21   started grabbing onto their pants.

22        Q.   And does heroin weigh more than other

23   substances?

24        A.   Are you talking about volume?

25        Q.   Yes.

1      A.    I'd say it's fairly comparable to cocaine.

2      Q.    Okay.  What about the crack?

3      A.    Crack -- it depends on the quality of the coke.

4  Crack can either be very dense and have a smaller amount

5  that weighs more or it can be very -- if they cook it too

6  hot too fast, it's full of air pockets and it has a much

7  lower weight.

8      Q.    Okay.  So what about the marijuana?  What do you

9  think Aspirin did after he purchased this marijuana?

10     A.    My personal opinion is he just threw it away.

11     Q.    You think he threw it away?

12     A.    Yeah.  Probably -- I mean, depending on the

13  amounts, he probably would have just gone back for it,

14  but marijuana is very -- has a very pungent odor, so he

15  would be foolish to bring it back to his handler with

16  him.

17     Q.    Unless the handler was letting him keep it?

18     A.    I can't --

19           MS. DIXON:  Objection to the commentary.

20           MR. SCHEWEL:  It's not a commentary.  It's a

21  question.

22           THE WITNESS:  I mean, I have no idea what was

23  going on with him and Abdullah if I wasn't present.

24           BY MR. SCHEWEL:

25     Q.    I'm going to ask you to turn to Exhibit 6 in

1   your binder, which is your SBI interview, and I see

2   you're there, so will you please turn to page 5?  I'm

3   going to read the third full paragraph.

4           "Rattelade thinks that Abdullah believes that he

5   is great at what he does and that other people are

6   jealous of him and his CI.  Rattelade does not believe

7   that Abdullah is a bad person, but would not be surprised

8   if he had a relationship with Aspirin."

9           What did you mean by "a relationship with

10  Aspirin"?

11      A.   I mean, I really don't remember the context of

12  this -- that particular part of the interview.  I guess

13  that they -- maybe if they conversed more than, you know,

14  off hours or something.  I don't remember the context.

15      Q.   Okay.  So as you sit here today, do you think

16  it's possible that Abdullah had a relationship with

17  Aspirin?

18      A.   My personal feeling?

19      Q.   Your personal feeling.

20      A.   I think that it was a professional relationship

21  and I think that Abdullah was exploited.  His weaknesses

22  were exploited by a rogue CI and the CI took advantage of

23  Abdullah.

24      Q.   So what did you mean if he had a relationship

25  with Aspirin or that you would not be surprised if he had

1   a relationship with Aspirin?

2              MR. PETTEY:  Objection.

3              THE WITNESS:  I just -- I -- I honestly don't

4   remember the context of that response or even the

5   question that was asked that day.

6              BY MR. SCHEWEL:

7       Q.   So you're surprised that that's written down?

8       A.   I mean, I'm not surprised it's written down.  I

9   just don't recall that particular moment in the

10  conversation or in the interview.

11      Q.   But your testimony, as you sit here today, is

12  that you don't think that there was any relationship

13  between Abdullah and Aspirin?

14             MR. PETTEY:  Objection.

15             MR. BLANCHARD:  Objection.

16             THE WITNESS:  I do not believe there was a

17  nefarious relationship on Abdullah's part.  I personally

18  believe that he was -- he had weaknesses that were

19  exploited by the informant.

20             BY MR. SCHEWEL:

21      Q.   Would Abdullah let Aspirin sit in his car?

22      A.   Yes.

23      Q.   How often did you see that?

24      A.   It's hard to say.  I mean, multiple times, we'd

25  be back at the office and the CI would be, like, sleeping

1    or just sitting in the back of his car waiting on the --
2    I guess to get paid and taken back home.
3        Q.   Was that his personal car or his work car?
4        A.   His work car.
5        Q.   Would you ever let a CI sit or sleep in your
6    car?
7        A.   Me, personally?  I wouldn't.
8        Q.   Did you ever see any other vice officers do
9    that?
10       A.   No, sir.
11       Q.   Did Sergeant Rolfe know about that?
12       A.   I have no idea.
13       Q.   Did you tell him?
14       A.   I don't believe so.
15       Q.   Did you ever see Abdullah sleep in his car?
16       A.   Yes.
17       Q.   Did you know why he did that?
18       A.   I think it was due to the fact that he lived so
19   far away and he  moonlighted doing a lot of security
20   work, so it made more sense to sleep in his car and then
21   come to work versus driving home and back.
22       Q.   Did you ever moonlight?
23       A.   Yes.
24       Q.   Where did you moonlight?
25       A.   Multiple.  During this time, I would have worked

1    for the construction company that's rebuilding U.S. 1 and

2    440 and the west side of town.  N.C. State University,

3    Walnut Creek Amphitheater/Live Nation, multiple jobs for

4    the City of Raleigh at various venues, Wake County Public

5    Schools.  I get, usually, anywhere from 8 to 12 tax forms

6    each year.

7         Q.   And why do you do that?

8         A.   To make more money.

9         Q.   Approximately how much extra money do you make

10   by doing that?

11        A.   In a given year, I probably make -- depending on

12   how much I work, probably 20,000.

13        Q.   $20,000 more from moonlighting?

14        A.   Yeah.

15        Q.   Per job or just --

16        A.   No, just cumulatively.

17        Q.   Okay.  And do you typically do those jobs at

18   night or on weekends?

19        A.   I mean, it's in your off time.  Most jobs are

20   nighttime, but, you know, if you work a college football

21   game, that's a daytime Saturday job.  High school

22   graduations is a weekday daytime job.  High school sports

23   is a weekday afternoon/evening job, so it's just -- it's

24   all over the place.  We have more jobs open than we can

25   fill.

1       Q.   Who offers you these jobs?

2       A.   It's just in a database.  You either join a pool

3    of officers that work a specific location or you just log

4    into a database, and there's just a list of jobs, people

5    that want to hire off-duty officers.  You click on it and

6    take the job.

7       Q.   Who provides you this database?

8       A.   The city.

9       Q.   Is there any rule about how often you can

10   moonlight?

11      A.   There's a limitation on, like, total hours

12   worked in a pay cycle.

13      Q.   Do you know what that is?

14      A.   The exact number, no.  I mean, it's up there and

15   there's ways to offset numbers, such as, you know, if you

16   take a day off, then that's however many hours that shift

17   is, that's more time you could work.

18      Q.   Do you think moonlighting affected Abdullah's

19   performance?

20      A.   I don't think so.

21      Q.   Do you think it ever affects your performance?

22      A.   No.

23      Q.   Does it affect your sleep?

24      A.   No.  I sleep -- you know, you've got to get

25   enough sleep so you can come to work and be safe.

1    There's no point in risking your jeopardy and getting

2    killed over a few dollars.

3         Q.   So when you moonlight, can you give me an

4    example what your typical moonlight schedule and work

5    schedule would be?

6         A.   Let's say I work a day shift.  It's 6 a. to

7    6 p., and then I'll go work a basketball game at

8    Broughton from 6:30 to 9:30.

9         Q.   And then you'll go home?

10        A.   Go to sleep.

11        Q.   Okay.  Have you ever worked at bars?

12        A.   When I was a younger officer, yes.

13        Q.   And if you did that, obviously, you would --

14   your shift would end later?

15        A.   Correct.  I was also able to rebound a lot

16   easier in my 20s.

17        Q.   Fair enough.  Okay.  So I'm just turning back to

18   page 5 of the SBI interview and the paragraph that I

19   read, and I'll read it again.

20             "Rattelade thinks that Abdullah believes he is

21   great at what he does and that other people are jealous

22   of him and his CI."  What did you mean by that statement?

23        A.   I mean, he genuinely thought he was a good

24   detective and he was successful and that it was due to

25   his relationship with his informant and he thought -- I

1    genuinely believe that he thought we were jealous of him.

2          Q.   Did he express that to you?

3          A.   No.

4          Q.   So why would he think you were jealous?

5          A.   Just that's his personality.

6          Q.   But didn't you tell me earlier that you hadn't

7    ever even expressed your concerns to Abdullah?

8               MR. PETTEY:  Objection.

9               THE WITNESS:  I guess I'm missing the context of

10   the question.

11              BY MR. SCHEWEL:

12         Q.   So earlier you testified that after Nance left,

13   you never really even spoke to Abdullah about Aspirin.

14   You didn't express your concerns about him.  You

15   expressed it to Rolfe.

16         A.   Uh-huh,

17         Q.   So why would he think you were jealous if you

18   weren't expressing your concerns?

19              MR. PETTEY:  Objection.

20              MR. BLANCHARD:  Objection.

21              THE WITNESS:  I'm sure that offhand comments

22   about the informant were made or information got back to

23   him that we were talking poorly about his informant.

24              BY MR. SCHEWEL:

25         Q.   Okay.  So you think maybe, even if he

1    didn't -- if you didn't direct it to him specifically, he

2    heard you talking to other vice officers about it?

3         A.   Correct.

4         Q.   Because you were all sitting in that same room

5    at Green Dairy together?

6         A.   Yes.

7         Q.   Okay.  And do you recall specific instances

8    where that occurred?

9         A.   Specifically, no, not talking about the

10   informant in his presence or anything like that.  Did it

11   happen?  I'm sure it did, but I don't recall any

12   specifics.

13        Q.   Okay.  So you -- but you're sure that, at times,

14   you were all sitting in the room together talking about

15   concerns about Aspirin?

16        A.   It could have happened.  I don't remember

17   specifically if it did.

18        Q.   Well, did it happen or not?

19        A.   I don't know.

20        Q.   So then why would you have been jealous?

21             MR. PETTEY:  Objection.

22             THE WITNESS:  I mean, that's just my personal

23   opinion that he thought -- that he thought we were

24   jealous.

25             BY MR. SCHEWEL:

1      Q.   Did he ever express that to you?

2      A.   No.  We very rarely spoke.

3      Q.   Did you hear that he ever expressed that to

4 anyone else?

5      A.   It's possible.  I don't remember specifics.

6      Q.   Okay.  One of the cases you mentioned having

7 concerns about to Internal Affairs was the arrest of

8 Sherrod Smith.  Do you recall that?

9      A.   Which exhibit are we on?

10     Q.   Okay.  I can direct you to Exhibit 2.  And I'm

11 not sure if we've looked at this one.  This is your

12 August 14th, 2020, interview with Internal Affairs.

13          (Exhibit 2 was identified for the record.)

14          BY MR. SCHEWEL:

15     Q.   Have you seen this document?

16     A.   Yes, sir.

17     Q.   Okay.  And I'm going to ask you to turn to

18 page 25.

19          MR. PETTEY:  It only goes to 23.

20          BY MR. SCHEWEL:

21     Q.   Do you have 25 on yours?

22     A.   I do.

23          MR. SCHEWEL:  Okay.  Sorry, Rod.  Just look on

24 with him, if that's okay.

25          BY MR. SCHEWEL:

1        Q.   Okay.  So I'm going to direct you to the bottom.

2   Well, if we go to the middle, it says, "And the CI you're

3   talking about, what's the nickname?"

4             Answer, "His nickname is Aspirin."

5             Question, "Alright."

6             Answer, "Uh, let's see.  It may not -- it may

7   not have been Sherrod Smith.  I know Sherrod Smith is

8   definitely one of the questionable ones that we looked

9   at.  And, let's see (unintelligible). I'm not seeing, and

10  obviously, with the current gag order, I wouldn't be able

11  to discuss it with Monroe.  I don't see it.  There was a

12  case that, I'm almost positive, I remember, oh, Curtis

13  Logan."

14            Okay.  So do you recall that Sherrod Smith was

15  one of the cases you had concerns about?

16       A.   In context of this interview with Internal

17  Affairs, it was because he was part of a list that I

18  compiled after the fact of suspicious cases.

19       Q.   Okay.  So you just -- your testimony is you

20  don't recall being present for the takedown of Sherrod

21  Smith?

22       A.   I don't recall specifically the Sherrod Smith

23  case.  I'd have to look at the case report and see if it

24  were to jog my memory.

25       Q.   Okay.  Can you turn to Exhibit 7 in your binder,

 1    please?  Okay.  So this is the Felony Investigative

 2    Report of Sherrod Anton Smith.

 3              (Exhibit 7 was identified for the record.)

 4              BY MR. SCHEWEL:

 5        Q.    Have you seen this document?

 6        A.    This is the first time --

 7        Q.    Okay.

 8        A.    -- I'm seeing it recently, I guess, would be

 9    right.

10        Q.    Okay.  So do you see where the date is circled?

11        A.    Yes, sir.

12        Q.    And it says March 12th, 2020?

13        A.    Correct.

14        Q.    And I'm going to -- just so we go in order, I'm

15    going to direct you to page 3 of this document.  Okay.

16    And this also says "Felony Investigative Report"?

17        A.    Correct.

18        Q.    And it says March 5th, 2020.

19        A.    Yes, sir.

20        Q.    And do you see where it's underlined .5 grams of

21    heroin?

22        A.    Yes, sir.

23        Q.    And so it says, "At that time, the CI purchased

24    approximately .5 grams of heroin from the defendant."

25        A.    Yes, sir.

1      Q.   Okay.  And now I'll have you go back -- if you

2  want to -- why don't you go ahead and just read that full

3  paragraph to make sure you -- to see if it refreshes your

4  recollection at all.

5      A.   "At the above date and time, a confidential and

6  reliable source was provided with RPD buy money and went

7  to the above location to purchase narcotics from the

8  defendant.  When the defendant arrived, he was the sole

9  occupant in the vehicle that he was driving.  At that

10  time, the CI purchased approximately 0.5 grams of heroin

11  from the defendant."

12      Q.   Okay.  And this is, as we said, March 5th, 2020.

13  Now I'm going to ask you to go back to page 1.

14      A.   Yes, sir.

15      Q.   So seven days later, March 12th, 2020, and I'll

16  just read the detail to you.

17           "At the above date and time, a confidential and

18  reliable source was provided with RPD buy money and went

19  to the above location to purchase narcotics from the

20  defendant.  When the defendant arrived, he was the sole

21  occupant in the vehicle that he was driving.  At that

22  time, the CI purchased approximately 8 grams of heroin

23  from the defendant.  The defendant was taken into custody

24  and all the RPD buy money was recovered on the scene."

25           Do you recall why you had concerns about this

1  case?

2      A.   I'd say it would have to be just the jump from

3  the half gram to 8 grams, looking at these two documents.

4      Q.   Do you recall Sherrod Smith stating during the

5  takedown that he had sold marijuana?

6      A.   It's possible.  The address listed on this FIR

7  is the Food Lion on Poole Road.  I don't remember if it

8  was this particular case.  I do remember one of the

9  takedowns there, the subject had a gun and a bag of

10 marijuana but no heroin.

11     Q.   Okay.  Could you turn to page 7 of this exhibit?

12     A.   We're looking at a tax form?

13     Q.   Yeah.

14     A.   Okay.

15     Q.   Can you tell me what this is?

16     A.   This is a BD-4.  It's a tax form that we submit

17 to the North Carolina Department of Revenue and they

18 assess a tax on controlled substances.

19     Q.   Okay.  And who was that tax assessed to?

20     A.   The defendant.

21     Q.   And the tax is assessed based on the amount and

22 type of drugs?

23     A.   Correct.  It's a -- kind of like income tax.

24 It's a preset amount, so based on what we submit on the

25 form is the tax that they levy on the defendant.

1      Q.   Now, do you actually send the narcotics to the

2    DOR?

3      A.   The actual drugs, no.

4      Q.   What happens to the narcotics?

5      A.   They go into evidence until it's determined if

6    they're going to be tested at the crime lab or not.

7      Q.   And what if the case is dismissed?

8      A.   If the case is dismissed, it'll sit in evidence

9    until the officer disposes of it during his yearly

10   evidence purge.

11     Q.   And that happens every year?

12     A.   With exception to -- I think, during COVID, they

13   skipped a year due to some issues.  We're currently in

14   this year's evidence purge right now.  It's typically

15   yearly, but sometimes a year gets missed.

16     Q.   Now, at the bottom it says, "General Fund, 25%,

17   RPD, Raleigh Police Department Fund, 75%."  Can you tell

18   me what that means?

19     A.   It means that the State of North Carolina is

20   going to keep 25 percent of the taxes.  I guess that's an

21   administrative fee.  Seventy-five percent will come back

22   to us and then ultimately go to the school system.

23     Q.   Do you fill these forms out on each drug bust

24   you make?

25     A.   Depends on the amount.  There's a threshold

1    amount for each drug.

2         Q.   Okay.  And what happens if a case is dismissed?

3         A.   As far as the case dismissed, I have no idea of

4    what that protocol is.

5         Q.   Well, does someone still get taxed?

6         A.   I'm assuming they get a tax letter and then I'm

7    assuming that there is an appeals process.

8         Q.   So from your standpoint, when you were a vice

9    officer, you would never seek to go in and alert DOR that

10   the case had been dismissed?

11        A.   For any of my cases?

12        Q.   Right.

13        A.   I have never contacted DOR or notified them of

14   any case dispositions.

15        Q.   Okay.  So you see section 4 says, "Amount of

16   controlled substance by type," and it says, "Marijuana,

17   7.5 grams."

18        A.   Yes.

19        Q.   Earlier, you stated that you weren't sure or

20   not, but does this refresh your recollection at all as to

21   whether Sherrod Smith had marijuana on him?

22        A.   I mean, based on this form, it would appear he

23   has marijuana.

24        Q.   But does it refresh your recollection as to at

25   the time --

1       A.   It doesn't.

2       Q.   Now, if we go back to the Felony Investigative

3   Report, did you see or do you see any mention of

4   marijuana?

5       A.   Are we talking about March 12th?

6       Q.   Sure.  We can start with March 12th.

7       A.   There is no marijuana charge, discussed or

8   listed.

9       Q.   Okay.  How about March 5th?

10      A.   No, sir.

11      Q.   Do you know why that would be?

12      A.   Probably because it's a misdemeanor amount of

13  marijuana.  Maybe he wasn't stacking charges.  I really

14  can't speak to why those charges weren't filed.

15      Q.   What does stacking charges mean?

16      A.   Just hitting a defendant with every single

17  offense, I'd guess you'd say, like overwhelming him,

18  trying to force a plea deal.

19      Q.   So if Sherrod Smith was charged with marijuana,

20  would it have typically been in the Felony Investigative

21  Report?

22      A.   If I was the charging officer completing this

23  document, yes, it would have been there.

24      Q.   Was it a red flag to you that a number of

25  Aspirin's controlled buy targets had marijuana on them

1    when they were taken down?

2              MR. PETTEY:  Objection.

3              THE WITNESS:  At that point in time, it wasn't a

4    concern to me, just because marijuana use is so

5    recreational.

6              BY MR. SCHEWEL:

7         Q.   So when did it become a concern?

8         A.   Going back after the May 21st incident, going

9    back and reviewing all the cases, that's kind of when we

10   were like, "Okay, the light bulb started going on."

11        Q.   And why was it different after you went back and

12   reviewed all the cases?

13        A.   Because we debriefed that one subject at the

14   DA's office and he admitted to selling marijuana to the

15   informant, and it started making sense.

16             If you look at all the -- it's like a jigsaw

17   puzzle.  If you look at all the little pieces, we were

18   able to kind of start piecing it together.  Even though

19   not all the pieces are there, you could kind of look at

20   it and start to see the picture.

21        Q.   Okay.  I'm going to show you the search warrant

22   from May 21st, 2020.  It's marked as Exhibit 4.

23             (Exhibit 4 was identified for the record.)

24             BY MR. SCHEWEL:

25        Q.   Have you seen this document?

 1      A.   I don't believe so.

 2      Q.   And I'm going to ask you to actually go ahead

 3   and take this one out, because some of the pages are

 4   upside down, and arrange it so you can see it.

 5           So your testimony -- and I guess I just asked

 6   you to look through Exhibit 4.  Just to be clear, you've

 7   never seen any of these documents?

 8      A.   I don't recall ever seeing these documents.  It

 9   would appear this was a search warrant drafted and

10   obtained by Detective Abdullah.

11      Q.   And you didn't see it in preparation for your

12   deposition today?

13      A.   For today, no.  I don't recall ever seeing any

14   of this information.

15      Q.   Okay.  What time do you recall the warrant being

16   executed on May 21st, 2020?

17      A.   I remember it was during daytime hours.

18   According to this return, we executed it at 1:35 in the

19   afternoon.

20      Q.   Does that seem accurate to you?

21      A.   I would say that seems accurate.

22      Q.   Okay.  I want to turn back to May 20th, 2020, so

23   one day prior.  Do you recall working with Abdullah and

24   Aspirin to conduct a controlled buy on this date?

25      A.   I know a controlled purchase occurred that day

1    that led to this event.  I don't remember much about it,

2    other than I'm sure I was there as a security officer.

3         Q.   Well, you're sure you were there or do you

4    recall being there?

5         A.   I don't recall specifically being there the day

6    before.

7         Q.   So you don't recall if you traveled to Raleigh

8    North Apartments on May 20th, 2020?

9         A.   After this much time has passed, I believe I was

10   there the day before on the 20th.  I just don't remember

11   specifics about it.

12        Q.   Do you recall if Aspirin rode with you in your

13   vehicle on May 20th, 2020?

14        A.   I believe he rode with me on the 21st.

15        Q.   What about on -- sorry.

16        A.   I do not recall him riding with me on the 20th.

17        Q.   On May 20th, did you observe Aspirin make a

18   purchase from Marcus VanIrvin?

19        A.   I do not recall personally witnessing a

20   transaction, no.

21        Q.   Do you recall if you witnessed a transaction on

22   the 20th on the 10-21 app?

23        A.   I do not recall.  We're talking about the 20th

24   still, right?

25        Q.   The 20th.

1      A.    Yeah, I don't recall.

2      Q.    Okay.  Can you turn to page 4 of the warrant?

3   And I guess this is actually page 4 of the warrant

4   application.

5            Okay.  So I'm going to read starting at the top

6   of page 4.  "After the confidential informant spoke to

7   Marcus, the confidential informant then went to the

8   subject's apartment located at 1628 Burgundy Street,

9   Apartment B, Raleigh, NC 27610.  The buy was monitored

10  using electronic and physical surveillance.  The

11  confidential informant was then observed by detectives

12  being let into the residence by the target of this

13  investigation, Marcus, and an amount of heroin was then

14  purchased from the subject for an amount of U.S.

15  currency."

16           Did you observe that?

17     A.    I do not recall specifically observing this

18  event.

19     Q.    Did you ever tell Officer Abdullah that you

20  observed that?

21     A.    I don't recall telling Detective Abdullah that I

22  observed this event

23     Q.    Do you recall any other detectives telling

24  Officer Abdullah that they observed that happen?

25     A.    I don't recall any other conversations between

 1   Detective Abdullah and a different detective.

 2       Q.   Do you recall if another detective was with you

 3   on the 20th?

 4       A.   I could speculate that another one had to have

 5   been there, but I do not recall.

 6       Q.   Why do you say that?

 7       A.   We try to have at least three people present.

 8   It's not always possible, but try to have three present.

 9       Q.   Did you meet with Aspirin after this buy?

10       A.   I don't recall meeting with Aspirin after this

11   buy.

12       Q.   Do you recall observing the alleged heroin he

13   had purchased?

14       A.   No, sir.

15           MR. SCHEWEL:  Do y'all want to take a break for

16   lunch?

17           MR. PETTEY:  We can.  How much longer do you

18   believe?

19           MR. SCHEWEL:  I've got about ten pages, which is

20   about less than a third of my questions, so not too long,

21   actually.  Probably about an hour and a half.

22           MR. PETTEY:  First, what do you want to do?

23           THE WITNESS:  I'm at y'all's mercy.

24           MR. PETTEY:  What do you all want to do?

25           MS. KIBLER:  I don't care.

    1            MR. SCHEWEL:  Let's get lunch.  Can we go off

    2   the record?

    3            (Luncheon recess from 1:19 p.m. to 2:01 p.m.)

    4            BY MR. SCHEWEL:

    5       Q.   Okay.  So before we broke, we were talking about

    6   May 20th, 2020.  I want to turn to May 21st, the day the

    7   warrant was executed at my client's home.

    8            Prior to executing the search warrant, you met

    9   with the vice team to discuss the operation?

   10       A.   Correct.

   11       Q.   And the SEU team was present as well?

   12       A.   Correct.

   13       Q.   And at the meeting, Abdullah went over the

   14   target of the buy?

   15       A.   Correct.

   16       Q.   And the type of narcotics he was going to be

   17   purchasing?

   18       A.   Yes, sir.

   19       Q.   Which was heroin?

   20       A.   Yes, sir.

   21       Q.   Not fake heroin?

   22       A.   Correct.

   23       Q.   And that you were -- he was using Aspirin?

   24       A.   I believe it was known that Aspirin was going to

   25   be there, yes.

 1        Q.   Okay.  Well, did you later learn that Aspirin

 2   was his CI for this?

 3        A.   Yes.

 4        Q.   And did he go over that Aspirin had previously

 5   purchased heroin from the target?

 6        A.   Yes, sir.

 7        Q.   And that he was going to purchase heroin again

 8   prior to the execution of the warrant?

 9        A.   Yes, sir.

10        Q.   Okay.  I'm going to show you Exhibit 3.  Have

11   you seen this document?

12        A.   No, sir.

13        Q.   Well, earlier today you stated that you had seen

14   some text messages.

15        A.   That is correct, but not this one.

16        Q.   Not that one?

17        A.   Correct.

18        Q.   Can you turn to the second page?  Is that the

19   one you've seen?

20        A.   Yes, sir.

21        Q.   Okay.  You can go back to page 1.  Okay.  So

22   this is Plaintiff's Exhibit 3 and it is the text messages

23   from Officer Gwinn's cell phone.

24             (Exhibit 3 was identified for the record.)

25             BY MR. SCHEWEL:

1       Q.   So on May 21st, 2020, Officer Gwinn sends a text

2   that says "Front Street 2:30 for Omar.  I started this

3   because Slim Thug wasn't on the other thread."  Who is

4   Slim Thug?

5       A.   Detective Gay.

6       Q.   Why was she called Slim Thug?

7       A.   Just because she's lanky and tall and skinny.

8       Q.   And Monroe gives a thumbs up.  Do you see that?

9       A.   Yes, sir.

10      Q.   And then someone responds, "That's fine.  I

11  texted her earlier."  Is that Officer Abdullah or do you

12  believe that that's Officer Abdullah who's responding?

13      A.   I don't -- I don't know whose phone number that

14  is.

15      Q.   Well, based off the context of the conversation,

16  do you believe that to be Officer Abdullah?

17      A.   Looking at the follow-up message from Detective

18  Monroe, I believe that that 984 phone number is, in fact,

19  Detective Abdullah.

20      Q.   Okay.  And do you believe that you were on this

21  text thread?

22      A.   I don't believe so because the texts read shows

23  four people and there's four people conversing, and I'm

24  not one of them.

25      Q.   Okay.  So we have Gwinn, Monroe --

1      A.   Actually, I'm sorry.  There's three people

2  conversing.  I don't know who the fourth is.

3      Q.   Okay.  Do you recall being on this text thread?

4      A.   I don't.

5      Q.   Okay.  So let's look at page two.  So this is

6  also May 21, 2020, at 2:44 p.m., and this is a different

7  thread?

8      A.   Yes, sir.

9      Q.   And this has you, David Rattelade, Rishar Monroe

10 and Officer Gay?

11     A.   Correct.

12     Q.   And you text, "Place your bets here," with two

13 exclamation points.

14     A.   Yes.

15     Q.   What were you betting on?

16          MR. PETTEY:  Objection.

17          THE WITNESS:  It's just a gesture of dark humor,

18 trying to figure out what the results of the search and

19 the takedown were going to be.

20          BY MR. SCHEWEL:

21     Q.   And what did you -- well, I'll just say you

22 predicted or you wrote in your text, "7 grams brown sugar

23 mixture."

24     A.   Yes.

25     Q.   Why were you predicting that Aspirin would

1    produce a brown sugar mixture?

2        A.   At this point in the string of investigations,

3    even though I hadn't seen any of the lab results or the

4    products from the prior cases, it was not my belief that

5    he was purchasing real heroin.  I thought he was being

6    played by the targets.

7        Q.   So why was that your belief even if you hadn't

8    seen any of the other heroin?

9        A.   Just -- like we discussed earlier, the

10   succession of the cases, the frequency of them, the small

11   buy, big up, doing a takedown or search warrant really

12   quick like that just -- to me, it didn't add up, so I

13   thought that he was being played and that these suspects

14   or targets were selling fake drugs to the CI.

15       Q.   Was the manipulation of the buy camera also a

16   factor?

17       A.   Everything we've discussed today would be a

18   total factor, yes.

19       Q.   Why did you predict 12 grams of weed?

20       A.   Just a random number.

21       Q.   Why weed?

22       A.   It's common to get weed on a takedown.

23       Q.   So your testimony is that your prediction of

24   weed had nothing to do with the fact that this was

25   Aspirin?

1            MR. PETTEY:  Objection.

2            THE WITNESS:  I would say correct.  I mean, we

3    recover weed no matter what.  It's everywhere.

4            BY MR. SCHEWEL:

5       Q.   Okay.  How about nonbuy money?

6       A.   That was basically saying that the suspect's

7    going to have money on him, but it wasn't going to be our

8    money.

9       Q.   Why was that?

10      A.   Drug dealers carry around money.

11      Q.   I know, but why were you predicting that the

12   drug dealer would not have RPD buy money?

13      A.   Because it would get passed off or something

14   would go haywire.  Things just always went nuts with him,

15   kind of like the case we discussed earlier where the

16   vehicle drove off with the money.  Just --

17      Q.   How about 3 red flags?

18      A.   Strictly talking about the warnings, as far as

19   adjusting the camera, concealing it, not speaking up

20   correctly, delaying a buy signal.  It's strictly related

21   to the CI's behavior.

22      Q.   Okay.  And so Detective Monroe responds.  He

23   says, "For sure fake heroin."  He also says, "Water

24   billing," with a question mark.  What does that mean?

25      A.   It would appear that he's calling into question

1    whether or not Abdullah has taken all the investigative

2    steps he needs.

3         Q.   Is water billing an investigative step?

4         A.   It could be, yes.  It would -- in this

5    particular instance, it wouldn't matter because it's

6    government housing, so it wouldn't -- it's a community

7    water bill.  It doesn't -- it's not like a single-family

8    residence where you'd have target-specific information

9    that could be beneficial to your investigation.

10        Q.   So the resident's name wouldn't be on the water

11   bill?

12        A.   At this property, no.

13        Q.   Okay.  What about, "Talk with Gina who knows

14   apartment manager who can identify tenant," question

15   mark?

16        A.   That would be another investigative step that

17   could have been done.  She is one of our gang liaisons.

18   At the time, I believe she did have a relationship with

19   one of the managers there, and then one of the other

20   managers, from my recollection, was not friendly to the

21   department, so it was -- I think the higher-ranking

22   manager was not friendly to law enforcement.  The lower

23   one was, and I believe Gina had a working relationship

24   with her, so she potentially could have reached out to

25   that person and said, "Hey, who do you have living in

1   this apartment?"

2       Q.   And the apartment being the apartment on the

3   warrant?

4       A.   Yes, sir.

5       Q.   Okay.  How about, "Advise lieutenant of search?"

6       A.   Basically saying that a supervisor has to be

7   notified and present of the search.  The reason it would

8   say a lieutenant on this day is because Sergeant Rolfe

9   was off on this day, so the next step up in the chain of

10  command would be the lieutenant.

11      Q.   Okay.  And just going back to the previous

12  thread that you think you were not on, is that why Monroe

13  was telling Omar to contact a South Side supervisor for

14  the search?

15      A.   Correct.  He was trying to -- he's basically

16  making a predictive thought that Omar had failed to

17  contact a supervisor and was reminding him that he needed

18  to do so.

19      Q.   Before the search?

20      A.   Correct.

21      Q.   Okay.  And so then Officer Gay says, "Flushed

22  dope, fake gun, no buy money, foot pursuit," and then you

23  respond with an emoji of Justin Timberlake laughing and

24  saying, "Oh, stop it."

25      A.   Correct.

1      Q.   Did you think that this was funny?

2      A.   As far as -- I mean, it's just dark humor that

3   the CI is going to get played and Omar keeps falling for

4   it.  There's no humor in -- or was there ever any thought

5   that a defendant was being wrongly detained or wrongly

6   charged.

7      Q.   Well, if you're predicting that there's going to

8   be brown sugar mixture or fake heroin --

9      A.   We're predicting that the defendants were --

10  were -- they were completing a felony offense of selling

11  fake drugs.  We did not think, at the time, that the

12  informant was planting drugs.  We thought that these guys

13  were selling fake drugs to our informant.

14     Q.   But if you're then charging someone with

15  trafficking heroin --

16     A.   There's no "we."  It was Detective Abdullah.

17     Q.   If he's charging someone with trafficking

18  heroin, isn't that a wrongful charge?

19     A.   If he has knowledge that there's -- that the

20  drug is not what he's charging, then yes, that would be

21  an issue.

22     Q.   And based on this text message chain, at least

23  that's what you were predicting?

24     A.   We were predicting, but we had no results.  It

25  was complete predict -- we were just predicting it.

 1      Q.   So you're saying if you had known that -- well,
 2   I'll strike that.
 3           You didn't think it was funny that people were
 4   being wrongfully arrested?
 5           MR. PETTEY:  Objection.
 6           MR. BLANCHARD:  Objection.
 7           MS. DIXON:  Objection.
 8           THE WITNESS:  I would never think that's funny.
 9           BY MR. SCHEWEL:
10      Q.   And that you didn't think that was funny here.
11   That wasn't the purpose of this emoji?
12      A.   The humor here was the incompetence of the CI
13   and the investigator that's running that operation.
14      Q.   Was it -- did you feel that that reflected
15   negatively on you in any way?
16      A.   No.  I had a very strong reputation with the
17   DA's office, through the court system and my supervisors
18   and chain of command.
19      Q.   Did this incident or string of incidents affect
20   your reputation in any way?
21      A.   Since then, yes, negatively.
22      Q.   How so?
23      A.   I've been accused in the courthouse of being a
24   dirty cop.  I've been harassed on the street by people
25   calling me out by name, say I'm a dirty cop.  I've had my

1   name published in the media in a negative light.

2        Q.   What about internally?

3        A.   Internally, I've been cleared of any wrongdoing.

4        Q.   But have other cops in RPD treated you any sort

5   of negative way?

6        A.   No.

7        Q.   And when you're saying in the courthouse you

8   were called a dirty cop, who called you a dirty cop?

9        A.   Not to my face, but behind my back, one of the

10  defense attorneys that represented some of the clients

11  from the first lawsuit.

12       Q.   So you didn't hear that or you did hear it?

13       A.   It was relayed to me, and then I've, since then,

14  while in court, had attorneys kind of -- when discussing

15  cases, kind of question my reliability, whether or not

16  we're trying to negotiate plea deals or anything to that

17  effect.

18       Q.   And is that related to cases with Aspirin or

19  just generally?

20       A.   Because I'm attached to these lawsuits and Omar,

21  what happened with Aspirin and Omar, it's just a global

22  effect.  It's tied to me, it's tied to Gay, it's tied to

23  Monroe, it's tied to everybody.

24       Q.   And do you feel like that's unfair?

25       A.   Considering that I was one of the two

1    whistleblowers, I do.

2         Q.   And you said "whistleblowers."  Who's the other

3    one?

4         A.   Detective Monroe.

5         Q.   And how were y'all the whistleblowers?

6         A.   Because we finally figured it out and reported

7    it to our chain of command and, ultimately, the DA's

8    office.

9         Q.   Do you wish you had gone over Sergeant Rolfe's

10   head sooner?

11             MR. BLANCHARD:  Objection.

12             MS. DIXON:  Objection.

13             THE WITNESS:  I don't, because I didn't know

14   then what I know now, or what I knew -- what we figured

15   out on May 22nd.

16             BY MR. SCHEWEL:

17        Q.   And what did you figure out on May 22nd?

18        A.   That Abdullah -- or not Abdullah.  The

19   informant -- after reviewing the video, me and Monroe

20   came to the conclusion that the informant was lying about

21   what he was there to buy, what he had purchased and the

22   entire -- pretty much everything.

23        Q.   How is that different than what you've stated in

24   your text messages on May 21st, 2020?

25        A.   The humor in that is around these suspects

1   selling intentionally to the informant a fake controlled

2   substance.  On May 22nd, we determined that that wasn't

3   the case, or we believed it wasn't the case, that the

4   informant was the one playing the detective by planting

5   the fake drugs, and that's when we went to the bosses

6   with a much bigger problem.

7           It was our belief the entire time that, even

8   though there may or may not be, you know, for lack of

9   better words, crimes charged with the wrong drugs, that

10  they were still committing a felony offense, that they

11  were still selling counterfeit drugs.

12          That was our belief the entire time, and after

13  May 21st, we were very fortunate that the next morning,

14  we discussed what went down.  Our frustrations were very

15  high.  We saw the body-worn camera sitting on Abdullah's

16  desk.

17          There's no reason for us to ever watch any of

18  that footage because it's not our case, and we took the

19  camera, downloaded it, reviewed the footage, and that's

20  when we had -- pardon my French -- a holy-shit moment and

21  started picking it apart and collaborating.  And then we

22  went to the bosses immediately with it.

23      Q.  So when you say you saw the body camera on his

24  desk, you saw his -- what body camera did you see?

25      A.   It's a button camera that's a covert camera that

1    the informant wears.  It does not wirelessly transmit.

2    It's -- all the data is stored on the device itself.

3        Q.    And so y'all went on your own, took the camera

4    and downloaded and watched it?

5        A.    Yes.

6        Q.    And the videos, where are they stored?

7        A.    That -- the body-worn video would be stored, I'm

8    assuming, on the assigned detective's hard drive.  The

9    phone videos would be stored on a third-party server that

10   we contract with.

11       Q.    And do you have access to that?

12       A.    Not to the detectives' files.  I would have

13   access to the phone files, but I would have no reason to

14   look at them other than my personal cases.

15       Q.    And by the phone files, you mean the 10-21 app

16   files?

17       A.    Correct.

18       Q.    So I just want to make sure I'm clear.  With the

19   earlier cases, you didn't think it was as big of an issue

20   because you felt, at least, you had probable cause to

21   charge them with selling fake heroin?

22       A.    We believed that probable cause existed that a

23   crime was occurring.  We thought the entire time that

24   these people were selling -- or not the entire time, but

25   leading up towards, as this progressed on and on and on,

1   it was our belief that he was being sold fake heroin, but

2   we didn't have the personal, intimate details of each

3   investigation and lab results to definitively say that

4   because they weren't our cases.

5           At the end of the day, the investigator has to

6   work his case and then collaborate with the DA's office

7   to successfully prosecute them.  Do we collaborate with

8   each other?  If you have a professional working

9   relationship, yes, but Detective Abdullah did not have

10  that relationship with us.

11     Q.   What level felony is selling fake narcotics?

12     A.   Class I, I believe.

13     Q.   What is trafficking heroin?

14     A.   Depending on the level, I think the highest

15  level is a class C felony for level 3 trafficking, I

16  think spanning from there to class G for the trafficking

17  and then class H for possession with intent.

18     Q.   So did you not think it was an issue that folks

19  were being charged with a much higher level felony than

20  they were actually -- what you believed you had probable

21  cause for?

22          MR. PETTEY:  Objection.

23          THE WITNESS:  Yeah.  As far as the class, it

24  didn't, I guess, ring into my thought of the process, in

25  my mind.  The charges would be -- you know, if the system

1    works like it's supposed to work, then these lab results

2    would show that the drugs were fake and the charges would

3    be amended accordingly to the proper charge.

4              BY MR. SCHEWEL:

5         Q.   So back to the text messages on May 21, 2020.  I

6    think you stated earlier that Gina was an individual who

7    worked with the gang unit at RPD; is that correct?

8         A.   She's a civilian employee that does, like, gang

9    outreach.

10        Q.   Okay.  And had you worked with Gina in the past?

11        A.   I have.

12        Q.   And what type of information has Gina provided

13   you in the past?

14        A.   Helping me out with getting information about

15   people that may or may not be involved in criminal

16   activity in this same neighborhood.

17        Q.   Has she ever provided you with the people living

18   at a specific location?

19        A.   One case, in particular, I remember.  She

20   confirmed -- she came to me with a tip about a residence

21   and provided the name of the resident who lived there.

22        Q.   Why do you think Officer Abdullah did not

23   attempt to verify who was living at the address where you

24   executed the search warrant on this day?

25        A.   I have no idea why he didn't do it.

1      Q.   Are you surprised that he didn't?

2      A.   No.

3      Q.   Okay.  So I'm going to the next page where we

4  have the Justin Timberlake emoji, and then, in green,

5  Gwinn says, "Aspirin is already in Omar's car and

6  definitely foot pursuit."  What does it mean, "Aspirin is

7  already in Omar's car"?

8      A.   So basically, because this was a takedown

9  operation with a search warrant, Aspirin should be

10 walking out of the residence and giving the signal

11 simultaneously, giving us the time to get there, secure

12 the location and the target.

13          Basically, he's predicting that Aspirin's not

14 going to throw the signal at the correct time and then

15 will get into Omar's car, say -- Omar would then ask him,

16 "Did the buy happen?"  Then he would say, "Yes," and then

17 Omar would get on the radio and say, "Go, go, go,"

18 allowing so much time to pass that the target, you know,

19 could come outside, see us coming, and then it would turn

20 into a foot pursuit.

21     Q.   And that had happened in the past?

22     A.   Yes.

23     Q.   And then if we turn to the following page, we

24 have Officer Gay with three laughing emojis and then you

25 state, "More brown sugar."

 1      A.   Correct.

 2      Q.   What do you mean by "more brown sugar"?

 3      A.   Just I'm assuming -- this was on the 21st?

 4      Q.   Yeah.  This is still part of the same chain.  If

 5 you go back one page --

 6      A.   Okay.

 7      Q.   -- you'll see the top of Meghan Gay's three

 8 emojis.

 9      A.   Okay.

10      Q.   And then it looks like a screenshot by Gwinn on

11 the next page.

12      A.   Without seeing the time stamp, it -- I'm either

13 just restating my earlier text about the prediction that

14 we're going to get fake drugs.  That would be my best

15 guess.

16      Q.   So earlier you testified that you had only seen

17 the drugs, the heroin produced by Aspirin on one

18 occasion.

19      A.   Correct.

20      Q.   Why were you predicting more brown sugar if

21 you'd only seen it on one occasion?

22      A.   Because I was just confident he wasn't buying

23 real dope.

24      Q.   How were you confident in that if you had never

25 seen it?

1      A.   Just the pattern of the way these cases were

2  being managed.  I just didn't believe it was true.  It

3  was too good to be true.

4      Q.   So you thought that the drugs were brown sugar

5  even though you had never seen them?

6      A.   It's just a presumptive -- I guess a guess is

7  the best way to describe it.

8      Q.   I mean, had you heard from anyone else on the

9  vice team that they were brown sugar?

10     A.   I mean, we had the negative field test that was

11 discussed before.  Other than that, it was just a

12 speculation that it was -- he was buying fake stuff.

13     Q.   Are you saying other people were speculating as

14 to that or you were speculating as to that?

15     A.   I think, I mean, it was me and others were

16 speculating that he was likely purchasing fake drugs, but

17 without seeing any lab results, we didn't know for sure.

18     Q.   Okay.  But you had never actually seen it until

19 May 21st?

20     A.   May 21st was when I laid eyes -- just the way

21 that day played out, I ended up having to go scoop up the

22 informant and he handed me the package, and because

23 the -- I just happened to fortuitously be in that place

24 at that time, in that moment, with that assignment.  I

25 was able to visually inspect it, say, "This isn't right,"

1    conduct a field test and confront Detective Abdullah with

2    those results.

3        Q.   Okay.  And that was the first time you'd seen

4    it?

5        A.   For that -- for that product -- we're talking

6    about May 21st?

7        Q.   Let me be more specific.  That was the first

8    time you had ever seen the alleged heroin produced by

9    Aspirin?

10       A.   On a buy walk operation, it would have been the

11   first, if not second.  I mean, I probably -- based on

12   discussing the conversation with Detective Monroe at the

13   first field testing, there's a good chance that I may

14   have seen that product or at least have been there during

15   the field test.

16       Q.   Okay.  So you think maybe on January 2nd, also?

17       A.   Whatever that date was that Monroe did the field

18   test.

19       Q.   Okay.  And then -- but you're saying the rest of

20   your speculation was based off of concerns you had about

21   Aspirin, but then also other things that you had heard

22   vice members talking about?

23       A.   It was just concerns over the CI and then the

24   concerns on the pattern in which these buys were

25   happening.

1      Q.   Had you heard any other members of the vice team

2   talking about the possibility that Aspirin was producing

3   brown sugar?

4      A.   We never -- it never crossed our mind that the

5   informant was producing this product.

6      Q.   Had you heard any other members of the vice team

7   speculate that Aspirin was being sold brown sugar and not

8   heroin?

9      A.   It had been discussed that the CI was being

10  duped and being sold -- I don't think the word "brown

11  sugar," maybe just fake drugs, because heroin and brown

12  sugar look nothing alike.

13     Q.   And who did you hear discussing that?

14     A.   It would have been just various members of the

15  drug unit.

16     Q.   So what I'm confused about is, how were you

17  predicting brown sugar if no one had mentioned brown

18  sugar?

19          MR. PETTEY:  Objection.

20          THE WITNESS:  I mean, I just -- I can't speak to

21  why I came up with brown sugar.  It's just whatever fake

22  substance I would have come up with.

23          BY MR. SCHEWEL:

24     Q.   Okay.  So you were pretty confident that there

25  was a fake substance, but brown sugar was just the first

1   thing that came to your mind?

2        A.    Correct.

3        Q.    And on the 21st when you saw that product, was

4   that brown sugar?

5        A.    In my mind, it was brown sugar.

6        Q.    Had you previously placed bets on what Aspirin

7   would produce?

8        A.    I'm sure we did.  I don't have personal

9   knowledge or recollection of actual bets, but, you know,

10  it's the dark humor of, you know, the stressful world

11  that we live in and operate in and just the frustration

12  of working with this detective and informant.

13       Q.    And do you recall whether or not you or your

14  colleagues placed bets on Aspirin producing brown sugar?

15       A.    Specific- --

16            MR. PETTEY:  Objection.

17            THE WITNESS:  Specifically brown sugar, I don't

18  recall.

19            BY MR. SCHEWEL:

20       Q.    How about producing fake heroin?

21       A.    I can't specifically say that I remember a

22  conversation where we said fake heroin was going to be

23  produced, but I'm sure that we did because this had gone

24  on for, I believe, a few months.

25       Q.    And you think that was said in a text message?

1          A.    Honestly, it was probably more face-to-face.  I

2    mean, we would eat together, stuff like that, so it was

3    probably more face-to-face conversation or even just

4    being in the office together whenever Abdullah wasn't

5    around.

6          Q.    Okay.  And the vice team members, just so I'm

7    clear, who would have been involved in these

8    conversations were yourself?

9          A.    Yes.

10         Q.    Monroe?

11         A.    Yes.

12         Q.    Gay?

13         A.    Yes.

14         Q.    Gwinn?

15         A.    For a very short period of time.  He was, like,

16    brand-new.

17         Q.    How about Sergeant Rolfe?

18         A.    Yes.

19         Q.    Would Sergeant Rolfe eat with y'all?

20         A.    Yes.

21         Q.    So on this operation where you predicted Aspirin

22    would produce brown sugar, why did you not step in and

23    stop this buy from occurring?

24         A.    Because it was still a crime to sell a

25    counterfeit drug to an informant.

1      Q.    So it didn't matter to you that the drug that
2    you were after was heroin?
3      A.    Repeat that one more time.
4      Q.    It didn't matter to you that the drug that
5    Abdullah claimed his CI was buying was heroin?
6      A.    I mean, I can't --
7            MS. DIXON:  Objection to form.
8            THE WITNESS:  I can't control what he -- where
9    his investigations are going, what direction they're
10   heading in or what his intentions are of buying.  It's --
11   I mean, literally, as we just discussed a moment ago, as
12   soon as I realized something was not right, I mean, we
13   immediately went to our bosses.  We immediately
14   intervened.
15           BY MR. SCHEWEL:
16     Q.    Well, actually, you went to Sergeant Rolfe well
17   before this, right?
18     A.    With general concerns.
19           MR. BLANCHARD:  Objection.
20           BY MR. SCHEWEL:
21     Q.    Are you aware that Officer Monroe called
22   Lieutenant Bunch prior to this search warrant execution?
23     A.    I'm not aware of a phone call.
24     Q.    Are you aware that he called Lieutenant Bunch to
25   express concerns to Lieutenant Bunch about this warrant?

1           MR. PETTEY:  Objection.

2           THE WITNESS:  I am not -- I personally know

3    nothing about this phone call.

4           BY MR. SCHEWEL:

5       Q.   I mean, if you had concerns like you did about 7

6    grams brown sugar mixture that was going to be produced,

7    couldn't you have called Lieutenant Bunch and told him

8    that?

9       A.   There would be no reason for me to call the

10   lieutenant because, in my mind, a crime is still

11   occurring.  It's still illegal for someone to sell fake

12   drugs during a drug transaction, and we didn't, at the

13   time, have the lab results to know for sure that drugs

14   weren't being sold.

15      Q.   At this time, did you believe that Aspirin was a

16   reliable CI?

17      A.   As far as reliable, going there, buying drugs

18   and bringing them back, I had no reason not to believe

19   that he was doing that.  I thought he was being played.

20   I thought he was being sold fake drugs and he was

21   bringing those fake drugs back to the detective.

22      Q.   If your CI is repeatedly being played, is that a

23   reliable CI?

24      A.   I'd say it's on a case-by-case basis.

25   Definitely one of those change the facts, change the

1   outcome kind of situations.

2           I don't think Abdullah knew that he was being

3   played because he wasn't checking his lab results, so

4   therefore he didn't know that they were being played.  We

5   were speculating, but we sure didn't know because it's

6   not my job to check his lab results and put together a

7   discovery packet for the DA's office.  That's his job.

8       Q.   Or to check his body camera?

9       A.   Correct.  It's not my job.

10      Q.   So even with the concerns you had that you

11  expressed to Rolfe and that are in your text message

12  chain, you still thought that Aspirin was a reliable CI?

13      A.   Reliable as in he was going in, making a

14  purchase and bringing it back.  I thought he was reliable

15  for that.  I thought he was -- but as far as the quality

16  of the CI, I didn't -- I mean, I didn't like him.

17      Q.   Would you have used him as your CI?

18      A.   Knowing now what I know, absolutely not.  I

19  would have -- you know, if he was to provide me with some

20  information, I would definitely verify it.  The old trust

21  but verify, I think, applies here.

22      Q.   Would you have used him as your CI on the

23  morning of May 21st, 2020 to make a controlled buy?

24      A.   I don't think it would be fair for me to speak

25  to if I would have used him that day because what I knew

 1    that day is way less than what I know now, and I don't

 2    believe -- me, personally, I would have let it -- we

 3    wouldn't have got to that point.  I mean, I -- I would

 4    have been checking behind my informant, checking lab

 5    results.

 6         Q.   Well, in your text message, for example, you say

 7    "3 red flags."

 8         A.   Correct.

 9         Q.   Is it possible that you knew there's three red

10    flags about your CI and you're still going to use him to

11    make a controlled buy?

12         A.   If it was early on in the relationship and I

13    addressed those red flags with him and they heeded my

14    advice and we're, you know, not doing those red flags

15    anymore, I would say absolutely you could still use that

16    informant.

17              What you're looking for is -- it's a ongoing

18    pattern and consistency of reliability.  You know, a

19    young driver gets in a car crash; we don't take their

20    driver's license away.  We, you know, talk to them, maybe

21    issue them a citation, send them to safe driver's school

22    and send them on their way.

23              It's kind of the same thing with an informant.

24    They can make a mistake and then coach them and continue

25    to monitor their behavior.  It's when this poor behavior

1   is ongoing.  Me, personally, I would have uncovered this
2   and dealt with it.
3         Q.   And as of May 21, 2020, this behavior had been
4   ongoing with Aspirin?
5         A.   With hindsight, yes.
6         Q.   Well, you had raised it to your sergeant
7   multiple times.
8              MR. BLANCHARD:  Objection.
9              MS. DIXON:  Objection.
10             MR. PETTEY:  Objection.
11             THE WITNESS:  We had raised behavior; just the
12  job performance of Abdullah was raised over the years
13  because this predated Aspirin ever being an informant.
14             BY MR. SCHEWEL:
15        Q.   Okay.  So I just want to be sure that I have an
16  answer to the question whether or not you would have used
17  him as your CI to make a controlled buy on May 21, 2020,
18  and I think your answer is that you're not sure?
19        A.   Would you like the response in the context of
20  what I knew that day?
21        Q.   What you knew that day.
22        A.   I mean, yeah, I wouldn't have had an issue
23  sending him in there if I was in Abdullah's shoes because
24  I thought my informant was going in there to buy drugs.
25  The -- me, personally, I don't -- he wasn't my informant.

1    I didn't monitor him.  He wasn't my responsibility.

2              I just knew enough peripheral information that I

3    was suspicious of him.  I don't think it would be fair to

4    ask me to make an opinionated statement about whether I

5    would have used him that day because, A, he wasn't my

6    informant, B, I would -- didn't use him because he wasn't

7    my informant.

8         Q.   So after sending these text messages, what

9    happened?

10        A.   Informant went in, was -- informant was

11   deployed, went into the residence, walked into the

12   kitchen in the residence.  There was another buyer ahead

13   of him in line.  That buyer completed their drug

14   transaction with, I guess, Mr. VanIrvin.

15             That person exited the residence with an

16   open-carry firearm.  That information was broadcast over

17   the radio.  The supposed transaction then occurred

18   between Aspirin and VanIrvin.

19        At some point, a takedown signal was given.  The SEU

20   team moved in on the residence and then I moved in on the

21   guy with the open-carry firearm.

22        Q.   How do you know that someone made a buy from

23   VanIrvin prior to Aspirin?

24        A.   From watching the live feed and then whoever was

25   in direct surveillance at the house calling out that he

1   was exiting.

2       Q.   So the live feed, you're saying, shows someone

3   else in the house with VanIrvin?

4       A.   Yeah, it shows a guy standing with him

5   conducting some sort of transaction, and then that person

6   does complete their transaction because he admitted to me

7   during his brief detention that he had conducted a drug

8   transaction with VanIrvin.  He leaves the residence and

9   then Aspirin steps up and conducts his business with

10  VanIrvin.

11      Q.   Did you watch the live recording on the 10-21

12  app afterwards?

13      A.   Afterwards?  I don't believe so.  I think all we

14  watched was the body-worn camera.

15      Q.   So what you're testifying to today is what you

16  recall seeing on the 10-21 app?

17           MR. PETTEY:  Objection.

18           MS. DIXON:  Objection.

19           THE WITNESS:  Can you repeat that?

20           BY MR. SCHEWEL:

21      Q.   Yeah.  So earlier you testified that someone

22  else goes in first that's ahead of Aspirin, they make a

23  buy.

24      A.   Uh-huh.

25      Q.   I'm wondering, did you -- are you testifying to

1   what you observed live on the 10-21 app or are you saying

2   that you had gone back and seen that later?

3           MR. PETTEY:  Objection.  He also testified he

4   talked to the person, so it's not just an either/or.

5           MR. SCHEWEL:  Okay.

6           MR. PETTEY:  You can answer.

7           THE WITNESS:  Okay.  And my testimony is that

8   there -- I determined that this guy conducted a -- or had

9   likely conducted a transaction with VanIrvin.  He exited

10  the residence with an open-carry firearm, and I

11  approached that person and conducted a brief detention,

12  identifying him, determining that he was not a felon, the

13  weapon was not stolen.  He was lawfully in possession of

14  the weapon.

15          He did say that he had just left the residence,

16  had just purchased marijuana and then gave me the

17  marijuana.  He was then released.

18          BY MR. SCHEWEL:

19  Q.   So what about the part where you testified that

20  you saw him on the video standing there doing some sort

21  of transaction?

22          MR. PETTEY:  Objection.

23          THE WITNESS:  I mean, could it have been from

24  the body-worn camera?  Possibly.  There was -- I know for

25  a fact that we have a video that shows this person

1  standing in front of the CI.  Whether it was the

2  body-worn camera or the 10-21, I'm not sure.  I could be

3  blending the two camera feeds.

4            BY MR. SCHEWEL:

5      Q.   Okay.  Okay.  So just backing up a little bit,

6  after sending the text message and meeting with the vice

7  team, what was your first movement after that?

8      A.   From the initial safety briefing?

9      Q.   Yes.

10     A.   Put everyone in place around the residence,

11 drive the informant close to the location and then put

12 them out on foot.

13     Q.   Okay.  And Aspirin rode with you?

14     A.   On this particular day, yes.

15     Q.   In your vehicle?

16     A.   Yes.

17     Q.   And you were driving?

18     A.   Yes.

19     Q.   And Gwinn was your passenger?

20     A.   I believe so.

21     Q.   Where did you park your vehicle?

22     A.   The top of the hill, and I believe that's --

23 it's either Burgundy or Millbank Street.  I think it's

24 Millbank Street, about a block-and-a-half walk to the

25 residence.

1      Q.   Were you ever in a position where you could
2  observe Aspirin enter a residence with your own eyes?
3      A.   I don't believe so.  I think that would have
4  been someone else's task.
5      Q.   Okay.  But just so I'm clear, you were never in
6  a position where you could observe Aspirin enter a
7  residence with your own eyes?
8      A.   Physically, not using electronic surveillance,
9  I'm pretty confident that I stayed in my position on
10  Millbank until the signal was given to move in.
11      Q.   Did you observe Aspirin enter a residence on the
12  10-21 app?
13      A.   Whether it was on the live video feed versus the
14  body-worn feed -- it's on video.  I don't know which
15  video it is.
16      Q.   But you're -- you did observe Aspirin enter a
17  residence?
18      A.   After the fact on the video?
19      Q.   Just on a video, yes.
20      A.   I've seen a video where he walks up, enters the
21  residence and conducts a transaction with a person.
22      Q.   And by "conducts a transaction," did you
23  actually see an exchange of narcotics and an exchange of
24  money?
25      A.   You can hear the discussion.  I believe it was

1   Mr. VanIrvin that was like, "What do you want?"  I

2   believe it was 60, was muffled to the point to where I

3   think Mr. VanIrvin then goes, "What?"  And then he says

4   60 again, and then a transaction occurs, the CI leaves

5   the house and at some point gives the signal to go, and

6   everyone moves in.

7        Q.   And Aspirin was given $800 on that day?

8        A.   I believe that's the amount.

9        Q.   So were you surprised when you heard Aspirin

10  asking for 60?

11       A.   That day, I did not hear that.  That was the

12  next day when we were reviewing the video.  That was our

13  aha moment.

14       Q.   Okay.  So when you were watching the 10-21 app,

15  you didn't hear the transaction?

16       A.   Correct.

17       Q.   Okay.  All right.  Do you mind pressing -- I

18  think it's number 1.

19            MR. BLANCHARD:  Table box one?

20            MR. SCHEWEL:  Yes.  Thanks.

21            BY MR. SCHEWEL:

22       Q.   Okay.  So this is marked by me as Exhibit 9, a

23  VanIrvin 5/21 buy, and I'm starting it at 00 and I'm

24  going to play it.

25            (Exhibit 9 was identified for the record.)

```
 1                    (Video recording played.)

 2                    BY MR. SCHEWEL:

 3          Q.   Did you hear a phone ring?

 4          A.   Just now?

 5          Q.   Yeah.

 6          A.   I -- if I did, I missed it.

 7          Q.   Okay.  I'll go back a little bit.

 8                    (Video recording played.)

 9                    THE WITNESS:  I hear music.  I'm not sure if

10     that's a ringtone.

11                    BY MR. SCHEWEL:

12          Q.   Was that what your ringtone sounded like at the

13     time?

14          A.   I don't have ringtones.

15          Q.   You don't -- you just leave your phone on

16     silent?

17          A.   No.  I mean, it's a standard phone.  I don't

18     have musical ringtones.

19          Q.   Okay.  And did you hear someone say, "Hey, Rat,

20     can you text me the address?"

21          A.   Yes.

22          Q.   Do you know who that was?

23          A.   I'd have to listen to it again.

24          Q.   Okay.  So I paused it at 28 seconds.  I'm going

25     to go back to 13.
```

1              (Video recording played.)

2              THE WITNESS:  That's Officer Kellogg with the K9

3    unit.  He's saying, "I'm late in the game," like he's

4    somewhere else heading our way.

5              BY MR. SCHEWEL:

6        Q.   Is it common for the K9 unit to come?

7        A.   Yes.

8        Q.   To a takedown?

9        A.   Yes.

10       Q.   And they're not part of the SEU unit, right?

11       A.   No.

12       Q.   Okay.  And so did you text him the address?

13       A.   I'm sure I did.

14       Q.   How would you have known the address?

15       A.   From attending the briefing.

16       Q.   And so you think that Officer Abdullah told you

17   the address?

18       A.   Yeah.  It would have been on our board.  We use

19   a dry-erase board in a briefing room and then -- I don't

20   know if he did it on this particular day, but sometimes

21   we'll actually print out -- we'll have the intelligence

22   center, like, print out a map, so we'll have the address

23   and overhead, like, satellite photo of the area so that

24   we kind of have a lay of the land and know how everything

25   looks out there.

1       Q.   What about if the briefing is out in the field?

2       A.   If the briefing is on the field, he'll still

3   give us the information and just won't have a dry-erase

4   board, and SEU will not -- will not hit a house without

5   verifying the address.

6       Q.   Okay.  I'm going to play again at 28 seconds.

7   And sorry, before I do that, which camera is this that

8   we're watching from?

9       A.   I believe it's -- honestly, I don't know.  I'd

10  have to watch longer to figure it out.

11      Q.   Okay.  Playing at 28 seconds.

12           (Video recording played.)

13           BY MR. SCHEWEL:

14      Q.   Did you just hear someone say a phone number?

15      A.   Yeah.

16      Q.   Do you know whose phone number that is?

17      A.   It sounded like Kellogg was asking for someone

18  to text him the address, so it could be because I didn't

19  send it to him quick enough, maybe he was trying to get

20  it from someone else.  It looks like I'm counting money.

21      Q.   Okay.  And do you think that Kellogg was doing

22  that over --

23      A.   The radio.

24      Q.   -- the radio?  Okay.  And who all would be --

25  would have access to the radio frequency?

1          A.    Everyone on this operation.  Anyone in the drug

2    unit and special operations has access to these channels.

3          Q.    But Kellogg was in a different unit, right?

4          A.    He is in special operations.  It's just a

5    different unit within that division.

6          Q.    Okay.  So K9 is part of special operations?

7          A.    Correct.  Just like the motor unit, the DWI

8    unit, the horse unit.  There's multiple units in that

9    division.

10         Q.    All of them would have access to this frequency?

11         A.    Not all of them.  The -- this particular

12   frequency is a drug frequency and it's a need-to-know

13   channel, so it's only certain members of the department

14   have this channel.

15         Q.    Okay.  So people who are actually part of this

16   operation?

17         A.    Correct.

18         Q.    All right.  I'm going to play again at 1:03.

19               (Video recording played.)

20               THE WITNESS:  This is the phone.

21               BY MR. SCHEWEL:

22         Q.    And you know that because it's being held up?

23         A.    No, because of the echo.  Actually, now, this

24   looks like it might be the body-worn camera and then he's

25   picking up the echo from me turning the phone on.

1              (Video recording played.)

2              THE WITNESS:  That's the body-worn camera.

3              BY MR. SCHEWEL:

4         Q.   Okay.  Did he just state the intersection that

5    you all were at?

6         A.   No.  I was giving him a -- sounds like a pickup

7    location.

8         Q.   Which was what?

9         A.   Raleigh and Crabtree.

10        Q.   And that's an intersection?

11        A.   Yes, probably a couple blocks away.

12        Q.   Did you frisk Aspirin before he entered your

13   vehicle?

14        A.   No.  That would have been done by -- should have

15   been done by Abdullah.

16        Q.   Do you recall observing that?

17        A.   I don't.

18        Q.   Did you ever frisk Aspirin?

19        A.   I don't recall ever frisking Aspirin.  He had a

20   little bit of a body odor issue.  I liked to stay away

21   from him.

22        Q.   Okay.  I'm going to fast-forward now and I'll

23   just -- let's see here.  This is 8:27, so I'm pausing at

24   8:32.  Here where the camera is obscured, why do you

25   think the camera is obscured here?

1      A.   Because he zipped his jacket up.

2      Q.   Did you ever talk to Aspirin about not obscuring

3  the camera?

4      A.   I seriously doubt I ever had a conversation like

5  that with him because I wasn't his handler.  This is the

6  only time I can personally remember even deploying him.

7  I'm assuming I deployed him because Abdullah was probably

8  in the van with the SEU team.

9      Q.   Well, Abdullah would have driven the SEU team

10  anytime there was an operation he was in charge of where

11  there was a search warrant execution, right?

12      A.   That's typical, yes.

13      Q.   Okay.  I'm going to fast-forward to 17:27.

14           (Video recording played.)

15           BY MR. SCHEWEL:

16      Q.   Okay.  That's the end of the video.  So what

17  just happened at the end of the video?

18      A.   He got picked up.

19      Q.   By you?

20      A.   It looks like it was me.

21      Q.   Okay.  And did you say, "That went smooth"?

22      A.   That's what it sounds like I said, yes.

23      Q.   Why did you think it had gone smooth?

24      A.   Just -- he was in and out, made the transaction

25  and no one got hurt, and sounds like, if I remember

1    correctly, that -- given the buy bust and people moved

2    in, so just a general statement of saying that went

3    smooth.

4         Q.    Did he hand you the heroin at that point?

5         A.    Yes, he handed me the package.  I threw it down

6    in my cup holder.  I dumped him out behind the shopping

7    center at 1100 Raleigh Boulevard and then went back to

8    the scene because it was getting kind of chaotic out

9    there.

10        Q.    Why was it getting chaotic?

11        A.    I wasn't there when it all -- the initial entry.

12   It's a neighborhood known for coming out and being

13   confrontational with law enforcement, so that could be my

14   speculation.  But my help was needed at the scene, so

15   that's why I dumped him out and went back.

16        Q.    Okay.  And when you dumped him out, was he by

17   himself?

18        A.    Yes.

19        Q.    Do you know where he went?

20        A.    I put him out behind the shopping center and

21   gave him instructions to stay there until Abdullah came

22   and picked him up.

23        Q.    Did he do that?

24        A.    I have no idea.

25        Q.    So did you frisk Aspirin after he came back into

 1   your vehicle?

 2       A.   No, sir.

 3       Q.   When you got back to the scene of the warrant,

 4   what happened?

 5       A.   I believe the first two -- the primary residence

 6   had already been secured, people were inside.  There was

 7   a few officers standing around outside, I guess, because

 8   there was, I believe, some neighbors kind of out and

 9   about.

10           I think there was something going on with a

11   second residence next door.  I'm not sure what.  And then

12   ultimately I ended up at the third residence.  I believe

13   that's where they determined VanIrvin had gone after the

14   initial buy.  Spoke with a female.  I'm assuming she's a

15   tenant and I'm pretty sure I was the one that spoke to

16   her to get her to kind of calm down.

17           I think she was -- she had a conversation with

18   someone.  I think she was kind of upset, so I calmed her

19   down and then she ended up giving consent for the

20   residence.

21           I went inside, conducted a search.  If I

22   remember correctly, the house was kind of messy, and

23   ultimately an unloaded handgun was found in a diaper pail

24   in a upstairs bedroom.

25       Q.   How did you get to the third residence?

1      A.    I'm sure someone told me at some point because

2   this investigation had already -- was already underway

3   when I got to the scene, so basically it's one of those

4   deals where someone's telling me, "We need this done," so

5   someone would have told me either, "We think he's in that

6   house" or, "We just took him out of that house."  One of

7   those two scenarios, likely, is what played out.

8      Q.    Okay.

9      A.    And then I spoke with the resident.  I'm

10  assuming she was the resident, female of the house.  She

11  was out on the back steps sitting in a chair, not

12  handcuffed, and she ultimately gave consent.

13     Q.    Did you ever see Aspirin go into 1628-B?

14     A.    Physically?

15     Q.    Sure, physically.

16     A.    No.

17     Q.    Did you ever see him go into that residence on

18  any camera?

19     A.    I mean, I saw him go into a residence on camera

20  reviewing it the following day.  During the live video --

21  during the actual event as it's occurring, the answer is

22  no because I'm listening to radio traffic, listening to

23  the phone.  I'm scanning the area because this is a not

24  friendly neighborhood, so there's a lot going on.

25     Q.    Are you sure that Aspirin went into 1628-B?

1      A.   Am I sure?

2      Q.   Are you sure?

3      A.   I didn't watch him go in there, so I'm not sure.

4  That would be the -- whoever the eyeball surveillance was

5  or the lead detective.

6      Q.   At a location like the Raleigh North Apartments

7  where -- strike that.

8           At the Raleigh North Apartments, do you think

9  that Abdullah or another detective would have been able

10 to get close enough to confirm that Aspirin actually went

11 into 1628-B?

12     A.   I mean, it is possible he could have gotten in

13 there, yes.

14     Q.   Where would they have parked?

15     A.   The driveway forks as you're coming off the main

16 roadway, so it really depends on what door they went in.

17 Probably -- he probably needed at least one officer on

18 each side.

19          It's one of those deals, you change the facts,

20 you change the outcome kind of situation, because

21 sometimes the informants are holding the phone perfectly,

22 and you watch them go to the building and then they

23 disappear in a stairwell.  But on the video you watch

24 them go up and you see a 102 on a door and then the door

25 open up, so it's kind of a collaborative effort of

1   physical and electronic surveillance.  But that

2   particular neighborhood is a very difficult one to

3   conduct surveillance in.

4        Q.   So as you sit here today, you can't say for

5   certain if any detective actually saw Aspirin enter

6   1628-B?

7        A.   I don't know what the other detectives saw, no.

8        Q.   Did any of them tell you that they saw that?

9        A.   I don't believe.

10            MR. SCHEWEL:  I have no further questions.

11                         EXAMINATION

12            BY MR. BLANCHARD:

13       Q.   Sergeant Rattelade, my name is Norwood

14   Blanchard.  I represent Sergeant Rolfe, retired Sergeant

15   Rolfe, I guess you'd say at this point.

16            When Mr. Schewel was asking you some questions

17   earlier about the -- the earlier buys involving Abdullah

18   and the confidential informant, Aspirin, you mentioned

19   that your conclusion or your belief at the time -- and I

20   think you understood this to be the belief of the other

21   members of the team -- was that Aspirin was being scammed

22   by the suspects; is that correct?

23       A.   Yes, sir.

24       Q.   That they were selling counter- -- counterfeit

25   controlled substances?

 1        A.    Yes, sir.

 2        Q.    Okay.  This search warrant that Mr. Schewel

 3   showed you as Exhibit 4, looking at the -- I believe this

 4   is the second page of it, the description of items to be

 5   seized.

 6        A.    Yes, sir.

 7        Q.    You've got your copy?

 8        A.    Yes, sir.

 9        Q.    Number 2 is controlled substances in violation

10   of G.S. 90-95, including but not limited to heroin.  Did

11   I read that correctly?

12        A.    Yes, sir.

13        Q.    Okay.  Now, if I understood your testimony

14   earlier, one of the conclusions you had about that, about

15   the situation was that, hey, if they're selling

16   controlled -- counterfeit controlled substances, that's a

17   felony as well, right?

18        A.    Yes, sir.

19        Q.    And that's a crime?

20        A.    Yes, sir.

21        Q.    And, in fact, that's also covered by 90-95,

22   isn't it?

23        A.    Yes, sir.

24        Q.    The very same statute that covers heroin, right?

25        A.    Yes, sir.

1          Q.   The very same statute that covers marijuana,

2    right?

3          A.   Yes, sir.

4          Q.   So a controlled substance in violation of 90-95,

5    that includes not just heroin, right?

6          A.   Yes, sir.

7          Q.   But also marijuana?

8          A.   Yes, sir.

9          Q.   And also controlled -- counterfeit controlled

10   substances --

11         A.   Yes, sir.

12         Q.   -- right?

13         A.   Yes, sir.

14         Q.   And the warrant application isn't limited just

15   to heroin, is it?

16         A.   That's correct.

17         Q.   U.S. currency is covered by it, right?

18         A.   Yes, sir.

19         Q.   You did, in fact, have probable cause to believe

20   that U.S. currency would be there, didn't you?

21         A.   Yes, sir.  It's very common in these

22   investigations.

23         Q.   In fact, the controlled -- you were expecting

24   that the controlled buy money would be transmitted from

25   Aspirin to the suspect, right?

1      A.   Yes, sir.

2      Q.   Firearms and ammunition.  Did I hear you say you

3  recovered a firearm?

4      A.   Yes, sir.

5      Q.   Drug paraphernalia, manufacturing equipment used

6  for manufacturing, packaging of and the sale of

7  controlled substances.  You recovered that, too, didn't

8  you?

9      A.   I believe so.  I'd have to look at the evidence

10  card to say specifically what we recovered.

11      Q.   Well, how about the package that Aspirin brought

12  back to the car with you?  Would that qualify as

13  packaging --

14      A.   Yes.

15      Q.   -- of a controlled substance?

16      A.   Yes, sir.

17      Q.   Now, none of Mr. Schewel's clients here were

18  charged in this incident, were they, the ones at issue in

19  this lawsuit, right?

20      A.   Correct.

21      Q.   So this lawsuit is about a search, isn't it?

22      A.   I believe so, yes.

23      Q.   Do you recall on those prior buy situations

24  whether the Raleigh Police Department's marked bills were

25  recovered from suspects?

 1          A.    In prior buys, yes, bills were recovered.

 2          Q.    Did you hear anything during the course of those

 3    events that indicated to you that Aspirin was

 4    gratuitously giving the money to those suspects?

 5          A.    No, sir.

 6          Q.    So would it be fair to say that your belief was

 7    there was a transaction of some type taking place there?

 8          A.    Yes, sir.

 9          Q.    In every one of them, right?

10          A.    Yes, sir.

11          Q.    And you caught the guys with the money on their

12    person?

13          A.    Yes, sir.

14          Q.    And, in fact, at least one of them admitted to

15    you that he had marijuana and sold it, right?

16          A.    During the -- yes, sir.

17                MR. BLANCHARD:  I don't have any further

18    questions for you.  Thank you.

19                MR. PETTEY:  Anybody else?

20                      FURTHER EXAMINATION

21                BY MR. SCHEWEL:

22          Q.    I'm just going to ask a couple follow-up

23    questions about that.  I think you stated this earlier,

24    but have you ever seen this warrant prior to today?

25          A.    Prior to today -- it's the first time I've seen

1   this warrant.

2       Q.   Okay.  So you had no idea what was in it when

3   you were executing it?

4       A.   I mean, I had a rough idea that -- everything on

5   that is boilerplate language for that introduction.

6       Q.   Okay.  So everything on the description of items

7   to be seized is boilerplate language?

8       A.   I mean, it's customized to the particular

9   search, but it's routine -- I guess routine language.

10  So, for example, line 1, that matches the first line of

11  all my search warrants as far as residency.  It would

12  just be customized to the actual residence.

13          Line 2 is always the drugs, 3 is always the

14  currency, 4 is always -- I mean, this is a standard list

15  of items to be looked for, and it's been tailored for

16  this address and this particular type of drug.

17          I mean, there might be a few words here and

18  there that are different between detectives, but, I mean,

19  this is standard information.

20      Q.   So you're saying that you could guess what you

21  thought was going to be in Abdullah's warrant based on

22  what you typically put in your warrant?

23      A.   Yeah.  Guns, money, drugs, and documents.

24      Q.   But you didn't actually observe this or see

25  this?

 1        A.   I don't believe so.  No, sir.

 2        Q.   I'm going to ask you to turn to page 3 of the

 3   warrant, which is the probable cause affidavit.

 4        A.   Okay.

 5        Q.   And I'm going to direct you to the second

 6   paragraph of the probable cause affidavit.

 7        A.   Within the past 72 hours?

 8        Q.   Yeah.

 9        A.   Okay.

10        Q.   And I'll let you go ahead and read that to

11   yourself.

12        A.   (Witness reviews document.)  Okay.

13        Q.   The drugs that are alleged to have been sold

14   that are the basis for the probable cause affidavit in

15   this warrant is heroin?

16        A.   Yes, sir.

17        Q.   Not fake heroin?

18        A.   Yes, sir.

19        Q.   Not marijuana?

20        A.   Yes, sir.

21        Q.   Not any sort of other fake narcotics?

22        A.   Correct.

23        Q.   The firearm that you recovered was recovered

24   from the third residence?

25        A.   Yes, sir.

1            MR. SCHEWEL:  I have no further questions.

2            MR. BLANCHARD:  I have one follow-up about that.

3    Just one.

4                     FURTHER EXAMINATION

5            BY MR. BLANCHARD:

6        Q.   I believe in your testimony earlier today you

7    testified that Sergeant Rolfe was not present for this.

8        A.   Correct.  He was on vacation.

9        Q.   So he wouldn't have seen that warrant --

10       A.   Correct.

11       Q.   -- either, would he?

12       A.   No, sir.

13           MR. BLANCHARD:  Thank you.

14           MR. PETTEY:  No questions.  All done.

15           (Whereupon, at 3:14 p.m. on February 28, 2023,

16   the deposition was concluded.  Signature was reserved.)

17

18                       *  *  *  *  *

19

20

21

22

23

24

25

WITNESS CERTIFICATE          (1 of 3)

        I have read the foregoing pages, 1 through 173 inclusive, and find that they contain a correct transcription of the answers made by me to the questions therein recorded, with the exception of _____ corrections as listed on a separate sheet of paper and incorporated into this record.

        Signed this _____ day of _____ 2023.

_____
JULIEN DAVID RATTELADE

Sworn and subscribed before me this the _____ day of _____ 2023

_____
Notary Public

My Commission Expires:  _____.

**ERRATA SHEET**          (2 of 3)

Please indicate any corrections to your deposition on this sheet of paper, giving the page number, line number, change and reason for the change, and return this form and the signature page to: **Reed & Associates, 2401 Whirlaway Court, Matthews, NC 28105, or to vreed@carolina.rr.com.**

The reasons for making changes:

(1) To clarify the record;
(2) To conform to the facts; or
(3) To correct major transcription errors.

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**REED & ASSOCIATES**
980.339.3575

**ERRATA SHEET**          (3 of 3)

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

Thank You!

STATE OF NORTH CAROLINA                    <u>CERTIFICATE</u>

COUNTY OF FRANKLIN:

    I, DEBORAH A. HYDE, Certified Court Reporter and Notary Public in and for the County of Franklin, State of North Carolina, do hereby certify:

    That SERGEANT JULIEN DAVID RATTELADE appeared before me at the time and place herein aforementioned; was duly sworn in the manner provided by law by me prior to the taking of the foregoing deposition, and that said deposition was taken by me and transcribed under my supervision and direction; and that the foregoing 176 pages constitute a true and correct transcription of the proceedings.

    I do further certify that reviewing and signing of the transcript by the witness was reserved.

    I do further certify that the persons were present as stated in the appearance page.

    I do further certify that I am not of counsel for, or in the employment of, either of the parties in this action, nor am I interested in the results of this action.

    This the 17th day of March, 2023.

                    _____

                    DEBORAH A. HYDE, Certified Court Reporter

                    Notary Public Number 20021400234