IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CIVIL ACTION NO.: 5:22-cv-00068-BO

YOLANDA IRVING, individually and as the )
natural parent and guardian of J.I., JUWAN )
HARRINGTON, CYDNEEA HARRINGTON, KENYA )
WALTON, individually and as the natural )
parent and guardian of R.W. ZIYEL WHITLEY, )
DYAMOND WHITLEY, KAMISHA WHITLEY, NANETTA )
GRANT as the natural parent and guardian )
of Z.G., and EMANCIPATE NC, INC. )
)
                        Plaintiffs, )
)
    vs. )
)
THE CITY OF RALEIGH, Officer OMAR I. )
ABDULLAH, Sergeant WILLIAM ROLFE, Officer )
RISHAR PIERRE MONROE, Officer JULIEN DAVID )
RATTELADE, and Officer MEGHAN CAROLINE GAY, )
Officer DAVID MEAD, Officer JESUS ORTIZ, )
Officer KYLE PERRIN, Officer MICHAEL )
MOLLERE, Officer KYLE THOMPSON, Officer )
VINCENT DEBONIS, Officer DANIEL TWIDDY, )
Officer THOMAS WEBB, Officer DAVID )
McDONALD, Officer DAVID GARNER, Chief of )
Police ESTELLA PATTERSON and City Manager )
MARCHELL ADAMS-DAVID, in their official )
capacities, )
)
                        Defendants. )
_____)


D E P O S I T I O N

OF

**OFFICER RISHAR PIERRE MONROE**


At Raleigh, North Carolina

Tuesday, January 31, 2023

REPORTER:  DEBORAH A. HYDE


**REED & ASSOCIATES**
MATTHEWS, NORTH CAROLINA  980.339.3575

A P P E A R I N G


On behalf of the Plaintiffs:

    ABRAHAM RUBERT-SCHEWEL, ESQUIRE
    Tin Fulton Walker & Owen, PLLC
    119 East Main Street
    Durham, North Carolina  27701
    919-451-9216
    schewel@tinfulton.com


On Behalf of Defendants City of Raleigh, Estella
   Patterson, and Marchell Adams-David:

    DOROTHY V. KIBLER, ESQUIRE
    City of Raleigh Attorney's Office
    Post Office Box 590
    Raleigh, North Carolina  27602
    919-996-6560
    dorothy.kibler@raleighnc.gov


On Behalf of Defendant Officers David Mead, Jesus
   Ortiz, Kyle Perrin, Michael Mollere, Kyle Thompson,
   Vincent Debonis, Daniel Twiddy, Thomas Webb, David
   McDonald, and David Garner:

    MICHELLE LIGUORI, ESQUIRE
    Ellis & Winters LLP
    4131 Parklake Avenue, Suite 400
    Raleigh, North Carolina  27612
    919-865-7009
    michelle.liguori@elliswinters.com


On Behalf of Defendant Officer Omar I. Abdullah:

    JASON R. BENTON, ESQUIRE
    Parker Poe Adams & Bernstein, LLP
    620 South Tryon Street, Suite 800
    Charlotte, North Carolina  28202
    704-372-9000
    jasonbenton@parkerpoe.com


(Continued)


**REED & ASSOCIATES**
MATTHEWS, NORTH CAROLINA  980.339.3575

A P P E A R I N G


On Behalf of Defendant Officers Rishar Pierre Monroe,
    Julien David Rattelade, and Meghan Caroline Gay:

        RODNEY E. PETTEY, ESQUIRE
        Yates, McLamb & Weyher, LLP
        Two Hannover Square
        434 Fayetteville Street, Suite 2200
        Raleigh, North Carolina  27601
        919-835-0900
        rpettey@ymwlaw.com


On Behalf of Defendant Officer William Rolfe:
    (Appearing via Telephone)

        NORWOOD P. BLANCHARD, III
        Crossley McIntosh Collier Hanley & Edes, PLLC
        5002 Randall Parkway
        Wilmington, North Carolina  28403
        910-762-9711
        norwood@cmclawfirm.com


                    * * * * *

C O N T E N T S

PAGE

Examination by Mr. Schewel  . . . . . . . . . . . . . 5

Examination by Mr. Benton . . . . . . . . . . . . . 176

Examination by Ms. Liguori  . . . . . . . . . . . . 177


PLAINTIFFS' EXHIBITS:

Exhibit B      Notes of Interview with SBI . . . . 87, 135

Exhibit C      Text Messages from Det. Gwinn . . . . .  43

Exhibit D      Search Warrant 5/21/20  . . . . . . . .  40

Exhibit E      Telephone Interview with D.L. Davis
               8/14/2020 . . . . . . . . . . . . . . . 109

Exhibit F      Telephone Interview with D.L. Davis
               8/14/2020 . . . . . . . . . . . . . . .  99

Exhibit G      Interview with D.L. Davis on
               10/19/21  . . . . . . . . . . . . . . . 113

Exhibit H      Case Jacket for Marcus VanIrvin . . . . 105


(Exhibits provided with transcript.)




*   *   *

1          This is the deposition of OFFICER RISHAR PIERRE

2     MONROE, taken in accordance with the Federal Rules of

3     Civil Procedure in connection with the above case.

4          Pursuant to Notice, this deposition is being

5     taken in the offices of Yates, McLamb & Weyher,

6     434 Fayetteville Street, Suite 2200, Raleigh, North

7     Carolina, beginning at 9:57 a.m. on Tuesday, January 31,

8     2023, before Deborah A. Hyde, Certified Verbatim Reporter

9     and Notary Public.

10                          *   *   *

11    Whereupon,

12                   **OFFICER RISHAR PIERRE MONROE**

13    was called as a witness and, having first been duly

14    sworn, was examined and testified as follows:

15                          EXAMINATION

16         BY MR. SCHEWEL:

17         Q.   Good morning, Officer.

18         A.   Good morning.

19         Q.   My name is Abraham Rubert-Schewel.  I'm with

20    the law firm of Tin Fulton Walker & Owen.  We represent

21    the plaintiffs in this suit against the City of Raleigh

22    and individually named officers, such as yourself.

23         You are testifying under oath and under the

24    penalty of perjury today, just as if you were in a court

25    of law.  Do you understand that?

1       A.   Yes, sir.

2       Q.   Have you ever been deposed before?

3       A.   No, sir.

4       Q.   Other than the Washington case where you were

5  sued, have you ever been party to a lawsuit?

6       A.   No.

7       Q.   As you can tell, these questions and answers

8  are being transcribed by a court reporter.  They're being

9  written down, meaning it's very important that you speak

10 loudly and clearly, and you've done that so far.  You

11 must also answer questions verbally; for example, using

12 "yes" or "no," not "uh-huh" or "huh-uh," if you can avoid

13 it.  Do you understand that?

14      A.   Yes.

15      Q.   Your attorney, Mr. Pettey, may object to

16 certain questions that I ask.  You should know that you

17 are still required to answer every question unless

18 instructed not to, which should happen rarely.

19 Otherwise, you are required to answer each question

20 truthfully and completely as possible.  Do you

21 understand?

22      A.   Yes.

23      Q.   Please state and spell your name for the

24 record.

25      A.   Rishar Pierre Monroe.  It's R-i-s-h-a-r,

 1  P-i-e-r-r-e, M-o-n-r-o-e.

 2       Q.   You started with the Raleigh Police Department

 3  in 2007?

 4       A.   Correct.

 5       Q.   And you started with Drugs and Vice in 2017?

 6       A.   Correct.

 7       Q.   And when you started with Drugs and Vice, you

 8  were a member of Team 1?

 9       A.   This is correct.

10       Q.   And there's only two teams in Vice?

11       A.   Vice units, yes, correct.

12       Q.   And in May of 2021, you were transferred to the

13  Intel Unit?

14       A.   Yes.

15       Q.   Are you currently with the Intel Unit?

16       A.   Yes.

17       Q.   And what is your role with the Intel Unit?

18       A.   I'm currently a task force officer with FBI,

19  Internet Crimes Against Children, and also a member of

20  the Intelligence Unit as one of the five detectives that

21  are on that unit.

22       Q.   So you are a detective?

23       A.   Yes.

24       Q.   And what type of things do you do with the

25  Intel Unit?

 1          A.    Half of my duties are performing duties

 2    involving Internet Crimes Against Children, like I said,

 3    as a task force officer with FBI.   The other half of my

 4    duties, we do threat assessment.   We also deal with human

 5    trafficking and, also, crimes against children on our

 6    side, also.

 7          Q.    What to you mean by "threat assessment"?

 8          A.    So our unit deals with, say, if there were bomb

 9    threats against schools or specific threats against

10    schools, protests, any threats against public figures,

11    any type of threat assessment where they need someone

12    to -- it could be against an officer, another member of

13    the department or the city, but we investigate those

14    crimes.

15          Q.    Okay.   What do you do in response to protests?

16          A.    Our responsibility during protests would be

17    just to monitor any threats.   It kind of goes back to the

18    threat assessment, monitor any threats that may happen

19    during those protests.

20          Q.    Did you meet with your attorney, Mr. Pettey, to

21    prepare for this deposition?

22          A.    Yes.

23          Q.    Did you consult with a criminal attorney to

24    prepare for this deposition?

25          A.    No.

1      Q.   Do you intend to invoke your Fifth Amendment

2   right to remain silent in response to any questions?

3      A.   No.

4      Q.   Have you met with any attorneys in the Wake

5   County District Attorney's Office related to Officer

6   Abdullah?

7      A.   Yes.

8      Q.   Which attorneys at the Wake County District

9   Attorney's Office have you met with?

10      A.   I met with -- he's no longer an ADA, but Jason

11   Smith.

12      Q.   Okay.  Have you met with any attorneys at the

13   Wake County District Attorney's Office to discuss the

14   prosecution of Officer Abdullah?

15      A.   No.

16      Q.   Is it your understanding that you are going to

17   cooperate in any way in the prosecution of Officer

18   Abdullah?

19      A.   I haven't been asked.  I don't know that

20   answer.

21      Q.   So have you had any communication, e-mail,

22   text, phone call with any district attorneys from the

23   Wake County District Attorney's office related to the

24   prosecution of Officer Abdullah?

25      A.   No.

1        Q.   Are you aware that any other officers in Vice

2    Team 1 from the time period of 2018 to 2020 are

3    cooperating in the prosecution against Omar Abdullah?

4        A.   I don't have any knowledge of that.

5        Q.   Okay.  Have you met with any member of the U.S.

6    Attorney's office as part of the investigation into Omar

7    Abdullah?

8        A.   No.

9        Q.   Okay.  So I want to start by discussing the

10   process you used to execute an arrest warrant or a search

11   warrant when you were with the vice squad.

12       A.   Okay.

13       Q.   So let's assume you've already conducted a

14   controlled buy and you are using that controlled buy as

15   the basis for a warrant, and a magistrate has signed the

16   warrant.  After the warrant is granted by the magistrate,

17   will you -- is it your practice or was it your practice

18   to notify the rest of the vice team?

19       A.   And you're specifically talking about a search

20   warrant or an arrest warrant at this point?

21       Q.   Is the practice different?

22       A.   Well, yes, search warrants and arrest warrants

23   are different.

24       Q.   I know, but would your practice as a vice

25   officer at that -- we're talking about 2018 to 2020.

1    Would your practice have been different if it was a
2    search warrant or an arrest warrant?
3        A.   Well, if I was taking out an arrest warrant on
4    a suspect, I wouldn't necessarily tell my team that I'm
5    taking out an arrest warrant.
6        Q.   Okay.  So let's start with an arrest warrant.
7    Let's say a magistrate has signed an arrest warrant based
8    off of a controlled buy.  You're saying you wouldn't
9    necessarily notify your team?
10       A.   Correct.
11       Q.   Why not?
12       A.   Because if I have a suspect that I have
13   gathered probable cause for an arrest warrant, that
14   suspect is not in custody.  If I go and file for an
15   arrest warrant for that suspect, it's literally filing an
16   arrest warrant.  I may or may not go and serve that
17   arrest warrant.  It may just be put in the system.  I may
18   not know where that defendant is at currently, so that
19   would be something I would just go to a magistrate based
20   off of the probable cause leading up to that and file for
21   an arrest warrant.  If they grant the arrest warrant,
22   then it would just go into our system.  At some point,
23   either myself or any other officer who has jurisdiction
24   can arrest that individual if they locate them.
25       Q.   Are there ever situations where you have an

 1   arrest warrant, it's been signed by a magistrate and you

 2   do then notify the other members of your vice team?

 3        A.   Yes.

 4        Q.   Okay.  And in what type of context would that

 5   occur?

 6        A.   It could occur in just, "Hey, I took out the

 7   warrant on this individual that I was working," or it

 8   could be that, "Hey, I want to try to locate this

 9   individual," so I would give them some information on why

10   I took out the arrest warrant and what I would need for

11   them to locate this individual.

12        Q.   Let's say you already know where the individual

13   is, you've done a controlled buy and you want to do --

14   well, strike that.

15             You already know where the individual is,

16   you've done a controlled buy, and now you want to make an

17   arrest of that person.  What would you do then?

18        A.   Every situation is different, but if -- for

19   instance, if someone -- I knew where they were employed

20   or lived at or maybe where they would spend their hours

21   during the day, I may -- it just depends.  I may

22   personally go out with other officers or myself, other

23   detectives or myself and do surveillance to see if I

24   could put eyes on that individual.  We may effect the

25   arrest as a team or I may contact a patrol officer or

 1   some other unit to effect that arrest.  Every situation
 2   is different.
 3        Q.   Okay.  So let's go to a search warrant.  A
 4   search warrant has been signed and granted by the
 5   magistrate based off of a controlled buy with one of your
 6   CIs.
 7        A.   Okay.
 8        Q.   Do you then notify the vice team?
 9        A.   Yes.
10        Q.   And what do you tell them?
11        A.   Once again, just based off of that particular
12   circumstance and the facts in that case, if there's going
13   to be a search warrant, I would just notify them of time,
14   location.  We would set up a briefing, so I would -- the
15   first step would be, "This is what I have," and there
16   would be a briefing at this day, at this location, at
17   this time.
18        Q.   Okay.  So let's back up a little bit.  How
19   would you communicate to the vice team that there's going
20   to be a briefing?
21        A.   It could be everything from verbally to through
22   texts or --
23        Q.   What about e-mail?
24        A.   E-mail could be possible, also.  That just
25   wouldn't be necessarily even normal.

 1      Q.   What was your normal practice between 2018 and

 2   2020?

 3      A.   Just to notify my coworkers to come in, say,

 4   "Hey, I have this.  Are you guys available?  This is the

 5   time and date.  Can you be there?"

 6      Q.   Your most common practice was to do that

 7   verbally?

 8      A.   Right, and then next would be text.

 9      Q.   Okay.  And you would set up a briefing?

10      A.   Correct.

11      Q.   And at the briefing, what type of information

12   would you provide to the team?

13      A.   You would normally supply some basis to your

14   case.  You would give them some of the back story, how

15   you got to that point.  You mentioned a controlled buy.

16   That is the scenario that you gave, so I would give them

17   information and say, "Hey, I gathered probable cause

18   based off a controlled buy.  A search warrant was

19   granted."  And then you would go into details, the

20   location, the occupants of the residence, are there any

21   known weapons, are there any known animals, are there any

22   children, are there any safety concerns, the meeting

23   location, any emergency response that may be needed,

24   where they would meet.  There's several different details

25   you go over.  Some of it is specific to the case, the

 1  details; some of it is specific to officer safety for the

 2  event, who's going to be involved, what their assignments

 3  are, those types of things.

 4      Q.   What about the type of narcotics?

 5      A.   That would be brought up in the -- once you get

 6  the back story of how you got to that probable cause, you

 7  would provide that.

 8      Q.   What about the informant who you're using?

 9      A.   Not always.

10      Q.   Why not?

11      A.   It may just be, "Hey, I've -- during a

12  controlled buy, an informant provided this information,

13  purchased these drugs, and this is, once again, what led

14  us to the probable cause."  In most cases, you probably

15  would say the informant, but it's not necessarily

16  required because there are other individuals in this

17  briefing.  It's just not Drugs and Vice detectives, so

18  other individuals may not know who your informant is.

19      Q.   Would the vice team typically know who your

20  informant is?

21      A.   They would typically know because we

22  communicate prior to the briefing.  We have some type of

23  conversation.

24      Q.   But you're saying maybe SEU might not know who

25  your informant is?

 1      A.   Correct, or other officers that may respond or

 2   other people that may come to the briefing.  That

 3   information, as far as who the informant is, is not

 4   really necessary for them.

 5      Q.   And when you say the name of the informant at

 6   least to the vice team, do you typically use the

 7   informant's legal name or do you use their code name?

 8      A.   Normally, their code name.

 9      Q.   Okay.  And when you said that other officers

10   may be present at the briefing in addition to vice and

11   SEU, would that usually be plain clothes officers?

12      A.   Could be other agencies.  I mean, there's --

13      Q.   Give me an example.

14      A.   I mean, it depends on the case.  If you're

15   working a case with Wake County detectives, if they have

16   some interest in the case, maybe they're present,

17   Knightdale, Garner, ATF, DEA.  It would just depend on --

18   every case is different.  And then you would have,

19   possibly, patrol officers who were there for the briefing

20   in case they have a role in that search.

21      Q.   Do you typically send out the warrant that

22   you've just gotten signed to any of these officers?

23      A.   Yes, your supervisor would have to review the

24   search warrant, which should have been reviewed prior to

25   giving the warrant to the magistrate to look at.  And

1    then, also, we would always provide a copy of the search

2    warrant to our Selective Enforcement Unit so that they

3    could review the warrant for their part of the search.

4         Q.    And would that be sent to the entire SEU Unit

5    or to their sergeant?

6         A.    In most cases, you would include the sergeant

7    and they have team leaders, so there are several team

8    leaders on each team and they would be your point of

9    contact.

10        Q.    Does the vice team have team leaders?

11        A.    No.

12        Q.    So the vice team -- the only hierarchy in the

13   vice team is the sergeant?

14        A.    Correct.

15        Q.    I mean, is there other hierarchy based on

16   seniority or any other --

17        A.    Right, not officially, but you have individuals

18   who have been on the vice unit longer than others.  You

19   have individuals who are new, so they would --

20   technically, could still be in training, but there's not

21   a hierarchy.  We don't supervise.  There's only one

22   supervisor.

23        Q.    And I think I forgot to ask you this, but when

24   you were transferred to the Intel Unit in May of 2021,

25   why were you transferred?

 1      A.   I had been working drugs for several years and

 2   it was an opportunity to -- it was just an opportunity to

 3   move.

 4      Q.   So it had nothing to do with this case?

 5      A.   No.  It was actually an opportunity to expand

 6   my detective -- I mean, my resume and do other things in

 7   the department.

 8      Q.   As far as you know, were any of your colleagues

 9   transferred out of the vice unit because of this case?

10      A.   Just the sergeant.

11      Q.   Okay.  And Officer Abdullah?

12      A.   Well, yes, obviously.  He no longer works for

13   the department.

14      Q.   As far as you know, no other officers have left

15   the vice team, at least that you were on, because of this

16   case?

17      A.   No.  Detective Rattelade was promoted.  I took

18   a higher position and then Detective Gay is still there.

19   Detective Gwinn has also moved on to a different

20   position.

21      Q.   Okay.  And when you say you took a promotion,

22   can you tell me why your new position is a promotion?

23      A.   I said a higher position, just as far as -- for

24   the amount of investigative work that goes into it.

25   There's more investigative work in what I do now, so once

1   again, I took that position as a resume builder to expand
2   my detective skills within the department.
3        Q.   Okay.  So it's not necessarily a pay promotion?
4        A.   No.
5        Q.   Okay.  And I think that I confused you.  You
6   said Rattelade got a promotion.  Is that what you said?
7        A.   He was promoted to sergeant, yes.
8        Q.   He was promoted to sergeant.  Okay.  And do you
9   know what division he's in?
10       A.   He is currently in the Downtown District as a
11  patrol sergeant.
12       Q.   Thank you.  Okay.  So back to the briefing that
13  we were discussing about pre-search warrant, would
14  Sergeant Rolfe be present at those meetings?
15       A.   Normally, yes.
16       Q.   Why would he not be present?
17       A.   If he wasn't at work that day.
18       Q.   Okay.  If he's off?
19       A.   Right.
20       Q.   But every time he's on duty, he would be there?
21       A.   Correct.
22       Q.   And I think you stated the SEU officers are
23  also at that briefing.
24       A.   In most of our search warrants, we use SEU.
25  There could be cases where we don't, speaking of those

1   arrest warrants or maybe a different type of search

2   warrant, but in most of our cases, we use SEU.

3       Q.   Okay.  At this briefing, does the SEU give any

4   sort of -- do they give any briefing?

5            MS. LIGUORI:  Objection.

6            BY MR. SCHEWEL:

7       Q.   You can answer.

8       A.   There are times -- I mean, it's an open

9   briefing, so everyone can give their input, so yes, they

10  do give input during these briefings.

11      Q.   Well, I mean, I guess the reason why I'm asking

12  this is because I know the SEU is the first one to breach

13  the residence.

14      A.   Correct.

15      Q.   So is it their responsibility to create any

16  sort of operation plan that they will then share with

17  you?

18      A.   Whatever their responsibilities, I know they

19  have responsibilities.  That's for them to handle.

20      Q.   I know, but you've been at these meetings

21  before, right?

22      A.   Correct.

23      Q.   And so what I'm asking you is, typically, what

24  type of things do they go over with the vice team at

25  these meetings?

1      A.   Occupants, dogs, weapons, location, type of

2  drugs, weapons, those types of things they need to know

3  for safety reasons.

4      Q.   Do they go over type of -- strike that.  Do

5  they go over where they will enter the residence?

6      A.   Yes.

7           MS. LIGUORI:  Objection.

8           BY MR. SCHEWEL:

9      Q.   And by where, I mean what door.

10     A.   Yes.  They --

11     Q.   So, for example, "We'll enter through the

12  front" or "We'll enter through the back"?

13     A.   Yes.

14     Q.   Do they also go over the type of entry they

15  will use; for example, if they will use a no-knock entry?

16          MR. PETTEY:  Objection.

17          THE WITNESS:  We don't do no-knock.

18          BY MR. SCHEWEL:

19     Q.   Okay.  So do they go over the type of entry

20  they will use?

21     A.   Yes.

22     Q.   Okay.  And how do they state that?

23     A.   Just, once again, every search warrant is

24  different.  They would just advise the roles for

25  everyone, so they may have officers assigned to the rear,

1   officers assigned to the front, what their approach is
2   going to be, and they may talk about how they're going to
3   breach the door if that is the option that they're going
4   with.
5           So breaching a door could be by using a ram.
6   They have several other types of equipment, depending on
7   the type of structure it is, to breach a door, but they
8   may speak about how they're going to breach the door.
9       Q.   Do they ever talk about how long they will wait
10  to breach the door after knocking?
11      A.   Not with us.  Once again, they have their own
12  requirements that they have to figure out amongst their
13  team.  They speak amongst themselves.
14      Q.   In your experience, when the SEU team breaches
15  the door, is that typically within your line of sight?
16          MS. LIGUORI:  Objection.
17          THE WITNESS:  No.
18          BY MR. SCHEWEL:
19      Q.   Okay.  So, usually, you cannot actually see the
20  breach?  Let me ask it this way.  I'll strike that.
21          Have you ever been able to see an SEU breach?
22      A.   Yes.
23      Q.   Okay.  And in the times that you've seen the
24  SEU breach, have they knocked and then rammed right away
25  or do they typically knock and wait for some period of

1    time before entering?

2             MS. LIGUORI:  Objection.

3             MR. PETTY:  Objection.

4             THE WITNESS:  There's always been a knock and

5    announce.

6             BY MR. SCHEWEL:

7       Q.   Okay.  And after they knock and announce, do

8    they typically then ram the door in within a matter of

9    seconds or do they wait for some extended period of time

10   to allow someone to come to the door?

11            MS. LIGUORI:  Objection.

12            MR. PETTEY:  Objection.

13            THE WITNESS:  There's always a period of time

14   between them knocking and them entering.

15            BY MR. SCHEWEL:

16      Q.   And how long would you say that period of time

17   typically is?

18      A.   I can't speculate.  I don't know.

19      Q.   Well, I'm just asking on what you've seen.

20            MR. PETTEY:  Objection.

21            THE WITNESS:  I mean, they knock and announce,

22   and at some point they enter the door.  I don't know the

23   exact -- I can't tell you an exact period of time.

24            BY MR. SCHEWEL:

25      Q.   Have you ever been at a search warrant

1    execution where they've knocked and announced and someone

2    has come to the door and opened the door?

3         A.    Yes.

4         Q.    How many times has that happened?

5         A.    I can't recall.

6         Q.    And you can't recall how many times they've

7    knocked and rammed the door in either?

8              MS. LIGUORI:  Objection.

9              THE WITNESS:  Every case is different.  Every

10   structure is different.  Each investigation is different.

11             BY MR. SCHEWEL:

12        Q.    I'm just asking if you can recall the number of

13   times.

14        A.    No.

15        Q.    Prior to executing a search warrant on a

16   suspected drug location, is it typical for the vice team

17   to conduct a controlled buy from that location?

18        A.    Sorry.  Could you repeat the question?

19        Q.    Sure.  Before executing a search warrant on a

20   suspected narcotics location, is it typical for the vice

21   team to conduct a controlled buy from that location?

22        A.    I don't like "typical."

23        Q.    Would you like me to rephrase the question?

24        A.    Yes.  Could you rephrase that?

25        Q.    Sure.  Have you ever conducted a controlled buy

1   from a suspected drug location prior to executing a

2   search warrant at that location?

3        A.   Yes.

4        Q.   Why would you do that?

5        A.   Once again, every scenario is different.  I

6   mean, that may be information from the CI.  It may be

7   intelligence that we gain from surveillance.  There may

8   be -- there's multiple reasons why you would go to a

9   specific location and purchase narcotics, whether with a

10  confidential informant or, say, you gathered evidence

11  through surveillance.  So how you got to that residence

12  and why you want to purchase or attempt to purchase at

13  that residence can come from different avenues.

14       Q.   Do you ever do that to verify that the target

15  is present at the location to be searched?

16       A.   Yes.

17       Q.   Do you ever do that to verify that the target

18  has narcotics on them?

19       A.   Yes.

20       Q.   Will vice detectives also surveil the location

21  of the home or apartment to be searched prior to

22  execution?

23       A.   Yes.

24       Q.   How is the surveillance typically done?

25       A.   Physical surveillance.

1       Q.   So does that mean you're doing surveillance of

2   a location where you try and have a view of the location?

3       A.   Yes.

4       Q.   And if you're doing a controlled buy, will you

5   actually try and see the informant go in and out of the

6   apartment?

7       A.   Yes.

8       Q.   And do you do this on the day of the warrant

9   execution?

10      A.   Not always.

11      Q.   Why would you not do it on the day of the

12  warrant execution?

13      A.   Once again, every case is different without

14  speaking of a specific case, a specific detective working

15  their case, but there would be times you would not.

16      Q.   Okay.  But if you wanted to verify that the

17  target was at that location, would you want to do it on

18  the same day?

19      A.   The surveillance?

20      Q.   Yes.

21      A.   Possibly.

22      Q.   All right.  Let's talk a little bit about

23  confidential informants.  When you started out in vice,

24  who was your training officer?

25      A.   Didn't have a specific assigned training

1   officer, but Detective Rattelade and Detective Nance were

2   the two individuals at that time that were training me.

3          Q.   Were they the most senior at that time?

4          A.   I'm sorry.  There were other detectives -- I'm

5   trying to think.  I believe so.

6          Q.   Okay.  Did they train you on how to work with

7   informants?

8          A.   Yes.

9          Q.   What were some of the important things you

10  learned during your time in vice or with these officers

11  about working with informants?

12         A.   Never trust them.

13         Q.   What else?

14         A.   Just how to verify their information, how to

15  conduct yourselves when you're with an informant, how to

16  conduct your investigation when it involves an informant,

17  just the overall interaction, do's and don'ts with

18  informants.

19         Q.   What would you say are the best ways to verify

20  the information an informant gives you?

21         A.   Through multiple sources is the best way, not

22  one single source, but multiple sources.

23         Q.   Okay.  And I'm talking specifically about the

24  vice squad, so vice informants, CIs who you've been doing

25  controlled buys with.  What are the best tools that you

 1   have to verify that what they're telling you is correct?

 2        A.   Well, as I said, multiple sources would be --

 3   there's information, there's reports, there's public

 4   utilities, there's so many different sources of

 5   information that you could take what they give you,

 6   telephone numbers, and you go back and do research on

 7   these locations, these telephone numbers, the names.  So

 8   when I say "multiple sources," you take that information

 9   and then you vet it through multiple sources to try to

10   make sure that the information that's given is what they

11   say it is.

12        Q.   How do you use public utilities?

13        A.   Well, you could verify things like water

14   billing, like this water billing is in someone's name.

15        Q.   Okay.  And that would be used to verify the

16   tenants of an apartment?

17        A.   Correct.

18        Q.   Anything else that you would use that

19   information for?

20        A.   The water billing?

21        Q.   Yeah.

22        A.   No, that would just be to verify who lives

23   at -- well, who has it registered to them at that

24   address.

25        Q.   Who's paying the bills?

1      A.    Right.

2      Q.    What about buy cameras?

3      A.    Like our specific --

4      Q.    So the 1021 app, the buy camera you put on a

5   CI, are those important tools to verify?

6      A.    Yes.

7      Q.    Okay.  And how do you typically do that?

8      A.    It would depend on the type of equipment we're

9   using at the time.  We had different pieces of equipment,

10  so each equipment has its own way that it's operated and

11  that the media is stored.

12     Q.    Why are buy cameras important ways to verify

13  what an informant is telling you?

14     A.    They couldn't explain what happened and you can

15  go back and verify it through audio and video footage

16  that has been captured.

17     Q.    And what are you typically looking for on the

18  audio or video footage?

19     A.    The conversation between the informant and the

20  suspect or other individuals.  I mean, if it's video,

21  then obviously the buy itself, the location where the buy

22  is happening, so other occupants, weapons, all those

23  things I spoke about; dogs, the structure, the setup of

24  the location.  So there's some aspects that are specific

25  to the actual buy and some aspects that are specific to

1    officer safety that you can get from the video and/or

2    audio.

3        Q.   And when you say "the buy itself," do you mean

4    actually viewing the hand-to-hand transaction?

5        A.   Correct.

6        Q.   Is it important for an informant to be

7    reliable?

8        A.   Yes.

9        Q.   Why?

10       A.   Because the information that they are providing

11   is what you're basing your investigation off of and you

12   need reliable information to gain probable cause to go

13   forward with an investigation.

14       Q.   Did you ever use an informant in the vice who

15   you had doubts about their reliability?

16       A.   Yes.

17       Q.   On what occasion?

18       A.   As an example?

19       Q.   Yeah.

20       A.   Had an informant that you give specific

21   instructions, and that could be go to the location from

22   this street, from this location, a closer location from

23   this area, and they didn't follow my directions, which,

24   in most cases, the biggest concern was their safety and

25   the officer's safety.  So if they didn't operate in a

1 safe manner, I had issues with them.

2      Q.   And did you continue to use that informant?

3      A.   I think we did a few buys and I didn't like the

4 way they operated.  No.

5      Q.   Okay.  Well, let me ask it a different way,

6 then.  Did you ever use an informant who you knew was

7 unreliable?

8      A.   Not initially.  They had -- trying to vet their

9 reliability, realized that they were unreliable and then

10 discontinued to use them.

11     Q.   Right.  So once you've determined an informant

12 is unreliable, you no longer use them?

13     A.   Absolutely.

14     Q.   Right, but I understand that what you're saying

15 is that in the way you create informants, invent

16 informants is you do buys to make sure they are reliable.

17     A.   Along with other things, so vetting an

18 informant is, "Meet me here at this location at this

19 time."  Do they show up when they're supposed to show up?

20 Do they contact you when they're supposed to contact you?

21 Do they get the information you asked them to get?

22          So there's -- once again, every one of these

23 situations is different.  Every informant is different.

24 Every detective handles their informants differently.

25 But for me personally, these are things that -- not only

 1   their reliability; it's how they operate.  They could be

 2   reliable in their information and reliable in their

 3   conduct of the buy, but I may not like how they operate.

 4   So I may not use them because I need to be on the same

 5   page with them, and if we're not, then I can't -- I

 6   personally cannot use them.

 7        Q.   So, essentially, you're testing your informant?

 8        A.   Yes.

 9        Q.   And you're trying to determine if they are

10   reliable?

11        A.   Ultimately, yes.

12        Q.   And I think you stated this earlier, but I just

13   want to be clear.  Once you've determined they are

14   unreliable, at that point you would no longer use them?

15        A.   I would not.

16        Q.   And that's because you need to have a reliable

17   informant to establish probable cause?

18        A.   Absolutely.

19        Q.   Have you ever charged a person with a crime

20   based off of information from an informant who you

21   believed was unreliable?

22        A.   No.

23        Q.   Would you ever do that?

24        A.   No.

25        Q.   I know you said earlier that it's a

1   case-by-case scenario, but do you think it would be

2   proper for any police officer in the Raleigh Police

3   Department to charge someone based off of information

4   they were provided by an informant who they knew was

5   unreliable?

6           MR. BENTON:  Objection.

7           MR. PETTEY:  Objection.

8           THE WITNESS:  I'm sorry.  That was long.  Can

9   you repeat that?

10          BY MR. SCHEWEL:

11      Q.   Do you want me to repeat it?

12      A.   Yeah.

13      Q.   So earlier you stated that it's a case-by-case

14  scenario, every officer is different; is that right?

15      A.   Yes.

16      Q.   Is there ever a situation you could imagine

17  where someone could use information provided by an

18  informant they knew was unreliable to charge a defendant

19  with a crime?

20          MR. BENTON:  Objection.

21          MS. KIBLER:  Object to the form.

22          THE WITNESS:  No.

23          BY MR. SCHEWEL:

24      Q.   Did you ever meet with an informant alone

25  during your time in the vice unit?

 1      A.    Yes.

 2      Q.    On what occasion?

 3      A.    I can't recall specifics, but it has happened.

 4      Q.    How many times would you say it happened?

 5      A.    A handful of times.

 6      Q.    Would you say that prior to 2020, it was common

 7   practice in the vice unit for vice officers to meet with

 8   informants of the same sex alone?

 9      A.    Not common practice, but it happened.

10      Q.    And by "common practice," I just mean not that

11   it occurred all of the time, but that other officers did

12   it as well?

13           MS. KIBLER:  Object to the form.

14           MR. BENTON:  Same.

15           THE WITNESS:  I have met with an informant of

16   the same sex.

17           BY MR. SCHEWEL:

18      Q.    Are you aware if Officer Rattelade has met with

19   an informant alone ever?

20      A.    Yes.

21      Q.    Yes, he has?

22      A.    Yes.

23      Q.    Are you aware if Officer Nance has met with an

24   informant alone ever?

25      A.    No.

1      Q.   Are you aware if Officer Gwinn -- or, sorry,

2   Detective Gwinn has met with an informant alone?

3      A.   No.

4      Q.   No, you're not aware?

5      A.   I'm not aware.

6      Q.   Were you trained by any of your training

7   officers that it was okay to meet with informants alone?

8      A.   No.

9      Q.   So what made you think it was okay to do that?

10     A.   I mean there's -- I mean I met with them alone

11  at times.

12     Q.   I know, and -- well, were you aware at the time

13  that that was in violation of Raleigh Police Department

14  procedure?

15          MR. PETTEY:  Objection.

16          THE WITNESS:  Yes.

17          BY MR. SCHEWEL:

18     Q.   Okay.  So if you were aware you were violating

19  procedure, what made you think it was okay to do that?

20     A.   Each circumstance was different, but I have met

21  with informants by myself.

22     Q.   Okay.  Did Sergeant Rolfe tell you that it was

23  okay to do that?

24     A.   No.

25     Q.   What about paying a CI for their work?  Have

1    you ever done that alone?

2         A.    No.

3         Q.    Are you familiar with a Payment of Informant

4    Funds Sheet?

5         A.    Yes.

6         Q.    Which requires another person or a witness to

7    be present at the time of a CI's payment?

8         A.    Correct.

9         Q.    And they actually have to sign off and say,

10   "Yes, I observed this"?

11        A.    Yes.

12        Q.    And so that requires that person to sign the CI

13   payment sheet to show they had witnessed the actual

14   payment?

15        A.    Correct.

16        Q.    And so in your practice, when you were filling

17   out a CI payment sheet and you had a witness sign, that

18   witness was actually there to observe the payment?

19        A.    Correct.

20        Q.    Do you currently have an RPD-assigned work

21   phone?

22        A.    Yes.

23        Q.    When did you obtain this phone?

24        A.    The current phone?

25        Q.    The current phone.

 1      A.   In the -- I believe it was the July time frame
 2  of 2021.
 3      Q.   What happened to your previous phone?
 4      A.   It was inoperable.  It was swapped out with IT
 5  for a new phone.
 6      Q.   In July of 2021?
 7      A.   Correct.
 8      Q.   How did it become inoperable?
 9      A.   The screen was cracked.  It was old.  It was
10  slowing down, so they upgraded.  They had an upgrade,
11  upgraded me.
12      Q.   Okay.  Are you aware that you were sued in
13  April of 2021 --
14      A.   Yes.
15      Q.   -- related to these incidents?
16      A.   Yes.
17      Q.   And when you were sued, were you instructed to
18  preserve your phone?
19      A.   Prior to July, no.
20      Q.   When were you instructed to preserve?
21      A.   Sometime that fall of 2021.
22      Q.   The phone that you turned in in July of 2021,
23  do you know how long you had had that phone for?
24      A.   A couple years.  I don't recall how long
25  exactly.

 1      Q.   Okay.  When you turn your phone in or when you

 2   turned it in, did you immediately get a new phone?

 3      A.   Yes.  They activated a new cellphone when I

 4   turned my old cellphone in.

 5      Q.   Can you just describe how that works and where

 6   that occurs?

 7      A.   So at our main district is where our IT

 8   Department is located at, and you literally just go up to

 9   our office, and I contacted them ahead of time and they

10   let me know when they had a phone available.  So you

11   literally go in, you give them your old phone, and they

12   open up a new one in a box and do all the setups, like

13   you would any normal phone.

14      Q.   How did you contact them?

15      A.   I think via e-mail.

16      Q.   Okay.  And did you get any paperwork in return

17   showing that you had turned in your old phone?

18      A.   No.

19      Q.   So they just -- you hand them the old phone,

20   they hand you the new phone; there's no sort of receipt

21   or anything?

22      A.   No.  They just -- they do whatever they have to

23   do to activate it, which is on them, and then they hand

24   you a new phone that's activated and a new case for it.

25      Q.   Do they transfer any of your data?

1    A.   I think they do your contacts and stuff.  I'm

2    not -- I'm not quite sure.

3    Q.   Do you know if they save a copy of the contents

4    of your old phone?

5    A.   I don't know.

6    Q.   Do you know who you met with in the IT

7    Department?

8    A.   No.

9    Q.   The last time you were sued, the case was

10   called, essentially, Gregory Washington, et al. versus

11   The City of Raleigh, et al.  Do you recall receiving a

12   copy of that complaint?

13   A.   Yes.

14   Q.   Do you recall approximately when that occurred?

15   A.   No.

16   Q.   Okay.  Do you recall being interviewed by the

17   SBI?

18   A.   Yes.

19   Q.   At the time you were interviewed by the SBI,

20   did you think it was possible that you could be subject

21   to a lawsuit because of Officer Abdullah's actions?

22   A.   No.

23   Q.   When did you first start to think that that was

24   a possibility?

25   A.   I never thought it was a possibility.

1      Q.   Until you were sued?

2      A.   Correct.

3      Q.   Okay.  Okay.  I'm going to show you what I've

4  marked as Exhibit D.  I'm going to hand you a binder that

5  has a number of tabs in it.  I'll flip for you to the

6  first one, and this is Exhibit D.

7           (Exhibit D identified for the record.)

8           MR. SCHEWEL:  And, sorry, Rod.  I will give you

9  a copy, too.

10          MR. PETTEY:  Okay.  Thank you.

11          MR. SCHEWEL:  And, Jason, I've sent you this.

12          MR. BENTON:  I just didn't know what it was.

13          MR. SCHEWEL:  I just sent it to you via Dropbox

14  in that e-mail.

15          MR. BENTON:  Was it labeled?

16          MR. SCHEWEL:  Exhibit D, yeah.

17          BY MR. SCHEWEL:

18     Q.   Okay.  Have you seen this before?

19     A.   Yes.

20     Q.   When did you see it?

21     A.   Sometime over the last several months.

22     Q.   Do you recall seeing it on the day of the

23  execution of the warrant?

24     A.   No.

25     Q.   Do you recall seeing it anytime in the period

1  after the warrant was executed?

2       A.   No.

3       Q.   Until you saw it at some time during this

4  litigation?

5       A.   Yes.

6       Q.   Okay.  Do you see that the warrant -- and I'm

7  just going to read some identifying markers on it.   In

8  the top left corner, it says, "In the matter of 1628

9  Burgundy Street, Apartment B."  Do you see that?

10      A.   Yes.

11      Q.   And if you go down to applicant, it says,

12 "Detective O.I. Abdullah."

13      A.   Yes.

14      Q.   And then on date received, it says "5/21/20,"

15 and date executed, it also says "5/21/20;" is that

16 correct?

17      A.   Correct.

18      Q.   And time executed, it says "13:35 p.m."

19      A.   It appears that way, but there's --

20      Q.   It's a little hard to read.

21      A.   Yes.

22      Q.   Well, and if it was 13:35 p.m., that would also

23 be 1:35 p.m., right?

24      A.   Correct.

25      Q.   Is that your recollection of roughly the time

1  the warrant was executed?

2       A.   I just remember it was in the afternoon.  I

3  don't recall the time.

4       Q.   Okay.  From the time the warrant was executed

5  to the time you left and went back to Green Dairy on this

6  date, approximately how long do you think that was?

7       A.   Like a couple hours, maybe, passed.

8       Q.   Okay.  And just to be clear, after the warrant

9  was executed, you did go back to Green Dairy?

10      A.   At some point.

11      Q.   To process the evidence?

12      A.   (No response.)

13      Q.   And let me -- let me strike that question.

14  Well, I'll just say, you did go back to Green Dairy?

15      A.   Yes.

16      Q.   And I think your hesitation is because you are

17  not sure if you were the crime scene reporter.

18      A.   I don't recall if I was or not.

19      Q.   Okay.  I'm now going to show you or I'd like

20  you to turn to Exhibit C in your binder.

21           MR. SCHEWEL:  And, Rod, I'll give you a copy,

22  too.

23      Q.   Have you seen these before?

24      A.   Yes.

25      Q.   Okay.  So these are text messages.  They are

1    marked as taken from Officer Gay's cellphone, but that is

2    incorrect.  They were taken from -- we actually received

3    these from Detective Gwinn.

4         A.   Okay.

5              (Exhibit C identified for the record.)

6              BY MR. SCHEWEL:

7         Q.   So what is this?

8         A.   It's a text thread.

9         Q.   And are you on this thread?

10        A.   I am.

11        Q.   Okay.  And this was -- this thread, at least

12   what we have here, the portion of it we have here was

13   started on May 21st, 2020?

14        A.   Yes.

15        Q.   At 12:28 p.m.?

16        A.   This portion, yes.

17        Q.   And so if the time on the warrant is correct,

18   this thread was started about an hour before the warrant

19   was executed?

20        A.   Yes.

21        Q.   And Officer Gwinn, in the green text, "I

22   started this because Slim Thug wasn't on the other

23   thread."  Do you see that?

24        A.   Yes.

25        Q.   And would you agree that that's Officer Gwinn?

1      A.   That said this?

2      Q.   Yeah.

3      A.   By this, I can't tell who sent it.

4      Q.   Okay.  Well, are you familiar -- do you have an

5   iPhone?

6      A.   No.

7      Q.   You don't?  What type of phone do you have?

8      A.   Android.

9      Q.   Okay.  Are you familiar with what iPhone text

10  messages look like?

11     A.   I know nothing about iPhones.

12     Q.   Okay.  Who is Slim Thug?

13     A.   That's referring to Detective Gay.

14     Q.   And when this officer who I'm going to call

15  Detective Gwinn in the green part of the text says "the

16  other thread," what does he mean by "the other thread"?

17          MR. PETTEY:  Objection.

18          THE WITNESS:  I don't know.

19          BY MR. SCHEWEL:

20     Q.   So you don't know what it means to say, "I

21  started this because Slim Thug wasn't on the other

22  thread"?

23     A.   I mean, I can make an assumption, but I don't

24  know exactly.

25     Q.   Well, I mean, you are on this thread, right?

1      A.    Right.

2      Q.    And what does it mean to you to be on a text

3 thread?

4      A.    That you're part of a text message group with

5 other individuals.

6      Q.    Okay.  So is it fair to say that Detective Gay

7 was not on the other thread?

8      A.    That's what this in the green would indicate.

9      Q.    Okay.  And you give a thumbs up?

10      A.    Correct.

11      Q.    An emoji?

12      A.    Yes.

13      Q.    And then someone else responds, "That's fine.

14 I texted her earlier."

15      A.    Correct.

16      Q.    Is that Officer Abdullah responding?

17      A.    I don't know this phone number.

18      Q.    Okay.  Based off of your knowledge of this

19 situation, is that Officer Abdullah responding?

20      A.    I don't know.

21      Q.    Okay.  If this was -- well, on May 21st, 2020,

22 who was in charge of the CI?

23      A.    Officer Abdullah.

24      Q.    Would it have been Officer Abdullah's

25 responsibility to notify the rest of the vice team on

1    what was occurring?

2         A.    Yes.

3         Q.    Okay.  So then the same day, May 21, 2020, at

4    3:07 p.m., you state, "Omar, please contact a Southside

5    supervisor for search."

6         A.    Yes.

7         Q.    Why did you tell Omar to do that?

8         A.    Because during the briefing and as we were

9    preparing for this search, I realized that Detective

10   Abdullah had not contacted a supervisor to be present for

11   the search.

12        Q.    How did you realize that?

13        A.    Because there was not a supervisor present.

14   Our supervisor was off and there was not -- there was a

15   supervisor for SEU, but he is not a supervisor for the

16   search, and I became aware that he had not, so I wanted

17   to make sure, as protocol, that we have a supervisor

18   there.

19        Q.    So was this text sent before or after the

20   warrant was executed?

21        A.    This would have been before.

22        Q.    Okay.  So, then, either this time stamp is

23   wrong or the warrant is wrong, based on what time the

24   warrant was executed?

25        A.    They are two different times.

1      Q.   Okay.  But you're saying that this time stamp

2   that says "3:07 p.m.", at that point, when you sent,

3   "Omar, please contact the Southside supervisor for

4   search," that was before the warrant had been executed?

5      A.   Yes, I told him that before the warrant was

6   executed.

7      Q.   Okay.  Did he contact a supervisor?

8      A.   A supervisor did respond, yes.

9      Q.   Which supervisor?

10     A.   Sergeant Chris Roberts from the Southeast

11  District.

12     Q.   And did he respond to the scene?

13     A.   I remember him being at the scene at some

14  point.

15     Q.   Okay.  And what's his name?

16     A.   Chris Roberts.

17     Q.   And what is his -- what was his -- sorry.  You

18  stated he was a sergeant?

19     A.   Yes.

20     Q.   Of what unit?

21     A.   I believe he was just a patrol sergeant.

22     Q.   Okay.  Did Officer Abdullah also contact

23  Lieutenant Bunch?

24     A.   I contacted Lieutenant Bunch.

25     Q.   Prior to the search?

1      A.   Yes.

2      Q.   To inform him that the search was being

3  executed?

4      A.   To perform -- to inform him about the details

5  of the search and my concerns.

6      Q.   Okay.  So you did this prior to the search

7  being executed?

8      A.   Yes.

9      Q.   Okay.  What did you tell Lieutenant Bunch prior

10 to the search?

11     A.   I advised him that Detective Abdullah was

12 conducting a search briefing and had planned on doing a

13 search warrant and that it was for a certain amount of

14 money, and was he aware that we were doing this search

15 because we didn't have a supervisor that day, so that he

16 would be next in line, since our supervisor wasn't there.

17 So I was checking with him to see if Abdullah had

18 contacted him to make him aware of what was happening.

19     Q.   Did you tell him that Abdullah was using

20 Aspirin for the search?

21     A.   I don't recall.

22     Q.   Did you tell him that you were concerned that

23 the CI that Abdullah was using would produce fake heroin?

24          MR. PETTEY:  Objection.

25          THE WITNESS:  No.

1            BY MR. SCHEWEL:

2        Q.   So you didn't tell Lieutenant Bunch any

3   concerns about the CI that was being used?

4        A.   I told Lieutenant Bunch that we were conducting

5   a search warrant and that it was for a large quantity of

6   money, which had to be approved by a supervisor, and that

7   we didn't have a supervisor for the search.  This was at

8   the time after the briefing.

9        Q.   Did you tell Lieutenant Bunch that you had any

10  concerns about the reliability of the search?

11       A.   I advised him on the things that I previously

12  stated.

13       Q.   Okay.  But the answer to that question is no?

14       A.   No.

15       Q.   So did you tell Lieutenant Bunch that via

16  phone?

17       A.   Yes.

18       Q.   Via phone call or text?

19       A.   I'm pretty sure I called him.

20       Q.   Okay.  Let's look at the next page of the text

21  messages.  So this is a different thread, but these are

22  also provided by Officer Gwinn, or Detective Gwinn, and

23  on this thread is Detective Rattelade, yourself,

24  Detective Gay, and Detective Gwinn.  And the date here is

25  May 21st, 2020, at 2:44 p.m.

1       A.   Yes.

2       Q.   And Rattelade starts by saying, "Place your

3   bets here."  Do you see that?

4       A.   Yes.

5       Q.   What was Rattelade betting on?

6       A.   This was talking about the search warrant.

7       Q.   Okay.  But what about the search warrant?

8       A.   That it would not be done in a manner

9   consistent with how other detectives would do their

10  search warrants.

11      Q.   Okay.  Was he also betting on what Aspirin

12  would produce that day?

13      A.   No, because Aspirin wouldn't produce all the

14  things he spoke of here.

15      Q.   Okay.  So let's go to the first one.  He said

16  "7 grams brown sugar mixture."  What did Detective

17  Rattelade -- what does that mean to you?

18      A.   That at some point during the search, we would

19  locate a substance that was not heroin.

20      Q.   But that was actually brown sugar?

21      A.   Yes.

22      Q.   And that's what Detective Rattelade was

23  predicting would happen?

24           MR. PETTEY:  Objection.

25           THE WITNESS:  I can't say that's what he was

1    predicting.  I don't know what his thoughts were.

2              BY MR. SCHEWEL:

3         Q.   Is that what he was betting would happen?

4         A.   These are the list of things he put down as his

5    bets, yes.

6         Q.   Okay.  He also bet 12 grams of weed?

7         A.   Correct.

8         Q.   $230 (non-buy money)?

9         A.   Correct.

10        Q.   And 3 red flags?

11        A.   Correct.

12        Q.   What are red flags?

13        A.   Pertaining to the colors used by the Blood

14   street gang.

15        Q.   Okay.  That's what that means to you?

16        A.   Yes.

17        Q.   And he also says "1 BB pistol"?

18        A.   Correct.

19        Q.   What is a BB pistol?

20        A.   A pistol that's not a real handgun, just a BB

21   pistol.

22        Q.   And then you respond and you say, "For sure

23   fake heroin"?

24        A.   Correct.

25        Q.   Why were you sure on this day that Aspirin

1   would have fake heroin?

2        A.    This isn't Aspirin.  This is what's going to be

3   found in the search of the residence.  All of these are

4   bets on what we're going to find in the search of the

5   residence.

6        Q.    Okay.  So why were you sure that you were going

7   to find fake heroin?

8        A.    Because at this time, I did not believe

9   Detective Abdullah was managing Aspirin properly and that

10  because of the way he was managing him, they were being

11  ripped off by drug dealers.

12       Q.    Okay.  So you thought the search would result

13  in fake heroin?

14       A.    Yes.

15       Q.    Had operations involving Aspirin in the past,

16  prior to this incident, resulted in fake heroin?

17       A.    At this time, I can't say for sure because I

18  don't know what the lab reports were.

19       Q.    Well, I mean, you had field tested alleged

20  heroin produced by Aspirin prior to this?

21       A.    Alleged heroin, yes, but not for other

22  narcotics.

23       Q.    Well, then, let me ask you this.  Why were you

24  sure it would be fake heroin?

25       A.    Because it was my opinion that Detective

1    Abdullah was not supervising Aspirin properly.

2         Q.   I know, but --

3              MR. PETTEY:  Let him finish.

4              THE WITNESS:  Was not supervising Aspirin

5    properly, and based on the way he was operating, it was

6    my opinion that he had purchased real narcotics from this

7    suspect the day prior and that he had jumped him up to a

8    $800 amount the following day, which I had a problem with

9    because I felt that it allowed him to set himself up to

10   be ripped off by the drug dealers, which is what my

11   opinion that day was, is that, "We're going to do an $800

12   buy," after just recently buying a small amount of

13   heroin, which would set yourself up to be ripped off if

14   you were purchasing drugs, based on my training and

15   experience.  And that's why I listed the other things,

16   like lose the buy money, because I felt that we were

17   going to get ripped.

18             BY MR. SCHEWEL:

19        Q.   Did you tell Lieutenant Bunch that?

20        A.   I think I just let him know how much heroin we

21   were buying, what my concerns were and that we didn't

22   have a supervisor, and then I allowed him to be the

23   supervisor.  And at that point I advised him this is what

24   my concerns were that day, and I don't know what he did

25   after that.

1     Q.   So you didn't tell Lieutenant Bunch that you

2  thought you were going to get ripped off?

3            MR. PETTEY:  Objection.

4            THE WITNESS:  I advised him that we were

5  purchasing, supposedly, $800 worth of heroin.

6            BY MR. SCHEWEL:

7     Q.   And did you advise him that you had doubts

8  about the reliability of that?

9     A.   I had previously indicated I had doubts about

10 the reliability.

11    Q.   To Lieutenant Bunch?

12    A.   To supervisors.

13    Q.   To Lieutenant Bunch?

14    A.   I can't recall, but to supervisors.

15    Q.   Okay.  So you're not sure if you had ever had

16 that conversation specifically with Lieutenant Bunch?

17    A.   Directly with Lieutenant Bunch, no, I can't

18 recall.

19    Q.   Had you ever expressed doubts about the

20 reliability of Aspirin?

21    A.   Yes.

22    Q.   To your supervisors?

23    A.   Yes.

24    Q.   Prior to this incident?

25    A.   Yes.

1      Q.   Okay.  You also say in your text message,

2  "Water billing?"  Right?

3      A.   Correct.

4      Q.   What does that mean?

5      A.   As we were having the banter on the bets, this

6  text here was saying, "Okay, understand this banter --"

7  this is me speaking my opinion, but, "Did he check the

8  water?"  This is me starting to ask the questions were

9  these other things done that I would do to make sure that

10  we had the correct address.  I'm not sure that Detective

11  Abdullah did this, but this is me just asking the group,

12  "I wonder if all these things were done.  How much did he

13  do to verify this information?"

14      Q.   And, again, this was sent prior to the warrant

15  even being executed?

16      A.   Yes, because these were our predictions before

17  the warrant actually being executed.

18      Q.   And, again, why is it important to check the

19  water billing?

20      A.   It provides several different things.  One, if

21  the actual suspect is on the water billing, it

22  establishes residency.  Two, maybe it's a family member

23  or an associate or a girlfriend or a boyfriend.  Three,

24  it just allows to add one more piece of the puzzle to try

25  to determine the reliability of the information you

 1    received and the probable cause you've established for

 2    your warrant.

 3        Q.   Why did you think that Officer Abdullah may not

 4    have done this?

 5             MR. BENTON:  Objection.

 6             THE WITNESS:  Based on my experience, I felt

 7    that he did not operate in the same way that I operate,

 8    so I was questioning did he go through these other

 9    avenues to confirm his information.

10             BY MR. SCHEWEL:

11        Q.   And specifically water billing, why was that a

12    specific concern that you listed there?

13             MR. BENTON:  Objection.

14             THE WITNESS:  It's just one of the many things

15    I do whenever I'm doing an investigation.

16             BY MR. SCHEWEL:

17        Q.   But why did you think Abdullah did not do that?

18             MR. BENTON:  Objection.

19             THE WITNESS:  These were just, at the time,

20    questions that I put out there that included steps that I

21    would have taken; not all the steps I would have taken,

22    but was putting that out to the group, "Do you think he

23    did these things," which would have been what I would

24    have done.

25             BY MR. SCHEWEL:

1       Q.   Were you aware that he had not taken this step

2    in the past?

3            MR. PETTEY:  Objection.

4            THE WITNESS:  I'm not sure what steps he had

5    taken, but just my past experience dealing with him and

6    his cases, I felt like he did not do cases in the manner

7    that I would have done them.

8            BY MR. SCHEWEL:

9       Q.   So then you stated, "Talk with Gina who knows

10   apartment."

11      A.   Correct.

12      Q.   What does that mean?

13      A.   Gina Bascone is our -- she is a gang liaison

14   outreach for the police department and she used to work

15   very closely with the management of Raleigh North

16   Apartments, and she also knew a lot of the people because

17   she worked with the gang members that lived in that

18   apartment complex.  That was her job, so I knew that she

19   knew people there.  I knew that she knew the management

20   there and thought maybe she could provide information on

21   who resides in these apartments from her own experience

22   of out there doing outreach.

23      Q.   Had you used her in the past?

24      A.   Yes.  I'm actually on her -- she's on my unit

25   now, but I had used her in the past, also.

1        Q.   During your time on the vice squad?

2        A.   Yes.

3        Q.   To verify who was at a certain location?

4        A.   That, and to maybe -- location or if she knew

5   these individuals, if they maybe hung out there or she

6   had run into them while she was out there doing outreach.

7        Q.   So sometimes -- sorry to interrupt.  Sometimes

8   she would provide you information?

9        A.   I would just -- if I -- if I had a case out

10  there.  I did not have a lot of cases out there.  In the

11  past, I had reached out there because I had cases out

12  there, so in the past, I had reached out to her just to

13  inquire if she had anything to offer.

14       Q.   Prior to May 21, 2020, did you suggest to

15  Officer Abdullah that he reach out to Gina?

16       A.   It was known that that was Gina's job, and we

17  worked closely with our Gang Suppression Unit and she

18  worked closely with them, so that was a resource that was

19  provided to us that was -- for me, was common knowledge

20  for me as a drug detective, but what Detective Abdullah

21  chose to do or who he chose to contact, I can't comment

22  on.

23       Q.   I'm just asking you, yes or no, did you suggest

24  to Officer Abdullah that he reach out to Gina prior to

25  May 21, 2020?

1        A.   I did not make any suggestions to Abdullah, no.

2        Q.   How was the information about Gina and the Gang

3   Suppression Unit provided to you or the vice team?

4        A.   Well, her position was available to the whole

5   police department.  I can't identify when I became aware

6   of that, but prior to -- Gina has been an employee with

7   the City.  She used to work on our evidence unit and

8   she's been the gang liaison outreach individual for many

9   years.  I don't know when I became aware of that, but I

10  knew it was a resource that we had.

11       Q.   And you said it was common knowledge on the

12  vice team?

13       A.   Yes.

14       Q.   And then the last thing you texted was, "Advise

15  Lt. of search," and by that, you meant, "Advise

16  lieutenant of search"?

17       A.   Correct.

18       Q.   And why did you say that?

19       A.   Because we didn't have a sergeant.  I knew he

20  was taken -- and this is an assumption here, but this is,

21  obviously, before the search.  And at some time between

22  the briefing and the search, I was made aware of the

23  amount of money that was being put in play, and I knew we

24  didn't have a supervisor, so he would be our next line of

25  supervision.  So it was kind of like me asking the group,

1   "Do you guys know if he did any of these things," which

2   included contact the lieutenant because that would be

3   required.

4        Q.   And so after this, shortly after this, you

5   actually took this step to contact the lieutenant on your

6   own?

7        A.   Right, because I felt like I wasn't sure what

8   Detective Abdullah had done, but I wanted to make sure

9   that that step was taken.

10       Q.   Okay.  And then Officer Meghan Gay, she texts,

11  "Flushed dope."

12       A.   Uh-huh.

13       Q.   Why do you think a concern of hers was flushed

14  dope?

15            MR. PETTEY:  Objection.

16            THE WITNESS:  That's just what she documented.

17  I don't know what her thought process was.

18            BY MR. SCHEWEL:

19       Q.   Had that happened in the past with Abdullah's

20  operations?

21       A.   Suspects in the past have flushed dope.  It's a

22  common occurrence.  I don't know why she indicated at

23  that --

24       Q.   So you're not sure why it was a concern

25  specifically with Abdullah and Aspirin?

1          MR. PETTEY:  Objection.

2          THE WITNESS:  No.

3          BY MR. SCHEWEL:

4     Q.   What about fake gun?  What does that mean to

5  you?

6     A.   Just that a fake gun would be located, not a

7  real gun.

8     Q.   Would that be a concern?

9     A.   Concern for?

10    Q.   The operation.

11    A.   I mean, we always assume everyone has weapons.

12 I'm not sure why she thought there would be a fake gun,

13 but yes, weapons would be a concern.

14    Q.   Would it be a concern if it was a fake weapon

15 as opposed to a real weapon?

16         MR. PETTEY:  Objection.

17         THE WITNESS:  They're both a concern.  I'm not

18 sure why she put that.

19         BY MR. SCHEWEL:

20    Q.   Why are they both concerns?

21    A.   Fake guns, real guns, weapons -- we just assume

22 weapons, so like I said previously, it's part of the

23 briefing.  We cover any known weapons or any possibility

24 of weapons based off of the investigation.

25    Q.   You also stated that you always assume there

1   are weapons.

2        A.   Correct.

3        Q.   Is that stated at the briefing?

4        A.   I think it's just being in law enforcement.

5   You just always assume there's a weapon.

6        Q.   In any search warrant you're executing?

7        A.   At any point.

8        Q.   Okay.

9        A.   In law enforcement, you can encounter weapons,

10  so you always assume there's a weapon.

11       Q.   During the briefing for a search warrant

12  execution, do you try and determine or state whether or

13  not there actually is a known weapon in that apartment?

14       A.   Yes.

15       Q.   Why is that important?

16       A.   Just because it's another safety concern if we

17  know that weapons are present, has the suspect been seen

18  with a weapon, just so we would know that going into the

19  situation.

20       Q.   Okay.  So back to the text messages, and we're

21  going to look at the bottom of page 2 and then you can

22  flip to page 3.

23            After Officer Gay's text, Detective Rattelade

24  responds with an emoji of Justin Timberlake saying, "Oh,

25  stop it."

1      A.   Correct.

2      Q.   Why did Detective Rattelade do that?

3           MR. PETTEY:  Objection.

4           THE WITNESS:  I don't know.

5           BY MR. SCHEWEL:

6      Q.   Do you think Justin Timberlake is laughing in

7  that emoji?

8      A.   I can't say exactly what he's doing in that

9  emoji.

10     Q.   Did you think that the situation with Aspirin

11 was funny?

12     A.   No.  It was concerning.

13     Q.   So did you think that the emoji that Detective

14 Rattelade sent was concerning?

15     A.   Once again, I can't recall even seeing this

16 emoji sent by Detective Rattelade, so I can't make what I

17 thought about it at the time.

18     Q.   Looking at it today here, is it concerning?

19     A.   To me, no.

20          MR. PETTEY:  Objection.

21          BY MR. SCHEWEL:

22     Q.   Why?

23     A.   I would say, based off of -- yes, there is

24 banter, but there is, okay, seriousness.  And him saying,

25 "Oh, stop it" would be more like, "Let's get serious,

1   stop it."  I mean, we're making jokes, but then it's,

2   "Okay, let's -- let's get back to --"

3       Q.   You think this was, "Let's get back to

4   business, to work"?

5       A.   But that's just an assumption.  You asked me

6   how I felt about it today, but I can't say because I

7   don't remember from that time.

8       Q.   Okay.  So why don't you turn to the next page.

9       A.   (Witness complies.)

10      Q.   And if you'll see -- sorry.  Why don't you go

11  back to page 3.  See at the bottom of page 3, Detective

12  Rattelade says, "Hope he relays stuff to us in a timely

13  manner," and then there's a text from Meghan Gay at the

14  bottom?

15      A.   Correct.

16      Q.   So that text continues on page 4, and those are

17  emojis sent from Meghan Gay of smiling, laughing faces.

18      A.   Okay.

19      Q.   Do you take those as, "Let's get back to work"?

20      A.   I don't know what that has to do with -- I

21  can't -- once again, I don't remember these texts or

22  these emojis, so I don't know.

23      Q.   Well, looking at it today, how do you perceive

24  it?

25      A.   I can't make an assumption either way.  I would

 1   just assume that she is -- my assumption, whenever

 2   Detective Rattelade says he hopes he relays stuff in a

 3   timely manner, which was another concern, I think she is

 4   saying -- laughing at that, like, "Do you think that's

 5   going to happen?"  Because, once again, there was

 6   concerns brought forward about the way the operations had

 7   been ran in the past, so I think that's a hope he, which

 8   I'm assuming is Abdullah and/or Aspirin, one of the

 9   two -- I don't know exactly who "he" is in this because

10   right before this, it says "Aspirin."  So I would just

11   assume that's a -- like a non-belief in that statement,

12   but that's an assumption.

13        Q.   Had the use of Aspirin become a running joke to

14   the vice squad?

15        A.   The use of Detective Abdullah's supervision of

16   Aspirin and his cases had become a concern.  You say a

17   joke.  It was more of a concern and an aggravation.

18        Q.   So for you, it was a concern?

19        A.   And an aggravation, yes.

20        Q.   Would you be surprised that other officers

21   called it a running joke?

22             MR. PETTEY:  Objection.

23             THE WITNESS:  I don't know what other officers

24   called it.

25             BY MR. SCHEWEL:

 1      Q.   So you never -- strike that.  But as you sit

 2   here today, you don't think that the situation with

 3   Aspirin was funny?

 4      A.   I think more than anything, the situation with

 5   Detective Abdullah and his supervision of Aspirin was

 6   aggravating and concerning.

 7      Q.   Why was it aggravating?

 8      A.   Because the way that Detective Abdullah

 9   completed his investigations with Aspirin is not how I

10   would have completed my investigations.

11      Q.   Are you saying that Abdullah was not doing a

12   good job in monitoring Aspirin?

13      A.   No, he was not.

14      Q.   Can you go back to page 3 for me, please?

15      A.   (Witness complies.)

16      Q.   So after the -- you're on the right page.

17   After the Detective Rattelade emoji of Justin Timberlake,

18   Detective Rattelade then states -- and, sorry, I'm

19   incorrect about that.

20           In green, there's a text that I'm telling you

21   is from Detective Gwinn where he states, "Aspirin is

22   already in Omar's car and definitely a foot pursuit."

23   What does he mean by that?

24           MR. PETTEY:  Objection.

25           THE WITNESS:  Once again, I can't recall that

1   specific day.

2          BY MR. SCHEWEL:

3      Q.   Well, what does that text message mean to you,

4   "Aspirin is already in Omar's car and definitely foot

5   pursuit"?

6      A.   Even reading it now, it reads a little odd, so

7   I mean, obviously, Aspirin is in Omar's car, which I'm

8   assuming this is prior to the buy, that he's already on

9   scene waiting to go to do this controlled buy.  And the

10  foot pursuit wouldn't be Aspirin; it would be the

11  suspect, so for whatever reason, he thought the suspect

12  would run.

13     Q.   Is that problematic?

14     A.   If the suspect runs?

15     Q.   Yes.

16     A.   Absolutely, it's problematic.

17     Q.   Why?

18     A.   One, there's officer safety; two, we have $800

19  in play that we don't want to lose, so between the safety

20  aspect and the amount of money that's in play, it's a

21  concern.

22     Q.   When you are in charge of an operation or when

23  you were during vice, would you try and make sure there

24  was not a foot pursuit?

25     A.   Yes.

1      Q.   Okay.  And how would you do that?

2      A.   I would give my CI specific instructions.  Once

3   again, every situation is different.  You have open-air

4   purchases, purchases made from vehicles, purchases made

5   from residences.  If you use a vehicle, as an example, if

6   a CI was to meet with an individual to purchase

7   controlled substances while in a vehicle, I would ask --

8   and, say, this is just a scenario -- if this was a

9   takedown, I would ask the CI that when he passes off the

10  money, to remain in the car or count the money out

11  slowly, but conduct the deal and remain in the car until

12  we advance on the vehicle to take everyone in custody.

13      And once the CI separates from the suspect, it

14  is common that the suspect would leave, whether on foot,

15  in a vehicle.  As long as the CI is there and follows my

16  instructions, there's a better chance that we can catch

17  them off guard and stop everything in the moment, which

18  is safer for everyone, compared to someone moving in a

19  vehicle or moving about on foot and having to deal with

20  the aspect afterwards.

21      Q.   So is one of the concerns that you had about

22  Aspirin that he would leave the transaction prior to the

23  team being able to move in?

24      A.   Well, I think that relays -- hope he relays

25  stuff in a timely manner.  This was a previous issue of

 1    not relaying stuff in a timely manner.  These are all
 2    very time sensitive.  Seconds, minutes matter, so that
 3    was a concern that, somehow or another, this wouldn't
 4    operate properly.
 5         Q.   Okay.  And because if he doesn't relay it to
 6    you in a timely manner, then you can't tell the SEU team
 7    to move in; you can't move in until maybe the suspect
 8    runs?
 9         A.   Right.
10         Q.   I'm going to ask you to go back to page 4,
11    please.
12         A.   (Witness complies.)
13         Q.   So we see Officer Gay has the laughing -- the
14    three laughing emojis and then in response to that,
15    there's one more text from Detective Rattelade and he
16    says, "More brown sugar."
17         A.   Correct.
18         Q.   What does that text message mean to you?
19         A.   Again, going back to -- in one particular case,
20    specifically, but that our assumption is that there is
21    actual narcotics being purchased on the first buy, but
22    they are going to too high of an amount immediately on
23    the second buy, which sets themselves up to be ripped.
24    So it's an assumption that this is referring to, "Here we
25    go.  If we jump too quick, we're going to get ripped."

1          And the brown sugar is just basically relating

2   to, "You're not going to get narcotics.  You're going to

3   get ripped."

4      Q.   Well, why was that a prediction here,

5   specifically, with Aspirin?

6          MR. PETTY:  Objection.

7          THE WITNESS:  I don't know.

8          BY MR. SCHEWEL:

9      Q.   I'm asking you for yourself, I mean, because

10  you -- in your text message, if we go back to page 2, you

11  stated, "For sure fake heroin," right?

12     A.   Correct.

13     Q.   So why was that your prediction?

14         MR. PETTEY:  Objection.

15         THE WITNESS:  Because of the jump up to the

16  $800.

17         BY MR. SCHEWEL:

18     Q.   But why with Aspirin?

19         MR. PETTEY:  Objection.

20         THE WITNESS:  Because I felt that Detective

21  Abdullah was not supervising Aspirin and doing enough

22  follow-up in his investigations, that he was not

23  operating like I would operate and that that would

24  ultimately lead to him being ripped and putting the CI in

25  a situation to be ripped.

1           BY MR. SCHEWEL:

2       Q.   And prior to May 21, 2020, did you believe that

3   Aspirin had been ripped?

4       A.   Yes.

5       Q.   And so you were betting or predicting that this

6   could happen again?

7       A.   Yes.

8       Q.   Now, I think you just said that your belief was

9   that actual narcotics were being purchased on Aspirin's

10  first controlled buy.

11      A.   That was my belief.

12      Q.   Was it -- were you present for the first

13  controlled buys in cases involving Aspirin?

14      A.   I do not recall and do not believe I was

15  present for this controlled buy, but I had been present

16  for controlled buys with Detective Abdullah in the past.

17      Q.   And you're saying that during the first

18  controlled buys involving Aspirin -- and I'm not just

19  asking you about for this case.  I'm asking you in

20  general.  You didn't have concerns about the initial

21  controlled buys involving a suspect?

22      A.   With the limited information I was provided and

23  my role in those buys, I didn't have a concern at that

24  time.

25      Q.   So your concern with Aspirin was primarily the

1    second buys that he was making?

2              MR. PETTEY:  Objection.

3              THE WITNESS:  My concern when Detective

4    Abdullah would use Aspirin would be that he wasn't being

5    managed properly, regardless of the controlled buy,

6    itself.

7              BY MR. SCHEWEL:

8         Q.   Okay.

9         A.   It wasn't -- I would have done things

10   differently, just the entire operation, for the most

11   part, but whenever there became a question if the

12   purchase -- potential controlled substances were real or

13   fake, at that point, my concern wasn't so much that they

14   had made a controlled buy initially.  My concern was when

15   I found out that they jumped up so quickly.  I thought

16   that was the disconnect, that you're going to get ripped

17   if you do that.

18        Q.   You thought it was a major red flag to go from

19   a small purchase to then the next day or in the following

20   couple of days a very large purchase?

21        A.   I would never do that.

22             MR. PETTEY:  Objection.

23             MR. BLANCHARD:  Objection.

24             BY MR. SCHEWEL:

25        Q.   You can answer the question.

1      A.   I would not operate that way.

2      Q.   Was that a concern for you?

3      A.   Yes.

4      Q.   Had you previously placed bets on the result of

5  search warrants related to Aspirin?

6      A.   I can't recall specifically if it was related

7  to Aspirin.

8      Q.   So you're saying that you had placed bets at

9  some point related to an operation in the vice unit?

10     A.   Yes.

11     Q.   Prior to this situation?

12     A.   Yes.

13     Q.   Do you know if, in placing those bets, that --

14  did they involve Officer Abdullah's CIs?

15     A.   I don't recall specifically what detective or

16  what case, but yes.

17     Q.   Was that a common practice?

18     A.   We would make assumptions on what we were going

19  to find based off the strength of the cases, yes.

20     Q.   Was it typical to assume that you would find

21  fake heroin?

22     A.   No.

23          MR. PETTEY:  Objection.

24          BY MR. SCHEWEL:

25     Q.   Was it typical that you would bet that the CI

1    would lose the buy money?  Sorry.  Let me strike that
2    question.
3              Was it typical that the buy money would be
4    lost?
5         A.   No.
6         Q.   Was it typical that you would find a brown
7    sugar mixture?
8         A.   No.
9         Q.   So is it fair to say that in making bets, you
10   would usually bet on actually finding real drugs?
11             MR. PETTEY:  Objection.
12             THE WITNESS:  There are a multitude of things
13   that we would bet that we would locate.
14             BY MR. SCHEWEL:
15        Q.   Okay.  So not just narcotics, but potentially
16   guns?
17        A.   Money, yes.
18        Q.   But usually your prediction was not that, "Oh,
19   I'm predicting we're going to be ripped off"?
20        A.   No.
21        Q.   And you stated you do not recall if you had
22   previously placed bets or predicted with your colleagues
23   on what Aspirin would produce?
24        A.   I can't say Aspirin specifically, no.
25        Q.   Okay.  The bets that you had made in the past,

 1   had you done that via text?

 2              MR. PETTEY:  Objection.

 3              THE WITNESS:  I don't recall.

 4              BY MR. SCHEWEL:

 5        Q.   Do you recall your vice colleagues ever making

 6   bets or predictions on what Aspirin would produce prior

 7   to this incident?

 8        A.   I don't recall.

 9              MR. PETTEY:  You doing okay?  Do you need a

10   break?

11              THE WITNESS:  No, I'm good.

12              BY MR. SCHEWEL:

13        Q.   I'm just going to ask you a couple more

14   questions and we can do a break.

15              With all these concerns prior to this search

16   warrant execution, why did you not step in and say, "We

17   cannot use Aspirin"?

18              MR. PETTEY:  Objection.

19              THE WITNESS:  Prior to this, it's like a large

20   puzzle.  We only -- and I only individually had small

21   pieces of the puzzle, different things that I would do

22   differently.  I only knew a little bit about the

23   different cases that Abdullah was working.  I wasn't with

24   him every time.

25              There were little things here and there that I

1   would do differently, but as a whole, it wasn't until

2   this all came together on this day and everything came

3   together and what led up after this brought the picture

4   more whole.  I didn't have -- there were just little

5   pieces that were here and there that we brought up with

6   supervisors, that we talked about, but they were more

7   about his productivity and his behavior as a detective

8   and how he handled things, and didn't have this full

9   picture that eventually came to light.

10          BY MR. SCHEWEL:

11     Q.   So you're saying that you could have stepped in

12  and said, "We should not be using Aspirin"?

13          MR. PETTEY:  Objection.

14          THE WITNESS:  There was nothing, prior to this

15  date, that I knew that would -- one, that I could step in

16  and say not to use Aspirin.  I voiced my concerns to the

17  supervisor, but there was nothing prior to this date that

18  was, "Hey, I see this.  This is happening and this is

19  against the law," or "This is wrong."  It was more

20  procedural, more preference.  It was more my opinion on

21  things, of how I would do things, so all I could do is

22  voice my opinion on how I would do things and what made

23  me uncomfortable or not to the supervision.

24          BY MR. SCHEWEL:

25     Q.   I'm just asking you if you could have said

1    that.

2               MR. PETTEY:  Objection.

3               THE WITNESS:  No.

4               BY MR. SCHEWEL:

5          Q.   You're telling -- your testimony is that you

6    could not have, when speaking to Lieutenant Bunch, said,

7    "Lieutenant Bunch, we should not be using Aspirin"?

8          A.   Yes, I could speak those words and say those

9    words verbally.  Yes, I'm capable of doing that.

10              MR. SCHEWEL:  All right.  We can take a break.

11              (Brief recess from 11:39 a.m. to 11:58 a.m.)

12              BY MR. SCHEWEL:

13         Q.   Okay.  I want to ask you a little more about

14   Officer Abdullah.  Who was Abdullah's training officer at

15   the vice team?

16         A.   Detective Nance.

17         Q.   Did you ever train Abdullah?

18         A.   No.

19         Q.   Not formally?

20         A.   Not formally, no.

21         Q.   Informally?

22         A.   We were on a team together, so I'm sure I

23   provided guidance, yes.

24         Q.   On what type of things?

25         A.   Investigations.  Once again, more my opinion on

1   how I would do things.

2       Q.   Would you say that Abdullah was a loner on the

3   vice squad?

4       A.   Yes.

5       Q.   Why?

6       A.   Why he specifically was a loner?

7       Q.   Yes.

8       A.   I don't know why he's --

9       Q.   I'm just asking you why you would characterize

10  him that way.

11      A.   Abdullah just kept to himself, mostly.  He was

12  quiet.  He was private.  He didn't reach out for help

13  often.  He just separated himself, for whatever his

14  reasons were.

15      Q.   So earlier you testified that when you were

16  preparing to execute a warrant, you would come in and

17  typically tell the vice team.

18      A.   Correct.

19      Q.   What was Abdullah's practice?

20      A.   In a lot of situations, we would be advised by

21  our supervisor of what Abdullah was doing or where we

22  needed to meet, and/or Abdullah would send texts with an

23  indicator of where he was planning a brief and/or a buy,

24  and then he, obviously -- I mean, he did speak, I mean,

25  so he did verbalize that at times, too.

1     Q.   At the briefing?  So let's back up a bit, I

2  guess.

3          And just to be clear, does what you're saying

4  also apply to when he is informing the team about

5  controlled buys?

6     A.   Correct.  I'm sorry.  That's what I was

7  referring to.

8     Q.   Okay.  So I'm discussing controlled buys,

9  informing the team, but also informing the team about

10 search warrant execution.

11    A.   It was mostly the same way.  Like I said, he

12 would verbalize it at times.  At times, we would be

13 advised by the sergeant, and then a lot of times he

14 would -- he would just -- even if he was present and

15 could verbalize, he may leave and then text the squad

16 after he left, when he was just present with the squad.

17    Q.   And would his texts be group texts?

18    A.   Yes, as far as -- I didn't have a lot of

19 communication with him one on one.

20    Q.   Right.  So if he's informing the squad of an

21 operation, he would sometimes inform the group through a

22 group text?

23    A.   Correct.

24    Q.   Sometimes he would communicate verbally?

25    A.   Correct.

1     Q.   And sometimes he would inform Sergeant Rolfe,
2  who would then inform the team?
3     A.   Correct.
4     Q.   How would Sergeant Rolfe inform the team?
5     A.   In a lot of cases, if we were all there at the
6  office, he would walk out and say, "Hey, Abdullah has got
7  a buy," whatever, you know, and give us the details.
8     Q.   Would Abdullah be present for that?
9     A.   No.  Like I said, a lot of cases, he would be
10 present, but then he would leave and then the supervisor
11 would come in and advise us that that's where Abdullah
12 had just left to do, when he was just there and could
13 have verbalized it but did not.
14    Q.   And would the vice team then go and assist
15 Abdullah?
16    A.   Members.  I wouldn't just say the team.  It
17 doesn't require the whole team, but someone would be --
18 in some cases, just the sergeant would go.
19    Q.   Okay.  Okay.  Did the sergeant ever communicate
20 that via text?
21    A.   I don't recall.
22    Q.   Did the sergeant ever communicate with the vice
23 team via text?
24    A.   Yes.
25    Q.   Via group text?

1      A.    Yes.

2      Q.    And after this communication about an operation

3   occurring, would the vice team then have a debriefing?

4      A.    A debriefing or a briefing?

5      Q.    A briefing.

6      A.    Not always.

7      Q.    Why not always?

8      A.    Once again, we get small pieces, so -- and I'm

9   just given an overview.  We may be told, "Hey, this is

10  happening, I need two of you," and then it would be like,

11  "Hey, can you go here and can you go there?"  I guess you

12  could call that a briefing, but we would get assignments,

13  so you would only have a piece.  You may not know the

14  details of the case, but you are part of the piece,

15  maybe, just to go to a certain location and watch this

16  particular individual or this potential suspect or a

17  vehicle or residence, but you didn't always get -- it

18  wasn't a full briefing.  Every buy was not a full

19  briefing, no.

20     Q.    Was there always a full briefing for a search

21  warrant execution?

22     A.    In most cases, yes.

23     Q.    And we're talking about Officer Abdullah and

24  Aspirin here.  When you're getting assignments, who was

25  making those assignments?

 1       A.   The lead detective is in charge of making

 2  assignments, so they would make assignments.  I'm sure

 3  there were situations where maybe the sergeant may have

 4  told people, for whatever reason, but it was normally the

 5  lead detective would indicate where he wanted different

 6  individuals to go and what their assignment would be

 7  during that particular operation.

 8       Q.   So there were operations involving Aspirin

 9  where Abdullah said to you, "I need you to do X, Y or Z"?

10       A.   Yes.  It might be, "You and this detective

11  cover the rear, you cover this," you know, whatever

12  everyone's positions would have been.

13       Q.   Okay.  And you described this earlier, but now

14  I'm asking you specifically about operations involving

15  Abdullah and Aspirin.  When you are meeting for a

16  briefing for a search warrant, what type of things would

17  you discuss?

18       A.   That was what I previously stated.  We kind of

19  had a go by, so each search warrant had the location, you

20  know, the type of drugs, suspect information, the

21  residence, weapons, guns, elderly, kids, a staging area,

22  critical staging area.  So if we have a critical event,

23  you always have a critical staging area set up for a

24  search warrant.  The watch commander has to be notified,

25  who's the watch commander notified.

1          So these are all kind of a basic rundown on

2    every search warrant, and in most cases we would write it

3    on a dry erase board and cover all those things, and that

4    was what was covered at every search warrant.  And then

5    anything else that would be specific to that search

6    warrant may be covered, but those particular things were

7    always covered.

8          Q.   And you say that the vice team would typically

9    know who the informant was?

10         A.   If there was an informant in play.  Just to say

11   a search warrant is based off of a controlled buy

12   previously, you may or may not have that information

13   individually.  If this controlled buy is happening today,

14   along with a search warrant, and an informant is in play,

15   then we would need to know because we need to know what

16   the informant is wearing, who he is, who she is, so that

17   we know they're not a suspect and we're aware of who they

18   are.

19         Q.   So on May 21, 2020, Abdullah told you, "We are

20   using Aspirin"?

21         A.   Yes, he made --

22              MR. PETTY:  Objection.  You can answer.

23              THE WITNESS:  Yes, he made everyone aware of

24   that because we were doing a controlled buy at the onset

25   of the search warrant.

1         BY MR. SCHEWEL:

2    Q.   That you would be using Aspirin for that

3  controlled buy?

4    A.   Yes.

5    Q.   And controlled buys involving Aspirin, would

6  Aspirin ever ride in your vehicle to the scene of the

7  controlled buy?

8    A.   No.

9    Q.   That never occurred?

10   A.   No.

11   Q.   Would Aspirin ever ride in vehicles other than

12  Officer Abdullah's vehicle?

13   A.   I don't recall.

14   Q.   Was it your practice during Aspirin's

15  controlled buys to monitor the 1021 app on your phone?

16   A.   Not always.

17   Q.   Why not?

18   A.   Depends on my position.  If it's an open-air, I

19  can see what's happening.  I may be monitoring the radio.

20  It just depends on what my assignment was.

21   Q.   Did you ever monitor the 1021 app in buys

22  involving Aspirin?

23   A.   Yes.

24   Q.   Did you ever observe a hand-to-hand transaction

25  on the 1021 app in buys involving Aspirin?

1      A.   I can't recall.

2      Q.   So you're not sure?

3      A.   I can't recall.

4      Q.   You just stated that you thought that sometimes

5  you observed Aspirin in open air.

6      A.   Correct.

7      Q.   Did you ever observe Aspirin in open air or

8  visually with your own eyes do a hand-to-hand

9  transaction?

10     A.   I can't recall.

11     Q.   On the controlled buys that you can recall, did

12 Aspirin have his cellphone camera in his pocket?

13     A.   I can recall two instances where I remember

14 that the cellphone -- the 1021 app did not present a

15 video.

16     Q.   So either it -- the video was obscured in some

17 way?

18     A.   Yes.

19     Q.   Meaning that it was either in his pocket or

20 behind some article of clothing?

21          MR. PETTEY:  Objection.

22          THE WITNESS:  In his hand.  It just could be in

23 his hand.  I mean, I just remember that there was no

24 video.

25          BY MR. SCHEWEL:

 1      Q.   He could have been covering it?

 2      A.   Yeah.  I'm not sure where the phone exactly

 3  was.

 4      Q.   And your testimony is that you only recall that

 5  on two separate occasions?

 6      A.   I recall that it happened, but thinking back

 7  three years ago, right now do I recall?  I can recall

 8  two, specifically.

 9      Q.   Do you know the defendants who were involved in

10  those controlled buys?

11      A.   I remember one of the defendants.

12      Q.   Who is that?

13      A.   VanIrvin from this case.

14      Q.   Okay.  So one of them that you're saying was

15  this case?

16      A.   Correct.

17      Q.   On this case, you observed the 1021 app and you

18  could tell that the screen was obscured in some way?

19      A.   Yes.

20      Q.   And you could not actually observe a

21  hand-to-hand transaction?

22      A.   I could not, no.

23      Q.   Because you couldn't see anything?

24      A.   No.

25      Q.   Okay.  What was the other one?

1      A.   I remember a location.  I don't remember the

2    defendant's name.

3      Q.   What was the location?

4      A.   There was a buy off of Raleigh Boulevard near

5    Raleigh North at the PVA.  There's a Little Caesar's and

6    a Food Lion.  I don't remember the exact block.  I

7    remember him obscuring the phone in that one, also.

8      Q.   Did the buy occur in the Little Caesar's

9    parking lot?

10     A.   It was more further down.  I can't remember

11   what's all in that shopping center, but there's a Food

12   Lion further down, but it occurred in a vehicle in the

13   parking lot.

14     Q.   I'm going to ask you a little bit about your

15   interview with the State Bureau of Investigation.  It is

16   Exhibit B in your binder.

17          (Exhibit B identified for the record.)

18          MR. PETTEY:  Do you happen to have a copy?

19          MR. SCHEWEL:  Yes.  Sorry.

20          MR. PETTEY:  Thank you.  I'm sorry, you said

21   this is Exhibit B?

22          MR. SCHEWEL:  Yeah.

23          BY MR. SCHEWEL:

24     Q.   Do you recall your interview with the SBI?

25     A.   Yes.

1      Q.   Were you truthful and honest with the SBI?

2      A.   Yes.

3      Q.   Have you seen this document before?

4      A.   Yes.

5      Q.   As you sit here today, do you have any reason

6   to believe that anything in this document isn't accurate?

7      A.   Yes.

8      Q.   What?

9      A.   Several statements in the document are not

10   accurate to what I said.

11      Q.   Okay.  So what I'm going to do, then, is I'm

12   going to ask you some questions about the document, and

13   if you -- you can explain anything that you think is

14   inaccurate, and then at the end, if we've missed

15   anything, I'll just ask you to go back and let me know

16   what we missed.

17          Okay.  So the -- do you know the name of the

18   SBI agent that you met with?

19      A.   I know it's documented here, but I don't -- I

20   don't recollect on my own.

21      Q.   Okay.  So Special Agent W.F. Carman wrote in

22   her report that you told her that Abdullah's

23   proficiencies were not what they were supposed to be.

24      A.   I spoke with a male agent, not a female agent.

25      Q.   Okay.  Is that statement that Abdullah's

1    proficiencies were not where they were supposed to be, is

2    that accurate?

3        A.   That was my opinion, yes.

4        Q.   Okay.  So your opinion was that Abdullah's

5    proficiencies were not where they were supposed to be?

6        A.   Yes.

7        Q.   In terms of his drug investigation

8    proficiencies?

9        A.   Yes.

10       Q.   What did you mean by that?

11       A.   I just felt like he did not put in the

12   background and the leg work in some of his investigations

13   and the way he managed his investigations or the

14   operations to include controlled buys and search

15   warrants, that he did not do that in a proficient manner.

16       Q.   You also, according to Agent Carman, stated

17   that Abdullah did not grasp the narcotics concept.

18       A.   Correct.

19       Q.   What did you mean by that?

20       A.   Buying $20 of heroin one day and asking for

21   $800 the second day.  It's one of my main concerns of not

22   grasping how narcotics are sold and the level of what you

23   buy from a street dealer compared to a wholesaler or a

24   supplier and how easily you can get ripped off and the

25   things that come along with that.  That was one of my

1    main concerns.

2         Q.   Can you just describe a little more why that's

3    a concern?

4         A.   Because for me, it puts everyone at risk, the

5    foot pursuits, the losing of the money.  We only operate

6    off of a certain budget that we all share, so it's

7    important in these situations to -- when you have that

8    much money out there, which is not a large money in the

9    drug world, but for our units it is, so we have to try to

10   not allow suspects to run off with the money.

11        Our officer safety, if we start having to chase

12   people or get in those types of situations, we have a lot

13   of safety concerns.

14        Also, I felt like as if -- the best way I can

15   explain it is when you're the lead detective, you're the

16   quarterback, so you direct everything that's happening,

17   and I always felt like he did not direct things.  In a

18   lot of cases, he would be -- he wouldn't direct things in

19   a quick enough manner.  There would be long pauses of

20   things happening and we would be unaware of what was

21   happening, and we would be asking him for updates.  So

22   there was a lot of things that he did that weren't

23   proficient from how he managed CIs to how he managed his

24   cases that I thought, one, would create an environment

25   where officer safety was a concern, CI safety was a

1    concern, and the overall integrity of the investigation

2    was a concern.

3        Q.   And by the integrity of the investigation, were

4    you concerned that he was arresting innocent people?

5        A.   I did not have any indicators at the time that

6    he was arresting innocent people, no.

7        Q.   Do you recall your Internal Affairs

8    investigations or speaking to officers in Raleigh Police

9    Department's Internal Affairs?

10       A.   Yes.

11       Q.   Do you recall stating to Internal Affairs

12   officers that you were concerned about Officer Abdullah

13   and that he was violating people's civil rights?

14           MR. PETTEY:  Objection.

15           THE WITNESS:  No.

16           BY MR. SCHEWEL:

17       Q.   Well, we'll come to that.  These deficiencies

18   for Abdullah, were they deficiencies that you noticed

19   with CIs other than Aspirin?

20       A.   The deficiencies with Abdullah largely were

21   based around his ability to, once again, quarterback the

22   situation, so his deficiencies were present whether they

23   were with Aspirin or other informants, but every

24   informant is different, so Aspirin's actions or reactions

25   were different than other informants, but Abdullah's

1   deficiencies had the same problems.  It's just the way he

2   operated.  It wasn't how he grasped drug work because of

3   Aspirin.  It was just how he grasped it because of how he

4   did things, and everyone does their thing their way.  It

5   just wasn't my way, which doesn't mean it's the right

6   way.  It's just -- it went against my grain.

7        Q.   So you're saying you, personally, did not

8   approve of how he monitored his informants in general?

9        A.   His investigations in general, yes, which

10  included informants.

11       Q.   Do you know the names of his other informants?

12            MR. PETTEY:  Objection.  I'll let you say "yes"

13  or "no," but I don't want you giving names of other

14  informants.  That might be confidential and put people at

15  risk.

16            MR. SCHEWEL:  After he answers "yes," I'll

17  follow up appropriately.

18            THE WITNESS:  I don't recall their names.

19            BY MR. SCHEWEL:

20       Q.   Do you recall their code names?

21       A.   That's mostly the only thing I knew them by,

22  was code names.  I don't recall their names.

23       Q.   Do you recall any specific instances with

24  informants other than Aspirin where you had concerns

25  about Abdullah's investigation or monitoring of that

1    informant?

2        A.   I don't remember a lot of his investigations.

3    I don't -- I don't recall.  We're focused on this one, so

4    I remember these, but I don't recall.  I can remember --

5    can visualize some of his other informants, but I can't

6    recall how -- how he operated, I know, was always an

7    issue, so it didn't really matter the informant.

8        Q.   So when you say you can visualize some of his

9    other informants, what do you visualize?

10       A.   A Hispanic male, a white male, a black male.

11       Q.   And you recall some concerns with those

12   informants, as well, or the monitoring of them?

13            MR. PETTEY:  Objection.

14            THE WITNESS:  I could just recall Abdullah

15   doing things his way, which were bigger than the

16   informant.

17            BY MR. SCHEWEL:

18       Q.   Okay.  The Hispanic male, do you recall

19   anything else about the Hispanic male as far as a

20   description of him?

21       A.   Yes.

22       Q.   What do you recall?

23       A.   Hispanic male in his 20s with tattoos.

24       Q.   What kind of tattoos?

25            MR. PETTEY:  Objection.

1            THE WITNESS:  I don't recall.

2            BY MR. SCHEWEL:

3       Q.    Do you recall what type of drugs the Hispanic

4   male purchased?

5       A.    He ordered cocaine.

6       Q.    Do you recall that that was a good buy?

7       A.    Define "good buy."

8       Q.    Was it real cocaine that was produced?

9       A.    Yes, as I recall.

10      Q.    Do you -- did you have concerns about the use

11  of the Hispanic male or Abdullah's monitoring of the

12  Hispanic male?

13           MR. PETTEY:  Objection.

14           MR. BENTON:  Objection.

15           THE WITNESS:  I don't recall the whole case.  I

16  don't recall.

17           BY MR. SCHEWEL:

18      Q.    So you don't recall specific concerns that you

19  had?

20      A.    Nothing that I can remember specifically.

21      Q.    Okay.  Do you recall any specific concerns

22  about any of Abdullah's informants other than Aspirin?

23      A.    I don't know all of Abdullah's informants.

24  Aspirin is really the only one I can recall.

25      Q.    Specifics?

1       A.    Specifics.

2       Q.    Okay.  What deficiencies did you notice related

3    to Abdullah's monitoring of Aspirin?

4       A.    Him briefing us on where things were going to

5    happen or where the CI was going to move about once the

6    operation was started, and he wouldn't always operate.

7    He would go a different route.  He would do different

8    things and we would complain to him that you've got to

9    either make Aspirin do what he's supposed to do, because

10   we were more concerned -- we're responsible for Aspirin

11   if he gets hurt.

12           One of our major concerns was that Aspirin was

13   going to get hurt, which always seemed like a concern,

14   that he was going to get hurt because he wasn't following

15   the directions that Abdullah gave us that he said that he

16   gave him, so we would complain that Aspirin is not --

17   "You're supposed to walk through the parking lot and go

18   behind the building and do it here; you don't walk

19   through the parking lot and go into the wood line behind

20   someone's house and a fence, we can't see where you are,

21   and you make a purchase."  And we would complain to him,

22   "You're putting us all at risk because if we have to run

23   in there, we don't know what we're getting into."

24           And those were always concerns that he didn't

25   manage the buy, and Aspirin was known for not doing

1   things how we were briefed they were going to happen and

2   what him and Abdullah talked about.  Abdullah would brief

3   us, but then Aspirin would not do those things that he

4   briefed us on.

5       Q.   And I believe you already mentioned some

6   deficiencies related to Aspirin's buy camera.

7       A.   Yes.

8       Q.   Can you tell us a little bit about those?

9       A.   I said I can remember those two occasions.  I

10  know there was other occasions.  He notoriously would

11  not -- you could have audio from the -- the 1021 -- now,

12  he may have had a body bug, but what's live is the phone,

13  so we can hear in real time what's happening, and in the

14  majority of the cases that I was there on -- I don't know

15  how many of those cases were.  They were not all of them.

16  He would obscure the video portion; therefore, you

17  couldn't see exactly what was happening.  You could only

18  hear what was happening.

19      Q.   What other deficiencies did you notice related

20  to Aspirin?

21      A.   I just recall not liking the way he operated.

22  I didn't want to use him as a CI.

23      Q.   What about the narcotics that he produced?  Did

24  you have concerns about that?

25      A.   I directly only had direct knowledge of one

1    particular buy, indirect knowledge of some of the others.

2        Q.    Okay.  And the one direct one that you had

3    knowledge of, that was concerning?

4        A.    Yes.

5        Q.    Why?

6        A.    Because that's the one I field tested.

7        Q.    And it field tested negative?

8        A.    The field test for heroin was negative, yes.

9        Q.    Did it test positive for any controlled

10   substance?

11       A.    I only tested it for the heroin.

12       Q.    Okay.  So the way the field test works is you

13   test it for one specific substance?

14       A.    Correct.  The field test kit was just for

15   heroin.

16       Q.    And now you said that you had indirect

17   knowledge of other instances.  Can you describe that?

18       A.    I can't remember exactly, but other -- this

19   particular case here, but I didn't directly see the

20   evidence.  I think there were concerns that Detective

21   Rattelade brought up that were addressed with this case,

22   so indirectly because I didn't see it.  I heard it from

23   him in a conversation that we all had and that he had had

24   with Detective Abdullah.

25            And I can remember another case, seeing the

1    drugs packaged, but thought it was packaged odd for

2    heroin, based on my training and experience.

3         Q.   Why was it packaged odd?

4         A.   It was vacuum sealed, which isn't how we

5    normally buy.  On my transparence, you either buy heroin

6    loose, which means like in a bag, or, you know, it's

7    weighed out.  Or you buy it in what we call tickets or

8    bindles, and you buy so many bindles for so much

9    currency.  So it was normally bindles or loose.  That was

10   the first time I had ever seen it in the middle of a

11   vacuum-sealed package, which seemed odd to me.

12        Q.   Did anything else about the drugs seem odd to

13   you on that occasion?

14        A.   I just remember seeing that package and

15   thinking, "That doesn't look right."

16        Q.   So that was not the occasion that you field

17   tested it?

18        A.   No.

19        Q.   And that was not May 21, 2020?

20        A.   I do not believe so, no.

21        Q.   It was some date prior?

22        A.   Or in between or at some point.

23        Q.   I just mean before May 21, 2020.

24        A.   Yes.

25        Q.   Okay.  I'm going to direct you to Exhibit F in

1   your binder.

2           MR. SCHEWEL:  Here you go, Rod.

3           MR. PETTEY:  Thank you.

4           MR. SCHEWEL:  That's F.

5           (Exhibit F identified for the record.)

6           BY MR. SCHEWEL:

7       Q.   Have you seen this document before?

8       A.   Yes, sir.

9       Q.   Okay.  I'm going to direct you to page 5 of

10  this document.  And just for the record, this states that

11  this is a recorded follow-up telephone interview

12  conducted by Sergeant D.L. Davis of the Raleigh Police

13  Department's Internal Affairs Unit and Detective R.P.

14  Monroe.  Is that accurate, that this was an interview

15  between you and D.L. Davis?

16      A.   Yes.

17      Q.   And is D.L. Davis a male or a female?

18      A.   He's a male.  He's a sergeant.

19      Q.   Okay.  So at the bottom of page 5, you were

20  asked the question by Sergeant Davis, "Okay.  Did, um,

21  have you, did you field test anymore of his cases with,

22  ah, Aspirin?"

23          You then answer, "Ah, I don't believe I did.

24  Um, I remember seeing additional heroin on additional

25  cases and not believing that it was, just once again

1    right off initial appearance, completely just first gut

2    reaction, that's counterfeit.  Um, but I don't

3    believe --" I'm sorry, "Um, but I don't, I don't believe

4    that I was, we have different people do the evidence,

5    what we call our CSR."

6        A.    Yes.

7        Q.    Did I read that accurately?

8        A.    Yes.

9        Q.    So how many times would you say that happened

10   where, completely, just first gut reaction is, "That's

11   counterfeit"?

12       A.    I think I was referring to the packaging I just

13   told you about when it was vacuum sealed.  I saw it and

14   just my gut reaction was, "That -- that doesn't look

15   right."

16       Q.    Okay.  So your testimony is that your

17   recollection today is three instances?

18             MR. PETTEY:  Objection.

19             BY MR. SCHEWEL:

20       Q.    Being May 21, 2020, the time you field tested

21   it and then the time you saw it vacuum sealed?

22             MR. BENTON:  Objection.

23             THE WITNESS:  I mean, right now, I recall those

24   cases, yes.

25             BY MR. SCHEWEL:

1      Q.   Do you think there's more?

2      A.   Those are the only cases I recall, and that's

3 what I was referring to, what I had said about the way it

4 was packaged.

5      Q.   Do you recall hearing concerns from other

6 officers on other occasions about the quality or the

7 nature of the narcotics that Aspirin was producing?

8           MR. BENTON:  Objection.

9           THE WITNESS:  There was the instance that I

10 tested it at the Sheetz, the instance with the vacuum

11 seal, and then not even sure that I saw it, but I was

12 made aware of it on this case from Detective Rattelade.

13 I can't recall anyone saying specifically any specific

14 case that they saw or knew what he had purchased.  I

15 didn't, and I wasn't there for most of the buys, so I

16 don't know what he --

17           BY MR. SCHEWEL:

18      Q.   So your last statement in there, in that part,

19 portion that I just read -- I'm just going to read the

20 first sentence on the top of page 6 of your Internal

21 Affairs interview that's marked as Exhibit F.

22           "But I don't, I don't believe that I was, we

23 have different people do the evidence, what we call our

24 CSR."  What is a CSR?

25      A.   Crime scene reporter.

1      Q.    Is the CSR typically a member of the vice team?

2      A.    Yes.

3      Q.    What are the CSR's responsibilities after a

4  buy?

5      A.    Well, normally, after a buy, nothing, because a

6  buy is normally done by the investigative detective, and

7  CSRs are more used for search warrants, so if there's

8  just a buy and not any other evidence, you, as the lead

9  detective, would collect the evidence.  You could fill

10  out your own evidence card for one piece of evidence and

11  do your paperwork and press on without your help from

12  your counterparts.

13      More, the CSR is when there's a larger

14  operation and people have different assignments, so the

15  lead detective can interview suspects, quarterback the

16  actual project, and the CSR would be dealing with the

17  evidence that's collected and getting it logged in and

18  put in the system.

19      So on a controlled buy, in a lot of cases,

20  there's not a CSR unless it's -- understand, a controlled

21  buy and a takedown are two totally different things.  A

22  takedown would be more like a search warrant, but on a

23  controlled buy, you almost never -- as a lead detective,

24  you never see what the other detective purchased, unless

25  you were right there seeing them hand it over, but you

1    normally wouldn't have any knowledge of what the drugs

2    looked like.

3         Q.    And from 2018, you had a desk at Green Dairy?

4         A.    Yes.

5         Q.    Where was your desk in relation to Officer

6    Abdullah's desk?

7         A.    So if I was sitting here across from you,

8    facing you, it would be off to my left facing away from

9    you, so I would be facing your back, sitting in a chair

10   with a desk that faced away, so my view was at his back,

11   as he sat at his desk.

12        Q.    Approximately how far away?

13        A.    10, 15 feet.

14        Q.    And after a warrant, search warrant, would you

15   process evidence at your desk?

16        A.    No.

17        Q.    Where would you process it?

18        A.    We have a -- it's kind of a multi-room.  It's a

19   mail room/evidence room where you could take -- we have

20   scales and big tables, and all of our evidence, items to

21   bag and tag evidence, and the actual evidence lockers

22   where you would store that are in that room.

23        Q.    So the CSR would be involved after a controlled

24   buy with a takedown?

25        A.    If there were more than just the drugs.  So if

1    you had a takedown and you had other evidence, if there's

2    multiple items of evidence and/or the -- in most of those

3    cases, we take a suspect into custody, so the lead

4    detective has to go do interviews and they have

5    responsibilities.  So instead of them waiting to come

6    back to process this evidence, whoever is assigned as a

7    CSR can go ahead and put your evidence up and do all that

8    stuff to keep the process moving so that when you're done

9    with the interview, the next step would be for you to

10   decide your charges and move on, but the evidence has

11   been taken care of.

12          Compared to a control buy, the detective would

13   just have that -- there would be no arrest.  You'd do a

14   controlled buy; they'd go back and put up their evidence

15   and go on with their day.

16       Q.   And same scenario with a search warrant

17   execution?

18       A.   Right, because normally we would have multiple

19   items of evidence, possibly suspects in custody and other

20   assignments.

21       Q.   Is the CSR responsible for submitting narcotics

22   to the CCBI lab?

23       A.   No.

24       Q.   Whose responsibility is that?

25       A.   The lead detective.

 1      Q.   Okay.  I'm going to show you what I will mark
 2   as Exhibit H, and I only have one copy of this.  This is
 3   the case jacket for Marcus VanIrvin.
 4           (Exhibit H identified for the record.)
 5           BY MR. SCHEWEL:
 6      Q.   And before I show you this, what documents does
 7   the CSR produce, if any?
 8      A.   In most cases, they probably fill out the
 9   evidence card, which documents the evidence that was
10   taken, and then in some cases they'll produce like a
11   ledger that states where items were found and what
12   detectives found those items during the search.
13      Q.   Okay.  So -- okay.  I'm going to pass you --
14   this is page 25 of Marcus VanIrvin's case jacket.  It's
15   marked as Exhibit H.
16           MR. SCHEWEL:  Rod, I'll show you the front.
17      Q.   And this is the document I want you to look at.
18   It's titled "Evidence Index"?
19      A.   Yes, sir.
20      Q.   Is that the document that you were referring to
21   that the CSR would typically create?
22      A.   The ledger, yes.
23      Q.   Okay.  And does this, from May 21, 2020, does
24   it say that the ledger was created by Detective Gwinn?
25      A.   Yes, it lists him as the CSR.

1      Q.   Okay.  Now, on this ledger, it also states

2   different detectives' names.

3      A.   Yes.

4      Q.   What does that indicate to you?

5      A.   That's who recovered the evidence or came in

6   contact with the evidence first.

7      Q.   Okay.  So number 1 states, "Recovered from CI,

8   Rattelade."  What does that mean to you?

9      A.   Whatever item number 1 is on the evidence index

10  card was recovered by Detective Rattelade.

11     Q.   I'm going to show to you part of Exhibit H,

12  which is marked as item 3 in this case jacket.  Is this

13  the evidence index card?

14     A.   That's an evidence index card.

15     Q.   Okay.  And I'll hand it over to you.

16          MR. BENTON:  Any Bates number?

17          MR. SCHEWEL:  Sure.  It is COR-014516.

18          BY MR. SCHEWEL:

19     Q.   Okay.  So can you just look at this document

20  and tell me what your understanding of item number 1 is?

21     A.   It's marked with a case number at the top,

22  which matches the case number on this evidence index.

23  Item number 1 is listed as 3 grams of heroin as packaged,

24  and the evidence index says, "Recovered from the CI by

25  Detective Rattelade," so I would assume that is

1   contraband that was recovered from the CI by Detective

2   Rattelade, I will say on this date, on 5/20.

3       Q.   Okay.  Can you flip that page?  What date does

4   that next document state?

5       A.   5/21.

6       Q.   And this is -- what document are you looking at

7   now?

8       A.   It's the index card -- I mean the evidence

9   control form from the actual -- I don't know what

10  location.  It doesn't have it written in there.

11      Q.   Sorry.  I'm just saying, this is the evidence

12  control form?

13      A.   It has the same case number, evidence control

14  form, yes.

15      Q.   Okay.  So this document, it is an evidence

16  control form?

17      A.   Correct.

18      Q.   And it's an evidence control form that has the

19  case number that's the same case number as the evidence

20  index sheet?

21      A.   Correct.

22      Q.   And it has the same date, May 21, 2020, as the

23  evidence index sheet?

24      A.   Yes.

25      Q.   And what is item number 1 on that evidence

1   control form?

2       A.   8 grams of unknown brown crystals as packaged.

3       Q.   Okay.  So what does that tell you or what does

4   that indicate to you was recovered from the CI by Officer

5   Rattelade?

6       A.   Well, there's some confusion because there's

7   two evidence cards.

8       Q.   I'm asking you about the evidence card from

9   5/21/2020, not the one from 5/20.

10      A.   Right, but I have the same case number with

11  item number 1 on both, regardless of the date, so I can't

12  say that this item number 1 pertains to this one or is it

13  pertaining to that one.  I don't know.

14      Q.   Can you hand me the 5/21 one?  I mean, I'm

15  sorry.  I'm sorry.  I keep saying 5/20/21.  I mean

16  5/20/20.  The evidence control form you have in front of

17  you, it has eight items on it?

18      A.   Correct.

19      Q.   And the evidence index sheet, how many items

20  does it have on it?

21      A.   It has eight.

22      Q.   And what is the first item on the evidence

23  control form?

24      A.   On this evidence control form dated 5/21?

25      Q.   Yeah.

1      A.    8 grams of unknown brown crystals as packaged.

2      Q.    And the evidence index form, which is dated

3  5/21, states that item number 1 was recovered by

4  Detective Rattelade?

5      A.    Correct.

6      Q.    Okay.  I'm going to put this back there so it's

7  in order.  I'm now going to ask you to look at Exhibit E.

8            MR. SCHEWEL:  Rod, have I given you a copy of

9  this yet?

10           MR. PETTEY:  No.

11           MR. SCHEWEL:  I didn't think I have.

12           (Exhibit E identified for the record.)

13           BY MR. SCHEWEL:

14     Q.    Okay.  Exhibit E is a telephone interview

15  between Detective Davis and yourself on August 14th,

16  2020.

17     A.    Yes.

18     Q.    I am going to read page 29, starting at

19  page 29, for you.

20           MR. PETTEY:  And just for the record,

21  Exhibit E, that's not the entire copy; is that correct?

22           MR. SCHEWEL:  That is correct.

23           MR. PETTEY:  Okay.

24           MR. SCHEWEL:  It starts, in fact, at page -- it

25  has the first page and then it goes to page 29.

1          MR. PETTEY:  Do you have the whole copy, just

2    in case he needs to read it for context?

3          MR. SCHEWEL:  I do not have it.

4          MR. PETTEY:  It would be important if you're

5    going to ask him about a specific place to let him look

6    at it in context.

7          MR. SCHEWEL:  Well, how about this?  I'll read

8    it and if you need context, I'm happy for -- we can print

9    it out and you can get context.  Okay?

10         BY MR. SCHEWEL:

11    Q.   So I'm going to read starting at the bottom of

12    page 29, and I'll just ask you to follow along.  Okay?

13    A.   Yes.

14    Q.   And I'll start with the question from Detective

15    Davis.  "Does the department, I mean the way that our,

16    your procedures, you know, do you guys have a way of

17    mitigating that, where you, where you feel very confident

18    that they haven't retrieved something, to give to you

19    guys later on?"

20         "Um, here's, the thing is, that's why the

21    video's so important.  That's why reviewing your previous

22    cases with the CI is important, what the CI is telling

23    you.  Why you've -- what you've researched on your

24    suspect.  So, that's why I say it's kinda like,

25    holistically, like, you're the quarterback of the team.

1   You gotta know everybody's route.  You gotta know who's

2   blocking where, who's running where, who is going for

3   this, this, and that's the same way with a CI.  You know,

4   who are the suspects?  What information has the CI

5   provided in the past?  How does the CI follow your

6   directions?  Do they do the things they tell you to do?

7   Are they providing video, like you've asked them, to

8   where you could see on the video, that what they're

9   purchasing is what they handed you back?"

10          I'm going to stop right there on the top of

11  page 30.  Is what I read so far accurate?

12       A.   Yes.

13       Q.   And do you still -- as you sit here today, do

14  you still feel that for vice officers working with CIs,

15  that the video of a buy is very important?

16       A.   Yes.

17       Q.   Why?

18       A.   It's an additional piece of that puzzle that is

19  beneficial to the investigation to make sure that the

20  reliability of the case and what the CI has told you or

21  what has supposedly happened, you have that additional

22  bit of evidence to determine your investigation.

23       Q.   And as you sit here today, do you still feel

24  that it is important to verify what your CI tells you as

25  a vice officer?

1      A.   Yes.

2      Q.   Why?

3      A.   Because your investigation, if you're using a

4 CI, you're using their reliability to direct your

5 investigation and possibly to lead on to probable cause,

6 so you need that to be reliable information.

7      Q.   I'm going to keep reading where I stopped at

8 the top of page 30.  "So, all things go into play.  And

9 if the CI isn't doing those things consistently, then

10 you, as the detective, have no other option than to not

11 use that CI.  Like, it is not, like, it may happen once

12 or twice.  We're not perfect.  But, if 2 or 3 or 4 times,

13 if the CI is not following all these directions and doing

14 these things in the procedural way that we've set up, you

15 cannot use that CI."

16           Do you still agree with that statement today?

17      A.   Yes, that was my opinion.

18      Q.   And could you just explain that opinion?

19      A.   Everything you just read is my opinion on how I

20 personally handle CIs.  I believe that things can happen,

21 like stated, a couple times, a couple missteps, different

22 things.  Every CI is different.  Every situation is

23 different.  But if you have the repeated problems over

24 and over again, then you, as the detective, have to take

25 the lead.  That is your job, and it is your job solely to

 1  make sure because you have all the pieces.  No one else

 2  has all the pieces.  That detective needs to take all

 3  those things in account and make an informed decision off

 4  of what's happened up to that point.

 5      Q.   Okay.  I'm going to now ask or direct you to

 6  Exhibit G.

 7           MR. SCHEWEL:  And Rod, I'll give you a copy.

 8           MR. PETTEY:   Thank you.

 9           BY MR. SCHEWEL:

10      Q.   And just for the record, this is not the

11  complete -- well, sorry.  Strike that.

12           This is your interview with Detective Davis

13  that occurred on 10/19/21, and it is marked as Exhibit G.

14           (Exhibit G identified for the record.)

15           BY MR. SCHEWEL:

16      Q.   And I am starting or I'm directing you to --

17  well, the exhibit starts on page 26, but I'm actually

18  going to direct you to page 27.  And I'm going to direct

19  you to line 947 and I will read it out loud to you and

20  then I'll ask you a question.

21           Question, "Okay.  Um, did you suspect, uh,

22  Detec- Detective Abdullah's CI Aspirin of, uh, being

23  questionable, unreliable?"

24           And your answer was, "100%."

25           Did I read that correctly?

 1        A.    Yes.

 2        Q.    And as you sit here today, was that an accurate

 3   statement?

 4              MR. PETTEY:  Objection.

 5              THE WITNESS:  Yes, that's the statement I made.

 6              BY MR. SCHEWEL:

 7        Q.    Okay.  And is that a true statement?

 8        A.    Yes.

 9        Q.    It's true to say that you felt that Aspirin was

10   unreliable?

11              MR. PETTEY:  Objection.

12              THE WITNESS:  And questionable before

13   unreliable, yes.

14              BY MR. SCHEWEL:

15        Q.    Okay.  Questionable and unreliable.  Why did

16   you feel that way?

17        A.    Because of the things I previously stated where

18   he'd cover the camera up.  He didn't follow the

19   directions.  And, once again, this is my opinion and how

20   I base my investigations with my CIs.

21        Q.    Okay.  So I'm going to keep reading, starting

22   on 952 of the same document.

23              Question, "And, uh, did you ever inform

24   Sergeant Rolfe why Aspirin was still being used of your

25   feeling?"

1          Answer, "He was informed of the -- I'm trying
2    to say this in the nicest way.  I mean, we -- it -- it
3    was made -- it was noted by several detectives that we
4    didn't think he was a good CI.  We didn't think he was
5    being handled appropriately, which we thought that
6    Abdullah didn't -- didn't -- yeah.  Yeah, I mean, we
7    didn't -- yeah.  We -- we thought -- we thought Abdullah
8    wasn't handling him properly, um, and we made it known
9    that we -- that we disliked him as a CI.  Yes."
10         Question, "Um, and did Sergeant Rolfe -- did he
11   do anything with that information that you were aware
12   of?"
13         Answer, "Uh, no.  I mean, we were -- I would
14   assume no because we were still using him."
15         Did I read that correctly?
16   A.    Yes.
17   Q.    Does that --
18         MR. BLANCHARD:  Objection.
19         BY MR. SCHEWEL:
20   Q.    And is that statement that you made to
21   Detective Davis, was that truthful and accurate?
22   A.    Yes.
23         MR. BLANCHARD:  Objection.
24         BY MR. SCHEWEL:
25   Q.    Did you raise issues with Aspirin and Abdullah

1   or your concerns about Aspirin and Abdullah to

2   management?

3       A.   Yes.  Sergeant Rolfe was part of management,

4   yes.

5       Q.   Did you raise concerns about Aspirin's

6   reliability and your feeling that Aspirin was

7   questionable or unreliable to Sergeant Rolfe?

8       A.   Yes.

9       Q.   When?

10      A.   I go back to the detective's handling was

11  always in question, so to say when, I can't recall when I

12  spoke on Aspirin because I thought the process was

13  already questionable by the detective, the way he handled

14  his cases, compared to myself.  So I don't know when

15  exactly I can say that things were said about Aspirin in

16  context of things that were said about the detective and

17  where those two came together.

18      Q.   Okay.  But in your statement at the bottom of

19  page 27, starting at 966 -- well, let's start at 963

20  where you're asked the question, "Um, and did Sergeant

21  Rolfe -- did he do anything with that information that

22  you're aware of?"

23           Answer, "Uh, no.  I mean, we were -- I would

24  assume no, 'cause we were still using him."

25           MR. BLANCHARD:  Objection.

 1          MR. PETTEY:  Can he finish reading?  I got it,
 2  Norwood.
 3          MR. BLANCHARD:  You're not reading the whole
 4  response on it.
 5          MR. PETTEY:  And I would ask for complete --
 6          MR. BLANCHARD:  He qualifies a lack of
 7  knowledge after that.
 8          MR. PETTEY:  Thank you.  I would just ask for
 9  the record that he complete what answer he gave.
10          MR. BLANCHARD:  Exactly.
11          MR. PETTEY:  So, Detective, you are free to
12  read your entire answer to the question rather than just
13  picking part of the answer.
14          THE WITNESS:  I can read it out loud?
15          MR. PETTEY:  Yes, sir.
16          MR. SCHEWEL:  And what I'll do is -- I'm happy
17  to read it out loud for you and then I'll ask my
18  question.  Is that okay?
19          THE WITNESS:  All right.
20          BY MR. SCHEWEL:
21      Q.   "I mean, I don't -- I don't know if he -- if he
22  ever spoke to Abdullah about dealing with him.  But, um,
23  you know, I can't -- I can't say if he spoke with
24  Abdullah about that or not.  But I mean, he -- he knew
25  how we felt about, um --" I'm going to the next page,

1   which is 28, "-- none of us like to be -- like I go back

2   to before, the CIs work for the City of Raleigh Police

3   Department ..."

4           Question, "Right."

5           Answer, "But they're handled by a specific

6   detective.  And at times different detectives were, uh,

7   would -- would let's say would use other detectives' CIs.

8   I know not one detective within our unit, if they had the

9   opportunity to, would have tried to work with Aspirin on

10  a case.  None of us would have worked with him.  That's

11  how we felt about him."

12          So I'll ask you the question again.  Do you

13  recall when you specifically raised questions about -- or

14  concerns about Aspirin's -- Aspirin being questionable or

15  unreliable to Sergeant Rolfe?

16      A.   No.

17      Q.   Is it accurate to say -- or is your statement

18  in 966 where you say, "Uh, no.  I mean, we were -- I

19  would assume no 'cause we were still using him," is that

20  an accurate statement?

21          MR. PETTEY:  Objection.

22          MR. BLANCHARD:  Objection.  Again, it's

23  Rule 106.  Go ahead, you can answer.

24          BY MR. SCHEWEL:

25      Q.   Let me rephrase the question, okay?  Is it

     1   accurate that after you raised concerns about Aspirin's
     2   reliability to Sergeant Rolfe, that he was continued to
     3   be used by Detective Abdullah?
     4            MR. BLANCHARD:  Objection.  You can respond --
     5            THE WITNESS:  Yes.
     6            MR. BLANCHARD:  -- if you recall.
     7            BY MR. SCHEWEL:
     8       Q.   Can you just say that again for the record,
     9   please?
    10       A.   Yes.
    11       Q.   Thank you.  Would you ever have worked with
    12   Aspirin on a case you were in charge of?
    13       A.   No.
    14       Q.   Would any of the other detectives on the unit
    15   have worked with Aspirin?
    16            MR. PETTEY:  Objection.
    17            MR. BENTON:  Objection.
    18            THE WITNESS:  I don't know.
    19            BY MR. SCHEWEL:
    20       Q.   Well, do you recall us just reading the
    21   statement where you stated to Detective Davis that none
    22   of the other detectives on the unit would have used
    23   Aspirin?
    24       A.   That was my opinion, yes.
    25       Q.   Okay.  So your opinion is that none of the

1  other detectives on the unit would have used Aspirin?

2       A.   Yes.

3       Q.   What do you base that opinion off of?

4       A.   My opinion or their opinion?

5       Q.   Their opinion, what did you base that off of?

6       A.   Just go back again to -- my opinion was that I

7  did not like the way he operated.

8       Q.   I know.  I'm just asking you what you based

9  your statement that none of the other detectives --

10      A.   They didn't like the way he operated.

11      Q.   And they told you that?

12      A.   Yes.  They agreed with me.  They agreed with my

13 opinion.

14      Q.   In Detective Rattelade's IA interview, he

15 stated, "Abdullah was, in my opinion, treated differently

16 than the rest of us as far as not being reprimanded for

17 stuff that he should have been reprimanded for."  Do you

18 agree with that statement?

19      A.   Read it again, if you don't mind.

20      Q.   Sure.  "Abdullah was, in my opinion, treated

21 differently than the rest of us as far as not being

22 reprimanded for stuff that he should have been

23 reprimanded for."  And my question is, do you agree?

24      A.   Yes.

25      Q.   Why?

1      A.   It's my opinion that other detectives have been
2   moved off the unit for some of the same deficiencies, and
3   when Abdullah had those same deficiencies, he was not
4   moved off the unit.
5      Q.   Why do you think that was?
6      A.   I have an opinion.  I have no knowledge of why
7   he wasn't moved.
8      Q.   I'm just asking for your opinion.
9      A.   It's my opinion that they were -- the
10  supervision was less inclined to move Abdullah --
11          MR. BLANCHARD:  I'm going to object again.
12          BY MR. SCHEWEL:
13      Q.   You can continue.
14      A.   It's just my opinion they were declining to
15  move Abdullah for different reasons, other than those
16  other detectives.
17      Q.   What were those reasons, in your opinion?
18          MR. BLANCHARD:  Objection.  You can answer.
19          THE WITNESS:  I mean, my assumption was, just
20  based off of everything that was going on, that he had
21  complained on supervisors in the past and supervisors
22  were more cautious of reprimanding him with the
23  repercussions that could come onto their career for
24  reprimanding Abdullah.
25          BY MR. SCHEWEL:

 1       Q.   Did it have anything to do with him being

 2  Muslim?

 3       A.   I think it had more so to do with him being

 4  black and not Muslim.

 5       Q.   And what do you mean by that?

 6       A.   My opinion is, is that there were rumors and

 7  gossip that he had made complaints in the past about

 8  being treated differently because of his race, and I

 9  think some supervisors were apprehensive because they

10  didn't want to be labeled as that.

11       Q.   And by some supervisors, are you referring to

12  Sergeant Rolfe?

13       A.   He is one of other supervisors, yes.

14       Q.   Who are the other supervisors you're referring

15  to?

16       A.   It's my opinion at the time we had other

17  lieutenants and captains and this went all the way up to

18  the major of the division.

19       Q.   Okay.  Who are those other lieutenants and

20  captains that you're referring to?

21       A.   Lieutenant Previtali and Captain Amstutz.

22       Q.   Can you spell that for us, Amstutz?

23       A.   I think Amstutz is A-m-s-t-u-t-z, I believe.  I

24  cannot spell Previtali.

25       Q.   What about Lieutenant Bunch?

 1       A.   It is my opinion that Lieutenant Bunch -- I

 2   don't think it was based off of the same reasons.

 3       Q.   And I think you said it went all the way up to

 4   the major.

 5       A.   The captain was right underneath the major, so

 6   it went all the way up to the major.  What I mean is like

 7   right underneath the major.

 8       Q.   Gotcha.  Does the captain supervise the

 9   lieutenant?

10       A.   Yes.

11       Q.   Okay.  Do you believe that Previtali and

12   Amstutz were aware of concerns about Abdullah and his

13   monitoring of confidential informants?

14           MR. PETTEY:  Objection.

15           THE WITNESS:  The only thing I have an opinion

16   on is just that his performance was brought up and was

17   ran up the chain.  Obviously, being a drug detective,

18   your performance includes your handling of confidential

19   informants, to include other things, the umbrella of what

20   falls on a drug detective, where he was deficient at.

21           BY MR. SCHEWEL:

22       Q.   Did that happen before May 21, 2020?

23       A.   Yes.  The captain and lieutenant had already

24   retired by then.  They were previous from the years I had

25   worked with Abdullah leading up to this.

1     Q.   Do you know approximately when they retired?

2     A.   I don't recall.

3     Q.   Okay.  And you're saying that concerns about

4  Abdullah have been run up the chain?

5     A.   Yes.

6     Q.   And who raised those concerns?

7     A.   I know we raised those concerns and it was told

8  to us that Sergeant Rolfe also raised those concerns.

9     Q.   And when you say "we," who are you referring

10  to?

11    A.   Myself, Detective Rattelade, Detective Gay and

12  Detective Gwinn.

13    Q.   And did you do this via e-mail?

14    A.   No, this is just -- we raised concerns verbally

15  that we disagreed with how he handled his investigations.

16    Q.   And did this -- did this occur at a meeting?

17    A.   No.  After working with him for two and a half

18  years -- I can't recall when, but this was just

19  verbalized to the supervision that these were our

20  concerns.

21    Q.   Lieutenant Privette and Captain Amstutz --

22    A.   Previtali and Amstutz.

23    Q.   Sorry.  Were they based at Green Dairy?

24    A.   Yes.

25    Q.   So it was the type of situation where you could

 1  go walk in their office if you wanted to?

 2       A.    I mean, you could jump rank, but you report it

 3  to your supervisor and your supervisor says he's talking

 4  to the lieutenant and the captain.  So, no, I didn't go

 5  and talk to someone after my supervisor told me he was

 6  talking to these people.

 7       Q.    So what you're saying is that you, Rattelade,

 8  Gay, Gwinn reported concerns about Abdullah to Rolfe?

 9       A.    We expressed our concerns with his

10  deficiencies.

11       Q.    To Rolfe?

12       A.    To Rolfe, not formally in an e-mail, but we

13  expressed our problems with how he handled cases.

14       Q.    And you never expressed them, yourself, to the

15  lieutenant or the captain that you just mentioned?

16       A.    As far as just him not operating as I operate,

17  no, I did not go to them and say I didn't like how he

18  operates as a detective compared to myself.

19       Q.    Well, earlier you said that you ran your

20  concerns up the chain.

21       A.    Right.

22       Q.    And I am just trying to nail down whether or

23  not you spoke those concerns specifically to the

24  lieutenant and the captain.

25       A.    Lieutenant Bunch took Lieutenant Previtali's

1   spot and, yes, as we go through this case, when I have

2   pieces of the puzzle, I did go to the lieutenant over my

3   sergeant and then beyond that, so, yes, I did do that.

4        Q.   And that was after May 21, 2020?

5        A.   When pieces of the puzzle came together on this

6   case, yes.

7        Q.   Right, but I'm -- so I'm saying prior to

8   May 21, 2020, did you ever go above Sergeant Rolfe on

9   your own?

10       A.   No.  Prior to that, my coworker's deficiencies

11  in his everyday job, I just expressed to his supervisor,

12  not to my supervisor's supervisor's supervisor.

13       Q.   To your knowledge, did Rattelade, Gay or Gwinn

14  go to Previtali or Amstutz?

15       A.   I don't know what they did.

16       Q.   And when you state that there was concerns

17  about reprimanding him in a certain way because of his

18  race, how did you learn that?

19       A.   Prior to being on the drug unit, through my

20  years on the police department and talking to other

21  people who had worked with Abdullah in the past.  This

22  was hearsay from other officers on the department that he

23  was hard to work with, that he was a loner, that he had

24  complained on squad mates, that supervisors had had

25  problems, down to two female officers that trained him

 1  when he first became an officer and said they had a hard

 2  time training him because his religious beliefs made it

 3  hard to work with him as being women and giving him

 4  directions.  I heard that directly from them.

 5          So over my 16 years, I had had other knowledge

 6  about people's opinion of Detective Abdullah, which I

 7  also assumed the supervisors had.  So when he came there,

 8  I think these supervisors were apprehensive because of

 9  what came along with him, so they were apprehensive to

10  bring forth these deficiencies as not to look as if they

11  were isolating him.

12      Q.   Who were the two female officers?

13      A.   One is a retired detective, Catherine Woodard,

14  and another one is Detective Gretchen Wilson.

15      Q.   And when you raised your concerns to Sergeant

16  Rolfe, did Sergeant Rolfe ever come back and inform you

17  that he had raised your concerns up the chain?

18      A.   Yes.

19      Q.   Okay.  And what did he tell you?

20      A.   He apologized that Abdullah wasn't -- he was

21  told he wasn't being moved off the squad.

22      Q.   And did he say why?

23      A.   I don't know that he said or that we asked, but

24  he had took it to management and he was told that he

25  wasn't being moved.

1       Q.   And did he tell you specifically that he had

2  raised it to Lieutenant Previtali?

3       A.   I know that that was his chain of command.  I

4  can't speak on where he went from there.

5       Q.   So you're saying he could have gone directly to

6  Captain Amstutz?

7       A.   Yes.

8       Q.   I mean, earlier you said that you believed that

9  it was raised all the way up to Amstutz.  What is your

10  basis of knowledge for that?

11       A.   The captain over the drug unit is involved and

12  is around, so it's my opinion that they have some kind of

13  grasp on how detectives are navigating through their

14  career and how proficient they are or not proficient they

15  are.  So just my opinion was, he knew that people's

16  opinion was that Omar was deficient, just based off of

17  him being around, and it was my opinion that he knew.

18  And that's when we were told on more than one occasion,

19  more than one time, Abdullah was supposed to be moved,

20  which normally happens during our promotion cycle.

21       Q.   So you were told on more than one occasion that

22  Abdullah was supposed to be moved?

23       A.   Right.  Those concerns were brought.  Sergeant

24  Rolfe was addressing those concerns with management and

25  then he was shut down saying it wasn't going to happen

1   above his head.

2       Q.   Were you ever present at a conversation where

3   concerns were discussed about Abdullah and where

4   Previtali was present?

5       A.   No.

6       Q.   What about Amstutz?

7       A.   No.

8       Q.   What about Bunch?

9       A.   I had a conversation with Bunch about Abdullah,

10  so yes.

11      Q.   Prior to May 21, 2020?

12      A.   No.

13      Q.   And is that not that you recall or you're sure

14  that none happened?

15      A.   I don't recall having a conversation.

16      Q.   Did you ever raise concerns to Abdullah,

17  himself, about his use of informants?

18      A.   I would offer opinions to Abdullah.

19      Q.   How often would you say that this happened?

20      A.   Here and there.

21      Q.   So, basically, as it came up?

22      A.   Not as it came up.  Just kind of here and

23  there, some advice here and there, trying to pitch it to

24  him in a way that wasn't directing him to do something,

25  like bouncing some things off of him over the years.

1      Q.   How did he take it?

2      A.   He just took it.

3      Q.   Was he responsive to your --

4      A.   There was no emotional response.  He just took

5  it.

6      Q.   Was there a verbal response?

7      A.   "Okay."

8      Q.   Did you ever notice him making any of the

9  changes that you suggested?

10          MR. BENTON:  Objection.

11          THE WITNESS:  I didn't -- I didn't monitor his

12  every move.

13          BY MR. SCHEWEL:

14     Q.   Well, I guess you stated that you raised your

15  concerns with him on occasion.

16     A.   Uh-huh.

17     Q.   Yes?

18     A.   Yes.  Sorry.

19     Q.   And my question is, after raising these

20  concerns, can you think of any instances where he changed

21  what he was doing?

22     A.   It's my opinion that he digressed after

23  Detective Nance left, so I would have offered my opinion

24  even when Detective Nance was there, but I do remember

25  that after Detective Nance left, his isolation became

 1    more apparent.

 2        Q.    Are you aware of any of Detective Abdullah's

 3    other informants producing alleged narcotics that tested

 4    negative for a controlled substance?

 5        A.    I don't have any knowledge.

 6        Q.    So no?

 7        A.    No.

 8        Q.    Did you ever, prior to May 21, 2020, try and

 9    stop Abdullah from using Aspirin as a confidential

10    informant?

11        A.    No.

12        Q.    Did you ever say to Abdullah, "Aspirin is not

13    reliable; you should not be using him"?

14        A.    No.

15        Q.    Did you ever say to Abdullah, "Aspirin is

16    producing fake heroin"?

17        A.    Yes, I came out and said I tested the heroin on

18    that one case.

19        Q.    Okay.  So on one instance, you told Abdullah,

20    "Look, this has tested negative for heroin"?

21        A.    Right.  That's the only case I had direct

22    knowledge of.  I didn't have no direct knowledge of these

23    other cases.

24        Q.    Well, I mean, we saw your text message chain

25    from earlier today where you state, "For sure fake

1  heroin."

2      A.   Based on the circumstances of how you buy to

3  the next.  If it would have been cocaine, I would have

4  said, "For sure fake cocaine," because you jump so fast.

5      Q.   So did you ever express that concern to

6  Abdullah, that for sure, Aspirin was going to produce

7  fake heroin?

8           MR. PETTEY:  Objection.

9           THE WITNESS:  No, because I didn't have that

10  knowledge.

11           BY MR. SCHEWEL:

12      Q.   Well, you stated that in a text message.

13      A.   I did, and that was my opinion based off of my

14  training and experience of how we got to where we were at

15  in that investigation.

16      Q.   And my question is, did you ever state that to

17  Abdullah?

18      A.   No.

19      Q.   How was Aspirin recruited as a confidential

20  informant?

21      A.   Detective Nance and Detective Abdullah were

22  using another confidential informant that was supposed to

23  buy prescription pills from Aspirin.  He was a suspect at

24  the time.

25      Q.   And did Aspirin make a sale?

1    A.   Yes.

2    Q.   And were you present for that?

3    A.   Yes.

4    Q.   And who was the CI or the code name of the CI

5    who was used in that operation?

6         MR. PETTEY:  Objection.  Don't answer that

7    unless you don't know.

8         THE WITNESS:  I don't know.

9         BY MR. SCHEWEL:

10   Q.   And what did Aspirin produce as the part of

11   that controlled buy?

12   A.   Aspirin.  That's how he got his name.

13   Q.   And what had you expected that he was going to

14   produce?

15   A.   From what I recall, they were supposed to be

16   buying some type of opioid pills.

17        MR. SCHEWEL:  Do you all want to break for

18   lunch?

19        MS. KIBLER:  How much longer do you have, Abe?

20        MR. SCHEWEL:  I've got about -- I've got about

21   10 pages, and I had -- my total was 33 pages, so I've got

22   an hour, maybe an hour and a half.

23        MR. PETTEY:  You brought your lunch, so sure.

24        MR. SCHEWEL:  Break?

25        THE WITNESS:  I'm good for whatever.

1              MR. SCHEWEL:  All right.

2              (Luncheon recess from 1:28 p.m. to 2:06 p.m.)

3              BY MR. SCHEWEL:

4         Q.   Okay.  Good afternoon, Detective Monroe.

5         A.   Good afternoon.

6         Q.   Earlier you stated that you raised concerns

7    related to Aspirin to the district attorney's office.

8         A.   Yes.

9         Q.   And by that, I mean the Wake County District

10   Attorney's office.

11        A.   Yes.

12        Q.   And you stated that was to DA Jason Smith?

13        A.   Correct.

14        Q.   And when, approximately, did this happen?

15        A.   I believe I spoke to Jason specifically

16   sometime towards the middle of June when I contacted him

17   about the situation, towards the end of June, middle, end

18   of June of 2020 -- 2021.  No, 2020, sorry.

19             MR. SCHEWEL:  Sorry.  Can we go off the record

20   for one second?

21             (A discussion was held off the record.)

22             BY MR. SCHEWEL:

23        Q.   I'm going to direct your attention to Exhibit B

24   in your binder, and this is your interview -- notes of

25   your interview with the SBI.

```
 1        A.    Yes.

 2              (Exhibit B identified for the record.)

 3              BY MR. SCHEWEL:

 4        Q.    Can you turn to page 4, please?

 5        A.    (Witness complies.)

 6        Q.    And I'm going to direct you to the fifth full

 7   paragraph on page 4.  It starts with, "Monroe brought up

 8   concerns."  Do you see where I'm reading from?

 9        A.    Yes.

10        Q.    I'll read it out loud.  "Monroe brought up

11   concerns to the district attorney's office about suspects

12   being charged approximately around March or April 2020.

13   Monroe had a brief -- a debrief with a defendant, that

14   defendant's attorney and an assistant district attorney,

15   Jason Smith."

16              So I'll ask you, did you first raise your

17   concerns in March or April of 2020?

18              MR. PETTEY:  Objection.

19              THE WITNESS:  I don't recall.

20              MR. PETTEY:  Abe, I think that refers to

21   suspects being charged approximately March or April.

22              BY MR. SCHEWEL:

23        Q.    Okay.  I'll just read the statement again.  It

24   says, "Monroe brought up concerns to the district

25   attorney's office about suspects being charged
```

1    approximately around March or April 2020."  Did I read

2    that correctly?

3          MS. KIBLER:  Objection to the characterization

4    as a statement.

5          BY MR. SCHEWEL:

6       Q.   Did I read that correctly?

7       A.   Yes, you read it correctly.

8       Q.   Did you bring up concerns to the district

9    attorney's office about suspects being charged around the

10   time period of March or April 2020?

11         MR. PETTEY:  Objection.

12         MR. BENTON:  Objection.

13         MR. BLANCHARD:  Objection.

14         MR. PETTEY:  Are you asking about suspects

15   being charged during that time frame or did he bring up

16   concerns during that time frame?  That's what's unclear.

17         MR. SCHEWEL:  Okay.  I'm literally reading the

18   statement, so I don't know what the objection is, but

19   I'll clarify.

20         MR. BENTON:  It was to your question, your

21   reading of the statement.

22         BY MR. SCHEWEL:

23      Q.   Okay.  Did you bring up your concerns to the

24   district attorney's office in March or April of 2020?

25      A.   I don't recall that time frame.

 1          Q.   Okay.  Do you recall the debrief you had with a

 2     defendant, the defendant's attorney and ADA Jason Smith?

 3          A.   Yes.

 4          Q.   When did that occur?

 5          A.   Sometime the end of June, beginning of July.

 6          Q.   Of 2020?

 7          A.   Of 2020, yes.

 8          Q.   Did you raise any concerns to the district

 9     attorney's office related to Aspirin via e-mail?

10          A.   I don't recall.

11          Q.   Did you raise your concerns to the district

12     attorney's office about Aspirin via text message?

13          A.   I don't recall.

14          Q.   Did you have an in-person meeting with the

15     district attorney?

16          A.   Yes.

17          Q.   Who else was present at that meeting?

18          A.    It was ADA Jason Smith, Attorney Jackie

19     Willingham -- I don't recall the defendant's name at this

20     time -- and myself.

21          Q.   Was the defendant Marcus VanIrvin?

22          A.   No.

23          Q.   Did you communicate your concerns with any

24     other district attorney than Jason Smith?

25          A.    I don't recall.

1      Q.   So it's possible?

2      A.   Yeah.  I don't recall.

3      Q.   What concerns did you raise at this meeting?

4      A.   This meeting was scheduled after the May 21st

5    incident happened, the reporting to the lieutenant and

6    the evidence that came along when that happened.  And

7    then weeks later there was no resolution being given to

8    us, so I decided to go to the district attorney's office

9    overtop of the lieutenant, and I had asked Jason Smith --

10   at this point, we knew that defendants' cases had been

11   being dismissed, and this is when we found out that other

12   cases had -- did not come back and test positive for

13   controlled substances.

14        And I asked Jason Smith were there any

15   defendants that had been charged that their charges were

16   dropped that they would be willing to debrief with their

17   lawyer to try to figure out what was happening between

18   Abdullah, Aspirin, and these cases, at which time he was

19   able to contact me back and said that Jackie Willingham

20   would be willing to come forward with her client and

21   speak about the takedown that was done on him where

22   supposed heroin was purchased, and to speak about what

23   happened to try to figure out what was going on with all

24   these cases.

25      Q.   Was that defendant in custody?

 1     A.   No, he was not in custody.

 2     Q.   Were any other vice team members present at

 3  that meeting?

 4     A.   No.

 5     Q.   Were any other Raleigh Police Department

 6  officers present at that meeting?

 7     A.   No.

 8     Q.   Did you raise concerns at that meeting?

 9     A.   Yes.

10     Q.   What concerns?

11     A.   The concerns were that these individuals had

12  been charged with selling heroin.  The heroin didn't test

13  for heroin.  It tested as not a controlled substance, and

14  the concerns were what occurred that day during that

15  controlled buy and that takedown, to try to understand

16  why these individuals were being charged and what was

17  their connection to this CI and why did this go down the

18  way it went down.

19     Q.   So did you raise the concerns to Jason Smith

20  that we've discussed earlier about Aspirin, such as

21  covering his camera, producing --

22     A.   As I recall, by this point, the district

23  attorney's office was well aware.  They had dropped

24  several charges for several people and expunged their

25  charges, so they were well aware of the concerns with

1   Aspirin.  They knew he had been suspended.  They knew

2   Abdullah had worked these cases and they were dismissing

3   charges and they knew that these substances were coming

4   back as not controlled substances.  To what extent, I

5   don't know, but they were aware at this point that this

6   had happened after the pieces came together and what

7   happened on the 21st of May.

8        Q.   What did the defendant tell you?

9        A.   The defendant told me that he knew Aspirin from

10  the neighborhood and that he had smoked marijuana with

11  him before, that he was a marijuana dealer, had sold

12  marijuana throughout the years, and that Aspirin had

13  contacted him and set up a marijuana drug deal that day.

14  Aspirin had met with him that day, provided him with the

15  money, which we later identified as the marked currency

16  that we had provided Aspirin, and that he had sold

17  Aspirin a quantity of marijuana that he claimed Aspirin

18  stuck down his pants, got out of the car.

19            And as Aspirin was walking away, we, you know,

20  came upon the car, took him out, took him into custody,

21  and he was in possession of the money for the drugs.  And

22  Aspirin had left the scene at that point and was dealt

23  with by detectives.

24       Q.   And then at some point, Aspirin produced

25  narcotic -- or alleged heroin?

1      A.    Correct, and he had been charged with -- I

2   don't know what charges, but he had been charged with

3   charges related to heroin that day.

4      Q.    The defendant had?

5      A.    The defendant had, yes.

6      Q.    And as you sit here today, what do you think

7   Aspirin did?

8      A.    That concept was eye-opening.  That was the

9   first time in all of this, May 21st, and this happens,

10  that that concept was even a concept that we had

11  considered, and the information that he provided was one

12  of the final pieces of that puzzle where we had to

13  consider, "Is this what was happening throughout the

14  other cases?"

15     Q.    Hadn't other defendants told you after they

16  were taken down that -- or arrested that they were

17  marijuana dealers?

18     A.    I can't remember exactly which defendants, but

19  I do know that defendants had claimed that they only sell

20  marijuana, amongst other claims they made, also.

21     Q.    And that was prior to May 21, 2020?

22     A.    Correct.

23     Q.    Okay.  Earlier you stated that you recalled an

24  arrest that occurred at the Sheetz gas station.

25     A.    Yes.

1      Q.   Do you recall the name Curtis Logan?

2      A.   Yes.

3      Q.   Was that the defendant who was arrested at

4  Sheetz?

5      A.   Yes.

6      Q.   What do you recall about the incident?

7      A.   It was at the Sheetz at Green Road, the corner

8  of Green Road and Millbrook.  I remember us receiving

9  information that this individual was supposed to show up

10  in a pickup truck.  I believe the color, they said, was a

11  blue pickup truck.  This was information coming from

12  Abdullah, from the CI.  We had had the initial debrief of

13  once he arrives, Aspirin would do this controlled buy.

14  He would give a takedown signal and then SEU would take

15  the individual into custody.

16         He parked in front of the Sheetz.  Aspirin -- I

17  do not remember exactly where I was at in the parking

18  lot, but I remember being able to see the vehicle.

19  Aspirin got into the passenger side of the vehicle, the

20  front passenger side, spent a short amount of time in the

21  vehicle, exited the vehicle.  The takedown signal was

22  given, but there was some delay in that one, too.  I

23  don't believe that Aspirin gave the correct takedown

24  signal, as I recall.

25         And then there were some questions to Omar,

1   "Should we take this individual into custody at this

2   point?"  Eventually, that was worked out very quickly and

3   they took Mr. Logan into custody.  His two children were

4   in the backseat, and I remember the buy money was sitting

5   like in the console of the truck after they took him in

6   custody.

7       Q.   Why was there a question about whether or not

8   to take him into custody?

9       A.   Because Omar or Aspirin -- I do not remember --

10  were not giving the signal, like, "Are we taking him now?

11  Are we taking him now?  Is that the signal?"  And what we

12  don't want to do is the person to back out, so we were --

13  we had everyone in the parking lot and we were waiting

14  for the takedown signal, but there was some confusion

15  about Aspirin giving the takedown signal.

16          In most cases, he was told to stay in the

17  vehicle to be with the suspect so that they wouldn't just

18  leave, but as had happened in the past, he got out and

19  started walking away when he gave the takedown signal.

20      Q.   You stated earlier that you field tested the

21  heroin on this occasion.  Where did that occur?

22      A.   It was in the evidence room of Greens Dairy

23  that I spoke of earlier.

24      Q.   Okay.  On this date when you observed the

25  heroin, did it look like heroin to you?

1      A.   So I did not observe the heroin, suspect the

2   heroin at the scene.  It was once we got back to the

3   station, had recovered it from Abdullah.  And my initial

4   thoughts in this specific case was that it looked like

5   brown sugar, and I wasn't familiar at the time that

6   suspects were using brown sugar as a cut.  It was just

7   very granulated and thick.  They were more using white

8   sugar that was a little bit thinner.  But right off the

9   bat, it just looked odd because I hadn't experienced

10  that.

11     Q.   Did you tell Officer Abdullah that it did not

12  look like heroin?

13     A.   So I think what happened at that point is I

14  then waited and I asked how much was the buy supposed to

15  be for, and I just remembered that whatever the weight

16  that we were supposed to purchase, this weighed heavier

17  than that, which was another red flag because no one

18  sells you extra drugs.  If anything, they sell you less

19  drugs.  So I had a heavy bag with a substance that did

20  not look like heroin.

21          And then at that particular time, I ended up

22  doing a field test on it to test it.  And, yes, I did go

23  to Abdullah afterwards, told him how much it weighed and

24  that it did not test for heroin.

25     Q.   And that it did not appear to look like heroin?

1          MR. BENTON:  Objection.

2          THE WITNESS:  Well, he gave it to me, so he saw

3   what it looked like, so his observation was as good as

4   mine.

5          BY MR. SCHEWEL:

6     Q.    What device did you field test the heroin with?

7     A.    I believe it was one of -- could have been one

8   of our -- Sirchie is the company -- kits.  I can't

9   remember the manufacturer, but it's an actual test kit

10  that has like a pouch that you put the sample of the

11  product in the pouch, and it has different vials that you

12  pop at different levels, at different time points to test

13  the powder that you put in there.  We have wipes.  This

14  wasn't a wipe.  You actually had to put the product in a

15  pouch.

16    Q.    Okay.  So you put the product in a pouch and

17  then you put it in a vial?

18    A.    So these pouches are very small.  They're

19  plastic and they have two or three vials, and what you do

20  is you -- once you put the product in there, you pop them

21  and based off the instructions, you know, first, second,

22  third, however their instructions are, and then normally

23  you would agitate it to get that product to dissolve.

24  And the liquid from the vials are inside, and then that

25  would give you a color code and you would have to match

 1    it to the color code on the pouch, which would indicate

 2    whether or not it was testing, you know, presumptive for

 3    that particular narcotic.

 4         Q.    Okay.  And is the pouch that you pop -- is that

 5    dependent on what type of test you're trying to do?

 6         A.    Yes.  So they make one for marijuana, they make

 7    one for different LSD, different -- so you would put

 8    whatever the sample of that product is in the pouch.

 9         Q.    And how do you determine the results of the

10    test?

11         A.    Every pouch has a color code on the front and

12    it will tell you if it's this color, then it's positive

13    or negative, so you would -- it either doesn't turn that

14    color or it turns some other color, but it has to turn

15    the color of whatever the positive indicator is on that

16    specific test.

17         Q.    Is the device electronic in any way?

18         A.    No, it's all manual.

19         Q.    And so based off of the field test, the price

20    of the alleged narcotics and the weight of the alleged

21    narcotics, as well as other factors that you saw during

22    the controlled buy, you believed that the alleged

23    narcotics were not heroin?

24         A.    If I recall, I think it was not enough money

25    for that amount, so it was underpriced.  I recall around

 1  400 bucks, but we had over 20 grams of heroin, which
 2  would have been a very low price for that amount of
 3  heroin.  And I wasn't familiar with it being cut with
 4  that type of material, and with the field test, I felt
 5  that it wasn't heroin, but I couldn't test it for other
 6  narcotics.
 7      Q.  Did you preserve the test results?
 8      A.  The pouch has -- pouches have acid in them.
 9  You have to dispose of them.  They start to -- because
10  they're just presumptive, so it's not something you can
11  put in like a hazardous -- it would disintegrate and it
12  wouldn't -- it wouldn't be something you can preserve.
13      Q.  So it's not like a COVID test that shows like a
14  line of what color it is?
15      A.  No, it's like a heavy rubber, plastic.  They
16  tell you to wear gloves.  And then after it sits there
17  for a while, all those chemicals and stuff start
18  bubbling.  It can, you know, be kind of caustic, so you
19  have to dispose of it.
20      Q.  Did you take a picture of the field test
21  results?
22      A.  No.
23      Q.  Did you preserve the results in any way?
24      A.  No.
25      Q.  Are you aware that Officer Abdullah charged

1    Mr. Logan with trafficking heroin?

2        A.    I don't recall his exact charges, but I know he

3    charged him.

4        Q.    Did Sergeant Rolfe learn of all these issues

5    that we've just discussed?

6            MR. BLANCHARD:  Objection.  You can answer.

7            THE WITNESS:  I mean, I made him aware that the

8    presumptive test didn't test.  What happened thereafter,

9    I don't know what official testing happened, but I let

10   them know at this specific time that the presumptive test

11   was negative for heroin.

12           BY MR. SCHEWEL:

13       Q.    Did you also let Sergeant Rolfe know about the

14   price and weight discrepancy?

15       A.    He had to approve the money to purchase it, so

16   he would have already known how much we were buying.

17   And, also, he has to -- he gets a copy of the evidence

18   card, so all those things Detective Abdullah would have

19   already provided him, or should have provided him, but

20   whether or not that happened between the detective and

21   the supervisor, I don't know.

22       Q.    Do you recall if you discussed these issues

23   with Sergeant Rolfe?

24       A.    Not specifically, but I made him aware.  I

25   don't know specifics as to what that conversation was.

1      Q.   But by making him aware, do you mean you

2  actually had this conversation saying, "Sergeant Rolfe,

3  this is what happened," or he was in the room when this

4  conversation was occurring?

5      A.   I can't recall how the conversation happened,

6  but I made him aware that the presumptive test was

7  negative.

8      Q.   Okay.  Did you also make him aware about the

9  discrepancy in price and weight?

10     A.   Once again, the price he would have known, so I

11 didn't make him aware of that.  He already knew that.

12     Q.   Okay.

13     A.   I don't recall whether I said anything about

14 the price or weight.

15     Q.   Okay.  If you were Officer Abdullah's

16 supervisor at this point, what would you have done?

17     A.   I'm not a supervisor.  I'm not sure.

18     Q.   Would you have allowed him to charge Curtis

19 Logan with trafficking heroin?

20         MR. BLANCHARD:  Objection.

21         THE WITNESS:  I don't have any -- I mean, I'm

22 not in that situation.  That's just assumptions.

23         BY MR. SCHEWEL:

24     Q.   Would you have charged Curtis Logan with

25 trafficking heroin?

 1        A.   I don't know the details of the case prior.

 2   Once again, I have one piece that day, that buy.  I don't

 3   know what he bought from him previously.  I don't have

 4   any details to the investigation before, just that

 5   takedown and provided with that evidence.

 6        Q.   So you're saying maybe you would have charged

 7   Curtis Logan with trafficking heroin?

 8        A.   I can't answer that.  I don't have the details.

 9        Q.   Did you at this time attempt to stop Officer

10   Abdullah from charging Curtis Logan with trafficking

11   heroin?

12             MR. PETTEY:  Objection.

13             THE WITNESS:  I provided him what I knew about

14   the evidence.  That was it.  I didn't do anything else

15   with the investigation.

16             BY MR. SCHEWEL:

17        Q.   Were you ever present for a takedown involving

18   Aspirin and Abdullah where heroin was located on the

19   person seized?

20        A.   No.

21        Q.   Were you ever present for a takedown involving

22   or I guess -- strike that.

23             Were you ever present for a search warrant

24   execution where heroin was located at the home or

25   apartment in a case involving Aspirin?

 1      A.   Not that I can recall.

 2      Q.   As you sit here today, is it your belief that

 3   Williams was purchasing marijuana and not actually

 4   purchasing heroin?

 5           MR. PETTEY:  Objection.

 6           THE WITNESS:  At least on one case because I

 7   believed the individual when I spoke with him in the

 8   debrief.

 9           BY MR. SCHEWEL:

10      Q.   What do you think was happening in the other

11   cases?

12      A.   It's an assumption that this was happening, but

13   I still don't know for sure.

14      Q.   I'm not asking for sure.  I'm asking your

15   opinion.

16      A.   It's my assumption that the same scenario

17   happened in other cases.

18      Q.   The scenario being that Williams would purchase

19   marijuana?

20      A.   That he would meet with drug dealers that he

21   previously set up controlled buys with, would meet them,

22   purchase controlled substances from them, and then at

23   some point, in some manner or some fashion, provide

24   Detective Abdullah with something that he did not

25   purchase.

1      Q.   And he would claim that it was heroin?

2      A.   That was the claim, correct.

3      Q.   Do you believe that Williams was keeping the

4  marijuana?

5      A.   I don't know.

6      Q.   Do you believe that Williams was pocketing buy

7  money?

8      A.   It is my belief that he pocketed buy money in

9  this case, yes.

10      Q.   What about on other cases?

11      A.   In other cases, we had discovered the amount of

12  money we gave him for the purchase, so in the Logan case

13  he was provided $400 and, as I recall, the $400 was

14  recovered from Logan's vehicle.

15           But in this specific case, we were missing a

16  large quantity of money, so --

17      Q.   $740?

18      A.   Correct.

19      Q.   So I guess what I'm unclear about, then, is in

20  instances where you do an initial buy -- right?  We

21  discussed an initial buy for a small amount of heroin and

22  you don't do a takedown.

23      A.   Correct.

24      Q.   In those instances, you have no idea what

25  happens with the buy money, right?

1       A.   In my experience, in my cases, I have narcotics

2  that equal the amount of the going rate of street prices,

3  so if I send someone in to buy $40 worth of marijuana, I

4  get $40 worth of marijuana in return, along with other

5  evidence I've collected, the video and so forth and so

6  on.  I don't know in his cases.

7       Q.   But even in your cases, the buy money is now

8  out in the wind, right?  You don't expect to recover that

9  buy money later?

10      A.   I have had cases where I've done buys from

11 individuals and later, when we do a search warrant at

12 their residence, I've recovered some of my buy money,

13 which further goes to the evidence that the drugs that

14 were purchased at the residence were actually purchased

15 there because within their money that they have at the

16 residence, I located my buy money.  That has happened on

17 several occasions.

18      Q.   But that doesn't always happen, right?

19      A.   No, but it does happen.

20      Q.   And, in fact, as a vice unit, you assume that

21 in these initial controlled buys where you're not doing

22 an arrest or takedown afterwards, that that money may

23 never be recovered?

24      A.   Right.  It's not assuming that you would

25 recover it.  It's part of doing business.

1      Q.   So, now, thinking about Abdullah's cases with

2   Aspirin where you just stated that you think that what

3   was happening was Williams was purchasing marijuana, what

4   do you think happened to the buy money?

5      A.   Are you saying on the initial --

6      Q.   On the initial buys.

7      A.   It's not -- my opinion is that -- initial

8   opinion was that the first buys were for heroin and that

9   the second buys he got ripped.  I don't know -- I don't

10  have an opinion on the first buys.  I wasn't there for

11  them.  I never really -- I don't have an opinion on that.

12     Q.   So I understand that that -- you're saying that

13  was your opinion prior to May 20, 2021, but is that your

14  opinion today still?

15     A.   I still don't have all the facts.  I don't have

16  a true opinion.  I don't --

17     Q.   So you don't think that he was also purchasing

18  marijuana on the first buy?

19     A.   To be frank, I don't -- I don't have an answer.

20  I wasn't part of most of them.  I have, really, no

21  opinion, don't know what they were doing and what the

22  case detailed.

23     Q.   Do you believe that Officer Abdullah was

24  benefitting from his relationship with Aspirin in any

25  way?

1      A.   No.

2      Q.   Detective Rattelade told Internal Affairs that

3  there was, quote, "gross negligence as far as the

4  handling of that CI," referring to Aspirin.  Do you agree

5  with that statement?

6           MR. PETTEY:  Objection.

7           MR. BENTON:  Objection.

8           THE WITNESS:  That wasn't my opinion.

9           BY MR. SCHEWEL:

10     Q.   What was your opinion?

11     A.   That he was deficient in his handling.  "Gross

12  negligence" isn't the words that I used.

13     Q.   Okay.  So you say he was -- and by "he was

14  deficient," you mean Abdullah was deficient?

15     A.   Correct.

16     Q.   And what about Rolfe?

17     A.   As far as?

18     Q.   His handling of Abdullah.

19     A.   I think he was deficient in his supervision of

20  Abdullah.

21     Q.   Okay.  Let's go to May 20, 2020.  You were on

22  duty on this day?

23     A.   The 20th?  I can't say with certainty, but I

24  believe so.

25     Q.   If the roll call says that you were on duty on

1    that day, would you trust that?

2        A.    Yes.

3        Q.    Do you recall working with Officer Abdullah in

4    conducting a controlled buy on May 20, 2020, one day

5    prior to the raid?

6        A.    No.

7              MR. PETTEY:   Objection.

8              BY MR. SCHEWEL:

9        Q.    Do you recall a controlled buy from Marcus

10   VanIrvin one day prior to the raid?

11       A.    No.

12       Q.    Okay.   If you would look at Exhibit D again,

13   please, and I'm going to direct your attention to page 4.

14       A.    (Witness complies.)

15       Q.    And I guess before you do that, I'll let you

16   turn back to what is page 2 of this document, just so you

17   can see what we're looking at.   So page 2 states that

18   this is the attachment to Application for a Search

19   Warrant by Detective O.I. Abdullah, Date 5/21/2020.   Do

20   you see that?

21       A.    Yes.

22       Q.    Have you seen this document?

23       A.    Yes.

24       Q.    Did you see this document on 5/21/2020?

25       A.    I don't recall.

1        Q.   Okay.  If you'll turn back to page 4, please.

2        A.   (Witness complies.)

3        Q.   So page 4 -- and I'll just read from the very

4   top -- states, "After the confidential informant spoke to

5   Marcus, the confidential informant then went to the

6   subject's apartment located at 1628 Burgundy Street,

7   Apartment B, Raleigh, NC, 27610.  The buy was monitored

8   using electronic and physical surveillance.  The

9   confidential informant was then observed by detectives

10  being let into the residence by the target of this

11  investigation, Marcus, and an amount of heroin was then

12  purchased from the subject for an amount of U.S.

13  currency."

14       A.   Okay.

15       Q.   Did you ever observe that on May 20th, 2020?

16       A.   No.

17       Q.   Did any other detectives in the vice unit tell

18  you that they observed what I just read?

19       A.   I mean, the following day, I think they went

20  over the search warrant and gave the details of what

21  happened, but that's when I found out about it, so yes,

22  Detective Abdullah had a briefing the following day about

23  what had happened previously.

24       Q.   Okay.  And as part of his briefing prior to the

25  execution of the search warrant, he stated this

 1  information to you?

 2      A.   He said he had had a controlled buy the day

 3  before, yes.

 4      Q.   Did he also state that detectives had observed

 5  Marcus being let into the residence -- or, sorry, the

 6  informant being let into the residence by the target of

 7  this investigation?

 8      A.   I don't recall specifics.  I just know he did a

 9  controlled buy at that residence the day before.

10      Q.   Okay.  And just to be clear, you do not recall

11  if you were present on May 20th, 2020?

12      A.   I did not see Aspirin go into the Burgundy

13  Street address.

14      Q.   Do you recall if you were out on that operation

15  with Abdullah?

16      A.   It's my opinion that I was not.  I did not

17  participate in that.

18      Q.   Okay.  So turning to May 21st, 2020, you

19  already stated that prior to executing the search

20  warrant, you met with the vice team to discuss the

21  operation.

22      A.   Yes, we had a briefing, yes.

23      Q.   I know you've gone over this.  And you stated

24  the SEU team was present?

25      A.   Correct.

1      Q.    And you stated that Officer Abdullah led the

2    briefing and he had explained that he had made a

3    controlled buy using Aspirin the day before?

4      A.    Yes.

5      Q.    And that that controlled buy was the basis for

6    the search warrant?

7      A.    Yes.

8      Q.    And he described the target of the operation,

9    who was Marcus VanIrvin?

10     A.    Don't recall his description of the suspect,

11   but he stated a suspect was there.

12     Q.    Okay.  And Abdullah told the vice team the

13   target's address?

14     A.    Yes.

15     Q.    And the SEU team?

16     A.    Correct.

17     Q.    And he informed everyone at that meeting that

18   he was going to conduct a second controlled buy prior to

19   execution of the warrant?

20     A.    Yes.

21     Q.    And after this meeting, the vice team,

22   including yourself, went to the location?

23     A.    To that area, yes.

24     Q.    Where did you go?

25     A.    I was assigned to the rear of the apartment.

1      Q.   Who was in your vehicle?

2      A.   I don't recall who was in my vehicle.  I can

3   only remember moving on foot across the back of the

4   apartment complex.

5      Q.   Do you recall that Rattelade and Gwinn drove

6   Aspirin to the scene?

7      A.   Yes, I do know that.

8      Q.   Why would Rattelade and Gwinn drive Aspirin to

9   the scene if it was Abdullah's operation?

10      A.   Because whenever we do operations and search

11   warrants, the SWAT team operators don't drive their van

12   because they're all loaded down with equipment, so

13   whoever the lead detective is, and it's their search

14   warrant, they know where they're going and their address.

15   They drive the vehicle while the SWAT team is in the rear

16   of the van, so it's the lead detective's job to drive

17   that vehicle there so that they can deploy to the

18   address, so it leaves your other teammates.

19         In this particular case, someone had to drop

20   off the CI because Abdullah was staged in the SWAT team

21   van as the driver while the SWAT team was suited in the

22   back of the van.

23      Q.   Is that true for takedowns as well?

24      A.   Takedowns can be different because sometimes

25   they have a van, sometimes they load in unmarked

1  vehicles, so several vehicles may have several SWAT team

2  members in each vehicle.  They may have their van there,

3  so the lead detective may be driving a vehicle with

4  several SWAT officers in it or they may be driving the

5  van.  It just depends on where the takedown is going to

6  happen and how many vehicles we need to block the

7  individual in.

8       Q.   Okay.  But this is always the case for a search

9  warrant execution?

10      A.   Right.  A different detective may drive it

11  sometimes, but for the most part, the lead detective

12  drives the van.  That's their -- that's their assignment.

13      Q.   But you have never -- or had never driven

14  Aspirin?

15      A.   No.

16      Q.   Had you ever been asked to drive Aspirin?

17      A.   Not that I can recall.

18      Q.   So it's not that you had refused to do it; it's

19  just that Abdullah had never asked you?

20           MR. PETTEY:  Objection.

21           THE WITNESS:  I just hadn't driven him.  It

22  wasn't my assignment.

23           BY MR. SCHEWEL:

24      Q.   Would you have been comfortable driving

25  Aspirin?

1       A.   It depends.

2       Q.   It depends on what?

3       A.   The circumstances of the case, the details to

4    the case, where they were going, what they were doing.

5       Q.   Let's say May 21st, 2020.  Would you have been

6    comfortable driving him on this date?

7       A.   If my only assignment was to bring him to the

8    location and allow him out of the vehicle, I most likely

9    would have been okay with that.

10       Q.   Even though you believed he was unreliable at

11    this point?

12            MR. BENTON:  Objection.

13            MR. PETTEY:  Objection.

14            THE WITNESS:  If I was just going to drop him

15    off.  That's why I said "depends."  I don't know.  I

16    don't know.  It depends.

17            BY MR. SCHEWEL:

18       Q.   So on this date, you drove to the location, you

19    stated, and you were responsible for the back of the

20    apartment.  Where were you located when the controlled

21    buy was occurring?

22       A.   Off the top of my head -- I'm not familiar with

23    all the streets, but there's Burgundy Street that ends in

24    a cul de sac, and the apartments kind of sit up on the

25    hill.  I think I was in the neighborhood a street or two

 1  over, back in the neighborhood, along a side street.

 2      Q.   Were you able to observe visually, with your

 3  eyes, Aspirin going to the apartment?

 4      A.   No.

 5      Q.   Were you able to observe Aspirin on the 1021

 6  app?

 7      A.   Initially.

 8      Q.   What did you observe?

 9      A.   Him walking towards the apartment building, and

10  at some point over that distance that he walked, he

11  continued to zip up his jacket where the cellphone was at

12  and, eventually, covered the cellphone, and then all you

13  had was audio.

14      Q.   So how did he have the cellphone positioned?

15  I'm just trying to understand how zipping up the jacket

16  would have covered the cellphone.

17      A.   I don't -- well, you know, I strike that

18  because I've watched several videos.  That was the body

19  cam --

20      Q.   Okay.

21      A.   -- that he zipped the jacket up on.  I don't

22  remember exactly where he had the phone at, but I

23  remember I could not see.  It was audio.

24      Q.   So he zipped up the jacket to cover the body --

25      A.   The button cam.

 1      Q.    -- the button cam?

 2      A.    Yes.

 3      Q.    And at some point, the 1021 camera also became

 4  obscured?

 5      A.    I just remember not being able to see.  I could

 6  only hear --

 7      Q.    Okay.

 8      A.    -- and then listened to the radio or the radio

 9  traffic.

10      Q.    Did you observe any transaction on the 1021

11  app?

12      A.    No.

13      Q.    Did you observe any transaction on the button

14  cam?

15      A.    There's audio, but no video, no.

16      Q.    And is your testimony that the audio indicates

17  the transaction occurring?

18      A.    Some type of transaction, yes.

19      Q.    Okay.  What do you recall about the audio?

20      A.    I recall hearing a knock.  I recall hearing a

21  HVAC, like, running, which they have those on the back of

22  the apartments.  There's some conversation with someone.

23  It sounds like someone opens the door and you hear them

24  yell, like as if yelling for someone.  And the kitchens

25  of those apartments is where the steps leads upstairs.

1  You could hear someone come down the steps, like tapping

2  down the steps with their feet.

3          They greet Aspirin and in some fashion asked

4  him, "What do you need?" or "What's up?" or something to

5  that effect.  And Aspirin said something that I couldn't

6  make out, as if under his breath, but then the next thing

7  he says is "60."  And then a very short period of time

8  later, you can hear some greetings and he exits and he's

9  out.

10          And then he's talking, advising us that another

11  buyer had just left out and was going to his car, and

12  described him and was giving us -- I don't know if he

13  gave a takedown signal or saying like he had made the

14  purchase.  At that point, I think we converged on the

15  residence.

16      Q.   And what you just described was all from what

17  you observed on the button camera?

18      A.   Yes, but I'm pretty sure -- yes, that's what --

19  on the button camera it sounds like that.  On the 1021, I

20  can't recall exactly what was happening.  I just know

21  that we knew that the buy had happened and that he was

22  giving us information and we were told to converge, but

23  that's what the button camera showed, audio.

24      Q.   And when you say you knew that the buy had

25  happened, is that because Aspirin told you that?  He gave

1   you the takedown signal?

2       A.   We were given a signal, whether from him or

3   Abdullah, to converge on the residence.

4       Q.   So the audio that you just described, to be

5   clear, you could not hear that audio on the 1021 app?

6       A.   I know I could hear audio because he was giving

7   a description of another individual at the house that I

8   actually encountered, actually detained in the rear, so I

9   know I could hear him talking because there was a point

10  where he was giving us directions to another individual

11  that was leaving the house.  And when I came up to the

12  rear, along with at least two other SEU officers, we

13  encountered this other individual and ended up detaining

14  him and dealt with that situation.

15      Q.   I'm sorry, I mean the audio that you discussed

16  earlier about the 60.

17      A.   That was clearly after I sat down and listened

18  to the button camera.  I can't say that I heard the 60 on

19  the 1021, but I could hear talking and some type of

20  communication before he entered the residence and then,

21  also, after he exited the residence.

22      Q.   But you can't recall exactly what you heard on

23  the 1021 app?

24      A.   All I know for sure is that he described

25  another individual that was leaving, and that was my

1  focus being on the rear, was to encounter that individual

2  as we approached from the rear.

3       Q.   And by "he," you mean Aspirin?

4       A.   Yes.  He was -- because he -- we would always

5  tell our CIs, "We can hear you on the bug phone.  Talk to

6  us, you know, tell us what's going on.  If you're walking

7  up, speak with us.  Tell us what you see.  Tell us how

8  many people were there."  So we would try to tell him.

9  So as he's walking out, he's giving a description of

10 things, but yes.

11      Q.   Okay.  Did you encounter that individual?

12      A.   Yes.

13      Q.   Do you recall that individual's name?

14      A.   No.

15      Q.   Where did you encounter that individual?

16      A.   There's some parking at the rear of the

17 apartment complex.  I feel like I remember a blue car,

18 but he was in a smaller car in the back of the complex.

19 And I know at least one other SEU officer was with me,

20 and we dealt with him at the vehicle.  I think he may

21 have already gotten in the vehicle.

22      Q.   Did you bring him into 1628?

23      A.   No.  We briefly detained him at the vehicle and

24 debriefed him and talked with him.  He had a weapon in

25 the car.  I think we secured the weapon.  He did have

1   some marijuana, and at some point we determined that the

2   weapon was legally possessed.  And I don't know if

3   they -- you know, how much marijuana he had or didn't

4   have.  I just know at some point we decided he was free

5   to leave, so he was initially detained, but I did deal

6   with that for some time while they had already made

7   entrance to the apartment and were doing their things.  I

8   never got up to the apartment.  I was dealing with this

9   individual at the car.

10      Q.   So you don't believe that that individual or

11  the female who was with him were ever brought into

12  1628-B?

13      A.   I'm pretty positive they weren't, but I do not

14  recall.

15      Q.   Okay.  Are you aware that Marcus VanIrvin

16  resided at 1620 Burgundy Street in the Raleigh North

17  Apartments?

18           MR. PETTEY:  Objection.

19           THE WITNESS:  No.

20           BY MR. SCHEWEL:

21      Q.   You're not aware of that today?

22           MR. PETTEY:  Objection.

23           THE WITNESS:  No.

24           BY MR. SCHEWEL:

25      Q.   And you weren't aware of that on May 21, 2020,

1    prior to the raid?

2         A.   No.

3         Q.   Do you know who Yolanda Irving is?

4         A.   Just the name.

5         Q.   What does that mean?

6         A.   I think she's one of the mothers, I think.

7         Q.   Do you know who Jalen Irving is?

8         A.   No.

9         Q.   Do you know who Juwan Harrington is?

10        A.   No.

11        Q.   Do you know who Cydneea Harrington is?

12        A.   No.

13        Q.   Do you know who Kenya Walton is?

14        A.   No.

15        Q.   Do you know who Dyamond Whitley is?

16        A.   No.

17        Q.   Do you know who Kamisha Whitley is?

18        A.   No.

19        Q.   Do you know who Ziyel Whitley is?

20        A.   No.

21        Q.   Do you know who Ziquis Grant is?

22        A.   No.

23        Q.   Have you ever observed any of the people I just

24   mentioned selling narcotics?

25        A.   No.

1      Q.   Do you have any reason to believe that any of

2   the individuals I just mentioned have ever sold

3   narcotics?

4      A.   No.

5      Q.   Do you have any reason to believe that any of

6   them are members of any gang?

7      A.   No.

8      Q.   After the arrest of Marcus VanIrvin and the

9   raid on this date, do you recall going back to Green

10  Dairy?

11     A.   At some point, yes.

12     Q.   Do you recall that someone on the vice team

13  told Abdullah that the heroin did not field test for

14  heroin or the alleged heroin did not field test positive?

15     A.   Yes.

16     Q.   Do you recall that Officer Gay typed up the

17  arrest warrant for Officer Abdullah?

18     A.   Yes.

19     Q.   Why would Officer Gay do that?

20     A.   So going back to the logging of the evidence,

21  while a lead detective is navigating and doing other

22  things, they would direct other detectives on what they

23  needed, and then for arrest warrants, they would say,

24  "These are the charges."  And when you do the arrest

25  warrants, there's a dropdown where you assign that

 1   detective to the arrest warrant and you're physically

 2   just putting in the data, any swearing out or anything

 3   else.  You're just putting in the data so that when

 4   they're done with their assignment, they can move forward

 5   with whatever their next step is going to be.

 6       Q.   Did you observe Officer Gay typing up the

 7   warrant?

 8       A.   I don't recall if I physically saw her typing

 9   the warrant.

10       Q.   How do you know that she typed up the warrant?

11       A.   Because that was her assignment that day, as I

12   recall.

13       Q.   Do you recall her telling Abdullah that the

14   heroin tested negative and asking him whether -- what

15   Abdullah wanted --

16            MR. PETTEY:  Objection.

17       Q.   -- Mr. VanIrvin to be charged with?

18            MR. BENTON:  Objection.

19            THE WITNESS:  I don't recall the exact

20   conversations, no.

21            BY MR. SCHEWEL:

22       Q.   Do you recall Officer Gay having any objection

23   to charging Mr. VanIrvin with trafficking heroin?

24            MR. PETTEY:  Objection.

25            THE WITNESS:  I don't recall the conversation.

 1          BY MR. SCHEWEL:

 2     Q.   Was Sergeant Rolfe present when the alleged

 3 heroin field tested negative?

 4     A.   No.

 5     Q.   Was Sergeant Rolfe informed of that?

 6     A.   I did not inform Sergeant Rolfe of that.

 7     Q.   But were you present at any time when he was

 8 informed or learned that the alleged heroin field tested

 9 negative?

10     A.   I don't recall.

11     Q.   Did you tell any of your superiors about this?

12     A.   The following day, yes.

13     Q.   Who did you tell?

14     A.   Lieutenant Bunch.

15     Q.   And what did you tell Lieutenant Bunch?

16     A.   I don't recall specifics.  I know we spoke

17 about the button cam.

18     Q.   What about it?

19     A.   What I had overheard and what my thoughts were

20 on what I heard.

21     Q.   And what were your thoughts?

22     A.   Based off of other evidence that was collected

23 at the search warrant and the totality of the operation

24 that day, it was my opinion that Aspirin had purchased

25 something for the amount of $60 and had kept the

1   additional 740 bucks.

2       Q.   Did you have any other concerns that you

3   expressed to Lieutenant Bunch?

4       A.   Only an assumption that we spoke about the --

5   I'm sure we spoke about the entire operation, but I don't

6   recall what that conversation was.

7       Q.   Okay.  And at that point, you also -- you did

8   not bring your concerns to the district attorney?

9       A.   Later, not at that point.

10      Q.   Okay.  Why did you not bring them to the

11  district attorney at that point?

12      A.   Because I jumped chain of command, went to my

13  lieutenant.  I brought him the video.  My lieutenant told

14  me he was going to talk to the captain and that I may be

15  a part of that conversation.  I was later told that he

16  had spoke with the captain and I wouldn't be a part of

17  that conversation, that it was beyond me at that point

18  and that it was being looked into, so it had been

19  reported to the chain of command.  I was told it was

20  being looked into and they were dealing with it.

21      Q.   And then at some point, you decided, you know,

22  that you needed to essentially jump chain of command and

23  speak to the DA?

24      A.   Yes.  So Aspirin was suspended.  Some time went

25  by and Detective Abdullah was still working cases, and at

1  that point, I decided that we weren't seeing any

2  resolution, other than the suspension of Aspirin, and so

3  I reached out to the district attorney's office because I

4  felt as if we didn't have a full picture of what was

5  happening.  So that was the conversation I had with Jason

6  Smith, to try to come to some idea of what was going on

7  in these cases.

8       Q.   Did you talk to Jason Smith before you met with

9  him and Jackie Willingham and her client?

10      A.   Yes.  Yes, we spoke.

11      Q.   And was that on the phone?

12      A.   As I recall.

13      Q.   And after your conversation with Jason Smith,

14  was Officer Abdullah suspended?

15      A.   Detective Abdullah was initially moved from the

16  unit at some point, but he wasn't suspended.  He was just

17  moved to another unit.  Eventually, he was suspended,

18  which, yes, came after that conversation, but that was

19  several steps down the road when that happened.

20      Q.   Were there any other conversations that you

21  were part of or that you learned about that led to

22  Abdullah's suspension?

23      A.   I don't know why Abdullah was suspended, only

24  an assumption that it had to do -- I don't know any of

25  the details of what the department did in his case.

1      Q.   So after your conversation with Jason Smith,

2   you didn't have any other conversations with your

3   superiors related to Abdullah?

4      A.   Not specifics that I can recall.  You know,

5   overview of the whole debacle, but not specifics.

6      Q.   Do you think your conversation with Jason Smith

7   led to Abdullah being suspended?

8      A.   I know that Internal Affairs was contacted on

9   that day that I had the debriefing scheduled, and

10   sometime thereafter we had to speak with Internal

11   Affairs.

12      Q.   Jackie Willingham contacted Internal Affairs,

13   right?

14      A.   I believe that day, yes, that we had the

15   debriefing scheduled.

16      Q.   And did Jason Smith encourage her to do that?

17      A.   I don't know what their conversations prior --

18      Q.   Well, I mean in the meeting that you were privy

19   to.

20      A.   I think Jackie Willingham said she had already

21   had a call in.  I don't know if she had spoke with

22   Internal Affairs, but I know she had a call in to Captain

23   Hodge.  I don't know what that conversation was, but I

24   know that was mentioned during the debrief.  I don't

25   recall if there was encouragement from Jason Smith or

 1  not.

 2          MR. SCHEWEL:  Okay.  I have no further

 3  questions.  Thanks.

 4          MR. BENTON:  Take a break?

 5          MR. PETTEY:  Yeah, let's take a short break.

 6          (Brief recess from 3:15 p.m. to 3:29 p.m.)

 7                      EXAMINATION

 8          BY MR. BENTON:

 9      Q.  I've just got a few questions.  My name is

10  Jason Benton.  I represent Omar Abdullah.  I just have a

11  few questions in follow-up, Detective Monroe.

12          You testified throughout the day that all of

13  the pieces of this came together for you after the search

14  on May 21, 2020; is that correct?

15      A.  Correct.

16      Q.  And when all those pieces came together for

17  you, that's when you determined that Aspirin was

18  unreliable; is that true?

19      A.  A complete determination, yes.

20      Q.  Okay.  That's when you -- you had a conclusion

21  by that point, by May 21, after the search, that Aspirin

22  was unreliable?

23      A.  Correct.

24      Q.  There's been some testimony about betting in

25  the texts that you were shown earlier from plaintiff's

1   counsel.  Do you recall that testimony?

2       A.   Yes, sir.

3       Q.   Was there any exchange of money, like gambling

4   or betting concerning that?

5       A.   No money.  It was just banter between

6   teammates.

7       Q.   Officers chatting?

8       A.   Yes, sir.

9       Q.   Did you ever tell Omar Abdullah about your

10  observations about the packaging of the drugs?  I don't

11  remember what date you put on that, but did you ever

12  inform him about what you saw about packaging?

13      A.   Not that I can recall.

14           MR. BENTON:  All right.  Those would be my

15  questions for now.  Thank you, sir.

16           MS. LIGUORI:  I just have a few questions.

17                        EXAMINATION

18           BY MS. LIGUORI:

19      Q.   My name is Michelle Liguori.  I represent the

20  SEU officer defendants.

21      A.   Yes, ma'am.

22      Q.   And I'd like to turn your attention to what's

23  marked Exhibit D.  And is this document a search warrant

24  for 1628-B Burgundy Street?

25      A.   Yes, ma'am.

 1      Q.   And do you recall testifying earlier today

 2  about a briefing on May 21st, 2020?

 3      A.   Yes, ma'am.

 4      Q.   And that briefing was given by Detective

 5  Abdullah; is that right?

 6      A.   Correct.

 7      Q.   And do you recall testifying earlier that

 8  during that briefing, Abdullah told the vice team and the

 9  SEU team the target's address?

10      A.   Correct.

11      Q.   And was the address that he told the vice team

12  and the SEU team that day 1628-B Burgundy Street?

13      A.   As I recall, correct.

14           MS. LIGUORI:  Thank you.  I have no further

15  questions.

16           MS. KIBLER:  I have no questions.

17           MR. PETTEY:  Norwood?

18           MR. BLANCHARD:  I don't have any questions

19  either.

20           MR. PETTEY:  I don't have any questions.  All

21  done.

22           COURT REPORTER:  Rod, read and sign?

23           MR. PETTEY:  Sure, send it to me.

24           (Whereupon, at 3:31 p.m. on January 31, 2023,

25  the deposition was concluded.  Signature was reserved.)

## <u>WITNESS CERTIFICATE</u>          (1 of 3)

   I have read the foregoing pages, 1 through 178 inclusive, and find that they contain a correct transcription of the answers made by me to the questions therein recorded, with the exception of \_\_\_\_\_ corrections as listed on a separate sheet of paper and incorporated into this record.

   Signed this _____ day of _____ 2023.


       _____
        RISHAR PIERRE MONROE



Sworn and subscribed before me this the _____ day of _____ 2023


_____
Notary Public

My Commission Expires:  _____.

**ERRATA SHEET**          (2 of 3)

Please indicate any corrections to your deposition on this sheet of paper, giving the page number, line number, change and reason for the change, and return this form and the signature page to: **Reed & Associates, 2401 Whirlaway Court, Matthews, NC 28105, or to vreed@carolina.rr.com.**

The reasons for making changes:

        (1) To clarify the record;
        (2) To conform to the facts; or
        (3) To correct major transcription errors.

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**REED & ASSOCIATES**
MATTHEWS, NORTH CAROLINA  980.339.3575

**ERRATA SHEET**                    (3 of 3)

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

Thank You!

**REED & ASSOCIATES**
MATTHEWS, NORTH CAROLINA  980.339.3575

STATE OF NORTH CAROLINA                          <u>CERTIFICATE</u>

COUNTY OF FRANKLIN


    I, DEBORAH A. HYDE, Certified Court Reporter and Notary Public in and for the County of Franklin, State of North Carolina, do hereby certify:

    That RISHAR PIERRE MONROE appeared before me at the time and place herein aforementioned; was duly sworn in the manner provided by law by me prior to the taking of the foregoing deposition, and that said deposition was taken by me and transcribed under my supervision and direction; and that the foregoing 181 pages constitute a true and correct transcription of the proceedings.

    I do further certify that reviewing and signing of the transcript by the witness was reserved.

    I do further certify that the persons were present as stated in the appearance page.

    I do further certify that I am not of counsel for, or in the employment of, either of the parties in this action, nor am I interested in the results of this action.

    This the 12th day of February 2023.


_____

DEBORAH A. HYDE, Certified Court Reporter

Notary Public Number 20021400234


**REED & ASSOCIATES**
MATTHEWS, NORTH CAROLINA  980.339.3575