IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CIVIL ACTION NO.: 5:22-cv-00068-BO

YOLANDA IRVING, individually and as the )
natural parent and guardian of J.I. JUWAN )
HARRINGTON, CYDNEEA HARRINGTON, KENYA )
WALTON, individually an as the natural )
parent and guardian of R.W. ZIYEL WHITLEY, )
DYAMOND WHITLEY, KAMISHA WHITLEY, NANETTA )
GRANT as the natural parent and guardian )
of Z.G. and EMANCIPATE NC, INC. )
)
)
Plaintiffs, )
)
vs. )
)
THE CITY OF RALEIGH, Officer OMAR I. )
ABDULLAH, Sergeant WILLIAM ROLFE, Officer )
RISHAR PIERRE MONROE, Officer JULIEN DAVID )
RATTELADE, and Officer MEGHAN CAROLINE GAY, )
Officer DAVID MEAD, Officer JESUS ORTIZ, )
Officer KYLE PERRIN, Officer MICHAEL )
MOLLERE, Officer KYLE THOMPSON, Officer )
VINCENT DEBONIS, Officer DANIEL TWIDDY, )
Officer THOMAS WEBB, Officer DAVID )
McDONALD, Officer DAVID GARNER, Chief of )
Police ESTELLA PATTERSON and City Manager )
MARCHELL ADAMS-DAVID, in their official )
capacities, )
)
Defendants. )
_____)


D E P O S I T I O N

OF

**OFFICER MEGHAN CAROLINE GAY**


At Raleigh, North Carolina

Friday, October 28, 2022


**REED & ASSOCIATES**
MATTHEWS, NORTH CAROLINA   980.339.3575

REPORTER:  DEBORAH A. HYDE

**REED & ASSOCIATES**
MATTHEWS, NORTH CAROLINA  980.339.3575

A P P E A R I N G

On behalf of the Plaintiffs:

    ABRAHAM RUBERT-SCHEWEL, ESQUIRE
    Tin Fulton Walker & Owen, PLLC
    119 East Main Street
    Durham, North Carolina  27701
    919-451-9216
    schewel@tinfulton.com

    EMILY D. GLADDEN, ESQUIRE
    Tin Fulton Walker & Owen, PLLC
    204 North Person Street
    Raleigh, North Carolina  27601
    919-720-4201
    Egladden@tinfulton.com

On Behalf of Defendants City of Raleigh, Estella
    Patterson, and Marchell Adams-David:

    DOROTHY V. KIBLER, ESQUIRE
    City of Raleigh Attorney's Office
    Post Office Box 590
    Raleigh, North Carolina  27602
    919-996-6560
    dorothy.kibler@raleighnc.gov

On Behalf of Defendants Officers David Mead, Jesus
    Ortiz, Kyle Perrin, Michael Mollere, Kyle Thompson,
    Vincent Debonis, Daniel Twiddy, Thomas Webb, David
    McDonald, and David Garner:

    LESLIE C. PACKER, ESQUIRE
    Ellis & Winters LLP
    4131 Parkdale Avenue, Suite 400
    Raleigh, North Carolina  27612
    919-865-7009
    leslie.packer@elliswinters.com

(Continued)

**REED & ASSOCIATES**
MATTHEWS, NORTH CAROLINA  980.339.3575

A P P E A R I N G

On Behalf of Defendant Officer Omar I. Abdullah:

JASON R. BENTON, ESQUIRE
Parker Poe Adams & Bernstein, LLP
620 South Tryon Street, Suite 800
Charlotte, North Carolina  28202
704-372-9000
jasonbenton@parkerpoe.com


On Behalf of Defendant Officers Rishar Pierre Monroe,
    Julien David Rattelade, and Meghan Caroline Gay:

RODNEY E. PETTEY, ESQUIRE
ALAYNA M. POOLE, ESQUIRE
Yates, McLamb & Weyher, LLP
Two Hannover Square
434 Fayetteville Street, Suite 2200
Raleigh, North Carolina  27601
919-835-0900
rpettey@ymwlaw.com
apoole@ymwlaw.com


On Behalf of Defendant Officer William Rolfe:

NORWOOD P. BLANCHARD, III
Crossley McIntosh Collier Hanley & Edes, PLLC
5002 Randall Parkway
Wilmington, North Carolina  28403
910-762-9711
norwood@cmclawfirm.com


* * * * *

C O N T E N T S

                                                          PAGE

Examination by Mr. Schewel  . . . . . . . . . . . .  5


PLAINTIFFS' EXHIBITS:

Exhibit AAA    Case Jacket for David Mitchell,
               Bates numbers 0001 to 0005 . . . . . . 69

Exhibit BB     SBI Case 2020-2929865 - Statement
               of Officer Gay . . . . . . . . . . . . 12

Exhibit BBB    Marcus VanIrvin Body Camera 3  . . . 156

Exhibit CCC    Dash Cam of Marked Patrol Car  . . . 159

Exhibit DDD    5/21/20 Buy Cam  . . . . . . . . . . 209

Exhibit GGG    Extraction of Samsung Galaxy S7 Phone 137

Exhibit HHH    Officer McDonald's Body Cam - Arrest
               of Connell Williams  . . . . . . . . 173

Exhibit R      Sergeant Rattelade's SBI Interview . 122

Exhibit UU     Returned Search Warrant  . . . . . . 47

Exhibit VV     Gay's First Interview w Sergeant Davis 90

Exhibit XX     Body Cam 2 - Arrest of Curtis Logan 107

Exhibit YY     Body Cam 1 - Arrest of Curtis Logan 104

Exhibit ZZ     Receipt of Informant Funds Report  . 193

Exhibit ZZ.1   Search Warrant of 5/21/20  . . . . . 205

(All paper exhibits are provided with the transcript.  It
was agreed by all parties that video exhibits will not be
attached.)

*   *   *

**REED & ASSOCIATES**
MATTHEWS, NORTH CAROLINA  980.339.3575

1           This is the deposition of OFFICER MEGHAN

2      CAROLINE GAY, taken in accordance with the Federal Rules

3      of Civil Procedure in connection with the above case.

4           Pursuant to Notice, this deposition is being

5      taken in the offices of Yates, McLamb & Weyher, LLP,

6      434 Fayetteville Street, Suite 2200, Raleigh, North

7      Carolina, beginning at 10:10 a.m. on Friday, October 28,

8      2022, before Deborah A. Hyde, Certified Verbatim Reporter

9      and Notary Public.

10                              *   *   *

11     Whereupon,

12                    **OFFICER MEGHAN CAROLINE GAY**

13     was called as a witness and, having first been duly

14     sworn, was examined and testified as follows:

15                          EXAMINATION

16          BY MR. SCHEWEL:

17          Q.   My name is Abraham Rubert-Schewel.  I'm with

18     the law firm of Tin Fulton Walker & Owen.  We represent

19     the plaintiffs in this lawsuit against the City of

20     Raleigh and individually named officers, such as

21     yourself.

22          You are testifying under oath and under the

23     penalty of perjury today just as if you were in a court

24     of law.  Do you understand?

25          A.   Yes.

1      Q.    Have you ever been deposed before?

2      A.    No.

3      Q.    Have you ever been party to a lawsuit?

4      A.    Yes.

5      Q.    What was that lawsuit for?

6      A.    The first lawsuit.

7      Q.    The first Washington -- the first case related

8  to Officer Abdullah --

9      A.    Yes.

10     Q.    -- and the vice team?  These questions and

11  answers are being transcribed by a court reporter,

12  meaning it's important you speak loudly and clearly.  You

13  must also answer questions verbally; for example, using

14  "yes" or "no," not phrases such as "uh-huh."  Do you

15  understand?

16     A.    Yes.

17     Q.    Your attorney, Mr. Pettey, may object to

18  certain questions that I ask.  You should know that

19  you're still required to answer every question unless

20  instructed not to, which will happen rarely.  Otherwise,

21  you are required to answer each question truthfully and

22  completely as possible.  Do you understand?

23     A.    Yes.

24     Q.    Please state and spell your name for the

25  record.

1     A.   Meghan Gay.  Do you need my middle name as

2  well?

3     Q.   I do not.

4     A.   M-e-g-h-a-n, last name G-a-y.

5     Q.   And you started with RPD in June of 2014?

6     A.   That is correct.

7     Q.   And your current assignment is Drugs and Vice

8  Team 1?

9     A.   Yes.

10    Q.   And you've been with Drugs and Vice since 2019?

11    A.   December 2019.

12    Q.   On Team 1 the entire time?

13    A.   Yes.

14    Q.   Did you meet with your attorney, Mr. Pettey, to

15  prepare for this deposition?

16    A.   Yes.

17    Q.   Did you consult with a criminal attorney before

18  this deposition?

19    A.   A criminal defense attorney, no.

20    Q.   Do you intend to invoke your Fifth Amendment

21  right to remain silent in response to any questions?

22    A.   I do not.

23    Q.   Have you met with anyone from the Wake County

24  District Attorney's office as part of the investigation

25  into Dennis Williams?

1    A.   Yes.

2    Q.   Who have you met with?

3    A.   Attorney David Saxe.

4    Q.   How many times have you met with David Saxe?

5    A.   Once.

6    Q.   When was that?

7    A.   I don't recall the exact date.

8    Q.   Was it after Dennis Williams was indicted?

9    A.   Yes.

10   Q.   Were you interviewed by David Saxe?

11   A.   I was.

12   Q.   What did Mr. Saxe ask you?

13   A.   He had several questions regarding Dennis

14   Williams' actions and the investigation.

15   Q.   Were they related to May 20th or 21st, 2020?

16   A.   Yes.

17   Q.   Was it related to -- strike that question.  Did

18   he ask you about the alleged heroin that Dennis Williams

19   provided on May 21st, 2020?

20   A.   It was a conversation regarding that incident.

21   I don't remember all of the details of it.

22   Q.   Okay.  Did Mr. Saxe ask you if you observed the

23   heroin on May 20th, 2020, or May 21st, 2020?

24   A.   I don't recall the exact questions.  We

25   discussed all of that incident.  I couldn't tell you what

1    exact questions were that he asked me.

2         Q.   Was he taking notes?

3         A.   No.

4         Q.   So he wasn't writing anything down?

5         A.   Not that I recall.

6         Q.   Was he recording this?

7         A.   Not that I was told.

8         Q.   Did you provide Mr. Saxe with any documents?

9         A.   No.

10        Q.   Did you tell Mr. Saxe that you had observed the

11   drugs that Dennis Williams provided be field tested?

12             MR. PETTEY:  Objection to form.  You can

13   answer.

14             THE WITNESS:  I was present.  I did not field

15   test the drugs.

16             BY MR. SCHEWEL:

17        Q.   Did you tell that to Mr. Saxe?

18        A.   Yes.

19        Q.   Okay.  When were the drugs field tested?

20        A.   Like a time?

21        Q.   Sure, a time if you know one, yes.

22        A.   I don't recall the exact time.  It was after we

23   had left the scene of the search warrant and gone back to

24   the Detective Division.

25        Q.   Was that on -- the Detective Division on Green

1    Dairy Road?

2         A.   Greens Dairy, yes.

3         Q.   Greens Dairy?

4         A.   Uh-huh.

5         Q.   Okay.  And is that 5240?

6         A.   Yes, I believe so.

7         Q.   It's okay if you're a little off there.  I may

8    be, too.

9         A.   It's on Greens Dairy Road.

10        Q.   And so at some point you got back to Greens

11   Dairy Road to the Detective Division after the arrest of

12   Marcus VanIrvin?

13        A.   I did not personally arrest Marcus VanIrvin.

14        Q.   But you were present for it?

15        A.   I believe he was detained and transported for

16   further interview.

17        Q.   And after that occurred, you went back to

18   Greens Dairy Road?

19        A.   Yes.

20        Q.   With the rest of the vice team?

21        A.   Yes.

22        Q.   Vice Team 1?

23        A.   Yes.

24        Q.   And when you got back to Greens Dairy Road,

25   someone field tested the alleged heroin?

1      A.   I believe so, yes.

2      Q.   Well, were you present for that?

3      A.   I was in the room.

4      Q.   Okay.  And --

5      A.   I don't want to speak for other people's

6   actions.

7      Q.   Did you observe someone field test the alleged

8   heroin?

9      A.   I believe Detective Rattelade did.

10      Q.   Okay.  And why do you believe that?

11      A.   I believe he was in charge of packaging the

12   evidence.  That was not my job.

13      Q.   Okay.  And did at some point you discover that

14   the alleged heroin had tested negative for a controlled

15   substance?

16           MR. BENTON:  Object to form.

17           THE WITNESS:  Detective Rattelade said that,

18   yes.

19           BY MR. SCHEWEL:

20      Q.   Okay.  And you were in the room when he said

21   this?

22      A.   Yes.

23      Q.   Was Officer Abdullah in the room?

24      A.   I don't remember the exact time frames.  I

25   believe at some point he was interviewing the suspect, if

1   my recall is correct, so I can't tell you the exact time

2   frames of when he was in the room and when he was not.

3        Q.   Do you recall if, at that time or on a second

4   occasion or different occasion, Officer Abdullah was

5   informed that the drugs had tested negative?

6        A.   I believe he was.

7        Q.   Who informed him?

8        A.   I don't want to speak for anyone else.  It was

9   not me.  I did not field test the drugs.

10       Q.   Did you inform Officer Abdullah that the drugs

11  had field tested negative?

12       A.   I believe he was informed.

13       Q.   Did you inform him?

14       A.   I did not.

15       Q.   You gave a statement to the State Bureau of

16  Investigation in this case?

17       A.   I did.

18            MR. SCHEWEL:  Okay.  I am going to show Officer

19  Gay her statement to the SBI.  It is labeled for

20  plaintiffs as Plaintiffs' Exhibit BB.  I have a copy for

21  her and for Mr. Pettey.  I can also tell you all the SBI

22  document number, if you would like to pull it up or if

23  you don't have it.

24            (Plaintiffs' Exhibit BB was identified.)

25            MR. SCHEWEL:  I'll give these to you

1    afterwards.

2              COURT REPORTER:  Okay.

3              MR. SCHEWEL:  Rod, here's your copy.

4              MR. BENTON:  Did you say BB?

5              MR. SCHEWEL:  BB.

6              MR. PETTEY:  I'll just note for the record my

7    objection to the form when you said it was her statement.

8              MR. SCHEWEL:  And for the other attorneys in

9    the room, this is SBI 41.

10             BY MR. SCHEWEL:

11        Q.   Okay.  So Officer Gay, I'm showing you what is

12   labeled SBI Case 2020-2929865, Activity Date

13   October 22nd, 2020, State of North Carolina, and then

14   further down towards the middle, it has your name, Meghan

15   Caroline Gay, and your business address.  Do you see

16   that?

17        A.   I do.

18        Q.   Have you seen this document before?

19        A.   I have.

20        Q.   To your knowledge, is anything in this document

21   inaccurate?

22        A.   This document was not a recording of the

23   interview.  This was -- the SBI agent took notes and then

24   created her own report that I did not review before she

25   submitted, so to the best of my recollection, it is

1   accurate, but this was not a recorded statement.

2       Q.   Okay.  Can you just turn to page 5 for me,

3   please.  It's the last page.  It states, "At the

4   conclusion of the interview, S.A. Farrington reviewed the

5   contents of the interview with Gay.  Gay indicated the

6   contents of the interview were true and accurate to the

7   best of her knowledge and belief."  Do you recall that?

8       A.   I do.

9       Q.   And you recall stating that?

10      A.   She had written down notes that she reviewed,

11  the notes that she had handwritten.  We made that

12  statement, yes.

13      Q.   You made the statement that they were true and

14  accurate, to the best of your knowledge?

15      A.   Yes.

16      Q.   Okay.  Thank you.  Okay.  I'm going to ask you

17  to look at page 4, and I'm sorry that it printed upside

18  down on that page.  Let me know when you're there,

19  please.

20      A.   I am on page 4.

21      Q.   Okay.  I'm going to direct you to the paragraph

22  that starts, "In May of 2020."  Are you there?

23      A.   I am.

24      Q.   And I'll read it out loud to you.  "In May of

25  2020, there was a case in North Raleigh.  After the

1    arrest, the drugs were tested, and they tested to not be

2    heroin.  Gay asked Abdullah what to charge because she

3    was typing up the warrants for him, and he told her

4    'trafficking heroin.'  Gay typed the warrants as Abdullah

5    requested.  Abdullah was asked about sending the drugs to

6    the lab and then charging.  However, Abdullah liked to

7    charge on the front end so he could pay the informant."

8              Is that statement accurate?

9        A.   To the best of my recollection, yes.

10       Q.   Okay.  So after these drugs had field tested

11   negative, Officer Abdullah asked you to type up the

12   arrest warrant?

13       A.   He may not have directly asked me.  We worked

14   as a team to get everything done, and that was part of my

15   responsibility at this day and time to do.

16       Q.   Okay.  And you did that after the drugs had

17   tested negative?

18       A.   Yes.

19       Q.   And you knew that they were negative?

20       A.   I knew that the field test had said they were

21   negative, but that may not have been -- field tests are

22   what we do in the field before we sent them off to CCBI

23   to get the true and accurate representation of the drugs.

24       Q.   Had you observed the heroin?

25       A.   I had not.

1    Q.   Had any of the other officers in your unit
2  observed the heroin?

3    A.   I believe they had.

4    Q.   Which officers do you believe had observed the
5  heroin?

6    A.   I believe Detective Rattelade was doing the
7  evidence.

8    Q.   Do you recall hearing Detective Rattelade say
9  that the drugs did not appear to be heroin?

10    A.   I recall him saying the field test was
11  negative.

12    Q.   What about the appearance of the drugs?

13    A.   I don't remember.

14    Q.   Okay.  So you asked Abdullah what to charge
15  Mr. VanIrvin with?

16    A.   Yes.

17    Q.   And he told you to charge trafficking heroin?

18    A.   Yes.

19    Q.   Did you object at all to that?

20    A.   The objection had been stated by other people
21  in the room.  I did not swear out these charges.  I wrote
22  them and handed them to the detective that was in charge
23  of this case.

24    Q.   So the answer is no?

25    A.   Correct.

1      Q.   It also says here, "Abdullah was asked about
2  sending the drugs to the lab and then charging."  Did you
3  ask that or did a different officer ask that?
4      A.   I don't recall.
5      Q.   Do you recall what Abdullah's response to that
6  was?
7      A.   I do not.
8      Q.   But, clearly, he decided to charge Marcus
9  VanIrvin?
10     A.   That is my belief, yes.
11     Q.   Well, you typed up the warrant, right?
12     A.   Yes, but I did not swear it out.
13     Q.   Okay.  But the warrant was for trafficking
14  heroin?
15     A.   Yes.
16     Q.   Okay.  Did you tell what we've just talked
17  about -- did you state that to Mr. Saxe?
18     A.   I believe so.
19     Q.   Is there anything else -- sorry.  Strike that.
20          Did Mr. Saxe ask you about any other instances
21  involving Detective Abdullah or Dennis Williams?
22     A.   I don't recall.  I believe most of our
23  conversation was regarding this case.
24     Q.   Okay.  Did you talk to any other district
25  attorneys?

1        A.   I was not interviewed by anybody else.

2        Q.   Is it your understanding that you may be called

3    as a witness in the prosecution of Dennis Williams?

4        A.   I'm not sure about the Dennis Williams case, as

5    a witness to that case.

6        Q.   Is it your understanding that you'll be called

7    as a witness in the prosecution of Detective Abdullah?

8        A.   That is my understanding.

9        Q.   Did you meet with the District Attorney Saxe or

10   any other district attorneys at the Wake County District

11   Attorney's office related to the prosecution of Detective

12   Abdullah?

13       A.   It was in that same conversation with David

14   Saxe.

15       Q.   Had Officer Abdullah been indicted at that

16   time?

17       A.   No.

18       Q.   Did you testify in the grand jury?

19       A.   I did not.

20       Q.   Who else was present with the interview with

21   Mr. Saxe?

22       A.   Just me and him.

23       Q.   Did you ever speak with Lorrin Freeman?

24       A.   I did not.

25       Q.   Prior to that interview, did you talk to your

1    attorney, Mr. Pettey?

2         A.   Regarding?

3         Q.   The interview.

4              MR. PETTEY:  You can't discuss any

5    conversations we had.  He just wants to know did we talk,

6    did we meet prior to that meeting.

7              THE WITNESS:  In regard --

8              MR. PETTEY:  Don't disclose -- don't disclose

9    the substance or what our meeting was about, just did you

10   meet with me prior to your meeting with Detective Saxe?

11             THE WITNESS:  ADA Saxe?

12             MR. PETTEY:  Yes.

13             THE WITNESS:  We have had several meetings

14   before that interview.

15             BY MR. SCHEWEL:

16        Q.   Did you meet with anyone at the Raleigh Police

17   Department prior to that interview with Mr. Saxe?

18        A.   In regards to?

19        Q.   In regards to doing that interview or what you

20   would say at that interview.

21        A.   No, I don't believe so.

22        Q.   As far as you know, are any of the other Vice

23   Team 1 members or members in 2019 witnesses against

24   Officer Abdullah in the criminal matter?

25             MR. BENTON:  Objection to form.

1            THE WITNESS:  I'm not sure.  I was interviewed

2      by myself.  I can't speak for who else would be --

3            BY MR. SCHEWEL:

4         Q.   Well, and nobody has told you that they are a

5      witness?

6         A.   I don't recall.  I'm sure I wouldn't be the

7      only witness, but --

8         Q.   Well, just so you know, in a deposition we

9      don't have the same hearsay rules that you have in court,

10     so if someone has told you something, you are required to

11     tell me that here today.  Okay?

12        A.   (Witness nods head.)

13        Q.   And you have to answer "yes."

14        A.   Yes.  I apologize.

15        Q.   It's okay.  Did Mr. Saxe tell you that any of

16     the other Raleigh Police Department officers were going

17     to be witnesses against Officer Abdullah?

18            MR. BENTON:  Objection to form.

19            THE WITNESS:  I believe he mentioned that

20     Detective Rattelade had been interviewed.  I apologize.

21     Sergeant Rattelade now.

22            BY MR. SCHEWEL:

23        Q.   Anyone else?

24        A.   I don't recall if he said that anyone else was

25     interviewed.

1      Q.   Did Mr. Saxe show you any video during your

2    interview?

3      A.   No.

4      Q.   And I think I asked you this before, but I just

5    want to be clear.  You did not provide Mr. Saxe with any

6    documents?

7      A.   No.

8      Q.   Okay.  All right.  I'm going to ask you

9    questions about the Vice Unit and RPD policy as it

10   operated in 2019 and through today.  If policy or

11   practice has changed at all from 2019 to today, please

12   let me know in answering my questions.

13     A.   Yes.

14     Q.   Thank you.  And if you're unclear, of course,

15   you can always say that as well, or if you're unsure.

16          How is the Vice Unit structured?

17     A.   Define "structured."

18     Q.   How many members are on Vice Team 1?

19     A.   Currently or in 2019?

20     Q.   In 2019.

21     A.   I believe there was five detectives and the

22   sergeant over the unit.

23     Q.   The sergeant was Rolfe?

24     A.   Yes.

25     Q.   And the detectives are -- go ahead.

1        A.   At that time?

2        Q.   Yeah.

3        A.   Myself, Detective Rattelade, Detective Monroe.

4    So which time period?  Because they switched over.

5        Q.   So at some point there was Gwinn?

6        A.   Correct.

7        Q.   At some point there was Ouellette?

8        A.   Yes.  Those were the two that switched.

9        Q.   Okay.  Who did they switch for?

10       A.   They switched for each other, so it was

11   originally Detective Ouellette.  He got transferred out

12   of the unit and Detective Gwinn got transferred into the

13   unit.

14       Q.   Got it.  Then there was Abdullah?

15       A.   Yes.

16       Q.   And who else are we missing?

17       A.   That should be five.

18       Q.   Okay.  One, two -- yeah, that's five.  Okay.

19   Now, there was also Vice Team 2?

20       A.   Yes.

21       Q.   Who was in charge of Vice Team 2?

22       A.   At that time -- he's retired.  Oh, what was his

23   name?  I'm sorry.  I completely blanked on his name, but

24   it was a supervisor who has since retired.

25       Q.   Okay.  He was a sergeant?

1          A.    Yes.

2          Q.    And was there a lieutenant who was over both

3     vice teams?

4          A.    Yes.

5          Q.    And who was that?

6          A.    Jennings Bunch.

7          Q.    And were you stationed, both teams, at Greens

8     Dairy Road?

9          A.    Yes.

10         Q.    And did you -- can you just describe for me

11    what the physical location was like at Greens Dairy Road?

12         A.    It's an open area with desks, so both teams are

13    set up in the same room.  There's two offices for each of

14    the sergeants.  Team 1's desks are kind of clumped in one

15    area and Team 2's is kind of clumped in the same room.

16         Q.    Okay.  So the sergeants have individual

17    offices?

18         A.    Yes.

19         Q.    Where they can close their door?

20         A.    Yes.

21         Q.    Everyone else is in an open room?

22         A.    Yes.

23         Q.    And Team 1 is kind of on one side.  Yes?

24         A.    Yes.  It's since changed a little bit when

25    people like different desks, but at this time we were

1  kind of clumped over here, and Team 2 is --

2      Q.    Approximately how big is this room?

3      A.    So the area where the two drug teams are, a

4  little bigger than the size of this room, but there's

5  also a hallway that leads to our Gang Unit and some

6  other --

7      Q.    Okay.  And would it be fair to say that this

8  room is approximately 30 by 20?

9      A.    I'll have to get out my tape measure.  It's a

10  little bit bigger than this room.

11      Q.    A little bit bigger than this room.  And just

12  to be clear, we are in the main conference room at Yates,

13  McLamb and --

14          MR. PETTEY:  Weyher.

15          BY MR. SCHEWEL:

16      Q.    Weyher.  Do we know the number of this room?

17          MR. PETTEY:  I don't know.

18          MR. SCHEWEL:  The main conference room, for the

19  record.

20          BY MR. SCHEWEL:

21      Q.    And so each detective has their own desk within

22  this room?

23      A.    That is correct.

24      Q.    Are there any holding cells in this room?

25      A.    No.

 1          Q.   Okay.  Are there any holding cells at 5240
 2     Green Dairy?
 3          A.   Holding cells with bars, like a jail cell?
 4          Q.   If a suspect or a defendant, an arrestee is
 5     brought there, where do you place them?
 6          A.   We have interview rooms.
 7          Q.   Okay.  So you put them in an interview room?
 8          A.   Depending on a case-by-case basis, but that
 9     would be the normal practice.
10          Q.   And where are the interview rooms located?
11          A.   They are across the building from where we are
12     located.
13          Q.   Is there a front desk area to Green Dairy?
14          A.   Yes.
15          Q.   Where is that?
16          A.   On the front of the building, closest to the
17     street.
18          Q.   Okay.  And so if someone -- if a suspect is
19     brought into Green Dairy, are they brought in through
20     that front entrance?
21          A.   No.
22          Q.   They're brought in through the back?
23          A.   Yes.
24          Q.   Okay.  At that time, in 2019, whose desk was
25     closest to yours?

1      A.   So I was only a drug detective for December of
2   2019, so are we talking about December of 2019 or are you
3   talking about spring of 2020?
4      Q.   Did your desk change?
5      A.   So my desk at some point changed.  I don't
6   recall the exact date.
7      Q.   Okay.  So let's start with initially, who was
8   closest to your desk?
9      A.   I believe I was closest to the door, if I
10  recall correctly.  There's a lot of life that has
11  happened between now -- and I've switched desks, I think,
12  three times now.  I don't recall everybody's placement.
13     Q.   Okay.  Do you recall in 2020, in the spring, is
14  your desk today still in the same spot as it was in 2020?
15     A.   No.
16     Q.   So it's moved multiple times?
17     A.   Yes.
18     Q.   Okay.  Today, who are you closest to?
19     A.   So I sit against a wall.  The desk beside me is
20  Detective Gilyardi, who's new to the unit, and then
21  there's four desks kind of over here that are together.
22     Q.   Was Detective Monroe your field training
23  officer?
24     A.   Yes.
25     Q.   Did you have multiple field training officers?

1     A.   No.

2     Q.   Were you next to Detective Monroe in the spring

3  of 2020?

4     A.   He was in the desk that I currently occupy in

5  the spring of 2020, up against the wall.

6     Q.   How far was your desk from that desk?

7     A.   Fifteen feet, approximately.

8     Q.   Where was Officer Abdullah's desk in the spring

9  of 2020?

10    A.   His and my desk sat facing each other.

11    Q.   Okay.  So you were directly across from him?

12    A.   Yes.

13    Q.   Did you have a computer on your desk?

14    A.   I did.

15    Q.   Did he have a computer on his desk?

16    A.   He did.

17    Q.   Did you have an assigned phone on your desk?

18    A.   Yes.

19    Q.   Did he have an assigned phone on his desk?

20    A.   I believe so.

21    Q.   And this is in addition to a cellphone.  I just

22 want to be clear that when I say "a phone on his desk or

23 your desk," I'm talking about a landline.

24    A.   Yes.

25    Q.   How often did your vice team meet when you

1  started in December of 2019?

2       A.   Define "meet."

3       Q.   How often did you have a meeting as a team?

4       A.   As far as going into a separate room to have a

5  meeting, occasionally, but part of the nice thing about

6  having an open forum is we discussed a lot of things in

7  that --

8       Q.   Kind of all the time?

9       A.   Yes.

10      Q.   Where would you go in a separate room to have a

11 meeting?  Is there a meeting room at Green Dairy?

12      A.   In this hallway with all of the drug units,

13 there's a pseudo conference room, if you will.

14 Occasionally, we would meet in there.

15      Q.   Is there an evidence processing area?

16      A.   Yes.

17      Q.   Where is that?

18      A.   Attached to our offices.

19      Q.   Okay.  And what's in the -- is there a better

20 name for that room?  It's an evidence room?

21      A.   Evidence room works.

22      Q.   Okay.  And what's in that room?

23      A.   Evidence supplies, the lockers where we put

24 evidence and lock them at the end of a case, as well as

25 mailboxes where assorted mail comes in.

 1      Q.   Field tests?

 2      A.   No.

 3      Q.   Where are field tests located?

 4      A.   The lieutenant over the Drug Unit is in charge

 5  of them and then I have a personal area where I keep mine

 6  so I don't need to go to the lieutenant every time I need

 7  one.

 8      Q.   And is that in your desk?

 9      A.   Yes.

10      Q.   Where is the lieutenant stationed?

11      A.   His office is at the far end of this drug area,

12  if you will.

13      Q.   The big room where everyone is in together?

14      A.   Yes.

15      Q.   Okay.

16      A.   So the other -- the opposite end of this area.

17      Q.   Is the lieutenant today still Lieutenant Bunch?

18      A.   No.

19      Q.   Is Sergeant Rolfe still your sergeant?

20      A.   No.

21      Q.   When was Sergeant Rolfe no longer your

22  sergeant?

23      A.   I do not recall the exact date that he was

24  moved.

25      Q.   Do you know if it was in 2020?

1      A.   I believe it was, but, again, I do not recall
2  the exact date.
3      Q.   Do you think it was after Officer Abdullah was
4  suspended?
5      A.   It was during that investigation.  I do not
6  recall the exact date.
7      Q.   Do you know Sergeant Rolfe's current position?
8      A.   I believe he's a senior detective.
9      Q.   In what unit?
10     A.   Juvenile, I believe.
11     Q.   Are Monroe and Rattelade still in your unit?
12     A.   No.
13     Q.   Where are they located now?
14     A.   Detective Rattelade got promoted.  He is now
15 Sergeant Rattelade.  I believe he's downtown.  Detective
16 Monroe is moved to our Intel Unit.
17     Q.   What does it mean to be downtown?
18     A.   So we have different districts.  There's six
19 different districts.  Downtown is a district, so he is
20 assigned to that specific district.
21     Q.   So he's on patrol?
22     A.   He is a sergeant over a Patrol Unit, yes.
23     Q.   And you think that Monroe is on Intel?
24     A.   Yes.
25     Q.   What is Intel?

1      A.   It is like our human trafficking, sex crimes,
2   intelligence-gathering unit.
3      Q.   Okay.  How many interview rooms are there at
4   Green Dairy?
5      A.   So we have two different types of interview
6   rooms.  We have soft interview rooms and then we have an
7   area specifically designed for interviews.  I believe
8   there's two or three soft interview rooms, and then maybe
9   seven or eight of the normal interview rooms, to the best
10  of my recollection.
11     Q.   Do you have the capability to record
12  interviews?
13     A.   We do in the normal interview rooms.  I don't
14  recall if we do in the soft interview rooms.  I don't --
15  I don't tend to use those.
16     Q.   Is it your practice in Drugs and Vice to video
17  record interviews with defendants?
18     A.   During what time frame?
19     Q.   After an arrest.
20     A.   In 2019 and 2020 or current?
21     Q.   In 2019 and 2020.
22     A.   It was not always the practice.
23     Q.   Okay.  Is it the practice today?
24     A.   It is my practice today.
25     Q.   So it's a detective-by-detective choice?

1      A.   Yes.

2      Q.   So your practice today is if you make an arrest

3  of a suspect and you have an interrogation, you will

4  record, video-record that interrogation?

5      A.   That is my practice.

6      Q.   But in 2019 and 2020, when you were initially

7  being trained, you weren't always doing that?

8      A.   Correct.

9      Q.   Were other officers recording their interviews,

10  to the best of your knowledge?

11      A.   I believe that was a case-by-case basis.

12      Q.   So some?

13      A.   Yes.

14      Q.   And once you record an interview, is it placed

15  in the case file?

16      A.   It depends on the size, so it is kept.  It may

17  not necessarily be put in the physical case file,

18  depending on the size, but it is kept.  It is also on the

19  server.

20      Q.   Were you present for any interviews with

21  Officer Abdullah?

22      A.   I don't believe so.  Not that I can recall.

23      Q.   To your knowledge, did Officer Abdullah

24  video-record his interviews?

25      A.   I have no knowledge of that.

1          Q.   Did you have a practice in the Vice Unit to
2     meet every morning after roll call or any other time?
3          A.   No.  We did not have a roll call.
4          Q.   Was there ever a set meeting date or time?
5          A.   No.
6          Q.   It was just kind of on an as-needed basis?
7          A.   Yes.
8          Q.   Okay.  What about meeting with Lieutenant
9     Bunch?  When would that occur?
10         A.   As a group?
11         Q.   Or as an individual, both.
12         A.   There was not set meeting times.
13         Q.   What about as an individual?
14         A.   If there was an issue or something that needed
15    to be discussed with him, he had a fairly open-door
16    policy.
17         Q.   Okay.  As a member of Drugs and Vice, you work
18    with confidential informants?
19         A.   Yes.
20         Q.   And these can you be your CIs as well as CIs
21    working with other officers in your unit?
22         A.   Yes.
23         Q.   How many CIs have you been in charge of since
24    2019, approximately?
25         A.   How many have I signed up or how many have

1  actually done work?

2      Q.   Signed up.

3      A.   Maybe approximately two dozen.

4      Q.   How many would you say you've worked with?

5      A.   Approximately 12 to 15.

6      Q.   And just so we're clear, what do you mean when

7  you're saying "worked with"?

8      A.   I mean conducted a controlled buy.

9      Q.   That you were in charge of?

10     A.   Yes.

11     Q.   Okay.  Because you've also been part of

12  controlled buys that you were not in charge of?

13     A.   That is correct.

14     Q.   And so if I ask you that number, that would be

15  significantly more?

16     A.   Yes.

17     Q.   In 2019, was it typical for the vice team to

18  share CIs?

19     A.   No, with a caveat.

20     Q.   What's the caveat?

21     A.   I was on training during this time, so I --

22  even when I was first starting out, I didn't have a lot

23  of CIs, so I would use Detective Monroe's to do buys to

24  learn, but it was not super common practice to share CIs.

25  That was just -- I was training.  I was learning, so I

1   was sharing other CIs because I did not have my own early

2   on.

3        Q.   Okay.  I'm just going to read to you from BB

4   and then I'll hand it back to you.  Okay?

5            This is the same exhibit that we read from

6   earlier.  This is the description of your interview with

7   the SBI agent, and I'm starting at the -- I think it's

8   the fifth paragraph.  It starts, "The group works as a

9   team and would share confidential informants.  However,

10  it was Abdullah's confidential informant when dealing

11  with Abdullah's case.  Abdullah never shared informants."

12           So just again, it says, "The group works as a

13  team and would share confidential informants."  And I'll

14  give you a second to look at that.

15       A.   (Witness reviews document.)

16       Q.   So is that statement accurate?

17       A.   As I said, at that time, I was sharing several

18  informants because I did not have any of my own.  I was

19  learning.  I was training, so I did share multiple CIs.

20       Q.   Did other detectives in your unit ever share

21  each other's CIs?

22       A.   Occasionally.

23       Q.   Okay.  And -- strike that.  How do you

24  typically pick up a CI?

25       A.   Pick up a CI?

1        Q.   Start a CI, sign up a CI.  How does it happen?

2        A.   There's multiple different ways to acquire a

3    CI.  If you've arrested someone, there can be a plea

4    agreement with the DA's office where they work in

5    exchange for a reduced sentence.  There are also people

6    that call in and request to become confidential

7    informants.  There are also people who are looking to

8    make money that become confidential informants to receive

9    a monetary -- money in return.

10       Q.   Can you work with a CI who is on probation?

11       A.   You can, but there has to be additional

12   paperwork in place.

13       Q.   What about CI who is arrested while you are

14   working with them on a separate, new charge and goes to

15   jail?  Could you continue working with that CI?

16       A.   That would be a conversation with the DA's

17   office on a case-by-case basis.

18       Q.   So there's not a set policy that says someone

19   who is re-arrested and goes to jail can no longer --

20       A.   I do not believe that is a set policy.  I think

21   it's a case-by-case basis.

22       Q.   But in that situation, you believe you are

23   required to consult with the DA?

24       A.   Again, a case-by-case basis.

25       Q.   Okay.  So there is no policy of what to do if

1   that happens?

2       A.   I'd have to look at the policies.  I don't

3   recall all the exact policies.

4       Q.   Okay.  But if that did happen to you, you're

5   saying you probably would consult the DA?

6       A.   That would be my common practice.

7       Q.   Okay.  And before a CI can start working with

8   you, you're required to create a CI packet?

9       A.   That is correct.

10      Q.   And what is in that CI packet?

11      A.   It contains their DMV history, their CJ leads

12  history, contains their history with our department as

13  far as reports are concerned.  It also contains their

14  pertinent information, name, address, emergency contact,

15  et cetera.

16      Q.   What is a CJ leads history?

17      A.   That is -- it's one of our databases for

18  criminal history.  It's one of the most accurate, up to

19  date databases that we all use for criminal history.

20      Q.   And so it includes arrests within the State of

21  North Carolina?

22      A.   Yes.

23      Q.   And outside the State of North Carolina?

24      A.   No.  We use a DCI for that, which contains

25  out-of-state history.  That is included as well.

1        Q.   In the CI packet?

2        A.   Yes.

3        Q.   And the point of gathering all this information

4   is to make sure you are signing up a reliable and

5   trustworthy CI?

6             MS. KIBLER:  Object to form.

7             MR. BENTON:  Same.

8             THE WITNESS:  It is information you should

9   gather to paint a picture of the CI and their history.

10            BY MR. SCHEWEL:

11       Q.   So you can know as much about them as possible?

12       A.   As much about them and their criminal history

13  as possible.

14       Q.   Why is that important?

15       A.   Depending on what they've been arrested and

16  charged for, it's important to know what their history

17  is, to know whether or not they would be eligible as a

18  CI.

19       Q.   What did you do in 2019 or 2020 with the CI

20  packet once it was completed?

21       A.   So at that point, I was still on training, so

22  when I filled out a CI pack, I would give it to Detective

23  Monroe and he would look over it.  I would correct any

24  changes and then I would give it to Sergeant Rolfe for

25  review.

1      Q.   How do you determine the reliability of a CI?

2      A.   As far as when signing them up?

3      Q.   Yes.

4      A.   You would usually do what's called a qualifying

5   buy, where we would equip them with electronic

6   surveillance, search them, provide them with recorded

7   currency, send them to a location to buy controlled

8   substances.  When they came back with the drugs, the

9   video matched up with what they said.  It's what we call

10  a qualifying buy.  It's how we help deem them as

11  reliable.

12     Q.   Would you make an arrest off of a qualifying

13  buy?

14     A.   That was not common practice.

15     Q.   So a qualifying buy is what allows you to say

16  on a warrant that your CI is trustworthy and reliable?

17     A.   It is one of the factors used.

18     Q.   What are the other factors?

19     A.   Information can also deem a CI reliable, if

20  they provide information about a dealer or an address or

21  that type of thing that I can corroborate through

22  independent law enforcement sources.  That would also

23  help deem a CI reliable.

24     Q.   And let me back up a little bit to the

25  qualifying buy.  If the CI brings in drugs from a

1  qualifying buy, will you test those drugs?

2       A.   It's on a case-by-case basis.

3       Q.   In what situation would you not test them?

4       A.   Marijuana usually is not tested on a --

5       Q.   Not field tested?

6       A.   Not field tested.

7       Q.   Is it sent to the CCBI lab?

8       A.   It's a case-by-case basis.

9       Q.   What about if your CI was purchasing heroin?

10 Would you test it?

11      A.   My common practice would be to test it.

12      Q.   For a qualifying buy?

13      A.   For any buy.

14      Q.   Okay.  But for a qualifying buy?

15      A.   Yes.

16      Q.   And would you field test the heroin for a

17 qualifying buy?

18      A.   That would be my common practice.

19      Q.   And why would you do that?

20      A.   It's my common practice to field test any drug

21 that I get back.

22      Q.   Why?

23      A.   Why is that my common practice?  To help deem

24 the reliability of the CI or the ongoing reliability of a

25 CI.

1      Q.   And how does field testing it help deem the
2   reliability of the CI?
3      A.   It can be used to help confirm that a substance
4   that I believe is drugs, based on my training and
5   experience -- it backs up my information that I have.
6      Q.   And I think I asked you this before, but this
7   is important because it allows you to say on an arrest or
8   a search warrant that your CI is trustworthy and
9   reliable?
10          MS. KIBLER:  Object to the form.
11          THE WITNESS:  Which part?
12          BY MR. SCHEWEL:
13     Q.   Field testing the drugs and confirming that
14   they are what you believe they are.
15     A.   That is part of my common practice.
16     Q.   What else is part of it?
17     A.   What do you mean?
18     Q.   Well, I think you're saying that there's
19   multiple different ways that you confirm that your CI is
20   reliable.
21     A.   It's an ongoing thing with every CI that I use.
22     Q.   Okay.  So in addition to field testing and
23   information, are there any other factors that you take
24   into consideration?
25     A.    I mean, I also send the drugs to the lab,

1    depending on whether or not a search warrant or charges
2    could be taken out.
3        Q.   Any other factors that you consider?
4        A.   And their history as well.  I mean, all of that
5    is relevant, everything we've discussed.
6        Q.   What do you think would happen if you wrote on
7    a warrant that your CI was unreliable?
8        A.   What would happen when?
9        Q.   You're presenting your warrant to a magistrate,
10   a warrant application, and you write in your warrant
11   application your CI is unreliable.  What would happen?
12           MR. BENTON:  Objection, foundation.
13           THE WITNESS:  If my CI is unreliable, I would
14   not utilize them to get a search warrant.
15           BY MR. SCHEWEL:
16       Q.   Why?
17       A.   Because if they're unreliable, I cannot trust
18   their information.  Therefore, I don't have probable
19   cause for a search warrant.
20       Q.   And if you wrote that on a warrant, it would
21   probably be rejected by a magistrate?
22       A.   I have never had that experience.
23       Q.   Is that your assumption?
24       A.   That would be my assumption.
25       Q.   Would you use a CI who had provided inaccurate

1  information in the past?

2      A.   Once the CI has been deemed unreliable, no.

3      Q.   Okay.  So it sounds like you're saying that

4  potentially, if a CI provided inaccurate information, you

5  still could continue to use them in certain situations?

6      A.   It depends on the context.

7      Q.   What context does it depend on?

8      A.   If they had information they believed to be

9  true that they were unaware was untrue, I could see still

10  using that CI.  But if they purposely provided false

11  information, I would no longer utilize that CI.

12      Q.   How do you determine if someone has purposely

13  provided false information?

14      A.   It's part of your training and experience and,

15  also, the reliability kind of tests that we talked about.

16      Q.   In your opinion, did Dennis Williams purposely

17  provide false information?

18           MR. PETTEY:  Objection.

19           THE WITNESS:  My knowledge was not directly

20  with Dennis Williams.  That's Detective Abdullah's case.

21  He was not a CI that I worked with.

22           BY MR. SCHEWEL:

23      Q.   I'm not asking if he was your CI or not your

24  CI.  I'm asking if, in your opinion, he deliberately

25  provided false information.

1            MR. PETTEY:  Objection.

2            MR. BENTON:  Objection, foundation.

3            THE WITNESS:  That is my opinion.

4            BY MR. SCHEWEL:

5       Q.   Yes?

6       A.   Yes.

7       Q.   Do you ever fully trust your CIs?

8       A.   No.

9       Q.   Why not?

10      A.   Most individuals that become CIs are either an

11  addict or a dealer or somehow involved in the drug life.

12  I don't ever consider them fully reliable.

13      Q.   Do you keep a log of all your contacts with a

14  CI?

15      A.   In what time frame?

16      Q.   Currently.

17      A.   Yes.

18      Q.   In 2019, did you?

19      A.   It was not common practice to keep a written

20  log.  I kept all of the relevant information.  It was

21  just not written in one specific place.

22      Q.   Is there a form that you are provided with by

23  the police department to keep a log, a written log of

24  your contacts with a confidential informant?

25      A.   I believe so.

1      Q.   Well, do you have one today?

2      A.   With me?

3      Q.   No.  Today, when you're working, when you're

4   back at Green Dairy, do you have a contact form to keep

5   track of your written -- keep track of your contacts with

6   a confidential informant?

7      A.   I do.

8      Q.   Okay.  What is that form called?

9      A.   I mean, I call it the -- I just call it a CI

10  form.  That's my name for it.  I'm not sure what the

11  specific name is for it.

12     Q.   What columns are on that form?

13     A.   It has the date, the case report number, amount

14  of money that was given to the CI, depending on if it's a

15  paid CI or if they're working off charges, and then it's

16  got a brief description of whatever the event was.

17     Q.   Did you have that form in your possession when

18  you started in December of 2019?

19     A.   I don't know that I had it.  I believe it was

20  part of some information.  I don't remember if I had

21  physical -- a physical copy of it.

22     Q.   And today, just to be clear, it's your practice

23  to write down every single in-person contact or

24  communication that you have with a confidential

25  informant?

1     A.   It is my practice every time we utilize their

2  information, to write that down.

3     Q.   Okay.  So you don't necessarily write down

4  every single time you have a phone call with a CI?

5     A.   Not necessarily.  Any time it is relevant, it

6  is written down.

7     Q.   What does that mean, to be relevant?

8     A.   So if it's information regarding an ongoing

9  investigation or anything that we're doing controlled

10 buys for, then it is written down.

11    Q.   Okay.  Why else would a CI contact you?

12    A.   Sometimes they have personal stuff going on or

13 they're like, "I won't be out of -- you know, I can't do

14 anything this week, I have this going on," or something

15 of that.  I would not necessarily include that in a CI

16 log.

17    Q.   Got it.  And does your CI log include text

18 messages with a CI?

19    A.   Does the actual log?

20    Q.   The log that you keep -- do you keep a log of

21 your text messages with a CI?

22    A.   Yes.

23    Q.   Okay.  And I guess do you keep a record of your

24 text messages with a CI?

25    A.   I keep all of my text messages with CIs.

1      Q.    And where do you keep those?

2      A.    On my phone.

3      Q.    Are you familiar with a Cellebrite Report?

4      A.    I am.

5      Q.    What is a Cellebrite Report?

6      A.    When a phone goes to our guys on Taru to be

7  extracted, it comes back to us in a Cellebrite -- I think

8  that's the name of the report that gets spit out.

9      Q.    And what is in that report, typically?

10     A.    So it depends on what they are able to extract

11 from the phone.  If they have the password and can do a

12 full extraction, a lot of times it'll include the

13 majority of what is located on the phone.

14     Q.    And that includes text messages?

15     A.    It can.

16     Q.    What else can it include?

17     A.    Photographs, a variety of things.

18     Q.    And if you need to take a break, just let me

19 know.  We'll take one soon because I have to move my car.

20           Okay.  I am going to show you what is marked as

21 Plaintiffs' Exhibit UU, and this is from the SBI file and

22 it is -- UU is 0069, and I have a copy for you and for

23 your attorney.

24           (Plaintiffs' Exhibit UU was identified.)

25           MR. PETTEY:  Thank you.

1            BY MR. SCHEWEL:

2       Q.   Okay.  I'll just read you the first page.  It

3    says, "July 25th, 2022, Returned Search Warrant, Attached

4    as #865-31 is a copy of the returned search warrant and

5    inventory for Verizon Samsung Galaxy S7 cellular phone,"

6    and then it gives a SN number.  "The phone was used by

7    former Raleigh Police Department Officer Abdullah during

8    his course of business."

9            Have you seen this document?

10      A.   I have not.

11      Q.   Okay.  If we turn to the second page, or the

12   back of page 1 -- it's printed double-sided -- do you see

13   where it says "Search Warrant, State of North Carolina"?

14      A.   Yes.

15      Q.   Okay.  And this is a search warrant?

16      A.   It appears to be.

17      Q.   And it's received November 22nd, '21?

18      A.   That is the date that is listed on here.

19      Q.   And it's signed by an officer.  I think it says

20   "S.Q. Minschew" at the bottom.

21      A.   Yes.

22      Q.   Is Minschew the officer who interviewed you

23   with the SBI?

24      A.   No.

25      Q.   And the warrant is also signed by a judge?

1      A.   I believe so.

2      Q.   And it says "A. Graham Shirley"?

3      A.   (Witness nods head.)

4      Q.   Yes?

5      A.   Yes.

6      Q.   Okay.  I'm going to direct your attention to

7  the third page where it says, "Application for Search

8  Warrant."  And it says "Crime" in the middle, on the

9  left-hand side, "Common Law, Obstruction of Justice."  Do

10 you see that?

11     A.   I'm sorry.  Where are we?

12          MR. PETTEY:  I think we're on the wrong page.

13          MR. SCHEWEL:  No, you're on the right page,

14 "Application for Search Warrant."

15          THE WITNESS:  Oh, yes, I see that, yes.  I'm

16 sorry.

17          BY MR. SCHEWEL:

18     Q.   "Common Law, Obstruction of Justice"?

19     A.   Yes.

20     Q.   Okay.  And now I'm going to direct you to turn

21 that page over.  This is page 4, "Attachment -

22 Property/Evidence to be Seized," and then it lists

23 various items that are to be searched on the cellphone.

24 Do you see that?

25     A.   I do.

1  Q. Okay.  You can go to the next page, "Attachment

2 - Places to be Searched."  Do you see that?

3  A. Yes.

4  Q. And it says, "The property is currently being

5 held in the custody of the Raleigh Police Department"?

6  A. I see that.

7  Q. The next page -- you can turn that over --

8 "Attachment III - Probable Cause Affidavit."  Do you see

9 that?

10  A. I do.

11  Q. What is a Probable Cause Affidavit?

12  A. The information that is presented as part of

13 the search warrant that states the probable cause for the

14 search warrant.

15  Q. Okay.  And I'm going to ask you to go to the

16 next page and then turn that page over, so it should say

17 "Inventory of Items Seized."  And at the bottom it says,

18 "Download of data from above stated phone."  Do you see

19 that?

20  A. I do.

21  Q. So from looking at this document, does this

22 tell you that a search was conducted of Officer

23 Abdullah's issued -- or police issued cellphone?

24  A. So I don't have knowledge of his -- I know he

25 had his cellphone.  This has a serial number and stuff.

 1   I don't know if that's his cellphone.  I see that it is a

 2   search warrant, but I did not write this search warrant.

 3        Q.   Okay.  Can I see the copy that you're looking

 4   at?

 5        A.   (Witness complies.)

 6        Q.   Is it okay if we take a short break?

 7             MR. PETTEY:  Sure.

 8             (WHEREUPON, a brief recess was taken.)

 9             BY MR. SCHEWEL:

10        Q.   Okay.  We can go back on the record.  Officer

11   Gay, I'm going to ask you about the conversation that you

12   said you had with District Attorney Saxe.

13             MR. PETTEY:  Can she have back the exhibit?  I

14   think you took UU.

15             MR. SCHEWEL:  I'm not asking her about it right

16   now.

17             MR. PETTEY:  But we're just going to keep the

18   exhibits all together.  That way, we don't --

19             MR. SCHEWEL:  Yeah, that's fine.

20             MR. PETTEY:  -- we don't lose them.

21             MR. SCHEWEL:  I thought I gave you the one that

22   was marked, did I not?

23             MR. PETTEY:  I've got this one, then.

24             MR. SCHEWEL:  Yeah, UU is it.

25             MR. PETTEY:  Then where's -- I handed it to

 1  Jason.

 2          MR. SCHEWEL:  You're saying Officer Gay's copy?

 3          MR. PETTEY:  Right.

 4          MR. SCHEWEL:  Yeah.

 5          MR. BENTON:  We're on the record, by the way.

 6          MR. PETTEY:  Sorry.

 7          BY MR. SCHEWEL:

 8      Q.  When you spoke with District Attorney Saxe, you

 9  did not have a criminal defense attorney present?

10      A.  I did not.

11      Q.  Were you offered immunity on any criminal

12  charges in exchange for your testimony against Officer

13  Abdullah?

14      A.  No.

15      Q.  Do you expect that you will receive immunity in

16  exchange for your testimony against Officer Abdullah?

17          MR. BENTON:  Objection to form.

18          THE WITNESS:  Immunity?

19          BY MR. SCHEWEL:

20      Q.  Immunity from prosecution.

21      A.  It is not my understanding that I will be

22  prosecuted in this case.

23      Q.  But you don't have any sort of immunity

24  agreement?

25      A.  No.

1      Q.    So earlier we were discussing keeping a log of

2   your informant contacts.

3      A.    Yes.

4      Q.    And you stated that in 2019, you did not keep a

5   formal written log.

6      A.    That was not my practice at that point.

7      Q.    But today it is your practice?

8      A.    Yes.

9      Q.    And you were interviewed by the -- by an

10  officer in the Internal Affairs Unit?

11     A.    Sergeant, yes.

12     Q.    And that was Sergeant Davis?

13     A.    Yes.

14     Q.    And Sergeant Davis asked you about whether or

15  not you kept a written log of contacts with your

16  confidential informants?

17     A.    Yes.

18     Q.    And you answered the same way you did today,

19  which is you told him that you did not keep a formal

20  written log?

21     A.    That was not my practice in 2019.

22     Q.    Were you disciplined for your failure to keep a

23  formal written log in 2019?

24          MR. PETTEY:  Objection to form.

25          THE WITNESS:  I did not receive any written

1  discipline for that, no.

2            BY MR. SCHEWEL:

3      Q.   Did you receive any sort of correction or any

4  other sort of discipline?

5      A.   I don't believe I was disciplined.  There was

6  conversation had about best practices going forward, but

7  I was not -- I did not sign any paperwork for discipline.

8      Q.   Who had the conversation with you about best

9  practices?

10     A.   I don't recall.  I believe Lieutenant Bunch at

11 one point had a conversation about best practices for

12 CIs.

13     Q.   And was this after Abdullah was suspended?

14     A.   I don't recall the exact time frame.

15     Q.   Okay.  Was it after Dennis Williams was

16 suspended?

17     A.   I believe so, yes.

18     Q.   And who else was present for that conversation?

19     A.   I believe the whole squad was present.  It was

20 a loose conversation.

21     Q.   Okay.  And at that conversation with Lieutenant

22 Bunch, you discussed or he discussed making a formal

23 written log of all your contacts with your informants?

24     A.   We read over policy for CIs and it was

25 reiterated practices going forward in regards to policy.

1       Q.   Okay.  I'll ask you about that.  I'll come back

2   to that in a second.  But for now, can you walk me

3   through the process of making a controlled buy?

4       A.   If the CI is already established?

5       Q.   Yes.

6       A.   So contact is made with the CI regarding either

7   a location or a person.  It kind of is a case-by-case

8   basis.  Meet with the CI; the CI and I would discuss

9   information regarding this case.  The CI would be

10  searched for any money, drugs, weapons, et cetera.  If

11  the CI had a vehicle, this vehicle would be searched as

12  well.

13          There's a form that the CI would sign when

14  money is handed over.  The serial numbers are recorded.

15  A witness signs this form as well.  The CI is given the

16  money to do the controlled purchase.  The CI is wired up

17  with, usually, numerous cameras.  Location is discussed,

18  price is discussed, all of that is discussed prior to the

19  CI doing the buy.  And then on a case-by-case basis, if

20  they don't have a car, you know, I might drop them off

21  with someone else close to the location or they might

22  drive there and drive to a pre-determined location after

23  the buy.

24      Q.   Do you meet with your supervisor to approve a

25  buy prior to making it?

1      A.   There's really no formal meeting.  Part of my

2  best practice is I keep my supervisors ongoingly advised

3  about what is occurring.  The supervisor also has to

4  approve the monetary transaction.

5      Q.   So they will automatically know if you're

6  making a buy because they have to give you the money?

7      A.   That is current common practice, yes.

8      Q.   And let me -- I asked you previously about

9  the -- how Green Dairy and your office is organized.

10 Where is the pre-recorded buy money kept?

11     A.   On what time frame?

12     Q.   In 2019.

13     A.   In 2019, Sergeant Rolfe had a small lockbox in

14 his office that contained the money.

15     Q.   Where is it kept today?

16     A.   Sergeant Barber's office in a different

17 lockbox.

18     Q.   Okay.  So for all intents and purposes, the

19 same type of location?  No policy has changed related to

20 where the pre-recorded buy money is kept?

21     A.   No.

22     Q.   Prior to making a controlled buy, I know you

23 state that your policy is to talk to -- you know, get

24 money from your supervisor so your supervisor knows.  Do

25 you also alert the rest of the vice team that you are

1    making a controlled buy?

2        A.    Again, it's more of an informal -- we're all in

3    the same room.  We all discuss ongoing cases.  We like to

4    stay up to date on what everybody has going on.

5        Q.    So, typically, if -- in 2019, if Detective

6    Monroe was going to make a controlled buy, you would know

7    about it?

8        A.    Typically, yes.

9        Q.    And, typically, would you be involved in it?

10       A.    Typically, yes, if I was there and not on

11   another assignment.

12       Q.    Okay.  So if you are physically in Green Dairy,

13   in the office, he's going to make a controlled buy,

14   usually you would go be involved in it as well?

15       A.    That is correct.

16       Q.    Okay.  And so there's no requirement that you

17   inform the rest of the vice team or your supervisor,

18   necessarily, of what you're doing?

19       A.    The supervisor has control of the money.

20   Certain amounts of money have to be approved by a

21   supervisor, so my common practice is to always keep my

22   supervisor or the supervisor who's there, if mine is not,

23   apprised of what I am doing.

24       Q.    Okay.  And in 2019, when you started, was that

25   the same -- was that your practice?

 1       A.    Which part?

 2       Q.    Keeping your supervisor and your colleagues

 3   apprised of what you were doing.

 4       A.    Typically, yes.

 5       Q.    Okay.  And so let's say that, you know, you're

 6   going out to make a buy.  What would you usually tell the

 7   rest of the team?

 8       A.    Well, at this point, I was still on training,

 9   so Detective Monroe was often helping me to make sure

10   that I was doing it accurately, so he was already

11   involved, and then normally we would have several others

12   involved to have a full group that did buys.

13       Q.    Okay.  And at those meetings or those

14   discussions, what type of information would you share

15   with the group?

16       A.    A case-by-case basis, suspect information, if

17   we had it, location of the buy, which CI was being

18   utilized, et cetera.

19       Q.    Okay.  How much buy money you were using?

20       A.    At this point, I was still on training, so all

21   of that I made sure to run through Detective Monroe so

22   that I was doing it correctly.

23       Q.    Was it common practice to share the type of

24   drugs you were seeking?

25       A.    Yes.

1       Q.   And for other officers in the unit, would they

2  also share this information with you prior to them going

3  to make a controlled buy?

4       A.   So a case-by-case basis.

5       Q.   What do you mean by that?

6       A.   It depended on the detectives.  Some detectives

7  were more open about it, some not as much.

8       Q.   Okay.  Are you permitted to meet with a

9  confidential informant by yourself?

10      A.   Policy dictates, whenever possible, that two

11 people meet with informants.

12      Q.   Whenever possible?

13      A.   I believe so.  I can't quote the policy.

14      Q.   But your understanding of the policy is that

15 there are exceptions to that?

16      A.   I'd have to read the policy.  I don't have it

17 in front of me.

18      Q.   Have you ever met with a CI alone?

19      A.   Not in the initial meet, no.

20      Q.   Okay.  But after the initial meet, there have

21 been occasions where you've met by yourself with a CI?

22      A.   On occasion, case-by-case basis.

23      Q.   How many times, would you say?

24      A.   I remember twice off the top of my head.

25      Q.   Have you ever paid a CI by yourself?

1    A.   No.

2    Q.   Is that against policy?

3    A.   Yes, to the best of my recollection on policy.

4    Q.   Okay.  So to the best of your knowledge, when

5  you're paying a CI, there has to be another witness there

6  present to observe the payment?

7    A.   To the best of my recollection, yes.

8    Q.   And they actually have to sign a sheet saying

9  that they witnessed the payment?

10   A.   Yes.

11   Q.   Okay.  So let's go to when you -- after you've

12 done the discussion or the meeting with your team where

13 you actually meet with the CI, where will you typically

14 first meet with the CI?

15   A.   It's a case-by-case basis.

16   Q.   Do you ever meet with them at Green Dairy?

17   A.   Occasionally, yes.

18   Q.   You'll have them come there?

19   A.   Occasionally, yes.

20   Q.   Okay.  Where else would you typically meet with

21 a CI?

22   A.   It's a case-by-case basis.  If the location of

23 the buy is going to be far away, it makes no sense for

24 the recording devices to be recording a long-distance

25 travel, so a lot of times we will meet close to the

1    location of the buy, somewhere private, in order to do

2    all of the things I previously mentioned.

3         Q.   Okay.  And I think that you said when you

4    initially contact the CI, you do a search of the CI.

5         A.   Initially contact before a controlled buy?

6         Q.   Yes.

7         A.   Yes.

8         Q.   And what type of search is this?

9         A.   What do you mean?

10        Q.   Is it a frisk?

11        A.   It's more thorough than a frisk.  It's a search

12   of their person with their clothes on.

13        Q.   Okay.  And what are you looking for?

14        A.   Currency, drugs, weapons, et cetera.

15        Q.   Have you ever found any contraband on a CI when

16   you were doing the search prior to a buy?

17        A.   I don't recall.  I don't believe I have on any

18   of my CIs.

19        Q.   Have you ever found any contraband on a CI

20   after the controlled buy?

21        A.   That was not handed over as part of --

22        Q.   Right.  Yes, so contraband that should not have

23   been on them.

24        A.   Yes.

25        Q.   You have?

1        A.    Yes.

2        Q.    Okay.  Is this the instance that you mentioned

3   with Detective Monroe where, I believe, a woman had some

4   drugs in their bra or their shirt?

5        A.    Yes, sir.

6        Q.    Okay.  In addition to that instance, has it

7   happened any other times?

8        A.    Not that I can recall.

9        Q.    Okay.  And in that instance with Detective

10  Monroe, did you search that CI?

11       A.    I did.

12       Q.    And you searched her bra?

13       A.    I searched the exterior of her bra and felt

14  something that I believed to not be -- something other

15  than what should be currently contained in her bra and

16  believed it to be narcotics.

17       Q.    Okay.  And it was narcotics?

18       A.    It was bindles of heroin.

19       Q.    And she was not supposed to have bundles of

20  heroin in her bra?

21       A.    She had already turned over or her -- it was

22  two CIs.  They had already turned over the drugs and this

23  was a search after that, so she should no longer have had

24  controlled substances on her person at that point.

25       Q.    Okay.  At that point, was she terminated as a

1  CI?

2        A.   I believe so.

3        Q.   Why?

4        A.   She, in my training and experience -- and this

5  was not my CI.  This was Detective Monroe's CI, so I did

6  not do any terminating.  You'll have to discuss that with

7  him.  But based on my training and experience, she was no

8  longer deemed reliable because she had withheld drugs.

9        Q.   In that instance, do you recall observing her

10 purchase heroin on either her jacket camera or her

11 cellphone camera?

12       A.   My recollection -- this was a long time ago.

13 To the best of my recollection, I believe we were

14 watching it on the cellphone camera, but, again, my

15 details of that -- I remember the events you are talking

16 about, but watching of the videos, I do not recall

17 exactly how that transpired.

18       Q.   Okay.  But -- okay.  But you do think that you

19 observed some transaction?

20       A.   I believe so, yes.

21       Q.   And when you were observing the transaction, at

22 that time did something seem off to you?

23       A.   During the controlled purchase?

24       Q.   During the controlled purchase that you were

25 observing on the camera.

1      A.   I do not remember anything seemed off during

2   that period of time.

3      Q.   Not until you got back and frisked her?

4      A.   Searched her.

5      Q.   Searched her.  Okay.  And I believe you said

6   you place cameras on your confidential informants prior

7   to a buy.

8      A.   That is common practice, yes.

9      Q.   Is that your practice?

10     A.   That is my practice, yes.

11     Q.   Is it required policy?

12     A.   I believe it is, but, again, I do not have that

13   policy in front of me.

14     Q.   How many cameras do you place on the CI?

15     A.   I typically, personally, try to do 2 to 3.

16     Q.   Okay.  Where are your 2 to 3 cameras?

17     A.   That is a case-by-case basis.

18     Q.   Typically?

19     A.   Typically, there's a cellphone that livestreams

20   and then I like to have 2 additional, whether that's a

21   shirt button camera or a hat or a phone charger.  There's

22   a variety of methods we use to record interactions.  It

23   honestly depends on the CI and it's a case-by-case basis.

24     Q.   You have a camera that can be attached to a

25   phone charger?

1      A.   It like plugs into a cigarette lighter in the

2   car, yes.

3      Q.   Okay.  And I believe you said -- you started

4   with a cellphone that's a livestream.  Where is the

5   camera that shows you the buy or shows you what's

6   happening?  Where is it on the cellphone?

7      A.   It would be the typical camera of the

8   cellphone.

9      Q.   Okay.  And is the livestream recorded?

10     A.   Yes.

11     Q.   Do these cameras all provide audio of the

12  transaction?

13     A.   When they're working correctly, they are

14  supposed to.

15     Q.   And the livestream, where do you access the

16  livestream?

17     A.   Of --

18     Q.   The livestream that is on the cellphone camera.

19     A.   So we switched software companies somewhere in

20  2020.  I don't recall at what point.  Currently, we're

21  using a software called 1021, and you can access that

22  online.  It's uploaded to a cloud server of sorts.

23     Q.   Okay.  So let's say you're doing a controlled

24  buy in 2020 or 2019, prior to the May 21st incident.  You

25  have a cellphone camera on your CI.  It's a livestream.

1   How do you monitor the livestream?

2       A.   Oh, I apologize.  There's an app on my phone

3   where you can monitor that buy.

4       Q.   Okay.  Let's say you're doing it with Detective

5   Monroe.  Can Detective Monroe also have the app on his

6   phone at the same time?

7       A.   Yes.

8       Q.   Can a SEU officer have the app on their phone

9   at the same time?

10      A.   Yes.

11      Q.   Is it common practice for multiple officers to

12  have the app on at the same time?

13      A.   That is common practice.

14      Q.   How do you decide how much currency to provide

15  a CI?

16      A.   In regards to?

17      Q.   Prior to a controlled buy.

18      A.   The money utilized to buy the drugs?

19      Q.   To buy the drugs.

20      A.   It's a case-by-case basis.  It depends on the

21  quantity and what type of drug you're purchasing.

22      Q.   And I think you said that your sergeant has to

23  approve the currency distribution.

24      A.   That's common practice.

25      Q.   Well, has that ever not happened with you?

1      A.    Not approved the transaction?

2      Q.    Not approved the -- has it ever happened where

3  you've just gone and taken the currency on your own?

4      A.    Yes.

5      Q.    Okay.  In what situation?

6      A.    I don't recall all of the situations, but that

7  was something that did occur during this time frame.

8      Q.    Okay.  So tell me how that would happen.

9      A.    If the sergeant was otherwise occupied or had

10  something else going on or was not present.

11      Q.    Okay.  So let's say Sergeant Rolfe is out of

12  town.  Okay, Sergeant Rolfe is out of town and you need

13  some buy money.  What do you do?

14      A.    It depends on the amount of the money.  If it

15  was a certain amount, it had to be approved by a

16  different supervisor.  If it was a small buy, a lot of

17  times I got the money, myself, to do the buy.

18      Q.    So other people had keys to Sergeant Rolfe's

19  lockbox?

20      A.    There was a singular key that we all had access

21  to.

22      Q.    Okay.  Where was it kept?

23      A.    In his office.

24      Q.    And so if you needed buy money and he was out

25  of town, you would go to another supervisor?

1        A.   On a case-by-case basis.

2        Q.   And who were the other supervisors if Rolfe was

3   out of town?

4        A.   Lieutenant Bunch, the sergeant of the other

5   squad, whose name escapes me.  There was also several

6   other sergeants and the gang sergeant, CCU, Sea-doo

7   sergeant.  We're all considered drug supervisors.

8        Q.   Was the Gang Unit in Green Dairy?

9        A.   Yes.

10       Q.   Okay.  What other units are in Green Dairy?

11       A.   Total?

12       Q.   Yeah.

13       A.   The majority of our detective divisions.  I

14   would leave them out if I named all of them, but

15   Homicide, General.

16       Q.   Oh, all detective units are at Green Dairy?

17       A.   Most of them.

18       Q.   Okay.  So tell me the ones you recall.

19   Detective, Gang -- sorry, Homicide, Gang.

20       A.   So on our side of the building is Drugs and

21   Vice 1, Drugs and Vice 2, Sea-doo, CCU and Gangs.  That's

22   our kind of corner of the building.

23            The rest of the building has the RIC, Intel,

24   Homicide, General, Burglary, Robbery.  I'm sure one

25   escapes me.

1      Q.   Okay.  And so -- but what you're saying is

2   Sergeant Rolfe is out of town.  You need buy money.  You

3   either go to Bunch or the other sergeant who is in charge

4   of Vice Team 2?

5      A.   Typically, unless it was a smaller amount.

6      Q.   And if it's a smaller amount, what do you do?

7      A.   Occasionally, I would get the money myself.

8      Q.   Okay.  And in that -- well, I'm going to show

9   you what is marked as Plaintiffs' Exhibit AAA.  This is

10  the case jacket for David Mitchell.  It's from the second

11  consent production from the Raleigh Police Department.

12  The Raleigh Police Department has Bates stamped this as

13  0001.

14           MR. PETTEY:  Thank you.

15           (Plaintiffs' Exhibit AAA was identified.)

16           MR. SCHEWEL:  And I think there's one page

17  missing from that.  This is the last page.  It's 001

18  through 005, is what I'm currently showing.

19           MR. PETTEY:  Thank you.

20           BY MR. SCHEWEL:

21      Q.   Okay.  So what is this document?

22      A.   These are Receipt of Informant Funds documents.

23      Q.   And this one is dated May 12, 2020?

24      A.   Yes.

25      Q.   Time, 22:40?

1       A.    It is.

2       Q.    Okay.  And the signature of the requesting

3  officer is Officer Abdullah?

4       A.    I don't recall exactly what his signature looks

5  like.

6       Q.    Does it appear to be that?

7       A.    It appears to be that.

8       Q.    And his name is listed up top as officer?

9       A.    It is.

10      Q.    And the signature of the authorizing supervisor

11  is Rolfe?

12      A.    It is.

13      Q.    And the brief summary says, "RPD buy money used

14  for the purchase of an amount of heroin.  Future charges

15  will be sworn out on the target of this investigation"?

16      A.    That is what the brief summary says, yes.

17      Q.    Okay.  Now, just -- we can stay on the front

18  page there.  Just so I'm clear, I think you stated that

19  if there was a small amount of drugs, you would get the

20  money, yourself, right?

21      A.    It was a rare occurrence that that would

22  happen.  My common practice would be to get it from

23  Sergeant Rolfe.

24      Q.    If you got the money, yourself, who would sign

25  as the authorizing supervisor?

1       A.   Sergeant Rolfe would.

2       Q.   Even though he wasn't there?  I'm saying in the

3   hypothetical where he's out of town and you don't go to

4   Bunch, you don't go to the other sergeant, you get the

5   money, yourself.  Who signs as the authorizing

6   supervisor?

7       A.   I don't remember in any particular cases where

8   that occurred, so I -- I believe he would sign as the

9   authorizing supervisor, but I can't point a case out in

10  particular where that occurred for me.

11      Q.   Well, how would he sign as the supervisor if he

12  was out of town?

13      A.   You will have to ask him that.

14      Q.   Are you saying he signed it retroactively?

15      A.   I don't recall any cases where I did this.

16  Like I can't point you to any of my cases, so that will

17  be a conversation you'll have to have with him.

18      Q.   Well, you did just tell me that on occasion,

19  you did that.

20           MR. PETTEY:  Objection.

21           THE WITNESS:  I don't recall exact cases and

22  how the paperwork transpired.

23           BY MR. SCHEWEL:

24      Q.   Okay.  So let's turn this document over, and

25  this is 00002.  This is also a Receipt of Informant Funds

1   and this sheet shows or documents the distribution made

2   to Aspirin; is that correct?

3        A.   Based on what I can tell, yes.

4        Q.   And Aspirin is Dennis Williams?

5        A.   Yes.

6        Q.   And just for the record, when I refer to

7   Aspirin or Dennis Williams, I'm referring to the same

8   person.  Aspirin is his confidential informant name,

9   right?

10       A.   Yes.

11       Q.   Okay.  And on this page, the informant

12  signature is Aspirin?

13       A.   That is what it appears to be, yes.

14       Q.   The witness 1 is Abdullah?

15       A.   Yes.

16       Q.   And witness 2 is Rolfe?

17       A.   Yes.

18       Q.   So based on what you're reading here, is it

19  your presumption that Sergeant Rolfe and Officer

20  Abdullah, on May 12th, 2020, at 11:40, witnessed payment

21  of $80 to Aspirin?

22       A.   I did not sign this paperwork, so I have --

23  you're asking me questions I do not have direct knowledge

24  of.

25       Q.   Okay.  Well, let's say it said Meghan Gay was

1    witness 1.

2        A.    Okay.

3        Q.    In your practice, if you were witness 1 and

4    Sergeant Rolfe was your supervisor as witness 2, would

5    that mean that you had paid Aspirin $80 and Rolfe had

6    witnessed it?

7        A.    So this says that this was buy money used to

8    purchase heroin, so this was not a payment to Aspirin.

9    This was money utilized to buy heroin, based on what this

10   sheet says.

11       Q.    The same question for that.

12       A.    That would be my common practice.

13       Q.    Okay.  So the payment would be done --

14       A.    Again, this is not a payment.

15       Q.    The buy money would be given to the CI and the

16   witness would actually be there present to observe that?

17       A.    That is common practice, yes.

18       Q.    Have you ever paid a witness by yourself?

19       A.    No.

20       Q.    Have you ever paid a CI by yourself?

21       A.    I apologize.  I don't think I've ever paid a

22   witness for anything.  I answered too quickly.

23       Q.    I'll strike the question.  Have you ever paid a

24   CI without another witness present?

25       A.    No.

1      Q.   Have you ever given buy money to a CI without

2   another witness present?

3      A.   I don't believe so.

4      Q.   You think you may have?

5      A.   I don't believe so.

6      Q.   Is it your belief that had you done so, that

7   would be in violation of RPD policy?

8      A.   I'd have to have the policy in front of me.  I

9   believe policy is that all payments be done with another

10  person.

11     Q.   There is no RPD policy that says you're allowed

12  to get the money, yourself, for a small amount of drugs,

13  is there?

14     A.   I don't believe so.

15     Q.   After you distribute the buy money, what

16  happens next in a controlled buy?

17     A.   So after the confidential informant has been

18  searched and provided with electronic surveillance

19  equipment, at that point?

20     Q.   Yes.

21     A.   The CI would go to the location that was

22  discussed and attempt to buy controlled substances.

23     Q.   Do you attempt to get in close proximity to the

24  buy?

25     A.   Either I would or another detective would.

1         Q.    And if you are in the same car as another

2    detective, then both of you are, right?

3         A.    Usually, we utilize more personnel than that.

4         Q.    Describe that.

5         A.    So if the CI is driving and myself and another

6    detective are in a follow car, we might stop and then

7    follow them out, where another detective may be posted up

8    closer to have a better visual of what's occurring.

9         Q.    Okay.  So other members of the vice team are

10   usually involved to help monitor the buy and monitor the

11   confidential informant?

12        A.    Typically, yes.

13        Q.    And how many cars are typically used to monitor

14   a controlled buy?

15        A.    It's a case-by-case basis.

16        Q.    As the CI -- after the CI leaves the car, do

17   you then watch the livestream of the buy on your

18   cellphone?

19        A.    That is common practice, yes.

20        Q.    And by "common practice," you mean it's your

21   common practice?

22        A.    Yes.

23        Q.    Is it also the common practice of the unit, of

24   the team?

25        A.    Yes.

1     Q.   What can you typically see on the cellphone

2  video?

3     A.   It depends on the CI.

4     Q.   Okay.  What would you like to be able to see on

5  the cellphone video?

6     A.   The whole point of the livestream is to be able

7  to not only see what's occurring, but also help protect

8  the CI if it becomes a dangerous situation.

9     Q.   So what would you like to be able to see on the

10  cellphone video?

11     A.   I would like to be able to see the suspect.  I

12  would like to be able to see as much of the drug

13  transaction as is available.  I would like to see

14  everything that I can see.

15     Q.   How often are you able to observe the

16  transaction on the livestream?

17     A.   Very often.

18     Q.   So you think 9 out of 10 times?

19     A.   In my practices with my CIs, approximately.

20     Q.   Okay.  And does it set off a red flag for you

21  if you are not able to observe the transaction?

22     A.   It's a case-by-case basis.

23     Q.   What do you mean by that?

24     A.   If the drug dealer becomes suspicious of the

25  phone and asks them to put it away or something like that

1  occurs, that would not trigger a red flag because that

2  happens.

3       Q.   Sure.

4       A.   But if there was no video, it would become a

5  conversation.  If it happened a second time, it would

6  become a problem.

7       Q.   Okay.  And if it happened a second time and it

8  became a problem, what would you do?

9       A.   I have not had that occur with my CIs.

10      Q.   What do you think you would do?

11      A.   I would probably discontinue using the CI.

12      Q.   After a second time of being not able to

13 observe a controlled buy on a livestream?

14      A.   At that point, that would conflict with my

15 ability to deem them reliable.

16      Q.   Do you instruct the CI to hold the phone a

17 certain way so you can surveil the operation?

18      A.   I do.

19      Q.   How do you do that?

20      A.   I inform them where the camera is, what buttons

21 they can and cannot press and what I need from them in

22 regards to that livestream.

23      Q.   Can you describe how you do that?

24      A.   I would take the phone, I would show them where

25 the camera is.  I would tell them there's a button on the

1   side you can't press; otherwise, it will freeze the

2   video.  And I tell them, "This is what I need to see, so

3   you need to let the camera do the work."

4        Q.   And just for the record, Officer Gay is

5   holding -- is that your department-issued phone?

6        A.   It is.

7        Q.   -- your department-issued phone and you are

8   holding it facing the camera towards me?

9        A.   Yes.

10       Q.   And is it fair to say that I'm sitting across

11  from you?

12       A.   Yes.

13       Q.   And you are holding the camera as to -- so it

14  would picture me?

15       A.   Yes.

16       Q.   Is there anything else you tell the informants

17  to do when holding the livestream camera?

18       A.   That's all that I can recall at this moment.

19       Q.   What about with the other cameras that are --

20  you mentioned a hat camera and a jacket camera.  Are

21  those livestream?

22       A.   No.

23       Q.   And what do you instruct the CIs to do with

24  those cameras?

25       A.   So for the hat, the viewing tends to be a

 1    little big high, so we instruct them, as the buy is

 2    occurring, to dip their head so that the camera gets a

 3    full view of what's occurring.  The button camera tends

 4    to be the middle of the chest, so we tell them not to

 5    obstruct the view, but there's really not a lot of

 6    instruction as to -- it just records.

 7        Q.   How often would you say the jacket camera shows

 8    the transaction?

 9        A.   It's a case-by-case basis.  Sometimes you can

10    do everything right and the camera doesn't pick it up.

11        Q.   How often is the jacket camera obstructed and

12    it shows nothing or is black?

13        A.   Occasionally.

14        Q.   What does that mean?  Half the time?

15        A.   It's occasionally.  It's a case-by-case basis,

16    depending on what they're wearing, what the scenario is,

17    is it winter, is it not.

18        Q.   Okay.

19        A.   I can't put a numerical value on that.

20        Q.   Is it fair to say that the cellphone livestream

21    is typically more accurate and shows the transaction more

22    often than the jacket camera?

23        A.   Not necessarily.

24        Q.   Well, you said the cellphone livestream got it,

25    in your experience, approximately 9 out of 10 times.

1      A.    Approximately.

2      Q.    So you're saying the jacket camera also gets it

3  approximately 9 out of 10 times?

4            MR. PETTEY:  Objection.

5            MR. BENTON:  Objection.

6            THE WITNESS:  I'm having -- you're trying to

7  place a numerical value on this.

8            BY MR. SCHEWEL:

9      Q.    I'm just asking you --

10     A.    Every case is different.

11     Q.    I'm sorry to interrupt.  I'm just asking you if

12 they're --

13     A.    That's part of the reason we use so many

14 cameras, is to be able to capture it from as many

15 viewpoints as possible, so if one camera fails, we have

16 it on other recording devices.

17     Q.    Have you ever had a situation where none of the

18 cameras showed anything?

19     A.    Yes.

20     Q.    What did you do in that situation?

21     A.    I planned another buy.

22     Q.    Okay.  And what happened in the second buy?

23     A.    Usually, the buy is better recorded.

24     Q.    Okay.  In the situation where none of the

25 cameras show anything -- and by that, I just mean they're

 1   dark or blank or covered -- did you make an arrest based

 2   off of that transaction?

 3        A.   Not to my knowledge.

 4        Q.   Why not?

 5        A.   Because at that point, based on my common

 6   practices, I would like to have a better video because I

 7   know when it goes to court, the district attorney's

 8   office needs video, and so if I can't have a video, to

 9   me, I would like to see another transaction with video to

10   further my case.

11        Q.   Is that Mr. Blanchard that we're hearing

12   feedback from?

13             MR. BLANCHARD:  Yeah.  I just dropped my pen.

14   I'm sorry.  My hand is tired.

15             MR. SCHEWEL:  Norwood, are you able to put

16   yourself on mute?

17             MR. BLANCHARD:  Yeah.  Sorry.

18             MR. SCHEWEL:  Thanks.

19             BY MR. SCHEWEL:

20        Q.   After the buy occurs, what happens?

21        A.   I meet with the CI and another officer at a

22   predetermined location.

23        Q.   Does the CI give a signal of a successful buy?

24        A.   Not necessarily.

25        Q.   But that does happen sometimes?

1      A.   I mean, what do you mean, a signal?

2      Q.   I don't know.  Do you tell the CI to signal in

3  any way if they've had a successful buy?

4      A.   If it's just a buy, there's no need for a

5  signal.  Whether they did the buy or not, we're going to

6  meet at the same predetermined location.

7      Q.   What about if it's a takedown?

8      A.   The takedown, there would be some sort of a

9  signal, unless I could see it on the livestream.

10     Q.   How does the CI give a signal?

11     A.   It's a case-by-case basis.  It's something you

12  work out with the CI.

13     Q.   So is it like a code word?

14     A.   Typically, it can be.

15     Q.   So my question, I guess, is, is it a verbal

16  signal?

17     A.   Based on what I do, my common practice is I

18  would tend to do a verbal signal.

19     Q.   Okay.  Okay.  So let's go to picking up the CI

20  afterwards.  What happens when you pick up the CI?

21     A.   When you meet with the CI at a predetermined

22  location, I take custody of the controlled substances.  I

23  turn off all the recording devices.  I search the CI for

24  any additional contraband.  If the CI has a vehicle, that

25  is searched again as well, and then we debrief on what

1    happened.

2         Q.   Has it ever occurred where other officers on

3    your vice team will pick up the CI after a buy?

4         A.   Rarely, but it does happen.

5         Q.   Okay.  If they -- if other officers on the vice

6    team pick up a CI after a buy, will they search and do

7    all the things that you just described?

8         A.   I would say it was a case-by-case basis.

9         Q.   Why do you say that?

10        A.   Because if it's my CI, I'm responsible for them

11   and I'm responsible for all pieces of that.  So if

12   someone else picked up the CI and brought them to me, I

13   like to do my own searching.  I like to do my own

14   recoveries because it's my case, so I can't speak for

15   every detective's practices.

16        Q.   Why would a different member of the vice team

17   pick up your CI or a CI that you had dropped off?

18        A.   It's a case-by-case basis.  Occasionally, if we

19   have a CI that's in trouble that needs to get picked up

20   quickly, whoever is closest to them will pick them up, or

21   if I wanted to run by the location where the buy occurred

22   because I want to connect some dots for myself or see a

23   suspect, someone else might pick them up, but I tend to

24   like to have control over my CIs.

25        Q.   Have you ever heard of CIs in Vice Team 1 or

1    Vice Team 2 taking drugs?

2         A.   What do you mean, taking drugs?

3         Q.   So during a controlled buy, taking some of the

4    drugs that they were supposed to give back to the

5    officer.

6         A.   It does occur occasionally, yes.

7         Q.   How many times have you heard of it occurring?

8         A.   Less than a half a dozen, maybe.  I don't think

9    I can put an exact number on it.  It does happen

10   occasionally.

11        Q.   Okay.  And those are the times where a CI has

12   been, I guess, caught doing that?

13        A.   Yes.

14        Q.   And when a CI is caught doing that, what

15   happens?

16        A.   So if I catch a CI doing that, I discontinue

17   the use of the CI.  I cannot speak for every detective in

18   that division.

19        Q.   Do you think it's possible that detectives on

20   the vice team could catch a CI taking drugs and not

21   discontinue use of them?

22        A.   I don't have any knowledge of that.  I just

23   don't want to speak for them.

24        Q.   Okay.  What about taking buy money?  Have you

25   ever heard of CIs in Vice Team 1 or Vice Team 2 taking

1   buy money?

2       A.   Are you talking about specific cases related to

3   this or are you talking about in general?

4       Q.   Other than Dennis Williams, have you ever heard

5   of that happening?

6       A.   No.

7       Q.   Is it your opinion that Dennis Williams took

8   buy money?

9       A.   Again, I do not have firsthand knowledge of

10  those events.  Is it my opinion?  I believe so.

11      Q.   Why?

12      A.   Based on the events and the money found on

13  May 21st, it is my opinion that money was missing.

14      Q.   Do you believe that Dennis Williams took buy

15  money on more than one occasion?

16      A.   I do not have that opinion.

17      Q.   Do you recall your interview with the SBI that

18  we spoke about previously?

19      A.   Yes.

20      Q.   Do you recall telling the SBI agent about a

21  situation where you executed a search warrant on a

22  home -- sorry.  Strike that question.

23           Do you recall telling an SBI agent about other

24  occasions involving Dennis Williams where you believed

25  that money had gone -- buy money had gone missing?

1              MR. PETTEY:  Objection, form.

2              THE WITNESS:  Are you talking about the one

3     particular case referenced in my SBI interview?

4              BY MR. SCHEWEL:

5         Q.   I'm not talking about the 5/21/20 case.

6         A.   Correct.

7         Q.   Yes.

8         A.   You're talking about on page 3 where Omar did a

9     takedown of a house?

10        Q.   Could you read that out loud for us, please?

11        A.   "On a second occasion, Abdullah had a takedown

12    of the house.  The suspects at the back had approximately

13    one pound of marijuana.  There was no evidence of heroin

14    and the main suspect only had $60 in special funds.  The

15    rest of the money was found stuffed in a pool table."

16    Would you like me to continue?

17        Q.   No.  So on that occasion, did you believe that

18    buy money had gone missing?

19        A.   I don't believe so.

20        Q.   Okay.  What happened on that occasion?

21        A.   In reference to --

22        Q.   Well, you said only $60 was found on the -- on

23    the suspect, right?

24        A.   I believe so.

25        Q.   Okay.  And so, just to be clear, the rest of

1   the money was found in a pool table?

2       A.   To the best of my recollection, the rest of the

3   buy money was found --

4       Q.   Okay.

5       A.   -- in a pool table.

6       Q.   Do you mind if I see that?

7       A.   (Witness complies.)

8       Q.   Thanks.  Okay.  So this is what I'm referring

9   to.  It's on page 3 of your SBI interview.  In the middle

10  paragraph, it starts, "Gay's first week," if you could

11  just read that out loud to us, please.

12      A.   "Gay's first week, Abdullah had takedown

13  involving Williams.  Williams ended up losing the money

14  and the narcotics ended up being fake."

15      Q.   Okay.  So do you recall what happened on that

16  situation?

17      A.   I recall vague details.  This was my first -- I

18  don't even think I had been promoted yet.  I was just

19  starting to loosely train over there before I got

20  promoted.

21      Q.   Do you know what your first day was?

22      A.   I would have to look.

23      Q.   But it was December 2019?

24      A.   I believe so.

25      Q.   Okay.  And so can you tell us the loose details

1    that you recall?

2        A.   This was a case involving a vehicle off of Rock

3    Quarry Road.  The -- again, I don't recall most of the

4    vehicles -- or details.  I just recall that I believe it

5    was being middle manned and that the middle man ran, the

6    vehicle ran and it was a little bit chaotic.

7        Q.   And so the buy money was never located?

8        A.   That was my belief, but, again, I did not

9    handle any piece of this.  I was there and beginning to

10   train as a detective.

11       Q.   And in this instance, you didn't necessarily

12   think that Dennis Williams had taken the buy money, just

13   that it had disappeared?

14       A.   Well, again, the vehicle ran from marked patrol

15   units that attempted to stop it, and there was another

16   individual that ran on foot, so it was -- I had no

17   knowledge of anything other than this being a takedown

18   that went sideways.

19       Q.   Thank you.  Okay.  So after you pick up a CI,

20   you've searched him or her, and they hand you the

21   narcotics that they've just purchased.

22       A.   So this is at the end of a buy?

23       Q.   At the end of a buy.

24       A.   Yes.

25       Q.   Do they typically hand you the narcotics?

1      A.   Case-by-case basis.  Occasionally, if it's in

2 the car, I will retrieve it or they will hand it to me.

3      Q.   Okay.  So they might say, "Okay, the drugs are

4 in the back seat"?

5      A.   Typically, it would be somewhere in the

6 lungeable area of the front of the car or on their person

7 if they were walking.

8      Q.   Got it.  And when you get the drugs, if they

9 are alleged heroin, do you field test the drugs?

10      A.   At that moment?

11      Q.   Or sometime after.

12      A.   Typically, yes.

13      Q.   When would you typically do it?

14      A.   When I -- so, typically, if it's loose heroin,

15 I would test it.  If it was in bindles, I typically would

16 not.

17      Q.   Okay.  And the reason why is because if it's in

18 bindles, you are worried about fentanyl exposure?

19      A.   Yes, fentanyl exposure, as well as heroin can

20 be just as deadly if it's inhaled, and bindles are so

21 small that it is not common practice to open bindles,

22 especially if they're taped shut in order to get drugs

23 out to field test them.  That's what we have CCBI for.

24      Q.   Okay.  Do you recall telling Detective Davis

25 during your Internal Affairs interview that at the time,

1    in 2020 and 2019, heroin was typically loose?

2          MR. PETTEY:  Objection to form.

3          THE WITNESS:  I'd have to look at it.  I

4    believe it just depends on the way it comes, but a lot of

5    time it is loose.

6          BY MR. SCHEWEL:

7    Q.    I'm just asking if you recall stating that to

8    Detective Davis.

9          MR. PETTEY:  Objection.

10          THE WITNESS:  Do you mind if I look back at my

11    Internal Affairs interview?

12          BY MR. SCHEWEL:

13    Q.    Sure.  Let's look back at it.  Okay.  So I am

14    giving you what is marked as Plaintiffs' Exhibit VV.

15    This is your first interview with Detective Davis.

16    A.    Sergeant Davis.

17    Q.    Sergeant Davis, and this one is 29 pages long.

18          (Plaintiffs' Exhibit VV was identified.)

19          BY MR. SCHEWEL:

20    Q.    Okay.  And I think that I will direct you to

21    page 19.

22          MR. PETTEY:  Do you have a copy?

23          MR. SCHEWEL:  I think I do.  Give me one

24    second.  I'm sorry, Rod, I only made -- I don't have a

25    second copy of this, but I'm happy to share it with you.

1          MR. PETTEY:  I'll look over her shoulder.

2          BY MR. SCHEWEL:

3     Q.    Okay.

4     A.    Could you repeat the question?

5     Q.    Sure.  Give me one second, please.  Okay.  So

6    on the bottom of page 18, Sergeant Davis asks you, "And

7    in that situation, do you -- do you guys field test any

8    of that?"

9          And then your answer was, "So heroin, if it

10   comes in bindles, we don't tend to field test because

11   there's such a small amount, it's very hard to get out of

12   the bindles, but anything that comes in a bindle that

13   I've ever dealt with has been heroin.  If it's loose,

14   usually we will test a small amount."

15         Question, "So loose drugs you'll test?"  And

16   now I'm on page 19.  "Yes."

17         "And can you kind of describe?  Any kind of

18   like --"

19         Question, "Like --"

20         Answer, "I'm sorry."

21         Question, "Loose drugs because I've seen it."

22         Answer, "So anything is like --"

23         Question, "And I -- I can picture --

24         Answer, "Like --"

25         Question, "A bindle, because normally there is

 1   what, a little mark on it or something to signify the
 2   dealer; is that right?"
 3              Answer, "Yes."
 4              Question, "So --"
 5              Answer, "Yes, sir."  And we're on to page 20.
 6              Question, "But what is --"
 7              Answer, "And a lot of times they'll be closed
 8   with tape or something and so we don't tend to open up
 9   these tiny bindles that are specifically closed because
10   they'll spill everywhere, but loose drugs is like -- like
11   in a corner of a plastic bag, so like you know how crack
12   rocks can be in a corner of a plastic bag?"
13              Question, "Yeah."
14              Answer, "For some reason, in Raleigh now,
15   they'll do loose heroin -- they'll do heroin loose like
16   that, but it's pretty distinctive, um, depending on what
17   type of heroin.  But the brown heroin is pretty
18   distinctive and sometimes it'll just come loose, like
19   powdered cocaine would, so we test that."
20              So my question was, do you recall telling
21   Sergeant Davis that at this time in Raleigh, they'll do
22   heroin loose?
23        A.   Yes.
24        Q.   And what did you mean by that?
25        A.   So loose, I mean exactly that.  It's not in

 1  bindles, so a bindle is a small, little waxy piece of

 2  paper that is -- or not piece of paper.  It's like a

 3  little, tiny envelope that contains a small quantity of

 4  drugs.

 5          Loose would be, where as a larger quantity of

 6  drugs is in one singular plastic bag, as opposed to

 7  individually divvied up into bindles.

 8      Q.   And the point you were making or you were

 9  telling Sergeant Davis was that at this time in Raleigh,

10  most sellers were selling their heroin loose?

11          MR. PETTEY:  Objection.

12          THE WITNESS:  I don't know that I said "most,"

13  but it is -- I've seen it both ways.

14          BY MR. SCHEWEL:

15      Q.   Okay.  Is it your decision to field test the

16  drugs or not?

17      A.   Typically, yes.

18      Q.   When would it not be your decision?

19      A.   If a supervisor or another detective felt like

20  something was wrong.  For example, during this period of

21  time when Detective Monroe was my field training officer,

22  if he requested it, I would do it as well.

23      Q.   Do you ever tell a CI to make more than one buy

24  on the same day?

25      A.   Do I ever tell them?

1     Q.   Do you ever take them to do that or tell them

2  to do that, yes.

3     A.   Occasionally, yes.

4     Q.   Okay.  In what situation?

5     A.   Sometimes we will do projects, for example, if

6  there's high crime, high drug areas, we'll do a project,

7  we'll work with the DA's office to target a specific area

8  that is high crime.

9          So if we have a good CI that can walk up to

10  these areas and buy from multiple dealers, occasionally

11  we will do several buys.

12     Q.   Okay.  And in that situation, you'll instruct

13  them to do that?

14     A.   So each buy is handled individually, so one buy

15  would occur, all of the previous things I stated,

16  including searching, wiring them up, et cetera, would

17  occur.  They would return with the drugs and then the

18  same set of scenarios would happen again.  It would not

19  be multiple purchases off of one thing.

20     Q.   Why is that?

21     A.   Again, you're dealing with reliability of CIs.

22  They're instructed to do one specific thing, go to one

23  specific place.  It's how we deem them reliable.

24          If they deviate from what I've asked them to

25  do, we start to have a problem.

1        Q.    And, also, you want to be able to search them

2   afterwards to see if they have any sort of contraband on

3   them and to make sure that they've actually bought the

4   drugs that you told them to buy?

5        A.    Correct.

6        Q.    When you are finished with the buy, you've

7   picked up the CI, they've given you the drugs, do you pay

8   the CI?

9        A.    It depends on the situation.

10       Q.    If they are a paid informant?

11       A.    It depends on the situation.

12       Q.    Okay.  Please describe.

13       A.    Are you talking about this -- like a project

14   where we would send them for multiple --

15       Q.    Sure, yes.

16       A.    So for that instance, say, we knew we wanted to

17   do two or three different buys.  We would bring the money

18   to pay them for that after all of those -- each

19   individual buy had occurred, we would typically pay them

20   there and send them on their way.

21       Q.    Okay.  Are there -- in what situation would you

22   not pay them there?

23       A.    If it was a takedown or something of that

24   instance, their payment would depend on how the takedown

25   went, and so nothing was promised.  And then it was, "I

1  will get up with you at a later time when I have my

2  investigation finished," in order to pay the CI.

3       Q.   Did you ever sign as a witness to Officer

4  Abdullah paying Aspirin?

5       A.   I don't recall.

6       Q.   Did you ever observe Officer Abdullah paying

7  Aspirin?

8       A.   I don't recall.

9       Q.   Did you ever observe Officer Abdullah giving

10 Aspirin buy money?

11      A.   Sometimes when these occurred, I might have

12 been in the same like kind of group, if that makes sense,

13 if we were all doing a buy together, so all of the

14 details of all of these buys that happened almost three

15 years ago, I don't recall exact dates and times and what

16 happened.

17      Q.   Okay.  But you're saying you think that there

18 were times where Abdullah was meeting with Dennis

19 Williams, you were with the vice team and you were

20 present as he gave Williams buy money?

21      A.   I'm sure I was.  I don't recall specifics, but

22 I know I was a part of these takedowns and I was a part

23 of several times that he did buys.

24      Q.   In these -- in these instances that you're

25 talking about, was the buy money distributed at Green

1   Dairy?

2        A.   Distributed to --

3        Q.   Dennis Williams.

4        A.   The buy money?

5        Q.   The buy money.

6        A.   If I remember correctly, typically, we met

7   Dennis somewhere in the field close to where the buy was

8   going to be.

9        Q.   Okay.  And the full vice team or everyone who

10  was going to be present on that day for that buy would be

11  there with Dennis Williams and with Abdullah when the buy

12  money was being distributed to him?

13       A.   Not necessarily.

14       Q.   But on some occasions?

15       A.   Detective Abdullah tended to deal with Aspirin

16  kind of on his own, but I don't want to say something and

17  be wrong.  I just don't recall exact details.

18       Q.   Right, but you just told me that you recall

19  times where you were present with other members of the

20  vice team and at least you were talking, and Abdullah was

21  talking to Aspirin prior to a buy.

22       A.   Yes.

23       Q.   Okay.  And on the times you recall, do you

24  recall other members of the vice team being present?

25       A.   Yes, but I don't know that I could name them

1  for individual instances.

2      Q.   Okay.  Do you know if Sergeant Rolfe kept a

3  record of buy money distributed to detectives?

4      A.   So, again, what he did, I cannot speak to.  He

5  did what he did.  To the best of my recollection, he kept

6  the --

7      Q.   Receipt of Informant Funds?

8      A.   -- the Receipt of Informant Funds, yes.  I

9  believe those are audited by our Internal Affairs or our

10  Inspections Division.

11      Q.   Why do you believe they're audited by Internal

12  Affairs or Inspectors?

13      A.   Inspections is another division of our Internal

14  Affairs office.  I've seen them come in and count the

15  money and make sure the slips and everything match.

16      Q.   Did you see them do that in 2019?

17      A.   I'm sure I did.  It's a pretty regular

18  occurrence.  And, again, probably 2020 -- let me correct

19  myself.  I was only a detective for a very small part of

20  2019.

21      Q.   Okay.  So when you say it's a regular

22  occurrence, you think it happens approximately once a

23  month?

24      A.   I could not tell you the exact occurrence, but

25  it's -- it's a common practice that occurs on a regular

 1   basis.  I can't be any more specific than that.

 2        Q.   When's the last time it happened?

 3        A.   A week or two ago.

 4        Q.   Do you recall it happening in 2020?

 5        A.   I'm sure it did.  I just can't give you dates.

 6        Q.   Do you recall in your interview with Detective

 7   Davis that we just went over -- Sergeant Davis, sorry,

 8   that we just went over, do you recall telling him --

 9        A.   They work very hard for those stripes.

10        Q.   -- that a CI has motivation to produce more

11   than just a simple street buy?

12             MR. PETTEY:  Objection.

13             THE WITNESS:  Produce more than a simple street

14   buy?  Can you elaborate on -- or do you want me to

15   elaborate?

16             BY MR. SCHEWEL:

17        Q.   Yes, please.

18        A.   So if a confidential informant is motivated by

19   money, they can get different amounts of money, depending

20   on -- like if a search warrant is executed and different

21   quantities of drugs are found, they can get paid

22   different amounts.

23        Q.   So is your statement to Sergeant Davis accurate

24   that a CI has motivation to produce more than just a

25   simple street buy?

1          MR. PETTEY:  Objection.

2          THE WITNESS:  Yes.  It just requires context

3    because a simple street buy, depending on if it leads to

4    a search warrant, can produce different things, so a

5    simple street buy might be a crack rock of cocaine, but

6    that could produce -- if that leads me to the execution

7    of a search warrant, that can produce, depending on what

8    we find during the search warrant.  Does that make sense?

9          BY MR. SCHEWEL:

10    Q.   So in that situation that you're just

11    describing, the CI actually could make more money because

12    it led to a search warrant?

13    A.   Depending on what is recovered during the

14    search warrant, yes.

15    Q.   I see.  So what you're saying is a CI has

16    motivation to produce either larger amounts of drugs or

17    more serious drugs?

18          MR. PETTEY:  Objection.

19          THE WITNESS:  I'm a part of the Drug Detective

20    Unit.  Our goal is to get violent criminals and drug

21    dealers off the streets, so the larger the quantities or

22    different types of drugs, or if it's more of a career

23    offender or if there's firearms involved, we are willing

24    to pay CIs more to get bad people off the streets.

25          BY MR. SCHEWEL:

1      Q.   And that's -- the CI's motivation is to make

2   more money?

3      A.   Depending on the CI.  If they are financially

4   motivated, yes.

5      Q.   Okay.  So after the controlled buy is over and

6   you've returned to Green Dairy, when you were in field

7   training, would you typically debrief the case with

8   Officer Monroe, your field training officer?

9      A.   Typically, yes.

10     Q.   Would you also debrief with other members of

11  the vice team?

12     A.   Typically, it would happen in that office where

13  everyone is present.

14     Q.   And so everyone is kind of listening and

15  hearing and pitching in?

16          MR. PETTEY:  Objection.

17          THE WITNESS:  It depends on the case.  It's a

18  case-by-case basis.  There was not a set debriefing after

19  every buy.

20          BY MR. SCHEWEL:

21     Q.   Okay.  After your controlled buy, is it your

22  practice to review the buy videos?

23     A.   Yes.

24     Q.   All three videos?

25     A.   Yes.

1          Q.    And does your supervisor review the buy videos?

2          A.    Currently?

3          Q.    In 2019.

4          A.    Typically, he did not.

5          Q.    Currently?

6          A.    Typically, he does not.

7          Q.    He does not?

8          A.    Typically.

9          Q.    He does not review the buy videos?

10         A.    So let me rephrase.  I do not know who reviews

11   the livestream that is uploaded to a cloud server.  All

12   of my supervisors have my log-in access.  I do not know

13   what they review.

14              The ones that are just recorded and downloaded,

15   I put in my file and they're not typically reviewed

16   unless there's a problem.

17         Q.    Okay.  So the practice, as far as supervisor

18   review of buy videos, has not changed since 2019?

19         A.    Typically, no.

20         Q.    Okay.

21         A.    To my knowledge, again.  I don't know who

22   accesses the cloud data of the -- I can't speak for my

23   current supervisors because they have access to that and

24   they can pull it without me -- my knowledge.

25         Q.    In 2019, was it common practice for Sergeant

 1  Rolfe to come with you on a controlled buy?

 2      A.   Typically, yes.

 3      Q.   And was it typical for Sergeant Rolfe to

 4  observe the livestream?

 5      A.   Typically, yes.

 6      Q.   Was it common practice for Sergeant Rolfe to go

 7  on a buy with Sergeant Abdullah in 2019?

 8      A.   Detective Abdullah.

 9      Q.   Detective Abdullah?

10      A.   Typically, yes, but it was kind of a

11  case-by-case basis, depending on what administrative

12  duties he needed to get done in the office.

13      Q.   Was it common practice for Sergeant Rolfe, in

14  2019 and 2020, to go on controlled buys with any member

15  of the vice team?

16      A.   Again, on a case-by-case basis.  A lot of

17  times, he was typically there, depending on what other

18  administrative things he had going on.

19      Q.   Got it.  Okay.  I'm going to show you a video

20  and ask you questions about it, and I think, then, after

21  that, if folks would like, we can have a short lunch

22  break.  Sound good?

23          MR. PETTEY:  I was going to ask you about that.

24          MR. SCHEWEL:  Okay with everybody?  All right.

25  All right.  Table box 1?

1          THE WITNESS:  I think he said 1.

2          BY MR. SCHEWEL:

3      Q.    Okay.  This is body camera footage from the

4  arrest and takedown of Curtis Logan, and this is marked

5  as Body Cam 1 on the Raleigh Police Department consent

6  production, and for the plaintiffs' exhibits today, it's

7  marked as Exhibit YY.

8          (Plaintiffs' Exhibit YY was identified.)

9          BY MR. SCHEWEL:

10     Q.    Do you recall being present for the arrest of

11  Curtis Logan with his two minor children in the car?

12     A.    Can you give me a time and location where this

13  occurred?

14     Q.    January 2nd, 2020, at a Sheetz gas station, I

15  believe.

16     A.    Yes.

17     Q.    What do you recall about the incident?

18     A.    I believe it was a takedown for a quantity of

19  heroin.  I remember SEU was going to do a flash bang.

20     Q.    SEU was going to use a flash bang?

21     A.    But they -- based on, I believe, the criminal

22  history of the person in question, they did not because

23  of the minor children in the car.  The takedown -- again,

24  this happened a while ago.  My details are a little

25  fuzzy.  I remember the takedown occurred.  The male that

1   was driving the vehicle was detained, and I helped assist

2   with the children afterwards because they were -- I dealt

3   with the children afterwards.

4       Q.   So you said that SEU was going to use a flash

5   bang.

6       A.   Based on my recollection, yes.

7       Q.   Why were they going to use a flash bang?

8       A.   I believe -- and, again, I can't speak for

9   SEU's tactics because that is not my area of expertise.

10  But based on the criminal history of the defendant, I

11  believe -- I believe he had a violent criminal history.

12      Q.   How would you use a flash bang at a gas

13  station?

14      A.   Again, I cannot speak to tactics.  I am not an

15  SEU member.

16      Q.   Have you ever been in a situation where a flash

17  bang has been used anywhere other than a house?

18      A.   Yes.

19      Q.   Where?

20      A.   Cars.

21      Q.   How do you use a flash bang at a car?

22      A.   Again, I am not an SEU officer.  I cannot speak

23  to tactics.  I do not touch the flash bangs.  I do not

24  throw them.  That is not my decision.

25      Q.   I'm just curious.  So when you -- the situation

1   you are mentioning where a flash bang was used at a car,

2   did you observe the flash bang being used?

3        A.   Yes.

4        Q.   Okay.  And what happened?

5        A.   Define "what happened."

6        Q.   Was the flash bang thrown?

7        A.   The flash bang was thrown, yes.

8        Q.   And it was thrown in what direction?

9        A.   I believe it landed on top of the car.

10       Q.   And what happened when it landed?

11       A.   The flash bang deployed effectively.

12       Q.   And what does that mean?

13       A.   It's -- again, I can't speak to tactics.  I

14   don't train with these, but it's used to help --

15       Q.   I'm just asking you what you observed.

16       A.   It's a loud banging sound to help kind of stun

17   and disorient people so they do not have time to reach

18   for weapons.

19       Q.   Okay.  And is that what happened on that

20   occasion?

21       A.   Yes.

22       Q.   Okay.  But you say that on this occasion, the

23   arrest and takedown of Curtis Logan, did not use it

24   because they observed that children were in the car?

25       A.   That was what I believe I heard afterwards.

1   Again, I was involved in none of that decision-making

2   process.

3       Q.   Well, okay.  All right.  I'm going to start

4   this video.  And it says 07 seconds, but I'm going to

5   play it and see if it just starts at the beginning.

6            (A portion of Exhibit YY was played on the

7   videoconference monitor.)

8            BY MR. SCHEWEL:

9       Q.   All right.  Do you know why there's no sound at

10  the start of a body camera video?

11      A.   So the first -- I believe it's 20 or 30

12  seconds, once the button is pushed, it captures the

13  previous 20 or 30 seconds of footage because they're

14  continuously recording, but it does not have sound.

15      Q.   And just for the record, I paused the video at

16  6 seconds, and this is Exhibit XX, Logan Body Camera

17  Video 2.  Is that you driving the van?

18      A.   It is.

19      Q.   So do you recall -- and strike that question.

20  You're driving the van and there are SEU officers in the

21  van?

22      A.   Yes.

23      Q.   Do you recall the SEU officers talking about

24  using a flash bang?

25      A.    I don't recall if that was conversation in the

1   van or if that was conversation at the briefing before

2   the takedown.

3        Q.   Okay.  Do you recall the SEU officers in the

4   van saying, "Well, we're not going to use the flash bang

5   now because we see that there's kids in the car"?

6        A.   I think that was an on-the-fly decision.  I

7   don't remember that being a conversation that occurred

8   before -- that was information I believe I received after

9   everything had calmed down, after the takedown had taken

10  place.

11       Q.   Somebody said to you, "Well, we saw on the live

12  cam or --"

13       A.   I don't remember how that conversation

14  occurred.  I just remember -- I believe they were going

15  to and then they made the decision not to.

16       Q.   Okay.

17       A.   But, again, I'm not -- I am not a tactical

18  expert.  I will leave that to my very capable SEU guys.

19       Q.   I'm not asking you to be one.  Okay.  I'm just

20  going to play this video.

21            (A portion of Exhibit XX was played on the

22  videoconference monitor.)

23            BY MR. SCHEWEL:

24       Q.   I'm pausing at 1:41.  In the vest with a red

25  shirt on in the center of the screen, that's you?

1      A.    That is.

2      Q.    And you are talking to Mr. Logan's daughter?

3      A.    I believe it was his daughter.

4      Q.    Okay.  I'm now going to play what is marked as

5  Plaintiffs' Exhibit YY.  It is Logan Body Camera 1 and

6  I'm starting at the beginning of the video.

7            (A portion of Exhibit YY was played on the

8  videoconference monitor.)

9            BY MR. SCHEWEL:

10     Q.    Okay.  I'm stopping at 16 seconds.  The officer

11 pictured in the 16 second video footage that we just

12 watched, is he observing video feed from Dennis Williams'

13 body camera?

14     A.    That is what typically the screen looks like

15 when you are on the 1021 app.

16     Q.    Okay.  And so this is the takedown and arrest

17 of Curtis Logan?

18     A.    Okay.

19     Q.    Yes?

20     A.    You're showing me videos.

21     Q.    I'm telling you, and we'll play forward so you

22 can see all of it.  And Dennis Williams was the CI used

23 for this takedown?

24     A.    I believe so.

25     Q.    And so if this officer was watching the live

 1   camera feed, it would have been live camera feed of

 2   Dennis Williams' cellphone video?

 3       A.   I believe so.

 4       Q.   And what did you call it earlier?

 5       A.   1021.

 6       Q.   What's that mean?

 7       A.   It's the app.  It's the software that records

 8   the video.

 9       Q.   What's it called?

10       A.   1021.

11       Q.   I'm going to play the video again starting at

12   16 seconds.

13            (A portion of Exhibit YY was played on the

14   videoconference monitor.)

15            BY MR. SCHEWEL:

16       Q.   Okay.  I'm stopping at 1:06.  Do you see the

17   screen at 1:06?

18       A.   I do.

19       Q.   And so this body camera that we're watching,

20   this is an SEU officer's body camera?

21       A.   Yes.

22       Q.   Do you know who this SEU officer is?

23       A.   Not from looking at that picture.

24       Q.   Well, this SEU officer said to you, "Meghan,"

25   and then he signaled to come back.

1          A.   I believe it could have been Perrin, but

2    without seeing whose body camera it is -- they all know

3    me by first name.

4          Q.   Do you know what Perrin's first name is?

5          A.   Kyle.

6          Q.   Kyle Perrin.  Is he a sergeant?

7          A.   No.

8          Q.   Did you recognize his voice?

9          A.   I believe so.

10          Q.   Do you want to hear it again?

11          A.   Sure.

12              (A portion of Exhibit YY was played on the

13    videoconference monitor.)

14              THE WITNESS:  I believe that is Officer Perrin.

15              BY MR. SCHEWEL:

16          Q.   Okay.  Sorry.  I'm playing it again, starting

17    at -- that was 58 seconds.  Now we're at 59 seconds.

18              (A portion of Exhibit YY was played on the

19    videoconference monitor.)

20              BY MR. SCHEWEL:

21          Q.   Okay.  There's three vice officers pictured at

22    1:21 in this exhibit where I just paused.  Can you

23    identify the officers, starting on the left of the

24    screen?  And by the left, I mean facing the screen.

25          A.   Detective Monroe, Sergeant Rolfe, Detective

1   Rattelade.

2       Q.   Okay.  So just to be clear, facing the screen,

3   left to right, can you just describe what Sergeant Rolfe

4   is wearing?  Sorry.  Can you name the person on the far

5   left and describe what they're wearing?

6       A.   Detective Monroe, he's wearing a flannel shirt,

7   lighter colored pants and a hat.

8       Q.   Who's in the middle?

9       A.   Sergeant Rolfe is wearing a long-sleeved shirt,

10  jeans and a hat, as well as they're both -- they're all

11  wearing vests, exterior vests.

12      Q.   Okay.  And who's that on the right as we're

13  facing it?

14      A.   Detective Rattelade.  He's wearing a backwards

15  hat, long-sleeved shirt and jeans.

16      Q.   Do you recall what happened to the children

17  after Mr. Logan was arrested?

18      A.   I believe someone came to pick them up.

19      Q.   Do you think it was their mother?

20      A.   I don't recall.

21      Q.   Are you aware that Child Protective Services

22  was notified?

23      A.   This was not my investigation.  I do not know

24  who was contacted.  This was Detective Abdullah's

25  investigation.

1     Q.   So is the answer no?

2     A.   I don't -- I don't have that answer for you.

3  No, I do not know if they were called.

4     Q.   Is it standard practice, when an arrest is made

5  of someone and children are there, to notify Child

6  Protective Services?

7     A.   During what time frame?

8     Q.   2019, this time.  And, actually, for the

9  record, this is January 2020.

10     A.   I believe it was a kind of a case-by-case

11  basis.

12     Q.   Has that changed?

13     A.   My understanding of it has changed.

14     Q.   What is your understanding now?

15     A.   That if any kind of drug search warrant occurs

16  where there are children involved, the CPS is contacted.

17     Q.   Prior to this controlled buy, did you meet with

18  the other vice and SEU officers to prepare for the

19  takedown?

20     A.   I'm sure we did.  I don't recall the exact

21  meeting, but any time we have a takedown, we do a meeting

22  with the SEU officers.

23     Q.   Does that meeting typically occur at Green

24  Dairy?

25     A.   It depends.

1       Q.   Where else would it occur?

2       A.   Close in time and proximity to where the

3   takedown would occur.

4       Q.   So, hypothetically, you could meet in a parking

5   lot somewhere?

6       A.   Yes.

7       Q.   Does that happen?

8       A.   Yes.

9       Q.   And in your meetings before takedowns, what

10  type of things are discussed?

11      A.   The suspect is discussed.  If there is suspect

12  information, their criminal history is discussed, what

13  types of drugs the informant -- we try and discuss

14  everything about the takedown to limit surprises during

15  the actual takedown.

16      Q.   And what do you discuss about the informant?

17      A.   Typically, what the informant looks like.  They

18  don't typically -- they don't need knowledge of the

19  person.  They just need to know what they look like and

20  what their role will be because, typically, during a

21  takedown, if they stay in the car, they're detained as

22  well.

23      Q.   So you're saying sometimes they would just give

24  you a description of what the informant looked like?

25      A.   So if it's not my informant, I don't typically

1    even know their names.  I know them by a code name.

2         Q.   Well, clearly, you knew Aspirin's name or

3    Aspirin's code name.

4         A.   I knew his code name.  I --

5         Q.   Okay.

6         A.   Before May, I don't believe I knew Aspirin's

7    real name.

8         Q.   Sure.  So you're saying that what would happen

9    at one of these meetings is someone would say, "The CI

10   we're using here is Aspirin; this is what he looks like"?

11        A.   Typically, yes.

12        Q.   Okay.  And would the person who says that be

13   the person who was in charge of that CI?

14        A.   Typically, yes, whoever is utilizing the CI,

15   whose case it is, leads the debriefing because they have

16   the most information.

17        Q.   Does someone from the SEU team discuss what the

18   takedown, actual takedown operation will be?

19        A.   Yes.

20        Q.   Who usually does that?

21        A.   Again, it depends on the circumstance.

22   Sergeant McDonald is head of this particular SEU team.

23   Usually, he runs the show.

24        Q.   Does he create any sort of document that shows

25   what the takedown will be or what the operation will be?

1      A.   You will have to ask them that.  I'm not sure

2  what documentation they do or don't do.

3      Q.   You've never seen a document that shows the

4  house will be entered here, this is where the flash bang

5  will be thrown, anything of that sort?

6      A.   So, typically, they have a -- I hesitate to

7  call it a plan, but they fill out paperwork for a search

8  warrant where they ask, you know, "Are there any elderly,

9  weapons, criminal history, are there children inside," et

10 cetera, and then if they've hit the house before, they'll

11 have a sketch of the inside of the house.  Based on my

12 belief, they create a sketch of all the houses that they

13 do search warrants on so they can maintain a record of

14 it.

15      But, again, I do not keep up with any of this.

16 I don't want to put words in their mouths.  This is --

17      Q.   We'll do a formal document request for that,

18 but we would ask that that be produced.

19      When you are meeting with the SEU team, do they

20 describe the operation and their plan to you or do you

21 actually see that paperwork?

22      A.   Typically, it's a verbal discussion about what

23 is going to occur.

24      Q.   So prior to this situation -- I'll strike that.

25 Is it standard practice for a drug operation to have your

1    guns drawn and pointed during an arrest or takedown?

2        A.   It is standard -- my standard practice during a

3    takedown of a violent offender is to have my firearm

4    drawn.  It is not to point it at people.

5        Q.   How do you determine if they're a violent

6    offender?

7        A.   Based on criminal history, based on CI

8    information, based on a variety of factors.

9        Q.   And do you think that your standard practice is

10   different from SEU's standard practice?

11            MR. PETTEY:  Objection.

12            THE WITNESS:  I cannot speak to their standard

13   practice.

14            BY MR. SCHEWEL:

15       Q.   Based on what you have observed?

16       A.   Their -- can you repeat the question?

17       Q.   Sure.  So this video we just observed, the SEU

18   officers had their guns pointed towards the car.

19       A.   Yes.

20       Q.   You just told me your standard practice is to

21   keep your gun out, but pointed down?

22       A.   Pointed at a low ready position.

23       Q.   Okay.  So what your practice is is different

24   from what we just saw the SEU officers do?

25       A.   So the SEU officers are the people that go in

1    first.  They're the head of this team.  I am backup, so

2    my tactics are, obviously, going to be different than the

3    professionals that are trained to do that job.

4         Q.   And I'm just asking you, are your practices

5    different?

6         A.   Yes.

7         Q.   Okay.  What about if you were doing a takedown

8    where someone did not have a violent history?

9         A.   So, typically, when people sell drugs, that, in

10   and itself [sic], can be -- you know, drugs and guns go

11   hand in hand, so even without a violent history, if we've

12   already established that they are a drug dealer, this

13   job, in and of itself, would be considered inherently

14   dangerous.

15        Q.   Okay.  So, basically, the practice doesn't

16   change?

17        A.   Not for me, typically.

18        Q.   Okay.  Have you noticed that it changes for the

19   SEU officers?

20        A.   You will have to ask them that.

21        Q.   Have you ever been in a takedown with SEU

22   officers where they did not have their guns up and

23   pointed initially?

24        A.   No.

25        Q.   For this operation, when you positioned your

1   van, where did you park?

2       A.   So, again, I was still learning, so I actually

3   parked a little bit away from the vehicle.

4       Q.   But at the Sheetz gas station?

5       A.   Yes.

6       Q.   And it looks like you parked in one of the gas

7   stalls.

8       A.   Kind of parked in the middle of the parking

9   lot.

10      Q.   Okay.  And so were you observing Mr. Logan's

11  vehicle?

12      A.   Yes.

13      Q.   And did you observe Aspirin enter his truck?

14      A.   I don't recall.

15      Q.   Did you observe Aspirin exit the truck?

16      A.   I don't recall.

17      Q.   Were you watching the cellphone video?

18      A.   I had the job to position the vehicle where it

19  needed to when I was told to, so I don't recall that I

20  was doing anything else, other than making sure that I

21  was doing what I was asked to do, when I was asked to do

22  it.

23      Q.   I'm just asking if you recall if you were

24  observing the cellphone video.

25      A.   I don't recall.

 1       Q.   How did you know when it was time to move in
 2  and do the takedown?
 3       A.   I believe I was told by an SEU officer.
 4       Q.   What would they say?
 5       A.   I don't recall the exact words that were said.
 6       Q.   I just have two more pages.
 7            MR. PETTEY:  She needs a restroom break, too,
 8  so --
 9            MR. SCHEWEL:  Five or ten minutes or you want
10  to do it now?
11            THE WITNESS:  Can I just run real quick and --
12            MR. SCHEWEL:  Yeah, that's fine.
13            THE WITNESS:  -- come right back?  Is that
14  okay?
15            MR. SCHEWEL:  It's okay.  We're off the record.
16            (WHEREUPON, a brief recess was taken.)
17            BY MR. SCHEWEL:
18       Q.   Okay.  We're back on the record.  So after the
19  arrest of Curtis Logan, did the vice team debrief at
20  Green Dairy?
21       A.   As a full group?
22       Q.   At all.
23       A.   Again, I was still in training, so I'd always
24  have conversations with Detective Monroe on how I could
25  be better and how I can better perform as a drug

1  detective.

2      Q.   Do you recall anything further at this time?

3      A.   In regards to?

4      Q.   What happened after the arrest of Curtis Logan?

5      A.   I mean, I believe Detective Monroe was the one

6  that collected evidence, if I recall correctly.  I don't

7  remember.  I may have done charging.  I don't recall my

8  particular role that day.

9      Q.   So on multiple occasions, you -- well, strike

10  that.  What does it mean to do charging?

11      A.   Writing up the warrants that are then sworn out

12  by the detective who's in charge of the case.

13      Q.   How often did you do that for Abdullah?

14      A.   Fairly often.

15      Q.   How many times would you say you did that on

16  cases where Aspirin was involved?

17      A.   I couldn't give you an exact number.  Everybody

18  kind of had -- filled different roles when we did a

19  takedown or a search warrant.  We tried to work as many

20  people as possible to get it done as efficiently as

21  possible.

22      Q.   Okay.  I'm going to -- and I'm sorry I don't

23  have multiple copies of this because I wasn't expecting

24  to use it, but I'm going to show you Officer

25  Rattelade's -- Detective Rattelade's and now Sergeant

1  Rattelade's --

2        A.    Correct.

3        Q.    -- SBI interview.  And what I'm going to do --

4  this is Plaintiffs' Exhibit R, and it is marked in the

5  SBI file as number 26.  And I am looking at page 4 and

6  I'm going to read this out loud, and then I'm happy to

7  show it to you.  If you'd like to see it, just ask me.

8  Okay?

9        A.    Okay.

10             (Plaintiffs' Exhibit R was identified.)

11             MR. PETTEY:  Yeah, definitely, please review

12  it.  You probably have not reviewed it.

13             THE WITNESS:  I have not seen this.

14             BY MR. SCHEWEL:

15        Q.    This is paragraph 4.  "On January 2nd, 2020,

16  Aspirin purchased 20.8 grams of heroin for $400 when the

17  going rate for 20 grams of heroin was approximately

18  $2,000.  The previous also tested negative in a field

19  test for heroin.  On that date, Monroe told Abdullah that

20  the field test came back negative for heroin, and

21  Abdullah later charged the drug target with trafficking

22  charges."  Would you like to see it?

23        A.    Yes, please.

24        Q.    So this is what I'm referring to and this is

25  the last page of that document.

 1      A.   (Witness reviews document.)

 2      Q.   Have you reviewed that document?

 3      A.   Yes.

 4      Q.   Okay.  Or at least that paragraph?

 5      A.   That paragraph, yes.

 6      Q.   So earlier you stated that you thought Monroe

 7  processed evidence.

 8      A.   I thought he did.  He may not have.

 9      Q.   Well, doesn't that say that Monroe --

10      A.   Oh, I'm sorry.  Yes, it does.

11      Q.   -- field tested the heroin?

12      A.   I'm sorry.  Yes.

13      Q.   Okay.  And does looking at that refresh your

14  recollection to Monroe field testing the heroin after the

15  takedown of Curtis Logan on January 2nd, 2020?

16      A.   I remember hearing that he field tested it.  I

17  don't know that I had direct observation of that

18  happening.

19      Q.   And do you remember hearing that he field

20  tested it and it field tested negative?

21      A.   I do.

22      Q.   And do you remember also learning that the 20.8

23  grams of heroin should have cost closer to $2,000?

24          MR. PETTEY:  Objection.

25          THE WITNESS:  I do.

1          BY MR. SCHEWEL:

2      Q.   And do you remember that the actual price that

3  Williams paid for it or Aspirin paid for it was closer to

4  $400?

5          MR. PETTEY:  Objection.

6          THE WITNESS:  Again, I don't -- I don't believe

7  I was present for the paying.  I don't know that I knew

8  the exact numbers, but I remember this particular

9  conversation.

10         BY MR. SCHEWEL:

11     Q.   And just so we're clear on that, your

12  understanding was that the 20.8 grams should have cost

13  substantially more --

14     A.   Yes.

15     Q.   -- than what Williams paid?

16     A.   Yes.

17     Q.   Okay.  And do you recall that Monroe told

18  Abdullah that the heroin had field tested negative?

19         MR. PETTEY:  Objection.

20         THE WITNESS:  I don't recall a conversation

21  with him.  I may have been present.  I don't recall it.

22  I recall speaking with Detective Monroe.  I don't -- I

23  don't recall what he said to Abdullah.

24     Q.   Okay.

25     A.   Or if I was present.

1      Q.   Okay.  And you don't recall Monroe telling you

2    that he had told Abdullah that either?

3      A.   I don't recall.

4      Q.   Okay.  Can I see that back, please, Rod?  Does

5    this refresh your recollection as to whether you drafted

6    up these particular charges on behalf of Officer

7    Abdullah?

8      A.   It did not.

9      Q.   Do you have any more of these pages?

10         MR. PETTEY:  No, just what you gave me.  Is

11   that marked?

12         MR. SCHEWEL:  It is, Plaintiffs' R.

13         MR. PETTEY:  Okay.  Just when you're done with

14   it, I just want to keep it all together.

15         MR. SCHEWEL:  I don't know where the other two

16   pages went, but -- oh, maybe it is.  Sorry.  Yeah.  I

17   think we're missing the back page.

18         BY MR. SCHEWEL:

19     Q.   So you do recall that Mr. Logan was charged

20   with trafficking heroin?

21     A.   I believe so.

22     Q.   Based off this arrest?

23     A.   I believe so.

24     Q.   And do you recall that his bond was set at

25   $500,000?

1          MR. PETTEY:  Objection.

2          THE WITNESS:  This was not my case.  I don't

3     believe I followed up with his bond amount.

4          BY MR. SCHEWEL:

5     Q.   So no?

6     A.   Not that I knew of at that time.

7     Q.   After you learned this, that the heroin had

8     tested negative --

9     A.   Had field tested negative.

10    Q.   -- field tested negative and that the price was

11    substantially less than it should have been, did you ever

12    go to your supervisors, so Rolfe or Bunch, and say, "This

13    is a bad buy"?

14    A.   I remember being a part of a conversation,

15    discussing it.  I did not -- I was more listening and

16    learning at that point.  It wasn't something that I

17    brought forward.

18    Q.   Okay.  And who was part of that conversation?

19    A.   I don't remember.  I just --

20    Q.   But you're saying this happened after the

21    Curtis Logan arrest?

22    A.   I believe so.

23    Q.   And I asked you if you went to your

24    supervisors.  Are you saying that one of your supervisors

25    was present for that conversation?

1          A.   I believe Sergeant Rolfe was, but, again, I did

2     not go to him with concerns at that point.  That was --

3          Q.   Okay.  But this was kind of in the room where

4     everyone was and you overheard this?

5          A.   I believe so.

6               MR. PETTEY:  Objection.

7               BY MR. SCHEWEL:

8          Q.   Okay.  And who was talking to Sergeant Rolfe?

9          A.   I don't remember if it was Detective Monroe or

10    Detective Rattelade.

11         Q.   Okay.

12         A.   I believe it was one of those two.

13         Q.   Okay.  And they expressed concerns about this

14    being a valid buy?

15         A.   I believe so.

16         Q.   And what did Sergeant Rolfe say?

17         A.   I believe the thought was to send it to CCBI to

18    get confirmation of whether or not the drugs were actual

19    heroin.

20         Q.   Did you ever go to Lieutenant Bunch and say, "I

21    have concerns with Williams or Abdullah; I think that

22    they're making bad buys"?

23         A.   I did not.

24         Q.   Do you know if any of the other members of the

25    vice team, other than the instance that you've just

1  described, went to Rolfe or Bunch and said they had

2  concerns?

3      A.   After the May 21st incident.

4      Q.   But prior to that, your only recollection of

5  anyone saying they had concerns was in January after the

6  arrest of Curtis Logan?

7           MR. PETTEY:  Objection.

8           THE WITNESS:  Every detective does things a

9  little bit differently and I was learning as a growing

10  detective, so there were conversations along the way

11  about, "This may not be the way that I do things; this

12  may be the way that someone else does it, but it's not

13  the way that I do things.  Take, you know, the good and

14  the bad from everybody and learn how to be the best

15  detective that you can be."

16           BY MR. SCHEWEL:

17      Q.   And people were having those conversations with

18  you?

19      A.   Detective Monroe and I had those conversations.

20      Q.   Okay.  And these were specifically related to

21  Abdullah's cases with Williams?

22      A.   Some of them were.

23      Q.   What other things were these conversations

24  about?

25      A.   I mean, every detective does things different

 1    and Detective Monroe would do things different than

 2    Detective Rattelade.  He would do things different than

 3    Detective Ouellette.  Everybody does stuff different, so

 4    that was a common -- he didn't want to tell me what to

 5    do.  He wanted to shape me to be the best drug detective

 6    that I could be.

 7         Q.   So today, as we sit here, if you were in a

 8    similar situation where drugs field tested negative and

 9    they cost substantially -- they should have cost

10    substantially more than what you gave your CI, and

11    another member of the vice team is going to charge that

12    person with trafficking, as you sit here today, if that

13    happened, would you seek to intervene or go to a

14    supervisor or stop that person?

15              MR. PETTEY:  Objection.  You can answer.

16              THE WITNESS:  I believe I would have a

17    conversation with a supervisor.

18              BY MR. SCHEWEL:

19         Q.   And what would you say?

20         A.   That I had concerns.  We also have different

21    ways to test drugs that we did not have back then as

22    well.

23         Q.   And the reason why you didn't do that in 2019

24    or 2020 was because you were new?

25         A.   I was new, as well as if Detective Monroe

1   expressed concerns to me, he had also expressed them to

2   Rolfe and it was being expressed by my senior detective

3   that was training me.

4       Q.   But I -- so you relied on Monroe to do that?

5       A.   Yes.

6       Q.   But my understanding is you only know of one

7   time prior to May 21, 2020, where you believe Monroe or

8   Rattelade actually expressed concerns to a supervisor?

9            MR. PETTEY:  Objection.

10           THE WITNESS:  Regarding Dennis Williams and his

11  buys, I don't recall that.  That was a -- that's

12  something that I recall and then I recall him going to a

13  supervisor after the May 21st, but anything other than

14  that -- I mean, we had ongoing conversations, but I can't

15  pinpoint a time.  Does that make sense?  Or a date that

16  they occurred on.  I mean, he was training me throughout

17  this whole period.

18           BY MR. SCHEWEL:

19      Q.   After January 2nd, 2020, after this happened,

20  did you still believe that Aspirin was a reliable CI?

21      A.   Yes.

22      Q.   Why?

23      A.   The opinion expressed at that time was that the

24  drug dealer was trying to rip off Aspirin, if the drugs

25  were, in fact, fake.  Again, we did not have anything

1    other than the field test.  They were sent to CCBI to get

2    those results, so the -- every CI, on occasion, gets

3    ripped off.  I mean, it's part of drug work.  It's part

4    of having confidential informants.

5         So that was the opinion after this, was that

6    the drug dealer had -- if the drugs came back fake, he

7    had attempted to rip Aspirin off.

8         Q.   Was that your opinion or was that Officer

9    Abdullah's opinion?

10        A.   I believe that was kind of the group opinion.

11   I don't really remember discussing this with Detective

12   Abdullah.

13        Q.   But was that your actual opinion?

14        A.   Again, I was learning.  I didn't have a lot of

15   opinions.  I had not done drug work such as this while I

16   was on the line.  I did different drug work, but as far

17   as using confidential informants, I was learning how to

18   do this.  January was two months -- less than two months

19   after I started.

20        Q.   Did you ever see the CCBI lab results?

21        A.   For this case?

22        Q.   For Dennis Williams.

23        A.   I don't recall seeing those before May 21st.

24   Again, this was not my case.  This was his case.  I was

25   running my own cases at this time.  It was my

1    responsibility to get my labs.  It wasn't my

2    responsibility to get anybody else's lab results.

3        Q.   Did you ever notice that the heroin produced by

4    Dennis Williams appeared to look sugary or like a

5    substance other than heroin?

6        A.   I don't believe I ever did his gathering of

7    evidence.  There was one or two times, but I don't think

8    they had anything to do with Aspirin, so I was not in

9    charge of packaging evidence that I can recall.

10       Q.   Did you ever hear that from Monroe or Rattelade

11   or any other officers on the vice team?

12       A.   I believe I remember hearing that about this

13   case.  For the May 21st case, I remember Detective

14   Rattelade testing it.  I don't remember that I ever

15   looked at it.

16       Q.   Any other occasions?

17       A.   Not that I can recall.

18       Q.   Okay.  Let's take a break.

19            (WHEREUPON, a luncheon recess was taken.)

20            BY MR. SCHEWEL:

21       Q.   Good afternoon, Officer Gay.

22       A.   Good afternoon.

23       Q.   Before we went off the record, before lunch, I

24   had asked you about the process for drafting warrants.

25       A.   Drafting search warrants or arrest warrants?

1      Q.    Both.

2      A.    Okay.

3      Q.    And if I didn't get in to that much detail, I

4   want to ask you a little bit about that now.

5      A.    Yes.

6      Q.    When you are drafting up a warrant, how do you

7   physically do that?  Do you do that on your computer?

8      A.    Again, the search warrant or arrest warrant?

9      Q.    Is the process different?

10     A.    Well, they're two different things.

11     Q.    Let's start with an arrest warrant.

12     A.    Okay.

13     Q.    Do you do that on your computer?

14     A.    Typically, yes.

15     Q.    Okay.  Would you ever not do it on your

16  computer?

17     A.    If we were at a different district or something

18  like that where I hadn't brought my computer, it's a

19  software that can be accessed from any of our computers.

20     Q.    Okay.  And let's assume you're doing it on your

21  computer.  Do you log in so you're on your user name?

22     A.    Yes.

23     Q.    And would you log in on your user name in

24  another district?

25     A.    Typically, yes.

1      Q.   You're able to do that?

2      A.   Yes.

3      Q.   Okay.  And what is the software called?

4      A.   E-Warrants.  I think it just changed over, but

5   I believe it's now called E-Warrants.

6      Q.   What was it called in 2019?

7      A.   Some version of Warrants.  It's the warrant

8   system.  It's only one system.

9      Q.   Okay.  And when you draft an arrest warrant,

10  what is the first thing you do?

11     A.   After I log in?

12     Q.   Yes.

13     A.   You typically put in the defendant's

14  information.

15     Q.   What do you do next?

16     A.   Write out the charges, the date, the time the

17  incident occurred.  You add the name of the charging

18  officer or detective.

19     Q.   And the process is the same whether or not

20  you're doing this for yourself or for another detective?

21     A.   Yes.  I just change who the charging detective

22  is.

23     Q.   Okay.  And is there anything else different

24  that you'll do if you're doing this for another

25  detective?

 1      A.   The actual process of writing it remains the

 2   same.

 3      Q.   Okay.  And after you're finished writing up the

 4   arrest warrant, what do you do?

 5      A.   You have to write an FIR, which is a Field

 6   Investigative Report.  That goes to the magistrate and

 7   then you videoconference with the magistrate to swear out

 8   the charges.

 9      Q.   What if you are not the arresting officer?

10      A.   So it depends on how much is going on, so I

11   typically like to write my own FIRs, but if someone else

12   is doing my charges, say I'm interviewing multiple

13   people, then they will also write my FIR for me.

14      Q.   Okay.  And are your FIRs saved on your user

15   name?

16      A.   So the FIR is not part of the E-Warrant system.

17      Q.   Okay.  So, then, let's back up to the warrant.

18   Are your arrest warrants saved on the warrant system?

19      A.   Yes.

20      Q.   Okay.  And so you can go back and look up old

21   warrants that you've drafted?

22      A.   So it's not necessarily saved under my name,

23   but if I went and looked up the defendant, I could pull

24   up that charge.

25      Q.   Well, and it won't say you drafted it?

1       A.   It may say that, but there's not like a

2   database where I can go and say, "These are all of

3   Detective Gay's warrants."  I would have to look it up by

4   individual defendant.

5       Q.   But there is something that says who the author

6   of the warrant is?

7       A.   Yes, that is written on the warrant, yes.

8       Q.   Well, I just want to make sure we're clear

9   here.  I'm talking about the actual person who typed up

10  the warrant in the system, not the arresting officer.

11      A.   There should still be some note in there that I

12  wrote it.

13      Q.   In the computer system?

14      A.   I believe so.  When you print out the

15  paperwork, it should say the charging detective's name on

16  it.

17      Q.   Okay.  So the warrants that you drafted on

18  behalf of Officer Abdullah, we should be able to go into

19  that system or the police department should be able to go

20  into that system and find those?

21      A.   By defendant.

22      Q.   By defendant?

23      A.   Yes.

24      Q.   Okay.  I'm going to show you what I was trying

25  to show you earlier, and I apologize.  I only have this

1   up on my laptop.  Okay.  This, for today's purposes, is

2   marked as Plaintiffs' GGG, and this is an extraction of

3   Samsung Galaxy S7 Phone.

4           (Plaintiffs' Exhibit GGG was identified.)

5           BY MR. SCHEWEL:

6       Q.   Do you see where that's written on this

7   document?

8       A.   I see where that is written on this document.

9       Q.   Okay.  And this is part of SBI Case No.

10  2020-02929, and the activity date is November 22nd, 2021.

11  I'll read the first paragraph out loud.

12          "The extraction was performed at the Raleigh

13  Police Department located at 6716 Six Forks Road,

14  Raleigh, North Carolina.  It was conducted pursuant to a

15  special warrant received by Assistant Special Agent in

16  Charge S.Q. Minschew, which included in a separate report

17  within this case."

18          I'm now scrolling down in the document, and now

19  I am on page 3 of the document, which is an Attachment

20  #1214-01, and I am on page 2 of that document, which is

21  page 4 of the full document.  I'm on page 2 of the

22  attachment, sorry, page 4 of the full document.

23          And do you see where it says, "Was any attempt

24  made to access the phone (i.e. turn it on or remove

25  anything from it?"  The answer is, "Yes."

1          "If yes, plain actions taken:  RPD conducted

2     extraction prior, airplane mode."

3          Could you just tell us again what an extraction

4     is?

5          A.   So, again, I'm not part of our Taru unit, so

6     I'm not intimately familiar with how the phones are

7     extracted, but we -- I believe we have software that the

8     phone is hooked up to that has the ability to pull data

9     off of a cellphone, and that is what we call an

10    extraction.

11         Q.   Does that create a Cellebrite report?

12         A.   So it creates data that I think is an insert

13    into a Cellebrite report.  Again, I'm not intimately

14    familiar with the process.  It is not something I do, but

15    when I request a cellphone extraction, I get it back in

16    the Cellebrite software.

17         Q.   Okay.  I'm taking this off.  Okay.  So let's

18    discuss the process now for planning to execute an arrest

19    warrant or a search warrant.  And we went over this a

20    little bit already, so I will streamline it some.

21         After making a controlled buy, you can use the

22    evidence from the controlled buy as probable cause for a

23    search or arrest warrant?

24         A.   Typically, yes.

25         Q.   If that evidence created probable cause?

 1      A.   Yes.

 2      Q.   And to get a search warrant, you have to draft

 3   a warrant application?

 4      A.   A search warrant application, yes.

 5      Q.   Is your supervisor required to approve an

 6   application for a search warrant?

 7      A.   Based on our policy, a supervisor is required

 8   to read over the warrants, I believe.  That has always

 9   been my common practice.

10      Q.   And when you were in field training, was your

11   field training officer required to read over your search

12   warrants?

13      A.   He did for mine.

14      Q.   And after drafting your warrant application, as

15   you stated, the next step would be to take it to a

16   magistrate?

17      A.   A search warrant application, a magistrate or a

18   superior court judge.

19      Q.   And the magistrate or superior court judge will

20   read the application?

21      A.   Yes.

22      Q.   Will they ask you questions under oath?

23      A.   Yes.

24      Q.   What type of questions?

25      A.   If they have any questions about the

1   information in the search warrant, they have the ability

2   to ask questions.

3       Q.   And the magistrate then approves or denies the

4   warrant?

5       A.   Yes.

6       Q.   Have you ever had a magistrate deny one of your

7   warrants?

8       A.   Occasionally, I made a mistake, as far as like

9   a date or one of those types of things that I've had to

10  correct, but to the best of my knowledge, I don't think

11  I've had one outright denied.

12      Q.   And is the arrest warrant process, in terms of

13  what we just discussed, is that any different than the

14  search warrant process?

15      A.   They are two entirely different things.

16      Q.   Okay.  So what are the differences?

17      A.   An arrest warrant is when you have an arrest

18  warrant for somebody, so you present it and probable

19  cause that this person needs to be arrested, that's an

20  arrest warrant.

21      A search warrant is a search of a house or a hotel

22  or a car that's -- there can be people in cars and

23  buildings on the search warrant to be searched.  It is

24  not an arrest warrant.

25      Q.   Do you need probable cause for both a search

 1   warrant and an arrest warrant?

 2       A.   Yes.

 3       Q.   Okay.  So, then, other than -- so let's just

 4   focus on the procedural part of it, drafting it,

 5   presenting it to a magistrate.  Is any of the procedural

 6   part different?

 7       A.   I'm just having trouble because these are two

 8   different things that you're making synonymous.

 9       Q.   Okay.

10       A.   They're just not --

11       Q.   Well, please tell me the difference.

12       A.   I mean, one is to arrest somebody and take them

13   before a magistrate for an arrest, and one is to search a

14   person, place or thing.

15       Q.   Are there any other differences?

16       A.   Those are different, in and of themselves.

17       Q.   I agree.

18       A.   So --

19       Q.   Okay.  Can you tell me again what an FIR stands

20   for?

21       A.   I believe it's Field Investigative Report.

22       Q.   And is a Field --

23       A.   Field Interview Report.  It's one of those two

24   things.

25       Q.   Is that created for a search warrant as well?

1        A.    So it's -- any time you have a felony arrest

2   warrant, you have to produce one of those that is sent to

3   the magistrate.

4        Q.    What about if you have a search warrant?  Do

5   you have to produce an FIR, as well, and send it to the

6   magistrate?

7        A.    No.

8        Q.    Okay.  What you send them in the case of a

9   search warrant is just the search warrant application?

10       A.    Correct.

11       Q.    Is an arrest warrant required to be approved by

12  your supervisor?

13       A.    No, I don't believe so, based on -- based on

14  policy.

15       Q.    What about -- is that your practice?

16       A.    Again, my practice is that my supervisor is

17  involved in everything that I do, so even if I don't go

18  to him and say, "I'm charging this, this and this," he's

19  involved in every aspect of my case, so he knows what

20  drugs we got, he knows what I'm charging based on what I

21  got.

22       Q.    So --

23       A.    There's just not a physical conversation that

24  says, "I'm doing, you know, these things."

25       Q.    But in the vast, vast majority of your cases,

1    if not all of them, your supervisor knows who you're

2    charging and what they're charging them with?

3         A.   Yes, as long as he is present and not out of

4    town.

5         Q.   But, then, there could be times where they are?

6         A.   Yes.

7         Q.   Okay.  So let's say you are pursuing a search

8    warrant.  After the warrant is granted by the magistrate,

9    do you notify the vice team?

10        A.   Usually, my common practice is they're involved

11   through all of this, so they're involved in the buy.

12   They know what I'm trying to do.  They know when I'm

13   drafting a search warrant because other people have other

14   things going on, so we all communicate in order to

15   effectively use everybody's time.

16        Q.   Do you communicate this at all via e-mail?

17        A.   Which --

18        Q.   Any part of it.

19        A.   Usually, I will e-mail, if I have time, the

20   search warrant to the SEU team so that they know the

21   address and possibly the suspect.

22        Q.   Okay.  Do you e-mail it to the sergeant or is

23   there a group e-mail, you can send it to everyone?  How

24   does it work?

25        A.   Typically, I send it to the sergeant and like

1    kind of the top two guys that are in charge of the team.

2        Q.   Who are the top two?

3        A.   Of my team, so it would be Sergeant McDonald,

4    David Mead and Thomas Webb.

5        Q.   Okay.  And I believe all three of them were

6    active in 2019 and 2020.

7        A.   Yes.

8        Q.   And just, again, that's Webb, Mead and

9    McDonald?

10        A.   Yes.

11        Q.   Are all three sergeants?

12        A.   No, Sergeant McDonald is the only sergeant over

13    that team, but, again, this was my common practice.  I

14    can only speak for what I do.

15        Q.   Any other times where you send out e-mails

16    during this process?

17        A.   If I need the search warrant read by a

18    supervisor and he's already left for the day, I will

19    e-mail that to him for him to approve.  Otherwise,

20    typically, I mean we're all in the same room.  Everybody

21    typically knows what's going on.

22        Q.   What about text messages?  Do you communicate

23    with the vice team via text message?

24        A.   Yes.

25        Q.   What types of things?

1      A.   All things, I mean, about the case, about,

2  "Hey, I've got a buy" or, "I've got a search warrant" or,

3  "Hey, I need people for this, these things at these

4  times."

5      Q.   Is this typically done in an individual,

6  one-on-one text message or on a group chat?

7      A.   It depends.

8      Q.   Do you have a group chat with Vice Team 1?

9      A.   Currently or previously?

10     Q.   Both.

11     A.   Yes.  They're just different teams.

12     Q.   Okay.  So you had a group chat with Vice Team 1

13  from 2019 and 2020?

14     A.   I believe so, yes.

15     Q.   And you have one currently, today?

16     A.   Yes.

17     Q.   Would Officer Abdullah utilize the group chat

18  to tell people what he was doing on his cases?

19     A.   Sometimes, yes.

20     Q.   Would Officer Abdullah ever text you separately

21  to tell you what he was doing on his cases?

22     A.   Typically, it was in the group chat.

23     Q.   Okay.  So let's go back to the process for the

24  search warrant execution.  Let's say you've gotten it

25  granted.  You've e-mailed it to the SEU team.  You want

1   to have it executed that day.  What do you do next?

2        A.   We would arrange a debriefing time if it works

3   for the SEU team, and we would all meet up and discuss

4   the case.

5        Q.   And would you discuss the various items that

6   you previously mentioned, such as the CI involved, the

7   possible danger?

8        A.   So are you talking about a takedown or a search

9   warrant?

10       Q.   Well, I know that on certain occasions you will

11  do a controlled buy prior to executing a search warrant.

12       A.   So, normally, those two things, for me, don't

13  necessarily occur in close time and proximity.  So,

14  normally, I will try and separate the buy from the

15  execution of my search warrant.

16       Q.   Why is that?

17       A.   To protect the CI.

18       Q.   Okay.  So let's go back to my question, which

19  was at the debriefing, do you go over -- for the search

20  warrant execution now, do you go over the same things

21  that we talked about?

22       A.   So I wouldn't necessarily mention the CI if

23  it's just a search warrant.  It's no longer relevant to

24  the actual execution of the search warrant.

25       Q.   Okay.  What type of things would you mention?

1    A.   Criminal history, what I know about the

2    residents in question, who lives there, pets, adults,

3    children, et cetera, violent history, et cetera.  Those

4    are all things discussed.

5    Q.   And will an SEU officer typically help you lead

6    this debriefing in some way?

7    A.   So, typically, if it's my case, I will discuss

8    the actual aspects of the case and then a SEU officer

9    will take over and discuss tactics.  Usually, at this

10   point, they've already done a -- they've gone by the

11   residence in question, driven by it to check on the

12   address and see who's out and about, that type of thing.

13   Scout, if you will, is the term used.

14   Q.   And when you're executing a search warrant, is

15   there a document that is created by the SEU team to show

16   where the SEU team will enter?

17   A.   You would have to ask them that.  I -- they've

18   entered different entrances on a case-by-case basis.

19   Usually, the entrance most -- that appears to be most

20   traveled by, but that's a question for their tactics.

21   Q.   But this isn't a document that you routinely

22   see prior to a search?

23   A.   No.  I leave all tactical decisions up to my

24   SEU team.

25   Q.   But you're present during the debriefing?

1      A.   Yes.

2      Q.   And you're saying they don't discuss how

3  they're going to enter the home during the debriefing?

4      A.   They do discuss it.  I don't -- there's not a

5  document that I know of.

6      Q.   Okay.  Will SEU discuss if they are going to

7  use a flash bang during the debriefing?

8      A.   Typically, yes.

9      Q.   Will they discuss if they are going to enter

10  with a hammer or to knock the door down?

11          MS. GLADDEN:  Ram.

12          BY MR. SCHEWEL:

13      Q.   Ram, sorry.

14      A.   I mean, that's -- common practice is to execute

15  a search warrant with the assistance of the ram if the

16  door is not unlocked.

17      Q.   Okay.  So if the door is unlocked, SEU will

18  just open the door and go in?

19      A.   Yes, based on my experience.

20      Q.   Okay.  But if the door is locked, in your

21  experience, SEU will knock and then --

22      A.   Typically.

23          MS. PACKER:  Objection to form.

24          BY MR. SCHEWEL:

25      Q.   -- use the ram to go in?

1      A.   Typically, they will -- yes, typically.

2      Q.   Okay.  And just so I'm clear, in your

3  experience, when the door is unlocked, do they also knock

4  prior to opening the door?

5      A.   Typically, yes.  Some stuff has changed in the

6  last three years and I'm not sure exactly when some stuff

7  changed, but I know currently, they typically knock and

8  then --

9      Q.   Go ahead.

10     A.   -- and then execute their search warrant.

11     Q.   In 2019 or 2020, were there ever occasions or

12  in your experience where SEU officers did not knock, but

13  just opened the door and went into an apartment?

14     A.   No, I don't believe so.  There is always,

15  always some sort of pronouncement of police.

16     Q.   Okay.  But was there always a knock on the

17  door?

18     A.   Their presence was always loudly made known.  I

19  don't know if there was a physical knock on every

20  occasion that I went to, but their presence was always

21  loudly made known.

22     Q.   Okay.  And after they made their presence

23  known, in your experience, they would either open the

24  door and go in or knock the door down with a ram?

25     A.   Within a short period of time.  Again, I cannot

1    speak to their tactics.

2        Q.   I'm just asking from your experience and your

3    observations.

4            In your practice, I know you just said that you

5    don't try -- you try not to conduct a controlled buy

6    prior to the execution of a search warrant in a short

7    period.  Do you still conduct one on the same day or do

8    you try and do it on a different day?

9        A.   It's a case-by-case basis.

10       Q.   What do you usually do?

11       A.   So it depends.  A hotel room that is active,

12   that has multiple people coming in and out, I would feel

13   comfortable hitting closer to the buy than, say, a

14   residence, where not as many people are to and from.  I

15   would attempt to put a little more distance as allowed by

16   law in order to protect the CI.

17       Q.   Will vice detectives surveil the location of

18   the home or apartment to be searched prior to the

19   execution of a search warrant?

20       A.   That's typically my common practice.  It

21   depends on how long of an investigation this is and it

22   depends on the CI.

23       Q.   And when you surveil the location, what do you

24   do?

25       A.   Usually, I will -- I typically try and document

 1   how many people are coming and going, if I can get

 2   license plates, times that the dealer seems to be most

 3   active, that type of thing.

 4        Q.   Where do you attempt to station yourself during

 5   your surveillance?

 6        A.   It depends on the place.  Some places are

 7   harder to observe than others.  If they're in cul-de-sacs

 8   or if they're on narrow streets, sometimes it can be very

 9   difficult to sit up on an address.  I have a good set of

10   binoculars.  I try and get close enough that I can at

11   least observe information that's occurring.

12        Q.   Such as who's going in and out of the house?

13        A.   Typically.

14        Q.   Is part of the reason this surveillance is done

15   to make sure you are correct about the location you are

16   searching?

17        A.   It's for a variety of reasons.  That's one of

18   them.

19        Q.   You also said that SEU officers will scout the

20   location.

21        A.   Typically, yes.

22        Q.   Have you ever been with an SEU officer when

23   they were scouting the location?

24        A.   Yes.

25        Q.   How was that done?

1      A.    Typically, in my cases, I drive because I am

2   familiar with the address and one or two of them will

3   join me in my vehicle in the back, and I will drive by

4   the address.

5      Q.    And is that so they know the correct location?

6      A.    It's for a variety of reasons.  We can see

7   who's there, if people are outside, are there cars in the

8   driveway, what handle is the doorknob on.  There's a

9   variety of reasons.

10     Q.    Have you ever been in charge of a warrant

11  execution where you raided the incorrect location?

12     A.    Not to my knowledge.

13     Q.    Have you ever been a part of one, other than

14  this case?

15         MS. PACKER:  Objection.

16         MS. KIBLER:  Objection.

17         MR. BENTON:  Objection.

18         BY MR. SCHEWEL:

19     Q.    And by "this case," I'm referring to May 21st,

20  2020.

21         MR. PETTEY:  Objection.

22         BY MR. SCHEWEL:

23     Q.    You can answer.

24     A.    So I did not physically view the search warrant

25  for this address, so my knowledge of that is you're going

1   to have to ask Detective Abdullah.

2        Q.   I'm not asking you about this case.  I'm saying

3   have you ever been part of a search warrant execution

4   where you went to the wrong house.

5        A.   Not to my knowledge.

6        Q.   And so you're saying you're not sure if that

7   happened in this case either?

8        A.   I did not approve the search warrant.  I did

9   not read the search warrant.  Detective Abdullah did not

10  request my advice in this case.

11       Q.   I'm just asking you if, in your opinion, as you

12  sit here today, you went to the wrong apartment.

13       A.   That is not my opinion.

14       Q.   Your opinion is you went to the right

15  apartment?

16       A.   Based on the information I had at the time,

17  that was what my opinion was.

18       Q.   I know, but I'm saying based on the information

19  you know now, as you sit here on October 28th, 2022.

20            MR. PETTEY:  Objection to the extent it's based

21  on information I've given you.  I don't believe she's --

22            MR. SCHEWEL:  Sure.

23            MR. PETTEY:  So outside of information that

24  I've given you and what we've discussed, if you have --

25            BY MR. SCHEWEL:

1      Q.   Yeah, so not from your attorney, but

2   information you learned from Detective Monroe or

3   Detective Rattelade or anyone else on the vice team or

4   District Attorney Saxe.

5      A.   I believe that was the apartment that the buy

6   was done out of.  That was the information I was led to

7   believe.

8      Q.   How do you communicate with the vice team

9   during a search warrant?

10     A.   What do you mean?

11     Q.   How do you communicate?

12     A.   We're usually on a radio channel, encrypted

13  radio channel.

14     Q.   What's the radio channel called?

15     A.   It depends on the search and who's involved.

16  Typically, we use Investigations TAC 6, which is an

17  encrypted channel, Investigative TAC 6.

18     Q.   Is that channel recorded?

19     A.   I don't believe so.

20     Q.   And this radio, what does it look like?

21     A.   It's a typical, standard, police-issued -- I

22  believe it's Motorola, but don't quote me on that.  I

23  mean, it's a --

24     Q.   Hand held?

25     A.   -- hand-held radio.

 1      Q.   Okay.  And if you want to use the radio, what
 2   do you do?
 3      A.   So you can key up on the side of the radio or
 4   if you have the little connected piece attached to your
 5   vest, you can key up on that as well.
 6      Q.   Okay.  And when you key up, what happens?  Does
 7   it make a sound?
 8      A.   There's a click.
 9      Q.   Okay.  And if someone keys up on it and wants
10   to talk to you, does your radio make a sound?
11      A.   I think it's also a click, but everybody on
12   that channel can hear it.
13      Q.   Okay.  So something happens when someone else
14   talks on the radio or wants to open up the line?
15      A.   Usually, there's a small clicking sound and
16   then their voice if they're speaking.
17      Q.   Okay.  If SEU is present, are they on the radio
18   communication or do they have access to the radio
19   communication as well?
20      A.   We all typically use the same channel to be on
21   the same page.
22      Q.   Okay.  I'm going to show you what is marked
23   Exhibit BBB, and this is Marcus VanIrvin's body camera --
24   or, sorry, it's body camera from the search warrant
25   execution on Marcus Van -- well, it's labeled Marcus

1   VanIrvin Body Camera 3.

2              MR. PETTEY:  Did you say BB or DD?

3              MR. SCHEWEL:  Three Bs.

4              MR. PETTEY:  Three Bs, thank you.

5              (Plaintiffs' Exhibit BBB was identified.)

6              BY MR. SCHEWEL:

7       Q.   And it says 00 -- it says 7 seconds, but I

8   think I've moved it back to start at the beginning.

9              (A portion of Exhibit BBB was played on the

10  videoconference monitor.)

11             BY MR. SCHEWEL:

12      Q.   Okay.  I'm pausing it at 55.  These are SEU

13  officers in a van?

14      A.   Yes.

15      Q.   What is this van called?  Does it have a name?

16      A.   The SEU van.

17      Q.   And --

18      A.   Very original.

19      Q.   Did you hear them ask about a car and say,

20  "What color is that car," or something to that effect?

21      A.    I remember a conversation about the car.  I

22  don't remember exact words that were exchanged.

23      Q.   And did you just hear that on the video?

24      A.   Yes.

25      Q.   And did you also hear a beep sound and Officer

1    Abdullah come on the radio and say something to the

2    effect of, "There is a blue car, there is a car"?

3         A.   Something to that effect.

4         Q.   Okay.  And is it your opinion that that was on

5    the radio?

6         A.   I believe so.

7         Q.   Do you want to hear it again?

8         A.   I believe that was radio traffic.

9         Q.   Okay.  So if SEU is going to execute a search

10   warrant, where will the vice team be stationed?

11        A.   Depends on -- it's a case-by-case basis.

12        Q.   Typically?

13        A.   Typically, we'll be responsible for the rear of

14   the residence, so whatever entrance they go in, we'll be

15   on the sides and the back to contain anyone that runs out

16   of the residence.

17        Q.   And sometimes vice officers will drive the SEU

18   vans to the location to be searched?

19        A.   Typically, we drive the SEU vans.

20        Q.   And when you arrive on the location, what

21   happens?

22        A.   As the -- as a normal vice officer or if I'm

23   driving the van?

24        Q.   Well, let's start with when you're driving the

25   van.

 1      A.   So I'd stop the van.  They'd all get out and go

 2   in front of me.  I'd be responsible for turning the van

 3   off, making sure the doors were locked, and then I'd fill

 4   into whatever position as -- after them.

 5      Q.   And what happens if you're not driving the van?

 6      A.   Typically, if we've already been given a

 7   responsibility, that was in the brief, so if my

 8   responsibility is the back of the house, then that may be

 9   coming over from a different street.  That may be -- it's

10   my job to get into place before they execute the search

11   warrant or as they are doing so.

12      Q.   And you will always enter after them?

13      A.   Typically, yes.

14      Q.   Will you ever enter before them?

15      A.   I can't think of a time that I have.

16      Q.   After a search, do you have a procedure for

17   processing evidence?

18      A.   Every detective is different, but yes.

19      Q.   What is your procedure?

20      A.   So if I'm the crime scene recorder, which is

21   what we call our evidence collector, I will try and clear

22   as many people out as I can.  I will take pictures of the

23   residence after SEU is done with their sweeps, and then

24   if there's already evidence in plain view, I'll go ahead

25   and photograph and collect that and write down where it

 1   was found and who found it, and then once all the obvious

 2   items have been collected, we will begin our search and

 3   all photographs have been taken, we'll begin our search.

 4   As detectives find evidence, they will call me.  I will

 5   come take a picture.  I will collect it.  I will write

 6   down where it was located and the detective that

 7   collected it, and then I will collect all of the

 8   evidence.

 9        Q.   Do you have a kit that you can take to a scene

10   of an arrest or a search to use to test drugs?

11        A.   So I have what I would call an evidence kit

12   that's just a -- like a pelican case, of sorts, that has

13   evidence supplies that also includes test kits, yes.

14        Q.   Is it black?

15        A.   Mine is.

16        Q.   I did not mean to play that.  I am now going to

17   show you what is marked as Exhibit CCC, and this is

18   VanIrvin Addendum 1.  It is a dash cam of a marked patrol

19   car.

20             (Plaintiffs' Exhibit CCC was identified.)

21             BY MR. SCHEWEL:

22        Q.   Do you see yourself in this video?

23        A.   I do.

24        Q.   And facing it, you see an officer on the left

25   of the screen in khaki pants?

1        A.   Light-colored pants.

2        Q.   Yes.  Okay.  I am going to fast-forward this

3   video to 53.  I'll just do right here, 53:46.

4

5             (A portion of Exhibit CCC was played on the

6   videoconference monitor.)

7             BY MR. SCHEWEL:

8        Q.   And I'm pausing at 53:49.  Who is the officer

9   on the left of the frame who appears to be holding a

10  black case?

11       A.   I believe that's Detective Rattelade.

12       Q.   And is that the evidence collection case you

13  were referring to?

14       A.   That is not mine.

15       Q.   But that is an evidence collection case?

16       A.   I believe so.  I believe that's his.

17       Q.   Okay.

18       A.   We each had our own separate case.

19       Q.   And do they each look the same?

20       A.   It depends on the detective.

21       Q.   Okay.

22       A.   Everybody's got a different kind of kit that

23  they have.

24       Q.   And so there's different brand kits?

25       A.   We create the kits, ourselves.  It's not like a

1  kit that I got when I went over there.  We found a

2  container and then I went through and collected the

3  evidence supplies that I needed into my kit.

4       Q.   So everyone's kit could be a different size and

5  shape?

6       A.   Yes.

7       Q.   Okay.  But sitting here, looking at this video

8  today, you think that is what officer?

9       A.   I believe that's Detective Rattelade.

10      Q.   And you believe that's Detective Rattelade's

11  evidence collection kit?

12      A.   I believe so.

13      Q.   Okay.  And just so I'm clear, your evidence

14  collection kit contains field tests?

15      A.   Yes, it does.

16      Q.   Did it contain field tests in 2019 and 2020?

17      A.   I believe so.

18      Q.   Did you receive classroom training or formal

19  training on identifying narcotics?

20      A.   We have a BLET block in the academy where we

21  receive multiple hours of training on narcotics.

22      Q.   And are you trained on how to identify

23  different types of narcotics?

24      A.   Yes.

25      Q.   Did you also receive training on identifying

1   different types of narcotics during your field training?

2        A.    There was a lot of on-the-job training, so I

3   had a training detective who walked me through some of

4   his cases and I learned by his example.

5        Q.    And that was Monroe?

6        A.    Yes.

7        Q.    In your formal training of classroom or

8   otherwise formal, did you receive training on how to

9   identify heroin?

10       A.    I believe so, yes.

11       Q.    Did you receive training through experience as

12  part of your field training on how to identify heroin?

13       A.    Yes.

14       Q.    Did Abdullah provide you any training?

15       A.    Any formalized training, not particularly.

16       Q.    Did he provide you any field training?

17       A.    No.

18       Q.    Would you say Abdullah provided you any

19  training how to type up warrants?

20       A.    I wouldn't say that Detective Abdullah -- I had

21  a specific field training officer.  That was Detective

22  Monroe.  He was the one that taught me.  I wouldn't say

23  that anyone else taught me in that capacity.

24       Q.    Okay.  In 2019 or 2020, if Officer Abdullah

25  told you or asked you to do something, did you feel like

1    you had to do it?

2         A.   What do you mean?

3         Q.   Let's say Officer Abdullah asked you to type up

4    a warrant for him.

5         A.   In each case, for the people that were present,

6    we worked as a team to be most effective, so we all had a

7    different piece of that puzzle for each case that we were

8    helping do for each person.

9         Q.   Did you feel like if he asked you to type up a

10   warrant for him or something of that sort, you could say

11   no?

12        A.   Yes.

13        Q.   Officer Abdullah made approximately 30

14   controlled buys with Dennis Williams.  How many of those

15   were you with Abdullah during the controlled buy?

16        A.   I don't recall.

17        Q.   Do you think it was more than five?

18        A.   We were all working at the same time.

19   Everybody had cases going on, so people -- you know, I

20   could be doing buys, everyone could be doing buys.  I'm

21   having trouble differentiating which ones were

22   specifically Omar's with Dennis Williams.  I don't know

23   that I can give you a number on that.

24        Q.   Okay.  But would you say that most of the time

25   when an officer on your team was going out to make a

1   controlled buy, if you were in that day, you would be out

2   assisting with that?

3       A.   Typically, unless we had something else that

4   was occurring at the same time.

5       Q.   Okay.  And how often would the vice team, in

6   2019 and 2020, be making two controlled buys at the same

7   time, separate controlled buys --

8       A.   It happens.

9       Q.   -- with separate CIs?

10      A.   It happened.

11      Q.   How often?

12      A.   Maybe in 20 to 30 percent of the time.

13      Q.   Okay.

14      A.   Approximately.

15      Q.   I just want to ask you about the times when you

16  were with Abdullah and Williams, what Abdullah's general

17  process was.  Would Abdullah search Williams prior to a

18  controlled buy?

19      A.   I don't know.

20      Q.   Did you ever observe Abdullah search Williams

21  prior to a controlled buy?

22      A.   I don't want to speak for Detective Abdullah.

23  I don't recall.  I may have seen that once or twice.  It

24  wasn't something I commonly saw.

25      Q.   Okay.  So you think of the times that you were

1  with Abdullah and Williams prior to a controlled buy, you

2  only observed him search him once or twice?

3      A.   So, again, you say with Detective Abdullah.  He

4  would typically show up with Aspirin.  I was a part of

5  the group.  I may not have been a part of the

6  minute-to-minute transactions of what he was doing.  You

7  know, typically, if we knew where a buy was, I could

8  already be in place to do surveillance on that position.

9      Q.   Would you ever ride with Abdullah to pick up

10 Williams?

11     A.   No.

12     Q.   So you're saying that what could have happened

13 is Abdullah could have searched Williams prior to

14 bringing Williams to the group?

15     A.   I believe that could have been possible, yes.

16     Q.   Were you ever with Abdullah when he picked up

17 Williams after a controlled buy?

18     A.   Not that I can recall.

19     Q.   During a buy with Abdullah and Williams, would

20 you typically observe the buy on the cell camera, the

21 livestream of the buy?

22     A.   I would typically monitor the app.

23     Q.   Okay.  Which is the livestream?

24     A.   Yes.

25     Q.   And, typically, when you were monitoring the

1   buy of the livestream with Williams, what would you see?

2        A.   He liked to keep the phone in his pocket.

3        Q.   So nothing?

4        A.   Depending on a case-by-case basis.

5        Q.   And if the phone was in his pocket, usually,

6   the screen would be black?

7        A.   Yes.

8        Q.   Did you ever observe a livestream where

9   Williams actually made a buy that you could observe on

10  the app?

11       A.   I believe I did, but I can't recall exact

12  times.

13       Q.   Do you know who the subject was?

14       A.   I do not.

15       Q.   Do you know what year it was?

16       A.   I mean, most of my experience with Aspirin is

17  going to be in 2020 because, you know, I was only there

18  for three to four weeks in December of 2019.

19       Q.   So you think there is one time, at least, where

20  you observed a hand-to-hand transaction on the

21  livestream?

22       A.   I don't recall.

23       Q.   Did you ever hear Abdullah reprimand Williams

24  or instruct Williams to have the cell camera facing the

25  subject or showing the sale?

1      A.   I don't know if I was present for any of those
2   that I can recall.
3      Q.   Did someone else ever tell you that Abdullah
4   did that or instructed Williams to do that?
5      A.   I remember a conversation with -- somebody else
6   had with Sergeant Rolfe while I was present regarding
7   that and that it was going to be addressed.  I don't
8   think I was present for when it was addressed.
9      Q.   Do you know approximately when that
10  conversation occurred?
11     A.   No.
12     Q.   Was it after May 21st, 2020?
13     A.   After May 21st, 2020, Aspirin was suspended and
14  no longer utilized as a CI.
15     Q.   So you think it must have been before May 21st
16     A.   That would be my recollection.
17     Q.   Okay.  And do you believe that this
18  conversation was involving Monroe and Rolfe?
19     A.   Possibly.  It would have been Detective Monroe
20  or Detective Rattelade.  I don't recall --
21     Q.   Okay.
22     A.   -- which one at the current moment.
23     Q.   Okay.  But I believe you already stated that
24  Rolfe was at many of these controlled buys and so he
25  would have been observing the livestream on his phone as

 1   well?

 2        A.   Again, I can't speak for what he was or was not

 3   doing.  A lot of times, we were in separate vehicles to

 4   get the best angle of watching the events that occurred,

 5   but that is my belief.

 6        Q.   Okay.  So at some point, at least you began to

 7   notice that Officer Abdullah was doing certain things in

 8   violation of RPD policy?

 9        A.   Can you be more specific?

10        Q.   Well, let me ask you a question.  Did you

11   notice Abdullah was doing anything in violation of RPD

12   policy in 2019 or 2020?

13        A.   I believe policy, as I was instructed, is that

14   we meet with CIs in pairs, especially for money

15   transactions and searching and that type of thing.

16        Q.   And so you noticed that he was meeting with

17   Dennis Williams alone?

18        A.   That tended to be my observation.

19        Q.   And this included picking up Dennis Williams by

20   himself?

21        A.   Yes.

22        Q.   And you also observed Mr. Williams waiting in

23   Abdullah's car at Green Dairy?

24        A.   I did observe that, yes.

25        Q.   And was that Abdullah's police issued car?

 1       A.   Yes.

 2       Q.   And how many times did you observe Williams

 3   waiting in Abdullah's car?

 4       A.   It was on more than one occasion.  I don't

 5   recall how many.

 6       Q.   And I believe you stated to the SBI that he was

 7   waiting there so he could get paid.

 8       A.   I believe so, yes.

 9       Q.   Did you inform any of your supervisors that you

10   saw Williams waiting in Abdullah's car outside the

11   station by himself?

12       A.   It was -- I was not the only one with knowledge

13   of that.

14       Q.   So you're saying everyone in the vice team knew

15   that that was happening?

16            MR. PETTEY:  Objection.

17            THE WITNESS:  Again, I can't speak for what

18   they did or did not know.  Was it common knowledge to me

19   that this was an occurrence with Aspirin?  Yes.

20            BY MR. SCHEWEL:

21       Q.   And you believe that Sergeant Rolfe, your

22   supervisor, knew that?

23       A.   Again, I can't speak for what he did or didn't

24   know.

25            MR. BLANCHARD:  Objection to the form.

 1          THE WITNESS:  I'm sorry.  Could you repeat the

 2    question?

 3          BY MR. SCHEWEL:

 4     Q.   The question was, you believe that Sergeant

 5    Rolfe knew that Williams was sitting in Abdullah's

 6    vehicle?

 7     A.   Again, I cannot speak to whether he did or did

 8    not know.

 9          MR. BLANCHARD:  Objection to the form.  You can

10    answer.  I'm just preserving it for the record.

11          THE WITNESS:  But that was my knowledge.

12          BY MR. SCHEWEL:

13     Q.   And that's why you didn't report this to Rolfe?

14     A.   Again, I was on training.  This was something

15    that other people knew as well.

16     Q.   Did you believe that Lieutenant Bunch knew that

17    this was happening?

18     A.   I cannot speak to what Lieutenant Bunch knew.

19     Q.   Is there a reason why you didn't tell

20    Lieutenant Bunch about this?

21     A.   I believe my direct supervisor had knowledge of

22    it.

23     Q.   Did Officer Monroe tell you not to do what

24    Abdullah was doing?

25     A.   We had conversations about, again, like I

 1  stated earlier, about best practices and how that may not

 2  have been the way that Detective Monroe did it and how

 3  that was not the way that I was going to do it.

 4      Q.   Okay.  And, specifically, he was referring to

 5  the things Abdullah was doing?

 6      A.   I'm talking specifically about having a CI

 7  waiting in the car to get paid.

 8      Q.   And, also, specifically to not meet with the CI

 9  by yourself?

10      A.   Yes.

11      Q.   And not pay the CI by yourself?

12      A.   Yes.

13      Q.   And during your interview with the SBI, the

14  agent asked you why nothing was done by Lieutenant Bunch

15  or Sergeant Rolfe to stop Abdullah from meeting alone

16  with Williams, and you said you thought it was because he

17  was a black Muslim.

18      A.   It is in the SBI report.

19           MR. BLANCHARD:  Objection.

20           THE WITNESS:  That was in my SBI report.

21           BY MR. SCHEWEL:

22      Q.   And is that accurate?

23      A.   Yes.

24      Q.   And why would the supervisors not want to

25  intervene with a black Muslim, in your opinion?

1        A.    I believe that Detective Abdullah had

2   previously had some issues with supervision and made some

3   complaints, and so it seemed like there was a more

4   hands-off approach to him.

5        Q.    Did Lieutenant Bunch or Sergeant Rolfe tell you

6   this?

7        A.    No.

8        Q.    Did Officer Monroe tell you this?  Sorry,

9   strike that.  Did Sergeant Monroe tell you this?

10       A.    Detective.

11       Q.    Detective.

12       A.    It was a conversation we had.

13       Q.    You and Detective Monroe?

14       A.    Yes.

15       Q.    He told you that Abdullah had made some prior

16  complaints that were race or religion related?

17       A.    I believe we discussed it.

18       Q.    And by "we," I just need you to tell me who.

19       A.    Detective Monroe and me.

20       Q.    And Detective Monroe also said as part of that

21  conversation that he thought that was why the supervisors

22  did not want to intervene and stop Abdullah from doing

23  what he was doing?

24       A.    You'll have to ask Detective Monroe for his

25  opinion on the subject.

1       Q.   No, I'm asking you if Monroe told you that.

2       A.   I believe that was -- not those exact words,

3  but a portion of a conversation that we had.

4       Q.   Okay.  So that was, essentially, what Monroe

5  conveyed to you?

6       A.   Yes.

7       Q.   Did anyone else tell you that there was this

8  issue that Abdullah had made these complaints and that

9  that was why the supervisors were not intervening and

10  stopping him?

11       A.   I believe that was a conversation we may have

12  had with Detective Rattelade as well.

13       Q.   Okay.  I am going to show you one more video.

14  This is marked as Plaintiffs' HHH.  This is a video from

15  May 12th, 2020.  It is from the arrest and takedown of

16  Connell Wilson, and I believe that this is marked as

17  Officer McDonald's Body Camera in the production produced

18  by the Raleigh Police Department.

19            (Plaintiffs' Exhibit HHH was identified.)

20            (A portion of Exhibit HHH was played on the

21  videoconference monitor.)

22            BY MR. SCHEWEL:

23       Q.   And, sorry, I am going to start this at the

24  beginning.

25            (A portion of Exhibit HHH was played on the

1    videoconference monitor.)

2              BY MR. SCHEWEL:

3         Q.   Okay.  I'm pausing it at 1:17.  Is that you in

4    the right corner of the video?

5         A.   That is me.

6         Q.   And at the start of the video, it showed an SEU

7    officer in a van with his phone directly next to him.

8    Did you see that?

9         A.   I did.

10        Q.   Do you recall this arrest?

11        A.   I recall being there.  My recollection of

12   everything that happened is a little fuzzy.

13        Q.   Okay.  Do you recall if you were driving a van

14   during this arrest?

15        A.   I believe I was driving that van.

16        Q.   Okay.  Do you recall observing Williams enter

17   the car that Connell Wilson was in?

18        A.   I don't recall.

19        Q.   Do you recall if you were observing the buy on

20   your cellphone?

21        A.   I don't recall.

22        Q.   Do you still have the app on your cellphone?

23        A.   I do.

24        Q.   Have you changed cellphones since 2019?

25        A.   I have.

1       Q.    What happened to your old cellphone?

2       A.    I kept it.

3       Q.    Do you still have it?

4       A.    I do.

5       Q.    Will you preserve it, please?

6       A.    That was a directive that was given to me.

7       Q.    Good.  Does the app, as far as you know, does

8   it keep track of times when you use it?

9       A.    I have no idea.

10      Q.    Okay.  So you haven't tried to scroll back

11  through it ever before and see if it shows --

12      A.    So I can't access the videos from the app.  The

13  app, I can either record or I can see it livestream.  To

14  get access, there's a -- it's a cloud-based storage

15  website that I would have to go to in order to access the

16  videos.

17      Q.    Do you have the app on your phone right there?

18      A.    I do.

19      Q.    Can you open it up?

20            MR. PETTEY:  I don't believe this is a request

21  to produce anything, so --

22            MR. SCHEWEL:  I just want to ask her questions

23  about how the app works.  I think it may save us some

24  time in discovery.

25            MR. PETTEY:  If it's about how the app works,

1    okay, if it'll help aid you in your testimony.

2            BY MR. SCHEWEL:

3       Q.   So my question is, if you could open the app up

4    and if you can look through the app and are you able to

5    see the last time you used the app?

6       A.   Not to my knowledge.

7       Q.   Can you try and do it?

8       A.   (Witness complies.)  I don't believe I see

9    anything in here that would allow me to see the last time

10   I used it.

11      Q.   Okay.  Can you just describe what it shows you?

12      A.   So there's the main screen.  I can either go

13   live to start recording or I can tune in to watch a

14   recording.  Those are my two options.

15           Under the settings, there's "return to main

16   screen," "recording settings," which has "high quality

17   balanced viewing," "high quality live viewing."  There's

18   a mute microphone button.  There's an "update my

19   profile."  There's an "appearance," "invite a coworker,"

20   "send feedback, policy --" or "privacy policy," "delete

21   my account," "help" and "sign out."

22      Q.   Okay.  Thank you.  I believe you stated earlier

23   that you never actually observed any of the heroin that

24   Williams brought back after an arrest or after a

25   controlled buy.

1      A.   So I said I was never the crime scene recorder,

2  so I wasn't in charge of collecting and processing the

3  evidence.

4      Q.   Did you ever observe the heroin that Williams

5  brought back?

6      A.   I may have on the January case you referenced,

7  but I don't recall.

8      Q.   Okay.  Do you think there was any other times

9  where you observed the heroin that Williams brought back?

10      A.   I don't recall.  Again, that was not my job to

11  process the evidence.

12      Q.   Do you recall after a controlled buy occasions

13  where Monroe told Abdullah that, "This is not what heroin

14  looks like," in reference to heroin produced by Williams?

15      A.   After the controlled buy?

16      Q.   After a controlled buy, yes.

17      A.   So Detective Abdullah would process his own

18  controlled buys.

19      Q.   I know that.  Well, sorry.  I don't know that,

20  but you're saying that Abdullah would not have other

21  people assist him with evidence processing?

22      A.   For buys.

23      Q.   Okay.

24      A.   Same as I don't have anyone assist me for a

25  buy.  It's my -- unless there's a time constraint or

1    something.  If I do a buy, I take control of the drugs.

2    I package them.  I do all of the stuff for what I put

3    into evidence.

4        Q.   My question is just, do you recall Monroe

5    telling Abdullah, when he was looking at some point at

6    heroin that Williams had produced, that, "This does not

7    appear to be heroin"?

8        A.   I don't recall a conversation between the two

9    of them.

10       Q.   Okay.  Do you recall Monroe telling you that he

11   had looked at Abdullah's heroin and it did not appear to

12   be heroin?

13       A.   I can remember one occasion where we had that

14   conversation, yes.

15       Q.   One occasion?

16       A.   At least.

17       Q.   Okay.  How many do you think, though?

18       A.   I don't recall.  I just remember at least one

19   occasion where we had that conversation.

20       Q.   Do you think it was more than five times?

21       A.   No.

22       Q.   Less than five times?

23       A.   Less than five.

24       Q.   Okay.  But it could be more than one, you're

25   saying?

1      A.   Possibly.  I just can recall one as we're
2  sitting here.
3      Q.   Do you recall that Monroe said that the heroin
4  looked sugary?
5      A.   I believe so.
6      Q.   How many occasions do you recall Monroe or
7  Rattelade field testing alleged heroin produced by
8  Williams?
9      A.   The January case that Detective Monroe field
10  tested and then the May 21st case that Detective
11  Rattelade field tested.
12      Q.   Those are the only two occasions that you know?
13      A.   That I can recall, yes.
14      Q.   Could it have happened more than that?
15      A.   I don't -- not to my knowledge.  I believe it
16  would have come up in conversation.
17      Q.   Okay.  But you're saying the only two times
18  where you actually heard about it that you can recall
19  were January and May?
20      A.   Yes.
21           MR. PETTEY:  When you get a chance, restroom
22  break?
23           MR. SCHEWEL:  Sure.  Let me just finish this
24  page.
25           MR. PETTEY:  Sure.

1            BY MR. SCHEWEL:

2        Q.   So I know you said that Rattelade and Monroe

3    went to Rolfe to tell him that they thought that Williams

4    was making bad buys.  Did -- you didn't say that?  Is

5    that what you're saying?

6            MR. PETTEY:  Objection.

7            THE WITNESS:  Is that your question?

8            BY MR. SCHEWEL:

9        Q.   Well, I believe previously you testified that

10   Monroe and Rattelade told Rolfe that they believed that

11   Williams was making bad buys.

12           MR. BLANCHARD:  Objection.

13           BY MR. SCHEWEL:

14       Q.   My question for you is if they ever went to

15   Lieutenant Bunch, to your knowledge, to tell him

16   something similar about what Williams was doing.

17           MR. PETTEY:  Objection.

18           MR. BENTON:  Objection.

19           THE WITNESS:  I believe that Detective Monroe

20   went to Lieutenant Bunch after the May 21st incident.

21           BY MR. SCHEWEL:

22       Q.   Is that the only time you know of that they

23   went to Lieutenant Bunch, either of them?

24       A.   That's the only time that I can recall hearing

25   about it.

1      Q.   Is that true for everyone in the vice team?  Do

2   you know of any occasion where anyone else on the vice

3   team went to tell Lieutenant Bunch that they had concerns

4   about Williams?

5      A.   I don't recall any other time.

6      Q.   Were you ever present for a takedown involving

7   Williams, so a controlled buy involving Williams with a

8   takedown that occurred afterwards where heroin was

9   located on the person seized?

10     A.   I don't believe so.

11     Q.   What about where heroin was located at a home

12  or an apartment?

13     A.   I don't believe so.

14     Q.   Okay.  So none of the buys you were involved in

15  with Williams was there any heroin actually found during

16  the takedown or during a search?

17     A.   In addition to what was presented to Detective

18  Abdullah?

19     Q.   Right.  I mean actually found on the person or

20  in the person's home, as you would expect would be the

21  case with someone who is selling drugs?

22          MR. PETTEY:  Objection.

23          THE WITNESS:  Heroin, specifically, not that I

24  can recall.

25          BY MR. SCHEWEL:

1      Q.   Was it your belief that Williams was purchasing

2   marijuana and not actually purchasing heroin?

3      A.   At what time frame?

4      Q.   Is that your belief today?

5      A.   That is my belief today.

6      Q.   Was that your belief on May 22nd, 2021 -- 2020?

7      A.   I don't believe that was my belief until

8   conversations started occurring about the totality of the

9   circumstances.  I cannot give you an exact date as to

10   when that became the topic of discussion, but it was

11   after May 21st.

12      Q.   Was it after Abdullah was suspended or before

13   Abdullah was suspended?

14      A.   Somewhere in that time frame.

15      Q.   How do you think the fake heroin was produced?

16      A.   In what -- define "produced."

17      Q.   Well, we know that in at least or approximately

18   15 cases, fake heroin was produced.  How do you think it

19   got there?

20      A.   Based on my belief at this current time?

21      Q.   Yeah.

22      A.   That Dennis Williams was bringing that to the

23   takedowns.

24      Q.   So how do you think that he did that without

25   Abdullah or anyone else on the vice team catching him?

 1      A.   I didn't -- I've never searched Aspirin.  I
 2 can't tell you what he did or did not have on his person
 3 during this time frame.
 4      Q.   Do you think he hid it in his underwear?
 5      A.   I think that's a possibility.
 6      Q.   And you think Abdullah just didn't see it?
 7      A.   Again, I can't speak for what Detective
 8 Abdullah did.
 9      Q.   What do you think Williams did with the
10 marijuana he purchased?
11      A.   Again, he could have possibly hidden it on his
12 person, but I can't speak to the searches that were done
13 of his person.
14      Q.   Is it surprising to you that Abdullah never
15 located marijuana on Williams after a controlled buy?
16      A.   Is it surprising in the context of today?
17      Q.   Yes.
18      A.   Yes.
19      Q.   Why?
20      A.   I know how I search my CIs and I know how I was
21 trained to search my CIs, and I would have the same
22 expectation of the members of my team.
23      Q.   And what expectation is that?
24      A.   That it would be a thorough enough search that
25 evidence would be found, but we're also not strip

 1   searching CIs.

 2       Q.   Do you believe that Williams was pocketing buy

 3   money today?

 4       A.   Based on today's event, I believe -- in my

 5   belief, I think he pocketed the money on May 21st.

 6       Q.   What about on other occasions?

 7       A.   I don't believe he did.

 8       Q.   Do you believe that Abdullah was benefitting

 9   financially or any other way from his arrangement with

10   Williams?

11       A.   I do not.

12       Q.   Okay.  We can take a break.

13            (WHEREUPON, a brief recess was taken.)

14            BY MR. SCHEWEL:

15       Q.   Was Brian Lindsey a detective in vice?

16       A.   At some point, I don't know that he was, or he

17   may have been.  He was not when I was.

18       Q.   Okay.  Who is Brian Lindsey?

19       A.   He's a detective. He was, I believe, in Taru or

20   Fugitive, I believe.  He has since retired.

21       Q.   Did you observe him talk with Abdullah?

22       A.   I don't believe so.  Actually, now that I might

23   recall, he may not even have been a detective.  He may be

24   an officer, but I believe he was in Fugitive.

25       Q.   And you don't recall saying in your interview

1   with Internal Affairs that Lindsey was one of the

2   officers you observed talking with Officer Abdullah?

3            MR. PETTEY:  Objection.

4            THE WITNESS:  It was common knowledge that they

5   were friends.  I don't remember specific instances where

6   I saw them communicating.

7            BY MR. SCHEWEL:

8       Q.   Okay.  So what do you mean by them being

9   friends or there was common knowledge that they were

10  friends?

11      A.   Conversations with Detective Monroe or

12  Rattelade.  That was --

13      Q.   Okay.  So you don't actually have a

14  recollection of seeing Abdullah with Lindsey?

15      A.   I don't believe so.

16      Q.   But you knew he was friends with Lindsey?

17      A.   That was the third-party knowledge that I had.

18      Q.   Did you ever assist Abdullah with submitting

19  the drugs to the CCBI lab?

20      A.   I could have possibly written the request form

21  as part of the search warrant.  Again, we all had

22  different jobs, so it's possible that I could have

23  written it.  I don't recall a specific instance.

24            MR. SCHEWEL:  Can you hand me Officer Gay's SBI

25  interview, please?

1              MR. PETTEY:  Exhibit BB.

2              MR. SCHEWEL:  Thank you.

3              MR. PETTEY:  I'll let her look at my copy.

4              MR. SCHEWEL:  Thank you.

5              BY MR. SCHEWEL:

6       Q.    Okay.  I'm going to direct you to page 4,

7    towards the bottom.  It's the third paragraph from the

8    bottom.  It states, "Abdullah never followed up checking

9    with --" sorry.  Strike that.

10             "Abdullah never followed back up with checking

11   on lab reports.  Gay would go out of her way to help,

12   even when it was at the end of the day.  Gay did not

13   think what Abdullah was doing with Williams was

14   malicious, but there was so many issues, she could not

15   say for sure."

16             So I'll ask you again, did you help Abdullah

17   file his CCBI requests to have drugs tested?

18             MR. PETTEY:  Objection.

19             THE WITNESS:  So, again, possibly.  I mean, it

20   was one of the jobs that we did during the processing of

21   a search warrant or a takedown, so it's very possible I

22   could have written them.  Once that's written, you have

23   to get approval from the DA's office before CCBI will

24   test the drugs.

25             BY MR. SCHEWEL:

1          Q.    How do you get that approval?

2          A.    Normally, it's a communication with a district

3    attorney and then an e-mail is sent to evidence for

4    approval before the drugs get sent off to CCBI.

5          Q.    How long does that process take you today?

6          A.    It depends on when the lab is submitted.  If

7    they're submitted with the drugs and I can get approval

8    from the DA's office that day, I would say less than a

9    month, but back then it took longer.

10         Q.    Okay.  So you're saying there is a process by

11   which you can submit the lab request and e-mail the DA

12   immediately and say, "I have these drugs; I need them

13   tested"?

14         A.    Yes.

15         Q.    But in 2019, you could not do that?

16         A.    I said the process took longer back then.

17         Q.    So you could still do that?

18         A.    Yes.

19         Q.    But it took longer then to get the result back

20   from the lab?

21         A.    Yes.

22         Q.    Okay.  And when the result -- describe for me

23   how the result comes back from the lab.

24         A.    So then or now?  Because it's changed.

25         Q.    Then.

1          A.    So then, there's a file on Pol Share that had

2     all of the CCBI lab results for every Raleigh police case

3     that was submitted.  You had to go in the folder.  You

4     had to find -- it was labeled by case report number, so

5     you had to go in and find your case report numbers and

6     open it up and that was the file.

7          Q.    And what was it called?  Pol Share?

8          A.    Pol Share.

9          Q.    P-o-l-e?

10         A.    P-o-l and then Share, Pol Share.  It's like our

11    logistical -- so if you're on the other side of the

12    department, you can put this file and I can access it

13    from my computer.

14         Q.    What else is on Pol Share?

15         A.    There's a variety of things, roll calls, forms,

16    paperwork.  Anything that you could not find on RPD Net,

17    which is like our website for officers, you could find on

18    Pol Share, like a common sharing network.

19         Q.    Okay.  And this SBI report on your interview

20    says, "Abdullah never followed back up on checking on lab

21    reports."  What does that mean?

22         A.    So it was something you had to seek out, so if

23    you -- sometimes it would take weeks or months for a CCBI

24    lab request to come back, so it was something that you

25    had to seek out later.  That has since changed, but it

1  was something that you had to remember, you know, "On

2  this date, I did this case, I sent the lab out, I have to

3  go back and look at this lab request whenever it comes

4  in," but you don't know when it comes in.

5       Q.   And how do you know that Abdullah was not doing

6  that?

7       A.   Again, this was conversations with Detective

8  Monroe and other detectives, that they did not believe he

9  was checking it.

10      Q.   In conversations that they had with you?

11      A.   Yes.

12      Q.   Did you ever hear them confront Abdullah about

13 this?

14      A.   I don't recall.

15      Q.   Do you recall if you ever heard them talk to

16 Sergeant Rolfe about this?

17      A.   That specific issue, I don't recall.

18      Q.   Do you know how they knew that Abdullah was not

19 checking his labs?

20      A.   I don't recall, but they worked with him a lot

21 longer than I had.

22      Q.   Do you recall Monroe or Rattelade ever having a

23 meeting with a district attorney and a public defender

24 from the Wake County Public Defender's Office related to

25 concerns about Dennis Williams and Abdullah?

1      A.   I did hear about this meeting.

2      Q.   Do you know when this meeting occurred?

3      A.   After May 21st.

4      Q.   After May 21st?

5      A.   (Witness nods head.)

6      Q.   Were you at that meeting?

7      A.   I was not.

8      Q.   What did you hear about that meeting?

9      A.   What did I hear?

10     Q.   (Counsel nods head.)

11     A.   The defendant that came in stated that he knew

12 Dennis Williams, that he had intended to sell Dennis

13 Williams several zips, which is an ounce of marijuana,

14 and then the takedown occurred.

15     Q.   Was the defendant in custody?

16     A.   I don't recall.  Again, I was not at this

17 meeting.  I don't recall if he was in custody or if this

18 was after he had been released.  I don't recall.

19     Q.   Do you recall anything else about this meeting?

20     A.   I don't recall which attorney it was.  I

21 believe the ADA was Jason Smith, but I -- that was just

22 the highlights of what I remember.

23     Q.   Did you report to any of your supervisors that

24 Abdullah was not checking his CCBI lab results?

25     A.   I did not have firsthand knowledge of that, so

 1  I --

 2      Q.   I'm just asking if you did.

 3      A.   No, I don't believe so.

 4      Q.   So after you learned all of this about

 5  Williams, that he was covering his body camera, that his

 6  heroin had field tested negative, you say, once --

 7      A.   Twice.

 8      Q.   Well, let's say prior to May 20th.  That he had

 9  claimed to buy drugs for way less than they should have

10  cost, that the drugs on at least one occasion did not

11  look like heroin -- and I think I said this already, but

12  that his livestream was not showing a transaction or a

13  sale occurring.  Your testimony is that you still

14  believed him to be a reliable and credible informant?

15      A.   After learning all of that?

16      Q.   Prior to May 20th, 2020, yes.

17      A.   So, again, he was not my CI.  I did not make

18  the determination for whether or not he was credible.

19      Q.   I'm not asking if you did.  I'm just asking if,

20  on May 19th, 2020, did you believe Aspirin was a credible

21  and reliable informant?

22      A.   I don't think I would have used him, but I

23  can't make the -- I don't make the determination for

24  other people's CIs.

25      Q.   Well, I mean, if you were in the same situation

1   today, would you have gone to your supervisor and said,

2   "I don't think we should be using this informant

3   anymore"?

4           MR. PETTEY:  Objection.

5           THE WITNESS:  Hypothetically, if we were in the

6   same scenario now, I would have concerns.

7           BY MR. SCHEWEL:

8       Q.   And you would have had those concerns prior to

9   May 20th and May 21st, 2020?

10          MR. BENTON:  Objection.

11          THE WITNESS:  There were concerns along the

12  way.  I did not have the wealth of information and

13  knowledge now on the 20th of May.

14          BY MR. SCHEWEL:

15      Q.   Well, you knew he was obscuring his buy camera?

16      A.   I had seen that on a couple of occasions.

17      Q.   You knew that his heroin had field tested

18  negative at least once?

19      A.   Once.

20      Q.   You knew that Monroe had said it didn't look

21  like heroin?

22      A.   Once.

23      Q.   You knew that Monroe had said the heroin looked

24  sugary at least once?

25      A.   Once.

1      Q.   Only once now?

2      A.   I believe that was --

3      Q.   I mean, I think your testimony was --

4           MS. KIBLER:  Objection.

5           MR. PETTEY:  Objection, arguing.

6           BY MR. SCHEWEL:

7      Q.   And so, again, I mean, I guess what you've

8  testified is that you would have concerns.

9      A.   If he was my CI, I would have concerns.

10     Q.   And by "concerns," you mean you would not

11 continue to use him?

12     A.   It would have been a discussion with a

13 supervisor and with the CI.

14     Q.   Okay.  Let's turn to May 20th, 2020.  You were

15 off that day?

16     A.   May 20th, I don't recall.  What day was it?

17     Q.   I don't know.

18     A.   I don't recall.

19     Q.   Well, okay.  I'm going to show you a Receipt of

20 Informant Funds Report.  This is from the Marcus VanIrvin

21 case jacket.  It is marked ZZ for plaintiffs' purposes.

22          (Plaintiffs' Exhibit ZZ was identified.)

23          BY MR. SCHEWEL:

24     Q.   And I believe that this is the first page of

25 the Marcus VanIrvin case jacket.

1           Okay.  Do you recognize this first document on

2    page 1?

3        A.   Do I recognize it in what capacity?

4        Q.   Okay.  Well, what is this document?

5        A.   This is a Receipt of Informant Funds.

6        Q.   And it's dated 5/20/20?

7        A.   Yes.

8        Q.   And the time is 14:22?

9        A.   Yes.

10        Q.   Case Number P20-023804?

11        A.   Yes.

12        Q.   For the release of $110 in buy money?

13        A.   Yes.

14        Q.   And the officer requesting or receiving the

15    money is Abdullah?

16        A.   That is what is listed here under "Officer,"

17    yes.

18        Q.   And he signed as well?

19        A.   To the best of my --

20        Q.   It appears to be his signature?

21        A.   It appears to be, yes.

22        Q.   And the signature of the authorizing supervisor

23    is Mr. Rolfe?

24        A.   I believe so, yes.

25        Q.   So if we assume everything on this form to be

1    true, it would mean that on May 20th, 2020, Abdullah

2    received $110 in buy money distributed to him from Rolfe?

3        A.   I believe so.

4        Q.   Why do you have doubts?

5        A.   I don't -- as I said, there were the occasion

6    where if Rolfe was out of town, the money would have been

7    gotten by the detective, and so I --

8        Q.   Do you believe Rolfe was out of town on the

9    20th?

10       A.   I believe he was out of town on the 21st.  I

11   don't recall on the 20th.

12      Q.   Okay.  Well, how would Rolfe have signed this

13   document if he was out of town?

14      A.   You will have to ask him that.

15      Q.   Was it a process of the vice team at this time

16   to sign on behalf of Sergeant Rolfe if he was out of

17   town?

18      A.   No.

19      Q.   Was it a process of the vice team at this time

20   or Sergeant Rolfe at this time, to your knowledge, to

21   sign when he got back in town?

22      A.   So his -- as the authorizing supervisor, he

23   would have when he got back in town as long as the money

24   was right.

25      Q.   You're saying he could have retroactively

1    signed it?

2        A.   Yes.

3        Q.   Has that ever happened in any of your cases?

4        A.   So this form is always signed after the buy

5    occurs, so the Receipt of Informant Funds we give to the

6    sergeant that says, "I am taking out this amount of money

7    from the thing," and then after the buy occurs and all

8    these forms are signed by the CI and by the detective,

9    they're given to Sergeant Rolfe who rectifies and makes

10   sure all the money is correct and then he signs as the

11   authorizing supervisor.

12       Q.   So you're saying Sergeant Rolfe never signs

13   these forms when he actually distributes the money?

14       A.   No.

15       Q.   Sergeant Rolfe signed these forms at some point

16   after the buy occurs?

17       A.   That was common practice.

18       Q.   For the buy money and the payment to the CI

19   money?

20       A.   Because they're split into multiple different

21   forms.

22       Q.   Right.

23       A.   So the initial form is for all of the money,

24   and then the money for the buy and the money to pay the

25   CI are two separate forms.

1        Q.   Right.  Okay.  Well, let's turn this document

2   over.  So this is, again, a Receipt of Informant Funds

3   sheet and I assume it's page 2, and this has "Amount

4   Received, $110.  Date: May 20th, 2020," at the same time?

5        A.   Yes.

6        Q.   14:22, which, if we turn back to the front of

7   it, it's the same time that the money was allegedly

8   distributed to Officer Abdullah?

9        A.   That is what this says.

10       Q.   In your practice, is the time that's listed and

11  the date that's listed on this sheet, is that the time

12  and the date that the money is actually picked up or is

13  that the time and the date that the document is signed?

14       A.   So for my common practice, on the first page I

15  would put the time and date that I was receiving the

16  money, and then on the back I would put the time and the

17  date that the informant signed it.

18       Q.   And then you wouldn't have your sergeant sign

19  this until when?

20       A.   From the forms at the end of the buy, when all

21  the forms were signed by the CI and the buy was

22  concluded, I would put these on his desk.

23       Q.   Okay.  And what about -- if we go back to the

24  first page, do you see where it says, "Amount Received,

25  $110"?

1      A.   Yes.

2      Q.   And then you see where it says, "Officer

3  Initials, OIA"?

4      A.   Yes.

5      Q.   And then, "Supervisor Initials, WSR"?

6      A.   Yes.

7      Q.   When would Sergeant Rolfe initial?

8      A.   Again, when this was concluded.

9      Q.   Okay.  Let's turn over to the back.  It says,

10  "Informant Signature: Aspirin.  Witness 1: Abdullah.

11  Witness 2: J.D. Rattelade."  Are you saying, again, that

12  this is not signed until the operation ends?

13      A.   So the witness signature, based on my common

14  practice, I do at the time or close in time that the CI

15  receives the money.

16      Q.   Okay.  And the witness, in addition to

17  yourself, would be a witness who actually physically

18  observed you give the money to your informant?

19      A.   That is typical.

20      Q.   And so if that's what occurred in this case, it

21  would mean that Officer Rattelade observed Abdullah give

22  $110 to Aspirin?

23      A.   Again, that -- neither one of these signatures

24  are mine, so I cannot speak for Detective Rattelade.

25      Q.   That's what this form would indicate to you?

 1        A.   Typically, yes.

 2        Q.   All right.  Let's look at page 3.  This is also

 3   a Receipt of Informant Funds sheet?

 4        A.   This?

 5        Q.   Yeah, that one.  And it's dated 5/20/20?

 6        A.   Yes.

 7        Q.   Time, 14:22?

 8        A.   Yes.

 9        Q.   So same date, same time?

10        A.   Yes.

11        Q.   And same officer, Abdullah?

12        A.   Yes.

13        Q.   And on this one, it says, "Amount Received:

14   $100"?

15        A.   Yes.

16        Q.   And Signature of Requesting Officer is Abdullah

17   and Signature of Authorizing Officer is Rolfe?

18        A.   Yes.

19        Q.   Why would Abdullah get two separate informant

20   fund distributions on the same date, at the same time?

21        A.   One is for the buy and one is to pay the CI, so

22   that form, I told you initially, is the form that's

23   turned over to Rolfe says that I'm taking -- in this

24   case, it would be $210 out of the informant funds, and

25   then it's broke up into the buy and the payment of the

 1  CI.

 2      Q.   Okay.  And so if we turn this over, this is the

 3  witness sheet that shows the same date, same time,

 4  Aspirin received $100 as payment for this buy?

 5      A.   That is what this says.

 6      Q.   And that was witnessed by Abdullah and

 7  Rattelade?

 8      A.   That is what this paperwork says.

 9      Q.   Do you believe this paperwork is accurate?

10      A.   I was not there.  I don't recall being there,

11  so I can tell you what the paperwork says.  I have no

12  direct knowledge of this event.

13      Q.   So, really, based on your practice in 2019 and

14  2020, we have no clue when Sergeant Rolfe signed this

15  piece of paper?

16      A.   I do not have direct knowledge of when he

17  signed this piece of paper.

18      Q.   Because there's no date that we can -- if

19  Abdullah's and Rolfe's practice is the same as the

20  practice that you describe, Rolfe could have signed it at

21  any point afterwards?

22      A.   You'll have to ask him.

23      Q.   Well, are you saying that what you would do and

24  what would happen in 2019 and 2020 is that when you got

25  back from the controlled buy that day, you would give

1    this piece of paper back to Sergeant Rolfe and you would

2    say, "Look, here's the paper, here's the buy money"?

3         A.   That was my practice, yes.

4         Q.   Okay.  The same day?

5         A.   I would at least put it on his desk if he was

6    not there or hand it to him directly if he was.

7         Q.   Did it ever come back to you?

8         A.   So I kept a copy for my CI files and then he

9    kept the copy that was audited by our Inspections Unit.

10        Q.   And your copy, is it signed by Sergeant Rolfe?

11        A.   I think I had it both ways.  If he wasn't

12   there, I went ahead and made a copy and put it in my

13   files, if I recall correctly.  My practices have changed

14   now than they were back then.

15        Q.   In 2019 and 2020, you would give this piece of

16   paper to Sergeant Rolfe, say, put it on his desk, he

17   would sign it, then you would go and get it back from him

18   and make a copy?

19        A.   Sometimes.

20        Q.   Do you still have those copies?

21        A.   For my CIs?

22        Q.   Yeah.

23        A.   I believe so.

24        Q.   And you're saying some of them will have his

25   signature and some won't?

1      A.   Possibly.  He kept the official record.  I kept

2  a record for my CI logs.

3      Q.   And is that the same -- strike that.  This

4  process that you described is the same process that still

5  occurs today?

6      A.   Which, the process of receiving informant funds

7  and the paperwork associated?

8      Q.   And when the sergeant signs.

9      A.   Yes.

10     Q.   Okay.  I'm going to ask you to look at the next

11  page, the next Receipt of Informant Funds sheet.  This is

12  dated 5/21/20 at 19:12.  Do you see that?

13     A.   I do.

14     Q.   Case Number P20-023804?

15     A.   I do.

16     Q.   And this is for Officer Abdullah?

17     A.   Yes.

18     Q.   Amount received, $100, initialed by Abdullah

19  and WSR?

20     A.   Yes.

21     Q.   And signed by Abdullah and Rolfe?

22     A.   Yes.

23     Q.   And this says, "CI payment for the purchase of

24  an amount of heroin.  A search warrant will be executed

25  on the target," and then someone handwrote, "The target

1   of this investigation was arrested."

2       A.   Yes.

3       Q.   So does this indicate to you that on this date,

4   Sergeant Rolfe distributed $100 in payment to Abdullah,

5   CI payment?

6       A.   I don't believe on this date that Sergeant

7   Rolfe was working.  I believe he was off.

8       Q.   Okay.  So you think what happened -- what do

9   you think happened, then?

10      A.   I think Detective Abdullah got the money from

11  the CI box to pay the CI.

12      Q.   Okay.  How much money went missing on the 21st?

13      A.   I don't recall the exact amount.  I believe it

14  was --

15      Q.   Was it $740?

16      A.   That's, I believe, what went missing, based on

17  my recollection.

18      Q.   Approximately?

19      A.   (Witness nods head.)

20      Q.   Okay.  And just so we've closed this loop, can

21  you turn to the back of the page that you're looking at

22  now?

23      A.   Yes.

24      Q.   And it says, "Informant Code Name: Aspirin.

25  Amount Received: $100," signed by Aspirin?

1      A.    Yes.

2      Q.    And date, 5/21/20, same time as the front,

3  19:12?

4      A.    Yes.

5      Q.    And the witness is Abdullah and the second

6  witness is Rattelade?

7      A.    Yes.

8      Q.    So, again, if this is accurate, it indicates

9  that Rattelade and Abdullah witnessed payment of $100 to

10  Aspirin on this date, at this time?

11      A.    Again, you'll have to ask --

12      Q.    If it's accurate.

13      A.    -- them.

14      Q.    But that's what it appears to say, right?

15      A.    Yes.

16      Q.    Okay.  Now, of all the sheets we just looked

17  at, there is no one indicating any receipt of

18  distribution of buy money on this date, on 5/21/20?

19      A.    Sir?

20      Q.    And you can look at it again.  Do you see

21  anyone that indicates a distribution of buy money on the

22  21st?

23      A.    On the 21st?  I see two labeled the 20th and

24  one labeled the 21st, but the one on the 21st says

25  "payment."

1      Q.   Well, there's nothing -- there's no Receipt of

2   Informant Funds for buy money on the 21st?

3      A.   Not that is currently in front of me.

4      Q.   Did you -- at this point in time, do you know

5   whether or not Abdullah got a Receipt of Informant Funds

6   for buy money for $800 on the 21st?

7      A.   I do not know.

8      Q.   Okay.  And you've never heard anything about

9   whether he did or whether he didn't?

10     A.   As far as a sheet?

11     Q.   As far as a sheet.

12     A.   It was common practice to fill out a sheet.  I

13   don't have --

14     Q.   I'm just asking you if you know that he did or

15   if he didn't.

16     A.   I don't.

17     Q.   All right.  I'm going to show you a search

18   warrant, 5/21/20.  This is in the Marcus VanIrvin case

19   jacket.  It's labeled Plaintiffs' Exhibit ZZZ.

20          (Plaintiffs' Exhibit ZZ.1 was identified.)

21          MR. BENTON:  What was that exhibit number?

22          MR. SCHEWEL:  It's Plaintiffs' ZZ -- sorry, two

23   ZZs and it's in the VanIrvin case jacket.

24          MR. PETTEY:  Abe, I'm sorry.  ZZ is the one we

25   just did.

1          MR. SCHEWEL:  You're right.  Let me check my

2    exhibit list.  Oh, they're all part of the VanIrvin --

3    the VanIrvin case jacket is Exhibit ZZ.  It's just like a

4    60-page document.

5          MR. PETTEY:  Okay.

6          COURT REPORTER:  So this is not going to be

7    marked separately?

8          MR. SCHEWEL:  It's going to be ZZ.

9          BY MR. SCHEWEL:

10     Q.   Okay.  I'm passing you page 1, which is the

11   search warrant.  Do you recognize this document?

12     A.   I recognize it as a search warrant.  I don't

13   think I ever read this particular search warrant.

14     Q.   Okay.  And the address on this search warrant

15   is 1628 Burgundy Street, Apartment B?

16     A.   Yes.

17     Q.   Raleigh, North Carolina 27610?

18     A.   Yes.

19     Q.   And the warrant was received at 12:09 p.m.?

20     A.   I believe so.

21     Q.   Is that what it says on the document?

22     A.   Yes.

23     Q.   And it says that the warrant was executed at

24   13:35, so that would be 1:35 p.m.?

25     A.   That is what this says.

1      Q.   Is it typical practice to execute a warrant
2  slightly over an hour after it's received?
3      A.   It can be.  It just depends, a case-by-case
4  basis.
5      Q.   Okay.  Are there any factors that go into that
6  decision?
7      A.   Every detective does things different.  I like
8  to execute early morning search warrants, but that's my
9  thing.  That's not everybody's thing.  Every detective
10 has a different way that they execute search warrants.
11     Q.   So does that mean you get your warrant the
12 night before?
13     A.   Possibly, or I'd wake up early and get it
14 signed that morning.  It's a case-by-case basis.
15     Q.   What's the earliest you can get a warrant
16 signed?
17     A.   Magistrates are 24/7.
18     Q.   Sorry.  Could you just repeat that for the
19 record?
20     A.   Magistrates are 24/7.
21     Q.   And this document was signed by a magistrate?
22     A.   The box is checked for magistrate, yes.
23     Q.   And it says "M.P. Smith"?
24     A.   I believe so.
25     Q.   Do you know that magistrate?

1      A.   I'm sure I would probably know their face.   I

2   don't know all of their names.

3      Q.   You don't remember that name?  It doesn't ring

4   a bell?

5      A.   The name rings a bell.  I just wouldn't be able

6   to put it with a specific person.

7      Q.   Okay.  So prior to executing the warrant, this

8   warrant, you met with the vice team to discuss the

9   operation?

10     A.   I believe so.

11     Q.   And this occurred at Green Dairy or in a

12   parking lot nearby?

13     A.   I don't believe it was at Greens Dairy, but I

14   don't recall the exact location.

15     Q.   And -- okay.  And Abdullah would have led the

16   debrief or the discussion of the warrant or the

17   operation?

18     A.   I don't recall the exact incident, but it was

19   his case.  Typically, he would have led the briefing.

20     Q.   And then the SEU part of it would have been led

21   by an SEU officer?

22     A.   Yes.

23     Q.   Do you recall which SEU officer led it?

24     A.   I do not.

25     Q.   Okay.  Do you recall Abdullah informing the

1   vice team -- well, strike that.

2          Do you recall that Abdullah conducted a second

3   controlled buy or a controlled buy on this date using

4   Dennis Williams?

5      A.   I believe so.

6      Q.   Okay.  And did you learn that at the meeting

7   prior to executing the warrant or did you plan that and

8   learn that earlier in the day?

9      A.   I don't recall.

10     Q.   Okay.  I'm going to show you a video, and this

11  is marked DDD, as Plaintiffs' Exhibit.  And this is

12  5/21/20 Buy Cam 1.

13          (Plaintiffs' Exhibit DDD was identified.)

14          (A portion of Exhibit DDD was played on the

15  videoconference monitor.)

16          BY MR. SCHEWEL:

17     Q.   Okay.  I'm pausing it at 33 seconds.  Did you

18  just hear a radio communication?

19     A.   Yes.

20     Q.   And did it say, "Hey, Rat, this is someone.

21  Can you text me the address"?

22     A.   I believe so.

23     Q.   And you believe that was referring to

24  Rattelade?

25     A.   I believe so.

1       Q.   And did you hear the person's name when they
2   said, "Hey, this is --"
3       A.   I did not.
4       Q.   Do you want to try it one more time?
5       A.   Sure.
6            (A portion of Exhibit DDD was played on the
7   videoconference monitor.)
8            THE WITNESS:  Can you play it one more time?
9            (A portion of Exhibit DDD was played on the
10  videoconference monitor.)
11           BY MR. SCHEWEL:
12      Q.   So you can't tell whose name that is?
13      A.   I can't.
14      Q.   Okay.  But you do believe that Rat is
15  Rattelade?
16      A.   I do.
17      Q.   And so this was a radio communication from
18  someone else communicating to Rattelade?
19      A.   I believe so.
20      Q.   And what type of video do you think this is,
21  from looking at it?
22      A.   It looks like, possibly, the button cam.
23      Q.   And the button cam would go on a jacket?
24      A.   Or a shirt.  It's a button, so it would go like
25  in a button-up shirt or polo.

1      Q.   Okay.  And so this is -- if this is from

2   5/21/20, this is a camera that's on Dennis Williams?

3      A.   That is the context you were giving me, yes.

4      Q.   All right.  I'm going to continue to play this.

5           (A portion of Exhibit DDD was played on the

6   videoconference monitor.)

7           BY MR. SCHEWEL:

8      Q.   I'm stopping at 2:17.  Do you recognize the two

9   officers in the video?

10     A.   The one on the left is Detective Rattelade.

11  I'm not sure who the one on the right is.

12     Q.   Okay.  I'm going to keep playing it, 2:17.

13          (A portion of Exhibit DDD was played on the

14  videoconference monitor.)

15          BY MR. SCHEWEL:

16     Q.   You still don't recognize the other officer?

17     A.   I didn't get a good look at his face.

18     Q.   But it was not Officer Abdullah, was it?

19     A.   I don't believe so.

20     Q.   What kind of hair did Officer Abdullah have in

21  May of 2020?

22     A.   I don't recall.  His hair changed a couple

23  times.  I don't recall.

24     Q.   It didn't look like the officer pictured in the

25  camera, did it?

 1      A.   I don't believe so.  I believe he was driving

 2   the van.

 3      Q.   Okay.  But there were clearly two vice

 4   detectives in that car?

 5      A.   I'm not sure who the second one up front was.

 6      Q.   So you're saying it could have been someone in

 7   SEU?

 8      A.   Possibly.

 9      Q.   Okay.  But it was a Raleigh police officer?

10      A.   I believe so.

11      Q.   All right.  I'm going to fast-forward this

12   video to very close to the end.

13           (A portion of Exhibit DDD was played on the

14   videoconference monitor.)

15           BY MR. SCHEWEL:

16      Q.   All right.  I'm going to play that again for

17   you, starting here.

18           (A portion of Exhibit DDD was played on the

19   videoconference monitor.)

20           BY MR. SCHEWEL:

21      Q.   Based on what you know about this operation,

22   was that an officer picking up Williams after the

23   controlled buy?

24      A.   I believe so.

25      Q.   Was that Officer Rattelade?

1      A.   I believe so, in the front driver's seat.

2      Q.   And did you hear him say, "That went smooth"?

3      A.   Yes.

4      Q.   During the controlled buy, where were you

5 stationed?

6      A.   I believe that I was driving the black van with

7 some SEU guys.

8      Q.   And Officer Abdullah was in a second SEU van?

9      A.   I believe so.

10      Q.   So why was Officer Abdullah not driving

11 Williams on this date?

12      A.   It was common practice for search warrants for

13 the lead detective to drive the SEU van.

14      Q.   Okay.  So any time there was a search warrant

15 executed, the lead detective is not in the car with the

16 CI?

17      A.   It was common practice for search warrants for

18 the lead detective to drive the SEU van.

19      Q.   What about for takedowns?

20      A.   So for most takedowns during this time period,

21 I was the only one that had a van, and so typically I

22 would be the lead vehicle driving my van with SEU guys in

23 the back.

24      Q.   What do you mean, your van?

25      A.   I had a mini-van.  I was assigned a mini-van.

 1      Q.   Okay.  Why could you not drive the SEU van?

 2      A.   So you're talking about takedowns?

 3      Q.   Yeah, like arrests in the street, takedowns.

 4      A.   So takedowns -- so my van was more under cover

 5   than their large SEU van, so to get closer to the

 6   targets --

 7      Q.   Got it.

 8      A.   -- three or four of them would be in the back

 9   of my van.

10      Q.   Got it.  Okay.  So for a takedown involving

11   Dennis Williams as the CI, it's possible that Abdullah

12   was driving Dennis Williams?

13      A.   Possibly.

14      Q.   But for a search warrant execution, practice

15   would have been for a different officer in the vice unit

16   to have been driving Williams?

17      A.   It was not super often that those two things

18   happened simultaneously.

19      Q.   You mean that Williams is involved with a

20   search warrant execution?

21      A.   Correct.

22      Q.   But it did happen?

23      A.   Yes.

24      Q.   I mean, it happened on 5/21/20?

25      A.   Yes.

 1      Q.   Yeah.  Now, were you providing surveillance at
 2  any point on Marcus VanIrvin's apartment or the apartment
 3  where the controlled buy occurred?
 4      A.   I don't believe so.  That area is very
 5  difficult to sit in.
 6      Q.   Were any detectives providing surveillance?
 7      A.   During which portion?
 8      Q.   During the time of the controlled buy, the
 9  second controlled buy that occurred on 5/21/20?
10      A.   I'm not sure.
11      Q.   Have you heard that any detectives were
12  providing surveillance of the controlled buy?
13      A.   Direct surveillance of him walking in and out
14  of the apartment?
15      Q.   Yeah.
16      A.   I'm not sure.
17      Q.   You're not sure or you didn't hear that or you
18  don't recall?
19      A.   I don't recall.
20      Q.   Okay.  So you never observed Williams enter an
21  apartment during a controlled buy on 5/21/20?
22      A.   I don't believe that was something I witnessed.
23      Q.   Did you ever witness Williams exit an apartment
24  on 5/21/20?
25      A.   I don't believe so.  If my recollection is

 1   correct, I was driving my van with SEU guys in the back,

 2   which means I wouldn't have been close because you would

 3   have been able to see them in the back of my van.

 4       Q.   Okay.  So it wouldn't have made sense for you

 5   to be stationed right there in that parking --

 6       A.   Correct.

 7       Q.   -- lot because everyone would have seen you?

 8       A.   Correct.

 9       Q.   Do you recall whether Williams made any sort of

10   code, signal that he had to report a successful buy on

11   this occasion?

12       A.   I believe there was a code phrase.  I don't

13   remember if it was said.

14       Q.   Okay.  Do you recall discussing an entry plan

15   with the SEU officers on 5/21/20?

16       A.   I'm sure they discussed it.  I don't remember

17   the content of it.

18       Q.   Okay.  Do you recall whether any sort of prior

19   record or any sort of danger was mentioned related to the

20   apartment to be searched?

21       A.   I don't recall.

22       Q.   Do you recall whether SEU officers surveilled

23   the apartment?

24       A.   I don't recall.

25       Q.   How did the SEU officers know what apartment to

1  go to?

2       A.   I believe they had the CI and I believe they

3  did the scout, but I don't think I did it with them, so I

4  cannot speak to their scout.

5       Q.   Okay.  So you just stated, "I believe they had

6  the CI."  Do you mean you believe they had the --

7       A.   I'm sorry, I thought I said "search warrant."

8       Q.   Okay.  So you believe they had a copy of the

9  search warrant?

10      A.   I believe so.

11      Q.   Would they have had a copy of the search

12  warrant application?

13      A.   They would have had a copy of the search

14  warrant and the affidavit.

15      Q.   Okay.  I'm going to show you the -- and this

16  says "application," but I presume that's what you mean.

17      A.   Yes.

18      Q.   And I'm sorry, this one is not -- that's page 1

19  of it.  Okay.  I'm passing you the other pages of the

20  search warrant, and those should go behind the ones that

21  you have.

22           MR. PETTEY:  Are you going to mark this or not?

23           MR. SCHEWEL:  It's all part of Z --

24           MR. PETTEY:  Oh, okay.

25           MR. SCHEWEL:  ZZ, sorry.

1          BY MR. SCHEWEL:

2      Q.   So this is the application for the warrant on

3   5/21/20 of Apartment -- 1628 Burgundy Street, Apartment

4   B.   And your testimony is that you did not see this

5   document prior to the execution of the warrant?

6      A.   I don't believe I did, no.

7      Q.   But you're stating that this document would

8   have been given to the SEU team so they would have known

9   where to go?

10      A.   Yes.

11      Q.   And there's also a picture that's provided in

12   this.  I realize it's black and white here, but the

13   purpose of that picture is to show which apartment you

14   are executing the warrant on?

15      A.   That is typically the purpose.

16      Q.   Is there any other purpose?

17      A.   It could be a photograph of the streets.  It

18   could be a -- it's a photograph to give directions to the

19   place to be searched.

20      Q.   Okay.  I'm going to show you VanIrvin Body

21   Camera Video 3, and this is Plaintiffs' Exhibit BBB.

22          (A portion of Exhibit BBB was played on the

23   videoconference monitor.)

24          BY MR. SCHEWEL:

25      Q.   Do you believe you were driving this van?

1      A.   I actually -- now that I'm watching the body

2   camera video, I do not believe I was driving this van.

3   And based on the number of officers that I'm seeing, I

4   actually don't think any of them were in my van.  I

5   believe they were all in this van.

6      Q.   Okay.  And just for the record, this is stopped

7   at 59 seconds.  Okay.  So does that mean that you were

8   driving in a different car?

9      A.   I was still probably driving in my van.  I just

10  no longer believe I had SEU members in it.

11     Q.   Okay.  So it is possible that you provided

12  surveillance on this occasion?

13     A.   I don't believe I did.

14     Q.   Okay.  You don't recall doing that?

15     A.   I don't recall doing that, no.

16     Q.   Okay.  Can you tell who's driving this van --

17     A.   I cannot.

18     Q.   -- based on the voices that you heard?

19     A.   I heard SEU voices.  I couldn't tell who was

20  driving the van.

21     Q.   So how do you -- okay.  And the reason why you

22  know you're not driving it is because it's not your van?

23     A.   This is the SEU van.

24     Q.   And you would not have been driving the SEU van

25  in any circumstance?

 1      A.   I don't believe so.  This was not my search
 2  warrant.
 3      Q.   Okay.  So you think Abdullah is driving this
 4  van?
 5      A.   I believe so, but that was --
 6      Q.   Did you -- sorry.  Go ahead.
 7      A.   That would be what would typically happen for a
 8  search warrant.
 9      Q.   Did you hear his voice in the first 59 seconds?
10      A.   You would have to play it again.  I wasn't
11  listening for it.
12      Q.   All right.  I'll keep playing.
13           (A portion of Exhibit BBB was played on the
14  videoconference monitor.)
15           BY MR. SCHEWEL:
16      Q.   Okay.  So I'm stopping at 3:14.  That is you in
17  the center of the screen?
18      A.   That is.
19      Q.   And you just entered the house?
20      A.   Yes.
21      Q.   Or the apartment?
22      A.   Yes.
23      Q.   And do you know who the SEU officer is who
24  said, "Meghan, do you want him?  I haven't frisked or
25  searched him."

1    A.   I believe it was Officer Garner, based on the

2  voice.

3    Q.   And Garner is an SEU officer?

4    A.   Yes.

5    Q.   And Garner -- earlier in the video, you saw he

6  had a firearm in his hand?

7    A.   I believe so.

8    Q.   And his firearm appeared to have a flashlight

9  on it?

10   A.   I believe they have flashlights on their

11 firearms, yes.

12   Q.   Okay.  And this was a -- it was -- it was not a

13 rifle?

14   A.   It looked like a handgun.

15   Q.   Looked like a handgun.  Thank you.  That's the

16 word I'm trying to come up with.

17        And where is the flashlight on the handgun?

18   A.   Underneath the barrel.

19   Q.   And how do you operate the flashlight?

20   A.   Typically, it's a one-fingered -- there's a

21 switch on the back of it that you can click on and off.

22   Q.   On the back of --

23   A.   The flashlight.

24   Q.   -- the flashlight.  Okay.  So you do it with

25 your thumb?

 1        A.    So I'm not sure.  I can't speak for their guns.

 2   My gun currently has a flashlight on it.  It did not

 3   then.  I operate it with my finger.

 4        Q.    Okay.  And so if you want to point the

 5   flashlight, you have to point the gun in the direction

 6   you're pointing the flashlight?

 7        A.    If he's using the flashlight that is on the

 8   firearm, yes.

 9        Q.    Okay.  All right.  I'm going to keep playing,

10   and this is at 3:14.

11             (A portion of Exhibit BBB was played on the

12   videoconference monitor.)

13             BY MR. SCHEWEL:

14        Q.    So after the SEU team entered the apartment,

15   you followed?

16        A.    As requested by SEU, yes.

17        Q.    What do you mean, as requested by SEU?

18        A.    So, typically, we will wait outside until

19   they've done a sweep and then a secondary sweep, but if

20   they need assistance, they will ask us to come in to

21   assist.  In this case, he needed my assistance.

22        Q.    Does watching this video refresh your

23   recollection on where you parked and what car you were

24   driving?

25        A.    I don't see my car in the video, so it does

1    not.  I believe I was driving the van, my van, because

2    that was the car I was assigned, but I cannot give you --

3        Q.   Okay.  And --

4        A.   I was not wearing a body camera.

5        Q.   And you are pictured in the body camera

6    frisking and taking an individual out of the apartment?

7        A.   I don't know that I took him out.  I frisked

8    him.

9        Q.   Okay.  So you think he may still be in the

10   apartment?

11       A.   I believe so.

12       Q.   Okay.  I think you're right.  And at some point

13   after -- well, we see on the body camera video Officer

14   Abdullah and a second vice team officer?

15       A.   Which second vice team officer?

16       Q.   Well, I guess I'm wrong, then.  Is this officer

17   in the center of the video at 3:52 -- is that an SEU

18   officer?

19       A.   That is a tactical medic.

20       Q.   That's a tactical medic.  Okay.  What is his

21   name?

22       A.   We call them "Doc."  I do not know his name.

23   Sorry.

24       Q.   Does he accompany you on search warrant

25   executions?

1        A.    If they're available.  We have multiple tac

2   medics and one of them will usually accompany us in the

3   van if they're available.

4        Q.    Okay.  On search warrant executions only or

5   also on takedowns?

6        A.    Both, if they're available.

7        Q.    And that's in case there's any injuries during

8   the operation?

9        A.    Yes.

10        Q.    Okay.  So after you entered the apartment and

11   handcuffed the young man, Ziyel Whitley, what happened

12   next?

13        A.    I don't remember if I --

14             MR. PETTEY:  Objection.

15             THE WITNESS:  -- actually handcuffed him.  I

16   know I did frisk him and then maintain security over him

17   while they finished clearing the apartment.

18             BY MR. SCHEWEL:

19        Q.    Okay.  What happened after that?

20        A.    After that, I believe I assisted with searching

21   the apartment.  I believe that was what we did next.

22        Q.    What were you looking for?

23        A.    Narcotics, firearms, evidence of drug activity.

24        Q.    Did you discover any contraband?

25        A.    I don't believe that I did, but I don't recall.

1    I'd have to look at the evidence sheet.

2         Q.   From your recollection, did anyone discover any

3    contraband at this apartment?

4         A.   I don't recall.

5         Q.   Did you discover any buy money at this

6    apartment?

7         A.   I don't believe so.

8         Q.   Did -- so I believe you just stated that you

9    searched the apartment.

10        A.   I believe I assisted in searching the

11   apartment.

12        Q.   What does that mean?

13        A.   I mean, I didn't do it by myself.

14        Q.   Okay.  Did you search only the downstairs or

15   the upstairs as well?

16        A.   There were portions of the upstairs that I

17   assisted in searching.

18        Q.   In the bedrooms?

19        A.   I believe so.

20        Q.   Okay.  And what did your search entail?

21        A.   What do you mean?

22        Q.   What did you do during your search?

23        A.   Searched under beds, in closets, in drawers, et

24   cetera.

25        Q.   And you were looking for any type of contraband

1    at the time?

2         A.   Yes, or firearms, et cetera.

3         Q.   Was there anything specific you were looking

4    for?

5         A.   Heroin.

6         Q.   Buy money?

7         A.   Buy money, firearms.

8         Q.   What happened when you left the apartment?

9         A.   What do you mean?

10        Q.   Did you move the furniture back in place prior

11   to leaving?

12        A.   No.

13        Q.   Did you apologize to any of the occupants of

14   the apartment?

15        A.   I don't recall doing that.

16        Q.   Okay.  I'm going to show you one more video and

17   this should be the last one.  No promises, though.  Okay.

18   This is Exhibit CCC and we've already seen this video

19   once today, and I'm going to play it at 1:04:19.

20             (A portion of Exhibit CCC was played on the

21   videoconference monitor.)

22             BY MR. SCHEWEL:

23        Q.   I'm pausing it at 1:05:10.  Do you recognize

24   one of the voices in the video as Officer Abdullah?

25        A.   I do.

 1      Q.   Did you hear the other voice say that his name
 2  was VanIrvin?
 3      A.   I did.
 4      Q.   Did you speak to Mr. VanIrvin at all after he
 5  was arrested?
 6      A.   I don't believe so.
 7      Q.   I'm playing again at 1:05:11.
 8           (A portion of Exhibit CCC was played on the
 9  videoconference monitor.)
10           BY MR. SCHEWEL:
11      Q.   The person who is walking out right there to
12  the right of the patrol officer, is that Monroe?
13      A.   I believe so.
14      Q.   And to the right of Monroe, as we're facing the
15  screen, that's you?
16      A.   I believe so.
17      Q.   And to the right of you?
18      A.   I believe that's Detective Gwinn.
19      Q.   Does Detective Gwinn also appear to have a
20  evidence kit in his left hand?
21      A.   He does.
22      Q.   Okay.  I'm going to continue playing at
23  1:05:42.
24           (A portion of Exhibit CCC was played on the
25  videoconference monitor.)

1          BY MR. SCHEWEL:

2     Q.   So I'm pausing at 1:10:13.  Facing the screen

3   on the left, talking to a civilian, what appears to be a

4   civilian female is Officer Abdullah with a mask on?

5     A.   Detective Abdullah, yes.

6     Q.   And with his back to the screen is Detective

7   Monroe?

8     A.   Yes.

9     Q.   And he's actually speaking -- or he's facing

10  you.  We just can't see you right now?

11    A.   Yes.

12    Q.   I'm going to fast-forward to 1:12:56.

13         (A portion of Exhibit CCC was played on the

14  videoconference monitor.)

15         BY MR. SCHEWEL:

16    Q.   Okay.  I'm pausing at 1:13:31.  On the -- if

17  we're facing the video, there's three vice detectives on

18  the screen.  You are on the right?

19    A.   Yes.

20    Q.   And then in the middle is Monroe?

21    A.   Yes.

22    Q.   And to the left is Abdullah?

23    A.   Yes.

24    Q.   And you all are talking?

25    A.   Yes.

 1      Q.   Do you know what you're talking about?

 2      A.   I don't remember.

 3      Q.   At this point, were you aware that the heroin

 4  had field tested negative?

 5      A.   I don't believe there had been a field test at

 6  this point.

 7      Q.   Okay.  When do you believe the field test was

 8  done?

 9      A.   Later at Greens Dairy.

10      Q.   Did you observe the field test?

11      A.   I remember Rattelade did it at his desk.  I was

12  at my desk doing my thing.  I know it occurred.  I didn't

13  watch it happen.

14      Q.   Okay.  Did you talk to Rattelade after he did

15  it or as he was doing it?

16      A.   He kind of said to the group that it field

17  tested negative.

18      Q.   Did you observe the heroin at that point?

19      A.   I don't believe I did.

20      Q.   Did you observe the heroin at any point?

21      A.   I don't believe I did.

22      Q.   Okay.  Do you know if Officer Abdullah met with

23  Williams after the search?

24      A.   I don't recall.  I'm sure he did, but you'll

25  have to ask Detective Abdullah.

1       Q.   Well, we know from the video that Williams was

2  picked up by Officer Rattelade, right?

3       A.   Yes.

4       Q.   So you -- but you still believe that Rattelade

5  would have then brought him back to meet with Abdullah at

6  some point?

7       A.   So Abdullah was on the search, so I don't know

8  what Rattelade did, but he would not immediately leave

9  this scene to go deal with --

10      Q.   Williams?

11      A.   -- Aspirin.

12      Q.   Do you recall if Williams met with Abdullah at

13 Green Dairy?

14      A.   I don't recall.

15      Q.   Can I see the SBI report, please?  It's

16 Exhibit BB.  Thanks.

17           Okay.  So after the heroin had field tested

18 negative, this was at least the second time on which you

19 knew that Aspirin had produced heroin that field tested

20 negative?

21      A.   Yes.

22      Q.   At this time, did you believe that Aspirin --

23 after you learned that this happened for a second time,

24 did you believe Aspirin to be a reliable informant?

25      A.   I believed there were issues here.

1      Q.   Did you believe he was a reliable informant at

2   this time?

3      A.   I would say no.

4      Q.   Okay.  I'm going to read from your SBI report,

5   and if you want to follow along, I think that Rod has a

6   copy right there, too, but I'm happy to give this back to

7   you.

8           Okay.  So this is page 4, and I am starting at

9   the top of the third paragraph or maybe, actually, the

10  second full paragraph.  It starts, "In May of 2020."  Do

11  you see where I am?

12     A.   Yes.

13     Q.   "In May of 2020, there was a case in North

14  Raleigh.  After the arrest, the drugs were tested, and

15  they tested to not be heroin."  Is this the case that you

16  are describing?  Is that the one that we've just watched

17  the video of that's the search warrant execution --

18     A.   Yes.

19     Q.   -- at 1628 Burgundy?  Sorry.  Can you answer

20  that again?

21     A.   Yes.

22     Q.   "The drugs were tested, and they tested to not

23  be heroin.  Gay asked Abdullah what to charge because she

24  was typing up the warrants for him, and he told her,

25  'Trafficking heroin.'  Gay typed the warrants as Abdullah

 1   requested.  Abdullah was asked about sending the drugs to

 2   the lab and then charging; however, Abdullah liked to

 3   charge on the front end, so he could pay the informant."

 4          Who asked Abdullah about sending the drugs to

 5   the lab?

 6       A.   I don't recall.

 7       Q.   Was it you?

 8       A.   I don't believe it was.

 9       Q.   Okay.  So at this time, you just testified that

10   you believed that Aspirin was no longer reliable, but

11   when Abdullah told you to type up the warrant for

12   trafficking heroin, you still did that?

13       A.   I did.

14       Q.   Why?

15       A.   Because this was not my case.  This was

16   Detective Abdullah's case.  He requested that I write the

17   warrants.  I wrote the warrants.  I gave them to him.  If

18   he swore those out after that, that's his decision as the

19   lead investigator.

20       Q.   Did you think -- strike that.  Did you tell

21   Sergeant Rolfe about this?

22       A.   I do not believe he was present at this search.

23       Q.   Did you tell a supervisor about this?

24       A.   At that time?

25       Q.   Yeah.

1      A.   I don't believe I did.

2      Q.   Why did you not go to a supervisor and say, "I

3  don't believe this informant is reliable.  The heroin has

4  just tested negative.  I don't think we should be

5  charging this person with trafficking heroin"?

6      A.   Again, I was on training.  I was still

7  learning.  Concerns, I think, had been expressed by one

8  of the senior detectives.

9      Q.   Sorry.  What do you mean by that?

10     A.   I believe my interview says that Abdullah was

11  asked about sending the drugs to the lab and then

12  charging, so I believe concerns were expressed.  I don't

13  believe I expressed them, but everyone there -- Detective

14  Monroe and Detective Rattelade were senior detectives to

15  me, so I was still learning at this point.

16     Q.   And you're saying that Detective Monroe and

17  Detective Rattelade expressed concerns to Abdullah about

18  charging trafficking in this case?

19     A.   One of them did.  I'm not sure if both of them

20  did.

21          MR. SCHEWEL:  I have no further questions.

22  Anyone else like to ask any?

23          MS. PACKER:  No questions.

24          MR. PETTEY:  We're done.  Anybody?  Norwood,

25  you still there?

1          MR. BLANCHARD:  Yeah, and I don't have any

2     questions either.

3          MR. PETTEY:  Okay.  I don't either.

4          MR. SCHEWEL:  Thank you all, sir.

5          COURT REPORTER:  Do you want to read, sign?

6          MR. PETTEY:  Yes.

7          (Whereupon, at 5:04 p.m. on October 28, 2022,

8     the deposition was concluded.  Signature was reserved.)

9

10                         *  *  *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>WITNESS CERTIFICATE</u>          (1 of 3)

       I have read the foregoing pages, 1 through 234 inclusive, and find that they contain a correct transcription of the answers made by me to the questions therein recorded, with the exception of _____ corrections as listed on a separate sheet of paper and incorporated into this record.

       Signed this _____ day of _____ 2022.


                       _____
                       MEGHAN CAROLINE GAY


Sworn and subscribed before me this the _____ day of _____ 2022.

_____
Notary Public

My Commission Expires:  _____.

**ERRATA SHEET**                    (2 of 3)

    Please indicate any corrections to your deposition on this sheet of paper, giving the page number, line number, change and reason for the change, and return this form and the signature page to:  **Reed & Associates, 2401 Whirlaway Court, Matthews, NC 28105, or to vreed@carolina.rr.com** .

The reasons for making changes:

        (1) To clarify the record;
        (2) To conform to the facts; or
        (3) To correct major transcription errors.

**Page no.** \_\_\_\_\_ **Line no.** \_\_\_\_\_ **Reason:** _____

Change _____ to _____

**Page no.** \_\_\_\_\_ **Line no.** \_\_\_\_\_ **Reason:** _____

Change _____ to _____

**Page no.** \_\_\_\_\_ **Line no.** \_\_\_\_\_ **Reason:** _____

Change _____ to _____

**Page no.** \_\_\_\_\_ **Line no.** \_\_\_\_\_ **Reason:** _____

Change _____ to _____

**Page no.** \_\_\_\_\_ **Line no.** \_\_\_\_\_ **Reason:** _____

Change _____ to _____

**Page no.** \_\_\_\_\_ **Line no.** \_\_\_\_\_ **Reason:** _____

Change _____ to _____

**Page no.** \_\_\_\_\_ **Line no.** \_\_\_\_\_ **Reason:** _____

Change _____ to _____

**Page no.** \_\_\_\_\_ **Line no.** \_\_\_\_\_ **Reason:** _____

Change _____ to _____

**Page no.** \_\_\_\_\_ **Line no.** \_\_\_\_\_ **Reason:** _____

Change _____ to _____

**REED & ASSOCIATES**
MATTHEWS, NORTH CAROLINA  980.339.3575

**ERRATA SHEET**                    (3 of 3)

**Page no.** \_\_\_\_\_ **Line no.** \_\_\_\_\_ **Reason:** _____

Change _____ to _____

**Page no.** \_\_\_\_\_ **Line no.** \_\_\_\_\_ **Reason:** _____

Change _____ to _____

**Page no.** \_\_\_\_\_ **Line no.** \_\_\_\_\_ **Reason:** _____

Change _____ to _____

**Page no.** \_\_\_\_\_ **Line no.** \_\_\_\_\_ **Reason:** _____

Change _____ to _____

**Page no.** \_\_\_\_\_ **Line no.** \_\_\_\_\_ **Reason:** _____

Change _____ to _____

**Page no.** \_\_\_\_\_ **Line no.** \_\_\_\_\_ **Reason:** _____

Change _____ to _____

**Page no.** \_\_\_\_\_ **Line no.** \_\_\_\_\_ **Reason:** _____

Change _____ to _____

**Page no.** \_\_\_\_\_ **Line no.** \_\_\_\_\_ **Reason:** _____

Change _____ to _____

**Page no.** \_\_\_\_\_ **Line no.** \_\_\_\_\_ **Reason:** _____

Change _____ to _____

**Page no.** \_\_\_\_\_ **Line no.** \_\_\_\_\_ **Reason:** _____

Change _____ to _____

Thank You!

**REED & ASSOCIATES**
MATTHEWS, NORTH CAROLINA  980.339.3575

STATE OF NORTH CAROLINA                    <u>CERTIFICATE</u>

COUNTY OF FRANKLIN


      I, DEBORAH A. HYDE, Certified Court Reporter and Notary Public in and for the County of Franklin, State of North Carolina, do hereby certify:

      That MEGHAN CAROLINE GAY appeared before me at the time and place herein aforementioned, was duly sworn in the manner provided by law by me prior to the taking of the foregoing deposition, that said deposition was taken by me and transcribed under my supervision and direction, and that the foregoing pages constitute a true and correct transcription of the proceedings.

      I do further certify that reviewing and signing of the transcript by the witness was reserved and the persons were present as stated on the appearance page.

      I do further certify that I am not of counsel for or in the employment of either of the parties in this action, nor am I interested in the results of said action.

      I have hereunto subscribed my name this the 12th day of November 2022.


_____

DEBORAH A. HYDE, Certified Court Reporter

Notary Public Number 20021400234


**REED & ASSOCIATES**

MATTHEWS, NORTH CAROLINA  980.339.3575