IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CIVIL ACTION NO.: 5:22-cv-00068-BO

YOLANDA IRVING, individually and as the    )
natural parent and guardian of J.I. JUWAN  )
HARRINGTON, CYDNEEA HARRINGTON, KENYA       )
WALTON, individually an as the natural      )
parent and guardian of R.W. ZIYEL WHITLEY,  )
DYAMOND WHITLEY, KAMISHA WHITLEY, NANETTA   )
GRANT as the natural parent and guardian    )
of Z.G. and EMANCIPATE NC, INC.             )
                                            )
                    Plaintiffs,             )
                                            )
        vs.                                 )
                                            )
THE CITY OF RALEIGH, Officer OMAR I.        )
ABDULLAH, Sergeant WILLIAM ROLFE, Officer   )
RISHAR PIERRE MONROE, Officer JULIEN DAVID  )
RATTELADE, and Officer MEGHAN CAROLINE GAY, )
Officer DAVID MEAD, Officer JESUS ORTIZ,    )
Officer KYLE PERRIN, Officer MICHAEL        )
MOLLERE, Officer KYLE THOMPSON, Officer     )
VINCENT DEBONIS, Officer DANIEL TWIDDY,     )
Officer THOMAS WEBB, Officer DAVID          )
McDONALD, Officer DAVID GARNER, Chief of    )
Police ESTELLA PATTERSON and City Manager   )
MARCHELL ADAMS-DAVID, in their official     )
capacities,                                 )
                                            )
                    Defendants.             )
_____)


D E P O S I T I O N

OF

OFFICER OMAR ABDULLAH


At Raleigh, North Carolina
Thursday, December 15, 2022
REPORTER:  DEBORAH A. HYDE

                    A P P E A R I N G


On behalf of the Plaintiffs:

       ABRAHAM RUBERT-SCHEWEL, ESQUIRE
       Tin Fulton Walker & Owen, PLLC
       119 East Main Street
       Durham, North Carolina  27701
       919-451-9216
       schewel@tinfulton.com

       EMILY D. GLADDEN, ESQUIRE
       Tin Fulton Walker & Owen, PLLC
       204 North Person Street
       Raleigh, North Carolina  27601
       919-720-4201
       Egladden@tinfulton.com


On Behalf of Defendants City of Raleigh, Estella
    Patterson, and Marchell Adams-David:

       DOROTHY V. KIBLER, ESQUIRE
       City of Raleigh Attorney's Office
       Post Office Box 590
       Raleigh, North Carolina  27602
       919-996-6560
       dorothy.kibler@raleighnc.gov


On Behalf of Defendants Officers David Mead, Jesus
    Ortiz, Kyle Perrin, Michael Mollere, Kyle Thompson,
    Vincent Debonis, Daniel Twiddy, Thomas Webb, David
    McDonald, and David Garner:

       MICHELLE LIGUORI, ESQUIRE
       Ellis & Winters LLP
       4131 Parkdale Avenue, Suite 400
       Raleigh, North Carolina  27612
       919-865-7009
       michelle.liguori@elliswinters.com


                   (Continued)

A P P E A R I N G

On Behalf of Defendant Officer Omar I. Abdullah:

    JASON R. BENTON, ESQUIRE
    Parker Poe Adams & Bernstein, LLP
    620 South Tryon Street, Suite 800
    Charlotte, North Carolina  28202
    704-372-9000
    jasonbenton@parkerpoe.com

    CHRISTIAN E. DYSART, ESQUIRE
    Dysart Willis, PLLC
    530 Hillsborough Street, Suite 200
    Raleigh, North Carolina  27603
    919-747-8380

On Behalf of Defendants Officers Rishar Pierre Monroe,
    Julien David Rattelade, and Meghan Caroline Gay:

    ALAYNA M. POOLE, ESQUIRE
    Yates, McLamb & Weyher, LLP
    Two Hannover Square
    434 Fayetteville Street, Suite 2200
    Raleigh, North Carolina  27601
    919-835-0900
    apoole@ymwlaw.com

On Behalf of Defendant Officer William Rolfe:

    NORWOOD P. BLANCHARD, III
    Crossley McIntosh Collier Hanley & Edes, PLLC
    5002 Randall Parkway
    Wilmington, North Carolina  28403
    910-762-9711
    norwood@cmclawfirm.com

* * * * *

# C O N T E N T S

PAGE

Examination by Mr. Schewel:                          5

Examination by Mr. Blanchard:                      170

Examination by Ms. Kibler:                         172


PLAINTIFFS' EXHIBITS

Exhibit III - Witness's Diagram                     31

Exhibit JJJ - Screenshot of Work Phone              37

Exhibit KKK - Offense/Incident Report 5/20/2020     56

Exhibit LLL - Detective Monroe's IA Interview       88

Exhibit MMM - Confidential Informant Log           120

Exhibit NNN - Drawing by Witness                   142

Exhibit OOO - Interview with Officer Abdullah      150
              Dated 11/1/21


DEFENDANTS' EXHIBITS

Exhibit 26 - Garrity Warning                       173

Exhibit 27 - Interview of September 4, 2020        173

Exhibit 28 - Interview of August 26, 2020          173

Exhibit 29 - Interview of August 23, 2021          173

Exhibit 30 - Interview of August 24, 2021          173

Exhibit 31 - Interview of September 14, 2021       173

(Exhibits retained by counsel.)


Reporter's Note:  This transcript contains quoted
material.  Such material is reproduced as read or quoted
by the speaker.

1          This is the deposition of OFFICER OMAR ABDULLAH,

2     taken in accordance with the Federal Rules of Civil

3     Procedure in connection with the above case.

4          Pursuant to Notice, this deposition is being

5     taken in the offices of Parker Poe Adams & Bernstein, LLP,

6     301 Fayetteville Street, Suite 1400, Raleigh, North

7     Carolina, beginning at 10:17 a.m. on Thursday,

8     December 15, 2022, before Deborah A. Hyde, Certified

9     Verbatim Reporter and Notary Public.

10                              *   *   *

11    Whereupon,

12                    OFFICER OMAR ABDULLAH

13    was called as a witness and, having first been duly

14    affirmed, was examined and testified as follows:

15                        EXAMINATION

16         BY MR. SCHEWEL:

17         Q.    My name is Abraham Rubert-Schewel.  I'm with the

18    Law Firm of Tin Fulton Walker & Owen.  We represent the

19    plaintiffs in this lawsuit against the City of Raleigh and

20    individually named officers, such as yourself.

21              You're testifying under oath and under the

22    penalty of perjury today, just as if you were in a court

23    of law.  Do you understand that?

24         A.    Yes, I do.

25         Q.    Have you ever been deposed before?

```
 1        A.    No, I haven't.

 2        Q.    Other than the lawsuits related to this

 3   incident, have you ever been party to a lawsuit before?

 4        A.    Are you saying in terms of this incident?

 5        Q.    Other than this incident and the lawsuit where

 6   you were previously sued related to Mr. Williams, have you

 7   ever been a party to a lawsuit?  Have you ever sued anyone

 8   or have you ever been sued?

 9        A.    Not to my knowledge, no, except for the previous

10   defendants.

11        Q.    Okay.  Have you ever been a party to any marital

12   or custody dispute or lawsuit?

13        A.    Yes, I have.

14        Q.    Okay.  And who did that involve?

15        A.    Erika DeSouza.

16        Q.    And was that your spouse?

17        A.    At the time, yes.

18        Q.    And what year was that?

19        A.    I don't recall the year.

20        Q.    Approximately?

21        A.    I would say, possibly, between a range of maybe

22   '19, 2019, 2020.  I'm not real positive.

23        Q.    Okay.  And did you and Ms. DeSouza have any

24   children together?

25        A.    No, we didn't.
```

1    Q.    Okay.  Was Ms. DeSouza your first wife?

2    A.    No, she wasn't.

3    Q.    Who were you married to previously?

4    A.    Tamika Nunn.

5    Q.    Did you get divorced from Ms. Nunn?

6    A.    Yes, I did.

7    Q.    And what year, approximately, did that happen?

8    A.    I can't say off the top of my head what year

9    that was.

10    Q.    And did you have any children with Ms. Nunn?

11    A.    No, I didn't.

12    Q.    Do you have any children?

13    A.    Yes, I do.

14    Q.    How many?

15    A.    Three.

16    Q.    And who is the mother of those children?

17    A.    That would be my first wife, Auliya Khatib.

18    Q.    Do you pay any child support or have you ever

19    paid any child support related to your three children?

20    A.    No.  I'm the primary custodian.

21    Q.    So they live with you?

22    A.    They do now.  Well, they've always lived with

23    me, the two that I'm taking care of now, but the other one

24    is 21, 22, so he doesn't live with me.

25    Q.    Okay.  As part of the divorce proceedings, were

1    you required to pay any money or are you still required to
2    pay any money to any of your former spouses?
3          A.    No.
4          Q.    So as you can tell, these questions and answers
5    are being transcribed by a court reporter.  It's very
6    important that you speak loudly and clearly.  You also
7    must answer questions verbally, for example, using "yes"
8    or "no," not phrases such as "uh-huh."  Do you understand?
9          A.    Yes.
10         Q.    And you've done a good job of that so far.
11   Thank you.  Your attorney, Mr. Benton, may object to
12   certain questions that I ask.  You should know that you
13   are still required to answer every question unless
14   instructed not to, which will happen rarely.  I understand
15   that in some instances you may invoke your right to the
16   Fifth Amendment here, and of course you are entitled to do
17   that, but otherwise you are required to answer each
18   question as truthfully and completely as possible.  Do you
19   understand?
20         A.    Yes, I do.
21         Q.    Please state and spell your name for the record.
22         A.    Omar, O-m-a-r, Abdullah, A-b-d-u-l-l-a-h.
23         Q.    What year did you start at RPD?
24         A.    I would have to say 2009.
25         Q.    And what year did you join Drugs and Vice?

1    A.   To the best of my knowledge, I believe that was

2  in 2017.

3    Q.   And what year were you named Raleigh Police

4  Department Officer of the Year?

5    A.   I don't remember what year that was.

6    Q.   Was it approximately 2013?

7    A.   I don't know.  I can't say what year that was.

8    Q.   Okay.  Why were you given that recognition?

9    A.   Based on the hard work that I did while on

10  patrol.

11    Q.   So there wasn't any one specific achievement; it

12  was based on a number of good achievements that you had

13  had?

14    A.   Based on a number of achievements -- based on

15  work I did in different areas.  Whatever criteria that

16  they used, I don't know.

17    Q.   Okay.  And you say "different areas."  What do

18  you mean by that?

19    A.   Physical arrests, warrants, in that manner.

20    Q.   And how did receiving that recognition make you

21  feel?

22    A.   I felt good for being acknowledged for the work

23  I did.

24    Q.   Did you feel like you were a good police

25  officer?

1      A.   Yes, I did.

2      Q.   Do you still feel that way?

3      A.   Yes, I do.

4      Q.   Did you receive any recognitions or awards

5  during your time as a vice officer?

6      A.   To my knowledge, I don't believe so.

7      Q.   Okay.  Within the vice unit itself, was it

8  possible to receive any awards or recognition, such as

9  from your supervisor, Sergeant Rolfe, or Lieutenant Bunch?

10      A.   I don't know.  I was pretty much -- I just do my

11  work.  The work that you do will speak for itself in terms

12  of you get recognized or not.  I just never used that as a

13  criteria to work hard.  I just had that ability in me.

14      Q.   Was it possible to be recognized for the amount

15  of arrests that you made?

16      A.   Yes, it's possible to be recognized for the

17  amount of arrests you make.

18      Q.   Okay.  And how would that happen?

19      A.   I don't know.  It depends on the department and

20  how they do.  I don't know how they do the awards.

21      Q.   Well, I mean, you said yes, it is possible to be

22  recognized for the amount of arrests, so I'm just -- my

23  question is, in your experience, how do you recall that

24  happening?

25          MR. BENTON:  Objection, asked and answered.  You

1    may answer again if you know.

2          THE WITNESS:  You pretty much just do your job,

3    and when you make an arrest, you make an arrest.  If they

4    recognize it or not, the department makes that decision.

5    I don't know how they go about that process.

6          BY MR. SCHEWEL:

7    Q.  Are there any recognitions you could receive

8    other than being awarded Officer of the Year?

9    A.  To my knowledge, I don't know what other type of

10    ones.  I know that you could be recognized for work that

11    you did, the quality work that you did.

12    Q.  Okay.  Did you graduate college?

13    A.  Yes, I did.

14    Q.  What university?

15    A.  University of Nebraska, Lincoln.

16    Q.  What year?

17    A.  I believe 2001.

18    Q.  And what was your degree in?

19    A.  Fine and performing arts.

20    Q.  What type of art did you do?

21    A.  I did graphic design, sculpture, pottery, which

22    would be ceramics.

23    Q.  Are you still an artist?

24    A.  I haven't had a chance to do any artwork lately.

25    Q.  Are you currently married?

```
1        A.    No.

2        Q.    And just so I'm clear, you've had a total of

3   three wives and that's who we discussed earlier; is that

4   correct?

5        A.    That's correct.

6        Q.    Are you currently employed?

7        A.    Yes.

8        Q.    Where?

9        A.    P & G Security.

10        Q.    Where is that based?

11        A.    I don't know the exact address.  I know -- I

12   believe Salisbury, I believe.

13        Q.    Okay.  And where do you work?

14        A.    I was working at the sheriff's office in Forsyth

15   County before I was put on admin leave.

16        Q.    Okay.  And what type of security were you doing

17   at the sheriff's office?

18        A.    Watching the inmates and officers.

19        Q.    At the detention facility?

20        A.    That's correct.

21        Q.    And when were you put on admin leave?

22        A.    When the -- when the charge came down from the

23   district attorney's office.

24        Q.    Okay.  And so currently, are you on admin leave?

25        A.    That's correct.
```

1    Q.   And are you being paid while you're on admin

2  leave?

3    A.   No.

4    Q.   So do you have any income currently?

5    A.   I have some income.

6    Q.   What's that from?

7    A.   From savings and odd jobs I do.

8    Q.   What type of odd jobs do you do?

9    A.   Food deliveries.

10    Q.   Okay.  And do you do that for some sort of app?

11    A.   Yes.

12    Q.   Okay.  And which app is that?

13    A.   Door Dash.

14    Q.   Other than the Forsyth County Sheriff's Office,

15  have you applied to work at any other police or sheriff's

16  departments?

17    A.   No.

18    Q.   So when did you begin working at the Forsyth

19  County Sheriff's office?

20    A.   I don't remember the exact date.

21    Q.   Okay.  Had you been working there for over a

22  year?

23    A.   Well, a little less than a year.

24    Q.   After you -- or strike that question.  Since you

25  were terminated by the Raleigh Police Department, have you

```
 1   held any other employment, other than with the Forsyth
 2   County Sheriff's office?
 3           MR. BENTON:  Objection, mischaracterizes his
 4   testimony.  You can answer.
 5           THE WITNESS:  That was the only place.
 6           BY MR. SCHEWEL:
 7      Q.   Okay.
 8      A.   I just worked for P & G Security.
 9      Q.   So P & G Security and then, also, the odd jobs
10   that you've done?
11      A.   That's correct.
12      Q.   Okay.  Do you currently have any outstanding
13   loans?
14      A.   Yes.
15      Q.   And what are those to?
16      A.   I'm sorry?
17      Q.   What do those consist of?
18      A.   There were some home improvement loans.
19      Q.   When were those taken out?
20      A.   When I was still employed in the department.  I
21   don't know what year that was.
22      Q.   Approximately, how much were those loans for?
23      A.   I can't say off the top of my head.  It ranges
24   anywhere from $11,000 to $18,000.
25      Q.   How many loans would you say you have?
```

1      A.   I'm not sure.  Possibly, maybe four or six.

2      Q.   Do you have any credit card debt?

3      A.   I have some credit card debt.

4      Q.   Approximately, how much?

5      A.   I don't know off the top of my head.

6      Q.   Would you say it's over $10,000?

7      A.   I can't say for sure what that exact amount is.

8      Q.   Have you ever declared bankruptcy?

9      A.   No.

10      Q.   Have you ever consulted with any lawyer or

11   accountant about declaring bankruptcy?

12          MR. BENTON:  Objection.  You can't answer that

13   to the extent that it asks for you to divulge confidential

14   communications with an attorney.  If you can answer

15   without divulging same, then you may answer.

16          THE WITNESS:  No.

17          BY MR. SCHEWEL:

18      Q.   Did you meet with Mr. Benton to prepare for this

19   deposition?

20      A.   Yes, I did.

21      Q.   Did you also consult with your criminal defense

22   attorney to prepare for testifying today?

23      A.   Yes, I did.

24      Q.   Have you communicated with anyone from the Wake

25   County District Attorney's Office as part of the criminal

 1    investigation into Dennis Williams?

 2        A.   What was your question again?

 3        Q.   Have you communicated with anyone from the Wake

 4    County District Attorney's Office as part of the criminal

 5    investigation into Dennis Williams?

 6        A.   No, not to my knowledge.

 7        Q.   Have you communicated with anyone from the Wake

 8    District Attorney's Office related to your own criminal

 9    charges?

10        A.   No.

11        Q.   Have you communicated with anyone from the State

12    Bureau of Investigation?

13        A.   Your question is what, again?  I'm sorry.

14        Q.   Related to your criminal investigation or the

15    criminal investigation related to you and Dennis Williams,

16    have you ever communicated with anyone from the State

17    Bureau of Investigation?

18        A.   They have reached out to me, but in particular

19    or through the case, I did not discuss that.

20        Q.   Okay.  And when they reached out to you, what

21    did they say?

22        A.   I don't remember the exact, word for word.  The

23    conversation, in summary, was that they were opening up a

24    criminal investigation and wanted to have a time to sit

25    down and talk.

1    Q.    And how did you reply?

2    A.    Initially agreed, but I got in touch with my

3  attorney and then my attorney called that individual back,

4  whoever that individual was.

5    Q.    Okay.  And who was your attorney at that time?

6    A.    That was Lee Turner.

7    Q.    And so he called that individual back and told

8  them that you were not going to be providing information?

9    A.    That's correct.

10   Q.    What is your understanding of the nature of the

11  criminal prosecution against you?

12   A.    My basic understanding is that it's being

13  alleged that misstatements were made, I guess, into the

14  arrest warrant.  That's how I understand it.  It's hard.

15  It's a vague description.

16   Q.    Do you know what you're charged with?

17   A.    Yes, I know.

18   Q.    What is that?

19   A.    Obstruction.

20   Q.    Do you know how many counts?

21   A.    I believe it's just one count.

22   Q.    And do you know which law enforcement agency

23  initiated the prosecution?

24   A.    I believe it would be the SBI.

25   Q.    Do you intend to go to trial on these charges?

1    A.   On the advice --

2         MR. BENTON:  Let me stop you right there.  We

3    need to take a break.

4         MR. SCHEWEL:  Okay.

5         (Recess from 10:36 a.m. to 10:39 a.m.)

6         BY MR. SCHEWEL:

7    Q.   I believe the question I asked was, do you

8    intend to go to trial on these charges?

9    A.   I don't know at this time.

10   Q.   Have you considered making any deal with the

11   prosecution related to these charges?

12        MR. BENTON:  Objection, insofar as your answer

13   requires you to divulge any confidential communications

14   with your counsel.  If it does not, you may answer.

15        THE WITNESS:  What was your question, sir?

16        BY MR. SCHEWEL:

17   Q.   Have you considered making any deal with the

18   prosecution related to these charges?

19   A.   At this time, no.

20   Q.   Do you think you could provide information to

21   the prosecution that would allow them to give you a deal

22   related to these charges?

23        MR. BENTON:  Same objection.  You can answer if

24   you know, without divulging any attorney-client

25   communications.

1           THE WITNESS:  I don't know at this time.

2           BY MR. SCHEWEL:

3       Q.   Have you been approached by anyone at the

4   district attorney's office to provide information related

5   to the other officers in the vice unit?

6       A.   At this time, to my knowledge, no.

7       Q.   Okay.  Were you ever discriminated against at

8   the Raleigh Police Department?

9       A.   I'm sorry, sir.  In terms of what?

10      Q.   Were you ever discriminated against based on

11  your race at the Raleigh Police Department?

12      A.   Could you be a little bit more specific because

13  it's a general kind of -- I don't know exactly what you're

14  referring to.

15      Q.   Well, you know what the word "discrimination"

16  means, right?

17      A.   I do know what discrimination is, but I don't

18  know what you're referring to, though.

19      Q.   Well, I'm just asking you, in your experience,

20  do you ever recall being discriminated against in any way

21  at the Raleigh Police Department?

22      A.   To the best of my knowledge, based on your

23  question, which is kind of broad, if you're speaking in

24  terms of the police department towards me, no.

25      Q.   Okay.  Is there any other way that you've

1    received discrimination at the Raleigh Police Department?

2         A.    Not in that type of line of questioning.

3         Q.    Well, in what type of line of questioning?

4         A.    When you're saying "discriminatory."

5    Discriminatory means that somebody that's in power either

6    try to prevent you from getting a promotion or prevent you

7    from going to another unit.  That's how I see as what you

8    mean by being discriminatory.

9         Q.    Okay.  Did you ever receive discrimination from

10   people who were not in power?

11              MR. BENTON:  Objection.  You can answer if you

12   know.

13              THE WITNESS:  It's still -- the wording you use

14   is "discriminatory."  I'm trying to figure out exactly --

15   discriminatory in what would prevent you from trying to do

16   your work?

17              BY MR. SCHEWEL:

18        Q.    No, I mean in any context.  For example,

19   discrimination could be, you know, if someone made a

20   racist remark to you based on your skin or your heritage

21   or your ethnicity or your -- you know, your sexual

22   orientation.  If someone said something about that to you

23   at work, that's what I'm -- that's my question.

24        A.    Yes.

25        Q.    Okay.  And what happened?

1    A.   It was a racist comment that was made.

2    Q.   Okay.  Did this happen only one time?

3    A.   That particular point, there was once that I had

4  raised an issue with.

5    Q.   Do you recall racist comments happening on more

6  than one occasion?

7    A.   I would say one occasion there was a racist

8  comment.  There was other occasions where it was something

9  I may not agree with that was maybe borderline.

10    Q.   Okay.  So let's start with the borderline

11  comments first.  Tell me what happened on that occasion.

12    A.   It was a video that we were watching and I

13  believe, to the best of my knowledge, Nance was watching

14  something on his computer or standing around and, like I

15  said, the context has been a while.  It's been about three

16  years.  It was an arrest on a subject and Rattelade made a

17  comment that based on the way the guy was acting, he

18  stated that, you know, that was years ago.  You know, he

19  wouldn't have done something like that, in that type of

20  line.

21    Q.   Was the subject black?

22    A.   Yes, he was.

23    Q.   Okay.  And what was happening in the video?

24    A.   The best of my knowledge, I believe it was an

25  arrest being made.  Like I said, it was a while back, so I

1    don't really remember the whole context of it.

2        Q.   Did you believe that the officer in the video

3    was using excessive force?

4        A.   It's hard to say.  I didn't really -- it didn't

5    strike me as anything being out of the ordinary, just more

6    of the individual he was arresting, I believe, was just --

7    was kind of being difficult with the officer.  But, like I

8    said, the whole situation is kind of vague.

9        Q.   So what did you think was the problem with

10   Officer Rattelade's statement?

11       A.   Was the fact that stating that he wouldn't do

12   something like that; this was years ago.  I don't know

13   what you're referring to.  You referring to 1960s?  I

14   don't know.

15       Q.   So is it correct to say that you interpreted him

16   as potentially referring to, you know, the civil rights

17   era or the 1960s where black people may have been treated

18   worse by police officers?

19            MR. BENTON:  Objection.  You can answer if you

20   know.

21            THE WITNESS:  I don't know.  I would be

22   assuming.  I wasn't sure, but that's just what I would

23   think, so --

24            BY MR. SCHEWEL:

25       Q.   Okay.  Did you say anything to Officer Rattelade

1  about that?

2      A.  No.

3      Q.  Did you say anything to any supervisors about

4  that?

5      A.  No, I didn't.

6      Q.  Did you say anything to other officers about

7  that?

8      A.  No.

9      Q.  Did any other officers make any comments about

10  the video?

11      A.  I don't remember making other comments about the

12  video.

13      Q.  No, any other officers.

14      A.  I don't -- I don't believe so.  I'm not sure.

15      Q.  And the video that was being shown, was this an

16  arrest made by Officer Nance?

17      A.  No, this was something he was watching.  I'm not

18  sure exactly what it was off of, but it wasn't -- I don't

19  believe it was an arrest off of something he did, no.

20      Q.  Do you believe it was an arrest from an officer

21  in the Raleigh Police Department?

22      A.  No.

23      Q.  Okay.  So you think it was like YouTube or

24  something?

25      A.  It's possible.  I don't know where he was

 1    looking at in terms of where he got that video from.

 2        Q.    Okay.  Any other, quote, "borderline" comments

 3    that you recall?

 4        A.    In terms of race, no, being borderline, no, that

 5    I can think of at this time.

 6        Q.    Okay.  What about in terms of religion?

 7        A.    No.

 8        Q.    What is your religion?

 9        A.    I'm Muslim.

10        Q.    And so just to be clear, you don't feel like

11    you've ever been discriminated against at the Raleigh

12    Police Department based on your religion?

13        A.    No, I haven't, in my experience.

14        Q.    Okay.  So you mean nothing that you're aware of?

15        A.    That is correct.  I haven't personally felt like

16    I've been discriminated against based on my -- based on my

17    religion, my belief.

18        Q.    Okay.  Did you ever make a complaint against

19    anyone at the Raleigh Police Department based off of some

20    sort of discrimination?

21        A.    Yes, I did.

22        Q.    Okay.  And when was that complaint made?

23        A.    I don't remember exact -- I remember it was in

24    June.  I don't know if it was in 2020, the year, but I

25    remember it was in June.

1    Q.   Okay.  And is this the incident that you're

2  referring to when you said there was one occasion?

3    A.   Yes, with Detective Gay.

4    Q.   Okay.  And who was present during this incident?

5    A.   Detective Gay, myself, Rattelade and Gwinn.

6    Q.   Okay.  And were you at 5240 Greens Dairy Road?

7    A.   That's correct.

8    Q.   At the substation?

9    A.   (Witness nods affirmatively.)

10   Q.   And were you sitting at your desk when this

11  occurred?

12   A.   Yes, I was.

13   Q.   Okay.  And what did Officer Gay say?

14   A.   I remember she sat down after she had went to

15  the copy machine.  I don't know if she pulled up an

16  article or whether she read off her phone, but she

17  referenced a -- some comments about should black people

18  get reparations for slavery.

19   Q.   And what did she say?

20   A.   She didn't agree with it.  She said that she

21  felt that would be a dumb idea because her grandfather or

22  her relative, whatever, didn't own any slaves and she

23  believed that would be a waste of taxpayer money.

24   Q.   Did anyone else respond?

25   A.   They responded after she had went on to say

1  that, "You know how black people love some free money,"
2  and then laughed at it.
3       Q.   Who said that?
4       A.   Detective Gay.
5       Q.   Did anyone else say anything?
6       A.   Yeah.  Rattelade chimed in and stated that -- he
7  said that Dave Chappelle said it best in a skit that he
8  did.  And the skit he was referring to was the skit that
9  when black people get reparations, they run out of chicken
10 and Cadillacs.
11      Q.   Were you sitting with your -- strike that.  Did
12 you have headphones on at this time?
13      A.   My headphones were pulled up over my ear because
14 I was watching a video of a body cam arrest.
15      Q.   Do you think the other vice officers knew that
16 you could hear what they were saying?
17      A.   I don't know if they knew or not.
18      Q.   Do you recall anything else that was said?
19      A.   Yeah.  And then Gwinn made a comment that
20 slavery wasn't that far -- slavery wasn't that long ago
21 and at that point, I walked out.
22      Q.   When you -- did you say anything?
23      A.   No.
24      Q.   When you walked out or as you got up to leave,
25 did the other officers notice you?

1     A.   I don't know if they noticed me or not.  I mean

2  we're sitting pretty close.  I walked out and went to my

3  car.

4     Q.   Okay.  And what did you do when you got in your

5  car?

6     A.   Called Sergeant Rolfe.

7     Q.   Okay.  What did you tell Sergeant Rolfe?

8     A.   The incident that just occurred with -- the

9  comment that Detective Gay made.

10     Q.   What did he say about it?

11     A.   He initially stated that he was going to have us

12  come in and we will just have a discussion, everybody in

13  the unit, and talk about it.  And I told him that, you

14  know, I have some things I want to say to her.

15     Q.   Did that discussion occur?

16     A.   No.  He told me that he wanted it to be a

17  productive conversation and he was going to let Lieutenant

18  Bunch know.

19     Q.   Did any conversation about that ever occur?

20     A.   Did we have that meeting, you mean?

21     Q.   Yeah.

22     A.   No, the meeting didn't occur.

23     Q.   Did you make any sort of formal complaint

24  against any of these officers?

25     A.   With Detective Gay.

REED & ASSOCIATES
MATTHEWS, NORTH CAROLINA  980.339.3575
Case 5:22-cv-00068-BO  Document 203-5  Filed 03/31/23  Page 27 of 180

1    Q.   And was that complaint made in writing?

2    A.   I assume it would be in writing because I got a

3    phone call from Sergeant Davis the following week.

4    Q.   Okay.  And was this -- what was this type of

5    complaint called?

6    A.   I don't understand what you mean.

7    Q.   Did you make the complaint with Internal

8    Affairs?

9    A.   That's correct.

10    Q.   As far as you know, was officer Gay or any other

11    officers ever reprimanded for this?

12    A.   Far as I know, Sergeant Rolfe showed me that she

13    was reprimanded, Detective Gay was.

14    Q.   What was her reprimand?

15    A.   That the complaint was sustained.  She had to do

16    some hours of sensitivity training, and I'm not sure what

17    the others were.

18    Q.   Did you ever hear Sergeant Rolfe or any of the

19    other officers in the vice unit say that they were afraid

20    to discipline you because you might make a complaint

21    against them about your race or your religion?

22    A.   No, I never -- I have not heard that.

23    Q.   You've not heard that ever?

24    A.   No.

25    Q.   In your opinion, do you think Sergeant Rolfe was

1  afraid to discipline you?

2       A.   No, he wasn't.

3       Q.   Why do you say that?

4       A.   If he had any problems, he would let me know.

5  He didn't -- as supervisor, he didn't appear to me that --

6  if he needed to speak up and say his mind, he did.

7       Q.   Okay.  And whenever he did have problems, how

8  would he typically raise them with you?  Would he do that

9  in person or via e-mail or via text?

10      A.   If he had something he needed to say to you,

11  he'll say it to you in person.

12      Q.   And at Green Dairy, where was your desk in

13  relation to Sergeant Rolfe's?

14      A.   So if you're in the office, we have the desks

15  situated where my desk was here, Detective Gay's desk was

16  right in front of me, so from here to here is about the

17  right distance.  Right behind her would be Sergeant

18  Rolfe's office.  To the right of her would be Gwinn and

19  from him would be Rattelade, and then right behind him

20  Monroe.

21      Q.   Do you mind drawing that out for us on a sheet

22  of paper, please?

23      A.   Yeah, that's fine.

24           MR. BENTON:  What do you want him to draw?

25           MR. SCHEWEL:  Your desk in relation to the other

 1    officers' desks at 5240 Green Dairy.  Do you need a pen?

 2              THE WITNESS:  Yes.  I don't have anything to

 3    write with.

 4              (Witness completes diagram.)

 5              BY MR. SCHEWEL:

 6         Q.   Thank you.  Can you also place Lieutenant

 7    Bunch's office on that drawing?

 8         A.   Okay.  (Witness complies.)  I put on here "not

 9    to scale."  You understand that this is an open space,

10    office space, so you would have Drugs and Vice, you would

11    have team 1 and team 2, the office for the supervisors for

12    team 1 and team 2, and then a little further down in the

13    office space, you would have the Gang Unit and CEDU, which

14    would be in the same area, but CEDU has an office right

15    off to your left, and then you have the Lieutenant's

16    office.

17         Q.   And, sorry, what's CEDU?

18         A.   Criminal Enterprise Drug Unit.

19         Q.   And just so I'm clear, is vice team 2 in the

20    same room as you?

21         A.   Yes, they are.  They're just off to your right.

22         Q.   And do you also mind putting on that drawing

23    where the evidence room is and the interview room as well?

24         A.   The interview room would be more towards the

25    back side of Greens Dairy, so it's not going to be in the

1    same space.

2        Q.    Okay.  Well, that's fine.  You don't need to put

3    it on there.  What about the evidence room?

4        A.    The evidence lockers is what we have.  The

5    evidence room would be at Cabarrus Street.

6        Q.    Okay.  So where are the evidence lockers?

7        A.    (Indicating).

8        Q.    Okay.  Thank you.

9        A.    You're welcome.

10            MR. BENTON:  Are you marking this?

11            MR. SCHEWEL:  Yes, we will mark that as

12   Exhibit III.

13            (Plaintiffs' Exhibit III was marked for

14   identification.)

15            BY MR. SCHEWEL:

16       Q.    Have you communicated with any of your former

17   RPD vice colleagues related to this lawsuit?

18       A.    No.

19       Q.    Not via text or e-mail or any sort of

20   communication?

21       A.    I have not spoken to them since I have been

22   terminated from the department.

23       Q.    Okay.  Prior to being terminated and after the

24   time on which you were on administrative leave, did you

25   communicate with your colleagues?

```
 1              MR. BENTON:  About what?

 2              MR. SCHEWEL:  At all.

 3              THE WITNESS:  You said while I was on admin

 4    leave to my colleagues?

 5              BY MR. SCHEWEL:

 6         Q.   Yes, in the vice unit.

 7         A.   In the vice unit, no.

 8         Q.   Not at all?

 9         A.   Not while I was on admin leave, no.

10         Q.   Okay.  Have you communicated with any of your

11    former vice colleagues related to your criminal charges?

12         A.   No.

13         Q.   Are you aware that some of your former vice

14    colleagues are cooperating with the Wake District Attorney

15    in your criminal prosecution?

16         A.   I don't know.  In terms of what, exactly, do you

17    mean by "cooperate"?

18         Q.   That they intend to serve as witnesses against

19    you.

20         A.   That was not -- I'm not sure about that.

21         Q.   You're not sure about that?

22         A.   I don't know what they're doing.

23         Q.   Okay.  So you haven't heard at all that Officer

24    Meghan Gay or Sergeant Rattelade are cooperating against

25    you?
```

1     A.   Not to my knowledge.

2     Q.   Are you aware that Officer Meghan Gay has been

3  told that she will not be prosecuted in exchange for her

4  cooperation?

5     A.   That has not been told to me.

6     Q.   Now that that has been told to you, do you think

7  that's fair?

8     A.   Fair in terms of what?

9     Q.   Do you think that's just?

10    A.   I don't agree with it.

11    Q.   Why?

12    A.   Based on the fact that we -- what she's

13 alleging, I don't agree with her.  I think it's biased.

14    Q.   What's biased about it?

15    A.   Well, I don't know exactly what she may be

16 referring to the DA's office.  I don't know what

17 conversation they have spoke about, but based on my

18 belief, I believe it's biased.

19    Q.   And I'm asking you what is biased about it.

20         MR. BENTON:  Objection, asked and answered.  If

21 you know, you can answer.

22         THE WITNESS:  I don't know what she'd be saying.

23 The only thing I can go based off of is what I can assume,

24 but I don't know for certain.

25         BY MR. SCHEWEL:

1    Q.   Okay.  So if she's saying that you knew that the

2  alleged heroin that you charged Marcus VanIrvin with

3  trafficking was not, in fact, heroin and you knew that,

4  are you saying that that's based on some bias?

5          MR. BENTON:  Objection.  You can answer if you

6  know.

7          THE WITNESS:  I believe that would be biased.

8          BY MR. SCHEWEL:

9    Q.   Why?

10   A.   Because she doesn't know what I know.

11   Q.   Well, did you know that the heroin you charged

12 Marcus VanIrvin with trafficking had tested negative in a

13 field test for a controlled substance?

14   A.   On the advice of counsel, I choose not to answer

15 based on my Fifth Amendment rights.

16   Q.   Had you observed the heroin that you charged

17 Marcus VanIrvin with trafficking?

18   A.   What was your question again?

19   Q.   Did you observe the heroin that you charged

20 Marcus VanIrvin with trafficking?

21   A.   On the advice of counsel, I choose not to answer

22 based on my Fifth Amendment rights.

23   Q.   Were the members of vice team 1 aware of your

24 use of Dennis Williams as a confidential informant?

25   A.   Yes, they were.

 1      Q.   And would this include Officer Meghan Gay?

 2      A.   Yes.

 3      Q.   Officer Rattelade?

 4      A.   Yes.

 5      Q.   Officer Monroe?

 6      A.   Yes.

 7      Q.   Sergeant Rolfe?

 8      A.   Yes.

 9      Q.   Officer Gwinn?

10      A.   Yes.

11      Q.   And, of course, Officer Nance?

12      A.   Yes.

13      Q.   Did the members of vice team 1 participate in

14  your controlled buys with Dennis Williams?

15      A.   Yes.

16      Q.   And your takedowns involving controlled buys

17  with Dennis Williams?

18      A.   Yes.

19      Q.   Would you inform vice team 1 when you were using

20  Dennis Williams for a controlled buy?

21      A.   Yes, I would inform them if I had a buy that I

22  would be conducting.

23      Q.   How would you inform them?

24      A.   Either orally or it could be through text.

25      Q.   And when you'd text them, would you use your

1  personal phone or your duty phone?

2      A.   We would be -- like duty phone -- I would say

3  either duty phone or personal, but I don't recall exactly

4  what phone I used.  If I needed to send a text, I'd just

5  text.

6      Q.   In 2018, did you own a personal phone?

7      A.   In 2018, did I own a personal phone?  Yes, I

8  did.

9      Q.   What type of phone was it?  Was it an iPhone?

10     A.   No.  I think it was -- it was an Android,

11 Samsung.

12     Q.   I'm going to show you a picture that we can mark

13 as Exhibit JJJ.  And just for the record, this is from the

14 Internal Affairs file.

15          Is this a picture of your Samsung phone that you

16 owned in 2018 and 2019?

17     A.   No, this would be the work phone.

18     Q.   Do you mind passing that back when you're done

19 looking at it?

20          MR. BENTON:  You don't have a copy?

21          MR. SCHEWEL:  I don't.

22          MS. KIBLER:  Would you pass it around for the

23 rest of us?

24          COURT REPORTER:  Do you want me to mark it

25 first?

1          MR. SCHEWEL:  You can pass it around and then

2    mark it.

3          MS. LIGUORI:  I don't want to interrupt the

4    prior question, but when we have a moment, I'd like to

5    take a quick break.

6          MR. BENTON:  Yeah, I need a break anyway, so --

7          (Recess from 11:09 a.m. to 11:26 a.m.)

8          (Plaintiffs' Exhibit JJJ was marked for

9    identification.)

10          MR. BENTON:  Oh, he did want to amend a response

11    to one of your questions.

12          BY MR. SCHEWEL:

13    Q.   Go ahead.

14    A.   If I'm recalling right, you said had I had any

15    communication with any DV Unit member.  I was trying to go

16    back to the last question that you stated, did I have any

17    contact with any D&V Unit member.  Is that right, what you

18    said?

19    Q.   That's correct.

20    A.   Okay.  And that was while I was on admin leave?

21    Q.   That's correct.

22    A.   Okay.  And that's the thing I was trying to make

23    sure because I got a little confused, but I remember being

24    contacted by Sergeant Rolfe a couple times.

25    Q.   What did those communications consist of?

1     A.   Asking how I was doing, letting me know that he

2  wasn't upset with me.

3     Q.   Were those phone calls or text messages?

4     A.   Those were phone calls.

5     Q.   Did you discuss anything else with Sergeant

6  Rolfe on those phone calls?

7     A.   He discussed the fact that he's being moved to

8  another unit, which was, I believe, the Transit Unit.  I'm

9  not sure what they're called now, but they patrol like the

10  downtown transit mall area.

11     Q.   Did he say why he was being moved to Transit?

12     A.   No.  To my knowledge, no.

13     Q.   Did he say if he was being punished at all?

14     A.   I don't know.  He was saying that, you know, how

15  they make their decisions is based on what they feel may

16  be best.  I don't know, but I didn't have that

17  communication with the department.  That was between him

18  and the department.

19     Q.   And I guess I'm just asking you if, during your

20  communications with Sergeant Rolfe, did Sergeant Rolfe

21  state if he was being punished at all?

22     A.   He didn't tell me that he was being punished.

23  He told me he was being moved.

24     Q.   In your communications, did you discuss your use

25  of confidential informants or your use of Dennis Williams

1    at all?

2         A.   No.

3         Q.   Do you recall anything else you discussed?

4         A.   He asked me had I heard anything about where I

5    was going, and I told him I haven't heard anything.

6         Q.   At that point, did you think that you were going

7    to be terminated?

8         A.   No.

9         Q.   Why not?

10        A.   I believe I was a good detective.

11        Q.   So all the people -- well, strike that.  The 11

12   individuals that were brought up in your Internal Affairs

13   interview, those 11 case files, do you believe that those

14   people were wrongfully arrested?

15        A.   On the advice of counsel, I choose not to answer

16   based on my Fifth Amendment rights.

17        Q.   Okay.  Before we took a break, I was asking you

18   about your use of a personal phone and your use of a duty

19   phone, and I had showed you a picture of Exhibit JJJ, and

20   you stated that that was your work phone; is that correct?

21        A.   That's correct.

22        Q.   And that was your work phone in 2018?

23        A.   Yes.

24        Q.   And 2019?

25        A.   I don't know because we had one phone that

1    either stopped working or something was wrong, and I had
2    to get another phone, but I can't say for certain.
3         Q.   Okay.  And you also testified that you would
4    sometimes text your vice colleagues using your personal
5    phone.
6         A.   That's correct.
7         Q.   And what was your personal phone number?
8         A.   (919) 802-6566.
9         Q.   Is that still your personal phone number?
10        A.   Yes, it is.
11        Q.   Would other vice officers text you using their
12   personal phone numbers?
13        A.   I don't know.  I can't say for certain.  I don't
14   know.
15        Q.   Okay.  So you received -- strike that.  Did you
16   receive text messages from the other members of vice team
17   1?
18        A.   In the past or --
19        Q.   Ever.
20        A.   Yes.
21        Q.   Are you aware of how many controlled buys you
22   made with Dennis Williams?
23        A.   No, I'm not aware how many.
24        Q.   Okay.  So according to the SBI file, you made
25   approximately 30 controlled buys with Dennis Williams.

1    Does that sound right?

2        A.   I'm not sure.

3        Q.   Okay.  When you were making your controlled buys

4    with Dennis Williams, what officers in the Vice Unit were

5    most often with you?

6        A.   It depends, availability, whoever's there.

7    Sergeant Rolfe, Rattelade, Gay, Gwinn, Monroe.  I mean

8    everybody, you know, took part.

9        Q.   Okay.

10       A.   Whatever help I need.

11       Q.   So would you say that for most of your

12   controlled buys involving Dennis Williams, those five

13   officers you mentioned were involved?

14            MR. BLANCHARD:  Objection.

15            MR. BENTON:  You can answer.  If you know, you

16   can answer.

17            THE WITNESS:  It depends.  Like I said, whoever

18   is available that day for whatever help I needed, it could

19   be any of the officers and my supervisor that's on the

20   unit.

21            BY MR. SCHEWEL:

22       Q.   Okay.  I'm going to read for you from your IA

23   interview.  This is your interview that was conducted on

24   September 4th, 2020, and this is page 67 and it's

25   Bates-stamped number 6085.

1          And I'll just -- I'm going to read the --

2     three-quarters down the page, and you are being questioned

3     at this time by Officer Davis from Internal Affairs.

4          Question, "It would have been great to actually

5     have a video of an actual drug transaction occurring."

6          Answer, "It would, I agree with you 100

7     percent."

8          Question, "Out of these 11 heroin cases and

9     multiple buys, it would have been great to have just one."

10          Answer, "Yes, sir.  I will -- I will love that

11     too, and I had made that clear to him.  And you gotta keep

12     in mind that, when we're doing these, um, these buys and

13     takedowns, I'm not doing it by myself.  Okay, you have

14     other guys in the unit that are helping.  My supervisor

15     helps me a lot.  He's there as well, and there's times I

16     tell him, 'Hey, when you're gonna do the buy, take the

17     phone out of your pocket.'  And he go, 'It is out of my

18     pocket.'  But, you know, that has been relayed.  You know,

19     when we do these things, buying this stuff, he's not by

20     himself doing this stuff.  And so I just want to make sure

21     that's clear and that's reflected.  And so" -- and then

22     something unintelligible.

23          What did you mean by that statement?

24          MR. BENTON:  Objection.  You can answer.

25          THE WITNESS:  What do you mean, what do I mean

1    by the statement?

2              BY MR. SCHEWEL:

3         Q.   So in part of that statement, you said, "I had

4    made clear to him and you got to keep in mind that when

5    we're doing these -- these buys and these takedowns, I'm

6    not doing it by myself."

7              MR. BENTON:  Objection.  You can answer.

8    Objection to form.  You can answer --

9              THE WITNESS:  Okay.

10             MR. BENTON:  -- if you know.

11             THE WITNESS:  That I have help doing these buys.

12   It's just not me and a CI by ourself doing a buy. That's

13   what I'm referring to.

14             BY MR. SCHEWEL:

15        Q.   Okay.  And you said, "My supervisor helps me a

16   lot."

17        A.   He helps me in buys as well.

18        Q.   How often was Sergeant Rolfe with you during

19   your buys with Dennis Williams?

20        A.   He was with me quite a bit.

21        Q.   Would you say he was with you 90 percent of the

22   time?

23        A.   About that.

24        Q.   And by "with you," do you mean he's physically

25   in the car with you?

1    A.   He has his own vehicle.

2    Q.   Okay.  So when you would make controlled buys

3  with Dennis Williams involving Sergeant Rolfe being

4  present, was it his practice to drive in his own vehicle?

5    A.   That's correct.

6    Q.   And what would he typically be doing during the

7  controlled buy?

8    A.   Helping with surveillance, monitoring the buy

9  and pretty much just being -- just like what we all do in

10  terms of assisting each other on each other's buys.

11    Q.   And when you say "monitoring the buy," do you

12  mean monitoring the video on his phone?

13    A.   Yes, live and physical surveillance.

14    Q.   Okay.  And can you first describe for me how

15  someone would monitor the video live?

16    A.   Well, we use a 1021 app.  I don't know if it's

17  changed, but that would be one surveillance equipment,

18  which would be like a cellphone that would be monitored

19  through there that's streaming live.

20    Q.   And in your experience, when Sergeant Rolfe was

21  assisting you with these buys, was he monitoring the

22  surveillance live?

23    A.   I don't know what he was doing, but it would be

24  used through the phone that we all had access to and

25  through physical surveillance if you use your eyeball or

1  an aid with binoculars.

2      Q.    Okay.  Did Sergeant Rolfe ever accompany you in

3  your car?

4      A.    I remember a time that he has, but that was us

5  being -- follow out of a neighborhood in Southeast

6  Raleigh.

7      Q.    Did that involve Dennis Williams?

8      A.    No, that involved a citizen tip.  I don't know

9  if it was a citizen tip or a Crime Stopper's tip.  I

10  called Sergeant Rolfe about the fact that I think I got

11  burned trying to observe the residence of hand-to-hand

12  transactions.

13      Q.    Did other vice officers ever accompany you in

14  your vehicle when you were doing controlled buys with

15  Dennis Williams?

16      A.    I would say maybe once, maybe David Nance, I

17  think, when we first signed up Dennis Williams.

18      Q.    Did other officers in the vice unit ever

19  transport Dennis Williams in their own vehicles to conduct

20  controlled buys?

21      A.    Yes.  That was much later.

22      Q.    Do you recall which officers?

23      A.    Yeah.  That would be Rattelade.

24      Q.    So on at least one occasion, Officer Rattelade

25  transported Dennis Williams?

1      A.   For a buy?  Is that what you're saying?

2      Q.   Yeah.

3      A.   That's correct.

4      Q.   And why did that occur?

5      A.   That was based on the fact that I was then with

6   the SEU officers, in their van.

7      Q.   Okay.  And is it a practice when SEU officers

8   are involved in doing a takedown for the lead officer to

9   ride with the SEU van?

10     A.   That's correct.

11     Q.   And so is it the case that on any occasion where

12  SEU officers were involved in doing a search or a takedown

13  that you would have been riding with the SEU van?

14     A.   I would -- what was your -- I'm sorry.  I'm

15  trying to understand that a little clearer.

16     Q.   So I'm asking you, on occasions where you're

17  working with Dennis Williams and there's a controlled buy

18  that's going to result in a takedown or a search, would

19  you be riding with the SEU officers?

20          MR. BENTON:  Objection to the compound question.

21  You can answer if you know.

22          THE WITNESS:  Yes, and it depends on the type of

23  operation.

24          BY MR. SCHEWEL:

25     Q.   Okay.  Can you describe that for me?

 1       A.    If you're not able to get a SEU van into the
 2   area, we may break down to our covert vehicles where I've
 3   had SEU officers in the vehicle with me.
 4       Q.    Okay.  But the point is that if SEU officers are
 5   involved, you are riding with the SEU officers?
 6       A.    For a takedown, yes.
 7       Q.    And Dennis Williams will not be in the car with
 8   you?
 9       A.    It depends on the operation.
10       Q.    Tell me why.
11       A.    I'm just saying that if I'm using a SEU van, he
12   would not be in the van with me.
13       Q.    Okay.  So on occasions where you're using the
14   SEU van, Dennis Williams would not be in the SEU van?
15            MS. LIGUORI:  Objection.
16            MR. BENTON:  Did you hear the question?
17            THE WITNESS:  No.  What was the question?
18            BY MR. SCHEWEL:
19       Q.    I believe you stated that on occasions when you
20   are using -- or when you're in the SEU van, Dennis
21   Williams would not be riding in the SEU van.
22       A.    That's correct.
23       Q.    And that means that Dennis Williams would be
24   being transported by another officer?
25       A.    I believe so.

```
 1        Q.   So these five officers that you've mentioned in
 2   the vice unit -- Gwinn, Monroe, Rolfe, Rattelade, Gay --
 3   what role would they typically play when you were making a
 4   controlled buy with Dennis Williams?
 5        A.   Surveillance.  I would say surveillance pretty
 6   much if we need to go in and get them for safety reasons.
 7   We have our tact vest with us, tactical vest.  If we ever
 8   have to go in and pull them out of a unsafe situation,
 9   we'll throw on our covering over our clothing.
10        Q.   Anything else?
11        A.   And this is just for like a buy walk?
12        Q.   Yes.
13        A.   That's it.  I mean you're going to -- like I
14   say, it just depends on if you're going to tell the
15   individual afterwards, they'll provide surveillance and
16   assistance in tailing.  It just depends on the operation.
17        Q.   What about a takedown?
18        A.   They'll assist in the search.  That depends on
19   what people's assignments are for that takedown.
20        Q.   What about for a search warrant execution of a
21   home?
22        A.   They will assist in the search warrant.
23        Q.   Will they also assist in surveilling the home?
24        A.   Yes.
25        Q.   What would that surveillance consist of?
```

1      A.   Either physical surveillance or if a buy is

2   happening in the home, it would be through the live app,

3   1021 app.

4      Q.   On May 20th, 2020, are you aware if any of these

5   vice officers we've been discussing surveilled 1628-B?

6      A.   Your question is what, again, exactly?

7      Q.   On May 20th, 2020 --

8      A.   Okay.

9      Q.   -- are you aware if any officers in the vice

10  unit surveilled Apartment 1628-B on Burgundy Street in

11  Raleigh?

12     A.   To my knowledge, yes.

13     Q.   Which officers?

14     A.   Be Gay and Gwinn.

15     Q.   And just to be clear, the date the raid occurred

16  was May 21st, 2020?

17     A.   That's correct.

18     Q.   Okay.  My question was on May 20th, 2020, so

19  that was the date you allegedly made the initial buy from

20  Marcus VanIrvin.  My first question is, on May 20th, 2020,

21  are you aware of any vice officers surveilling 1628-B?

22     A.   What do you mean, surveilling?  That's what I

23  don't understand.

24     Q.   Observing the home.

25     A.   Prior to the buy or -- I don't understand

 1    exactly what you mean.

 2         Q.    At all on that day.

 3         A.    The individuals that helped me on the buy is Gay

 4    and Gwinn on that date.

 5         Q.    And just to be clear, this is on May 20th, 2020?

 6         A.    That's correct.

 7         Q.    Okay.  Did Officers Gay and Gwinn ride with you

 8    in the car on that day?

 9         A.    No.

10         Q.    Did they drive together?

11         A.    No, they didn't.

12         Q.    So they each rode in their own vehicles?

13         A.    That's correct.

14         Q.    Did you conduct surveillance of Apartment 1628-B

15    on May 20th, 2020?

16         A.    Did I conduct surveillance?

17               MR. BENTON:  We need to take a break.

18               MR. SCHEWEL:  Okay.

19               (Recess from 11:49 a.m. to 11:55 a.m.)

20               BY MR. SCHEWEL:

21         Q.    Did you conduct surveillance of 1628-B Burgundy

22    Street on May 20th, 2020?

23         A.    Yes.

24         Q.    Describe that surveillance.

25         A.    It was physical surveillance, also surveillance

1   electronically.

2       Q.   What occurred?

3       A.   In terms of what occurred, meaning?

4       Q.   What did you observe?

5       A.   Pretty much the CI pointed out the residence

6   that was going to be where the buy is going to take place,

7   like it will be the front of the residence.

8       Q.   What else do you recall?

9       A.   Him pointing out that that's the residence where

10  he goes and that he always -- the guy always has him going

11  to the back of the residence.

12      Q.   Do you recall anything else in your

13  surveillance?

14      A.   The only thing I recall in the surveillance,

15  that it was really not many people walking around outside.

16      Q.   Were you parked in your car during the

17  surveillance?

18      A.   We drove through.

19      Q.   And you were in your car alone with Dennis

20  Williams?

21      A.   That's correct.

22      Q.   And Officer Gay and Officer Gwinn were in their

23  own cars?

24      A.   Yes.

25      Q.   And did they park their cars?

 1      A.   I don't know what they did.

 2      Q.   Did you observe Officer Gay or Officer Gwinn

 3 conducting surveillance?

 4      A.   I did not observe them.

 5      Q.   When you drove by the apartment with Dennis

 6 Williams, did he physically point to the location where he

 7 allegedly purchased narcotics?

 8      A.   That's correct.

 9      Q.   And what apartment number was that?

10      A.   1628-B.

11      Q.   How did you know that?

12      A.   That's from what he pointed and told me.

13      Q.   Well, when he pointed, could you observe a

14 number on that apartment?

15      A.   Yes, you can, in the front.

16      Q.   On the front door?

17      A.   I'm not sure if it's to the right of the door or

18 what, but there's -- the unit is marked.

19      Q.   Okay.  So your testimony is that when you drove

20 by the apartment, Dennis Williams pointed at an apartment

21 and you could see that it was marked as 1628?

22      A.   1628, I believe, is -- I'm not sure if it's --

23 is it B?  But you can -- it's marked which units because

24 in the front, each individual unit is marked.

25      Q.   And they're marked with the address number as

1  1628?

2      A.  I'm not sure.  I haven't -- It's been a while.

3      Q.  Okay.  Well, I guess my question is, are you

4  sure that it was marked as 1628 or are you saying that it

5  was only marked as A or B?

6      A.  I would have to see the picture because my

7  recollection is that I believe it's marked with the

8  number, the unit number, and then I don't know if it's A

9  or B.  I have not seen that.  It's been about three years.

10     Q.  Okay.  But your testimony is that you observed

11 the address that Dennis Williams pointed out to you?

12     A.  That's correct.

13     Q.  And you're saying Dennis Williams also told you

14 the address?

15     A.  He told me the address that we were going into

16 by pointing to it.

17     Q.  By pointing to it?

18     A.  That's correct.

19     Q.  But he never told you, "The one that I've been

20 going into is 1628-B"?

21     A.  He pointed to that address --

22     Q.  But he -- sorry.  Go ahead.

23     A.  He pointed to the address, saying that that's

24 the address that he goes in.  I'm not sure if he said it

25 or I said, "Is this, you know, 1628?"  But that's the

1    address -- he made clear to me that that's where he goes

2    in to do -- to meet with the guy.

3        Q.   Did he tell you this when he was in the car with

4    you?

5        A.   That's correct.

6        Q.   Did you ever attempt to verify who was living at

7    1628-B?

8        A.   I did not verify who was in that unit.  You

9    would have to be careful because you don't want to tip off

10   whoever is in that unit because it's not going to be

11   listed in their name if you try to look it up.

12       Q.   Why do you say that?

13       A.   It's owned by a property group, so they don't

14   have an individual person, in my experience.  You have to

15   call somehow and get that type of information with whoever

16   lives there.

17       Q.   Okay.  So you didn't attempt to verify who was

18   living at 1628-B?

19       A.   No.

20       Q.   Did you verify in any way that Marcus VanIrvin

21   was living at 1628-B?

22       A.   Did I verify?  No.

23       Q.   Did you observe Dennis Williams enter 1628-B?

24            MR. BENTON:  Abe, on what day?

25            MR. SCHEWEL:  May 20th, 2020.

1          THE WITNESS:  I observed -- what I observed was
2   him enter after watching the video after the buy.  I
3   observed him being let into the apartment that I believe
4   to be 1628-B.
5          BY MR. SCHEWEL:
6     Q.   Okay.  So through watching surveillance video
7   after the alleged buy, you knew that he had been let into
8   an apartment?
9     A.   I reasonably believed that he was let into the
10  apartment that was 1628-B by the subject in question.
11    Q.   And in that surveillance video, could you see
12  him being let into an apartment?
13    A.   You see the door open up, the CI go in, shut the
14  door.  You see the back of the individual and at the time
15  he turns around, the camera got obscured.
16    Q.   Did Officer Gay or Officer Gwinn tell you that
17  they observed Dennis Williams enter 1628-B?
18    A.   What I remember was Gwinn telling me back at the
19  station that he saw him go inside.
20    Q.   Did he say the apartment number?
21    A.   I don't remember him saying the apartment
22  number.  I remember him saying that he went inside the
23  apartment.
24    Q.   So based on what Officer Gwinn told you, you
25  believed that Officer Gwinn was physically surveilling

1   Dennis Williams?

2     A.   I reasonably believe that he had a position that

3   he could see him go inside.  I don't know exactly what

4   position he was at.  I can't say for that, but the back of

5   the apartments don't have a number.

6     Q.   Okay.  Do you recall what color the door of

7   1628-B was?

8     A.   I don't remember the color of it.

9     Q.   Okay.  I'm going to hand your attorney an

10   exhibit that we'll mark as KKK.

11        (Plaintiffs' Exhibit KKK was marked for

12   identification.)

13        BY MR. SCHEWEL:

14     Q.   And I'll hand you a copy.

15        MR. BENTON:  Take your time and review it,

16   please.

17        MR. BLANCHARD:  Abe, what Bates stamp does that

18   start with?

19        MR. SCHEWEL:  This is not Bates-stamped.  This

20   is the one that --

21        MR. BLANCHARD:  Is this it?

22        MR. SCHEWEL:  That's correct.

23        MS. KIBLER:  How many pages does it consist of?

24        MR. SCHEWEL:  Five pages.

25        MR. BENTON:  Abe, we're going to take a break.

1          MR. SCHEWEL:  Okay.

2          (Recess from 12:07 p.m. to 12:20 p.m.)

3          BY MR. SCHEWEL:

4     Q.    So I was asking you about -- sorry, off the

5     record.

6          (Discussion off the record.)

7          BY MR. SCHEWEL:

8     Q.    I was asking you about Exhibit KKK.  Do you have

9     that in front of you?

10    A.    I have Exhibit, yes, KKK.

11    Q.    Do you recognize this report?

12    A.    Yes, I do.

13    Q.    And is this your report related to a controlled

14    buy using Dennis Williams related to Marcus VanIrvin?

15    A.    Parts of it.

16    Q.    And is this dated May 20th, 2020?

17    A.    Yes, it is.

18    Q.    The phone number listed there, (919) 457-6199,

19    did you ever verify that that was Marcus VanIrvin's phone

20    number?

21    A.    I don't recall what steps I did in that phone

22    number.  That was a phone number that was provided by the

23    CI that the subject uses.

24    Q.    Did you ever do a background check on Marcus

25    VanIrvin?

1    A.   I don't remember.

2    Q.   Well, did you ever do a background check on

3 Marcus VanIrvin when you were making an application for

4 the search warrant?

5    A.   On the advice of counsel, I choose not to answer

6 based on my Fifth Amendment rights.

7    Q.   So if we look at the second paragraph of this

8 document, the third sentence says, "A short time later the

9 CI went to the buy location where detectives observed the

10 target of this investigation meet with the CI inside the

11 service station which is adjoined to the McDonald's at

12 5016 Spring Forest Road.  Shakari Ore and the CI then came

13 outside and walked to a white Nissan Maxima," and then it

14 continues down for a number of sentences.  Was that

15 written in error?

16    A.   Yes, it was.

17    Q.   Can you describe what happened?

18    A.   It appears to be a draft where it has several

19 different cases.

20    Q.   So are you saying that you drafted the VanIrvin

21 Incident Report using an old report?

22    A.   It's cut and paste, but the thing was that when

23 I'm working on it, that's not reflective of what I turned

24 in because there's no -- that's not -- it has a lot of

25 different individuals in there besides the VanIrvin.

1      Q.   So what is your practice when -- or what was

2  your practice in 2018 and 2019 when drafting an incident

3  report?

4      A.   I didn't really have a practice.  I just -- you

5  know, I cut and paste, type up reports for, you know,

6  times we're helping out other detectives.

7      Q.   And by "cut and paste," do you mean you would

8  copy an old incident report and then paste that

9  information onto a new incident report?

10     A.   I would remove old information and put new

11 information in.

12     Q.   But my question was, would you copy an old

13 incident report and then paste that information onto a new

14 incident report?

15     A.   No.  I would put the new information report onto

16 the old one and take the old stuff out, but the thing is

17 that this was -- it's like all bungled together. For me,

18 it appears to be a draft.

19     Q.   Why would you not just start off of a completely

20 new blank incident report?

21     A.   Due to time, I just did what I used.

22     Q.   And is that because you would keep in some of

23 the information from the old reports?

24     A.   No, not really.

25     Q.   So why would it help save time?

1    A.   It's the fact that you're starting over from

2  scratch.  You just pretty much type in the new information

3  that you have and go on with the new information that you

4  have.

5    Q.   Because you're keeping some of the old

6  information?

7    A.   Not necessarily.

8    Q.   Okay.  So you're stating that Exhibit KKK is a

9  draft?

10    A.   It appears to me to be a draft because I don't

11  see a supervisor's name or date on here.

12    Q.   Okay.  So how would this have been -- well,

13  strike that.  Is it standard practice to provide drafts to

14  the district attorney's office?

15    A.   It's -- I wouldn't say anything about being

16  standard practice.  I don't know how that got in there.  I

17  can't say, but that's -- putting the case jacket together,

18  I'm not sure how that got in there.  It looks like it was

19  inadvertently put in.  That's how it appears to me.

20    Q.   Okay.  Are you aware of that ever happening in

21  any of your other cases?

22    A.   Not to my knowledge.

23    Q.   Okay.  I'm going to ask you to turn to page 3 of

24  3 of this document, as it's marked.

25    A.   (Witness complies.)

 1    Q.   And I'm going to ask you -- well, first, is this
 2  document also dated May 20th, 2020?
 3    A.   That's correct.
 4    Q.   And is this document related to an alleged
 5  heroin sale from Marcus VanIrvin to Dennis Williams?
 6    A.   Yes, it is.
 7    Q.   And this document is drafted by you?
 8    A.   That is correct.
 9    Q.   And it's approved by your supervisor, Sergeant
10  Rolfe?
11         MS. KIBLER:  Objection.
12         THE WITNESS:  Still answer or --
13         MR. SCHEWEL:  You can answer.
14         MR. BENTON:  Still answer, if you know.
15         THE WITNESS:  It says down here Sergeant Rolfe
16  for supervisor.
17         BY MR. SCHEWEL:
18    Q.   So does that indicate to you that it was
19  approved by Sergeant Rolfe?
20         MR. BLANCHARD:  Objection.
21         MR. BENTON:  You can answer if you know.
22         THE WITNESS:  Based on what's down here under
23  supervisor, it would appear to be that way.
24         BY MR. SCHEWEL:
25    Q.   Now, I'm going to direct you again to the middle

1  paragraph and I'm just going to read it out loud. "After

2  the confidential informant spoke to Marcus, the

3  confidential informant then went to the subject's

4  apartment located at 1628 Burgundy Street, Apartment B,

5  Raleigh, North Carolina 27610.  The buy was monitored

6  using electronic and physical surveillance.  The

7  confidential informant was then observed by detectives

8  being let into the residence by the target of the

9  investigation, Marcus, and an amount of heroin was then

10  purchased from the subject for an amount of U.S.

11  currency."

12       Is it correct to say that you did not observe

13  physically Dennis Williams being let into the apartment?

14       MR. BENTON:  Objection to form.  You can answer

15  if you know.

16       THE WITNESS:  What I observed is him going

17  inside when I reviewed the video of the buy.

18       BY MR. SCHEWEL:

19  Q.   And so this statement that says he was observed

20  by detectives being let into the residence by the target

21  of this investigation, Marcus, was that based on your

22  knowledge or was that based on something that you learned

23  from another detective?

24  A.   Based on what was told to me by Detective Gwinn

25  observing him and what I observed as well, and viewing the

```
 1   video.
 2        Q.   Did the video actually show Marcus?
 3        A.   The part I saw was the back of the individual's
 4   head and his back.
 5        Q.   And from that picture, could you tell that that
 6   was Marcus VanIrvin?
 7        A.   I had reason to believe that it -- to assume
 8   that that was him.
 9        Q.   What was your reason to believe that?
10        A.   Based on his stature, the size.  He's a
11   heavy-set black male, close-cut hair, which appeared to be
12   very similar in the video.
13        Q.   Had you seen him before?
14        A.   Personally, no.
15        Q.   So how did you know that he was a heavy-set
16   individual with close-cut hair?
17        A.   This would be after -- because I get my dates
18   mixed up in my head with the search warrant and the video.
19        Q.   So I guess my question still remains, when you
20   watched the video, how did you know what Marcus VanIrvin
21   looked like and that it was him in the video?
22        A.   I had reason to believe that it could possibly
23   be him based on the fact that the individual seemed to
24   know who the CI was from the fact that the CI went in.  If
25   there was a problem, you would hear some type of scuffle
```

1   and I didn't get that, and I didn't get any information

2   from the CI that that wasn't, you know, the person who

3   sold him heroin.

4       Q.   Okay.  So earlier you stated that you could tell

5   it was him because of his stature.  Do you recall that?

6       A.   Yeah, but I -- that's me mixing up the events.

7   That's what I'm saying.

8       Q.   Okay.  So you're saying that was incorrect?

9       A.   That's the incorrect way of stating it.

10      Q.   Okay.  Were you watching the 1021 app

11  surveillance live as this sale occurred?

12           MR. BENTON:  What date, Abe?

13           MR. SCHEWEL:  May 20th, 2020.

14           THE WITNESS:  I was watching the app, that's

15  correct.

16           BY MR. SCHEWEL:

17      Q.   Did you observe a hand-to-hand transaction?

18      A.   Through the app, I can't see that.

19      Q.   What could you see?

20      A.   I remember the screen being obscured.

21      Q.   Could you hear anything that indicated a

22  hand-to-hand transaction occurred?

23      A.   That's -- that's -- it's difficult to say

24  because they're just having general conversation.  You're

25  not going to really know from hearing, okay, the

1  hand-to-hand transaction occurred, unless the person

2  states, you know, obviously, but when you're just having a

3  general conversation, it's hard to differentiate that.

4      Q.   Okay.  I'm going to direct your attention to the

5  last page of KKK.  It's marked as a supplemental report.

6  The supplemental report is marked Page 1 of 7.

7      A.   Okay.

8      Q.   Do you see that that's dated May 28th, 2020?

9      A.   Okay.

10     Q.   Is that correct?

11     A.   (No response.)

12     Q.   Just to be clear, my question is only whether

13 the document states May 28th, 2020, in the top left-hand

14 corner.

15     A.   Yes, it states that in the top left corner.

16     Q.   Do you recognize this document?

17     A.   Yes, I do.

18     Q.   Did you draft this document?

19     A.   Yes, I did.

20     Q.   What is this document?

21     A.   This is a report.

22     Q.   And is it correct to say it's a supplemental

23 report related to the arrest of Marcus VanIrvin?

24     A.   That's correct.

25     Q.   Do you see where it says "Investigative Notes"?

1      A.   Yes.

2      Q.   I'm going to direct you to the second paragraph

3   below "Investigative Notes," where it says, "On March

4   19th, 2020 another controlled buy was set to take place at

5   1628-B Burgundy Street involving the target of this

6   investigation, Marcus VanIrvin, for a trafficking amount

7   of heroin (8 grams)."  Is that date a typo?

8      A.   That is correct.

9      Q.   Do you see in the third paragraph where it says,

10  "An amount of heroin was purchased from Keith Green," and

11  his name is circled?

12     A.   Yes, I see that.

13     Q.   Is that an error?

14     A.   That is correct.

15          MR. BLANCHARD:  Wait a minute.  I apologize.

16  Can you make that clear?  He said, "Is that an error," and

17  you said, "That is correct."  Do you mean it is, in fact,

18  an error?

19          THE WITNESS:  For reference to VanIrvin, yes.

20          MR. BLANCHARD:  Okay.  Instead of saying "Keith

21  Green"?

22          THE WITNESS:  Yes.  It shouldn't be Keith Green.

23          MR. BLANCHARD:  Just trying to get that clear on

24  the transcript.  Thank you.

25          BY MR. SCHEWEL:

1      Q.   I'm now going to direct your attention to

2  Plaintiffs' Exhibit ZZZ.  Do you need a copy?

3        MR. BENTON:  He does.

4        BY MR. SCHEWEL:

5      Q.   Do you recognize this document?

6      A.   Yes, that's correct.

7      Q.   What is this document?

8      A.   On the advice of counsel, I choose not to answer

9  based on my Fifth Amendment rights.

10       MR. BENTON:  Before you go on, you said this is

11  Exhibit ZZZ?

12       MR. SCHEWEL:  Sorry, it's just ZZ.

13       MR. BENTON:  Okay.

14       BY MR. SCHEWEL:

15      Q.   So I understand that you are invoking your Fifth

16  Amendment right.  I'm just going to ask you a few more

17  questions about it and you can continue to invoke your

18  Fifth if you choose.

19      A.   Okay.

20      Q.   Do you know which magistrate approved this

21  warrant?

22      A.   On the advice of counsel, I choose not to answer

23  based on my Fifth Amendment rights.

24      Q.   Did you apply for this warrant?

25      A.   On the advice of counsel, I choose not to answer

1   based on my Fifth Amendment rights.

2       Q.   Do you intend to answer any questions today

3   about this warrant?

4       A.   No.

5       Q.   Do you intend to answer any questions about the

6   warrant application?

7       A.   No.

8       Q.   And if I ask you any further questions about

9   this warrant or this warrant application, would you

10  continue to invoke your Fifth Amendment privilege?

11      A.   Yes.

12      Q.   Do you believe that the statements in the

13  warrant application are true, to the best of your

14  knowledge?

15      A.   On the advice of counsel, I choose not to answer

16  based on my Fifth Amendment rights.

17      Q.   Are you aware that Marcus VanIrvin's address was

18  1620 Burgundy Street?

19      A.   On advice of counsel, I choose not to answer

20  based on my Fifth Amendment rights.

21      Q.   Did the other members of vice team 1 ever say

22  anything negative about Dennis Williams?

23      A.   The best of my knowledge, I don't know the exact

24  problems that they may have had.  I couldn't tell you for

25  sure what was the complaints.

 1      Q.   Well, my question is, did they ever say anything

 2   to you or communicate anything to you in any way, text,

 3   e-mail or in person, negative about Dennis Williams?

 4      A.   I don't know.  You know, I have not -- I can't

 5   recall a specific comment.  That's the problem.

 6      Q.   Have you reviewed the SBI file in preparation

 7   for your deposition today?

 8      A.   I looked through it.

 9      Q.   Are you aware that Sergeant Rolfe was

10   interviewed by the SBI?

11      A.   Yes, I am.

12      Q.   Are you aware that Sergeant Rolfe told the SBI

13   investigator that about 6 to 7 cases in involving Dennis

14   Williams, he expressed concerns to you about your use of

15   Dennis Williams?

16           MR. BLANCHARD:  Objection.  You can answer.

17           THE WITNESS:  Can you repeat that question,

18   please?

19           BY MR. SCHEWEL:

20      Q.   Are you aware that Sergeant Rolfe told the SBI

21   investigator that he expressed concerns to you about

22   Dennis Williams about 6 to 7 cases into using him?

23      A.   I was not aware from what he told to me.  What

24   made me aware is what was said to the SBI in the document.

25      Q.   So your statement is you read that in the SBI

1    report?

2          A.   I came across that in the SBI report.

3          Q.   And was that surprising to you?

4          A.   It was surprising to me.

5          Q.   Why?

6          A.   Because that's not -- that's not consistent with

7    what my evaluation said.

8          Q.   Okay.  Is it consistent -- and by your

9    evaluation, you mean your performance evaluation?

10         A.   That's correct.

11         Q.   Is it consistent with what Sergeant Rolfe ever

12   said to you?

13         A.   On the advice of counsel, I choose not to answer

14   based on my Fifth Amendment rights.

15         Q.   Are you aware that Officers Monroe and Rattelade

16   also gave statements to the SBI?

17         A.   Yes, I'm aware based on the SBI document.

18         Q.   You read that document?

19         A.   Yes.

20         Q.   And you reviewed their statements?

21         A.   That's correct.

22              MR. BENTON:  I'm going to object to the use of

23   the term "statements."  You can -- just for the record.

24              THE WITNESS:  Yes.

25              BY MR. SCHEWEL:

1      Q.   And are you aware that Officer Monroe stated to

2 the SBI investigator that he believed that Dennis Williams

3 was providing fake heroin?

4      A.   That was in the SBI report. I don't know what

5 he personally said to him, just what I read that was in

6 there.

7      Q.   And was that statement surprising to you?

8      A.   Yes, it was.

9      Q.   Why?

10      A.   Because he's saying that he believed the CI was

11 providing fake heroin to the dealers. That was not

12 mentioned to me.

13      Q.   So your testimony is that Officer Monroe never

14 told you that he thought that Dennis Williams was

15 providing fake heroin?

16      A.   That's correct.

17      Q.   Did Officer Monroe ever tell you that the heroin

18 recovered from Dennis Williams appeared to be fake?

19      A.   On advice of counsel, I choose not to answer

20 based on my Fifth Amendment rights.

21      Q.   Did Officer Monroe ever field test the heroin

22 recovered from Dennis Williams?

23      A.   On advice of counsel, I choose not to answer

24 based on my Fifth Amendment rights.

25      Q.   Did Officer Monroe ever express concerns to you

 1   that Dennis Williams was obscuring his buy camera?

 2        A.   No.

 3        Q.   Did Officer Rattelade?

 4        A.   To my knowledge, no.

 5        Q.   Well, I'm asking did he express it to you.

 6        A.   Not to me directly, no.

 7        Q.   Did Sergeant Rolfe?

 8        A.   Sergeant Rolfe did not direct that to me

 9   personally.

10        Q.   Did Officer Gay?

11        A.   No.

12        Q.   Did Officer Gwinn?

13        A.   No.

14        Q.   Did anyone ever inform you, other than your

15   lawyers, that these officers who we just mentioned

16   expressed concerns about Dennis Williams obscuring the buy

17   video?

18        A.   Your question is what?

19        Q.   So earlier you stated that these officers did

20   not express these concerns directly to you.

21        A.   That's correct.

22        Q.   Did anyone express these concerns directly to

23   you?

24        A.   No.

25        Q.   Did Lieutenant Bunch?

 1      A.   No.

 2      Q.   Did anyone in the vice unit ever express any

 3   concerns to you about the use of Dennis Williams as a

 4   confidential informant?

 5      A.   In terms of what, exactly?

 6      Q.   Any concern at all.

 7      A.   That's -- you know, like I said, that's pretty

 8   vague because I don't know exactly -- what exactly are you

 9   saying in terms of --

10      Q.   Well, you know what the -- when I say "a

11   concern," I mean, you know, maybe a worry.  Did anyone

12   express a worry about the use of Dennis Williams as a

13   confidential informant?

14           MR. BENTON:  When?  What is the time line of

15   your question?

16           MR. SCHEWEL:  At any time.

17           THE WITNESS:  On the advice of counsel, I choose

18   not to answer based on my Fifth Amendment rights.

19           BY MR. SCHEWEL:

20      Q.   Did any vice team 1 officers ever tell you they

21   thought Dennis Williams was unreliable?

22      A.   On the advice of counsel, I choose not to answer

23   based on my Fifth Amendment rights.

24      Q.   Did any vice team 1 officers ever tell you to

25   stop using Dennis Williams?

1      A.   No.

2      Q.   Did Sergeant Rolfe ever tell you to stop using

3  Dennis Williams?

4      A.   I don't remember him telling me personally to

5  stop using him.

6      Q.   Was Dennis Williams a productive informant?

7      A.   I would say he was productive.

8      Q.   Why?

9      A.   He made some good cases.

10     Q.   Was he your most productive informant at RPD?

11     A.   I used a lot of different informants.  I

12  wouldn't say he's the most.  A lot of the informants I

13  used were productive as well.

14     Q.   Are you aware that Dennis Williams made at least

15  10 trafficking controlled buys?

16     A.   I don't know the exact count.  I know he made

17  some trafficking buys, yes.

18     Q.   Did you have any other informants in the vice

19  unit that made that many trafficking buys of heroin?

20     A.   I did not deal with heroin with other CIs.  It

21  was cocaine or weed, and I had made some trafficking cases

22  in their -- in those -- in marijuana and cocaine.

23     Q.   Did you have any other CIs who made 10 or more

24  trafficking purchases of any narcotics?

25     A.   No.

1      Q.   Did any other officers in the vice unit, to your

2   knowledge, have CIs who made 10 or more trafficking

3   purchases?

4      A.   I don't know because I didn't pay attention to

5   what they did.

6      Q.   Well, you went on their buys, right?

7      A.   I went on their buys, but I wasn't paying

8   attention to if it was a trafficking case or not.  You

9   know, I'm just helping out.  I'm not keeping score.

10     Q.   Do you think that any of the other officers, the

11  vice officers, were jealous of your CI and his success?

12     A.   I don't know what they felt.  I can't say what

13  they felt.

14     Q.   Did you ever feel like they were picking on your

15  CI?

16     A.   I felt like they berated at times, yeah.

17     Q.   What do you mean by that?

18     A.   The fact that when we had a buy and the target

19  may cancel the buy on us and we have to switch to another

20  target.  The CI doesn't have control over that.  The guy

21  cancelled.  And you're going to have times where you're

22  told that the guy is going to meet the CI at a certain

23  location and you're waiting for hours and he doesn't show

24  up.  He flakes on you.  You don't have control over that.

25     Q.   And you're saying after that occurred, other

 1  vice officers berated Dennis Williams?

 2      A.   All I'm saying is that they didn't like the fact

 3  that, you know, if you're saying we're going to meet at

 4  this said place with this target that you're saying that

 5  you're going to buy from and it always ends up being a

 6  different target because the guy doesn't show up, what are

 7  you supposed to do?

 8      Q.   How many times did that happen with Dennis

 9  Williams?

10      A.   I don't know how many times.  Did it happen?

11  Yes.  Was it unusual?  No.

12      Q.   Did other vice officers get upset about that?

13      A.   I don't know how they felt, but cracking jokes

14  about it, that's what I saw.

15      Q.   What type of jokes?

16      A.   Just based on the fact that here you're supposed

17  to be showing up to do a buy with a certain person and

18  you've got to switch, so you've got to switch targets, and

19  people have other cases that they want to work and it ties

20  everybody else up.

21      Q.   Who do you recall making jokes about it?

22      A.   I don't recall the specific person.  I just know

23  that that was a general type of talk.

24      Q.   Among officers in vice team 1?

25      A.   Among detectives.

1    Q.   Among the detectives in vice team 1?

2    A.   That's correct.

3    Q.   Is there any other reason why you felt like

4  people were picking on your CI?

5    A.   No.  My opinion is that whatever concerns they

6  have, I don't know, but it's just the fact that that was a

7  particular incident where people were upset.  You don't

8  have control over who shows up and who doesn't, and I've

9  seen them do the same thing where they go up for a buy and

10 you're waiting and waiting for hours.  The guy doesn't

11 show up and you're having to switch, trying to buy from

12 another target.  It happened to everybody, and Star was in

13 particular.

14   Q.   Sorry?

15   A.   Star, a CI, Star.

16   Q.   Who did he work for?

17   A.   She worked with mostly Monroe.

18   Q.   And you're saying there was multiple occasions

19 where he was using this CI named Star and the target would

20 not show?

21   A.   There was a time that I was helping with his buy

22 and did the same thing.  No CI is immune to it.

23   Q.   Other than this occasion that you've just

24 described, do you recall any other occasions where

25 officers in vice team 1 expressed any concerns about your

1   use of Dennis Williams?

2       A.   Not to my knowledge, that I can remember.

3       Q.   And how about Sergeant Rolfe?

4       A.   I don't remember.  I don't remember.

5       Q.   Is it possible that Sergeant Rolfe expressed

6   concerns to you?

7       A.   I don't know.  If there was a concern, then that

8   should have been a one-on-one meeting or whatever, but I

9   don't remember him saying anything about not using him.

10      Q.   Did you ever have a one-on-one meeting with

11  Sergeant Rolfe where he expressed his concerns about

12  Dennis Williams?

13      A.   On the advice of counsel, I choose not to answer

14  based on my Fifth Amendment rights.

15      Q.   Do you recall the arrest of Curtis Logan with

16  his two minor children in the car?

17      A.   Yes, I do.

18      Q.   What do you recall about the incident?

19      A.   The only thing I recall, doing the buy.  I don't

20  remember the particular details.

21      Q.   What do you recall about the buy?

22      A.   I don't remember much about the buy, itself.

23      Q.   What is a buy walk?

24      A.   A buy walk is where you're going to -- you're

25  going to do the transaction, but you're not going to

1    charge the transaction.  You're going to hold off on

2    charges.

3        Q.    Did you conduct a buy walk with Curtis Logan?

4        A.    I don't remember if we did one or if we went

5    straight into a takedown.  I don't remember.

6        Q.    Is it typical to conduct a buy walk?

7        A.    It depends on the detective and the

8    investigation that they're doing.

9        Q.    What would be some factors that you would

10   consider?

11       A.    As your long-term target, as your short-term

12   target?  Is this just an operation where you're going to

13   order up a certain amount of quantity and make an arrest

14   right then and there, a buy bust?

15       Q.    Do you recall what happened to the children

16   after Mr. Logan was arrested?

17       A.    No, I don't.

18       Q.    Do you recall calling their mother?

19       A.    I don't remember calling their mother.

20       Q.    Do you recall their mother coming to pick the

21   children up?

22       A.    No, I don't remember that.

23       Q.    Did you notify Child Protective Services about

24   this arrest?

25       A.    On advice of counsel, I choose not to answer

```
 1    based on my Fifth Amendment rights.
 2         Q.   Prior to the controlled buy involving Curtis
 3    Williams [sic], did you meet with other vice and SEU
 4    officers to prepare for the takedown?
 5         A.   Curtis Williams.  Who's --
 6         Q.   Sorry, Curtis Logan.
 7         A.   Okay.  And what was your question, sir?
 8         Q.   Did you meet with the vice team and the other
 9    SEU officers to prepare for the takedown?
10         A.   Yes.
11         Q.   And did you discuss the operation with the vice
12    team and the SEU officers?
13         A.   Yes.
14         Q.   And did you discuss that you were using the
15    confidential informant, Dennis Williams?
16         A.   I don't remember the exact details of the -- of
17    the briefing, but pretty much we're going over the
18    operation.  What CI was being used, I don't remember if
19    that was stated.
20         Q.   Do you recall debriefing with the vice team
21    after this arrest at Greens Dairy Road?
22         A.   Vaguely.
23         Q.   Are you aware that you alleged that Mr. Logan
24    sold over 20 grams of heroin to Dennis Williams?
25         A.   Yes, I'm aware of that.
```

1    Q.   And are you aware that you alleged that he sold
2    the 20 grams of heroin for $400?
3    A.   Yes, I am.
4    Q.   Do you recall Officer Monroe observing the
5    heroin and telling you that it did not appear to be
6    heroin?
7    A.   I'm aware that he field tested the heroin.
8    Q.   So the answer to that question of Monroe
9    observing the heroin and telling you that it did not look
10   like heroin --
11   A.   Your question is what?
12   Q.   Do you recall Officer Monroe observing the
13   heroin and telling you that it did not appear to be
14   heroin?
15   A.   That's not observing.  What he did was field
16   test.
17   Q.   Right.  I understand that, but my question is,
18   did Officer Monroe also tell you that the heroin did not
19   look like heroin?
20   A.   I don't remember him saying that.  What I
21   remember is him field testing it.
22   Q.   Did you observe him field test it?
23   A.   I observed him field test the substance.
24   Q.   Okay.  And what was the result of the field
25   test?

1    A.   I don't know what those results were.  I never
2  field tested heroin.
3    Q.   Well, did he tell you that it field tested
4  negative?
5    A.   He did tell me that, yes.
6    Q.   Did you believe him?
7    A.   I went based on what the policy stated.
8    Q.   I'm just asking if you believed him that it had
9  field tested negative.
10   A.   I didn't -- based on my training that I received
11 from outside the department, as well as the department,
12 especially outside, field tests were unreliable.  It's
13 just an indicator of a color change.  It's not conclusive
14 confirmation of a positive or a negative.
15   Q.   I'm not asking you that.  I'm just asking you
16 whether or not you believed that Officer Monroe was being
17 honest about the results of the field test.
18   A.   I can't say his honesty, but I'm saying it's
19 what I was trained.
20   Q.   I know, and I'm not asking -- sorry.  I'm just
21 asking you whether or not you thought he was being
22 truthful about it.
23   A.   Like I said, I was going based on my training,
24 and the training that I received, that's what I based my
25 conclusion off of.  I didn't base it off of what I

 1  believed he was.  I just believed the fact that you cannot

 2  trust a field test in that manner.

 3       Q.   So, essentially, it didn't matter to you whether

 4  or not a field test was done?

 5       A.   On the advice of counsel, I choose not to answer

 6  based on my Fifth Amendment rights.

 7       Q.   If it had field tested positive, would that have

 8  mattered?

 9       A.   You cannot go based on a field test.

10       Q.   Did Officer Rattelade tell you the price of 20

11  grams of heroin should have been closer to $2,000?

12       A.   I don't remember him telling me that.

13       Q.   Were you aware of that?

14       A.   Aware of what, exactly?

15       Q.   That the price of 20 grams of heroin at the time

16  should have been closer to $2,000?

17       A.   I was aware, based what the CI told me, why

18  there was a vast difference.  I know that the price was

19  low.  We have a price guide that we go by, but from what

20  the CI told me was he was working -- he was going to work

21  the amount off for the subject.

22       Q.   What is a price guide?

23       A.   The price guide is what the supervisor provides

24  us with, which will have a breakdown of all the different

25  types of drugs and the typical price ranges for those

 1  drugs.

 2      Q.  Is this a document?

 3      A.  That's correct.

 4      Q.  How many pages is it?

 5      A.  I don't know how many pages it is.  I know that

 6  it's -- I believe it's about one page.

 7      Q.  Does it tell you prices by gram?

 8      A.  Yes, it does.

 9      Q.  What was the price by gram for heroin in 2018?

10      A.  Typically, it's between $100 and $300 per gram.

11      Q.  What was the typical price of crack in 2018?

12      A.  I can't say for sure.  I'm thinking $10 and up.

13      Q.  That's what the price guide --

14      A.  Based on the price guide -- I haven't looked at

15  it in a while, but the thing is that it depends on the

16  seller and the weight of the crack rock, but typically, it

17  could be from $10 on a scale range.  Crack is -- crack

18  rock is a little cheaper.

19      Q.  What about cocaine?

20      A.  Per gram, I can't tell you off the top of my

21  head.

22      Q.  So I think you just testified that Mr. Williams

23  told you that he was going to work off the remaining

24  amount of money to the -- that he would have owed to the

25  seller.

1    A.   Yeah, so he was pretty much putting an
2  impression to the seller that he'll work it off for him by
3  selling the rest at the motels on New Bern Avenue.

4    Q.   Mr. Williams told you this?

5    A.   Yes.

6    Q.   Did you document this anywhere?

7    A.   No.

8    Q.   When did he tell you this?

9    A.   I don't remember the exact date, but I know that
10 was when we were getting ready to do the operation because
11 I have to be able to sign out the amount of money because
12 we need to know how much we need for the buy.

13    Q.   So prior to this operation, did he tell you that
14 he was attempting to purchase 20 grams of heroin?

15    A.   I don't remember the exact amount.

16    Q.   Did he tell you it was a large amount?

17    A.   It was going to be a large -- large amount.

18    Q.   Do you know how he contacted Curtis Logan?

19    A.   I can't say how he contacted him, no.

20    Q.   Did you ever observe Dennis Williams contact any
21 of his targets?

22    A.   No.

23    Q.   You never observed Dennis Williams text message
24 any targets?

25    A.   I observed one case where he was on the phone, I

1  believe, with Keith Green and that case where they were

2  trying to -- the CI was trying to buy from the house, the

3  residence.  Keith Green was trying to get him to go to a

4  different location, and so it was pretty much back and

5  forth conversation on the phone between them.

6  　　　Q.　And that's the only interaction that you

7  observed between Mr. Williams and the target?

8  　　　　　MR. BENSON:  Objection.  You can answer.

9  　　　　　THE WITNESS:  To my knowledge, that and I think

10  the Messiah Howard and Blake Banks, I believe, where there

11  was a conversation.  To my knowledge, that's the best I

12  can remember.

13  　　　　　BY MR. SCHEWEL:

14  　　　Q.　And the Messiah Howard/Blake Banks incident, you

15  recall a conversation between Mr. Williams and one of

16  those two individuals on the phone?

17  　　　A.　Yes, because I believe that was -- I remember

18  the buy.  Messiah Howard was acting as a middle man

19  between the CI and the main target, which was Blake Banks.

20  　　　Q.　How did Mr. Williams procure his targets?

21  　　　A.　Procure, what do you mean?

22  　　　Q.　How did he identify the targets?

23  　　　A.　I don't know how he identified them.

24  　　　Q.　How would he tell you who the targets were?

25  　　　A.　He would just tell me he has a person he can buy

1  from, what it is. The thing is that, you know, if you're

2  living in that area, you know who's selling and who's not

3  selling, so it's pretty much who he comes across. That's

4  what I'm assuming.

5       Q.  Did you believe that these were friends of his?

6       A.  I don't know if they were friends or not.

7       Q.  Was it your practice to run background checks on

8  the individuals who he provided?

9       A.  If I can get a background check on him, I would,

10 depending on the phone number. Some phone numbers you're

11 able to, some you're not.

12      Q.  Okay. I'm going to read to you from Detective

13 Monroe's IA interview. This is at page 3, and Jason,

14 there should be a copy for you down at the end of the

15 table.

16           MR. BENTON:  Great. This is an exhibit?

17           MR. SCHEWEL:  This will be marked as Exhibit

18 LLL.

19           MS. POOLE:  Abe, did you say which date?

20           MR. SCHEWEL:  Yeah. We're starting with

21 August 14th, 2020.

22           MR. BENTON:  Are you going to give him a copy?

23           MR. SCHEWEL:  Not unless there's an extra one

24 down there. I don't believe I have one.

25           MR. SCHEWEL:  Can we go off the record?

1          (Discussion held off the record.)

2          (Plaintiffs' Exhibit LLL was marked for

3    identification.)

4          BY MR. SCHEWEL:

5      Q.   Okay.  I am referencing Exhibit LLL, which is in

6    front of you right now.  This is dated Friday,

7    August 14th, 2020.  This is a telephone interview with

8    Detective Monroe related to the Internal Affairs

9    investigation related to you.  And I'm starting at page 3

10   of 7, which is Bates-stamped 6288, and I'm starting at the

11   bottom of the page with an answer from Detective Monroe.

12         "So that was done.  The purchase was done.  We

13   were given the order that it was completed from Detective

14   Abdullah and that suspect was taken into custody.  And

15   after he was taken into custody, you know, he was removed

16   from the scene.

17         "Later, after that, I was given the heroin by

18   Detective Abdullah, which he told me he recovered from CI

19   Aspirin in that case and he indicated that this was the

20   heroin that Aspirin had purchased from the individual that

21   was just taken into custody as part of that takedown."

22         We're now on page 4 of 7.

23         Question, "Okay."

24         Answer, "And immediately when the heroin was

25   handed to me, I immediately looked at the heroin and just

 1    based on my training experience was, I believed the heroin
 2    was counterfeit, immediately.  Soon as I saw it, I was
 3    like, 'That looks like brown sugar.'  I was like, 'We were
 4    ripped off.'"
 5            Do you recall Officer Monroe making these
 6    statements to you immediately after you handed him the
 7    alleged heroin?
 8        A.   No.  And I'm trying to figure out -- which case
 9    is this referencing?
10        Q.   This is referencing the Curtis Logan case that
11    we've been talking about.
12        A.   I don't remember him making that statement.
13        Q.   Did you observe the heroin in the Curtis Logan
14    case?
15        A.   I was -- on the advice of counsel, I choose not
16    to answer based on my Fifth Amendment rights.
17        Q.   Okay.  I'm going to keep reading from page 4 of
18    7 of Detective Monroe's Internal Affairs interview.
19            "Um, looked at it.  It was crystallized.  Did
20    not have any known markers or indicators that it was
21    heroin as far as a description and so forth, how it was
22    packaged and everything.  So I told Detective Abdullah
23    based on my own experience that the heroin was counterfeit
24    and that we had purchased counterfeit heroin. And then I
25    proceeded to use the heroin test kit to test the heroin,

1   the suspected heroin, which produced a negative result,

2   and at that time I told Detective Abdullah that the heroin

3   did not test -- that he should have it tested with CCBI

4   because it is not testing as heroin and does not appear to

5   be heroin."

6          Question, "And what was his response to that?"

7          Answer, "I believe he said, 'Okay,' just, just

8   that simple."

9          Do you recall this interaction?

10         MR. BENTON:  Objection.  You can answer.

11         THE WITNESS:  I don't recall him making that

12   type of a statement.  I recall him saying that the field

13   test came back negative and we should have it sent off to

14   be tested.  All the extra, I don't remember him ever

15   expressing that concern to me.

16         BY MR. SCHEWEL:

17    Q.  Did you share any of the concerns that he

18   expressed?

19    A.  From what was stated here, that wasn't stated to

20   me, so there was nothing for me to share.  This is new to

21   me.

22    Q.  Did you agree with the concerns that he

23   expressed?

24         MR. BENTON:  Objection, asked and answered.

25         THE WITNESS:  I don't agree with what he's

1    saying because that's not what he said to me.  I don't

2    agree with that.  He's saying some -- two different

3    things.

4              BY MR. SCHEWEL:

5        Q.   Did you consider charging Mr. Logan with selling

6    fake narcotics?

7        A.   On the advice of counsel, I choose not to answer

8    based on my Fifth Amendment rights.

9        Q.   Do you recall other occasions where any other

10   detectives in the vice unit field tested narcotics

11   provided by Aspirin?

12       A.   I was told by Rattelade in the VanIrvin case.  I

13   didn't see one done.

14       Q.   Any other occasions?

15       A.   To my knowledge, that's all I can think of.

16       Q.   Do you recall any occasions where officers in

17   the vice unit told you that the narcotics provided by

18   Dennis Williams appeared to be fake?

19       A.   No, I don't recall that exact terminology being

20   used.

21       Q.   Do you recall any other terminology being used?

22       A.   Not to my knowledge.  Like I said, this is --

23   I'm trying to -- from what I read is different from what I

24   remember during that time.  Like I said, it's different

25   from what was said then.

1      Q.    Yeah, sure.  My question, just to be clear, is

2   not what you've read.  My question is, do you recall

3   officers ever telling you that the heroin did not appear

4   to be heroin?

5      A.    From what -- from what I remember was that

6   Rattelade saying that the heroin didn't test -- didn't

7   come back positive from the field test.  It came back

8   negative, and that you needed to send it off and get

9   tested.  Well, not "you."  Excuse me.  He's saying it

10  would need to get sent off to be tested for further

11  analysis.

12          I remember -- I believe it was Gwinn that made a

13  comment.  It was almost kind of like a joking type of

14  comment where he was saying, "It looks kind of like brown

15  sugar."  I mean, I don't know if you're asking or you're

16  telling me, so --

17     Q.    When was that?

18     A.    On the grounds -- on the advice of my counsel, I

19  choose not to answer based on my Fifth Amendment rights.

20     Q.    Did you ever think that the heroin provided by

21  Dennis Williams looked like brown sugar?

22     A.    No, because in different cases, the substances

23  weren't the same color.

24     Q.    I don't -- can you describe that?

25     A.    It would have a white appearance.  Heroin comes

 1  in different colors.  It doesn't come in just one
 2  particular color.
 3      Q.   My question is, did you ever think that the
 4  heroin provided by Dennis Williams looked like brown
 5  sugar?
 6      A.   It didn't appear to me that it was just like
 7  brown sugar.
 8      Q.   So the answer is no?
 9      A.   No.
10      Q.   Did it ever appear to you to look like anything
11  other than heroin?
12      A.   It appeared to me that it looked like heroin.
13      Q.   Did you receive classroom training on narcotics?
14      A.   Yes, I did.
15      Q.   On identifying narcotics?
16      A.   Discussed main topics, so it's hard to say.
17  It's been a while since I took that class, but it covered
18  a lot of areas.
19      Q.   Did you have a field training officer in the
20  vice unit?
21      A.   Yes, I did.
22      Q.   Who was your field training officer?
23      A.   David Nance.
24      Q.   Did Officer Nance provide you with any field
25  training or give you any experience on identifying

1  narcotics?

2      A.    I don't remember about field training and

3  identifying narcotics.  I remember him, you know, doing

4  some of his cases and a recovery was made for cocaine, and

5  you're pretty much watching how the process of the buy

6  took place.

7      Q.    Did you ever recover heroin during your field

8  training with Officer Nance?

9      A.    No.

10     Q.    Did you ever recover any heroin prior to using

11 Dennis Williams?

12     A.    No.

13     Q.    Had you ever seen heroin prior to using Dennis

14 Williams?

15     A.    Not on patrol.  On other individuals' cases, I

16 think they had some heroin cases.  I didn't work closely

17 with their investigation, with whoever their target was

18 and what they were actually buying.

19     Q.    So the first time you had ever worked closely

20 with or seen heroin up close was the first purchase made

21 by Dennis Williams of alleged heroin?

22     A.    To my knowledge, I believe so.  With me handling

23 a heroin case, that would be my first.

24     Q.    To your knowledge, did other officers in the

25 vice unit have experience handling heroin cases?

 1      A.   I don't know what their experiences were.

 2      Q.   Who was the most experienced officer in the vice

 3 unit?

 4      A.   Well, when I was being trained -- when Nance was

 5 still there, Nance was the most experienced.

 6      Q.   What about after Nance left?

 7      A.   I don't know how much time.  It would be

 8 Rattelade and Monroe.  I don't know what their experience

 9 level was.

10      Q.   At the time Nance left -- well, strike that.

11 When you joined the vice unit, was it fair to say that you

12 were the least experienced officer?

13      A.   Yes.

14      Q.   And it's fair to say that Detectives Rattelade

15 and Monroe were more experienced than you?

16      A.   Yes, that's correct.

17      Q.   And so when they told you that it did not appear

18 to be heroin, why did you not believe them?

19      A.   I went based on the training I received.

20      Q.   Which --

21      A.   And the training I received was based on the

22 fact that -- with the field test.  That's what I went,

23 based on that.

24      Q.   Did you receive training in the cost of

25 narcotics?

1    A.    I wouldn't say about the cost.  The training I

2  received covered, like I said, a lot of different topics,

3  a lot of different drugs, but cost wise, I don't know if

4  cost was mentioned.  I just know that we were given a

5  price guide of the different costs of narcotics by our

6  supervisor.

7    Q.    Were you trained in submitting narcotics to the

8  CCBI lab for testing and how to do that?

9    A.    I observed Nance showing me some of the lab

10  reports that they do when they submit the work.

11    Q.    Did he show you how to submit lab reports to the

12  CCI [sic] or did he show you how to submit drugs to be

13  tested by the CCBI lab?

14    A.    I don't remember how.  I just know that when we

15  got there, myself and Privette, you're pretty much -- you

16  know, you start off handling the evidence for them and

17  you're just, you know, pretty much submitting the

18  paperwork and they're telling you what they would submit

19  in this case, and you're watching them.  You're pretty

20  much learning by visual.

21    Q.    In 2018 and 2019, were you aware of how to

22  submit drugs to the CCBI lab for testing?

23    A.    Eventually, you become more familiar with doing

24  the paperwork and how to do it.

25    Q.    And what was that process?

1     A.   Typically, you would get prompted by a DA's

2   office to submit the paperwork.

3     Q.   Is this Markita?

4     A.   Markita worked in the evidence department.

5     Q.   Of RPD?

6     A.   Yes.

7     Q.   And so how would that process work?

8     A.   I would get a e-mail stating to submit evidence

9   in reference to this case number.

10    Q.   And who would the e-mail be from?

11    A.   District attorney's office to her, then to me.

12    Q.   Okay.  So they would send an e-mail to Markita?

13    A.   Uh-huh.

14    Q.   And then Markita would send an e-mail to you?

15    A.   That's correct.

16    Q.   Would you ever submit drugs to the CCBI lab

17  without receiving an e-mail from the DA's office?

18    A.   Each detective is different.  They -- were there

19  times when it has been done?  Yes, there has been times.

20  You may have another detective who would direct you to do

21  it.

22    Q.   I'm just asking about you, personally.

23    A.   Specifically, my practice was to wait for -- to

24  be prompted by the DA's office.

25    Q.   In the Curtis Logan case, did you wait until you

 1    received an e-mail from the DA's office until you

 2    submitted the CCBI labs?

 3         A.   No.  I remember Monroe told me to send the lab

 4    results -- to send the request off for the drugs and

 5    testing it, and I -- that's what I did.

 6         Q.   Was Monroe your supervisor?

 7         A.   No, Sergeant Rolfe is.

 8         Q.   But you still followed Officer Monroe's

 9    instructions?

10         A.   I followed what he told me to do on that.

11         Q.   Was that because he was more experienced than

12    you?

13         A.   No.  It was just -- he was saying to send it

14    off, and that's what I did.

15         Q.   So in that instance, you did not wait for an

16    e-mail notification from the district attorney's office?

17         A.   That's correct.

18         Q.   You did it on your own initiative?

19         A.   I did it based on what he told me to do.

20         Q.   Were you trained in how to obtain the results of

21    drugs sent to the CCBI lab?

22         A.   I don't understand your question.

23         Q.   So after the drugs are sent to the CCBI lab to

24    be analyzed, there are results that are provided back to

25    the Raleigh Police Department that says whether or not

 1    they're positive or negative, right?

 2         A.   I believe so, yes.

 3         Q.   Okay.  Were you trained on how to find out what

 4    the results were of the CCBI lab testing?

 5         A.   I don't remember being trained on how to do

 6    that.

 7         Q.   In 2018 and 2019, did you know how to do that?

 8         A.   I remember asking how to do that, but I wasn't

 9    trained on it, to my knowledge.  I don't remember being

10    trained.

11         Q.   Who did you ask?

12         A.   I asked Rattelade.

13         Q.   And did Rattelade tell you how to do it?

14         A.   Yes, he did.

15         Q.   And what year was this?

16         A.   I don't remember the year.

17         Q.   And what did Rattelade say to do?

18         A.   He was saying that you had to go on to Pol Share

19    and then you would have to go through individual files to

20    get to the particular file that you're looking for, and

21    then you would have to scroll down and find the case

22    number.

23         Q.   Did you ever do that?

24         A.   When he was telling me how to do it.

25         Q.   Did you do that in cases involving Dennis

1    Williams?

2         A.    On the advice of counsel, I choose not to answer

3    based on my Fifth Amendment rights.

4         Q.    Do you want to take a break?

5              MR. BENTON:  Let's do it.

6              (Luncheon recess from 1:31 p.m. to 2:20 p.m.)

7              BY MR. SCHEWEL:

8         Q.    Good afternoon.

9         A.    Good afternoon.

10        Q.    Do you have any -- do you currently have any

11   medical conditions?

12        A.    Yes, I do.

13        Q.    What are they?

14        A.    Deep vein thrombosis and pulmonary embolism.

15        Q.    When did you develop deep vein thrombosis?

16        A.    I can't say, the top of my head.  I want to say

17   back in 2014.  I'm not sure the exact date.

18        Q.    And how about the pulmonary embolism?

19        A.    It was the same time.

20        Q.    Any other medical conditions?

21        A.    Not that I'm aware of.  That's the only things

22   I've been diagnosed for that I take medication for.

23        Q.    And are you on any medication today?

24        A.    Blood thinners.

25        Q.    Any other medication?

1      A.   No.

2      Q.   And have you taken any drugs in the last 24

3  hours?  And by "drugs," I mean illegal drugs.

4      A.   No, I don't take any drugs.

5      Q.   Have you consumed any alcohol in the last 24

6  hours?

7      A.   I've never drank before.

8      Q.   You mentioned use of your personal phone before

9  the break.  Do you have the same personal phone that you

10  were using in 2018 and 2019?

11      A.   No.

12      Q.   Did you keep that phone?

13      A.   No.  You have to turn it back in to who your

14  cellphone carrier is.

15      Q.   Okay.  Have you attempted to preserve any of

16  your text messages from your personal phone at that time

17  period?

18      A.   Whatever my attorney told me to preserve, I

19  preserved.

20      Q.   So my question is, the phone that you were using

21  in 2018 and 2019, you testified that you on occasion would

22  text other vice team members from your personal phone.

23  Did you preserve those text messages?

24      A.   I'm not sure.  Everything should be backed up in

25  the cloud.

1    Q.   Okay.  Do you have access to the cloud?

2    A.   I have access to the cloud, yes.

3    Q.   And have you reviewed the cloud recently?

4    A.   No, I haven't.

5    Q.   When was the last time you reviewed it?

6    A.   I don't know the last time I reviewed it.  I

7  can't say approximate date and time.

8    Q.   Did you review it to preserve records for this

9  case?

10   A.   Yes.

11   Q.   So Dennis Williams was recruited in August of

12  2018, right?

13   A.   I'm not sure of the exact date.

14   Q.   Okay.

15   A.   Recruited, I wouldn't use that word "recruited."

16   Q.   What word would you use?

17   A.   Pretty much it happened from a takedown to where

18  he agreed to cooperate.

19   Q.   And that was in the fall of 2018?

20   A.   I don't know the exact date.

21   Q.   Was it in 2018?

22   A.   I can't tell you off the top of my head.

23   Q.   Okay.  Well, he agreed to cooperate after he

24  sold aspirin to a confidential informant?

25   A.   He sold what was supposed to be either oxycodone

1    or whatever it was that the CI was purchasing from him and

2    it was later discovered to be aspirin.

3         Q.    And so you code named him Aspirin?

4         A.    That's correct.

5         Q.    Because he had sold aspirin?

6         A.    Yes.

7         Q.    Claiming it to be narcotics?

8         A.    That's correct.

9         Q.    Who came up with that name?

10        A.    That was a name I came up with, I believe.

11        Q.    Do you recall controlled buys made from an

12   individual named Mario King?

13        A.    I recall buys from Mario King, yes.

14        Q.    Do you recall whether Mr. Williams covered his

15   buy camera during these alleged buys?

16        A.    I don't remember that.

17        Q.    Do you recall whether video of these alleged

18   buys was obstructed?

19        A.    Not to my knowledge.  I don't remember that.  I

20   remember I was able to get a picture of Mario King on one

21   of the buy videos.

22        Q.    So you have a picture of Mario King?

23        A.    On one of the buy videos, I was able to get a

24   picture of him.

25        Q.    And did you place that picture in the file?

1    A.   I don't know if it was in a file or not.  I'm

2  not sure.  It's been a while.  I can't say for sure.

3    Q.   Do you have that picture in your custody?

4    A.   I would have to check.

5    Q.   Did you ever see a hand-to-hand transaction on

6  any of the buys involving Dennis Williams?

7    A.   From the video of this, you could see what

8  appeared to be a transaction taking place.  You're not

9  going to actually see the hand where the product is in

10 making exchange.  You don't really see that based on where

11 the view of the camera is.

12   Q.   Which transaction did you observe that?

13   A.   Observe what, exactly?

14   Q.   What you just described.

15   A.   I'm saying you observe something taking place,

16 which, you know, to your belief, the transaction would

17 occur.

18   Q.   So tell me one instance.

19   A.   One instance would be Demorris Meeks.

20   Q.   So in the Demorris Meeks buy video, your

21 testimony is that you could tell from the video that a

22 hand-to-hand transaction had occurred?

23   A.   Yeah, because that one was inside the bathroom.

24 You don't see -- you don't physically see, from what I'm

25 trying to remember back to that date, that the

1  hand-to-hand takes place, but you could see that the

2  transaction happens and it concludes.

3       Q.   Describe for me what you could see on the video.

4       A.   They're inside the bathroom.  The individual is

5  talking to the CI.  He's looking down.  They're having

6  just general talk.  I remember the CI saying to him, "Why

7  don't you wipe your nose."  He was bleeding from the nose,

8  the defendant, in the video.  He had made a comment that

9  he had been sniffing cocaine all night or something to

10 that effect.  And then he -- it appeared that -- you could

11 see some type of movement to where an exchange took place

12 from the video that I saw.

13      Q.   Could you see Demorris Meeks' face on the video?

14      A.   The video -- you could see his face.

15      Q.   And you said that you could see some sort of

16 movement taking place?

17      A.   Yes, because it's from the chest up, so you're

18 not seeing anything from the chest down.

19      Q.   What kind of movement did you see?

20      A.   Just kind of like the -- you know, it's hard to

21 say.  Your shoulders or your body moving, but you can't

22 see from the chest down because the button camera is

23 sitting right on your chest, so it's only covering you

24 from chest up.  That's it.  It's not covering what's down

25 below your chest level, the button, or the view of the

 1    camera.

 2         Q.   Did you see any money exchanged on the video?

 3         A.   I don't remember seeing money exchanged.

 4         Q.   Did you see any drugs exchanged on the video?

 5         A.   I don't remember seeing the exchange, but the

 6    fact that you have reason to believe that an exchange took

 7    place because if there wasn't an exchange, there would

 8    have been a commotion.

 9         Q.   But the answer to whether you observed any drugs

10    exchanged is no?

11         A.   No.

12         Q.   Other than the Demorris Meeks buy camera video,

13    are there any other buy camera videos involving Dennis

14    Williams where you observed the transaction occur?

15         A.   What I can remember, I want to say the Jordan

16    Miles case.  He had to get a supplier to bring the drugs,

17    and this was on Raleigh Boulevard in the -- not Raleigh.

18    Yeah, it is Raleigh Boulevard where the Food Lion is in

19    the strip mall area, and he's -- the guy pulls in, backs

20    into the parking spot.  The CI is standing on the

21    passenger side.  The supplier is in the driver's seat.

22    Jordan Miles was right by the CI, and I can't remember

23    if -- because I'm sitting in the parking lot, like several

24    places over, looking through my window, watching, as well.

25    I can't remember if the CI gave it to Jordan Miles and

1    then Miles gave it to the supplier, but the money was

2    exchanged.  As the guy was counting the money, the CI

3    walked off and then he made the comment to grab him.

4         Q.   So did you observe this physically, as you were

5    sitting there, or did you observe this on video?

6         A.   Pretty much both, because I'm looking and

7    watching at the same time.

8         Q.   Okay.  So your testimony is that the

9    surveillance video showed Dennis Williams hand cash to

10   Jordan Miles?

11        A.   I'm trying to remember the fact that -- because

12   I was -- I also had a good view as well, and so you could

13   see that an exchange does take place, because I remember

14   when the CI walked off, the guy yelled to grab him and the

15   CI took off running, and then they were chasing in the

16   parking lot.

17        Q.   Okay.  Any other instances where you recall

18   being able to see a transaction occur on the video?

19        A.   I want to say we did a 220 Bladen, B-l-a-d-e-n,

20   Street, where you could -- a transaction was done and that

21   was for marijuana.  I don't remember the individual's name

22   in that case, but it was a video where you could see a buy

23   take place.

24        Q.   And you believe this involved Dennis Williams?

25        A.   That's correct.  He was the CI in that.

1    Q.   And you don't remember the name of the suspect
2  or the defendant?
3    A.   No, I don't.
4    Q.   Okay.  Any other instances?
5    A.   Not off the top of my head, no.
6    Q.   Did you ever conduct a qualifying buy with
7  Dennis Williams?
8    A.   Yes, we did.
9    Q.   When did this occur?
10   A.   This occurred when we first had signed him up.
11 Myself and David Nance was there.  We did a qualifying
12 buy.  I don't remember the name of the defendant.  That
13 was for crack cocaine, I believe.
14   Q.   And did you charge the person who made the sale
15 to Williams?
16   A.   After other buys that we did; the qualifying
17 buy, we did not.
18   Q.   So you charged him down the road?
19   A.   Down the road, he got charged.
20   Q.   And you don't recall the name of this
21 individual?
22   A.   No, I don't, not off the top of my head.
23   Q.   Do you think it's Antoine Haywood?
24   A.   I would have to see the report.  I can't say for
25 sure what the name of the individual --

1    Q.   But the qualifying buy was the first buy you

2    ever made with Dennis Williams?

3    A.   The qualifying buy would be the first one to

4    establish his reliability.

5    Q.   Which was the first one you ever made with that

6    CI?

7    A.   That's correct.

8    Q.   Was it your practice to search Mr. Williams

9    prior to controlled buys?

10   A.   Yes.

11   Q.   How would you search him?

12   A.   Based on the way I was trained, it was a pat

13   down, as I recall, and I will take a step further to also

14   have him to flip his pockets inside out.

15   Q.   Did you ever find any contraband on his person

16   when you were searching him?

17   A.   No.

18   Q.   Was it your practice to search Mr. Williams

19   after a controlled buy?

20   A.   Based on the way I was trained was to search him

21   before and after.

22   Q.   So was it your practice to search Mr. Williams

23   after a controlled buy?

24   A.   I would search him after.

25   Q.   And was that the same search?

1      A.    What do you mean, the same search?

2      Q.    As prior.  Did you conduct the same search after

3   the controlled buy as you described to conducting prior to

4   the controlled buy?

5      A.    I would do the same thing again.

6      Q.    Did you ever meet with Dennis Williams alone?

7      A.    I wouldn't say meet.  Dennis Williams didn't

8   have a vehicle, so the only way he can get to the buy

9   location, I would go pick him up and then bring him to our

10  staging area.

11     Q.    So you would pick him up by yourself?

12     A.    Yes, I would pick up by myself sometimes.

13  Sometimes it might be SEU if we were doing a takedown.

14     Q.    Did you ever meet with Dennis Williams'

15  girlfriend?

16     A.    I never met with her, his girlfriend, alone.  Is

17  that what you're saying?

18     Q.    No.  I'm just asking if you ever met with his

19  girlfriend.

20     A.    Met, like how?

21     Q.    Did you ever talk to her?

22     A.    I've talked to her, yes, in the past.

23     Q.    Did you talk to her at her home?

24     A.    I don't believe I ever talked to her at her

25  home, no.

1      Q.   Did you ever talk to her outside of her home?

2      A.   Outside of her house?

3      Q.   Yes.

4      A.   In person?

5      Q.   Yes.

6      A.   I don't believe I ever talked to her outside in

7 person, outside of her home.

8      Q.   Where did you talk to her?

9      A.   I really didn't talk to her.  Now, the thing is

10 that if she was with Dennis, especially in the beginning,

11 she had drove a vehicle for him.  I was speaking to

12 Dennis; she'd be in the car.  Other times, she had

13 communicated looking for Dennis, sending me text messages,

14 but I never personally would just meet with her to meet

15 with her, no.

16      Q.   So was she driving Dennis Williams to his

17 controlled buys?

18      A.   In the beginning, she drove maybe one time.  I

19 don't remember that case, but that wasn't something that

20 was done regularly.

21      Q.   Was she signed up as a CI?

22      A.   She was not signed up as a CI.

23      Q.   Did you ever run a background check on her?

24      A.   I don't remember running a background check on

25 her.

1      Q.   Did you ever vet her as a CI would have been

2   vetted?

3      A.   No.  We didn't try to sign her up as a CI.

4      Q.   Did she ever ask you for money?

5      A.   She never asked me for money.

6      Q.   Did you ever provide buy money to Williams

7   alone?

8      A.   Provide buy money in terms of like what?

9      Q.   Okay.  So when you're doing a controlled buy,

10  you have to get buy money from Sergeant Rolfe, right?

11     A.   Okay.

12     Q.   Is that a yes?

13     A.   You're not providing buy money, no.  If you're

14  doing an operation and you have to have buy money for

15  whatever the amount is, and that's what you signed out,

16  that's what you get him to use for that purpose.  I didn't

17  just give him buy money just to give him buy money, no.

18     Q.   I understand that.  My question is, after you

19  got the buy money from Sergeant Rolfe, you would have to

20  then provide it to Dennis Williams, right?

21     A.   Depending on the operation.

22     Q.   Okay.  And in the instances where you provided

23  it to him, did you ever provide it to him alone with him,

24  with no other officers present?

25     A.   That's what I'm saying.  The way you're saying

 1    it -- now, if we're doing an operation, there would be

 2    other officers around, especially because I would search

 3    him, put the equipment on him, then I would give him the

 4    buy money.

 5        Q.   So the answer is no?

 6        A.   Well, no.  You had other officers around, but

 7    that's what I'm saying.  If I was paying him, you know,

 8    that's something else.

 9        Q.   Okay.  So I'm first talking about buy money.

10        A.   Okay.

11        Q.   So I just want to be clear that the question is

12    with buy money.  Did you ever provide buy money to Dennis

13    Williams when it was only you and Dennis Williams present?

14        A.   It wasn't only me and him present, so on the

15    practice, there would be other officers around.

16        Q.   I'm not asking about a practice.  I'm asking

17    about did you ever provide buy money to Dennis Williams

18    with only you and him present?

19        A.   No.  That's what I'm saying.  From a practice,

20    there would be other officers around.  Whatever they're

21    doing, I don't know because when I would hand over the buy

22    money, it would be at a staging location.  So if there is

23    a situation where we're extremely busy and we have a lot

24    of buys lined up, and that's on a rare occasion, I'll have

25    to provide buy money by ourself, but on a practice, there

 1   was always an officer around or other officers, excuse me,

 2   around.

 3        Q.   Okay.  So you're saying it is possible that you

 4   provided buy money to Dennis Williams with only you and

 5   him present?

 6        A.   On a rare occasion.  That wasn't a common

 7   practice.

 8        Q.   Okay.  Did you ever pay Dennis Williams with

 9   only you and him present?

10        A.   Yes.

11        Q.   Did that occur every time you paid him?

12        A.   Whenever -- especially if he did an operation

13   and we'd come back to the station.  I can't stop what I'm

14   doing to drive him home, so I'll go in.  Sergeant Rolfe

15   would say, you know, "Go ahead and just pay him and cut

16   him loose," and I will pay him and have him sign the

17   receipt.  But, usually, he will wait in the car sometimes

18   because he doesn't have a ride back.  If he doesn't have a

19   ride back or some other way to get -- he would have to

20   wait for me because I have to still search and interview

21   whoever is arrested.

22        Q.   And so where would you be located, typically,

23   when you paid Mr. Williams?

24        A.   A lot of times would be at the station.

25        Q.   And so you all would be in a room by yourselves?

1      A.   Be out in the back parking lot.

2      Q.   Okay.  So you'd be in the back parking lot and

3  you'd pay him the money in the parking lot?

4      A.   In my car, that's correct.

5      Q.   In your car?

6      A.   Uh-huh.

7      Q.   I'm going to show you what's previously been

8  marked as Exhibit ZZ.  Actually, I'm going to read from

9  the document first.  It says, "Receipt of Informant Funds,

10 May 20th, 2020."  It's signed by requesting officer, which

11 appears to be your signature, the authorizing supervisor,

12 which says Sergeant W.S. Rolfe.

13           And the brief summary of the transaction says,

14 "CI payment for the purchase of an amount of heroin.

15 Future charges will be sworn out at a later date on the

16 target of this investigation."

17           And --

18           MR. KIBLER:  CZ?

19           MR. SCHEWEL:  It's ZZ.  The Bates stamp is 172,

20 and I'm going into 173.  It's from the second CPO.

21           MR. BENTON:  Abe, I just want to be clear. You

22 previously marked a document Exhibit ZZ.  Did you change

23 this marking to ZZZ?

24           MR. SCHEWEL:  No, no.  So for clarity, ZZ is the

25 entire case jacket involving Marcus VanIrvin, so all of

```
 1   these documents are from Marcus VanIrvin's case jacket.
 2   They're all ZZ.
 3            MR. BENTON:  So you're pulling out documents
 4   from a larger exhibit known as ZZ?
 5            MR. SCHEWEL:  Exactly.
 6            BY MR. SCHEWEL:
 7       Q.  So I'm going to hand you now what's
 8   Bates-stamped 172 and 173 from ZZ and let you look at
 9   these documents.
10       A.  Okay.
11            MS. LIGUORI:  Abe, did you give us copies of
12   those?
13            MR. SCHEWEL:  No.  They were from the last
14   deposition.
15            BY MR. SCHEWEL:
16       Q.  Okay.  So the first sheet, 172, this is a
17   Receipt of Informant Funds sheet; is that right?
18       A.  Receipt of Informant Funds.  It says "Receipt of
19   Informant Funds," yes.
20       Q.  Okay.  And the date is May 20th, 2020?
21       A.  Yes, I believe so.  It has a number scribbled in
22   there in the upper left-hand corner, I believe.
23       Q.  Does it look like May 20th?
24       A.  Possibly, yes.
25       Q.  Okay.  And at the bottom, it says, "Signature of
```

 1    Requesting Officer."  Is that your signature?

 2         A.   That is my signature.

 3         Q.   And then it says "Signature of Authorizing

 4    Supervisor."  Is that Sergeant Rolfe's signature?

 5         A.   Yes, it is.

 6         Q.   And it says, in the brief summary of

 7    transaction, "CI payment for the purchase of an amount of

 8    heroin."

 9         A.   That's correct.

10         Q.   Do you recall -- strike that.  Do you recognize

11    this document?

12         A.   Yes, I recognize this document.

13         Q.   Do you recall receiving CI payment money on this

14    date?

15         A.   I believe so.

16         Q.   Okay.  I'm going to ask you to turn to the next

17    page.

18         A.   Okay.

19         Q.   And this document says, "Receipt of Informant

20    Funds;" is that correct?

21         A.   That's correct.

22         Q.   And the informant code name is Aspirin?

23         A.   Yes.

24         Q.   And it's signed by Aspirin?

25         A.   It would be the signature.  I'm not sure if that

1   was signed.

2        Q.   Do you think that was written by you?

3        A.   I don't know.  I don't remember.

4        Q.   Okay.  Well, it says "Signature" on it.

5        A.   Yeah, I see that.

6        Q.   But you're saying it's possible that it was not

7   signed by Aspirin?

8        A.   I don't know.

9        Q.   And was it your practice to fill these documents

10  out on your own?

11       A.   You fill the documents out, the requesting

12  detective.  The requesting detective would fill the

13  document out, whoever was requesting the funds.

14       Q.   Okay.  So in this instance, you were requesting

15  the funds, so you would have filled this sheet out?

16       A.   That's correct.

17       Q.   Was it your practice to sign for Aspirin?

18       A.   That's not my practice, no.

19       Q.   Is it possible that on this date, you signed for

20  Aspirin?

21       A.   I can't say for sure.

22       Q.   It says, "Witness 1 --

23       A.   Yes.

24       Q.   -- Abdullah."

25       A.   That's correct.

1      Q.   And that's you?

2      A.   That's correct.

3      Q.   And so you witnessed the payment to Aspirin on

4  this date?

5      A.   That is correct.

6      Q.   And "Witness 2," it says "Officer Rattelade"?

7      A.   That is correct.

8      Q.   Did Officer Rattelade witness the payment to

9  Aspirin on this date?

10     A.   I can't speak for Rattelade.  I believe he did.

11  That's his signature.

12     Q.   Well, earlier you said that it was your

13  practice, typically, to pay Aspirin by yourself in your

14  vehicle.

15     A.   I'll give him the money in the vehicle, yes.

16     Q.   Okay.  So if you were paying him by yourself in

17  your vehicle, how would Rattelade have witnessed it?

18     A.   Witnessed the buy take place.

19     Q.   So your testimony is that this sheet where it

20  says he's the witness, this is for witnessing the buy?

21     A.   Yeah, that's the thing, so even though I may pay

22  the CI by myself, if you help me in the buy, you can

23  witness it as well.

24     Q.   So you don't think this sheet is supposed to be

25  witnessing payment?

1    A.   What I'm saying is I'm not sure if the date is

2  off, but that's -- that's what I'm looking at.

3    Q.   So do you recall if on May 21st, 2020, you paid

4  Aspirin by yourself in your car?

5    A.   I paid him afterwards, after we did the search,

6  when we were at the station.

7    Q.   In your car?

8    A.   Yes.

9    Q.   Was Rattelade in your car?

10   A.   He was not inside my car, but he was there with

11  the search warrant.

12   Q.   Okay.  I'm going to show you what is going to be

13  marked as MMM.

14        (Plaintiffs' Exhibit MMM was marked for

15  identification.)

16        BY MR. SCHEWEL:

17   Q.   I'm going to hand this to you, and this is the

18  Confidential Informant Log.  And, Jason, here is a copy

19  for you.

20        MR. BENTON:  Thank you.

21        BY MR. SCHEWEL:

22   Q.   Do you recognize this document?

23   A.   It looks familiar.

24   Q.   Did you create this document?

25   A.   Yes.

1      Q.   Why did you create this document?

2      A.   To log the CI's buys.

3      Q.   When was this document created?

4      A.   I don't know when.  Based on the date entered,

5   it has 8/16/18 for one of the buys.

6      Q.   Was this document created after you were placed

7   on administrative leave?

8      A.   No.

9      Q.   Okay.  I'm going to direct your attention to

10   8/22/18.

11      A.   Okay.

12      Q.   Do you recall a controlled buy made by Dennis

13   Williams from an individual named David Weaver?

14      A.   That's correct.

15      Q.   Do you recall a controlled buy from an

16   individual named Mario King that occurred 22 minutes prior

17   to the controlled buy from David Weaver?

18           MS. KIBLER:  Objection to the form of the

19   question.

20           MR. BENTON:  Same.  You can answer if you know.

21           THE WITNESS:  I don't know.

22           BY MR. SCHEWEL:

23      Q.   Okay.  I'm going to direct you to -- so this

24   document has a number of different columns.  One of the

25   columns says "Date."  Do you see that column?

 1      A.   That's correct.

 2      Q.   And one of the dates -- well, the first date

 3 says August 16th, 2018.  Do you see that?

 4      A.   Yes.

 5      Q.   And then in the second row, there's four

 6 separate dates.  Do you see that?

 7      A.   Yes.

 8      Q.   And on the second date, on the second row, it

 9 says "8/22/18."  Are you with me?

10      A.   Yes, I am.

11      Q.   Now, if you go over to the right, we're in the

12 column that says "Time," and it says, "Time, 22:06."

13      A.   22 or 20:06.

14      Q.   Sorry, 20:06.

15      A.   Okay.

16      Q.   Now, if you go down one row, it also says

17 "8/22/18" and it says "20:38."

18      A.   Okay.

19      Q.   Do you see that?

20      A.   Yes, I do.

21      Q.   So does that indicate that a buy occurred on

22 8/22/18 at 20:06, and then a second buy occurred on the

23 same date 22 minutes later?

24      A.   I don't know about that.

25           MR. BENTON:  Objection.  I think your math is

1    off.

2              BY MR. SCHEWEL:

3         Q.   Is it 32 minutes later?  Does it indicate that a

4    second buy occurred 32 minutes later?

5              MR. BENTON:  That's why you went to law school,

6    right?

7              THE WITNESS:  I don't remember that particular

8    day.  I'd like to see the case jacket to see exactly when

9    those buys actually occurred because it may be a mis- -- a

10   typo.  I don't know.

11             BY MR. SCHEWEL:

12        Q.   Okay.  Well, do you think it's possible that two

13   buys could have occurred from two separate individuals

14   within 32 minutes of each other?

15        A.   It's possible.  I don't know if that happened

16   that day.  I don't remember, but it's possible.

17        Q.   Would that be a common practice for buys to

18   occur directly after each other?

19        A.   We have done that as a unit, but different

20   detectives swapping out equipment, hand to other

21   detectives, and like I said before, we'll have buys lined

22   up and everybody is trying to get a buy done.

23        Q.   And is it -- is it common practice for that to

24   happen with the same CI?

25        A.   It depends on the operation.  I mean if you're

```
1    doing a -- because we have done operations before where we
2    had the same CI buy from several different locations,
3    Black Street, Martin Street, pretty much in the complaint
4    areas that we've gotten tips in and we'll send the same CI
5    to buy from all those different locations.
6         Q.   On the same date?
7         A.   On the same date.
8         Q.   Okay.  So it's -- and on those instances, you
9    send the CI out with two separate sets of buy money and
10   you say, "Go make two separate buys at two separate
11   locations"?
12        A.   Yeah.  You would have to separate the buy money
13   and set -- you would have to set your paperwork up where
14   that you're mix -- confusing them with the different
15   individuals.  So after each buy, you have to shut the
16   equipment off, restart, so they show a separation and
17   you're going to have your envelope evidence -- evidence
18   envelopes broke down a way where you're online with
19   whatever buys they're doing, multiple buys.
20        Q.   Do you recall a buy that occurred on
21   August 22nd, 2018, from David Weaver?
22        A.   I recall doing a buy from him, but I don't
23   remember the date.
24        Q.   Okay.  Did you observe this transaction?
25        A.   I don't recall.  From the video, I believe you
```

```
 1    could see something.  It's been a while.  I have not seen
 2    that video since, so I can't say for sure, but I remember
 3    we did a buy from David Weaver.
 4         Q.   Do you recall whether you could visibly observe
 5    it, not from the video?
 6         A.   I don't remember.
 7         Q.   Do you recall if you were in your vehicle
 8    conducting surveillance on that occasion?
 9         A.   Yes, with help from other detectives.  I'm
10    trying to think because I believe that David Nance was in
11    the car with me.  For that, yeah, they -- yes.
12         Q.   Was Officer Rolfe present for this surveillance?
13         A.   I don't remember, but I believe he may have
14    been, but I'm not -- I'm not positive.
15         Q.   Was Officer Gwinn present?
16         A.   He wasn't there then.
17         Q.   He wasn't there in 2018?
18         A.   He wasn't there in terms of -- he was promoted
19    later.  There had been other detectives before Gwinn came
20    on the unit, the same thing with Gay.
21         Q.   Was Monroe present?
22         A.   I believe he was present.
23         Q.   Was Officer Rattelade present?
24         A.   I believe he may have been present.
25         Q.   Were there any other officers present?
```

1     A.   I'm not sure.  I don't remember -- like I said,

2  I'm not sure because there was other detectives then, too,

3  so I don't know -- I don't remember when Privette left and

4  Ouellette came on.  I don't remember those exact dates.

5     Q.   Okay.  So on August 22nd, 2018, you allege that

6  David Weaver sold 2.85 grams of crack cocaine to Dennis

7  Williams, and you allege that he sold that for $40.  Do

8  you recall that?

9     A.   No, I don't recall that.

10     Q.   Do you think that that would be -- sorry, strike

11  that question.

12         Based on the price log that you were provided by

13  your supervisors, is 2.85 grams of crack cocaine -- is $40

14  what you would expect the price of that to be?

15     A.   It just depends on what the -- you can have a

16  price guide about -- the price guide gives you a range

17  what it could -- the street drug may go through for value,

18  but then you also have the individual seller, viewer, but

19  you also have a price that they may charge you for, so it

20  can be on a range.  It just depends on the seller.

21     Q.   So your answer is yes?

22     A.   Yes to what, exactly?

23     Q.   I mean, that seems like a reasonable price for

24  2.85 grams?

25     A.   It can.  I like to see the product because it's

1    been about three years.  I have not -- I don't remember

2    exactly what it looked like, what was purchased.

3         Q.   Are you saying that if it was a lower quality

4    product, potentially, it would cost less?

5         A.   No, it's a range.  Typically, crack cocaine per

6    gram or rock go from $10 on up, on a scale.  It could be

7    about right, but like I said, it depends on the seller,

8    too.

9         Q.   Why would you need to see the product?

10        A.   To think that that might be fair value, but like

11   I said, that might be my interpretation, but I'm not the

12   one selling it.  The seller can have another

13   interpretation of what they want to sell it for because,

14   ultimately, they're the ones that are going to charge the

15   price.

16        Q.   Do you remember the date that you started with

17   the vice unit?

18        A.   I don't remember the exact date.  I believe it

19   was sometime in 2017, I think.

20        Q.   When you returned to Green Dairy on August 22nd,

21   2018, did you re-watch the buy video of the alleged sale

22   to David Weaver?

23        A.   I will watch it while I'm burning the disk.

24   That's -- typically, I would be watching the video.

25        Q.   Do you recall doing that on this date?

1     A.   When I'm burning it, I'll be seeing the video

2  while I'm burning it.  I just don't remember the details

3  of the video.

4     Q.   I'm asking if you, as you sit here today, have a

5  recollection of re-watching the video on that date.

6     A.   I will watch the video when I'm burning it.

7     Q.   I'm not asking what your practice is.  I'm

8  asking if you remember actually re-watching it.

9     A.   That's what I'm saying to you.  I will watch it

10  when I'm burning the disk, but I don't remember the exact

11  details in the video, is what I'm telling you.

12     Q.   But you do remember burning it on that night and

13  re-watching it that night?

14     A.   When I'm burning the disk, I watch it after the

15  buy.

16     Q.   And you remember doing that in this case?

17     A.   I remember doing that.  I don't remember the

18  details in the buy video.

19     Q.   Okay.  Do you remember any other details that

20  Mr. Williams told you about the buy?

21     A.   No, I don't.

22     Q.   Do you remember how he identified Mr. Weaver?

23     A.   No, I don't remember the particulars on how he

24  identified Weaver as being a seller.

25     Q.   And based on this sale, you took out warrants

REED & ASSOCIATES
MATTHEWS, NORTH CAROLINA  980.339.3575
Case 5:22-cv-00068-BO  Document 203-5  Filed 03/31/23  Page 128 of 180

 1    for the arrest of David Weaver?

 2         A.   Based on the sale, we have probable cause to

 3    take out the warrants on him.

 4         Q.   Did you take out warrants on David Weaver?

 5         A.   Yes, I did.

 6         Q.   And I'm going down now to the next row, 8/23/18,

 7    and if you go to the synopsis of information, it states,

 8    "The CI located David Weaver in the area of East Martin

 9    Street."

10         A.   Okay.

11         Q.   So does that mean that Dennis Williams saw David

12    Weaver on East Martin Street and called you up and said,

13    "He's right over here"?

14         A.   So the context, we were doing a project for the

15    Martin Street area and adjoining areas around it, so the

16    CI, Dennis Williams, was on -- I don't remember if it was

17    a bike or a little moped riding around because all the

18    detectives were doing a case at once.

19              He saw David Weaver over in that area and called

20    me and told me about it.  SEU officers are the one that

21    made the stop on David Weaver and got him in custody, so

22    pretty much everybody had took out warrants on individuals

23    that their CIs purchased in that area and were doing a

24    sweep.  It was a joint effort.

25         Q.   Okay.  And during that sweep, Dennis Williams

1   was just riding around on a moped?

2       A.   He was riding around on a moped calling

3   individuals out because if he'd draw too much suspicion,

4   once he hit one dealer, everybody was going to run, so we

5   had to do it in a way where he will call them out.  We'll

6   try to pick up the dealer out of view so we can continue

7   to keep rounding up everybody that we had took warrants

8   out on.

9       Q.   Was he on a moped the day before?

10      A.   No.  I believe he was -- I'm not sure.  I think

11  he was on foot, but on this case, he was either on a moped

12  or like a little bicycle, whatever he was on, riding

13  around.

14      Q.   So the day prior, we know he made two buys.

15  After he made the first buy, did he get back in your

16  vehicle?

17      A.   For what?  Which date you talking about?

18      Q.   So I'm going back to August 22nd, 2018.

19      A.   Okay.

20      Q.   We know that he made a buy at 20:06, according

21  to this sheet.

22      A.   Oh, I haven't seen the report, so I don't know

23  that that time is correct.  I don't know.

24      Q.   Okay.  Well, do you recall if on that date when

25  he made the purchase from David Weaver and he made the

1   purchase prior, do you recall whether he got back into

2   your car in between those two purchases?

3       A.   I don't remember if there was two purchases, but

4   I remember he will get back into the vehicle.  Like I

5   said, I haven't seen the report, so I don't know if there

6   was two buys done in the same day or not.

7       Q.   But you're saying if you do conduct two buys,

8   it's your practice for him to get back in the vehicle

9   after the first buy?

10      A.   That's correct.

11      Q.   Okay.  So back to 8/23/18, Dennis Williams

12   called you and told you that he had observed David Weaver

13   in the area of East Martin Street; is that correct?

14      A.   I believe so.

15      Q.   And once he called you that, did you alert SEU?

16      A.   I'm trying to remember the details.  I'm not

17   positive.  I would need to see the report on that because

18   I'm getting my events mixed up, so I'm not quite positive

19   if I -- if I got a phone call or if I alerted them.  I'm

20   not sure.

21      Q.   Okay.  But you testified that SEU arrested

22   Mr. Weaver.

23      A.   They had detained him and arrested him at the

24   scene over on Martin Street because when I got there, he

25   was already in handcuffs.

1      Q.   Okay.  Did you observe SEU search Mr. Weaver?

2      A.   No, I didn't.

3      Q.   Is it SEU's standard practice to search someone

4   when they detain them?

5           MR. BENTON:  Objection.

6           MS. LIGUORI:  Objection.

7           MR. BENTON:  You can answer if you know.

8           THE WITNESS:  I can't speak to the practice of

9   SEU officers.  I don't know their practices. I'm not an

10  SEU officer.

11          BY MR. SCHEWEL:

12     Q.   Well, you've worked with SEU officers on many

13  occasions, right?

14     A.   I've worked with them, but I don't know their

15  practices in terms of what they do.

16     Q.   Is it your standard practice when you detain

17  someone to search them?

18     A.   You've got to be careful when you say "detain"

19  and "search" because if you're -- if you have someone to

20  arrest, you can search them, but there's a limited scope

21  about that type of search, so I don't want to say -- you

22  know, you detain someone, you could pat them down for a

23  belief of weapons, but you're not going to stick your

24  hands in their pockets, so --

25     Q.   Okay.  Did you observe Mr. Weaver in the custody

```
 1   of SEU officers?
 2        A.   When I got to the scene, he was in custody.
 3        Q.   Okay.  Did you recognize him?
 4        A.   I did recognize him.
 5        Q.   How?
 6        A.   Looking at his face.
 7        Q.   How did you know what he looked like?
 8        A.   CJLEADS, when they did the workup on him.
 9        Q.   How did you get his name?
10        A.   I don't remember how I got his name.  I have not
11   seen the report.  It's been about three years, so I can't
12   say the particulars behind it.
13        Q.   Okay.  But you know that you had done a CJLEADS
14   workup prior to his arrest?
15        A.   I believe so.
16        Q.   And so when you saw him, you said, "Oh, I know
17   that's him"?
18        A.   That's correct.
19        Q.   Okay.  Did you transport him from the scene to
20   Green Dairy?
21        A.   No.  It was by a patrol officer.
22        Q.   Do you know which patrol officer?
23        A.   No, I don't.
24        Q.   When you got back to Green Dairy, did you
25   interview Mr. Weaver?
```

1    A.   It wasn't at Greens Dairy.

2    Q.   Where was it?

3    A.   It was at the Southeast District, the old

4  Southeast District.

5    Q.   Why did you take him there?

6    A.   That's where we were meeting backup at, since it

7  was a joint effort and was closer to where we were at, so

8  that was the location that we went back to, and it's the

9  old Southeast station, not the new one.

10   Q.   Did you interview Mr. Weaver there?

11   A.   I attempted to try to interview him.

12   Q.   What happened?

13   A.   I believe he invoked his rights.  I'm not sure.

14   Q.   Did you ask him to become an informant?

15   A.   I tried to sign him up.

16   Q.   What did he say?

17   A.   He declined.

18   Q.   Did you have any other conversation with him in

19  addition to trying to get him to become an informant?

20   A.   Not to my knowledge.  I don't believe so.

21   Q.   Did you record any of this interaction?

22   A.   No.

23   Q.   After you attempted to sign him up and he

24  declined, what happened next?

25   A.   We finished the charges.  The evidence was

 1  packaged up and then took him to the -- had an officer
 2  transport him to jail and processed him.
 3      Q.   Do you recall strip searching him at the
 4  Southeast District?
 5      A.   That's correct.
 6      Q.   And was there another officer present with you
 7  during the strip search?
 8      A.   Yes.
 9      Q.   Do you recall the name of that officer?
10      A.   Taylor Leggett.
11      Q.   And was that strip search done inside of the
12  bathroom?
13      A.   It was done inside the men's bathroom.
14      Q.   And what happened during that strip search?
15      A.   An amount of crack cocaine was located in his
16  underwear.
17      Q.   Okay.  And how did you locate it in his
18  underwear?
19      A.   So we had to -- when we did the strip search,
20  Leggett was standing next to me.  He was facing -- he was
21  standing in front of the wall.  He had the chair beside
22  him and I would instruct him one piece of clothing at a
23  time to hand to -- to hand it over to me, but he was
24  handing it over to Leggett, and Leggett would search that
25  clothing until we got down to his underwear, and I

1    instructed him to hand over his underwear.

2          He handed his underwear over to Taylor Leggett

3    and Leggett was searching the underwear.  You could hear

4    something was in the underwear.

5       Q.   Okay.  So just so I'm clear, at the start of the

6    strip search, you instructed Mr. Weaver to hand each of

7    his pieces of clothing to Mr. Leggett?

8       A.   One at a time.

9       Q.   And each piece of clothing Mr. Leggett searched

10   through?

11      A.   That's correct.

12      Q.   And at some point, he handed Mr. Leggett his

13   underwear?

14      A.   Yes, he did.

15      Q.   And when he handed him the underwear, you could

16   hear something was in the underwear?

17      A.   You could hear something and he was fumbling

18   around with the underwear.

19      Q.   Mr. Leggett was?

20      A.   Yes.  And I told Leggett I could hear that

21   there's something there.  He said, "I know.  I'm

22   trying" -- he was saying, "I was trying to figure out how

23   to get to it."  And I didn't understand what he meant

24   because they were standing in front of a big mirror and a

25   sink, because he was placing the clothes on the sink as he

1    finished the clothing.

2            And he kind of ripped the underwear open to get

3    to it, and where it was located at was there was -- I

4    don't know if you're familiar with the old briefs that

5    they call tighty-whities, and the air vent where your

6    testicles will be to get air in, there was like a sock

7    sewn into the underwear, to where the crack cocaine was

8    inside the sock.  Then it was placed inside the air vent,

9    which will be open for your testicles to get air in.

10       Q.   And so Leggett was the one who ripped the

11   underwear open and located the crack cocaine?

12       A.   That's correct.

13       Q.   And what form was the crack cocaine in?

14       A.   It would be referred to as a cookie, is what

15   they would call it on the street, which is that the crack

16   cocaine had just been cooked and it hasn't been broken

17   down for sale yet.  So typically, when you're buying crack

18   cocaine, it would be in a nugget, like a rock, like they

19   call it, but it was one solid form.  So that's why you

20   refer to it as a cookie, because it hadn't been chopped

21   down yet to individually sell, so it looked like he had

22   just reupped or cooked it himself, one or the other.

23       Q.   When's the last time you spoke to Officer

24   Leggett?

25       A.   Probably that day after -- it's been a long

1    time.  I haven't spoken to him probably since that day.

2    He eventually left the department, him and Kay, to go into

3    a different venture in terms of selling homes or whatever

4    they're doing, but the last time I could think of when I

5    spoke to him was that day.

6         Q.   Have you spoken to him about this case?

7         A.   I don't know his number.  I haven't talked to

8    him.

9              MR. BENTON:  Are you talking about the Irving

10   case, Abe, or the Weaver case?

11             BY MR. SCHEWEL:

12        Q.   Good question.  Have you spoken to him about the

13   Irving case?

14        A.   No.

15        Q.   Have you spoken to him about the Weaver case?

16        A.   No.

17             MR. BENTON:  Let's take a break, please.

18             MR. SCHEWEL:  Okay.

19             (Recess from 3:20 p.m. to 3:31 p.m.)

20             BY MR. SCHEWEL:

21        Q.   Okay.  So earlier you testified that you located

22   crack cocaine inside of Mr. Weaver's underwear.

23             MR. BLANCHARD:  Objection.

24             BY MR. SCHEWEL:

25        Q.   Earlier you stated that Mr. Leggett located

 1    crack cocaine inside of Mr. Weaver's underwear.

 2         A.   That's correct.

 3         Q.   What type of bag was the crack cocaine located

 4    in?

 5         A.   I don't know off the top of my head.  I would

 6    have to see the case jacket for that.  It's been almost

 7    four years.

 8         Q.   And you stated that the crack cocaine was a

 9    cookie size or cookie shaped?

10              MR. BENTON:  Objection.  You can answer.

11              THE WITNESS:  It looked like a cookie.  What I

12    mean is like -- it's a circle, circular, almost kind of

13    like the form of a cookie.  It was just a solid form, one

14    solid form, so when they're selling you crack rocks on the

15    street, it will be individual rock shape type crack

16    cocaine.  Like he had in his underwear was one solid form.

17    It hadn't been broken down yet.

18              BY MR. SCHEWEL:

19         Q.   Would you say it was the size of a baseball?

20         A.   No, I wouldn't say it was the size of a

21    baseball.  I would say it's more like the shape and size

22    of a cookie.  And I'm from Nebraska, so if I tell you the

23    Cookie Company cookies, I don't know if it's going to

24    register to you, but a gas station cookie like the ones

25    that's in the plastic, that shape, so look more like that.

1    Q.   Okay.  And was it -- how about its width?  Are

2    you saying it was essentially thin, like a cookie?

3    A.   Probably like -- maybe like this (indicating),

4    to my knowledge.

5    Q.   Okay.  But it was -- and how many inches wide

6    would you say it was?

7    A.   I couldn't say off the top of my head.  I can't

8    say off the top of my head how the measurements would be.

9    The same -- is there something I could draw with?

10   Q.   Sure.  Let's give you a sheet of paper.  Why

11   don't you draw for us what it looked like.

12   A.   To the best of my knowledge, I don't remember if

13   it was -- because it was kind of jagged.

14   Q.   Now, is that to scale?

15   A.   It's not to scale.

16   Q.   Can you draw it to scale, please, below that?

17   A.   I couldn't do that.

18        MR. BENTON:  Are you able to do it?

19        THE WITNESS:  No.  That's -- I can't draw it to

20   scale, but I remember it was kind of jagged.  I don't know

21   if it was, you know, rectangle shaped more than the oval

22   shape.  I don't know.  From what I remember, it was that

23   solid form.  And when they got it into a solid form, they

24   refer to that as a cookie.

25        BY MR. SCHEWEL:

1    Q.   Was it bigger than that?

2    A.   Oh, it was way bigger than that.

3    Q.   Okay.  Was it bigger than that sheet of paper?

4    A.   It was about the size of -- in your hand, that

5  you could hold it in.  I've got kind of big hands, but it

6  could fit in your hand.  It was -- it's hard to say

7  without seeing the case jacket and looking at -- without

8  looking at the product, I can't say off the top of my head

9  because it's been so long.

10   Q.   Okay.  Did you locate any other contraband on

11 Mr. Weaver?

12   A.   Me, personally, or the officers at the scene?

13   Q.   During your strip search at the Southeast

14 Station, did you locate any contraband?

15   A.   The crack cocaine, I remember, is what we

16 located on him.  I don't know if there was any others

17 without seeing the case jacket.  What I recall was

18 discovering the crack cocaine during the strip search.

19   Q.   Did you recover marijuana on him during the

20 strip search?

21   A.   I don't know.  I don't remember.  I'd like to

22 see the case jacket for that.

23   Q.   And was the crack cocaine sewn into Mr. Weaver's

24 underwear?

25   A.   From what I believe, the crack cocaine was

1  inside like a sock.  That material was inside the air

2  vent, and I believe the material that the crack cocaine

3  was in was sewn to the underwear, itself.  It was almost

4  like another -- it had a separate compartment within

5  itself.

6      Q.   Okay.  So you think the sock was sewn to the

7  underwear?

8      A.   I believe so, based on the fact that when

9  Leggett was trying to get to it, he couldn't figure out

10 how to get to what he was feeling.

11     Q.   Okay.  After that -- after you discovered that,

12 what did you do next?

13     A.   We confiscated it, came back to the room, which

14 is an open room like this with a conference table, and we

15 started working on the evidence.

16     Q.   And, I'm sorry, before we proceed, could we mark

17 that drawing as Exhibit NNN?

18          (Plaintiffs' Exhibit NNN was marked for

19 identification.)

20          BY MR. SCHEWEL:

21     Q.   Thanks.  And did you weigh the crack cocaine at

22 the Southeast Station?

23     A.   Yes, it was.

24     Q.   And do you recall that the crack cocaine weighed

25 36 grams?

1    A.   I don't recall the exact weight.

2    Q.   But does that seem about right to you?

3         MR. BENTON:  Objection.  You can answer if you

4    know.

5         THE WITNESS:  I don't know without seeing the

6    case jacket.  I just remember it was a tracking amount.

7         BY MR. SCHEWEL:

8    Q.   Had you ever located that amount of crack

9    cocaine prior to that occasion?

10   A.   What do you -- I'm not sure what you mean.

11   Q.   36 grams.  Had you ever located that much?

12   A.   On him, personally?

13   Q.   On anyone.

14   A.   On anyone?

15        MR. BENTON:  Objection.  You can answer.

16        THE WITNESS:  I can't say that amount.  I mean I

17   located some crack that the guy had coming out of his

18   rectum.  I pretty much told him he's got to pull the bag

19   out, and he tried to shove it in his mouth.  I remember

20   that.

21        BY MR. SCHEWEL:

22   Q.   Okay.  And do you remember how much weight that

23   was?

24   A.   It was a pretty good size.  I don't remember

25   exact weight, but I don't believe it came to a tracking

1    amount, but it was a pretty good sized nugget.

2        Q.    Okay.  So you don't recall whether or not this

3    is the most crack you had ever located?

4        A.    During a strip search, it's probably -- I'd like

5    to see other case jackets.  I don't know off the top of my

6    head, but like I said, the other one was kind of a good

7    size that came out of his behind.

8        Q.    Okay.  Has Mr. Williams -- did he ever provide

9    you with individuals' license plate numbers to ask you to

10   identify those individuals?

11       A.    On the advice of counsel, I choose not to answer

12   based on my Fifth Amendment rights.

13       Q.    Did you ever provide names of suspected drug

14   dealers to Mr. Williams?

15       A.    I don't believe so.

16       Q.    So he always provided them to you?

17       A.    Based on when I was trained, the CI is supposed

18   to bring you work.  You're not supposed to bring them

19   work, according to what David Nance told me when I was

20   being trained by him.

21       Q.    Okay.  So what would happen is he would give you

22   a name or he would give you some sort of other identifying

23   information and you would go off of that?

24       A.    And based off what he's trying to buy from that

25   individual.

1    Q.   Okay.  Were you ever concerned about

2  Mr. Williams' safety?

3    A.   I was concerned about all CIs' I worked with

4  safety.  Based on the way I was trained, that you still

5  have a level responsibility for their safety when we're

6  doing these buys.

7    Q.   Do you recall his girlfriend telling you that

8  you needed to provide him with new shelter because she was

9  concerned that he was going to be killed based on being an

10  informant?

11    A.   I don't recall the exact conversation.  I

12  remember getting into an argument with her back and forth.

13    Q.   Did you ever try to provide him with different

14  shelter?

15    A.   No.  That's his responsibility to provide for

16  himself a shelter.  Under my understanding, they were

17  living together and I don't know if she kicked him out or

18  whatever she did, but they stayed together at one point. I

19  don't know when that stopped.

20    Q.   Did Mr. Williams ever stab his girlfriend?

21    A.   I don't know anything about that.

22    Q.   You've never heard of that?

23    A.   No, not to my knowledge.

24    Q.   Did you ever tell Mr. Williams to make sure that

25  he was not obscuring the buy camera in his clothing?

1     A.   I told him that he needs to make sure he gets

2  good video.

3     Q.   When did you tell him that?

4     A.   I don't remember the exact date, but I discussed

5  with him, "Make sure that you try to get some good video."

6     Q.   And did he change his practices after you told

7  him that?

8     A.   Some of the videos were still kind of -- kind of

9  grainy, but it was about the same type of quality on some

10  of them.

11     Q.   So you're saying it didn't get better?

12     A.   It depends because, like I said, the Demorris

13  Meeks was -- that video was more towards the end and that

14  was a good video, so like I said, it just depends because

15  there was times where there was some good video.

16     Q.   Did you know that Dennis Williams was on

17  probation after he got out of jail in Nash County?

18          MR. BENSON:  Objection.  You can answer if you

19  know.

20          THE WITNESS:  To my knowledge, he was not on

21  probation.

22          BY MR. SCHEWEL:

23     Q.   Did his girlfriend text you and tell you that he

24  was on probation?

25     A.   She texted that, but to my knowledge, he

```
 1    didn't -- he wasn't on probation.  I remember her sending
 2    me a lot of texts and trying to argue with me, and I just
 3    came off the night shift.
 4         Q.   You just -- sorry?
 5         A.   She was trying to argue with me because she
 6    called me up and I hung up on her.  She was pretty much
 7    venting her frustration at me.  I remember that
 8    conversation.  I was trying to sleep when all this was
 9    going back and forth.
10         Q.   Okay.  I am going to pass you what will be
11    marked as OOO.
12              MR. SCHEWEL:  This is your copy, Jason.  I'll
13    give you a copy.  And this is the interview with Officer
14    Abdullah.  It is dated 11/1/21.
15              MR. BENTON:  Are we looking at the top copy or
16    the --
17              MR. SCHEWEL:  Let me ask you one other question
18    before we look at this.
19              BY MR. SCHEWEL:
20         Q.   Are you aware if Dennis Williams' girlfriend was
21    ever shot?
22         A.   No.
23         Q.   Okay.
24              MR. BENTON:  Take your time to read that.
25              THE WITNESS:  (Complies.)
```

 1          BY MR. SCHEWEL:

 2      Q.   Was Dennis Williams' girlfriend named Carlotta

 3  Merical Winston?

 4      A.   I don't know what her name was.

 5      Q.   Okay.  I'm going to direct your attention to the

 6  back of this document.  It's the fourth to last page and

 7  it's Bates-stamped -- well, let's go to the third to last

 8  page.  It's Bates-stamped 8188.  It says "Southeast

 9  Officer" on the very top of the document.

10      A.   Okay.

11      Q.   Is this a screenshot of your mobile phone?

12      A.   It's a screenshot of the work phone.

13      Q.   Of your work phone?

14      A.   That's correct.

15      Q.   Who is the Southeast Officer?

16      A.   I don't remember his name.  I just put it in my

17  phone Southeast Officer because sometimes he will contact

18  me with questions, so I was just saving the phone number

19  in my phone and titled it Southeast Officer.  I don't know

20  his actual name.

21      Q.   Okay.

22      Q.   And on July 23rd, 2019, you texted the Southeast

23  Officer and you said, "I have a guy signing up to do

24  heroin buys.  Has a lot of good info but he's on

25  probation.  I haven't been able to get his probation

 1    officer to get back to me.  You said you had done buys

 2    with probationers.  Any advice?"

 3         A.    That's not me.  That's him saying that to me.

 4         Q.    He's saying that to you?

 5         A.    He's asking me and I gave him Angela Brewer,

 6    who's a person he would need to get in contact with.

 7         Q.    Okay.

 8         A.    That didn't come from me.  That came from him.

 9         Q.    He texted you that with that question?

10         A.    Yes, that's correct.

11         Q.    Okay.

12         A.    And I answered his question with Angela Brewer

13    and gave him the details, what he needed to do.

14         Q.    And so is it true that you had done buys with

15    people on probation?

16         A.    I have done buys with people on probation, yes.

17         Q.    Okay.  And how did you do that?

18         A.    You have to get permission to do that.

19         Q.    From who?

20         A.    From the probation, which Angela Brewer would be

21    one, and then through a judge.

22         Q.    Okay.  All right.  I'm going to ask you to turn

23    to the next page.  It's Bates-stamped 8189 and this is a

24    text with ADA Coleman.  Who's ADA Coleman?

25         A.    He was over the drug unit.

1      Q.   The Wake District Attorney's Office?

2      A.   That's correct.

3      Q.   And it looks like he sent you a screenshot of a

4   text message that he was having with someone else.

5      A.   Okay.

6      Q.   Is that correct?

7      A.   That's -- that's what appears, yes.

8      Q.   Do you recall receiving this?

9      A.   I recall now, looking at it, having that type of

10   exchange, yes.  It's been a while since I've seen this.

11      Q.   Are you aware who sent ADA Coleman that text

12   message?

13      A.   I can't see the name on here.

14      Q.   Do you recall who it was?

15      A.   I believe it may have been from Jackie

16   Willingham.

17           MR. BENTON:  Do you want this marked?

18           MR. SCHEWEL:  Yes, that should be marked OOO.

19           MR. BENTON:  I don't know if it's in order, so I

20   have no clue.

21           MR. SCHEWEL:  I have one that's in order.

22           (Plaintiffs' Exhibit OOO was marked for

23   identification.)

24           BY MR. SCHEWEL:

25      Q.   What was Mr. Williams arrested for in Nash

```
 1   County?
 2        A.   From what I remember, he had a pending charge, I
 3   believe, for felony larceny.
 4        Q.   Did he inform you when he was arrested?
 5        A.   I don't remember.
 6        Q.   Did you ever speak to the Nance [sic] County
 7   District Attorney about this case?
 8        A.   Which case?
 9        Q.   Mr. Williams' charges.
10        A.   For what?
11        Q.   Larceny.
12        A.   No, I wasn't talking to -- to the district
13   attorney about his larceny charge.
14        Q.   Yeah.
15        A.   I don't believe so, no.
16        Q.   Did you talk to the Nance [sic] County District
17   Attorney about anything related to Dennis Williams?
18        A.   About his work that he did as a CI.
19        Q.   Okay.  What did you tell the Nance [sic] County
20   District Attorney?
21             MR. BENTON:  You mean Nash County?
22             MR. SCHEWEL:  Is it Nash County?
23             THE WITNESS:  That's correct.
24             BY MR. SCHEWEL:
25        Q.   What did you tell the Nash County District
```

1    Attorney?

2         A.   I just showed him his CI log and the work that

3    he did.

4         Q.   And why did you do that?

5         A.   To show, you know, the judge that he was helping

6    us and that he had been cooperating with our department.

7         Q.   Okay.  So did you also show these details to the

8    judge?

9         A.   The judge saw it as well, yes.

10        Q.   And was this at a court date?

11        A.   That's correct.

12        Q.   And did you approach the bench to show the

13   judge?

14        A.   Yes, with the ADA and his attorney as well.

15        Q.   And was this on the record or off the record?

16        A.   I don't know if it was on or off the record.  I

17   just know that the judge said that should have been shown

18   before and he said that's got to be handled by the ADA,

19   but just said that should have been done before.

20        Q.   And did you show the judge the Confidential

21   Informant Log that we observed earlier today?

22        A.   I believe so.

23        Q.   And is it your testimony that the document you

24   showed the judge is the same document as the exhibit

25   marked MMM, which is the Confidential Informant log we

```
 1    were looking at earlier?
 2         A.   I don't know.  Let me see.  I had a CI log that
 3    I showed him.  It's possible.  I don't remember exact --
 4    it's been a while, but I showed him a CI log.
 5         Q.   How did you find out when Mr. Williams was
 6    released from jail?
 7         A.   He had texted me, I believe.
 8         Q.   And did he text you from his personal phone?
 9         A.   I don't know what he texted me from.
10         Q.   Did you purchase a phone for Mr. Williams?
11         A.   Me and Nance checked in to get a little
12    disposable phone at Walmart for him to use when we signed
13    him up because he was working substantial assistance.
14         Q.   And did he have that phone the entire time he
15    was working for you?
16         A.   No.  He had broke it.
17         Q.   Okay.  What type of phone was he using after he
18    broke that phone?
19         A.   Whatever he could come across.  We didn't get
20    him another phone.
21         Q.   Would he text you from different numbers?
22         A.   Yes, he would.
23         Q.   After he broke the phone that you purchased, did
24    you take custody of that phone?
25         A.   I didn't know what happened to that phone.  He
```

 1    had -- I don't know if he texted or called from a
 2    different number, but it wasn't the same number that he
 3    used before to contact me.  The numbers were constantly
 4    changed.  He wasn't using the same phone that me and Nance
 5    had chipped in to buy.
 6         Q.   Okay.  And so after he was released from custody
 7    in Nash County and he texted you, did you decide to
 8    re-recruit him as a confidential informant?
 9              MR. BENTON:  Objection.  You can answer.
10    Objection to form.
11              THE WITNESS:  I didn't have to re-recruit him.
12    He was already assigned CI.
13              BY MR. SCHEWEL:
14         Q.   Okay.  Did you decide to continue to use him?
15         A.   Yes, I did.
16         Q.   And did he offer to continue?
17         A.   I don't remember exact details of the
18    conversation.  I remember we had a couple buys into Mario
19    King before he had went away, so we pretty much tried to
20    pick back up.
21         Q.   Okay.  I want to ask you about May 21st, 2020,
22    so this is the date you executed the search warrant at
23    1628-B Burgundy Street.  I know you invoked your Fifth
24    Amendment right when I showed you the search warrant, so
25    I'm not going to show you that again now, but prior to

1  executing the warrant, did you meet with the vice team to

2  discuss the operation?

3       A.   Yes, I did.

4       Q.   Was the SEU team present?

5       A.   Yes, they were.

6       Q.   Did you also send a description of the

7  operation?

8       A.   Send a description, I'm not sure what you mean

9  by that.

10       Q.   Well, did you e-mail the warrant to the SEU

11  sergeant?

12       A.   No.  He read the warrant in person.

13       Q.   At the meeting?

14       A.   I believe so.

15       Q.   Okay.  And who was the SEU sergeant?

16       A.   Sergeant McDonald.

17       Q.   Did the other vice officers read the warrant?

18       A.   I don't know if they read the warrant.  I think

19  there was other SEU officers that may have read the

20  warrant.

21       Q.   At the meeting, did you discuss the warrant?

22       A.   Yes.

23       Q.   Did you discuss that you were using Dennis

24  Williams?

25       A.   I don't remember discussing using Dennis

1    Williams.

2        Q.   Did you discuss that you were using Aspirin?

3        A.   I don't remember discussing that.  I'm

4    discussing how the operation will go, where, and what

5    resources that we needed to pull from and how we were

6    going to ascend on the property.

7        Q.   Was Dennis Williams present at that meeting?

8        A.   He was -- he was sitting inside the vehicle

9    outside the station, from my knowledge.

10       Q.   Inside your vehicle?

11       A.   Yes.

12       Q.   But on that date, you rode with the SEU van --

13       A.   I drove the van.

14       Q.   -- to the location?

15       A.   That's correct.

16       Q.   So Dennis Williams was transported by other

17   officers?

18       A.   He was transported by Rattelade.

19       Q.   Okay.  Do you know who was in Rattelade's car

20   with him?

21       A.   It was more likely Gwinn.

22       Q.   So at the time of the meeting, Dennis Williams

23   was in your vehicle?

24       A.   I don't know exactly what he was doing, but he

25   was brought there in my vehicle.  I didn't know if he was

```
 1    still sitting in the vehicle while I was having the
 2    meeting or if he was walking around, but he was not inside
 3    the building.
 4         Q.   Was Officer Monroe present for the meeting?
 5         A.   He was present.
 6         Q.   Was Officer Rattelade present?
 7         A.   Yes.
 8         Q.   Was Officer Gwinn present?
 9         A.   Yes.
10         Q.   Was Sergeant Rolfe present?
11         A.   Sergeant Rolfe wasn't there.
12         Q.   Was Officer Gay present?
13         A.   Yes.
14         Q.   Did you describe the target of the operation?
15         A.   I don't remember if I described him.  I had the
16    location that we were supposed to be going to go hit on
17    the warrant.
18         Q.   Did you -- when you went over the basis -- when
19    you went over the warrant, did you describe the basis for
20    the probable cause of the warrant?
21         A.   On the advice of counsel, I choose not to answer
22    based on my Fifth Amendment rights.
23         Q.   Do you recall anything else you discussed at
24    that meeting?
25         A.   On the advice of counsel, I choose not to answer
```

```
 1    based on my Fifth Amendment rights.
 2         Q.   After this meeting, the vice team went to 1628-B
 3    and conducted a controlled buy?
 4         A.   We did a buy first.
 5         Q.   Okay.  And was it from 1628-B?
 6         A.   That's the location that we were going to be
 7    buying from, yes.
 8         Q.   Were you present for that buy?
 9         A.   I was present for the buy in the SEU van.
10         Q.   Where was the SEU van located?
11         A.   We were at the fire station.
12         Q.   Did you have the video on your phone of the live
13    buy?
14         A.   Yes.
15         Q.   Did the SEU officers have a video on their
16    phones of the live buy?
17         A.   Yes.
18              MS. LIGUORI:  Objection.
19              BY MR. SCHEWEL:
20         Q.   Did Officer Rattelade drive Dennis Williams to
21    the location?
22         A.   Yes.
23         Q.   Who provided buy money to Dennis Williams?
24         A.   That would be Rattelade.
25         Q.   Did you witness him providing buy money to
```

1    Dennis Williams?

2         A.   No, I couldn't because I was dealing with the

3    SEU van.

4         Q.   Did Officer Rattelade tell you that he observed

5    Dennis Williams go into 1628-B?

6         A.   I don't remember him saying that to me.

7         Q.   Did Dennis Williams give any sort of

8    confirmation that there had been a successful buy?

9         A.   He had called me, said the buy was completed.

10        Q.   Did you observe the buy on the video?

11        A.   The phone had went out during the -- during the

12   buy at some point.  The phone cut out, so the only thing

13   that would be able to pick that up from there would be the

14   button camera, but that's not live.

15        Q.   Okay.  So you're sitting in the SEU van and

16   you're observing the live video on the 1021 app?

17        A.   That's correct.

18        Q.   And what do you recall observing on the live

19   video?

20        A.   Being let him, hearing him talking to the

21   target.  I'm not sure how long into the conversation, but

22   the video cuts out.  I remember an SEU officer say over

23   the radio, "Did the phone go out on you guys as well?"

24   Because it cuts off and we had problems with the phone on

25   previous buys, and that was some type of equipment failure

1    because I remember Rattelade had to get a new -- we had

2    got a new bug phone, which was an iPhone or something, but

3    that equipment failed mid buy.

4         Q.   Did any of the other vice officers tell you that

5    it had failed for them as well?

6         A.   It failed when we were doing another buy.  It

7    had done that.

8         Q.   On this occasion?

9         A.   On this occasion, I don't know.

10        Q.   But you did hear one other SEU officer in the

11   van say, "Did that go out for you as well?"

12        A.   Yeah, I heard that over the radio.

13        Q.   Oh, you heard that over the radio?

14        A.   The guy on the radio said that.

15        Q.   An SEU officer?

16        A.   From my recollection, yes.

17        Q.   So were there SEU officers in other locations on

18   this date than in the van with you?

19        A.   I don't know because I know that we had patrol

20   that was there as well.  Kilgore, I remember him because I

21   knew Kilgore.  I didn't know the other officer, and he had

22   Canine that came late, so they were there.  I'm not sure

23   what their position was at.

24        Q.   Are you sure it was an SEU officer who said

25   that?

 1     A.   I can't be positive, but I just remember someone

 2   saying, "Did your phones go out, too?"

 3     Q.   Okay.  So I want to back up to you observing the

 4   live video footage.  What do you recall seeing on the live

 5   video footage?

 6     A.   I don't recall much of the live footage.  I'm

 7   listening to it, but I know that at some point it cuts

 8   out.  That's what I remember.

 9     Q.   So you can't tell me anything that you saw prior

10   to it cutting out?

11     A.   I wasn't looking down at the phone.

12     Q.   Okay.

13     A.   I'm pretty much listening.

14     Q.   Can you recall anything you heard prior to it

15   cutting out?

16     A.   Heard conversations going between him and the

17   target, the CI and the target.

18     Q.   Do you recall what those conversations were?

19     A.   I don't recall the basis of the conversation

20   because at some point, the phone, it cuts out.

21     Q.   Why weren't you watching the video?

22     A.   I'm in the van with the SEU officers, so a lot

23   of times I may be watching or may not, but I just -- at

24   that point, like I say, I had the phone.  I'm listening,

25   but I remember the phone cutting out.

1     Q.   After the phone cut out, what do you remember

2 next?

3     A.   Silence for a little bit and then the CI calling

4 me, saying that the buy had completed and to hurry up

5 because they're trying to leave.

6     Q.   So after the video cut out, you don't recall

7 seeing anything else on the video?

8     A.   I don't recall anything else.

9     Q.   And do you recall hearing anything else on the

10 video?

11     A.   You couldn't hear anything.

12     Q.   What do you mean, you can't hear anything?

13     A.   It cut off.  That's what I'm saying, so you

14 can't -- the live feed was done, so you can't hear

15 anything.

16     Q.   So after it cut off, it never came back on?

17     A.   No.

18     Q.   Okay.  And then Aspirin calls you and he tells

19 you, "The buy is done, hurry up"?

20     A.   Yeah.

21     Q.   What happens next?

22     A.   Told everybody to move in over the radio.

23     Q.   And what did you do?

24     A.   Proceeded to drive from our location to 1628-B.

25     Q.   What did you do next?

1    A.  When I got there, I'm the last person to get out

2  because I have to secure the van while the SEU officers

3  get out, so me and the medic are the last two individuals

4  coming out.

5    Q.  What did you do after you secured the van?

6    A.  Went to the location that everybody was at, at

7  the unit.  They are holding one spot and it looked like

8  they're going towards another unit next to it, so I held

9  where I was at.

10    Q.  Do you know if the SEU officers surveilled the

11  apartment prior to the warrant execution?

12    A.  I don't remember.  Typically, we would drive

13  through a location that we're going to execute a search

14  warrant at, and they liked to see exactly where the door

15  is at, which -- is there a storm door?  Is there a door

16  handle?  What type?  Which way would it open out?  I

17  believe that we did.  I don't remember in that case, but,

18  typically, when we're getting ready to do a search

19  warrant, we would do that.

20    Q.  At the meeting before the execution of the

21  warrant, do you remember discussing with the SEU officers

22  whether or not they had surveilled the apartment?

23    A.  I don't remember that conversation.

24    Q.  Do you believe that you executed the search

25  warrant on the correct location?

1      A.   On the advice of counsel, I choose not to answer

2   based on my Fifth Amendment rights.

3      Q.   Did you discover any contraband in the

4   apartment?

5      A.   On the advice of counsel, I choose not to answer

6   based on my Fifth Amendment rights.

7      Q.   Did you discover any buy money in the apartment?

8      A.   On the advice of counsel, I choose not to answer

9   based on my Fifth Amendment rights.

10     Q.   Did you search the apartment?

11     A.   What apartment are you talking about?

12     Q.   1628-B.

13     A.   Did I personally search it?

14     Q.   (Nods affirmatively.)

15     A.   You had Gay and Monroe searching it.

16     Q.   Did you ever go upstairs?

17     A.   I believe I walked through, but pretty much

18   every -- Monroe pointed out that they had previously

19   searched.

20     Q.   So why did you go upstairs?

21     A.   To see what was going on.

22     Q.   Did you search 1628-A?

23     A.   1628-A?

24     Q.   (Nods affirmatively.)

25     A.   No.

1    Q.    Did you go inside?

2    A.    I did go inside.

3    Q.    Did you go upstairs?

4    A.    No, I did not go upstairs.

5    Q.    Why did you decide to leave Apartment 1628-B?

6    A.    What do you mean, leave?

7    Q.    Well, at some point, the SEU officers and the

8    vice officers all left that apartment.

9    A.    That's correct.

10    Q.    Why?

11    A.    It was -- we were done holding it.

12    Q.    Did you go to a different location?

13    A.    Yes, we did.

14    Q.    What location did you go to?

15    A.    I believe it was the location of his girlfriend,

16    1620, whatever the apartment number is.

17    Q.    Whose girlfriend?

18    A.    VanIrvin.

19    Q.    And how did you get alerted to that location?

20    A.    That was the location he was standing at when we

21    made an arrest of him.

22    Q.    So do you believe that he lived somewhere

23    different than that location?

24    A.    1620-B?

25    Q.    Yeah.

1          MR. BENTON:  Objection.  If you understand, you

2   can answer.

3          THE WITNESS:  I can't say for sure.

4          BY MR. SCHEWEL:

5     Q.   Okay.  Well, I'm just asking because you said

6   that was where he was staying at.

7          MR. BENTON:  Objection.

8          THE WITNESS:  That's where he was standing at.

9          BY MR. SCHEWEL:

10    Q.   Standing at?

11    A.   Yes, sir.  That's what I was saying.

12    Q.   Oh, okay.

13    A.   He was standing in the doorway watching us from

14   that location.

15    Q.   Okay.  And he was watching you while you were at

16   1628-B and 1628-A?

17    A.   That's correct.

18    Q.   And did you observe him?

19    A.   Other SEU officers observed him.  I observed him

20   as well, but he was standing in the doorway.

21    Q.   And did you execute a search at 1620?

22    A.   A search was conducted there, yes.

23    Q.   Okay.  Were you present for that search?

24    A.   In the beginning, no, but eventually I did go

25   inside and assist the search as well.

1    Q.   Okay.  And did you locate any contraband in that

2  apartment?

3    A.   I don't know -- I don't remember if we located

4  any contraband.  I remember locating the gun where he said

5  he had it placed and a black bag that he said that he had

6  the heroin in.

7    Q.   Okay.  So he located a black bag inside Marcus

8  VanIrvin's apartment; is that correct?

9    A.   That's correct.  That's what he said that he

10  kept it in.

11    Q.   And he told you that he kept heroin in that bag?

12    A.   That's the bag he said -- that he claimed that

13  he had the heroin in that he ran with when he said he

14  flushed it down the toilet.

15    Q.   And he told you that he ran with it?

16    A.   That's correct.

17    Q.   Ran with it where?

18    A.   To that location.

19    Q.   From where?

20    A.   I'm assuming from 1628-B.

21    Q.   He told you he ran with the heroin from 1628-B?

22    A.   Well, I remember him saying that he grabbed the

23  bag and ran out and went back to his girl's place, went up

24  the steps and flushed, according to him, a shitload of

25  heroin down the toilet.

1    Q.    Okay.  And you stated that -- I think you're

2  assuming that he ran from 1628-B.  Why are you assuming

3  that?

4    A.    That was the location where we asked to get a

5  search warrant at, and it was also the location where we

6  did the buys at.

7    Q.    Did he ever tell you that he ran from 1628-B?

8    A.    I would have to see the case jacket.  I can't

9  say off the top of my head.

10    Q.    So you don't remember?

11    A.    I don't remember.  I would have to see the case

12  jacket.

13    Q.    Did he tell you that the heroin was his heroin?

14    A.    I don't recall that exact phrasing, so I can't

15  say for sure.

16    Q.    Did you ever locate the buy money?

17    A.    I located some of the buy money on VanIrvin.

18  The rest, we weren't able to locate it.

19    Q.    How much did you locate on VanIrvin?

20    A.    It was $60.

21    Q.    How much was missing?

22    A.    About $800, the rest of it, $700, whatever the

23  amount is on that.

24    Q.    What do you think happened to the rest of the

25  buy money?

1      A.   His brother took it.  He was the only person

2  left that we were able to recover.

3      Q.   Did you ever observe his brother?

4      A.   I didn't observe him, no.

5      Q.   Did any other officers observe his brother?

6      A.   I don't know if they did or not.

7      Q.   After the arrest -- well, sorry.  Strike that

8  question.

9           When you left the -- when you left Yolanda

10  Irving's apartment, 1628-B, did you say anything to

11  Ms. Irving or her family?

12     A.   I don't remember saying anything.  I remember

13  leaving the warrant and walking out.  My mind was pretty

14  much trying to figure out exactly what happened to the

15  rest of the money and where was the brother at.

16     Q.   After you got back to Green Dairy, do you recall

17  Meghan Gay typing up the arrest warrant for Marcus

18  VanIrvin?

19     A.   I don't know.  I remember interviewing VanIrvin

20  when I came back to my desk.  I remember the warrants

21  being handed to me.

22     Q.   Okay.  You were interviewing him at your desk?

23     A.   I was interviewing him in the interview room.  I

24  came back to my desk, so that stuff was already done.

25     Q.   So do you know who typed them up?

1    A.   I don't remember who typed it up.  I remember it

2  was handed to me.

3    Q.   Okay.  Do you remember a vice officer telling

4  you that the heroin tested negative for a controlled

5  substance?

6    A.   On the advice of counsel, I choose not to answer

7  based on my Fifth Amendment rights.

8    Q.   Is there anything else you'd like to say today?

9    A.   No.

10    Q.   We can end early.  And just for the record, I'll

11  ask you afterwards how much time we have remaining, but we

12  reserve our right to continue the deposition of Officer

13  Abdullah at a later date.

14          MR. BENTON:  And we reserve the right to object.

15          MS. LIGUORI:  I have a question.  Are we

16  concluding or taking a break?

17          MR. BLANCHARD:  Can we take a break for just a

18  minute?

19          MR. BENTON:  We can take a break.

20          (Recess from 4:27 p.m. to 4:40 p.m.)

21                    EXAMINATION

22          BY MR. BLANCHARD:

23    Q.   Mr. Abdullah, my name is Norwood Blanchard and I

24  represent Sergeant Rolfe in this matter.  I just had a

25  couple very quick clarification questions.

REED & ASSOCIATES
MATTHEWS, NORTH CAROLINA  980.339.3575
Case 5:22-cv-00068-BO   Document 203-5   Filed 03/31/23   Page 170 of 180

1      A.   Yes, sir.

2      Q.   I'm just going to show you a document that he

3  had shown you earlier today.

4      A.   Okay.

5      Q.   And it's Bates-stamped 172 and it's the Receipt

6  of Informant Funds document.

7      A.   Yes.

8      Q.   And Mr. Schewel asked you about the date on it,

9  5/20 of 2020, and your signature and I think you verified

10 that that was your signature and verified that you believe

11 that to be Sergeant Rolfe; is that correct?

12     A.   That's correct.

13     Q.   Okay.  I want to ask you about the timing of

14 that.  Would Sergeant Rolfe have signed -- if he signed

15 that document, he would have signed that after the fact,

16 according to what Detective Gay had testified earlier; is

17 that accurate?

18     A.   That's correct.  He was -- he wasn't working

19 that day, so for accounting purposes, he signed that for

20 the receipt fund.

21     Q.   Okay.  So that was just to verify for accounting

22 purposes, to balance the drawer, so to speak?

23     A.   That's correct.

24     Q.   And it was after the fact, correct?

25     A.   Yes, it was.

1     Q.   And that leads me to the other follow-up

2  question I was going to ask.  I think I understood from

3  your testimony earlier today that Rolfe was not present

4  either for VanIrvin's controlled buy or the later searches

5  at 1628 and 1620; is that correct?

6     A.   That's correct.

7     Q.   So he was out of town for both of those, as far

8  as you know?

9     A.   I remember him being off that day.

10     Q.   That was all I had for you.  Thank you.

11     A.   Thank you.

12          MS. POOLE:  I just need to state an objection on

13  the record to some of the questions earlier about the

14  communications or interactions with Detective Gay and the

15  Wake County District Attorney's Office to the extent that

16  those questions are inconsistent with her prior deposition

17  in this case.

18          MS. LIGUORI:  I have no questions.

19                    EXAMINATION

20          BY MS. KIBLER:

21     Q.   Mr. Abdullah, I'm Dottie Kibler.  I represent

22  the City of Raleigh.

23     A.   Yes, ma'am.

24     Q.   And if you don't mind, I'll just pull a chair

25  up.

1      A.    Okay.

2           (Defendants' Exhibits 26, 27, 28, 29, 30 and 31

3      were marked for identification.)

4           BY MS. KIBLER:

5      Q.    I'm going to hand you a number of exhibits.  The

6      first is Exhibit 26, and this, for the attorneys, is City

7      of Raleigh, COR document 8308 through 8309.  I'll hand

8      that to you and ask if you recognize that document.

9      A.    Yes.  It's the Garrity Warning for my

10     administrative warnings.

11     Q.    And you chose to answer questions both times in

12     which you signed the Garrity warnings?

13     A.    Yes, ma'am.

14     Q.    And you did so because you were ordered to

15     answer questions, correct?

16     A.    That's correct.

17     Q.    I'm going to hand you what's been marked as

18     Exhibit 27, and for the lawyers this is COR-6019 through

19     COR-6088.  Mr. Abdullah, this was an interview that was

20     taken of you.  It appears to be on September 4, 2020.

21     Were you interviewed on that date by Sergeant Davis?

22     A.    Yes, that's correct.

23     Q.    And is the information that you provided to

24     Sergeant Davis on September 4, 2020 fair and accurate

25     based on your understanding as of that date?

 1     A.   At the time, I believe my testimony was truthful

 2   and accurate to the best of my abilities.

 3     Q.   Let me hand you what's been marked as Exhibit

 4   Number 28, and for the attorneys, this is City of Raleigh

 5   document Bates stamp number 6089 through 6212.

 6          Mr. Abdullah, this looks like it was an

 7   interview of you taken by Sergeant Davis and Lieutenant

 8   Williams on August 26, 2020, as part of your

 9   administrative investigation; is that correct?

10     A.   Yes, ma'am.

11     Q.   And was the information that you provided on

12   August 26, 2020, accurate and truthful based on the facts

13   as you understood them as of August 26, 2020?

14     A.   At that time, I believe my testimony was

15   truthful and accurate to the best of my abilities.

16     Q.   Let me hand you what's been marked as Exhibit

17   Number 29, and for the attorneys this is Bates-stamped as

18   COR-6213 through 6222.  Mr. Abdullah, I'll ask you the

19   same questions.  This appears to be an interview you gave

20   to Sergeant Davis on August 23, 2021; is that correct?

21     A.   Yes, it is.

22     Q.   And was the information that you provided to

23   Sergeant Davis on August 23, 2021 fair, accurate, and

24   truthful as of your understanding of the facts on

25   August 23, 2021?

1    A.   At the time, I believe my testimony was truthful

2    and accurate to the best of my abilities.

3    Q.   Exhibit 30 is Bates-stamped City of Raleigh 6223

4    through City of Raleigh 6235.  Is this an interview you

5    gave to Sergeant Davis on August 24, 2021?

6    A.   Yes, it is.

7    Q.   And would that have also been part of the

8    administrative investigation that we spoke about?

9    A.   Yes, that's correct.

10   Q.   And is the information that you provided to

11   Sergeant Davis on August 24, 2021, accurate and truthful

12   based on your understanding of the facts at that time?

13   A.   At that time, I believe my testimony was

14   truthful and accurate to the best of my abilities.

15   Q.   I have one more interview to give you and it's

16   been marked as Exhibit 31.  For the lawyers, that's Bates

17   stamp COR-6236 through 6258.

18        Mr. Abdullah, is this an interview you gave on

19   September 14, 2021, to Sergeant Davis?

20   A.   Yes, it is.

21   Q.   And was this part of the administrative

22   investigation that we spoke about earlier?

23   A.   Yes, it is.

24   Q.   And when you spoke with Sergeant Davis, was the

25   information that you gave him and the answers to the

1    questions that you provided, was that information true,

2    accurate and truthful to the best of your understanding of

3    the facts as of September 14, 2021?

4         A.   At that time, I believe my testimony was

5    truthful and accurate to the best of my abilities.

6              MS. KIBLER:  Thank you.  I don't have anything

7    further for you.

8              THE WITNESS:  Thank you.

9              (Whereupon, at 4:49 p.m. on December 15, 2022,

10   the deposition was concluded.  Signature was reserved.)

11

12                        * * * * *

13

14

15

16

17

18

19

20

21

22

23

24

25

WITNESS CERTIFICATE        (1 of 3)

        I have read the foregoing pages, 1 through 176 inclusive, and find that they contain a correct transcription of the answers made by me to the questions therein recorded, with the exception of _____ corrections as listed on a separate sheet of paper and incorporated into this record.

        Signed this _____ day of _____ 2023.


        _____
                    OMAR ABDULLAH




Sworn and subscribed before me this the _____ day of _____ 2023

_____
Notary Public

My Commission Expires:  _____.

ERRATA SHEET                    (2 of 3)

Please indicate any corrections to your deposition on this sheet of paper, giving the page number, line number, change and reason for the change, and return this form and the signature page to: Reed & Associates, 2401 Whirlaway Court, Matthews, NC 28105, or to vreed@carolina.rr.com.

The reasons for making changes:

(1) To clarify the record;
(2) To conform to the facts; or
(3) To correct major transcription errors.

Page no. _____ Line no. _____ Reason: _____

Change _____ to _____

Page no. _____ Line no. _____ Reason: _____

Change _____ to _____

Page no. _____ Line no. _____ Reason: _____

Change _____ to _____

Page no. _____ Line no. _____ Reason: _____

Change _____ to _____

Page no. _____ Line no. _____ Reason: _____

Change _____ to _____

Page no. _____ Line no. _____ Reason: _____

Change _____ to _____

Page no. _____ Line no. _____ Reason: _____

Change _____ to _____

Page no. _____ Line no. _____ Reason: _____

Change _____ to _____

Page no. _____ Line no. _____ Reason: _____

Change _____ to _____

ERRATA SHEET                                    (3 of 3)

Page no. \_\_\_\_\_ Line no. \_\_\_\_\_ Reason: _____

Change _____ to _____

Page no. \_\_\_\_\_ Line no. \_\_\_\_\_ Reason: _____

Change _____ to _____

Page no. \_\_\_\_\_ Line no. \_\_\_\_\_ Reason: _____

Change _____ to _____

Page no. \_\_\_\_\_ Line no. \_\_\_\_\_ Reason: _____

Change _____ to _____

Page no. \_\_\_\_\_ Line no. \_\_\_\_\_ Reason: _____

Change _____ to _____

Page no. \_\_\_\_\_ Line no. \_\_\_\_\_ Reason: _____

Change _____ to _____

Page no. \_\_\_\_\_ Line no. \_\_\_\_\_ Reason: _____

Change _____ to _____

Page no. \_\_\_\_\_ Line no. \_\_\_\_\_ Reason: _____

Change _____ to _____

Page no. \_\_\_\_\_ Line no. \_\_\_\_\_ Reason: _____

Change _____ to _____

Thank You!

STATE OF NORTH CAROLINA                    CERTIFICATE

COUNTY OF FRANKLIN:

       I, DEBORAH A. HYDE, Certified Court Reporter and Notary Public in and for the County of Franklin, State of North Carolina, do hereby certify:

       That OMAR ABDULLAH appeared before me at the time and place herein aforementioned; was duly affirmed in the manner provided by law by me prior to the taking of the foregoing deposition, and that said deposition was taken by me and transcribed under my supervision and direction; and that the foregoing 179 pages constitute a true and correct transcription of the proceedings.

       I do further certify that reviewing and signing of the transcript by the witness was reserved.

       I do further certify that the persons were present as stated in the appearance page.

       I do further certify that I am not of counsel for, or in the employment of, either of the parties in this action, nor am I interested in the results of this action.

       This the 26th day of December 2022.

_____

DEBORAH A. HYDE, Certified Court Reporter

Notary Public Number 20021400234