IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CIVIL ACTION NO.: 5:22-cv-00068-BO

YOLANDA IRVING, individually and as the )
natural parent and guardian of J.I. JUWAN )
HARRINGTON, CYDNEEA HARRINGTON, KENYA )
WALTON, individually an as the natural )
parent and guardian of R.W. ZIYEL WHITLEY, )
DYAMOND WHITLEY, KAMISHA WHITLEY, NANETTA )
GRANT as the natural parent and guardian )
of Z.G. and EMANCIPATE NC, INC. )
                                          )
                    Plaintiffs,           )
                                          )
        vs.                               )
                                          )
THE CITY OF RALEIGH, Officer OMAR I.      )
ABDULLAH, Sergeant WILLIAM ROLFE, Officer )
RISHAR PIERRE MONROE, Officer JULIEN DAVID )
RATTELADE, and Officer MEGHAN CAROLINE GAY, )
Officer DAVID MEAD, Officer JESUS ORTIZ,  )
Officer KYLE PERRIN, Officer MICHAEL      )
MOLLERE, Officer KYLE THOMPSON, Officer   )
VINCENT DEBONIS, Officer DANIEL TWIDDY,   )
Officer THOMAS WEBB, Officer DAVID        )
McDONALD, Officer DAVID GARNER, Chief of  )
Police ESTELLA PATTERSON and City Manager )
MARCHELL ADAMS-DAVID, in their official   )
capacities,                               )
                                          )
                    Defendants.           )
_____)


D E P O S I T I O N

OF

**OFFICER WILLIAM ROLFE**


At Raleigh, North Carolina

Tuesday, January 17, 2023

REPORTER:  DEBORAH A. HYDE


**REED & ASSOCIATES**
MATTHEWS, NORTH CAROLINA  980.339.3575

A P P E A R I N G


On Behalf of the Plaintiffs:

        IAN A. MANCE, ESQUIRE
        EMANCIPATE NC
        P.O. Box 309
        Durham, North Carolina  27702
        828-719-5755
        ian@emancipatenc.org

        ABRAHAM RUBERT-SCHEWEL, ESQUIRE
        Tin Fulton Walker & Owen, PLLC
        119 East Main Street
        Durham, North Carolina  27701
        919-451-9216
        schewel@tinfulton.com


On Behalf of Defendants City of Raleigh, Estella
    Patterson, and Marchell Adams-David:

        DOROTHY V. KIBLER, ESQUIRE
        AMY PETTY, ESQUIRE
        City of Raleigh Attorney's Office
        Post Office Box 590
        Raleigh, North Carolina  27602
        919-996-6560
        dorothy.kibler@raleighnc.gov


On Behalf of Defendant Officers David Mead, Jesus
    Ortiz, Kyle Perrin, Michael Mollere, Kyle Thompson,
    Vincent Debonis, Daniel Twiddy, Thomas Webb, David
    McDonald, and David Garner:

        MICHELLE LIGUORI, ESQUIRE
        Ellis & Winters LLP
        4131 Parkdale Avenue, Suite 400
        Raleigh, North Carolina  27612
        919-865-7009
        michelle.liguori@elliswinters.com


                    (Continued)

A P P E A R I N G

On Behalf of Defendant Officer Omar I. Abdullah:

    JASON R. BENTON, ESQUIRE
    Parker Poe Adams & Bernstein, LLP
    620 South Tryon Street, Suite 800
    Charlotte, North Carolina  28202
    704-372-9000
    jasonbenton@parkerpoe.com


On Behalf of Defendant Officers Rishar Pierre Monroe,
   Julien David Rattelade, and Meghan Caroline Gay:

    ALAYNA M. POOLE, ESQUIRE
    Yates, McLamb & Weyher, LLP
    Two Hannover Square
    434 Fayetteville Street, Suite 2200
    Raleigh, North Carolina  27601
    919-835-0900
    apoole@ymwlaw.com


On Behalf of Defendant Officer William Rolfe:

    NORWOOD P. BLANCHARD, III
    Crossley McIntosh Collier Hanley & Edes, PLLC
    5002 Randall Parkway
    Wilmington, North Carolina  28403
    910-762-9711
    norwood@cmclawfirm.com


* * * * *

C O N T E N T S

                                                               PAGE

Examination by Mr. Mance:                                         8

                    PLAINTIFFS' EXHIBITS

Exhibit A   Findings & Recommendations (Abdullah)        10

Exhibit B   Excerpt of Abdullah Deposition               15

Exhibit C   Incident #P18051289                          20

Exhibit D   Gregory Marshall Report                      23

Exhibit E   Rattelade Internal Affairs Interview         26

Exhibit F   Abdullah 2020 Annual Performance Eval        28

Exhibit G   Abdullah 2019 Annual Performance Eval        28

Exhibit H   Det. Abdullah, O.I. C2020-023                31

Exhibit I   IA Interview - Rolfe                         36

Exhibit J   Interview With Detective Abdullah            36

Exhibit K   Detective Rattelade C202                    118

Exhibit L   Interview, J.C. Gwinn                        52

Exhibit M   Interview, J.D. Rattelade                    52

Exhibit N   Personnel File, W. Rolfe                    136

Exhibit O   Interview,  J.W. Bunch                       59

Exhibit P   Interview, M.C. Gay                          67

Exhibit Q   Interview, R.P. Monroe                       68

Exhibit R   Detective Monroe, R.P. C2020-023             73

Exhibit S   Sergeant Rolfe, W.S. C2020-023               75

(Continued)

**REED & ASSOCIATES**
MATTHEWS, NORTH CAROLINA  980.339.3575

PLAINTIFFS' EXHIBITS
(Continued)

                                                                   PAGE

Exhibit T    Rattelade SBI Interview                                 91

Exhibit U    Tab 1 Appeal Docs from Rolfe                            94

Exhibit V    Preliminary Extraction Report - Abdullah                99

Exhibit W    Texts from M. Gay Cellphone                            104

Exhibit X    Transcript, 12021-025 Dep. Chief Jordan               134
             and W.S. Rolfe

Exhibit Y    Marcus VanIrvin Offense/Incident Report               160

(Exhibits provided with the transcript.)

\*   \*   \*

*Reporter's Note:  This transcript contains quoted
material.  Such material is reproduced as read or quoted
by the speaker.*

1           This is the deposition of OFFICER WILLIAM

2    ROLFE, taken in accordance with the Federal Rules of

3    Civil Procedure in connection with the above case.

4           Pursuant to Notice, this deposition is being

5    taken at the City Attorney's Office, One Exchange Plaza,

6    Raleigh, North Carolina, beginning at 10:14 a.m. on

7    Tuesday, January 17, 2023, before Deborah A. Hyde,

8    Certified Verbatim Reporter and Notary Public.

9                        *   *   *

10          MR. MANCE:  I think before we get into

11   questions, Norwood, this copy is for you.  This is a

12   binder of materials that I'm going to be making reference

13   to today.  And, Dottie, you weren't here when I spoke to

14   the others about it.

15          Everyone should have this binder.  On the front

16   is a table of contents.  These are all the documents that

17   I intend to refer to in the deposition today.  These are

18   things like SBI interviews or various interviews where I

19   might say, for example, "Detective Rattelade said this.

20   Do you agree with that statement?"

21          And so all of those statements are in this

22   binder.  I tried to organize them in the order in which

23   I'm going to refer to them.  As I read the question, if I

24   use a direct quote, I'll tell you where you can find it

25   in the binder.  So I'll say Exhibit B, page 4, you know,

 1   so you can flip through it.  I thought that would just be

 2   more efficient in getting us through this so that we

 3   don't spend a whole lot of time, since there are a lot of

 4   documents, kind of pausing and hunting for things.  So

 5   y'all can just kind of read along.

 6        Mr. Rolfe, if you need to see -- if, in order

 7   to answer a question, you need to, like, visualize it and

 8   look at it, you're able to do that.

 9        THE WITNESS:  Okay.

10        MS. POOLE:  Ian, I just want to state an

11   objection on the way Exhibit W is worded.  These were

12   from Detective Gwinn, not Detective Gay, but I don't want

13   to interrupt you if you refer to it.

14        MR. MANCE:  That's how it was produced to us.

15   I haven't changed the title.

16        MS. KIBLER:  That's what was given to us.

17        MS. POOLE:  Okay.  I'm sorry, do not

18   misunderstand.  We still have no access to Detective

19   Gay's phone.  Those were from Gwinn, so I apologize for

20   that.

21        MR. MANCE:  All right.

22   Whereupon,

23                    **OFFICER WILLIAM ROLFE**

24   was called as a witness and, having first been duly

25   sworn, was examined and testified as follows:

1                        EXAMINATION

2            BY MR. MANCE:

3       Q.   Good morning.  My name is Ian Mance.  I'm one

4   of the attorneys for the plaintiffs in this case.  Can

5   you state and spell your name for the record?

6       A.   My name is William Rolfe, W-i-l-l-i-a-m

7   R-o-l-f-e.

8       Q.   Are you the same William Rolfe who worked as

9   Sergeant of the Drugs and Vice Unit in 2019 and 2020?

10      A.   Yes.

11      Q.   Today you will be testifying under oath and

12  under penalty of perjury, just as if you were in a court

13  of law.  Do you understand that?

14      A.   I do.

15      Q.   Have you ever taken a deposition before?

16      A.   I don't think I have.

17      Q.   Other than lawsuits related to this incident,

18  have you ever been party to a lawsuit before?

19      A.   No.

20      Q.   The questions I'm going to ask today and the

21  answers you give are being transcribed by a court

22  reporter.  It's important you speak clearly and at a

23  level that she can hear you.  Do you understand that?

24      A.   Yes.

25      Q.   And it's also important that you answer

1   questions verbally with words like "yes" or "no," instead

2   of "uh-huh."  Do you understand that?

3       A.   I do.

4       Q.   At times today your attorney might object to

5   certain questions that I ask, which is fine.  You're

6   still required to answer every question unless you're

7   instructed by your attorney not to.  You're required to

8   answer each question I ask truthfully and completely as

9   possible.  Do you understand that?

10      A.   Yes.

11      Q.   Okay.  So I do have a lot of questions to get

12   through today.  I want to do this in an efficient manner.

13   I want to be respectful of your time and others' time.

14         A lot of the questions are going to be yes or

15   no questions, "Did that happen?  Is that true?"  If you

16   think that there's more nuance than a yes/no answer,

17   you're welcome to provide a more complete answer.

18      A.   Okay.

19      Q.   Okay.  Much of what I'm going to ask you about

20   are going to be either things you said or wrote to

21   investigators in the Internal Affairs investigations into

22   Detective Abdullah and into yourself.  I'm going to be

23   asking you about statements from the detectives who

24   worked for you concerning matters relative to this

25   lawsuit.  I'm going to ask you to react to them and tell

 1   me if, from your point of view, they are accurate.

 2        A.   Okay.

 3        Q.   All of these statements and writings that I'll

 4   be referencing are going to be from things that your

 5   attorneys have had access to, so none of these materials

 6   should be a surprise.  As I said, I brought printed

 7   copies of all of them, one of which I've handed the court

 8   reporter.  I'm going to quote directly from these a lot,

 9   and when I do, I'll do my best to say "quote" before and

10   after any direct quotations.  Okay?

11        A.   Okay.

12        Q.   I've already explained sort of the system we

13   have for tracking those.  All right.  So I'm going to

14   start by looking at the first exhibit, if you want to

15   open up just Exhibit A, and I've labeled this Plaintiff's

16   Exhibit A.  And this is what's labeled "Findings and

17   Recommendations," and it's the RPD Internal Affairs

18   Report about Detective Abdullah.  The bottom right-hand

19   corner of the page is stamped COR 005974.

20             (Exhibit A was identified for the record.)

21             BY MR. MANCE:

22        Q.   And we're going to look at that page and the

23   next one, 5975.  I'm going to read the highlighted --

24   some passages that I have highlighted to you and then I'm

25   going to ask you a question.

1          Okay.  So the conclusions -- the findings say,

2     "Detective Abdullah made an arrest of Dennis Williams on

3     August 15, 2018, when Mr. Williams sold counterfeit pills

4     to a confidential informant."  And I'm not going to read

5     the whole thing.  I'm just going to skip around and read

6     a few things from this.

7          "Dennis Williams was released from prison on

8     August 30th, 2019 and placed on parole with certain

9     post-release conditions that included no contact with

10    illegal drugs or people in possession of illegal drugs.

11         "On November 26, 2019, Dennis Williams made the

12    first of 19 total buys for what was supposed to be

13    heroin.  Detective Abdullah used Dennis Williams as a

14    confidential informant to make 10 heroin cases against a

15    total 13 suspects from November 2019 through May 2020.

16    In every case where Dennis Williams returned from the

17    purchase with a product that was reported to be heroin,

18    the lab test confirmed lack of any controlled substance

19    to be present in the material.  Detective Abdullah

20    received the first negative lab test result on January 7,

21    2020, and the second negative lab test on February 25,

22    2020.  An additional 8 heroin cases were made by

23    Detective Abdullah while using Dennis Williams as a

24    confidential informant after the first negative lab test.

25    Additionally, none of the above-mentioned heroin cases

1   made by Detective Abdullah while using Dennis Williams as

2   a confidential informant resulted in audio or video

3   recording of any drug transaction, despite the fact that

4   working equipment was used in each case, and in some

5   cases more than one type of recording device was used at

6   the same time."

7            My question is, sitting here today, do you

8   dispute the accuracy of any of those conclusions?

9            MR. BLANCHARD:  Objection.

10           MR. BENSON:  Objection, form, foundation.

11           MR. BLANCHARD:  And knowledge, for that matter.

12  Go ahead.

13           THE WITNESS:  I can't say that I could

14  accurately confirm all that information, no.

15           BY MR. MANCE:

16      Q.   Do you believe that information to be correct?

17           MR. BENSON:  Same objection.

18           MR. BLANCHARD:  Objection.

19           THE WITNESS:  I don't.

20           MR. BLANCHARD:  Same thing.

21           BY MR. MANCE:

22      Q.   When did Dennis Williams first become known to

23  you?

24      A.   From the -- when you first started reading the

25  information regarding him about the -- when he sold the

1    counterfeit pills to another informant.

2         Q.    And when was that?

3         A.    I don't know a specific date, but you had a

4    date referenced in there that you just read.

5         Q.    Are you the person who approved him to work as

6    a confidential informant?

7         A.    No.

8         Q.    Who was?

9         A.    Ultimately, all the confidential informant

10   packets are approved by the Lieutenant for Drugs and

11   Vice, who at the time would have been Jennings Bunch.

12        Q.    Did you have a role in the approval process?

13        A.    Yes.

14        Q.    What was your role?

15        A.    The role is to review the informant packet,

16   make sure that everything in the packet is included, and

17   then forward it to the lieutenant.

18        Q.    And how long did Dennis work as a CI?

19        A.    From -- I don't have a specific date, but he

20   was blacklisted on that last case in May, so from -- I

21   don't have a specific time frame, but when you -- shortly

22   after the sale of those counterfeit pills, he was

23   approved, and then he was blacklisted after that last

24   case when I was on vacation.

25        Q.    Was his work for your unit continuous or were

1    there any interruptions?

2         A.   There were some interruptions.  He was arrested

3    on a unrelated charge and was in jail in another county

4    for a time.

5         Q.   How many buy operations did he conduct in total

6    for your unit?

7         A.   I do not know.

8         Q.   Did Dennis have a code name?

9         A.   Yes.

10        Q.   What was that code name?

11        A.   Aspirin.

12        Q.   And why was that given?

13        A.   It was a reference to the counterfeit pills

14   that he sold on the initial encounter that we had that

15   ended up being aspirin.

16        Q.   Did that name raise any red flags for you?

17        A.   No.

18        Q.   The SBI concluded that Dennis made 30

19   controlled buys and Internal Affairs said that 10 of the

20   arrests involved heroin trafficking.  Does that sound

21   correct?

22        A.   Yes.

23        Q.   Of those 30 buys, approximately how many of the

24   buys were you involved in in some capacity?

25        A.   I would say the majority of them.

1        Q.    Detective Abdullah testified in his

2   deposition -- this is Exhibit B at page 43 -- that you

3   were there for about 90 percent of the buys he set up,

4   that you would typically accompany them in your own

5   vehicle.  Is that correct?

6        A.    Right.

7              (Exhibit B was identified for the record.)

8              BY MR. MANCE:

9        Q.    He described your activities -- and this is at

10  B-44 -- as, quote, "helping with surveillance, monitoring

11  the buy and assisting each other on each other's buys."

12  Is that accurate?

13       A.    Yes.

14       Q.    He testified that you would monitor the buy

15  through video on your phone, through things like the 1021

16  app, as well as through physical surveillance.  That's at

17  B-44 as well.  Is that correct?

18       A.    Yes.

19       Q.    When did the operations with Dennis Williams

20  come to a halt?

21       A.    In May, when the case that occurred when I was

22  on vacation.

23       Q.    What about the first time around that there was

24  an interruption?

25       A.    I would assume when he went to jail.

1     Q.   And when -- did he go to prison?

2     A.   As far as I know, he was in a county jail.

3     Q.   Okay.  Do you recall for how long he was

4  incarcerated?

5     A.   I do not.

6     Q.   Was Dennis Williams on probation at the time he

7  was released in 2019?

8     A.   I do not know.

9     Q.   To be clear, you do not know, sitting here

10 today, or you did not know at the time?

11    A.   Both.

12    Q.   Okay.  Has the court in his case, to your

13 knowledge -- or did the court in his case, to your

14 knowledge, impose any terms that he was not to have

15 contact with narcotics?

16    A.   I do not know.

17    Q.   If a person is working under such terms, are

18 they permitted to work as a CI for Vice?

19    A.   They're permitted to work as a CI for Vice if

20 they get the approval of probation and parole.

21    Q.   Did you ever see paperwork signed by Dennis

22 Williams' probation officer, Mr. Upchurch, saying that

23 Dennis was approved to work with Omar Abdullah doing CI

24 buy work?

25    A.   Yes.

1      Q.   Did you produce that paperwork in your Internal

2   Affairs hearing?

3      A.   No.

4      Q.   Did you ever see paperwork signed by a judge

5   saying that it was okay for Dennis to work with Omar

6   Abdullah doing CI buy work?

7      A.   That would have been the same paperwork.

8      Q.   Okay.  Why didn't you produce to Internal

9   Affairs investigators that paperwork when you had an

10  incentive to do so?

11     A.   Because it wasn't my paperwork.  It was

12  Detective Abdullah's paperwork.

13     Q.   Was it not available to you?

14     A.   No.

15     Q.   Is it your understanding that you could not

16  have gotten it or your attorney could not have gotten it

17  for purposes of the IA process?

18          MR. BLANCHARD:  Objection.  Just to be clear, I

19  don't represent him in the IA stuff and I don't know if

20  he had an attorney.

21          BY Mr. MANCE:

22     Q.   Did you have an attorney?

23     A.   No.

24     Q.   Okay.  In your role as sergeant of the unit,

25  was it the department's expectation that you would

1   require that paperwork be turned in with all the

2   necessary signatures before you would approve a proposed

3   CI who was on probation to work with one of your

4   detectives?

5       A.   Yes.

6       Q.   Did you ever ask Omar Abdullah if Dennis

7   Williams was on probation?

8       A.   I don't know if I specifically asked him, but I

9   specifically recall that we had to get court approval

10  paperwork for him to additionally work as a CI, and I

11  remember specific correspondence between Detective

12  Abdullah and the office of probation/parole to get that

13  approved.

14      Q.   Did you personally verify that information?

15      A.   I don't -- I personally saw the paperwork for

16  the approval when Detective Abdullah brought it to the

17  station.

18      Q.   Do you have access -- or did you have access to

19  CJLEADS at that time?

20      A.   I didn't specifically have access to CJLEADS.

21  CJLEADS was available through multiple detectives if I

22  were to need it.

23      Q.   So you had a way of getting on CJLEADS if you

24  wanted to?

25      A.   Yes.

1      Q.   Did you check CJLEADS at any time to look up

2   Dennis Williams?

3      A.   No.

4      Q.   As sergeant, was it the Raleigh Police

5   Department's expectation that you would not approve a

6   detective's request to certify CIs if there was a

7   reasonable basis to think that the CI had a pattern of

8   dishonesty?

9           MR. BLANCHARD:  Objection to the form.  You can

10  respond.

11          THE WITNESS:  Can you repeat that?

12          BY MR. MANCE:

13     Q.   Sure.  As sergeant, was it the department's

14  expectation that you would not approve a detective's

15  request to certify a CI if there was a reasonable basis

16  to think that the CI had a pattern of dishonesty?

17     A.   Yes.

18     Q.   Are you aware if Dennis Williams is a member of

19  a gang?

20     A.   That was my understanding.

21     Q.   Did you see that as any issue?

22     A.   No.

23     Q.   Did Dennis Williams stab a woman the same year

24  that he assisted your unit with the operation we're here

25  about today?

1          A.    I have no knowledge of that.

2          Q.    To your knowledge, did he ever stab a woman?

3          A.    I don't know.

4          Q.    Would that be the type of thing that you would

5     expect to be told about if it did happen?

6          A.    Yes.

7          Q.    Did any of the drugs Dennis Williams produced

8     in buy operations in 2018, prior to his time of

9     incarceration, come back as counterfeit or not what they

10    were represented to be?

11         A.    Not to my knowledge.

12         Q.    Okay.  I'd like to look at a report.  It's

13    labeled Exhibit C, if you could just turn to it.  It's

14    labeled "Incident Number P18051289."  It identifies the

15    suspect as, quote, "white boy."  I've labeled it

16    Plaintiffs' Exhibit C.  It's from September 20th, 2018.

17              (Exhibit C was identified for the record.)

18              BY MR. MANCE:

19         Q.    This was a purported purchase of crack cocaine

20    that turned out not to be narcotics.  Do you recall this

21    incident?

22         A.    Not specifically.

23         Q.    What would you have generally done in response

24    to something like this?

25         A.    So there are occasions when drug dealers or

1   people posing as drug dealers will sell counterfeit

2   controlled substance to rip people off or to just make

3   money off of producing fake drugs, especially in an

4   open-air drug market where there's no specific

5   relationship, per se, between the dealer and the

6   customer, so it wouldn't be uncommon for fake drugs to be

7   sold to a customer.

8       Q.   Would you have made a report somewhere that

9   this CI had produced counterfeit drugs so that if it

10  happened again and became a pattern, you would notice

11  that pattern?

12      A.   Well, in reference to this, are you talking

13  about a CI or are you talking about -- I'm not really

14  following your line of questioning.

15      Q.   If you had a report that indicated that a CI

16  had made a purchase and that purchase turned out to be

17  counterfeit, would you make some sort of report of that

18  so that you would have an opportunity, if that happened

19  again, to see that this was a pattern?

20      A.   Are you asking in the -- prior to a person

21  being signed up as a CI for the police department?

22      Q.   No.  I'm saying that once someone is working as

23  CI, if they make a buy -- and this would have been early

24  on with Dennis -- and that buy turns out to be a

25  counterfeit substance, would you generate any paperwork

1  that, "Hey, this CI produced a counterfeit substance," so
2  that if in the future the same thing happens again, you
3  would have a way of determining that, perhaps, a pattern
4  exists?
5      A.    No, because it's not uncommon for that to
6  occur, depending on the circumstances.  It's too
7  circumstantial to immediately make some kind of notation
8  that the informant ended up purchasing a counterfeit
9  substance.  It's not -- it's not necessarily a reflection
10  on the informant, depending on what we've asked him to go
11  do.
12          Like, if we're asking him to buy drugs from
13  this location, it's not necessarily a reflection on him
14  that the drugs ended up being fake.  Maybe something to
15  keep an eye on, but I wouldn't say it's necessarily
16  something that you would need to make documentation on.
17      Q.    To your knowledge, did you make any
18  documentation in response to this?
19      A.    No.
20      Q.    I'd like to look at another one.  This is
21  marked Exhibit D.  This one, the defendant's name is
22  Gregory Marshall, and this one says, "Analysis for --"
23  there was an analysis done for controlled substances
24  performed when a solid white material came back negative.
25  Do you remember this case?

1     A.   No.

2          (Exhibit D was identified for the record.)

3          BY MR. MANCE:

4     Q.   If you had seen this in terms of what you would

5 have done, would your answer be kind of same as your

6 previous answer?

7     A.   Yes.  One thing I'd like to point out is these

8 are -- this is Detective Abdullah's paperwork.  This is

9 drug analysis that he got returned to him.  It wasn't

10 anything that I had reviewed or had knowledge of.  This

11 was all his -- these are his cases.  I'm not a drug

12 detective.  I'm a supervisor of detectives.

13     Q.   As his supervisor, if you had wanted to look at

14 these documents, would you have been able to?

15     A.   If he had them available, yes.

16     Q.   Well, is there a reason to believe that they

17 would not have been available on the dates that are

18 reflected on the documents?

19     A.   Well, it just depends on, you know, where he

20 kept his files, if they were available to me or not.  You

21 know, a lot of this stuff was generated later and after

22 the fact, the paperwork put together.

23     Q.   These I'm talking about from 2018.

24     A.   Right.

25     Q.   If in 2018 you had gone to Detective Abdullah

1   and said, "I'd like to see your files," even if you

2   didn't know where he kept them, do you think you could

3   have gotten custody of those files?

4            MR. BLANCHARD:  Objection.  Go ahead and

5   respond.

6            THE WITNESS:  If he had them available, yes.

7            BY MR. MANCE:

8       Q.   And if he didn't, that would have been a

9   problem, correct?

10      A.   It very well could have.

11      Q.   Okay.  So this Gregory Marshall incident would

12  have been the second time in about a month's time that

13  drugs came back fake.  Would that have drawn your

14  attention?

15      A.   It would just depend on what we were asking the

16  CI to do, kind of the same answer I gave on the last.

17  It's certainly something to be aware of, but not

18  necessarily red flag material, I would say.

19      Q.   So these documents are dated October and

20  September of 2018.  Would you agree that these operations

21  would have occurred prior to Dennis Williams' stint in

22  prison, after which time he came out?

23           MS. KIBLER:  Objection.

24           THE WITNESS:  I don't know that time frame.

25           MR. MANCE:  What's the objection?

1          MS. KIBLER:  Object to the form.

2          BY MR. MANCE:

3     Q.    Prior to your realization that he was selling

4  fake drugs, was there anything notable about Dennis

5  Williams as an informant?

6          MR. BLANCHARD:  Object to the form.

7          BY MR. MANCE:

8     Q.    You can answer.

9     A.    He was selling --

10    Q.    Let me withdraw the question.  I'll just -- was

11 there anything notable about Dennis Williams as an

12 informant?

13    A.    No.

14    Q.    Were the drug buys he was making generally

15 consistent in terms of quantity and frequency of purchase

16 as the other purchases that the other CIs used by your

17 unit were making?

18    A.    Yes.

19    Q.    A number of your detectives told Internal

20 Affairs that Abdullah and Williams were making

21 unprecedented buys, that they made 10 heroin trafficking

22 cases, which are among the more serious cases that you

23 can make and are often handled by other units.  Were

24 these cases unprecedented?

25          MR. BENSON:  Objection.

1              THE WITNESS:  Am I supposed to answer?

2              BY MR. MANCE:

3        Q.    You can answer.

4        A.    Okay.  I wouldn't say unprecedented, no.

5        Q.    Okay.  I'm going to reference a quote on

6    Exhibit E, page 4.

7              (Exhibit E was identified for the record.)

8              BY MR. MANCE:

9        Q.    Detective Rattelade says no one on your whole

10   squad had a CI who had the kind of connections and street

11   credit necessary to make the kind of buys that Williams

12   was making for Abdullah.  His quote was, quote, "You'd

13   have to have a really good connection and real people

14   vouching for you.  Nobody assigned to my unit really has

15   anyone with that kind of street credit," end quote.  He

16   said the people who make those types of arrests are

17   generally in the Career Criminal Unit and Criminal

18   Enterprise Unit.

19             What is your reaction to those statements?

20             MR. BENSON:  Objection to form.

21             MS. POOLE:  Objection.

22             THE WITNESS:  Answer it?

23             BY MR. MANCE:

24       Q.    Uh-huh.

25       A.    I would -- I kind of contributed his ability to

 1   bring in those sorts of cases to his gang affiliation.
 2   That's why I felt that he was able to bring in that many
 3   trafficking cases, because of his gang affiliation.
 4        Q.   Who else would you compare Williams' arrests to
 5   in terms of productivity?
 6        A.   I don't have a comparison.
 7        Q.   Is there anyone that you can think of, even if
 8   by name -- not by name, who was as productive in terms of
 9   the volume and frequency of heroin?
10        A.   No.
11        Q.   Are you aware of any such person in the history
12   of the Raleigh Police Department?
13             MR. BLANCHARD:  Objection.  Go ahead.
14             MR. MANCE:  You know -- what is the objection?
15             MR. BLANCHARD:  Objection to the form and,
16   also, because it calls for speculation, but go ahead.
17             MR. MANCE:  I'm just asking if he's aware.
18             THE WITNESS:  There's plenty of large
19   trafficking -- heroin trafficking cases that we've had on
20   the Raleigh Police Department, much more than this
21   informant ever got combined.
22             BY MR. MANCE:
23        Q.   Did detectives believe they needed to complete
24   a certain number of investigations and identify a certain
25   number of suspects per year in order to get a positive

1    performance review?

2         A.    No.

3         Q.    I'm going to reference Exhibit F and Exhibit G

4    here in this next question.

5              (Exhibit F and Exhibit G were identified.)

6              BY MR. MANCE:

7         Q.    Would you agree that the annual performance

8    review that you conducted of Detective Abdullah in 2020,

9    a month after the raid, which he also had an opportunity

10   to review, identified one of his employee goals as,

11   quote, "Conduct 4 to 5 street level/short-term

12   investigations per quarter involving low level drug

13   traffickers or habitual felons in order to cultivate

14   confidential sources onto mid to high level drug

15   traffickers," end quote, and that it identified another

16   goal as, quote, "Conduct 1 to 2 mid to long-term drug

17   investigations, high-value targets or criminal

18   organizations per year."

19             Would you agree that his written performance

20   review identifies both of those as employee goals?

21             MR. BENSON:  Objection to form.

22             THE WITNESS:  Yes.

23             BY MR. MANCE:

24        Q.    Who came up with those employee goals of 4 to 5

25   street-level folks and 1 to 2 high-value targets?

1      A.   It's just basically boilerplate stuff that's on

2  most anybody -- all the drug guys' performance

3  evaluations.

4      Q.   I'm going to ask the question again.  Who came

5  up with those goals?

6      A.   I don't know.

7      Q.   Was Lieutenant Bunch aware that that was part

8  of the performance evaluation?

9      A.   Yes.

10     Q.   Did you always give Detective Abdullah positive

11 performance reviews?

12     A.   Yes.

13     Q.   If Detective Abdullah had completed less than 4

14 to 5 street-level operations per quarter and less than

15 two long-term investigation of high-value targets per

16 year, would you have been as likely to give him a

17 positive performance review?

18     A.   Yes.

19     Q.   Okay.  I want to turn now and ask some

20 questions about various detective statements to IA

21 investigators during the inquiry into Detective Abdullah.

22 Detective Abdullah told Internal Affairs that you advised

23 him not to file charges against Dennis Williams'

24 girlfriend after he threatened to charge her on account

25 of her texting him saying that his work with Dennis was

1  endangering her and her child and saying she was going to

2  blow the whistle on him.  Do you remember that?

3          MR. BLANCHARD:  What are you talking about in

4  that?  There's a whole lot of parts.  Does he remember

5  what?

6          MR. MANCE:  I asked him, "Do you remember --"

7  okay.  I'll try to break it down.

8          BY MR. MANCE:

9      Q.  Do you remember advising Abdullah not to file

10  charges against Dennis Williams' girlfriend?

11     A.  I remember a conversation related to that

12  topic.  I don't remember the specifics of what I told him

13  or didn't tell him to do.

14     Q.  Do you remember -- were you aware that she

15  claimed that she was being threatened?

16     A.  No.

17     Q.  Were you aware that she had texted Detective

18  Abdullah?

19     A.  Yes.

20     Q.  And were you aware that those texts were what

21  prompted him to contemplate taking charges out against

22  her?

23     A.  I remember him basically saying that she was --

24  she was somewhat threatening Abdullah because she was

25  upset with her boyfriend or Aspirin being involved in

1   these cases, and she felt that it was endangering her

2   when it was something along those lines.

3        Q.   Endangering her?

4        A.   Right.

5        Q.   And also endangering her child?

6        A.   Right.

7        Q.   And to your knowledge, did you ever ask

8   Detective Abdullah to see those text messages?

9        A.   No.

10       Q.   Did you inquire into her safety?

11       A.   No.

12       Q.   And just to be clear, were you aware that she

13  was saying that gang members were threatening her and her

14  children -- her child's life?

15       A.   No.

16       Q.   To your knowledge, was this the same lady

17  who -- the same lady who asked for help, is she the same

18  woman who he stabbed later that year?

19       A.   I don't know.

20       Q.   I'm going to reference Exhibit H, page 62.

21            (Exhibit H was identified for the record.)

22            BY MR. MANCE:

23       Q.   Detective Abdullah made repeated reference to

24  your evaluations of him.  In his IA defense, he said he,

25  quote, believed you, Rolfe, "did give me an accurate

1    evaluation."  Do you agree?

2             MR. BENSON:  Objection to form.

3             THE WITNESS:  Yes.

4             BY MR. MANCE:

5        Q.   I'm going to read some statements from the IA

6    investigator to Detective Abdullah and I want you to tell

7    me if you have any reason to dispute the accuracy of what

8    he said.  These are located on pages 63 to 67 of

9    Detective Abdullah's interview with IA.  This is H, pages

10   63 to 67.

11            Quote, "So let me explain --" and this is the

12   IA investigator speaking.  Quote, "So let me explain

13   something to you about the buy videos.  There's no

14   recording of a buy.  There's no audio.  There's typically

15   no audio of a buy occurring.  And I'm talking generally.

16   Maybe there was one, one I can think of that happened

17   outside of a gas station where they went inside of a

18   bathroom and made the purchase.  That is probably by far

19   the best video that you ever presented in these 11 cases.

20            "All that does is show the defendant's face for

21   like two seconds.  You don't see a transaction.  They're

22   just in a bathroom together.  There's no video.  There's

23   just footage to support any -- there's just no footage to

24   support anything that you're putting in these reports.

25            "It would have been great to actually have a

1  video of an actual drug transaction occurring.  Out of

2  these 11 heroin cases and multiple buys, it would have

3  been great to have just one."

4           MR. BLANCHARD:  That's not in our --

5           MR. BENSON:  It's missing from the binder.

6           MR. BLANCHARD:  It's not in our version of it.

7           MR. MANCE:  Are you looking under the H tab?

8           MR. BLANCHARD:  Uh-huh.

9           MS. KIBLER:  Yes.

10          MR. BENSON:  Yes.  We're missing --

11          MR. BLANCHARD:  Yeah, you skipped from 63 to

12 67.  But, I mean, if you've got questions to ask him --

13          MR. MANCE:  Well, I don't know -- that could

14 have just been like gotten lost in the copy machine.

15          MR. BLANCHARD:  It's okay.

16          MR. MANCE:  Well, I represent that that is what

17 the -- that is what he said.

18          MR. BLANCHARD:  And to clarify, you're asking

19 if he agrees with what the IA investigator said or agrees

20 that the IA investigator said it?  What exactly is the

21 question?

22          BY MR. MANCE:

23     Q.   My question is, do you have any reason to

24 dispute that characterization of what the investigator

25 said the videos show or do not show?

1              MR. BENSON:  Objection to form.

2              MR. BLANCHARD:  Objection to form.

3              THE WITNESS:  I don't have any knowledge of

4    what was -- I don't have any specific knowledge of what

5    was on any of the audio or video recordings.  That was

6    the responsibility of the detective to determine that

7    there was sufficient video and audio evidence to satisfy

8    prosecution by the DA's office.

9              BY MR. MANCE:

10       Q.   Okay.  So Abdullah responded to that statement

11   and this is what he said.  He said, quote, "I would love

12   that, too.  You've got to keep in mind that when we're

13   doing these buys and takedowns, I'm not doing it by

14   myself.  Okay.  You have other guys in the unit that are

15   helping.  My supervisor helps me a lot.  He's there as

16   well.  I just want to make sure that's clear and that's

17   reflected."

18              So Abdullah is saying, yes, none of these

19   videos show anything, but he's saying he didn't realize

20   the lack of video was an issue because you were right

21   there with him.  Is he being truthful?

22              MR. BENSON:  Objection to form.

23              MR. BLANCHARD:  Objection to form.

24              THE WITNESS:  So what he's saying here, there's

25   a couple of different audio and video devices that are

1   used.  There's a phone app, which was mentioned earlier,

2   the 1021 app, so it's an app that's embedded on a

3   cellphone that the informant has, live audio so you can

4   hear what's going on, and then there could be a secondary

5   recording device.  It might be a camera inside of a hat

6   or a shirt button or something along those lines that

7   records on a USB device that is downloaded later that is

8   not -- nobody's privy to that during the actual deal.

9            What he's referring to is the 1021 app, which

10  is a live audio feed that you can listen -- kind of

11  listen to what's going on inside the vehicle.  You might

12  not necessarily be watching what's going on inside the

13  vehicle, but it just kind of gives you the ability to

14  hear what's going on.

15           And of all these cases, these were kind of open

16  air where the informant was inside of a vehicle, so we're

17  not necessarily keyed in looking at a feed on a phone.

18  We're watching a car, a transaction occurring in a car,

19  at the same time utilizing that audio, waiting to hear

20  either a takedown signal, which is indication that the

21  deal had been done, and then you have tactical teams and

22  et cetera that are ready to pounce out and make the

23  arrest.

24           So what he's referring to is the -- in my

25  opinion, what he's referring to is the 1021 app, which is

1   a live audio, and also referring to us just visually

2   seeing the car, knowing he's inside the car waiting for

3   those signals to make the arrest.

4        Q.   You told Internal Affairs -- this is at I,

5   page 17 -- "I'm there to listen and do overwatch and to

6   be able to respond in the event that something goes bad.

7   I'm monitoring the radio.  I'm monitoring our audio

8   device.  If I see something that's being missed, I'll

9   interject that."

10            (Exhibit I was identified for the record.)

11            BY MR. MANCE:

12       Q.   Is that an accurate description of your

13  involvement in these operations that we're discussing?

14       A.   Yes.

15       Q.   Okay.  I want to turn to a separate interview

16  that Detective Abdullah gave the IA.  This is Exhibit J.

17            (Exhibit J was identified for the record.)

18            BY MR. MANCE:

19       Q.   This occurred on August 25th, 2020, and this

20  was with Sergeant Davis.  And I'm going to be asking

21  about a statement on page 8 and 9.

22            Sergeant Davis has asked Detective Abdullah

23  whether it was possible that the CIs could have

24  contraband hidden on their person, and Detective Abdullah

25  responds, quote, "We're not strip searching them."  He

 1   says, quote -- and that's a direct quote, "We're not

 2   strip searching them."

 3            He then says, quote, "There's not a 100 percent

 4   chance," quote, that that won't happen.  Quote, "To be

 5   honest with you, you know, we're not asking them to bend

 6   over.  We do a pat down.  We also have -- what I do is

 7   have them turn their pockets inside out.  I'll just do a

 8   quick pat down of their outer clothing.  I'm not going to

 9   stick my hands in their pants or anything like that."

10            MS. KIBLER:  Object to form.

11            MR. MANCE:  I haven't even asked the question.

12            MS. KIBLER:  Just letting you know it doesn't

13   look like what you said is directly --

14            MR. MANCE:  So we can -- why don't we look at

15   it, because I think it is and I think I just am -- I'm

16   not paraphrasing.  I'm reading all direct quotes, but I'm

17   omitting "ums" "ahs," things in between, and you're

18   welcome to go back and, you know, address that.  I think

19   the words I read were what he said.

20            MR. BENSON:  If you're going to paraphrase and

21   attribute that to --

22            MR. MANCE:  I'm not paraphrasing.

23            MR. BENSON:  I couldn't find where you were

24   reading from.

25            MS. KIBLER:  And there are pieces where you

1   skipped words.

2           MR. BENSON:  Yeah.

3           MS. KIBLER:  So I just want to put that on the

4   record so you're aware of it, and that is all I need to

5   do.

6           MR. BENSON:  Same.

7           MR. MANCE:  Okay.  And just to be clear, I did

8   not mean to say "paraphrase," because "paraphrase" means

9   you're putting other people's words and your words.  I

10  was not doing that.  I was reading all statements from

11  the witness.  There were some spaces where I kind of

12  hopped around on that page, but I tried to highlight

13  where I am so you can follow along.

14          BY MR. MANCE:

15      Q.   Okay.  Were you aware that when Detective

16  Abdullah was doing pre-buy searches of CIs, that his

17  practice was to do a quick pat-down and then ask people

18  to turn their pockets out?

19      A.   That's standard practice, yes.

20      Q.   Is that how officers are trained to do it?

21      A.   Yes.

22      Q.   And that's consistent with department policy?

23      A.   Yes.

24      Q.   In that same interview, Detective Abdullah

25  said -- this is at J-13 -- "Some of our best CIs are

 1    going to have extensive criminal histories."

 2              Sergeant Davis asked him if he would be

 3    concerned if that, quote, "extensive criminal history"

 4    included -- and then I put in brackets "crimes" and

 5    brackets of "deception if they have charges like larceny

 6    or fraud or stuff like that," end quote.

 7              Abdullah responded, quote, "I don't worry so

 8    much about that."  Detective Rattelade told IA, quote,

 9    "Typically, we try to shy away from CIs that are involved

10    in anything involving any -- anything kind of involving

11    theft or deception," end quote.  That's at E-11.

12        A.    Okay.  Hold on.

13        Q.    And my question is, do you agree with Abdullah

14    or Rattelade?

15              MR. BENSON:  Objection to form.

16              MS. POOLE:  Objection.

17              MR. BLANCHARD:  I'm going to object to form,

18    too.

19              THE WITNESS:  So informants, in nature, are --

20    you know, almost all of them are criminals.  They're all

21    manipulators.  They're -- it's just the nature of the

22    beast that they're in the position where they're working

23    for the police for a reason, an ability to make money and

24    other ways or just to capitalize on that sort of

25    behavior, so it's not uncommon for almost all informants

1   to have criminal backgrounds.  So I wouldn't say that it

2   was -- I guess both Abdullah and Rattelade points were

3   valid in their own right, I would say, but it's not

4   uncommon.  All informants are mostly criminals.

5           BY MR. MANCE:

6       Q.   So one seems to say, "That would be an issue

7   for me."  And the other seems to say, "It wouldn't."

8   What was your perspective when you were the sergeant

9   about if a history of theft, larceny, charges involving

10  deception would be disqualifying --

11      A.   My perspective would be --

12           MR. BENSON:  Objection to form.  Sorry.

13           THE WITNESS:  My perspective would be if the

14  packet was forwarded to our Drugs and Vice lieutenant for

15  approval and all of his criminal background was included

16  in those packets, which they were, and he was approved to

17  work, it would be on a case-by-case basis and it's the

18  individual detective's decision whether or not they were

19  going to use that informant.  And if they didn't want to

20  use him, they would not have brought the packet forward,

21  most likely.

22           BY MR. MANCE:

23      Q.   Sergeant Davis also asked Detective Abdullah --

24  this is H-14 -- quote, "When they go --" and the "they"

25  here is the CIs.  "When they go and purchase the drugs,

1    how many times do you do a qualifying buy before you can
2    label them as reliable," end quote.
3              Detective Abdullah responded, quote, "I would
4    do one, one time," end quote.
5              Is that answer correct?  Are officers
6    instructed that they may qualify someone as reliable with
7    a single drug purchase?
8         A.   Yes.
9              MR. BENSON:  Objection to form.  Where is H-14?
10             MR. BLANCHARD:  Yeah.  We don't have H-14.
11             MR. MANCE:  So the 14 refers to the -- oh,
12   you're right.  It will be in here, then.  Do y'all want
13   to see it?
14             MR. BENSON:  I've already stated my objection.
15             MS. POOLE:  Yes.  I mean -- I'm okay right now.
16             BY MR. MANCE:
17        Q.   How many purchases were necessary before
18   detectives could qualify a CI as reliable?
19        A.   One.  One.
20        Q.   It is one.  In that interview, Detective
21   Abdullah described to Sergeant Davis the process of
22   writing up the paperwork associated with a search
23   warrant.  This is at J-25.
24             One of the things that he says is they ask the
25   CIs, quote, "Was there any women inside the apartment?

 1   Was there any children?  If there's any elderly, if
 2   there's any women, children, dogs, anything like that,"
 3   and there's an ellipsis here, "I'm putting it on the
 4   board during my briefing for a search warrant.  That's
 5   something they need to know, so that way, they can do the
 6   job safely."
 7           Do you agree with that statement?
 8           MR. BENSON:  Object to form.
 9           BY MR. MANCE:
10      Q.   All right.  I'm going to withdraw that
11   question.  Should search warrant briefings include the
12   type of information Detective Abdullah described?
13           MS. KIBLER:  Object to form.
14           THE WITNESS:  What that is, is those -- those
15   references to elderly, children, dogs, et cetera, those
16   are questions that are on our tactical raid plan, so
17   basically our tactical units want to know the answers to
18   those questions for their safety when doing search
19   warrants, et cetera, so that is a reference to those
20   qualifying questions that are included in every search
21   warrant, just for the benefit of the tactical operators.
22           BY MR. MANCE:
23      Q.   Are you aware of any documents generated by
24   Detective Abdullah relating to the search aimed at Marcus
25   VanIrvin that made any mention of the women or children

1   plaintiffs in this case?

2        A.    No.

3        Q.    In that same interview -- this is at H-33 --

4   Detective Abdullah describes Dennis Williams, the

5   informant, as, quote, "a Blood gang member, a Billy," end

6   quote.

7             Were you aware that the Raleigh Police

8   Department was paying cash to a member of the Blood

9   street gang to facilitate these arrests?

10       A.    Yes.

11       Q.    Does the department routinely employ gang

12  members as confidential informants?

13       A.    Yes.

14       Q.    The answer is yes?

15       A.    (Witness nods head.)

16       Q.    Sergeant Davis asked Detective Abdullah about

17  the CCBI sending your unit the results of drug tests of

18  purported heroin purchased by Dennis Williams and that

19  this test result was received on February 25th, 2020.

20  That's at J-60.

21            He said the results were, quote, "not heroin,

22  not heroin, not heroin.  That's three cases, three tests,

23  all not heroin.  Do you have any red flags," end quote.

24            Abdullah responded that it, quote, "went

25  back --" it went, quote, "back to the drug dealer," end

1    quote.

2         A.    I don't know.

3         Q.    Do you remember this?

4         A.    No.

5         Q.    If you had been aware of it, would that seem a

6    probable explanation to you, as the sergeant of a drug

7    unit, that three negative tests indicated that the

8    witness -- that the CI was ripped off by three different

9    dealers?

10        A.    We don't -- by policy, we don't test, field

11   test drugs in the police department because of the threat

12   of fentanyl; and, moreover, most drugs that are sold as

13   heroin today are fentanyl, which would not come back in a

14   positive fashion for heroin, so there's no indication

15   that there wasn't possibly another active ingredient

16   other than heroin.

17        Q.    Do you believe that the substances that were

18   seized in the arrests involving the men who got the

19   settlement with the City who were arrested behind this --

20   do you believe that those substances were fentanyl?

21        A.    Well, now, having -- you know, the full

22   investigation having occurred and being aware of what was

23   speculated to have happened, I don't believe it, but at

24   the time it could have been believable.

25        Q.    Sergeant Davis asked Detective Abdullah -- this

 1  is at J-80 -- quote, "Do you know how much money Dennis

 2  Williams made, roughly," end quote.

 3           Abdullah responded, quote, "No, I have no idea

 4  how much he made, roughly," end quote.

 5           Do you know how much money Dennis Williams

 6  made, roughly?

 7       A.   No.

 8       Q.   Were you aware that Dennis -- excuse me.  Were

 9  you aware that Detective Abdullah said that he had

10  reservations about Dennis Williams' trustworthiness on

11  the day of the raid of my clients' homes just a few hours

12  before?

13           MR. BLANCHARD:  Objection to form.

14           THE WITNESS:  No.

15           BY MR. MANCE:

16       Q.   As a sergeant of a drug unit, if one of your

17  detectives expresses reservations about the honesty of

18  their CI, would you permit them later that day to seek a

19  search warrant on that CI's word?

20       A.   No.  And are we talking about the case where I

21  wasn't here and had no involvement?

22       Q.   I'm just asking, sir, if you had been there.  I

23  understand you weren't there.

24       A.   No.

25       Q.   Detective Abdullah told Sergeant Davis that

1    during the VanIrvin buy, Williams zipped up his jacket in

2    a way that convinced Abdullah that Williams was, quote,

3    "trying to conceal something," end quote.  That's at

4    J-95.

5            Abdullah said that he reprimanded Williams and

6    told him directly that, quote, "When you do that, you

7    bring suspicion into the case.  You can't do crap like

8    that.  You're manipulating the video," end quote.

9            Is it your testimony that you were not aware

10   that that conversation occurred prior to today?

11       A.   Yes.

12       Q.   Is that the sort of information that Detective

13   Abdullah should have told the judge?

14       A.   What judge?

15       Q.   Who he sought a search warrant for.

16       A.   I'm going to answer to his -- not knowing the

17   background of that scenario, what that conversation was,

18   I wouldn't answer to what his -- what he should have

19   provided the judge.  If you can rephrase it in a

20   different way, I might be able to answer it.

21       Q.   Sure.  If a detective has misgivings about the

22   honesty of a CI upon who he's relying, and those

23   misgivings are strong enough that he has verbally stated

24   them out loud, is that the sort of thing that a judge

25   should be made aware of by that detective if the

1   detective is going to seek a search warrant on the basis

2   of that CI's word?

3       A.   I would say no because -- so as a handler of an

4   informant, it's almost like a parent/child type

5   relationship in some aspects.  You know, the informant,

6   (A) Wants the money from the police department for

7   completing the buy, would be more than happy if there

8   weren't enough evidence to prosecute where he wouldn't

9   have to go to court to testify or that sort of thing, so

10  they're going to play the boundaries as much as they can

11  if they can get away with it.

12          Now, that doesn't necessarily mean that the

13  informant is no good or shouldn't be used, but it's an

14  indication that Detective Abdullah was addressing a

15  behavior that he felt was detrimental to a good case.  It

16  doesn't necessarily mean that he would be feeling like

17  this informant is not capable of completing the task or

18  isn't still a good informant to use.  It's almost like a

19  corrective behavior with a child.  As long as the child

20  or CI, you know, correctly changes those behaviors

21  doesn't necessarily mean that the informant is not

22  someone that we'd continue to use.

23      Q.   Okay.  I want to just spend another minute on

24  this.  So Detective Abdullah told Internal Affairs on the

25  day that he sought the search warrant that led to my

1   clients' homes, he said, "I caught him," quote, "trying

2   to conceal something."  And he was referring to the

3   camera, and this was now, you know, more than a dozen

4   operations in.  There would have many discussions of the

5   camera at this point.

6             MR. BLANCHARD:  Objection to the form.

7             MR. BENSON:  Same.

8             MR. MANCE:  I have to get my question out

9   first.

10            MR. BLANCHARD:  When you're done testifying, go

11  ahead.

12            BY MR. MANCE:

13       Q.   Okay.  So it's your testimony that if Detective

14  Abdullah caught Dennis Williams trying to conceal

15  something earlier that day, that it would not be your

16  expectation that he should share that with the judge?

17            MR. BLANCHARD:  Objection to the form.  I think

18  he testified that he wasn't present, also, at that --

19            MR. MANCE:  But he --

20            BY MR. MANCE:

21       Q.   I'm asking about as the supervisor who's

22  responsible for making sure his detectives do the right

23  thing, would it be the right thing, in your view as a

24  sergeant, to withhold that information from the judge?

25            MS. KIBLER:  Object to form.

1            THE WITNESS:  So when you're presenting a

2    search warrant to the judge, it's a totality of the

3    circumstances.  It's information that you provide to them

4    and then the judge determines whether or not you have

5    probable cause to obtain the search warrant in the form

6    that you're asking.  I was answering in the generality

7    of, you know, how you would handle that type of --

8    something that he picked up on in concealing or what have

9    you.

10           And the specifics of that particular incident,

11   which I was not privy to, wasn't present.  I was in

12   another -- on vacation.  I wouldn't give an opinion on

13   what Abdullah should have included or not included in

14   this search warrant affidavit.

15           BY MR. MANCE:

16       Q.   Fair enough.  Are you aware that Detective

17   Abdullah was found by IA to have violated a policy

18   against seeking a search warrant without a sergeant's

19   approval?

20       A.   Yes.

21       Q.   Are you aware he was found to have violated a

22   policy about using in excess of $400 in an operation

23   without approval?

24       A.   Yes.

25       Q.   If you had been in town, would you have been

1    the person typically to give approval to those requests?

2         A.   Yes.

3         Q.   Why would Detective Abdullah be cavalier about

4    breaking those policies?

5              MR. BENSON:   Objection.

6              MR. BLANCHARD:   Objection.

7              BY MR. MANCE:

8         Q.   Why would Detective -- question withdrawn.  Why

9    would Detective Abdullah believe that he could break

10   those policies?

11             MR. BENSON:   Objection.

12             MR. BLANCHARD:   Objection.

13             THE WITNESS:   I don't have any opinion on what

14   Abdullah's thought process was or if he was even aware

15   that he was violating a policy.

16             BY MR. MANCE:

17        Q.   Were you aware that detective Abdullah told

18   Sergeant Davis that even knowing all of the heroin turned

19   out to be fake, quote, "I would still feel comfortable

20   doing a buy with him," end quote.  That's J-107.

21        A.   No.

22        Q.   Would you still feel comfortable doing a buy

23   with Dennis Williams?

24        A.   After the fact, knowing what occurred, no, I

25   would not.

1        Q.   Do you think Detective Abdullah shows good

2   judgment?

3        A.   No.

4        Q.   Sergeant Davis asked Detective Abdullah -- this

5   is J-111 -- quote, "Have you done anything different from

6   training," end quote.  And Abdullah responded that he had

7   done what he was trained to do.  Do you agree?

8        A.   I wouldn't be able to share an opinion on that

9   because I don't know specifically what he was trained to

10  do.

11       Q.   Did you have training responsibilities with

12  respect to Detective Abdullah?

13       A.   No.  He was trained by a seasoned drug

14  detective, almost like a training officer for a new

15  police officer.

16       Q.   Do you know if Detective Abdullah knew how to

17  look up the lab results for drug tests of substances he

18  submitted to the CCBI during the time he was working for

19  you?

20       A.   I don't know if he did or not.

21       Q.   Is that the sort of thing a drug detective

22  needs to know how to do?

23       A.   Yes.

24       Q.   Okay.  I'm going to now turn to -- did you at

25  any time direct Abdullah to look up the CCBI lab results?

 1      A.   No.

 2      Q.   Okay.  I want to look now at some statements

 3  that detectives made during the IA inquiry into the

 4  complaint against you and ask you about some of the

 5  things that the detectives said in the course of your

 6  case.  And I know you wrote an appeal on this case, so

 7  I'm assuming you've seen these before.

 8           Detectives Gwinn and Rattelade told Internal

 9  Affairs that you did not typically watch buy videos after

10  arrests.  That's L-13 and M-10.

11           (Exhibit L and Exhibit M were identified.)

12           BY MR. MANCE:

13      Q.   Is that true?

14      A.   Yes.

15      Q.   Detective Gwinn told IA, quote, "When I got

16  there --" and this would have been in March '20 -- "I

17  think the first week there were doubts about Aspirin from

18  other detectives," end quote.

19           Do you recall concerns being openly expressed

20  about Aspirin in March 2020?

21      A.   I don't know specific to the time, but I do

22  remember concerns about the CI Aspirin.

23      Q.   Do you recall those concerns being discussed at

24  least a month prior to the May 2020 raid?

25      A.   Yes.

1     Q.    Okay.  Detective Gwinn said Sergeant Rolfe was,

2    quote, "aware of those doubts that," bracket, "his," end

3    bracket, "co-detectives had."  That's Gwinn, L-16.

4          "Detective Rattelade told IA," quote, "it was

5    pretty common to speak negatively about the informant

6    Aspirin," end quote, and that you were present for those

7    remarks.  That's M-13.  Is that accurate?

8     A.    I don't know specific on -- you know, if I were

9    present at every instance that people would talk

10   negatively about him, but I was privy to a few instances

11   that people were griping about the CI, yes.

12    Q.    Detectives Gwinn and Rattelade at L-17 and M-13

13   made statements to the effect that you had a

14   responsibility to look into the situation with Dennis

15   Williams.  Do you believe you had that responsibility?

16          MR. BLANCHARD:  Object to the form.

17          MR. BENSON:  Objection.

18          THE WITNESS:  Yes, and as mentioned in the --

19   probably a little further down into this investigation,

20   as I was supervisor of multiple detectives, including

21   Detective Rattelade, Gwinn, Gay, Monroe, Abdullah, there

22   were personality conflicts among the squad between

23   Detective Abdullah and the remaining detectives, so there

24   was tendency for these other detectives to kind of be

25   more vocal about Abdullah's CI because of the personality

1    conflicts among the squad.

2           So as I was continuing on doing my job and it

3    was -- I was evaluating the situation with Aspirin and

4    the doubts with Aspirin, and I was also weighing to

5    myself whether or not this was more, "Hey, I don't like

6    Detective Abdullah, nor his CI," or if there were actual

7    credible issues with the informant.

8        Q.   Detective Gwinn describes your management style

9    as, quote, "Very hands off.  He trusted his detectives to

10   do the work," end quote.  Do you agree with that?

11       A.   Yes.  Well, let me retract that.  My leadership

12   style was hands off in that I could trust the detectives

13   to do their job because, you know, you're not promoted to

14   detective or assigned to a drug team unless you have a

15   certain skill set and a certain ability to conduct

16   yourself; therefore, you don't need to be hand held.

17   It's not to say that I was laissez-faire or, you know,

18   asleep at the wheel as far as their supervision.  It just

19   meant that these detectives were seasoned.  They knew how

20   to do their job, so they didn't need me to hold their

21   hand and be overbearing or micromanaging on their cases.

22       Q.   I noticed in your recent performance reviews,

23   you were found to have exceeded expectations with respect

24   to developing employees, and they had added a note about

25   your work assisting detectives in developing informants

1  and you got your highest marks for that.  Would you say

2  you were more hands on than the typical sergeant at RPD?

3              MS. KIBLER:  Object to form.

4              THE WITNESS:  I would say for the most part,

5  all our supervisors here on the police department are

6  very good, and I would categorize myself as the same.

7              BY MR. MANCE:

8      Q.   Getting back to the IA interviews, Detective

9  Gwinn also said with respect to Dennis Williams and the

10 issues with him that Rolfe, quote, "didn't proactively

11 try and address any of the issues that were brought to

12 his attention," end quote.  That's at L-023.  In your

13 view, is that an accurate statement?

14     A.   That is inaccurate, so, you know, this is a new

15 detective, the newest detective on the squad, not being

16 privy to what I may or may not have been discussing with

17 my supervisors, what I may or may not have been paying

18 attention to on my own in regards to the CIs.  So I

19 would -- I would categorize that as his uneducated

20 opinion on what his observations were and what he was not

21 aware of.

22     Q.   Detective Rattelade, at M-15, said, quote, "I

23 was pretty suspicious of," bracket, Dennis Williams,

24 talking about the informant.  He said, quote, "The fact

25 that he was arrested under the circumstances that he was

1    arrested, for selling fake drugs, should've been a red

2    flag for close monitoring."  Do you agree?

3         A.   I don't 100 percent agree with that.  It's not

4    uncommon for people to sell fake drugs.  I would say

5    that, you know, this particular informant would not be

6    the only informant that we had utilized and I don't have

7    the specifics, other comparisons, but I would say

8    certainly something to keep an eye on, but I would not

9    consider that necessarily a huge red flag that would

10   require extensive monitoring, no.

11        Q.   Detective Rattelade -- this is also on 15 and,

12   also, onto 16 of M -- said he, quote, "informed Sergeant

13   Rolfe while Aspirin was still being used of the

14   suspicions," end quote, but that you didn't seem to do

15   anything with that information, quote, "because the

16   purchases continued occurring."  Is that accurate?

17             MS. POOLE:  Objection to form.

18             MR. BLANCHARD:  Objection.

19             THE WITNESS:  I would say that it just goes

20   back to the same exact thing that I described with

21   Detective Gwinn, of him not being fully aware.  You know,

22   as a supervisor, you don't necessarily make your

23   employees privy to everything that you may be doing to

24   monitor those concerns.

25             BY MR. MANCE:

1        Q.    What's steps were you taking to monitor the
2   situation with Dennis?
3        A.    So what I was doing was basically trying to
4   judge whether or not this is just kind of inter-squad
5   squabbles.  You know, Detective Abdullah was kind of a
6   loner of the squad.  He was somewhat antisocial.  He
7   didn't care to take any advice of his peers, so he was
8   often, in my opinion, maybe tolerated for, you know,
9   pessimistic opinions and that sort of thing about his
10  handling of the CI.
11            So basically what I was doing was, on my own,
12  monitoring the transactions, monitoring the activity of
13  the CI as best I could when we were out making the buys
14  and trying to determine whether or not this is just kind
15  of a hate parade on Detective Abdullah, just because the
16  other detectives didn't like him or if there was any
17  substantial validity to the comments.  And I didn't find
18  that, other than just other detectives not necessarily
19  liking the way that Aspirin operated, that he was doing
20  anything outside of what anyone else was doing.
21       Q.    Did you ever tell any of your detectives to
22  stop working with the CI?
23       A.    No.
24       Q.    Detective Rattelade said, quote, "Abdullah was
25  in my opinion treated differently than the rest of us as

1   far as not being reprimanded for stuff that he should

2   have been reprimanded for," end quote.  That's at M-19.

3   Did you treat Detective Abdullah differently or with a

4   lighter touch than you did other detectives?

5        A.   No.

6        Q.   Detective Rattelade said that he had a,

7   quote -- this is at M-20 -- "firm belief that Williams

8   was purchasing marijuana from suspects, either hiding or

9   discarding the marijuana," and then ellipses, "handing

10  off fake heroin to Detective Abdullah and claiming to

11  have purchased that drug from the suspects."  Do you

12  believe that's what was happening?

13           MR. BLANCHARD:  Objection to the form, and the

14  reason I objected is I'm trying to figure out whether

15  you're asking about after the fact or at the time.

16           MR. MANCE:  I'm asking after the fact.

17           THE WITNESS:  So in hindsight, you know, to my

18  knowledge -- and somebody correct me if I'm wrong -- I

19  don't think anybody has ever proven that that is what

20  occurred, plain speculation that -- and after long

21  Internal Affair -- internal investigations, trying to

22  figure out what in the heck happened in these instances,

23  it was -- as far as I know, that was the speculation as

24  to how this ended up occurring.  I don't have any

25  specific knowledge of any confirmation of that

1   information.  This is just what was speculated, and we

2   had conversations toward the end of like how this

3   occurred because on its face, the bad guys were showing

4   up, a drug transaction was heard over our audio

5   equipment, and we were recovering our RPD-marked buy

6   money.  So on its face, everything was as any other

7   normal drug buy would be.

8            We did have conversations later, in hindsight,

9   after, you know, you put the Monday morning quarterback

10  and microscope on it, that more than likely, that could

11  have been what was occurring.  So I don't know if that

12  answered your question, but --

13           BY MR. MANCE:

14       Q.    It does.  Lieutenant Bunch told Internal

15  Affairs that Detective Monroe called him after the search

16  on my clients' homes and said, quote -- this is at O-6.

17           (Exhibit O was identified for the record.)

18           BY MR. MANCE:

19       Q.    "Hey, sir, that search, it just didn't go

20  right.  There was something just not right about it,"

21  ellipses.  "He tells me some stuff and I called the SEU

22  team.  I got two stories that weren't exactly the same.

23  One was that they had hit the target location and then

24  they searched two other places.  In that second location,

25  they may not have had a good reason to knock on the

1    door."

2            Did you get different accounts of how the

3    searches transpired?

4        A.   I wasn't here, so all I got was after the fact.

5        Q.   After the fact, did you get different accounts

6    of how the searches unfolded?

7        A.   I don't remember any specific different

8    accounts of how it unfolded.  All I got was kind of a

9    combined conversation of what the detectives said had

10   occurred.  I don't remember the specifics of what those

11   were.

12       Q.   Was Lieutenant Bunch your supervisor?

13       A.   Yes.

14       Q.   IA asked Lieutenant Bunch, quote, "How

15   important it is to have a recording of the narcotics

16   transaction when dealing with undercover drug buys," end

17   quote.  Lieutenant Bunch responded -- replies that it's,

18   quote, "It's mandatory," end quote.  That's O-14.  Do you

19   agree?

20       A.   Can you back up?  You were asking if it was

21   mandatory for what?

22       Q.   Lieutenant Bunch answered the question, "How

23   important is it to have a recording of the narcotics

24   transaction when dealing with undercover buys?"  And he

25   replied, "It's mandatory."

1          MS. KIBLER:  Object to form.

2          BY MR. MANCE:

3     Q.   I'm asking you if you agree.

4          MR. BENSON:  Objection.

5          THE WITNESS:  So the recordings of the drug

6    transactions are mandatory for prosecution in Wake

7    County.  I don't know of a specific policy within the

8    police department that states you must have a audio or

9    video recording of a drug buy, but it has been the policy

10   of the Wake County DA's office that in order to prosecute

11   a drug case, you'd have to have prosecutable audio and

12   video to support your charge.  So that's, I think, what

13   he may be referring to.  I can't speak on his behalf, but

14   I think that's what he means.

15         BY MR. MANCE:

16    Q.   Were the -- were the people who were arrested

17   in the heroin buys that were the subject of the prior

18   lawsuit, were they prosecuted by the Wake County District

19   Attorney's office?

20    A.   I don't know if they all were.  I know a lot of

21   it was dismissed after the fact, but, you know, that's

22   another thing that I think everyone is missing here, is

23   that ultimately it's the DA's office's decision to

24   prosecute a case or not, and when you file your felony

25   investigative report, you provide your probable cause and

1   it's ultimately their decision whether or not those

2   charges are made.  If they were going outside of their

3   protocols of prosecuting cases without good audio and

4   video surveillance, that would be outside of my purview.

5       Q.   When did you first notify Lieutenant Bunch

6   about the -- that there were buys taking place with

7   Aspirin?

8       A.   I don't know of any specific need to have

9   notified him or I don't remember ever notifying him of

10  the buys.  His job is to improve -- approve the informant

11  for use and beyond that point, he doesn't need to know or

12  want to know whether they're being used unless something

13  comes up in which they don't need to be used anymore.

14      Q.   Lieutenant Bunch told IA, quote -- that you

15  had, quote, "Never mentioned anything about these buys

16  taking place with Aspirin," end quote, to him.  That's at

17  O-15.  He said that he learned about the potential issues

18  with Aspirin on either 21st or 22nd, following the raid

19  on my clients' homes.  Does that sound correct to you

20  timeline-wise?

21      A.   I would say so.  You know, unless there's a

22  specific -- you don't go to your lieutenant with every

23  little squabble over an informant.  We would have

24  hundreds of informants that we use, so unless there's

25  something specific to the point where the informant is

1   problematic to the point where he's no longer going to be

2   utilized, then you may go to Lieutenant Bunch and say,

3   "Hey, we no longer need to use this informant," for

4   example, but there would have been no reason to and I

5   don't recall any reason that I needed to inform

6   Lieutenant Bunch of the CI's use.  There's hundreds of

7   CIs being used all the time, so that's not information

8   that he would have needed to know.

9       Q.   Lieutenant Bunch told Internal Affairs -- this

10  is at O-18 -- that, quote, "Sergeant Rolfe should have

11  known or should have done something earlier on with these

12  cases," end quote, when there are repeated red flags.  He

13  said as a sergeant, it was your responsibility to say,

14  quote, "Hey, Abdullah, you're not doing anything about

15  this, so now I have to do something."  Is Lieutenant

16  Bunch correct that that that was your responsibility?

17            MR. BENSON:  Object to form.

18            THE WITNESS:  I would say it is the

19  supervisor's responsibility to, quote, "do something."

20  As I mentioned earlier in the conversation, I was still

21  evaluating whether or not these grumblings about Aspirin

22  were more of a inter-squad squabble or an actual problem.

23            BY MR. MANCE:

24      Q.   Lieutenant Bunch was also asked by Internal

25  Affairs, quote, "If Sergeant Rolfe, if he was aware that

1  detectives were meeting with CIs by themselves, would

2  that be a violation of our policy," end quote.

3          Lieutenant Bunch said, "Yes."  That's O-20.  Is

4  Lieutenant Bunch correct that that was Raleigh PD's

5  policy?

6      A.   Yes.

7      Q.   So you were operating in violation of that

8  policy?

9          MR. BLANCHARD:  Objection to the form.

10          BY MR. MANCE:

11      Q.   Were you operating in violation of that policy?

12      A.   So, and this also goes back to something that I

13  put in my appeal of practice versus policy, so there are

14  hundreds of policies that are on paper that are supposed

15  to be followed as a practice and are not, just basically

16  things that are day-to-day common practice that don't

17  necessarily align with paper policy.  So in -- to answer

18  your question, yes, that was against policy and I was

19  aware it was against policy, but it was a common

20  practice, if that makes sense.

21      Q.   So to be clear, you did not require detectives

22  under your supervision to always have at least two

23  officers present for CI meetings?

24      A.   What I'll say on that is no, but with a

25  qualifier that in all initial meetings with CIs, there

1  are two detectives present.  Any opposite sex informant,
2  there's two detectives present.  The only time that I
3  knew that detectives were meeting with informants was
4  by -- were one-on-one where after a relationship with
5  these CIs have been established and everyone was
6  comfortable that the safety of the detective was okay, I
7  would allow them to -- for instance, after a takedown,
8  Detective Abdullah would go pick up Aspirin at a
9  predetermined location, just based on manpower issues.
10 We didn't have enough detectives to double up with
11 Abdullah, go pick him up, so there were instances where
12 policy was broken by detectives, meaning one-on-one, but
13 it wasn't just a common practice.  It was an occasional
14 practice.
15      Q.   Was it your responsibility to review all drug
16 reports?
17      A.   No.
18      Q.   Lieutenant Bunch told IA that it was Sergeant
19 Rolfe's responsibility to, quote, "review all drug
20 reports," end quote.  That's O-25.  Why would Lieutenant
21 Bunch say that?
22      A.   Well, when you're saying "all," so I guess it
23 depends on what -- so there is a drug report queue, so
24 any drug-related report that occurs in the City of
25 Raleigh goes into a computer system.  There's four drug

1   supervisors within the department.  You go into the

2   queue.  You pull up reports and you review reports, so it

3   wouldn't necessarily be accurate that I was responsible

4   for all reports because that was a shared responsibility.

5        Q.   Did you review written reports about the facts

6   and circumstances around the arrest of the 15 people for

7   fake heroin prior to May 2020?

8        A.   I can't -- I can't specify if I reviewed them

9   all, but I'm sure I reviewed a bulk of them.

10       Q.   Were you aware that Detective Monroe field

11  tested the seizure from Curtis Logan at the Sheetz gas

12  station in March 2020 and got a negative result?

13       A.   I don't know if that's the specific -- I had a

14  recollection of a negative field test, but I don't know

15  if that is specifically the one.

16       Q.   Lieutenant Bunch, at O-28, said that you had

17  not told him about any field testing on substances seized

18  in operations in which Williams was involved; is that

19  correct?

20       A.   I don't recall that.

21       Q.   Detective Gay -- this is at P-13 -- said that

22  even as a new detective, she thought it was, quote,

23  "odd," end quote, that Detective Abdullah was making so

24  many, quote, "great cases," end quote, in a short period

25  of time and that he was doing it while working without

1    any other detectives.

2              (Exhibit P was identified for the record.)

3              BY MR. MANCE:

4        Q.   Do you agree that it was odd to make that many

5    cases of that nature in that time frame?

6        A.   Not necessarily.  Like I said earlier, I

7    attributed his success to his gang affiliations.

8        Q.   Detective Gay said that she became aware that

9    Williams was passing sugar off as heroin the day that

10   Detective Monroe tested it after the arrest at the Sheetz

11   gas station.  She said that it prompted, quote -- this is

12   at P-15 -- "a whole conversation about," ellipses, "the

13   day -- the way that detective was a drug detective."  So

14   this would have been the Curtis Logan incident.  Were you

15   part of those conversations?

16             MR. BENSON:  Objection, form.

17             THE WITNESS:  I don't remember a specific

18   conversation regarding that specific case, no.

19             BY MR. MANCE:

20       Q.   Detective Gay said later she thought it, quote,

21   "very odd," end quote, that someone would make 11 heroin

22   trafficking arrests in the span of time that Abdullah and

23   Williams did.  That's at P-20.  She said, quote -- this

24   is at P-22 -- "We had several conversations kind of among

25   the squad about how that seemed odd," end quote.  Did

1  those conversations occur?

2      A.   I don't know.

3      Q.   Do you remember anything being expressed to

4  that effect?

5      A.   I remember, like I said, kind of ongoing

6  grumblings about the informant.  It's all kind of the

7  same things that I covered earlier.

8      Q.   Detective Monroe told IA -- this is at Q-12 --

9  that many detectives would make, quote, "copies of the

10  buy videos and put them in our case jackets.  We turned

11  our case jackets in," bracket, "to Sergeant Rolfe.  He

12  has the same passcodes and access to that system," end

13  quote.

14          (Exhibit Q was identified for the record.)

15          BY MR. MANCE:

16      Q.   Do you have the same passcodes and access to

17  that system, or did you at that time?

18      A.   I don't know specifically.  If you're talking

19  about like a reader to view disks, I don't know

20  specifically if I did or not, but it's possible.

21      Q.   If you had wanted to see the videos, could you

22  have gotten access to them?

23      A.   Yes.

24      Q.   Monroe also said at Q-13 that you, quote, "had

25  the same access as all the detectives within the unit."

1  Is that correct?

2       A.   In reference to what?

3       Q.   To the videos, the buy videos.

4       A.   Yes.

5       Q.   Detective Rattelade, at E-16, described the

6  process of accessing video as, quote, "very simple," end

7  quote.  Would you agree that it was very simple?

8       A.   Yes.

9       Q.   He also said, E-16, quote, "As soon as the

10 device is deactivated, it creates a file with the server

11 for the video server we use," end quote.  Is that

12 correct?

13      A.   Yes.

14      Q.   Detective Rattelade, at E-16, also said, quote,

15 "If there were some questions that arose --" I'm going to

16 have an ellipses here -- "you can always go to the video

17 and review the video while you're making your charging

18 decisions.  That is an option."  Is that true?

19      A.   Yes.

20      Q.   I'm going to now reference E-19.  Detective

21 Rattelade was asked if detectives needed to wait for the

22 DA's office to request a drug test for sending it to the

23 lab.  He said no, that, quote, "if there's a suspicion as

24 to whether the drugs are real, we have the ability

25 because we have a good working relationship with the

1   district attorney's drug unit."  Is that true?

2        A.   They did have the ability to do so.  However,

3   it was the policy of the Wake County DA's office that we

4   were not to test the drugs because, basically, they were

5   wasting a lot of resources, because it was the policy of

6   the DA's office to very quickly offer a plea agreement in

7   these cases, so they didn't want, basically, CCBI

8   backlogged with drug analysis requests when they were,

9   many times, completing pleas that would basically make

10  the need for that information not necessary, if that

11  makes sense.

12       Q.   Going back, though, to the question, if there

13  was a suspicion as to whether the drugs were real, did

14  your detectives have the ability to get those tests done?

15       A.   They had the ability, but it was the request of

16  the DA's office that they be the ones that requested the

17  analysis, so it would require the detective to get

18  approval from the DA's office for that.

19       Q.   Okay.  Was it -- was Detective Rattelade

20  incorrect when he said that you had a good working

21  relationship with the DA's office?

22       A.   No, he was not -- that's not incorrect.  Are

23  you asking if I had a good relationship or he had a good

24  relationship?

25       Q.   Let me put it this way.

1        A.    Everyone had a good relationship with the DA's

2   office.

3        Q.    If there was a strong need to test a substance

4   because there were real suspicions as to whether or not

5   it was real, would you expect to meet resistance from the

6   DA's office --

7        A.    No.

8        Q.    -- in getting that tested?

9        A.    No.

10       Q.    Okay.  At Q-18, Detective Monroe says that if

11  even two buys came back as fake drugs, he would not

12  charge cases from the CI involved without first testing

13  the substances.  He said he would be -- that would make

14  him suspicious of his CI.

15             Do you agree with Detective Monroe that after

16  two buys come back with fake drugs, that the appropriate

17  thing to do is to have them tested before moving forward

18  with additional charges?

19             MR. BENSON:  Objection, form.

20             MS. POOLE:  Objection.

21             THE WITNESS:  It's an opinion-based question on

22  what the detective -- Detective Monroe was thinking or

23  his thoughts were.  You know, back to the point of, (A),

24  the DA's office asking us not to test drugs, the issue

25  regarding fentanyl being the most common active

1  ingredient of what is being sold as heroin, it wouldn't

2  necessarily be uncommon that a test comes back negative

3  for heroin and not still be another type of controlled

4  substance.

5        BY MR. MANCE:

6     Q.   So this is Detective Monroe's sort of own

7  personal policy?  This is not something you would have

8  directed him as a policy as supervisor?

9     A.   It's just all case by case, but from what it

10 sounds like, you're asking me about the opinion of

11 Detective Monroe.

12    Q.   As a supervisor of the vice unit, would you

13 agree that if two buys come back with fake drugs, that

14 the appropriate thing to do would be to have them tested

15 before moving forward with criminal charges related to

16 similar substances?

17    A.   Yes, but it would be dependent upon -- you're

18 saying fake drugs, so I don't know if you -- when you're

19 saying "fake drugs," you're referring to a negative test

20 result for heroin or a no-controlled substances at all

21 located.  There's no clarifier in there, so that's

22 difficult to answer that based on the facts that you're

23 providing.

24    Q.   Let me clarify by saying no controlled

25 substances at all.

1      A.   If it were no controlled substances at all, it
2  certainly would be something that would need to be
3  discussed moving forward, yes.
4      Q.   Detective Monroe told IA regarding the seizure
5  from Curtis Logan, quote, "I did make it known to the
6  supervisor of our squad that it did not appear to be
7  heroin and that it did not test," meaning test positive,
8  end quote, in a field tests.  That's R-5.
9           (Exhibit R was identified for the record.)
10          BY MR. MANCE:
11     Q.   Do you recall Detective Monroe telling you
12  that?
13     A.   I recall one instance where they field tested,
14  which we're not supposed to, and it did come back
15  negative for heroin.  It doesn't necessarily mean it
16  wasn't something different.
17     Q.   The amount of drugs that -- or the amount of
18  substance that you seized that day was more than 20
19  grams, which Detective Monroe said was significantly,
20  quote, "over what it was supposed to be," end quote,
21  meaning more than you all had ordered.  That's at R-6.
22          That's more than five times the amount
23  necessary for a heroin trafficking charge.  Did that
24  amount or the fact that it was more drugs than you had
25  ordered give you any pause?

1             MR. BENSON:  Objection to form.

2             THE WITNESS:  I wasn't here for this case, so I

3    wouldn't have any opinion on that.

4             BY MR. MANCE:

5        Q.   Were you aware that your officers had arrested

6    Curtis Logan?

7        A.   I'm not sure who is who, to be quite honest

8    with you.  Which one is that?

9        Q.   Would you expect to hear about a 20-plus gram

10   heroin arrest?

11       A.   I did hear about it after the fact, yes.

12       Q.   Do you recall how long after the fact you heard

13   about it?

14       A.   Well, I was on vacation, so when I got back,

15   which was a couple days afterward.

16       Q.   You were on vacation during the Curtis --

17       A.   I don't know.  I'm not sure which case we're

18   talking about here, like I just mentioned.

19       Q.   Okay.  So Curtis Logan was the incident at the

20   Sheetz in January of 2020, the Sheetz gas station, and

21   you signed a report, I believe, related to that.  Do you

22   have a recollection of that incident?

23       A.   I don't have specific recollection of that

24   incident, no.

25       Q.   Was it common to make a 20-gram heroin purchase

1    on your unit?

2        A.   No.

3        Q.   Was it very uncommon?

4        A.   I wouldn't say it would be very uncommon, but

5    it was not common, so I guess somewhere in the middle.

6        Q.   If you had to estimate how many 20-gram plus

7    heroin purchases that your unit made in a calendar year,

8    what would be your guess?

9        A.   Maybe one.

10       Q.   So this -- okay.  So sitting here today, you

11   don't have -- you can't recall the Curtis Logan --

12       A.   No.

13       Q.   -- incident?  Okay.  You told Internal

14   Affairs -- this is at S-8 -- that your unit paid extra

15   for trafficking cases; is that correct?

16       A.   Yes.

17            (Exhibit S was identified for the record.)

18            BY MR. MANCE:

19       Q.   And you told them that, quote, "The pay does

20   fluctuate based on what we recover," end quote.  That's

21   S-8.  That was your statement, correct?

22       A.   Yes.

23       Q.   So if someone produces more than 20 grams of

24   heroin, which is five times the trafficking amount, would

25   they expect to get paid more?

1      A.    No.  The going rate, I think, for a trafficking

2  case was $200, unless it was some exorbitant amount more.

3  There could have been additional pay, but in general, it

4  was $200 and then we paid a little more if there were

5  weapons, guns recovered and that sort of thing.

6      Q.    Detective Monroe said he, quote -- excuse me.

7  Detective Monroe said he expected that you would have had

8  the same reaction to the Williams cases that he did.  He

9  said, quote, "I would assume," bracket, "his reaction

10  would be like, 'Hey, let's time out here, like what's

11  happening, like why is this going on?  We can't use this

12  person because we're ultimately responsible.'"  That's at

13  Q-19.

14          Why did you not react that way?

15          MS. KIBLER:  Object to the form.

16          THE WITNESS:  I don't remember the specifics of

17  why I did or didn't react in any fashion related to that.

18          MR. BLANCHARD:  Ian, when you get to a good

19  stopping point, can we take a break?

20          MR. MANCE:  Yeah.  We can do that now if you

21  want.

22          MR. BLANCHARD:  Go ahead.  I mean, if you've

23  got something --

24          MR. MANCE:  We can stop there.  I'm happy to

25  take a break.  We want to do 10 minutes?

1           MR. BLANCHARD:  Restroom break.

2           MR. MANCE:  Okay.  Sure.

3           (Recess from 11:50 a.m. to 12:08 p.m.)

4           BY MR. MANCE:

5      Q.    This question is going to refer to Q-19.

6  Mr. Rolfe, Internal Affairs had asked Detective Monroe if

7  you had intervened -- I'm realizing this probably

8  connects to my previous question, so let me see what I

9  was asking.

10          Okay.  This is -- we were discussing Detective

11 Monroe doing a field test on the -- during the Curtis

12 Logan arrest, and he -- I had asked you about whether he

13 told you about that field test.

14          Detective Monroe told Internal Affairs, when

15 asked if you had intervened, quote, "I can't say if he

16 spoke with Abdullah or not, but I know he was there and

17 he knew the frustration of the detectives that were

18 assisting the cases.  They made it known that they were

19 frustrated with the way that the buys and the CI was

20 handling the situation."

21          Do you recall that conversation?

22     A.    Yes.

23     Q.    Did you know that detectives were frustrated?

24     A.    Yes.

25     Q.    And, specifically, did you know they were

 1   frustrated with the CI, Aspirin?

 2       A.   Yes.

 3       Q.   And did you know they were frustrated with

 4   aspects of Abdullah's handling of the CI, Aspirin?

 5       A.   Yes.

 6       Q.   Okay.   Sergeant Monroe said there wasn't,

 7   quote, "any doubt in his mind," end quote -- he said "my

 8   mind," just to be accurate -- end quote, that Sergeant

 9   Rolfe was aware that he had tested a large amount of what

10   turned out to be brown sugar following the Curtis Logan

11   arrest at the Sheetz.   Were you aware it was brown sugar?

12       A.   No.

13       Q.   This is at Q-22.   Monroe also said Sergeant

14   Rolfe was aware that he, meaning Detective Monroe, had

15   told Detective Abdullah, prior to Detective Abdullah

16   charging Logan with heroin trafficking, that the drugs

17   were fake.

18            Were you aware that Sergeant Monroe -- excuse

19   me, Detective Monroe had told Detective Abdullah these

20   are fake drugs prior to his filing charges?

21            MS. POOLE:   Objection.

22            MR. BENSON:   Objection.

23            MR. BLANCHARD:   Objection.

24            BY MR. MANCE:

25       Q.   Okay.   Let me try to ask that again.   Are you

1  aware of a conversation between Detectives Monroe and

2  Abdullah prior to Abdullah charging Curtis Logan?

3      A.    No.

4      Q.    Okay.  Detective Monroe said, quote -- this is

5  at Q-24 and 25 -- quote, "To buy heroin in Raleigh loose

6  and get over 4 grams is not normal on a regular buy

7  because most drug dealers understand that 4 grams get you

8  trafficking."  Do you agree with that statement?

9      A.    Not necessarily.  There's plenty of instances

10  you can buy a trafficking amount of heroin.  They are

11  aware that it's trafficking, so sometimes they will try

12  to break it up in 3 grams and then come back later and

13  give you the other gram if they're savvy enough, but

14  there's plenty of instances that you could go out and buy

15  trafficking amounts of heroin.

16      Q.    He also said on the same page, "Drug dealers

17  get really suspicious when you ask for a certain amount

18  of heroin because of the low-level trafficking weight."

19  Do you agree with that?

20      A.    It's basically the same response on the

21  previous question, same exact thing.

22      Q.    He also said -- this is on page 25 and 26 of

23  Q -- that heroin, quote, "wasn't a traditional Raleigh

24  drug.  You had to go to Durham or Henderson."  Is that

25  correct?

1          A.   Way back, a long time ago, that would have been

2     accurate, but it's not anymore.   Heroin -- real heroin

3     hit Raleigh in, you know, substantial amounts probably in

4     the mid -- early to mid 2000s, but prior to that, it was

5     Durham, Henderson, were the main sources of that.

6          Q.   He also said -- and I believe this was in a

7     2020 interview.   This is also Q-25.   Referring to the

8     heroin trade in Raleigh, quote, "It's really only been

9     about the last three or four years," end quote, so that

10    would put it, I guess, 2017 and '18.   Does that -- is

11    that correct?

12         A.   It's just kind of an opinion-related question,

13    but it certainly has heated up.   It transitioned from a

14    crack market to a heroin market in the more recent years,

15    yes.

16         Q.   Monroe said multiple detectives brought

17    concerns to you prior to the raid on my clients' homes.

18    He said you were, quote, "informed by several detectives

19    that we didn't think he was a good CI, we didn't think he

20    was being handled appropriately, we thought Abdullah

21    wasn't handling properly, we made it known that we

22    disliked him as a CI."   I think, actually, I already

23    asked you this question.   But you recall those

24    conversations?

25         A.   It's the same kind of thing.

1      Q.   Why didn't you -- when you heard those

2   statements from the detectives that worked for you, why

3   did you not suspend Aspirin as a CI?

4      A.   It goes back to the same reply that I had

5   earlier about weighing whether or not these were general

6   gripings or valid concerns, and I was still in the

7   process of determining that, so I didn't make any action.

8      Q.   Do you think you have a high threshold for

9   suspending CIs?

10      A.   Yes.

11      Q.   Have you previously described CIs as inherently

12   unreliable and suspicious?

13      A.   Probably.  I don't know a specific instance,

14   but I would say that would be accurate.

15      Q.   Detective Monroe said -- this is at Q-28 --

16   quote, "I know not one detective within our unit, if they

17   had the opportunity to, would have tried to work with

18   Aspirin on a case.  None of us would have worked with

19   him.  That's how we felt about him," end quote.

20           Is that how your whole unit, except for

21   Abdullah, felt about Aspirin?

22           MR. BENSON:  Objection to form.

23           BY MR. MANCE:

24      Q.   To your knowledge?

25      A.   I would say, you know, it's all kind of beating

 1   a dead horse here at this point, but it's -- a lot of

 2   that is derived on the squad squabbles and just general

 3   disdain with Abdullah, and anything associated with

 4   Abdullah, in turn, would include this CI.

 5        Q.   Let me ask it another way.  Do you believe your

 6   detectives would want to work with Aspirin?

 7        A.   No.

 8        Q.   In the transcript of your appeal, I believe

 9   it's on the final page, 16, you wrote that you were

10   willing to accept some discipline and you take

11   responsibility.  What do you take responsibility for?

12             MR. BLANCHARD:  Objection.

13             THE WITNESS:  I think that was, basically, a --

14   based on the severity of the overall punishment, which

15   ended up being -- and I don't know if it was in this

16   instance or later on, ended up being a demotion.  In

17   retro- -- or in hindsight, after having had the

18   opportunity of the long-term investigation and all the

19   things coming to light later, I would say that I could

20   have done a better job, in hindsight, having all the

21   information provided after, you know, the length of this

22   investigation.  There were things that I could have done

23   better.

24             I fully admitted during the investigation that

25   there were policies that were violated.  They were

1   violated because they were a practice that was -- had
2   gone on before I got there and the entire time that I had
3   been there, so, basically, I think what I was referring
4   to there, if I'm thinking of the same time, was I
5   wasn't -- I wasn't ever saying like, you know, I had done
6   everything perfect and there weren't some things that I
7   couldn't have done better, but based on the -- what I had
8   been given and based on, you know, the way I was trying
9   to maintain my squad and maintain their forward progress,
10  I guess I was just basically saying that there were
11  things that I could have improved on and I would be
12  willing to take some sort of discipline, but not --
13  didn't agree with the severity of what it was.  I know
14  that's a lot of long-windedness, but --
15          BY MR. MANCE:
16      Q.   Are there specific things that you would do
17  differently now?
18      A.   Yes.
19      Q.   And what are they?
20      A.   It's just based on the lesson you learned of
21  the -- finding out later that -- or the speculation of
22  what had occurred that maybe a stronger eye on the
23  situation would have been warranted.  Now, granted, that
24  was found after the fact.  During the times of these
25  buys, you know, these were spread out over months, so it

1    wasn't a pattern that was necessarily picked up on at the

2    time, but I guess it would be, maybe, just a generalized

3    higher suspicion or a little more aggressively keeping

4    tabs on a CI when questions come about about their

5    reliability.

6         Q.   What responsibility do you assign to Detective

7    Abdullah for what happened to you?

8         A.   I don't necessarily assign any responsibility

9    on Abdullah.  You know, the things that occurred to me

10   happened beyond anything that he had any involvement in.

11        Q.   Do you believe Abdullah was always honest and

12   straightforward with you?

13        A.   Yes.

14        Q.   Do you think he reasonably conveyed to you all

15   the information you needed to know to make informed

16   judgments about how to run your unit?

17        A.   I don't know what he did or didn't share.  It's

18   not necessarily his responsibility to -- I actually don't

19   even really understand that question fully.

20        Q.   Well, do you think Detective Abdullah gave you

21   the information you needed to be able to do your job the

22   way that you felt it should be done?

23        A.   I don't really know what he knew, so I can't

24   really answer that.

25        Q.   As a sergeant, do you rely on detectives to

1    give you information so that you can make decisions?

2         A.   Yes.

3         Q.   And is there an expectation that certain facts

4    are sufficiently serious that we have to tell the

5    sergeant?

6         A.   Yes.

7         Q.   Okay.  So I guess going back to that same

8    question again, the question was, in light of everything

9    you know now about Williams, do you think that Abdullah

10   told you all the things he needed to tell you in order

11   for you to do the job the way it should have been done?

12        A.   I don't know because I don't know what he knew.

13        Q.   Is it possible in your mind that Detective

14   Abdullah misled you with respect to aspects of his work

15   with Williams?

16        A.   I don't feel like he ever misled me.  He may

17   not have been savvy enough to share what he needed to,

18   but I never got the feeling that he misled me.

19        Q.   Is it accurate that you told Internal Affairs a

20   number of times that you had directed Abdullah to address

21   the camera situation with Williams?

22        A.   Yes.

23        Q.   And did you tell them that you had no reason to

24   believe that it had not been addressed?

25        A.   Yes.

1          Q.    But, in fact, it was not addressed; is that

2     right?

3               MR. BENSON:  Objection.

4               THE WITNESS:  I don't know.

5               BY MR. MANCE:

6          Q.    Was it addressed?

7          A.    It was addressed as far as my knowledge.

8          Q.    But sitting here today, was it addressed?

9          A.    Apparently not.

10          Q.    And would you agree that, ultimately, that

11     contributed to the investigation against you?

12          A.    Yes.

13          Q.    Okay.  You told the SBI investigator that you

14     expressed concerns about Williams to Abdullah maybe

15     around the 6th or 7th buy, and you specifically said you

16     addressed the issue with the camera being positioned

17     because it wasn't recording the transaction.

18               Mr. Schewel asked Detective Abdullah about that

19     in deposition and his statement, which is at B-69 and 70,

20     in response was, "It was surprising to me," end quote,

21     that you said that.

22               Why would Detective Abdullah express surprise

23     to hear that you told the SBI that you had had those

24     conversations with him?

25               MR. BENSON:  Objection.

1              THE WITNESS:  I have no idea.

2              BY MR. MANCE:

3         Q.   We asked Detective Abdullah, quote, "Did

4    Sergeant Rolfe ever express concerns to you that Dennis

5    Williams was obscuring his buy camera," end quote.  This

6    is at B-72.

7              And Abdullah replied, quote, "Sergeant Rolfe

8    did not direct that to me personally," end quote.  Was he

9    being accurate?

10        A.   No.

11        Q.   We asked Detective Abdullah about statements

12   from Detective Monroe regarding his suspicions following

13   the arrest of Curtis Logan for the 20 grams of heroin

14   that the substance was brown sugar.  Detective Monroe

15   said a number of times that he voiced his concerns

16   directly to Abdullah, but Detective Abdullah denied that.

17             Do you think that Detective Monroe would lie

18   about something like that?

19        A.   No.

20        Q.   Do you believe that Detective -- now my

21   question is gone.

22             If Detective Abdullah had done what you say you

23   asked him to do, do you believe you would have been

24   demoted?

25             MR. BENSON:  Objection, speculation.


                         **REED & ASSOCIATES**
             MATTHEWS, NORTH CAROLINA  980.339.3575

1            BY MR. MANCE:

2       Q.   You can answer.

3       A.   Can you --

4       Q.   If Detective Abdullah had done what you say you

5    asked him to do, to address the camera issue with

6    Williams, do you believe you would have been demoted?

7            MR. BENSON:  Objection.

8            MR. BLANCHARD:  Objection.

9            THE WITNESS:  That's -- I can't really even

10   answer that.  Too many variables to say that that would

11   have any effect or any substantial effect.

12           BY MR. MANCE:

13      Q.   Was the fact that you made a point of having

14   the conversation with Abdullah about Williams and the

15   camera indication that you believed it was important that

16   he address that issue?

17      A.   Yes.

18      Q.   In your mind, could Detective Abdullah have

19   misinterpreted you when you talked to him about that?

20      A.   I don't think so.

21      Q.   If Detective Abdullah understood that you were

22   serious about getting this corrected and he didn't

23   correct it, and he, instead, continued to lock people up

24   and seek search warrants on Williams' account, would you

25   agree that there's an element of dishonesty, at least

1   with respect to his interactions with you in the sense

2   that he's doing things that reflect on you, you've told

3   him to fix them, but he hasn't done it and he's not

4   telling you that he hasn't done it?

5              MR. BLANCHARD:  Objection.

6              MR. BENSON:  Objection.

7              MR. MANCE:  I knew that was going to get an

8   objection.

9              BY MR. MANCE:

10       Q.   If you understand the question, answer it.

11       A.   I wouldn't necessarily categorize it as

12  dishonesty.  It may reflect on his case-handling

13  abilities, but, you know, ultimately, all those charges

14  were approved by the DA's office, so I would have

15  assumed, and that's just an assumption, that there was

16  video -- audio or video sufficient enough to support the

17  probable cause for those charges.

18       Q.   Do you know when these videos were turned over

19  to the DA by Abdullah?

20       A.   No.

21       Q.   Would you agree that being honest in the

22  workplace is a necessity when it involves matters that

23  affect people's freedom and personal safety?

24       A.   Yes.

25       Q.   Do you believe, sitting here today, that there

```
 1    were elements of dishonesty to Detective Abdullah's

 2    actions with respect to Mr. Williams?

 3         A.    No.

 4              MR. BLANCHARD:  Objection.

 5              MR. BENSON:  Objection.

 6              BY MR. MANCE:

 7         Q.    Did you say no?

 8         A.    I said no.

 9         Q.    Okay.  Do you remember telling Internal Affairs

10    that even after Williams was blacklisted as a CI, and

11    even after it became clear that he had been passing off

12    fake drugs, that Detective Abdullah came to you and

13    asked, quote, "If he thought we'd be able to use Aspirin

14    again," end quote.  That's Exhibit I-41.  Do you remember

15    him saying that to you?

16         A.    Yes.

17         Q.    Are you aware that Detective Rattelade told the

18    SBI that although he did not think, quote, "that Abdullah

19    is a bad person, he would not be surprised if he had a

20    relationship with Aspirin," end quote?

21         A.    Am I aware that he said that?

22         Q.    Uh-huh.

23         A.    I don't remember specifically, no.

24         Q.    Would that concern you?

25              MR. BLANCHARD:  Objection to form.  That he
```

1  said it or that the underlying allegation?

2          MR. MANCE:  Okay.  Let me clarify it.

3          MS. POOLE:  Where are you pulling this from?

4  I'm sorry.

5          MR. MANCE:  I'm sorry?

6          MS. POOLE:  Where are you pulling that from?

7          MR. MANCE:  It's Exhibit T-5.

8          (Exhibit T was identified for the record.)

9          MS. POOLE:  And I'm going to object to the

10  extent it's being quoted as a statement of Rattelade.

11          BY MR. MANCE:

12     Q.   Would it concern you if one of your detectives

13  believed another detective had a personal relationship

14  with a CI?

15     A.   Yes.

16     Q.   Okay.  If Detective Abdullah has shown a

17  propensity for dishonesty -- let me withdraw that.

18          If Detective Abdullah still wanted to work with

19  Aspirin, even after it was clear that he had been selling

20  fake drugs, sitting here today, can you be 100 percent

21  certain that Detective Abdullah was not in on the scheme

22  to share proceeds of buy money with Aspirin?

23          MR. BLANCHARD:  Objection to form.

24          MR. BENSON:  Objection.

25          MR. BLANCHARD:  And I don't think there's been

 1   any evidence that Aspirin was repeatedly selling fake

 2   drugs.  I think that that was -- that wasn't the

 3   allegation.

 4              MR. MANCE:  What?  Oh, you mean purchasing.

 5   I'm saying selling, purchasing.

 6              MR. BLANCHARD:  I think you meant to say

 7   "purchasing," not "selling."

 8              MR. MANCE:  Yes.  I'm sorry.  Yes, yes, yes,

 9   yes.  That is an important distinction.  I did mean to

10   say "purchasing," yes.

11              BY MR. MANCE:

12       Q.   Let me reword the question.  I'll withdraw the

13   question and ask it a different way.

14              Can you be certain that Detective Abdullah was

15   not personally profiting from some of this buy money in

16   these operations?

17              MR. BLANCHARD:  Objection to the form.

18              MR. BENSON:  Objection.

19              THE WITNESS:  Nobody could be certain of that,

20   but my gut feeling and everything that I know about him,

21   I would say 100 percent no.

22              BY MR. MANCE:

23       Q.   Do you know if Detective Abdullah has an

24   ex-wife?

25       A.   Yes.

1      Q.   Does he have three ex-wives?

2      A.   I don't know.

3      Q.   Was Detective Abdullah known to sleep in his

4  car between shifts?

5      A.   Not necessarily.  Well, Detective Abdullah

6  worked a lot of off-duty work and sometimes from the end

7  of his shift until his off-duty shift started, it might

8  be a couple hours and he would, you know, catch -- catch

9  a nap, or whatever, because he lived far -- far from

10 Raleigh, so he couldn't drive home.

11     Q.   When we asked Detective Abdullah in deposition

12 if following these operations he would typically

13 compensate Dennis Williams, quote, "with only him and

14 Williams present," he responded, "Yes."  And this is at

15 B-114 and 115 of the Abdullah depo.

16          He said, typically, he did it in his car,

17 quote, "out in the back parking lot," end quote.  Then he

18 said that you would say, you know, quote, "Go ahead and

19 just pay him and cut him loose."  Is that a fair

20 description of how he would be paid?

21     A.   Yes.

22     Q.   Would Abdullah be alone with Williams in the

23 parking lot when he would give him the cash?

24     A.   Yes.

25     Q.   You wrote -- and this is at U-14.

1          (Exhibit U was identified for the record.)

2          BY MR. MANCE:

3     Q.   This is in your appeal, that, quote, "It was

4  clear in this investigation that it was easier for all

5  the responsible entities to distance themselves from

6  their contribution to the problems and past failures that

7  led to these outcomes," end quote, and that, quote, "It

8  is incredibly unfair to assign them all to me," end

9  quote.

10         Who are, quote, "all the responsible entities,"

11 end quote, that you were referring to?

12    A.   So the DA's office, basically, for prosecuting

13 the cases without sufficient audio and video; the Raleigh

14 Police Department for, basically, allowing practice or

15 even in some instances, you know, training, oncoming

16 supervisors, practices that were, I guess, technically

17 against policy, as we referred to earlier, so the agency,

18 in general; the DA's office; other entities that would

19 have had oversight on this type of -- this type of

20 investigation.  So that's what I was referring to.

21    Q.   The Internal Affairs Report says that Dennis

22 Williams was on probation at the time he was released and

23 that one of the terms was that he was not to have contact

24 with narcotics or people selling narcotics.  Is that also

25 what you believed to be the case?

1              MR. BENSON:  Objection.

2              THE WITNESS:  Well, it was my understanding the

3      entire time that this CI was in use that he was approved

4      by his probation and parole for use as a CI.

5              BY MR. MANCE:

6          Q.    The IA Report concluded that Detective Abdullah

7      did not contact Mr. Williams' probation officer,

8      Mr. Upchurch, even though Mr. Upchurch had tried to get

9      in touch with Mr. Abdullah to discuss Mr. Williams.  Do

10     you agree that that's what happened or do you -- or did

11     something else happen?

12             MR. BENSON:  Objection.

13             THE WITNESS:  I don't have any knowledge of

14     that.  Like I just stated, it was my knowledge -- or it

15     was my understanding that he was approved for use as a CI

16     and I recall the initial setup for that.

17             BY MR. MANCE:

18         Q.    Do you believe you have been treated fairly by

19     the department?

20         A.    No.

21         Q.    Have you ever expressed a concern that if you

22     had disciplined or scrutinized Abdullah more, it could

23     appear retaliatory because of a past history of

24     complaints?

25         A.    Yes.

1        Q.    Can you tell me about that?

2        A.    So Detective Abdullah, for pretty much his

3    entire -- I won't say his entire -- a good bit of his

4    career had a reputation of being a loner, having

5    personality conflicts kind of wherever he went, and so

6    that was another one of the -- going back to that

7    previous question about another one of the reasons I felt

8    I was treated unfairly is -- pardon me -- kind of

9    continued to kick the can down the road and make -- you

10   know, he was a problem here, so now he's your problem,

11   then he's -- you know, not being addressed prior to him

12   ending up under my supervision.

13       Q.    What do you recall about the complaint

14   Detective Abdullah filed against Detective Gay?

15       A.    That complaint, Detective Abdullah called me

16   one night and said he had overheard a conversation in the

17   squad room.  The other detectives were talking about some

18   news story regarding reparations, and Abdullah had told

19   me that he overheard Detective Gay -- and I won't quote

20   what it was, but it was making some reference about

21   people just wanting free money.  And so when he indicated

22   that to me, I made contact with Internal Affairs and he

23   ended up filing a complaint through them.

24       Q.    And do you know what the resolution of that

25   complaint was?

1       A.   I don't know specifically what it was.  I don't

2   think it was -- I think the outcome was not sustained, if

3   I remember correctly, but I wouldn't go on the record

4   saying for sure.

5       Q.   The quote I saw was, "Black people love them

6   some free money."  Does that sound correct?

7       A.   Yes.

8       Q.   Did you determine if Detective Gay made that

9   statement?

10      A.   I didn't determine that.  That was turned over

11  to Internal Affairs, any kind of complaint regarding a

12  racial type thing, immediately.

13      Q.   So that would be the sort of thing IA would

14  handle, not you?

15      A.   Right.

16      Q.   Okay.  Do you know if IA determined if she made

17  the complaint or made that statement?

18      A.   I think it was determined to be not sustained,

19  which means that it didn't occur, but I can't 100 percent

20  say that was the outcome.

21      Q.   Do you recall the allegation that Detective

22  Rattelade had responded to Gay's statement with a

23  reference to chicken and Cadillacs?

24      A.   No.

25      Q.   You said in your IA appeal that your

1  supervisors failed to act when you brought your concerns
2  to them about Abdullah.  What concerns were you referring
3  to?
4       A.   Primarily, on multiple occasions, I had
5  requested through Lieutenant Bunch that Detective
6  Abdullah be transferred to a unit that was more conducive
7  to his kind of loner mentality.  This was prior to any
8  complaints or anything that he waged against his
9  coworkers, but basically the strife that it was causing
10 on the squad due to the personality conflicts.  You know,
11 a Drugs and Vice team is a very cohesive, team-oriented
12 job and it just didn't necessarily fit Abdullah's
13 personality, so I, on multiple occasions, spoke with
14 Lieutenant Bunch and asked if he could be considered for
15 a transfer to a different squad, like a general
16 investigations where you can more work on your own versus
17 in a team environment.
18      Q.   What could and should, in your opinion, the
19 supervisors have done?
20      A.   I would say based on, you know, the ongoing
21 problems, the personality conflicts, et cetera, with
22 Detective Abdullah, that an evaluation could have been
23 made and should have been made that he be transferred to
24 a unit that was more conducive to his personality style.
25      Q.   I want to ask you some questions about text

**REED & ASSOCIATES**
MATTHEWS, NORTH CAROLINA  980.339.3575

Case 5:22-cv-00068-BO  Document 203-6  Filed 03/31/23  Page 98 of 201

1   messages that were exchanged by you and various people in

2   your unit.  I'm going to start with a March 26, 2020

3   exchange between you and your detectives.  This is

4   located at V-982 to 992.

5            (Exhibit V was identified for the record.)

6            BY MR. MANCE

7       Q.   You sent a text message on March 26, 2020, to

8   your detectives that said, quote, "That was straight

9   grisly shit."  Abdullah responded, "Hell, yeah."  Monroe

10  says, "Good transition and overall team execution."

11           You then responded, "Caught em slippin."

12  Abdullah says, "Definitely nice teamwork."

13           Then you ask, "How much did the dope weigh?"

14  Abdullah replied, "I'm weighing it now.  12.5 --" and

15  he's talking about grams -- "on the first bag, 6.0 on the

16  second."  You replied, "Nice."

17           Do you remember that exchange?

18      A.   Not specifically, but it sounds like something

19  that we would have been saying.

20      Q.   I want to see if you can tell me if you

21  remember anything about that day, March 26.  This was the

22  date, I believe, that the unit arrested a man named

23  Demorris Meeks, as well as three other men, and this was

24  following a hand-to-hand sale in a bathroom, and this was

25  an operation where it appears the whole unit worked

 1    together on a buy bust.

 2             Does that ring a bell?  Do you recall that

 3    operation?

 4        A.   There's one that occurred in Garner that sounds

 5    like this.  I don't know specifically if this is the one

 6    or not.

 7        Q.   So in this one, you had believed you recovered

 8    18 1/2 grams of heroin.  Can you put that in perspective?

 9        A.   With respect to what?

10        Q.   How significant a seizure that would be.

11        A.   That would be a significant seizure, yes.

12        Q.   Would that be the sort of seizure that maybe

13    higher-ups in the department would hear about?

14        A.   Not necessarily.  I mean, every drug case we

15    did, we did a case update and it was sent out.  So,

16    actually, any drug arrest we had, higher-ups would hear

17    about.

18        Q.   And would you agree that amount is more than

19    four times the amount that's needed for a trafficking

20    charge?

21        A.   What was the weight again?

22        Q.   18.5.

23        A.   Yes.

24        Q.   Did that strike you as suspicious?

25        A.   No.

1        Q.   Did you order 18.5 grams from the dealer?

2        A.   I don't now the specifics of this case.

3        Q.   If you ordered an amount of drugs and then the

4   drug dealer delivered significantly more, would that make

5   you suspicious?

6        A.   Well, there's no indication whether he

7   delivered significantly more.  It could have been other

8   drugs that were located in the vehicle, on his person,

9   that were slated for somebody else.  Like I say, I don't

10  know the specifics of this case or what --

11       Q.   As a general matter, not specifically referring

12  to this case, if you order a certain amount of drugs, you

13  know how much you're ordering, they know how much you're

14  ordering, but then they show up with significantly more,

15  would you find that suspicious?

16       A.   If they were delivering it to you, yes.  If

17  they had it on their person, not necessarily because it

18  could have been for someone else.

19       Q.   So just to put a pin on it --

20       A.   Yeah.

21       Q.   If you ordered a certain amount of drugs and

22  they showed up and gave you -- gave you more drugs, so

23  you walked away from the transaction with significantly

24  more than you had ordered, would that make you

25  suspicious?

 1      A.   Yes, sir.

 2      Q.   Okay.  Are you aware of any officer who has

 3 purchased that much heroin for that little money before?

 4 And the amount was $680.

 5      A.   I don't have any specifics on any other

 6 instances, no.

 7      Q.   On April 9th, 2020, you sent a text message to

 8 the detectives in your unit saying, quote, "Ole Aspirin

 9 pulls it off again!!"  This is also in V.

10           What was your thinking when you sent that

11 message?

12      A.   That I guess I was happy that he was continuing

13 to make good cases.

14      Q.   So this was the day, April 9th, that Isaiah

15 Walker was arrested for 7 grams of what was claimed to be

16 heroin in the parking lot of a Food Lion, and I believe

17 there was an incident with a car that Walker was in

18 collided with Detective Abdullah's vehicle.  Do you

19 remember that incident?

20      A.   I do.  I'm just trying to remember which one it

21 was.  I remember a car colliding with Abdullah's vehicle.

22      Q.   So in this instance with Walker, you recovered

23 7 grams, which is almost twice the -- not quite, but

24 close to twice the trafficking amount, but you had given

25 Williams the same amount of money as you had on

 1  March 26th.  Did that raise any red flags?

 2       A.   I'm not sure what you mean.

 3       Q.   Well, you gave Williams the same amount of

 4  money two different dates.  In one instance, they

 5  produced 18.5 grams of purported heroin, and the second

 6  7 grams.  Was that -- did that raise concerns or

 7  suspicions with you?

 8       A.   No, because it was kind of a blanket dollar

 9  amount for a trafficking case, so it didn't matter

10  whether it was 4 or 24.  It was basically about a $200

11  payment, unless there were other guns or other things

12  that were located.

13       Q.   Was there any specific combination of drugs and

14  price that would have raised a red flag for you?

15       A.   No.

16       Q.   To clarify my previous questions, when I was

17  saying $680, I was referring to the buy money, not the

18  compensation to Aspirin.  Would the $680 have seemed too

19  low for 18 1/2 grams of heroin?

20       A.   Yes.

21       Q.   And would it raise your suspicions if that same

22  informant then wanted the same amount of money, $680, to

23  get a fraction of that amount shortly thereafter?

24       A.   No.

25       Q.   Okay.  You called Williams, quote, "Ole

1    Aspirin" in that message.  Why did you do that?

2         A.   Because that was his nickname.

3         Q.   Had he endeared himself to you?

4         A.   No.

5         Q.   Were you excited about the cases he was making?

6         A.   I was excited for any success that my squad was

7    making, yes.

8         Q.   I want to ask about another text message.  This

9    one is from May 21st, 2020.  These are at W, tab W.

10             (Exhibit W was identified for record.)

11             BY MR. MANCE:

12        Q.   This one is a text message from Detective

13   Rattelade that was sent to Detectives Gay and Monroe on

14   the day they raided my clients' homes.  It says, quote,

15   "Place your bets here, 7 grams brown sugar mixture,

16   12 grams weed, $230 (non buy money) 3 red flags."

17             What do you think Detective Rattelade meant by,

18   "Place your bets, 7 grams brown sugar mixture, 3 red

19   flags"?

20        A.   I think that is basically a reference to kind

21   of their ongoing disdain for Aspirin and they were

22   basically making a bet on what the seizure was going to

23   be.  That's what they're talking about.

24        Q.   And this was on the day that they raided my

25   clients' home, would you agree, May 21st?

1       A.   I was on vacation, but that appears to be the
2   date stamp on the top.
3       Q.   Do you think those text messages indicate that
4   they were taking things seriously?
5       A.   You know, that is just like any job.  You kind
6   of joke and play around amongst themselves.  I can
7   100 percent guarantee you in the field they were very
8   much taking the operation seriously.  This is just kind
9   of the side, you know, joking amongst themselves of what
10  they thought the outcome would be.
11      Q.   So you take these -- am I right that you take
12  these text messages to suggest that they believed there
13  was a reasonable chance that they were going to be
14  producing brown sugar?
15      A.   I think they were basically believing that the
16  results would be poor, the results of the search would be
17  poor.
18      Q.   As their supervisor, knowing that they're going
19  to be sending armed people into homes, does it concern
20  you that this is the way they were talking to each other
21  around the time that they went into people's homes?
22          MR. BLANCHARD:  Objection to the form.
23          THE WITNESS:  This doesn't just concern me.
24  This is just kind of a squad banter type thing.  They all
25  take it all very seriously and 100 percent professional

1    out in the field.  This is nothing more than just kind of

2    yucking it up amongst themselves.

3              BY MR. MANCE:

4         Q.   So Detective Monroe replied to Detectives

5    Rattelade and Gay and he said, quote, "For sure fake

6    heroin."  What do you think Monroe meant by that?

7              MR. BENSON:  Objection.

8              THE WITNESS:  Like I kind of mentioned earlier

9    multiple times, you know, these guys didn't like the CI

10   and this was kind of their way of venting that amongst

11   themselves.

12             BY MR. MANCE:

13        Q.   Is this the -- so do you read this to indicate

14   that Detective Monroe believed it was likely that they

15   were going to find brown sugar?

16        A.   No.  What I see this as is just kind of a

17   joking thing.  He may have that opinion, but I can't -- I

18   can't answer what his thoughts were.  To me, it's just

19   kind of a joking thing amongst the squad.

20        Q.   Is it reasonable to read these messages, in

21   your opinion, to suggest that they at least expected not

22   to find heroin?

23        A.   You can read them and sway them whichever way

24   you'd like it to be, but I mean, clearly, they're making

25   indication that they didn't feel like it was going to be

1    a good recovery.

2         Q.   As their supervisor, what does it indicate to

3    you about the seriousness about -- with which your

4    detectives took their responsibilities that they were

5    taking bets about brown sugar?

6         A.   I don't have any issue with knowing that they

7    were taking their job seriously.  Like I said, this was

8    just a banter, side banter amongst themselves.  I don't

9    know how else to explain it.

10        Q.   I want to move forward a week, to May 28th, the

11   last text message I want to look at.  This is the last

12   page of the V tab.  You sent a text message to Detective

13   Abdullah and it says you still had, quote, "not had an

14   opportunity to discuss what happened while I was gone on

15   vacation with Aspirin," end quote.  Do you remember that?

16        A.   Not really.

17        Q.   You can review it if --

18        A.   What's the reference?

19             MR. BLANCHARD:  It's not in here, I don't

20   think.

21             MR. MANCE:  It's behind the -- it should be

22   behind the V tab.  Is it not?  They're kind of hard to

23   find.  I tried to circle them.  It might be the last one.

24   It's like the big, bold text, I think maybe that one.

25   And you're looking for "not had an opportunity to discuss

 1   what happened while I was gone on vacation."

 2              THE WITNESS:  Okay.

 3              BY MR. MANCE:

 4        Q.   Is that the text message you're looking at?

 5        A.   Yes.

 6        Q.   Did you send that text message?

 7        A.   Yes.

 8        Q.   And you seem to indicate then that he shouldn't

 9   be worried, that his punishment, quote, "Should be

10   nothing more than a written counseling form.  It's not

11   going to be anything crazy."  Did you write that?

12        A.   It's right here.  Yes, sir.

13        Q.   Why did you write that?

14        A.   Well, I was trying to make him feel better

15   about the situation, you know, just because, you know,

16   everything went south.  It doesn't mean I want to beat up

17   on the guy.  I was trying to make him feel better about

18   it and, you know, at that time, not knowing the entirety

19   of what was going on, just being a good supervisor,

20   trying to make him feel better about, you know, getting

21   himself in hot water.

22        Q.   Why would you communicate with him about the

23   severity of his punishment and imply that you hoped it

24   would be light before you had even gotten his account of

25   what happened?

1       A.   Because as a supervisor, you want to do your

2   best to make your employees, you know, feel good, and

3   anybody that gets in trouble, you would hope that

4   somebody was there to try to make you feel better, kind

5   of just having an optimistic spin on it, really.

6       Q.   Do you believe it was your responsibility to

7   have their back, even when they're wrong?

8       A.   Yes.

9       Q.   Is it fair to say that you were hoping he would

10  avoid trouble whether he had done anything wrong?

11      A.   Nobody wants people to get in trouble.  If he

12  had done something to the point where it was a bad

13  violation, you know, he would be punished, just like

14  anybody else would.

15      Q.   Okay.  I'm going to ask some questions about

16  statements that you made to Internal Affairs.  Some of

17  these are statements you made directly to them and some

18  are things I think you wrote in your appeal to the

19  hearing officers.

20           So I'm going to read you some quotes of things

21  you wrote and ask you questions about them.  Most of

22  these are from the 16-page document, which is, I think,

23  U, tab U, called "Appeal Docs from Rolfe with DC Jordans

24  notes."

25           You wrote in your appeal to your demotion that

1   although you were aware of suspicion among the squad that

2   Aspirin was producing fake drugs, quote, "Video observed

3   on Callyo devices were consistent with drug exchanges."

4   That's U-3.

5           How were you able to characterize what the

6   video showed when you said that you never watched the buy

7   videos?

8       A.   So it says, "Audio and video observed on Callyo

9   devices were consistent with drug exchanges," so the

10  Callyo device is the phone device, the monitoring audio

11  and sometimes video monitoring.  The videos that get

12  provided to the DA's office are from a secondary device

13  that's a camera that's hidden in a hat or a button on a

14  shirt, and that's a separate -- separate video from the

15  Callyo.  So everything that I heard over the phones --

16  the Callyo device, the live audio link was consistent

17  with your average drug exchange.

18      Q.   So the first question I asked you today, I read

19  you the conclusion of the IA Report and asked if you

20  agreed with it, and I believe you did.  And one of the

21  conclusions they made said, "None of the above-mentioned

22  heroin cases made by Detective Abdullah while using

23  Dennis Williams as a confidential informant resulted in

24  an audio or video recording of any drug transaction,

25  despite the fact that working equipment was used in each

1    case, and in some cases more than one type of recording

2    device was used at the same time."

3              So, again, you wrote in your appeal that video

4    observed on Callyo devices were consistent with drug

5    exchanges.  How could that be true -- how do you

6    reconcile that statement with the statement you agreed to

7    earlier?

8         A.   Because --

9              MR. BLANCHARD:  Objection to the form.  I don't

10   think he agreed to the earlier statement, but go ahead.

11             BY MR. MANCE:

12        Q.   Okay.  Let's withdraw that question for now.

13   Let's revisit the earlier statement.

14             So do you agree with Internal Affairs'

15   characterization, the one I just read you?

16        A.   Can you repeat it?

17        Q.   Sure.  "None of the above-mentioned heroin

18   cases made by Detective Abdullah while using Dennis

19   Williams as a confidential informant resulted in an audio

20   or video recording of any drug transaction, despite the

21   fact that working equipment was used in each case and in

22   some cases more than one type of recording device was

23   used at the same time."

24             Do you have any reason, sitting here today, to

25   believe that that is an inaccurate statement?

1      A.    Somewhat because, basically, what is -- what is

2  normally provided for the case jacket on a hard disk is

3  the recording from the button camera, not the Callyo, so

4  that is -- that is what the difference is.  So I may have

5  heard and seen video on the Callyo device on my phone,

6  and that's the one that's captured in the cloud on the

7  system -- on a different system than what is normally

8  provided to the DA's office.  That's the difference.

9      Q.    So you would disagree with this

10 characterization?

11     A.    I would disagree.

12     Q.    Okay.  Can you identify any of the specific

13 videos that you were referring to in your appeal that you

14 contend were consistent with drug exchanges?

15     A.    No.

16     Q.    You cannot?

17     A.    (Witness shakes head.)

18     Q.    Okay.  You also wrote in your appeal that,

19 quote, "Drugs were being recovered that were consistent

20 with what was ordered."  That's at U-3.  Do you stand by

21 that?

22     A.    Yes.

23     Q.    So you maintain that there were drugs recovered

24 from these 11 or 15 men?

25     A.    Right.

1      Q.   Is it true that Dennis Williams purported to

2  produce more heroin than was even ordered sometimes by a

3  factor of 3 or 4 on multiple occasions?

4      A.   I wouldn't say multiple occasions, but we did

5  go over a few that had.

6      Q.   And did you sign off on those reports?

7      A.   Yes.

8      Q.   The fact that -- so we've quoted your

9  detectives earlier about saying there should have been a

10 red flag.  I'm going to ask again.  Why was that not a

11 red flag?

12     A.   It was a red -- may have been a red flag to

13 them, but like I stated earlier, I was doing my own

14 evaluation on whether it was inner squabbling amongst the

15 squad, complaints, or factual problems.

16     Q.   You wrote, quote -- this is at U-3 --

17 "Regardless of those suspicions, without evidence to

18 prove that the informant was misleading Detective

19 Abdullah and/or providing false evidence, there was no

20 reason to stop using him until proven otherwise."

21          Did you not believe suspicions by the majority

22 of your squad constituted a reason to stop using him?

23     A.   No, for the same exact reason I just mentioned,

24 that due to personality conflicts, they were constantly

25 complaining about --

1        Q.   Just to be clear, you're suggesting that these

2   detectives might have been dishonest about their real

3   motivations?

4        A.   I wouldn't categorize anything that they say or

5   do as dishonest.  They might have different reasons to be

6   more critical of a detective or a CI based on their

7   dislike.

8        Q.   Were you aware that the consequences of being

9   wrong could include people being wrongfully convicted or

10  innocent people have armed police officers enter their

11  homes?

12            MR. BLANCHARD:  Objection.

13            THE WITNESS:  Can you repeat that, please?

14            BY MR. MANCE:

15       Q.   Were you aware that the consequences of being

16  wrong -- so when I say "being wrong," wrong about

17  Williams and whether he was trustworthy.  Were you aware

18  that the consequences of being wrong about something like

19  that could include people being wrongfully convicted,

20  going to prison, people having their homes searched?

21       A.   Yes.

22       Q.   Did you consider there to be an acceptable

23  level of risk to keep working with Aspirin in spite of

24  your detectives' suspicions?

25       A.   I would say that we continued to use Aspirin.

1   There was never anything that I saw outside of the kind
2   of thing that we continue to say about the personality
3   conflicts that stuck out enough to me to stop using him.
4       Q.   But I want to get to my question.  Did you
5   believe it was an acceptable level of risk?
6       A.   Yes.
7       Q.   You wrote in your appeal -- this is at U-4 --
8   "The CI was approved for use by my supervisor, the CI's
9   probation officer and the Wake County DA's office."  Why
10  did you include the CI's probation officer in that
11  statement?
12      A.   Because that was one of the things that came up
13  in the IA investigation, so I was making sure that it got
14  covered in my appeal.
15      Q.   Well, who was that supervisor?
16      A.   What supervisor?
17      Q.   The probation officer.
18      A.   I don't recall what their name was.
19      Q.   What is your basis for saying in your appeal
20  that they approved Williams' use as a CI?
21      A.   Because I had specific remembrance of the
22  paperwork that Detective Abdullah obtained to use Aspirin
23  as a CI.
24      Q.   What happened to that paperwork?
25      A.   I don't know.

 1      Q.   Have you looked for it?

 2      A.   No.

 3      Q.   Did you not believe that paperwork would have

 4 been important for purposes of your IA appeal?

 5      A.   It would, but it wasn't in my possession and at

 6 that point, Detective Abdullah wasn't -- he was on

 7 administrative leave.

 8      Q.   You wrote in your appeal, quote, "I was aware

 9 the informant was not providing quality surveillance

10 footage.  I addressed this with Detective Abdullah by

11 requiring him to apply an additional recording source

12 when utilizing CI Aspirin and ordering him to make

13 criminal charges if footage was at the level required by

14 the DA assigned to his case.  I had no reason to believe

15 he was doing otherwise; thus, I did not feel the need to

16 confirm."  That's at U-14.

17           Elsewhere you wrote, quote, "I had no

18 indication that Detective Abdullah was not following

19 those directives and, therefore, had no reason to follow

20 up."  That's at U-8.  Did you make those statements?

21      A.   Yes.

22      Q.   Assuming an officer -- let's just assume.

23 Assuming an officer is being dishonest in a scenario such

24 as the one that you were faced with, how would you have

25 expected to be given a reason to believe otherwise if you

1    weren't taking the time to review the video, yourself?

2                MR. BLANCHARD:  Objection.

3                THE WITNESS:  I had no -- nobody from the DA's

4    office reached out to me indicating that there was any

5    problems.  I would assume if there had been multiple

6    cases brought forth for prosecution and that there wasn't

7    the evidence sufficient to make those charges, that I

8    would have heard something.  The case would have been

9    dismissed or got a phone call saying, "Hey, we're having

10   a problem.  Abdullah is presenting cases without audio

11   and video support," gotten into that, so in the absence

12   of that, it was just kind of business as usual.

13               BY MR. MANCE:

14        Q.   Did you assign anyone else to review the

15   footage on your behalf?

16        A.   No.

17        Q.   Whose word, other than Abdullah's, were you

18   relying on so as to not need to watch the videos?

19        A.   Nobody.

20        Q.   Weren't there concerns voiced to you by the

21   third Williams heroin arrest?

22        A.   Can you clarify that?

23        Q.   By the time the third heroin -- purported

24   heroin arrest was made involving Dennis Williams as the

25   CI, were you by that time aware of concerns?

1     A.   I can't recall where in the time line that I
2  was informed of it.
3     Q.   Were you aware that Detective Abdullah was
4  filing trafficking charges against these individuals at
5  the time that you were not checking his videos?
6     A.   Yes.
7     Q.   Was Detective Rattelade accurate when he said
8  those videos are easily accessible with a touch of a few
9  buttons on the computer?
10     A.   Yes.
11     Q.   Detective Rattelade told Internal Affairs at
12  K-22 that there was, quote, "gross negligence as far as
13  the handling of that CI."  Do you agree?
14     A.   No.
15          (Exhibit K was identified for the record.)
16          BY MR. MANCE:
17     Q.   You responded to allegations by Internal
18  Affairs that you failed to review Detective Abdullah's
19  case jackets in a timely manner by saying that all but
20  one of them didn't exist at the time the issue was first
21  raised with you by Detective Davis.  Do you recall that?
22     A.   Yes.
23     Q.   What is your responsibility as a sergeant to
24  make sure that detectives are maintaining case jackets in
25  a timely fashion?

1      A.    None.

2      Q.    You have no responsibility?

3      A.    (Witness nods head.)

4      Q.    In the event there is a problem, as there was

5  here, wouldn't you rely on those case jackets to be able

6  to identify issues?

7      A.    I suppose.  I mean that's kind of like putting

8  the cart before the horse, but, you know, you expect that

9  your detectives are going to have their cases documented

10  for prosecution, so at least they would be available.

11      Q.    You wrote -- and this is at U-6 -- that, quote,

12  "The evidence produced indicating violations of rules,

13  regulations, policies and procedures of the department,

14  while true in some instances, were a product of

15  acceptable, taught and consistent practices that were

16  commonplace among all the Drugs and Vice, Career Criminal

17  Unit, Criminal Enterprise Drug Unit and Gang Suppression

18  Unit."  Did you write that?

19      A.    Yes.

20      Q.    What specifically were you referring to?

21      A.    There was multiple references, a lot of

22  different references.

23      Q.    Okay.  Well, what were the violations of

24  procedure that were deemed acceptable within RPD culture

25  and throughout the different units that you were

1   referring to?

2        A.   One was access to CI funds without me being

3   there, like I had a -- Detective Rattelade was kind of my

4   alternative team leader.  If I were not there, he was

5   able to access the CI funds to make the buys, et cetera.

6   I had a protocol in place to make sure that all that was

7   documented.  There had to be a second detective to sign

8   off that the funds were received.  That was one of them.

9             Meeting CIs solo was one of them.  It was just

10  all the different things that -- the violations of policy

11  that they waged against me in the investigation.

12       Q.   You wrote at -- this is at U-9 -- that, quote,

13  "There is precedence of practice of detectives meeting

14  informants alone within all the Drugs and Vice units."

15  Did you write that?

16       A.   Yes.

17       Q.   And is that true?

18       A.   Yes.

19       Q.   So should I understand that to mean that

20  despite the policy saying one specific thing, the actual

21  policy that is followed is something different?

22            MR. BLANCHARD:  Objection.

23            THE WITNESS:  Not the actual policy that is

24  followed is different.  The practice is different.

25            BY MR. MANCE:

1       Q.   So the practice is different than the policy?

2       A.   Right.

3       Q.   And that's for things like, you said, logging

4  contacts with informants and having two officers at a CI

5  meet and the lock box issue?

6       A.   Yes.

7       Q.   Okay.  You wrote, "I received praise --" this

8  is at U-9.  "I received praise from my supervisor,

9  Lieutenant J. Bunch, for the system I developed to

10  maintain CI funds."  Did you write that?

11       A.   Yes.

12       Q.   Is that true?

13       A.   Yes.

14       Q.   Are you saying that you received praise from

15  Lieutenant Bunch for the same thing you were later

16  disciplined for?

17       A.   Yes.

18       Q.   What were the circumstances of you receiving

19  praise?

20       A.   So the agency didn't really have a process on

21  paper on how to keep up with your CI slips and payment

22  slips, so anytime you made a drug transaction, there was

23  a hard copy slip of the amount of money that was going to

24  be used for the purchase of the drugs, and then there was

25  another slip that was a hard copy paper slip that was

 1  used for when you pay out the informant.  You know, those

 2  slips have to be signed by -- witnessed by another

 3  detective or myself.

 4          And then I created a booklet, basically a

 5  checks and balances for these slips, where all the

 6  original copies were maintained and secured, and then in

 7  order for a detective to check out any more money, they

 8  had to clear the last slip, make sure everything was

 9  accounted for before they could get additional money.  So

10  it was just an organization of the CI payment process

11  that was absent prior.

12      Q.   You wrote -- and this is at U-9 -- that, quote,

13  "There has been no direct evidence presented in this

14  investigation in regard to the manipulation of Detective

15  Abdullah by CI Aspirin."  Do you remember writing that?

16      A.   Yes.

17      Q.   Why did you write that?

18      A.   I guess, basically, what I was saying was that,

19  you know, other than general speculation, it's never --

20  to my knowledge, never been proven that, you know, this

21  bait and switch situation actually occurred.  It was just

22  basically kind of the best speculation after the fact

23  that we were able to come up with on how he was able to

24  get over on us.  So, basically, I was just indicating

25  that even though the speculation was this, I don't think

1  it's ever been proven that that was actually what

2  occurred.

3        Q.   Did you mean to suggest that there might not

4  have actually been dishonesty on Aspirin's part?

5        A.   No, I did not.

6        Q.   Because there's a number of ways to interpret

7  that statement.  I mean you could read it to say that you

8  didn't -- you thought Abdullah was in the scheme, but you

9  said earlier you do not believe that is the case.

10       A.   No, I don't.

11       Q.   Okay.

12       A.   Basically, what I -- the interpretation was

13 that, you know, I was punished for all the speculation of

14 what occurred.  However, it was never actually proven

15 that this is exactly what happened.

16       Q.   Did you mean to suggest that Detective Abdullah

17 might have been wrongfully accused?

18       A.   Of what?

19       Q.   Of all the things he was accused of.

20       A.   No.

21       Q.   You wrote -- this is at U-10 -- quote, "There

22 is no evidence presented in this investigation that

23 indicated my awareness of inconsistencies or inaccuracies

24 (only suspicions) prior to the service of my discipline

25 and receipt of investigative materials."  Why did you

1  write that?

2       A.   Because I was -- where are we at, again?

3            MR. BLANCHARD:  (Indicating.)

4            THE WITNESS:  So we're talking about the

5  suspicions that everybody had of CI Aspirin and I was

6  basically saying that there's been no evidence presented

7  that confirmed all the suspicions everybody had about

8  him.

9            BY MR. MANCE:

10      Q.   Were you aware that the detectives who worked

11 with you had talked to Internal Affairs?

12      A.   Yes.

13      Q.   And I've read you a number of those statements

14 today.

15      A.   Right.

16      Q.   Would you agree that if you've got all the --

17 multiple detectives in the unit telling Internal Affairs,

18 "I told Rolfe this; I did a field test that came back

19 negative," things of that nature, is that not evidence

20 presented that would have indicated your awareness of

21 inconsistencies or inaccuracies?

22      A.   This reference was --

23           MR. BLANCHARD:  Object to form.

24           THE WITNESS:  This reference was, in my head,

25 the way I wrote it was specific to the inconsistencies of

1  Aspirin.

2          BY MR. MANCE:

3      Q.   Internal Affairs wrote -- this is at U-10.

4  Internal Affairs wrote, "You should have seen," quote,

5  "red flags as a seasoned Drugs and Vice supervisor."  And

6  you responded by admitting you were suspicious of the CI,

7  but also said you should not be held responsible because

8  you had not actually reviewed the footage that was

9  available to you.

10         Would you agree with me that that was your

11 general argument?

12     A.   My general argument was -- where is that,

13 again?  Sorry.

14     Q.   So they're saying on U-10 -- they just

15 basically said you should have seen these red flags as a

16 seasoned supervisor of the Drugs and Vice Unit.  And you

17 said, "I was suspicious, but I shouldn't be held

18 responsible because I didn't actually review the footage

19 that would have confirmed this one way or another."

20         Is that a fair characterization of sort of what

21 you said to IA?

22     A.   In general.

23     Q.   Okay.  Can you make sense of that argument for

24 me?  I mean, why would that not be a responsibility to go

25 watch those videos if you had all these red flags?

1      A.    Because, well --

2            MR. BLANCHARD:  Objection.

3            MR. BENSON:  Objection.

4            THE WITNESS:  I didn't have all these red

5      flags.  Other people had red flags.  Like I stated

6      earlier, I was making my own evaluation based on

7      personality conflicts, the same explanation I've

8      regurgitated multiple times, that I was making my own

9      evaluation on whether these things were valid or not.

10           I had not heard anything from the DA's office,

11     any discrepancies that they had.  They continued to

12     prosecute the cases, so it was my assumption that

13     everything was good on their end with the audio and

14     video, which was policy of the Wake County DA's office

15     not to prosecute without it, so I had no reason to

16     believe that they weren't getting what they needed to

17     move forward.

18           It's not the sergeant's responsibility to

19     review the videos because it's not my case.  It's the

20     detective's case.  It's their responsibility to make sure

21     that they have what they need to prosecute the case.

22           BY MR. MANCE:

23     Q.    You wrote -- this is at U-13 -- quote, "In all

24     appearances, the investigators and others associated with

25     this investigation had/have preconceived notions as to my

1   supervision of the Drugs and Vice Unit that were

2   preexisting and inaccurate," end quote.  Why did you

3   write that?

4        A.   Oh, it was basically, you know, when I reviewed

5   the IA file, you know, everybody -- or based on their

6   line of questioning, it was kind of like a preconceived

7   notion or, you know, this is what the punishing --

8   punishment is going to be, so we need to tailor our

9   investigation to support those policy violations.  There

10  was, in my opinion, no real -- there was not a thorough

11  enough investigation to -- very, in my opinion, poor

12  investigation on my -- on the violations that they placed

13  against me.  So, basically, I was indicating that I felt,

14  based on the line of questioning of the IA, that they

15  basically had a preconceived outcome that they were

16  tailoring their investigation toward.

17       Q.   Do you think that Detective Davis from Internal

18  Affairs had preconceived notions going into the

19  investigation?

20       A.   Maybe not preconceived notions, but possibly a

21  preconceived outcome that he needed to be working toward.

22       Q.   Do you think that D.C. Jordan had preconceived

23  or biased notions going into the investigation?

24       A.   I don't think he had preconceived or biased

25  notions.  I think he probably had an outcome that was

1   indicated that it needed to be, and so, therefore, he

2   tailored his investigation in that manner.

3        Q.   If we were looking at the whole IA file and you

4   had to pick one thing as the clearest illustration of

5   their having preconceived notions, what would you point

6   to?

7        A.   I guess maybe the final findings where they

8   kind of summarize everything.

9        Q.   At what point in the process did you come to

10  believe that they had preconceived ideas about the

11  investigation?

12       A.   From the beginning, really.

13       Q.   And was there something during the course of

14  the investigation or some incident that persuaded you

15  that Internal Affairs was biased in the way they were

16  conducting the investigation?

17       A.   Having been a police officer for 27 years now

18  and understanding kind of the political, with all these

19  cases being in the media and all the civil traction that

20  was going on, I think ultimately the Internal Affairs via

21  probably the City was saying, you know, "In order to

22  mitigate some of these losses, we're going to need

23  somebody to blame here," and I happened to be that guy.

24       Q.   D.C. Jordan's handwritten notes, which are at

25  U-13, say that, quote, "Rolfe should have followed up on

 1  Abdullah utilizing the secondary camera and whether he
 2  changed the charges as directed at the very least," end
 3  quote.  Do you believe D.C. Jordan was wrong?
 4      A.    Not necessarily.  You know, I did -- on one
 5  case where I was told that the drugs were -- came back --
 6  field tested negative, I told him to amend the charge
 7  from trafficking to sale and delivery of counterfeit
 8  controlled substance and had no reason to believe that he
 9  had not.
10      Q.    How much effort would it have taken to do what
11  they suggested?
12      A.    Not much.
13      Q.    How much time would it have taken?
14      A.    Fifteen minutes.
15      Q.    You wrote in two different places -- I think
16  one of them is at U-14 -- that you didn't believe you
17  deserved the discipline that was imposed, in part,
18  because some of RPD's policies and protocols that you
19  were found to have violated were, quote, "outdated."
20  What did you mean by that?
21      A.    You know, unfortunately, our police department
22  in a lot of aspects is kind of in the stone ages on a lot
23  of things, you know, as far as these old policies that
24  don't fit current times.  They haven't really been
25  updated over the years to kind of go along with the more

1   modern -- more modern investigations.  You know, now

2   we're doing, you know, social media, investigate in

3   different -- anyway, long story short, we're a little bit

4   behind in some of our policies and procedures and, you

5   know, just could have been -- a lot of this stuff could

6   have been avoided if we had other fail-safes in place,

7   more modern policies that had fail-safes in place to

8   protect against situations like this.

9        Q.   Do you agree that it's the department's

10  prerogative and not yours to determine when and if a

11  policy is outdated?

12       A.   Yes.

13       Q.   You wrote at U-15 that you received, quote, "an

14  unprecedented punishment," end quote.  What did you mean

15  by that?  What is unprecedented about it?

16       A.   Because nobody has ever been demoted for a

17  situation like this.

18       Q.   When you say "a situation like this," what do

19  you mean?

20       A.   To my knowledge, there's never been a

21  supervisor demoted for the actions of a detective or

22  never been a supervisor demoted based on his oversight of

23  an employee to that extent.

24       Q.   Does the fact that the department responded the

25  way it did indicate to you that it thought what happened

1  was among the more serious scandals its had?

2          MR. BLANCHARD:  Objection.

3          MS. KIBLER:  Object to form.

4          MR. BENSON:  Objection.

5          THE WITNESS:  Can you repeat that?

6          BY MR. MANCE:

7     Q.   Yeah.  Does the fact that the department

8  responded the way it did indicate to you that it thinks

9  what happened was very serious?

10         MR. BLANCHARD:  Objection to form.

11         THE WITNESS:  Yes.

12         BY MR. MANCE:

13    Q.   You wrote at U-15 that, quote, "Defendants in

14 this case --" this is referring to, I believe, the -- I

15 think this is referring to Abe's first case -- "hired a

16 consultant expert witness to review current policies,

17 procedures and best practices, and his findings indicate

18 and support that," ellipses, "we were lacking in basic

19 training --" excuse me, "basic testing equipment and

20 oversight."

21         What was it that the expert said, if you

22 recall, about basic failures of oversight?

23    A.   I don't know specifically what he said, but I

24 did include his memorandum somewhere in all this.

25    Q.   At U-15, you refer to, quote, "multiple

1    attempts," again, ellipses, "to have Detective Abdullah
2    reassigned to a different unit," end quote.  If you were
3    very eager to get Detective Abdullah out of the unit and
4    had suspicions or were aware of suspicions related to his
5    work, why did you not scrutinize his work more?
6         A.    My reasoning for wanting Abdullah transferred
7    to another unit was more so on the personality conflict
8    piece than it was necessarily his work product.
9         Q.    You wrote -- this is at U-15 -- that the
10   department, quote, "kicked the can down the road," end
11   quote, with respect to Detective Abdullah and his known
12   problems.  Do you remember writing that?
13        A.    Yes.
14        Q.    You wrote that he failed to graduate the
15   academy; is that correct?
16        A.    Right.
17        Q.    Tell me what you know about that.
18        A.    So he flunked out of the initial academy.  I
19   don't know the specifics, but I think I was told
20   academic, and they recycled him into the next academy,
21   the following academy, at which point he made it through.
22        Q.    You wrote that he was recommended, quote, "not
23   to get off field training by both of his training
24   officers, "end quote.  What does that mean?
25        A.    So, basically, when you're on your initial --

1   you get out of the police academy and you're assigned to

2   a training officer, there's two portions to that over, I

3   think, a 20 -- maybe a 20-week period.  I'm not 100

4   percent on that.  But, basically, both of his trainers --

5   Detective Gretchen Peterson was one and the other one was

6   Detective Sonny Woodard -- indicated that he should not

7   make it off training.

8       Q.   You wrote that he had, quote, "multiple

9   personality conflicts," end quote.  Why did you write

10  that?

11      A.   Because I was trying to indicate that pretty

12  much everywhere he had gone in the department, he had

13  conflicts on his squads, so I was basically trying to

14  indicate that due to all these things being overlooked

15  prior to him landing on my squad contributed to what

16  happened.  Basically, if these things had been addressed

17  earlier, he would, (A) either not been there or possibly

18  assigned to a squad that was more fitting of his

19  personality.

20      Q.   You wrote that he had, quote, "issues on his DD

21  Patrol Squad up to the date he was placed on

22  administrative leave," end quote.  What does that mean?

23      A.   Issues on his DD, Downtown District Patrol

24  Squad, so that's just where he was assigned.  He had

25  issues with squad members there as well.

1        Q.   When you say "issues," do you mean issues with

2    other officers or issues in the course of his work, like

3    in the street?

4        A.   Other officers.

5        Q.   Was Detective Abdullah Raleigh's Police Officer

6    of the Year in 2013?

7        A.   I don't know if he was the Officer of the Year,

8    but I know he won an aware for warrant service.

9        Q.   For warrant service?

10       A.   Yes.

11       Q.   I'm going to ask you some questions now about

12   statements that you made to Deputy Chief Jordan in your

13   August 30th, 2022 appeal hearing.

14            In your appeal hearing, you said -- this is at

15   X-2.

16            (Exhibit X was identified for the record.)

17            BY MR. MANCE:

18       Q.   Quote, "I further indicated to Detective

19   Abdullah that it was his responsibility to confirm the

20   prosecutable audio and video footage being obtained

21   before bringing charges against the subjects."  Do you

22   remember saying that?

23       A.   Yes.

24       Q.   I know this is going to get an objection, but

25   doesn't this essentially mean that you told a person who

1   you knew needed more supervision that he could reasonably

2   expect that you would not be reviewing his audio and

3   video footage moving forward?

4           MR. BLANCHARD:  Objection.  You're correct.

5   That will get an objection.

6           THE WITNESS:  No.

7           BY MR. MANCE:

8       Q.   Would that not have been one of his takeaways

9   from that conversation?

10          MR. BENSON:  Objection.

11          THE WITNESS:  I can't speculate on what his

12  takeaway would have been.

13          BY MR. MANCE:

14      Q.   Do I understand that -- okay.  Let's talk about

15  this statement.  You said, "I indicated to Detective

16  Abdullah it's his responsibility to confirm the audio and

17  video footage was obtained before you bring any charges."

18          So when you say it's his responsibility, did he

19  have the belief following that conversation that you were

20  going to be looking at his videos?

21      A.   I don't know what his belief would have been,

22  but it's any detective's responsibility to make sure that

23  they have that.

24      Q.   Was it your responsibility as sergeant to pull

25  those videos and determine for yourself so that you

1    didn't have to rely on his word that the corrective

2    instructions that you had given him were being followed?

3         A.    No.

4         Q.    That was not your responsibility?

5         A.    No.

6         Q.    In your 2020 evaluation -- this is N-39, which

7    was completed a month after the raid.

8              (Exhibit N was identified for the record.)

9              BY MR. MANCE:

10        Q.    It said, quote, "You bear the responsibility of

11   developing detectives' investigative skills." Does that

12   sound correct?

13             MR. BENSON:  Objection.

14             THE WITNESS:  It's just all boilerplate.  They

15   all say the same thing.

16             BY MR. MANCE:

17        Q.    Okay.  Did your 2020 evaluation indicate that

18   you bear the responsibility of developing your

19   detectives' investigative skills?

20        A.    Yes.

21        Q.    Okay.  Does developing those skills,

22   particularly when it comes to critical skills like

23   directing informants, necessitate following up and

24   watching things like buy videos?

25        A.    No.

1      Q.   In your appeal hearing -- this is at X-4 -- you

2   said, quote, "Most of the complaints were surrounding

3   Detective Abdullah's handling of the CI and Aspirin's

4   sloppy camera work.  As the supervisor, it's my

5   responsibility to weigh whether these complaints were

6   primarily a result of ongoing personality conflicts and a

7   way for the detectives to express their overall dislike

8   for Abdullah."  What did you mean by that?

9      A.   It's the same thing I've been repeating over

10  and over.  Basically, I was weighing whether or not the

11  complaints were based on the personality conflicts or if

12  they had validity on their own, the same thing I've been

13  saying.

14     Q.   So did you have questions about the veracity of

15  what the detectives were telling you about what the buy

16  videos showed or did not show?

17          MR. BLANCHARD:  Objection.

18          THE WITNESS:  The veracity wasn't necessarily

19  related to the buy videos.  It was overall just the same

20  thing I've been saying.  It was not specific to the

21  videos all the time.

22          BY MR. MANCE:

23     Q.   When I look at that statement, should I take

24  you to mean that you suspected that the detectives might

25  just be trying to get Abdullah in trouble because they

**REED & ASSOCIATES**
MATTHEWS, NORTH CAROLINA  980.339.3575

1   didn't like him?

2          A.    Not necessarily trying to get him in trouble.

3   Just like I've been saying, there's a way for them to

4   vent and a way for them to highlight their overall

5   dislike.

6          Q.    Would you agree that there's kind of two

7   options when they come to you and tell you something like

8   they told you; that either they are accurately relating

9   their subjective impressions about Abdullah and his

10  trustworthiness and Williams and his trustworthiness or

11  they are misleading you in an attempt to get them into

12  trouble?

13              MR. BLANCHARD:  Objection.

14              MS. KIBLER:  Objection.

15              MR. BENSON:  Objection.

16              MS. POOLE:  Objection.

17              MR. MANCE:  I'm just trying to drill down.

18              THE WITNESS:  It's just all speculative. You

19  know, it's -- it's the same thing that I've been saying

20  10 times prior.  I was in the process of evaluating

21  whether it was, "We don't like Abdullah, let's bitch

22  about him," or the complaints were actual, valid

23  complaints.

24              BY MR. MANCE:

25          Q.    Yeah, and I guess the reason I keep hovering on

1    this is, wouldn't that mean you have a squad of

2    detectives who are willing to lie to their supervisor --

3         A.   No.

4         Q.   -- and falsely accuse a coworker, and wouldn't

5    that have also been a big problem for your squad?

6         A.   No, no lying.  They're just -- they were

7    venting their frustrations.

8         Q.   So you believed they were telling the truth?

9         A.   I believe they were sharing what their opinion

10   was on all of it.  I don't think anybody was lying.  It

11   was all just what their opinion was.

12        Q.   Would you agree it would be a big problem if

13   detectives did lie to you to try to get another detective

14   out of the unit?

15        A.   Yes.

16        Q.   Okay.  Were your suspicions that they may have

17   had some secondary motive enough -- let me reword this.

18             Were your suspicions that they had a secondary

19   motive in coming to you about this strong enough that you

20   did not feel the need to review the footage?

21        A.   No.

22        Q.   No, they were not strong enough?

23        A.   I don't think their concerns were anything that

24   would sway me one way or the other about the footage.

25        Q.   Okay.  You stated -- this is at X-5 and 6 --

1   that part of your job was to keep things harmonious among
2   the group of detectives who didn't like one another.  You
3   said you held, quote, "weekly meetings," end quote, to
4   address, quote, "personality conflicts."  Do you remember
5   saying that?
6        A.   Yes.
7        Q.   Who specifically disliked who in the unit when
8   you were in charge?
9        A.   Everybody disliked Abdullah and everybody else
10  got along great.
11       Q.   So that was it?  It was just everyone versus
12  Abdullah?
13       A.   And, actually, it wasn't even versus Abdullah.
14  It was people had problems with -- they weren't against
15  Abdullah as a person.  They just -- they were just not
16  cohesive.  They were -- I wouldn't categorize it as a
17  ganging up or whatever.  They just did not -- nobody got
18  along with the guy.
19       Q.   Detective Abdullah told us when we deposed him
20  that you called him after the raid at our clients' homes
21  and you told him that you weren't mad at him, and he said
22  it was also a call where you had talked to him about
23  being transferred to the Transit Unit.  Do you remember
24  that call?
25       A.   I remember talking to him at some point, but I

1    don't remember the specifics of it.

2         Q.   What do you remember about that phone call?

3         A.   I don't remember anything other than having it.

4         Q.   Did you have any other phone calls with

5    Abdullah after he was put on leave?

6         A.   I would check in on him from time to time, just

7    to make sure he was doing okay.

8         Q.   Did you speak to him after Internal Affairs let

9    you know they were going to be looking into you?

10        A.   I don't remember specifically, but maybe.

11        Q.   Have you spoken to the other detectives since

12   the Internal Affairs investigation into you started?

13        A.   Yes.

14        Q.   Do you maintain -- do you stay in touch with

15   them?

16        A.   Yes.

17        Q.   In your appeal hearing -- this is X-7 -- you

18   said that Internal Affairs had made a, quote, "assertion

19   that you could have influenced that May case," so that

20   May case is -- and you disputed that.  You said, "I was,"

21   quote, "out of town on vacation."  That May case refers

22   to the Marcus VanIrvin arrest and the raid on my clients'

23   homes.

24             Do you agree that by May 20th, there were a

25   dozen videos that you could have accessed with the touch

1   of a button that would -- that had you done that, would

2   have prompted you to discontinue Aspirin as an informant?

3            MR. BLANCHARD:  Objection.

4            MR. BENSON:  Objection.

5            BY MR. MANCE:

6        Q.   Let me just try that again.  I'll withdraw that

7   question.

8            By May 20th, were there a dozen videos

9   available to you of purported buys involving Aspirin?

10       A.   Available to me, yes.

11       Q.   Do you believe that if you had watched those

12  videos, you would have discontinued him as an informant?

13       A.   Maybe.

14       Q.   What is the reason that your answer is not yes?

15       A.   Because without having reviewed the videos, I

16  don't know -- I can't really speak on what they would

17  have contained or not.

18       Q.   Do you entertain suspicions that the police

19  department has misrepresented what the videos show or do

20  not show?

21       A.   No.

22       Q.   You said -- this is at X-8 -- quote, "There was

23  nothing occurring visibly or on the surface that was

24  anything different than any of the other -- any other

25  drug deal that we were familiar with," end quote.  Do you

1    stand by that statement?

2          A.   Yes.

3          Q.   Is what occurred in this case representative of

4    how RPD generally handles drug buys involving CIs?

5          A.   Yes.

6          Q.   You told hearing officers -- this is at X-14 --

7    that you thought Raleigh PD was, quote, "negligent," end

8    quote, in ignoring a memo to Dottie Kibler and some other

9    recommendations, including from you, to purchase

10   something called Trunarc that you said would have helped

11   identify Williams as a dishonest informant sooner.  Why

12   did you believe the department was negligent?

13         MS. KIBLER:  Objection.

14         THE WITNESS:  Because the Trunarc device is

15   good in more than one way.  It's a way that you can test

16   narcotics, including fentanyl, which is very deadly. It's

17   airborne.  It can kill you.

18         So twofold, that it would protect officers

19   because you have the ability to test drugs through

20   packaging without taking them out of the package, and it

21   could identify immediately whether it was a

22   non-controlled substance, so if we had had the Trunarc

23   capabilities, you know, this could have been stopped much

24   sooner in the investigation.

25         BY MR. MANCE:

1        Q.   Does the department have Trunarc today?

2        A.   Yes, they do.

3        Q.   Do you know when they got it?

4        A.   After my thing.  I'm not sure exactly when.

5        Q.   What was -- you also reference Ms. Kibler in

6   that passage.  What was her role in that?

7        A.   I don't know what her specific role was, but

8   the major of the detective division, I believe, sent her

9   recommendations for basically kind of preventing this

10  sort of thing from occurring again and part of that

11  recommendation was the purchase of the Trunarc equipment.

12       Q.   You told hearing officers at X-18 that your,

13  quote, "partner sergeant at the time rarely checked

14  reports," end quote.  Was that Chuck Lynch you were

15  referring to?

16       A.   Yes.

17       Q.   You told them that Chuck was, quote, "A very

18  poor administrative task," end quote, sergeant and,

19  quote, "He basically would not check any of these

20  reports.  I was the one that was fully responsible for

21  checking every single drug-related report in the City of

22  Raleigh with very few exceptions," end quote.

23            And you said that you were -- that there were

24  instances where the queue would get up to 400 cases at

25  once.  Is that statement accurate?

1      A.   Yes.

2      Q.   Who in the department put this all on you?

3      A.   Oh, there's nobody that specifically did.  It's

4  one of those deals where it's a responsibility that has

5  to occur, and if I didn't do it, it would just sit there

6  and build up and build up.  There were a few other

7  detectives -- or detective sergeants -- on a rare

8  occasion, Sergeant Lynch would check a few.  There were

9  sergeants in other drug-related units that had access to

10  the queue that occasionally would check a few, but

11  primarily, I was checking them.

12      Q.   Did you complain about your workload?

13      A.   No.

14      Q.   Did you ever say to anyone above you, "This is

15  unreasonable to have one person exercise oversight of all

16  these reports when there are things like home raids that

17  turn on them being accurate"?

18      A.   Home -- I'm sorry, I didn't understand that.

19      Q.   I'll reword the question.  Did you ever say to

20  anyone above you in rank that you thought it was

21  unreasonable to have just one person be responsible for

22  all this, given the importance of that information being

23  accurate?

24      A.   I may have mentioned it kind of in passing to

25  my lieutenant, but not to the point where I would say I

1   was saying to him that this was unreasonable, maybe just

2   a general griping, but not anything more than that.

3        Q.   Were you aware that two of your detectives,

4   Rattelade and Gay, both used the phrase, quote, "running

5   joke," independent of one another to describe the unit's

6   opinion of how unreliable and dishonest Aspirin was?

7        A.   No.

8        Q.   You were not aware they made those statements?

9        A.   Not until I read the --

10       Q.   And those are at P-20 and K-26.

11            MS. POOLE:  P-20 and what?

12            MR. MANCE:  P-20 and K-26.

13            BY MR. MANCE:

14       Q.   You also said -- this is at X-19 -- quote, "I

15  had no indication that Detective Abdullah was not

16  following these directives and, therefore, had no reason

17  to follow up."  Do you still feel that way?

18       A.   Yes.

19       Q.   Do you believe that you did not have a

20  responsibility to do as IA said and to follow up?

21       A.   As IA said?

22       Q.   Uh-huh.  They found that -- in their findings,

23  they found that you should have done that.  Do you

24  disagree with that?

25       A.   I do at the time that it was occurring.

1       Q.    RPD has a policy that says, quote, "Officers
2  must have another officer accompany them when meeting an
3  informant," end quote.  You acknowledged at X-21 that you
4  were aware of that policy, but you said it wasn't
5  followed in the department, that it was, quote,
6  "extremely common," was your quote, for officers to meet
7  CIs alone because there was a, quote, "precedence of
8  practice of detectives meeting informants alone within
9  all the Drugs and Vice units," end quote, after, quote,
10 "the initial contacts were made," end quote.
11          You also said, quote, "That is known by all the
12 supervisors over there that occurs," end quote.  That's
13 at X-21.  Do you recall saying that?
14      A.    Yes.
15      Q.    What are the names of the people above your
16 rank who were aware that the actual common practice of
17 your detectives was different than the written
18 departmental policy?
19      A.    Jennings Bunch, Captain Quick, Captain Amstutz,
20 everybody.  I mean, literally everybody, especially if --
21 for the most part, anybody that was a upper-level
22 supervisor in the drug unit came from the drug unit, so
23 they -- you know, through progression, they were familiar
24 with how that was.
25      Q.    What indication did you receive from your

1    supervisors that it was okay to deviate from the written

2    policies in these instances?

3         A.   There were no conversations of it.  It was just

4    status quo.  There was no -- well, there was nobody

5    around saying, "This is okay, that's okay."  You just do

6    it.  You've learned to do from your predecessors.

7         Q.   So to be clear, during your time as sergeant,

8    did anyone above your rank come to you and say, "It is

9    okay to do these things, even though they contradict the

10   written policy"?

11        A.   No.

12        Q.   Did you assume -- you assumed it was okay?

13        A.   Yes.

14        Q.   Based on sort of things you observed within the

15   department?

16        A.   Practice, yes.

17        Q.   Okay.  Why didn't higher-ups in the department

18   change the written policy to align with the actual

19   practice, if they were aware of it and they approved of

20   it?

21             MS. KIBLER:  Object to the form.

22             THE WITNESS:  I mean, it's just basically like

23   nothing gets fixed until there's some catastrophic

24   failure, just like this situation, so nothing gets the

25   microscope until it's time to get the microscope.  It's

1    just -- I mean there's hundreds of policies that -- the

2    police department and the City have thousands of policies

3    that, you know, you don't have specific knowledge of

4    every word, so it's just -- it's not so much like they

5    are giving you approval to violate the policy.  You know,

6    they just don't receive the attention that these have

7    until something catastrophic occurs.

8        Q.   Would you agree that with respect to some of

9    these areas we have discussed, there was a significant

10   deviation between the practice and the policy?

11       A.   Yes.

12       Q.   And that department supervisors were aware of

13   that?

14       A.   Yes.

15       Q.   And chose to maintain the existing policies as

16   they were?

17       A.   Yes.

18            MS. KIBLER:  Object to the form.

19            BY MR. MANCE:

20       Q.   I'll ask you the same thing with the lock box.

21   You said at X-22 this is, quote, "precedent of literally

22   every drug unit within RPD as well as GSU."  Is that

23   correct?

24       A.   Yes.

25       Q.   And --

 1      A.   Now, let me clarify that.  That was correct at

 2 the time.  I think there's been significant cleaning up

 3 of these type things post this situation to correct some

 4 of those behaviors.

 5      Q.   And what does GSU stand for?

 6      A.   Gang Suppression Unit.

 7      Q.   Were supervisors -- was Lieutenant Bunch aware

 8 of the lock box practice during your time as sergeant of

 9 the unit?

10      A.   I don't know specifically, but I would assume

11 so.

12      Q.   And just to clarify for the record, by

13 "practice," I mean the fact that detectives in the unit

14 had knowledge of the location of the key to the lock box.

15 Was he aware of that?

16      A.   I can't answer to that.

17      Q.   Okay.  Did you -- were you the one who told the

18 detectives in the unit where they could find that key?

19      A.   I told my ATL, Detective Rattelade, where the

20 key was.  In my absence, he was responsible for giving

21 the money.

22      Q.   Are you aware of how others came to know where

23 the key was?

24      A.   I assume when he was -- Detective Rattelade

25 went to get the money, they probably saw where it was.

 1      Q.   You told hearing officers -- this is at X-27 --

 2   that Abdullah could, quote, "go as long as he did without

 3   producing case files for court," end quote, because,

 4   quote, "everything was being pled out, so there was never

 5   actually really a need for these files because most

 6   everything got pled and very little of it ever made it to

 7   trial."  Did you make that statement?

 8      A.   Yes.

 9      Q.   You also said that, quote, "People that

10   submitted their case files for review," end quote, were

11   basically just doing it, quote, "just because they were

12   detail oriented," end quote.  Did you actually require

13   officers to create and maintain case files?

14      A.   No.

15      Q.   What were the requirements or expectations?

16      A.   To what?

17      Q.   With respect to case files.

18      A.   The case files are -- so back on the point of

19   everything getting pled out, so in any non-contested --

20   well, if something was going to be contested and you know

21   it's going to go to trial, you have to provide a complete

22   case file to the DA's office so they can, in turn,

23   provide a copy to the defense, so that was the

24   requirement that they had a complete file for contested

25   cases.

1      Q.   Do you agree that Raleigh PD has a written

2   policy requiring maintenance of case files related to

3   arrests and prosecutions?

4      A.   Yes.

5      Q.   Do you agree -- and I'm going to quote from

6   X-29 here -- that, quote, "Policy places the burden of

7   ensuring the proper procedures are utilized by detectives

8   during case investigations on the supervisor of the

9   unit"?

10     A.   Can you --

11     Q.   I can read it slower.

12     A.   Yeah.

13     Q.   "Policy places the burden of ensuring proper

14  procedures are utilized by detectives during case

15  investigations on the supervisor of the unit."  It's kind

16  of a weirdly worded sentence, but, essentially, they're

17  saying supervisors bear the burden of making sure that

18  detectives follow proper procedures.

19     A.   I mean that's kind of a vague thing and there

20  was a couple things that came up during this

21  investigation where they were implying a case file -- or

22  case squad oversight on a drug unit, which it didn't fit

23  the -- what our type work was involved in.

24     Q.   Yeah, you maintained in your IA hearing that

25  the case file policy didn't apply to your squad at all,

1    right?

2         A.   Right.

3         Q.   Did you find it strange that a disagreement

4    could exist between you and Internal Affairs about

5    something as basic as whether there was a policy to

6    maintain case files?

7              MR. BLANCHARD:  Objection.

8              THE WITNESS:  No.

9              BY MR. MANCE:

10        Q.   How could it be that Internal Affairs and you,

11   as sergeant, could disagree about that subject?

12        A.   Because you have an office-type investigator

13   that doesn't have any knowledge of drug units or the way

14   drug units are operated, trying to apply rules from a

15   book when he doesn't really have a general working

16   knowledge of drug investigation and prosecution of drug

17   cases.

18        Q.   Outside of referring to the policy, itself, did

19   anyone ranked above you ever tell you specifically that

20   the policy regarding case files did not apply to your

21   unit?

22        A.   Nobody that I would mention.

23        Q.   So someone did tell you?

24        A.   Somebody agreed with my assessment that that

25   did not match the -- our style of work.

1      Q.    But you would be unwilling to share their name?

2      A.    Right.

3      Q.    Is this someone in the department?

4      A.    I don't want to share anything about it.

5      Q.    Okay.  Before you assumed that your detectives

6   didn't have to maintain case files, why didn't you ask

7   for clarification?

8      A.    I didn't assume that they didn't have to have

9   case files.  That was in relation to a policy -- an

10   oversight policy for case-related squads.

11      Q.    Did IA ultimately find that you had violated

12   this case file policy that you contended did not apply?

13      A.    Yes.

14      Q.    Do you maintain that despite that, that policy

15   still does not apply in the department?

16      A.    It applies to case squads, not drug squads, so

17   a case squad is -- the wording of that policy -- and I

18   don't know it verbatim.  It's probably in there

19   somewhere.  It basically says supervisors who assign

20   cases basically have like 30 days, or something along

21   those lines, to follow up and make sure that, you know,

22   the cases are progressing and it's in reference to -- so,

23   say an assault squad or a domestic violence squad or

24   something where a detective is assigning -- or a

25   detective sergeant is assigning you this case.  "Here,

1   Detective, go investigate this house burglary."  And then

2   the fail-safe there is that after a certain amount of

3   days, you're checking to determine that the detective has

4   done the steps necessary to proceed with the case and

5   either continue or close it out, whereas a drug unit,

6   they are not assigned cases.  They make their own cases,

7   so it doesn't apply.  It's a policy that was, in my

8   opinion, specifically designed for a case-related squad,

9   not a self-generated drug unit.

10      Q.   Your performance review, which is at N-59,

11  describes, quote, "Essential job responsibilities," end

12  quote, to include, quote, "maintaining case assignment

13  logs," end quote.  You just said your unit was not a case

14  assignment unit.

15      A.   No.

16      Q.   How do you reconcile the two?

17      A.   So can you clarify what you're asking?

18      Q.   Yeah.  So on your employee evaluations, when

19  they list your essential job responsibilities, one of

20  them is maintaining case assignment logs, so it talks

21  about case assignment.  It uses that phrase.  How do you

22  reconcile that with sort of what you just --

23      A.   I reconcile it's just all boilerplate stuff

24  that's passed from whoever to whoever.  Every -- I would

25  beg to say that every single one of them says the same

 1   thing, and then they'll cut something out and add

 2   something more specific to their -- you know, if they

 3   felt the effort to do so.  But for the most part, it's

 4   just all kind of boilerplate stuff.

 5       Q.   You said -- and I'm looking at X-32 here -- to

 6   IA, when you were discussing -- they had written that

 7   there were some mitigating features in your case and you

 8   wrote that that was, quote, "a recognition that practice

 9   and policy were completely different."  Am I right to

10   take that to mean that you feel that IA did recognize

11   there are instances where policy and practice are

12   different?

13       A.   Yes.

14       Q.   Okay.  You told IA -- this is at X-32 as

15   well -- quote, "Historically, Drugs and Vice has kind of

16   been the dumping ground of either people that don't

17   necessarily have somebody politicking to get them or have

18   no particular skill set."  Is that still your belief?

19       A.   Yes.

20       Q.   You told IA that RPD, quote, "ruined your

21   career within 5 months of retirement," end quote, and

22   that it was, quote, "a hard pill to swallow."  That's at

23   X-34.  Is that how you still feel?

24       A.   Yes.

25       Q.   That this series of events involving Abdullah

 1   and Williams ruined your career?

 2        A.   Yes.

 3        Q.   You told the hearing officer that, quote --

 4   this is at X-35 -- "The fact of the matter is a large

 5   majority of the policies that I got penalized for are

 6   commonly practiced, had been and probably still are," end

 7   quote.  Why did you say "probably still are"?

 8        A.    Well, basically, it's -- you know, people are

 9   creatures of habit.  I know post my situation, the City

10   Attorney's office and the command of the Drugs and Vice

11   Units had multiple meetings, basically trying to clean up

12   all the things that kind of contributed to how this

13   occurred and, hopefully, for the betterment of the

14   department and, you know, for the protection of the

15   public later on.  But, you know, it's kind of like, well,

16   the teacher is here now.  We better act straight.  But

17   when they're gone, they may, you know, slide back into

18   old habits.

19        That's just complete speculation, but -- and,

20   you know, I've been gone from there for a while, so I

21   can't say what they are or not doing, but it's just kind

22   of a "old habits are hard to break," I guess, kind of

23   deal.

24        Q.   Are you familiar with the plaintiffs who have

25   sued you and the detectives in this case?

1      A.   Not specifically.  I mean, familiar with when I

2  dealt with them during the -- each investigation.

3      Q.   In your interactions with Internal Affairs, did

4  you ever express concern for the people who were

5  wrongfully arrested in this case?

6           MR. BLANCHARD:  Objection.

7           THE WITNESS:  I think I did.

8           BY MR. MANCE:

9      Q.   You think you did?

10     A.   Yeah.

11     Q.   Would that be in the IA materials?

12     A.   Probably.

13     Q.   Do you know where I could find that?

14     A.   I think it was probably in -- there was a

15  couple references to the Trunarc equipment.  It may have

16  been somewhere in there.  A couple other different places

17  where I indicated that, you know, if we had had these

18  resources available to us, you know, this sort of thing

19  might not have happened to the people.  I don't remember

20  where it was, but I know there's probably a reference or

21  two in there.

22     Q.   Have you expressed -- did you, in the course of

23  your meetings with IA, express concern for the wellbeing

24  of the people whose homes were searched pursuant to

25  warrants that included incorrect information?

1          A.    No.

2          Q.    Are you aware that my clients, Kenya Walton and

3    Yolanda Irving, are public school bus drivers here in

4    Wake County?

5          A.    No.

6          Q.    And that they work with special needs children?

7          A.    No.

8          Q.    Do you have any reason to think they're drug

9    dealers?

10         A.    I don't know the circumstances of -- I don't

11   know.  I can't answer that.

12         Q.    I'm just asking if you are aware of any facts

13   personally that would make you think they're drug

14   dealers?

15         A.    No.

16         Q.    You're not?

17         A.    (Witness shakes head.)

18         Q.    Are you aware of any facts personally that

19   would make you think they're involved with drug dealers?

20              MR. BLANCHARD:  Objection.

21              THE WITNESS:  I don't know either way.  There's

22   a lot of people that have good, regular jobs and are

23   associated with drug dealers.

24              BY MR. MANCE:

25         Q.    Are you aware of any facts --

1     A.   I'm not aware of anything, any facts to

2  associate them with drug dealers.  I wasn't here for

3  that.

4     Q.   Do you have any information or reason to

5  believe, sitting here today, two years removed from this

6  incident, that they or anyone in their home was letting

7  Marcus VanIrvin sell or traffic illegal drugs there?

8     A.   I don't know.

9          MR. BLANCHARD:  Objection.

10         THE WITNESS:  I'm not familiar with the case.

11  I wasn't here when it occurred.

12         BY MR. MANCE:

13    Q.   I'm just asking you about your personal

14  knowledge.

15    A.   I don't have any personal knowledge.  I don't

16  try to involve myself in the backgrounds of following

17  this investigation on any of the defendants.

18    Q.   Okay.  I'm going to show you a report.  This is

19  going to be Exhibit Y, the last one, if you could just

20  turn to that.

21         (Exhibit Y was identified for the record.)

22         BY MR. MANCE:

23    Q.   This is a three-page document.  I would just

24  like you to read this document and tell me if, as a

25  former supervisor of the Drugs and Vice Unit, anything

 1    stands out to you.

 2         A.    (Witness complies.)  Not really.

 3         Q.    If you had been in town and presented this --

 4    with this report, is there anything that you know for

 5    certain you would have done if you had had a chance to

 6    review it?

 7              MR. BLANCHARD:  Objection.  Go ahead.  Answer

 8    if you can.

 9              THE WITNESS:  No.

10              BY MR. MANCE:

11         Q.    Do you agree that the report indicates on

12    page 3 that Marcus VanIrvin was, quote, "residing at the

13    apartment and that he had sold the CI drugs out of the

14    apartment and that the detectives intended to raid the

15    apartment"?

16         A.    That's what it says.

17         Q.    Would it have concerned you that Detective

18    Abdullah used two different addresses, 1620-B and 1628-B,

19    interchangeably on pages 1 and 3 of this report to refer

20    to Marcus VanIrvin's residence?

21         A.    Well, I guess it just depends on whether or not

22    you would consider any background information as to if he

23    resided at one address and may or may not be dealing out

24    of another address, but --

25         Q.    Would you agree that that report makes clear

1   that the police officer believed that he was residing out

2   of the home he was selling drugs out of?

3               MR. BLANCHARD:  Objection.

4               THE WITNESS:  I wouldn't say that.

5               BY MR. MANCE:

6       Q.   You wouldn't say that?  Why would you not say

7   that?

8       A.   That's speculative to me.

9       Q.   Okay.  I'm going to read this first line.  "A

10  confidential informant was utilized to purchase an amount

11  of heroin from a black male who goes by the name Marcus,

12  and same," same is referring to Marcus, "is residing at

13  1628 Burgundy Street, Apartment B.  According to the

14  confidential informant, Marcus is selling heroin out of

15  the apartment."

16              Is it reasonable to read that passage the way

17  you just described?

18      A.   I don't really have a comment on that.  You're

19  asking me to speculate on a case that --

20      Q.   I'm not asking you to speculate.  I'm saying --

21              BLANCHARD:  Actually, you are.

22              BY MR. MANCE:

23      Q.   Okay.  Well, let me try another question.

24  Would you agree that this -- this line that I just read

25  to you indicates that Marcus was selling heroin out of

1    the apartment that he was residing in?

2         A.   For a case that I wasn't here to witness or

3    have any part in, I don't --

4         Q.   Would you agree those are the plain meanings of

5    the words?

6         A.   I don't feel comfortable answering any

7    questions about a case I wasn't involved in.

8         Q.   Is that your name at the bottom of the page?

9         A.   It is.

10        Q.   Okay.  So you reviewed this report at some

11   point?

12        A.   5/30.

13        Q.   Okay.  Is it fair to say you did not notice the

14   discrepancy in the dates?

15        A.   Yes.

16        Q.   Okay.  If you hadn't --

17        A.   Do you mean dates or addresses?

18        Q.   Excuse me.  Thank you for clarifying.  Is it

19   fair to say that you did not notice the discrepancy in

20   the addresses?

21        A.   Yes.

22        Q.   Thank you.  If you had noticed the

23   discrepancies in the addresses, as sergeant, would you

24   have taken steps to make sure Detective Abdullah verified

25   the address?

1       A.   Yes.

2       Q.   And that the SEU team raided 1620, not 1628?

3            MR. BENSON:  Objection.

4            MS. POOLE:  Objection.

5            MS. KIBLER:  Objection.

6            THE WITNESS:  Well, it would be based upon the

7   clarification, what address was what.

8            BY MR. MANCE:

9       Q.   Okay.  Do you agree that addresses are a very

10  important detail?

11      A.   Yes.

12      Q.   Do you agree that it's imperative that

13  detectives get the addresses right and consistently use

14  the right address in all of their written materials?

15      A.   Yes.

16      Q.   Sitting here today, do you understand how your

17  officers would end up at the wrong address?

18           MR. BLANCHARD:  Objection.

19           MS. KIBLER:  Objection.

20           MR. BENSON:  Objection.

21           MS. POOLE:  Objection.

22           THE WITNESS:  I'll go back to what I said.  I'm

23  not going to comment on anything that I wasn't here for.

24           BY MR. MANCE:

25      Q.   Okay.  Do you believe your officers raided the

 1   right home?

 2        A.    Yes.

 3        Q.    You do?

 4        A.    I do.

 5        Q.    So you think Yolanda Irving was involved in --

 6              MR. BLANCHARD:   Objection.

 7              BY MR. MANCE:

 8        Q.    Do you think Yolanda Irving was involved in

 9   drug activity?

10        A.    I don't have any knowledge of this case.  I

11   wasn't present here for it and I'm not going to answer

12   any other questions about speculation into any of the

13   people that are there.  I don't know anything about them.

14        Q.    So there are certain questions today you will

15   not answer?

16        A.    Right.

17        Q.    Okay.  Were you not curious to understand what

18   happened in this case?

19        A.    This case or the case in general?

20        Q.    With respect to the home search.

21        A.    I wasn't necessarily specifically interested in

22   the case.  I was -- you know, at that point, the

23   informant had been blacklisted, so I was more concerned

24   for my detectives and see what was -- what had happened,

25   so the specifics of the case, in general, not any

1   specific interest, just more so --

2        Q.   How many years have you worked for the Raleigh

3   Police Department?

4        A.   27.

5        Q.   And your testimony is that this incident ruined

6   your career?

7        A.   This in its entirety, yes.

8        Q.   And this incident was something that you were

9   out of town for when it happened?

10       A.   Right.

11       Q.   So your career is ruined for something that

12  happens when you're out of town; is that correct?

13       A.   No, this situation in its entirety, not just

14  this case.

15       Q.   Is it your testimony that you did not have

16  curiosity as to how this came about?

17       A.   How what came about?

18       Q.   How it is that your officers ended up at my

19  clients' homes.

20       A.   I had an interest in what happened, but, you

21  know, the way you're forming your question is if I had

22  interest in the -- you know, it's not so much that I was

23  disinterested in the case in general.  It was more so my

24  interest didn't necessarily lie in the background of this

25  investigation, more of the outcome, what happened, what

 1  went wrong, what needs to be fixed, et cetera.

 2      Q.   Mr. Schewel deposed Detective Abdullah.  I'm

 3  going to reference B-54.  And Detective Abdullah

 4  testified that he did not attempt to verify who was

 5  living at 1628-B Burgundy Street.  Would that be

 6  consistent with how you would expect your drug detectives

 7  to act when seeking a search warrant?

 8          MR. BENSON:  Objection.

 9          THE WITNESS:  I would say that's kind of, you

10  know, out of the context.  I don't know what context that

11  was in.  You know, you're quoting one line from a

12  interview without the background information, what was

13  asked.

14          BY MR. MANCE:

15      Q.   Did you earlier testify that it's a very

16  important detail to get correct addresses?

17      A.   Yes.

18      Q.   In light of that, if Detective Abdullah did not

19  attempt to verify who was living at that address, would

20  that be a mistake?

21      A.   Not necessarily.  I mean, it just depends on,

22  you know, if the deal occurred in that address, he bought

23  drugs out of that address from that person, not

24  necessarily a requirement that you find out who else

25  lives there or other information about other occupants.

1      Q.   Detective Abdullah also told Mr. Schewel that

2  he did not verify in any way that his target, Marcus

3  VanIrvin, was affiliated with that address.  Is that

4  consistent with how you understand your detectives should

5  operate?

6           MS. KIBLER:  Object to the form.

7           THE WITNESS:  You're saying that he's

8  affiliated -- whether he was affiliated or not with that

9  address, if he sold drugs out of the address, it would

10  still support a search warrant.

11           BY MR. MANCE:

12      Q.   Would you typically permit your detectives to

13  raid homes without doing anything to verify the

14  occupants?

15           MR. BLANCHARD:  Objection.

16           THE WITNESS:  The -- excuse me.  The probable

17  cause for search warrants is the totality of a lot of

18  different things.  You don't necessarily have to identify

19  every occupant or who may or may not reside there, basing

20  it off your observations during the buy, whether you can

21  confirm that the buy occurred out of that location or

22  not.

23           BY MR. MANCE:

24      Q.   I'm going to ask you --

25      A.   A lot of times, we don't even know who the

1    suspect is until after the fact.

2        Q.   Were your detectives trained that it is

3    permissible for them to enter a neighboring home without

4    a warrant if they approach a home for which they do have

5    a warrant and see a person who they cannot identify flee

6    into that neighboring home?

7              MR. BLANCHARD:  Objection.

8              MS. LIGUORI:  Objection.

9              MR. MANCE:  What's the objection?

10             MS. LIGUORI:  To the form.

11             THE WITNESS:  That's all circumstantial.  I

12   could say I wasn't here for this case, so I won't comment

13   on what happened.

14             BY MR. MANCE:

15       Q.   Do you understand the question I asked you,

16   though?

17       A.   If it would be okay for -- to chase somebody

18   into an adjoining property that was not the listed

19   location?  Is that what --

20       Q.   Yes.

21       A.   So, like I said, it would just depend on what

22   the circumstances were.  I don't know any background of

23   the case.  I don't know if it was somebody that was

24   identified as being involved.

25       Q.   My premise was --

 1      A.   Was there a consent?  Was there not?  So you're
 2  asking me to comment on a case that I've already
 3  indicated I'm not comfortable discussing because I wasn't
 4  here for it.
 5      Q.   Are you familiar with Breonna Taylor?
 6      A.   No.
 7      Q.   Do you agree that anytime a group of armed
 8  people enter a building, aiming weapons, catch the
 9  occupants by surprise, that that can be a dangerous
10  situation?
11           MR. BLANCHARD:  Objection.
12           MS. KIBLER:  Objection.
13           MS. POOLE:  Objection.
14           THE WITNESS:  All police work is a dangerous
15  situation.
16           BY MR. MANCE:
17      Q.   Okay.  Do you agree that officers are told
18  these are dangerous situations?
19           MS. KIBLER:  Object to the form.
20           THE WITNESS:  It's just a known fact that
21  police work is dangerous, inherently dangerous.
22           BY MR. MANCE:
23      Q.   Do you agree that even with careful planning
24  and good intentions, tragedies can happen?
25      A.   Absolutely.

 1      Q.   Do you agree, as a police sergeant, when you

 2   send officers into another person's home, you're in

 3   effect relying on them to conduct themselves

 4   professionally with respect to any use of force?

 5      A.   Yes.

 6      Q.   Is that an objection or just a sigh?

 7           MR. BLANCHARD:  No, just a sigh.

 8           BY MR. MANCE:

 9      Q.   Okay.  Would you agree --

10           MR. BLANCHARD:  Wishing this was over.

11           MR. MANCE:  It'll be soon.  Well, I wish this

12   didn't happen to my clients.

13           MR. BENSON:  Do you have a question?

14           BY MR. MANCE:

15      Q.   Would you agree that well-intentioned officers

16   have sometimes been startled and forced to make quick

17   split-second judgments and have accidentally shot and

18   killed people?

19           MS. KIBLER:  Objection

20           MS. LIGUORI:  Objection.

21           THE WITNESS:  I don't have any specific

22   knowledge of it.

23           BY MR. MANCE:

24      Q.   Are you familiar with Officer Aaron Dean, who

25   was convicted last month in Forth Worth, Texas, for

1    shooting Atatiana Jefferson in her home?

2        A.    No.

3              MS. KIBLER:  Objection.

4              BY MR. MANCE:

5        Q.    Are you aware that one of the children who was

6    living at 1628 is partially paralyzed?

7        A.    No.

8        Q.    Are you aware that because of that, he can't

9    respond, as most people can, to orders to move that are

10   being screamed at him by armed police officers?

11             MR. BLANCHARD:  Objection.  I think he already

12   answered he didn't -- he wasn't aware of the paralysis in

13   the first place, but go ahead and answer if you know.

14             THE WITNESS:  No.

15             BY MR. MANCE:

16       Q.    Is it a dangerous situation to have an armed

17   officer give commands to a person who they have no

18   information about who's physically incapable of complying

19   and who might also have mental disabilities that inhibit

20   their ability to communicate?

21             MS. KIBLER:  Objection.

22             MS. LIGUORI:  Objection.

23             THE WITNESS:  As a trained police officer, you

24   have enough common sense to be able to tell if that -- or

25   at least have an indication that the person you're giving

1  warnings to is either not understanding or needs

2  additional clarification.  It's just common sense.

3           BY MR. MANCE:

4      Q.   Are you aware there was a pregnant woman living

5  in 1628?

6      A.   I wasn't aware of anything regarding this case.

7  I wasn't here.

8      Q.   Can you understand why my clients would be

9  upset that this would happen to them?

10     A.   I don't have any --

11     Q.   If they didn't have any connection to the man

12 your detectives were looking for?

13     A.   I can't speculate on your clients.  I don't

14 know who they are.

15     Q.   So you can't understand why someone would be

16 upset by that?

17     A.   I don't have any opinion on that.

18     Q.   You have no opinion?

19     A.   Not on that.

20     Q.   Did you ever talk to your officers about the

21 importance of respecting people's civil rights?

22     A.   I don't have to.  They already know.  They're

23 well trained.

24     Q.   So you never had a conversation about civil

25 rights with your officers?

1    A.    No.

2    Q.    Ever?

3    A.    No.

4    Q.    Okay.  To your knowledge, was there any

5 discussion within your unit after the May raid on my

6 clients' homes, like, "Hey, we just pointed a gun at a

7 pregnant woman and children; we need to do better"?

8              MS. LIGUORI:  Objection.

9              MR. BLANCHARD:  Objection.

10             THE WITNESS:  My team are drug detectives.  The

11 people that do the initial securing of the apartment are

12 tactical officers.  They have no purview over them.

13             BY MR. MANCE:

14   Q.    Have you ever inquired into the wellbeing of

15 any of my clients?

16   A.    No.

17   Q.    Have you had any discussions with any of your

18 detectives or your former detectives about the VanIrvin

19 case or the search of my clients' home?

20   A.    No.

21   Q.    Even when you got back to town, you never

22 talked to them about it?

23   A.    Not specifics of the search of the home.  Just

24 generalities of what went wrong.

25   Q.    Do you have any opinions about the dozen people

1   who served time on the fake heroin?

2            MR. BLANCHARD:  Objection.

3            MS. KIBLER:  Objection.

4            THE WITNESS:  Should I answer?

5            BY MR. MANCE:

6        Q.   Yeah.

7        A.   I think, in my opinion -- and this is just

8   based on, you know, the people that came to do a drug

9   deal did a drug deal.  They were coming to deal drugs and

10  it just so happens that they were duped by an informant

11  that switched the drugs out, so I don't have a lot of

12  empathy.

13       Q.   Do you regard that, what happened to them, as

14  an injustice?

15       A.   I wouldn't say I would call it injustice.  I

16  think it was an unfortunate circumstance and I think

17  we've all somewhat forgotten that the manipulator in this

18  case was the informant.  I don't think any of my

19  detectives had any ill effect -- or had any ill will

20  against your defendants.  They were doing their job, what

21  they're sworn to do, so --

22       Q.   My clients are the plaintiffs.

23       A.   Right.  Sorry.  So can you -- I got lost in my

24  response there.  Can you ask the question again?

25       Q.   I was asking if -- I understand -- I was asking

1  about the guys who did jail time on the heroin.

2       A.   Right.

3       Q.   And you said you believed they were selling

4  marijuana.  Do you believe --

5            MS. POOLE:  Objection.

6            MS. KIBLER:  Objection.

7            BY MR. MANCE:

8       Q.   Was that an injustice, what happened to those

9  men?

10       A.   No.

11       Q.   No?  Okay.  Do you think the civil rights of

12  people engaged in criminal activity are as important to

13  protect as the rights of the people who are not engaged

14  in criminal activity?

15            MR. BLANCHARD:  Objection.

16            THE WITNESS:  Yes.

17            BY MR. MANCE:

18       Q.   You do?  Okay.  Do you consider the people who

19  are convicted of heroin trafficking as having been

20  wrongfully convicted?

21       A.   Yes.

22       Q.   Do you know if the vice detectives you work

23  with regarded them as wrongfully convicted?

24       A.   Yes.

25       Q.   Are you aware of any of your detectives ever

1    having expressed any concern for the wellbeing of my

2    clients?

3         A.    Nothing specific.

4         Q.    Do you think the Raleigh Police Department has

5    learned anything or made any changes in response to what

6    happened to my clients?

7         A.    Yes.

8              MS. KIBLER:  Object to the form.

9              BY MR. MANCE:

10        Q.    You do?

11        A.    I do.

12        Q.    What do you think has changed?

13        A.    Well, I think, like I mentioned earlier, I

14   think Dottie met with our commanders over in the

15   Detective Division to try to prevent these sort of things

16   from happening again.  I think the facilitation of

17   getting the equipment that we should have already had was

18   done and, obviously, when bad things happen and you're

19   able to make corrections, I think we've done so, or at

20   least heading in the right direction.

21        Q.    Are you familiar with the Raleigh North

22   Apartments where this happened?

23        A.    Yes.

24        Q.    How would you characterize that neighborhood?

25        A.    It's just a subsidized apartment housing.

1          Q.    Are the people who live there generally poor?

2          A.    Yes.

3          Q.    Do you think the people that live there are

4     generally good people?

5          A.    Yes.

6          Q.    Do you think it's an easy place for a child to

7     grow up?

8          A.    Probably not.

9          Q.    Would you agree that many live there because

10    that's one of the few places in town they can afford to

11    live?

12         A.    Yes.

13         Q.    Would you agree that many people who live there

14    would prefer to live somewhere else, but this is where

15    their job is and this is where they can afford to live

16    with their paycheck?

17              MR. BLANCHARD:  Objection.

18              MS. KIBLER:  Objection.

19              THE WITNESS:  That's a little speculative, but

20    possibly.

21              BY MR. MANCE:

22         Q.    Would you agree this includes people like you

23    who work for the City or the County, but who have

24    lower-wage jobs?

25              MR. BLANCHARD:  Objection.  And these are

 1  relevance, not --

 2          MR. MANCE:  We're almost done.

 3          THE WITNESS:  I don't understand the question.

 4  Can you repeat it?

 5          BY MR. MANCE:

 6      Q.   Do you agree that city and county workers live

 7  in those apartments?

 8      A.   I don't have any knowledge of that, but it's

 9  possible.

10      Q.   Well, you've been sued by the plaintiffs in

11  this case, right?

12      A.   Yes.

13      Q.   Did you get a copy of the complaint?

14      A.   Yes.

15      Q.   Did you read it?

16      A.   I read some of it.

17      Q.   Would it be appropriate for a police officer to

18  treat a person's simple presence in a place like Raleigh

19  North as indicia that they're engaged in criminal

20  activity?

21      A.   No.

22      Q.   Do children in that neighborhood have to be

23  more careful than in other parts of the city to avoid

24  gang elements?

25          MS. KIBLER:  Object to form.

1           THE WITNESS:  I would say there's more gang

2    element there, so --

3           BY MR. MANCE:

4       Q.   Do gangs pose a danger to the safety of kids in

5    that neighborhood?

6       A.   Yes.

7       Q.   Have gang members been known to shoot people in

8    that neighborhood?

9       A.   Yes.

10      Q.   Have they sometimes been known to shoot young

11   people?

12      A.   Yes.

13      Q.   As a police department employee, is there any

14   situation in which you would ever consider it acceptable

15   to insinuate that a child was involved in drug or gang

16   activity if you knew they were not?

17      A.   If I knew that they were not?

18      Q.   Yeah.

19      A.   No.

20      Q.   That would not be appropriate?

21      A.   Not if I knew they were not.

22      Q.   Were you reprimanded in 2011 for consuming

23   alcohol with an underage CI?

24      A.   Yes.

25           MR. BLANCHARD:  Objection.

1              BY MR. MANCE:

2        Q.   N-439.  Yes?

3              MR. BLANCHARD:  And that was relevance, by the

4    way.

5              BY MR. MANCE:

6        Q.   Did you threaten a motorist in a traffic stop

7    in 1999?

8              MR. BLANCHARD:  Same objection.

9              THE WITNESS:  Yes.

10             BY MR. MANCE:

11       Q.   Did you make a comment over a radio about

12   having PTSD from fighting the Viet Kong?

13             MR. BLANCHARD:  Same objection.

14             THE WITNESS:  I don't recall that, no.

15             BY MR. MANCE:

16       Q.   You don't recall that?

17       A.   I don't think so.

18       Q.   2014?

19             MR. BLANCHARD:  Objection.

20             THE WITNESS:  I don't think so.

21             BY MR. MANCE:

22       Q.   Were you in Vietnam?

23       A.   No.

24       Q.   Do you understand that there are significant

25   disputes between the parties in this case that you could

1    be called to testify if this case goes to trial?

2        A.   Yes.

3        Q.   Do you understand that at the trial, you might

4    be asked the same questions you were asked today?

5        A.   Yes.

6             MR. BLANCHARD:  Objection.

7             BY MR. MANCE:

8        Q.   Do you intend to testify consistent with how

9    you've testified today?

10       A.   Yes.

11            MR. MANCE:  Okay.  I'd like to take a 10-minute

12   break and confer with Abe.

13            (Brief recess from 2:27 p.m. to 2:42 p.m.)

14            BY MR. MANCE:

15       Q.   Mr. Rolfe, when did you start with the Raleigh

16   Police Department?

17       A.   October 30th, 1995.

18       Q.   When did you join -- when did you start doing

19   drugs or vice work?

20       A.   I was a Drugs and Vice Detective in 2007-ish,

21   and then I want to say I was moved over there as a

22   sergeant -- oh, Lord -- I was over there about five years

23   before being relocated.

24       Q.   Did you transition from detective to sergeant

25   without leaving the unit?

 1      A.    No.

 2      Q.    You worked in another place in between?

 3      A.    Right.

 4      Q.    And where did you work then?

 5      A.    Patrol.

 6      Q.    How many years were you a Drugs and Vice

 7  Detective?

 8      A.    One.

 9      Q.    Just one?  When you -- and you said that was

10  around 2007?

11      A.    Uh-huh.

12      Q.    When you were working in 2007 in Drugs and

13  Vice, were the practices and policies similar to the ones

14  that existed when you were sergeant?

15      A.    Yes.

16      Q.    Can you think of any policies that changed?

17      A.    No.

18      Q.    To the best of your knowledge, were all the

19  policies that were in effect in the unit in 2007 the same

20  ones that were in effect when you were the sergeant of

21  the unit?

22      A.    Yes.

23      Q.    And to be -- okay.  When you were working in

24  2007 as a drug detective, was it the practice -- was it

25  your practice to ever meet alone with CIs?

1        A.    Yes.

2        Q.    Was it the practice of other detectives that

3    you worked with in 2007 to meet alone with CIs?

4        A.    Yes.

5        Q.    When you worked as a detective in 2007 in the

6    drugs unit, vice unit, was the lock box policy -- what

7    was the lock box policy?

8        A.    I don't remember the specific policy, you know,

9    since I wasn't the one giving out the money, but it was

10   similar to what we had been doing up to this incident.

11       Q.    Did drug detectives, when you worked there in

12   2007, have access to cameras in the way that they do when

13   you were sergeant?

14       A.    No.

15       Q.    How would buys be documented in 2007?

16       A.    Very rudimentary, little cameras, terrible

17   reception that had little -- I can't think of -- losing

18   the term there.  The little disk that you put in to

19   record and put in a reader.  I can't even think of what

20   you call those, but just very ancient-type recording

21   equipment.

22       Q.    So there were cameras available to the unit;

23   they were just of poor quality?

24       A.    Right.

25       Q.    Okay.  Was it the practice of the sergeant --

1    or did you have a sergeant at that time?

2         A.   Yes.

3         Q.   Who was your sergeant?

4         A.   Mike Glendy.

5         Q.   Do you know if your sergeant made a -- reviewed

6    the buy videos that were available in 2007?

7         A.   No.

8         Q.   Were there ever occasions when you were a

9    detective in 2007 on the Drug and Vice Unit where you

10   personally took money out of the drop box -- the lock

11   box?

12        A.   I don't think so.

13        Q.   Were there any occasions where you think other

14   detectives might have done so?

15        A.   Yeah.

16             MS. KIBLER:  Objection.

17             BY MR. MANCE:

18        Q.   Can you recall any specific occasions?

19        A.   No.

20        Q.   Did you have a work phone when you were

21   sergeant of the drugs unit?

22        A.   Yes.

23        Q.   Do you still possess that work phone?

24        A.   No.  It was damaged and turned in.

25        Q.   How was it damaged?

1      A.   The screen was cracked or shattered, dropped.

2      Q.   When did that happen?

3      A.   I don't know.  We tried to find the work order

4  on that, had it narrowed down to somewhat of a window,

5  but I don't know the specific date we were looking at

6  that.

7      Q.   Do you recall the circumstances of how the

8  phone became damaged?

9      A.   It got dropped and the screen shattered, that

10  tempered glass, and you couldn't do anything to the

11  screen, manipulate the screen.

12      Q.   Did you or anyone at the department attempt to

13  determine if it was possible to recover the information

14  on that phone so that you could transfer it to a new

15  phone?

16      A.   Maybe not so much that.  I think Dottie just

17  inquired with me if I still had the same phone that I had

18  back then, and we were trying to determine if we could

19  pinpoint the date that I went to IT to get a new phone.

20      Q.   What was your practice as sergeant with respect

21  to texting detectives?

22      A.   We texted a lot, almost exclusively.

23      Q.   And would you participate in those

24  conversations regularly?

25      A.   Yes.

1      Q.   And when you would text with detectives, would

2  you typically text one-on-one with detectives?

3      A.   Mostly group.  Occasionally, one-on-one, just

4  depending on what -- whether we're -- you know, there was

5  always an ongoing thread and then, you know, if it was a

6  specific question or something specific to one person, an

7  individual text.

8      Q.   Did the text -- did you have a practice of

9  always texting your officers on department-issued phones?

10     A.   For the most part.

11     Q.   Were there occasions that you did text your

12 officers on personal phones?

13     A.   Probably.

14     Q.   Do you know if your officers were texting on

15 personal or professional phones, primarily?

16     A.   For the most part, anything work related would

17 be on the work phone and then personal related would be

18 on the personal phone.

19     Q.   Okay.  Do you -- when you were sergeant of the

20 Drugs and Vice Unit, would you review -- how many

21 drug-related reports would you estimate that you might

22 review in the course of a year?

23     A.   Probably thousands because it wasn't just my

24 drug guys' reports; it's any drug report citywide from

25 somebody stopping a car and finding a dime bag of weed to

1   any report that was categorized as a drug report and

2   ended in the drug queue and had to be filtered through.

3        Q.   Is it possible -- was it possible, given your

4   other job responsibilities, to read -- substantially read

5   most of those drug reports?

6        A.   Yes.

7        Q.   Did you attempt to read all drug reports in

8   full?

9        A.   No.

10       Q.   Were there times where you would initial or

11  sign off on drug reports without having read them in

12  full?

13       A.   You don't sign off on them at all, just if you

14  pull up that report, and so part of that responsibility

15  is to determine whether an arrest was made, and you had

16  to do some clicking and updating, or whatever, so it's

17  automatically to stamp with your name.  You know, if you

18  open it up and approve it, it's got your name on it.

19       Q.   What does approving it in that way signify?

20       A.   So, basically, for me to approve it is just

21  pull it up, make sure, you know, the tabs, which, you

22  know, has a person, you know, a person that was arrested

23  and that sort of thing; a skim of the synopsis and the

24  narrative to see if there's any value in following up, if

25  it's just a basic, "Hey, I pulled this guy over for the

 1   odor of marijuana, found the marijuana, put the marijuana

 2   in evidence."

 3          You know, that was his very quick review, so,

 4   you know, it would be impossible to fully review those

 5   word for word with a fine-toothed comb.  The amount of

 6   reports that were in there, you had to prioritize based

 7   on whether it looked like it had meat to it or not.

 8          Q.   Do you recall the password that you would use

 9   for your work-issued phone, the one that broke?

10          A.   No, not specifically.  I'm trying to remember

11   if it's the same one that I have now, and if it is, I

12   don't want to share it.

13          Q.   So you do have a number in mind.  You're

14   just --

15          A.   I don't --

16          Q.   -- that you believe could potentially work?

17          A.   Yeah.

18          Q.   Okay.

19          A.   Actually, I think it was a pattern.

20          Q.   Okay.  Have you met with the Wake District

21   Attorney related to Detective Abdullah or Dennis

22   Williams?

23          A.   You mean the ADA or --

24          Q.   Anyone from the Wake DA's office.

25          A.   Not -- a few times we've with the DA's office

1   in person.  I don't know if it was specifically related

2   to those cases.  There might have been some phone calls

3   and some e-mails, but I don't have a specific

4   recollection of the meetings regarding that.

5        Q.   So you may have met with them about other

6   cases?

7        A.   Oh, in general, when we first came over, you

8   know, and met with all the drug DA's.  There's a high

9   volume of turnover up there in the drug unit, so I don't

10  have any specific recollection of meetings specific to

11  these Abdullah cases.  I know there were some -- after

12  the IA investigation, of course, there were some

13  inquiries on obtaining different things, but I don't have

14  any specific recollection of an in-person meeting.

15       Q.   Are you aware that both Mr. Abdullah and

16  Mr. Williams have been criminally charged?

17       A.   Yes.

18       Q.   Okay.  Do you recall having any conversations

19  with the Wake DAs about either of those specific

20  prosecutions?

21       A.   No.

22       Q.   Sitting here today, have you ever reviewed

23  Abdullah's buy videos or Williams' buy videos?

24       A.   No.

25       Q.   You've made a number of references today to the

1   1021 app.  Can you just give me a brief description of
2   how that app works?
3       A.   The 1021 app is just on a cellphone.  It's an
4   app basically embedded into the phone that allows you to
5   monitor live audio, and if the phone is out, you can also
6   see through the camera.  And basically you activate the
7   phone and then other phones can hook into the app to
8   monitor the goings-on.
9       Q.   So if we were to assume that -- let's just say
10  I'm the informant and this is my phone and I'm on a buy,
11  and I've got my phone out so that my camera lens is
12  exposed.
13      A.   Right.
14      Q.   Would it be that you could essentially see on
15  your screen what my camera is recording?
16      A.   Yes.
17      Q.   Is there any interface or would you just see
18  sort of the raw video?
19      A.   It's the raw video.
20      Q.   Okay.  And so --
21      A.   Granted, if you're a drug dealer and somebody
22  has their phone out, it's going to be a no-go, bad
23  situation, so it wasn't like, "Hey," you know, that kind
24  of deal, so you either had to try to put it in your
25  pocket or hold it in your hand kind of nonchalantly.  You

 1  might catch something and you might not.  But if you had
 2  just held it up in an obvious fashion, it would not be a
 3  good situation.
 4      Q.   Okay.  Do you know if it is the practice of the
 5  Raleigh Police Department to still not field test certain
 6  drugs?
 7      A.   As far as I know, there's still a policy not to
 8  field test anything that could potentially be heroin due
 9  to the fentanyl risk.
10      Q.   Did you say earlier today that you thought --
11  and I may have misheard you -- that most of the heroin
12  being sold today might not test positive for heroin?
13      A.   Right.
14      Q.   And is that because of fentanyl?
15      A.   Yes.
16      Q.   And can you field test specifically for
17  fentanyl?
18      A.   You can.
19      Q.   And is that the narc -- the Trunarc technology?
20      A.   Well, the Trunarc can test -- any kind of drugs
21  it can identify if it's in there.  There were field tests
22  that were specific to fentanyl, but we didn't purchase
23  those because it was against policy and too dangerous to
24  test fentanyl.  So prior to the Trunarc, you just -- it
25  was the policy not to test anything that would be heroin

1    related due to the threat of the fentanyl exposure.

2         Q.    To clarify your question, was it against policy

3    to purchase something that would have detected fentanyl?

4         A.    No.

5         Q.    Okay.

6         A.    What I'm saying is, Trunarc is a scientific

7    device, but there were fentanyl field test kits

8    available, a chemical reaction, that could have been

9    purchased, but we didn't purchase them because it was

10   against our -- deemed to be too dangerous to test it, so

11   we didn't -- we didn't buy those style test kits.

12        Q.    You made some references or you have given some

13   answers today about discussing concerns related to

14   Detective Abdullah with Lieutenant Bunch.  Do you recall

15   approximately how many different conversations you might

16   have had with Lieutenant Bunch about Detective Abdullah?

17        A.    Probably 10, 12.

18        Q.    So you've also made a number of statements

19   about kind of trying to assess whether this internal

20   squabble between detectives might be the reason that some

21   of these concerns are being voiced.  Is that fair?

22        A.    Yes.

23        Q.    What specific things were you doing to make a

24   determination of that question?

25        A.    Just evaluating each case, you know, case by

1   case, on its merit.  Did the target show up?  Did it
2   appear that there was a drug transaction occurring?  Did
3   we recover our buy money?  Is everything that you're
4   seeing and hearing on audio and video consistent with a
5   drug deal?  And, you know, did the targets have a history
6   of drug activity, you know, that sort of deal, just
7   basically physical observation of the cases.
8        Q.   With respect to this question regarding the
9   internal squabble, I think is the phrase we've used, did
10  you meet with anyone specifically to have conversations
11  about that?
12       A.   No, because, you know, it was evident that, you
13  know, everybody -- all the other detectives had such
14  negative interaction with Abdullah that there wouldn't
15  have been -- I already knew what their reaction or
16  conversation would be related to him, so I was trying to
17  just evaluate on my own kind of independently, you know,
18  what value these complaints held.
19       Q.   Did you seek Lieutenant Bunch's perspective on
20  this question?
21       A.   No.
22       Q.   Did you meet with any of the individual
23  detectives specifically about this question?
24       A.   No.
25       Q.   Did you have any other strategies or ideas in

1    mind to get to the bottom of this question that you did

2    not get a chance to do because this all blew up?

3         A.   No.  And, you know, granted, this was cases

4    that occurred over a period of time.  I think we're kind

5    of ignoring the fact that there were five other

6    detectives operating and doing their cases, so it's not

7    like I had a full-time job to evaluate Abdullah and his

8    CI.  You know, I had other job tasks that I was

9    responsible for and other additional detectives that had

10   their own cases and investigations and arrests, so the

11   short answer would be no.

12        Q.   Are you aware of whether Abdullah's audio and

13   video of buys were provided to the Wake County DA's

14   office?

15        A.   No.

16        Q.   Do you know where Officer Abdullah worked off

17   duty?

18        A.   Different bars and places.  I don't know all

19   the specifics.  He worked at multiple, different places.

20        Q.   Was the way that you came to be aware of issues

21   with the video from -- strike that question.

22             Do you recall we discussed your first

23   conversation with Detective Abdullah about the need to

24   have Aspirin correct the way he was holding the video?

25        A.   Can you ask that again?  Sorry.

1      Q.   Do you recall we had discussed earlier the

2  first time you spoke to Abdullah about Aspirin -- Aspirin

3  needs to correct the way he's holding the video?

4      A.   Right.

5      Q.   Did you have that conversation with him because

6  of something you had observed in the field via the 1021

7  app?

8      A.   If I recall correctly, that was the reason,

9  yes.

10     Q.   There was some discussion about case update

11 e-mails.  Do you recall that?

12     A.   I may need a refresher on that.

13     Q.   I think somewhere in -- actually, it might not

14 be a discussion.  It might have just been in the

15 discovery.  I've seen references.  Are you aware of a

16 case update e-mail?  Does that mean anything to you?

17     A.   You know, all -- a lot of cases, the

18 disposition is -- a case update is sent out either

19 citywide, or depending on what your job assignment is, it

20 might be narrowed down to a smaller group of people, but

21 the case update is just basically like a wrap-up of what

22 happened and if charges were made and different things

23 like that.

24     Q.   And, generally speaking, what is the type of

25 information?  You said a few things, but what else --

1        A.    A very short synopsis of what occurred, who was

2   arrested, what was recovered.  Now, this is specific to

3   drugs.  What was recovered, currency recovered, weapons

4   recovered, and the charges made.

5        Q.    Were you on any text threads with your

6   detectives where they bet on the results of Aspirin's

7   cases?

8        A.    No, I don't think so.

9        Q.    Were you part of any text messages with your

10  detectives where they discussed their belief that Aspirin

11  was providing fake heroin?

12       A.    I can't speak on that.  We've probably sent a

13  million texts over this span, you know.  I wouldn't dare

14  to speculate whether I did or didn't in fear of being

15  wrong.

16            MR. MANCE:  Okay.  Okay.  I don't have any

17  further questions.

18            MR. BENSON:  I don't have any questions.

19            MS. POOLE:  I'm good.

20            MS. LIGUORI:  I have no questions.

21            MS. KIBLER:  No questions.

22            MR. BLANCHARD:  None for me.

23            MR. MANCE:  All right.  Thank you very much.

24            (Whereupon, at 3:04 p.m. on January 17, 2023,

25  the deposition was concluded.  Signature was reserved.)

**E R R A T A   S H E E T**          (1 of 3)

DEPOSITION OF:  WILLIAM ROLFE

Re:  Irving, et al. vs. The City of Raleigh, et al.
     Civil Action No.: 5:22-cv-00068-BO

Please read the foregoing transcript with care, and if you
find any corrections or changes you wish be made, list them
by page and line number below.

You may return these ORIGINAL errata sheet pages within the
30-DAY REQUIRED timeframe by mail or email to:

Reed & Associates
2401 Whirlaway Court
Matthews, North Carolina  28105
(980) 339-3575
VReed@carolina.rr.com

To assist in making any such corrections, please use the
forms provided below.  If additional pages are necessary,
please furnish same and attach hereto.


Page _____ Line _____ Change _____

_____

Reason for Change _____

Page _____ Line _____ Change _____

_____

Reason for Change _____

Page _____ Line _____ Change _____

_____

Reason for Change _____

Page _____ Line _____ Change _____

_____

Reason for Change _____


**REED & ASSOCIATES**
MATTHEWS, NORTH CAROLINA  980.339.3575

**E R R A T A   S H E E T**          (2 of 3)

Page _____ Line _____ Change _____

Reason for Change _____

_____

Page _____ Line _____ Change _____

_____

Reason for Change _____

Page _____ Line _____ Change _____

_____

Reason for Change _____

Page _____ Line _____ Change _____

_____

Reason for Change _____

Page _____ Line _____ Change _____

_____

Reason for Change _____

Page _____ Line _____ Change _____

_____

Reason for Change _____

Page _____ Line _____ Change _____

_____

Reason for Change _____

Thank You!

**REED & ASSOCIATES**
MATTHEWS, NORTH CAROLINA   980.339.3575

### WITNESS CERTIFICATE          (3 of 3)

       I, WILLIAM ROLFE, do hereby certify that I have read and understand the foregoing transcript and believe it to be a true, accurate, and complete transcript of my testimony, subject to the attached list of changes, if any.

                                       _____

                                          WILLIAM ROLFE

     This deposition was signed in my presence by WILLIAM ROLFE on (day) _____, this (date) _____ day of (month) _____, 2023.

                                       _____

                                        Notary Public

My Commission Expires: _____

STATE OF NORTH CAROLINA                    <u>CERTIFICATE</u>

COUNTY OF FRANKLIN:

      I, DEBORAH A. HYDE, Certified Court Reporter and Notary Public in and for the County of Franklin, State of North Carolina, do hereby certify:

      That WILLIAM ROLFE appeared before me at the time and place herein aforementioned; was duly sworn in the manner provided by law by me prior to the taking of the foregoing deposition, and that said deposition was taken by me and transcribed under my supervision and direction; and that the foregoing 200 pages constitute a true and correct transcription of the proceedings.

      I do further certify that reviewing and signing of the transcript by the witness was reserved.

      I do further certify that the persons were present as stated in the appearance page.

      I do further certify that I am not of counsel for, or in the employment of, either of the parties in this action, nor am I interested in the results of this action.

      This the 25th day of January 2023.


            _____

            DEBORAH A. HYDE, Certified Court Reporter

              Notary Public Number 20021400234


**REED & ASSOCIATES**
MATTHEWS, NORTH CAROLINA  980.339.3575