IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CIVIL ACTION NO.: 5:22-cv-00068-BO

YOLANDA IRVING, individually and as the )
natural parent and guardian of J.I. JUWAN )
HARRINGTON, CYDNEEA HARRINGTON, KENYA )
WALTON, individually an as the natural )
parent and guardian of R.W. ZIYEL WHITLEY, )
DYAMOND WHITLEY, KAMISHA WHITLEY, NANETTA )
GRANT as the natural parent and guardian )
of Z.G. and EMANCIPATE NC, INC. )
                                        )
                   Plaintiffs, )
                                        )
      vs. )
                                          )
THE CITY OF RALEIGH, Officer OMAR I. )
ABDULLAH, Sergeant WILLIAM ROLFE, Officer )
RISHAR PIERRE MONROE, Officer JULIEN DAVID )
RATTELADE, and Officer MEGHAN CAROLINE GAY, )
Officer DAVID MEAD, Officer JESUS ORTIZ, )
Officer KYLE PERRIN, Officer MICHAEL )
MOLLERE, Officer KYLE THOMPSON, Officer )
VINCENT DEBONIS, Officer DANIEL TWIDDY, )
Officer THOMAS WEBB, Officer DAVID )
McDONALD, Officer DAVID GARNER, Chief of )
Police ESTELLA PATTERSON and City Manager )
MARCHELL ADAMS-DAVID, in their official )
capacities, )
                                        )
                   Defendants. )
_____)

D E P O S I T I O N

OF

**OFFICER JESUS M. ORTIZ**

At Raleigh, North Carolina
November 1, 2022

REPORTER:  DEBORAH A. HYDE

**REED & ASSOCIATES**
MATTHEWS, NORTH CAROLINA  980.339.3575

A P P E A R I N G

On Behalf of the Plaintiffs:

        ELIZABETH SIMPSON, ESQUIRE
        Associate Director
        EMANCIPATE NC
        Post Office Box 309
        Durham, North Carolina  27702
        703-587-8563
        elizabeth@emancipatenc.org

        EMILY D. GLADDEN, ESQUIRE
        Tin Fulton Walker & Owen, PLLC
        204 North Person Street
        Raleigh, North Carolina  27601
        919-720-4201
        Egladden@tinfulton.com


On Behalf of Defendants City of Raleigh, Estella
    Patterson, and Marchell Adams-David:

        DOROTHY V. KIBLER, ESQUIRE
        AMY PETTY, ESQUIRE
        City of Raleigh Attorney's Office
        Post Office Box 590
        Raleigh, North Carolina  27602
        919-996-6560
        dorothy.kibler@raleighnc.gov


On Behalf of Defendants Officers David Mead, Jesus
    Ortiz, Kyle Perrin, Michael Mollere, Kyle
    Thompson, Vincent Debonis, Daniel Twiddy, Thomas
    Webb, David McDonald, and David Garner:

        LESLIE C. PACKER, ESQUIRE
        Ellis & Winters LLP
        4131 Parklake Avenue, Suite 400
        Raleigh, North Carolina  27612
        919-865-7000
        leslie.packer@elliswinters.com


                    (Continued)


                **REED & ASSOCIATES**
        MATTHEWS, NORTH CAROLINA  980.339.3575

A P P E A R I N G

On Behalf of Defendant Officer Omar I. Abdullah:

    JESSICA DIXON, ESQUIRE
    Parker Poe Adams & Bernstein, LLP
    620 South Tryon Street, Suite 800
    Charlotte, North Carolina  28202
    704-372-9000
    jessicadixon@parkerpoe.com


On Behalf of Defendants Officers Rishar Pierre
    Monroe, Julien David Rattelade, and Meghan
    Caroline Gay:

    RODNEY E. PETTEY, ESQUIRE
    Yates, McLamb & Weyher, LLP
    Two Hannover Square
    434 Fayetteville Street, Suite 2200
    Raleigh, North Carolina  27601
    919-835-0900
    rpettey@ymwlaw.com
    apoole@ymwlaw.com


On Behalf of Defendant Officer William Rolfe:

    NORWOOD P. BLANCHARD, III
    Crossley McIntosh Collier Hanley & Edes, PLLC
    5002 Randall Parkway
    Wilmington, North Carolina  28403
    910-762-9711
    norwood@cmclawfirm.com
    (Appearing by Telephone)



                    *  *  *  *  *

C O N T E N T S

PAGE

Examination by Ms. Simpson: . . . . . . . . . . . . . 5

Examination by Ms. Dixon . . . . . . . . . . . . . . 91


PLAINTIFFS' EXHIBITS:

Exhibit BBB    Marcus VanIrvin Body Camera 3 . . . . . 55

Exhibit OOO    Google map of 1628 Burgundy Street . . . 50

Exhibit PPP    Irving Camera 2 . . . . . . . . . . . 63

Exhibit QQQ    Irving Camera 10 . . . . . . . . . . . 65

Exhibit RRR    Ortiz Body Camera Re:  Banks . . . . . . 74

Exhibit SSS    Ortiz Body Camera Re:  Smith . . . . . . 78

Exhibit TTT    Ortiz Body Camera Re:  Washington . . . 80

Exhibit ZZ     VanIrvin Warrant . . . . . . . . . . . 52


(All paper exhibits provided with the transcript.  It was
agreed by all parties that video exhibits will not be
attached.)



*   *   *

1           This is the deposition of OFFICER JESUS M.

2    ORTIZ, taken in accordance with the Federal Rules of Civil

3    Procedure in connection with the above case.

4           Pursuant to Notice, this deposition is being

5    taken in the offices of Ellis & Winters LLP, 4131 Parklake

6    Avenue, Suite 400, Raleigh, North Carolina, beginning at

7    2:04 p.m. on Tuesday, November 1, 2022, before Deborah A.

8    Hyde, Certified Verbatim Reporter and Notary Public.

9                            *   *   *

10   Whereupon,

11                  **OFFICER JESUS M. ORTIZ**

12   was called as a witness and, having first been duly sworn,

13   was examined and testified as follows:

14                         EXAMINATION

15         BY MS. SIMPSON:

16       Q.   Hello, Officer Ortiz.  My name is Elizabeth

17   Simpson.  I am an attorney and I'm employed by Emancipate

18   NC, and I, along with other attorneys, represent the

19   plaintiffs in this lawsuit against the City of Raleigh and

20   several individual officers, including you.

21           You are testifying under oath and under penalty

22   of perjury, just as if you were in a court of law.  Do you

23   understand that?

24       A.   Yes, ma'am.

25       Q.   Have you ever been deposed before?

1     A.   Say what, again?

2     Q.   Have you ever been deposed before?

3     A.   Yes.

4     Q.   Okay.  Tell me about that.

5     A.   Vehicle wreck, just responding to a scene, crash

6  with an ambulance and the person that lived in the house

7  at the corner where the accident happened, said that they

8  got hurt when they heard the noise of the crash.

9     Q.   Were you a party to that lawsuit?

10     A.   I was one of the defendants, I guess, or

11  complaints.

12     Q.   Do you understand that all of your answers are

13  being transcribed by the court reporter?

14     A.   Uh-huh.

15     Q.   So you need to answer orally rather than nodding

16  your head.

17     A.   Okay.

18     Q.   And your attorney may object to certain

19  questions, and you should know that you're still required

20  to answer questions, even if she objects, unless she

21  instructs you not to respond.  Do you understand that?

22     A.   Yes.

23     Q.   So you started with Raleigh Police in 2004; is

24  that correct?

25     A.   That's correct.

 1      Q.   What was your assignment when you started?

 2      A.   Patrol Officer, Southeast District.

 3      Q.   And what is your current assignment?

 4      A.   Selective Enforcement Unit.

 5      Q.   When did you start in that unit?

 6      A.   2010.

 7      Q.   How were you selected for that team?

 8      A.   Put an application, went to a tryout process and

 9   passed the tryouts and then was placed on a list until

10   openings on the team came available.

11      Q.   What did the tryout process consist of?

12      A.   A lot of physical obstacles, firearm skills and

13   just general fitness, and then you also go to an oral

14   board, and then after that psych evaluation, I believe,

15   and then you get put on a list and when an opening comes,

16   they call your name, you get transferred.

17      Q.   What was the oral board?

18      A.   It was command staff from the Special

19   Operations.  They just -- it's been 12 years, so I can't

20   remember all the questions they ask.  It was just general

21   questions about trying to figure out if you will be a good

22   fit to be on the team or not.

23      Q.   What makes someone a good fit for the team?

24      A.   The main reason will be flexibility on your

25   schedule, since we are on call, and about half of our

 1   lives, so a lot of times the phone rings and you've got to

 2   come in to work, drop what you're doing.  So you have to

 3   be able to have a flexible family life that you can just

 4   drop and go.

 5        Q.   What kind of activities does your team perform?

 6        A.   We execute search warrants.  We also do drug

 7   takedowns, fugitive apprehensions.  We have done hostage

 8   rescues, active shooters.  We provide security on events

 9   like protests or anything like that in case there's some

10   critical incident happen during those events.  We have a

11   team available that includes like Christmas parades or New

12   Year's, 4th of July, any big event.

13        Q.   What is a critical incident?

14        A.   Anything like, God forbid, something happen like

15   it happened in Wisconsin, if somebody was to attack that

16   crowd or something of that nature, then we're there to

17   respond.  We have a tactical element to respond to those.

18        Q.   What is your standard schedule?

19        A.   We have -- we switch our schedules, go from day

20   shift to night shift every week, or supposed to be, but

21   our hours shift constantly.  One day you're 8:00 to 6:00,

22   next thing you know, you're 4:00 a.m. to 2:00 p.m.  It's

23   just whenever they need us.  They might need us to change

24   our hours, like they did today.

25        Q.   What happened today?

1        A.   We had a early search that we had to do.

2        Q.   How many hours do you work a week?

3        A.   Schedule, 42.

4        Q.   Did you meet with your attorney to prepare for

5    this deposition?

6        A.   Yes.

7        Q.   And did you consult with a criminal attorney

8    before this deposition?

9        A.   No.

10        Q.   Do you intend to invoke your Fifth Amendment

11    right to remain silent at any point?

12        A.   No.

13        Q.   I'm going to ask you questions about the SEU

14    team and how it operates, and the time frame I'm referring

15    to is 2019 to the present.

16        A.   Okay.

17        Q.   But if there's anything that's changed between

18    2019 to the present, you can indicate that to me.  Okay?

19        A.   Okay.

20        Q.   You went into it a little bit, but what is the

21    mission of the SEU team?

22        A.   Again, that's why the name of Selective

23    Enforcement Unit changes.  It all depends on the needs of

24    the department, as recently we've been helping with the

25    911 calls, as well, so that is added to all our list of

1   duties that we do, but that -- our main mission is we just

2   do needs of the department as of right now.

3        Q.   When you say respond to 911 calls, what does

4   that mean?

5        A.   Listen to the radio and help out by knocking out

6   some of the calls that are pending on the boards, so we

7   get a list of so many calls for service in the city and a

8   lot of times they get -- they keep piling up if people

9   don't take them, so if we're not assigned to anything,

10  we'll grab some of those calls and knock them down.

11       Q.   Does that interrupt your normal duties?

12       A.   If we have normal -- if we have a current

13  assignment related to tracking down fugitives or working

14  on -- briefing for a search warrant or a vehicle takedown

15  or anything like that, we won't be answering calls, but

16  when we're not doing those things, then we'll answer some

17  calls.

18       Q.   So it would be during down time?

19       A.   Yeah.

20       Q.   Is that because of staffing shortages?

21       A.   Yeah.

22       Q.   How is the SEU team structured?  For instance,

23  how many people are on a team?

24       A.   We have 10 people on the team.  We have a

25  lieutenant and a captain above us and we have two teams,

1  so we have 22 people assigned to SEU right now.

2      Q.   Do people have a specific role on the team?

3      A.   Yes.

4      Q.   What's your role?

5      A.   I am the covert guy for the scout, so I cover

6  Dave Mead that was here earlier.

7      Q.   What does that mean?

8      A.   That means that when he is busy doing -- with

9  another task, I am his eyes around him, so making sure

10  that no harm comes to him or if things happen that he's

11  not able to see because he's doing something else, I'm

12  able to pick it up.

13      Q.   Is that a role that is primarily in the field?

14      A.   What do you mean by that?

15      Q.   Like it's not when you're in the office waiting

16  for a call that you need to cover him?

17      A.   No.  That's just when we're --

18      Q.   When you're out somewhere?

19      A.   Yes.

20      Q.   Okay.  So if he goes out to scout a location,

21  would you be like in a different car or a different

22  location?

23      A.   No.  Yes, I'll be in a different location.

24  Usually, we call it cell, so it's like first cell, so me

25  and Dave Mead are first cell, then second cell -- the

 1   scout for second cell will go with Dave Mead most times to

 2   do the scouts because wherever Dave Mead -- if Dave Mead

 3   peals off on the front yard, for whatever reason, I go

 4   with him, so that scout should be able to take the team to

 5   the door if me and Dave Mead are not there.

 6        Q.   Who is on the second cell, then?

 7        A.   Mainly, it's going to be Mike Mollere.

 8        Q.   And does he have someone who partners with him

 9   or covers him?

10        A.   Tom Webb, for the most part.

11        Q.   So is this -- is the context for this primarily

12   executing a search warrant or some other context?

13        A.   We do it also for our vehicle takedowns that we

14   do.  We maintain the same partnership.

15        Q.   Anything else?

16        A.   No.

17        Q.   When Mead goes out to scout a location for a

18   search warrant, do you go out as well?

19        A.   No, that's the times that I -- he does that with

20   Mike Mollere most of the time.

21        Q.   Is Mike Mollere a scout?

22        A.   Yeah.

23        Q.   Okay.  And you're a cover for a scout?

24        A.   All right.  The scout thing, the scout is the

25   person that's assigned to scout, so it's mainly going to

 1   be -- we call it point, first cell, and I'm cover, second
 2   cell, so I am cover for point, first cell.
 3        Q.   Do you have any other roles on the team?
 4        A.   Sometimes backup to the backup shield guy, so
 5   sometimes if we have no other person that operates the
 6   shield, since I used to be the primary shield guy sometime
 7   prior, I might pick up the shield and cover and, also,
 8   every single one of us being breachers at some point, so
 9   I'm the backup to the backup to the backup, I think, on
10   that department.
11        Q.   Are there other roles that are assigned on the
12   team?
13        A.   Yes, we handle robotics, you know, the
14   electronics that we use, cameras and things of that nature
15   that we use on all the things that get us on to team
16   members, but they're not -- I mean they're not really
17   absolute.  A lot of us -- most of us know how to use them
18   all.  We just -- depends on who's available to use them
19   that day, so they're not like hard roles.
20        Q.   Can you name all the people who are on your
21   team, the 10 people?
22        A.   Yeah.  Dave McDonald, Dave Mead, Mike Mollere,
23   Tom Webb, Kyle Perrin, Daniel Twiddy, Kyle Thompson, Shawn
24   Thompson, Dave Garner.  Do I have 10 there?  Did I miss
25   anybody?

1      Q.    Just you.

2      A.    Just me.

3      Q.    And is one of those a sergeant?

4      A.    Dave McDonald is our sergeant.

5      Q.    Is that the supervisor for your team?

6      A.    Uh-huh.

7      Q.    And who's lieutenant?

8      A.    Matthew VanAntwerp.

9      Q.    So it sounds like you don't have a typical day,

10   but if you were to come into the office and you were going

11   to be executing a search warrant that day, how would that

12   unfold?

13     A.    Like not typical day, but you're asking me how

14   does it go when we're about to execute a warrant?

15     Q.    Yeah.

16     A.    They'll give us a briefing location.  Whoever

17   the detective is that's handling the warrant will give us

18   a briefing location.  Sometimes we already have the

19   address ahead of time, so the scout might be done before

20   the briefing or it gets done after the briefing.  It

21   depends if we have the address ahead of time.

22          A lot of times we're familiar with a lot of the

23   addresses, so it makes that a little bit easier for the

24   scouting portion, but we show up to a briefing location.

25   They'll brief us of how they came about the information

1   and how they developed a probable cause to do a search

2   warrant.  They give us the information that we ask in

3   regards to occupants, any vehicles, any other -- well,

4   yeah, I already said that -- residents in the structure,

5   things of that nature.

6        Q.   And then what do you do next?

7        A.   After that's done, if the scout hasn't been

8   done, the scout will be completed.  During that time, the

9   supervisor and assistant team leader and the scout will

10  read the warrant, so they will check the warrant, see if

11  there's anything wrong with the warrant or things of that

12  nature, that the warrant is good.  They're just verifying

13  there's a valid warrant.

14       Q.   Who's the assistant team leader?

15       A.   Tom Webb.

16       Q.   What are you looking for when you're seeing if

17  there's something wrong with the warrant?

18       A.   Wrong dates, wrong address, anything of that

19  nature, or missing signature.

20       Q.   Anything else?

21       A.   Not that I can think of right now.

22       Q.   How would you figure out if it was a wrong date?

23       A.   By knowing what date it is and reading it,

24  seeing that is the wrong date.  Then we'll -- we'll see it

25  a lot of times.  You catch it on the paragraph, on the

1  description.  You'll say, "Hey, you got one date here, one
2  date here."  That's a discrepancy that shouldn't be there,
3  so they have to drive back to the magistrate, reprint it,
4  get a new warrant, or if the magistrate allows for them to
5  initial -- change the date and initial, sometimes that
6  happens.
7       Q.   So the paragraph description is an important
8  part of the warrant?
9            MS. PACKER:  Objection to the form.  You can
10 answer.
11           THE WITNESS:  Yeah.  I mean the paragraph
12 description just gives us the story.  A lot of it is like,
13 well, the portion where we call the "I love me" paragraph
14 where it just gives him his whole career and experience on
15 the first few paragraphs, but if there's any discrepancies
16 on dates, yeah, we'll have him change it.
17           BY MS. SIMPSON:
18      Q.   And how would you figure out if the address was
19 wrong?
20      A.   Again, if he is telling me, "This is the
21 address," and they are taking us to the scout and the
22 scout is confirming the address, and then we see that
23 address doesn't match, then that will be a wrong address
24 on the warrant.
25           If you happen to have one address on page 1 and

1   a different address on page 2, that's an easy way to catch

2   it, but -- yeah.

3       Q.   What if the picture doesn't match the --

4       A.   That's not a concern.  A lot of those pictures

5   come from Google and I don't go by those.  Most times,

6   they're correct, but they can be incorrect in the picture

7   on Google when you put an address.  That happened last

8   week.

9       Q.   Tell me about that.

10      A.   The picture on the trailer we're hitting was

11  different than the trailer we were actually going to.

12      Q.   Because the picture came from --

13      A.   Google.

14      Q.   -- Google Street View?

15      A.   Whatever, Google Earth, whatever they use on

16  that program.  But when we saw the pictures, like that's

17  not the trailer, so the guy scouted and we're like,

18  "Yeah."

19      Q.   So if there's a discrepancy, then a scout goes

20  out; they check it out?

21      A.   Well, yeah, they're always going to check,

22  confirm that that's the right location and the address.

23  And it's always pretty clear when you type an address on

24  Google and then the picture that it's showing you has a

25  different number than the address you typed, that's pretty

 1  clear.

 2      Q.   Is there anything else that might be wrong with

 3  a warrant?

 4      A.   Not that I can think of off the top of my head.

 5      Q.   So maybe a date is wrong, address wrong, no

 6  signature?

 7      A.   That could happen, yeah.

 8      Q.   So signature by like a magistrate?

 9      A.   Yeah.

10      Q.   Or no signature --

11      A.   Or not a signature on all pages.  That's what I

12  meant by that.

13      Q.   Anything else?

14      A.   Not that I can think of.

15      Q.   So you mentioned breacher, ballistic shield

16  person, scout, cover for scout, supervisor, assistant team

17  lead.  Are there other assigned roles on the team?

18      A.   Again, it depends on what we're doing at that

19  point, so it's just real broad; depends on what we have to

20  do, any specific incident.  So right now, no.

21      Q.   What's your interaction with chain of command

22  above your sergeant?

23      A.   Above my sergeant?  Occasionally, a lieutenant

24  hangs around, comes to briefings.  Other than that, we

25  don't really interact too much with them.

 1      Q.   Who's above the lieutenant?

 2      A.   Captain, which is currently vacant.

 3      Q.   And above the captain?

 4      A.   The division commander.

 5      Q.   And above --

 6      A.   It would be a major.

 7      Q.   And who's above that?

 8      A.   The deputy chief.

 9      Q.   And above that?

10      A.   Chief.

11      Q.   Is the major also vacant right now?

12      A.   As in today.  He just retired today, so we're

13  waiting on a new one.

14      Q.   Do you have any vacancies on the SEU team?

15      A.   On my team, no.  On the other team there's

16  vacancies, yes.

17      Q.   How many?

18      A.   I believe two.

19      Q.   Did you undergo any training about how to

20  execute a search warrant on a residence?

21      A.   Yes.

22      Q.   Tell me about that.

23      A.   We go to different basic SWAT school and we go

24  to all the room clearing of the portion of the execution

25  of the search warrant.  All the other ones is just in

 1   training within your team and unit.

 2        Q.   What kind of skills do they teach at those

 3   trainings?

 4        A.   Well, if you're assigned scout, then they teach

 5   you the things that you're looking for on the scout.

 6   Depends what role you're about to do on the team, then you

 7   start training -- they start training you up on that

 8   specific role.

 9        Q.   Is there a methodology to approaching a home to

10   execute a search warrant?

11        A.   Again, we do have a training, but a lot of times

12   it's going to be depending on how the scout feels. It's

13   like we -- the scout would check which one of the areas

14   that give us the most concealment until we get to the

15   door, and that will be the most advantageous for us to do,

16   so that's normally one of the main things we're looking

17   for, is which way we're going to approach.

18             Also, he's confirming addresses, where is the

19   markings, and then also, depending on what type of warrant

20   we're doing in regards to if we're going to deploy an

21   NFDD, then he's looking for any children's toys.  So if we

22   see children's toys or anything like that, then that's out

23   the window, so it's those type of things that he's looking

24   for, a scout.

25        Q.   If there's children's toys, why does that mean

1    it's out the window?

2         A.   We don't deploy the noise distraction device

3    when there's children in the house.

4         Q.   Are there other things the scout is looking for?

5         A.   That's what I can think off the top of my head

6    right now.

7         Q.   Have you engaged in scouting before?

8         A.   Uh-huh.

9         Q.   When does that happen?

10        A.   Usually, when Dave Mead is off, I might go on a

11   scout.  Also, I might take over the scout from Dave Mead

12   if we are dealing with a language barrier, so then I'll be

13   up front giving the commands instead of Dave Mead, so

14   we'll flip-flop on situations like that.

15        Q.   So does scout mean that it's the lead person on

16   the approach, as well as --

17        A.   That's the point, but I will -- the scout is the

18   person that goes out and scouts the location and looks for

19   which points you want to come from, any of the other

20   indications.  If we don't have pictures of the interior,

21   we try to piece which way portions of the house might be

22   by looking at the structure, the roof, all the houses,

23   chimneys, things of that nature.

24        Q.   So that is a separate role from the point who's

25   the first person in the line of officers --

1       A.   More than likely, it's going to be the same

2   person, but the scout just means that that's the person

3   that's going to scout the structure.

4       Q.   Before you execute the warrant?

5       A.   Uh-huh.

6       Q.   So when the scout goes out to scout, they're

7   doing that in like a secretive way, right?

8       A.   Yes.

9       Q.   They're trying not to be seen?

10      A.   Trying not to be seen.

11      Q.   When you do it, how do you -- how do you do a

12  scout?

13      A.   A lot of times, we just use the detectives'

14  unmarked vehicles and they usually have tinted windows and

15  we might drive by a structure multiple times.  Sometimes I

16  try to use the camera on my phone and record, and then

17  slow it down so I can see better in case there's something

18  I miss driving through.

19          I usually drive multiple times around the

20  structure, scout it, and we also go to Google Earth and we

21  look at aerial pictures of the area and, "Hey, there's a

22  trail that leads to the house; let's just use that," then

23  go back and scout the trail and make sure there's no

24  fences.

25      Q.   Okay.  So the purpose of a scout, from what I've

1  heard you say, is make sure it's the right location and

2  pick the best approach?

3       A.   Yes.

4       Q.   Is there anything else?

5       A.   Make sure there's no children and things of that

6  nature.

7       Q.   What are other things of that nature?

8       A.   Maybe animals in the house.  That might be

9  another concern.

10       Q.   What's the concern with animals?

11       A.   Getting bit.

12       Q.   What about elderly people?

13       A.   That's another one, too.  If we do have

14  information that they're elderly, we also will not use any

15  noise distraction devices.

16       Q.   Is there any other precautions you take?

17       A.   That I can think of right now.

18       Q.   What about with children?  Any precautions other

19  than not using the noise device?

20       A.   Well, what do you mean by that?  Like I'm trying

21  to --

22       Q.   Just differences to your methodology when you

23  are going to enter a home you know has children in it.

24       A.   No, we still execute the warrant and, obviously,

25  when we encounter them, it's handle with care.

1      Q.   When you're scouting a building, do you take

2   note of colors of the house or the door or the windows?

3      A.   I confirm that it's the address that they

4   describe and you try to keep colors of the doors or

5   shutters and stuff like that.  You can't go by the Google

6   pictures because sometimes you Google that, it might have

7   a blue door one day and the next thing you know, it's a

8   white door now, so -- but I don't often run the scout, but

9   when I do, I do try to -- I have a video, so when I do my

10  post scout form, when I fill out my form regarding

11  description of the structure, I just pull out the video I

12  just took and then write it down.

13     Q.   What about criminal history of a subject?  What

14  do you look into as a scout?

15     A.   Well, as a scout, that's just a supervisor will

16  make a determination at this point if there's a violent

17  history, weapon charges, assault charges, like that, gang

18  history and stuff like that.  Then we'll try to deploy a

19  noise distraction device.

20     Q.   What's the purpose of the noise distraction

21  device?

22     A.   It resets the decision-making loop somewhat, as

23  you call it.  A lot of times you -- and we see it a lot of

24  times when we do deploy those devices, you have a person

25  that is thinking about running and then you interrupt that

1  thought process with the noise distraction device and then
2  you give them commands, and you just give them a new idea
3  of what to do, and a lot of times they do listen to that
4  after that.
5      Q.  Are any of the protocols around scouting written
6  down in policy?
7      A.  I don't recall, ma'am.
8      Q.  How did you learn about them, like how to do it?
9      A.  Like we -- when you asked me earlier, so when
10 you are taking a role of scouting, then you get trained up
11 with somebody that's already being the one that's -- like
12 somebody will teach you.
13          Usually, when you come to the team, you have a
14 training officer assigned to you, so you are assigned to a
15 team member that's been there for a while.
16     Q.  So it's kind of passed down with them?
17     A.  Yeah.
18     Q.  Do you find out about a search warrant before or
19 after the magistrate has signed it?
20     A.  That I don't know.  I mean we find out that
21 there's a search warrant and then sometimes we are waiting
22 for it, for it to get signed from the magistrate, but for
23 the most part they're already signed.
24     Q.  Do you ever get advised of a warrant that you
25 need to execute so fast you can't go out and scout?

1      A.   No, not that I recall.

2      Q.   How do you decide whether you're going to

3    execute it during the day or under nightfall or early

4    morning hours?

5      A.   Unless there is a reason for concern for us,

6    more than likely that's going to be whatever time the

7    detective wants the warrant executed in regards to -- it's

8    his case.  We don't -- if he believes this house is --

9    usually, like if you have a house that has constant flow

10   of drug deals, things of that nature, a lot of times

11   they're like, "Hey, this is the time of the day that the

12   house is active.  This is when I want to do it."  So we

13   try to accommodate what they want.

14         If there is a reason for concern, like if you

15   tell me this guy's -- there's a lot of weapon history and

16   weapons present and stuff like that, then we might have to

17   change it to a time that we want to do.

18     Q.   What kind of time do you change it to?

19     A.   If it's -- if -- depends exactly what the

20   evidence we're looking for, but if it's -- if we're

21   looking for weapons or things of that nature, we might

22   just camp out and wait for the target to leave and then

23   try to detain the person.  If he's not leaving and it's a

24   brick structure, obviously, the structure will dictate.  I

25   don't want to stand outside the door on a vinyl siding

1  structure, so if it's a brick structure, we might knock

2  and announce and call people out to us and then proceed

3  afterwards.

4        So, again, if the evidence cannot be destroyed

5  quickly, then chances are we're not going in there

6  dynamically or rapid entry.

7        Q.   But if the evidence could be destroyed --

8        A.   We'll try to do rapid entry.

9        Q.   What is rapid entry to you?

10       A.   We come up to the door, we announce, "Police

11  search warrant, police search warrant, police search

12  warrant."  And if we haven't heard any answer or anything

13  like that, then we try to make entry.

14       So that's when we start the process of making

15  entry.  Sometimes they go one hit, sometimes they go ten,

16  so that's when we start the process of making entry.

17       Q.   And how much time would elapse between making

18  the announcement and making the entry?

19       A.   Again, we are talking case by case in regards to

20  what you see, what you hear, but for the most part, it

21  takes three to five seconds when you're knocking that many

22  times, or that's what it feels like to me when I'm

23  knocking for that many times.

24       Q.   Is that enough time for someone to answer the

25  door if they want to let you in and not have their door

1  banged off?

2      A.   Well, if we haven't heard any answer.  If I hear

3  somebody, "Hey, I'm coming," then that might be a big

4  difference, but if we don't hear anything, then we --

5  again, we're going after evidence that can easily be

6  destroyed, so then we just go ahead and make entry.

7          We don't want to destroy property, but if we do

8  have a key, then we might use a key, so --

9      Q.   Under what circumstances might you have a key?

10     A.   We waited for somebody to leave the house or the

11 suspect to leave the house and we took them into custody

12 away, and he happens to have a key to the structure, but

13 there's still other occupants in the structure.  That way,

14 we might have a key.

15         If it's a hotel room and we have a search

16 warrant, we can get a master key, you know.

17     Q.   Do you know when you are headed to the door

18 whether it's going to be a forced entry or do you make a

19 call while you're there?

20     A.   The call is done there, so that's the practice.

21 If we haven't heard any answer, that's where the door is

22 going to be breached, but that is going to happen there.

23 The scout would, not the breacher, when he had knocked and

24 no answer.

25     Q.   Okay.  So the scout gives the call to the

1  breacher?

2       A.   Yes, he gets authorized beforehand by the

3  supervisor, but yes, the scout will call the breacher up.

4  There's sometimes that the scout will check and find a

5  door to be unlocked, so there's no need for a breacher, so

6  he'll wave them off.

7       Q.   And do you ever knock, announce and the

8  individual opens the door?

9       A.   I have before.  I had a guy answer the door, but

10 just stood behind the door and he just kept telling, "Quit

11 beating on my door."  I said, "Well, open it."  And he

12 still wouldn't open it, so I just kept beating on the door

13 and that one took a lot of hits.  I'm proud of that one.

14      Q.   But have you ever had it where the occupant

15 actually opened the door and permitted you to enter?

16      A.   Yes.

17      Q.   Is that common?

18      A.   Not as common.

19      Q.   More commonly you breach the door with the

20 breacher?

21      A.   Yes.

22      Q.   If you're executing a warrant for the vice team,

23 do you meet with them --

24      A.   I'm sorry.  For the what?

25      Q.   The vice team.  Do you meet with them

 1  beforehand?

 2       A.   Yes.

 3       Q.   And what do those meetings look like?

 4       A.   That was the briefing that you asked earlier

 5  about where they will give us their briefing of, "This is

 6  the address, this is how we came about the address, and

 7  this is what we're going to develop a probable cause."

 8       Q.   In May 2020, did you discuss COVID safety?

 9       A.   Say what, again, ma'am?

10       Q.   Did you discuss COVID safety in May 2020?

11       A.   Yes, I'm pretty sure.

12       Q.   Did you have any protocols at that time?

13       A.   We would wear masks when we did our entries and

14  that's all I remember about that.  And if we had somebody

15  at a house that -- obviously, there was somebody had COVID

16  or said that they had COVID, then we'd have to go back to

17  the city protocols at the time of COVID, which you have

18  to -- I can't remember what they were exactly, honestly.

19       Q.   Did you have any procedures around mixing

20  occupants of different households in the same space?

21       A.   I don't recall if we did or not.

22       Q.   Have you ever filled out a form like a scout

23  form?

24       A.   Yes.

25       Q.   Tell me about that form.

 1      A.   It's a form that indicates who the scout is.  It

 2  shows you -- you notify what type of -- the build of the

 3  door, if it's a wooden door, metal door, which way it

 4  swings; does it have any storm doors, any other obstacles;

 5  does it have a barricade behind.  You do a diagram of the

 6  structure.  Does it have windows, how many windows, are

 7  the windows near the door, those type of things.

 8      Q.   And how do you find out all that information?

 9      A.   During the scout.

10      Q.   When you do a scout to find out those things, do

11  you approach the door?

12      A.   No.  No, not at all.  That's things that you add

13  to the note after the fact, too.

14      Q.   So you don't find out in advance which way the

15  door swings?

16      A.   Well, you can see the knob.

17      Q.   So in advance, do you note which side the knob

18  is on?

19      A.   Yes.  Again, we tell the breacher which way the

20  knob is because that helps him, which way he's holding the

21  ram.

22      Q.   What about storm doors?  How do they play in?

23      A.   We'll try to -- a lot of times, they're

24  unlocked.  If they're not unlocked, and if you actually

25  pull hard enough, they'll come open, and then you just

 1   have the door.

 2          If you can get it open, then -- and we still get

 3   no answer, then the breach goes through the storm door.

 4      Q.   Do -- anything else you put in the scout form?

 5   Anything else you put in the scout form?

 6      A.   Not that I can think of right now.

 7      Q.   So the way the door is, whether there's a storm

 8   door?

 9      A.   The markings of the door, like where the address

10   is located at, and that's all I can remember right now.

11      Q.   Well, you mentioned before if there's kids, you

12   might put that in there?

13      A.   I can't remember if that's on the scout form

14   portion.  I know we do note it and make our -- adjust our

15   plan accordingly, if we do see that.  I don't remember 100

16   percent if it's actually on the form.  It is on one of our

17   forms.  I just can't remember which one of the forms.

18      Q.   Do you usually approach from the primary

19   entrance of the home?

20      A.   We approach -- we're normally going to approach

21   from the primary entrance or if -- if we have indication

22   or prior knowledge that a different door is used, then

23   we're going to try to use the door that we know works

24   because a lot of times we come to a structure and you find

25   a door that has furniture stuck behind it in a house, so

 1   if you have informa -- or if you have knowledge that the

 2   side door is the common door to come and go, then we try

 3   to use the side door.

 4        Q.   How do you acquire that knowledge?

 5        A.   From the detective who had done surveillance on

 6   the location or not.

 7        Q.   What's the difference between the scout form and

 8   the pre-raid form?

 9        A.   I don't -- I don't recall a form titled "The

10   Pre-Raid Form."  I do know we have three forms.  Again, I

11   don't usually handle a lot of those forms or I don't --

12   I'm not going to discuss them.  I just don't know.

13        Q.   Is one of them a post warrant form?

14        A.   I do know we have a post warrant, yes.

15        Q.   And you've filled out a scout form when you've

16   acted as a scout?

17        A.   Yes.

18        Q.   But you don't know about a pre-raid form?

19        A.   The pre-raid form -- the other form that we have

20   in there is the one where they go about some of the

21   procedures for the search, but the plan, itself, is mainly

22   whatever the detective presented and it's all verbal from

23   us, so I don't -- I'm not very familiar with a pre-raid

24   form.  Now I'm going to have to go back and look at one

25   when I'm done here.

 1      Q.   Do you have an understanding of what a no-knock
 2   warrant is?
 3      A.   Yes.
 4      Q.   What is it?
 5      A.   Making rapid entry into a residence without
 6   announcing your presence or purpose.
 7      Q.   Does Raleigh police do those?
 8      A.   No.
 9      Q.   Has that been the case as long as you've worked
10   at Raleigh Police?
11      A.   Yes, ma'am.
12      Q.   And why is that?
13      A.   Because we don't have a no-knock warrant.  I
14   believe that's -- you have to get a specific requirement
15   for that.  We don't do those.
16      Q.   But do you know why?
17      A.   No.
18      Q.   Are there any exigencies in which you would
19   enter a home without announcing?
20      A.   Hot pursuit, chasing somebody that's just -- I'm
21   literally behind them and they run in there, a hostage
22   rescue or active shooter, if there's some type of bodily
23   harm being caused to somebody inside, as well.  Yeah, I
24   will just go in without announcing.
25      Q.   But for a drug warrant, you would knock?

1          MS. PACKER:  Objection.  You can answer.

2          THE WITNESS:  No, we'll announce for drug

3   warrants.

4          BY MS. SIMPSON:

5      Q.   What's the purpose of the announcement?

6      A.   To let them know that the police is there and,

7   also, give them a chance to come to the door or respond

8   that we're at the door, so we knock and announce so they

9   know we're the police.

10     Q.   Why do you want them to know that you're the

11  police?

12     A.   So they know that is the police entering, maybe

13  not getting home invaded or something like that.

14     Q.   Do you know if there's a written policy against

15  no-knock warrants that Raleigh police has written down?

16     A.   I'm not aware of the policy in regards to

17  no-knock warrants.

18     Q.   So how do you know that they aren't done?

19     A.   How do I know what?

20     Q.   That they aren't done.

21     A.   Because SEU does all the warrants of the city,

22  so we don't do them.

23     Q.   But you're not aware of a policy?

24         MS. PACKER:  Objection.  Object to the form.

25  You can answer.

1          THE WITNESS:  I feel like I did.  Sorry.

2          BY MS. SIMPSON:

3     Q.   Just clarifying.  You're not aware of a policy?

4     A.   No.

5          MS. PACKER:  Are you talking about a written

6  policy?

7          MS. SIMPSON:  A written policy.

8          MS. PACKER:  Because he said there was a policy.

9          BY MS. SIMPSON:

10    Q.   A written policy.

11    A.   For the no-knock?

12    Q.   Yeah.

13    A.   Honestly, like I can't think of -- I know

14  there's a warrant [sic] about not doing no-knock -- or I

15  can't -- I just can't tell you any of the wording on the

16  warrant.  I can't remember at all, so I'm just going to

17  stay -- stay out for -- I just really don't recall exactly

18  about what the policy says.

19    Q.   Okay.  What is a knock and announce warrant,

20  then?

21    A.   Say what, again, ma'am?

22    Q.   A knock and announce warrant.

23    A.   We're announcing our presence and we knock and

24  announce three times, and we're not getting any response,

25  so we do a forced entry if we don't have another way to

 1   open the door, and then we clear the structure.

 2        Q.   And is that written down in a policy?

 3        A.   There's not like -- this part, what I do recall,

 4   there's not a time period on the policy.

 5        Q.   But is there any policy you've ever read that

 6   says, "This is what a knock and announce warrant is,"

 7   doop, doop, doop?

 8        A.   Yes, there is.

 9        Q.   Okay.  And when did you review that last?

10        A.   It usually gets read before every warrant, but

11   it's -- I want to tell you the words.  I just don't want

12   to force your hand and this being on record and not being

13   right, so there is a thing that our presence and notice

14   will be announced before making entry, so I know that part

15   is in there.

16        Q.   Are there any requirements with regard to what

17   you're wearing when you execute a search warrant?

18        A.   Yes.  It helps to make sure it says -- your

19   stuff says "police," and if you're a detective in plain

20   clothes, you've got jackets and ball caps that clearly

21   distinguishes as police officers.

22        Q.   What's the purpose of that?

23        A.   So they know that they're not getting home

24   invaded, that we are police.

25        Q.   Are you familiar with controlled buy procedures

1    that the vice team do?

2         A.   Yes, ma'am.

3         Q.   What's your relationship to that process as a

4    member of the SEU team?

5         A.   Well, when they want an apprehension done, they

6    normally call because there's times that they don't

7    apprehend when they do controlled buys immediately, but if

8    they do a controlled buy and they want an apprehension

9    after the buy, then we get notified and then we'll come up

10   with a plan on how to apprehend the person.

11        Q.   Do you ever monitor a controlled buy from an

12   application on your phone?

13        A.   Yes.

14        Q.   What does that look like?

15        A.   I can see the camera and I can hear on the

16   phone.  Sometimes it's hard to hear, but I can see what's

17   happening during a controlled buy live on my phone.

18        Q.   Did you watch a livestream of a controlled buy

19   related to the arrest of Marcus VanIrvin?

20        A.   Not that I recall.

21        Q.   Did you ever watch controlled buys that related

22   to a confidential informant named Dennis Williams a/k/a

23   Aspirin?

24        A.   I believe I have.

25        Q.   How many times?

 1        A.    I don't recall that.

 2        Q.    Was it more than 10 times?

 3        A.    I don't think so.

 4        Q.    But more than five?

 5              MS. PACKER:  Objection.

 6              THE WITNESS:  Maybe around that.  I'm not sure.

 7              BY MS. SIMPSON:

 8        Q.    Did you have any information about the person

 9   that was called Aspirin in May 2020?

10        A.    Is this around -- yeah.  Yes.

11        Q.    What did you --

12        A.    That's the CI that Detective Abdullah was using,

13   so I know that.

14        Q.    Anything else?

15        A.    Not that I can recall now.

16        Q.    Did SEU detectives ever surveil locations where

17   a controlled buy was happening?

18        A.    You're talking about the vice detectives?

19        Q.    I'm talking about the SEU team, whether you

20   surveil for the vice detectives, essentially.

21        A.    For them?

22        Q.    Uh-huh.

23        A.    No, we don't surveil for them.

24        Q.    So under what circumstances do you work

25   together?

 1      A.   Again, when we're executing their warrants, when

 2  we're doing an apprehension for them and then, as in

 3  recent, when they want us to stop a car or something to

 4  that nature, of a house that they're watching.  Other than

 5  that, that's about it.

 6      Q.   When you're headed out to execute a search

 7  warrant, what kind of vehicle do you take?

 8      A.   Ninety-nine percent of the time, we drive our

 9  white van.

10      Q.   How many people fit in there?

11      A.   All 10 of us, maybe more.

12      Q.   Do vice officers go in there with you?

13      A.   The detective handling the case usually drives

14  us, as well.

15      Q.   Any other vice officers or detectives?

16      A.   Not normally.

17      Q.   And what do you do when you arrive?

18      A.   At the structure?  So we proceed to the entry

19  point.  We knock and announce our presence and if we don't

20  have a response, then we need to do -- we do rapid entry,

21  depending, if we have to do a breach or if we have ways in

22  without breaching.

23      Q.   And you would know in advance what your route

24  was to the residence based on what the scout planned out,

25  correct?

1       A.   Yes, correct.

2       Q.   When you enter the home, what is your job then?

3       A.   My job is to cover areas that -- what I call

4  clear, obviously.  We have stepped in there and make sure

5  that there's nobody else and there are no threats of that

6  nature, then will wait until somebody taps me to go into

7  the specific room because we usually go two to a room,

8  step into that room, clear the structure.

9            If we have a person secured and they are

10  compliant, just give them commands to keep their hands on

11  top of their head and continue on until all the rooms and

12  people are accounted for.

13       Q.   Do you search for drugs?

14       A.   No.

15       Q.   So you're simply trying to get all the people in

16  one controlled location?

17       A.   Yes.  We make sure we render the structure safe

18  and then we gather up all the occupants of the structure

19  and get them into one location so those areas can get

20  searched.

21            We do search that location where we're going to

22  place them in regards to we're looking for weapons, stuff

23  like that, and we move any furniture away from them just

24  so, when they're sitting there, they don't have to move

25  again.  So when the detectives come and start searching,

 1  then all that's done, but we do not search for drugs.

 2      Q.   How do you hold weapons when you enter a

 3  structure?

 4      A.   If I am the first one on the structure, I have

 5  my weapon shoulder and the barrel is up.  I scan the

 6  structure to make sure there's no threats.  If there's no

 7  threats, then it goes down.

 8      Q.   Which number -- do you have a number on the line

 9  that you usually occupy or does it switch?

10      A.   I'm usually number 3.  We usually have the

11  ballistic shield, Dave Mead and myself.  That is 90

12  percent of the time.  Unless one of us is off, that's how

13  it goes.

14      Q.   What do you do if you encounter children in a

15  residence?

16      A.   We just talk easy to them, try to comfort them

17  if we can, and then just keep them occupied and try to

18  keep their little brains occupied while the rest of the

19  stuff is going on.  A lot of times we talk about games,

20  what they're doing, what they like to play.

21      Q.   And when you say you're number 3, does that vary

22  if you're approaching someone that you expect to speak

23  Spanish?  Do you go into number 1?

24      A.   I still -- I still go behind the shield.

25      Q.   Oh, right.  So the shield is number 1?

 1      A.   So just me and Dave Mead will flip around or we
 2   might stay the same position, but I will handle the
 3   commands.
 4      Q.   What sign are you looking for before you lower
 5   your weapons?
 6      A.   Just if I have compliance.  Again, I don't --
 7   the weapon is not pointing at anybody.  It's just in that
 8   general direction, unless I see a threat.  If a person
 9   goes to the waist band, then yes, absolutely, but for the
10   most part, when people go like this (indicating), then we
11   just talk to them, give them commands.
12           MS. PACKER:  For the record, he put his hands up
13   when he said "go like this."
14           THE WITNESS:  Sorry.  Yes.
15           BY MS. SIMPSON:
16      Q.   What do you do if you encounter someone who is
17   disabled, not able to walk well?
18      A.   We try to accommodate for them by helping them
19   get to wherever they need to go.
20      Q.   What if they can't respond to a command because
21   of their disability?
22      A.   Like -- you're talking about like a deaf person
23   or someone like that?
24      Q.   Yes.
25      A.   Then, again, if they're not doing anything

1  threatening, then, obviously, it would be hard to know

2  immediately, but if they're not doing anything

3  threatening, then you just continue to clear the structure

4  and then go to that person to secure them.  Then at that

5  point, I should be able to figure out that they cannot

6  understand.

7      Q.   What if it's a physical disability that prevents

8  them from moving the way they're directed to move?

9      A.   If they can't move at all, then we're just going

10  to have to shelter in place there and then go have to --

11  if they want to search that room, they're going to have to

12  search around.  Like if they can't move, they can't move.

13      Q.   Do you -- does your team ever play a role in

14  testing drugs that are found at a residence?

15      A.   No.

16      Q.   Who's responsible for that?

17      A.   Drugs and Vice.

18      Q.   Is your team ever part of putting together

19  charging documents for someone?

20      A.   No, ma'am.  Again, all our roles, when it comes

21  to Drugs and Vice, is we'll apprehend somebody for them

22  and we'll secure a structure for them.  Other than that,

23  that's -- to narrow it down, that's basically our

24  relationship, working relationship, what we do for them.

25  All that stuff about testing drugs, searching, charges,

 1   that's all them.

 2        Q.   Are there other circumstances when an SEU

 3   officer would be a charging officer?

 4        A.   Maybe a -- no.  They usually take those even

 5   when we have some resistance and force has to be used.

 6   They still usually pick those up, themselves.  I'm not

 7   saying that it hasn't happened, somebody has to do -- a

 8   SEU person has to do a charge, but not related to their

 9   case.

10        Q.   So you're referring to maybe resistantly

11   obstruct or assault?

12        A.   Yes, that's what I'm referring to.

13        Q.   Something that arises in the moment --

14        A.   In the moment.

15        Q.   -- not something that was investigated prior?

16        A.   Correct.

17        Q.   Are there written policies within the Raleigh

18   Police Department about how to handle it if you suspect a

19   fellow officer of misconduct?

20        A.   Yes.

21        Q.   And what is your understanding of that policy?

22   I'm not asking you to say verbatim, but --

23        A.   You have to report it.  I believe if you don't

24   report it, then you're also a guilty party.

25        Q.   And what types of misconduct does that cover?

1      A.   Again, I don't know verbatim what type of
2  misconduct, but anything that I think is illegal or
3  anything like that, absolutely.
4      Q.   Have you ever suspected an officer of
5  misconduct?
6      A.   No, ma'am.
7      Q.   Have you ever reported an officer?
8      A.   No, ma'am.
9      Q.   Are you aware of other officers reporting
10  misconduct they've noticed?
11      A.   I don't think I -- I don't think I even heard of
12  that, but I'm sure it happens.  I just haven't heard of
13  it.
14      Q.   Did you hear of anything with Officer Abdullah?
15      A.   Prior to this or after the fact?
16      Q.   Either one.
17      A.   Just after the fact with all the new stuff and
18  whatever happened afterwards.
19      Q.   What did you know about Abdullah in May of 2020?
20      A.   He was a drug detective.
21      Q.   Anything else?
22      A.   Huh-uh.
23      Q.   Did he have any kind of reputation that you're
24  aware of?
25      A.   I'm not aware of any reputation.

1      Q.   Do you want any water?

2      A.   I'm okay.  Thank you.  Well, if you're getting

3  up, I'll take one.  Thank you.

4      Q.   How often have you worked on search warrants

5  that were related to an Abdullah case?

6      A.   I don't recall doing many actual structure

7  search warrants for Abdullah.  From what I recall, we did

8  a lot more vehicle interdictions for him or vehicle

9  takedowns for him.  That's what I remember, for the most

10 part.

11     Q.   Did you find him a reliable case agent?

12     A.   Yes.  It's not for me to determine because,

13 again, I have no way to know him.  I don't know how his

14 corndog could end up afterwards, so I have no idea.

15     Q.   And did you -- would you have been able to

16 recognize Dennis Williams a/k/a Aspirin in May 2020?

17     A.   Back in May 2020, yes.  Now, probably not.

18     Q.   And who did you know him as?

19     A.   I mean I wouldn't recognize him, so like I

20 wouldn't know him as anything.  As a matter of fact, I

21 believe I actually arrested him after this incident, and I

22 still didn't recognize him.

23     Another one of my team members said, "Hey, this is so

24 and so."  I go, "Okay.  I've got a warrant."

25     Q.   But in May 2020, what did you know about him,

1   like who he was?

2        A.   He was Abdullah's CI.

3        Q.   Did he have any particular reputation as a CI

4   that you know about?

5        A.   I don't recall right now.

6        Q.   Did you ever see any drugs related to one of the

7   Abdullah cases that looked fake to you?

8        A.   I'm sure I've seen some of the drugs.  Again,

9   I'm not a drug guy, so I really pay no mind.

10       Q.   Turning to the warrant that you did execute on

11  May 20th, 2020, did you meet with the vice team before

12  that?

13       A.   I'm sure we did.

14       Q.   Do you know who was there from the vice team?

15       A.   I want to say Detective Gay.  I don't remember

16  if Detective Monroe was there or not, but he was part of

17  that team at the time, so I'm assuming he was.  Honestly,

18  I just don't have -- it's two years.  I don't really

19  remember.

20       Q.   Did you discuss an entry plan in that briefing

21  meeting?

22       A.   Yes.  We were just going to come to the front

23  door, and then I believe on approach we were informed that

24  somebody left the residence and was going to a vehicle, so

25  we were going to send two people to splint off and go

 1   detain them and figure out what was going on, if he was

 2   our target or not at that point, and then we continued to

 3   the front door.

 4        Q.   Do you know who the two people who split off

 5   were?

 6        A.   I want to say it was Twiddy and Thompson, Shawn

 7   Thompson.  I'm almost certain.

 8        Q.   And tell me again what they were doing.

 9        A.   There was a person that was leaving from the

10   structures.  They were just trying to intercept to make

11   sure it wasn't our target leaving because it was hard to

12   see, I guess, from where they saw him leave.  I can't

13   remember exactly, but they were splintering off to go

14   there while we continued to the structure.

15        Q.   Where did you all set up to deploy out of the

16   van?

17        A.   I'll say a building prior to it and then it gave

18   us a blind approach to the front door until we came around

19   the building, so we were trying to use that prior building

20   as cover as much as we can till we got as close as we

21   could to the door.

22        Q.   And do you know if those two officers who split

23   off did encounter a person?

24        A.   I think they did, but I don't know what came of

25   that.

 1       Q.   And when was that person noticed?

 2       A.   When -- I want to say when we were deployed or

 3   when we were like pulling up.

 4       Q.   Were you familiar with that apartment complex?

 5       A.   Yes.

 6       Q.   What from?

 7       A.   We have done multiple search warrants there and

 8   I had responded to multiple calls for service there as

 9   either a patrol officer or non-patrol officer.  I've been

10   there numerous times.

11       Q.   Do you know how many apartments, more or less,

12   are there?

13       A.   Oh, Lord.  There's a lot.  I can't even help you

14   count them because you also have across the street.

15   That's just -- it's a lot of buildings.

16       Q.   Were you part of scouting the location that day?

17       A.   No, Dave Mead was.

18       Q.   Did you have a copy of the warrant that day?

19       A.   Dave Mead did.

20       Q.   But you?

21       A.   No.

22       Q.   Okay.  I want to put this on here so everyone

23   can see it.  It's going to be Exhibit OOO.  Okay.  This is

24   1628 Burgundy Street.

25            (Plaintiffs' Exhibit OOO was identified.)

 1          BY MS. SIMPSON:

 2      Q.   Is that the location of the warrant you executed

 3  that day?

 4      A.   Ma'am, I didn't really read this before I came

 5  over here, so if this is the address of where we ended up,

 6  then yes.

 7      Q.   Okay.  Do you recognize this area as the

 8  apartment complex we were talking about?

 9      A.   Yes, ma'am.

10      Q.   Do you -- when you said that you came in in a

11  van, do you know where your van sat before you all jumped

12  out of the van?

13      A.   Is there any way you can take that first, the

14  little -- I believe we deployed right about here

15  (indicating), I believe.  Obviously, on the street, but --

16      Q.   Okay.  I'm just going to zoom -- so you came in

17  on Burgundy Street?

18      A.   Uh-huh.

19      Q.   Where did you park your van?

20      A.   I want to say we stopped behind this building

21  and then when we came around, this is where the other two

22  guys split off, and then this is where we slightly paused

23  to let Dave Mead know that we had everybody that we were

24  going to have and then we moved over to the front door.

25      Q.   Now you can actually say that again, but refer

1   to the members of the structures.

2       A.    Again, going back to two years ago, I remember

3   that we parked somewhere on Burgundy, maybe in front of

4   either 1620, 1618, if my memory serves me right.  And then

5   we -- can I use that?

6       Q.    Uh-huh.

7       A.    And then we deployed on foot using this blind

8   approach, and I believe this is where Officers Thompson

9   and Twiddy went in this direction, and the rest of us came

10  to this corner of this building (indicating), and then we

11  proceeded up.

12          It looks -- you know, on the mapping system,

13  it's like I don't -- I don't really remember exactly where

14  we deployed.  If you're telling me that's the actual

15  address that we went to, 1628, then I believe this is

16  where we deployed and this is where we split off and then

17  this is where we deployed from.  Dave Mead is better with

18  dates and addresses, though.

19      Q.    So OOO would be the Google map of 1628.  I took

20  a screen shot we can share afterwards.

21          Now I'm going to show you what was already

22  marked as ZZ, the VanIrvin warrant.

23          (Plaintiffs' Exhibit ZZ was identified.)

24          MS. PACKER:  Was that a current Google map that

25  you just showed?

 1              MS. SIMPSON:  It's on the Internet, so yes.

 2              BY MS. SIMPSON:

 3         Q.   Okay.  So I'm going to show you this.  This is

 4    the warrant for 1628 Burgundy Street, which is the warrant

 5    that you executed on May 20th, 2020.

 6              MS. PACKER:  May 21st.

 7              BY MS. SIMPSON:

 8         Q.   Did you ever see this warrant when you were

 9    executing it?

10         A.   No.

11         Q.   That wasn't your role that day, right?

12         A.   No.

13         Q.   Do you know today that 1628 Burgundy Street was

14    an incorrect address for Marcus VanIrvin?

15              MS. DIXON:  Objection.

16              THE WITNESS:  I don't believe it was incorrect

17    address.  From my understanding, that's where the sale

18    took place and that's what the address in the warrant

19    says.  The address in the warrant is the same, so that's

20    where the detective observed or told us that the sale

21    happened.

22              That's what he swore under oath to the

23    magistrate, so once we get the warrant and he's telling us

24    it came from this building, and we scout it and the scout

25    matches the numbers on the warrant, then to us that's a

 1   good warrant on its face.

 2             BY MS. SIMPSON:

 3        Q.   But do you have an understanding today that

 4   Marcus VanIrvin did not live there or deal drugs out of

 5   that apartment?

 6        A.   I still don't believe that he did not deal drugs

 7   from that apartment.  I know he doesn't live there.  I

 8   understand that he doesn't live there, but not that he

 9   didn't sell the drugs from there.

10        Q.   When you approached, did you see kids sitting

11   out front?

12        A.   I didn't see kids.  I could see individuals

13   running and I could have swore I saw two running into the

14   apartment that we were hitting the search warrant and

15   later found out I was incorrect, and somebody let me know,

16   "No, they went into the apartment."  I was like, "Okay.  I

17   missed that."

18             But I can see individuals on the front, but I

19   couldn't make out because it was -- Dave Mead saw them

20   first.  They saw Dave Mead first, so by the time I come

21   around Dave Mead, then the movement was already happening.

22        Q.   And what number were you in line?

23        A.   At that point, I was actually number 2 because

24   the shield that normally follows us to the door -- we lead

25   the shield to the door and then once we get into the door,

1   it's usually the habit, when we're in direct -- in that

2   one, where someone's in direct pursuit, we're already

3   compromised.  First cell went ahead and took the first

4   room with a shield.

5        Q.   The two officers that peeled off, was that to

6   address those same teenagers who were out front or some

7   other person?

8        A.   Some other person that was in a vehicle, I

9   believe, that left and was getting in a vehicle.

10       Q.   I'm going to show a video from this search

11  warrant execution, the BBB video.

12            MS. PACKER:  B, as in boy?

13            MS. SIMPSON:  Uh-huh.

14            (Plaintiffs' Exhibit BBB was identified.)

15            (A portion of Exhibit BBB was played on the

16  videoconference monitor.)

17            BY MS. SIMPSON:

18       Q.   Do you recognize what's happening here?

19       A.   It looks like we're driving to a location, and

20  I'm assuming that we're going to the location that we

21  discussed.

22       Q.   And is this in that white van you mentioned

23  earlier?

24       A.   Yes.

25       Q.   Do you know if Abdullah was driving this van?

1        A.    Normal practice is he would be.  I don't

2    remember if he was that day, but --

3              (A portion of Exhibit BBB was played on the

4    videoconference monitor.)

5              THE WITNESS:  I guess I'm just talking -- it

6    sounds like that's when I'm hearing on the radio that

7    there's a blue car about to leave, so it's en route to the

8    location.

9              BY MS. SIMPSON:

10       Q.    And who was stating something about a blue car?

11       A.    That sounded like Abdullah to me.

12       Q.    And is that the person that those two officers

13   peeled off to take care of?

14       A.    I believe so.

15       Q.    Do you have any knowledge of who Abdullah

16   thought was in the blue car?

17       A.    I don't have any knowledge.

18             (A portion of Exhibit BBB was played on the

19   videoconference monitor.)

20             BY MS. SIMPSON:

21       Q.    So this is a moment at 1:33 when you're jumping

22   out of the vehicle?

23       A.    Yeah.

24       Q.    And you indicated with the map this would have

25   been in front of either 1618 or 1620?

 1        A.    I believe so, yeah.

 2        Q.    Can you see what color the doors are there?

 3        A.    They look red.

 4        Q.    And do you know if this is your body camera or

 5   someone else's that we're watching?

 6        A.    That's not my body cam.  That's -- I can't say.

 7   Maybe Dave Garner if he was the breacher that day.

 8        Q.    If it was noted as position 3?

 9        A.    It's not mine.  I'm currently in position 2.

10        Q.    Is this you right here?

11        A.    Yeah, I believe so.

12        Q.    And this person was Mead?

13        A.    I believe so.

14        Q.    Okay.

15              (A portion of Exhibit BBB was played on the

16   videoconference monitor.)

17              THE WITNESS:  Actually, incorrect.  That person

18   that you have in body position 3 is currently on 4 right

19   now.  He's 4.  Dave Mead, then me, then Kyle Perrin with

20   the shield.

21              BY MS. SIMPSON:

22        Q.    Okay.  So this person carrying the shield is

23   whom?

24        A.    Kyle Perrin.

25        Q.    And Dave Mead is in front?

1      A.   Yeah, in front of me.  I'm in front of him and

2  he's in front of me.

3      Q.   So you can't see Mead in this view?

4      A.   Yeah, that's --

5      Q.   We can see you?

6      A.   I believe so, yeah.

7      Q.   And you believe that you're in front of the guy

8  with the shield?

9      A.   Yeah, I'm the shortest guy, yeah.

10      Q.   Okay.

11           (A portion of Exhibit BBB was played on the

12  videoconference monitor.)

13           BY MS. SIMPSON:

14      Q.   And you see this tree right here?

15      A.   Uh-huh.

16      Q.   Is that blocking the vision of these two doors?

17      A.   At least the one on the left right now.

18      Q.   This is at 1:34, this video, just for the

19  record.

20           (A portion of Exhibit BBB was played on the

21  videoconference monitor.)

22           BY MS. SIMPSON:

23      Q.   Okay.  Here there's another apartment complex at

24  1:45.  What color are the doors?

25      A.   Tan.

1        Q.   And going back to the map, can we match up what

2    addresses each of these are?  Do you think that's

3    possible?

4        A.   Sure, but I guess I stated I wasn't 100 percent

5    sure on the map.

6        Q.   Right.  Do you see that?  It's the same map.

7             MS. PACKER:  He can see it.

8             BY MS. SIMPSON:

9        Q.   Okay.  So you all got out here, right?

10            MS. PACKER:  He said he wasn't sure.

11            THE WITNESS:  I believe that's where we deployed

12   from.

13            BY MS. SIMPSON:

14       Q.   That's 1618, 1620?

15       A.   I believe so, but, again, I'm not 100 percent

16   sure.  That's what you're pointing at, yes.

17       Q.   Yes.  And you ran past three sets of apartments,

18   correct?  We watched that.

19       A.   Yes.  From the video, I'm assuming that 1620 is

20   the one that has the tree on it.

21       Q.   Right.

22       A.   Okay.

23       Q.   And then you come around the -- coming around

24   the corner, I can't quite see what this is.  It could be

25   22 or 26.  I'll hold off on deciding, unless you have

 1   certainty.
 2        A.   I don't have certainty.
 3             (A portion of Exhibit BBB was played on the
 4   videoconference monitor.)
 5             BY MS. SIMPSON:
 6        Q.   And now an officer is at this door.
 7        A.   That's Dave Mead.
 8        Q.   This is at 1:48.  Dave Mead is at a door.  What
 9   color is the door?
10        A.   Tan, I believe.
11        Q.   So that one is 1628, the one that is written on
12   the warrant, right?
13        A.   That's the -- we can go back to the warrant.
14   Yeah, that's 16 --
15        Q.   The warrant --
16        A.   It's got the right address, 1628, yeah.
17        Q.   I'll continue the video.  So we're at 1:48 and
18   Mead is at the door of 1628.
19             (A portion of Exhibit BBB was played on the
20   videoconference monitor.)
21             BY MS. SIMPSON:
22        Q.   Are you inside at this point of the video, 1:50?
23        A.   Uh-huh.
24        Q.   What kind of entry was this?
25        A.   That was with -- I guess it's going to be a

1  rapid entry because right there we're compromised and now

2  evidence can be destroyed, so we're making rapid entry at

3  this point.

4         Q.   What does "compromise" mean?

5         A.   That they know we're there and they ran inside,

6  so if we're going after drugs and somebody sees us and

7  they run inside, chances are they're going to destroy

8  evidence, so that's why we're trying to get in there and

9  prevent that from happening.

10        Q.   And the door was unlocked at this time?

11        A.   Yes.  I think Dave Mead stopped it from shutting

12 all the way.

13             (A portion of Exhibit BBB was played on the

14 videoconference monitor.)

15             THE WITNESS:  All right.  That camera is going

16 to be Dave Garner's.  I recognize his voice.

17             (A portion of Exhibit BBB was played on the

18 videoconference monitor.)

19             BY MS. SIMPSON:

20        Q.   What's this right here?

21        A.   That's Dave Garner's weapon, pistol.

22        Q.   Is that the standard type of weapon that SEU

23 officers use?

24        A.   During the entry, some of us will use a rifle,

25 but because he was the breacher, he has his holster

 1    weapon, similar to the one I have on right now.

 2        Q.   Because he can't hold the breaching tool and a

 3    rifle?

 4        A.   It would be in the way, yeah.

 5        Q.   What is he doing with his weapon right here?

 6        A.   You'll have to ask him.

 7        Q.   You can't tell from looking at it?

 8        A.   If you want me to make an assumption, he's

 9    probably not sure if we cleared that area, so he continues

10    because this is the second time I've seen him go in that

11    same direction, so he's continued to look until he feels

12    comfortable that there's nobody there.

13             (A portion of Exhibit BBB was played on the

14    videoconference monitor.)

15             BY MS. SIMPSON:

16        Q.   Does the breacher drop the breaching tool

17    outdoors before entering?

18        A.   Yes, most -- 99 percent of the time.

19        Q.   And in this case, Garner did not need to use a

20    breaching tool, correct?

21        A.   He did not.

22             (A portion of Exhibit BBB was played on the

23    videoconference monitor.)

24             BY MS. SIMPSON:

25        Q.   Okay.  I'm going to switch it out to your

 1  camera, if I can find it.

 2          MS. PACKER:  Would this be an okay time to take

 3  a short break?

 4          MS. SIMPSON:  Sure.

 5          (WHEREUPON, a brief recess was taken.)

 6          BY MS. SIMPSON:

 7      Q.  Is this your view?

 8      A.  I'm not sure yet.

 9          (A portion of Exhibit PPP was played on the

10  videoconference monitor.)

11          BY MS. SIMPSON:

12      Q.  Is it Mead in front of you or in front of the

13  person?

14      A.  No, that's -- I don't think that's my camera.

15      Q.  Okay.  Is that Mead?

16      A.  I don't think that's Mead either.

17          (A portion of Exhibit PPP was played on the

18  videoconference monitor.)

19          BY MS. SIMPSON:

20      Q.  Do you know who that person is?

21      A.  That's Detective -- or former Detective

22  Abdullah.  So that's going to be Shawn Thompson's camera.

23  That's not my camera.  That's Shawn Thompson's.

24          MS. PACKER:  Did you identify this?  I'm sorry.

25          MS. SIMPSON:  That was camera 2 that we put at

1   PPP, Irving Camera 2.

2              MS. PACKER:  Okay.

3              MS. SIMPSON:  Not Ortiz's camera.

4              THE WITNESS:  Obviously, not my camera because I

5   can see myself in that video.

6              (A portion of a video was played on the

7   videoconference monitor.)

8              THE WITNESS:  Not my camera.  I believe that's

9   going to be Kyle Perrin's camera.

10             MS. SIMPSON:  Okay.  I can mark all these or I

11  can --

12             MS. PACKER:  Just continue until you find one

13  that's --

14             MS. SIMPSON:  Yeah.  You all have all these and

15  probably know who they are, but --

16             THE WITNESS:  Not my camera.  The best way I can

17  tell it's not my camera, my camera is on top of my helmet

18  and I can see hands in front, so I know it's not me.

19             BY MS. SIMPSON:

20       Q.   So it's a different view?

21       A.   Yeah.

22             (A portion of a video was played on the

23  videoconference monitor.)

24             THE WITNESS:  Not my camera.  This guy is way

25  back.

 1          MS. PACKER:  Do you want to go off the record
 2   and do this?
 3          MS. SIMPSON:  Sure.  Yeah.  Should we do that?
 4          MS. PACKER:  Sure.
 5          MS. SIMPSON:  I apologize.  Thank you so much.
 6          (WHEREUPON, a discussion was held off the
 7   record.)
 8          BY MS. SIMPSON:
 9      Q.  So I'm showing what I will mark as QQQ, the
10   Irving Camera 10.
11          (Plaintiffs' Exhibit QQQ was identified.)
12          BY MS. SIMPSON:
13      Q.  Is this your view?
14      A.  I believe so, yes, ma'am.
15          (A portion of Exhibit QQQ was played on the
16   videoconference monitor.)
17          BY MS. SIMPSON:
18      Q.  At 1:29 I'm stopping it.  The first officer has
19   gotten out of the vehicle?
20      A.  Yes.
21      Q.  Who's that first officer?
22      A.  Dave Mead.
23      Q.  And can you tell, from your familiarity with
24   this complex and looking at the map, what address you're
25   in front of?

 1      A.   By looking at the map, that's -- I can't even
 2   remember.  You might need to show me.  But is it 1620, I
 3   thought it was, 1618, 1620?
 4      Q.   And what color are the doors of this apartment?
 5      A.   They look red.
 6      Q.   And is there a tree in the yard?
 7      A.   Yes.
 8           (A portion of Exhibit QQQ was played on the
 9   videoconference monitor.)
10           BY MS. SIMPSON:
11      Q.   Okay.  I'm stopping at 1:45.  What do you see at
12   this moment?
13      A.   I see one subject still standing in front of the
14   door.  I saw two subjects running in, I believe, and,
15   obviously, in this video, I can tell it was one and one.
16      Q.   And were you aware of these individuals being
17   outside the apartment when you first got out of the van?
18      A.   I don't remember.
19           (A portion of Exhibit QQQ was played on the
20   videoconference monitor.)
21           BY MS. SIMPSON:
22      Q.   When you did the briefing for this search
23   warrant, was there any discussion of the existence of
24   women or children or teenagers?
25      A.   I don't remember.

 1        Q.   You don't remember whether there was any

 2   discussion or --

 3        A.   I don't remember if any of those details were

 4   discussed.  Again, some time has passed since, so I just

 5   don't remember that.

 6        Q.   But you did know you were looking for an adult

 7   man, right?

 8        A.   Yes.

 9             (A portion of Exhibit QQQ was played on the

10   videoconference monitor.)

11             BY MS. SIMPSON:

12        Q.   Remind me who had the shield.

13        A.   Kyle Perrin.

14             (A portion of Exhibit QQQ was played on the

15   videoconference monitor.)

16             BY MS. SIMPSON:

17        Q.   When you're saying, "He's in that room," what

18   are you referring to?

19        A.   So I saw three figures run into the structure

20   and that's what I mentioned earlier, that I thought all

21   three went into the apartment, so we counted one in the

22   front room, one that was on the ground in the kitchen, and

23   so I was assuming the other one had to make it upstairs,

24   so it's like he's get to it, get to it, not realizing at

25   that moment -- obviously, after watching the video, I can

1  tell that the other one went into the other apartment, but

2  at the moment I believed all three went in there.

3       Q.   Okay.  So you thought there was a third male --

4       A.   That ran.

5       Q.   -- that ran and had not been located yet?

6       A.   Correct.

7       Q.   And so you were looking for that male?

8       A.   Yes.

9            (A portion of Exhibit QQQ was played on the

10  videoconference monitor.)

11           THE WITNESS:  I was certain.

12           (A portion of Exhibit QQQ was played on the

13  videoconference monitor.)

14           BY MS. SIMPSON:

15      Q.   Is that a dog?

16      A.   Yeah, she's yelling at a dog.

17      Q.   Was that a dog that caused you any concern?

18      A.   No.  It was a total barker.

19           (A portion of Exhibit QQQ was played on the

20  videoconference monitor.)

21           BY MS. SIMPSON:

22      Q.   So what role are you playing right now?  I can

23  see the video panning between these two females.

24      A.   My role is the feel in the room.  I'm, honestly,

25  in my head, still thinking, "They're going to find these

1   guys that I just saw running upstairs," so I keep glancing
2   back out there, hoping that I was right, but I was,
3   obviously, wrong.
4           (A portion of Exhibit QQQ was played on the
5   videoconference monitor.)
6           BY MS. SIMPSON:
7       Q.   That was at 3:46 when you had that conversation.
8   Is there anybody in this bathroom right now?
9       A.   I can't tell right now.
10          (A portion of Exhibit QQQ was played on the
11  videoconference monitor.)
12          BY MS. SIMPSON:
13      Q.   Was that your voice saying, "The other one ran
14  to the other apartment"?
15      A.   Yeah, I guess, like that was the only assumption
16  I can come up to at that point.
17      Q.   Okay.  So here at 4:53, you're coming to the
18  realization the guy you're looking for must have run in
19  the other apartment?
20      A.   Yes.
21      Q.   Because he's not in this apartment?
22      A.   Uh-huh.
23          (A portion of Exhibit QQQ was played on the
24  videoconference monitor.)
25          BY MS. SIMPSON:

 1      Q.   Here at 5:48, what are you all talking about?

 2      A.   We all play the same video game on our phones,

 3  so we're just talking about the video games that we play

 4  because they -- I guess they'll play it, too, so she's the

 5  one that plays it, the one in the room that I'm in.

 6           (A portion of Exhibit QQQ was played on the

 7  videoconference monitor.)

 8           BY MS. SIMPSON:

 9      Q.   Here at 6:41, when someone says, "The detective

10  will come in and explain everything," do you know whose

11  voice that was?

12      A.   Yes.  Kyle Perrin.

13      Q.   And is the detective that he's referring to

14  Abdullah?

15      A.   Correct.

16      Q.   Is that normal for the detective to come in and

17  explain things to someone?

18      A.   Yeah, absolutely, because that's their case.

19  They're the ones that explain to them how they got there

20  or what are they looking for, who they're looking for.

21  It's like that -- our piece of securing the structure.

22  That's it.

23      Q.   In this particular search warrant, were you

24  looking for Marcus VanIrvin?

25      A.   I don't recall if he had him identified or not

1   at that point.  I don't remember that.

2          (A portion of Exhibit QQQ was played on the

3   videoconference monitor.)

4          BY MS. SIMPSON:

5      Q.  At this point in the video, did you have any

6   sense that the search had gone differently than was

7   planned?

8      A.  I don't think I knew at this point, no.  I'm not

9   sure if I knew if they had their person, the person that

10  we were looking for or not.  I'm not sure if I knew that

11  at this time.

12     Q.  When did you find out?

13         MS. PACKER:  Find out -- I'm sorry.  Object to

14  the form.

15         THE WITNESS:  I don't really recall exactly.  I

16  know at some point -- I want to say after the search, we

17  realized that the person we're looking for was not in

18  there.

19         BY MS. SIMPSON:

20     Q.  And who was the person you were looking for?

21     A.  I don't recall like his name.  Like, again, that

22  was two and a half years ago.

23     Q.  Was it Marcus VanIrvin?

24     A.  Is that the target?

25         MS. PACKER:  If you don't remember, then just

 1  say you don't remember.

 2          THE WITNESS:  I don't remember.

 3          BY MS. SIMPSON:

 4      Q.   I'm going back to the warrant for 1628 Burgundy

 5  Street.  So looking at the warrant, when it says, "Within

 6  the past 72 hours, a confidential informant was utilized

 7  to purchase an amount of heroin from a black male who goes

 8  by the name of Marcus and same is residing at 1628

 9  Burgundy Street, Apartment B.  According to the CI, Marcus

10  is selling heroin out of the apartment."

11          Does that indicate that the subject is someone

12  named Marcus, a black male?

13      A.   By reading that, I'm assuming that, yes.  I

14  mean, safe to say.

15      Q.   Did you ever come to understand that Abdullah

16  had made a mistake on this warrant and that that black

17  male named Marcus lived at 1620 Burgundy Street, Apartment

18  B?

19      A.   To this day, my understanding is that the sale

20  took place in the other apartment.  I have no other way of

21  knowing what you just said is correct or not.  I mean,

22  there's no possible way for me to know that.

23      Q.   So you don't have any possible way of knowing,

24  but if I -- if I told you that, would you have a reaction

25  to it?

  1        A.    Well --
  2               MR. PETTEY:  Objection.
  3               MS. PACKER:  Object to the form.
  4               MS. DIXON:  Objection.
  5               THE WITNESS:  I'm sure he'll tell me the same
  6     thing, so it's like you got two people telling me this,
  7     but I mean, I see right now he swore to this address and
  8     this -- and that's what the warrant says and there's no
  9     mistakes in regards to the warrant or the building that he
 10     showed us or he showed Dave Mead, so to me, that's --
 11     that's the correct address.
 12               BY MS. SIMPSON:
 13        Q.    And the description here, where it says that it
 14     has a red front door --
 15        A.    I didn't read that.
 16        Q.    Would a scout read that?
 17        A.    Him or the supervisor, yeah.
 18        Q.    To match that up?  And 1620, the address that
 19     Irvin lived in that you ran past, it had a red door,
 20     right?
 21               MR. PETTEY:  Objection.
 22               MS. PACKER:  Objection.
 23               MS. DIXON:  Objection.
 24               THE WITNESS:  Do I still answer?
 25               MS. PACKER:  Go ahead.

 1            THE WITNESS:  Yes.

 2            BY MS. SIMPSON:

 3       Q.   1620 Burgundy Street, Apartment B, had a red

 4   door?

 5       A.   Which I believe, based on the map that you

 6   showed me, this is kind of where we deployed.  I believe,

 7   yes, it does have a red door.  It does, the right

 8   building.

 9       Q.   This is a previous -- no, it hasn't.  This is a

10   new video, so this will be RRR.

11       A.   Can we take a quick bathroom break?  I drank too

12   much water.

13       Q.   Of course.

14            (WHEREUPON, a brief recess was taken.)

15            BY MS. SIMPSON:

16       Q.   So I'll mark this as RRR.  This is a body camera

17   that was marked as Ortiz in relationship to a case labeled

18   Banks.

19            (Plaintiffs' Exhibit RRR was identified.)

20            (A portion of Exhibit RRR was played on the

21   videoconference monitor.)

22            BY MS. SIMPSON:

23       Q.   Does this look familiar to you?

24       A.   Is there going to be painters in the hallway?

25   Then no, not yet.

1            (A portion of Exhibit RRR was played on the

2    videoconference monitor.)

3            BY MS. SIMPSON:

4        Q.    Do you believe this is your body camera footage?

5        A.    That is my body camera footage.  I'm just trying

6    to remember.

7            (A portion of Exhibit RRR was played on the

8    videoconference monitor.)

9            BY MS. SIMPSON:

10       Q.    So what was the officer doing here at 1:35?

11       A.    It looks like he's either checking the door or

12   locking it.

13           (A portion of Exhibit RRR was played on the

14   videoconference monitor.)

15           BY MS. SIMPSON:

16       Q.    Is it more clear now at 1:38?

17       A.    Yeah.  He was unlocking the door.

18       Q.    With a key?

19       A.    Uh-huh.

20       Q.    Was that prior to any announcement?

21       A.    Yes.

22           (A portion of Exhibit RRR was played on the

23   videoconference monitor.)

24           BY MS. SIMPSON:

25       Q.    What weapon are you carrying in this?

1         A.    My issue patrol rifle.

2         Q.    What type of rifle is?

3         A.    It's a AR-15 M4.

4         Q.    Is that what you typically carry on search

5    warrant executions?

6         A.    Uh-huh.

7               (A portion of Exhibit RRR was played on the

8    videoconference monitor.)

9               BY MS. SIMPSON:

10        Q.    Does everyone carry that except for the

11   breacher?

12        A.    And the shield guy.

13        Q.    And those two people, the breacher and the

14   shield guy, just have their holster pistol?

15        A.    Yes.

16        Q.    And what do you refer to that gun as?

17        A.    That's a Smith & Wesson semi-automatic handgun.

18              (A portion of Exhibit RRR was played on the

19   videoconference monitor.)

20              BY MS. SIMPSON:

21        Q.    Do you remember this execution now that you've

22   seen most of this video?

23        A.    No, I don't.  I don't remember it.

24              (A portion of Exhibit RRR was played on the

25   videoconference monitor.)

1          BY MS. SIMPSON:

2     Q.   So were there no people inside this apartment?

3     A.   It didn't appear and, obviously, since I don't

4    remember, I don't recall the circumstances of why Dave

5    Mead already had the key and everything and the apartment

6    being empty, so --

7     Q.   But from what you saw, there's no people being

8    secured?

9     A.   It didn't look like it.

10          (A portion of Exhibit RRR was played on the

11    videoconference monitor.)

12          BY MS. SIMPSON:

13     Q.   So what are you looking for here?

14     A.   Well, I'm not looking for anything, so they're

15    opening drawers, so a lot of times you've got this little

16    furniture that when you open it, it's like you think it's

17    a drawer or stuff like that and there's some things in

18    there, and then -- now, obviously, they're getting Curious

19    George, what they can see in there because I feel like

20    they should already be able to determine that there's not

21    a person in there.

22          (A portion of Exhibit RRR was played on the

23    videoconference monitor.)

24          THE WITNESS:  And I guess being so slim, bare,

25    of no furniture, it's just -- you can only look right

1    there.

2                BY MS. SIMPSON:

3         Q.   I'm going to mark -- I think I'm on SSS.  This

4    is the Ortiz body camera of you for a case marked Smith.

5                (Plaintiffs' Exhibit SSS was identified.)

6                (A portion of Exhibit SSS was played on the

7    videoconference monitor.)

8                BY MS. SIMPSON:

9         Q.   Do you remember this incident when I start

10   playing it?

11        A.   Not yet.  Please continue.

12               (A portion of Exhibit RRR was played on the

13   videoconference monitor.)

14               BY MS. SIMPSON:

15        Q.   Do you believe this is your body camera?

16        A.   Yes.

17        Q.   And who was the officer who just did that

18   extraction?

19        A.   Twiddy.

20        Q.   Is that a normal way of taking someone out of a

21   vehicle?

22        A.   Yes.

23        Q.   Why is that?

24        A.   Again, the inside of the vehicle is all

25   unfamiliar to us and based on our experience, a lot of

1   times when drug deals happen, there's a lot of weapons

2   involved, which it was in a lot of these cases that we

3   did.

4          So we put them in a position of disadvantage

5   without letting them get their feet off the floorboard,

6   just immediately getting down in a position of

7   disadvantage.  They can't harm us that way and that way,

8   we can pat them down and make sure they don't have weapons

9   at that point, so yeah, that's normally how we do.

10         Q.   Do you remember this incident, the first one

11  right now?

12         A.   I remember a little bit of it.

13         Q.   Do you remember if it involved a confidential

14  informant?

15         A.   It did.  I do remember that.

16         Q.   Okay.  Do you remember who it was?

17         A.   I want to say it's the one we keep referring to

18  as Aspirin.

19         Q.   Do you know why his name was Aspirin?

20         A.   I do not.

21         Q.   And what do you remember about this incident?

22         A.   The main thing I remember about that incident

23  was that guy on the ground, after the fact, saying, "They

24  told me not to deal with you," in other words, as, "I knew

25  not to deal with you, but I still did," something to that

 1 effect.  I can't remember verbatim, obviously, because I

 2 think there was a little different language used, but

 3 something to that effect, "They told me not to mess with

 4 you, but I still did."  That's what I remember about that

 5 one.  I remember this guy.  After the fact, we knew he had

 6 a cast.

 7      Q.   And when you say "not to deal with you," was

 8 that referring to Aspirin?

 9      A.   Yes, I think it is referring to -- he said

10 "you," or I think he said, "told me not to mess with this

11 MF."

12      Q.   Indicating that he realized he had been set up

13 by a CI?

14      A.   I believe so.  That's my assumption from him,

15 yeah.

16      Q.   And he was not happy about it?

17      A.   Yes.

18           (A portion of Exhibit RRR was played on the

19 videoconference monitor.)

20           BY MS. SIMPSON:

21      Q.   Okay.  This one is TTT.  It's a body camera

22 marked "Ortiz" in a case called Washington.

23           (Plaintiffs' Exhibit TTT was identified.)

24           (A portion of Exhibit TTT was played on the

25 videoconference monitor.)

1         BY MS. SIMPSON:

2    Q.   I don't think it's this one.

3         (A portion of Exhibit TTT was played on the

4    videoconference monitor.)

5         BY MS. SIMPSON:

6    Q.   Do you recognize this as your body camera

7    footage?

8    A.   Yes, that's my body cam footage.

9    Q.   And do you remember this Washington case?

10   A.   I remember being there.  I don't remember all

11   the circumstances behind it, but yes.

12   Q.   Do you recognize this apartment complex?

13   A.   Yes.

14   Q.   Which one is it?

15   A.   I recognize that I've been there.  I don't

16   recognize it by -- that I'll be able to tell you which

17   apartment complex in Raleigh that is.

18   Q.   Who is the officer that is in front of you?

19   A.   Dave Mead.

20        (A portion of Exhibit TTT was played on the

21   videoconference monitor.)

22        BY MS. SIMPSON:

23   Q.   So this is 1:35.  We're hearing an announcement,

24   right?

25   A.   Uh-huh.

1          Q.   And that's 1:37 the door is breached, correct?

2          A.   Uh-huh.

3          Q.   Is that a typical amount of time between an

4    announcement and a breach?

5          A.   That's not the typical.  Again, I'll have to go

6    back to that briefing or file and figure out the

7    circumstances around the whole case.  Other than that, I

8    can't tell you right now why.

9          Q.   I'm close to done, so that's why I'm just

10   pausing to look at my notes.

11         A.   It's okay.

12         Q.   What do you know about the status of Abdullah as

13   an officer now?

14         A.   I believe he was fired or -- he either got fired

15   or he quit, one of those two.  I just know he's no longer

16   an officer here.  That's all I know.

17         Q.   Do you know why?

18         A.   Something to do with these -- the cases with

19   Aspirin.

20         Q.   What to do with the cases with Aspirin?

21         A.   I don't know the details of the IA

22   investigation.

23         Q.   When you say "IA," what does that stand for?

24         A.   Internal Affairs, I guess.  I'm assuming that's

25   who investigated him.  And that, again, that's my

1 assumption because I don't know anything about that

2 investigation.

3     Q.   Do you know that he was indicted criminally?

4     A.   No, I don't know, or maybe I can't remember.

5 I'm sorry. I didn't -- I didn't remember right away.

6     Q.   What do you do if a residence is heavily

7 fortified?

8     A.   What do you mean by "heavily fortified"?

9     Q.   Like beyond what the breacher can knock down.

10     A.   And how do I know this?

11     Q.   You're there and --

12     A.   And it's not happening?

13     Q.   Yes.

14     A.   We look for an alternate breach point. We'll

15 try another door or a window.

16     Q.   Does that happen often?

17     A.   Not often, but it does happen.

18     Q.   How often does it happen that occupants do go

19 for weapons when a search warrant is executed?

20     A.   That happens quite a bit, too, so we have

21 multiple incidents where somebody pulls out a gun and when

22 you talk to some of those people, someone happened to be

23 home invaded before, so they already -- those are people

24 who already have a plan in place when it happens again,

25 and this happened to be us.

 1      Q.   What do you do in those circumstances?

 2      A.   We try to give commands.  It just happened to me

 3   last week, and we just gave commands and the subject

 4   dropped the weapon and then followed commands and he came

 5   up to us.  Lucky he didn't raise it all the way.  So we

 6   gave commands, he complied and he was taken into custody.

 7   We haven't been in a shootout because of it yet, but it

 8   does happen quite a bit.

 9      Q.   Shootouts don't happen quite a bit?

10      A.   No, no, no.  Encountering somebody with a

11   weapon, yes.

12      Q.   And how do they react when you tell them to put

13   it down?  What do they say?  What do they do?

14      A.   Oh, they comply.  I mean if you're asking me to

15   go back to each incident --

16      Q.   The incident that happened last week.  What

17   happened last week?

18      A.   He immediately jumped out and then came back,

19   "No, my hands are empty," because he heard me yelling like

20   he has a weapon, and he comes out saying, "I got empty

21   hands, I got empty hands."  So we're like, "All right,

22   come to me," and he followed.  Every single command, he

23   followed, and we took him into custody.

24      Q.   He wanted to comply?

25      A.   Yes.  He wasn't going to fight us.

1      Q.   So he had a weapon because he was in fear of a

2  home invasion?

3           MR. PETTEY:  Objection.

4           MS. DIXON:  Objection.

5           THE WITNESS:  That's speculation, but I don't

6  know.

7           BY MS. SIMPSON:

8      Q.   That's the assumption you have?

9           MS. DIXON:  Objection.

10          THE WITNESS:  I don't have an assumption to that

11 specific person.  It's like -- I mentioned another person

12 before.  That's what they said.  This gentleman, could be

13 any number of reasons why he was ready.

14          BY MS. SIMPSON:

15     Q.   And did you see the weapon?

16     A.   Oh, yeah.

17     Q.   What number were you in the line?

18     A.   At this point, I was on the hinge side of the

19 door.  As that door came open, right in front of him, as

20 he was raising that weapon.  Then we did commands and he

21 complied.

22     Q.   So how far away was he?

23     A.   Oh, he was -- the door hit him.  He was right in

24 there, right in the doorway.

25     Q.   Was that a drug search warrant?

 1      A.    Yes.

 2      Q.    And going into that, did you have specific

 3  information letting you know that there might be a danger

 4  of someone who was armed?

 5      A.    Yes.   There was neighbor -- neighbor information

 6  saying that they've seen him showing weapons to friends or

 7  something like that.

 8      Q.    What type of entry did you make into that home?

 9      A.    We were going to use the NFDD because, again,

10  it's like just the mere mention of weapons, itself, is

11  like -- I assume that most people own weapons at home for

12  home protection, so just the mere mention of weapons

13  doesn't change much of the tactic, other than maybe use an

14  NFDD.  But because of how the incident unfolded, we stayed

15  at the door.  We just called him to us and then we -- and

16  clear, empty structure.

17      Q.    Can you say what NFDD stands for, for the

18  reporter?

19      A.    Noise Flash Distraction Device.

20      Q.    So NFDD?

21      A.    Yes.

22      Q.    Okay.   Is that what people call commonly a flash

23  bang?

24      A.    Commonly, yes.

25      Q.    Have you been on a team that's had to shoot

 1   someone?

 2        A.   Our team hasn't -- well, we have a team member

 3   that has shot at somebody.

 4        Q.   Have you been present for that?

 5        A.   I was in the vicinity, but not involved.

 6        Q.   And was that in a search warrant or that was a

 7   different kind of scenario?

 8        A.   That was an active shooter.

 9        Q.   So, fortunately, in executing search warrants,

10   you haven't had that scenario?

11        A.   No.

12        Q.   Is that one of the reasons that you bring EMS to

13   the scenes of search warrant executions, because of the

14   possibility of having to use force?

15        A.   Not just that.  There's a number of reasons.

16   Injuries happen either to ourselves -- myself, I required

17   medical attention from the medic before and there was no

18   scuffle.  I just bumped into a window, shattered glass,

19   and sliced my elbow, so just things of that nature.  We

20   have a medic on standby.

21        Q.   Prior to executing the search warrant on 1628

22   Burgundy, had the sergeant authorized a forcible entry if

23   it had been necessary?

24        A.   I believe so, yes, ma'am.

25        Q.   Was that recorded somewhere in writing?

1          A.    No, not in writing, no.

2          Q.    So that was an oral authorization?

3          A.    That is oral authorization and then after --

4    let's say we were to use forced entry, a forced entry

5    report is done and then we'll state that Sergeant McDonald

6    authorized or so and so, and then he'll review that,

7    himself, and then it gets sent up to the chain of command.

8          Q.    What's the purpose of a forced entry report?

9          A.    Just to document the incident of how force was

10   used and then it gets reviewed through the chain of

11   command and I guess that is the purpose of it, just

12   documentation.

13         Q.    And when that oral authorization is given, is it

14   discussed how long to wait before forcing entry?

15         A.    If it's going to be different than the police

16   search warrant, police search warrant, police search

17   warrant, that is normally our queue, that if we have had

18   no response, we are going to breach.  So if it's going to

19   happen different than that, more than likely some

20   discussion will happen and why.

21              If -- again, going back to last week, if we had

22   information that this guy is a runner or that he sits by

23   the toilet with his drugs -- as crazy as that sounds, we

24   have incidents like that.  We might just skip it and we

25   know that he's going to destroy.  We know he's set up to

1   destroy.  We're just going to go ahead and do rapid entry

2   or shorten up that time span.

3           If we don't like the structure, how the

4   structure looks -- and what I mean, like if there's too

5   many windows on that doorway and the doorway recedes in

6   and we're somewhat trapped in, and the structure is vinyl

7   siding instead of brick, then we don't want to be there

8   longer than -- longer than we need to, so we're going to

9   expediate some things.

10          So a lot of times, that stuff gets discussed

11  ahead of time and we bring up our concerns based on the

12  structure, what we see, and the supervisor will make a

13  determination that's what we're going to do or not.

14      Q.   What's the concern with vinyl siding?

15      A.   That if we were to take fire, it's just paper

16  mache, basically.  It's going to go right through us, so

17  we -- the only thing we have is concealment, no cover, and

18  so we're very vulnerable in front of that.

19      Q.   In terms of priority, destruction of evidence is

20  one thing to think about, right, in terms of goals when

21  you're executing a search warrant?  You want to protect

22  against destruction of evidence?

23      A.   Yes.

24      Q.   And you also want to protect against loss of

25  life, correct?

1      A.   Correct.

2      Q.   How do you weigh those together when you're

3 making an approach like this?

4      A.   Well, if we do have a history of violence and we

5 know that the only thing that we're after is drugs or

6 something of that nature and the violence is heavy, like a

7 prior murder charge or -- which, believe it or not, we

8 encounter those a lot -- armed robberies, things of that

9 nature, we might set up differently as we camp out, wait

10 for the person to leave, then stop them so that we

11 prioritize -- priority of life there so for the safety of

12 all involved, based to how he has a history of violent

13 behavior, we try to separate the two, and that will help

14 out sometimes.

15           Sometimes we can't do that.  It depends on,

16 again, case by case.  But if we can, that's what we

17 probably try to do.

18      Q.   And when you're ranking these things, do you

19 rank protection of officer life and civilian life the

20 same?

21      A.   I think they all go hand in hand because if one

22 gets injured, it's going to end up being mutual at that

23 point, so I think they go hand in hand, so they're one, to

24 me, when I rank them.

25      Q.   So when you say that, if one is injured, the

 1   other one is going to be injured?  Is that what you're

 2   saying?

 3        A.   There's the potential of that because if

 4   somebody shoots at us, more than likely we're probably

 5   going to try to shoot back if we -- to defend ourselves at

 6   that point, so yeah, so I think it's one.  To protect one,

 7   you protect both.

 8        Q.   That's all the questions I have.

 9             MS. PACKER:  Anyone else?

10             MR. PETTEY:  I don't have any questions.

11             MS. DIXON:  I have just one or two.

12                        EXAMINATION

13             BY MS. DIXON:

14        Q.   My name is Jessica Dixon.  I represent Detective

15   Abdullah.

16             When you were discussing the execution of the

17   warrant last week, when you encountered a subject that had

18   a gun, did you and your team announce yourselves as police

19   prior to entering the residence?

20        A.   We did, and we got alerted -- you could hear as

21   soon as we took the first step on the wood step, the dog

22   inside started barking, so he had the pre-alert there, so

23   then we knocked and announced three times, "Police search

24   warrant."

25             We also decided to deploy an exterior flash bang

1   instead of an interior because we couldn't tell which side

2   of the trailer was his room going to be, so we just did

3   external flash bangs in addition to it and then the door

4   came open.

5           So all those -- all that was in place before we

6   made entry and he still came up with a weapon.

7       Q.    And you said this was a trailer?

8       A.    Uh-huh.

9       Q.    So in addition to announcing, "Police search

10  warrant" three times, you also deployed --

11      A.    NFDD.

12      Q.    -- NFDs outside of the exterior, correct?

13      A.    Correct.

14      Q.    And once you made entry, the occupant still

15  presented with a weapon; is that correct?

16      A.    Correct.

17      Q.    And when you were asked earlier if the occupant

18  believed he was being the victim of a home invasion, do

19  you agree that would not be a reasonable assumption, given

20  that you audibly announced your presence three times and

21  deployed an NFDD?

22      A.    Again, that assumption is just a word, like I

23  can't prove what this man is thinking. I mean that's

24  just -- I don't know what he's thinking. I just know that

25  we did announce three times, "Police search warrant." We

1  deployed an NFDD and we breached the door, and when the
2  door was breached, he presented himself with a weapon.
3          And then I'm not sure, again, if it was him
4  seeing us at that point, that made him give up.  I
5  can't -- I can't know what this man is thinking.
6          MS. DIXON:  Those are my questions.  Thank you.
7          THE WITNESS:  Yes, ma'am.
8          MS. PACKER:  I think we're done.
9          COURT REPORTER:  Read and sign as well?
10          MS. PACKER:  Yes.
11          (Whereupon, at 5:04 p.m. on November 1, 2022,
12  the deposition was concluded.  Signature was reserved.)
13
14                          * * * * *
15
16
17
18
19
20
21
22
23
24
25

<u>WITNESS CERTIFICATE</u>

          I have read the foregoing pages, 1 through 93
inclusive, and find that they contain a correct
transcription of the answers made by me to the questions
therein recorded, with the exception of _____ corrections
as listed on a separate sheet of paper and incorporated
into this record.

          Signed this _____ day of _____
2022.

                              _____
                              JESUS M. ORTIZ




Sworn and subscribed before
me this the _____ day of
_____ 2022.


_____
Notary Public

My Commission Expires:  _____.

**REED & ASSOCIATES**
MATTHEWS, NORTH CAROLINA  980.339.3575

**ERRATA SHEET**

Please indicate any corrections to your deposition on this sheet of paper, giving the page number, line number, change and reason for the change, and return this form and the signature page to: **Reed & Associates, 2401 Whirlaway Ct., Matthews, NC 28105, or to VReed@carolina.rr.com.**

The reasons for making changes:

        (1) To clarify the record;
        (2) To conform to the facts; or
        (3) To correct major transcription errors.

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**REED & ASSOCIATES**
MATTHEWS, NORTH CAROLINA   980.339.3575

STATE OF NORTH CAROLINA                        <u>CERTIFICATE</u>

COUNTY OF FRANKLIN


      I, DEBORAH A. HYDE, Certified Court Reporter and Notary Public in and for the County of Franklin, State of North Carolina, do hereby certify:

      That JESUS M. ORTIZ appeared before me at the time and place herein aforementioned, was duly sworn in the manner provided by law by me prior to the taking of the foregoing deposition, and that said deposition was taken by me and transcribed under my supervision and direction, and that the foregoing pages constitute a true and correct transcription of the proceedings.

      I do further certify that reviewing and signing of the transcript by the witness was reserved.

      I do further certify that the persons were present as stated in the appearance page.

      I do further certify that I am not of counsel for or in the employment of either of the parties in this action, nor am I interested in the results of said action.

      This the 16th day of November, 2022.


_____

DEBORAH A. HYDE, Certified Court Reporter

Notary Public Number 20021400234


**REED & ASSOCIATES**

MATTHEWS, NORTH CAROLINA  980.339.3575