IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CIVIL ACTION NO.: 5:22-cv-00068-BO

YOLANDA IRVING, individually and as the )
natural parent and guardian of J.I. JUWAN )
HARRINGTON, CYDNEEA HARRINGTON, KENYA )
WALTON, individually and as the natural )
parent and guardian of R.W. ZIYEL WHITLEY, )
DYAMOND WHITLEY, KAMISHA WHITLEY, NANETTA )
GRANT as the natural parent and guardian )
of Z.G. and EMANCIPATE NC, INC. )
                                           )
                    Plaintiffs,            )
                                           )
        vs.                                )
                                           )
THE CITY OF RALEIGH, Officer OMAR I.       )
ABDULLAH, Sergeant WILLIAM ROLFE, Officer  )
RISHAR PIERRE MONROE, Officer JULIEN DAVID )
RATTELADE, and Officer MEGHAN CAROLINE GAY, )
Officer DAVID MEAD, Officer JESUS ORTIZ,   )
Officer KYLE PERRIN, Officer MICHAEL       )
MOLLERE, Officer KYLE THOMPSON, Officer    )
VINCENT DEBONIS, Officer DANIEL TWIDDY,    )
Officer THOMAS WEBB, Officer DAVID         )
McDONALD, Officer DAVID GARNER, Chief of   )
Police ESTELLA PATTERSON and City Manager  )
MARCHELL ADAMS-DAVID, in their official    )
capacities,                                )
                                           )
                    Defendants.            )
_____)


D E P O S I T I O N

OF

**OFFICER DAVID MEAD**


At Raleigh, North Carolina
Tuesday, November 1, 2022

REPORTER:  DEBORAH A. HYDE


**REED & ASSOCIATES**
MATTHEWS, NORTH CAROLINA  980.339.3575

A P P E A R I N G


On behalf of the Plaintiffs:

    ELIZABETH SIMPSON, ESQUIRE
    Associate Director
    EMANCIPATE NC
    Post Office Box 309
    Durham, North Carolina  27702
    703-587-8563
    elizabeth@emancipatenc.org

    EMILY D. GLADDEN, ESQUIRE
    Tin Fulton Walker & Owen, PLLC
    204 North Person Street
    Raleigh, North Carolina  27601
    919-720-4201
    Egladden@tinfulton.com


On Behalf of Defendants City of Raleigh, Estella
   Patterson, and Marchell Adams-David:

    DOROTHY V. KIBLER, ESQUIRE
    City of Raleigh Attorney's Office
    Post Office Box 590
    Raleigh, North Carolina  27602
    919-996-6560
    dorothy.kibler@raleighnc.gov


On Behalf of Defendants Officers David Mead, Jesus
   Ortiz, Kyle Perrin, Michael Mollere, Kyle Thompson,
   Vincent Debonis, Daniel Twiddy, Thomas Webb, David
   McDonald, and David Garner:

    LESLIE C. PACKER, ESQUIRE
    Ellis & Winters LLP
    4131 Parklake Avenue, Suite 400
    Raleigh, North Carolina  27612
    919-865-7000
    leslie.packer@elliswinters.com


(Continued)


**REED & ASSOCIATES**
MATTHEWS, NORTH CAROLINA  980.339.3375

A P P E A R I N G

On Behalf of Defendant Officer Omar I. Abdullah:

    JESSICA DIXON, ESQUIRE
    Parker Poe Adams & Bernstein, LLP
    620 South Tryon Street, Suite 800
    Charlotte, North Carolina  28202
    704-372-9000
    jessicadixon@parkerpoe.com


On Behalf of Defendant Officers Rishar Pierre Monroe,
    Julien David Rattelade, and Meghan Caroline Gay:

    RODNEY E. PETTEY, ESQUIRE
    Yates, McLamb & Weyher, LLP
    Two Hannover Square
    434 Fayetteville Street, Suite 2200
    Raleigh, North Carolina  27601
    919-835-0900
    rpettey@ymwlaw.com


On Behalf of Defendant Officer William Rolfe:

    NORWOOD P. BLANCHARD, III
    Crossley McIntosh Collier Hanley & Edes, PLLC
    5002 Randall Parkway
    Wilmington, North Carolina  28403
    910-762-9711
    norwood@cmclawfirm.com


                    *  *  *  *  *

# C O N T E N T S

PAGE

Examination by Ms. Simpson  . . . . . . . . . . . . . 5

Examination by Ms. Packer . . . . . . . . . . . . . . 99


PLAINTIFF'S EXHIBITS:

Exhibit BBB    Marcus VanIrvin Body Camera 3 . . . . . . 71

Exhibit HHH    Mead Body Camera In Re:  Banks  . . . . . 82

Exhibit III    Mead Body Camera In Re:  Mitchell . . . . 83

Exhibit JJJ    Mead Body Camera In Re:  Smith  . . . . . 85

Exhibit LLL    Mead Body Camera In Re:  Washington . . . 86

Exhibit MMM    Body Camera In Re:  Knight  . . . . . . . 88

Exhibit NNN    Mead Body Camera In Re:  VanIrvin . . . . 91

Exhibit ZZ     Warrant for 1628 Burgundy Street
               Apartment B . . . . . . . . . . . . . . . 68

(All paper exhibits are provided with transcript.  It was
agreed by all parties that video exhibits will not be
attached.)




* * * * *

1          This is the deposition of OFFICER DAVID MEAD,

2     taken in accordance with the Federal Rules of Civil

3     Procedure in connection with the above case.

4          Pursuant to Notice, this deposition is being

5     taken in the offices of Ellis & Winters LLP, 4131 Parklake

6     Avenue, Suite 400, Raleigh, North Carolina, beginning at

7     10:07 a.m. on Tuesday, November 1, 2022, before Deborah A.

8     Hyde, Certified Verbatim Reporter and Notary Public.

9                              *   *   *

10    Whereupon,

11                        **OFFICER DAVID MEAD**

12    was called as a witness and, having first been duly sworn,

13    was examined and testified as follows:

14                           EXAMINATION

15         BY MS. SIMPSON:

16         Q.   Good morning.

17         A.   Good morning.

18         Q.   Hi.  So my name is Elizabeth Simpson.  I'm an

19    attorney and I work at Emancipate NC, and we, along with

20    some other attorneys, represent all the plaintiffs in this

21    case.

22         A.   All right.

23         Q.   So you're testifying under oath today and under

24    penalty of perjury, just as if you were in court.  Do you

25    understand that?

1      A.    Yes, ma'am.

2      Q.    And have you ever been deposed before?

3      A.    No, ma'am.

4      Q.    Have you ever been party to a lawsuit?

5      A.    No, ma'am.

6      Q.    So all these questions are being transcribed

7 here by the court reporter, so it's important that you

8 speak in a clear voice and give oral answers to the

9 questions.  Do you understand that?

10      A.    I do.

11      Q.    And your attorney may object to certain

12 questions and you should know that you're required to

13 answer what I ask you unless she directs you not to

14 answer.  Does that make sense?

15      A.    It does.

16      Q.    Okay.  Did you consult with a criminal attorney

17 before your testimony today?

18      A.    No.

19      Q.    And do you ever intend to invoke your Fifth

20 Amendment right today?

21      A.    No.

22      Q.    So I'm going to ask you questions about the SEU

23 team and Raleigh police policy as operated in 2019 and

24 through today, so anything that's changed in terms of

25 Raleigh's policy and procedure between 2019 and today, you

1    can indicate that in your testimony.

2         A.   Okay.

3         Q.   What is the mission of the SEU team?

4         A.   SEU stands for the Selective Enforcement Unit.

5    We are part of the Special Operations Division and we are

6    tasked with many different responsibilities throughout the

7    police department.  We assist every division within the

8    police department from the Investigative Division to the

9    Training Division and then we are in charge or are

10   responsible for every special event that also occurs in

11   the City of Raleigh.

12        Q.   Okay.  What's the Investigative Division?

13        A.   The Detective Division.

14        Q.   And the Training Division?

15        A.   The Training Division would be part of our

16   Administrative Division, and training is under that.  And

17   we assist with training at the academy, and we do our own

18   training, as well, weekly.

19        Q.   And when you say "special events," what do you

20   mean by that?

21        A.   Every parade that happens in the City of

22   Raleigh, every big, large event, such as First Night, New

23   Year's Eve celebration, 4th of Julys, any sort of protest

24   or anything that comes up, the Christmas parades,

25   basically every big special event that causes the city to

1   shut down.

2       Q.   So would you say there's a typical day in your

3   job?

4       A.   I don't think anything is really typical, a

5   typical day for us, because we are just tasked with so

6   much and sometimes things come up last minute.  We have to

7   change our schedules quite often to be able to staff

8   certain events and other -- and other responsibilities

9   throughout the department.

10      Q.   Is your team a discrete number of people that

11  always work together?

12      A.   So the unit is comprised of two teams and then

13  my team, there are 10 guys assigned to our team --

14      Q.   Okay.

15      A.   -- that we predominantly work together.

16      Q.   Is each team 10 people?

17      A.   They're slotted to be, but we don't -- have

18  vacancies currently.

19      Q.   Is there a particular officer in charge of the

20  team?

21      A.   There's a sergeant for each team.

22      Q.   So it's the Team 1 sergeant and then 9 officers?

23      A.   Yes.

24      Q.   And who is above the sergeant in the chain of

25  command?

1       A.   We have a lieutenant in our division, we have an

2  opening for a captain in our division and an opening for a

3  major, which is the division commander.

4       Q.   And if those are vacant, as you indicated, who

5  fills the role of those positions?

6       A.   I'm not sure right now.  It just stops kind of

7  at the highest level.

8       Q.   And the highest level is the sergeant?

9       A.   Today would be a lieutenant.

10      Q.   Who is that lieutenant?

11      A.   Lieutenant VanAntwerp is my personal lieutenant.

12      Q.   Who is your sergeant?

13      A.   My sergeant is Sergeant McDonald.

14      Q.   Was that the case in 2020, at the time of the --

15      A.   Sergeant McDonald has been my supervisor since

16  2016, I want to say, or '17.

17      Q.   What about Lieutenant VanAntwerp?

18      A.   He has been in his capacity now for maybe half

19  the year.  I'm not sure on his exact time back over in the

20  division.

21      Q.   Do you recall who was lieutenant in May 2020?

22      A.   It would have been Lieutenant Roland.

23      Q.   And where is Roland now?

24      A.   He is a captain overseeing -- he's a watch

25  commander overseeing field operations.

1    Q.   Is your team part of field operations?

2    A.   No, we are part of the Special Operations

3  Division.

4    Q.   How often does your team of 10 meet together?

5    A.   We work on day shift.  We're day shift this

6  week, so we work Tuesday through Friday, and then we're on

7  night shift the following week.  We'll work Wednesday

8  through Saturday, and guys have days off.  Again, there's

9  different responsibilities that we have to change our

10  hours for, so not all 10 people are at work on all those

11  days.

12    Q.   Do you start your shift with any particular

13  meeting or procedure?

14    A.   We meet at our office, at the Special Operations

15  Division.

16    Q.   Where is that?

17    A.   That's at 1221 Front Street in Raleigh.

18    Q.   And what happens first?

19    A.   We get a brief for the day, what's going on.

20  Again, we're responsible for our training and assisting

21  all these other divisions, so we'll field phone calls from

22  different divisions to see what kind of assistance they

23  need from our unit that day, or if we -- if the Special

24  Operations Division needs our assistance, too.

25    Q.   Does every officer field phone calls?

1      A.    Not every officer.   Sometimes supervisors

2   communicate between supervisors.

3      Q.    Who indicates to you what your plan will be for

4   the day?

5      A.    Typically, the supervisor.

6      Q.    Is that the sergeant?

7      A.    Yes, ma'am, the sergeant.

8      Q.    So did you begin with RPD in June 2005?

9      A.    I did.

10     Q.    How long have you been part of the SEU team?

11     A.    Since February 11th of 20 -- or, I'm sorry,

12  February 12th of 2011.

13     Q.    How were you selected for the team?

14     A.    There's a series of evaluations that are done

15  and then as you pass those certain evaluations, then at

16  some point you're selected by the chain of command.

17     Q.    What do those evaluations entail?

18     A.    There is physical abilities tests that you have

19  to demonstrate your capability to be physically fit,

20  manage heavy gear and other equipment.   Then there are

21  shooting capabilities.   Basically, it's just passing a

22  qualification course, our standard qualification course,

23  but with a higher score than what's typically recommended,

24  and some different stress tests and things like that.   If

25  you pass all those, you go to an oral board, they call it,

1  with the command staff, where they ask you questions

2  related to policy and tactics.  And if you're selected

3  from there, you have just a physical assessment with a

4  doctor to make sure that you're physically fit and capable

5  of completing the duties, and then we do an annual

6  psychological evaluation.

7        Q.   Can you tell me about the stress test?

8        A.   It's basically just a course of -- it's a

9  shooting course that requires just getting your heart rate

10  up.  You have several different series of things to

11  remember as you go along through the course.  It's just

12  something, again, to get your mind thinking and your heart

13  rate up while you're having to complete these tasks during

14  the shooting course.

15        Q.   And what sort of questions do they ask you?

16        A.   Basically, they're tactics related and policy

17  related.

18        Q.   Do you have to have the policies all committed

19  to memory?

20        A.   Maybe not verbatim.

21        Q.   But familiarity?

22        A.   But familiar, familiar wise.

23        Q.   And what sort of psychological evaluation is it?

24        A.   It's an annual psychological evaluation with a

25  contracted psychologist here in Raleigh.

1        Q.   And did you self select to become a member of

2   the SEU team or did somebody indicate that you should

3   apply for that?

4        A.   I applied for it, myself.

5        Q.   Why did you want to be a part of the SEU team?

6        A.   It was a unit within the department that I've

7   always wanted to be a part of due to the amount of

8   training that we get and our responsibilities in order to

9   assist the entire police department and the city at large.

10       Q.   Is it one of the more elite teams in the police

11   department?

12       A.   Yes, ma'am.

13       Q.   Would you say it's the most elite?

14       A.   In terms of what we do, yes, in a tactics

15   situation, yes.

16       Q.   What do you mean by that?

17       A.   Well, I'm not a homicide detective, so they're

18   the best homicide detectives --

19       Q.   Right.

20       A.   -- that do that job.  You know, there's shooting

21   instructors in the department and they're probably the

22   best shooting instructors.  There are street cops out

23   there that are really good street cops.  They're good in

24   their position in field operations.

25            And so because of our ability to be able to -- to be

 1  so fortunate to get the training time that we get, to be

 2  able to go to schools and classes and then get to have the

 3  real world, hands-on experience that we've gathered over

 4  our careers here working in the big city of Raleigh, we're

 5  the best at what we do.

 6      Q.   How many hours of training do you get a month?

 7      A.   We train weekly, so we have 10-hour days, so 40

 8  hours a month, depending on how many months -- or weeks

 9  are in that month.

10      Q.   So you do 10 hours of training per week?

11      A.   Yes, ma'am, because we work 10-hour shifts.

12      Q.   So one day a week is dedicated to training?

13      A.   Yes, ma'am.

14      Q.   And how many additional days do you work?

15      A.   We -- again, we work a day shift of Tuesday

16  through Friday, and a night shift of Wednesday through

17  Saturday.

18      Q.   So four 10-hour days?

19      A.   Yes, ma'am.

20      Q.   What happens during your training day?

21      A.   It depends.  We pick up -- we decide on what

22  training is most applicable to what we have going on in

23  that cycle, so some days we may start out at the range to

24  refine or keep our shooting skills up to proficiency.

25  Other days we strictly train in tactics where we use our

1    range in other locations to train on just tactics and how

2    we would approach certain situations that we commonly deal

3    with.

4        Q.   Do you want any water?

5        A.   I'm fine right now.  Thank you.

6        Q.   Do you have a particular role on the team?

7        A.   I do.

8        Q.   What's that?

9        A.   I am designated as the -- what they call the

10   primary scout.

11       Q.   What does the primary scout do?

12       A.   I am responsible for basically creating --

13   creating a plan during whatever situation we have going on

14   that day, whether it's a -- to start on the high end, you

15   know, a hostage situation on down to a barricaded subject,

16   to a canine track, to an arranged drug buy reversal that

17   we may do where we have to do an open-air arrest or an

18   arrest out of a vehicle, and any search warrant planning.

19   I then present, typically, my plan to my supervisor, who

20   gives approval.

21       Q.   Do you have a partner on that?

22       A.   No.  We work as a team, so whenever I come up

23   with a plan, obviously I'll present it to my supervisor

24   for approval.  And also, because of the way we work, and

25   again as a team, I present it to the whole team as well.

1   And we have many, many years of experience on our team, so

2   we can always spiffel ideas off of each other quite a bit.

3       Q.   When you're making a plan, are you guided by any

4   particular policies or procedures?

5       A.   In terms of making a plan, they're outlined to

6   be -- what's said in policies and procedures, you need to

7   make a plan, but there's no set way that we make a plan.

8   It just depends on the situation or the scenario.

9       Q.   Well, starting with -- you said the high end,

10  the hostage scenario.  How would you go about making a

11  plan if that was on the docket for the day?

12      A.   Hopefully, that's not on the docket for a day

13  because that's one of the most dangerous things that we

14  could possibly do, but, again, every scenario is

15  different.  Every situation is different.  You know, are

16  we talking about a house, an apartment, a business, a car

17  outside in the wide open?  I mean, terrain would dictate

18  just a bunch of environmental factors, so lots of things

19  to take into consideration.

20      Q.   So you would take all those things into

21  consideration.  Would you reduce the plan to writing or

22  would it be an oral plan?

23      A.   Depending on how fluid the situation is and how

24  fast it's progressing, I don't know.  If it's happening

25  right now and we need to make a decision and act on a

1  plan, then we're going to do that.  If time is somehow on
2  our side, maybe we have an opportunity to kind of write it
3  out.
4        Q.   How about like a canine track situation?
5        A.   Canine, again, they do their own training, but
6  sometimes we will incorporate them into our training, and
7  their training would be just joint training between the
8  two units.  That way, obviously, we like to be familiar
9  with our canine handlers and their canines, so that way,
10 the canines feel comfortable and familiar around us, as
11 well.
12       So, typically, it's at the discretion of the
13 canine handler how they want to handle their track, but
14 we're -- we work close enough with them that they listen
15 to our suggestions sometimes and, again, a terrain would
16 dictate whether we're outside or we're in a house or we're
17 in a structure, a large building or something like that.
18       Q.   So coming into work on a typical day, do you
19 usually know what's going to happen or it's a surprise
20 based on what's developing?
21       A.   It can be a surprise.  I mean there may be a
22 particular unit within the department that maybe gave us a
23 day's notice or a couple days' notice that they had
24 something going on that they may need our help with, but,
25 again, it's day to day.

1       Q.   With a search warrant, for instance, for --
2   looking for drugs, was that something you would know in
3   advance?
4       A.   Sometimes we know in advance, sometimes we know
5   that day.
6       Q.   What determines whether you know in advance or
7   not?
8       A.   I guess that person's investigation, that
9   officer's investigation, how it's progressing for them.
10      Q.   Is your team ever part of obtaining a search
11  warrant?
12      A.   Not typically.
13      Q.   So is it fair to say that it's more typical that
14  another officer or unit is obtaining the warrant and then
15  asks you all to help execute it?
16      A.   Yes.
17      Q.   What are the other roles on the team?  You said
18  you're a scout.  What are the other roles?
19      A.   We have designated breachers in case that we
20  have some sort of obstacle or fortification that we need
21  to have breached.  We have a designated ballistic shield
22  person who carries a ballistic rated shield on searches
23  and takedowns.  And then everybody else from there just
24  kind of finds a job as whatever the mission is that kind
25  of transpires in terms of just designated positions at the

 1 time.  That's the big three.

 2      Q.   How many breachers does a team of 10 have?

 3      A.   I like to consider everybody as a breacher.

 4      Q.   If necessary?

 5      A.   Uh-huh.

 6      Q.   What about the ballistic shield person?

 7      A.   We have -- typically, we just use one at a time,

 8 but there's been instances where we've had to go into a

 9 larger structure where we knew we would kind of get

10 separated, so we've taken two with us.

11      Q.   And would everyone be qualified to do that role?

12      A.   Yes.

13      Q.   And everyone would be qualified to be a

14 breacher?

15      A.   Yes.

16      Q.   Would everyone be qualified to be a scouter?

17      A.   Yes.

18      Q.   But you're the one who most typically does the

19 scouting?

20      A.   Yes, ma'am.

21      Q.   So if you're not at work, somebody else would do

22 it?

23      A.   Yes, ma'am.

24      Q.   Is there somebody, in particular, who does it if

25 you're not at work?

1      A.    No.   Again, we have a -- on my particular team,

2  we have six guys with over 10 years of experience on the

3  unit, so anybody can really do it, a lot of experience.

4      Q.    And the other four guys are a little bit less

5  experienced?

6      A.    Just a little bit less time.

7      Q.    Does the composition of the 10-person team vary

8  or does it stay pretty steady?

9      A.    How do you mean?

10     Q.    Is it the same 10 guys on your shift week to

11 week to week to week?

12     A.    Depending on who's off or who has other

13 responsibilities that week, whether it be a training

14 situation or a class they had to go to.  I mean, for the

15 most part, the same 10 guys have been on my team now

16 consistently for three years.  Our team has been

17 consistently the same 10.

18     Q.    Okay.  Can you name out who those people are?

19     A.    Sergeant McDonald, Officer Twiddy, Officer

20 Ortiz, Officer Perrin, Officer K. Thompson, Officer

21 Mollere, Officer Garner, Officer Webb, Officer S. Thompson

22 and myself.

23     Q.    Those are all men?

24     A.    I'm sorry?

25     Q.    Are they all men?

1      A.    Yes.

2      Q.    And McDowell is the sergeant?

3      A.    McDonald.

4      Q.    McDonald.  Thank you.

5      A.    Yes, ma'am.

6      Q.    Do you have any interaction with the chief of

7  police?

8      A.    No, ma'am, not often, no.

9      Q.    Under what circumstances would you?

10      A.    I may see her at a special event.  That's about

11  it.

12      Q.    How many layers of supervision are there

13  between, say, you and the chief?

14      A.    Well, there's my sergeant and lieutenant, then

15  if I had a captain, and then if I had a major, and then

16  there's the deputy chief and then there's the chief, so I

17  guess there's six degrees to the chief.

18      Q.    The two positions are empty?

19      A.    Currently.

20      Q.    Currently.  How long has the deputy chief --

21  it's called deputy chief?

22      A.    There's a deputy chief.

23      Q.    How long has that been vacant?

24      A.    The deputy chief is not vacant.

25      Q.    Okay.  Who's that?

1      A.    I'm sorry?

2      Q.    Who is it?

3      A.    Oosterhoudt, two O's on the front end.

4      Q.    The captain is vacant?

5      A.    Captain and the major are vacant currently

6   because there were recent retirements, as in very recent.

7      Q.    So what is your team's general practice when

8   your plan for the day is to execute a warrant for drugs in

9   a private home?

10            MS. PACKER:  A search warrant?

11            MS. SIMPSON:  A search warrant.

12            THE WITNESS:  Search warrant?

13            BY MS. SIMPSON:

14     Q.    Yes.

15     A.    We either have prior knowledge that this was

16  happening or we just found out today?

17     Q.    Let's say you had prior knowledge.

18     A.    Okay.

19     Q.    So you come in today, you already know.

20     A.    Okay.  Great.  That makes it a lot easier for

21  us.  My -- again, my specific role as the primary scout

22  would be to start putting together a plan of how we would

23  serve the search warrant.

24            Typically, if we're being used, we're being used

25  because of our ability to maybe respond to the location

1    without being noticed.  Having some kind of surprise,

2    element of surprise on our side is always helpful, so I

3    like to go ahead and start immediately looking up the

4    location.  Obviously, we know that there's a search

5    warrant going on.  I've already received the information

6    on where the location will be, so I do a thorough

7    background of the location, itself.

8              If it were, say, just a residence, I'll start

9    with something as easy as Google Maps, look that up.  I'll

10   look at Google Street Views, I'll look at satellite

11   imagery.  In Wake County, the Wake County government real

12   estate site is kind enough to provide pictures and

13   perimeter floor plans and square footages of homes and

14   they have pictures.  Depending on how old the house is,

15   they have pictures that date back to 1996 on there, so I

16   can see if there's been any remodeling done to homes or

17   anything of that nature.

18             There's several Internet based real estate sites

19   out there that also take pictures of the inside of homes

20   and, if need be, I can use those to kind of preemptively

21   design a floor plan and what it may look like inside.

22             I will physically go and look at the location,

23   oftentimes with the case agent, so to speak, or at least

24   somebody with very intimate knowledge of the case and the

25   location.  That's at the very least, so that way, when I

1  go to the location and it's the same place that I saw on

2  any of those mapping databases, I can confirm that with my

3  own two eyes.  I can confirm the address, the description

4  of the property and I have somebody there with me that can

5  physically point at it or say, "Yes, that's the place I

6  have a search warrant for."

7       Q.   And what do you do next after you've done those

8  things?

9       A.   Well, if I -- again, if I was fortunate enough

10 to have at least a day's notice to get a lot of that done,

11 it saves some time on the back end the next day.

12       Sometimes we'll work out a route, how we want to

13 go there in terms of driving and how we want to deploy and

14 where we want to deploy from once we get there, always

15 thinking on the -- erring on the side of caution, always

16 trying to be as safe as possible.  And, again, we don't

17 like to compromise our approach because, typically -- we

18 don't want to be compromised, obviously, approaching the

19 location, just for our safety.

20       Q.   When you go out to do a physical scout, do you

21 go in plain clothes?

22       A.   It depends.  I mean I can jump in a covert car

23 that's got good enough tint, if need be, and just kind of

24 hop in the back seat and watch through the window as we

25 drive by, but I have -- there's been times, too, where

1  I've thrown a coverup or a jacket on, or whatever.

2      Q.    So after you plan the route, what do you do

3  next?

4      A.    Typically, there's a briefing -- or not

5  typically.  Always there's a briefing.  That will be held

6  where the case agent that's in charge will give us a

7  background on what prompted their investigation, what

8  probable cause that they've established to, therefore, go

9  get a search warrant and have it signed by a judge or

10 magistrate.  Basically, it's just them retelling kind of

11 what they wrote in their affidavit for their search

12 warrant, typically, to us.

13         We'll go over safety concerns in terms of, like

14 I said, the approach and the deployment area.  We always

15 want to know if there's any children or elderly or

16 aggressive animals in the house.

17         We oftentimes like to know who is there, if

18 they -- has their investigation led them to identify a

19 suspect or a person in particular that we need to be aware

20 of and what their criminal history is like.  Again, in

21 terms of the criminal history and whatever the probable

22 cause is for the search warrant, itself, will kind of

23 change how we do our tactics.

24         We will go over a medical plan, if need be.

25 Wake County EMS has a TEMS medic program where it has

1  several paramedics that are trained in tactical medicine

2  and field medicine, so we will oftentimes have a TEMS

3  medic with us from the Wake County EMS.  If one is not

4  available, we will always have at least an ambulance and

5  paramedics on standby in the area.

6      Q.   When you're looking at someone's criminal

7  history, what kind of things do you look at?

8      A.   Crimes of violence, number one, any sort of

9  aggression not only towards other people, but towards law

10 enforcement.  That withstanding, we're not being there

11 just -- if this is a drug search warrant, do they have a

12 pattern of drug history?  Do they have a criminal record

13 that is indicative of continuous drug sales and felonious

14 behavior?

15      The big ones are just definitely crimes of

16 violence on the front end.

17      Q.   When you -- go ahead.

18      A.   Oh, I'm sorry.  I was just going to say, you

19 know, any propensity to use firearms, obviously, is a big

20 one.

21      Q.   What kind of planning do you do if you know

22 there are children in a residence?

23      A.   Typically, we'll stick to our -- what I would

24 say our normal course of business, but, obviously, we're

25 going to be a bit more cautious when we are in a house

1  dealing with adults than, you know, if children are

2  around.  We're going to be respectful and, obviously,

3  everybody on our team is a father, has children.  We

4  understand what that can be like for children.  It could

5  be scary.  Sometimes kids don't even pay us any mind.  It

6  just depends, but we're always very -- just cautious and

7  remind ourselves that there may be children, or if we know

8  that there's going to be children there, just be cautious

9  of the children.

10      Q.   And how would you know if there would be

11  children there?

12      A.   If there's been any -- we just know who this

13  person is and we know that they have children.  Typically,

14  on a scout, too, what I would look for when driving past a

15  residence, are there any kids' toys on the front porch?

16  Is there a play set in the backyard?  You know, do you see

17  a car seat in the car, a "Baby on Board" sticker in the

18  car?  If the investigator had pulled trash or whatever

19  from this residence, were there any diapers or anything

20  like that in the trash?

21      Q.   What about if you know there are elderly people

22  in the house?

23      A.   We kind of treat that the same way we would as

24  children in one way.  We're just, obviously, very cautious

25  if there's elderly people there.  We don't know if -- you

1  know, they may have any sort of medical conditions or

2  anything like that, so we just try and be very cautious

3  around elderly, as well.

4       Q.   And what does it mean to be very cautious?

5       A.   We're loud, so we would probably kind of tone

6  down just the volume of our announcements, every now and

7  then, to not be as startling throughout a residence.  And

8  then, obviously, if we encountered a child or an elderly

9  person or a person that needs medical assistance

10  constantly, or whatever, we're just very cautious around

11  them.

12       Q.   Does being cautious have any definition aside

13  from being less loud?

14       A.   I mean, respectful.

15       Q.   Anything else?

16       A.   (Witness nods head.)

17       Q.   So what's the source of your knowledge about how

18  to do scouting?

19       A.   I was in a way trained.  There's not really a

20  formal training for it, but it's -- I was trained by the

21  guy that did it before me and you kind of watch and learn

22  when you come on the unit, as well.

23            I've been in my current role for over 10 years,

24  so a lot of the things that I do, you know, the easy

25  things were taught to me and then there's things that I've

1    kind of done, myself, to make my job easier and make it

2    safer for everybody else.

3         Q.    What are examples of that?

4         A.    Again, doing the more -- now that we just have

5    the ability to have technology so readily available, like

6    I said before, doing those very thorough backgrounds of

7    the checks of the locations that we have to go to, rather

8    than just go straight up, jump in the car with someone and

9    go look at the house physically.  I'll put in a good

10   amount of effort using, you know, technology and the

11   Internet to my best abilities, and then, obviously, also

12   just going out and physically looking at the location, if

13   need be, kind of planning routes, more safer routes is

14   something I take pride in, personally.  I kind of -- I

15   won't say I started, but I just take pride in getting my

16   team from place to place as safely as possible without

17   being compromised or otherwise.

18        Q.    How do you plan a safe route?

19        A.    Again, it kind of depends on the location and

20   terrain, you know, but if we have to come from a street

21   over and cut through a side yard or something like that,

22   or cut through the woods or deploy from multiple vehicles

23   instead of just one, are just examples of how we approach

24   places differently.

25        Q.    And when you say the goal is safety, what does

1   that mean to the officers?

2        A.   Well, every day, it doesn't matter what we're

3   doing.  As police officers, we just try and be as safe as

4   possible every day.  If you're -- what are you referring

5   to, specifically?

6        Q.   What are the risks that you're protecting

7   against?

8        A.   Again, because of the nature of what we do and

9   the types of search warrants that we serve and the types

10  of people that, typically, we are tasked with arresting or

11  detaining, there's a propensity for violence and firearms

12  to be used.  So if we can, obviously, sneak up to a

13  location as best we can without being seen coming from a

14  long ways away, it limits our risk of being shot at or,

15  say, a residence being heavily fortified.

16       Q.   Who typically informs you that a search warrant

17  is going to be executed on a home?

18       A.   Or that somebody has a search warrant?

19       Q.   Yes.

20       A.   More often than not, obviously, the case agent

21  has to present their warrant to their supervisor for

22  review, and then that supervisor would contact our

23  supervisor, who would then notify us.

24       Q.   Is there a pattern that you can discern in terms

25  of whether you have advance notice, i.e. before the day or

1  whether it's a sudden thing that's developing that day?

2      A.   There's no set pattern.  I mean, honestly, it

3  just lies all on the case agent, how they want to

4  investigate their case and when they want to do it.

5      Q.   Does anyone on the SEU team have any say on the

6  speed with which something is executed?

7      A.   In terms of --

8      Q.   If you got notice on a morning that there was a

9  warrant to be executed, would you have any discretion to

10  say, "It's not safe today; can we do it tomorrow"?

11      A.   It's not -- it's rare, but there have been times

12  where we thought, just based on the location, it was maybe

13  better to serve it with a little bit of nightfall and not

14  in the broad daylight, or to serve it bright and early in

15  the morning while we knew somebody was still in bed.

16      Q.   Do you ever stake it out to see if people leave

17  the house, to go when it's empty?

18      A.   Again, every case is different.  It's just based

19  on, again, that case agent's investigation, but we've had

20  instances where, you know, we've wanted to wait somebody

21  out before.  And then there's instances where, you know,

22  we know they're in there and we'll serve it then.

23      Q.   And is that based on the case agent's

24  preference?

25      A.   Sometimes, not all times.  Sometimes we can go

1   back and forth about it.  We try not to get involved in

2   their investigation and not tell us how to do our tactic

3   side of our job.  But every now and then, we, obviously,

4   have a friendly back and forth about how they want this

5   done or whether they prefer the person out of the house or

6   in the house.  It just depends on how their investigation

7   is unfolding.

8        Q.   When a warrant is coming from the vice team, do

9   you have a meeting with that whole team?

10       A.   The Drug and Vice Team?

11       Q.   Uh-huh.

12       A.   Uh-huh.  Yes, ma'am, we will meet all together.

13       Q.   Where does that occur?

14       A.   Locations vary.

15       Q.   And if it is a warrant coming from the Homicide

16  Team, do you meet with them?

17       A.   We have.  Just, again, that's not something we

18  do often, but we have, you know, met with the Homicide

19  Team to help them before, yes.

20       Q.   Is that the briefing you described where the

21  case agent would kind of tell them what's going on?

22       A.   Uh-huh.  Yes, ma'am.

23       Q.   Do you discuss the target at those meetings?

24       A.   Discuss the target?  If they're known, then

25  absolutely.  We've -- more often than not, we like to know

1   who it is.  It, obviously, helps us do our job a little

2   bit better if we know who the person is.  Again, that way,

3   we can determine if they have a propensity for violence or

4   they like to use firearms a lot, what their criminal

5   history is.  Yeah, that helps, so if they want to tell us

6   who the target is, we definitely like to know.

7        Q.   Do you talk about the basis of probable cause?

8        A.   We don't really dis- -- I mean, yeah.  I mean,

9   probable cause is obviously discussed, you know, how did

10  you -- they tell us the story, like how did this happen,

11  how did you establish your probable cause to even get a

12  warrant, you know, yeah.

13       Q.   Does the case agent usually inform you about

14  whether there are children or elderly in the residence?

15       A.   Yes.

16       Q.   And if they don't, do you investigate that in

17  your scouting?

18       A.   Yes.

19       Q.   In 2020, did you discuss any COVID safety?

20       A.   At the time, we were -- I want to say -- I don't

21  know that -- I can't remember.  I can't remember if there

22  was a mask mandate then or not, so no, I don't think there

23  was an official coded brief or anything like that.

24       Q.   Did you discuss confidential informants, if that

25  was the source of information?

1      A.    Probably didn't discuss the confidential

2 informant.

3      Q.    And you discussed the possibility of weapons?

4      A.    Yes.

5      Q.    Do you presume that drug searches have a

6 likelihood to become dangerous?

7      A.    I presume that all search warrants can

8 inherently be dangerous, but especially drug search

9 warrants.

10     Q.    Why is that?

11     A.    Because people that sell and use drugs have a

12 propensity to use firearms and commit acts of violence.

13     Q.    Are any of the things that you've described in

14 terms of preparations you do as a scout written down in

15 policy?

16     A.    Not to the lengths that I take it, but it is

17 stated in policy that a formal plan will be done prior to

18 any search warrant execution, which, in turn, just becomes

19 my job to make that plan, and part of that planning is

20 doing all the research and physical location scouting.

21     Q.    So the terminology that is used is "formal

22 plan"?

23     A.    I believe so.

24     Q.    And that's left to you to actually flesh out?

25     A.    For the most part.

1      Q.    For what part is it not?

2      A.    That they're -- I don't think there is a part

3    that I wouldn't really not look at.

4      Q.    So when you say for the most part it's left to

5    you, what part is not left to you?

6      A.    Oh, overall approval.

7      Q.    So the formal plan is created by you entirely?

8      A.    On the front plan, the in-depth plan, and then

9    again it has to be approved by my supervisor.

10      Q.    Okay.  So after you create the plan, then the

11    supervisor approves it?

12      A.    Yes.

13      Q.    Are there any elements that are required of you

14    in making a formal plan?

15      A.    Yes, to physically look at the location and

16    confirm addresses or descriptions of properties, make sure

17    it matches up with what we have been told and what is

18    written on the search warrant, if that's the case.

19      Q.    Is that written down?

20      A.    We have internal paperwork that we write that

21    down on.  Yeah, everything is documented.

22      Q.    So you're referring to paperwork that documents

23    you went out to a location and viewed it?

24      A.    Yes, like if I have to go to a location, I

25    physically have to look at it, confirm numbers, confirm

1  descriptions and make sure that matches all up with
2  wherever we're going.
3       Q.   And then you write that down?
4       A.   Yes.
5       Q.   And is it written down in policy that you have
6  to go visit the location?
7       A.   I'm not sure.
8       Q.   Is there a particular form that you write it
9  down on?
10      A.   There is.
11      Q.   Does it have a number or a name?
12      A.   It's just an internal SEU document that we use
13 to just keep a formal recording of every location that we
14 go to and, in particular, I fill out what is called a
15 scout form.  It's nothing that's in policy or anything
16 like that.  It's just something extra that we do to keep
17 details of locations that we go to in case we ever have to
18 go back to them again.
19      Q.   What details do you write down?
20      A.   The address, the description, if there are kids
21 or elderly or dogs or other aggressive animals, if there's
22 any weapons information, if there's any suspect
23 information, were there any cars at the location that we
24 need to be aware of, the type of structure.  Maybe it's
25 construction, the colors, where the numbers are located,

1  how many windows are nearby the entry location, what time

2  I did it, when we briefed, who was in charge, who the case

3  agent was.

4      Q.   When you're planning the approach, do you also

5  plan how to enter the home?

6      A.   Yes.

7      Q.   What determines what you think is the best way

8  to enter a home?

9      A.   We typically like to enter the home where it is

10 primarily entered and exited on a daily basis by the folks

11 that may reside there or may visit.

12     Q.   Why is that?

13     A.   It's probably the -- in my experience, it's more

14 often than not the door that is easier to get in and out

15 of.  It doesn't have a couch up against it or -- it's just

16 a common way that people enter their home, so there's

17 nothing sneaky about it, something that they -- we just

18 don't come bursting through windows, I guess is what I'm

19 trying to say.

20     Q.   Aside from the scout form, are there other

21 documents that you create or that anyone creates as part

22 of the search warrant execution process?

23     A.   We have a -- for lack of a better term, a

24 pre-raid form that, again, kind of -- it just -- it's

25 redundant, redundancy paperwork, again, where we'll talk

1   about who's the case agent, who's in charge, what time we

2   brief, what time a scout went out, the location, do we

3   have EMS involved, how many team members do we have from

4   our unit, which ones were there that day, the order that

5   they would enter the residence, which officers or

6   detectives are going on the search and what their

7   responsibilities are.

8          We do have a use of force policy that is printed

9   out on every one and is read by a supervisor at every

10  briefing, and then just a quick synopsis of who our

11  suspect may be and what the probable cause was for the

12  warrant.

13      And then later on, after everything is said and done,

14  we will compile what evidence was located and recovered,

15  which people were arrested and what their charges were,

16  and that is documented on a separate form called a Post

17  Warrant.

18      Q.   Okay.  Any other forms?

19      A.   Those are the only three that we use.

20      Q.   Is the entire use of force policy read out loud

21  every time?

22      A.   It's not the entire policy.  Basically, it

23  refers to making sure you're wearing your appropriate

24  uniforms and ball cap, something that says "Raleigh

25  Police" on it, so that way, you're readily identifiable as

1  the police, that you make notice and announcement that you

2  are the police and your intent and authority, and then

3  yes, there is a small -- I believe it's the 15-A-401D2,

4  use of force.  It states use of force policy that is

5  included on the form, and then a Raleigh PD -- a Raleigh

6  police policy about not chasing cars and that is read

7  aloud by a supervisor at every briefing, yes.

8       Q.   What's your understanding of the term "no-knock

9  warrant"?

10      A.   The Raleigh Police Department has never done

11 no-knock warrants and we have policies against serving

12 no-knocks.  To my understanding, that is basically where

13 you serve a warrant without making your authority,

14 presence and intent known.

15      Q.   Is that policy written down?

16           MS. PACKER:  Objection to form.  You can answer

17 the question.

18           THE WITNESS:  All right.

19           MS. PACKER:  I was just objecting for the

20 record.

21           THE WITNESS:  Is that policy written down?

22 Which policy?

23           BY MS. SIMPSON:

24      Q.   You said, "Raleigh police has never done

25 no-knock and we have a policy against serving no-knocks."

1     A.   Yes.  It's in our Raleigh police policy that the

2   Raleigh Police Department will not serve nor seek no-knock

3   search warrants.

4     Q.   How long has it been there?

5     A.   I don't know.

6     Q.   Was it there in May 2020?

7     A.   Yes.  We've not done a no-knock search warrant

8   since I've been on the unit, since 2011.

9     Q.   Is that policy among the publicly available

10  policies?

11    A.   I think all of our policies are publicly

12  available, so I'm not -- I'm not sure.

13    Q.   Are you aware of any Raleigh policies -- Raleigh

14  police policies that are internal and confidential?

15    A.   Not off the top of my head, no, ma'am.

16    Q.   Does that policy have any exception for risk to

17  life?

18    A.   Which policy?

19    Q.   The policy that Raleigh will not seek or serve a

20  no-knock warrant.

21    A.   And then say your second question again.

22    Q.   Does it have any exception if there is a risk to

23  life?

24    A.   I believe there's definitely some exigency

25  standards, but in terms of search warrants, I mean,

1   obviously, we're going to serve a search warrant the way

2   that we're supposed to, unless there is some sort of

3   exigency that comes about, but, again, that's a

4   case-by-case kind of thing.

5        Q.   What sorts of exigencies?

6        A.   A risk to life, as you mentioned, destruction of

7   evidence, in flight, so a subject running into -- running

8   into a residence, so in direct pursuit.  I believe that's

9   a more appropriate term.

10       Q.   Anything else?

11       A.   I'll leave it at those.

12       Q.   If there's an exigency, who decides that the

13  circumstances are exigent?

14       A.   I think that would be pulsar discretion.

15       Q.   If it's a team of officers, does every officer

16  have discretion?

17       A.   I think if there is an exigency that one officer

18  sees that another officer doesn't, I mean maybe they can

19  communicate what they see, but it's going to be up to, I

20  guess, the officer that saw the need for that exigent

21  circumstance to act accordingly.

22       Q.   Going back to the hypothetical hostage

23  situation, would there ever be a scenario to enter a home

24  on a no-knock basis then?

25            MS. PACKER:  Objection to the form.  You can

1  answer the question.

2          THE WITNESS:  If we have a definite reason to

3  believe that somebody's life is in imminent danger of

4  physical injury or death, then yes.

5          BY MS. SIMPSON:

6      Q.   In terms of a search warrant for drugs, however,

7  is the policy that you will not execute such warrants on a

8  no-knock basis?

9      A.   Again, we do not do no-knock search warrants and

10 our intent is to state our authority and presence and

11 intent when we are serving a search warrant.

12     Q.   This may be redundant, but have you ever

13 executed a no-knock warrant?

14     A.   No.

15     Q.   How did you find out that Raleigh will not do

16 no-knock warrants?

17     A.   It is written in policy and as common practice,

18 as far as -- as long as I've been on the unit, we've never

19 done one.

20     Q.   Do you have an opinion about no-knock warrants

21 as a law enforcement tool?

22         MS. PACKER:  Objection to the form.

23         THE WITNESS:  I don't have an opinion.

24         BY MS. SIMPSON:

25     Q.   Do you think that they are safe?

1            MS. PACKER:  Objection.

2            THE WITNESS:  At the Raleigh Police Department,

3    we don't do them.

4            BY MS. SIMPSON:

5        Q.   Do you think they're safe?

6            MS. PACKER:  Objection.

7            THE WITNESS:  I don't have an opinion either

8    way.

9            BY MS. SIMPSON:

10       Q.   Is your understanding the reason Raleigh has

11   banned them has to do with safety?

12       A.   I can't really stipulate to their opinion on

13   why.

14       Q.   You've never been --

15           MS. PACKER:  Norwood just texted me that he's

16   been disconnected.

17           MS. SIMPSON:  Oh, sorry.  Let's pause.  Off the

18   record.

19           (WHEREUPON, a discussion was held off the

20   record.)

21           BY MS. SIMPSON:

22       Q.   So when you were trained in the very beginning,

23   did you ever hear anything about why Raleigh would not use

24   no-knock warrants?

25       A.   No.

1     Q.   It was told to you that you will not do that?

2     A.   Yes, that we will not serve no-knock search

3  warrants.

4     Q.   But there was no explanation of why?

5     A.   No.

6     Q.   Do you think it's safe to bust into a home

7  without warning?

8          MS. PACKER:  Objection to the form.

9          THE WITNESS:  I personally wouldn't do it.

10         BY MS. SIMPSON:

11    Q.   Why is that?

12    A.   Because I like to let people know that we're the

13  police and we're not somebody else trying to come rob you

14  or hurt you.

15    Q.   To give an announcement?

16    A.   Uh-huh.

17    Q.   To warn people that it's the police coming in?

18    A.   Yes.

19    Q.   And is that a safety tool for you and your

20  officers?

21    A.   It is another safety tool.  I would say it kind

22  of goes along with our presence, but also being able to

23  state clearly who we are is very helpful.

24    Q.   Why is it helpful?

25    A.   Again, it goes back to our safety.

1       Q.   How so?

2       A.   That people know that we're the police and we're

3  not, again, somebody coming to rob you or hurt you.

4       Q.   So they can make an informed decision about

5  whether they should submit?

6       A.   Or defend themselves.  I don't know.

7       Q.   And they can make that decision?

8       A.   Surely, yeah.

9       Q.   And is it your hope that they would decide to

10 submit to your authority and not try to defend themselves

11 with arms?

12      A.   Comply would be, I think, better.

13      Q.   Yeah, that's a better word.  So it's your hope

14 that they would comply with the demand that you're making

15 and not defend themselves?

16      A.   If they had the means and will to do so, I

17 guess, yeah.  I'd prefer that they comply with our

18 instructions.

19      Q.   And if they were surprised and thought their

20 home was being invaded by robbers, they might make a

21 different decision?

22      A.   I don't know.

23      Q.   Well, you're the scout, right?

24      A.   Uh-huh.

25      Q.   So do you think that a occupant of a home who

1  believed their home was being invaded by robbers would be

2  more likely to defend themselves than if they thought it

3  was being raided by the police?

4          MS. PACKER:  Objection to form.

5          THE WITNESS:  They might be.

6          BY MS. SIMPSON:

7     Q.   Do you think they should have an opportunity to

8  know who is coming into their home?

9          MS. KIBLER:  Objection.

10         MS. PACKER:  Objection.

11         THE WITNESS:  Especially if it's the police, and

12 they should know that it's us and not anybody else.

13         BY MS. SIMPSON:

14    Q.   Why is that?

15    A.   So that way, they don't feel like they're being

16 robbed or somebody is going to hurt them.

17    Q.   Why?

18    A.   I don't -- I can't talk about how somebody would

19 react.  Some people might cower in fear, some people might

20 want to defend themselves, some people might want to stand

21 there like a deer in the headlights.  I don't know.  I've

22 seen it all.

23    Q.   What is a knock and announce warrant?

24    A.   I'm sorry?

25    Q.   What is a knock and announce warrant?

1    A.   That is our common practice of stating who we
2  are, our authority and our intent and our purpose for
3  being there.
4    Q.   Where did you learn what a knock and announce
5  warrant was?
6    A.   When I first came onto the unit, again, that was
7  common practice and that is our policy and how we will
8  serve search warrants.
9    Q.   Was that in 2011 when you started on the SEU
10 team?
11   A.   I started, yes, in February of 2011.
12   Q.   Was that the first time that you engaged in
13 executing a knock and announce warrant?
14   A.   No.
15   Q.   When was the first time?
16   A.   When I was on patrol.
17   Q.   Do you remember what year?
18   A.   I wish I could.  I'm not certain on the year,
19 but it would have been prior to 2011.
20   Q.   And had you been trained on executing search
21 warrants before that?
22   A.   No.
23   Q.   What were the circumstances that led to you
24 being part of a team?
25   A.   Well, I should go back.  I should say I'm more

1  or less thinking of what I do now.  I was not trained in

2  the way that I serve search warrants currently, in my

3  current role, but yes, we were trained in the academy on

4  search warrant service, so very basic things there, but

5  the biggest thing is always to have a supervisor on scene

6  and, again, to state your authority, intent and purpose.

7       Q.   Is that written down in policy?

8       A.   What, exactly?

9       Q.   To have a supervisor and to state your

10  authority, intent and purpose.

11       A.   Yes.

12       Q.   Is there anything else in the policy?

13       A.   There's a lot of things in the policy.  I don't

14  know specifically what you're asking for.

15       Q.   Related to executing a knock and announce

16  warrant, what is in the policy?

17       A.   And, again, it goes back to the planning of the

18  service, a briefing with case agents, having supervisors

19  on scene, again, announcing your authority and purpose,

20  having radio communications, a medical plan, being dressed

21  like the police.

22       Q.   Right.  You said having something that says

23  "Raleigh Police" on it.

24       A.   Yes.

25       Q.   So people know who you are?

1      A.   Yes, you're readily identifiable as a police

2 officer.

3      Q.   Were you trained on how long you should wait

4 between knocking, announcing and entering?

5      A.   There's no set number.  Again, our policy just

6 states that we need to announce our authority and intent

7 and purpose.

8      Q.   Is there a particular team member that decides

9 the moment of entering?

10      A.   If the residence is fortified, then the sergeant

11 has to give approval for a forcible entry.

12      Q.   What does "fortified" mean?

13      A.   As simple as the deadbolt being thrown on a

14 door, but locked in some way.

15      Q.   Does the knock and announce require that the

16 resident have time to answer the door?

17           MS. PACKER:  Objection to the form.

18           THE WITNESS:  No.  Again, we have to state our

19 intent and our authority and our purpose.  It's a

20 reasonable -- especially, we have to be reasonably

21 audible, that they know who we are.

22           BY MS. SIMPSON:

23      Q.   Is the call made in advance about whether you'll

24 force the door if it's fortified?

25      A.   Sometimes yes, sometimes no.  Sometimes it could

1  be at the scene.

2      Q.   What determines which route you take or which of

3  those occurs?

4      A.   Again, if we get there and, say, the door is

5  unlocked, then we're not going to force entry, but a

6  sergeant will authorize forced entry if I -- if we get

7  there and we find that the door is locked and we knock and

8  announce and don't get an answer.

9      Q.   How long -- or how many seconds are enough to

10  determine that there's no answer?

11          MS. PACKER:  Objection to the form.

12          THE WITNESS:  Again, we don't have a hard

13  number.  I don't want to say "best practices," because I

14  don't know what other teams, really, throughout the

15  country do, but I will -- when I personally am knocking, I

16  will knock, I'll wait a period of three to five seconds,

17  and then I will knock again.  If the door is -- especially

18  if the door is locked or fortified, and then the

19  supervisor would either have already made the -- given the

20  authority to make a forced entry or would do so during

21  that time.

22          BY MS. SIMPSON:

23      Q.   And, again, your supervisor is Officer -- or

24  Sergeant McDowell?

25      A.   McDonald.

1     Q.    McDonald?

2     A.    McDonald, yes.

3     Q.    Before executing a search warrant for drugs on a

4 residence, is it your understanding that the vice team

5 often will do a controlled buy?

6     A.    That happens sometimes.

7     Q.    What's your team's relationship with vice?

8     A.    They're another unit within the department that

9 we assist.

10     Q.    Will SEU officers typically be present to

11 monitor a controlled buy?

12     A.    No.

13     Q.    During the controlled buy, are you --

14     A.    We have, but no, it's not -- it can happen

15 sometimes; it doesn't happen others.

16     Q.    What determines --

17     A.    It's not all the time.

18     Q.    What determines how it happens?

19     A.    If we're going to -- if they're doing a

20 controlled buy to where as soon as that buy happens, that

21 we're going to immediately arrest or detain the person

22 that sold the drugs or whatever at that time, then we'll

23 monitor that, but if it's to make or establish probable

24 cause for a residence during the course of their

25 investigation, we are typically not a part of that.

1       Q.   If you are going to be a part of it, would you
2   be in contact with the team by radio?
3       A.   Uh-huh.
4       Q.   And would you monitor the controlled buy on your
5   phone?
6       A.   It depends.  There are -- for lack of a better
7   term, a bug or a camera, a secret camera or something like
8   that, or a microphone that would be used, and we can
9   monitor that through different equipment.
10      Q.   Is that a bug or a camera carried by the
11  confidential informant?
12      A.   Typically.
13      Q.   Did you watch the livestream on the buy related
14  to Marcus VanIrvin?
15      A.   I'm not sure.
16      Q.   Did you ever watch any other buys with the
17  confidential informant named Dennis Williams, a/k/a
18  Aspirin?
19      A.   During certain open-air arrests, yes.
20      Q.   How many times?
21      A.   I can't say for sure.
22      Q.   Was it more than three?
23      A.   Yes.
24      Q.   More than five?
25      A.   I don't know.

1      Q.   Did your answer mean that you never monitored

2   one that was a buy not in open air?

3      A.   So if we are monitoring them, it was going to be

4   some sort of open-air arrest or detention at a vehicle.

5   More often than not, if you're using -- if Drugs and Vice

6   or an officer is using an informant with the equipment to

7   go to a residence to establish probable cause, we're

8   probably not going to be a part of that because that's not

9   something that we would do immediately very often.  But if

10  it were to happen, it would be because we're waiting

11  for -- waiting to make an arrest almost immediately.

12     Q.   If you're executing a drug search warrant and

13  you are deploying out to the location, does a vice ride

14  along with you?

15     A.   The case agent or, again, somebody with very

16  intimate knowledge of the location will oftentimes drive

17  us if we're going in one vehicle and then, yes, the other

18  members of that team or that squad would accompany us

19  because they typically help with perimeter security or

20  detentions of people that may be outside the residence,

21  and then later on they have their different search duties

22  inside the residence.

23     Q.   What's the division of labor between the SEU

24  team and the vice officers?

25     A.   The division of labor?  Oh, like how do we

1  divide our responsibilities?  Is that what you're saying?

2        Q.   Yes.

3        A.   Well, I mean they have their investigation that

4  they're working and we have the tactic side of everything,

5  which is basically we're just rendering an area or vehicle

6  or a person or persons in a residence safe, so that way

7  the detectives or the officers, whoever, can conduct

8  their -- complete their investigation or continue their

9  investigation safely.

10       Q.   So does your team search for drugs, for

11  instance?

12       A.   No.  We'll search for people, mainly, on the

13  front end.  If we happen to come across something in plain

14  sight or somewhere where something was secreted, while

15  we're looking for people, we may make note of that and

16  then inform the investigators where we saw and what we saw

17  and who we saw with it or where we saw this person.

18       Q.   So when your team goes in, your goal is to find

19  all the people in the house and get them in a position

20  that is safe?

21       A.   Yes.

22       Q.   What about dogs?

23       A.   If there are dogs in the house, we'll try and

24  find a -- depending on if they're aggressive or not

25  aggressive or they're scared, we'll try and find just a

1   safe location for them, maybe in a bathroom or a bedroom

2   or something that's safe, or if they've got the kennel or

3   something outside or a fenced-in backyard that we can put

4   them in.  It just depends.

5        Q.   And once you've done that, is it fair to say

6   that vice takes over the search?

7        A.   Yeah, once we are confident that we have located

8   all the people in a residence, let's say, and they are

9   seated and cooperative and compliant, then -- yes, then

10  we -- we basically switch out with the investigators or

11  the officers.

12       Q.   Do you have a methodology for searching through

13  a home?

14       A.   For people?

15       Q.   Yes.

16       A.   I guess everywhere is different, so a two-story,

17  single family, 2,300 square foot house is going to be way

18  different than a motel room that's just got a bed and a

19  bathroom.  So we'll look in the obvious areas, you know,

20  right in front of us.  We may look under beds.  People

21  hide under beds.  People can hide inside kitchen cabinets,

22  you know, in bathtubs, in attics.  Anywhere people can put

23  their bodies, they'll hide there.

24            So, yeah, we'll look kind of in obvious places

25  on the front end and then we do a very slow, methodical --

1  what we call either a black clear or a secondary clear,

2  and that's the time when we'll look under beds and in

3  cabinets and things like that for people that had the

4  opportunity to hide.

5       Q.   So you start just by checking every room?

6       A.   Uh-huh.

7       Q.   And after you've done that, you start looking in

8  the more secretive locations?

9       A.   Yes.

10      Q.   And once you're confident you have everybody

11 secured, you turn it over to the vice team?

12      A.   Yes.

13      Q.   Do you have information going in how many people

14 you're looking for?

15      A.   Yes and no.  Sometimes we do and sometimes we

16 don't.

17      Q.   Do you try and ascertain how many live in a

18 residence?

19      A.   Yeah, we like to know, but things change, and

20 it's case by case.

21      Q.   What's your practice if you encounter a child in

22 the course of a search?

23      A.   Someone will often stand by with the child,

24 depending on their demeanor or attitude, you know, try and

25 comfort them if they are, you know, not -- if they're

1  upset, or typically, I don't know, we'll just kind of

2  stand by.  Somebody will stand by with a child until --

3  especially if they're very young, till we can get them

4  with an adult to make them feel more comfortable.

5       Q.   What about disabled people?

6       A.   It depends on their disability and their

7  location.  Again, somebody will stand by with them until

8  we can get somebody there that knows what kind of

9  treatment or help or assistance they may need.

10      Q.   Is it typical to bring people who are outdoors

11 into a residence?

12      A.   If there's room to -- again, it's case by case.

13 I mean if we're talking about a 2,300 square foot house

14 that has a big, open area in front where we can gather

15 everybody in the same place, or if it's a little motel

16 room and there's 10 people in there, we might want to take

17 them all out just to make more room for the investigators

18 to do their search, so it just depends.

19      Q.   Is your team part of testing of drugs?

20      A.   No.

21      Q.   Is your team part of charging the suspect?

22      A.   Not in search warrant cases or other officers'

23 or detectives' investigations, no.

24      Q.   Does your team typically testify at criminal

25 trials for these types of cases?

1      A.   We have.

2      Q.   About what aspects?

3      A.   Maybe was the defendant, you know, in the house

4  on this day, were they near this big pile of drugs and

5  these guns, and they're convicted felons, things like

6  that.  It's not very often, but we have.

7      Q.   Does Raleigh have a written policy of what an

8  officer is supposed to do if you suspect an officer of

9  misconduct?

10     A.   Yes, there is.

11     Q.   What's that?

12     A.   I don't know it off the top of my head, but it

13 would basically refer to -- if you suspect an officer of

14 misconduct, there's a way to report that to a supervisor.

15     Q.   Does it go into what types of misconduct are

16 reportable?

17     A.   I'm not sure.  I just believe it's anything

18 that's, obviously, illegal or conduct unbecoming.

19     Q.   What is conduct unbecoming?

20     A.   Bribes or something like that is what I

21 would -- that's an example.

22     Q.   That's illegal, though, right?

23     A.   I'm sure it is, too.

24     Q.   Are there --

25     A.   Or taking -- I'm sorry.  You're right, "bribes"

1 is a bad word.  What's the word I'm looking for?  Just

2 taking money or gifts or things of that nature.

3      Q.   Is that graft?

4      A.   I'm not sure.

5      Q.   What about demeanor-type things, like the way an

6 officer treats the public or treats a subject?

7      A.   Yeah, I'm sure those are -- those are kind of

8 conduct unbecoming type situations, yeah, if somebody uses

9 foul language or is disrespectful to a citizen, yeah.

10     Q.   Have you ever reported an officer for

11 misconduct?

12     A.   No.

13     Q.   Have you ever seen an officer use foul language?

14     A.   Not to a citizen.

15     Q.   Are you aware of fellow officers reporting

16 misconduct?

17     A.   I'm not sure.

18     Q.   Is the policy related to reporting misconduct a

19 mandatory policy?

20     A.   I believe it is.

21     Q.   Is there any kind of ethical duties that bind

22 police officers?

23     A.   Ethical and moral duties, yes.  We are -- yes.

24     Q.   How would you describe those?

25     A.   To act in good standing, to, you know, follow

1   the law, be respectful and courteous to the citizens and

2   maintain all your duties that you're responsible for.

3        Q.   What did you know about Officer Abdullah as of

4   May 2020?

5        A.   He was a detective on the Drugs and Vice Team.

6        Q.   Did he fall in the category of case agent for

7   some cases?

8        A.   Some cases.

9        Q.   Had you worked with him before on search

10  warrants with him as the case agent?

11       A.   Yes.

12       Q.   How many times?

13       A.   I'm not sure of an exact number.

14       Q.   Was it more than 10 times?

15       A.   I would say so.

16       Q.   More than 20?

17       A.   I don't -- I don't know that much.

18       Q.   Did he have any reputation?

19       A.   In terms --

20       Q.   Any reputation that you knew about?

21       A.   No.

22       Q.   Did you ever engage in any conversations about

23  Abdullah with your fellow officers?

24       A.   No.

25       Q.   Did you consider him a reliable case agent to

1    work with?

2         A.    Yes.

3         Q.    Why?

4         A.    He worked very hard.  He seemed to always have

5    something going on in terms of work, like he was always

6    working on something.  He was on Drugs and Vice Unit.

7    They stay pretty busy.  They get a lot of complaints and

8    they follow up on those complaints and they'll try and act

9    their own investigations, so he was doing all the things

10   that appeared to me that he was doing his job.

11        Q.    When you say they get a lot of complaints, what

12   do you mean by that?

13        A.    There's a tip line that typically says you can

14   call into or e-mails or even reports to other officers

15   about locations that may have a high propensity for drug

16   sales or gang members dealing in weapons and things

17   like -- just different complaints from citizens around the

18   city.

19        Q.    Did vice deal in anything other than illegal

20   drugs and illegal weapons?

21        A.    They've been known to do -- work human

22   trafficking cases and prostitution, things of that nature,

23   as well.

24        Q.    Anything else?

25        A.    May be considered homicide if somebody dies from

1  using drugs that were sold, so they'll investigate --

2  sometimes they'll investigate what are called death by

3  distribution cases with the help of Homicide.  Frequently,

4  they'll kind of partner up, I guess, on those, but those

5  are just the things I'm aware of off the top of my head.

6       Q.   And what did you know about Dennis Williams as

7  of May 2020?

8       A.   Do you have another name for him or anything?

9       Q.   That's Aspirin.

10      A.   Okay.  I just knew him as one of Abdullah's

11 confidential informants.

12      Q.   When did you first become aware of Aspirin?

13      A.   I could not remember a date.

14      Q.   What's the first time you remember doing one of

15 those open-air arrests that you mentioned with Aspirin?

16      A.   Like one from 3416 Poole Road jumps out in my

17 mind.  I think he used that location quite often for folks

18 selling drugs.

19      Q.   What happened on that day?

20      A.   We had a briefing, said, you know, that Abdullah

21 had a confidential informant that could do a controlled

22 buy of narcotics from a subject and they would meet him at

23 the Food Lion shopping center at 3416 Poole Road, and that

24 he was put in the area.  The person that he said would

25 come came.  I guess they had text conversations or

1  something like that, and so they knew when he was coming.

2  They knew he would show up then.

3          The confidential informant got in the vehicle

4  with the alleged drug dealer.  A deal was done.

5  Typically, we would get kind of a code word.  I don't know

6  what the code word would have been that day, but it would

7  have been kind of the detective's queue or clue that the

8  deal was done and then we could move in to make the

9  arrest.

10      Q.   Were you watching that on a bug?

11      A.   Or listening, one of the two.

12      Q.   And if you make an arrest out of a car, how do

13  you do that?

14      A.   The person is -- basically, we would split up in

15  different covert vehicles and we would kind of try and

16  surround or box the car in, if they were still in the car,

17  so that way prevent their escape, and then make a full

18  detention of the vehicle and the person in it.  They'd be

19  removed and handcuffed and turned over to detectives.

20      Q.   Do you arrest the confidential informant in that

21  case?

22      A.   Sometimes.

23          MS. PACKER:  Just to clarify, are we talking now

24  about the specific memory of this incident --

25          MS. SIMPSON:  Yeah, 3416 Poole Road.

1          MS. PACKER:  Okay.  So she's asking you about

2   this specific time.

3          THE WITNESS:  Okay.

4          BY MS. SIMPSON:

5      Q.   Did you arrest the confidential informant known

6   as Aspirin on that day?

7      A.   I don't believe so.  I don't believe so.

8      Q.   Did you know the source of his nickname,

9   Aspirin?

10     A.   No.

11     Q.   Did you know --

12     A.   They give confidential informants all kinds of

13  names, so no, I don't.  I don't understand, no.

14     Q.   What else did you know about Aspirin on that

15  day?

16     A.   We don't get involved with confidential

17  informants.  If that's the informant of an officer or

18  investigator, that is their informant and we try and stay

19  out of that.  Again, we're not a part of the bigger,

20  broader investigation.

21     Q.   Were you trained on what to do if you ever had

22  doubts about the reliability of a confidential informant?

23     A.   I don't think there's any specific training on

24  that.  I think if there was any doubts, you know, you

25  would probably want to report that.

1     Q.   To whom?

2     A.   Maybe the case agent, maybe a supervisor.  I'd

3  start with a supervisor, maybe.

4     Q.   What if you have doubts about an officer's

5  reliability or truthfulness?

6     A.   That's a straight to the supervisor kind of

7  thing, I guess.

8     Q.   Did you ever encounter drugs on a search you

9  were doing for Abdullah that looked fake to you?

10     A.   No.

11     Q.   Did you see drugs when you were doing warrants

12  on some of the homes affiliated with Abdullah's cases?

13     A.   I'm sure we have.

14     Q.   But you don't have any specific memory?

15     A.   No.

16     Q.   Did you meet with vice officers prior to the

17  execution of the VanIrvin warrant on May 20th, 2020?

18     A.   Yes.

19     Q.   Who did you meet with?

20     A.   We would have met with the drug team for a

21  briefing.

22     Q.   Do you remember who was on that team?

23     A.   Yeah.  Abdullah and Detective Gay, Detective

24  Rattelade and Detective Monroe.  I think that's it.

25     Q.   In that meeting, did you discuss an entry plan?

 1      A.   Yeah, we would have done that after we probably
 2  did the scout and I did all my responsibilities and
 3  scouted it with a case agent.
 4      Q.   And the case agent was Abdullah?
 5      A.   Yes.
 6      Q.   When did you go out to the location?
 7      A.   It was daylight, so probably afternoon sometime.
 8      Q.   Was that May 20th?
 9      A.   I guess so.
10      Q.   Was it just you and Abdullah?
11      A.   Possibly.
12      Q.   Had you done those Internet searches you
13  mentioned, the Google Maps and the real estate, before you
14  went out?
15      A.   Yes.
16      Q.   And did you go out to 1620 Burgundy Street, B?
17      A.   Is it 1628?
18      Q.   Which one did you go to?
19           MS. PACKER:  Objection.
20           THE WITNESS:  Whatever is on the search warrant
21  is where I went.
22           BY MS. SIMPSON:
23      Q.   What did you observe there?
24      A.   The residence in question.  It's a neighborhood
25  that we've served numerous search warrants in.  It's a

1  City of Raleigh housing complex.  They would have pointed

2  out the apartment and confirmed that with what I saw

3  on -- the numbers on the building and the apartment and

4  what was on the search warrant.

5       Q.   Did you see any children when you scouted?

6       A.   No, not at that particular apartment, no.

7       Q.   Did you see any occupants?

8       A.   No.  When we drove by, there was nobody out in

9  front of that apartment.

10       Q.   Did you get out of the car?

11       A.   No.

12       Q.   Were you in an unmarked vehicle?

13       A.   Yes.

14       Q.   Were you driving?

15       A.   No.

16       Q.   Who was driving?

17       A.   Abdullah.

18       Q.   Where were you sitting?

19       A.   I'm not sure.

20            MS. PACKER:  When you get to a good point, can

21  we take a short break?

22            MS. SIMPSON:  That would be great.  I'm going to

23  pull some exhibits, so --

24            MS. PACKER:  Okay.

25            MS. SIMPSON:  All right.  Go off record.

 1          (WHEREUPON, a brief recess was taken.)

 2          BY MS. SIMPSON:

 3     Q.    Okay.  I'll display what our system has marked

 4  as Exhibit ZZ.

 5          (Plaintiffs' Exhibit ZZ was identified.)

 6          MS. DIXON:  I'm sorry.  What exhibit is this?

 7          MS. SIMPSON:  ZZ, as in Zada Zada.

 8          BY MS. SIMPSON:

 9     Q.    This is a warrant that Abdullah applied for for

10  1628 Burgundy Street, Apartment B.  Have you seen this

11  before?

12     A.    Yes, I have.

13     Q.    Does it say the premise to be searched is 1628

14  Burgundy Street, Apartment B, Raleigh, North Carolina?

15     A.    (No response.)

16     Q.    Does it say that?

17     A.    Yes.  Yes.  Sorry.

18     Q.    Is this the premises that you were scouting with

19  Abdullah when we were talking a minute ago?

20     A.    Yes.

21     Q.    When you drove by the premises, did you observe

22  that the house was brown-colored brick with a gray roof,

23  white windows and a red front door?

24     A.    Yes.

25     Q.    And did you observe the number 1628?

1      A.   Yes.

2      Q.   And did you observe a tree in the front of the

3  yard?

4      A.   I'm not sure.

5      Q.   When you were surveilling the location, did you

6  notice anything amiss between what was on the warrant and

7  what you saw?

8      A.   No.

9      Q.   Did you later find out it was the wrong

10  premises?

11      A.   No.

12      Q.   You never came to understand that you had

13  entered the wrong premises?

14      A.   No.  We never entered the wrong premise, based

15  on the search warrant.

16      Q.   Because the search warrant was for 1620 and you

17  entered 1628?

18      A.   No.  We entered 1628.

19      Q.   And is this a picture of 1628?

20      A.   That is what it looks like.

21      Q.   And did Marcus VanIrvin live at 1628?

22      A.   That I don't know.

23      Q.   Did you ever come to find out that a family

24  called Yolanda Irving and her children lived at 1628?

25      A.   Later on, and that's who was in the house.

1      Q.   What did you say?

2      A.   I said either later on, but that was who was in

3  the house.

4      Q.   Who was in the house?

5      A.   Yolanda Irving, yeah.

6      Q.   Okay.  And did you ever find out there was a

7  mistake that day?

8      A.   We were unaware of any mistake made.

9      Q.   Up until the present day?

10     A.   I don't understand.

11     Q.   When did you find out there was a mistake made

12  that day?

13          MS. PACKER:  Objection.

14          MS. DIXON:  Objection.

15          THE WITNESS:  I don't believe that a mistake was

16  made that day.

17          BY MS. SIMPSON:

18     Q.   So you -- okay.  When you approached for the

19  actual entry, did you see any kids outside?

20     A.   Yes.

21     Q.   Did that surprise you?

22     A.   No.  They were teenagers, appeared to be.

23     Q.   How many?

24     A.   Four.  I believe four.

25     Q.   And did your scouting suggest that there would

1  be teenagers on the premises?

2      A.   No.  I wouldn't have picked up teenagers living

3  there if they weren't outside when I did the scout.

4      Q.   Had Abdullah mentioned any teenagers?

5      A.   Not that I remember.

6      Q.   What did Abdullah describe as what to expect in

7  terms of residents of the home?

8      A.   I wouldn't be able to remember exactly who he

9  said lived there.  Based on the warrant, we were looking

10 for Mr. VanIrvin, I believe, or Irving, Mr. Irving.

11     Q.   Do you have an idea or understanding of how the

12 wrong number was placed on the warrant application?

13          MS. PACKER:  Objection.

14          MS. DIXON:  Objection.

15          MS. KIBLER:  Objection.

16          THE WITNESS:  No.

17          BY MS. SIMPSON:

18     Q.   I'm going to pull the video, and this has been

19 labeled BBB.

20          (Plaintiffs' Exhibit BBB was identified.)

21          BY MS. SIMPSON:

22     Q.   Sorry.  I didn't mean to push my screen share.

23 Okay.  I'm going to play this video.

24          (A portion of Exhibit BBB was played on the

25 videoconference monitor.)

1              BY MS. SIMPSON:

2         Q.   Do you know what's being shown on the screen

3    right now?

4         A.   It looks like the inside of our van.  Is there

5    any context to this?

6         Q.   This is -- my understanding is that this is a

7    video of the team headed towards the VanIrvin warrant.

8         A.   It looks like the inside of our van.

9         Q.   Is this typically what it looks like when you're

10   on your way to a search warrant situation?

11        A.   If we're arriving by that van.

12        Q.   I'm going to move it ahead a little bit.  Do you

13   know whether this is your body camera or somebody else's?

14        A.   It's not my body camera.

15        Q.   Do you have an understanding of whose it is?

16        A.   Maybe Officer Garner's.

17        Q.   Can you tell who is in front of the officer,

18   whose body camera it is?

19        A.   Who, now?

20        Q.   These two figures ahead of the body camera, can

21   you tell who that is?

22        A.   That's our shield that would be in front of him,

23   our ballistic shield.  That would be Officer Perrin.  And

24   then I can't tell if that's me or Ortiz in front of him.

25   I'm not sure, just based on that angle.

1        Q.   Do you recognize the location that this video

2   depicts?

3        A.   We are in the Raleigh North Apartments.

4        Q.   Is that an area you're familiar with?

5        A.   Very.

6        Q.   Why?

7        A.   I've personally responded to calls there.  We

8   have served numerous search warrants there.  We've made

9   numerous drug arrests, arrests for weapons violations,

10  homicide suspects, stolen cars, crimes of that nature.  It

11  has a high propensity for gang activity and drug sales and

12  violent crimes occur there all the time.

13       Q.   How often have you been there in the last few

14  years?

15       A.   I would say I'd got there -- at least patrol

16  through that neighborhood at least once a month.  If we

17  don't have something going on there or we're not

18  responding to a call there, we at least make a point to

19  proactively also patrol the area.

20       Q.   And did you say that it's run by the City of

21  Raleigh?

22       A.   I believe it's a City of Raleigh housing

23  complex, yes.

24       Q.   Is that public housing?

25       A.   Public housing.

1      Q.   Can you tell if you're in this image?

2      A.   I'm pretty sure that's me in the doorway.

3      Q.   Is it where I'm putting my cursor?

4      A.   No.

5      Q.   No, inside the door?

6      A.   Yeah.

7      Q.   Okay.  So were you the first officer in?

8      A.   Yes.

9      Q.   What color was the door when you entered it?

10          MS. PACKER:  Sorry, I just didn't hear your

11   question.

12          BY MS. SIMPSON:

13     Q.   What color is this door?

14     A.   I can't tell in that image there.

15     Q.   Do you remember what color it was?

16     A.   No.

17     Q.   What was your decision-making process in terms

18   of entering that door?

19     A.   Well, you can't see in this depiction what

20   happened.  You'd have to pull up my video to see what I

21   saw.

22     Q.   Do you remember what you saw?

23     A.   I remember what I saw.

24     Q.   Please tell me.

25     A.   Okay.  We are, obviously, responding to 1628,

1  Apartment B, on Burgundy Street.  This was the apartment

2  that was pointed out to me on the scout, with the

3  corresponding numbers and apartment letter match what is

4  on the search warrant.

5          We deployed from one building over, so that way

6  our approach would not be seen.  But as you can see, it's

7  daylight of some sort.  I don't remember what time of day

8  it was, but as I rounded the corner to go to the front of

9  that building to approach Apartment B, there were four

10 teenagers or teenage-aged males, what looked like to me in

11 that split second, standing out front of our target

12 location.

13         As we approached, obviously in full tactical

14 gear with "Police" on every side of our body, obviously,

15 the police -- and we are no stranger over there in that

16 neighborhood, as I have mentioned before.  Everybody knows

17 who we are.  Everybody knows what the police look like.

18 Everybody knows what the Selective Enforcement Unit

19 members look like.

20         As we approached that, around that corner, those

21 males were alerted to our presence and, obviously, readily

22 identifiable as police, upon seeing our presence, fled

23 into the apartment in which we had a search warrant for

24 and two others fled -- or two fled into the target

25 apartment and two others fled into the adjacent apartment

1   next door.

2        Q.   And what did you do at that point?

3        A.   I pursued the subjects running into the -- into

4   Apartment B because that was where our search warrant is

5   for.  Obviously, our presence had already been made known

6   because we are readily identifiable as police officers,

7   and upon our presence fled, so I gave chase in direct

8   pursuit of the subject into the target apartment, and that

9   subject was just -- I think he fell or tripped over

10  something in the apartment and he sat there on the floor

11  and was detained in that capacity.

12       Q.   So the pursuit of a subject, is that -- that's

13  something you mentioned to me earlier, right, as maybe an

14  exigency?

15       A.   That's part of it.

16       Q.   Can you tell me about that?

17       A.   Well, again, we had a search warrant for this

18  location.  The subjects were standing out in front of that

19  location and then they entered that location, as if -- I

20  guess it doesn't matter if they live there or they're

21  visitors, but they entered that location.  The door is not

22  fortified at that point.  It is wide open.

23            Clearly, our purpose and authority was made

24  known by our presence and by their flight into the

25  location, so, therefore, I have the authority to pursue

1  subjects in a direct pursuit into that location.

2      Q.   Are all of the team members at this time SEU

3  team members?

4      A.   Yes, from what I've seen.

5      Q.   What position did you have your gun in at the

6  entry?

7      A.   It's typically just in a state of low ready, of

8  readiness.  It's a rifle and we're trained to carry it in

9  a certain way, so that way, if a threat were to present

10 itself, we can respond or react accordingly.

11     Q.   This person here sitting on the floor, was that

12 one of the people who was outside the apartment?

13     A.   Yes.

14     Q.   Is he the person who fell or tripped?

15     A.   Yes.

16          (A portion of Exhibit BBB was played on the

17 videoconference monitor.)

18          BY MS. SIMPSON:

19     Q.   Do you know who that officer is right there?

20     A.   That's Detective Gay.

21     Q.   So at this point, vice officers have entered?

22     A.   Or they were invited in to assist.

23     Q.   Does that indicate that SEU felt that all the

24 people had been secured?

25     A.   No, not -- we will -- when we have secured a

1  residence, we will invite the entire team in.  It appears

2  just by looking at it, the way she came in, is she was

3  invited in to help with -- doing visual security on that

4  subject because we had kind of gotten split up.  Our team

5  had gotten split up, so to speak.

6        Q.   How had it gotten split up?

7        A.   Me and one or two other SEU members went and

8  knocked on the door next door for the other two subjects

9  that fled and gave them commands to come out of that

10 apartment until they could figure out whether they were

11 involved in whatever was going on in this house or not.

12       Q.   And how did they respond to that command?

13       A.   Two subjects came down and I believe a third

14 female that was already in that particular apartment came

15 down, as well.

16       Q.   I'm just going back in this video, back in time.

17            (A portion of Exhibit BBB was played on the

18 videoconference monitor.)

19            BY MS. SIMPSON:

20       Q.   I'm trying to see if there's a view -- here we

21 go.  Can you see what color the door is here?

22       A.   It looks light-colored in that view.

23       Q.   Does it match the description on the warrant of

24 a red front door?

25       A.   It says that on the warrant?  If you could pull

1   that back up so I could re-read that.

2        Q.   Sure.  I'll stop the screen for a second.  So

3   does the warrant say --

4        A.   A red front door.  Okay.

5        Q.   -- it had a red front door?  So did the premises

6   that you entered have a red front door?

7        A.   Not in that view.  It doesn't look like a red

8   door.

9        Q.   Did the premises you entered have this tree in

10  front of the door?

11       A.   I believe there was a tree.  I'm not sure about

12  the angle, though.

13       Q.   Did it match this picture?

14       A.   I'm not sure, looking at that picture and then

15  the view you see from the street.  I'm not sure.

16       Q.   How close is it to the street?

17       A.   What?

18       Q.   The front door of the premises you entered.

19            MS. PACKER:  I didn't hear the question.

20            BY MS. SIMPSON:

21       Q.   How far from the street?

22       A.   I'm not sure of the exact -- how many feet it

23  is, or whatever, but it's up kind of a hill from a street

24  that kind of dead ends on a cul-de-sac, kind of deal.

25  It's just a little hill from the street and the

1  cul-de-sac.

2       Q.   When you had that warrant, was it in color?  The

3  picture, was it in color?

4       A.   I'm not sure.  Sometimes copies were made and

5  I'd get a copy of a copy.

6       Q.   So you don't remember whether you had a color --

7       A.   I don't remember.

8       Q.   Okay.  Did you forcibly enter the apartment next

9  to this one?

10      A.   No.

11      Q.   How did you enter it?

12      A.   We didn't enter the apartment, really, next

13  door, I don't believe.  It was -- either the door was

14  unlocked or it was ajar and we gave instructions to the

15  subjects that ran in there to come downstairs.

16      Q.   So is checking details like the color of the

17  door part of what you normally do as a scout?

18      A.   It would normally be if it's obvious in the

19  search warrant or it's relevant to the search warrant.

20      Q.   What are the consequences of entering the wrong

21  home on a search warrant?

22      A.   I'm not sure I've ever entered the wrong home on

23  a search warrant, so I'm not familiar.

24      Q.   But you don't have any kind of sense of whether

25  that would be a problem to enter a private residence that

1  was not on a search warrant?

2      A.   I'm sure that's a problem, probably some

3  liability there.

4      Q.   But you say that you've never entered the wrong

5  home?

6      A.   No.

7      Q.   So you continue to believe that this home here

8  was the correct home, the home of Marcus VanIrvin?

9          MS. PACKER:  Objection to the form of the

10 question.

11         MS. DIXON:  Same objection.

12         THE WITNESS:  That is 1628 B and that was what

13 was on the search warrant and that is the residence that

14 we entered.

15         BY MS. SIMPSON:

16     Q.   But was it the home of Marcus VanIrvin?

17     A.   That I don't know.

18     Q.   Up until today, you have no idea whether that

19 was the residence of Marcus VanIrvin?

20         MS. PACKER:  Objection.

21         THE WITNESS:  I don't know.  I mean he could be

22 a visitor.  He could live there.  He could -- I don't

23 know.  I just don't know what his status is as a resident.

24 I didn't go to look in the City of Raleigh's housing

25 agreements or anything like that, so I wouldn't know.

1            BY MS. SIMPSON:

2       Q.   But if Mr. VanIrvin lived in an apartment with a

3  red door with a tree in front, and this is a house with a

4  beige door and not a big tree in front, would you agree

5  those are two separate homes?

6            MS. PACKER:  Objection.

7            THE WITNESS:  They may be.

8            BY MS. SIMPSON:

9       Q.   I'm going to play another video.  Okay.  If we

10 could label this one HHH.

11           (Plaintiffs' Exhibit HHH was identified.)

12      Q.   And this is the Mead body camera from the Banks

13 execution, so this is your body camera on an execution of

14 a residence with the last name Banks.

15      A.   Okay.

16           MS. KIBLER:  Just for the record, I want to

17 object to the description of the video.

18           (A portion of Exhibit HHH was played on the

19 videoconference monitor.)

20           BY MS. SIMPSON:

21      Q.   Do you remember this incident?

22      A.   I watched it.  It looked familiar, but I'm not

23 aware -- I don't remember any of the details behind it.

24      Q.   And where did you get the key to that apartment?

25 Do you remember?

1      A.   I would say the investigator received it from

2  the leasing office.

3      Q.   Is that typical of how you execute a knock and

4  announce warrant in terms of the order of opening the door

5  and announcing?

6      A.   If we have a key, yes.  That way, we don't have

7  to do any -- we don't have to force entry or anything like

8  that, or if it's unlocked, yeah, we'll always check the

9  knob first.  That way, we don't have to damage anybody's

10 property, and push it open.  Once it's opened, we announce

11 our presence and it's pretty much just an open door at

12 that point.

13     Q.   And then you immediately go in; is that

14 accurate?

15     A.   I mean, I guess there's a brief pause as that

16 door comes open, and then, of course, the first guy still

17 has to step in, so that takes him a second, so we're able

18 to at least kind of look in and assess what's happening on

19 the inside and then -- yeah.  Again, we're announcing our

20 authority and presence and intent.

21     Q.   Okay.  This one I will mark III, and this one is

22 marked Mitchell and it's also Mead's body camera.

23          (Plaintiffs' Exhibit III was identified.)

24          (A portion of Exhibit III was played on the

25 videoconference screen.)


**REED & ASSOCIATES**
MATTHEWS, NORTH CAROLINA  980.339.3375

1          BY MS. SIMPSON:

2     Q.   Can you tell us what's going on here?

3     A.   Appears to be a vehicle takedown or a detention.

4          (A portion of Exhibit III was played on the

5     videoconference monitor.)

6          BY MS. SIMPSON:

7     Q.   And what is that technique called, where the

8     person is taken out of the car?

9     A.   An intraction.

10    Q.   Is that how you're trained to do that?

11    A.   Yes.

12    Q.   And what's the purpose of doing it that way?

13    A.   It allows maximum control over a known subject

14    that is under arrest, or not that they're known, but they

15    are under arrest and it doesn't afford them the

16    opportunity to destroy any evidence or reach for any

17    weapons.

18         (A portion of Exhibit III was played on the

19    videoconference monitor.)

20         BY MS. SIMPSON:

21    Q.   Is there any analysis done about whether that

22    maneuver is necessary for a particular subject or is it

23    for all subjects being arrested out of a vehicle?

24    A.   All subjects that we primarily deal with.  That

25    doesn't happen all the time, depending on -- again, it's

 1   case by case.  I don't really have any context to this.

 2   Obviously, I'm there.  I somewhat remember it, but I don't

 3   know the background to it.  I don't know if we knew the

 4   subject's criminal histories, but that -- that is a proven

 5   technique that doesn't cause any harm to anybody and it

 6   keeps everybody safe on both ends.

 7       Q.   Okay.  This is another Mead body camera that I

 8   labeled JJJ, and it was marked as a Smith incident.

 9            (Plaintiffs' Exhibit JJJ was identified.)

10            (A portion of Exhibit JJJ was played on the

11   videoconference monitor.)

12            BY MS. SIMPSON:

13       Q.   Is this the type of incident you were describing

14   that you did with Aspirin and a buyer -- or a seller,

15   rather?

16       A.   That is the Food Lion parking lot at 3416 Poole

17   Road.

18       Q.   Okay.  So that's the exact incident you were

19   describing?

20       A.   I believe so.

21       Q.   Was Aspirin still in this car?

22       A.   No.  As you can see, it looks like only that one

23   subject was removed from the vehicle.

24       Q.   Right.  So does that mean Aspirin had left the

25   premises and then you moved in?

1     A.   Yes.

2     Q.   Okay.  This one, if I could label it KKK,

3  unfortunately.  Maybe we'll skip that one.  We'll skip

4  that one.  What's after that?  LLL, and this is your body

5  camera, Mead body camera in a case labeled Washington.

6          (Plaintiffs' Exhibit LLL was identified.)

7          (A portion of Exhibit LLL was played on the

8  videoconference monitor.)

9          BY MS. SIMPSON:

10    Q.   Do you remember this incident?

11    A.   I'm not sure.  I mean I think I know what

12  apartment complex it is.  Again, I have no context as to

13  the background or I don't recognize the name Washington.

14    Q.   Are apartment complexes more challenging than

15  single families?

16    A.   No.  I mean, each one has its things that make

17  them easy to approach and each one has difficulties, and

18  if there's multiple floors that you have to go upstairs

19  for or houses in cul-de-sacs are unpreferable.

20    Q.   Why is that?

21    A.   Just like if it's on a dead-end road or a

22  cul-de-sac, there's -- sometimes it's hard to just kind of

23  have a secretive approach.

24          (A portion of Exhibit LLL was played on the

25  videoconference monitor.)

1          BY MS. SIMPSON:

2      Q.   Can you describe how the entry was made in this

3   particular search warrant?

4      A.   Yeah.  I feel like I hear a noise flash device,

5   as well, so there's probably, obviously -- again, without

6   knowing the context behind it or a little bit of the

7   story, there's probably some allegation of a crime of

8   violence or a subject known to use weapons or firearm,

9   based on that noise device I heard go off in the

10  background, but, again, we approached and found the door

11  locked, knocked and announced.  It seems the audio and the

12  visual may be off a little bit, but that happens with

13  these body cams.  And then it was forcibly entered due to

14  it being locked.

15     Q.   So in this case, would the authorization have

16  been made prior to forcibly enter the home?

17     A.   More than likely, seeing as how there was also a

18  noise flash device used, because those have to be approved

19  by a supervisor and a plan has to be put in place to

20  utilize those.

21          (A portion of Exhibit LLL was played on the

22  videoconference monitor.)

23          BY MS. SIMPSON:

24     Q.   So was the first time I heard a knock and

25  announcement.  That's at 1:40, right?

1      A.    Okay.

2            (A portion of Exhibit LLL was played on the

3    videoconference monitor.)

4            BY MS. SIMPSON:

5      Q.    And that's at 1:41, you bang the door, right?

6      A.    Okay.

7      Q.    So that's one second?

8      A.    In that instance, yes.

9            (A portion of Exhibit LLL was played on the

10   videoconference monitor.)

11           BY MS. SIMPSON:

12     Q.    And that was -- was that at 1:43, the flash

13   bang?

14     A.    It sounds like it.

15           (A portion of Exhibit LLL was played on the

16   videoconference monitor.)

17   BY MS. SIMPSON:

18     Q.    Okay.  This one I will label MMM, and I don't

19   know whose body camera this is, but it is the Knight

20   incident, Knight, K-n-i-g-h-t.

21           (Plaintiffs' Exhibit MMM was identified.)

22           (A portion of Exhibit MMM was played on the

23   videoconference monitor.)

24           BY MS. SIMPSON:

25     Q.    Can you tell if this is your body camera?

1      A.   No.

2      Q.   Do you recognize this scene?

3      A.   No.

4      Q.   It's nighttime in this video, right?

5      A.   It appears so.  It's pretty dark.

6           (A portion of Exhibit MMM was played on the

7    videoconference monitor.)

8           BY MS. SIMPSON:

9      Q.   I think I stopped at -- I think it was 1:28.  Do

10   you agree, when the banging began?

11     A.   Yeah, I can agree on that.  I don't believe this

12   is -- I don't believe that's us.

13     Q.   Okay.

14     A.   Or my team is what I mean.

15     Q.   The door was opened at 1:30; is that correct?

16     A.   Okay.

17     Q.   But you don't believe this is your SEU team?

18     A.   I don't think so.  I don't recognize it, or if

19   it is, I wasn't there.  I don't recognize this.

20     Q.   Okay.  Is this an SEU team from the Raleigh

21   Police Department?

22     A.   It may be, I mean, if this is from the Raleigh

23   Police Department.

24          (A portion of Exhibit MMM was played on the

25   videoconference monitor.)

1          THE WITNESS:  It's the same apartment complex,
2    it looks like.
3          BY MS. SIMPSON:
4     Q.   As which?
5     A.   The previous video.
6     Q.   The Washington video?
7     A.   I forget what it was labeled.  I'm sorry.
8    Whatever that --
9     Q.   Not the City of Raleigh complex, but the other
10   complex?
11    A.   No, there's the previous video to this one.  It
12   appears to be the same apartment --
13    Q.   That was the Washington.
14    A.   Okay.
15         (A portion of Exhibit MMM was played on the
16   videoconference monitor.)
17         THE WITNESS:  Yeah, that's the other team, so
18   that is a Raleigh SEU team.
19         BY MS. SIMPSON:
20    Q.   Do you know who are the members of that team?
21    A.   They have changed.  Some guys have gotten
22   promoted or transferred to different divisions, so I'm
23   not -- I'm not sure who would have been in this one.
24         (A portion of Exhibit MMM was played on the
25   videoconference monitor.)

1          BY MS. SIMPSON:

2      Q.   I'm almost done, but I might need a couple of

3  minutes just to organize my thoughts, so if you would want

4  to go off the record.

5          MS. PACKER:  Sure, take a quick break.

6          (WHEREUPON, a brief recess was taken.)

7          BY MS. SIMPSON:

8      Q.   I'm going to mark one more video, MMM, and this,

9  I believe, is your body camera on the VanIrvin warrant

10  execution.

11     A.   Okay.

12         COURT REPORTER:  Did you say NNN?

13         MS. SIMPSON:  M, as in Mary.

14         MS. PACKER:  That was the last one.

15         MS. SIMPSON:  Oh, I'm sorry.  Then in that case,

16  NNN.  Thank you so much.

17         COURT REPORTER:  Sure.

18         (Plaintiffs' Exhibit NNN was identified.)

19         (A portion of Exhibit NNN was played on the

20  videoconference monitor.)

21         BY MS. SIMPSON:

22     Q.   Do you recognize this as your view on this

23  warrant execution?

24     A.   Not yet.

25     Q.   I can go back.

1      A.   It kind of comes in -- comes in a little late.
2  There we go.

3      Q.   Is that you?

4      A.   It appears to be me, yep.

5      Q.   And that showed your entry into the apartment?

6      A.   Yes.

7      Q.   And you followed in this teenager who's going to
8  the floor?

9      A.   Yes, and one other ran in there, as well.

10     Q.   Looking out here at 18 seconds, this is the
11 apartment next door to B, right?

12     A.   Yes, ma'am.

13     Q.   Do you know the address of that apartment?

14     A.   I would assume it's A, but I don't know for
15 sure.

16     Q.   Okay.  Who is that next to you?

17     A.   It looks like Officer Debonis.

18     Q.   Is it a technical problem that there's no audio
19 or is there no audio on at this time?

20     A.   If we're only 20 seconds in, it's about to kick
21 in.  There's a 30-second delay sometimes.

22          (A portion of Exhibit NNN was played on the
23 videoconference monitor.)

24          BY MS. SIMPSON:

25     Q.   So I just heard shouts, "So we know you're in

1   there."  What was the purpose of that shout?

2        A.   Because, again, there was four subjects that

3   were hanging out on the stoop in front of the target

4   location, 1628 B, so upon, obviously, our -- upon seeing

5   us as uniformed police officers, they fled upon our sight.

6   And so until we can determine that they are not a part of

7   that apartment and that they didn't just break into that

8   apartment or they're fleeing by some other means, we're

9   going to try and get them to comply with some

10  instructions.

11            (A portion of Exhibit NNN was played on the

12  videoconference monitor.)

13            BY MS. SIMPSON:

14       Q.   I think that second, you could actually see the

15  A.

16       A.   You could see the A.

17       Q.   Yeah.

18            (A portion of Exhibit NNN was played on the

19  videoconference monitor.)

20            BY MS. SIMPSON:

21       Q.   Did you have authority to go in this apartment?

22       A.   If we are -- again, if those -- until we

23  determine that those folks are not associated with our

24  target apartment -- again, we don't have a search warrant

25  to go in there, but they fled from our target apartment

1   into this apartment, so yes, we have authority to at least

2   detain them until we can determine otherwise.

3        Q.   But do you have authority to go in the

4   apartment?

5        A.   At --

6             MS. PACKER:  Objection, asked and answered.

7             THE WITNESS:  Yeah.  Yes, we do.

8             BY MS. SIMPSON:

9        Q.   And the basis of that is the subjects who were

10  outdoors fled into it?

11       A.   That fled from our sight and from our

12  approach -- upon sight of us, into that location, yes.

13            (A portion of Exhibit NNN was played on the

14  videoconference monitor.)

15            BY MS. SIMPSON:

16       Q.   Did you recognize who the other officers were in

17  there?  I can go back and show you.

18       A.   Yeah, you'd have to go back.  And it appears

19  they gave us, also, consent to come in there, as well.

20       Q.   Okay.  This person here?

21       A.   That's Officer Debonis.

22       Q.   And the second officer?

23       A.   That's kind of blurry.

24            (A portion of Exhibit NNN was played on the

25  videoconference monitor.)

1            THE WITNESS:  I want to say that's Officer K.

2    Thompson.

3            BY MS. SIMPSON:

4        Q.   And this person in the blue vest?  Is that blue?

5        A.   I don't know.  That looks like Abdullah.

6        Q.   Does Abdullah work with both SEU teams?

7        A.   He probably had.

8            (A portion of Exhibit NNN was played on the

9    videoconference monitor.)

10           BY MS. SIMPSON:

11       Q.   Do you know if drugs were found in either of

12   these apartments?

13       A.   I don't know.  I don't believe A was searched at

14   all, so --

15           (A portion of Exhibit NNN was played on the

16   videoconference monitor.)

17           BY MS. SIMPSON:

18       Q.   Is this voice your voice?

19       A.   Yes.

20       Q.   When you asked who's in contact with blue and

21   whites, what does that mean?

22       A.   To see -- I don't remember if we had some field

23   operations officers joining us on this or they needed to

24   be called to come assist us, but we just wanted a marked

25   police car's presence out there and then some assistance

1  with security.

2       Q.   And why was that?

3       A.   That's common practice to request a field

4  operations officer to come and stand by after the search

5  warrant is over with so that they can help with security

6  if there's people to watch for the time being while the

7  detectives search, and then if anybody is under arrest,

8  they can go in a marked patrol car.

9       Q.   Is this a view right now of the street in front

10 of this apartment?

11      A.   Yes, it is.

12      Q.   Is that the street you drove by when you were

13 scouting?

14      A.   Yes, and there's a little cul-de-sac at the end.

15      Q.   Okay.  You're standing right in front of the

16 doors now.  Is there a big tree right in front of the

17 door?

18      A.   Not right in front of the door.

19      Q.   When you were describing all of your scouting

20 procedures, are the big tree and the color of the door --

21 are those normal things that you would mark?

22      A.   They could be insignificant.  At the time, we're

23 going off the picture that was in the search warrant.  I

24 don't know if that's a older picture or whatnot.  That was

25 a screen grab off of Google.  Trees fall down or get cut

1  down and every door in that apartment complex has been

2  replaced here over the last couple of years because they

3  all used to be green.  So I don't -- like the color of the

4  door is kind of insignificant to me.  You know, it was

5  described based off of just the picture alone.

6       Q.   So what's the purpose of getting the real estate

7  shot or the Google shot, if not to match it against what

8  you're seeing when you scout it in real life?

9       A.   I mean, again, things change.  Things get

10 remodeled.  Doors get replaced or repainted.  Trees get

11 cut down or fall down during storms, so that's why you go

12 and you physically look at the location and have a case

13 agent physically, you know, tell you or point out the

14 location that we need to go to.

15      Q.   Did Abdullah do that in this case?

16      A.   Yes, he took me on the scout, on the physical

17 scout.

18      Q.   And how long were you on the premises when you

19 did the physical scout?

20      A.   Long enough just to drive down to that

21 cul-de-sac and turn around and head right back out.

22           (A portion of Exhibit NNN was played on the

23 videoconference monitor.)

24           BY MS. SIMPSON:

25      Q.   When you did that scout, did you mark it all

1   down on a scout form?

2         A.   I would have.

3              (A portion of Exhibit NNN was played on the

4   videoconference monitor.)

5              BY MS. SIMPSON:

6         Q.   When you're referring to "that," what was that?

7         A.   I believe we were looking for money.  We were

8   looking for Raleigh police buy money.

9              (A portion of Exhibit NNN was played on the

10  videoconference monitor.)

11             BY MS. SIMPSON:

12        Q.   And you're looking for an adult male, right?

13        A.   I believe so.  Are you referring to -- who are

14  you referring to?

15        Q.   Marcus VanIrvin.

16        A.   Okay.  Yes.

17        Q.   And was there ever an adult male encountered in

18  this apartment?

19        A.   Not that I've seen, no.

20             (A portion of Exhibit NNN was played on the

21  videoconference monitor.)

22             BY MS. SIMPSON:

23        Q.   Were you the one -- you were running a cane up

24  the stairs?

25        A.   I believe that's what that looked like, yeah, a

1  cane.

2      Q.   What was that for?

3      A.   I believe the young man that was using the

4  restroom there needed it for his mobility.

5      Q.   And how were you advised of that?

6      A.   I believe Officer Webb up there that was

7  escorting that young man asked for it and just said it was

8  downstairs, so I was down there.  I grabbed it.

9      Q.   I think I'm done now.  Thank you very much.

10          MS. PACKER:  Just one clarification, Officer

11  Mead.

12                        EXAMINATION

13          BY MS. PACKER:

14      Q.   You testified about these apartments, that you

15  were familiar with them generally, and you had been there

16  in that vicinity before.

17  A.Yes.

18      Q.   Do you know for sure who owned those apartments?

19      A.   I believe they were the City of Raleigh's

20  property, but I may be mistaken from that if it's a

21  private company now or something.  I think at one time, I

22  thought it was city property.

23      Q.   You were familiar with this property, generally?

24      A.   Regardless of that, I'm still very familiar with

25  the property, yes.

1            MS. PACKER:  That's all that I have.  Thank you.

2            MS. SIMPSON:  Thank you.

3            MS. PACKER:  I think you're done.

4            COURT REPORTER:  Read and sign?

5            MS. PACKER:  Yes.  You can send that to me.

6            (Whereupon, at 1:15 p.m. on November 1, 2022,

7    the deposition was concluded.  Signature was reserved.)

8

9                         *  *  *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>WITNESS CERTIFICATE</u>

       I have read the foregoing pages, 1 through 100 inclusive, and find that they contain a correct transcription of the answers made by me to the questions therein recorded, with the exception of \_\_\_\_\_ corrections as listed on a separate sheet of paper and incorporated into this record.

       Signed this _____ day of _____ 2022.


_____
                  DAVID MEAD



Sworn and subscribed before me this the _____ day of _____ 2022.


_____
Notary Public

My Commission Expires:  _____.

**ERRATA SHEET**

Please indicate any corrections to your deposition on this sheet of paper, giving the page number, line number, change and reason for the change, and return this form and the signature page to: **Reed & Associates, 2401 Whirlaway Court, Matthews, NC 28105, or email to VReed@carolina.rr.com.**

    The reasons for making changes:

            (1) To clarify the record;
            (2) To conform to the facts; or
            (3) To correct major transcription errors.

**Page no.** \_\_\_\_\_ **Line no.** \_\_\_\_\_ **Reason:** _____

Change _____ to _____

**Page no.** \_\_\_\_\_ **Line no.** \_\_\_\_\_ **Reason:** _____

Change _____ to _____

**Page no.** \_\_\_\_\_ **Line no.** \_\_\_\_\_ **Reason:** _____

Change _____ to _____

**Page no.** \_\_\_\_\_ **Line no.** \_\_\_\_\_ **Reason:** _____

Change _____ to _____

**Page no.** \_\_\_\_\_ **Line no.** \_\_\_\_\_ **Reason:** _____

Change _____ to _____

**Page no.** \_\_\_\_\_ **Line no.** \_\_\_\_\_ **Reason:** _____

Change _____ to _____

**Page no.** \_\_\_\_\_ **Line no.** \_\_\_\_\_ **Reason:** _____

Change _____ to _____

**Page no.** \_\_\_\_\_ **Line no.** \_\_\_\_\_ **Reason:** _____

Change _____ to _____

**Page no.** \_\_\_\_\_ **Line no.** \_\_\_\_\_ **Reason:** _____

Change _____ to _____

**REED & ASSOCIATES**
MATTHEWS, NORTH CAROLINA   980.339.3975

STATE OF NORTH CAROLINA                          <u>CERTIFICATE</u>

COUNTY OF FRANKLIN


      I, DEBORAH A. HYDE, Certified Court Reporter and Notary Public in and for the County of Franklin, State of North Carolina, do hereby certify:

      That DAVID MEAD appeared before me at the time and place herein aforementioned, was duly sworn in the manner provided by law by me prior to the taking of the foregoing deposition, that said deposition was taken by me and transcribed under my supervision and direction, and that the foregoing pages constitute a true and correct transcription of the proceedings.

      I do further certify that reviewing and signing of the transcript by the witness was reserved.

      I do further certify that the persons were present as stated in the appearance page.

      I do further certify that I am not of counsel for or in the employment of either of the parties in this action, nor am I interested in the results of said action.

      This the 14th day of November, 2022.


_____

DEBORAH A. HYDE, Certified Court Reporter

Notary Public Number 20021400234


**REED & ASSOCIATES**
MATTHEWS, NORTH CAROLINA   980.339.3975