IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No. 5:22-cv-00068-BO

| | |
|---|---|
| YOLANDA IRVING, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>THE CITY OF RALEIGH, et al.,<br><br>Defendants. | **OMAR I. ABDULLAH'S STATEMENT OF MATERIAL FACTS** |

Pursuant to Local Civil Rule 56.1 of the Local Civil Rules -- U.S. District Court for the Eastern District of North Carolina, and in support of its Motion for Summary Judgment, Defendant Omar I. Abdullah ("Abdullah") provides the following statement of material facts to which there is no genuine dispute. Citations to the record reference Defendant's Appendix to Local Rule 56.1 Statement of Material Facts in support of Motion for Summary Judgment ("DA"), filed contemporaneously herewith.

1. On and before May 21, 2020, Abdullah was a detective in the Vice Unit with the Raleigh Police Department ("RPD"). (D.E. 93, ¶ 44). The RPD Vice Unit is tasked with enforcing drug laws and often uses confidential informants for this purpose. (*Id.* at ¶¶ 46-47).

2. The RPD Selective Enforcement Unit ("SEU") is responsible for making the area in which the Vice Unit conducts its investigation safe so that the officers or detectives in the Vice Unit can complete their investigation. (DA8-9).

3. Abdullah was not an officer in the Selective Enforcement Unit ("SEU") and did not know their standards or practices. (DA28).

4. In Fall 2018, Abdullah developed, and received approval to work with, a confidential informant code named Aspirin. (D.E. 93, ¶¶ 55-63).

5. Aspirin completed controlled drug buys in 2018 after he was approved as a confidential informant. (Id. at ¶¶ 65-69). A single, initial qualifying buy established Aspirin as a reliable informant. (DA67; DA26-27; DA80). Eight out of nine controlled buys conducted by Aspirin in 2018 resulted in lab test results that were positive for controlled substances. (DA2).[1]

6. Typically, after a controlled buy, Abdullah would not submit the suspected narcotics recovered from the buy to the lab for testing until the District Attorney's Office prompted him. (DA23-24).

7. On January 2, 2020, Aspirin conducted a controlled buy for heroin from a suspected drug dealer named Curtis Logan, which resulted in a negative **field** test. (DA20-22; DA81). After that buy, Abdullah submitted the recovered substance to the lab for testing without prompting from the District Attorney's Office. (DA24-25).

8. Field tests of narcotics are not considered reliable, and therefore, are not admissible in court. (DA22; Sweeney Dep. __).[2]

9. In 2020, it took longer for lab results to be completed and made available than it does now. (DA69). Results could come back more than a month after they were submitted. (DA70-

---

[1] The only 2018 negative result was from one out of four controlled buys with the same suspected drug dealer. The other three buys with that dealer resulted in positive lab test results.

[2] Plaintiffs' liability expert, David Sweeney, was deposed on March 29, 2023. At the time of filing of this Statement of Material Facts, the transcript for Sweeney's deposition had not been provided to undersigned counsel. Sweeney's deposition was taken on March 29 because he had to postpone and re-schedule the original March 1 deposition due to illness. Due to this postponement, a consent motion for an extension of 30 days for both the discovery and dispositive motions deadlines was filed on March 3, 2023 and is currently pending with the Court. (D.E. 183). Abdullah reserves his right to request that this Court allow him to supplement his summary judgment materials with the Sweeney deposition transcript once it is made available.

71; DA88). This is consistent with the experience of Plaintiffs' liability expert witness, David Sweeney. (Sweeney Dep. __).

10. In 2020, RPD officers did not receive any alert as to when lab results in their cases were complete and available; rather, officers had to follow up on their own and access a database to look up any lab results pertaining to their cases. (DA70-71; DA87; DA90-91).

11. Abdullah did not follow up on or check for the lab results in his cases in 2020. (DA68-71; DA100).

12. When the District Attorney's Office became aware of a negative lab test of the substance brought back from the January 2, 2020 controlled buy from Curtis Logan, his charges were modified to Possession With Intent to Sell/Deliver Counterfeit Controlled Substance, **and he pled guilty to this charge** on April 15, 2020. (DA101).

13. On May 20, 2020, Aspirin and Abdullah went to Burgundy Street in Raleigh, NC where Aspirin specifically pointed to the residence at 1628 Burgundy Street, Apt. B, Raleigh, NC 27610 ("1628-B") as a residence from which heroin was being sold. (DA15-17). Aspirin told Abdullah that he had previously been to 1628-B and that the controlled buy of heroin would take place there later that day. (*Id.*) A controlled buy occurred on May 20, 2020. (DA18-19).

14. On May 21, 2020, Abdullah applied for, and received, a search warrant to search 1628-B. (D.E. 93, ¶ 101). Plaintiff Yolanda Irving and her children lived at 1628-B. (*Id.* at ¶¶ 114-115).

15. According to Plaintiffs' allegations, Abdullah's application for the search warrant for 1628-B included the following statements:

- Aspirin had provided information in the past that "has always proven to be truthful and reliable" (D.E. 93, ¶ 214);

- Aspirin purchased heroin from an individual at 1628-B (D.E. 93, ¶ 215); and

- RPD officers had observed Aspirin enter 1628-B (D.E. 93, ¶ 216).

16. As of May 21, 2020, Plaintiff Kenya Walton ("Walton") rented the residence at 1628 Burgundy Street, Apt. A, Raleigh, NC 27610 ("1628-A"). (DA40-41). She lived there with her children, R.W., Dyamond Whitley, Ziyel Whitley, and Kamisha Whitley. (D.E. 93, ¶¶ 116-117).[3] Z.G. had also been staying with Walton in 1628-A, as he was friends with her children. (Id. ¶ 118).

17. Walton's residence was not an address listed on the May 21, 2020 search warrant obtained by Abdullah. (Id. at ¶ 127).

18. SEU officers, and not Abdullah, made the initial entry into 1628-A on that date. (D.E. 93 ¶ 126; DA29-30).

19. After the SEU officers' initial entry, and in response to a request made by Abdullah, Walton consented to a search of her residence. (DA47-48).

20. The search only occurred upstairs and was "not long." (DA49; DA52-53).

21. The search to which Walton consented occurred in the afternoon. (D.E. 93, ¶ 118).

22. Abdullah did not conduct the search in 1628-A. (DA57; DA31).

23. After the search, the upstairs of 1628-A appeared just as it did before the search. (DA53).

24. After the search, the occupants of 1628-A were told to sit tight and a "Caucasian male officer" wearing a vest and helmet stayed with them in their living room. (DA49-51).

25. On May 21, 2020, Walton was 40 years old. (DA37).

---

[3] Ziyel Whitley ultimately ran into 1628-B when the SEU officers made their initial approach to that residence to execute the search warrant. Ziyel was detained in 1628-B during its search. (D.E. 93, ¶¶ 133, 135).

26. Though not a high school graduate, she received her GED at Wake Tech before May 21, 2020. (DA39; DA42).

27. Walton was employed as a bus driver on May 21, 2020. (DA38).

28. Before May 21, 2020, Walton saw police officers in the neighborhood in which she and her children lived in 1628-A everyday. (DA43-44).

29. Before May 21, 2020, Walton instructed her children on their legal rights when and if they encountered police. She gave them cards, which she received from "the courthouse," with that information. (DA45-46).

30. Before May 21, 2020, Walton instructed her children to not run from police. (DA45-46).

31. Before May 21, 2020, Walton sought police assistance as a victim of crime on at least two occasions. On both occasions, police responded to her calls by arriving to assist her. (DA53-54; DA55-56; DA58-60). On one of these occasions, in 2015, more than 10 police officers responded to assist her when she reported a shooting at her residence. (DA55-56; DA59-60).

32. According to Plaintiffs, the entire encounter with RPD officers lasted for approximately 1.5 hours. (D.E. 93, ¶ 147).

33. RPD Vice Unit officers did not conclude that Aspirin was unreliable until **after** the searches of 1628-A and 1628-B on May 21, 2020. (DA72; DA89; DA98-100).

34. It was only **after** the consent search of 1628-A and the search of 1628-B pursuant to warrant on May 21, 2020 that substances recovered from the controlled buy on that date field tested negative. (DA97).

Respectfully submitted, this the 31st day of March, 2023.

/s/ Jason R. Benton
Jason R. Benton
N.C. State Bar No. 27710
Jessica C. Dixon
N.C. State Bar No. 36719
Daniel E. Peterson
N.C. State Bar No. 41251
**PARKER POE ADAMS & BERNSTEIN LLP**
Bank of America Tower
620 S. Tryon St., Suite 800
Charlotte, NC 28202
Telephone: (704) 372.9000
Facsimile: (704) 334.4706
Email: jasonbenton@parkerpoe.com
jessicadixon@parkerpoe.com
danielpeterson@parkerpoe.com

*Attorneys for Defendant Omar I. Abdullah*

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this date, the foregoing **Omar I. Abdullah's Statement of Material Facts** was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send notification and serve same upon counsel of record via the Court's electronic case filing system.

This the 31st day of March, 2023.

/s/ Jason R. Benton
Jason R. Benton
N.C. State Bar No. 27710
Daniel E. Peterson
N.C. State Bar No. 41251
Jessica C. Dixon
N.C. State Bar No. 36719
**PARKER POE ADAMS & BERNSTEIN LLP**
Bank of America Tower
620 S. Tryon St., Suite 800
Charlotte, NC 28202
Telephone: (704) 372.9000
Facsimile: (704) 334.4706
Email: jasonbenton@parkerpoe.com
　　　　danielpeterson@parkerpoe.com
　　　　jessicadixon@parkerpoe.com

*Attorneys for Defendant Omar I. Abdullah*