IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No. 5:22-cv-00068-BO

| | |
|---|---|
| YOLANDA IRVING, et al., | **OMAR I. ABDULLAH'S APPENDIX TO LOCAL RULE 56.1(A)(1) STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| Plaintiffs, | |
| v. | |
| THE CITY OF RALEIGH, et al., | |
| Defendants. | |

## TABLE OF CONTENTS

| Description | Defendant's App. Page No. |
|---|---|
| Declaration of Omar I. Abdullah | DA1 |
| [**FILED UNDER SEAL**] Exhibit A to Declaration of Omar I. Abdullah – 2018 Lab Results | DA2 |
| Excerpts from Deposition of Officer David Mead taken November 1, 2022 | DA3 |
| Excerpts from Deposition of Omar I. Abdullah taken December 15, 2022 | DA10 |
| Excerpts from Deposition of Kenya Walton taken November 15, 2022 | DA32 |
| Excerpts from Deposition of Officer Meghan Gay taken October 28, 2022 | DA61 |
| Excerpts from Deposition of Officer William Rolfe taken January 17, 2023 | DA73 |
| Excerpts from Deposition of Detective Jason C. Gwinn taken December 19, 2022 | DA82 |
| Excerpts from Deposition of Sergeant Julien David Rattelade taken February 28, 2023 | DA92 |
| Curtis Logan Transcript of Plea | DA101 |

Respectfully submitted, this the 31st day of March, 2023.

/s/ Jason R. Benton

Jason R. Benton
N.C. State Bar No. 27710
Jessica C. Dixon
N.C. State Bar No. 36719
Daniel E. Peterson
N.C. State Bar No. 41251
**PARKER POE ADAMS & BERNSTEIN LLP**
Bank of America Tower
620 S. Tryon St., Suite 800
Charlotte, NC 28202
Telephone: (704) 372.9000
Facsimile:  (704) 334.4706
Email: jasonbenton@parkerpoe.com
        jessicadixon@parkerpoe.com
        danielpeterson@parkerpoe.com

*Attorneys for Defendant Omar I. Abdullah*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this date, the foregoing **Omar I. Abdullah's Appendix to Local Rule 56.1(A)(1) Statement of Material Facts in Support of Motion for Summary Judgment** was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send notification and serve same upon counsel of record via the Court's electronic case filing system.

This the 31st day of March, 2023.

/s/ Jason R. Benton
Jason R. Benton
N.C. State Bar No. 27710
Daniel E. Peterson
N.C. State Bar No. 41251
Jessica C. Dixon
N.C. State Bar No. 36719
**PARKER POE ADAMS & BERNSTEIN LLP**
Bank of America Tower
620 S. Tryon St., Suite 800
Charlotte, NC 28202
Telephone: (704) 372.9000
Facsimile:  (704) 334.4706
Email: jasonbenton@parkerpoe.com
        danielpeterson@parkerpoe.com
        jessicadixon@parkerpoe.com

*Attorneys for Defendant Omar I. Abdullah*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION

#### Case No. 5:22-CV-00068-BO

YOLANDA IRVING, et al.,

        Plaintiffs,

v.

THE CITY OF RALEIGH, et al.,

        Defendants.

**DECLARATION OF OMAR I. ABDULLAH**

       Pursuant to 28 U.S.C. § 1746, I, Omar I. Abdullah, hereby state and declare under penalty of perjury as follows:

       1.    I am over the age of eighteen and am under no disability which would render me incompetent to make this declaration. I have personal knowledge of all the matters stated in this declaration, and all statements made are true and correct.

       2.    Attached as Exhibit A to my declaration are true and accurate copies of lab test results from nine controlled buys in 2018 involving the confidential informant code named Aspirin.

       Executed this _3/_ day of March, 2023.

                                      Omar I. Abdullah

# (FILED UNDER SEAL)

# EXHIBIT A

## (to Declaration of Omar I. Abdullah)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CIVIL ACTION NO.: 5:22-cv-00068-BO

YOLANDA IRVING, individually and as the )
natural parent and guardian of J.I. JUWAN )
HARRINGTON, CYDNEEA HARRINGTON, KENYA )
WALTON, individually and as the natural )
parent and guardian of R.W. ZIYEL WHITLEY, )
DYAMOND WHITLEY, KAMISHA WHITLEY, NANETTA )
GRANT as the natural parent and guardian )
of Z.G. and EMANCIPATE NC, INC. )
)
Plaintiffs, )
)
vs. )
)
THE CITY OF RALEIGH, Officer OMAR I. )
ABDULLAH, Sergeant WILLIAM ROLFE, Officer )
RISHAR PIERRE MONROE, Officer JULIEN DAVID )
RATTELADE, and Officer MEGHAN CAROLINE GAY, )
Officer DAVID MEAD, Officer JESUS ORTIZ, )
Officer KYLE PERRIN, Officer MICHAEL )
MOLLERE, Officer KYLE THOMPSON, Officer )
VINCENT DEBONIS, Officer DANIEL TWIDDY, )
Officer THOMAS WEBB, Officer DAVID )
McDONALD, Officer DAVID GARNER, Chief of )
Police ESTELLA PATTERSON and City Manager )
MARCHELL ADAMS-DAVID, in their official )
capacities, )
)
Defendants. )
_____)

D E P O S I T I O N

OF

**OFFICER DAVID MEAD**

At Raleigh, North Carolina
Tuesday, November 1, 2022

REPORTER:  DEBORAH A. HYDE

**REED & ASSOCIATES**
MATTHEWS, NORTH CAROLINA  980.339.3575

A P P E A R I N G


On behalf of the Plaintiffs:

     ELIZABETH SIMPSON, ESQUIRE
     Associate Director
     EMANCIPATE NC
     Post Office Box 309
     Durham, North Carolina  27702
     703-587-8563
     elizabeth@emancipatenc.org

     EMILY D. GLADDEN, ESQUIRE
     Tin Fulton Walker & Owen, PLLC
     204 North Person Street
     Raleigh, North Carolina  27601
     919-720-4201
     Egladden@tinfulton.com


On Behalf of Defendants City of Raleigh, Estella
   Patterson, and Marchell Adams-David:

     DOROTHY V. KIBLER, ESQUIRE
     City of Raleigh Attorney's Office
     Post Office Box 590
     Raleigh, North Carolina  27602
     919-996-6560
     dorothy.kibler@raleighnc.gov


On Behalf of Defendants Officers David Mead, Jesus
   Ortiz, Kyle Perrin, Michael Mollere, Kyle Thompson,
   Vincent Debonis, Daniel Twiddy, Thomas Webb, David
   McDonald, and David Garner:

     LESLIE C. PACKER, ESQUIRE
     Ellis & Winters LLP
     4131 Parklake Avenue, Suite 400
     Raleigh, North Carolina  27612
     919-865-7000
     leslie.packer@elliswinters.com


                    (Continued)


                 **REED & ASSOCIATES**
        MATTHEWS, NORTH CAROLINA  980.339.3575

DA5

<u>A P P E A R I N G</u>


On Behalf of Defendant Officer Omar I. Abdullah:

    JESSICA DIXON, ESQUIRE
    Parker Poe Adams & Bernstein, LLP
    620 South Tryon Street, Suite 800
    Charlotte, North Carolina  28202
    704-372-9000
    jessicadixon@parkerpoe.com


On Behalf of Defendant Officers Rishar Pierre Monroe,
   Julien David Rattelade, and Meghan Caroline Gay:

    RODNEY E. PETTEY, ESQUIRE
    Yates, McLamb & Weyher, LLP
    Two Hannover Square
    434 Fayetteville Street, Suite 2200
    Raleigh, North Carolina  27601
    919-835-0900
    rpettey@ymwlaw.com


On Behalf of Defendant Officer William Rolfe:

    NORWOOD P. BLANCHARD, III
    Crossley McIntosh Collier Hanley & Edes, PLLC
    5002 Randall Parkway
    Wilmington, North Carolina  28403
    910-762-9711
    norwood@cmclawfirm.com


* * * * *


**REED & ASSOCIATES**
MATTHEWS, NORTH CAROLINA  980.339.3575

DA6

### C O N T E N T S

                                                          PAGE

Examination by Ms. Simpson  . . . . . . . . . . . . .  5

Examination by Ms. Packer . . . . . . . . . . . . . . 99

PLAINTIFF'S EXHIBITS:

Exhibit BBB   Marcus VanIrvin Body Camera 3 . . . . . . 71

Exhibit HHH   Mead Body Camera In Re:  Banks  . . . . . 82

Exhibit III   Mead Body Camera In Re:  Mitchell . . . . 83

Exhibit JJJ   Mead Body Camera In Re:  Smith  . . . . . 85

Exhibit LLL   Mead Body Camera In Re:  Washington . . . 86

Exhibit MMM   Body Camera In Re:  Knight  . . . . . . . 88

Exhibit NNN   Mead Body Camera In Re:  VanIrvin . . . . 91

Exhibit ZZ    Warrant for 1628 Burgundy Street
              Apartment B . . . . . . . . . . . . . . . 68

(All paper exhibits are provided with transcript.  It was
agreed by all parties that video exhibits will not be
attached.)

* * * * *

**REED & ASSOCIATES**
MATTHEWS, NORTH CAROLINA  980.339.3575

1          This is the deposition of OFFICER DAVID MEAD,

2    taken in accordance with the Federal Rules of Civil

3    Procedure in connection with the above case.

4          Pursuant to Notice, this deposition is being

5    taken in the offices of Ellis & Winters LLP, 4131 Parklake

6    Avenue, Suite 400, Raleigh, North Carolina, beginning at

7    10:07 a.m. on Tuesday, November 1, 2022, before Deborah A.

8    Hyde, Certified Verbatim Reporter and Notary Public.

9                              *   *   *

10   Whereupon,

11                      **OFFICER DAVID MEAD**

12   was called as a witness and, having first been duly sworn,

13   was examined and testified as follows:

14                          EXAMINATION

15        BY MS. SIMPSON:

16        Q.   Good morning.

17        A.   Good morning.

18        Q.   Hi.  So my name is Elizabeth Simpson.  I'm an

19   attorney and I work at Emancipate NC, and we, along with

20   some other attorneys, represent all the plaintiffs in this

21   case.

22        A.   All right.

23        Q.   So you're testifying under oath today and under

24   penalty of perjury, just as if you were in court.  Do you

25   understand that?

1      Q.   Did your answer mean that you never monitored
2   one that was a buy not in open air?
3      A.   So if we are monitoring them, it was going to be
4   some sort of open-air arrest or detention at a vehicle.
5   More often than not, if you're using -- if Drugs and Vice
6   or an officer is using an informant with the equipment to
7   go to a residence to establish probable cause, we're
8   probably not going to be a part of that because that's not
9   something that we would do immediately very often.  But if
10  it were to happen, it would be because we're waiting
11  for -- waiting to make an arrest almost immediately.
12     Q.   If you're executing a drug search warrant and
13  you are deploying out to the location, does a vice ride
14  along with you?
15     A.   The case agent or, again, somebody with very
16  intimate knowledge of the location will oftentimes drive
17  us if we're going in one vehicle and then, yes, the other
18  members of that team or that squad would accompany us
19  because they typically help with perimeter security or
20  detentions of people that may be outside the residence,
21  and then later on they have their different search duties
22  inside the residence.
23     Q.   What's the division of labor between the SEU
24  team and the vice officers?
25     A.   The division of labor?  Oh, like how do we

1 divide our responsibilities?  Is that what you're saying?

2      Q.   Yes.

3      A.   Well, I mean they have their investigation that

4 they're working and we have the tactic side of everything,

5 which is basically we're just rendering an area or vehicle

6 or a person or persons in a residence safe, so that way

7 the detectives or the officers, whoever, can conduct

8 their -- complete their investigation or continue their

9 investigation safely.

10      Q.   So does your team search for drugs, for

11 instance?

12      A.   No.  We'll search for people, mainly, on the

13 front end.  If we happen to come across something in plain

14 sight or somewhere where something was secreted, while

15 we're looking for people, we may make note of that and

16 then inform the investigators where we saw and what we saw

17 and who we saw with it or where we saw this person.

18      Q.   So when your team goes in, your goal is to find

19 all the people in the house and get them in a position

20 that is safe?

21      A.   Yes.

22      Q.   What about dogs?

23      A.   If there are dogs in the house, we'll try and

24 find a -- depending on if they're aggressive or not

25 aggressive or they're scared, we'll try and find just a

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CIVIL ACTION NO.: 5:22-cv-00068-BO

YOLANDA IRVING, individually and as the )
natural parent and guardian of J.I. JUWAN )
HARRINGTON, CYDNEEA HARRINGTON, KENYA )
WALTON, individually an as the natural )
parent and guardian of R.W. ZIYEL WHITLEY, )
DYAMOND WHITLEY, KAMISHA WHITLEY, NANETTA )
GRANT as the natural parent and guardian )
of Z.G. and EMANCIPATE NC, INC. )
)
            Plaintiffs,        )
)
    vs.                        )
)
THE CITY OF RALEIGH, Officer OMAR I.       )
ABDULLAH, Sergeant WILLIAM ROLFE, Officer  )
RISHAR PIERRE MONROE, Officer JULIEN DAVID )
RATTELADE, and Officer MEGHAN CAROLINE GAY, )
Officer DAVID MEAD, Officer JESUS ORTIZ,   )
Officer KYLE PERRIN, Officer MICHAEL       )
MOLLERE, Officer KYLE THOMPSON, Officer    )
VINCENT DEBONIS, Officer DANIEL TWIDDY,    )
Officer THOMAS WEBB, Officer DAVID         )
McDONALD, Officer DAVID GARNER, Chief of   )
Police ESTELLA PATTERSON and City Manager  )
MARCHELL ADAMS-DAVID, in their official    )
capacities,                                )
)
            Defendants.        )
_____)

D E P O S I T I O N
OF
OFFICER OMAR ABDULLAH

At Raleigh, North Carolina
Thursday, December 15, 2022
REPORTER:  DEBORAH A. HYDE

A P P E A R I N G


On behalf of the Plaintiffs:

    ABRAHAM RUBERT-SCHEWEL, ESQUIRE
    Tin Fulton Walker & Owen, PLLC
    119 East Main Street
    Durham, North Carolina  27701
    919-451-9216
    schewel@tinfulton.com

    EMILY D. GLADDEN, ESQUIRE
    Tin Fulton Walker & Owen, PLLC
    204 North Person Street
    Raleigh, North Carolina  27601
    919-720-4201
    Egladden@tinfulton.com


On Behalf of Defendants City of Raleigh, Estella
    Patterson, and Marchell Adams-David:

    DOROTHY V. KIBLER, ESQUIRE
    City of Raleigh Attorney's Office
    Post Office Box 590
    Raleigh, North Carolina  27602
    919-996-6560
    dorothy.kibler@raleighnc.gov


On Behalf of Defendants Officers David Mead, Jesus
    Ortiz, Kyle Perrin, Michael Mollere, Kyle Thompson,
    Vincent Debonis, Daniel Twiddy, Thomas Webb, David
    McDonald, and David Garner:

    MICHELLE LIGUORI, ESQUIRE
    Ellis & Winters LLP
    4131 Parkdale Avenue, Suite 400
    Raleigh, North Carolina  27612
    919-865-7009
    michelle.liguori@elliswinters.com


              (Continued)

A P P E A R I N G


On Behalf of Defendant Officer Omar I. Abdullah:

        JASON R. BENTON, ESQUIRE
        Parker Poe Adams & Bernstein, LLP
        620 South Tryon Street, Suite 800
        Charlotte, North Carolina  28202
        704-372-9000
        jasonbenton@parkerpoe.com

        CHRISTIAN E. DYSART, ESQUIRE
        Dysart Willis, PLLC
        530 Hillsborough Street, Suite 200
        Raleigh, North Carolina  27603
        919-747-8380


On Behalf of Defendants Officers Rishar Pierre Monroe,
    Julien David Rattelade, and Meghan Caroline Gay:

        ALAYNA M. POOLE, ESQUIRE
        Yates, McLamb & Weyher, LLP
        Two Hannover Square
        434 Fayetteville Street, Suite 2200
        Raleigh, North Carolina  27601
        919-835-0900
        apoole@ymwlaw.com


On Behalf of Defendant Officer William Rolfe:

        NORWOOD P. BLANCHARD, III
        Crossley McIntosh Collier Hanley & Edes, PLLC
        5002 Randall Parkway
        Wilmington, North Carolina  28403
        910-762-9711
        norwood@cmclawfirm.com



                    * * * * *

C O N T E N T S

PAGE

Examination by Mr. Schewel:                          5

Examination by Mr. Blanchard:                       170

Examination by Ms. Kibler:                          172


PLAINTIFFS' EXHIBITS

Exhibit III - Witness's Diagram                      31

Exhibit JJJ - Screenshot of Work Phone               37

Exhibit KKK - Offense/Incident Report 5/20/2020      56

Exhibit LLL - Detective Monroe's IA Interview        88

Exhibit MMM - Confidential Informant Log            120

Exhibit NNN - Drawing by Witness                    142

Exhibit OOO - Interview with Officer Abdullah       150
              Dated 11/1/21


DEFENDANTS' EXHIBITS

Exhibit 26 - Garrity Warning                        173

Exhibit 27 - Interview of September 4, 2020         173

Exhibit 28 - Interview of August 26, 2020           173

Exhibit 29 - Interview of August 23, 2021           173

Exhibit 30 - Interview of August 24, 2021           173

Exhibit 31 - Interview of September 14, 2021        173


(Exhibits retained by counsel.)


Reporter's Note:  This transcript contains quoted
material.  Such material is reproduced as read or quoted
by the speaker.

1          This is the deposition of OFFICER OMAR ABDULLAH,

2     taken in accordance with the Federal Rules of Civil

3     Procedure in connection with the above case.

4          Pursuant to Notice, this deposition is being

5     taken in the offices of Parker Poe Adams & Bernstein, LLP,

6     301 Fayetteville Street, Suite 1400, Raleigh, North

7     Carolina, beginning at 10:17 a.m. on Thursday,

8     December 15, 2022, before Deborah A. Hyde, Certified

9     Verbatim Reporter and Notary Public.

10                         *   *   *

11    Whereupon,

12                    OFFICER OMAR ABDULLAH

13    was called as a witness and, having first been duly

14    affirmed, was examined and testified as follows:

15                        EXAMINATION

16         BY MR. SCHEWEL:

17         Q.   My name is Abraham Rubert-Schewel.  I'm with the

18    Law Firm of Tin Fulton Walker & Owen.  We represent the

19    plaintiffs in this lawsuit against the City of Raleigh and

20    individually named officers, such as yourself.

21         You're testifying under oath and under the

22    penalty of perjury today, just as if you were in a court

23    of law.  Do you understand that?

24         A.   Yes, I do.

25         Q.   Have you ever been deposed before?

1    exactly what you mean.

2         Q.   At all on that day.

3         A.   The individuals that helped me on the buy is Gay

4    and Gwinn on that date.

5         Q.   And just to be clear, this is on May 20th, 2020?

6         A.   That's correct.

7         Q.   Okay.  Did Officers Gay and Gwinn ride with you

8    in the car on that day?

9         A.   No.

10        Q.   Did they drive together?

11        A.   No, they didn't.

12        Q.   So they each rode in their own vehicles?

13        A.   That's correct.

14        Q.   Did you conduct surveillance of Apartment 1628-B

15   on May 20th, 2020?

16        A.   Did I conduct surveillance?

17             MR. BENTON:  We need to take a break.

18             MR. SCHEWEL:  Okay.

19             (Recess from 11:49 a.m. to 11:55 a.m.)

20             BY MR. SCHEWEL:

21        Q.   Did you conduct surveillance of 1628-B Burgundy

22   Street on May 20th, 2020?

23        A.   Yes.

24        Q.   Describe that surveillance.

25        A.   It was physical surveillance, also surveillance

1    electronically.

2         Q.    What occurred?

3         A.    In terms of what occurred, meaning?

4         Q.    What did you observe?

5         A.    Pretty much the CI pointed out the residence

6    that was going to be where the buy is going to take place,

7    like it will be the front of the residence.

8         Q.    What else do you recall?

9         A.    Him pointing out that that's the residence where

10   he goes and that he always -- the guy always has him going

11   to the back of the residence.

12        Q.    Do you recall anything else in your

13   surveillance?

14        A.    The only thing I recall in the surveillance,

15   that it was really not many people walking around outside.

16        Q.    Were you parked in your car during the

17   surveillance?

18        A.    We drove through.

19        Q.    And you were in your car alone with Dennis

20   Williams?

21        A.    That's correct.

22        Q.    And Officer Gay and Officer Gwinn were in their

23   own cars?

24        A.    Yes.

25        Q.    And did they park their cars?

1     A.   I don't know what they did.

2     Q.   Did you observe Officer Gay or Officer Gwinn

3  conducting surveillance?

4     A.   I did not observe them.

5     Q.   When you drove by the apartment with Dennis

6  Williams, did he physically point to the location where he

7  allegedly purchased narcotics?

8     A.   That's correct.

9     Q.   And what apartment number was that?

10     A.   1628-B.

11     Q.   How did you know that?

12     A.   That's from what he pointed and told me.

13     Q.   Well, when he pointed, could you observe a

14  number on that apartment?

15     A.   Yes, you can, in the front.

16     Q.   On the front door?

17     A.   I'm not sure if it's to the right of the door or

18  what, but there's -- the unit is marked.

19     Q.   Okay.  So your testimony is that when you drove

20  by the apartment, Dennis Williams pointed at an apartment

21  and you could see that it was marked as 1628?

22     A.   1628, I believe, is -- I'm not sure if it's --

23  is it B?  But you can -- it's marked which units because

24  in the front, each individual unit is marked.

25     Q.   And they're marked with the address number as

1  address -- he made clear to me that that's where he goes

2  in to do -- to meet with the guy.

3      Q.   Did he tell you this when he was in the car with

4  you?

5      A.   That's correct.

6      Q.   Did you ever attempt to verify who was living at

7  1628-B?

8      A.   I did not verify who was in that unit.  You

9  would have to be careful because you don't want to tip off

10  whoever is in that unit because it's not going to be

11  listed in their name if you try to look it up.

12      Q.   Why do you say that?

13      A.   It's owned by a property group, so they don't

14  have an individual person, in my experience.  You have to

15  call somehow and get that type of information with whoever

16  lives there.

17      Q.   Okay.  So you didn't attempt to verify who was

18  living at 1628-B?

19      A.   No.

20      Q.   Did you verify in any way that Marcus VanIrvin

21  was living at 1628-B?

22      A.   Did I verify?  No.

23      Q.   Did you observe Dennis Williams enter 1628-B?

24           MR. BENTON:  Abe, on what day?

25           MR. SCHEWEL:  May 20th, 2020.

1          THE WITNESS:  I observed -- what I observed was

2   him enter after watching the video after the buy.  I

3   observed him being let into the apartment that I believe

4   to be 1628-B.

5          BY MR. SCHEWEL:

6     Q.   Okay.  So through watching surveillance video

7   after the alleged buy, you knew that he had been let into

8   an apartment?

9     A.   I reasonably believed that he was let into the

10  apartment that was 1628-B by the subject in question.

11    Q.   And in that surveillance video, could you see

12  him being let into an apartment?

13    A.   You see the door open up, the CI go in, shut the

14  door.  You see the back of the individual and at the time

15  he turns around, the camera got obscured.

16    Q.   Did Officer Gay or Officer Gwinn tell you that

17  they observed Dennis Williams enter 1628-B?

18    A.   What I remember was Gwinn telling me back at the

19  station that he saw him go inside.

20    Q.   Did he say the apartment number?

21    A.   I don't remember him saying the apartment

22  number.  I remember him saying that he went inside the

23  apartment.

24    Q.   So based on what Officer Gwinn told you, you

25  believed that Officer Gwinn was physically surveilling

1   based on my Fifth Amendment rights.

2       Q.   Prior to the controlled buy involving Curtis

3   Williams [sic], did you meet with other vice and SEU

4   officers to prepare for the takedown?

5       A.   Curtis Williams.  Who's --

6       Q.   Sorry, Curtis Logan.

7       A.   Okay.  And what was your question, sir?

8       Q.   Did you meet with the vice team and the other

9   SEU officers to prepare for the takedown?

10      A.   Yes.

11      Q.   And did you discuss the operation with the vice

12  team and the SEU officers?

13      A.   Yes.

14      Q.   And did you discuss that you were using the

15  confidential informant, Dennis Williams?

16      A.   I don't remember the exact details of the -- of

17  the briefing, but pretty much we're going over the

18  operation.  What CI was being used, I don't remember if

19  that was stated.

20      Q.   Do you recall debriefing with the vice team

21  after this arrest at Greens Dairy Road?

22      A.   Vaguely.

23      Q.   Are you aware that you alleged that Mr. Logan

24  sold over 20 grams of heroin to Dennis Williams?

25      A.   Yes, I'm aware of that.

```
 1        Q.   And are you aware that you alleged that he sold
 2   the 20 grams of heroin for $400?
 3        A.   Yes, I am.
 4        Q.   Do you recall Officer Monroe observing the
 5   heroin and telling you that it did not appear to be
 6   heroin?
 7        A.   I'm aware that he field tested the heroin.
 8        Q.   So the answer to that question of Monroe
 9   observing the heroin and telling you that it did not look
10   like heroin --
11        A.   Your question is what?
12        Q.   Do you recall Officer Monroe observing the
13   heroin and telling you that it did not appear to be
14   heroin?
15        A.   That's not observing.  What he did was field
16   test.
17        Q.   Right.  I understand that, but my question is,
18   did Officer Monroe also tell you that the heroin did not
19   look like heroin?
20        A.   I don't remember him saying that.  What I
21   remember is him field testing it.
22        Q.   Did you observe him field test it?
23        A.   I observed him field test the substance.
24        Q.   Okay.  And what was the result of the field
25   test?
```

1     A.   I don't know what those results were.  I never
2  field tested heroin.
3     Q.   Well, did he tell you that it field tested
4  negative?
5     A.   He did tell me that, yes.
6     Q.   Did you believe him?
7     A.   I went based on what the policy stated.
8     Q.   I'm just asking if you believed him that it had
9  field tested negative.
10     A.   I didn't -- based on my training that I received
11  from outside the department, as well as the department,
12  especially outside, field tests were unreliable.  It's
13  just an indicator of a color change.  It's not conclusive
14  confirmation of a positive or a negative.
15     Q.   I'm not asking you that.  I'm just asking you
16  whether or not you believed that Officer Monroe was being
17  honest about the results of the field test.
18     A.   I can't say his honesty, but I'm saying it's
19  what I was trained.
20     Q.   I know, and I'm not asking -- sorry.  I'm just
21  asking you whether or not you thought he was being
22  truthful about it.
23     A.   Like I said, I was going based on my training,
24  and the training that I received, that's what I based my
25  conclusion off of.  I didn't base it off of what I

1     A.   I wouldn't say about the cost.  The training I

2   received covered, like I said, a lot of different topics,

3   a lot of different drugs, but cost wise, I don't know if

4   cost was mentioned.  I just know that we were given a

5   price guide of the different costs of narcotics by our

6   supervisor.

7     Q.   Were you trained in submitting narcotics to the

8   CCBI lab for testing and how to do that?

9     A.   I observed Nance showing me some of the lab

10  reports that they do when they submit the work.

11    Q.   Did he show you how to submit lab reports to the

12  CCI [sic] or did he show you how to submit drugs to be

13  tested by the CCBI lab?

14    A.   I don't remember how.  I just know that when we

15  got there, myself and Privette, you're pretty much -- you

16  know, you start off handling the evidence for them and

17  you're just, you know, pretty much submitting the

18  paperwork and they're telling you what they would submit

19  in this case, and you're watching them.  You're pretty

20  much learning by visual.

21    Q.   In 2018 and 2019, were you aware of how to

22  submit drugs to the CCBI lab for testing?

23    A.   Eventually, you become more familiar with doing

24  the paperwork and how to do it.

25    Q.   And what was that process?

1      A.   Typically, you would get prompted by a DA's

2  office to submit the paperwork.

3      Q.   Is this Markita?

4      A.   Markita worked in the evidence department.

5      Q.   Of RPD?

6      A.   Yes.

7      Q.   And so how would that process work?

8      A.   I would get a e-mail stating to submit evidence

9  in reference to this case number.

10     Q.   And who would the e-mail be from?

11     A.   District attorney's office to her, then to me.

12     Q.   Okay.  So they would send an e-mail to Markita?

13     A.   Uh-huh.

14     Q.   And then Markita would send an e-mail to you?

15     A.   That's correct.

16     Q.   Would you ever submit drugs to the CCBI lab

17  without receiving an e-mail from the DA's office?

18     A.   Each detective is different.  They -- were there

19  times when it has been done?  Yes, there has been times.

20  You may have another detective who would direct you to do

21  it.

22     Q.   I'm just asking about you, personally.

23     A.   Specifically, my practice was to wait for -- to

24  be prompted by the DA's office.

25     Q.   In the Curtis Logan case, did you wait until you

1    received an e-mail from the DA's office until you

2    submitted the CCBI labs?

3          A.   No.  I remember Monroe told me to send the lab

4    results -- to send the request off for the drugs and

5    testing it, and I -- that's what I did.

6          Q.   Was Monroe your supervisor?

7          A.   No, Sergeant Rolfe is.

8          Q.   But you still followed Officer Monroe's

9    instructions?

10         A.   I followed what he told me to do on that.

11         Q.   Was that because he was more experienced than

12   you?

13         A.   No.  It was just -- he was saying to send it

14   off, and that's what I did.

15         Q.   So in that instance, you did not wait for an

16   e-mail notification from the district attorney's office?

17         A.   That's correct.

18         Q.   You did it on your own initiative?

19         A.   I did it based on what he told me to do.

20         Q.   Were you trained in how to obtain the results of

21   drugs sent to the CCBI lab?

22         A.   I don't understand your question.

23         Q.   So after the drugs are sent to the CCBI lab to

24   be analyzed, there are results that are provided back to

25   the Raleigh Police Department that says whether or not

1      Q.   And you don't remember the name of the suspect

2   or the defendant?

3      A.   No, I don't.

4      Q.   Okay.  Any other instances?

5      A.   Not off the top of my head, no.

6      Q.   Did you ever conduct a qualifying buy with

7   Dennis Williams?

8      A.   Yes, we did.

9      Q.   When did this occur?

10      A.   This occurred when we first had signed him up.

11   Myself and David Nance was there.  We did a qualifying

12   buy.  I don't remember the name of the defendant.  That

13   was for crack cocaine, I believe.

14      Q.   And did you charge the person who made the sale

15   to Williams?

16      A.   After other buys that we did; the qualifying

17   buy, we did not.

18      Q.   So you charged him down the road?

19      A.   Down the road, he got charged.

20      Q.   And you don't recall the name of this

21   individual?

22      A.   No, I don't, not off the top of my head.

23      Q.   Do you think it's Antoine Haywood?

24      A.   I would have to see the report.  I can't say for

25   sure what the name of the individual --

1     Q.   But the qualifying buy was the first buy you

2 ever made with Dennis Williams?

3     A.   The qualifying buy would be the first one to

4 establish his reliability.

5     Q.   Which was the first one you ever made with that

6 CI?

7     A.   That's correct.

8     Q.   Was it your practice to search Mr. Williams

9 prior to controlled buys?

10    A.   Yes.

11    Q.   How would you search him?

12    A.   Based on the way I was trained, it was a pat

13 down, as I recall, and I will take a step further to also

14 have him to flip his pockets inside out.

15    Q.   Did you ever find any contraband on his person

16 when you were searching him?

17    A.   No.

18    Q.   Was it your practice to search Mr. Williams

19 after a controlled buy?

20    A.   Based on the way I was trained was to search him

21 before and after.

22    Q.   So was it your practice to search Mr. Williams

23 after a controlled buy?

24    A.   I would search him after.

25    Q.   And was that the same search?

1    Q.   Okay.  Did you observe SEU search Mr. Weaver?

2    A.   No, I didn't.

3    Q.   Is it SEU's standard practice to search someone

4   when they detain them?

5         MR. BENTON:  Objection.

6         MS. LIGUORI:  Objection.

7         MR. BENTON:  You can answer if you know.

8         THE WITNESS:  I can't speak to the practice of

9   SEU officers.  I don't know their practices. I'm not an

10   SEU officer.

11        BY MR. SCHEWEL:

12   Q.   Well, you've worked with SEU officers on many

13   occasions, right?

14   A.   I've worked with them, but I don't know their

15   practices in terms of what they do.

16   Q.   Is it your standard practice when you detain

17   someone to search them?

18   A.   You've got to be careful when you say "detain"

19   and "search" because if you're -- if you have someone to

20   arrest, you can search them, but there's a limited scope

21   about that type of search, so I don't want to say -- you

22   know, you detain someone, you could pat them down for a

23   belief of weapons, but you're not going to stick your

24   hands in their pockets, so --

25   Q.   Okay.  Did you observe Mr. Weaver in the custody

1    Q.   After the phone cut out, what do you remember

2  next?

3    A.   Silence for a little bit and then the CI calling

4  me, saying that the buy had completed and to hurry up

5  because they're trying to leave.

6    Q.   So after the video cut out, you don't recall

7  seeing anything else on the video?

8    A.   I don't recall anything else.

9    Q.   And do you recall hearing anything else on the

10  video?

11    A.   You couldn't hear anything.

12    Q.   What do you mean, you can't hear anything?

13    A.   It cut off.  That's what I'm saying, so you

14  can't -- the live feed was done, so you can't hear

15  anything.

16    Q.   So after it cut off, it never came back on?

17    A.   No.

18    Q.   Okay.  And then Aspirin calls you and he tells

19  you, "The buy is done, hurry up"?

20    A.   Yeah.

21    Q.   What happens next?

22    A.   Told everybody to move in over the radio.

23    Q.   And what did you do?

24    A.   Proceeded to drive from our location to 1628-B.

25    Q.   What did you do next?

1      A.   When I got there, I'm the last person to get out

2 because I have to secure the van while the SEU officers

3 get out, so me and the medic are the last two individuals

4 coming out.

5      Q.   What did you do after you secured the van?

6      A.   Went to the location that everybody was at, at

7 the unit.  They are holding one spot and it looked like

8 they're going towards another unit next to it, so I held

9 where I was at.

10      Q.   Do you know if the SEU officers surveilled the

11 apartment prior to the warrant execution?

12      A.   I don't remember.  Typically, we would drive

13 through a location that we're going to execute a search

14 warrant at, and they liked to see exactly where the door

15 is at, which -- is there a storm door?  Is there a door

16 handle?  What type?  Which way would it open out?  I

17 believe that we did.  I don't remember in that case, but,

18 typically, when we're getting ready to do a search

19 warrant, we would do that.

20      Q.   At the meeting before the execution of the

21 warrant, do you remember discussing with the SEU officers

22 whether or not they had surveilled the apartment?

23      A.   I don't remember that conversation.

24      Q.   Do you believe that you executed the search

25 warrant on the correct location?

1     A.   On the advice of counsel, I choose not to answer

2  based on my Fifth Amendment rights.

3     Q.   Did you discover any contraband in the

4  apartment?

5     A.   On the advice of counsel, I choose not to answer

6  based on my Fifth Amendment rights.

7     Q.   Did you discover any buy money in the apartment?

8     A.   On the advice of counsel, I choose not to answer

9  based on my Fifth Amendment rights.

10     Q.   Did you search the apartment?

11     A.   What apartment are you talking about?

12     Q.   1628-B.

13     A.   Did I personally search it?

14     Q.   (Nods affirmatively.)

15     A.   You had Gay and Monroe searching it.

16     Q.   Did you ever go upstairs?

17     A.   I believe I walked through, but pretty much

18  every -- Monroe pointed out that they had previously

19  searched.

20     Q.   So why did you go upstairs?

21     A.   To see what was going on.

22     Q.   Did you search 1628-A?

23     A.   1628-A?

24     Q.   (Nods affirmatively.)

25     A.   No.

**DA32**

Kenya Walton        November 15, 2022
Irving, Yolandav. The City Of Raleigh

Page 1

1         IN THE UNITED STATES DISTRICT COURT

       FOR THE EASTERN DISTRICT OF NORTH CAROLINA

2                WESTERN DIVISION

3          Case No. 5:22-CV-00068-BO

4

5

     YOLANDA IRVING, et al.,    )

6                        )

            Plaintiffs,   )

7                        )

         V.           )

8                        )

     THE CITY OF RALEIGH, et   )

9     al.,                  )

                        )

10          Defendants.   )

     _____ )

11

12

13

14           VIDEOTAPED DEPOSITION

                 OF

15           KENYA WALTON

16

           NOVEMBER 15, 2022

17        10:24 A.M. - 3:15 P.M.

18

19       TIN FULTON WALKER & OWEN

          407 North Person Street

20       Raleigh, North Carolina

21

22

23

24   Reported by: Michelle Maar, RDR, RMR, FCRR

25

DA33

Kenya Walton                                    November 15, 2022
Irving, Yolandav. The City Of Raleigh

Page 2

```
1        APPEARANCES:
2        On Behalf of the Plaintiffs:
              TIN FULTON WALKER & OWEN
3             By: Emily D. Gladden
              407 North Person Street
4             Raleigh, NC 27601
              Egladden@tinfulton.com
5
         On Behalf of Defendant Omar Abdullah:
6             PARKER POE ADAMS & BERNSTEIN
              By: Jason R. Benton
7             620 S. Tryon Street, Suite 800
              Charlotte, NC 28202
8             Jasonbenton@parkerpoe.com
9        On Behalf of SEU Defendants:
              ELLIS & WINTERS
10            By: Leslie C. Packer
              PO Box 33550
11            Raleigh, NC 27636
              Leslie.packer@elliswinters.com
12
         On Behalf of Defendants Monroe, Rattelade, and Gay:
13            YATES, MCLAMB & WEYHER
              By: Alayna Poole
14            PO Box 2889
              Raleigh, NC 27602
15            Apoole@ymwlaw.com
16       On Behalf of Defendant The City of Raleigh:
              CITY OF RALEIGH ATTORNEY'S OFFICE
17            By: Amy C. Petty
              PO Box 590
18            Raleigh, NC 27602
              Amy.petty@raleighnc.gov
19
         On Behalf of Defendant William Rolfe:
20            CROSSLEY MCINTOSH COLLIER HANLEY & EDES
              By: Norwood P. Blanchard, III (via teleconference)
21            5002 Randall Parkway
              Wilmington, NC 28403
22            Norwood@cmclawfirm.com
23       Also Present:
              Carl Rehl, Videographer
24
25
```

Veritext Legal Solutions
800.743.DEPO (3376)      calendar-carolinas@veritext.com      www.veritext.com
Case 5:22-cv-00068-BO   Document 207   Filed 03/31/23   Page 36 of 105

DA34

Kenya Walton                    November 15, 2022
Irving, Yolandav. The City Of Raleigh

Page 3

1                         INDEX
2

        Examination by Ms. Packer.................. 5
3       Examination by Mr. Benton.................. 114
        Examination by Ms. Poole.................. 158
4       Examination by Ms. Petty.................. 162
        Examination by Ms. Gladden................ 164
5       Further examination by Mr. Benton.......... 165
6

                DEPOSITION EXHIBITS MARKED
7

        Exhibit No.         Description            Page
8

    Exhibit 8       Photograph: Marcus Darien Van Irvin   59
9

    Exhibit 9       Photograph: Dennis Leon Williams      60
10

    Exhibit 10      Photograph: Dennis Leon Williams      60
11

    Exhibit 11      KrayKray Johnson Facebook Post        68
12

    Exhibit 12      Rodney Overton Facebook Post          152
13

    Exhibit 13      Video Clip                            108
14

    Exhibit 14      Video Clip                            109
15

    Exhibit 15      Video Clip                            110
16
17
18
19
20
21
22
23
24
25

Veritext Legal Solutions
800.743.DEPO (3376)      calendar-carolinas@veritext.com      www.veritext.com
Case 5:22-cv-00068-BO   Document 207   Filed 03/31/23   Page 37 of 105

DA35

Kenya Walton                           November 15, 2022
Irving, Yolandav. The City Of Raleigh

Page 4

1              P R O C E E D I N G S

2              THE VIDEOGRAPHER:  We are now on the record at

3       10:24 a.m., on November 15, 2022.

4              This is Media Number 1 in the deposition of Kenya

5       Walton, taken in the matter of Yolanda Irving, et al.,

6       versus The City of Raleigh, et al., Case Number

7       5:22-CV-00068-BO.

8              This deposition is being held at Tin Fulton Walker

9       & Owen, in Raleigh, North Carolina.

10             My name is Carl Rehl.  The Court Reporter is

11      Michelle Maar.

12             Would counsel now please introduce yourselves,

13      after which the court reporter will swear in the witness.

14             MS. GLADDEN:  Emily Gladden on behalf of Ms.

15      Walton and all Plaintiffs.

16             MS. PETTY:  Amy Petty, on behalf of The City of

17      Raleigh and official capacity defendants.

18             MS. POOLE:  Alayna Poole, on behalf of Defendants

19      Gay, Monroe, and Rattelade in their individual capacities.

20             MR. BENTON:  Jason Benton, on behalf of Omar

21      Abdullah.

22             MS. PACKER:  Leslie Packer, on behalf of the SEU

23      Officers.

24             MR. BLANCHARD:  Norwood Blanchard, on behalf of

25      Sergeant William Rolfe.

Veritext Legal Solutions
800.743.DEPO (3376)     calendar-carolinas@veritext.com     www.veritext.com
Case 5:22-cv-00068-BO   Document 207   Filed 03/31/23   Page 38 of 105

DA36

Kenya Walton                                    November 15, 2022
Irving, Yolandav. The City Of Raleigh

1                    KENYA WALTON,

2        called as a witness and having been first duly sworn,

3              was examined and testified as follows:

4

5                      EXAMINATION

6    BY MS. PACKER:

7        Q.   Ms. Walton, my name is Leslie Packer.

8             And, as you just heard, I represent the SEU

9    Officers.  And I'm going to be leading off the questioning

10   today.

11       A.   Okay.

12       Q.   If at any time you don't understand my question

13   or would like for me to repeat it or rephrase it, will you

14   let me know that?

15       A.   Yes, ma'am.

16       Q.   And we can take breaks any time.

17       A.   Okay.

18       Q.   The only request would be if there's a pending

19   question, that you answer the question.  And then we can

20   take a break.

21       A.   Yes, ma'am.

22       Q.   Okay.  What did you do to prepare for your

23   deposition today?

24       A.   I just went over everything and made sure my mind

25   was clear.

Page 6

1        Q.    Without telling -- I assume you met with your

2    attorney?

3        A.    Yes.

4        Q.    Without telling me anything that you discussed

5    with your attorney, did you review any documents?

6        A.    No.

7        Q.    Did you review any videos?

8        A.    Yes.

9        Q.    Were the videos that you reviewed the police body

10   cam videos?

11       A.    Yes.

12       Q.    Do you remember which ones you reviewed?

13       A.    Me coming inside the house.

14       Q.    Any others?

15       A.    No, ma'am.

16       Q.    Have you ever given a deposition before?

17       A.    No, ma'am.

18       Q.    Have you ever had to testify for any reason?

19       A.    No, ma'am.

20       Q.    What is your date of birth?

21       A.    07-07-1979.

22       Q.    And your current name is Kenya Walton?

23       A.    Yes.

24       Q.    What are the other names that you've had either

25   due to marriage or --

Veritext Legal Solutions
800.743.DEPO (3376)    calendar-carolinas@veritext.com    www.veritext.com
Case 5:22-cv-00068-BO    Document 207    Filed 03/31/23    Page 40 of 105

DA38

Kenya Walton                    November 15, 2022
Irving, Yolandav. The City Of Raleigh

Page 13

1        A.   No.  He was there.

2        Q.   Living there?

3        A.   Yes.

4        Q.   Okay.  Are you currently working?

5        A.   Yes.

6        Q.   How do you -- what do you do for work?

7        A.   I drive the special needs kids for Wake County

8   Public Schools.

9        Q.   How many hours a week is that?

10       A.   Approximately, anywhere from 48 to 50 hours a

11   week.

12       Q.   How long have you had that job?

13       A.   Four years.

14       Q.   What did you do before that?

15       A.   I drove for Evan Transportation.

16       Q.   What type of driving?

17       A.   It was the same.

18       Q.   School bus?

19       A.   At that time, I wasn't driving the bus, I was

20   driving the vans.

21       Q.   And how long did you work for Evan

22   Transportation?

23       A.   They went out of business.  I think I was there

24   -- I want to -- I think I was there like four or five

25   months.

1    Q.   What type of work did you do before that?

2    A.   I was a store manager at City Trends.

3    Q.   I'm sorry -- at where?

4    A.   City Trends.

5    Q.   And how long did you work at City Trends?

6    A.   About two years.

7    Q.   And how about before that?

8    A.   The Shoe Department.

9    Q.   For which store?

10   A.   New Hope.

11   Q.   So in May of 2020, were you driving school buses

12   for Wake County?

13   A.   I was at -- we were still employed, but it was

14   COVID.  So we were shutdown.

15   Q.   Were you getting a paycheck?

16   A.   Unemployment, yes.

17   Q.   Okay.  So you were not able to work as a bus

18   driver obviously when the schools were shut down?

19   A.   No, ma'am.

20   Q.   What is your educational background?

21   A.   High school.

22   Q.   Where did you go to high school?

23   A.   Sanderson High.

24   Q.   In Raleigh?

25   A.   Yes, ma'am.

Veritext Legal Solutions
800.743.DEPO (3376)      calendar-carolinas@veritext.com      www.veritext.com
Case 5:22-cv-00068-BO   Document 207   Filed 03/31/23   Page 42 of 105

Kenya Walton                                    November 15, 2022
Irving, Yolandav. The City Of Raleigh

```
 1          Q.   Did you graduate?

 2          A.   No.

 3          Q.   What was the last year that you attended?

 4          A.   I have no idea.

 5          Q.   How old were you?

 6          A.   17.

 7          Q.   And why did you leave high school?

 8          A.   My mom made me.

 9          Q.   Why was that?

10          A.   I had no idea.

11          Q.   Okay.  Did you grow up in Raleigh?

12          A.   Yes.

13          Q.   Is your mother still living?

14          A.   Yes.

15          Q.   Where does she live?

16          A.   Macon -- she's in Raleigh, she's off Macon Drive

17     or Street.

18          Q.   What is your mother's name?

19          A.   Vickie Holliday.

20          Q.   And she made you leave high school when you were

21     17?

22          A.   Yes.

23          Q.   She didn't give you an explanation?

24          A.   No.

25          Q.   When you were living in the address on Burgundy
```

Veritext Legal Solutions
800.743.DEPO (3376)        calendar-carolinas@veritext.com        www.veritext.com
Case 5:22-cv-00068-BO   Document 207   Filed 03/31/23   Page 43 of 105

Page 16

1     Street, 1628 Burgundy Street, was that subsidized housing?

2          A.   Yes.

3          Q.   How, how was it subsidized?

4          A.   It was funded through HUD.  But I didn't go

5     through their program.  I went through, I had a Section 8

6     voucher.

7          Q.   And how did you come to have that Section 8

8     voucher?

9          A.   When I got, when Reggie and I separated, I filed

10    for Section 8.

11         Q.   And did you already tell me what year that was?

12         A.   No.  I didn't.

13         Q.   Do you know when it was?

14         A.   No.  I don't.

15         Q.   I think you said it was --

16         A.   We divorced, I mean we divorced in May.

17         Q.   Right.

18         A.   But we were separated for about a little over a

19    year.

20         Q.   So how much did you have to pay in rent when you

21    were living at 1628 Burgundy Street?

22         A.   It was 6, it was 614.

23         Q.   A month?

24         A.   Yes.

25         Q.   Was that true during the entire time you lived

Veritext Legal Solutions
800.743.DEPO (3376)        calendar-carolinas@veritext.com        www.veritext.com
Case 5:22-cv-00068-BO   Document 207   Filed 03/31/23   Page 44 of 105

Kenya Walton                    November 15, 2022
Irving, Yolandav. The City Of Raleigh

Page 17

1    there?

2         A.   No.  Because when I first moved there, I was in

3    school and working.  So at first -- I don't remember how

4    much it was.  But once I finished Wake Tech, it went, and I

5    was working and wasn't on unemployment, it was based off my

6    income.

7         Q.   Where were you going to school while you were

8    working?

9         A.   Wake Tech.

10        Q.   What were you studying at Wake Tech?

11        A.   My GED.

12        Q.   And did you get your GED?

13        A.   Yes.

14        Q.   When did you get that?

15        A.   I don't remember the date.

16        Q.   Sometime while you were living at Burgundy?

17        A.   Yes.  It was.

18        Q.   And the amount of rent that you paid was based on

19   the amount of income that you had?

20        A.   Yes.

21        Q.   Can you describe the neighborhood when you lived

22   at 1628 Burgundy, what it was like?

23        A.   I didn't go around the neighborhood, so I

24   can't -- I know the part I lived at wasn't as terrible as

25   the top.

DA42

Page 20

1    give them any instructions about where they should or

2    shouldn't go in the neighborhood?

3         A.   No.

4         Q.   Did you ever witness any violence in the

5    neighborhood?

6         A.   No.

7         Q.   But did you hear about violence in the

8    neighborhood?

9         A.   Only when the cops would come to the door and ask

10   questions.

11        Q.   How often would that happen?

12        A.   I can count like on my hands probably once.

13        Q.   Do you remember what types of questions they

14   asked?

15        A.   Did we see anything, did we hear anything.

16        Q.   Did you know what they were investigating?

17        A.   A shooting.

18        Q.   Had you seen or heard anything in connection with

19   the shooting?

20        A.   Just the gunshots, but I didn't witness anything.

21        Q.   Do you remember when that was?

22        A.   I don't remember.

23        Q.   Do you remember if it was before May of 2020?

24        A.   It was after.

25        Q.   Before May of 2020, had you seen police in the

Veritext Legal Solutions
800.743.DEPO (3376)        calendar-carolinas@veritext.com        www.veritext.com
Case 5:22-cv-00068-BO   Document 207   Filed 03/31/23   Page 46 of 105

DA44

Kenya Walton                                    November 15, 2022
Irving, Yolandav. The City Of Raleigh

                                                              Page 21

1    neighborhood?

2         A.   Yes.

3         Q.   How often would you see them in the neighborhood?

4         A.   Every day.

5         Q.   Every day?  And were these patrol cars that you

6    saw?

7         A.   Sometimes patrol or something probably had

8    happened.

9         Q.   I'm sorry -- I didn't hear what you said.

10        A.   I said sometimes patrol cars or sometimes

11   probably something had happened.

12        Q.   Something had happened and they were called to

13   the neighborhood?

14        A.   Yes.

15        Q.   Do you remember any reasons for them being called

16   to the neighborhood other than the shooting that you

17   already described?

18        A.   Yeah.

19        Q.   What do you recall?

20        A.   I mean if they be fighting, you'll see them come

21   out.  But other than that --

22        Q.   Did you ever see police just cruising around the

23   neighborhood?

24        A.   Yes.

25        Q.   And were you, were you glad that they were there?

DA45

Kenya Walton                                    November 15, 2022
Irving, Yolandav. The City Of Raleigh

                                                              Page 32

1    or when she go out of town, stuff like that.  It wasn't

2    never about the neighborhood.

3         Q.   Before May of 2020, had you ever had any

4    conversations with your children about how they should

5    interact with the police if they encountered police?

6         A.   Yes.

7         Q.   What had you told your children?

8         A.   I did my background on Leesville High School

9    because I didn't want them to go to Leesville.

10             It's a card that I gave them, a blue little card

11   that I gave my boys, which was Ziyel, Dyamond, and Robert,

12   when they started high school, their rights, what the

13   police officer is supposed to say to them, the dos or

14   don'ts, or how they're supposed to be treated.

15        Q.   That was a card?

16        A.   Yes.

17        Q.   Do you remember where you got it?

18        A.   The courthouse.

19        Q.   And did you give one of those cards to each of

20   your boys?

21        A.   Yes.

22        Q.   So basically it was to inform them about their

23   rights?

24        A.   Yes.

25        Q.   And did you ever have any conversations with them

Veritext Legal Solutions
800.743.DEPO (3376)    calendar-carolinas@veritext.com    www.veritext.com
Case 5:22-cv-00068-BO   Document 207   Filed 03/31/23   Page 48 of 105

Page 33

1   about how they should interact with if approached or

2   encountered by a police officer?

3        A.   Yes.  It was, everything was all on that card.

4        Q.   Do you remember anything about what it said on

5   the card?

6        A.   About being Mirandized, basically the rules and,

7   I mean not the rules, about their rights like they do and

8   they don't have, what to do if they are approached, follow

9   directions, stuff like that.

10       Q.   Is there a reason that you gave the card to the

11  boys and not the girls?

12       A.   Yes.

13       Q.   What's that?

14       A.   Because I fear for my boys more than I fear for

15  my girls.

16       Q.   Did you ever have any other conversations with

17  your boys about interacting with the police?

18       A.   No.

19       Q.   What was it that you were worried about about

20  Leesville High School?

21       A.   They had a bad reputation.

22       Q.   And did they end up going there?

23       A.   Yes.  My mom talked me into it.

24       Q.   Did they encounter any problems at Leesville?

25       A.   Yes.

DA47

Kenya Walton                    November 15, 2022
Irving, Yolandav. The City Of Raleigh

Page 48

1    only one missing.

2         Q.   And did you find out -- did you ask where he was?

3         A.   Dyamond said he was next door.

4         Q.   And you said that you were cussing?

5         A.   Yes.

6         Q.   Were you cussing at anybody in particular?

7         A.   Yes.

8         Q.   Who?

9         A.   Dyamond and Z.G.

10        Q.   So you were mad at them?

11        A.   For running.

12        Q.   Okay.  Why is that?

13        A.   Because I always tell them never run.

14        Q.   You had told them already in the past they should

15   not run from the police?

16        A.   Yes.

17        Q.   Do you remember what happened next?

18        A.   I just remember making sure Kamisha was okay.

19             Then somebody, I don't know which officer, I

20   don't recall what officer came in, and he asked about

21   counterfeit money.

22        Q.   What did he ask?

23        A.   He asked did I have counterfeit money.

24        Q.   What did you say?

25        A.   No.

Veritext Legal Solutions
800.743.DEPO (3376)     calendar-carolinas@veritext.com     www.veritext.com
Case 5:22-cv-00068-BO   Document 207   Filed 03/31/23   Page 50 of 105

Page 49

1        Q.   Do you recall any other questions that the

2    officers asked you?

3        A.   He asked could they search my house.

4        Q.   What did you say?

5        A.   Yes.

6        Q.   And this officer who asked about counterfeit

7    money and if they could search your house, can you describe

8    this officer?

9        A.   He was African-American with cornrows.

10       Q.   Do you know now who that officer was?

11       A.   Yes.

12       Q.   Who was it?

13       A.   The Abdullah guy.

14       Q.   Okay.  So you believe now that was Detective

15   Abdullah who asked you that?

16       A.   Yes.

17       Q.   And you gave Detective Abdullah permission to

18   search your house?

19       A.   Yes.

20       Q.   Did they then search your house?

21       A.   Yes.

22       Q.   Did they find anything --

23       A.   No.

24       Q.   -- as a result of the search?

25            What do you recall happening next?

Veritext Legal Solutions
800.743.DEPO (3376)      calendar-carolinas@veritext.com      www.veritext.com
Case 5:22-cv-00068-BO   Document 207   Filed 03/31/23   Page 51 of 105

Page 50

1          A.   Then they went out the back door.  Then they said

2     something about heroine.

3               And they said that a guy went through the attic

4     of Yolanda's house and I guess the attics were attached.

5     I'm not for sure about the attics being attached.

6          Q.   But you understood that they, the police officers

7     were telling you that somebody had gone through the attic

8     of Yolanda's house?

9          A.   (No audible response)

10         Q.   And you said -- you nodded yes?

11         A.   Yes.  I'm sorry.

12         Q.   Do you recall anything else they said about that?

13         A.   No.

14         Q.   What happened next?

15         A.   I sat in there with the kids.

16         Q.   You sat inside with the kids while they searched

17    your house?

18         A.   Yes.

19         Q.   And how long did that take?

20         A.   Not long.

21         Q.   What happened when they had completed their

22    search?

23         A.   They just told me to sit tight.

24         Q.   And at some point, did they finish?

25         A.   Yes.

Veritext Legal Solutions
800.743.DEPO (3376)      calendar-carolinas@veritext.com      www.veritext.com
Case 5:22-cv-00068-BO   Document 207   Filed 03/31/23   Page 52 of 105

Kenya Walton                        November 15, 2022
Irving, Yolandav. The City Of Raleigh

                                                    Page 51

1        Q.   And what did they tell you then?

2        A.   Nothing.

3        Q.   Did they tell you they were done or they were

4    leaving?

5        A.   Nothing.

6        Q.   Did they just leave?

7        A.   Yes.  There was still an officer in the living

8    room with us.

9        Q.   And can you describe the officer who was staying

10   in the living room with you?

11       A.   It was a Caucasian male.

12       Q.   Was he wearing the vest and helmet?

13       A.   Yes.

14       Q.   Did you have any conversation with him?

15       A.   I asked him what was going on.  He said that

16   they'll tell me once it was done.

17       Q.   Any other conversation with him?

18       A.   No.

19       Q.   Were you having any conversation with your kids?

20       A.   Yeah.

21       Q.   What type of conversation were you having?

22       A.   Not with Ziyel and Z.G., they was on the steps.

23            But I was talking to Kamisha and Robert, just

24   asking them was they okay because at the time Kamisha was

25   like six or seven months pregnant.

Veritext Legal Solutions
800.743.DEPO (3376)    calendar-carolinas@veritext.com    www.veritext.com
Case 5:22-cv-00068-BO   Document 207   Filed 03/31/23   Page 53 of 105

DA51

Kenya Walton                         November 15, 2022
Irving, Yolandav. The City Of Raleigh

                                              Page 52

1        Q.   And did they tell you they were okay?

2        A.   Yes.

3        Q.   Did you make any phone calls or receive any phone

4   calls during this time?

5        A.   While the officers are there?

6        Q.   Yes.

7        A.   Not -- like towards the end I did.

8        Q.   Who did you call or did --

9        A.   Ziyel was put on Instagram in handcuffs.  And my

10  aunt saw it.  My aunt called my mom, my sisters.  And it

11  went from there.

12       Q.   Who put Ziyel's photo on Instagram?

13       A.   I think it was J.I.

14       Q.   The next-door neighbor?

15       A.   Yes.

16       Q.   How did you know that?

17       A.   It was told from one of the kids.

18       Q.   And you started getting calls from your family?

19       A.   My mom asked what was going on.  By that time,

20  they was on their way there.

21       Q.   Were you angry about him being put on Instagram?

22       A.   Yes.

23       Q.   So you think the people that you spoke with on

24  the phone would have been -- you spoke with your mom on the

25  phone?

Page 98

```
 1          Q.   And you remember being woken up and asked
 2     questions about it?
 3          A.   Yes.
 4          Q.   I asked you a little bit about the search that
 5     the police conducted in your house.
 6               Did you have an understanding of what they were
 7     searching for?
 8          A.   The understanding was counterfeit money.
 9          Q.   Because they asked you if you had any counterfeit
10     money?
11          A.   Uh-huh.  Yes.
12          Q.   Did, did you have any understanding that they
13     might be looking for a person?
14          A.   After, after they came back down, they said a
15     person had entered Yolanda's unit and something about the
16     attic and said the attic was connected.
17               But I wasn't for sure because I'd never been in
18     the attic.
19          Q.   But you had the impression that perhaps the
20     police thought that a person could have entered Yolanda's
21     apartment and made his way over to your apartment?
22          A.   Yes.
23          Q.   And the search that they conducted, were you able
24     to see what they were doing while they were searching, at
25     least in the downstairs?
```

1          A.    No.  They didn't go, they didn't search anything

2     downstairs.

3          Q.    Okay.  So they didn't search the downstairs?

4          A.    No, ma'am.

5          Q.    They went upstairs?

6          A.    Yes.

7          Q.    And so you weren't able to observe what they were

8     looking for?

9          A.    No.

10         Q.    When you went back upstairs after they had

11    finished, when you eventually went back upstairs, was

12    everything the way you had left it?

13         A.    Yes.

14         Q.    Did you have any robberies at the apartment on

15    Burgundy prior to May of 2020?  Were you a victim of a

16    robbery?

17         A.    Yes.

18         Q.    How many times?

19         A.    Once.

20         Q.    What happened then?

21         A.    I left, I left to go and, I left to go and pick,

22    I think I went to pick one of the boys up from school,

23    Robert and Ziyel from school if I'm not mistaken.

24              The 3000 dollars in my top drawer was missing.

25    Dyamond, all of Dyamond's shoes were missing.  And we found

DA54

Kenya Walton                                November 15, 2022
Irving, Yolandav. The City Of Raleigh

Page 100

1     one shoe outside of the window.

2          Q.   Did you report that to the police?

3          A.   Yes.

4          Q.   Did they investigate?

5          A.   Honestly, I don't know.

6          Q.   Or did they come --

7          A.   They came.

8          Q.   Yeah.  Okay.  Do you know how that person gained

9     entry to your apartment?

10          A.   Yes.

11          Q.   How?

12          A.   He was Kamisha's friend.

13          Q.   Okay.  A friend of your daughter?

14          A.   Yes.

15          Q.   Do you know who it was?

16          A.   Yes.

17          Q.   Was he ever arrested?

18          A.   Yes.

19          Q.   And who, what's his name?

20          A.   The little boy's name was -- not John -- George

21     Simms.

22          Q.   And is it your understanding that Kamisha let him

23     in?

24          A.   Yes.

25          Q.   And he stole the money and the shoes while he was

Veritext Legal Solutions
800.743.DEPO (3376)      calendar-carolinas@veritext.com      www.veritext.com
Case 5:22-cv-00068-BO   Document 207   Filed 03/31/23   Page 57 of 105

Kenya Walton                    November 15, 2022
Irving, Yolandav. The City Of Raleigh

DA55

Page 103

1    Dyamond's clothes.

2            And we called the police then.  And the police

3    came to -- the police came -- well, I called the police,

4    and the police came to my job.  But I had to file a civil

5    suit or something like that.

6        Q.   Okay.  Did you file a lawsuit?

7        A.   No.

8        Q.   You knew who had done it?

9        A.   Yes.

10       Q.   Who was he?

11       A.   My ex-boyfriend.  His name is Rashid Campbell.

12       Q.   Did you ever get the clothes back?

13       A.   No.

14       Q.   Are there any other times you can think of that

15   you've been a victim of a crime?

16       A.   Another ex-boyfriend.

17       Q.   What happened with him?

18       A.   I broke up with him, and he tried to kill me.

19       Q.   Oh.  How did he do that?

20       A.   He -- when I was leaving, I was leaving the

21   house, I was leaving the house, going to the beach.

22           And he pulled up.  And he asked could we have a

23   conversation.  I said no.

24           When I said no, like 30 minutes, 45 minutes

25   later, he came while I was putting my bags in the trunk and

Page 104

1      the kids was sitting on the steps, and he started shooting.

2      The trunk of the car caught the bullet.  So --

3             Q.   Trying to shoot you?

4             A.   Yeah.  Yes.

5             Q.   But fortunately he missed?

6             A.   Yes.

7             Q.   Did you report that to the police?

8             A.   Yes.

9             Q.   And did they come?

10            A.   Yes.

11            Q.   What happened?

12            A.   He got arrested, did a restraining order.

13            Q.   Did he stay away from you after that?

14            A.   Yeah.  He stayed away for a while until he seen

15     me on the news.

16            Q.   Has he reconnected or tried to reconnect?

17            A.   Tried.

18            Q.   When he saw you on the news about the search

19     warrant?

20            A.   Yes.

21            Q.   And what was his name or is his name?

22            A.   Floyd Dunn.

23            Q.   Can you say it again?

24            A.   Floyd Dunn.

25            Q.   How did he try to reconnect with you?

Page 118

1    himself?

2          A.    No.

3          Q.    Do you know whether the officer you later learned

4    to be Omar Abdullah was part of the search upstairs?

5          A.    I didn't see him go upstairs.

6          Q.    Have you ever met with or communicated in any way

7    with the Wake County District Attorney Lorrin Freeman?

8          A.    No.

9          Q.    What about an Assistant District Attorney named

10   David Coleman --

11         A.    No.

12         Q.    -- have you ever met with him or spoken to him?

13         A.    No, sir.

14         Q.    Same question with respect to David Saacks.

15         A.    No, sir.

16         Q.    Have you spoken to anyone you understand to be an

17   assistant district attorney or district attorney concerning

18   either Omar Abdullah or the May 21, 2020 encounters?

19         A.    No, sir.

20         Q.    I told you I was going to hop around a little

21   bit --

22         A.    That's fine.

23         Q.    -- so apologies.  But the interview or the

24   examination of Ziyel by Dr. Etheridge, that occurred last

25   month, correct?

DA58

Kenya Walton                          November 15, 2022
Irving, Yolandav. The City Of Raleigh

Page 136

1    A.   It was fine.  Because I had a tracker on my car.

2         The car place said I couldn't, they couldn't cut

3    the car off until the Raleigh Police Department was

4    contacted.  So Raleigh Police Department had to cut the

5    tracker off.

6    Q.   And they ended up finding your car?

7    A.   They tracked it.  After they called and turned it

8    off.  And they had it, they had it towed to the address.

9    Q.   How quickly after you reported it or after police

10   responded to your call was your car found?

11   A.   A couple seconds.

12   Q.   Technology.  You mentioned an ex-boyfriend that

13   stole clothes from -- was it you or from your children?

14   A.   No.  It was the boys' clothes.

15   Q.   And you called the police related to that?

16   A.   Yes.

17   Q.   When did that occur?

18   A.   Not for sure.

19   Q.   Was it before or after May 21, 2020?

20   A.   Before.

21   Q.   Do you know how long before?

22   A.   Probably a year and a half before.

23   Q.   And did, did you call from your home?

24   A.   No.  I called from my job.

25   Q.   And did the police actually physically respond to

Veritext Legal Solutions
800.743.DEPO (3376)    calendar-carolinas@veritext.com    www.veritext.com
Case 5:22-cv-00068-BO   Document 207   Filed 03/31/23   Page 61 of 105

Kenya Walton                                    November 15, 2022
Irving, Yolandav. The City Of Raleigh

1    you?

2         A.   Yes.  They came to the job.

3         Q.   And how many police officers arrived?

4         A.   One.

5         Q.   And were they Raleigh police officers?

6         A.   Yes.

7         Q.   How was your encounter with that officer?

8         A.   It was fine.

9         Q.   You mentioned a situation in which an

10   ex-boyfriend actually shot at you.

11        A.   Yes.

12        Q.   And it struck your vehicle.

13        A.   Yes.

14        Q.   When did that occur?

15        A.   2015.

16        Q.   So about five years before the May 21, 2020

17   encounter?

18        A.   Yes.

19        Q.   And did you call -- you did call police for that?

20        A.   Yes.

21        Q.   It was Raleigh police?

22        A.   Yes.

23        Q.   And did they respond to you?

24        A.   Yes.

25        Q.   And did that -- did they come to your home?

Veritext Legal Solutions
800.743.DEPO (3376)     calendar-carolinas@veritext.com     www.veritext.com
Case 5:22-cv-00068-BO   Document 207   Filed 03/31/23   Page 62 of 105

Page 138

1     A.   Yes.

2     Q.   And how many responded?

3     A.   A lot.

4     Q.   Do you remember how many?

5     A.   No.  A lot.

6     Q.   More than two?

7     A.   Yes.

8     Q.   More than three?

9     A.   Yes.

10    Q.   More than four?

11    A.   Yes.

12    Q.   I'm going to keep going -- more than five?

13    A.   Yes.  You would have thought somebody got

14    murdered.

15    Q.   More than 10?

16    A.   It probably was more than 10, yes.

17    Q.   And can you describe the encounter you had with

18    the Raleigh police officers at that point?

19    A.   They found him the next day.  It was -- they came

20    by to make sure that I was okay.  But by that time, I was

21    gone.

22    Q.   Have you, yourself, had any encounters with

23    Raleigh Police Department officers since May 21, 2020?

24    A.   Say that again.

25    Q.   Have you had yourself any sort of face-to-face

Veritext Legal Solutions
800.743.DEPO (3376)     calendar-carolinas@veritext.com     www.veritext.com
Case 5:22-cv-00068-BO   Document 207   Filed 03/31/23   Page 63 of 105

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CIVIL ACTION NO.: 5:22-cv-00068-BO

YOLANDA IRVING, individually and as the )
natural parent and guardian of J.I. JUWAN )
HARRINGTON, CYDNEEA HARRINGTON, KENYA )
WALTON, individually an as the natural )
parent and guardian of R.W. ZIYEL WHITLEY, )
DYAMOND WHITLEY, KAMISHA WHITLEY, NANETTA )
GRANT as the natural parent and guardian )
of Z.G. and EMANCIPATE NC, INC. )
)
Plaintiffs, )
)
vs. )
)
THE CITY OF RALEIGH, Officer OMAR I. )
ABDULLAH, Sergeant WILLIAM ROLFE, Officer )
RISHAR PIERRE MONROE, Officer JULIEN DAVID )
RATTELADE, and Officer MEGHAN CAROLINE GAY, )
Officer DAVID MEAD, Officer JESUS ORTIZ, )
Officer KYLE PERRIN, Officer MICHAEL )
MOLLERE, Officer KYLE THOMPSON, Officer )
VINCENT DEBONIS, Officer DANIEL TWIDDY, )
Officer THOMAS WEBB, Officer DAVID )
McDONALD, Officer DAVID GARNER, Chief of )
Police ESTELLA PATTERSON and City Manager )
MARCHELL ADAMS-DAVID, in their official )
capacities, )
)
Defendants. )
_____)

D E P O S I T I O N

OF

**OFFICER MEGHAN CAROLINE GAY**

At Raleigh, North Carolina

Friday, October 28, 2022

**REED & ASSOCIATES**
MATTHEWS, NORTH CAROLINA 980.339.3575

REPORTER:  DEBORAH A. HYDE

                          A P P E A R I N G


On behalf of the Plaintiffs:

        ABRAHAM RUBERT-SCHEWEL, ESQUIRE
        Tin Fulton Walker & Owen, PLLC
        119 East Main Street
        Durham, North Carolina  27701
        919-451-9216
        schewel@tinfulton.com

        EMILY D. GLADDEN, ESQUIRE
        Tin Fulton Walker & Owen, PLLC
        204 North Person Street
        Raleigh, North Carolina  27601
        919-720-4201
        Egladden@tinfulton.com


On Behalf of Defendants City of Raleigh, Estella
    Patterson, and Marchell Adams-David:

        DOROTHY V. KIBLER, ESQUIRE
        City of Raleigh Attorney's Office
        Post Office Box 590
        Raleigh, North Carolina  27602
        919-996-6560
        dorothy.kibler@raleighnc.gov


On Behalf of Defendants Officers David Mead, Jesus
    Ortiz, Kyle Perrin, Michael Mollere, Kyle Thompson,
    Vincent Debonis, Daniel Twiddy, Thomas Webb, David
    McDonald, and David Garner:

        LESLIE C. PACKER, ESQUIRE
        Ellis & Winters LLP
        4131 Parkdale Avenue, Suite 400
        Raleigh, North Carolina  27612
        919-865-7009
        leslie.packer@elliswinters.com


                        (Continued)


                    **REED & ASSOCIATES**
          MATTHEWS, NORTH CAROLINA  980.339.3575

A P P E A R I N G


On Behalf of Defendant Officer Omar I. Abdullah:

     JASON R. BENTON, ESQUIRE
     Parker Poe Adams & Bernstein, LLP
     620 South Tryon Street, Suite 800
     Charlotte, North Carolina  28202
     704-372-9000
     jasonbenton@parkerpoe.com


On Behalf of Defendant Officers Rishar Pierre Monroe,
   Julien David Rattelade, and Meghan Caroline Gay:

     RODNEY E. PETTEY, ESQUIRE
     ALAYNA M. POOLE, ESQUIRE
     Yates, McLamb & Weyher, LLP
     Two Hannover Square
     434 Fayetteville Street, Suite 2200
     Raleigh, North Carolina  27601
     919-835-0900
     rpettey@ymwlaw.com
     apoole@ymwlaw.com


On Behalf of Defendant Officer William Rolfe:

     NORWOOD P. BLANCHARD, III
     Crossley McIntosh Collier Hanley & Edes, PLLC
     5002 Randall Parkway
     Wilmington, North Carolina  28403
     910-762-9711
     norwood@cmclawfirm.com



                    * * * * *




**REED & ASSOCIATES**
MATTHEWS, NORTH CAROLINA  980.339.3575

Officer Gay                                                    5



C O N T E N T S

                                                        PAGE

Examination by Mr. Schewel . . . . . . . . . . . .   5


PLAINTIFFS' EXHIBITS:

Exhibit AAA    Case Jacket for David Mitchell,
               Bates numbers 0001 to 0005 . . . . . .  69

Exhibit BB     SBI Case 2020-2929865 - Statement
               of Officer Gay . . . . . . . . . . . .  12

Exhibit BBB    Marcus VanIrvin Body Camera 3  . . .  156

Exhibit CCC    Dash Cam of Marked Patrol Car  . . .  159

Exhibit DDD    5/21/20 Buy Cam  . . . . . . . . . .  209

Exhibit GGG    Extraction of Samsung Galaxy S7 Phone 137

Exhibit HHH    Officer McDonald's Body Cam - Arrest
               of Connell Williams  . . . . . . . .  173

Exhibit R      Sergeant Rattelade's SBI Interview .  122

Exhibit UU     Returned Search Warrant  . . . . . . . 47

Exhibit VV     Gay's First Interview w Sergeant Davis 90

Exhibit XX     Body Cam 2 - Arrest of Curtis Logan  107

Exhibit YY     Body Cam 1 - Arrest of Curtis Logan  104

Exhibit ZZ     Receipt of Informant Funds Report  .  193

Exhibit ZZ.1   Search Warrant of 5/21/20 . . . . .  205

(All paper exhibits are provided with the transcript.  It
was agreed by all parties that video exhibits will not be
attached.)


*  *  *



**REED & ASSOCIATES**
MATTHEWS, NORTH CAROLINA  980.339.3575

1          This is the deposition of OFFICER MEGHAN

2   CAROLINE GAY, taken in accordance with the Federal Rules

3   of Civil Procedure in connection with the above case.

4          Pursuant to Notice, this deposition is being

5   taken in the offices of Yates, McLamb & Weyher, LLP,

6   434 Fayetteville Street, Suite 2200, Raleigh, North

7   Carolina, beginning at 10:10 a.m. on Friday, October 28,

8   2022, before Deborah A. Hyde, Certified Verbatim Reporter

9   and Notary Public.

10                         *   *   *

11  Whereupon,

12              **OFFICER MEGHAN CAROLINE GAY**

13  was called as a witness and, having first been duly

14  sworn, was examined and testified as follows:

15                      EXAMINATION

16      BY MR. SCHEWEL:

17      Q.   My name is Abraham Rubert-Schewel.  I'm with

18  the law firm of Tin Fulton Walker & Owen.  We represent

19  the plaintiffs in this lawsuit against the City of

20  Raleigh and individually named officers, such as

21  yourself.

22          You are testifying under oath and under the

23  penalty of perjury today just as if you were in a court

24  of law.  Do you understand?

25      A.   Yes.

1     Q.   How do you determine the reliability of a CI?

2     A.   As far as when signing them up?

3     Q.   Yes.

4     A.   You would usually do what's called a qualifying

5  buy, where we would equip them with electronic

6  surveillance, search them, provide them with recorded

7  currency, send them to a location to buy controlled

8  substances.  When they came back with the drugs, the

9  video matched up with what they said.  It's what we call

10  a qualifying buy.  It's how we help deem them as

11  reliable.

12     Q.   Would you make an arrest off of a qualifying

13  buy?

14     A.   That was not common practice.

15     Q.   So a qualifying buy is what allows you to say

16  on a warrant that your CI is trustworthy and reliable?

17     A.   It is one of the factors used.

18     Q.   What are the other factors?

19     A.   Information can also deem a CI reliable, if

20  they provide information about a dealer or an address or

21  that type of thing that I can corroborate through

22  independent law enforcement sources.  That would also

23  help deem a CI reliable.

24     Q.   And let me back up a little bit to the

25  qualifying buy.  If the CI brings in drugs from a

1          MR. PETTEY:  Exhibit BB.

2          MR. SCHEWEL:  Thank you.

3          MR. PETTEY:  I'll let her look at my copy.

4          MR. SCHEWEL:  Thank you.

5          BY MR. SCHEWEL:

6     Q.   Okay.  I'm going to direct you to page 4,

7    towards the bottom.  It's the third paragraph from the

8    bottom.  It states, "Abdullah never followed up checking

9    with --" sorry.  Strike that.

10         "Abdullah never followed back up with checking

11   on lab reports.  Gay would go out of her way to help,

12   even when it was at the end of the day.  Gay did not

13   think what Abdullah was doing with Williams was

14   malicious, but there was so many issues, she could not

15   say for sure."

16         So I'll ask you again, did you help Abdullah

17   file his CCBI requests to have drugs tested?

18         MR. PETTEY:  Objection.

19         THE WITNESS:  So, again, possibly.  I mean, it

20   was one of the jobs that we did during the processing of

21   a search warrant or a takedown, so it's very possible I

22   could have written them.  Once that's written, you have

23   to get approval from the DA's office before CCBI will

24   test the drugs.

25         BY MR. SCHEWEL:

1      Q.   How do you get that approval?

2      A.   Normally, it's a communication with a district

3  attorney and then an e-mail is sent to evidence for

4  approval before the drugs get sent off to CCBI.

5      Q.   How long does that process take you today?

6      A.   It depends on when the lab is submitted.  If

7  they're submitted with the drugs and I can get approval

8  from the DA's office that day, I would say less than a

9  month, but back then it took longer.

10      Q.   Okay.  So you're saying there is a process by

11  which you can submit the lab request and e-mail the DA

12  immediately and say, "I have these drugs; I need them

13  tested"?

14      A.   Yes.

15      Q.   But in 2019, you could not do that?

16      A.   I said the process took longer back then.

17      Q.   So you could still do that?

18      A.   Yes.

19      Q.   But it took longer then to get the result back

20  from the lab?

21      A.   Yes.

22      Q.   Okay.  And when the result -- describe for me

23  how the result comes back from the lab.

24      A.   So then or now?  Because it's changed.

25      Q.   Then.

1      A.   So then, there's a file on Pol Share that had

2   all of the CCBI lab results for every Raleigh police case

3   that was submitted.  You had to go in the folder.  You

4   had to find -- it was labeled by case report number, so

5   you had to go in and find your case report numbers and

6   open it up and that was the file.

7      Q.   And what was it called?  Pol Share?

8      A.   Pol Share.

9      Q.   P-o-l-e?

10     A.   P-o-l and then Share, Pol Share.  It's like our

11  logistical -- so if you're on the other side of the

12  department, you can put this file and I can access it

13  from my computer.

14     Q.   What else is on Pol Share?

15     A.   There's a variety of things, roll calls, forms,

16  paperwork.  Anything that you could not find on RPD Net,

17  which is like our website for officers, you could find on

18  Pol Share, like a common sharing network.

19     Q.   Okay.  And this SBI report on your interview

20  says, "Abdullah never followed back up on checking on lab

21  reports."  What does that mean?

22     A.   So it was something you had to seek out, so if

23  you -- sometimes it would take weeks or months for a CCBI

24  lab request to come back, so it was something that you

25  had to seek out later.  That has since changed, but it

1  was something that you had to remember, you know, "On

2  this date, I did this case, I sent the lab out, I have to

3  go back and look at this lab request whenever it comes

4  in," but you don't know when it comes in.

5      Q.   And how do you know that Abdullah was not doing

6  that?

7      A.   Again, this was conversations with Detective

8  Monroe and other detectives, that they did not believe he

9  was checking it.

10     Q.   In conversations that they had with you?

11     A.   Yes.

12     Q.   Did you ever hear them confront Abdullah about

13 this?

14     A.   I don't recall.

15     Q.   Do you recall if you ever heard them talk to

16 Sergeant Rolfe about this?

17     A.   That specific issue, I don't recall.

18     Q.   Do you know how they knew that Abdullah was not

19 checking his labs?

20     A.   I don't recall, but they worked with him a lot

21 longer than I had.

22     Q.   Do you recall Monroe or Rattelade ever having a

23 meeting with a district attorney and a public defender

24 from the Wake County Public Defender's Office related to

25 concerns about Dennis Williams and Abdullah?

1      Q.   Did you believe he was a reliable informant at

2    this time?

3      A.   I would say no.

4      Q.   Okay.  I'm going to read from your SBI report,

5    and if you want to follow along, I think that Rod has a

6    copy right there, too, but I'm happy to give this back to

7    you.

8           Okay.  So this is page 4, and I am starting at

9    the top of the third paragraph or maybe, actually, the

10   second full paragraph.  It starts, "In May of 2020."  Do

11   you see where I am?

12     A.   Yes.

13     Q.   "In May of 2020, there was a case in North

14   Raleigh.  After the arrest, the drugs were tested, and

15   they tested to not be heroin."  Is this the case that you

16   are describing?  Is that the one that we've just watched

17   the video of that's the search warrant execution --

18     A.   Yes.

19     Q.   -- at 1628 Burgundy?  Sorry.  Can you answer

20   that again?

21     A.   Yes.

22     Q.   "The drugs were tested, and they tested to not

23   be heroin.  Gay asked Abdullah what to charge because she

24   was typing up the warrants for him, and he told her,

25   'Trafficking heroin.'  Gay typed the warrants as Abdullah

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CIVIL ACTION NO.: 5:22-cv-00068-BO

YOLANDA IRVING, individually and as the )
natural parent and guardian of J.I. JUWAN )
HARRINGTON, CYDNEEA HARRINGTON, KENYA )
WALTON, individually an as the natural )
parent and guardian of R.W. ZIYEL WHITLEY, )
DYAMOND WHITLEY, KAMISHA WHITLEY, NANETTA )
GRANT as the natural parent and guardian )
of Z.G. and EMANCIPATE NC, INC. )
)
                        Plaintiffs, )
)
    vs. )
)
THE CITY OF RALEIGH, Officer OMAR I. )
ABDULLAH, Sergeant WILLIAM ROLFE, Officer )
RISHAR PIERRE MONROE, Officer JULIEN DAVID )
RATTELADE, and Officer MEGHAN CAROLINE GAY, )
Officer DAVID MEAD, Officer JESUS ORTIZ, )
Officer KYLE PERRIN, Officer MICHAEL )
MOLLERE, Officer KYLE THOMPSON, Officer )
VINCENT DEBONIS, Officer DANIEL TWIDDY, )
Officer THOMAS WEBB, Officer DAVID )
McDONALD, Officer DAVID GARNER, Chief of )
Police ESTELLA PATTERSON and City Manager )
MARCHELL ADAMS-DAVID, in their official )
capacities, )
)
                        Defendants. )
_____)


D E P O S I T I O N

OF

**OFFICER WILLIAM ROLFE**


At Raleigh, North Carolina

Tuesday, January 17, 2023

REPORTER:  DEBORAH A. HYDE


**REED & ASSOCIATES**
MATTHEWS, NORTH CAROLINA  980.339.3575

A P P E A R I N G


On Behalf of the Plaintiffs:

    IAN A. MANCE, ESQUIRE
    EMANCIPATE NC
    P.O. Box 309
    Durham, North Carolina  27702
    828-719-5755
    ian@emancipatenc.org

    ABRAHAM RUBERT-SCHEWEL, ESQUIRE
    Tin Fulton Walker & Owen, PLLC
    119 East Main Street
    Durham, North Carolina  27701
    919-451-9216
    schewel@tinfulton.com


On Behalf of Defendants City of Raleigh, Estella
    Patterson, and Marchell Adams-David:

    DOROTHY V. KIBLER, ESQUIRE
    AMY PETTY, ESQUIRE
    City of Raleigh Attorney's Office
    Post Office Box 590
    Raleigh, North Carolina  27602
    919-996-6560
    dorothy.kibler@raleighnc.gov


On Behalf of Defendant Officers David Mead, Jesus
    Ortiz, Kyle Perrin, Michael Mollere, Kyle Thompson,
    Vincent Debonis, Daniel Twiddy, Thomas Webb, David
    McDonald, and David Garner:

    MICHELLE LIGUORI, ESQUIRE
    Ellis & Winters LLP
    4131 Parkdale Avenue, Suite 400
    Raleigh, North Carolina  27612
    919-865-7009
    michelle.liguori@elliswinters.com


(Continued)


**REED & ASSOCIATES**
MATTHEWS, NORTH CAROLINA  980.339.3575

A P P E A R I N G


On Behalf of Defendant Officer Omar I. Abdullah:

    JASON R. BENTON, ESQUIRE
    Parker Poe Adams & Bernstein, LLP
    620 South Tryon Street, Suite 800
    Charlotte, North Carolina  28202
    704-372-9000
    jasonbenton@parkerpoe.com


On Behalf of Defendant Officers Rishar Pierre Monroe,
   Julien David Rattelade, and Meghan Caroline Gay:

    ALAYNA M. POOLE, ESQUIRE
    Yates, McLamb & Weyher, LLP
    Two Hannover Square
    434 Fayetteville Street, Suite 2200
    Raleigh, North Carolina  27601
    919-835-0900
    apoole@ymwlaw.com


On Behalf of Defendant Officer William Rolfe:

    NORWOOD P. BLANCHARD, III
    Crossley McIntosh Collier Hanley & Edes, PLLC
    5002 Randall Parkway
    Wilmington, North Carolina  28403
    910-762-9711
    norwood@cmclawfirm.com


* * * * *

Officer Rolfe                                                 4

C O N T E N T S

|  |  | PAGE |
|---|---|---|
| Examination by Mr. Mance: |  | 8 |

PLAINTIFFS' EXHIBITS

| Exhibit A | Findings & Recommendations (Abdullah) | 10 |
|---|---|---|
| Exhibit B | Excerpt of Abdullah Deposition | 15 |
| Exhibit C | Incident #P18051289 | 20 |
| Exhibit D | Gregory Marshall Report | 23 |
| Exhibit E | Rattelade Internal Affairs Interview | 26 |
| Exhibit F | Abdullah 2020 Annual Performance Eval | 28 |
| Exhibit G | Abdullah 2019 Annual Performance Eval | 28 |
| Exhibit H | Det. Abdullah, O.I. C2020-023 | 31 |
| Exhibit I | IA Interview - Rolfe | 36 |
| Exhibit J | Interview With Detective Abdullah | 36 |
| Exhibit K | Detective Rattelade C202 | 118 |
| Exhibit L | Interview, J.C. Gwinn | 52 |
| Exhibit M | Interview, J.D. Rattelade | 52 |
| Exhibit N | Personnel File, W. Rolfe | 136 |
| Exhibit O | Interview,  J.W. Bunch | 59 |
| Exhibit P | Interview, M.C. Gay | 67 |
| Exhibit Q | Interview, R.P. Monroe | 68 |
| Exhibit R | Detective Monroe, R.P. C2020-023 | 73 |
| Exhibit S | Sergeant Rolfe, W.S. C2020-023 | 75 |

(Continued)

**REED & ASSOCIATES**
MATTHEWS, NORTH CAROLINA  980.339.3575

PLAINTIFFS' EXHIBITS
(Continued)

                                                                  PAGE

Exhibit T   Rattelade SBI Interview                          91

Exhibit U   Tab 1 Appeal Docs from Rolfe                     94

Exhibit V   Preliminary Extraction Report - Abdullah         99

Exhibit W   Texts from M. Gay Cellphone                      104

Exhibit X   Transcript, 12021-025 Dep. Chief Jordan         134
            and W.S. Rolfe

Exhibit Y   Marcus VanIrvin Offense/Incident Report         160

(Exhibits provided with the transcript.)

* * *

*Reporter's Note:  This transcript contains quoted material.  Such material is reproduced as read or quoted by the speaker.*

**REED & ASSOCIATES**
MATTHEWS, NORTH CAROLINA  980.339.3575

1    This is the deposition of OFFICER WILLIAM

2    ROLFE, taken in accordance with the Federal Rules of

3    Civil Procedure in connection with the above case.

4    Pursuant to Notice, this deposition is being

5    taken at the City Attorney's Office, One Exchange Plaza,

6    Raleigh, North Carolina, beginning at 10:14 a.m. on

7    Tuesday, January 17, 2023, before Deborah A. Hyde,

8    Certified Verbatim Reporter and Notary Public.

9                          *   *   *

10    MR. MANCE:  I think before we get into

11    questions, Norwood, this copy is for you.  This is a

12    binder of materials that I'm going to be making reference

13    to today.  And, Dottie, you weren't here when I spoke to

14    the others about it.

15    Everyone should have this binder.  On the front

16    is a table of contents.  These are all the documents that

17    I intend to refer to in the deposition today.  These are

18    things like SBI interviews or various interviews where I

19    might say, for example, "Detective Rattelade said this.

20    Do you agree with that statement?"

21    And so all of those statements are in this

22    binder.  I tried to organize them in the order in which

23    I'm going to refer to them.  As I read the question, if I

24    use a direct quote, I'll tell you where you can find it

25    in the binder.  So I'll say Exhibit B, page 4, you know,

1  so you can flip through it.  I thought that would just be

2  more efficient in getting us through this so that we

3  don't spend a whole lot of time, since there are a lot of

4  documents, kind of pausing and hunting for things.  So

5  y'all can just kind of read along.

6          Mr. Rolfe, if you need to see -- if, in order

7  to answer a question, you need to, like, visualize it and

8  look at it, you're able to do that.

9          THE WITNESS:  Okay.

10          MS. POOLE:  Ian, I just want to state an

11  objection on the way Exhibit W is worded.  These were

12  from Detective Gwinn, not Detective Gay, but I don't want

13  to interrupt you if you refer to it.

14          MR. MANCE:  That's how it was produced to us.

15  I haven't changed the title.

16          MS. KIBLER:  That's what was given to us.

17          MS. POOLE:  Okay.  I'm sorry, do not

18  misunderstand.  We still have no access to Detective

19  Gay's phone.  Those were from Gwinn, so I apologize for

20  that.

21          MR. MANCE:  All right.

22  Whereupon,

23                  **OFFICER WILLIAM ROLFE**

24  was called as a witness and, having first been duly

25  sworn, was examined and testified as follows:

1  how many times do you do a qualifying buy before you can

2  label them as reliable," end quote.

3          Detective Abdullah responded, quote, "I would

4  do one, one time," end quote.

5          Is that answer correct?  Are officers

6  instructed that they may qualify someone as reliable with

7  a single drug purchase?

8      A.   Yes.

9          MR. BENSON:  Objection to form.  Where is H-14?

10         MR. BLANCHARD:  Yeah.  We don't have H-14.

11         MR. MANCE:  So the 14 refers to the -- oh,

12 you're right.  It will be in here, then.  Do y'all want

13 to see it?

14         MR. BENSON:  I've already stated my objection.

15         MS. POOLE:  Yes.  I mean -- I'm okay right now.

16         BY MR. MANCE:

17     Q.   How many purchases were necessary before

18 detectives could qualify a CI as reliable?

19     A.   One.  One.

20     Q.   It is one.  In that interview, Detective

21 Abdullah described to Sergeant Davis the process of

22 writing up the paperwork associated with a search

23 warrant.  This is at J-25.

24         One of the things that he says is they ask the

25 CIs, quote, "Was there any women inside the apartment?

1          MR. BENSON:  Objection to form.

2          THE WITNESS:  I wasn't here for this case, so I

3     wouldn't have any opinion on that.

4          BY MR. MANCE:

5          Q.   Were you aware that your officers had arrested

6     Curtis Logan?

7          A.   I'm not sure who is who, to be quite honest

8     with you.  Which one is that?

9          Q.   Would you expect to hear about a 20-plus gram

10    heroin arrest?

11         A.   I did hear about it after the fact, yes.

12         Q.   Do you recall how long after the fact you heard

13    about it?

14         A.   Well, I was on vacation, so when I got back,

15    which was a couple days afterward.

16         Q.   You were on vacation during the Curtis --

17         A.   I don't know.  I'm not sure which case we're

18    talking about here, like I just mentioned.

19         Q.   Okay.  So Curtis Logan was the incident at the

20    Sheetz in January of 2020, the Sheetz gas station, and

21    you signed a report, I believe, related to that.  Do you

22    have a recollection of that incident?

23         A.   I don't have specific recollection of that

24    incident, no.

25         Q.   Was it common to make a 20-gram heroin purchase

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CIVIL ACTION NO.: 5:22-cv-00068-BO

YOLANDA IRVING, individually and as the          )
natural parent and guardian of J.I. JUWAN        )
HARRINGTON, CYDNEEA HARRINGTON, KENYA            )
WALTON, individually and as the natural          )
parent and guardian of R.W. ZIYEL WHITLEY,       )
DYAMOND WHITLEY, KAMISHA WHITLEY, NANETTA         )
GRANT as the natural parent and guardian         )
of Z.G., and EMANCIPATE NC, INC.                 )
                                                 )
                    Plaintiffs,                  )
                                                 )
        vs.                                      )
                                                 )
THE CITY OF RALEIGH, Officer OMAR I.             )
ABDULLAH, Sergeant WILLIAM ROLFE, Officer        )
RISHAR PIERRE MONROE, Officer JULIEN DAVID        )
RATTELADE, and Officer MEGHAN CAROLINE GAY,      )
Officer DAVID MEAD, Officer JESUS ORTIZ,         )
Officer KYLE PERRIN, Officer MICHAEL             )
MOLLERE, Officer KYLE THOMPSON, Officer          )
VINCENT DEBONIS, Officer DANIEL TWIDDY,          )
Officer THOMAS WEBB, Officer DAVID               )
McDONALD, Officer DAVID GARNER, Chief of         )
Police ESTELLA PATTERSON and City Manager        )
MARCHELL ADAMS-DAVID, in their official          )
capacities,                                      )
                                                 )
                    Defendants.                  )
_____)

D E P O S I T I O N
OF
DETECTIVE JASON C. GWINN

At Raleigh, North Carolina
Monday, December 19, 2022
REPORTER:  LINDSEY CLINE, Notary Public

A P P E A R I N G

On Behalf of the Plaintiffs:

    NICHAD DAVIS, ESQUIRE
    Tin Fulton Walker & Owen, PLLC
    119 East Main Street
    Durham, North Carolina  27701
    919-451-9216
    ndavis@tinfulton.com

On Behalf of Defendants City of Raleigh, Estella
    Patterson, and Marchell Adams-David:

    DOROTHY V. KIBLER, ESQUIRE
    City of Raleigh Attorney's Office
    Post Office Box 590
    Raleigh, North Carolina  27602
    919-996-6560
    dorothy.kibler@raleighnc.gov

On Behalf of Defendant Officers David Mead, Jesus
    Ortiz, Kyle Perrin, Michael Mollere, Kyle Thompson,
    Vincent Debonis, Daniel Twiddy, Thomas Webb, David
    McDonald, and David Garner:

    MICHELLE LIGUORI, ESQUIRE
    Ellis & Winters LLP
    4131 Parkdale Avenue, Suite 400
    Raleigh, North Carolina  27612
    919-865-7009
    michelle.liguori@elliswinters.com

(Continued)

A P P E A R I N G


On Behalf of Defendant Officer Omar I. Abdullah:

    JASON R. BENTON, ESQUIRE
    JON McLAMB, ESQUIRE
    Parker Poe Adams & Bernstein, LLP
    620 South Tryon Street, Suite 800
    Charlotte, North Carolina 28202
    704-372-9000
    jasonbenton@parkerpoe.com
    jonmclamb@parkerpoe.com


On Behalf of Defendant Officers Rishar Pierre Monroe,
    Julien David Rattelade, and Meghan Caroline Gay:

    RODNEY E. PETTEY, ESQUIRE
    Yates, McLamb & Weyher, LLP
    Two Hannover Square
    434 Fayetteville Street, Suite 2200
    Raleigh, North Carolina 27601
    919-835-0900
    rpettey@ymwlaw.com


On Behalf of Defendant Officer William Rolfe:
    (By Telephone)

    ANDREW J. HANLEY, ESQUIRE
    Crossley McIntosh Collier Hanley & Edes, PLLC
    5002 Randall Parkway
    Wilmington, North Carolina 28403
    910-762-9711
    norwood@cmclawfirm.com



* * * * *

C O N T E N T S

PAGE

Examination by Mr. Davis . . . . . . . . . . . . . . . 5

Examination by Mr. Benton . . . . . . . . . . . . . 144


PLAINTIFFS' EXHIBITS:

Exhibit 1 - Transcript of Telephone Interviews,
            08/14/2020 and 12/09/2020 . . . . . . . . 16

Exhibit 2 - SBI Interview with Jason C. Gwinn,
            10/22/20 . . . . . . . . . . . . . . . . 45

Exhibit 3 - Receipts of Informant Funds and
            Offense/Incident Reports, 3/17/2020
            and 3/19/20 . . . . . . . . . . . . . . 61

Exhibit 4 - Offense/Incident Report, 5/20/20;
            Supplement Report, 5/28/20 . . . . . . . 91



*   *   *

 1          This is the deposition of DETECTIVE JASON C.

 2    GWINN, taken in accordance with the Federal Rules of

 3    Civil Procedure in connection with the above case.

 4          Pursuant to Notice, this deposition is being

 5    taken in the offices of Yates, McLamb & Weyher, LLP,

 6    Two Hannover Square, Suite 2200, 434 Fayetteville Street,

 7    Raleigh, North Carolina, beginning at 10:14 a.m. on

 8    Monday, December 19, 2022, before Lindsey Cline,

 9    Certified Verbatim Reporter and Notary Public.

10                       *   *   *

11    Whereupon,

12              DETECTIVE JASON C. GWINN

13    was called as a witness and, having first been duly

14    sworn, was examined and testified as follows:

15                    EXAMINATION

16          BY MR. DAVIS:

17     Q.   Hey, good morning, Officer Gwinn.  My name is

18    Nichad Davis.  I am with the law firm of Tin, Fulton,

19    Walker & Owen.  We represent the plaintiffs in this

20    matter against the City of Raleigh and other individually

21    named officers, and today you're going to be testifying

22    under oath.  So you're going to be under the penalty of

23    perjury.  So do you understand that today's testimony is,

24    in fact, you know, under oath?

25     A.   I do.

1    sent in CCBI labs that purported to be a drug indicating
2    that it's not?
3        A.    I've never seen his CCBI labs, so I honestly
4    don't know.
5        Q.    So you guys are not privy to each other's CCBI
6    lab reports between detectives, although you guys are on
7    the same team?
8        A.    We could go and find them, but we literally
9    have to -- we would have to go and hunt down his labs,
10   and that's just not something we do based on our own
11   caseloads.  We have to keep up with our own.
12       Q.    But it's -- it's common practice for detectives
13   to collaborate on either a controlled buy, search warrant
14   execution, and then evidence submission?
15           MR. PETTEY:  Objection.
16           THE WITNESS:  Yes.  At the time of an incident.
17   But generally if you're not working an active incident,
18   you're working as an independent detective, and not as a
19   team.
20           BY MR. DAVIS:
21       Q.    And sometimes the detective that conducts the
22   controlled buy is not the same detective that collects
23   the evidence, in your case, right?
24       A.    Correct.
25       Q.    In your case, you just told us about some

1   a CCBI lab report for him.

2       Q.    No.  How many times have you assisted him in

3   that process?

4       A.    So the -- the CCBI lab reports are simple.  So

5   it would either be I fill it out and submit it, or I

6   don't do anything at all.  And I don't recall ever

7   filling one out for him.

8       Q.    Are -- in any case by any detective on your

9   unit, were there -- you guys would conduct a field test

10  before submitting a CCBI lab report, correct?

11      A.    Occasionally, depending on the case.

12      Q.    But there's some cases where you just submit

13  the alleged drug and CCBI comes back with the findings of

14  what it is?

15      A.    Yes.

16      Q.    So for those weeks, you don't know how long --

17  you don't know what it is?

18      A.    Correct.

19      Q.    And how long does it usually take to get a lab

20  report back?

21      A.    It varies.

22      Q.    Approximately, generally speaking.

23      A.    I've seen it take a week and I've seen it take

24  four months.

25      Q.    Depending on quantity, investigation, a lot of

1  heroin, specific to the March incident that we talked

2  about with the money in the foosball table, whereas

3  things lined up that day in March after the May incident,

4  I could take the set of facts from May and apply them to

5  the March incident and make it line up that Aspirin had

6  gone in, bought marijuana, came back and reported it as

7  heroin.

8      Q.   So in some -- in some way or another, Aspirin

9  was not super reliable?

10     A.   No.  That's the crystallization that I saw

11 after the May incident.

12     Q.   And in your -- your estimation, does that make

13 him reliable?

14     A.   No.

15     Q.   So could you trust that Aspirin went to the

16 correct address?

17     A.   Well, after the incident when that became the

18 fact, he was never used again, so it didn't matter from

19 that point on.

20     Q.   It became the fact that he did not go to the

21 correct address?

22     A.   No.  It became the fact that I did not deem him

23 reliable after the May 21st incident.

24     Q.   Okay.  So back to my question, do you -- my

25 question is, we know he was reliable -- unreliable, based

1    sent to the lead detective.  Tell me what you mean by

2    that.  What is sent, if anything, to the lead detective

3    concerning CCBI lab results?

4        A.    Well, that might be a change that's happened.

5    Some results -- well, CCBI has changed and now they have

6    a portal called LIMS.  At the time, sometimes they would

7    get emailed to you, but very infrequently.  And if they

8    weren't emailed to you, they would get put into like a

9    network folder and you would have to go into that and

10    find the labs in a file folder labeled with your case

11    number.

12        Q.    And in that scenario you just described, is

13    that consistent with how the lab results were provided

14    between March 2020 and April 21, 2020, when you were on

15    the Vice Squad?

16        A.    No.  So I was on longer than that.  At some

17    point in time, up until the incident in May, they were

18    put into that shared network folder.  At some point, they

19    began like sporadically emailing to us, and then they

20    opened the LIMS system.

21        Q.    And that's what I'm getting at.  The sporadic

22    emailing of lab results, that came after May 21, 2020; is

23    that true?

24        A.    Yes.

25        Q.    Okay.  Before May 21, 2020, they went to a

1  database, and then the officer would have to go through

2  and find their name, their cases and search that way?

3  They weren't alerted to the results otherwise, true?

4        MR. DAVIS:  Objection.

5        THE WITNESS:  Correct.

6        MR. BENTON:  That's all I have.  Thank you,

7  sir.

8        MS. LIGUORI:  I don't have any questions for

9  the witness.  Thank you.

10       MS. KIBLER:  I have no questions.

11       MR. PETTEY:  Norwood?

12       MR. HANLEY:  Yeah, this is Andrew for Norwood.

13 No questions.

14       MR. PETTEY:  I don't have any questions.

15       COURT REPORTER:  Do you want him to read?

16       MR. PETTEY:  Yeah.  Send it to me.

17       COURT REPORTER:  Okay.

18       Whereupon, at 1:23 p.m. on December 19, 2022,

19 the deposition was concluded.  Signature was reserved.)

20

21                  *  *  *  *  *

22

23

24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CIVIL ACTION NO.: 5:22-cv-00068-BO

YOLANDA IRVING, individually and as the )
natural parent and guardian of J.I. JUWAN )
HARRINGTON, CYDNEEA HARRINGTON, KENYA )
WALTON, individually and as the natural )
parent and guardian of R.W., ZIYEL WHITLEY, )
DYAMOND WHITLEY, KAMISHA WHITLEY, NANETTA )
GRANT as the natural parent and guardian )
of Z.G., and EMANCIPATE NC, INC. )
)
                    Plaintiffs, )
)
       vs. )
)
THE CITY OF RALEIGH, Officer OMAR I. )
ABDULLAH, Sergeant WILLIAM ROLFE, Officer )
RISHAR PIERRE MONROE, Officer JULIEN DAVID )
RATTELADE, and Officer MEGHAN CAROLINE GAY, )
Officer DAVID MEAD, Officer JESUS ORTIZ, )
Officer KYLE PERRIN, Officer MICHAEL )
MOLLERE, Officer KYLE THOMPSON, Officer )
VINCENT DEBONIS, Officer DANIEL TWIDDY, )
Officer THOMAS WEBB, Officer DAVID )
McDONALD, Officer DAVID GARNER, Chief of )
Police ESTELLA PATTERSON and City Manager )
MARCHELL ADAMS-DAVID, in their official )
capacities, )
)
                    Defendants. )
_____)


D E P O S I T I O N

OF

**SERGEANT JULIEN DAVID RATTELADE**


At Raleigh, North Carolina

Tuesday, February 28, 2023

REPORTER:  DEBORAH A. HYDE


**REED & ASSOCIATES**
980.339.3575

DA93

A P P E A R I N G


On Behalf of the Plaintiffs:

        ABRAHAM RUBERT-SCHEWEL, ESQUIRE
        Tin Fulton Walker & Owen, PLLC
        119 East Main Street
        Durham, North Carolina  27701
        919-451-9216
        schewel@tinfulton.com


On Behalf of Defendants City of Raleigh, Estella
    Patterson, and Marchell Adams-David:

        DOROTHY V. KIBLER, ESQUIRE
        City of Raleigh Attorney's Office
        Post Office Box 590
        Raleigh, North Carolina  27602
        919-996-6560
        dorothy.kibler@raleighnc.gov


On Behalf of Defendant Officers David Mead, Jesus
    Ortiz, Kyle Perrin, Michael Mollere, Kyle Thompson,
    Vincent Debonis, Daniel Twiddy, Thomas Webb, David
    McDonald, and David Garner:

        LESLIE C. PACKER, ESQUIRE
        Ellis & Winters LLP
        4131 Parklake Avenue, Suite 400
        Raleigh, North Carolina  27612
        919-865-7009
        leslie.packer@elliswinters.com


On Behalf of Defendant Officer Omar I. Abdullah:

        JESSICA C. DIXON, ESQUIRE
        Parker Poe Adams & Bernstein, LLP
        620 South Tryon Street, Suite 800
        Charlotte, North Carolina  28202
        704-372-9000
        jessicadixon@parkerpoe.com


                        (Continued)

<u>A P P E A R I N G</u>


On Behalf of Defendant Officers Rishar Pierre Monroe,
    Julien David Rattelade, and Meghan Caroline Gay:

        RODNEY E. PETTEY, ESQUIRE
        ALAYNA M. POOLE, ESQUIRE
        Yates, McLamb & Weyher, LLP
        Two Hannover Square
        434 Fayetteville Street, Suite 2200
        Raleigh, North Carolina  27601
        919-835-0900
        rpettey@ymwlaw.com
        apoole@ymwlaw.com


On Behalf of Defendant Officer William Rolfe:

        NORWOOD P. BLANCHARD, III
        Crossley McIntosh Collier Hanley & Edes, PLLC
        5002 Randall Parkway
        Wilmington, North Carolina  28403
        910-762-9711
        norwood@cmclawfirm.com


                    *  *  *  *  *

Sergeant Rattelade                                          4


<u>C O N T E N T S</u>

                                                        <u>PAGE</u>

Examination by Mr. Schewel:                                 5

Examination by Mr. Blanchard:                             166

Further Examination by Mr. Schewel:                       170

Further Examination by Mr. Blanchard:                     173


<u>PLAINTIFFS' EXHIBITS</u>

Exhibit  2 - Rattelade IA Interview of 8/14/20          109

Exhibit  3 - Meghan Gay Cell Phone Text Messages       123

Exhibit  4 - VanIrvin Search Warrant of 5/21/20        117

Exhibit  5 - Rattelade IA Interview of 10/20/21          81

Exhibit  6 - Rattelade SBI Interview                     36

Exhibit  7 - Felony Investigative Report of Sherrod    111
             Anton Smith

Exhibit  8 - Rattelade Third Follow-up Internal          49
             Affairs Interview

Exhibit  9 - VanIrvin 5/21 Buy, Video Recording        155

Exhibit 10 - Banks-Howard Video Recording                58


(Exhibits provided with the transcript.)



*Reporter's Note:  This transcript contains quoted*
*material.  Such material is reproduced as read or quoted*
*by the speaker.*



**REED & ASSOCIATES**
980.339.3575

1          This is the deposition of SERGEANT JULIEN DAVID

2     RATTELADE, taken in accordance with the Federal Rules of

3     Civil Procedure in connection with the above case.

4          Pursuant to Notice, this deposition is being

5     taken in the offices of Yates, McLamb & Weyher,

6     434 Fayetteville Street, Suite 2200, Raleigh, North

7     Carolina, beginning at 10:24 a.m. on Tuesday,

8     February 28, 2023, before Deborah A. Hyde, Certified

9     Verbatim Reporter and Notary Public.

10                         *   *   *

11    Whereupon,

12              **SERGEANT JULIEN DAVID RATTELADE**

13    was called as a witness and, having first been duly

14    sworn, was examined and testified as follows:

15                      EXAMINATION

16          BY MR. SCHEWEL:

17     Q.   My name is Abraham Rubert-Schewel.  I'm with the

18    law firm of Tin, Fulton, Walker and Owen.  We represent

19    the Plaintiffs in this lawsuit against the City of

20    Raleigh and individually named officers such as yourself.

21          You are testifying under oath and under the

22    penalty of perjury today just as if you were in a court

23    of law.  Do you understand that?

24     A.   Yes, sir.

25     Q.   Have you ever been deposed before?

1     A.   Correct.

2     Q.   Okay.  So on May 21st, 2020, when you returned

3  back to Green Dairy, you field tested the alleged heroin?

4     A.   Correct.

5     Q.   And what device did you use to field test the

6  heroin?

7     A.   I used some sort of cutting instrument to open

8  the package, introduced a sample to the chemical reaction

9  test.  I think the manufacturer is Sirchie.  Conducted

10  the field test by breaking the ampules, which introduces

11  a mixture of acids to the sample, and you're looking for

12  a rapid color change through chemical reaction.  That did

13  not occur, so to me it was a negative field test.

14     Q.   Why did you feel comfortable testing it in this

15  instance?

16     A.   Because it was my opinion that it was not

17  heroin.

18     Q.   So you weren't worried about fentanyl exposure?

19     A.   At that particular moment, no.

20     Q.   At Green Dairy, does the vice team have any sort

21  of masks or gloves you could use to prevent fentanyl

22  exposure?

23     A.   We typically always have gloves.  We don't have

24  any sort of special masks or anything like that.  There

25  is a vented hood testing device at our evidence unit,

1      A.    It would have been -- where my desk is here

2  (indicating), he would have been sitting two chairs over,

3  distance-wise, and I was just coaching him, not --

4      Q.    Okay.

5      A.    I'm not over his shoulder, like assisting him.

6      Q.    But he could look at your computer screen and

7  see what you were doing to see what to do?

8      A.    I mean, I'm not -- I'm just literally verbally

9  giving him cues, like, "This is how you do it."

10      Q.    Okay.  And that was prior to May 21, 2020?

11      A.    Correct.

12      Q.    Did he tell you that he looked up the results?

13      A.    I don't believe so.  I think I literally -- so

14  we didn't communicate with each other very much.  Like,

15  it was kind of a big deal for him to ask me for help

16  because we just didn't get along.

17      Q.    Did you learn that the results were negative?

18      A.    After all this started snowballing, yes.

19      Q.    So your testimony is that you did not learn that

20  the heroin had tested negative from CCBI until after

21  May 21, 2020?

22      A.    Correct.

23          MR. SCHEWEL:  Norwood, you can hit PC if you

24  want.

25          MR. BLANCHARD:  PC?

1          MR. PETTEY:  Objection.

2          THE WITNESS:  I am not -- I personally know

3    nothing about this phone call.

4          BY MR. SCHEWEL:

5     Q.   I mean, if you had concerns like you did about 7

6    grams brown sugar mixture that was going to be produced,

7    couldn't you have called Lieutenant Bunch and told him

8    that?

9     A.   There would be no reason for me to call the

10   lieutenant because, in my mind, a crime is still

11   occurring.  It's still illegal for someone to sell fake

12   drugs during a drug transaction, and we didn't, at the

13   time, have the lab results to know for sure that drugs

14   weren't being sold.

15    Q.   At this time, did you believe that Aspirin was a

16   reliable CI?

17    A.   As far as reliable, going there, buying drugs

18   and bringing them back, I had no reason not to believe

19   that he was doing that.  I thought he was being played.

20   I thought he was being sold fake drugs and he was

21   bringing those fake drugs back to the detective.

22    Q.   If your CI is repeatedly being played, is that a

23   reliable CI?

24    A.   I'd say it's on a case-by-case basis.

25   Definitely one of those change the facts, change the

1   outcome kind of situations.

2           I don't think Abdullah knew that he was being

3   played because he wasn't checking his lab results, so

4   therefore he didn't know that they were being played.  We

5   were speculating, but we sure didn't know because it's

6   not my job to check his lab results and put together a

7   discovery packet for the DA's office.  That's his job.

8       Q.   Or to check his body camera?

9       A.   Correct.  It's not my job.

10      Q.   So even with the concerns you had that you

11  expressed to Rolfe and that are in your text message

12  chain, you still thought that Aspirin was a reliable CI?

13      A.   Reliable as in he was going in, making a

14  purchase and bringing it back.  I thought he was reliable

15  for that.  I thought he was -- but as far as the quality

16  of the CI, I didn't -- I mean, I didn't like him.

17      Q.   Would you have used him as your CI?

18      A.   Knowing now what I know, absolutely not.  I

19  would have -- you know, if he was to provide me with some

20  information, I would definitely verify it.  The old trust

21  but verify, I think, applies here.

22      Q.   Would you have used him as your CI on the

23  morning of May 21st, 2020 to make a controlled buy?

24      A.   I don't think it would be fair for me to speak

25  to if I would have used him that day because what I knew

| STATE OF NORTH CAROLINA<br>Wake County | *File No:*<br>20CR200104 |
|---|---|
| | In The General Court Of Justice<br>District Court Division |
| **STATE VERSUS** | |
| *Name of Defendant*<br>CURTIS RAY LOGAN | **TRANSCRIPT OF PLEA** |
| *DOB*<br>10/05/1986    *Age*    *Highest Level of Education Completed* | N.C.G.S. 15A-1022 |

**NOTE**: *Use this section ONLY when the Court is rejecting the plea arrangement.*

☐ The plea arrangement set forth within this transcript is hereby rejected and the clerk shall place this form in the case file. (Applies to arrangements disclosed on or after December 1, 2009.)

| Date | Name of Presiding Judge (Print) | Signature of Presiding Judge |
|---|---|---|
| | | |

The defendant, having offered a plea of **guilty** and being first duly sworn, makes the following answers to the question set out below:

| | ANSWERS |
|---|---|
| 1. Are you able to hear and understand me? | yes |
| 2. Do you understand that you have the right to remain silent and that any statement you make may be used against you? | yes |
| 3. At what grade level can you read and write? | 12th |
| 4. (a) Are you now under the influence of alcohol, drugs, narcotics, medicines, pills, or any other substances? | no |
| 4. (b) When was the last time you used or consumed any such substance? | 3 month |
| 4. (c) How long have you been using or consuming this medication or substance? | 10 year |
| 4. (d). Do you believe your mind is clear, and do you understand what you are doing at this hearing? | yes |
| 5. Have the charges been explained to you by your lawyer, and do you understand the nature of the charges, and do you understand every element of each charge? | yes |
| 6. (a) Have you and your lawyer discussed the possible defenses, if any, to the charges? | yes |
| 6. (b) Are you satisfied with your lawyer's legal services? | yes |
| 7. (a) Do you understand that you have the right to plead not guilty and be tried by a jury? | yes |
| 7. (b) Do you understand that at such trial you have the right to confront and to cross examine witnesses against you? | yes |
| 7. (c) Do you understand that by your plea(s) you give up these and your other valuable constitutional rights relating to a trial by jury, including rights related to sentencing and limitations on your right to appeal? | yes |
| 7. (d) Do you understand that your plea of guilty may impact how long biological evidence related to your case (for example, blood, hair, skin tissue) will be preserved? | yes |
| 8. Do you understand that, if you are not a citizen of the United States of America, your plea(s) of guilty or no contest may result in your deportation from this country, your exclusion from admission to this country, or the denial of your naturalization under federal law? | n/a |
| 9. Do you understand that upon conviction of a felony you may forfeit any State licensing privileges you have in the event that you refuse probation, or that your probation is revoked? | yes |
| 10. *(Victim Rights Act cases only)* Do you understand that upon your conviction of _____ you may be ordered to pay restitution to any persons directly and proximately injured as a result of your commission of that offense, and that a civil judgment in favor of each such person may be docketed against you and will be a lien against real estate owned by you for the next ten years? | yes |

11. Do you understand that you are pleading **guilty** to the charges shown below, which carry the total punishments listed?

| Plea | File No. | Count No. | Offense | G.S. | F/M | Class | Maximum Punishment |
|---|---|---|---|---|---|---|---|
| G | 20CR200104 | I | PWISD COUNTERFEIT CONTROLLED SUBSTANCE | 90-95(A)(2) | F | I | 24 MONTHS |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| | |
|---|---|
| **TOTAL MAXIMUM PUNISHMENT** | 24 MONTHS |
| **MANDATORY MINIMUM FINES & SENTENCES** (if any) | |

| 12. Do you now personally plead guilty? | Yes |
|---|---|
| 13. (a) (*if applicable*) Are you in fact guilty? | Yes |
| 13. (b) (*if applicable*) (Alford Plea)<br>(1) Do you now consider it to be in your best interest to plead guilty?<br>(2) Do you understand that upon your "Alford guilty Plea" you will be treated as being guilty whether or not you admit that you are in fact guilty? | n/a<br><br>n/a |
| 14. Have you agreed to plead as part of a plea arrangement? Before you answer, I advise you that the Courts have approved plea negotiating, and if there is such, you may advise me truthfully without fear of incurring my disapproval? | Yes |

15. (*if applicable*) The prosecutor and your lawyer have informed the Court that these are all the terms and conditions of your plea:

THE DEFENDANT IS PLACED ON SUPERVISED PROBATION FOR 18 MONTHS WITH A SUSPENDED SENTENCE OF 4 MONTHS MINIMUM TO 14 MONTHS MAXIMUM. ALL REGULAR CONDITIONS OF PROBATION, INCLUDING DRUG CONDITIONS, APPLY TO THE DEFENDANT'S PROBATION. THE DEFENDANT MUST ALSO COMPLETE THE SAFE CHILD PROGRAM. ONCE THE SAFE CHILD PROGRAM IS COMPLETED, IF THE DEFENDANT IS IN COMPLIANCE WITH ALL OTHER TERMS AND CONDITIONS OF PROBATION, THEN HIS PROBATION MAY BE TRANSFERRED TO UNSUPERVISED. ANY/ALL OTHER TERMS OF JUDGMENT REMAIN IN THE COURT'S DISCRETION.

| 16. (a) Is this correct as being your full plea arrangement? | Yes |
|---|---|
| 17. (b) Do you now personally accept this arrangement? | Yes |
| 18. Other than the plea arrangement between you and the prosecutor, has anyone made any promises or threatened you in any way to cause you to enter this plea against your wishes? | no |
| 19. Do you enter this plea of your own free will, fully understanding what you are doing? | Yes |
| 20. Do you agree that there are facts to support your plea and do you consent to the Court hearing a summary of the evidence? | Yes |
| 21. Do you have any questions about what has just been said to you or about anything else connected to your case? | no |

I have read or have heard all of these questions and understand them. The answers shown are the ones I gave in open court and they are true and accurate. Neither my lawyer nor anyone else has told me to give false answers in order to have the Court accept my plea in this case. The conditions of the plea as stated above, if any, are accurate.

| SWORN AND SUBSCRIBED TO BEFORE ME | Date 4-15-20 |
|---|---|
| Date 4/15/20   Signature *Caldwell Dadd*| Signature of Defendant<br>X *Curtis Loyan* |
| [ ] Deputy CSC   [ ] Assistant CSC   [ ] Clerk of Superior Court | Name of Defendant (Type or Print)<br>*Curtis Hosen* |

**CERTIFICATION BY LAWYER FOR DEFENDANT**

As lawyer for the defendant named above, I hereby certify that the conditions stated above, if any, upon which the defendant's plea was entered are correct and they are agreed to by the defendant and myself. I further certify that I have fully explained to the defendant the nature and elements of the charge(s) to which the defendant is pleading.

| Date 4-15-20 | Name of Lawyer for Defendant (Type or Print) *Alton Williams* | Signature of Lawyer for Defendant |
|---|---|---|

**CERTIFICATION BY PROSECUTOR**

As prosecutor for this Prosecutorial District, I hereby certify that the conditions stated above, if any, are the terms agreed to by the defendant and his/her lawyer and myself for the entry of the plea by the defendant to the charge(s) in this case.

| Date 4-15-2020 | Name of Prosecutor (Type or Print) **ADAM EVERETT** | Signature of Prosecutor |
|---|---|---|

**PLEA ADJUDICATION**

Upon consideration of the record proper, evidence presented, answers of defendant, and statements of the lawyer for the defendant and the prosecutor, the undersigned finds that:

1. There is a factual basis for the entry of plea.
2. The defendant is satisfied with his/her lawyer's legal services.
3. The defendant is competent to stand trial and that the plea is the informed choice of the defendant and is made freely, voluntarily and understandingly.

The defendant's plea is hereby accepted by the Court and is ordered recorded.

| Date 4-15-20 | Name of Presiding Judge (Type or Print) | Signature of Presiding Judge |
|---|---|---|

Updated 9/18/18