IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No. 5:22-cv-00068-BO

| | |
|---|---|
| YOLANDA IRVING, et al.,<br><br>        Plaintiffs,<br><br>v.<br><br>THE CITY OF RALEIGH, et al.,<br><br>        Defendants. | **OMAR I. ABDULLAH'S AMENDED MEMORANDUM OF LAW IN SUPPORT OF AMENDED MOTION FOR SUMMARY JUDGMENT** |

Defendant Omar I. Abdulla ("Abdullah"), is entitled to summary judgment on the claims brought against him in the Second Amended Complaint in this action. Plaintiffs' allegations in the Second Amended Complaint, and their forecasted evidence, fail as a matter of law, and therefore, dismissal with prejudice is appropriate under Fed. R. Civ. P. 56.

## NATURE OF THE CASE

Plaintiffs assert the following claims against Abdullah, all of which derive from May 21, 2020 searches of their residences:

- Fourth Amendment Unlawful Entry and Search of Plaintiffs' Homes (D.E. 93, ¶¶ 205-221)

- Fourth Amendment Unlawful Arrest and Seizure of Plaintiffs (Id., ¶¶ 227-233)

- Fourth and Fourteenth Amendment Fabrication of Evidence in Violation of Due Process of Law (Id., ¶¶ 234-245)

- Failure to Intervene (Id., ¶¶ 246-254)

- Civil Conspiracy (Id., ¶¶ 255-261)

- False Imprisonment (Id., ¶¶ 279-282).

## STATEMENT OF THE FACTS

Abdullah respectfully refers the Court to his Amended Statement of Material Facts and appendix thereto (references to which are hereinafter denoted as "DA___"), filed contemporaneously with this brief.

## ARGUMENT

**I.    ABDULLAH IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON ALL CLAIMS RELATED TO 1628-A.**

### A.    Plaintiff Kenya Walton provided voluntary consent for the search of 1628-A.

The Fourth Amendment prohibits unreasonable searches, and searches conducted without a warrant are per se unreasonable unless a valid exception to the warrant requirement is applicable. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Voluntary consent to a search is such an exception. *Id.* In determining whether consent to search was freely and voluntarily given, the totality of the circumstances surrounding the consent must be examined. *U.S. v. Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996) (citing *Schneckloth*, 412 U.S. at 227). Whether a person knew he had a right to refuse to consent to a search is relevant to the court's determination, but one need not demonstrate that the person knew of his right to refuse consent to prove that the consent was voluntary. *Lattimore*, 87 F.3d at 650.

Walton has admitted under oath that she consented to a search of her residence on May 21, 2020. (DA47-48). Though Walton has provided no testimony to suggest that she believes her consent was coerced, it is anticipated that her attorneys may nonetheless make such an argument to this Court.

### 1.    Characteristics of the person giving consent

In viewing the totality of the circumstances, it is appropriate to consider the characteristics of the person giving consent, such as age, race, maturity, education, intelligence, and experience.

Case 5:22-cv-00068-BO   Document 227   Filed 05/01/23   Page 2 of 17

*Lattimore*, 87 F.3d at 650; *U.S. v. Watson*, 423 U.S. 411, 424-25 (1976) (noting that the absence of any indication that the defendant was a "newcomer to the law" is an important factor in determining whether consent was voluntary).

The United States Supreme Court has held that a 22 year old African-American female who had not completed high school could provide voluntary consent to a search. *U.S. v. Mendenhall*, 446 U.S. 544, 558 (1980). Additionally, the Fourth Circuit has determined that a 29-year old U.S. Postal worker with a high school degree, who was not "a newcomer to the law," had sufficient characteristics to support a conclusion of voluntary consent to search. *Lattimore* at 651. Further, this Court has found that a criminal defendant who lived in North Carolina with his two children for almost nine years, had a high school education, owned and operated a business, and was able to converse intelligently with law enforcement officials, was capable of voluntarily consenting or withholding consent to the search of his vehicle. *U.S. v. Hernandez Sanchez*, 2011 WL 3420602 (E.D.N.C. July 8, 2011); *see also U.S. v. Azua-Rinconada*, 2016 WL 11264054, at *6 (E.D.N.C. Oct. 27, 2016) (finding that there were no known characteristics of the individual to suggest that consent was involuntary where person was born in North Carolina and lived there her whole life, was 20 years old, had completed high school and a two-year degree, and was enrolled in a nursing program).

Walton was 40 years old at the time of her consent, had obtained her GED at Wake Tech, and was employed as a bus driver. (DA37-39, 42). Further, she was clearly not a "newcomer to the law," as she had previously and frequently observed and/or interacted with police officers, including on at least two occasions in which she sought their assistance, and had even provided instruction to her children on their legal rights when encountering law enforcement. (DA43-46, 53-56, 58-60). Walton has sufficient characteristics to support a conclusion that her May 21, 2020

consent was voluntary.

### 2. Conditions under which consent to search was given

In viewing the totality of the circumstances, it is also appropriate to consider the conditions under which the consent to search was given, such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter. *Lattimore*, 87 F.3d at 650.

#### a. Officer Conduct

Mere officer display of a firearm does not conclusively establish the involuntariness of a person's consent to a search. *See U.S. v. Hernandez Sanchez*, 2011 WL 3420605 (E.D.N.C. July 8, 2011) (concluding that consent was given voluntarily, even though one of the officer's guns was visible to subject, because no physical intimidation was present, subject had minimal contacts with officers, no evidence of threatening or raised voices, and subject displayed no signs of nervousness or fear). In fact, neither the drawing of a gun by the interrogating officer nor the handcuffing of the confessor establishes involuntariness in and of itself. *U.S. v. Seni*, 662 F.2d 277, 281-82 (4th Cir. 1981); *U.S. v. Elie*, 111 F.3d 1135, 1143-44 (4th Cir. 1997) (concluding that consent to search was voluntary where subject was confronted at gunpoint, ordered to the floor, and handcuffed because tension created by such officer conduct was defused by time subject consented to the search), *abrogated in part on other grounds by Dickerson v. U.S.*, 530 U.S. 428 (2000).

Here, Walton does not allege or testify that a firearm was drawn or aimed at her by the time she consented to the search of 1628-A. Since she engaged with at least one officer in order to provide consent to the search, it stands to reason that the officer was armed, and even visibly so. However, Walton does not describe a tense or threatening scene ***at the time of her consent***; rather, she was merely asked for consent and she gave it. (DA47-48). In fact, any threats at the scene at this time came from Walton, and not the officers, as she expressed anger towards, and "cussed"

Case 5:22-cv-00068-BO   Document 227   Filed 05/01/23   Page 4 of 17

at, Dyamond Whitley and Z.G. for running from the officers. (DA47).

### b. Number of Officers Present

Courts consider the number of officers present for the consent in relation to the case circumstances. *Elie*, 111 F.3d at 1145 (concluding that the presence of six officers when person granted consent to search does not make such consent involuntary, as nothing in the record indicated an environment that was coercive or intimidating); *U.S. v. Hernandez Sanchez*, 2011 WL 3420606, at *9 (E.D.N.C. July 8, 2011) (holding consent was voluntary even though there were up to seven officers present). It is unclear how many officers were in 1628-A at the time of Walton's consent. She only states that Abdullah asked for her consent and she gave it. (DA47-48). However, even if up to ten officers were present at the time of consent, Walton has not described a coercive or intimidating environment. In fact, she found the environment conducive to admonishing her children for running from officers around the time she gave her consent. (Id.) Moreover, she had prior experience with a law enforcement encounter that involved more than ten police officers. (DA45-46).

### c. Duration, Location, and Time of Encounter

An encounter is not generally coercive if it occurs during daylight hours. *U.S. v. Alexander*, 2008 WL 11422070, at *5 (M.D.N.C. Dec. 1, 2008) (determining that time of encounter did not make it coercive because it took place from 4:00pm to 5:00pm and was clearly during daylight hours). An encounter is also generally not coercive if it occurs at a familiar setting. *U.S. v. Carter*, 300 F.3d 415, 423 (4th Cir. 2002) (per curiam) (determining that consent was voluntary because the individual provided consent to the search while in her own home). Further, whether the duration of a search is unduly coercive is dependent upon the particular type of encounter. *U.S. v. Tyson*, 360 F.Supp.2d 798, 806 (E.D. Va. Mar. 16, 2005) (determining that a little more than one

hour duration for the consenting search was not unduly coercive); *Alexander*, 2008 WL 11422070, at *6 (concluding that encounter was not of inordinate duration when the entire search was completed within an hour).

Plaintiffs' entire encounter with RPD on May 21, 2020 lasted for approximately 1.5 hours and the search of the upstairs level of 1628-A was considerably shorter in duration. (DA47-49, 52-53; D.E. 93, ¶ 147). Further, the consent and the search occurred in the afternoon and in 1628-A, familiar territory for Walton. (DA47-48; D.E. 93, ¶ 118).

**B.      Abdullah is not liable for the initial entry into 1628-A.**

SEU officers, and not Abdullah, made the initial entry into 1628-A on May 21, 2020. (D.E. 93, ¶ 126; DA29-30; D.E. 223 p 5). They only entered the residence after Dyamond Whitley and Z.G. ran from them and into 1628-A. (D.E. 93, ¶¶ 118, 121 and 123-124). The SEU officers, though, were dismissed and removed from this case by the Court's March 13, 2023 Order. (D.E. 191). If those officers who made initial entry into the residence are not constitutionally liable for that entry, then it strains logic to conclude that an officer, like Abdullah, who entered thereafter, could be liable for it. Regardless, to the extent that the legality of the SEU officers' initial entry into 1628-A is still in question, that entry constitutes an intervening and superseding cause that breaks any causal chain between the search warrant ***for 1628-B*** and the alleged constitutional injuries deriving from the SEU officers' entry ***into 1628-A***.

Constitutional torts are ordinarily governed by common law principles, which require a demonstration of both but-for and proximate causation. *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012). In other words, to establish proximate cause, a plaintiff must show that, except for that constitutional tort, such injuries would not have occurred and further that such injuries and damages were the reasonably foreseeable consequences of the tortious acts or omissions in issue.

*McCaskill v. Yankalunas*, 245 Fed. Appx. 274, 279 (4th Cir. 2007). Although section 1983 tort

defendants are certainly responsible for the natural consequences of their actions, a superseding or

intervening cause will break the chain of proximate causation. *Kane v. Lewis*, 604 Fed. Appx. 229,

234 (4th Cir. 2015). The subsequent acts of independent decision-makers may constitute

intervening or superseding causes that break the causal chain between the defendant-officer's

misconduct and a plaintiff's alleged constitutional injury. *Evans*, 703 F.3d at 647. Further, the

subsequent acts of a plaintiff in a civil rights action can break the chain of causation between an

officer's complained-of acts and the alleged injury. *See Kane* at 234-237 (plaintiff's decedent's act

of advancing towards officers with a knife caused the use of force that resulted in his death as

opposed to the officers' illegal entry into the residence).

The SEU officers, prompted by the decisions of Dyamond Whitley and Z.G. to run into

1628-A, made their own independent decision to enter that residence, which was not the subject

of the search warrant that Abdullah procured. Plaintiffs have not forecast any evidence to show

that Abdullah directed the SEU officers to make entry into 1628-A, or that he was even present for

it. That initial entry, and the acts of Dyamond Whitley and Z.G. that prompted it, are intervening

and superseding causes for which Abdullah is not liable.

     **C.**    **Abdullah is not liable for any temporary detention of the occupants of 1628-A during the search of that residence and of 1628-B.**

     **1.**    **Temporary detention during limited search of 1628-A**

It is well established that law enforcement officers are permitted to detain the occupants of

the premises during the execution of a search warrant. *Bailey v. United States*, 568 U.S. 186, 193

(2013); *Michigan v. Summers*, 452 U.S. 692, 701-02 (1981). The officers are not required to have

a particular suspicion that a detained occupant is involved in criminal activity or poses a specific

danger to them. *Bailey* at 193. Rather, the purpose of permitting such detention of occupants is to

provide for officer safety and to preserve evidence during the execution of a search warrant. *Id.* at 195, 198, 200. Further, this same principle naturally applies to consent searches as equally as it does to search warrant executions. *See U.S. v. Enslin*, 327 F.3d 788, 796-97 (9th Cir. 2003) (applying principle to seizure of person during consent search); *U.S. v. Rutherford*, 2007 WL 1514024, at \*5 (E.D. Mo. May 21, 2007) (applying principle to determine that the officers had reasonable basis for detaining defendant while conducting a search conducted pursuant to consent); *Joseph v. Donahue*, 392 F.Supp.3d 973, 987-88 (D. Minn. 2019) (applying principle to hold that detention of protestor during search of his mother's home pursuant to mother's valid consent was reasonable).

Accordingly, the detention of the 1628-A occupants during the limited consent search of the upstairs of that residence was lawful.

### 2. Temporary detention during search of 1628-B

Much like the initial entry claim discussed in Section I.B. *supra*, any claim by the 1628-A occupants against Abdullah for their detention in and around that residence during the execution of the search warrant of 1628-B must fail. First, Abdullah did not detain the 1628-A occupants during the search of 1628-B; rather, one "Caucasian male" wearing a vest and helmet stayed in the living room with them. (DA49-51). Second, the detention in 1628-A, outside of the limited consent search, derived from (1) the SEU officers' independent decision to enter 1628-A while executing the search warrant for 1628-B that Abdullah procured and/or (2) Dyamond Whitley's and Z.G.'s acts of running from the officers and into 1628-A. These independent decisions and acts broke the causal chain between any alleged wrongful conduct on the part of Abdullah in obtaining the search warrant for 1628-B. *See Evans*, 703 F.3d at 647; *Kane*, 604 Fed.Appx. at 234-237. Moreover, Plaintiffs do not appear to have ever alleged an illegal detention claim against the SEU officers

and, in any event, those officers have been dismissed and removed from this case. (D.E. 191).

How, then, could Abdullah be liable for the same detention?

For the foregoing reasons, Abdullah is entitled to qualified immunity and judgment as a

matter of law on all of the claims asserted against him by the 1628-A occupants, including

Plaintiffs Kenya Walton, R.W., Dyamond Whitley, Kamisha Whitley, Ziyel Whitley and Z.G.

## II.       ABDULLAH IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON ALL CLAIMS RELATED TO 1628-B.

### A.       Plaintiffs' forecasted evidence does not pierce the presumption of probable cause inherent in the search warrant for 1628-B.

The lynchpin of Plaintiffs' entire case is their contention that the searches of their

residences and attendant detentions were unreasonable because they follow from a warrant

affidavit that was deficient because it was dishonest. To show that law enforcement made false

statements in the affidavit, the defendant must provide facts to support his assertion. *U.S. v. Moody*,

931 F.3d 366, 371 (4th Cir. 2019). This necessitates proof of the affiant officer's "intent to mislead,

or ... reckless disregard for whether the statements would mislead, the magistrate." *Id.* "An

innocent or even negligent mistake by [an] officer will not suffice." *Id.* (citing *Franks v. Delaware*,

438 U.S. 154, 170 (1978)). The Fourth Circuit has made clear the high standard for establishing

reckless disregard in this context:

> ... reckless disregard in the *Franks* context requires a showing that the affiant *personally* recognized the risk of making the affidavit misleading. What the officer-affiant should have known does not matter if he did not in fact know. Reckless disregard is a subjective inquiry; it is not negligence nor even gross negligence. To establish a *Franks* violation, the particular affiant must have been subjectively aware that the false statement or omission would create a risk of misleading the reviewing magistrate judge and nevertheless chose to run that risk.

*U.S. v. Pulley*, 987 F.3d 370, 377 (4th Cir. 2021) (internal citations omitted) (emphasis added). Put

another way, reckless disregard requires a showing that "the affiant must have entertained serious

doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *Miller v. Prince George's Cty.*, MD, 475 F.3d 621, 627 (4th Cir. 2007).

Moreover, in order to establish their alleged constitutional injury, Plaintiffs' must show that the alleged false statements were "material," or "necessary to the [neutral and disinterested magistrate's] finding of probable cause." *Id.* at 628. (internal citations omitted). Materiality is determined by removing the offending inaccurate statements and determining whether, without them, the warrant affidavit would still establish probable cause. *Id.*

Plaintiffs' hitch their claims to their assertion that three statements in Abdullah's warrant application were false:

- The informant " has always proven to be truthful and reliable"

- The informant purchased heroin from 1628-B

- RPD officers observed the informant enter 1628-B

(D.E. 93, ¶¶ 214-216).

### 1. Aspirin has provided information in the past "that has always proven to be truthful and reliable"

It cannot be legitimately disputed that Aspirin provided reliable information to Abdullah in the past. By Plaintiffs' own admission, Abdullah received approval to use Aspirin as a confidential informant. (D.E. 93, ¶¶ 55-63). Further, he participated in multiple controlled buys in 2018 that resulted in positive lab tests for controlled substances. (DA2). These 2018 buys provided the basis for Aspirin's reliability in subsequent buys leading up to May 21, 2020. In fact, an important factor in determining whether an informant's report establishes probable cause is the degree to which it is corroborated. *Illinois v. Gates*, 462 U.S. 213, 241 (1983); *U.S. v. Miller*, 925 F.2d 695, 698 (4th Cir. 1991). Corroboration can come from showing an informant's history of providing accurate (corroborated) information— i.e., the informant's track record provides

verification and corroboration that his future tips will likewise be reliable. *U.S. v. Long*, 774 F.3d 653, 659 (10th Cir. 2014); *U.S. v. Smith*, 1989 WL 1235, at 3-*4 (4th Cir. 1989) (affirming district court's finding that there was no defect in search warrant or supporting affidavit in part because it was based on statement describing unnamed informant that has provided information and testimony "on various occasions in the past [that] led to the prosecution and conviction of persons for violations of Virginia law"). Plaintiffs' complaint, then, must be with Abdullah's use of the superlative "always."

It is anticipated that Plaintiffs will point the Court to the January 2, 2020 negative field test from the Curtis Logan buy in an effort to establish that Abdullah had obvious reasons to doubt that Aspirin was "always" reliable. (DA 20-22, 81). However, as Plaintiffs' own liability expert, David Sweeney, attests, field tests can be unreliable and negative results can be explained by the dealer's adulteration of the controlled substance by/with other substances. (DA 109, 111-112). This is particularly true in the case of heroin, which is almost always "cut" with another substance such that it is rarely, if ever, found pure on the street. (DA111-112). In any event, Logan eventually pled guilty to a modified charge in April 2020 of selling counterfeit drugs to Aspirin. (DA101-102).

Abdullah expects that Plaintiffs may also point to negative lab tests from Aspirin buys after January 2, 2020 and before May 21, 2020, however, there is no competent evidence that Abdullah saw those lab tests before May 21, 2020, as he did not take the initiative to follow up and check on such results. (DA68-71, 100).  Moreover, if the District Attorney's Office in April 2020— roughly a month before the May 21, 2020 search warrant—did not perceive the Logan negative lab result as a stain on the informant's reliability, then, even if there was evidence that Abdullah had seen such result, how could he be expected to have perceived things differently?

To the extent that Plaintiffs point this Court to the absence of clear video evidence of drug transactions during some of the buys leading up to May 21, 2020 in an effort to contend that Abdullah had obvious reason to doubt his statement concerning the informant's reliability, their own expert also explains this point away. Though Plaintiffs might refer to the informant placing the surveillance camera phone in his pocket during a controlled buy as furtive, their expert at least acknowledges an alternative explanation— that is, the informant's desire to avoid detection from the dealer so as to avoid injury or death. (DA115-117).

Regardless, if this Court were to defer to Plaintiffs' arguments, the statement concerning Aspirin's reliability still tends to establish probable cause after "always" is excised from it. Though it addressed the offense of omission (as opposed to addition) of a single word from an officer's statement, *Massey v. Ojaniit* is instructive here. 2013 WL 1320404 (W.D.N.C. Mar. 29, 2013), *affirmed in part dismissed in part,* 759 F.3d 343 (4th Cir. 2014).

In *Massey*, plaintiff alleged that the omission of the word "most" from the officer's report ("looked most like" as distinct from "looked like") made the written report of the identification of the suspect, which was the basis of the arrest warrant, false and misleading. 2013 WL 1320404*, *2. The federal district court found that even with the addition of the word "most" in the officer's written report, there was still probable cause to arrest the suspect. *Id.* at *12. On appeal, the Fourth Circuit upheld the trial court's determination, on the same reasoning as the federal district court, which reasoned that plaintiff had not pleaded facts adequate to undercut the grand jury's probable cause determination because, even adding the word "most" to the officer's written report, there still existed sufficient probable cause to arrest the suspect. 759 F.3d 343, 357 ("[P]robable cause to arrest [suspect] does not disappear upon the inclusion of the word "most" in [officer's] report.").

Here, removing the single word "always" from Abdullah's statement concerning his

confidential informant's reliability, like adding "most" in Ojaniit's report in *Massey*, does not materially change the statement's point concerning the informant's past reliability and does not destroy probable cause given the remainder of the warrant affidavit.

### 2. The informant had previously purchased heroin from 1628-B

Abdullah reasonably believed that Aspirin had purchased heroin from 1628-B during a controlled buy on May 20, 2020, ***the day before the search warrant application***. It is uncontroverted that, on May 20, 2020, the informant physically pointed to 1628-B as a residence from which heroin was being sold, that he told Abdullah that he had previously been there, and that it would be the location of a controlled buy on that same day. A controlled buy subsequently occurred on May 20, 2020 with Aspirin and there is no competent evidence that the substance that came from that buy was identified by Abdullah as anything other than heroin. (DA15-19). There is no evidence that the May 20, 2020 substance was field tested and no evidence that lab results were made available before the May 21, 2020 search warrant. As referenced *supra*, there was good reason for Abdullah to believe what his informant told him about 1628-B on May 20, 2020, and certainly no ***obvious*** reason to doubt it the next day, on May 21, when the warrant application was submitted.

### 3. Officers saw Aspirin enter 1628-B

After the May 20, 2020 controlled buy, Detective Gwinn of the RPD Vice Unit told Abdullah that he observed Aspirin enter 1628-B for the buy. (DA19). Even if Plaintiffs were able to contradict this evidence and establish its falsity, removing this statement from the warrant application does not vitiate probable cause given the existence of Statements 1 and 2 above, even with the deletion of the "always" superlative from the first statement.

Given that all of Plaintiffs' claims against Abdullah in this action derive from their failed

theory that he materially falsified the May 21, 2020 search warrant application, Abdullah is entitled

to qualified immunity and judgment as a matter of law on such claims.

> **B.** **Plaintiffs' fail to assert a cognizable fabrication of evidence claim under either the Fourth or Fourteenth Amendments.**

"To state a claim under Section 1983 based on fabrication of evidence, a plaintiff must

allege that the defendant fabricated evidence ***and that the fabrication resulted in a deprivation of***

***the plaintiff's liberty*.**" *Willis v. Ruff*, 2022 WL 4181666, at *5 (E.D.N.C. Aug. 19, 2022)

(emphasis added) (citing *Washington v. Wilmore*, 404 F.3d 274, 282 and concluding that defendant

cannot establish a due process violation under his fabricated evidence claim because defendant

was not convicted of any of the charged offenses arising from the relevant search).

"[F]abrication alone is not sufficient to state a claim for a due process violation." *Burgess*

*v. Goldstein*, 997 F.3d 541, 553 (4th Cir. 2021). "[A] plaintiff must plead adequate facts to establish

that the loss of liberty – i.e., his conviction and subsequent incarceration – resulted from the

fabrication." *Massey*, 759 F.3d at 354. In other words, a plaintiff must plead and prove facts to

establish that the fabrication caused his convictions, or that the convictions were the reasonably

foreseeable result of the fabrication. *Id.* at 356.

Here, Plaintiffs, though temporarily detained attendant to searches pursuant to a warrant

and consent, did not suffer a "deprivation of liberty" as our constitutional jurisprudence

understands that phrase. None of these Plaintiffs were convicted of any crime or incarcerated as a

result of the complained of search warrant. Accordingly, Plaintiffs have no cognizable "fabrication

of evidence" claim here. Moreover, they confuse their sources of constitutional protection.

"Where a particular Amendment provides an explicit textual source of constitutional

protection against a particular sort of government behavior, that Amendment, not the more

generalized notion of substantive due process, must be the guide for analyzing these claims."

*Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion of Rehnquist, C.J.) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)) (internal quotation marks omitted). The Fourth Amendment "provides an explicit textual source of constitutional protection against [unreasonable seizures and arrests]." *Graham*, 490 U.S. at 395.

In *Smith v. Travelpiece*, the Fourth Circuit held that plaintiff's claim alleging that a search warrant was improper because the defendant-officer made false statements and material omissions in his affidavit in support of the warrant was a claim under the Fourth Amendment rather than a claim under the Fourteenth Amendment. 31 F.4th 878, 884 (4th Cir. 2022). In so holding, the court reasoned that "[d]ressing a Fourth Amendment claim up in due process language does not transform it into a Fourteenth Amendment claim." *Id.* at 885; *see also Manuel v. City of Joliet, Ill.*, 580 U.S. 357 (2017) (holding that a Fourth Amendment detention claim cannot be converted into a due process claim); *U.S. v. Colkley*, 899 F.2d 297, 302 (4th Cir. 1990) (refusing to import due process principles into the warrant-application proceeding).

Accordingly, Abdullah is entitled to judgment as a matter of law on Plaintiffs' Fourth Claim alleging fabrication of evidence under the Fourth and Fourteenth Amendments.

## CONCLUSION

For these reasons, Abdullah respectfully requests that this Court grant him summary judgment on all of Plaintiffs' claims asserted against him and dismiss the same with prejudice.

Respectfully submitted, this the 1st day of May, 2023.

/s/ Jason R. Benton
Jason R. Benton
N.C. State Bar No. 27710
Jessica C. Dixon
N.C. State Bar No. 36719
Daniel E. Peterson
N.C. State Bar No. 41251
**PARKER POE ADAMS & BERNSTEIN LLP**
Bank of America Tower
620 S. Tryon St., Suite 800
Charlotte, NC 28202
Telephone: (704) 372.9000
Facsimile: (704) 334.4706
Email: jasonbenton@parkerpoe.com
jessicadixon@parkerpoe.com
danielpeterson@parkerpoe.com

*Attorneys for Defendant Omar I. Abdullah*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this date, the foregoing **Omar I. Abdullah's Amended Memorandum of Law in Support of Amended Motion for Summary Judgment** was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send notification and serve same upon counsel of record via the Court's electronic case filing system.

This the 1st day of May, 2023.

/s/ Jason R. Benton
Jason R. Benton
N.C. State Bar No. 27710
Daniel E. Peterson
N.C. State Bar No. 41251
Jessica C. Dixon
N.C. State Bar No. 36719
**PARKER POE ADAMS & BERNSTEIN LLP**
Bank of America Tower
620 S. Tryon St., Suite 800
Charlotte, NC 28202
Telephone: (704) 372.9000
Facsimile: (704) 334.4706
Email: jasonbenton@parkerpoe.com
danielpeterson@parkerpoe.com
jessicadixon@parkerpoe.com

*Attorneys for Defendant Omar I. Abdullah*