IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

CIVIL ACTION NO.: 5:22-cv-00068-BO

| | | |
|---|---|---|
| YOLANDA IRVING, individually and as the natural parent and guardian of J. I., JUWAN HARRINGTON, CYDNEEA HARRINGTON, KENYA WALTON, individually and as the natural parent and guardian of R.W., ZIYEL WHITLEY, DYAMOND WHITLEY, KAMISHA WHITLEY, and NANETTA GRANT as the natural parent and guardian of Z. G. | ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | **AMENDED MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT GAY, MONROE AND RATTELADE'S AMENDED MOTION FOR SUMMARY JUDGMENT** |
| vs. | ) ) ) | |
| THE CITY OF RALEIGH, Officer OMAR I. ABDULLAH, Sergeant WILLIAM ROLFE, Officer RISHAR PIERRE MONROE, Officer JULIEN DAVID RATTELADE, and Officer MEGHAN CAROLINE GAY, Chief of Police ESTELLA PATTERSON and City Manager MARCHELL ADAMS-DAVID, in their official capacities. | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

Pursuant to Local Civil Rule 7.1(c) and Rule 56 of the Federal Rules of Civil Procedure,

Defendant Meghan Gay, Defendant Rishar Monroe, and Defendant Julien Rattelade (collectively,

"Vice Defendants"), submit this Amended Memorandum of Law in support of their Amended

Motion for Summary Judgment filed contemporaneously herewith. The forecast of the evidence

produced in discovery, along with the pleadings, affidavits and documents filed with the Court,

demonstrate that there is no genuine dispute of any material fact as to Plaintiffs' claims against

Vice Defendants and that Vice Defendants are entitled to summary judgment as a matter of law.

**STATEMENT OF THE CASE**

On February 21, 2022 Plaintiffs' filed their Complaint against the above Defendants. [DE 1]. On February 22, 2022, Plaintiffs' filed a redacted version of their first Complaint. [DE 2] Plaintiffs filed an Amended Complaint on May 16, 2022. [DE 41]. Plaintiffs filed their Second Amended Complaint on August 31, 2022. [1] [DE 93]. In the Second Amended Complaint, Plaintiffs seek damages for injuries allegedly sustained as a result of a search warrant execution. Plaintiffs allege in their Second Amended Complaint that members of Raleigh Police Departments Vice Unit, including Defendant Meghan Gay ("Detective Gay"), Defendant David Rattelade ("Sgt. Rattelade"), and Defendant Rishar Monroe ("Detective Monroe") conspired with their co-defendant, Defendant Abdullah and a confidential informant, Dennis Williams ("Aspirin"), to deprive Plaintiffs of their constitutional rights in violation of 42 U.S.C. §1983. [DE 93]. Vice Defendants answered the Second Amended Complaint and denied liability for the claims asserted against them. [DE 98, 99,100]. Vice Defendants further asserted affirmative defenses of immunity, including, but not limited to, qualified immunity. [DE 98, 99, 100].

At the time of this Motion, Plaintiffs have deposed each of the Vice Defendants, and most of Phase I discovery was complete on or near March 3, 2023.

## STATEMENT OF FACTS

Vice Defendants respectfully refers the Court to their Statement of Material Facts ("Statement"), and appendix thereto, filed contemporaneously with Vice Defendants' Amended Motion for Summary Judgment and this Amended Memorandum of Law.

## STANDARD OF REVIEW

## I. SUMMARY JUDGMENT

---

[1] At this time, Plaintiffs have motioned to "Amend/Correct The Complaint Filed by Emancipate NC" [DE 185]

A defendant is entitled to summary judgment when a plaintiff "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may satisfy its burden by showing the discovery materials and other documents in the record "do not establish the . . . presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). The "moving party on a summary judgment motion need not produce evidence, but simply can argue that there is an absence of evidence by which the nonmovant can prove his case." *Cray Commc'ns, Inc. v. Novatel Computer Sys., Inc.*, 33 F.3d 390, 393–94 (4th Cir. 1994) (internal citations omitted).

If the moving party makes its motion properly, the burden shifts to the nonmoving party, whose "response must… set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). Unlike the moving party, the "opposing party may not rely merely on allegations or denials in its own pleadings; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." *Id.*

## II. QUALIFIED IMMUNITY

Qualified immunity shields government officials performing discretionary functions from personal liability for civil damages under § 1983, so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 306 (4th Cir. 2006) (quoting *Wilson v. Layne*, 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). Officials are entitled to immunity unless the § 1983 claim satisfies a two-prong test: (1) the allegations, if true, substantiate a violation of a federal statutory or constitutional right, and (2) the right was "clearly established" such that a reasonable officer would have known his acts or omissions violated that right. Id. Under

the first prong, a plaintiff must sufficiently allege that an officer's actions amount to a violation of a federal statutory or constitutional right. Id. at 307. Under the second prong, an alleged constitutional right is clearly established if, according to pre-existing law, "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The phrase "clearly established" depends on the "level of generality at which the relevant 'legal rule' is to be identified." Id. at 639, 107 S.Ct. 3034. Therefore, unlawfulness must be apparent, but the test does not require that "the very action in question has previously been held unlawful." *Wilson*, 526 U.S. at 615, 119 S.Ct. 1692 (quoting *Anderson*, 483 U.S. at 640, 107 S.Ct. 3034). This determination is to be assessed at the time an action occurred under an objective reasonableness standard. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The court may consider the prongs in either order, as a plaintiff's failure to satisfy either entitles the officer to immunity. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

## ARGUMENT

I. **VICE DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW OF ALL OF PLAINTIFFS' CLAIMS AS THERE IS NO EVIDENCE SUPPORTING A CLAIM OF DIRECT LIABILITY, CONSPIRACY OR BYSTANDER LIABILITY.**

### A. **Plaintiffs Cannot Support A Claim of Direct Liability Against Vice Defendants.**

Plaintiffs can show no facts to support direct liability against Vice Defendants, nor does their Complaint allege direct liability against Vice Defendants. Plaintiffs assert six claims against Vice Defendants in their Complaint. Plaintiffs can produce no facts against Vice Defendants that the Vice Defendants "deliberately or with a reckless disregard for the truth made material[ly] false

4

statements in the search warrant affidavit." *Bailey v. Polk*, 2011 WL 4565469 (W.D.N.C. March 7, 2011) (unreported) citing *Franks v. Delaware*, 438 U.S. 154,171 98 S. Ct. 2674 (1978). "Reckless disregard can be established by evidence that an officer acted 'with a high degree of awareness of a statement's probably falsity,' that is, 'when viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.'" *Id.* citing *Miller v. Prince George's County, Md.*, 475 F. 3d 621, 627 (4th Cir. 2007) (citations omitted).

Here, Plaintiffs cannot show any facts that demonstrate Vice Defendants were the affiants of the search warrant executed on May 21, 2020. In fact, the warrant was applied for and sworn to only by Defendant Abdullah. Plaintiffs cannot establish direct liability against Vice Defendants on the basis of the warrant nor can Plaintiffs attribute any statements of the Vice Defendants to the warrant application. Because the claims for relief sought by Plaintiffs all stem from the execution of the warrant on May 21, 2020, which Plaintiffs claim contained false statements, and none of those statements are attributable to Vice Defendants, Plaintiffs seek to establish liability on the basis of bystander or conspiracy theories, neither of which they can support.

## B. There Are No Facts Showing the Vice Defendants Were Parties to A Conspiracy

To support a claim for conspiracy to deprive an individual of a constitutional right in violation of § 1983, Plaintiffs must show that the VICE Defendants (1) "acted jointly in concert" and (2) performed an overt act (3) "in furtherance of the conspiracy" that (4) resulted in the deprivation of a constitutional right. *Hinkle v. City of Clarksburg, W. Va.*, 81 F.3d 416, 421 (4th Cir.1996) (citing *Hafner v. Brown*, 983 F.2d 570, 577 (4th Cir.1992)).

In the present matter, the Plaintiffs' claims of conspiracy are based on the contention that the Vice Defendants conspired with Aspirin to fabricate heroin trafficking charges and as a result

5

of those "fabricated charges" the Plaintiffs' homes were illegally raided. (Second Am. Compl. 73-74).  However, there is no evidence that any of the Vice Defendants conspired with Aspirin to fabricate such charges. There is no evidence of any Vice Defendant committing an "overt act" in further of the alleged conspiracy. The evidence of record is that Aspirin was Abdullah's CI. Abdullah communicated with him, paid him and was in charge of the investigations in which Aspirin did the controlled buy. (Rattelade Dep.136, Gay Dep. 192). The Vice Defendants' roles in the controlled buys were simply to provide security to make sure no one was hurt. (Gay Dep. 122). Thus, Plaintiffs have no evidence that the Vice Defendants fabricated the charges, committed any overt act in furtherance of a conspiracy or had a meeting of the minds to conspire.

### C. Plaintiffs Cannot Establish Bystander Liability Against Vice as Defendants.

In addition to overt acts, the Fourth Circuit has recognized that "[a]cquiescence can amount to a conspiracy agreement when ... one police officer watches an open breach of the law and does nothing to seek its prevention." *Hafner,* 983 F.2d at 578. This is commonly referred to as "bystander" liability, which allows an officer to be held liable if the bystanding officer: "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Randall v. Prince George's Cty*, 302 F.3d 188, 204 (4th Cir. 2002). Bystander liability "is premised on a law officer's duty to uphold the law and protect the public from illegal acts, regardless of who commits them." *Id*. at 203.

### 1. Plaintiffs Cannot Prove Any Facts Showing Vice Defendants Knew Or Should Have Known Of Any Violation of Plaintiffs' Constitutional Rights By A Fellow Officer

There is no evidence of record that Vice Defendants knew that Defendant Abdullah or Aspirin were violating any of the Plaintiffs' rights. There is also no evidence that Vice Defendants observed any open and obvious violation of any Plaintiffs' rights.

The Vice Defendants have all testified that prior to the search on May 21, 2020, they all believed that the smaller buys were legitimate and it was the larger sale of heroin where they thought the drug dealers were "duping" Aspirin. (Gay Dep. 131, Monroe Dep 52, Rattelade Dep. 166.) Moreover, prior to May 21st, this was simply their belief as they did not have definitive proof such as the CCBI lab results. (Rattelade Dep. 67). The only testing that had been done prior to the May 21st date was a field test which is not definitive, as the field tests could not rule out a controlled substance entirely. (Monroe Dep. 52). Nevertheless, the Vice Defendants still believed that the drug dealers were committing felonies for the sale of counterfeit substances should the lab results come back negative. (Rattelade Dep. 135-136). After the May 21st search, for the first time, Vice Defendants suspected that Aspirin might be fabricating the drugs. Following up their suspicion they went to their superiors and then the district attorney's office. The Vice Defendants were the individuals who ultimately uncovered Aspirins' actions, and promptly acted upon that information.

2.      *Plaintiffs Cannot Show That Vice Defendants Had A Reasonable Opportunity To Prevent Harm Nor That They Failed To Act*

Vice Defendants were not always present in each instance Aspirin was used as a confidential information. Vice Defendants' initial interactions with Aspirin showed them that although he may have some minor performance issues, they did not have any reason to believe his conduct amounted to a major concern. (Monroe Dep. 71, Rattelade Dep. 37). Any conduct observed by Vice Defendants as less than ideal behavior by an informant did not amount to an open violation of an individual's rights. Vice Defendants did not have an opportunity to prevent any harm to Plaintiffs, nor did they fail to act, because none of Vice Defendants were aware of Aspirin violating anyone's rights.

Vice Defendants eventually began to piece together their individual experiences involving Aspirin, which all came to together after the May 21, 2020 search warrant execution. At that time,

7

Vice Defendants realized that Aspirin may be purposefully acting against his targets and scamming the detectives by switching the illegal drugs he purchased, marijuana, with substances appearing to be heroin. (Rattelade Dep. 98, Gay Dep. 183, Monroe Dep. 151). The first opportunity Vice Defendants had to prevent harm and report Aspirin came after the May 21, 2020 controlled buy and search warrant execution. Following this, Vice Defendants immediately went to their supervisors, and reported their concerns to the district attorney's office, in an effort to prevent future harm. Plaintiffs cannot show that Vice Defendants had an opportunity to act earlier, because Plaintiffs cannot show any facts proving Vice Defendants had sufficient information upon which to act prior to May 21, 2020. For these reasons, Plaintiffs cannot establish bystander liability against Vice Defendants.

## II.     VICE DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER   OF LAW OF PLAINTIFFS' 4TH AND 14TH AMENDMENT           CONSTITUTIONAL CLAIMS STEMMING FROM THE ALLEGED SEARCHES OF   APARTMENTS 1628 A 1628 B AS THERE IS NO   EVIDENCE OF ANY CONSTITUTIONAL VIOLATIONS BY THESE DEFENDANTS.

### A.     Vice Defendants are entitled to judgment as a matter of law on all claims Vice Defendants Violated The Constitutional Rights of The Occupants of Apartment 1628 A.

#### 1.     Vice Defendants neither entered nor searched Apartment 1628 A.

Plaintiffs' Second Amended Complaint alleges that Vice Defendants entered "Plaintiffs' Homes" in violation of the Fourth Amendment of the U.S. Constitution.  (Second Am. Compl. ¶¶ 205-221) However, there are no facts to show that any Vice Defendant entered Apartment 1628 A.

Detective Gay testified that she entered Apartment 1628 B after SEU Officers requested assistance.  She did not enter Apartment 1628A. (Gay Dep. 222). Detectives Monroe and Rattelade never entered either apartment. Monroe testified that he was assigned to the backside of the

apartment buildings during the execution of the warrant on Apartment 1628 B by SEU Officers. (Monroe Dep. 159)  Rattelade testified that during the entry and search on Apartment 1628 A, he was outside speaking with the same individual Detective Monroe briefly interviewed. (Rattelade Dep. 150) After the individual was released, Sgt. Rattelade then went to pick up Asprin. (Rattelade Dep. 160).

The uncontroverted evidence is that Vice Defendants did not enter or search Apartment 1628 A.  As a result, the claims asserted against Vice Defendants for unlawful entry and search of Apartment 1628 A asserted by Plaintiff Kenya Walton individually and as guardian of R.W, Plaintiff Ziyel Whitley, and Plaintiff Kamisha Whitley, should be dismissed with prejudice.

### 2.    Vice Defendants cannot be individually liable for the SEU Officers' reasonable entry into Apartment 1628 A.

The Court has already granted the SEU Officers' Motion to Dismiss Plaintiffs' claims that their search of both apartments was unreasonable and violated their clearly established constitutional rights. Moreover, the admissible evidence shows the SEU Officers search of the apartments was reasonable.

### a.    SEU Officers' entry was based on voluntary consent from Apartment 1628 A occupants.

Even if Vice Defendants could be deemed responsible for the entry by others into Apartment 1628 A, the entry would be reasonable under the Fourth Amendment based on the voluntary consent to enter by occupants with apparent authority to provide consent for such entry. In order for voluntary consent to excuse the warrant requirement, the courts must examine the totality of the circumstances to determine whether the consent was freely and voluntarily provided. *U.S. v. Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996) (citing *Schneckloth*, 412 U.S. at 227). A statement is voluntary if it is "the product of an essentially free and unconstrained choice by its

9

maker." *Schneckloth*, 412 U.S. at 225, 93 S.Ct. 2041. In determining whether a consent is given voluntarily, courts look to the characteristics of the individual providing consent and the circumstances surrounding the encounter in which consent is provided. *Id.* at 226, 93 S. Ct. 2041.

> i. *Characteristics of Occupants Providing Consent For Entry Into Apartment 1628 A*

Relevant considerations include individual characteristics such as age, education, intelligence, and knowledge of an individual's rights. *Id.* at 227. After Plaintiffs Dyamond Whitley and Z.G. ran inside after seeing law enforcement approach Apartment 1628 B, there were four individuals inside the apartment. At the time of the events, Plaintiff Dyamond Whitley was eighteen years old and about to graduate high school. (Dyamond Dep. 26-27). Plaintiff Kamisha Whitley, who was also inside Apartment 1628 A was twenty years old, and had graduated from high school. Plaintiff Dyamond Whitley testified growing up his mother taught them about interacting with law enforcement (Dyamond Dep. 60-61). Plaintiff Kenya Walton, Plaintiff Dyamond Whitley and Plaintiff Kamisha Whitley's mother, testified that she had conversations with her children about interacting with law enforcement. (Walton Dep. 32) Plaintiff Walton explained that she provided them with information about "their rights, what the police officer is supposed to say to them, the dos and don'ts, or how they're supposed to be treated." (Walton Dep. 32). In addition to supplying her children with this information, Plaintiff Walton had conversations with her children about encounters with law enforcement which included information about the rights individuals do and do not have and how to behave if approached. (Walton Dep. 33)

Plaintiffs in Apartment 1628 A at the time SEU Officers requested to enter the apartment were aware of their rights when interacting with law enforcement, and Plaintiff Dyamond Whitley and Plaintiff Kamisha Whitley were over the age of eighteen at the time of the events. Plaintiff Kamisha Whitley was a high school graduate and soon to be mother, while Plaintiff Dyamond

Whitley was weeks away from graduating high school. Under these circumstances, Plaintiffs Dymond Whitley and Kamisha Whitley were capable of providing voluntary consent to SEU Officers for entering Apartment 1628 A.

### ii. Conditions do not invalidate the voluntary consent provided by the occupants of Apartment 1628 A.

The totality of the circumstance analysis for voluntary consent also considers other circumstances or conditions under which consent is given. Relevant to this analysis is officer conduct at the time of consent; the number of law enforcements present; and the time and place of the encounter. *U.S. v. Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996).

Officer conduct is relevant to whether or not a statement is given voluntarily. Included in this consideration is whether the officer's conduct presents a coercive force that would render the statement or consent involuntary. *U.S. v. Seni*, 662 F.2d 277, 281-82 (4th Cir. 1981); *U.S. v. Elie*, 111 F.3d 1135, 1143-44 (4th Cir. 1997). Display of a firearm by law enforcement does not on its own render consent involuntary. *Id.* Plaintiffs Robert Whitley, Kamisha Whitley, Dyamond Whitley and Z.G. were told to come downstairs. Plaintiff Dyamond Whitley testified that when told to come downstairs the officer used a "calm tone." (Dyamond Dep. 82). Plaintiff Robert Whitley testified that once SEU Officers determined no residents in Apartment 1628 A had any weapons, "they just relaxed, no weapons or nothing, they relaxed." (Robert Dep. 46). Plaintiff Dyamond Whitley testified that SEU Officers held their firearms for approximately four or five seconds. (Dyamond Dep. 71). Additionally, SEU Officers did not break down the door to enter Apartment 1628 A, as the door was left open after Plaintiff Z.G. ran inside. (Dyamond Dep. 71, Z.G. Dep. 107).

The number of officers is also relevant to the totality of the circumstance evaluation as to whether consent was given voluntarily. Plaintiff Dyamond Whitley testified that he believed four

officers to be in the apartment at the time they were told to come downstairs by SEU Officers, but he only saw two of them. (Dyamond Dep. 70).

The date of the search warrant execution on Apartment 1628 B was May 21, 2020. The warrant was executed during the daytime. Encounters with law enforcement during the day are not generally considered coercive. *U.S. v. Alexander*, 2008 WL 11422070, at *5 (M.D.N.C. Dec. 1, 2008). Familiarity of the setting is a factor in whether the location of the encounter bears on the volition of the consent provided. *U.S. v. Carter*, 300 F.3d 415, 423 (4th Cir. 2002). Whether the length of time of an encounter is coercive as to undermine voluntary consent is dependent upon the type of encounter. At the time SEU Officers were told they could enter Apartment 1628 A, the encounter was very short, and their initial encounter with Plaintiffs inside of Apartment 1628 A at that time had been very short in length. Plaintiffs inside the residence at that time who provided consent for SEU Officers to enter were residents of Apartment 1628 A and were familiar with this setting.

Under the totality of the circumstance approach, Plaintiffs encounter with SEU Officers at the time of entry did not invalidate the consent provided by occupants. Therefore the consent provided by Plaintiffs for SEU Officers to enter the Apartment 1628 was freely and voluntarily given, and all claims related to the alleged unlawful entry into Apartment 1628 A should be dismissed.

> *iii. Even if the occupants of Apartment 1628 A were unable to provide voluntary consent for entry into Apartment 1628 A, Plaintiff Kenya Walton's conduct provided valid, and voluntary consent for the entry and search of Apartment 1628 A.*

For similar reasons as set forth above regarding voluntary consent for entry into Apartment 1628 A, Plaintiffs' claims related to an unlawful search of Apartment 1628 A must also fail. Plaintiff Walton was forty years old on May 21, 2020. (Walton Dep. 6) She obtained her GED

12

from Wake Technical Community College and was employed as a bus driver for Wake County Schools. (Walton Dep. 14, 17) On May 21, 2020, Plaintiff Walton was notified that law enforcement was at her apartment after receiving a phone call from a friend. (Walton Dep. 43). She returned home, and was escorted into her residence by an officer. (Walton Dep. 45). Plaintiff Walton instructed her children on their rights and interactions with law enforcement. (Walton Dep. 32). Plaintiff Walton was asked if her home could be searched and she consented. (Walton Dep. 49). Plaintiff Walton was informed that officers were requesting to search her residence based on their belief that the suspect may be in her apartment. (Walton Dep. 50). Walton testified that the search did not take long. (Walton Dep. 50). The encounter with law enforcement during the execution of the warrant in Apartment 1628 B and search of Apartment 1628 A took approximately 1.5 hours. Plaintiff Robert Whitley described officers "cool" and as talking with Plaintiff Dyamond Whitley and Z.G. normally. (Robert Dep. 50). Plaintiff Walton had previously encountered law enforcement in other situations, including times she sought out their assistance. (Walton Dep. 101, 103). Plaintiff Walton did not testify to feeling threatened by law enforcement at her apartment during the encounter when she gave consent for officers to search her residence, nor did she have a firearm pointed at her during the encounter.

  b.  <u>SEU Officers' entry due to exigent circumstances.</u>

  The existence of an exigent circumstance is an exception to the warrant requirement of the Fourth Amendment. The exception applies when "the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable." *King,* 563 U.S. at 460, 131 S. Ct. 1849 (internal quotation marks omitted). This exception is designed to allow law enforcement to address emergencies, or "situations presenting a 'compelling need for official action and no time to secure a warrant.'" *Lange*, 141 S. Ct. 2011 quoting *Riley* 573, U.S.

at 402, 134 S. Ct. 2473. An exigent circumstance giving rise to an exception to the warrant requirement under the Fourth Amendment may exist to protect occupants from imminent injury; to ensure law enforcement officers personal safety; prevent the destruction of evidence; or prevent the escape of a suspect. *Lange,* 141 S. Ct. 2011 citing *Brigham City*, 547 U.S., at 403, 126 S.Ct. 1943; *Riley*, 573 U.S., at 388, 134 S.Ct. 2473*; Minnesota v. Olson*, 495 U.S. 91, 100, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990).

Whether the exigent circumstance exception to the warrant requirement of the Fourth Amendment applies is analyzed on a "case-by-case basis." *Birchfield v. North Dakota*, 579 U. S. 438, ——, 136 S.Ct. 2160, 2174, 195 L.Ed.2d 560 (2016). Meaning, the court must evaluate "whether an emergency justified a warrantless search in each particular case." *Riley*, 573 U.S. at 402, 134 S. Ct. 2473.

In *Lange*, the Supreme Court stated "[w]e have no doubt that in a great many cases flight creates a need for police to act swiftly." 141 S. Ct. 2011. As SEU Officers approached to execute the search warrant for narcotics, weapons and other related contraband on Apartment 1628 B, they witnessed four males standing directly in front of Apartment 1628 B. (Mead Dep. 75). SEU Officers were wearing tactical gear with the word "Police" written all over their uniform. (Mead Dep. 75). The males "were alerted to [SEU Officers'] presence … and upon seeing [their] presence fled …" (Mead Dep. 75). "Two fled into the target apartment and two others fled into the adjacent apartment next door." (Mead Dep. 75-76).

In addition to witnessing the flight of four individuals into two adjacent apartments, including into Apartment 1628 B, the location identified in the search warrant, and Apartment 1628 A, when law enforcement approached to execute a warrant for narcotics, the SEU Officers' familiarity with the neighborhood is relevant when considering whether their entry and search of

14

Apartment 1628 A was, under the totality of the circumstances, reasonable under the exigency exception to the warrant requirement. SEU Officers and other witnesses in this case testified to their familiarity with the neighborhood where the warrant was being executed.

SEU Officer Mead testified that he was very familiar with this neighborhood as he "personally responded to calls there … served numerous search warrants there … made numerous drug arrests, arrests for weapons violations, [and] homicide suspects ..." and that the neighborhood "has a high propensity for gang activity and drug sales and violent crimes occur there all the time." (Mead Dep. 73). SEU Officer Twiddy testified that he was also familiar with this neighborhood, noting it is "an area known for gang violence, drug sales, [and] weapons violations …" (Twiddy Dep. 25). Sgt. Rattelade characterized the neighborhood as being "known for coming out and being confrontational with law enforcement …" (Rattelade Dep. 162).

Not only were officers familiar with illegal activity involving weapons and hostility toward law enforcement in the neighborhood. Plaintiff Z.G. also admitted being aware of circumstances which supports the reasonableness of the concerns of officers in executing a search warrant in this particular neighborhood or otherwise interacting with individuals in the neighborhood. When asked about undercover cops in the neighborhood, Plaintiff Z.G. testified being aware of a situation involving a police officer entering the neighborhood and being attacked by a group of individuals. (Z.G. Dep. 62-63). Plaintiff Z.G. likewise testified that he "often" saw individuals with guns in the neighborhood, and he was aware of gang members selling drugs from their residences in the neighborhood, noting that gang activity is what the neighborhood is known for. (Z.G. Dep. 60, 64).

SEU Officers were familiar with the particular issue within this neighborhood. SEU Officers saw four individuals flee upon their approach, two into Apartment 1628 B and two others

into 1628 Apartment A. SEU Officers knew at that time, they were approaching to execute a search warrant for narcotics, which included a search for weapons. Plaintiffs Ziyel Whitley, Dyamond Whitley, J.I. and Z.G. ran into both apartments after seeing law enforcement approach, thereby creating confusion as the warrant on Apartment 1628 B was being executed. Under the totality of the circumstances, SEU Officers were reasonable in entering Apartment 1628 A. SEU Officers witnessed four individuals standing directly in front of the adjacent apartments, including the apartment identified in the warrant, Apartment 1628 B, who after seeing law enforcement approach, fled in both apartments. Considering the flight of the individuals into two apartments, including the location where the warrant was to be executed in conjunction with the nature of the items sought within the warrant, including narcotics and weapons, the possibility evidence may be destroyed, the safety of the occupants in Apartment 1628 A and the officers' safety created an exigent circumstance and an exception to the Fourth Amendment warrant requirement. If SEU Officers' entry and brief search of the premises is determined not to be based on consent, then their entry was justified as an exigent circumstance. Even if Plaintiffs could hold Vice Defendants responsible for the entry and search of SEU Officers into Apartment 1628 A, that entry and search was reasonable under the Fourth Amendment, and all claims related to the entry and search of Apartment 1628 A fail as a matter of law.

Because Plaintiffs cannot show Vice Defendants individually entered or searched Apartment 1628 A, and because any entry or search of Apartment 1628 A was reasonable as a matter of law, all claims of unlawful search or seizure of Plaintiffs stemming from the entry and search of Apartment 1628 A as to Vice Defendants should be dismissed.

### 4. Vice Defendants Are Not Liable For Any Detention Of Occupants Of Apartment 1628 A or Apartment 1628 B

Law enforcement can detain individuals on the premise during the execution of a search warrant. *Bailey v. United States*, 568 U.S. 186, 193 (2013); *Michigan v. Summers*, 452 U.S. 692, 701-02 (1981). Suspicion does not have to be particular to the detained individual, and is permitted without particularized suspicion for the safety of officers and others during the execution of a warrant. *Bailey* at 195, 198, 200. Temporary detention of occupants is also permitted for the same reasons during searches pursuant to consent or exigencies. *See U.S. v. Enslin*, 327 F.3d 788, 796-97 (9th Cir. 2003). The temporary detention of occupants of Apartment 1628 A during the consent search or search pursuant to the exigency is lawful, and Plaintiffs' claims related to an unlawful detention should be dismissed as to Vice Defendants. Likewise the temporary detention of occupants of Apartment 1628 B is lawful in connection with the execution of the search warrant.

### B. Vice Defendants Are Entitled To Judgment As a Matter Of Law On All Claims Related To Apartment 1628 B.

#### 1. The search warrant was valid as a matter of law.

Vice Defendants adopt and incorporate Defendant Abdullah's arguments as set forth in Defendant Abdullah's Memorandum of Law In Support of Summary Judgment for the arguments raised related to the validity of the search warrant executed on May 21, 2020. [DE 205 p. 8-13]. Vice Defendants likewise rely upon their previously stated arguments related to Plaintiffs' claims of conspiracy and/or bystander theories of liability. As Plaintiffs cannot show the warrant was invalid nor can they support their theories of bystander liability and/or conspiracy as to the claims arising out of the execution of the warrant, Plaintiffs claims must be dismissed.

#### 2. Even if the warrant is ultimately invalid, Vice Defendants were reasonable in relying upon the validity of the warrant on its face.

Vice Defendants did not attest to the statements contained in the warrant affidavit. Even if the warrant was deemed invalid, Vice Defendants, much like the SEU Officers, Vice Defendants

17

were reasonable in relying upon the presumed validity of the search warrant executed on Apartment 1628 B on May 21, 2020. Vice Defendants' reliance on the presumably valid warrant entitles them to judgment as a matter of law on these claims.

## CONCLUSION

For these reasons, Vice Defendants respectfully request that this Court grant summary judgment in favor of Vice Defendants on all of Plaintiffs' claims against them.

This the 1st day of May, 2023.

/s/ Alayna M. Poole_____
RODNEY E. PETTEY
N.C. State Bar No.: 17715
rpettey@rpsplaw.com
ALAYNA M. POOLE
N.C. State Bar No.: 57880
apoole@rpsplaw.com
PETTEY & PARTRICK, LLP
Post Office Box 2889
Raleigh, North Carolina 27602
Telephone: (919) 835-0900
Facsimile: (919) 835-0910
*Counsel for R.P. Monroe, J.D. Rattelade, and M.C. Gay in their individual capacities*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

CIVIL ACTION NO.: 5:22-cv-00068-BO

YOLANDA IRVING, individually and as the　　）
natural parent and guardian of J. I., JUWAN　）
HARRINGTON, CYDNEEA HARRINGTON,　）
KENYA WALTON, individually and as the　　）
natural parent and guardian of R.W., ZIYEL　）
WHITLEY, DYAMOND WHITLEY,　　　　）
KAMISHA WHITLEY, NANETTA GRANT as　）
the natural parent and guardian of Z. G., and　）
EMANCIPATE NC., INC.,　　　　　　　　）
　　　　　　　　　　　　　　　　　　　）
　　　　　　　　Plaintiffs,　　　　　　　）
vs.　　　　　　　　　　　　　　　　　　）
　　　　　　　　　　　　　　　　　　　）
THE CITY OF RALEIGH, Officer OMAR I.　）
ABDULLAH, Sergeant WILLIAM ROLFE,　）
Officer RISHAR PIERRE MONROE, Officer　）
JULIEN DAVID RATTELADE, and Officer　）
MEGHAN CAROLINE GAY, Officer DAVID　）
MEAD, Officer JESUS ORTIZ, Officer KYLE　）
PERRIN, Officer MICHAEL MOLLERE,　　）
Officer, KYLE THOMPSON, Officer　　　　）
VINCENT DEBONIS, Officer DANIEL　　　）
TWIDDY, Officer THOMAS WEBB, Officer　）
DAVID MCDONALD, Officer DAVID　　　　）
GARNER, Chief of Police ESTELLA　　　　）
PATTERSON and City Manager MARCHELL　）
ADAMS-DAVID, in their official capacities,　）
　　　　　　　　　　　　　　　　　　　）
　　　　　　　　Defendants.　　　　　　）

**CERTIFICATE OF SERVICE**

I hereby certify that on May 1, 2023, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following CM/ECF participants: Abraham Rubert-Schewel (schewel@tinfulton.com), Emily D. Gladden (Egladden@tinfulton.com), Michael L. Littlejohn, Jr. (mll@littlejohn-law.com), Nichad

Davis (ndavis@tinfulton.com), Ian A. Mance (ian@emancipatenc.com) and Elizabeth Simpson (elizabeth@emancipatenc.com), *Counsel for Plaintiffs;* Amy C. Petty (Amy.Petty@raleighnc.gov), Dorothy V. Kibler (Dorothy.Kibler@raleighnc.gov), Leslie C. Packer (leslie.packer@elliswinters.com), and Michelle A. Liguori (michelle.liguori@elliswinters.com) *Counsel for Defendant The City of Raleigh;* Daniel E. Peterson (danielpeterson@parkerpoe.com), Jason R. Benton (jasonbenton@parkerpoe.com) and Jessica C. Dixon (jessicadixon@parkerpoe.com), *Counsel for Defendant Omar Abdullah;* and Norwood P. Blanchard, III (norwood@cmclawfirm.com), *Counsel for Defendant William Rolfe,* and I hereby certify that I have mailed the document to the following non-CM/ECF participants: None.

Respectfully submitted,

BY:    /s/ Alayna M. Poole
       RODNEY E. PETTEY
       N.C. State Bar No.: 17715
       rpettey@rpsplaw.com
       ALAYNA M. POOLE
       N.C. State Bar No.: 57880
       apoole@rpsplaw.com
       PETTEY & PARTRICK, LLP
       Post Office Box 2889
       Raleigh, North Carolina 27602
       Telephone: (919) 835-0900
       Facsimile: (919) 835-0910
       *Counsel for R.P. Monroe, J.D. Rattelade, and*
       *M.C. Gay in their individual capacities*