**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**5:22:CV-0068-BO**

YOLANDA IRVING, individually and as the natural parent
and guardian of J.I., JUWAN HARRINGTON, CYDNEEA
HARRINGTON, KENYA WALTON individually and as the
natural parent and guardian of R.W., ZIYEL WHITLEY,
DYAMOND WHITLEY, KAMISHA WHITLEY, and
NANETTA GRANT as the natural parent and guardian of
Z.G.,

                    Plaintiffs,

        v.

THE CITY OF RALEIGH, Officer OMAR I. ABDULLAH,
Sergeant WILLIAM ROLFE, Officer RISHAR PIERRE
MONROE, Officer JULIEN DAVID RATTELADE, and
Officer MEGHAN CAROLINE GAY, Chief of Police
ESTELLA PATTERSON and City Manager MARCHELL
ADAMS-DAVID, in their official capacities.

                    Defendants.


**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT OMAR
ABDULLAH'S MOTION FOR SUMMARY JUDGMENT**


TIN FULTON WALKER & OWEN, PLLC
119 E. Main Street
Durham, NC 27701

EMANCIPATE NC
Post Office Box 309
Durham, NC 27702

*Attorneys for all Plaintiffs*

Plaintiffs respectfully submit this Response to Defendant Omar Abdullah's Motion for Summary Judgment. Plaintiffs incorporate by reference the relevant facts in their separately filed briefs in response to Defendant Rolfe's and the VICE Defendants' Motions for Summary Judgment. Defendant Abdullah's Motion should be denied in its entirety.

## I. INTRODUCTION

Detective Omar Abdullah and his colleagues in the Raleigh Police Department's ("RPD") VICE Unit[1] used an unreliable informant to obtain an illegal search warrant leading directly to a SWAT-style police raid on Plaintiffs' homes. Plaintiffs—two Black mothers who worked as Wake County school bus drivers and their children—were entirely innocent of any crime when RPD officers, armed with assault rifles and wearing body armor, executed a search warrant on their homes.

Abdullah and the VICE officers' informant, nicknamed "Aspirin" because he was recruited after selling fake cocaine disguised as Aspirin, was on probation for felony larceny and was *prohibited from possessing narcotics at the time he made 19 alleged heroin buys, all of which tested negative for a controlled substance*. Abdullah and the RPD VICE Unit received the first negative lab results on January 7, 2020, and they would receive three more negative results prior to the raid on Plaintiffs' homes. None of the alleged heroin buys involving Aspirin resulted in an audio or video recording of a narcotics transaction, despite the use of functioning surveillance equipment in each case.[2]

---

[1] Plaintiffs allege multiple Fourth Amendment violations by RPD VICE Detectives Monroe, Rattelade, Gay and Sgt. Rolfe. These arguments are addressed in a brief responding to Detectives Monroe, Rattelade and Gay, and in a separate brief responding to Sgt. Rolfe.

[2] RPD Internal Affairs ("IA"), recited these facts when determining Abdullah's termination from RPD (these facts were repeated at Sgt. Rolfe's deposition):

During the controlled buy that served as the basis for the search warrant that was ultimately executed on Plaintiffs' homes, Aspirin covered his buy camera by zipping up his jacket immediately prior to the alleged transaction. This caused Abdullah to have a conversation with Aspirin about how the recording would suggest he was trying to ███████ something, and that his actions could bring ████████████ onto the case they were working.

The next morning, Abdullah swore in his warrant application that his informant had "always" provided information that was "truthful and reliable." Abdullah omitted each of the above facts, among many others, that would have revealed Aspirin's unreliability. Abdullah also inserted numerous false statements in the warrant, including writing recklessly that the controlled buy had occurred at Yolanda Irving's address, 1628 B Burgundy Street. His actual target lived at 1620 B.

Plaintiffs bring claims against Abdullah under the Fourth Amendment for (1) illegally procuring a search warrant based on an unreliable informant, (2) illegal entry and search of Plaintiffs' homes, (3) continuing to search and detain Plaintiffs after realizing he had the wrong location in the warrant, (4) fabricating evidence in the warrant application, and (5) a conspiracy

---

Detective Abdullah received the first negative lab test result on January 7, 2020 and the second negative lab test on February 25, 2020. An additional 8 heroin cases were made by Detective Abdullah while using Dennis Williams as a confidential informant after the first negative lab test. Additionally, none of the above-mentioned heroin cases made by Detective Abdullah, while using Dennis Williams as a confidential informant, resulted in an audio or video recording of any drug transaction despite the fact that working equipment was used in each case and in some cases, more than one type of recording device was used at the same time.

56.1 at ¶¶ 85 (Rolfe Deposition 10-12).

by Abdullah, Aspirin and the VICE officers to procure illegal search and arrest warrants based on fabricated heroin buys.[3]

As detailed below, Abdullah's Fourth Amendment violations led directly to Plaintiffs' injuries, both by way of his own search and detention of Plaintiffs and by way of the search warrant he unlawfully procured, which resulted in the police raid on Plaintiffs' homes.

## II.      STATEMENT OF FACTS

### A.      RPD Officers Recruit and use an Unreliable Confidential Informant

In August of 2018, RPD VICE officers arrested Dennis Williams after he made a sale to a confidential informant employed by the VICE unit. 56.1 at ¶¶ 43-44. Mr. Williams sold the confidential informant crushed aspirin and claimed it was cocaine. *Id.* He was arrested and charged with selling fake narcotics. *Id.* After the arrest, Officer Abdullah recruited Williams, who had a lengthy history of violent crime and a pending felony larceny charge, to work as a confidential informant. 56.1 at ¶ 45. The VICE team gave Mr. Williams the code name "Aspirin." 56.1 at ¶ 46. VICE Detective Rattelade stated that the fact that Aspirin was arrested for "selling fake drugs should've been a red flag for close monitoring." 56.1 at ¶ 50.

Each of Aspirin's 2018 controlled buys were recorded using buy cameras that displayed a live feed on the VICE officer's cell phones. 56.1 at ¶ 56. None of the buy videos captured any audio or video of a transaction occurring; instead, the screens were obscured and showed a dark screen or a camera that faced away from any alleged transaction. *Id.*[4]

---

[3] This argument is addressed in the brief written in response to VICE Defendants Gay, Rattelade and Monroe's motion for summary judgment.

[4] Defendants argue that Aspirin was at one point reliable because eight out of nine controlled buys conducted by Aspirin in 2018 tested positive for a controlled substance. These narcotics were allegedly sold by four separate individuals. 56.1 at ¶ 5. Red flags—such as an obscured buy

**B.     Abdullah Continues to Use Aspirin as an Informant While he is on Probation**

Two months after he was approved to work as an informant, Aspirin was arrested on felony larceny charges in Nash County. 56.1 at ¶ 57. Aspirin pled guilty and was sentenced to prison. 56.1 at ¶ 58. In September of 2019, Aspirin completed his sentence and was placed on probation with post release conditions that included no contact with illegal drugs or people in possession of illegal drugs. *Id.* RPD Policy requires permission from a probation officer and the District Attorney's office, plus a signed motion by a judge, prior to working with an informant on probation. 56.1 at ¶ 59.

Within days of his release from prison, Abdullah re-recruited Aspirin to work as an informant. 56.1 at ¶ 60. Aspirin provided Abdullah the contact information of his probation officer and asked him to reach out and inform probation that he would be working as a confidential informant. 56.1 at ¶ 61. However, Abdullah never sought approval from Aspirin's probation officer, the District Attorney, or a judge. 56.1 at ¶ 62.

Shortly after his re-recruitment, Aspirin asked Abdullah in a text message if there was any way he could be taken off of his case load because he was not making enough money. 56.1 at ¶ 64. Abdullah advised him that to make more money, he needed to bring in heroin trafficking cases:

56.1 at ¶ 65.

Abdullah then instructed Aspirin to start reaching out to heroin dealers who they could do a ▮▮▮▮▮▮▮▮ 56.1 at ¶ 67.

---

camera—exist for each of these buys. *Id.* Aspirin also allegedly purchased controlled substances from additional individuals in 2018. These substances were never tested. *Id.*

**C. Abdullah and VICE Defendants use Aspirin to Wrongfully Prosecute Thirteen People for Heroin Trafficking Offenses**

After instructing Aspirin that he needed to start purchasing heroin to make more money, Abdullah and RPD VICE Officers Gay, Rattelade, Monroe, and Sgt. Rolfe used Aspirin to make trafficking charges against thirteen individuals despite their misgivings as to his reliability and their knowledge that he was producing fake heroin. 56.1 at ¶ 68. According to Abdullah, the ████ ████████████████████████████████████████████████████ ████████████████ 56.1 at ¶ 137 (Termination Letter).

Four negative lab results of the fake heroin were available and sent to Abdullah and the VICE unit prior to May 20, 2020: (1) on January 7, 2020, the result from a buy involving Blake Banks and Messiah Howard came back negative; (2) on February 24, 2020, the result from a second buy involving Banks and Howard also came back negative; (3) on February 25, 2020, the result from a buy involving Curtis Logan came back negative; and (4) on May 18, 2020, a result from a buy involving Jordan Miles came back negative. 56.1 at ¶ 71.

The VICE officers worked together as a team to complete controlled buys and takedowns. 56.1 at ¶ 72. Before each buy, Aspirin was fitted with at least one audio and visual surveillance device. 56.1 at ¶ 77. Abdullah wrote in his reports that he searched Aspirin before each controlled buy and located no contraband on his person. In reality, Abdullah would later admit, all he would do "is have [his informants put] their pockets inside-out," and he would "just do a quick pat-down of their outer clothing." 56.1 at ¶ 78. Aspirin always covered his buy camera, so none of the alleged buys were documented via video surveillance. 56.1 at ¶ 79. Audio can be heard on many of the alleged buys, but none of the recordings captured any discussion of a drug sale. 56.1 at ¶ 80. The VICE team would typically monitor buys using a surveillance application on their cell phone that

6

would allow them to see a "livestream" projected from Aspirin's cell phone camera. 56.1 at ¶ 81. VICE Detectives processed the fake heroin after each arrest. 56.1 at ¶¶ 106, 113, 116, 122, 125, 134.

According to VICE Detective Rattelade, "as soon as [Aspirin] started conducting heroin purchases, uh, the red flags went up pretty quick." 56.1 at ¶ 82. These included "obscuring the camera, not following instructions, delayed signals," and that the alleged heroin looked fake or was "packaged odd." 56.1 at ¶ 82 (RD 48) (MD 98). Neither fake heroin, nor real heroin, was ever discovered on the individuals arrested after allegedly selling heroin to Aspirin. 56.1 at ¶ 84. Still, Abdullah falsely charged thirteen individuals with trafficking heroin. 56.1 at ¶¶ 85-136.

1. **Aspirin's Third Heroin Buy Results in a Negative Field Test, VICE Officer Observations that the Substance is not Heroin, and a Negative Lab Test**

On January 2, 2020, Curtis Logan was driving with his two young children when he was arrested by the VICE team for allegedly selling heroin to Aspirin at a Sheetz gas station. One "buy" video exists of the alleged sale, but the camera was in Aspirin's pocket and captured no video. 56.1 at ¶ 93. Abdullah claimed Logan sold 20 grams of heroin to Aspirin for $400. 56.1 at ¶ 94. VICE Detective Monroe observed the alleged heroin, stated it did not look like heroin, and field tested it. 56.1 at ¶ 95. It field tested negative for a controlled substance. 56.1 at ¶ 96. Rattelade also observed the fake heroin and informed Abdullah that the price of 20 grams of heroin should be approximately $2000, not $400. 56.1 at ¶ 97. Abdullah subsequently charged Logan with trafficking heroin. 56.1 at ¶ 101. On February 25, 2020, the CCBI lab reported that the heroin allegedly sold by Curtis Logan tested negative for a controlled substance. 56.1 at ¶ 102.

**D. Abdullah Provides False Information to Procure a Search Warrant**

On May 21, 2020, Officer Abdullah applied for a warrant to search 1628 Burgundy St., Apt B, Raleigh, NC. 56.1 at ¶ 165. The warrant application was based on a heroin buy that was allegedly made one day earlier by Aspirin from an individual named Marcus VanIrvin. 56.1 at ¶ 166. Mr. VanIrvin lived at 1620 Burgundy St, Apt B, but Abdullah erroneously claimed in the warrant application that the buy occurred at 1628 Apt B—the home of Yolanda Irving and her family. 56.1 at ¶ 167.

Abdullah observed the alleged May 20 buy as it occurred via video on his cell phone. 56.1 at ¶ 160. According to Abdullah, the buy video showed Aspirin meeting with an individual but then zipping up his jacket, so the transaction was not depicted. 56.1 at ¶ 161. Abdullah picked up Aspirin after the alleged buy and questioned him as to why he zipped up his jacket during the transaction. 56.1 at ¶ 162. Abdullah then told Aspirin ███████████████████████████

████████████████████████████████████████████████████████

██████████████████

**E. VICE Officers Meet to Discuss the Warrant and then Predict Aspirin Will Again Produce Fake Heroin**

Prior to the execution of this warrant, the VICE team met with the SEU officers and discussed the details of the warrant and planned a controlled buy involving Aspirin, to be followed by a search warrant execution. 56.1 at ¶ 171. Abdullah falsely claimed in the search warrant application that Aspirin had provided information in the past that "has always been proven to be truthful and reliable." 56.1 at ¶ 172. The search warrant also falsely alleged that Aspirin had

purchased heroin from an individual at 1628 Burgundy St, Apt B—the home of Yolanda Irving and her children.[5] 56.1 at ¶ 173.

Immediately after this meeting, VICE defendants Rattelade, Monroe, and Gay expressed their misgivings about Aspirin in a text message chain. The officers predicted that Aspirin would again produce ██████████ or ██████████ 56.1 at ¶ 176.

██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

After sending these text messages, the VICE officers actively assisted with the controlled buy and search warrant operation. Detectives Rattelade and Gwinn drove Aspirin to a drop location from where he walked to Mr. VanIrvin's apartment to allegedly purchase heroin. 56.1 at ¶ 177. Detective Monroe called Lt. Bunch to report that Abdullah was planning to conduct a buy for a large amount of heroin with no supervisor approval. 56.1 at ¶ 182. In this call, Detective Monroe did not inform Lt. Bunch that he had concerns about Aspirin's reliability or that he believed Aspirin

---

[5] The warrant application made clear Abdullah believed VanIrvin was selling drugs out of *his own home*—not the home of a neighbor. *See* VanIrvin Warrant, at 4 (stating that CI purchased heroin from target named "Marcus *and same is residing at 1628 Burgundy St. Apt B*" (emphasis added)).

was going to again produce fake heroin. 56.1 at ¶ 184. All of the VICE Defendants followed the SEU officers to the scene and attempted to observe the buy on their cell phone cameras, but they again only saw a dark screen showing no transaction because Aspirin covered his buy camera.

**F.    RPD VICE and SEU Officers Raid the Homes of Yolanda Irving and Kenya Walton**

On May 21, 2020, Yolanda Irving lived at 1628 Burgundy St, Apt B, with her three children, J.I., Juwan Harrington and Cydnea Harrington. 56.1 at ¶ 189. Kenya Walton lived in the apartment next door, 1628 Burgundy St., Apt A, with her children R.W., Dyamond Whitley, Ziyel Whitley, and Kamisha Whitley. *Id.* 56.1 at ¶ 190. On the afternoon of May 21, J.I. was sitting outside on his front stoop, hanging out with his neighbors Ziyel Whitley, Dyamond Whitley, and their friend, Z.G. 56.1 at ¶ 191. As the children were talking, they saw approximately 15 SEU officers in SWAT gear running directly at them and pointing assault rifles. 56.1 at ¶ 193.

Plaintiffs immediately went into their homes. 56.1 at ¶ 194. The SEU officers followed the children and forced open the door to 1628 B. *Id.* The officers then pointed firearms in the face of Ziyel Whitley who had tripped and was sitting on the floor against the wall, telling him to cover his eyes with his hands. *Id.* The SEU officers ran up the stairs and pointed their firearms at 18-year-old Cydnea Harrington; her mother, Yolanda Irving; and her brother, Juwan Harrington, who is disabled and was sitting on his bed. 56.1 at ¶ 195-97.

Immediately after entering 1628 B, SEU officers barged into apartment 1628 A without knocking or announcing and without a warrant. 56.1 at ¶ 198. The officers ordered Dyamond Whitley, Kamisha Whitley, Ziquis Grant and R.W. to come downstairs with their hands raised. *Id.* ¶ 203. The plaintiffs all walked downstairs with their hands raised and the officers continued to point firearms at the children as they stood in the kitchen following the officers' instructions. *Id.*

**G.      The Defendants Continue to Search and Detain Plaintiffs Even After Realizing Marcus VanIrvin is not Present in Either Apartment**

Less than a minute after the entry by the SEU officers, VICE officers Gay and Abdullah arrived at the apartments and entered and began to search 1628 B. 56.1 ¶ 205. Officer Gay placed Ziyel Whitley in handcuffs. 56.1 ¶ 206. After approximately ten minutes of searching 1628 B, the officers had moved all of the occupants of the apartment downstairs and secured all of the rooms. *Id*.



Shortly after entering 1628 B, the SEU officers also entered 1628 A, the home of Kenya Walton and her family. 56.1 at ¶ 209. After nearly 14 minutes of the SEU officers being inside 1628 A and surrounding both entrances, Officer Abdullah entered Ms. Walton's home without permission. 56.1 at ¶ 210.

A dash cam video taken from an RPD patrol car shows the VICE officers going in and out of apartments 1628 B and A for one hour and ten minutes. 56.1 at ¶¶ 221-23. As the officers were searching the two apartments, they noticed that Marcus VanIrvin was standing in the

doorway of 1620 B. 56.1 ¶ 214. The SEU and VICE officers arrested Mr. VanIrvin at 1620 B. *Id.* One minute into the dash cam video, VanIrvin was in custody and being placed into the back of the patrol car. 56.1 at ¶ 217. Mr. VanIrvin can be heard on the video speaking to Abdullah and explaining that he had sold Aspirin marijuana from his apartment, 1620 B. 56.1 at ¶ 219. VanIrvin explained to Abdullah that the transaction occurred at ███████ *Id.* Abdullah asked VanIrvin,

███████████████████████████████████████████████████████████████

███████████████████████████████ *Id.* 56.1 at ¶ 220. After this conversation with VanIrvin, the VICE and SEU officers remained inside of 1628 A and B and continued to search and detain Plaintiffs for nearly an hour. 56.1 at ¶¶ 221-223.

## H.    Abdullah is Indicted and Invokes his Fifth Amendment Right to Silence at his Deposition

An investigation by the RPD Internal Affairs division into Abdullah's conduct sustained six separate policy violations. 56.1 ¶ 224. As a result, Abdullah was terminated as a RPD officer on October 13, 2021. 56.1 ¶ 225. On July 26, 2022, Abdullah was indicted by the Wake County District Attorney's office in connection to his actions in this case, for "providing false statements to a judicial official pertaining to a fake and counterfeit substance falsely represented by the Defendant to be heroin." 56.1 ¶ 228.

Abdullah sat for a deposition on December 15, 2022. 56.1 ¶ 78-80. He invoked his Fifth Amendment privilege at his deposition in response to 28 separate questions. 56.1 ¶ 230. This included invoking the privilege in response to:

- All questions about the search warrant application for the home of Yolanda Irving. 56.1 ¶ 231.

- All questions about whether other VICE officers ever expressed concerns about

Aspirin's reliability. 56.1 ¶ 232.

- All questions about whether the alleged heroin produced by Aspirin ever appeared to be fake or brown sugar. 56.1 ¶ 233.

- All questions about whether he had ever looked up the CCBI lab results related to Aspirin's alleged heroin purchases. 56.1 ¶ 234.

## III.    ARGUMENT

### A.    STANDARD OF REVIEW

Summary judgment is allowed only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Wilson v. Prince George's County, Maryland*, 893 F.3d 213, 218 (4th Cir. 2018). A reviewing court's function is not to decide the truth of the matter but "to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 255 (1986). Therefore, to determine whether genuine disputes of material fact exist, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

### B.    ABDULLAH'S ACTIONS VIOLATED THE FOURTH AMENDMENT

#### 1.    Officer Abdullah Illegally Procured a Search Warrant

Officer Abdullah intentionally or recklessly made materially false statements and omitted material information from his warrant application which led directly to the illegal search and seizure of Plaintiffs and their homes. "To establish a *Franks* violation, a [Plaintiff] must prove that the affiant either intentionally or recklessly made a materially false statement or that the affiant intentionally or recklessly omitted material information from the affidavit." *United States v. Pulley,* 987 F.3d 370, 376 (4th Cir. 2021). To assess materiality, a court must "excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the

'corrected' warrant affidavit would establish probable cause." *Miller v. Prince George's Cnty., MD*, 475 F.3d 621, 628 (4th Cir. 2007). Because the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," *Payton v. New York*, 445 U.S. 573, 585 (1980), "when reviewing cases such as the one before us, we must satisfy ourselves that the magistrate had a substantial basis for ... conclud[ing] that probable cause existed." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

### a. Aspirin Repeatedly Demonstrated his Unreliability and Provided False Information

Officer Abdullah's warrant application stated that his informant Aspirin had "always" provided information that was "truthful and reliable." An honest and accurate statement in his application would have included the details demonstrating Aspirin's pattern of unreliability and stating that Aspirin has been proven to be *unreliable.* 56.1 ¶ 33. Such a statement—that his informant was unreliable and listing the facts to support it—would have caused any magistrate to reject the warrant application. *See United States v. Lull,* 824 F.3d 109, 116 (4th Cir. 2016) ("[R]eliability is key to a magistrate's probable cause analysis.").

Officer Abdullah's warrant application omitted a multitude of facts known to him by May 21, 2020, which demonstrated Aspirin' unreliability, including: (1) that he was recruited to work as an informant after selling fake cocaine disguised as Aspirin; (2) that he was on probation, had not been approved to work as an informant by his probation officer, and one of the conditions of probation was no contact with narcotics; (3) that he repeatedly covered his buy camera, even after being instructed not to shield it; (4) that *none* of the nearly 30 buy videos he made actually showed a transaction, much less a heroin transaction; (5) that the alleged heroin he produced was not packaged like heroin and did not look like heroin; (6) that he typically purchased the alleged heroin for well below street value; (7) that neither real heroin nor fake heroin was ever recovered on the

thirteen individuals charged with heroin trafficking based on his buys; (8) that his third heroin buy resulted in a substance that did not appear to be heroin and field tested negative; (9) that by May 20, 2020, all of the heroin tested at the CCBI lab—Aspirin's first four "heroin" buys—had reported negative for a controlled substance; (10) that multiple VICE detectives openly regarded Aspirin as "unreliable" and his work as a CI "a running joke"; and (11) that *during the alleged buy that was the basis of the warrant application*, Aspirin covered his buy camera, prompting Abdullah to state that he ███████████████████████████████████████████ 56.1 at ¶ 58, 71, 79-80, 82, 161-164.

In *United States v. Lull,* 824 F.3d 109, 116 (4th Cir. 2016), the Fourth Circuit held that a *Franks* violation occurred when an officer used an unreliable informant during a controlled buy. The Court emphasized that the officer's omission in the warrant application of facts related to the informant's unreliability usurped "the magistrate's role." *Id.* at 116, 117 ("[D]eeming the informant reliable for some purposes but unreliable for others is an assessment that is for the magistrate, not [the] Investigator [] to make.").[6] Because the magistrate was not able to accurately assess the reliability of the informant, the Court held that it could not "rely on the [informant's] statements in assessing whether probable cause existed." *Id.* at 118. The Court then "set aside" the information provided by the informant and determined that what remained was insufficient to establish probable cause. *Id.*

---

[6] *See also Humbert v. Mayor & City Council of Baltimore City*, 866 F.3d 546, 557–58 (4th Cir. 2017) (*Franks* violation established where officer wrote "the victim positively identified [plaintiff] as her attacker" in warrant application but omitted "evidence [that] undercut the Officer's ability to rely on the victim's . . . identification"; officer's action was "at least reckless[]" because he "had an obvious reason to doubt [statement's] accuracy before including it in the warrant application"); *United States v. Tate*, 524 F.3d 449, 456 (4th Cir. 2008) (vacating conviction and sentence and remanding for *Franks* hearing where officer's inclusion of false statement in warrant application "amount[ed] to at least recklessness"; officer "omitted important facts and circumstances that, if true, were essential to the constitutionality of the . . . investigation").

In this case, Officer Abdullah falsely stated that Aspirin had always provided "reliable" information and then omitted all of the material facts that proved his *unreliability*. As in *Lull*, Abdullah neglected to tell the magistrate that his "informant [had] demonstrated that he was unreliable during the course of the very transaction that gave rise to the search warrant," *see* 824 F.3d at 116–18; mere hours earlier, Abdullah cautioned Aspirin that he was bringing ███████ ████████████████████ onto the case. 56.1 at ¶¶ 161-64. *Lull* found a *Franks* violation after a single dishonest act by an informant during the transaction that served as the basis for the warrant. Here, not only was there dishonesty during the transaction that served as the basis for the warrant, but there was a months' long pattern of dishonest behavior of which Abdullah was well aware.

Abdullah should have included the above information, which would have permitted the magistrate to make "an independent evaluation of the matter." *Franks v. Delaware,* 438 U.S. 154, 165, 98 (1978). Providing the information related to Aspirin's unreliability would have "undermined his credibility" and "the veracity of his statements presented in the warrant application." *Lull,* 824 F.3d at 118; *see also Humbert v. Mayor & City Council of Baltimore City*, 866 F.3d 546, 557–58 (4th Cir. 2017) (affirming determination that officer was "reckless" to omit "evidence [that] undercut the Officer's ability to rely on the victim's . . . identification"). Because the magistrate did not have the benefit of the omitted information concerning Aspirin's unreliability, his statements were not properly considered and must be excised from this Court's probable cause calculation. *Id.*

### b. The Remaining Allegations in the Warrant are False and Do Not Establish Probable Cause

When the information provided by Aspirin—that Marcus VanIrvin was selling heroin, that he went to the subject's apartment at 1628 B, and that on May 20 he purchased heroin—is excluded from the warrant application, little remains. What portion does remain—the allegation that

Detectives observed Aspirin enter 1628 B and that Aspirin provided Abdullah with a bag of heroin—are demonstrably false statements provided by Abdullah. These remaining statements are undercut by the omissions related to Aspirin's unreliability and the failures of his previous controlled buys. Aspirin's indiscretions and failures as an informant place grave doubt on the reliability of any statement made by Abdullah.

Notably, when asked at his deposition about the factual details he included in the warrant application, Abdullah repeatedly invoked his Fifth Amendment privilege and testified that he would continue to invoke his right to silence in response to any questions asked about the warrant application. 56.1 ¶ 231. Because Plaintiffs were unable to question Abdullah about the warrant application and the basis for the factual assertions he made in it, this Court should infer his silence is indicative of the spuriousness of those assertions. *See, e.g.*, *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) (stating that the Fifth Amendment permits "adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them"); *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 183–84 (4th Cir. 2002) (stating civil defendant's "assertion of her Fifth Amendment privilege provides additional, and quite substantial, support for the determination that [defendant] engaged in a pattern of racketeering activity"); *U.S. ex rel. DRC, Inc. v. Custer Battles, LLC*, 415 F. Supp. 2d 628, 634 (E.D. Va. 2006) (permitting an adverse inference to be drawn against a civil defendant who was silent when faced with questions about his alleged misconduct).

### i.    Abdullah Recklessly Alleged that Aspirin Entered 1628 B on May 20

Defendants argue that Abdullah believed that Aspirin entered 1628 B on May 20. Abdullah, in support of this assertion, claims that Aspirin "pointed to 1628 B as a residence from which heroin was being sold" as they drove by in Abdullah's vehicle. As an initial matter, statements

made by Aspirin as an unreliable informant should not be considered as corroboration or support that Abdullah could have relied on for any warrant application. *Lull,* 824 F.3d at 116-118. Moreover, these allegations are highly controverted.

First, at the time of the illegal search, the two apartments at 1628 only had small signs next to each door identifying the units. 56.1 at ¶ 15. As explained in Yolanda Irving's affidavit, because of the small size of the signs, it was not possible to identify the unit number or letter from the street. *Id.* Abdullah's claim that Aspirin pointed to 1628 B while driving by—leading to Abdullah's identification of Yolanda's residence—is a false or reckless assertion that should not be credited.

Second, Abdullah alleged in his warrant application that on May 20, "detectives" (plural) observed Aspirin enter 1628 B. At his deposition, he testified the detectives assisting him on May 20 were Gwinn and Gay. 56.1 at ¶ 16. However, VICE roll call records show Gay was off duty on May 20. 56.1 at ¶ 17. Abdullah testified that Detective Gwinn informed him that he observed Aspirin "go inside" but that Gwinn did not state "the apartment number" he entered. 56.1 at ¶ 16. Gwinn testified he did not recall participating in the operation on May 20 or observing anyone enter 1628 B. *Id.*

Third, Abdullah's inability to identify the correct target apartment was caused by his failure to ever run a successful background check on Marcus VanIrvin. Abdullah's text exchange with Aspirin on the day of the raid documented him attempting to determine VanIrvin's address. 56.1 at ¶ 15. At 9:30 A.M., Abdullah texted Aspirin, requesting VanIrvin's Facebook name. *Id.* Fifteen minutes later, Abdullah texted a second time, stating that he needs the Facebook name because the phone number Aspirin provided for VanIrvin ████████████████████ *Id.* Abdullah's following texts show him facilitating the signing of the search warrant and organizing the warrant

execution but failing to ever confirm VanIrvin's address. *Id.* When asked at his deposition whether he ever conducted a background check to confirm the address of Marcus VanIrvin prior to applying for the warrant, Officer Abdullah invoked his Fifth Amendment privilege. *Id.*

### ii. Abdullah Recklessly Claimed Aspirin Purchased Heroin on May 20

Abdullah's assertion in the warrant application that Aspirin produced heroin after an alleged buy on May 20 is at best a false statement recklessly made by Abdullah. Abdullah by this time knew that all of the alleged heroin produced by Aspirin that had been tested by the CCBI lab had shown a negative result, that it had field tested negative on at least one occasion, and that it typically was packaged and looked different than real heroin. 56.1 at ¶¶ 71, 82. In addition to his general pattern of unreliability, Abdullah admitted to investigators that Aspirin's actions on May 20 raised red flags: Aspirin zipped up his jacket as if he was ████████████████████ 56.1 at ¶¶ 160-164. Abdullah recklessly or intentionally chose to continue to use Aspirin when he knew he was producing fake narcotics.[7]

Simply put, when one sets aside the evidence provided by Aspirin, only false statements intentionally or recklessly made by Abdullah remain in the warrant application. Because the magistrate did not have the benefit of the omitted information demonstrating Aspirin's unreliability, and because the remaining statements in the affidavit are contradicted by the evidence, probable cause did not exist to issue the warrant which led to the raid on Plaintiffs' homes.

---

[7] Even if Abdullah had provided credible evidence to support the claim that he reasonably believed a sale occurred, an allegation of a controlled buy, standing on its own, "is insufficient to establish probable cause." *Lull*, 824 F.3d at 119 (citing *United States v. Khounsavanh*, 113 F.3d 279, 285 (1st Cir. 1997) ("Because of the importance of Fourth Amendment freedoms to every American, and because of the fact-specific nature of the probable cause inquiry, we reject the government's contention that a controlled buy should be *per se* sufficient to establish probable cause.").

### c. Abdullah Acted Intentionally or Recklessly

Abdullah's omission of facts which would negate probable cause proves his reckless disregard for the truth. *See United States v. Lull,* 824 F.3d 109, 117 (4th Cir. 2016) ("One way of establishing reckless disregard is by proffering 'evidence that a police officer 'failed to inform the judicial officer of facts [he] knew would negate probable cause.'""). Abdullah knew that a magistrate who was properly informed of Aspirin's failures and history of unreliability and deception would reject his warrant application. *See, e.g.*, *United States v. Jacobs*, 986 F.2d 1231, 1234–35 (8th Cir. 1993) ("[T]he omission occurred at least with reckless disregard of its effect upon the affidavit. . . . Any reasonable person would have known that this was the kind of thing the judge would wish to know."). The relevance and nature of the omissions were clearly something Abdullah intended to withhold from the magistrate in a misguided attempt to maintain his ability to use Aspirin. Abdullah knew that Aspirin's reliability was critical to his continued ability to use him. Abdullah's concealment of key facts demonstrates his intent to withhold material evidence that would have prevented this episode.

### 2. Abdullah Illegally Searched and Seized Plaintiffs

Officer Abdullah violated the Fourth Amendment when he entered Yolanda Irving's home (1628 B) and seized Plaintiffs based on a warrant he knew was illegally procured. Abdullah subsequently violated the Fourth Amendment when he entered Kenya Walton's home (1628 A) without a warrant or legal justification.

Less than a minute after the SEU officers executed the illegal warrant on Yolanda Irving's home, Abdullah entered her apartment (1628 B) and began to search. 56.1 ¶ 205. Approximately 15 minutes later, Officer Abdullah entered 1628 A, Kenya Walton's home, without legal justification or consent. 56.1 at ¶¶ 209, 210. Even if the Court should find that Ms. Walton

subsequently consented to a search of the upstairs of her apartment—something Plaintiffs contest—Abdullah's *entry into her home without a warrant or consent* was unconstitutional. "[T]he brevity of the entry does not diminish the extent of the Fourth Amendment's protections. The 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' The Fourth Amendment "draw[s] a firm line at the entrance to the house ... [and] that threshold may not reasonably be crossed without a warrant.'" *McKenna v. Police Chief,* No. 1:22CV00002, 2022 WL 15046725, at *5 (W.D. Va. Oct. 26, 2022) (quoting *Payton v. New York*, 445 U.S. 573, 585-90 (1980)).

### 3. Abdullah Illegally Continued to Search 1628 A and B and Detained Plaintiffs After Realizing He Was at the Wrong Address

Officer Abdullah knew that he had mistakenly entered 1628 A and B, yet he continued to search the apartments and detain Plaintiffs for nearly an hour after their realizing that he, along with the SEU and VICE officers, had raided the wrong homes. Law enforcement officers are required to "immediately terminate" a search when a realization is made that the wrong apartment is being searched or a mistake has been made. *Maryland v. Garrison,* 480 U.S. 79 (1986); *see also Yanez-Marquez v. Lynch,* 789 F.3d 434, 463 (4th Cir. 2015) (finding officers must stop a search upon realizing they are at a location not covered by the warrant).

Here, Officer Abdullah entered 1628 B one minute after the SEU officers. After approximately ten minutes of searching 1628 B, Abdullah, Gay and the SEU officers had moved all of the occupants of the apartment downstairs and secured all of the rooms. 56.1 at ¶ 208. At this point, Abdullah knew that Mr. VanIrvin, the target of the warrant, was not present at the apartment, and he should have immediately terminated the search and detention of 1628 B. *Id.*

After realizing VanIrvin was not in 1628 B, Officer Abdullah entered 1628 A without legal authority or consent. 56.1 at ¶ 210. An SEU officer, at Abdullah's instruction, then searched the upstairs of 1628 A and located no other occupants. 56.1 at ¶ 211. At this point the officers knew Mr. VanIrvin was also not present at 1628 A.

Moreover, prior to entering 1628 A, Abdullah and VICE officers Monroe, Rattelade and Gay *had already located Mr. VanIrvin at his home at 1620 B and placed him into a squad car*. 56.1 at ¶ 213-221. On a dash cam video, VanIrvin can be heard on the video speaking to Abdullah and explaining that he sold Aspirin marijuana from his apartment and that the transaction occurred ███████████ *Id.* 8:00-8:15. Abdullah asked VanIrvin, ██████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████ *Id.* 8:40-9:00. Still, Abdullah and the VICE Defendants continued to search both residences and detain the Plaintiffs for another hour.

### 4.     Fabrication of Evidence by Abdullah in Violation of the Fourth Amendment

Plaintiffs also bring claims for fabrication of evidence under the Fourth Amendment. *Manuel v. City of Joliet, Ill.,* 137 S. Ct. 911, 914–15 (2017) (recognizing a Fourth Amendment claim for fabrication of evidence). This claim is based on Officer Abdullah's numerous fabrications in his application for a search warrant, which led directly to Plaintiffs' unlawful detention. In the warrant application, Abdullah falsely claimed (1) that Aspirin had "always" provided information that was "truthful and reliable," (2) that Aspirin had entered apartment 1628 B on May 20, 2020, and (3) that Aspirin purchased heroin on May 20, 2020. Abdullah made these fabrications with at minimum a "reckless disregard for the truth.'" *Howard v. City of Durham*, 487 F. Supp. 3d 377, 404-05 (M.D.N.C. 2020); *see also Massey v. Ojaniit*, 759 F.3d 343, 354 (4th Cir. 2014)).

Defendant Abdullah does not contest that he fabricated evidence, but he argues that Plaintiffs did not suffer a deprivation of liberty because they were not convicted of a crime. However, the standard cited by Abdullah—requiring a conviction to prove a fabrication of evidence claim—applies to Fourteenth Amendment due process claims. *See Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017) ("the Due Process Clause is not the proper lens through which to evaluate law enforcement's pretrial missteps."). A Fourth Amendment fabrication of evidence claim does not require a conviction. The Supreme Court made this clear in *Manuel v. City of Joliet, Ill.*, 580 U.S. 357 (2017), which recognized a "Fourth Amendment claim" where the Plaintiff sought relief for "pretrial detention" based on fabricated drug evidence. In *Manuel*, the Plaintiff was arrested based "solely on his possession of pills that had field tested negative for an illegal substance" *Id.* Because the officers' fabrications caused his "wrongful detention," Manuel was able to bring a claim under the Fourth Amendment. Here, Abdullah's fabrications in the warrant application caused Plaintiffs to be arrested without probable cause and detained in violation of the Fourth Amendment.

## C. DEFENDANTS' CONSTITUTIONAL VIOLATIONS PROXIMATELY CAUSED PLAINTIFFS' INJURIES

A § 1983 defendant is responsible in damages for all of the injuries that are caused by his wrongful acts. In cases brought under § 1983, damages are determined according to principles derived from the common law of torts. *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 306 (1986); *see also Carey v. Piphus*, 435 U.S. 247, 257 (1978) ("[O]ver the centuries the common law of torts has developed a set of rules to implement the principle that a person should be compensated fairly for injuries caused by the violation of his legal rights.").

Defendants attempt to argue that they are not liable for the SEU Officers' entry into the home of Kenya Walton and her family, because Plaintiffs' entry into their own homes at the sight of heavily armed officers and the SEU officers' decision to then enter 1628 A is a superseding cause that breaks the causal chain in Defendants' misconduct. Yet, because it was foreseeable that Plaintiffs would enter their homes at the sight of SEU officers, and that the officers would pursue them, see Section III.C.2, *infra*; this Court should find Defendants liable for all injuries stemming from their misconduct.[8] Even if the Court were to accept Defendants' argument, this would not insulate Defendants from accountability for the multitude of harms caused both prior to and after any alleged superseding cause.

1. **Defendants are Responsible for SEU Officers Pointing Assault Rifles at Plaintiffs and Illegally Searching and Seizing Plaintiffs at 1628 B**

Defendants do not contest the fact that their actions caused the SEU officers to point their assault rifles at Plaintiffs Ziyel Whitley, Z.G., Dyamond Whitley, and J.I. as they stood outside of their own homes. By pointing their assault rifles during the execution of the illegally procured warrant, the SEU officers inflicted injury[9] on the Plaintiffs for which Defendants bear

---

[8] Courts have consistently held that defendants in a § 1983 action are responsible for the foreseeable consequences of their actions, including acts by third parties who are not defendants. *See e.g.*, *Shaw v. Stroud*, 413 F.3d 791 (4th Cir 1994) (holding that "causal link" in 1983 cases is analogous to common law "proximate cause"); *Slakan v. Porter*, 737 F.2d 368 (4th Cir. 1984) (proof of causation in a § 1983 action may be supplied by the tort principle that a person is liable for the natural consequences of his actions); *accord*, *Jackson v. Sauls*, 206 F.3d 1156, 1169 (11th Cir. 2000); *Jones v. City of Chicago*, 856 F.2d 985, 993 (7th Cir. 1988).

[9] Pointing of a firearm and reasonable fear of injury amounts to the tort of assault under North Carolina and federal common law. *See* 2A N.C. Index 4th Assault and Battery § 1 ("an assault is an offer to show violence to another without striking that person . . . and the interest protected by the action for assault is freedom from apprehension of a harmful or offensive contact with one's person."); *Ellis v. United States*, 613 F. Supp. 3d 963, 965 (E.D. Va. 2020); *and see Holloway v. Wachovia Bank & Tr. Co.,* 339 N.C. 338, 349 (1994) (finding the pointing of a firearm sufficient for the tort of assault).

responsibility. Defendants had each conducted numerous takedowns and warrant executions and were aware that the SEU officers' standard practice was to have their weapons shouldered with the barrel up and pointed at the time of approach of a suspect or entry into an apartment. 56.1 at ¶¶ 3, 235. Defendants also do not contest that they proximately caused the SEU officers to search and seize the Plaintiffs at 1628 B.

### 2. Defendants are Responsible for SEU Officers Searching and Seizing Plaintiffs at Apartment 1628 A

Defendants argue that they are not responsible for Plaintiffs' injuries because (1) the Plaintiffs retreated to their own homes when faced by the SEU Officers armed with assault rifles, and (2) the SEU Officers made an independent decision to enter Plaintiffs' homes.

Plaintiffs—who turned and entered their own homes at the sight of heavily armed officers running towards them with guns pointed—are not to blame for the indignities they suffered. Defendants, having conducted numerous raids and takedowns with the SEU team, knew that they would be heavily armed, that they would initiate any search with their weapons drawn and pointed, and that they would locate and detain any suspects. 56.1 at ¶¶ 3, 199. The SEU standard practice of chasing down suspects or individuals simply present at a takedown or search warrant execution is widely documented in the body camera footage of cases involving Abdullah and Aspirin. 56.1 at ¶¶ 3, 72-73; *see* 1-28-20 Miles (Raleigh P DT Video).

Here, it was reasonably foreseeable, and was in fact predictable, that a group of teenagers standing in front of their homes would run into their homes when they saw a group of SEU officers heading in their direction pointing assault rifles. Unlike *Kane v. Lewis*, 604 Fed. Appx. 229, 234 (4th Cir. 2015), where the plaintiff came towards officers with a knife, the Plaintiffs retreat into their respective homes was predictable and more than justified by the approach of heavily armed

police. The SEU officers—as one might expect during a raid of two apartment doors situated mere feet from each other—followed the Plaintiffs inside their homes.

Importantly, there was no lawful reason for the Raleigh Police Department to be at the private homes of either the Irvings (1628 B) or the Waltons (1628 A) on May 21, 2020. But for Abdullah and Defendants' unconstitutional acts, the SEU Officers would never have executed a search warrant on 1628 B and been in the position to enter the home of their next door neighbor at 1628 A. "When an illegal arrest sets off a chain of indignities inflicted on the hapless victim, . . . she is entitled to obtain damages for these indignities whether or not they are independent violations of the Constitution. For they are foreseeable consequences of the illegal arrest, and the ordinary rules of tort causation apply to constitutional tort suits." *Herzog v. Village of Winnetka*, 309 F.3d 1041, 1044 (7th Cir. 2002). Such is the case here. When Abdullah engaged an unreliable confidential informant, who Abdullah *knew* for months was repeatedly presenting brown sugar as though it was heroin, it was reasonably foreseeable that innocent people would experience the indignities associated with police attention.

These indignities may be lawful when the victims are the proper subjects of the police attention, but they are unlawful when they are the foreseeable result of an unlawful act. The fact that the SEU Team was dismissed by the Court does not relieve Abdullah of liability for these "indignities," because he was responsible for the underlying constitutional violations that led to the raids on the Plaintiffs' homes. Without Abdullah's corrupt fake heroin scheme, police never would have visited either 1628 B or 1628 A, and the Irving and Walton families would have been left in peace.

Plaintiffs can recover damages that are proximately caused by any Fourth Amendment violation alleged against Detective Abdullah and the VICE Officers. As the U.S. Supreme Court

stated in *County of Los Angeles, Calif. v. Mendez*, "there is no need to dress up [a] Fourth Amendment claim"; even if qualified immunity might preclude recovery on something like an excessive force claim related to a home entry, "that will not foreclose recovery for injuries proximately caused by [an unlawful] entry" for which no such immunity applies. 581 U.S. 420, 430 (2017). Here, Plaintiffs have put forth facts from which a jury could conclude that Abdullah violated the Fourth Amendment by knowingly providing false information to a magistrate to obtain a search warrant for an erroneous address, thus proximately causing the Plaintiffs' injuries.

### 3. Defendants are Responsible for SEU Officers Continuing to Search and Seize Plaintiffs at 1628 B and 1628 A

As explained above in section II.A.3., Abdullah and the VICE Defendants failed to terminate the search and seizure of Plaintiffs at both 1628 A and B for nearly an hour after realizing they were at the incorrect location. Defendants' liability extends to their failure to instruct the SEU Officers to terminate the search and detention of Plaintiffs.

Even if this Court were to find that the causal chain of Defendants' unconstitutional acts was broken by an intervening act, it would not void the Defendants' constitutional requirement to terminate a search upon realizing they are at the incorrect location. *Maryland v. Garrison,* 480 U.S. 79 (1986). After conducting the search of the upstairs of Kenya Walton's apartment and discovering that Marcus VanIrvin, the target of the warrant, was not present, Officer Abdullah and SEU officers, at his instruction, remained inside and continued to detain the Plaintiffs in 1628 A and 1628 B for nearly another hour. 56.1 at ¶¶ 209-21.

## IV.    CONCLUSION

Plaintiff respectfully request this Court deny Defendants' Motion for Summary Judgment

and to set this matter for a jury trial.

Respectfully submitted, this the 30th day of May, 2023.


/s/ Abraham Rubert-Schewel
Abraham Rubert-Schewel
NC State Bar No. 56863
Tin, Fulton, Walker & Owen, PLLC
119 E. Main Street
Durham, NC 27701
schewel@tinfulton.com
*Counsel for all Plaintiffs*

Ian A. Mance
N.C. State Bar No. 46589
EMANCIPATE NC
P.O. Box 309
Durham, NC 27702
ian@emancipatenc.org
*Counsel for all Plaintiffs*

Elizabeth G. Simpson
N.C. State Bar No. 41596
EMANCIPATE NC
P.O. Box 309
Durham, NC 27702
elizabeth@emancipatenc.org
*Counsel for all Plaintiffs*

Emily D. Gladden
N.C. State Bar No. 49224
Tin, Fulton, Walker & Owen, PLLC
204 N. Person Street
Raleigh, NC 27601
egladden@tinfulton.com
*Counsel for all Plaintiffs*

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this Memorandum consists of 8,318 words, does not exceed 30 pages, and complies with EDNC Local Rule 7.2.

This, the 30th day of May, 2023.

**/s/ Abraham Rubert-Schewel**
Abraham Rubert-Schewel
NC State Bar No. 56863
Tin, Fulton, Walker & Owen, PLLC
119 E. Main Street
Durham, NC 27701
schewel@tinfulton.com
*Counsel for all Plaintiffs*