# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### 5:22:CV-0068-BO

YOLANDA IRVING, individually and as the natural
parent and guardian of J.I., JUWAN HARRINGTON,
CYDNEEA HARRINGTON, KENYA WALTON
individually and as the natural parent and guardian
of R.W., ZIYEL WHITLEY, DYAMOND WHITLEY,
KAMISHA WHITLEY, and NANETTA GRANT as the
natural parent and guardian of Z.G.,

                Plaintiffs,

    v.

THE CITY OF RALEIGH, Officer OMAR I.
ABDULLAH, Sergeant WILLIAM ROLFE, Officer
RISHAR PIERRE MONROE, Officer JULIEN DAVID
RATTELADE, and Officer MEGHAN CAROLINE
GAY, Chief of Police ESTELLA PATTERSON and
City Manager MARCHELL ADAMS-DAVID, in their
official capacities.

                Defendants.

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS GAY, RATTELADE AND MONROE'S MOTIONS FOR SUMMARY JUDGMENT

TIN FULTON WALKER & OWEN, PLLC
119 E. Main Street
Durham, NC 27701

EMANCIPATE NC
Post Office Box 309
Durham, NC 27702

*Attorneys for Plaintiffs*

Plaintiffs respectfully submit this Response to Defendants' Meghan Gay, Julien Rattelade, and Rishar Monroe's ("VICE Defendants") Motions for Summary Judgment. The VICE Defendants' Motions should be denied in their entirety.

## I.    INTRODUCTION

VICE Detectives Rattelade, Monroe, and Gay were aware of, participated in, and failed to intervene in a scheme to illegally arrest, detain, and search individuals based on fake heroin. This scheme culminated with an illegal raid on Plaintiffs' private homes. Plaintiffs—two Black mothers employed as Wake County school bus drivers, along with their children—were all innocent of any crime when RPD officers entered their homes armed with assault rifles and body armor.

Over a six-month period, the informant Dennis "Aspirin" Williams, Detective Abdullah, and the VICE Defendants made 19 controlled buys for alleged heroin, all of which tested negative for a controlled substance. 56.1, ¶ 59. The VICE officers received and "printed" the first negative lab results on January 7, 2020, and would receive and print three more negative lab results prior to the raid on Plaintiffs' homes. As stated by Officer Abdullah, the VICE Defendants were all aware of the "███████ ████████████████████████████████████████████████████████." 56.1, ¶ 7. The facts on the record support this statement and show that the VICE Defendants were present for the majority of the controlled buys, searches, and arrests for Aspirin's cases; watched the live stream during the buys and saw that Aspirin's buy camera was obscured and never documented a drug sale; routinely processed and examined the fake heroin and discussed that it did not look like real heroin, but

rather brown sugar; and knew that Aspirin had received his informant code name because he was arrested and recruited after selling fake drugs (aspirin disguised as cocaine). Despite knowing that Aspirin was unreliable and repeatedly producing fake heroin, the VICE Defendants participated in the wrongful arrests of thirteen individuals for heroin trafficking, and the search and detention of numerous others.

Minutes before the May 21, 2020, raid on Plaintiffs' homes, the VICE Defendants sent text messages predicting that the search warrant—based on a purported controlled heroin buy conducted by Aspirin—would again result in ██ ████████████████████ Instead of intervening and stopping the raid, the VICE Defendants assisted in it by *driving Aspirin to the scene* of the controlled buy and entering and searching Plaintiffs' homes immediately after the SEU officers entered.

Plaintiffs bring claims against the VICE Defendants under the Fourth Amendment for (1) failure to intervene and stop the unconstitutional raid on their homes, (2) illegal entry and search of Plaintiffs' homes, (3) failure to terminate their search after realizing they had the wrong location, and (4) a conspiracy by VICE Defendants along with Rolfe, Abdullah, and Aspirin to illegally search, detain and arrest individuals based on fake heroin.

## II.    STATEMENT OF FACTS

The VICE Defendants worked as a team with Rolfe, Abdullah, and Aspirin to wrongfully search, detain and arrest thirteen people for heroin trafficking.[1] The following facts demonstrate the VICE Defendants' complicity and knowledge in the ongoing constitutional violations that led directly to the illegal raid on Plaintiffs' homes:

- **The VICE Detectives Worked as a Team and all Worked Directly with Aspirin**. The VICE unit worked as a team. 56.1 ¶¶ 7, 35, 42. Gay, Rattelade, Monroe, and Rolfe all worked directly with Aspirin and Abdullah on controlled buys. They routinely drove with Abdullah and Aspirin to the buy location, signed off on release of informant funds to Aspirin, signed off on his pay, processed the fake drugs he produced after arrests, and assisted in drafting arrest warrants related to his fake heroin buys. 56.1, ¶ 7.

- **Aspirin Covering His Buy Camera.** The VICE Detectives monitored Aspirin's controlled buys through a surveillance application called 10-21 that allowed them to see a "livestream" projected from Aspirin's cell phone. 56.1, ¶ 7. Aspirin repeatedly "obscure[ed] the cellphone camera" and the VICE Detectives never actually observed a "buy" of narcotics. 56.1, ¶¶ 7, 46; MD 96-100; GD 64-65, 109-10.

---

[1] Plaintiffs incorporate by reference the statement of facts in Plaintiffs' Response Brief to Officer Abdullah's motion for summary judgment.

- **Knowledge that Aspirin's Controlled Buys Resulted in Fake Heroin.** On January 2, 2020—more than four months before the raid on the Plaintiffs' homes—Abdullah falsely claimed that Aspirin purchased heroin from an individual named Curtis Logan. 56.1, ¶ ¶ 9, 83-92. Each of the VICE Defendants were present for the controlled buy and take down. *Id.* Monroe stated that the alleged "heroin" did not look like heroin and that it field-tested negative for a controlled substance. 56.1, ¶ ¶ 8, 85. Rattelade observed that this "heroin" was fake and that the price of 20 grams of heroin should have been roughly five times higher ($2,000 not $400). 56.1, ¶ ¶ 8, 87. Gay learned that the alleged "heroin" field-tested negative and testified that the actual street price of real heroin was much higher than Aspirin paid. 56.1, ¶ 88. Each of these issues were conveyed to their supervisor, Sgt. Rolfe, in a meeting with Gay, Monroe, and Rattelade present. 56.1, ¶ 8, 89; GD 122-24, 126-27. Still, Abdullah charged Curtis Logan with trafficking heroin—not creating, selling or possessing a counterfeit substance. 56.1, ¶ 8; N.C. Gen. Stat. § 90-95(a)(2).

- **Knowledge of Negative Lab Results for Purported Heroin.** On multiple occasions, the VICE Detectives prompted Abdullah to send the alleged narcotics to the CCBI lab for testing. 56.1, ¶ 8. The result of the first CCBI lab test of the fake heroin was available to Abdullah and "printed" by the VICE unit as early as January 7, 2020. 56.1, ¶ 60. Four negative results were available and sent to the VICE unit prior to May 18, 2020—(1) on January 7, 2020, the result from a buy involving Blake Banks and Messiah Howard came

back negative; (2) on February 24, 2020, the result from a second buy involving Howard and Banks also came back negative; (3) on February 25, 2020, the result from a buy involving Curtis Logan came back negative; and (4) on May 18, 2020, the result from a buy involving Jordan Miles came back negative. 56.1, ¶ 61.

- **Direct Participation in Controlled Buys, Searches and Takedown Operations that Resulted in Abdullah Wrongfully Charging Individuals with Trafficking Heroin.** The VICE Detectives knew that Abdullah was illegally procuring warrants and charging individuals with trafficking heroin, even though the drugs produced in the operations were known to be fake. 56.1, ¶ ¶ 7, 26, 28, 31, 32; RD 135, 147. By the May 21, 2020, raid, Aspirin's pattern of producing brown sugar in lieu of heroin during his operations conducted with Abdullah, Rattelade, Gay, Monroe, and Rolfe had been repeated **19** times—resulting in at least **13** separate arrests. 56.1, ¶ ¶ 43-46, 58, 76-125. And in each instance, the target was charged with trafficking heroin, not with the sale of a counterfeit substance. *Id*. VICE officers Gay, Rattelade, Monroe and Rolfe were directly involved in almost all of these cases.

  o **Rolfe:** Sgt. Rolfe participated directly in "the majority," or "about 90 percent" of the counterfeit heroin arrests that Abdullah and Aspirin directed; his responsibilities included "surveillance" and "monitoring the buy." 56.1, ¶¶ 64.

6

- **Rattelade:** In addition to the January 2, 2020 arrest of Curtis Logan (in which the alleged heroin field tested negative, did not look like heroin and did not match the street price of heroin), Detective Rattelade processed the fake heroin produced by Aspirin on at least *four* subsequent occasions. 56.1, ¶ ¶ 7-8. He processed the fake heroin on January 28, 2020, in connection with the wrongful arrest of Jordan Miles; on February 28, 2020, in connection with the wrongful arrest of Gregory Washington; on April 9, 2020, in connection with the wrongful arrests of Shakari Ore and Isaiah Walker; and again on May 15, 2020, in connection with the wrongful arrests of Connell Wilson and David Mitchell. 56.1, ¶ 93-99, 114-117, 199-126. Additionally, Rattelade was present for the wrongful arrest of Keith Green on March 19, 2020, which included a search warrant execution of a house that Green was living in. 56.1, ¶ 111. Rattelade knew that Abdullah charged each of these individuals with heroin trafficking. 56.1, ¶ 7.

- **Monroe:** After the January 2, 2020, arrest of Curtis Logan, when Monroe personally examined the fake heroin and told Abdullah that the substance Aspirin produced field tested negative, did not look like heroin, and did not match the street price of heroin, Monroe also processed the fake heroin Aspirin produced on March 12, 2020, in connection with the wrongful arrest of Sherrod Smith for heroin trafficking. 56.1, ¶ 7, 105-109. Monroe is documented on body camera

footage participating in the controlled buy operations and arrests of Jordan Miles, Keith Green, Shakari Ore, Isaiah Walker, David Mitchell and Connell Wilson. 56.1, ¶ 63.

- o **Gay:** Gay was sometimes tasked with drafting arrest warrants for Aspirin's cases at Abdullah's request. 56.1, ¶ 7, GD 15, 136. Gay knew that "Abdullah liked to charge on the front end [prior to having the alleged drugs tested] so he could pay the informant." 56.1, ¶ 8; GD 16. Gay is documented on body camera footage participating in controlled buys and arrests involving Blake Banks and Messiah Howard, Curtis Logan, Sherrod Smith, Keith Green, and David Mitchell and Connell Wilson. 56.1, ¶ ¶ 63, 78.

- **Knowledge of Aspirin's Unreliability.** Monroe believed prior to May 21, 2020, that Aspirin was "questionable" and "unreliable." 56.1, ¶ 7, MD 116-19; Ex. G, IA p. 27. According to Detective Rattelade, "as soon as [Aspirin] started conducting heroin purchases, uh, the red flags went up pretty quick." 56.1, ¶¶ 7, 72; RAD 82. These red flags included "obscuring the camera, not following instructions, delayed signals" and that the alleged heroin was "packaged odd" or appeared to be "counterfeit." 56.1, ¶¶ 7, 72. Detective Gay testified that in her opinion, Dennis Williams deliberately provided false information and that she would never use an unreliable informant. 56.1, ¶ 130.

- **Dennis Williams is Given the Code Name Aspirin Because he was Arrested Attempting to Sell Fake Drugs.** The VICE team gave Dennis

Williams the code name "Aspirin," because in August 2018 he sold a confidential informant crushed aspirin while claiming it was cocaine. 56.1, ¶ 34, 39; AD 103.

## III. ARGUMENT

### A. STANDARD OF REVIEW

Summary judgment is allowed only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Wilson v. Prince George's County, Maryland*, 893 F.3d 213, 218 (4th Cir. 2018). A reviewing court's function is not to decide the truth of the matter but "to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 255 (1986). Therefore, to determine whether genuine disputes of material fact exist, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

### B. THE VICE DEFENDANTS' ACTIONS VIOLATED THE FOURTH AMENDMENT

#### 1. The VICE Defendants Failed to Intervene to Protect Plaintiffs' Constitutional Rights

At the time of the raid on Plaintiffs' homes, VICE Detectives Gay, Rattelade, and Monroe were aware that Officer Abdullah and Aspirin had repeatedly used fake heroin to illegally obtain search and arrest warrants and illegally charge individuals with heroin trafficking. 56.1, ¶ ¶ 28, 29, 31, 32, 76-125. The VICE Defendants had repeatedly expressed concerns about Aspirin's reliability as an informant—including

just minutes prior to the May 21, 2020, raid, when the officers predicted that Aspirin would again produce "███████████████████"—yet none of the VICE Defendants attempted to intervene and stop the illegal warrant execution on Plaintiffs' homes. To state a claim for failure to intervene, also referred to as bystander liability, a plaintiff must allege that an officer "(1) kn[ew] that a fellow officer [was] violating an individual's constitutional rights; (2) ha[d] a reasonable opportunity to prevent the harm; and (3) cho[se] not to act." *Randall v. Prince George's Cnty., Md.*, 302 F.3d 188, 204 (4th Cir. 2002).

Immediately prior to the raid of Plaintiffs' homes, the VICE Defendants met with Officer Abdullah to review the search warrant and discuss the warrant execution and controlled buy operation for May 21, 2020. 56.1, ¶ 161. Understanding that Abdullah was using an alleged heroin purchase by Aspirin as probable cause for the search warrant, the detectives sent each other messages on a text thread, placing "bets" on whether Aspirin would once again produce fake heroin—and expressing concerns about what would be recovered, and if Abdullah had confirmed the correct target location in the warrant. 56.1, ¶ 165. Detective Rattelade predicted that ███████████████████████████████████████████████ 56.1, ¶ 166. Detective Monroe responded ████████████████████████. *Id.* Monroe then speculated ██████████████████████████████████████ ████████████████████████████████████████████████ ██████████. *Id.* Detective Gay predicted ██████████████████████ ██. *Id.* Rattelade responded with a ████████████████████. *Id.* At his

deposition, Rattelade stated that ███████████████████████████████████████

████████████████████████████." 56.1, ¶ 32. Rattelade's final text

stated, "██████████████." 56.1, ¶ 166.

To confirm a supervisor was aware of the planned raid, Detective Monroe

called Lt. Bunch, to report that Abdullah was planning to conduct a buy for a large

amount of heroin with no supervisor present. 56.1, ¶ 172, MD 47-48. Despite Monroe's

documented misgivings about the reliability of Aspirin, Detective Monroe did not

inform Lt. Bunch that he believed Aspirin was unreliable or that he believed Aspirin

was going to produce fake heroin or brown sugar. 56.1, ¶ 174, MD 116-119.

Detectives Rattelade and Gwinn then drove Aspirin to a drop location from

where he walked to Mr. VanIrvin's home (1620 Burgundy Street) to allegedly

purchase heroin. 56.1, ¶ 167. Detectives Gay, Monroe, and Abdullah drove separately

to an area near Raleigh North apartments where they parked their vehicles. 56.1,

¶¶ 170-171. The VICE Detectives watched the livestream and observed a dark screen

as Aspirin once again covered his buy camera. 56.1, ¶¶ 7, 69, 71, 175.

Notwithstanding the inability to view Aspirin's controlled buy footage and document

what actually occurred, and notwithstanding the VICE Detectives' stated concerns

about Aspirin's "unreliability" and pattern of producing "brown sugar" in lieu of

"heroin," the VICE Detectives then participated in the raid and search of Plaintiffs'

homes at 1628 Burgundy Street. *Id.* None of the VICE officers sought to stop the

warrant execution.

**a. The VICE Defendants Knew that Abdullah was Using an**

## Unreliable Informant to Procure an Illegal Search Warrant

The VICE Defendants argue that they cannot be liable for failure to intervene because they believed Aspirin's "smaller buys were legitimate, and it was the larger sale" where they thought "drug dealers" were "duping" Aspirin by selling him counterfeit narcotics. D.E. No. 233 at 7, VICE Defendants' Memorandum. Even if this were true, which Plaintiffs contest i*nfra,* the VICE Defendants were all aware that Abdullah was committing a constitutional violation by using an unreliable informant to procure a search warrant. 56.1, ¶ ¶ 7, 130, 131.[2] *United States v. Lull,* 824 F.3d 109, 116 (4th Cir. 2016) (finding a constitutional violation occurred where an officer used an unreliable informant during a controlled buy).

The VICE Defendants post-hoc attempt to justify their failure to intervene by claiming that they believed drug dealers were selling real heroin on the first buy then "duping" Aspirin is a question of material fact that should go to the jury. First, setting the implausibility of this scenario aside, this is *not the testimony* of each of the VICE Defendants: Rattelade (RD 166) and Gay (GD 131) both testified that they believed that Aspirin was being "scammed" and sold counterfeit substances on each of his heroin buys, not just the larger buys. This means that VICE Defendants Gay and Rattelade knew that on May 21, 2020, Abdullah had at minimum misled a magistrate and procured a search warrant based on a controlled buy for alleged heroin—not for

---

[2] At her deposition, Detective Gay testified that a magistrate would never approve a warrant application based on information provided by an unreliable informant. 56.1, ¶ 131 (GD 42-43).

Case 5:22-cv-00068-BO   Document 247   Filed 05/31/23   Page 12 of 30

a sale of a counterfeit substance as the VICE Detectives believed was occurring—leading directly to the constitutional violations suffered by Plaintiffs.

Abdullah's act of misleading the magistrate as to the alleged crime occurring is an independent constitutional violation. *See, e.g.*, *United States v. Sykes*, No. 5:15-CR-00184-FL-5, 2016 WL 8291220, at *14 (E.D.N.C. Aug. 22, 2016)("Facts related to one crime, drug possession, cannot justify a search warrant for evidence of the entirely different crime of drug trafficking.")(quoting *United States v. Powers*, 1 F. Supp. 3d 470, 475 (M.D.N.C. 2014)); *accord*, *United States v. Doyle,* 650 F.3d 460, 472 (4th Cir. 2011)). It is insufficient that a target of a warrant be suspected of a crime, the warrant must identify the actual crime occurring. *United States v. Lalor,* 996 F.2d 1578, 1582 (4th Cir.1993) ("In determining whether a search warrant is supported by probable cause, the crucial element is not whether the target of the search is suspected of a crime, but whether it is reasonable to believe that the items to be seized will be found in the place to be searched."). Here, there is nothing to suggest that heroin would be found as a result of the search warrant, as made abundantly clear by the VICE Defendants' texts.

Second, each of the VICE Defendants were aware that Aspirin had been initially arrested for selling fake narcotics and given the moniker "Aspirin," a fact that according to Detective Rattelade (and Plaintiffs' police practices expert), "should've been a red flag for close monitoring." 56.1, ¶ ¶ 39, 40; *see also* EXPERT REPORT OF DAVID T. SWEENEY (Nov. 29, 2022), at 4–5. And by the time of the warrant execution on Plaintiffs' homes, the VICE Defendants had noted numerous concerns

about Aspirin's behavior as an informant including "obscuring the camera, not following instructions, delayed signals," and that the alleged heroin produced by Aspirin appeared to be fake and was "packaged odd." 56.1, ¶ ¶ 7, 72 (RAD 48) (MD 98). These concerns were noted during Aspirin's alleged small buys, which the VICE Defendants routinely participated in, as well as any later alleged purchase for a trafficking amount of heroin. 56.1, ¶ ¶ 7-8, 63, 64, 105-109, 111. By May 21, 2020, Aspirin had made 18 buys of alleged heroin, all of which were counterfeit substances. 56.1, ¶ ¶ 43-46, 58, 76-125.

Because the VICE Defendants believed that Aspirin was unreliable at the time and repeatedly producing fake heroin, they knew that Abdullah was committing a constitutional violation by using Aspirin's controlled "heroin" buy as the basis for a search warrant application. *United States v. Lull,* 824 F.3d 109, 116 (4th Cir. 2016) ("[A]n experienced investigator . . . would surely know that reliability is key to a magistrate's probable cause analysis."). Moreover, VICE Defendants Gay, Rattelade, and Monroe also knew that Abdullah had further misled the magistrate by falsely claiming in the search warrant application that Aspirin had purchased heroin, when they knew the alleged heroin was actually a counterfeit substance. 56.1, ¶ ¶ 161-163 166; *Lalor,* 996 F.2d at 1582. Each of these facts are sufficient evidence independently or when combined that the VICE Defendants knew a constitutional violation was occurring.

### b. The VICE Defendants Had Ample Opportunity to Intervene

The VICE Detectives also allege that they did not have a reasonable opportunity to prevent the harm to Plaintiffs. Defendants' text messages, sent shortly before the raid on Plaintiffs' homes, underscore how much contempt they had for Aspirin's "reliability" and how certain they were that he was not actually purchasing heroin, but rather planting brown sugar. 56.1, ¶ 26, 32, 166. Each of the Detectives had ample opportunity to call Lt. Bunch and explain that Aspirin was repeatedly producing fake heroin and should not have been used as an informant or as the basis for a search warrant on a private home. None of them did. Detective Monroe's decision to check with Lt. Bunch to make sure a supervisor had signed off on the raid—while omitting his and the other VICE Detective's concerns about Aspirin's reliability and their expectation that Aspirin would produce brown sugar rather than real heroin—does not insulate him from liability, but rather demonstrates his clear opportunity to intervene and prevent any constitutional harm to Plaintiffs. 56.1, ¶ ¶ 172, 174.

## 2. VICE Detectives Gay, Rattelade, and Monroe Knowingly Relied on an Illegal Warrant to Enter and Search Plaintiffs' Homes

The VICE Detectives violated the Fourth Amendment when they entered Yolanda Irving's home (1628 B) and seized Plaintiffs based on a warrant they knew was illegal. Officers participating in a search warrant execution are required to confirm that the warrant conforms to constitutional requirements. *Groh v. Ramirez*, 540 U.S. 551, 563 (2004). When analyzing the liability of the officers, Courts may look "outside the four corners of a deficient affidavit when determining, in light of all the circumstances, whether an officer's reliance on the issuing warrant was objectively

reasonable." *Id.* Because the VICE Detectives were aware that the search warrant was (1) based on information provided by an unreliable informant, and (2) contained falsehoods, they knew that the warrant application was not "lawfully authorized." 56.1, ¶ ¶ 162-166.

VICE Detectives Gay, Rattelade and Monroe knew that Aspirin was not actually purchasing heroin and that Abdullah should not have been relying on information provided by Aspirin as the basis for any warrant application. 56.1, ¶ ¶ 7, 26-29, 130-131, 162-166. After meeting with Abdullah and learning that he was again using Aspirin as the basis for a warrant application and buy operation for heroin, the VICE Detectives sent text messages where they predicted that Aspirin would again produce ███████████████████ 56.1, ¶ 166. And, the VICE Defendants knew that Abdullah's search warrant falsely alleged that Aspirin had purchased heroin— when they knew he had actually purchased or produced counterfeit narcotics—as he had done 18 times prior. 56.1 ¶ ¶ 43-46, 58, 76-125, 162-164.

Still, the VICE Defendants followed the SEU team to Plaintiffs' homes and entered their homes and searched and detained Plaintiffs. Less than a minute after the entry by the SEU officers, Gay and Abdullah entered and began to search 1628 B. 56.1 ¶ 195. Shortly after, both Rattelade and Monroe also entered and searched 1628 B. *Id.*

### 3. The VICE Defendants Continued to Search and Seize Plaintiffs After Realizing They Were at the Wrong Location

VICE Detectives Gay, Monroe and Rattelade, knew that they had mistakenly entered Plaintiffs' homes, yet they continued to search the apartments and detain Plaintiffs for nearly an hour after their realizing they were at the wrong location. 56.1, ¶ ¶ 198, 201-202. Law enforcement officers are required to "immediately terminate" a search when a realization is made that the wrong apartment is being searched or a mistake has been made. *Maryland v. Garrison,* 480 U.S. 79 (1986); *see also Yanez-Marquez v. Lynch,* 789 F.3d 434, 463 (4th Cir. 2015) (finding officers must stop a search upon realizing they are at a location not covered by the warrant).

Here, Officers Gay and Abdullah entered 1628 B one minute after the SEU officers. 56.1, ¶ 195. After approximately ten minutes of searching 1628 B, the officers had moved all the occupants of the apartment downstairs and secured all of the rooms. 56.1, ¶ 198. At this point, the VICE Defendants knew that Mr. VanIrvin, the target of the warrant, was not present at 1628 B,[3] nor was any contraband, and they should have terminated the search and detention. *Id.* They did not. Instead, the search and detention of Plaintiffs continued for roughly another hour. *Id*. 56.1, ¶ ¶ 202.

---

[3] Approximately fifteen minutes after entering 1628 B, Officer Abdullah, accompanied by SEU officers, searched 1628 A, and determined that Marcus VanIrvin was not present at that apartment either and located no contraband. 56.1, ¶ ¶ 198-201.

Shortly after discovering VanIrvin was not present at 1628 B, Abdullah and VICE Detectives Monroe, Rattelade and Gay located VanIrvin at his home at 1620 B and placed him into a squad car. 56.1 ¶ ¶ 204-206. On the squad car's dash cam video, VanIrvin can be heard speaking to Abdullah and explaining that he sold Aspirin marijuana from his own apartment and that the transaction ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ 56.1 ¶ 210. Still—after detaining VanIrvin at his own home and searching both apartments and discovering no narcotics—the dash cam video documents VICE Detectives Gay, Monroe, and Rattelade continuing to search and permit members of the RPD SEU team to search 1628B and 1628A and to detain Plaintiffs for nearly another hour. 56.1, ¶ 202.[4]

---

[4] Detective Rattelade is pictured entering Apartment 1628 B at 46:38 into the dash cam video. (VanIrvin Addendum Video at 46:38). At 1:05:40 in the dash cam video Detectives Monroe and Gay are pictured leaving 1628 B. 56.1, ¶ 213.

**C. THE VICE DEFENDANTS CONSPIRED WITH ABDULLAH AND ASPIRIN TO VIOLATE PLAINTIFFS' CONSTITUTIONAL RIGHTS**

Defendants Monroe, Gay, Rattelade, Rolfe, and Abdullah conspired with Aspirin violate the Plaintiffs' constitutional rights by participating in a scheme to illegally arrest, detain and search individuals. A civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict the harm or injury upon another and an overt act that results in damages." *Hafner v. Brown*, 983 F.2d 570, 576 (4th Cir. 1992) (internal citations omitted). A section 1983 conspiracy claim is adequate upon a particularized showing that the defendants "acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in the deprivation of a constitutional right." *Hinkle v. Wilson*, 81 F.3d 416, 421 (4th Cir. 1996) (citing *Hafner v. Brown*, 983 F.2d 570, 577 (4th Cir. 1992)).

To show a "meeting of the minds" the plaintiff does not need to prove a detailed plan about how the objective will be met, nor does the Plaintiff need to show direct evidence of the agreement. *Fonda v. Gray*, 707 F.2d 435, 438 (9th Cir. 1983) ("It is not necessary to prove that each participant in a conspiracy know the exact parameters of the plan"); *Hafner v. Brown*, 983 F.2d 570, 576-577 (4th Cir. 1992) ("In order to prove the existence of a civil conspiracy, the plaintiff is not required to provide direct evidence of the agreement between conspirators. Circumstantial evidence may provide adequate proof of the existence of such a conspiracy.").

Furthermore, a claim of civil conspiracy can be proven *"by a mere showing of acquiescence"* to the conspiracy. *Hafner v. Brown*, 983 F.2d 570, 576–78 (4th Cir. 1992) (emphasis added). In *Hafner v. Brown*, the Fourth Circuit found that the following jury instruction on mere acquiescence was proper:

> Thus, if you find two or more of the Defendants witnessed the beating inflicted upon the Plaintiff by any of the other Defendants either individually or jointly and did nothing to prevent it, then you must find that the Defendants participated in a civil conspiracy to deprive Plaintiff of his constitutional rights.

*Id* at 577.

To survive a motion for summary judgment, the Plaintiff's evidence "must at least, reasonably lead to the inference that [the Defendants] positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." *Hinkle v. Wilson*, 81 F.3d 416, 421 (4th Cir. 1996).

## 1. Defendants Acted in Concert to Procure Illegal Search and Arrest Warrants Based on Fake Heroin

Defendants Monroe, Gay, Rattelade, Rolfe, and Abdullah, along with Aspirin, came to either a tacit or overt mutual understanding to participate in a months-long scheme to illegally arrest, detain and search individuals, culminating with the illegal raid on Plaintiffs' homes. *See Hinkle*, 81 F.3d at 421.

The VICE Defendants argue that there is no evidence that they committed an overt act in furtherance of the conspiracy. However, each of the VICE Defendants took steps to facilitate the controlled buys and the resulting illegal search and arrest warrants. The Defendants then all acquiesced in the scheme by continuing to assist

Abdullah and watching as he used Aspirin's unreliable information and controlled buys as the basis for search and arrest warrants.

The facts on the record prove this, and any dispute of these material facts should be resolved by a jury. The VICE Defendants worked as a team and were present for the majority of the controlled buys and take downs for Aspirin's cases; they watched the live stream on their cellphones during the buys and saw that the camera was obscured and never recorded a drug sale; they routinely processed and examined the alleged heroin, discussed that it did not look like real heroin and that the amount of money exchanged often did not match the market price for heroin; they knew or had the opportunity to know that the CCBI lab tests for Aspirin cases had come back negative on at least four occasions prior to May 21, 2020; they knew that Abdullah procured illegal search and arrest warrants based on heroin trafficking, when the heroin was actually fake; they knew that the targets of Aspirin's cases were wrongfully charged with heroin trafficking; they believed that Aspirin was unreliable and would not have used him as a CI themselves; and they knew that Aspirin had originally gotten this CI nickname because he sold crushed aspirin disguised as cocaine. *See generally* Statement of Facts.

### 2. Defendants Acted in Concert to Violate Plaintiffs Rights on May 21, 2020

The VICE Defendants' conspiracy with Rolfe, Abdullah and Aspirin continued for nearly six months until May 21, 2020, when the VICE officers knowingly assisted with an illegal search warrant operation on Yolanda Irving's home. Their knowledge

Case 5:22-cv-00068-BO   Document 247   Filed 05/31/23   Page 21 of 30

and overt assistance with the conspiracy is put on display by their acts on May 21, 2020.

After meeting with Abdullah, reviewing the search warrant, and learning that he was again using an alleged heroin purchase by Aspirin as the basis for a search warrant operation, VICE Defendants Gay, Rattelade, and Monroe sent out a series of text messages predicting that they would once again recover ███████████████ ███████████ ¶ 166.

Despite their knowledge that Aspirin was unreliable and was repeatedly conducting controlled buys that produced fake heroin, the VICE Defendants assisted Abdullah in conducting the buy and search warrant operation—thereby giving their tacit consent. Detective Rattelade, minutes after predicting ████████████ *picked up Aspirin in his police vehicle and drove him to a drop location* from where he walked to Mr. VanIrvin's home to allegedly purchase heroin. Detectives Gay and Monroe also drove to the scene and watched the alleged buy live—the camera of course was obscured and showed no drug transaction. 56.1, ¶ ¶ 7, 69, 71, 175. Nevertheless, each of the VICE Defendants then participated in the raid and search of Plaintiffs' homes. 56.1, ¶ ¶ 177-178. None sought to stop the warrant execution. If the above does not qualify as overt acts in furtherance of a conspiracy to search, detain and arrest individuals based off of fabricated evidence, it is, at minimum, evidence from which a jury could conclude that the VICE Defendants acquiesced in the conspiracy when they "witnessed the [constitutional violation] being inflicted upon the Plaintiffs" and "did nothing to prevent it." *See Hafner*, 983 F.2d at 577.

**D.    The VICE Defendants' Constitutional Violations Proximately Caused Plaintiffs' Injuries.**

A § 1983 defendant is responsible in damages for all the injuries that are caused by his wrongful acts. In cases brought under § 1983, damages are determined according to principles derived from the common law of torts. *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 306 (1986); *see also Carey v. Piphus*, 435 U.S. 247, 257 (1978) ("[O]ver the centuries the common law of torts has developed a set of rules to implement the principle that a person should be compensated fairly for injuries caused by the violation of his legal rights.").

Defendants in a §1983 action are responsible for all injuries which are foreseeable consequences of their wrongful acts, whether or not those injuries stem from independent violations of the plaintiff's constitutional rights. Courts have consistently and repeatedly held that defendants in a §1983 action are responsible for the foreseeable consequences of their actions, including acts by third parties who are not even defendants. *See e.g.*, *Shaw v. Stroud*, 413 F.3d 791 (4th Cir 1994) (holding that "causal link" in 1983 cases is analogous to common law "proximate cause"); *Slakan v. Porter*, 737 F.2d 368 (4th Cir. 1984) (proof of causation in a section 1983 action may be supplied by the tort principle that a person is liable for the natural consequences of his actions); *Jackson v. Sauls*, 206 F.3d 1156, 1169 (11th Cir. 2000) (holding that defendant police officers in a §1983 case are liable for all reasonably foreseeable consequences of constitutional violation, including firing of weapons by third parties); *Jones v. City of Chicago*, 856 F.2d 985, 993 (7th Cir. 1988) ("In

constitutional-tort cases as in other cases, a man is responsible for the natural consequences of his actions.").

While the VICE Defendants argue that they should not be responsible for any acts committed by the SEU officers—such as their decision to enter the Waltons' home at 1628A Burgundy Street (DE 205 at 6)—their argument fails, because the only reason that the SEU officers were on the scene, executing a search warrant on the wrong home based on sworn information that Abdullah and the VICE Detectives *knew* to be unreliable, was because of the constitutional violations described in Parts B and C above. But for the corrupt conspiracy with Aspirin to manufacture fake trafficking heroin charges against Marcus VanIrvin, a resident of 1620B Burgundy Street, Abdullah would not have erroneously placed the Irving family's address (1628B Burgundy Street) on the search warrant application, and the SEU Team would never have visited 1628B, or subsequently entered 1628A.

There was no lawful reason for the Raleigh Police Department to be at the private homes of either the Irvings (1628B) or the Waltons (1628A) on May 21, 2020. The reason that RPD was there—and therefore, the reason that they were pointing guns at a handicapped person and others, frightening children, and searching through the families' private possessions inside their private homes—was all traceable to an unconstitutional conspiracy orchestrated by Abdullah and acquiesced to by the VICE Detectives. Thus, the VICE Defendants arguments regarding exigency and consent fail, because they cannot cure the original constitutional violation that brought them to Plaintiffs' private homes. (*See also* 56.1, ¶ 22).

"When an illegal arrest sets off a chain of indignities inflicted on the hapless victim, . . . she is entitled to obtain damages for these indignities whether or not they are independent violations of the Constitution. For they are foreseeable consequences of the illegal arrest, and the ordinary rules of tort causation apply to constitutional tort suits." *Herzog v. Village of Winnetka*, 309 F.3d 1041, 1044 (7th Cir. 2002). The same is true here. When Abdullah engaged an unreliable confidential informant, who Abdullah *knew* for months was repeatedly presenting brown sugar as though it was heroin, and when the VICE Detectives gained knowledge of the pattern of unreliable buys stemming from Aspirin's CI work, it was reasonably foreseeable that innocent people would experience the indignities associated with police attention, such as searches, seizures, and arrests. These indignities may be lawful when the victims are the proper subjects of the police attention, but they are unlawful when they are the foreseeable result of an initial unlawful act. The fact that the SEU Team was dismissed by the Court is of no import to the VICE Detective's liability for these "indignities," because they are responsible for the underlying constitutional violations that led to the raids on the Plaintiffs' homes. Without Abdullah's corrupt fake heroin scheme, and without the VICE Detective's participation in and acquiescence to the scheme, the police never would have visited either 1628B or 1628A, and the families would have been left in peace.

Plaintiffs can, subject to qualified immunity, generally recover damages that are proximately caused by any Fourth Amendment violation. In fact, "there is no need to dress up every Fourth Amendment claim as an excessive force claim" because even

25

if Plaintiffs cannot recover on an excessive force claim against the SEU officers, it "will not foreclose recovery for injuries proximately caused by [the illegal entry]." *County of Los Angeles, Calif. v. Mendez*, 581 U.S. 420, 430 (2017). Thus, if the Court finds that there are facts from which a jury could conclude that Abdullah violated the Fourth Amendment by providing known unreliable information to a magistrate and obtaining a search warrant for 1628B as part of a scheme to wrongfully charge individuals for trafficking heroin, and the Court finds that there are genuine issues of material fact as to whether the VICE Detectives acquiesced to this scheme pursuant to the analysis in Part C, then a jury may also find that all the injuries that the Irvings and Waltons suffered during the raids were proximately caused by Abdullah and the VICE Detectives' misconduct.

## E. Qualified Immunity Is Not a Shield for Defendants' Unlawful Conduct

The VICE Defendants are not entitled to qualified immunity as a shield for liability because it is not the case that their conduct "[did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 306 (4th Cir. 2006) (quoting *Wilson v. Layne*, 526 U.S. 603, 609 (1999)). Indeed, they did violate clearly established statutory or constitutional rights of which a reasonable person would have known.

There is ample evidence from which a jury can find that the VICE Detectives' direct participation in or acquiescence to a conspiracy to wrongfully charge people for trafficking heroin and to execute a search warrant that they knew was based upon

unreliable information from an unreliable informant (who they knew was producing "brown sugar" in lieu of "heroin") substantiates a violation of a constitutional right, namely the Fourth Amendment right "of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures" and that "no Warrants shall issue, but upon probable cause." U.S. Const. amend IV; *see also Franks v. Delaware*, 438 U.S. 154, 164–65 (1978) ("When the Fourth Amendment demands a factual showing sufficient to comprise 'probable cause,' the obvious assumption is that there will be a *truthful* showing . . . [S]urely it is to be 'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true."); *Miller v. Prince George's Cnty., MD*, 475 F.3d 621, 627 (4th Cir. 2007) ("Unquestionably, [t]he Fourth Amendment prohibits law enforcement officers from making unreasonable seizures, and seizure of an individual effected without probable cause is unreasonable.").

The VICE Defendants' knowledge of, participation in, and acquiescence to the scheme, whereby innocent people were being wrongfully detained, searched, arrested, and charged with heroin trafficking based upon a confidential informant who had proven to be unreliable and who was repeatedly producing brown sugar in lieu of fake heroin is an obvious violation of constitutional rights and a shocking abuse of police power. This scheme led to the wrongful arrests of more than a dozen innocent people, who lost their freedom and suffered many other consequences of wrongful incarceration. It led to the search warrant in this case that contained patently false information. 56.1, ¶ ¶ 162-163. And it led to children as young as 12, who had done

nothing wrong, being chased with guns pointed at them; to a handicapped person, a pregnant woman, and teenage boys believing they would be shot if they did not comply with the barrage of commands being shouted at them; and to terrifying two single mothers, who had no idea why heavily-armed SEU officers had just burst into their homes as they were preparing dinner for their families. This is not a joke—but the VICE Defendants laughed and joked about this grotesque abuse of government power, predicting that more innocent people would be victimized in pursuit of what they knew to be ███████████████████ 56.1, ¶ 166. Any reasonable person knows this is wrong and knows it is a violation of constitutional rights. Qualified immunity offers no protection for this clearly unlawful conduct that violated the Plaintiffs' clearly established Fourth Amendment rights.

## IV.    CONCLUSION

Plaintiff respectfully request this Court deny Defendants' Motion for Summary Judgment and to set this matter for a jury trial.

Respectfully submitted, this the 31st day of May, 2023.

/s/ Abraham Rubert-Schewel
Abraham Rubert-Schewel
NC State Bar No. 56863
Tin, Fulton, Walker & Owen, PLLC
119 E. Main Street
Durham, NC 27701
schewel@tinfulton.com
*Counsel for Plaintiff*

/s/Emily D. Gladden
N.C. State Bar No. 49224
Tin, Fulton, Walker & Owen, PLLC
407 N. Person Street
Raleigh, NC 27601
egladden@tinfulton.com

*Counsel for All Plaintiffs*

/s/Elizabeth G. Simpson
N.C. State Bar No. 41596
EMANCIPATE NC
P.O. Box 309
Durham, NC 27702
elizabeth@emancipatenc.org
*Counsel for All Plaintiffs*

/s/Ian A. Mance
N.C. State Bar No. 46589
EMANCIPATE NC
P.O. Box 309
Durham, NC 27702
ian@emancipatenc.org
*Counsel for All Plaintiffs*

# CERTIFICATE OF COMPLIANCE

The undersigned certifies that this Brief consists of 7,202 words including all signature blocks and headings.

This, the 31st day of May, 2023.

**/s/ Abraham Rubert-Schewel**
Abraham Rubert-Schewel
NC State Bar No.
Tin, Fulton, Walker & Owen, PLLC
119 E. Main Street
Durham, NC 27701
schewel@tinfulton.com
Counsel for Plaintiff