IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No. 5:22-cv-0068-BO

YOLANDA IRVING, individually and as the natural parent and guardian of J.I., JUWAN HARRINGTON, CYDNEEA HARRINGTON, KENYA WALTON individually and as the natural parent and guardian of R.W., ZIYEL WHITLEY, DYAMOND WHITLEY, KAMISHA WHITLEY, and NANETTA GRANT as the natural parent and guardian of Z.G.

*Plaintiffs*,

v.

THE CITY OF RALEIGH, Officer OMAR I. ABDULLAH, Sergeant WILLIAM ROLFE, Officer RISHAR PIERRE MONROE, Officer JULIEN DAVID RATTELADE, and Officer MEGHAN CAROLINE GAY, Chief of Police ESTELLA PATTERSON and City Manager MARCHELL ADAMS-DAVID, in their official capacities.

*Defendants*.

**MEMORANDUM IN OPPOSITION TO DEFENDANT SGT. ROLFE'S MOTION FOR SUMMARY JUDGMENT**

NOW COME the Plaintiffs, through undersigned counsel, and hereby file their Memorandum in Opposition to Defendant Sgt. William S. Rolfe's Motion for Summary Judgment.

1

Plaintiffs incorporate by reference the relevant facts as related in their separately-filed briefs in response to Defendant Abdullah's and the Vice Defendants' Motions for Summary Judgment.

## STANDARD OF REVIEW

On a defense motion for summary judgment, the court construes the evidence in the light most favorable to the plaintiffs and refrains from making credibility determinations. *Wilson v. Prince George's County, Maryland*, 893 F.3d 213, 218 (4th Cir. 2018) (citing *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc.*, 673 F.3d 294, 305 (4th Cir. 2012); *Gray v. Spillman*, 925 F.2d 90, 95 (4th Cir. 1991)). Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## SUPERVISORY LIABILITY

As an initial matter, the Plaintiffs agree that Defendant Rolfe's Memorandum in Support of his Motion for Summary Judgment identifies the correct legal standard pertaining to liability:

> A plaintiff must prove three elements for a supervisory liability claim: "(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff."

2

Def.'s Mem. in Support of Summary Judgment, at 3 (quoting *Timpson by & through Timpson v. Anderson Cnty. Disabilities & Special Needs Bd.*, 31 F.4th 238, 257 (4th Cir. 2022) (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)). Plaintiffs have produced competent evidence supporting each prong of the three-part inquiry. They address each prong in turn.

**(1) SGT. ROLFE HAD ACTUAL OR CONSTRUCTIVE KNOWLEDGE THAT HIS SUBORDINATE, OFFICER ABDULLAH, WAS ENGAGED IN CONDUCT THAT POSED A PERVASIVE AND UNREASONABLE RISK OF CONSTITUTIONAL INJURY TO PEOPLE LIKE THE PLAINTIFFS.**

Step 1 of the supervisory liability inquiry requires Plaintiffs to demonstrate that Defendant Sergeant Rolfe possessed actual or constructive knowledge[1] that his subordinate, Detective Abdullah, was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to people like the plaintiffs. Stated differently: Plaintiffs must show that Sgt. Rolfe was aware of facts that would have apprised a reasonable officer in his position that Det. Abdullah's activities with Dennis Williams posed a pervasive and unreasonable risk of causing the execution of search warrants against individuals for whom there was not probable cause to suspect of possessing or selling heroin.[2]

---

[1] "Constructive knowledge is imputed when 'the conduct is widespread, or at least has been used on several different occasions.'" *Jilani v. Harrison*, No. 5:15-CT-3271-FL, 2018 WL 1545584, at *11 (E.D.N.C. Mar. 29, 2018).

[2] *Cf. McLean v. Leonard*, No. 5:14-CV-718-FL, 2015 WL 5725818, at *5 (E.D.N.C. Sept. 30, 2015) (dismissing supervisory liability § 1983 claim against sheriff where the plaintiff failed to identify "any other incidents of misconduct by deputies that might have alerted [the sheriff]" to a problem such that he "should have known about plaintiff's wrongful detainment").

3

As an initial matter, Rolfe's employer, the Raleigh Police Department, determined that his actions in supervising Abdullah were incompetent, unreasonable, and warranted removing him from his post. (56.1 ¶¶ 139, 147; Rolfe Deposition 130-31, hereinafter "RD"). The department determined "                                   [

                            [

                                                  [          (56.1 at ¶ 139).[3]

Rolfe had a front row seat to Abdullah's and Williams' activities. As supervisor, he could review their work product at any time. (56.1 ¶¶ 41, 226; RD 23, 68). He participated directly in "                or "                    "[4] of the purported heroin arrests they directed; and his responsibilities included "                and "                    (56.1 ¶¶ 41, 74; RD 14-15; Abdullah Deposition 41-43, 48, hereinafter "AD"; Gay Deposition 104, 142-44, hereinafter "GD"). Rolfe was "        [

                         and aware the people Williams and Abdullah were targeting were being charged and prosecuted for felony heroin trafficking, a crime that carries a mandatory minimum sentence. (56.1 ¶¶ 40, 68, 79-80; RD 116-18; G.S. § 90-95(h)(4)). Rolfe had full view of the situation; he "

                              (56.1 ¶ 137).

---

[3] Even if certain reports and interviews may not be admissible at trial, Plaintiffs may rely on them for summary judgment purposes. *See, e.g.*, *Hicks v. City of Kinston*, No. 4:20-CV-14-FL, 2022 WL 3951359, at *5–6 (E.D.N.C. Aug. 31, 2022).

[4]                                                                             "

            (

4

As discussed below, these operations posed a pervasive risk of constitutional injury to not just the targets of the operations, but also to those who lived in their neighborhoods, like the Plaintiff Irving and Walton families, which at the time included multiple minors, a paraplegic man, and a pregnant woman.[5] According to the Raleigh Police Department:
"                                                                            -

[                                                                         [

-

(56.1 at ¶ 139).

By the time Rolfe's supervisors finally intervened, after the raid on the Plaintiffs' homes left them no choice,[6] more than a dozen people had been imprisoned for crimes they did not commit, and many more, including the Plaintiffs, had been subjected to unreasonable and frightening detentions, searches, and uses of force. The whole time, Sgt. Rolfe had personal knowledge of facts that would have prompted a reasonable supervisor to scrutinize and discontinue Det. Abdullah's use of Dennis Williams as an informant.

Because Rolfe failed to act, and because his inaction caused such harm, the Raleigh Police  Department                                                                    The department's internal investigation concluded that:

---

[5] *See Stockton v. Wake Cnty.*, 173 F. Supp. 3d 292, 305 (E.D.N.C. 2016) (stating that "pervasive" in this context means conduct that has occurred on "at least . . . several different occasions" (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).
[6] In deposition, Rolfe confirmed the raid on Plaintiffs' homes was the event that caused the operations with Dennis Williams to come to a halt. (RD 15).

5

(OPS REPORT, at 8 (emphasis added); 56.1 ¶¶ 139, 146-54, 227; RD 127-31, 166)

(                                                                                          ).

Plaintiffs' police practices expert, David Sweeney, a former Watch Commander in the Seattle Police Department who supervised sergeants for that department and often serves as a defense expert for police officers in civil cases, reached a similar conclusion when he reviewed discovery in this case. (56.1 ¶ 154); *see generally* EXPERT REPORT OF DAVID T. SWEENEY (Nov. 29, 2022) (hereinafter "SWEENEY REPORT") (stating that the lack of supervisory oversight resulted in the use of an unreliable CI, false criminal charges, and improper searches).

Rolfe was aware Williams and Abdullah were making purchases that were suspicious in terms of price, quantity, and circumstance; and he was aware that they were testing negative for controlled substances. (56.1 ¶¶ 37, 40-41, 52, 68, 74, 76; RD 66, 73-76, 100-03, 129). Detective Rattelade told Rolfe he was suspicious of Abdullah's and Williams' "pattern of repetitively doing these small buys and then going up to a bigger buy with a takedown and then doing it back-to-back-to-back." (56.1 at ¶ 97; Rattelade Deposition 72, hereinafter "JRD"). According to Rattelade, "as soon as [they] started conducting [purported] heroin purchases, uh, the red flags went up really quick." (56.1 ¶ 82; JRD 81-82). Rattelade went so far as to tell investigators that he "would not be

surprised" if it turned out that Abdullah had an improper relationship with Williams, pointing to Abdullah's frequent practice, when challenged, of siding with his "

." (56.1 at ¶ 97; RD Ex. T). When Rattelade would take these concerns to Rolfe, his response was, "

(56.1 at ¶ 97).

Some of Abdullah and Williams' purchases defied common sense. Months before Rolfe's unit raided the plaintiffs' homes, they arrested a man named Curtis Logan for purportedly selling more than 20 grams of heroin to Dennis Williams in an operation directed by Det. Abdullah. (56.1 ¶¶ 92-102; AD 80, 85; MD 142-52; JRD 93-98; GD 120-28). Following the operation, Abdullah and Williams claimed Logan had delivered *significantly more heroin than the Vice team had ordered or paid for*—and more than five times the amount necessary to sustain a trafficking charge. (56.1 at ¶ 94).

Although he estimated his unit only made "maybe one" purchase of more than 20 grams of heroin in a calendar year, Rolfe said he did not recall the Logan seizure. (56.1 ¶¶ 94, 100). He conceded only to being aware Det. Monroe tested purported heroin seized in a Williams-involved transaction two months prior to the raid on Plaintiffs' homes, and that the substance produced a negative result. (56.1 ¶¶ 95-99; RD 66, 73). Yet police records and deposition testimony indicate detectives made it known to Sgt. Rolfe that the alleged heroin produced in the Logan arrest did not appear to be heroin and did not test positive for heroin. (56.1 ¶¶ 95-99; RD Ex. R; GD 127-28; Monroe Deposition 144-48, hereinafter "MD"). Detective Monroe said                                         "

; he personally told him about it. (56.1 at ¶ 94).

7

Detectives Gay and Rattelade were also present for the conversation. (56.1 ¶ 99; GD 122-24, 126-27).

(56.1 at ¶ 139).

Yet, even setting the Logan incident aside, Rolfe knew Williams' level of production was very unusual. He had worked in Vice dating back as far as 2007 and he could not identify any informant, even by general recollection, to whom Williams could be compared "                                                                                   . (56.1 at ¶ 94).

(56.1 ¶ 37; MD 113-19; Rolfe Ex. U). These concerns were shared with him on multiple occasions, including at least a month prior to the May 2020 raid on the Plaintiffs' homes. (56.1 ¶ 37; RD 52-53, 77-78).

                                                                            . (56.1 at ¶ 97). Detective Gwinn, who began working with the Vice unit in February 2020, stated, "when I got there, I think the first week, there were . . . doubts about Aspirin from other detectives," and Rolfe was aware of them. (56.1 ¶ 37; Gwinn Deposition 9, hereinafter "JGD"; Rolfe Ex. L-16).

In separate interviews with RPD investigators, multiple detectives under Rolfe's command used the phrase                           to refer to how the unit viewed Abdullah's continued use of Dennis Williams as an informant during this period. (56.1 ¶ 37; RD Ex.

8

K-26, P-20). Although the detectives continued to play supportive roles in Abdullah's operations—and chose to participate in the raids on Plaintiffs' homes[7]—Rolfe knew that other than Abdullah, would work with Williams on a case in which they were the lead, specifically because of Williams' untrustworthiness. (56.1 ¶ 37; RD 81-82; Rolfe Ex. Q-28).

Rolfe also knew Williams had a history of passing off fake drugs as real and that he would have the opportunity to continue the practice under Det. Abdullah's supervision. (56.1 ¶ 46, 78; RD 14, 38). He knew Williams was given the code name "Aspirin," because he had been arrested for trying to pass Aspirin off as cocaine. (56.1 ¶ 46; RD 14). This (56.1 at ¶ 46). It did not with Rolfe, who, as Sergeant, approved Williams's use as a confidential informant ("CI") and was personally responsible for reviewing Abdullah's CI application for Williams. *Id.*

Given William's established history of producing fake drugs, Rolfe's failure to supervise is startling. Even if he believed Abdullah to be an honest officer, Rolfe knew the way Abdullah operated presented Williams with the opportunity to continue to his practice of producing fake drugs. Abdullah, in Rolfe's words, was "a　　," tended to work independently, and preferred to keep to himself. (56.1 at ¶ 51). These facts should have counseled Rolfe toward the exercise of greater scrutiny when Abdullah's fellow detectives raised their concerns. A competent police supervisor understands that "[a] detective that

---

[7] The detectives' decision to participate in the raid, when they were under no orders to do so, forms the basis of separate claims which are addressed in a separately-filed brief.

keeps to themselves and does not share information is more likely to disobey police and/or the law." (56.1 ¶ 237). Rolfe should have acted accordingly.

There were certainly objective reasons to be concerned. Rolfe was aware that Abdullah's practice, prior to conducting a transaction,

56.1 ¶ 51). This type of search would thwart only the clumsiest of bad actors, yet it was consistent with how Abdullah was trained while working under Rolfe's supervision. (56.1 ¶ 78).

Rolfe was also aware that, unlike the other detectives, Abdullah regularly met with Williams and his informants alone, in violation of the department's policy, and that the cameras the men employed were consistently *not* recording Williams' activities on purported buys. (56.1 ¶ 51, 238; RD 93, 119-20, 137, 196; Rolfe Ex. U-4). In his appeal of his demotion, Rolfe briefly claimed to have seen video evidence of drug transactions. (RD 110-12). However, he was unable to "identify any of the specific videos that . . . [he] contend[ed] were consistent with drug exchanges." (56.1 ¶ 41). Rolfe knew

and although Abdullah's videos did not depict drug transactions, he knew the individuals depicted in

10

them were nonetheless being criminally prosecuted for heroin trafficking, which carries a mandatory minimum sentence of 70 months or more in prison. *Id.*; N.C. Gen. Stat. § 90-95(h)(4).

Rolfe understood that Det. Abdullah was regularly employing Dennis "Aspirin" Williams to identify the people the Vice team pursued for trafficking-level heroin arrests. Given all the information available to him, he either knew or should have known that their work together posed a pervasive and unreasonable risk of constitutional injury to people living and working in areas where Williams was active.

Yet Rolfe did nothing to stop this repeated and predictable harm to innocent people. To the contrary, he cheered the search warrants and arrests that flowed from the pair's work together.                                        he wrote in a text message to Abdullah and the other detectives a month before the raid on Plaintiffs' homes.[8] (56.1 ¶ 124).

he wrote in another, following the purported seizure of 18.5 grams. *Id.* These exchanges reflect Rolfe's awareness of, and his excitement about, the productivity of Williams, who for a time brought positive attention to his unit and his management of it.

**(2) SGT. ROLFE'S RESPONSE TO THE INFORMATION IN HIS KNOWLEDGE WAS SO INADEQUATE AS TO SHOW HIS DELIBERATE INDIFFERENCE TO OR HIS TACIT AUTHORIZATION OF THE OFFENSIVE PRACTICES.**

---

[8] Rolfe said he "texted a lot" with Abdullah and the other detectives. (RD 186). Plaintiffs have been able to recover very few of these text messages and have a pending motion to compel their production. In deposition, Rolfe explained his phone "got dropped and the screen shattered," and he had conferred with a police attorney about it. *Id.* However, a broken screen should not preclude the electronic recovery of text messages, and when asked if he recalled the password for the cracked phone, Rolfe responded, "I don't want to share it" and declined to provide one. (RD 189).

Step 2 of the relevant inquiry looks to whether Rolfe's response to the situation was so inadequate as to show his deliberate indifference to, or his tacit authorization of, Det. Abdullah's practice of relying on information produced by Dennis Williams to secure arrest and search warrants. A plaintiff seeking to establish a supervisor acted with deliberate indifference is not required to show that the defendant subjectively believed their actions would result in harm. Rather, it is enough to show "a supervisor's 'continued inaction'" in the face of repeated misconduct. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (quoting *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984)); *see also Jones v. Han*, 993 F. Supp. 2d 57, 68 (D. Mass. 2014) ("Outside the Eighth Amendment context, . . . an official can be deliberately indifferent to constitutional violations by her subordinates without holding a subjective belief that their actions would result in constitutional harms."). The question is "whether, in the particular circumstances confronted by defendant[], they should have reasonably understood that their conduct jeopardized the constitutional rights [of people subjected to the offending practice]." *Jones*, 993 F. Supp. 2d at 69.[9] Here, RPD disciplined and demoted Defendant Rolfe for what it determined was his "incompetence" with respect to the way he responded to the information within his knowledge. (56.1 ¶ 147). According to Rolfe, this demotion amounted to an "unprecedented punishment," as "there's never been a supervisor [at Raleigh PD] demoted for the actions of a detective or . . . a supervisor demoted based on his oversight of an employee to [this] extent." *Id.* This

---

[9] *See also Shaw*, 13 F.3d at 800, *cert. denied*, 513 U.S. 813, and 513 U.S. 814 (1994); *Poe v. Leonard*, 282 F.3d 123, 141 (2d Cir. 2002).

determination and the course of action taken by the department reflects the objective unreasonableness of Sgt. Rolfe's response to the information that was available to him.

Among other things,

(56.1 ¶ 97; RD Ex. U).

(56.1 ¶ 85) (emphasis added).

Yet examples of Rolfe's unreasonable judgments predate the return of the 2020 test results and his decision to ignore his detectives' ridicule of Williams as a CI. They started with his decision to approve Williams' use as an informant in the first place, despite the existence of a court order prohibiting his participation, as well as objective indicia of his unreliability. (56.1 ¶ 58, 62). In deposition, Rolfe asserted he had seen paperwork indicating the court's authorization for Williams to work in undercover drug stings, but no such document has ever surfaced, and Rolfe failed to produce one to RPD's Office of Professional Standards when he had a strong professional and financial incentive to do so. (*Id.*; RD 16-17, 156-57). The truth, it appears, is that Rolfe applied very little scrutiny to those who became RPD Vice team informants. He told Abdullah he could qualify someone as a "reliable" CI with a single drug purchase, and as supervisor, he never acted to disqualify an informant once they were approved. (56.1 ¶ 5).

Rolfe has given varied accounts over time of whether and when he was suspicious of Williams.

(56.1 ¶ 149). In deposition, Rolfe said he did "not necessarily" disagree

he should have followed up on "Abdullah utilizing the secondary camera and whether he changed the [criminal] charges [from heroin trafficking to selling a counterfeit substance] as directed at the very least." (56.1 ¶ 150). He said it would have taken him "fifteen minutes" and "not much" effort to do so. (56.1 ¶ 151). He also agreed the appropriate course of action when officers have an informant make two buys of what appear to be fake drugs is to have the substances laboratory tested before permitting detectives to move forward with criminal charges related to similar substances produced by the same informant. (56.1 ¶ 83).

Unfortunately, Rolfe did none of these things. He made no substantive intervention with respect to Abdullah's use of Williams. He did none of the things that the department maintains, as a matter of professional responsibility, he should have done. His conduct in the face of the information in his possession was so unreasonable as to show his deliberate indifference and/or his tacit authorization of Abdullah's use of an informant whose dishonesty was regularly resulting in the violation of people's constitutional rights. *See,*

---

[10] In other contexts, courts have rejected supervisors' attempts to avoid liability for civil rights violations "by adopting a 'see no evil, hear no evil' strategy." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 334 (4th Cir. 2003); *cf. Howard v. Malcolm*, 658 F. Supp. 423, 437 (E.D.N.C. 1987).

14

*e.g.*, *Jones v. Han*, 993 F. Supp. 2d 57, 66–69 (D. Mass. 2014) (denying motion to dismiss and qualified immunity for § 1983 supervisory liability claim, where, "in the particular circumstances confronted by defendants, they should have reasonably understood that their conduct jeopardized [people's] constitutional rights").

Although most of his unit had expressed that Williams was deceitful and "unreliable," Rolfe did not believe that constituted a reason to stop using Williams as an informant, or to even investigate him. (56.1 ¶ 37). He understood the consequences to being wrong about this "could include people being wrongfully convicted or innocent people hav[ing] armed police officers enter their homes." *Id.* Faced with this prospect, he made an objectively unreasonable judgment that there was "an acceptable level of risk" to keep working with Williams. *Id.* To the extent Rolfe took any action at all, it was plainly inadequate.[11]

These failures, individually and collectively, demonstrate that Sgt. Rolfe's response to the information in his knowledge, and in the face of his duties and responsibilities, was so inadequate as to show his deliberate indifference to, and/or his tacit authorization of, practices by his subordinate that imperiled the rights, liberty, and safety of the people Williams interacted with, as well as those, like the Irving and Walton families, who lived in their vicinity. Summary judgment and qualified immunity are inappropriate for

---

[11]

supervisors whose subjective awareness of key facts render their failure to intervene to avert a constitutional injury objectively unreasonable.[12]

**(3) THERE IS AN AFFIRMATIVE CAUSAL LINK BETWEEN SGT. ROLFE'S INACTION AND THE CONSTITUTIONAL INJURY SUFFERED BY THE PLAINTIFFS.**

The third and final step of the relevant inquiry looks to whether there is an affirmative causal link between Sgt. Rolfe's action or inaction and the constitutional injury suffered by the Plaintiffs. In this case, there are many such links.

." (56.1 ¶ 146). As Sergeant, Rolfe played a supervisory role in Williams' initial and ongoing approval to work as an informant, despite the many red flags which cautioned against his use. Rolfe had duties, including competent supervision and enforcement of departmental policies, many of which exist to safeguard the constitutional rights of the public.

(56.1 ¶ 139). Plaintiff's expert, David Sweeney, a former police supervisor, reviewed the relevant

---

[12] *See, e.g.*, *Shaw v. Stroud*, 13 F.3d 791, 799–801 (4th Cir. 1994) (reversing district court grant of summary judgment for supervisor in § 1983 excessive force action; supervisor had "knowledge of at least three incidents in which [subordinate officer] used excessive force which posed an unreasonable risk of harm to arrestees" and had access to data indicating officer filed almost half of the department's charges of assault on a law enforcement officer and resisting/delaying/obstructing an officer); *Jackson v. City of New York*, 939 F. Supp. 2d 235, 258–59 (E.D.N.Y. 2013) (denying qualified immunity and summary judgment to police sergeant who "was the highest ranking officer on the scene and . . . had a realistic opportunity to intervene and end Plaintiff's arrest," determining that the sergeant was subjectively aware of facts that made it "not objectively reasonable for [him] to fail to intervene under [the] circumstances").

discovery materials and determined that the lack of meaningful supervision in the unit created a situation where there was "too much room" for misconduct to occur. *Id.*

Rolfe promoted a culture of noncompliance with departmental policies and the Fourth Amendment; he incentivized arrests at the expense of civil rights, and he failed to meaningfully supervise his detectives. As discussed below and in the response brief to Defendant Abdullah, *but for* these failures, Sgt. Rolfe's detectives would not have entered the homes of the Plaintiffs on May 21, 2020. Rolfe's motion for summary judgment should therefore be denied. *Cf. Stockton v. Wake Cnty.*, 173 F. Supp. 3d 292, 305 (E.D.N.C. 2016) (denying summary judgment for § 1983 claims brought against defendant supervisor where there were "genuine issues of material fact concerning the sufficiency of . . . the manner in which he trained, or failed to train, . . . and whether any such failure(s) were a proximate cause of [plaintiff's injury]").

The fact Rolfe was out of town on the day of the raid and did not know the Plaintiffs, something he has made a great deal of in his pleadings and in depositions, is hardly determinative. The U.S. Court of Appeals for the Fourth Circuit made that much clear in *Shaw v. Stroud*, which reversed a district court's grant of summary judgment for a police supervisor who had transferred out of the relevant unit *fifteen months* prior to incident in question, after concluding the subordinate officer's use of force "was a natural and foreseeable consequence of [the former supervisor's] failure to investigate, or even address" his conduct.[13] What matters is that Rolfe's inaction as supervisor enabled the

---

[13] 13 F.3d 791, 800–01 (4th Cir.), *cert. denied*, 513 U.S. 813, and 513 U.S. 814 (1994);

constitutional violations that occurred.[14]

### *Dennis Williams' Work as a Confidential Informant*

As unit supervisor, Rolfe bore a responsibility to scrutinize the use of Dennis Williams as an informant, first when Williams began his work as an informant in 2018; again, when he began his second stint as an informant in 2019; and yet again in the months leading to the raid on the Plaintiffs' homes, when he was deluged with information indicating Williams was unreliable. In the second instance, Rolfe permitted Williams to work as a CI without the approval of his probation officer, who wished to forbid it, and in violation of a court order that prohibited Williams from interacting with people involved with narcotics. (56.1 ¶¶ 58-62). Had Rolfe respected the wishes of the P.O. or complied with the court's order—had he bothered to determine whether the probation officer or

---

[14] *Id.*; *see also Morales v. Chadbourne*, 235 F. Supp. 3d 388, 403 (D.R.I. 2017) (denying qualified immunity to, and granting plaintiff's motion for summary judgment against, ICE field office director on § 1983 supervisory liability claim stemming from field agent's unlawful detention of U.S. citizen); *Stidham v. Hutchison*, No. 3:04-CV-139, 2005 WL 8162085, at *4 (E.D. Tenn. Feb. 22, 2005) (denying qualified immunity to sheriff; determining his "failure to train and supervise his deputies could result in supervisory liability if it is proven at trial that he was deliberately indifferent to the investigative detention custom or policy allegedly used by his deputies to seize and detain the plaintiffs"); *cf. Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 564 (1st Cir. 1989) (affirming jury verdict on § 1983 supervisory liability claim against police supervisor who was not present when subordinate shot plaintiff, concluding that with "proper supervision and discipline it is unlikely [the officer] would have been in command on [the date in question]"); *Fiacco v. City of Rensselaer,* 783 F.2d 319, 329–31 (2d Cir. 1986) (finding sufficient evidence to support jury's finding that a police chief was deliberately indifferent to his officers' use of excessive force where evidence showed the chief failed to exercise reasonable care in investigating several claims of brutality and conducted only a superficial questioning of the accused officers), *cert. denied,* 480 U.S. 922 (1987).

Abdullah had secured the permission of the court—Williams would not have been in the position to cause the harm that he did.

Rolfe was also not naïve about the importance of his role.

(56.2 ¶ 46). He nevertheless approved Williams as an informant in 2019, despite his history of producing fake narcotics as an informant in 2018 and his arrest for selling counterfeit narcotics. (56.2 ¶ 50). He continued to permit Abdullah to rely on Williams' representations in search and arrest warrants *even after he and others began to harbor and openly discuss doubts about Williams' trustworthiness*, and even after field and laboratory tests returned negative for the purported heroin he was producing with unprecedented regularity. (56.1 ¶ 40).

By the time May 2020 came around and the unit's attention turned to Yolanda Irving's and Kenya Walton's neighbor Marcus VanIrvin, Rolfe

. (56.1 ¶ 147).

When asked about this, Rolfe agreed he "had a responsibility to look into the situation with Dennis Williams," and that he should not have deferred to Abdullah's judgment, which he conceded was poor. *Id.*

But for Rolfe's failure to meet these responsibilities, Williams' use as an informant would have been disallowed. If Rolfe had reviewed the dozen videos that were readily available to him, particularly after multiple people expressed their concerns, he would have

19

discontinued Williams' use as an informant. (56.1 ¶ 6, 37, 82, 97, 184). If Rolfe had canceled Williams' CI designation, no warrant would have been pursued against Yolanda Irving's neighbor, Marcus VanIrvin, who Williams had proposed as a target. There would have been no raid on her home or Ms. Walton's home.

### Failures of Supervision

While not necessary to prove Plaintiff's case, it is nevertheless notable that Sgt. Rolfe violated many policies of the Raleigh Police Department during the events at issue in this case. To be clear, Plaintiffs do not contend policy violations in themselves establish a constitutional injury traceable to him.[15] Yet the failure of a supervising officer to intervene when an officer repeatedly violates department policies can help to illustrate a pattern of "corrective inaction that amounts to deliberate indifference or tacit authorization of the offensive [practices]." *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984) (internal quotation and citations omitted). This is significant in cases where the failure to abide by policy actually and proximately causes violations of the Constitution. Even if Rolfe were not Abdullah's supervisor, as a law enforcement officer possessing the knowledge that he

---

[15] Law enforcement policies can nevertheless be instructive. *See, e.g.*, *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir. 2004) (observing that in *Hope v, Pelzer*, 536 U.S. 536 U.S. 730, 744–45 (2002), the U.S. Supreme Court looked to state regulations and communications between public agencies as evidence the conduct at issue in the case was clearly proscribed); *Gutierrez v. City of San Antonio*, 139 F.3d 441, 450 n.7 (5th Cir. 1998) (noting that in "[*Tennessee v.*] *Garner*, the Supreme Court explained that in 'evaluating the reasonableness of police procedures under the Fourth Amendment, we have also looked to prevailing rules in individual jurisdictions.'" (quoting 471 U.S. 1, 15–16 (1985)).

did, he had "an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers."[16]

As one example: but for Rolfe's longstanding violation of the department's policy governing cash payments to informants, the raid on the Plaintiffs' home would and could not have occurred.

. (56.1 ¶ 168). Although no supervisor ever told him it was permissible to do so, Rolfe gave detectives access to his lockbox key while he was away, which they used to secure         cash for the May 20-21, 2020 operation, without a sergeant's prior knowledge and approval. *Id.* Rolfe's unreasonable decision to permit detectives to take public money that was not theirs to take directly enabled the violation of Plaintiffs' constitutional rights. *Id.*

Rolfe similarly told detectives they did not need to maintain written case files concerning their operations and arrests, a decision he was ultimately disciplined for following the raid on the Plaintiffs' homes. *Id.* In Rolfe's view, case files were unnecessary because "everything was being pled out . . . and very, very little of it ever, ever made it to

---

[16] *Randall v. Prince George's Cnty., Md.*, 302 F.3d 188, 203–04 (4th Cir. 2002) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)); *cf. Jackson v. Pantazes*, 810 F.2d 426, 427–30 (4th Cir. 1987) (observing that liability might be found when officer failed to intervene to stop state actor from performing unconstitutional search); *Wilcoxson v. City of Raleigh*, No. 5:13-CV-732-FL, 2014 WL 3895940, at *6 (E.D.N.C. July 18, 2014) (recommending denial of defendant officer's motion to dismiss where officer "was in the position to evaluate the correctness of his fellow officers' conduct . . . , had specific knowledge of the other officers' allegedly unconstitutional conduct, and could have had a reasonable opportunity to prevent the harm"), *report and recommendation adopted*, No. 5:13-CV-732-FL, 2014 WL 3895806 (E.D.N.C. Aug. 8, 2014).

trial." *Id.* Det. Abdullah took Rolfe up on the invitation to forego paperwork, likely significantly delaying the discovery of the fake heroin scandal and enabling Dennis Williams to propose the operation that culminated on May 21. While some of Abdullah's colleagues assiduously kept files, according to Rolfe, that was "just because they were detail oriented." *Id.* It was not his doing.

In deposition, Rolfe painted the picture of a unit that rarely wrote things down— even when the job required it or the failure to do so could implicate the rights of others. Rolfe supervised Detective Abdullah in 2018 when Williams first began work with Abdullah as a CI, and prior to a period of incarceration that took him off the street for a year. During this period, over the course of about a month, and in a sign of what was to come, records indicate that Williams twice produced what later turned out to be counterfeit controlled substances. (56.1 ¶ 5). Rolfe has denied knowledge of this, but laboratory and other records remain. *Id.* His inability to recall the incidents is understandable; he testified he did not make records of CIs who produced counterfeit substances, stating it was the sort of thing that was "maybe something to keep an eye on," but "not necessarily red flag material." (56.1 ¶ 50).

Rolfe was aware that Abdullah would compensate Williams with cash from the department informant fund and that payments would be made when Abdullah was alone with Williams, also in violation of policy. (56.1 ¶ 51). He explained this by stating that "there are hundreds of policies that are on paper that are supposed to be followed as a practice and are not." (56.1 ¶ 153). He agreed there was a significant difference between what his detectives did in the Dennis Williams cases and what the department required to

effect a lawful arrest. *Id.* But breaking departmental policy was "extremely common" and "just the status quo," he said. (56.1 ¶ 152). "There was nobody around saying, 'This is okay, that's okay.' You just do it. You've learned to do [it] from your predecessors." (56.1 ¶ 153).

While Rolfe let his detectives know it was okay to cut corners on policy and paperwork, he simultaneously employed a quota system that incentivized the kind of high-level felony trafficking arrests that came to characterize the work of Abdullah and Williams. (56.1 ¶ 145).

. *Id.*

Detective Rattelade was dubious. He thought the nature of Abdullah's arrests "should have been a red flag": "you'd have to have a really good connection and real people vouching for you," he said. (56.1 ¶ 82). "Nobody assigned to my unit really has anyone with that kind of street credit." *Id.* Rolfe did not do much to dispel this idea, at one point referring to his unit as a "dumping ground" of officers who had "no particular skill set." *Id.*

When it came to the search warrant at issue in this case, Rolfe and Abdullah shared similar views about the importance of being forthright with the judge. Remarkably, Rolfe said he did not believe his detective's "misgivings about the honesty of a CI upon who he's relying" were "the sort of thing that a judge should be made aware of by that detective if

Case 5:22-cv-00068-BO   Document 253   Filed 05/31/23   Page 23 of 31

the detective is going to seek a search warrant on the basis of that CI's word."[17] (56.1 ¶ 140). These statements help to explain why Abdullah might feel comfortable telling a magistrate that Williams "has always been proven to be truthful and reliable," despite his awareness of—and legal responsibility to disclose—considerable evidence to the contrary. *See United States v. Lull*, 824 F.3d 109, 116 (4th Cir. 2016) (stating that "deeming [an] informant reliable for some purposes but unreliable for others is an assessment that is *for the magistrate, not [the] Investigator . . .* , to make") (emphasis added).

Rolfe's failure to promote a culture of policy compliance and ethical behavior in the Vice unit contributed to his detectives' failure to intervene to stop—or at the very least, refrain from participating in—a search that text messages indicate they subjectively believed was being executed without probable cause.[18] Indeed, the warrant would not have issued but for their collective lack of forthrightness with the issuing court about relevant facts within their knowledge. Rolfe said he was unconcerned by his detectives' text exchange. (56.1 ¶ 37). He said he had never spoken to his unit about the importance of respecting people's civil rights. *Id.*

---

17

(RD Ex. J-95). He chose not to share these concerns with the magistrate judge from whom he secured the warrant, telling them instead that he knew Williams "to be truthful and reliable[.]" Attachment to Application for Search Warrant, *In the Matter of: 1628 Burgundy St. Apt. B, Raleigh, NC 27610*, at 4 (May 21, 2020) (hereinafter "*Burgundy St. Search Warrant*").

18

(RD Ex. W). These texts reflect the detectives' subjective belief that Dennis Williams had lied about having made an earlier heroin purchase in the home they were about to search. As Sgt. Rolfe later put it, "Clearly . . . they didn't feel like it was going to be a good recovery." (RD 106-07).

In sum, the Vice unit's pervasive mismanagement of CIs, its abuse and misuse of informant funds, its failure to maintain case files, its failure to obtain mandatory video footage of buys, and its routine pursuit of search warrants and felony charges in the absence of probable cause, all contributed to the raid on Plaintiffs' homes and explain why Raleigh PD relieved Sgt. Rolfe of his duties. These things were his responsibility, and it was these practices that proximately caused the Plaintiffs' constitutional injuries. Rolfe promoted a culture of disregard for his detectives' professional, constitutional, and legal obligations. He turned a blind eye to misconduct. He believed it was his responsibility to "have their back, even when they're wrong[.]" (RD 109). With this attitude, it was foreseeable and only a matter of time before innocent people got hurt.

Plaintiffs expect Sgt. Rolfe will respond and disagree with their framing of the facts, as well as their characterizations of his actions. However, any such disagreements should only highlight the fact that there exist significant and genuine disputes of material fact between the parties with respect to Defendant Rolfe's knowledge of the pervasive risk of constitutional injuries posed by his employee(s), whether his actions in response to the information within his knowledge was inadequate, and whether his actions or inaction proximately caused injury to the plaintiffs. In such a case, summary judgment is inappropriate. *See, e.g.*, *United States v. $66,015.00 in U.S. Currency*, No. 5:20-CV-00701-M, 2022 WL 19001969, at *5 (E.D.N.C. Nov. 29, 2022) (denying government's motion for summary judgment where "parties have presented genuine disputes of material fact").

## QUALIFIED IMMUNITY

Defendant Rolfe maintains that, even if the Plaintiffs do establish a supervisory liability claim, he is nevertheless entitled to qualified immunity. Def. Br. 7. Defendant argues that "in order to impose liability on Sgt. Rolfe, the Court must conclude that the law was 'clearly established' that his own actions would violate Plaintiff's constitutional rights." Def. Br. 9.

Contrary to his suggestion, the relevant law was clearly established prior to the events at issue in this case. "[T]he law related to § 1983 supervisory liability has been clearly established" in the Fourth Circuit since 1984 and has been reaffirmed on several occasions. *Pryor v. Debnam*, No. 5:98-CV-613-BR, 1999 WL 1939989, at *6 (E.D.N.C. Mar. 22, 1999) (discussing *Slakan v. Porter*, 737 F.2d 368 (4th Cir. 1984); *Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1994)). In sections (2) and (3), *supra*, Plaintiffs have detailed several ways that Rolfe's actions and inaction as the unit's supervisor proximately caused Plaintiffs' constitutional injuries—any one of which warrants the denial of qualified immunity.[19]

By 2020, it was clearly established that an investigator violates the Fourth Amendment when he possesses material information reflecting an informant's unreliability, seeks a warrant based on statements from that informant, and omits the information bearing on the informant's unreliability from the search warrant affidavit,

---

[19] Even if the court determined Rolfe was entitled to qualified immunity for certain of his (in)actions, that would not foreclose plaintiffs' ability to recover for injuries proximately caused by (in)actions that are not entitled to immunity. *See, e.g.*, *Cnty. of Los Angeles, Calif. v. Mendez*, 581 U.S. 420, 430–31 (2017).

"prevent[ing] a neutral magistrate from being able to accurately assess the reliability and the veracity, and thus the significance, of the informant's statements." *United States v. Lull*, 824 F.3d 109, 114–20 (4th Cir. 2016); *see also Franks v. Delaware*, 438 U.S. 154, 171 (1978).

As Abdullah's supervisor, Rolfe was responsible for ensuring that he was acting consonant with the Fourth Amendment, and he had the ability to stop him if he was not. Rolfe knew Abdullah was regularly conducting arrests and seeking search warrants based on statements made by Dennis Williams, and that those statements regularly served to establish the purported probable cause for his detectives to act. Rolfe knew Abdullah was regularly representing Williams as someone who "has always been proven to be truthful and reliable,[20] and [whose] information has led to many drug convictions," even though he was privy to an abundance of evidence to the contrary. (56.1 ¶ 18, 172; RD 66, *Burgundy St. Search Warrant*, at 4).

At the time, "the Fourth Amendment right to be arrested only on probable cause [wa]s clearly established," see *Smith v. Reddy*, 101 F.3d 351, 356 (4th Cir. 1996); and it was clearly established that "a supervisor . . . [wa]s obligated, when on notice of a subordinate's tendency to act outside the law, to take steps to prevent such activity." *Randall v. Prince George's Cnty., Md.*, 302 F.3d 188, 203 (4th Cir. 2002).[21] In the situation

---

[20] "The Supreme Court has repeatedly recognized that a proven, reliable informant is entitled to far more credence than an unknown, anonymous tipster." *United States v. Bynum*, 293 F.3d 192, 197 (4th Cir. 2002).

[21] This is also the law outside the Fourth Circuit. *See, e.g.*, *Attocknie v. Smith*, 798 F.3d 1252, 1258–60 (10th Cir. 2015), *cert. denied*, 578 U.S. 974 (2016); *Dimarzo v. Cahill*, 575 F.2d 15, 17–18 (1st Cir. 1978), *cert. denied*, 439 U.S. 927 (1978).

Rolfe was in, "a reasonable person could not have considered inaction to be acceptable. Consequently, qualified immunity is not available[.]" *Pryor v. Debnam*, No. 5:98-CV-613-BR, 1999 WL 1939989, at *7 (E.D.N.C. Mar. 22, 1999).

The U.S. Supreme Court has made clear that the doctrine of qualified immunity does not protect "the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 335 (1986)). For these and the additional reasons stated above, Rolfe is not entitled to qualified immunity.

## CONCLUSION

Plaintiffs have put forth evidence creating a genuine dispute of material fact as to whether former Sgt. Rolfe knew that Detective Abdullah was engaged in conduct that posed a pervasive and unreasonable risk of causing unlawful searches and seizures of persons and property without probable cause. The Raleigh Police Department investigated the conduct that forms the basis of this claim, deemed Rolfe's response as incompetent and unreasonable, and it removed him from his position.

Rolfe's response was so inadequate as to show his deliberate indifference to, or tacit authorization of, Abdullah's operations involving Dennis Williams. Rolfe's failure to do his duty and decertify Williams as an informant—when his detectives said he was being dishonest, when the video surveillance failed to record any drug transactions, and when field and lab tests continued to produce negative results—proximately caused the May 21,

2020 armed raid on the Plaintiffs' homes and the injuries they suffered. These allegations satisfy all three elements of a supervisory liability claim, see *Timpson by & through Timpson v. Anderson Cnty. Disabilities & Special Needs Bd.*, 31 F.4th 238, 257 (4th Cir. 2022), and they do so "with room to spare." *Camilo-Robles v. Hoyos*, 151 F.3d 1, 6 (1st Cir. 1998).

At all relevant times, the law was clearly established that a supervisor was obligated to act to avert constitutional violations from occurring if presented with the facts and circumstances that Rolfe found himself presented with.

For the foregoing reasons, his motion for summary judgment and qualified immunity should be DENIED.

Submitted this the 31st day of May 2023.

<div style="margin-left:2em">

Ian A. Mance
N.C. Bar No. 46589
EMANCIPATE NC
P.O. Box 309
Durham, NC 27702
Tel: (828) 719-5755
ian@emancipatenc.org
*Attorney for all Plaintiffs*

Elizabeth G. Simpson
N.C. State Bar No. 41596
EMANCIPATE NC
P.O. Box 309
Durham, NC 27702
elizabeth@emancipatenc.org
*Attorney for all Plaintiffs*

Abraham Rubert-Schewel
NC State Bar No.
Tin, Fulton, Walker & Owen, PLLC
119 E. Main Street

</div>

29

Durham, NC 27701
schewel@tinfulton.com
*Attorney for all Plaintiffs*

Emily D. Gladden
N.C. State Bar No. 49224
Tin, Fulton, Walker & Owen, PLLC
204 N. Person Street
Raleigh, NC 27601
egladden@tinfulton.com
*Attorney for all Plaintiffs*

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this Memorandum consists of 8,364 words, does not exceed 30 pages, and complies with EDNC Local Rule 7.2.

This, the 31st day of May, 2023.

**/s/Ian Mance**
Ian A. Mance
N.C. Bar No. 46589
EMANCIPATE NC
P.O. Box 309
Durham, NC 27702
Tel: (828) 719-5755
ian@emancipatenc.org
*Attorney for all Plaintiffs*